UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:6:25-bk-05570-GER

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

Debtor.

---

MARCH 27, 2026

# TRANSCRIPT OF TRIAL PROCEEDING

BEFORE THE HONORABLE GRACE E. ROBSON
UNITED STATES BANKRUPTCY JUDGE

GEORGE C. YOUNG COURTHOUSE
400 WEST WASHINGTON STREET
ORLANDO, FLORIDA

A P P E A R A N C E S:

JAMES A. TIMKO, ESQUIRE
Dean, Mead, Egerton, Bloodworth,
Capouano & Bozarth, P.A.
420 South Orange Avenue
Suite 700
Orlando, Florida
Appearing on behalf of Debtor Homemakers Real Estate, LLC

LAWRENCE M. KOSTO, ESQUIRE
Kosto & Rotella
1517 East Robinson Street
Orlando, Florida
Appearing on behalf of CTO Holdings, Inc., IMQA Investments Incorporated

Proceedings recorded by electronic sound recording
Transcript Provided by ACCREDITED COURT REPORTERS
acreporters@embarqmail.com
(407) 443-9289

APPEARANCES CONTINUED:

MATTHEW A. LEIBERT, ESQUIRE
5782A S. Semoran Blvd.
Orlando, Florida
Appearing on behalf of Horton S. Johnson

FRANK LOUIS AMODEO, PRO SE
4409 Hoffner Avenue
#348
Orlando, Florida
Appearing Pro Se

ALSO PRESENT:

Kenneth G. Dixon
Horton S. Johnson
Deborah Milotte
Marty Flynn

# I N D E X

PROCEEDINGS BEFORE JUDGE ROBSON: 5

1) Continued Trial - Debtor’s Motion to Dismiss Involuntary Bankruptcy Petition

TESTIMONY OF STUART GOLDMAN:

Direct Examination by Mr. Timko 25
Cross Examination by Mr. Amodeo 31
Cross Examination by Mr. Kosto 38
Redirect Examination by Mr. Timko 46

TESTIMONY OF STEPHANIE ADAMS:

Direct Examination by Mr. Kosto 51
Cross Examination by Mr. Timko 65
Cross Examination by Mr. Amodeo 67

TESTIMONY OF FRANK LOUIS AMODEO:

Direct Examination by Mr. Timko 70
Cross Examination by Mr. Kosto 126
Redirect Examination by Mr. Timko 171

TESTIMONY OF DEBORAH MILOTTE:

Direct Examination by Mr. Timko 181
Cross Examination by Mr. Amodeo 192

TESTIMONY OF KENNETH G. DIXON:

Direct Examination by Mr. Timko 203
Cross Examination by Mr. Amodeo 211

# I N D E X

TESTIMONY OF HORTON JOHNSON:


| | |
|---|---|
| Direct Examination by Mr. Kosto | 221 |
| Cross Examination by Mr. Timko | 225 |
| Redirect Examination by Mr. Kosto | 228 |
| CLOSING ARGUMENTS: | 234 |
| CERTIFICATE OF REPORTER: | 287 |
| WORD INDEX: | 288 |

ORLANDO, FLORIDA, MARCH 27, 2026, 9:30 A.M.

P R O C E E D I N G S

COURTROOM DEPUTY: All rise.

The United States Bankruptcy Court for the Middle District of Florida is now in session. The Honorable Grace E. Robson presiding. May God save the United States and this Honorable Court.

THE COURT: Okay. Good morning. Please be seated. Okay. Happy Friday, everybody.

MR. TIMKO: Happy Friday.

THE COURT: Okay. So we're here on Case Number 25-5570, Homemakers Real Estate, LLC. Let's first take appearances. Mr. Timko.

MR. TIMKO: James Timko for Homemakers Real Estate. With me today is Mr. Dixon.

THE COURT: Okay. Good morning. Mr. Kosto.

MR. KOSTO: Good morning, Your Honor. Larry Kosto for IMQA Investments Incorporated and CTO Holdings, Inc. And with me as representative for the two entities is Mr. Frank Amodeo, and also Ms. Milotte is also here.

THE COURT: Okay. Great. Thank you.

MR. LEIBERT: Matt Leibert for Horton Johnson.

THE COURT: Okay. Is Mr. Johnson here as well?

MR. LEIBERT: He is, yes.

THE COURT: Okay. Okay. Mr. Amodeo.

MR. AMODEO: Frank Amodeo, Your Honor, pro se.

THE COURT: Okay. All right. So I did see you filed something that attaches a state court order that reinstates your rights to --

MR. AMODEO: Here today and argue on my own behalf.

THE COURT: Okay. Very good.

Okay. So, Mr. Timko, we're here on day two on the motion to dismiss, and what I had wanted to proceed with was the bad faith issue first as to IMQA and CTO.

MR. TIMKO: Correct.

THE COURT: I presume you don't have any announcements for me about settlement or anything else?

MR. TIMKO: No, no.

THE COURT: Okay.

MR. TIMKO: I wish.

THE COURT: Okay. Well...

MR. TIMKO: There's a few administrative things that I think we probably should address.

THE COURT: Okay.

MR. TIMKO: Just from the outset, just so we have a better -- so I have a better understanding as to exactly what we're doing today in a way.

THE COURT: Okay.

MR. TIMKO: So I noticed that Mr. -- Mr. Amodeo

is here today and Mr. Johnson's counselor is here today.

THE COURT: Hum-hum.

MR. TIMKO: But we've already dealt with the issues of Mr. Amodeo's claim and joinder and Mr. Johnson's claim and joinder. And the scheduling order was very specific, that that was taken under advisement, and we're just dealing with CTO and IMQA today.

So I just want to make sure that that is what the parties understand and is the intention today, because I noticed Mr. Amodeo filed some exhibits yesterday, and honestly, I don't think Mr. Amodeo and Mr. Johnson, with respect to the evidentiary issues, really have a role here today. I mean, they can argue an abstention, of course, but I just wanted to clarify that and make sure that my understanding was correct.

THE COURT: Okay. That's how I would view it, so I don't know if -- I presume. Okay. The parties are rising, so we'll -- let's hear from them.

MR. TIMKO: That's why I wanted to bring it up, Your Honor.

THE COURT: Yeah. Okay, so.

MR. LEIBERT: Your Honor, I thought the order also said we were supposed to be ready to argue numerosity and whether the creditors were being paid when their debts came due, so.

THE COURT: True. Okay, true. So, okay, then.

MR. AMODEO: Well, Your Honor, before I'm -- you know, Mr. Timko last time talked about bringing order out of chaos, playing off on the name of CTO. But today I think I need to unmask the chaos.

This action has to commence with a determination of whether they are the real party of interest under Rule 17 and have the capacity to argue at all. Every document that exists in the public records in this Court show that the Tiered Land Trust, by virtue of your order, only owned the beneficial interest in Homemakers. But that entity never existed. It wasn't formed properly. It was never done. And even the putative or the alleged formation of it in February 2024 was after the purported assignment.

Under Florida law, Daniel versus Berry is the most prominent of the cases. You can't assign something to a non-entity. The entity didn't exist. They don't have any right to be here.

THE COURT: You say the entity. You're saying the land trust?

MR. AMODEO: The Tiered Land Trust did not exist. They had no authority to be here today. They have no authority to represent Homemakers. And, you know, AT Engineering is the best case for articulating

the theory in general. This Court has to determine their authority first, and they don't have any.

THE COURT: Well, okay. So what's -- what's your authority to say that the land trust did not exist, because that presumes facts not in evidence, right?

MR. AMODEO: Oh, they're -- I submitted them yesterday before the stricken pleadings, and --

THE COURT: Okay.

MR. AMODEO: -- here they are.

THE COURT: Okay. What is that? I don't know what that is. Okay.

MR. TIMKO: Your Honor --

MR. AMODEO: This is -- this is the document that Mr. Horton signed. He testified to that, Your Honor.

THE COURT: Okay. Hold on. You're -- you have to be closer to the microphone.

MR. AMODEO: Okay.

THE COURT: So we can --

MR. TIMKO: Your Honor, I'm just going to object to all of this because we've already multiple times, and the Court has also agreed, that all we would be litigating is whether this was filed in bad faith and the claims, and that the trust issues and all those issues were not supposed to be a part of these proceedings.

This is the -- I think we're up to the eleventh attempt to try to bring, I think, these issues before the Court, and the Court has denied that all the way throughout.

THE COURT: Okay. So, Mr. Amodeo.

MR. AMODEO: In responding to his objection, this is my first time that I've been authorized to rep -- to do anything, so. And the second time, this Court has the duty to look at issues which are dispositive. Again, CS -- CSX Transportation in the Eleventh Circuit is the best authority for that.

That's the deed Mr. -- the deed Mr. Johnson testified to that formed the trust, the one on the left-hand side.

THE COURT: Right, but where I couldn't -- okay. So you, you are aware, yes, from the outset of the involuntary that the -- when we set the trial, it was set on the issue of bad faith to be determined first. These facts that you're speaking of, or legal conclusion, right, that there was no trust in the first place, that would have already happened, right, or not happened prior to the involuntary. So why am I going to hear that issue now?

MR. AMODEO: Two things. First of all, I had submitted it to the Court when I was denied my right to continue representation. So the Court has this record.

THE COURT: Well, I didn't deny it. The -- okay.

MR. AMODEO: I understand, but you struck the pleadings that were there that had all of this evidence in it before it could be presented.

The second thing is, it doesn't matter. You should not -- anything they do is void based on these documents. It makes no sense for us to waste our time here. Let's get the Chapter 7 trustee in, put somebody in charge of these assets who's not going to take them and disperse it. That document --

THE COURT: Well, it doesn't moot it, because even if the Chapter 7 proceeded voluntarily and presumably valid, it doesn't mean that the involuntary was not filed in bad faith.

MR. AMODEO: It --

THE COURT: So that's not --

MR. AMODEO: It doesn't --

THE COURT: -- a moot issue.

MR. AMODEO: It doesn't mean that their -- what we're going to end up with, no matter at the end of the day, is determining whether they had the right to speak. They don't. That deed was filed. It was improper. The trust is never formed. This is filed after the fact. It is facially a forgery.

THE COURT: Okay. But you didn't -- you're saying you raised that at the outset of this, is that what you're --

MR. AMODEO: I raised it in my original pleadings, the ones that were stricken, obviously.

THE COURT: Right.

MR. AMODEO: And I raised it again yesterday.

THE COURT: But nobody else raised it.

MR. AMODEO: No, Your Honor. If you want to know the truth, I'm about to do a Netflix series called Bad Lawyering, and that's part of it.

THE COURT: Bad Lawyering?

MR. AMODEO: Bad Lawyering.

THE COURT: Okay. I'll write this down. Okay.

MR. AMODEO: So the --

THE COURT: Okay.

MR. AMODEO: The answer is they should have raised it. So if this Court wants to hear the truth, let me just tell you the truth. Okay? I talked to Mr. Wolff when he started this case way back.

THE COURT: The first case.

MR. AMODEO: First case. But I was not going to help, I was going to sit by the side and watch my friends, Mr. Dixon and these guys, fight over this issue. But I was okay because I thought you would be making

decisions on what is fair. Mr. Wolff didn't raise this issue. He knew it.

The day your order dismissing that case came out at 11:00 o'clock, I was in his office. I said, Frank, you're facing a procedural default problem.

I know about procedural default because from prison, every case I had, I had to overcome procedural default in the first instance.

Mr. Wolff didn't want to raise it. What Mr. Wolff raised was very much the argument that you presented at our last hearing when you did the proof argument, saying that it was really a security agreement and mortgage agreement. It wasn't. Mr. Wolff was wrong.

That night he calls me and apologizes. I'm not his client. I didn't really talk to him. But he said, Frank, you were right. I specifically asked him, does Judge Robson rule from the bench or does she rule from her chambers? He said, she always rules from the bench. I said, okay, Frank.

Monday, as opposed to Friday afternoon, I'm going to file this. I'm going to go convince my sister and IMQA to file an involuntary doggone petition and let the Court see the darn truth of what's happening. And then you made your ruling. I got the apology. And we've been run through this mill ever since then.

THE COURT: Okay.

MR. AMODEO: I'm on the stand testifying, and you're right, I was laying a foundation. If I complete my -- this is going to come up.

Also, Mr. Timko continues to flake the difference between bad faith and eligibility.

THE COURT: Okay, but now you're arguing.

MR. AMODEO: Okay. All right.

THE COURT: Okay. So why don't we just --

MR. AMODEO: So then I'll stop arguing.

THE COURT: Okay. So let's just --

MR. AMODEO: The point is that the actual motion today is they have no -- there's no evidence that they have authority to represent the trust, let alone Homemakers.

THE COURT: Well --

MR. AMODEO: In the absence of that, this Court should not hear them.

THE COURT: Okay. But the way you argue, it's just -- okay. Go ahead, Mr. Timko, I'm sure you want to --

MR. TIMKO: Well, Your Honor, two things to clarify. One with respect to Mr. Amodeo, and then one with respect to the trial order.

With respect to Mr. Amodeo, the order that he

attached to his filing saying that he has capacity to appear today was only with respect to his interests in the bankruptcy case. His interests in the bankruptcy case are a four hundred and I think thirty dollar claim and his joinder, which we've already litigated on February 3rd. So his interests have already been addressed.

So I object to Mr. Amodeo making any arguments beyond abstention, which I think that's what this is today. We're presenting evidence today or asking any questions of any of the witnesses. His day was done. He should have gotten that order. You know, I mean, he just said it. He was involved in the first -- the first case. He's known about these cases for an extended period of time. And, you know, at this point, it's too little too late.

I also want to make a motion, that since he does have capacity to participate. We initially did not seek fees or sanctions or punitive damages from Mr. Amodeo because he was not represented by a guardian and because of his incapacity. He wasn't represented. So I thought any judgment for those things would be void. Since he now has --

THE COURT: Well, I don't -- okay. So you're presuming that that order means it's retroactive

applicability.

MR. TIMKO: Well, that's that -- well, I was going to -- I was going to -- I was actually going to address that.

THE COURT: Um-hum.

MR. TIMKO: I did not have a chance to research whether or not it, you know, it applies retroactively, but because there is often a waiver argument, you know, you can seek fees unless you've waived them. I just want to make sure that I haven't waived them under 303(I). So I'm asserting and reserving that and making that motion now.

If it needs briefing in the future, we can address that issue. I don't know if there's any case law on that issue, but I just wanted to --

THE COURT: Okay.

MR. TIMKO: -- I just wanted to make sure that I reserved that, and I wanted to point out that Mr. Amodeo's ability to appear even under that order is quite limited.

The other issue is going back to your trial order, the issue about numerosity and things, about what the creditors could prove, I have your trial order here. It says the trial will continue first as to the issue of whether the involuntary petition was for bad faith, as to

IMQA and CTO. And then it defines them as creditors. And then it says, thereafter Creditors, capitalized, shall present evidence that the involuntary petition meets the requirements of 303(b) and whether they're generally not paying debts as they become due.

So according to your order, the only parties that can present evidence on that issue today, again, is CTO and IMQA. Mr. Johnson, Mr. Amodeo and, well, Tiered Capital has dropped out, all had their ability to bring up those issues on the 3rd, and you've already taken their evidence under advisement.

I'm just trying to bring some order to the -- order to the proceeding, Your Honor. If I may suggest how we can move forward.

THE COURT: Sure.

MR. TIMKO: Since Mr. Amodeo is already making abstention arguments, we can -- I mean, abstention is really a legal argument. We can make that argument now. My only concern about that is I have a witness who will be very short.

THE COURT: Um-hum.

MR. TIMKO: But he has to be out of here by noon. He's got a really big event this afternoon that he absolutely 100 percent can't miss.

THE COURT: Okay.

MR. TIMKO: So if -- I can't imagine those arguments would take that long, but if we start getting to like around 11:00 o'clock, I may just have to take that witness at around 11:00 if we could. I only have --

THE COURT: We can do it now, I mean.

MR. TIMKO: Okay. I only have like ten -- I only have like 10 questions for him.

THE COURT: Okay. Well --

MR. TIMKO: So I didn't know if the parties wanted to make openings or not but...

THE COURT: Well, okay. So this, this is presuming I'm overruling Mr. Amodeo's objection to the standing, right, so I'm going to go with Mr. Timko's arguments that this was already teed up the way it's framed. The standing issue had not -- I know I struck your pleading, so they effectively do not exist. And I know you filed a motion for reconsideration, but I would only grant that in part as to papers after the entry of the state court order. Okay. So that issue, the standing issue, is not an issue for today's trial. Okay.

MR. AMODEO: So I will obviously then preserve that for error.

THE COURT: Yes. Okay. Understood.

MR. AMODEO: So because I believe that issue has to be addressed first.

THE COURT: Understood. Okay. So then we're going to -- we're going to proceed. Obviously, you can make your arguments on the issues but --

MR. AMODEO: I -- I will definitely do that at the right time.

There are a couple of other witnesses here as well, which are -- are incidental, Milotte, my sister, and Stephanie Adams for the CPA firm. If we're going to take the early ones, we might as well get all the short witnesses out of the way.

THE COURT: I agree.

MR. TIMKO: Well, Your Honor, well, one thing, with respect to Ms. Milotte, she's part of my presentation.

THE COURT: Okay. So you're the movant.

MR. TIMKO: And so I'd like to take her in the order that that I call her, if I may.

THE COURT: Okay. But, okay, but is there any objection to when Ms. Milotte is on the stand for your case?

MR. TIMKO: I would prefer her to be on the stand after I take Mr. Amodeo's testimony.

THE COURT: Okay. I understand. But I'm just saying, do you have any objection to, because they want to call her, the other side wants to call her as well, so

we can get all of the questions out as opposed to doing your case and then calling her back?

MR. TIMKO: Oh, I mean -- well, I mean, honestly, their case, if you think about it, because I'm going to be addressing the debts anyway in my presentation. I mean, it's really their cross exam.

THE COURT: Okay. So, all right. So then we'll just -- my point is just the witness will come, and everyone will ask their questions.

MR. TIMKO: Right.

THE COURT: We'll kind of do it more fluidly as opposed to one party making their case, resting, and then letting -- being -- having that same witness called back later for the opposing side, so.

MR. KOSTO: Your Honor, it's my understanding at the last hearing that Mr. Timko rested.

THE COURT: No. As to the Tiered Capital and the other folks, not as to IMQA.

MR. TIMKO: Your Honor --

MR. AMODEO: Yeah, I didn't mean to be doing this, but I do have an eidetic memory, he -- we did rest. I was on the stand. You told me to behave, means don't talk to anybody, and for seven weeks now I haven't mentioned one thing to any of these attorneys.

THE COURT: Okay.

MR. AMODEO: I can talk to myself a lot.

THE COURT: Um-hum.

MR. AMODEO: So, but the only issue before the Court previously was the Tiered Capital bad faith. Nobody mentioned mine. I assume they're conceding Mr. Johnson and I based on what he just said. And I certainly haven't had a chance as a party in interest to examine anybody --

THE COURT: Well, if --

MR. AMODEO: -- and I'd like that opportunity.

THE COURT: Okay. But at the last hearing, Mr. Timko, as he said early today, he was not seeking any bad faith against you or Mr. Johnson. It was really seeking --

MR. TIMKO: No, I was seeking against Mr. Johnson.

THE COURT: Oh, were you? Oh.

MR. TIMKO: Yeah.

THE COURT: Okay, so.

MR. TIMKO: I was -- the scheduling order before required me to put on my evidence as to bad faith as to the petitioning creditors that existed at that time.

THE COURT: Okay, so.

MR. TIMKO: And so that is what I did.

We continued CTO and IMQA because I hadn't taken any discovery yet, and you wanted to give me time for discovery for those, and then I took their depositions between the last hearing and this hearing. So the idea that I rested as to CTO and IMQA is --

THE COURT: No, that's not true.

MR. TIMKO: -- that's not --

MR. AMODEO: (Simultaneous speaking) He rested his --

MR. TIMKO: That's not correct.

MR. AMODEO: He rested his general case at the point. I'm still on the witness stand at this point, I guess. Are you going to release me or --

THE COURT: Well --

MR. AMODEO: I'm on the witness stand and testifying about the bad faith of Tiered Capital. I was explaining, and you got it correctly, I was laying the foundation of what happened for that debt. The only person here that knows what happened is me. Mr. Dixon knows some of it, but he doesn't know --

THE COURT: Okay. All right. Hold on.

MR. AMODEO: I'm going to tell you things today he doesn't even know we did.

THE COURT: Okay. Hold on. So because of the witnesses that are here, we're going to do this. It

would seem out of order, right, because, yes, technically we left where Mr. Amodeo was testifying. So because of the party's time constraints, why don't we first proceed with Mr. Timko's witnesses that have time constraints? Okay?

MR. TIMKO: Okay.

THE COURT: Okay.

MR. TIMKO: Let's do that.

MR. KOSTO: Your Honor, we also have a CPA who's been subpoenaed and sitting in the audience and we'd like to get in and out as quickly as possible.

THE COURT: Okay. Well, is that -- that's your witness, yes?

MR. KOSTO: Yes, Your Honor.

THE COURT: Okay, so.

MR. KOSTO: Needless to say, she should not be sitting here all day.

THE COURT: Okay. Well, we'll just -- we'll go -- who -- okay. So who are the witnesses, Mr. Timko, besides the person that you said that has the time constraint is?

MR. TIMKO: Oh, no, it's -- it's just Mr. Goodman.

THE COURT: Okay. But then after that, you would intend to call Ms. Milotte?

MR. TIMKO: I would call Mr. Amodeo.

THE COURT: Okay.

MR. TIMKO: Ms. Milotte and then Mr. Dixon.

THE COURT: Okay. So Dixon, okay. So those are your people.

MR. TIMKO: Those are my witnesses.

THE COURT: And then, Mr. Kosto?

MR. KOSTO: Your Honor, we would just ask that Stephanie Adams be taken out of order and be allowed to get out of here.

THE COURT: Okay. So after Mr. Timko's first witness then.

MR. KOSTO: Thank you.

THE COURT: Okay. Any objection to that?

MR. TIMKO: I guess not.

THE COURT: Well, Mr. Kosto is saying it would be brief, and so maybe it wouldn't hurt the flow.

Okay. So who is your first person that you would like to call?

MR. TIMKO: Oh, it's a corporate representative for the property manager Beachside. Riley Goldman.

THE COURT: Okay. So, all right. So if you wouldn't mind approaching the podium where Mr. Timko is standing to be sworn in, and make sure when -- if you can, after you state your name, if you could spell your

name.

THE WITNESS: Yes.

THE COURT: Okay. Thank you.

COURTROOM DEPUTY: Raise your right hand.

Do you swear or affirm that the evidence you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I swear.

COURTROOM DEPUTY: State your full name and address.

THE WITNESS: Stuart Goldman. S-T-U-A-R-T. Goldman, G-O-L-D-M-A-N. And then my address is 485 North Shore Drive, Cocoa Beach, Florida, 32931.

COURTROOM DEPUTY: And if you'll have a seat over in the witness stand.

THEREUPON:

STUART GOLDMAN

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. TIMKO:

Q Mr. Goldman, there's three binders in front of you. We're going to be working with Volume 3 of 3, just so that you can have that in front of you.

Okay. Mr. Goldman, where do you work?

A I work for Beachside Vacation Rentals, Beachside VR --
Q And what is --
A -- LLC.
Q Okay. And what is your position at Beachside?
A I am the owner of the company and co-founder.
Q Okay. And what is Beachside's relationship to Homemakers?
A We manage the condos and townhomes at Cape Crossing.
Q And what services does Beachside provide to Homemakers?
A We are a full turnkey property management company. So we manage everything from cleaning, getting bookings, paying certain bills at times. Anything that's related to the condo in terms of operations we handle. Maintenance.
Q As the owner of Beachside, what is your role with respect to Homemakers, Homemakers condos specifically?
A So we handle everything for them. So the entire booking process, everything that goes on, we handle.
I handle the communication between Homemakers and -- and -- and my company. So anything that they need

or anything. We handle everything to get the units rented and booked.

Q Okay. How long has Beachside managed the condos?

A So we started December 2nd, 2023 was the first day of management.

Q December 2nd?

A December 2nd, 2023.

Q As part of Beachside's duties, does it collect the payments from people that stay at the condos?

A Yes.

Q And does Beachside oversee the paying of certain expenses relating to the condos such as utilities?

A Yes.

Q And does Beachside actually make the payments for those utilities?

A Yes.

Q Can you please turn -- okay, so we're going to go to that binder. Can you turn to Tab 50? Have you seen this document before, sir?

A Yes.

MR. KOSTO: Your Honor, I'm going to object.

MR. TIMKO: They didn't file any objections to my exhibits prior to the hearing.

THE COURT: Okay.

MR. AMODEO: Then I will object, Your Honor, because --

THE COURT: Okay. Hold on. Hold on.

MR. AMODEO: -- I certainly did file an objection.

THE COURT: Okay. One person at a time, please.

MR. TIMKO: Okay. All right.

THE COURT: Okay. Mr. Kosto objected. He didn't even identify the document yet. So, so what's the objection, Mr. Kosto?

MR. KOSTO: Your Honor, this is the first time I'm seeing this. This was --

MR. TIMKO: This was filed a week ago.

MR. KOSTO: A week, but this hearing is a continued hearing, and this should have been filed before the hearing started back on the first date of the hearing. It's not fair to --

MR. TIMKO: Okay.

MR. KOSTO: -- start adding a bunch of --

THE COURT: Okay. No. Overruled. Okay. Move on.

MR. TIMKO: Okay.

THE COURT: Okay. Mr. --

MR. AMODEO: But I want him to go ahead. I'm

waiting for the cross.

MR. TIMKO: Okay. Do you -- do you withdraw your objection?

MR. AMODEO: I'll withdraw my objection.

MR. TIMKO: Okay.

BY MR. TIMKO:

Q Okay. What is this document?

A So this document is the owner statements we send out monthly to the owners.

So this document, we actually prepared for -- for requests from everything from July 1, 2025 to through March. It includes all rental income. It includes everything that we've paid for; electric bills, water bills, pest control, certain things, repairs, maintenance, any supplies. If furniture needs to be replaced, occasionally furniture.

So, basically all expenses that we've paid for and then all the income that's been brought in.

Q And I note that this includes receipts as well?

A Yes, it does.

Q Without going through each receipt, obviously, because we'd be here all day, what receipts generally did you include?

A FPL, Florida Power and Light, and then the water bill, pest control. All of them are included.

Q How did Beachside first come to start working with Homemakers?
A Marty Flynn approached me. They were in a situation where they could no longer manage the condos. They had a management company, CCVR, and then they decided to bring me on to manage the condos on their behalf.
Q Are some of the utility accounts for Homemakers under the name of IMQA Investments?
A Yes.
Q And do you make the utility payments with respect to those accounts?
A Yes.
Q And which accounts are those?
A Florida Power and Light and then the water bill, which is City of Cocoa.
Q Now this summary starts on July 1st, 2025. Prior to that, did Beachside ever make other payments --
A Yes.
Q -- for Homemakers to FPL?
A Yes, we would. So the situation that would occur was the water bill and the FPL bill would not get paid. So occasionally the power gets shut off on our tenants. And then normally I would call. The contact I usually have for that of IMQA was Debbie Milotte, I would

call her. And then sometimes I would take care of the payment, or she would take care of the payment.

Q Okay. And why weren't they included in this summary?

A The reason why was it was very one-off, random. Random one. So it was a little bit more detailed one-off. Whenever that would occur, we couldn't get the receipt because it was in IMQA's or Homemakers' name on the accounts, so I didn't have access to like gain the receipt. So I would just pay for it and then take it out, do it as like a debit to their -- their payout.

Q Okay.

MR. TIMKO: No further questions.

THE COURT: Okay.

MR. TIMKO: Oh, I'd like to -- I don't know if I entered Exhibit 50 into evidence.

THE COURT: I don't think you technically asked.

MR. TIMKO: Oh, yeah. So may I enter Exhibit 50 into evidence, Your Honor?

THE COURT: Admit Exhibit 50. Okay. So, yes.

MR. TIMKO: Thank you.

THE COURT: Okay.

CROSS EXAMINATION

BY MR. AMODEO:

Q Mr. Goldman, are you familiar with the

properties?

A Yes.

Q Did --

MR. TIMKO: Your Honor, I'm going to object to Mr. Amodeo asking questions unless it specifically has to do with his interest in this case, which would be his $400 claim and his joinder, which was already litigated.

THE COURT: Okay. So, Mr. Amodeo, are you going to limit it to your claim in the case?

MR. AMODEO: I'm going to stay under 1109, and as a party in interest I have a right to ask questions about anything. But with Mr. Goldman, it specifically will address the utility payments that he just kind of skipped over, so.

THE COURT: Okay. Well, okay. This is a --

MR. TIMKO: Is he representing CTO and IMQA?

THE COURT: This is a limited proceeding. We have two other counsel here. I don't want it to turn into that everyone gets it. So how do we know that Mr. Leibert and Kosto were not going to ask the same questions?

MR. LEIBERT: I will not.

MR. KOSTO: Your Honor, to the extent the question is asked and I won't ask, I won't re-ask the question.

THE COURT: Okay. Go ahead.

MR. TIMKO: Well, again, I'm just going to say he's not representing his interest, just to preserve that for the record.

MR. AMODEO: It can be preserved for the record, but I have interest in this. When I get on the stand, I'm sure Mr. Timko can ask me, and I'll explain. For the moment, this will be really quick.

THE COURT: Okay. Go ahead.

BY MR. AMODEO:

Q Mr. Goldman, do you know who insures the properties?

A Who insures the properties? Are we talking about --

Q The condominiums, the Homemakers condominiums.

A So, well, there's -- there's two, because the HOA holds a coverage --

Q (Simultaneous speaking) I didn't --

A -- over it.

Q Do you know --

A I --

Q Do you know --

MR. TIMKO: Okay. He's badgering the witness, Your Honor.

THE COURT: Sustained. Okay. Go ahead.

BY MR. AMODEO:

Q Do you know the names of those insurance companies? Just tell me the names.

A It is not my responsibility to.

Q It's not your responsibility to insure them?

A Under my contract, I'm not responsible for anything in -- endures insurance.

Q And a month ago or less, did you get notified that the insurance on the units was canceled?

A I was, because Ken Dixon and Alison, his internal counsel, got a notice from Mainstreet Bank saying that the insurance was canceled, was being canceled, and they asked if I knew who the insurance company was. I did not.

I reached out to Marty and Woody. Woody emailed me and the insurance party saying that he took care -- care of that bill, but I don't know the name of the company. I can find it in my email.

Q That's all. I -- I -- I'm good, that that's all I needed to know is that you, you told the story exactly as I understand it.

THE COURT: Okay. I just want to clarify. So when you say Woody, you mean Mr. Johnson?

THE WITNESS: Mr. Johnson. I apologize.

THE COURT: Just making it clear for the record.

Okay.

BY MR. AMODEO:

Q And Marty, you mean Marty Flynn?

A Marty Flynn. That's correct.

Q And Alison, you mean Alison Pitkanen?

A Yes.

Q Mr. Dixon's internal person at Homemakers?

A I do not know her role. I work with her in representation of Ken occasionally.

Q And she's represented you individually in matters considering your girlfriend's divorce, correct? You don't have to tell me what it was.

MR. TIMKO: Objection, Your Honor.

THE COURT: Outside the scope. Let's just move on.

MR. AMODEO: All right. Thank you.

BY MR. AMODEO:

Q Well, you said you paid utility bills from the time you took over management in December 2nd of 2023, correct?

A No, I did not, actually.

Q Well, then clarify. I misunderstood.

A So I took over utility bill payments July 1, 2025. It was at -- that's when I started paying all the utility bills.

Occasionally, as I mentioned, when power or water would get shut off -- just so you know, the City of Cocoa, whenever the water gets shut off, the only way you can get it back on is by paying in person in Cocoa. I don't know the exact address off the top of my head, but you go to the City of Cocoa, and then you pay the water bill. So if the water would get shut off, I would go pay it in person.

Q So in the 20, the 18 months from January through June, January '24 through June of 2025, how many times did you go to Cocoa to pay the water?

A I do not know off -- off the top of my head.

Q Did you ever reimburse IMQA for the payments it made otherwise?

A Did -- excuse me?

Q Did Beachside ever reimburse IMQA for the payments it made for the utilities on those units?

A Why would I reimburse IMQA?

Q A minute ago you said you took the money out of the revenues and you gave it back to IMQA when you paid them.

A When I --

Q That you charged against it.

A So when I, if I paid for the bill, the way my contract states is if I pay for a bill on behalf of a

company, or on behalf of a property, I could deduct it, if I get permission from them. I would always call Deborah Milotte when I -- when there was an issue, and she would give me permission to go pay that bill and take it from the rents.

Q One last question. Right now, when you pay the utility bills this month, March, whose name is the Home -- is more than half the Homemakers utilities in?

A It is in Homemakers.

Q Is there any units in IMQA's name?

A I, off the top of my head, I do not know if we're still paying IMQA's, but most of them are in Homemakers.

I tried getting them switched into our name, unfortun -- and that was an attempt to get it put into Beachside's name. However, no party, Mr. Flynn, Deborah Milotte, and Mr. Johnson do not know the codes and they won't give me access. So I had to set up payments and then it emails me receipts.

Q When did the contract with Homemaker start?

A December 2nd, 2023.

Q When did the contract that you signed with Crescent Sound start?

A Well, I -- I made an adjustment sometime -- I don't know, to be honest, not off the top of my head.

Q So whose contract did most of the money -- oh, where do you wire the money? Do you wire it to Homemakers?

A I do not. I wire it to Crescent Sound.

Q Do you wire it to Crescent Sound or Alison Pitkanen?

MR. TIMKO: Objection. Relevance.

THE COURT: What is the relevance, Mr. Amodeo?

MR. AMODEO: I'm showing that they don't really manage these units and that the obligations to me should have come from him, he should have reimbursed me for my utility payments. I'm finished, Your Honor. Thank you.

THE COURT: Okay. Any redirect?

MR. TIMKO: No. No, Your Honor.

THE COURT: Okay. All right. So unless -- okay, Mr. Kosto.

MR. KOSTO: May I approach the witness, Your Honor?

THE COURT: Okay. Sure. What's that, your exhibit binder?

MR. KOSTO: (No audible response)

CROSS EXAMINATION

BY MR. KOSTO:

Q Can you turn to Exhibit 2?

A Okay.

Q I'm sorry to do this to you, but there's probably about -- let's see. Exhibit 3 to Exhibit 2. If you could find that, there's a list of payments.

A Where? Where am I looking, sir?

MR. KOSTO: Can I help the witness, Your Honor?

THE COURT: Yes.

MR. TIMKO: Your Honor, I'm going to object. I know they haven't moved, to move it into evidence yet, but I'm going to object that this is hearsay. It's not authenticated, and it doesn't appear that they're refreshing his recollection.

THE COURT: Well, we'll see what he --

MR. TIMKO: So I don't why we're referring to this document.

THE COURT: Okay. Well, we'll see what he does with this. Okay. Go ahead, Mr. Kosto.

MR. KOSTO: Okay. Thank you, Your Honor.

BY MR. KOSTO:

Q Okay. So what you have in front of you is the proof of, amended proof of claim of CTO Holdings. Okay. It lists some charges on the summary on Exhibit 3, and then behind that, Exhibit 4, are some payments made.

My question to you is, was there a hundred six dollar -- a hundred dollar and five cent payment made on July 16th by IMQA for utilities, to your knowledge?

A I -- I -- I don't know. This is the first I've seen this.
Q Okay. Did you pay Florida Power and Light a hundred dollars and five cents that was due for utilities on a unit for IMQA on July 16, 2025?
A You're asking me something from July on the specific units. I was paying for most of the units. I don't know if I was paying for every single unit, but I did provide receipts of every payment that came out of my bank account.
Q Okay. So is it fair to say that IMQA at the same time was paying for some of the units as well?
A Possibly.
Q And is it possible that CTO, CTO Holdings was paying for some of the units at the same time?
A I've never even heard of CO2 (sic) Holdings.
Q CTO Holdings?
A That, too.
Q Okay. But is it possible that they were paying for some of the units during that time in question as well?
A I don't think I can answer that because I'm not aware of that party. So how can I answer on their behalf?
Q Okay. But you're aware -- so you were not

paying for all of the Homemakers units; is that fair to say?

MR. TIMKO: Well, do you want to identify which units you're talking about?

MR. KOSTO: No, I don't. I want to ask the question the way I asked it.

THE COURT: Okay. Let's just -- okay.

THE WITNESS: So I was paying for all the ones that they were incapable of paying because they did not have the money. So they asked for me to pay for those units because the power was getting shut off, and then tenants were arriving without power, units were arriving without power. So I started paying, and I was told to start paying by Ms. Milotte.

Q How many Homemakers units were you managing?

A Well, the difficulty about this situation was some were in Homemakers' names and some were in IMQA's names. There's 26 total, because there's 27 -- Unit 506 is owned by Ken Dixon in a different name. So between Homemakers and IMQA, there was 26.

And then IMQA violated my contract midway through without power of notice. Neil --

MR. KOSTO: Judge -- Your Honor, this is not responsive to the question.

THE WITNESS: Well, no, it is. It's --

MR. KOSTO: I move to strike. I move to strike.

THE COURT: Okay. Let's just answer the question. I'll sustain it. So just answer the question that Mr. Kosto asked.

THE WITNESS: I was paying for all the ones that they told me to start paying for.

THE COURT: Okay. And that would be reflected in the other exhibit everything --

THE WITNESS: Yes, ma'am. It has every unit number that was being paid.

BY MR. KOSTO:

Q So how many different units were you paying utilities for?

A Off the top of my head, I do not know.

THE COURT: Okay. But it would be in the summary.

THE WITNESS: It would be in the summary. And I have also, each month, I create an Excel spreadsheet of the unit number with what I paid for.

BY MR. KOSTO:

Q Okay. From your summary, how do I determine how many units you were paying for?

A You can go to each individual one, and you can see which ones the electric bill was paid for and the month that it was paid.

Q Can you point me in that direction?

THE COURT: We're not going to, by the way, we're not going to be going one by one over bills.

MR. KOSTO: Your Honor, I'm just trying to determine how many of the 26 units he was collecting -- he was paying the utilities for.

THE COURT: Okay. Well, the point is, whatever he paid is in there. So why do you need to --

THE WITNESS: So, so on -- if you go at the end of each, each owner statement, so the way it will work is the first one is Unit 103, CC-103 is the way it's labeled in my system.

BY MR. KOSTO:

Q Well, what page does that start?

A That starts on Page 2 of 134.

Q 2 of 134?

A So if you go to Exhibit 50, right, and you open it up, there's 134 pages. It says page at the bottom, 134.

Q Okay.

A So the one you're looking at, so it starts on Page 2, that's CC-103. So for this unit, it has all the revenue first, and then it has expenses starting on Page 6. And as you can see, on August 31st, 2025, the FPL bill; September 14th, FPL bill, forty-eight ninety-nine;

October 14th, FPL bill, eighty-two twelve.

Q Okay. So on CC-103, what's the first light bill you paid?

A Well, it was retroactive because the way it was submitted. The first time I charged back for this unit, this was starting on August -- from July 31st to then. So the August 31st payment was really representative of July's FP and L light bill because it's going to be retroactive.

THE COURT: Okay. Well, I think he's asking for the date.

THE WITNESS: Oh, August 31st. Well, once again, that's when I -– that's when I debited their account. So I could have paid it prior to then. I don't have the exact day that I paid it in this, this system. That's when I added it to the account.

THE COURT: Okay, so.

BY MR. KOSTO:

Q But you're saying that was for July's light bill?

A That would have been for July's light bill because the July -–

Q July 2025.

A Yeah.

Q So for 10 -- CC-103, that's the first light

bill that you paid?

A Yes.

Q Okay. And so prior to that, IMQA was paying the light bills?

A As I mentioned, yes, they were, except on occasion when they wouldn't make the payment and then Deborah Milotte would request me to make the payment. This statement was just pulled from July 1st on.

Q Okay. Did you ever repay IMQA for the utility bills that IMQA paid on behalf of Homemakers?

A According to my contract, it's not my responsibility to pay the FPL, FPL bill.

Q What other bills was IMQA paying on behalf of Homemakers?

A You could argue what were they not paying. To answer your question, I was paying -- now I pay the water bill and the FPL Bill.

I am not responsible in my contract to pay for any bills on behalf of the owners. I was only doing it because of their inability to pay the payments. That's when they requested that I start making payments.

Q Okay. So up until that time, the light bill and the water bill were regularly paid by IMQA; is that correct?

A Yes.

Q And it may have been paid by CTO Holdings, but you don't know that, correct?
A That is correct.
Q Okay.
MR. KOSTO: Nothing further, Your Honor.
MR. TIMKO: Your Honor, just quick redirect?
THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. TIMKO:
Q All right. Let's turn to that Exhibit 2 in the other binder.
A This is the one he just brought up here?
Q Yeah, the one he just brought up. Thank you very much.
And this document appears to be CTO Holding's proof of claim. I don't expect you to know that but --
A No.
Q Okay. Can you turn -– remember when he was saying look at the bottom and turn to the exhibits attached?
A Yes.
Q He had you turn to Exhibit 3.
A Yes.
Q Okay. Can you turn back two pages from that exhibit?

A Okay.
Q Do you see a check on the bottom of that page?
A Oh, wait. I think I'm on the wrong one.
MR. KOSTO: Your Honor, objection.
MR. TIMKO: Your Honor, may I --
MR. KOSTO: It's outside the scope. This is --
THE COURT: Well, you brought up the claim.
MR. KOSTO: Also, it's not something this witness has personal knowledge of.
MR. TIMKO: Well, I just -- well, I just --
THE COURT: Okay. Well, he could say the same thing about when you were asking. So let's just proceed.
MR. TIMKO: Okay. May I approach and just show him?
THE COURT: Sure.
MR. TIMKO: Take him to the page. Oh, I'm sorry. There's two exhibits.
THE WITNESS: Oh.
MR. TIMKO: That's the issue. My bad. Am I on the right one? No. There we go.
BY MR. TIMKO:
Q Okay. On the bottom of that page, there's a xerox of a check, correct?
A Yes.
Q And if you look at the account number, it ends

in 5492, correct?

A Yes.

Q And that account is in the name of Horton, Horton Johnson, correct?

MR. KOSTO: Objection, Your Honor.

THE WITNESS: Yes.

MR. KOSTO: Foundation.

THE COURT: Are you disputing that? Well, he's just reading off the page, per the page

MR. TIMKO: You can take judicial notice of the proof of claim, Your Honor. I'm just reading off the page of something that they filed.

THE COURT: I mean, are you -– okay. So, Mr. Kosto, isn't this your client's proof of claim?

MR. KOSTO: Yes, Your Honor.

THE COURT: Okay. So are you denying --

MR. KOSTO: I just don't know why this witness is testifying as to a document that's not his document and --

THE COURT: He hasn't even asked the question yet, so

MR. KOSTO: Yeah, he's asked whether this was Horton Johnson's.

THE COURT: He just said, do you see that it's Mr. Johnson. I mean, are you denying that it's Mr.

Johnson's account?

MR. KOSTO: I'm not denying that Mr. Johnson wrote a check to Ross Johnston.

THE COURT: Okay.

MR. KOSTO: But I'm not sure what this has to do with --

MR. TIMKO: If I may ask the question.

MR. KOSTO: The question is -- the question is outside the scope of direct.

THE COURT: Okay. Let Mr. Timko ask the question. We'll see if it's relevant to anything.

MR. TIMKO: Okay.

BY MR. TIMKO:

Q And, and so the 5492, correct?

A Yes.

Q And then you'll notice on the top of all these Bank of America statements, they're from account 5492, if you go through the document, correct?

THE COURT: Mr. Timko, are you asking about that specific check or what's the --

THE WITNESS: Yes.

MR. TIMKO: I'm just pointing out, Your Honor, that account number 5492 is Mr. Johnson's account. And all these Bank of America statements that they're saying were paid by CTO actually came from Horton Johnson's

personal account, not CTO's account.

THE COURT: Okay.

MR. KOSTO: Your Honor, that's argument. It's not the appropriate time to --

THE WITNESS: Okay. I got it. All right. So sustained.

MR. KOSTO: Okay.

MR. TIMKO: All right. Thank you.

THE COURT: Okay. I think we're done unless Mr. Leibert -– no, okay. All right. So then you can sit down, and you're excused. So you can get to your other --

THE WITNESS: Thank you. I appreciate it.

THE COURT: No problem.

Okay. So we're going to have Mr. Kosto's witness?

MR. KOSTO: Yes, Your Honor.

THE COURT: What's the name of the person that you'd like to call as a witness, Mr. Kosto?

MR. KOSTO: She's coming around.

THE COURT: Okay. But what's her name so we can have it?

MR. KOSTO: Stephanie Adams. I'm sorry.

THE COURT: Okay.

COURTROOM DEPUTY: Stand right there, please,

behind the lectern. Raise your right hand.

Do you swear or affirm that the evidence you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURTROOM DEPUTY: Please state your full name and address for the record.

THE WITNESS: Stephanie Adams. Would you like my work address or my home address?

THE COURT: You can do your work address.

THE WITNESS: 110 North Orange Avenue, Orlando, Florida, 32801.

COURTROOM DEPUTY: If you'll have a seat over there, please.

THEREUPON:

STEPHANIE ADAMS

having been first duly sworn, was examined and testified as follow:

DIRECT EXAMINATION

BY MR. KOSTO:

Q Okay. Could you please again state your full name for the record?

A Stephanie Adams.

Q And for whom are you employed?

A Geller Ragans.

THE COURT: Can you spell that?

THE WITNESS: G-E-L-L-E-R, R-A-G-A-N-S.

BY MR. KOSTO:

Q And who is Geller Ragans?

A We're a CPA firm in Orlando.

Q Okay. And what is Geller Ragans', or for that matter, your -- your relationship with Homemakers?

A My firm prepared the tax returns for Homemakers in 2022, '23 and '24.

Q Are you familiar with those tax returns?

A Yes.

Q And those tax returns include a profit and loss statement and balance sheet?

A The tax returns includes, it's called Schedule L, is the balance sheet and the tax return, and then Schedule M-1 is the -- it's kind of the book to tax reconciliation, which would be an income statement. There's also Page 1 of the tax return, which would have your ordinary business income.

Q Okay. Can I get you to turn to -- I'm sorry. Exhibit 4 of -- can I help?

A Sorry.

MR. TIMKO: Is that CTO or IMQA?

MR. KOSTO: IMQA. Okay.

BY MR. KOSTO:

Q So Exhibit 2. I'm sorry.
A Okay.

THE COURT: Okay. Exhibit 2. Which exhibit of the exhibit?

MR. KOSTO: The second set, Your Honor. Oh, sorry.

THE COURT: No, I'm saying --

MR. TIMKO: Exhibit 2 or Exhibit 4?

MR. KOSTO: Exhibit 2.

MR. TIMKO: Oh, okay.

MR. KOSTO: Of the IMQA exhibits. So that would be the second set in the book.

THE COURT: All right, I understand. We're at Exhibit 2 of your client's exhibit binder. But the exhibit also has exhibits to it. So are we -- what part are we looking at?

MR. KOSTO: Okay. So it's going to be Exhibit 6.

THE COURT: Okay. Exhibit 6 within Exhibit 2. Okay. Just making sure.

MR. KOSTO: Correct.

MR. TIMKO: Didn't you attach these exhibits separately in your binder --

MR. KOSTO: Sorry.

THE COURT: That's fine. However he wants to

put them, that's fine. So, okay. So we have Exhibit 6 to Exhibit 2, I see as a balance sheet for Homemakers as of December 31, 2025.

MR. TIMKO: Oh, I have --

THE COURT: '25.

MR. KOSTO: I'm sorry, Your Honor. In, within Exhibit 2 --

THE COURT: Yes.

MR. KOSTO: -- Exhibit --

MR. TIMKO: I have -- I have a Geller Ragans letter.

THE COURT: Okay. Well, I guess I have something different, so.

MR. KOSTO: Your Honor, there's not a -- I apologize.

THE COURT: I don't -- well, I don't -- this is --

MR. TIMKO: It's the second set of exhibits, Your Honor.

THE COURT: Okay.

MR. TIMKO: In the binder. Maybe that's what's --

MR. KOSTO: There's another set 1 through 12 in there as well within that same binder.

THE COURT: Oh, the same exhibit? Oh.

MR. KOSTO: Sorry, Your Honor.

THE COURT Okay. This is going to be -- okay, so it's the second. Okay. I'll get there. Okay. I found it.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q Is this letter and the tax return the true and correct copy of the original tax return that was filed by Geller Ragans for Homemakers Real Estate, LLC?

A It appears to be a return that our firm prepared. However, I'm noticing that there's a -- there's a circled amount on the letter that says corrected. I don't recall what that is for.

Q Okay. And did you work on this tax return?

A I -- I did.

Q Okay.

A And as far as there may have been a draft return at some point. So without going back to our records to verify that this agrees to our copy of the return, I cannot say for sure if this was the final or the draft.

Q Okay. If you continue on that, if you look at Exhibit 7 to that doc, that document, does this indicate it's the final return?

A I'm sorry, what? I'm still looking for Exhibit

7. Sorry.

Q Okay.

A This is a tax return that our firm prepared.

Q Okay.

A But again, without going back to, you know, check it against our records, I couldn't say for sure if this was the draft or the final.

But given the date, this date, 9, September 9th, that would be close to the extended deadline. So it's probably most likely the final version.

Q Can you find -- show us Schedule L in this document?

A Sure. So if you go to -- should be Page 5 is the Schedule L. I'm sorry, Page 4 of the 1120-S is the Schedule L. And that is essentially the balance sheet for the tax return.

Q Okay. Let me come back to that. Can you turn to Exhibit 3?

THE COURT: Mr. Kosto, are we talking the tabbed exhibit or within the exhibit.

MR. KOSTO: The tab exhibit. The tab exhibit.

THE COURT: Okay.

BY MR. KOSTO:

Q Are you there?

A Yes.

Q Okay. What is this document?

A This is a balance sheet from QuickBooks that was prepared after, once the bankruptcy proceedings were started.

Q Okay. And is this based on the books and records of Geller Ragans and Homemakers?

A This balance sheet is for 2025. The last tax return that we prepared was 2024.

Q Okay. Is it based on that information? The balance sheet, is it based on information?

A The balance sheet that we -- when we did the tax return, we pulled the information from QuickBooks. So for 2024, the balance sheet is in the tax return, Schedule L is based off of the records in QuickBooks.

Q Okay. And what is the last entry?

MR. TIMKO: Your Honor, I'm going to object. They're asking her to discuss a balance sheet that was prepared by Homemakers that she wouldn't have personal knowledge of. I mean, she could, I guess, say she saw the balance sheet but she didn't --

THE COURT: So you're saying lack of foundation?

MR. TIMKO: Lack of foundation and hearsay.

THE COURT: Okay, so.

MR. AMODEO: Your Honor, I've got to chime in, I'm afraid. Number 1, it's --

THE COURT: Okay, hold on. Okay. First of all, let him --

MR. TIMKO: I also want to point out -- I'm sorry, Your Honor, one more thing. This balance sheet is dated December 31st, 2025. Per this Court's order, the interests in Homemakers were assigned in January of 2024. They didn't ask me for any discovery for balance sheets, so I don't know where this document even came from.

THE COURT: Okay. So, Mr. Kosto, why don't you ask where the source, et cetera.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q Where did this document -- who prepared this document?

A The Exhibit 3, the balance sheet?

Q Yes.

A This looks like an internally prepared document pulled from QuickBooks.

Q Okay.

A By the client, most likely. I can't say who pulled it. I did not pull it myself.

Q Okay.

THE COURT: Okay. So you didn't prepare the document, as far as the --

THE WITNESS: This balance sheet, no. These are

Quick -- they appear to be from QuickBooks.

THE COURT: Okay. But have you seen it before, to the best of your recollection?

THE WITNESS: I have not -- I can't say that I've seen this particular document. I have seen the QuickBooks file for this -- for Homemakers.

THE COURT: Okay. For what period of time?

THE WITNESS: I have seen it for December or for 2025 as well. I have not done any tax work on it, but I have seen the file.

THE COURT: Okay. Who provided that to you?

THE WITNESS: Homemakers.

THE COURT: Through Quickbooks. Okay. So who -- who at Homemakers provided that to you?

THE WITNESS: As part of our tax preparation procedures, we were given access to the QuickBooks files.

THE COURT: By who?

THE WITNESS: By Tracy.

THE COURT: Okay. Who is Tracy?

THE WITNESS: Tracy Martins. She's the -- she does -- I'm not sure what her actual title would be called, but she does the books, or she maintains the books for Homemakers.

THE COURT: Okay. And who at Homemakers do you deal with?

THE WITNESS: I deal with Woody.

THE COURT: Mr. --

THE WITNESS: Mr. -- Mr. Johnson and Tracy Martins.

BY MR. KOSTO:

Q Okay. So the balance sheet references an IMQA debt of $374,459. Are you familiar with that?

MR. TIMKO: Again, Your Honor, I object. Lack of foundation.

THE COURT: Okay. Mr. Kosto, what's the relevance of this balance sheet?

MR. KOSTO: The relevance of the balance sheet, Your Honor, is to show that IMQA and CTO are owed money.

THE COURT: Okay. But it's -- when was the involuntary filed?

MR. KOSTO: Your Honor, she'll testify this was before the involuntary was filed that this debt existed.

THE COURT: Well, why don't you ask that question?

MR. KOSTO: Okay. Well, I first asked her if she was familiar with that debt.

THE COURT: Okay. Well, I think you were asking about the balance sheet, but go ahead and ask.

BY MR. KOSTO:

Q So on the balance sheet it references a debt of

$374,459.40 to IMQA on a loan. Are you familiar with that?

MR. TIMKO: Objection, Your Honor. Again, lack of foundation. Even if it appeared on a balance sheet, she has no personal knowledge.

THE COURT: Okay. Well, let's see if she has any personal knowledge.

THE WITNESS: Again, this is balance sheets from 2025. We have not done any tax work for 2025. But if I recall correctly for 2024, this debt, this line item on the balance sheet was included on the 2024 tax work.

MR. TIMKO: Your Honor --

BY MR. KOSTO:

Q Can you show us where it was included?

THE COURT: Hold on. Go ahead.

BY MR. KOSTO:

Q Can you show us --

MR. TIMKO: She's referring to a document that's not before us.

THE WITNESS: It is on -- it's possibly on the Schedule L balance sheet.

BY MR. KOSTO:

Q Okay. Can you show us on the Schedule L balance sheet where it is?

A Let's see, if we go to -- it is -- I would have

to go back to check our -- our records, but if I call -- recall correctly, it's possibly on -- on that Line 18, other current liabilities, Statement 6. If you go to the detail, it says due to affiliates.

It could also -- I believe that's where we would have recorded it. But like I said, I'd have to go back and -- and check our work papers to trace it, definitely.

THE COURT: But the information that you utilize is given to you directly from the client, you don't independently, or do you independently audit and make sure like that their bills have backup that --

THE WITNESS: No, doing an audit or verification of the data is outside of the scope of a tax preparer.

THE COURT: Okay.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q So the question is, is the debt to IMQA on the books and records of Homemakers, on the internal records of Homemakers Real Estate, LLC?

MR. TIMKO: Objection. Based on this balance sheet, it's not the internal records of Homemakers.

THE COURT: Well, it's --

MR. TIMKO: Mr. Johnson wasn't the owner of Homemakers at the time.

THE COURT: Okay. It's on the balance sheet, as she knows it, based upon the information provided to her, so.

BY MR. KOSTO:

Q Okay. And your office prepared the balance sheet; is that correct?

A We prepared the tax return with the -– with a Schedule L balance sheet for the tax return.

Q And if we go back to Exhibit 3, the last entry on there is a $260,206 debt to CTO Holdings; is that correct?

A Exhibit 3, the December 31st, 2005 (sic) balance sheet. I'm sorry --

Q Yes.

A -- which line item are you referring to?

Q The last entry.

A Oh, to CTO Holdings?

Q Yes.

A This sheet states that there's 260,208 owed to CTO Holdings on this 2025 balance sheet.

Q And that was -– that line item that's on the exhibit, the 2023 tax return as well, is that correct, with regard to the IMQA debt?

A I don't recall the 20 -– the 2023 tax return. We can -- we can take a look. I'd have to go back

through the work papers to verify the line items from the client's balance sheet that we included on the schedule L for the tax return.

MR. TIMKO: Objection, Your Honor. He misstated her testimony. She said she wasn't sure if it was on the balance sheet. She's have to go back and look at her records.

MR. KOSTO: I asked a question. I didn't say she said anything.

THE COURT: Okay. Anyway, the point is, it doesn't matter in the sense that Ms. Adams' already testified that any information given to her -- I mean, prepared by her office was based upon information provided to her, she didn't independently audit the debts.

MR. KOSTO: Understood.

THE COURT: Okay. So it says what it says. So if the document is in evidence and it says what it says.

MR. KOSTO: Okay. Thank you. No further questions.

MR. TIMKO: Well, I objected to it being in evidence.

THE COURT: Okay. So, Mr. Timko, any cross examination?

MR. TIMKO: Okay. I think Your Honor's already

objected –- addressed most of my cross. So let me just see if there's anything else here.

CROSS EXAMINATION

BY MR. TIMKO:

Q So you're not involved in the day-to-day business of Homemakers, correct?

A No, I'm not.

Q And you're not involved in approving any loans those entities may have made or received, correct?

A No.

Q You're not an officer of Homemakers?

A No.

Q You're not an owner of Homemakers?

A No.

Q And so any -– your tax -– the tax documents that you prepare are based on documents provided from the QuickBooks of Homemakers, correct?

A Yeah, we -- we pull the reports from QuickBooks, and then occasionally we will follow up with the client for clarification, you know, usually through emails.

Occasionally we will get a source document, such as a mortgage statement, to support the balance at the end of the year.

Q Okay. And you're not involved in -- and you

said you don't necessarily -- your job is just to prepare the tax and not to necessarily verify the information, correct?

A Correct.

Q And it's possible some of that information they provide you could be inaccurate, correct?

MR. KOSTO: Objection, Your Honor. Calls for speculation.

THE WITNESS: Our job is not to verify the underlying information that the client provides. It's to prepare the tax returns.

BY MR. TIMKO:

Q Okay. Were you aware that Homemakers is no longer owned by Mr. Johnson?

A No, I'm not.

Q Has Homemakers continued -- Mr. Johnson never informed you that the ownership of Homemakers had changed?

A I am aware of these court proceedings, but to my knowledge, Mr. Johnson is still the owner of Homemakers and still takes responsibility for the filing of the Homemakers tax returns.

Q Okay. So he's just been acting as if this is his company the entire time, correct?

MR. KOSTO: Objection, Your Honor.

THE COURT: Okay.
MR. KOSTO: Spec --
THE COURT: It's sustained. I mean, it's --
MR. KOSTO: Calls for speculation.
THE COURT: -- this is outside the scope, so.
MR. TIMKO: Okay. It was brought up, but okay.
MR. AMODEO: Your Honor, I'll be very brief.

CROSS EXAMINATION

BY MR. AMODEO:
Q Ms. Adams, have you ever met Mr. Dixon?
A No, I have not.
Q Have you ever met Ms. Alison Pitkanen?
A No, I have not.
Q Have you ever met the gentleman that was here before you, Riley Goldman?
A No, I have not.
Q Did you prepare tax returns for Homemakers for 2024?
A Yes.
Q Who signed those tax returns?
A The tax returns are filed electronically. Mr. Johnson signs a form that allows us to electronically file the tax return, and the partner at my firm signs that form as well.
Q And it's your standard practice to reconcile

Schedule L and M of the tax return with the financial statements of your client?

A To reconcile it with the client's books and records, yes.

Q Thank you.

THE COURT: Mr. Amodeo, in the future, if you could just speak closer to the microphone --

MR. AMODEO: Oh, I'm sorry, Your Honor.

THE COURT: -- because it's harder to hear.

Okay. All right. So, Ms. Adams, you can step down.

THE WITNESS: Okay.

THE COURT: Thank you.

THE WITNESS: Am I excused?

THE COURT: Yes, you're excused.

THE WITNESS: Okay. Thank you.

THE COURT: All right. So, Mr. Timko, I think you had, in the order that I wrote my notes, you wanted to have Mr. Amodeo next?

MR. TIMKO: Yes. So I didn't know if we were going to continue with this or we were going to go to the abstention motion. That's fine, I can go with Mr. Amodeo.

THE COURT: All right, so.

MR. AMODEO: Your Honor, could I use the

restroom? Could we have a restroom break?

THE COURT: Okay. So why don't -- okay, that's fine. Why don't we all take a five-minute break, and then we'll come back and have Mr. Amodeo testify.

COURTROOM DEPUTY: All rise.

(Thereupon, a brief recess was taken, after which the following proceedings were had.)

COURTROOM DEPUTY: All rise. Court is back in session.

THE COURT: Okay. Please be seated.

All right. So Mr. Amodeo. Or Mr. Timko, we are going to go with Mr. Amodeo?

MR. TIMKO: Yeah, I'm going to call Mr. Amodeo. Okay.

THE COURT: Okay. All right. So, Mr. Amodeo, do we need to swear you in again?

MR. AMODEO: I'm still under oath, ma'am.

THE COURT: Okay. All right. Any objection to that, Mr. Timko, he's going to resume the stand?

MR. TIMKO: No. No, Your Honor.

THE COURT: Okay.

MR. TIMKO: Yes, sir.

THE COURT: Please proceed.

THEREUPON:

FRANK LOUIS AMODEO

having been previously sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. TIMKO:

Q Mr. Amodeo, you are the corporate representative of CTO, CTO Holdings, correct?
A Yes.
Q And CTO is owned by your sister, Deborah Milotte, correct?
A Yes.
Q And Ms. Milotte is also the president of CTO, correct?
A Yes.
Q And you are also the corporate representative of IMQA; is that correct?
A Yes.
Q And Ms. -- Ms. Milotte is the owner of IMQA?
A Yes.
Q And she’s also the president of IMQA?
A Yes.
Q And both CTO -- and when I refer to IMQA, I’m referring to IMQA Investments and CTO Holdings. And both CTO and IMQA joined the involuntary petition; is that correct?
A Yes.

THE COURT: Okay. Mr. Amodeo, just if you could --

THE WITNESS: Oh, I'll get closer and talk louder.

THE COURT: -- bring the microphone closer.

THE WITNESS: Yes.

THE COURT: Yes. Thank you.

MR. TIMKO: Actually, you can scoot it. I think you can scoot that forward.

THE COURT: Yeah.

THE WITNESS: Oh, okay.

MR. TIMKO: Yeah, just --

THE WITNESS: Yeah, all right.

THE COURT: That's much better. Thank you.

BY MR. TIMKO:

Q And both CTO and IMQA are claiming that they are owed unsecured claims, right?

A Correct.

Q And, Mr. Amodeo, you were an attorney at one time; is that right?

A Yes.

Q In fact, you practiced, I believe, bankruptcy law in Atlanta in the 90s, correct?

A I certainly have far more experience than your firm.

THE COURT: Okay.

BY MR. TIMKO:

Q And you were disbarred for mishandling your client's funds; is that correct?

A Actually, yes, but I was disbarred in absentia. I was -- I was in Puerto Rico and I just could not afford to come back and fight it.

Q And you have a -- and you were convicted of a crime in connection with the mishandling of those funds; isn't that right?

A Yes.

MR. KOSTO: Your Honor, I'm going to object.

THE WITNESS: There's a long story to that if you want me to tell it.

THE COURT: Hold on. There's an objection. Let's see what the objection is.

MR. KOSTO: I believe this was already discussed. This was --

THE COURT: Right.

MR. KOSTO: This is duplicative of the prior hearing.

THE COURT: I don't think there's any dispute that Mr. Amodeo's status --

MR. TIMKO: Okay.

THE COURT: -- meaning disbarment and the felony

conviction, so.

MR. TIMKO: Okay.

BY MR. TIMKO:

Q After you completed your first sentence, you started a company called Mirabilis Ventures; is that correct?

A No.

MR. KOSTO: Your Honor, again objection. This is outside the scope.

MR. TIMKO: (Simultaneous speaking) I'm actually showing his --

THE COURT; Okay. Hold on.

MR. KOSTO: It's duplicative of the hearing --

MR. TIMKO: I'm just establishing his bankruptcy experience.

THE COURT: Hold on. What's -- what is it duplicative of?

MR. KOSTO: This was gone over at the prior hearing in this case on this motion. I think it's duplicative.

THE COURT: I mean, I don't recall that, but, I mean, I don't --

MR. TIMKO: I don't recall if I asked about Mirabilis or not at the prior hearing. I didn't think I did. I'm just establishing that he has bankruptcy

experience. That's all.

THE COURT: Okay.

MR. TIMKO: It goes to --

THE COURT: Okay.

BY MR. TIMKO:

Q Okay. And so you founded a firm named Mirabilis Ventures, correct?

A No. Mr. Timko, I need to back you up to your prior question.

No, it didn't happen immediately after I got out of prison, out of the boot camp. And ultimately, there was a company called Mirabilis Ventures, which I didn't found but I did fund.

Q Okay. And if I understand it correctly, Mirabilis specialized in distressed company acquisitions; is that right?

A No. Mirabilis had, you know, lots of business. The best thing I can do is give you the FBI report. At that time, I'd acquired 74 companies for Mirabilis, which went far beyond distressed entities.

Q Far beyond distressed entities.

A Yes, there was distressed entities.

Q Okay. So you have experience in the distressed entity --

A Mr. Timko, I've had 60 Chapter 11 proceedings,

2,000 consumer cases. I'm -- I am certainly an expert in bankruptcy. Like I said, I doubt your firm has experienced that, and I know Mr. Bozarth well.

THE COURT: Okay.

BY MR. TIMKO:

Q Okay. And, okay. So, and Mirabilis ended up filing for bankruptcy as well?

A Yes.

Q Okay. So we've established that you have significant experience in bankruptcy, correct?

A Correct.

Q And recently you submitted an order to the Court stating, with respect to your guardianship order, correct?

A Yes.

Q And that order was related specifically to your participation -- to the representation of your interest in this case, correct?

A It was representing myself in this case, whatever that scope is.

I had a -- I was there with Judge Blechman, he's well aware of the full extent. There were five or six witnesses present. That I would -- that I would be protecting not only this, my own interest here directly, but my indirect interest that may come through the trust.

Q Okay. Okay. And so under your guardianship order, currently you're still not able to make or enter into contracts without your guardian, correct?
A That is correct.
Q All right. And you're still not allowed to manage businesses or income from any source; is that correct?
A No, that is not correct.
Q With respect to yourself, without your guardian?
A I -- I've been authorized to run companies and work for other people since I was released to home confinement in 2020.
Q Okay. But with respect to your own personal?
A No, not to my personal, but to other -- to businesses I could.
Q Okay. So is there an order that says that you can handle the business and income of other businesses --
A As Judge Blechman explained yesterday --
Q -- but you can't handle it as to yourself?
A -- and welcome a call from Judge Robson if she wanted to call him. The -- my -- the limitation on my rights are as small as possible under Florida statute.
Q Okay. And you're still not allowed to defend or litigate lawsuits on behalf of yourself, correct?

A No, I'm not.
Q And/or to pay or collect debts, correct, on behalf of yourself?
A No, not without permission of the guardians.
Q Okay. Now let's start -- let's try to go in order here, so it makes sense. Let's start with CTO, okay?
Your role at CTO is I believe you described it as the only active volunteer; is that right?
A Yes. They don't pay me.
Q And you were the negotiator of CTO's deals and transactions, correct?
A Correct.
Q And at least at one point of the time, if not the entire time, you ran the day-to-day operations of CTO; is that correct?
A CTO has no day-to-day operations.
Q Okay.
A It's a collection agency.
Q Okay. But when it did have operations.
A It never had operation. It was -- it was formed in August of 2024. Mr. Timko, I know the facts.
It was formed in August of 2024. It was done because Sherwood Construction, Canaveral Crossroads were collapsing and the revenues from Homemakers were being

directed to a particular creditor.

Q Well, we'll get to all that.

A No, no, that's what I'm telling you why it got formed.

Q I didn't ask that question, sir.

A All right.

Q If we follow through my questions, I think we'll hit all these --

A No, no. You're particularly masterful about saying things that aren't true, Mr. Timko.

THE COURT: Okay. Mr. Amodeo, that's not a question.

MR. TIMKO: Okay. I appreciate the compliment of being masterful. I would ask that you not attack my integrity again, sir.

THE WITNESS: Oh.

BY MR. TIMKO:

Q Okay. Now Ms. Milotte was president, was the president of the company. So you would need her approval of what you were doing in your activities for CTO, correct?

A No. But I had to get her approval before any contracts were signed or any pleadings were filed. I was staying way within the wide zone of this guardianship order.

Q Okay. And if any loans were made, correct?
A Loans were made from CTO?
Q Or accepted by CTO.
A Yeah, it should be inevitably would -- it would be my going to her and asking her if it was okay.
Q Okay. So she would -- she would approve that. And CTO stands for Chao -- Chaos To Order; is that right?
A Yeah. It wasn't my choice. But, yes.
Q And I think you started going down this road before. CTO was formed to wind up the affairs of Sherwood Construction and Canaveral Crossroad LLC, correct?
A Correct.
Q And it was going to act as a collection agency to, I think you just said, to collect the money owed to those entities and pay off creditors; is that right?
A Correct.
Q And Tiered Capital, the initial petitioning creditor in this case, was the holding company for Canaveral Crossroads, correct?
A Yes.
Q Okay. And Mr. Johnson, Mr. Flynn, and you as -- and you as a beneficiary of a trust owned interest in Tiered Capital, correct?
A Correct.

Q All right. And Canaveral Crossroads was the initial developer of the Cape Crossing Resort?

A That's as I understand it. I wasn't involved at the time.

Q Okay. And that's where the Mainstreet condos are. I'm sorry. That's where the Homemakers condos are located, correct?

A I'm sorry, they're located at Cape Crossing Resort in Reno, which I understand was developed by Canaveral Crossroads.

Q Okay. And Sherwood Construction was the actual builder for the Cape Crossing Resort, correct?

A Yes, it was.

Q And Sherwood Construction was Mr. Flynn's company, right?

A Ah, yes. I think at the time they were starting to build it it was actually -- originally I think Mr. Johnson owned part of it. He eventually sold that to Mr. Flynn. So Mr. Flynn owned it all. They gave some kind of off-the-books interest to Mike McPhillips. So Mike McPhillips was kind of an owner. But by 2021, it was a Tiered Capital subsidiary subject to completion of some affordable apartment complex jobs.

Q Okay. And to date, CTO has never actually collected any money to pay creditors; is that right?

A No, it's borrowed money from Mr. Johnson to pay creditors, and it has gotten a judgment against one of the -- the companies, two of the companies that owe money to.

Q But, but I believe at your deposition you testified that it hadn't collected on those judgments.

A But, no, we're just collecting on those judgments now. You are correct.

Q Okay. So the only source of funds for CTO, as I understand it, are two loans; is that correct?

A From Mr. Johnson?

Q No. Well, well, there were two loans. There's a loan, a small loan from Ms. Milotte to start the company, correct?

A I don't believe it was a loan. I think she just contributed it, yes.

Q Okay. So, okay. So it was contribution.

A It was a contribution.

Q And I think it was about 10 to $15,000, correct?

A I believe it was $15,000.

Q Okay. And then the other source of revenue for CTO was a loan from Horton Johnson; is that right?

A Correct.

Q And that loan was for about $1.5 million?

A Probably, yes.

Q Okay. And Sherwood Construction is one of the parties that's currently being sued under the guarantees owed to Pedixon; is that correct?

A Yes.

Q And that goes back to the loan agreement that we discussed at the last hearing, correct?

A Oh, I don't know. You'll have to refresh my memory on that.

Q Okay. Well, we can skip that.

And CTO's claim against Homemakers is based on expenses that CTO alleges it paid on Homemakers' behalf; is that right?

A No allegation. They did pay them.

Q Okay.

A I witnessed it, so. But that is correct. It is the expenses that they paid for Homemakers.

Q And as I understand how that worked was Mr. Johnson would pay expenses for Homemakers, and then CTO would increase the amount of the loan owed to Johnson, correct?

A Well, yes. We did it by executing a separate note. Mr. Johnson would not always pay directly. Many times it went to CTO, especially after he was given bank account authority.

Q And then --

A But primarily you are correct. What you were trying to do with the Johnson check earlier, it came from Woody's personal account. Woody then comes over and says, here's the proof I paid it. I looked at it. They would attach it to a note, and usually prepared by Ruben Theore (phonetic), and sent to my sister. She'd call me and say, Frankie, is this true? I say, it is. She looks at the number and then say, yeah, they match up. Should I sign it? I say, I think so, Debbie, it's up to you, obviously, but the numbers are real. And that's the deal.

Q And as I -– as I understand it, those notes are between Mr. Johnson and CTO, correct?

A Correct.

Q Okay. And CTO has not repaid Mr. Johnson for any of the Homemakers expenses, correct?

A No.

Q And Mr. Johnson also guaranteed the Mainstreet mortgage; is that right?

A Yes, he did.

Q Okay. So by him making payments or CTO making payments to Mainstreet -- well, by him making payments to Mainstreet, he was actually paying a debt he owed on his guarantee, correct?

A No. Mr. Timko, I'm way, way more sophisticated than that.

Mr. Johnson had his own attorneys, and I told them they better draw a very clear line upon where he's paying bills after he -- after this Court indicated on an extremely limited record that he no longer had an interest in Homemakers.

Before then he believed, that's why he files the tax return and pays the taxes on the income, that he owned it, he was the final beneficial owner. That's why he did what he did.

So what I talked to his attorneys about is we'll have a separate entity, and although my signature means absolutely nothing to anybody on earth legally, I told Mr. Johnson I'll cover half of it in the future if we -- if he pays these costs. Just like I told Mr. Dixon, that's the reason why he lent $10 million to these people, is that I had his back.

Q But Mr. -- Mr. Johnson did -- Mr. Johnson did pay those costs, correct?

A He did.

Q Okay. And Mr. Johnson is the vice president of CTO; is that correct?

A Yes.

Q And as you described to me earlier, I believe

his responsibilities were to be the lender and to essentially act as you described in your deposition as a gopher for the company, correct?

A I'm going to say he's a brilliant gopher for the company, because he doesn't understand much about this. But he's frankly tired of being burned by people and not paying attention, so he wanted to be involved. I said, great, I can use somebody to make copies and run around and talk to the lawyers so that we can collect this money that's owed.

Q And there is no promissory note between CTO and Homemakers evidencing any loan owed by Homemakers to CTO, correct?

A No, there's not.

Q And there's no written loan agreement either, correct?

A There's a memorandum that I believe was prepared by Mr. Johnson's son, but I was not able to locate it yet, but I know it was done because they asked me questions.

Q Okay. But that document is not here before us?

A It's not in the record today, no.

Q So the only notes are between CTO and Johnson, correct?

A Correct.

Q And you were stating earlier, you were intimately involved in the first bankruptcy case of Homemakers, correct?

A No.

Q Well, you were saying that you discussed the case with Mr. --

A That's why the case got screwed up, Mr. Timko, and I put this on the record before. A lot of people have listened to that transcript and kind of laughed.

I took -- Mr. Dixon, Thanksgiving of 2024, asked me to step aside and not help my friends, the knuckleheads. I said, Ken, I can't help you, and I won't help them. I'm going to get them good attorneys and let this go to it.

Mr. Flynn went to Elizabeth Greene at the time, and then went to -- and Mr. Johnson got Frank Wolff.

MR. TIMKO: Your Honor, can I strike this? This is non-responsive. Just --

THE WITNESS: It's absolutely responsive. You said I was intimately involved. I wasn't.

THE COURT: Okay. I'll allow it. Go ahead.

I think he had also said early he tried to stay out of it.

THE WITNESS: I tried to stay out of it.

BY MR. TIMKO:

Q But you were -- you were aware of the case, correct?

A Of course.

Q Okay. While it was pending.

A Before it was pending.

Q Okay. And CTO is not listed as a creditor of Homemakers in the bankruptcy schedules filed in that first bankruptcy case, correct?

A When I saw the schedule, I had the same comment that you gave to Ms. Pitkanen about how awful these were and these are six straight out amateurs.

THE COURT: So the answer is yes?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. TIMKO:

Q So the answer is yes, they were not -- it was not included, correct?

A Yes.

Q And you are aware of the affidavit that Mr. Johnson filed in this case consenting to the filing of this bankruptcy case, correct?

A One thousand percent he didn't consent to this case. He just said that personally he wasn't going to oppose it.

Q Okay. But your --

A Because in his view he was still Homemakers' owner. So he was asked and not -- he was asked to say that he personally was not opposed to Homemakers' filing because all the money was going to one creditor. That's what he did, that he consented.

Q Does that mean you're aware of the affidavit?

A No. Obviously that's kind of like asking me if a pleading says motion and then you say it's my motion.

Q Okay. And he did not list CTO as a creditor of Homemakers in that affidavit, did he?

A He didn't list any creditors.

Q Oh, he had --

A I read the affidavit. I apparently read much, much more thoroughly than most. I'll be glad to see it. I'll read it to the record. In fact, it's over there on my stack if you like.

Q Well, I believe it's actually already in the evidence, so. And I'm trying to --

A Let me read it.

Q -- speed this up.

MR. TIMKO: Your Honor, just for the record, the affidavit is entered as Exhibit 9, and it states what it states.

THE COURT: Okay.

MR. TIMKO: I'm just going from there.

THE WITNESS: Okay. Now, Mr. Timko, I'm not going to let that go. It states that Mr. Johnson is aware there's certain -- certain expenses related to Homemakers are not being paid. He never identified any creditor by any of the creditor standards in this circuit.

THE COURT: Okay. That can be -- you can save that for argument.

MR. TIMKO: Okay. Thank you.

BY MR. TIMKO:

Q And the first bankruptcy case was filed after CTO started making these alleged payments on behalf of Homemakers, correct?

A There was no alleged payments. Yes.

Q And CTO was formed in around August of 2024, I believe you testified?

A August of 2024, yes.

Q Okay.

A One month after Sherwood shut down.

Q Can you turn to Exhibit 41? I believe it's in Volume 2 in front of you, sir.

A Yes.

Q Okay. Have you seen this document before? Doesn't look like your --

A I've seen a version of it, yes.

Q Are you on the -- it doesn't look from here like you're on the right document. Are you on the CTO Holdings joinder, notice of joinder?
A Yes, I was.
Q Oh, you are. Okay.
So, okay. And this is the joinder that CTO filed in this case?
A It has a docketing number above, so I'll say yes.
Q Okay.
MR. TIMKO: Can I enter this into evidence? I'd like to enter this into evidence, Your Honor.
THE COURT: It's a court document, yes?
MR. TIMKO: Yes.
THE COURT: Okay. Any objections? No. Okay. So that will be admitted, Exhibit 41.
BY MR. TIMKO:
Q Now if you go in the background section to the second paragraph, do you see that? Are you there?
A Yes, I am.
Q Okay. It says CTO Holdings is a creditor of the Debtor. CTO Holdings has paid certain expenses on behalf of Homemakers Real Estate since at least January 2024.
And my question for you is, if the company

wasn't formed until August of 2024, how is it paying expenses prior to then?

A Well, that's a wonderful lawyer question. But, as somebody who does finance and accounting, I'm sure Mr. Dixon understands the formation of the first note incorporated prior payments and was -- it was accepted.

Mr. Johnson had made payments from 2024 on to keep the place from being foreclosed by Mainstreet Bank after they told him it was in default. And so we calculated all those payments, which he separately proved, and I said, okay, well, you can add them into this number as long as my sister doesn't object. She didn't until the first note in the files, you can see it.

Q Okay, so. So again, so that would be the note between CTO and Mr. Johnson, expenses prior to August were included.

A Correct.

Q And those expenses were paid by Mr. Johnson, correct?

A That's right.

Q Okay. Let's turn to IMQA.

Now as I understand it, IMQA was initially formed in 2021 to step in to receive a transfer of a condo unit; is that correct?

A Yes.

Q And that was from Canaveral Crossroad?
A Yes.
Q Okay. And IMQA did not pay anything for that unit, correct?
A No, it gave up $80,000 in fees that were due on other units.
Q Okay.
A And it assumed the Jeton (phonetic) mortgage, which was three hundred and some thousand dollars at the time.
Q Okay. And before, you said that Ms. Milotte was the owner of IMQA, but the original intent was for a portion of IMQA to be owned in a trust for your benefit, correct?
A The plan was to have 15, 20 units at Cape Crossing, and then ultimately she would have placed it in a trust for me and my children and her children. That’s the Phoenix-Odyssey Trust you have a copy of.
Q Okay. And that’s the trust that owns the beneficial interest of Tiered Capital for your benefit, correct?
A It owns the stock of Tiered Capital for its benefit.
Q Okay. And currently your role at IMQA is essentially to wind it up; is that right?

A To wind up its current business affairs. I don’t know that she’s going to want to dissolve the entity when it gets done, but that’s her call. I’ll give it to her if she wants. I don’t --

Q That’s Mrs. Milotte?

A Ms. Milotte, my sister.

Q And prior to winding it up, you would -- I believe you testified you would work with IMQA’s attorneys on various issues; is that correct?

A I worked with everybody’s attorneys, Mr. Timko. They generally come to me for advice.

Q And since the end of 2022, you made the strategic decisions for IMQA; is that correct?

A Since the end of 2022? No.

Q No?

A No. Ask your questions better, sir. I made them since probably March of 2022. It’s not since the end of 2022.

Q Oh, okay. So it was since March of 2022.

A It’s always been the case, yes.

Q Okay. And you also negotiated the deals on behalf of IMQA; is that right?

A If you’re talking about strategic out of the ordinary course deals --

Q Can you sit closer to the microphone, please,

sir?
A Okay. If you're talking about strategic out of the ordinary course deals, yes. As to the operation of IMQA's units, I had nothing to do with it.
Q Oh, okay. So Ms. Milotte, Ms. Milotte was in charge of things like paying utility bills and running units at the resort; is that right?
A It's like with Mr. Goldman and, you know, Ms. Daniels and all of them, yeah, that was Debbie's job.
Q Okay. So you didn't have anything to do with paying the utility bills?
A No.
Q And IMQA is a sister company to CTO; is that right?
A I would treat CTO more like a subsidiary company, but on the books, the way the stock's held, it is a sister company.
Q Okay. And by the time CTO was formed in June of 2022, IMQA's business was essentially to run I think it was seven to eight units that IMQA owned?
A Correct.
Q So how many -- how many units at its height did IMQA own?
A Eight.
Q Okay. And when did IMQA sell its last unit?

A The last units that were sold were done at the end of September to Neil Buchalter's company, who was a partner in it. And then there were two units that are putatively, and I do say putatively with real emphasis on the meaning, taken back in lieu of foreclosure by Parke Financial, Mr. Dixon's one solid company that's involved in these transactions.

Q And when you said September, was that September of 2025?

A Yes.

Q And that's right when -- and this bankruptcy was filed on September 2nd, correct?

A Yes.

Q Okay. And I believe IMQA is also currently being sued by Pedixon, claiming that IMQA guaranteed the loan owed to it as well, correct?

A Yes.

Q And that relates to this whole Cape Crossing project that we've been talking about?

A Not really. But if you want me to go there.

Q Okay. But it's the same loan agreement. It's in the same -- it's in the same case. Let's do that. It's in the same litigation.

A IMQA's is in the same litigation with Pedixon, yes.

Q Okay. Now, as I understand it, IMQA is claiming it is owed -- well, its claim is primarily based on a loan it claims it made to Homemakers in the principal amount of $342,482; is that correct?
A Yes, um-hum.
Q And Homemakers, and that was in the connection with the sale, the purchase of two condos by --
A Two townhomes.
Q Two townhomes by Homemakers from a company called Anidar; is that right?
A Yes.
Q All right. And IMQA held in option on those two condos, correct?
A Yes.
Q So rather than being paid its option fee, IMQA instead took a note or treated that as a loan?
A Took a note.
Q Okay.
A Executed the note.
Q Okay.
A I have it, by the way. You should talk to me more.
Q Well --
A I have the note. It's been signed. It's docusigned.

Q It's not --

A It's date verified.

Q It's not in evidence here, sir.

A Well, guess what? It's just in evidence now, because I just testified, and testimony is evidence.

If you want, you can go back and look at In re: Mary Hall in 1990 with the IRS to get that determination, because it was my case, and I put the evidence in by orally.

I have the notice over there on the bench, properly signed by Mr. Johnson and Ms. Milotte in 2023 when the transaction occurred.

Q Okay. Well, that's interesting.

IMQA claims it was never paid its option fee for those two condos, correct?

A It was not.

Q And when I took your deposition, you told me that IMQA didn't have a signed note in its possession; isn't that right?

A I told you I did not have one with me, and I was looking for it.

Q And you also testified you didn't witness the actual signing of the note, correct?

A No, it was docusigned. Fortunately, it didn't have to be recorded, though, so we don't have our other

problems.

Q And you also testified at your deposition that you had never actually seen a signed note; isn't that right?

A Never saw it.

Q Never saw it.

Can you turn to Tab 47? And didn't I -- do you recall at your deposition that I asked for documents, and you produced some documents?

A Yes.

Q And I requested all documents that supported the claim of IMQA; isn't that right?

A Yes.

Q And you didn't provide me with a signed note at that time.

A I told you I didn't have it. I was trying to find it.

Q Right.

A I never seen it, so it's not in my personal records.

Q And then you said you would provide it, and we would continue your deposition.

A No, no, no, no, Mr. Timko.

Q Hold on. Just hold on.

A This -- no, no, no. You just impugned my

integrity.

Let me make something really clear. I became the only person in the country who could sign pleadings from prison for other prisoners in every circuit of the country. You know why? Because I'm very precise. I'm very accurate.

You did not say that. You asked. And we're going to get a schedule that shows how the particular unit numbers match out for the payments, which I produced, and I was going to explain to you why the statement, the separate statement from Pitkanen that said something that I didn't understand, because I don't remember seeing it, I never said I'd get you the document, unless I found it, and I did find it this week.

Q Do you recall -- do you recall -–

A (Simultaneous speaking) And by the way, it's in evidence now.

Q Do you --

A I filed it.

Q Do you recall that I didn't conclude your deposition on your original deposition date because you said you were going to provide me more information?

A A list that shows how the units match out to the payments you received, so you could see what was IMQA's and not somebody else's, that these were

Homemakers' debts, and I would come back to you with an explanation of the statement that Pitkanen had showing there's some payments to IMQA, which I didn't know about. They don't match up to the numbers, and the notes separately identify, but I do have the answer.

Q And you didn't provide that information to me, did you?

A No, you wouldn't talk to me. I think you're afraid. Remember, until today I wasn't allowed to participate in these proceedings.

Q And we continued your deposition until March 16th after Ms. Milotte's deposition, correct?

A We could save the Judge time and go do the deposition now if you want.

Q Sir, can you please answer my questions?

We continued your deposition until March 16th after Ms. Milotte's deposition, if you had more information to provide me, and you didn't provide me any information for that deposition.

A I gave you this --

Q Is that correct?

A I gave, at least I believed, I turned over to the IMQA's attorney the summary list that shows the connection.

Q Okay. A summary list, but you didn't provide

me a note or any other information?

A I didn't have the note or I would have given it to you.

Q Okay.

A I want you to have the note, because it kind of verifies that this took place in 2023 just like Ms. Adams' firm said.

Q Can you please turn to Tab 47?

A I'm on 47.

Q Okay. Have you seen this document before, sir?

A I have.

Q Okay. And this is the closing statement for the sale that included the option fee that we were discussing before, sir, correct?

A Yes.

Q All right.

MR. TIMKO: I'd like to enter Exhibit 47 into evidence.

THE COURT: Okay. Any objection?

MR. KOSTO: No, Your Honor.

THE COURT: Okay. So that will be admitted.

BY MR. TIMKO:

Q Okay. So, sir, if we look at this, it says the buyer was Homemakers. We're in that third box.

So the buyer was Homemakers, the seller was

Anidar, and the lender was Mainstreet. Do you see that?
A Yes.
Q Okay. And this, I guess this, the transaction happened -- the settlement date was June 13th, and the disbursement date was June 14th, correct? It's right --
A It's what it says, yes.
Q Okay.
A It's not what happened, but it's what it said.
Q Okay. And then if we go over to the seller side of this ledger.
A Yeah.
Q All right. It says that there was a credit of one million and fifty thousand dollars to the seller, which would have been Anidar; is that correct?
A Wow. Okay. Now --
Q Is that what the document says, sir?
A What does the document say?
Q That a credit of one million fifty thousand dollars was paid to Anidar.
A It doesn't say it's paid. It says it's credited.
Q Okay. It says it was credited.
A That's correct.
Q Okay. Credit is generally a payment, isn't it?
A Mr. Timko, payments can be made in kind as

opposed to in cash. If you'd accept that, we wouldn't be here, because Mr. Dixon and I would have settled this a long time ago.

Q Okay. Let's turn to the next one.

A You laugh, but it's not a joke. You guys are wasting everybody's time. In kind payments count. The payment was in kind.

Q The payment was in kind.

A The credit, the credit that you're talking about involves an in kind payment, not a cash payment.

THE COURT: Okay. Mr. Timko, it says what it says. So let's --

MR. TIMKO: Oh, okay.

BY MR. TIMKO:

Q Let's go to the next page, sir. The next page there's a series of debits, right? Do you see that?

A Yes.

Q And it says 350 -- you see the one at $350,000?

A Yes.

Q And it says option fee to IMQA Investments Incorporated?

A Yes.

Q Okay. So that would be -- that was the option fee that IMQA was owed based on its -- its option on the condos, correct?

A Correct.
Q And this says, so this was debited from the money paid to the seller and then paid to IMQA; is that correct?
A Yes. No, the money was paid, no. There's no money.
Q Okay. So you're saying that that was -- that was taken rather as a loan?
A That's right.
Q Okay. Can you turn to Exhibit 48?
A Yep.
Q And this is an email with a transaction balance attached. Do you see that?
A Yes.
Q And that email was from Alison Pitkanen to you, correct?
A Yes.
MR. TIMKO: I'd like to enter Exhibit 48 into evidence.
THE COURT: Okay. Any objection? Okay. So Exhibit 48 is admitted.
BY MR. TIMKO:
Q Okay. Let's turn to the transaction balance, sir. It says incoming wires. Do you see that?
A Yes.

Q All right. And one of those incoming wires was $350,000 IMQA option fee on June 15, 2023.
A That's what this sheet says.
Q Okay. And that corresponds with the date of the closing of the sale of the condos, right?
A No, it's two days afterwards.
Q Okay. So it's close in time.
A Mr. Timko, please. It's two days after the closing. Why would the closing have occurred if the money wasn't there?
Q Maybe the wire didn't hit for a day. Okay. So --
A Okay. Now I'll take your -- but I cross examine you, I expect you'll go get into that speculation.
Q I don't think you're going to be calling me as a witness today, sir.
THE COURT: Okay. And let's just stick with questions and answers.
BY MR. TIMKO:
Q All right. And Ms. Pitkanen acted as the closing agent on some of the deals that IMQA and the various petitioning creditors were involved in; is that right?
A Among other roles, yes.

Q Now this refers to two transactions, the Dixon Riverfly and the Mainstreet deal. So I guess those were two deals that occurred in that month, correct?
A Yes. Yes, there's more than one deal in the month.
Q Okay. And if you look at disbursements, see where it says disbursements?
A Yes.
Q There's $50,000 to IMQA. Do you see that one on June 12th?
A I do.
Q And 29,477 to IMQA. Do you see that?
A A CVR loan, yes.
Q And then there's 228,456 to IMQA.
A Yes.
Q Do you see that? And then there's another $40,000 to IMQA, do you see that?
A Yes.
Q And I did the math on that and those disbursements total $347,903.81. So that's the option fee to IMQA, correct?
A No, it's not.
Q Well, it's about the same amount, isn't it?
A Coincidentally, the number is similar, but it's not. I told you I'd go figure out what happened, so.

Q Well, when I asked you at your deposition, you said you didn't know what those amounts were.

A And I told you I didn't. I went back and looked. I've been tracking this whole thing because I'm concerned about Alison's accounts.

Q Okay. And that amount is also about $5,000 more than IMQA claims it was the principal balance, the principal amount of the loan that IMQA is claiming, correct?

A The loan is $342,000.

Q Right. So this was 347. So this would be a little bit more than that, wouldn't it?

A Ms. Pitkanen is terrible with numbers.

Q Okay.

A That's why my niece took over her accounting after this. Her old account accounting.

MR. TIMKO: I'm having a little bit of difficulty here, your Honor, because I'm not getting yes or no answers, so I don't even now if I'm creating a record at this point.

BY MR. TIMKO:

Q So is that a yes, they're about the same amount?

A Okay. So let me make this really clear, Mr. Timko. I'm not going to answer a question like that

because you're asking me for subjective opinion and differences. I think $5,000 is a rounding error. But a lot of people think $5,000 is a lot of money. There's a $5,000 difference between the two numbers.

Q Okay. Thank you.

Now do you see the line item on here that says $347,482.40 acquisition funds for Anidar units?

A Yes.

Q Isn't it true that Pedixon allowed those funds to be used from a reserve it was holding under the loan agreement with Tiered Capital for the purposes of being able to fund the purchase of the Anidar condos?

A No.

Q No? Again, at your deposition, you couldn't tell me what this was, so.

A Again, I went back, I looked it up. I wanted to check through because I'm not going to make a statement about an attorney or a trust account unless I have actual knowledge. I've had people do that to me. I would never do that to somebody else.

THE COURT: Okay. So do you have a conclusion as to what the source of those funds were?

THE WITNESS: Yes.

THE COURT: And what is it?

THE WITNESS: What happened is Ms. Pitkanen

didn't know how to make the deal work with her new boss, Old Republic. So she took 350,000 without authorization and set it up to close the deal. When it came back, instead of it going to IMQA as a fee, I had to take the note. Told Debbie that's the best we could do. She trusted Woody, it was okay. But that money was taken out of the account without any authorization.

THE COURT: Taken out of what account?

THE WITNESS: Taken out of my old trust account, I presume for the benefit of Tiered. But I had the tracking of all the trust accounts, so I know. Because my niece did them for her at my request after she made this mistake, it's an accident. She doesn't know what she's doing. I said, Alison, I can't look at your accounts. I'm incapacitated. Hire my niece. She's innocent. She'll put everything down right, and then I can help you figure out how to do this correctly. But she'd taken the 350 beforehand. Nobody approved it. Because Old Republic would -- didn't know how to do a simultaneous close. That's all that happened. That starts this entire chain.

BY MR. TIMKO:

Q Okay. Now you claim that IMQA has made some utility payments on behalf of Homemakers, right?

A Best I can verify is eighty some thousand, yes.

I think it's more than that.

Q Did IMQA utilize its own funds to make those payments?

A Yes.

Q You were present at Ms. Milotte's -- oh, and earlier you testified that Ms. Milotte -- you testified that Ms. Milotte was the one that that actually made those payments, correct? She was in charge of them?

A Physically made those payments, yes.

Q And there's no loan agreement or promissory note evidencing Homemakers' requirement to pay any loans for utility payments, correct?

A No, there's not.

Q And you attended the deposition of Ms. Milotte, correct?

A Yes.

Q And do you believe her testimony was accurate and truthful?

A No, she was a mess. It's truthful. And I do think the -- and I went back and analyzed it because obviously it's a calamity from the basic perspective.

But what became apparent is, my sister asked me questions, made sure that I wasn't on some (indiscernible), and she was just trying to get the money back that we invested because $300,000 from our family is

a lot more money than is otherwise at stake.
Q Okay. But you said she was being truthful, correct?
A She's truthful, yes.
Q All right.
A She was wrong a lot, but she's truthful.
Q But she is the president of IMQA, correct?
A Yes.
Q And she was in charge of the utility payments, correct?
A She did make the utility payments, yes.
Q Okay. Do you recall her testimony that it was her responsibility to check, to make sure that utilities were being paid for units owned by IMQA, Satori Investments, and Homemakers?
A Yes.
Q So IMQA was paying for multiple, multiple units of multiple companies; isn't that right?
A No.
Q Well, it would be IMQA, Satori Investments, and Homemakers.
A Okay.
Q Correct?
A No. Satori's own units were all tied to IMQA because it was a joint venture. There are lease

agreements on all those units. Satori didn't have any independent units at the time.

Q And do you --

A Just the two.

Q And do you recall her testifying that she would not use IMQA's money to pay for Homemakers' expenses?

A No, I don't.

Q You don't recall her testifying to that?

A No, I don't, and we haven't reviewed the depositions because they just came in. That's why I don't know why you probably put them into the exhibits. We don't have an errata sheet yet. It's going to be extensive.

Q Oh, were you --

A My sister is an educator and a sign language expert. She doesn't know business.

Q Were you --

A She knows how to manage those units.

Q Were you aware that your attorney received that deposition on the 19th?

A No.

Q From the court reporter?

A I wasn't.

Q Oh, I'll show you the letter later.

So you're acting as the corporate rep, but

you were -- but you're at the same time stating that the president of the company who was in charge of making the utility payments basically doesn't know what she was testifying to.

A Yeah, and if you want, I'll call Howard Stern as an expert, because he did the same thing with Sirius.

Q So --

A Sometimes your star player knows more than your managers.

Q Okay. Now you were involved with the first bankruptcy case, correct, sir?

A I was what?

Q You were involved in the first bankruptcy case.

A No, I was not.

MR. KOSTO: Asked and answered.

MR. TIMKO: Okay.

BY MR. TIMKO:

Q You had discussions with Mr. Wolff, the attorney who filed the first bankruptcy case, while that case was pending, correct?

A I did.

Q All right.

A Oh, while it was pending, yes.

Q Yes.

A Just at the time of dismissal, yes.

Q In fact, you told him that he made concessions in that case that he should not have made; isn't that right?
A Yes, I did.
Q And he ignored that advice; isn't that right?
A He did.
Q And that, did those concessions relate to litigating the trust issues or the ownership issues?
A They -- yes, in -- they did. They did certainly relate to that.
Q Okay. And for this current involuntary bankruptcy case, you discussed the filing of this case with Mr. Johnson and Mr. Flynn right before it was filed, correct?
A Yes.
Q In fact, I think earlier during argument, you said you were going to go and file your own bankruptcy case.
A I told Mr. Dixon that last Thanksgiving. I would put -- I'd get my sister get IMQA to get an attorney and push Homemakers into involuntary bankruptcy. It wasn't paying its bills. It was just paying him. I understood why he was doing that, but it's just not the way the rule -- the game is played.
Q Okay. In fact, when the -- when the order came

down dismissing the first voluntary case, you told Frank Wolff you wanted to file, file an involuntary case at that time, correct?

A No. I actually went to Frank to talk to him about doing something to mitigate his mistake and filing a new voluntary on Homemakers. He told Mr. Johnson it was going to cost $85,000. Mr. Johnson was already upset at the fact that he spend a hundred and twenty with that firm beforehand and didn't want to go there.

In the meantime, Mr. Rost had been introduced to Mr. Flynn and Mr. Johnson, and they liked the firm. They were introduced by their senior partner, by the way, who I don't know. Richard Lee, I believe his name is. And so the end of that was they wanted what to do, and they said, how about an involuntary? I said, hey, that's what I've been saying all along. That's what you should do.

Q And so IMQA was aware of the involuntary bankruptcy case on the very day it was filed, correct?

A I think probably before.

Q Before?

A Yes, before.

Q So IMQA's been aware of these proceedings even before they started?

A As long as IMQA's me, yes. My sister, probably

no clue until late in the fall when it looked like IMQA was going to have to join.

Q Okay. And that would be true of CTO as well?

A Yes. At some point after my heart attack, I had to talk with her about it. I think I waited for Judge Robson's instructions that I wasn't a -- no, not guidance, that I wasn't a petitioning creditor. I believe that is January 10th.

Then I went ahead and talked to my sister and said you've got to do this if you want to protect the money you have out there.

Q Oh, I was under the understanding that you informed your sister within a few weeks of the case being filed.

A No, it was a few days of being told up here that I was not a petitioning creditor, so I couldn't participate.

Q Oh, that's right. Okay.

So you -- you were concerned that you were not going to be able to participate in these proceedings, you personally were not going to be able to participate in these proceedings. So you decided -- determined, decided to that you should file CTO and IMQA and have them be joined, correct?

A I wasn't terribly concerned because I know

there aren't enough creditors to make 303 apply, Mr. Timko, and I would have had a whole bunch of responses. But out of respect for this Court, I went through the process to have my rights reestablished so I could appear as quasi-counsel.

Q But prior to that, you had CTO and IMQA join so you could participate. That's what you just said.

A No, I had CTO and IMQA join so she didn't dismiss it because the one creditor wasn't enough and because one creditor's counsel was inadequate.

Q Okay. Do you remember testifying that you join -- you had IMQA join this petition specifically so that you could participate at your deposition?

A No, I didn't say that. And I haven't had a chance to review and read my deposition either. But I did notice in my first run of it there's a lot of mistakes, which probably is because I talk a little too fast for the court reporter. I don't think I'm ever going to let there be another Zoom deposition. I want to do them in person.

Q Okay. This is at Page 26, Line 4 of the deposition, this is where it starts.

And who made the decision -- of IMQA's deposition.

And who made the decision to file the joinder?

Well, my sister formally made the --

THE WITNESS: First, of all, Your Honor, I have to object, because I'm given 30 days to read. That hasn't passed. I don't have an errata sheet yet. He should not be presenting that as an exhibit.

MR. TIMKO: Your Honor --

THE COURT: Well --

MR. TIMKO: -- I actually looked this up yesterday. There is a case, I can get it for you, it's called In -– I think it's In re: Gallagher out of the -– I have a copy of it here in case this strike issue came up. I believe it's out of the Northern District of Virginia bankruptcy. It states that -– and it cites to another Second Circuit case. Again, I can get you the notes. I don't have them right in front of me.

But what that case holds is that even without the errata sheet, a deposition transcript can be used as evidence before the Court. And even if the, you know, there are corrections, the original deposition transcript can be used as evidence.

THE COURT: Okay. Well, right now aren't you using it as impeachment?

MR. TIMKO: Right now I'm using it as impeachment, but, you know, I just wanted to address.

THE WITNESS: It can't be used as impeachment.

But if you want to give it to me and let me read it, I'll come back afterwards.

THE COURT: Let's -- let's do this. We're going to go ahead and read from the transcript or --

MR. TIMKO: Okay.

THE COURT: -- do the impeachment. It'll be subject to an errata sheet later. But, as you know, Mr. Amodeo, an errata sheet only corrects like typographic. It doesn't change the testimony.

THE WITNESS: That's why I want to hear what was said, so I'm good.

BY MR. TIMKO:

Q Okay. Page 26.

MR. TIMKO: And, Your Honor, I apologize for making a legal argument during this but, you know, I'm responding.

THE COURT: Okay. No worries.

MR. TIMKO: Okay.

BY MR. TIMKO:

Q Page 26, IMQA deposition, starting on Line 4.

Question: Who made the decision to file the joinder?

Well, my sister formally made the – made the -- the jurisdiction, but, of course, she -- she took my recommendation.

Question: And so when you say the Court's directive, you -- and if I'm putting words in your mouth, just let me know, but I'm trying to speed this up a little bit. You said that you wanted to participate, so you needed to have creditors in the case, correct?

Well, no. Judge Robson said if I was going to participate, leaving aside all my competency issues, I had to be more than just a claimant, a creditor. I had to be a participant. I had to join the petition. So when she did that, it woke me up to the fact as why are -- well, this is a silly fight. Let me go talk to Debbie. They owe Debbie money from IMQA and CTO.

* * * * *

A Okay. I can follow that I certainly did say, but I was never going to join the petition until I was told I couldn't participate unless I did.

Q There's no question pending, sir.

A Mr. Timko, if we're going to do this the hard way, then we need do it the hard way. We're going to waste your client's money and my friend's time.

THE COURT: Mr. Amodeo, there's no pending question.

BY MR. TIMKO:

Q And then in the CTO deposition, Page 53, Line 24.

Okay. So TT -- CTO. So CTO didn't really do anything other than review what you filed within the case earlier?

Once, until Judge Robson came up, CTO wasn't even thinking about this bankruptcy. They waited for the bankruptcy to file the claim. No bankruptcy is active yet. The order for relief had been entered, as you're well aware. So CTO and my sister just didn't care. We were off looking to get real money to pay back the creditors, and so it only came up when Judge Robson pointed out that you should be a petitioning creditor if you're going to speak.

* * * * *

A And that's a question how?

THE COURT: I think it's part of the same impeachment.

BY MR. TIMKO:

Q And your intent is to have a trustee put in place for Homemakers, correct?

A I moved -- filed a motion to that effect, yes.

Q Okay. And you dispute this Court's ruling in the first bankruptcy case that Mr. Johnson is not the owner of Homemakers; isn't that right?

A No, I'm -- I'm the believer that the trust owns it.

Q Do you recall me asking a similar question when you were acting as corporate representative of CTO Holdings at your deposition?

A Probably. You know, I could have very well said, you know, my belief is no trust existed, but I'm not going to back up over an order until the Rule 60 is heard.

Q Okay. But Woody is not the owner.

Question: But Woody is not the owner of Homemakers?

Answer: That's a lie, Mr. Timko.

* * * * *

A And you know it.

Q And you would like to see the ownership or the trust issues litigated in this case, correct?

A Don't need to. Need to see a trustee sell the place. I don't care about who owns it. I wouldn't put Mr. Johnson back in charge or Mr. Dixon. Neither of them really want to do it.

Q Do you remember me asking you a similar question at your deposition?

A Probably. Go ahead.

Q Page 57, Line 14.

And then would CTO like to see the ownership of the entity Homemakers also be -- the ownership of the entity Homemakers also be litigated in this bankruptcy case?

I think it should be litigated.

Answer: I think it should be litigated someplace.

* * * * *

A That was between Mr. Johnson and Mr. Dixon.

Q And it's your opinion that there are 15 creditors of Homemakers, correct?

A Actually, I found 21 potential creditors of Mr. -– of Homemakers.

Q Twenty-one potential creditors. Okay. Thank you.

You provided no documentary evidence or other evidence for today's hearing regarding the value of Homemakers units, have you?

A I submitted a whole bunch of evidence yesterday. I submitted evidence yesterday. It should have the Homemakers value, the recent sales in there.

Again, I apologize to the Court that I was rushed in getting it done, not my normal style. But I didn't do anything until I had an authority to do so.

Q Okay. So that's --

A I know what the sales are. I know what the values are. I'll let them ask me.

Q Okay.

A Or you can ask me.

Q Now with respect to Homemakers' records, it is your -- oh, actually -- and as of the date of the involuntary filing, you are still acting as a corporate strategist or advisor for Mr. Flynn and Mr. Johnson, correct?

A And Mr. Dixon, yes.

Q And their entities?

A Everybody. Seems to be my role in the world. So, yes, here's the short answer.

MR. TIMKO: Thank you, Your Honor.

THE COURT: Okay. So is now a good time to take a break? Or how long do you think you'll be, Mr. Kosto?

MR. KOSTO: It's a good time to take a break, Your Honor.

THE COURT: So, okay. So we'll take a lunch break. As you know, Mr. Amodeo, you're under oath. Don't talk to anybody about your testimony so far.

THE WITNESS: Yes, Your Honor.

THE COURT: What time do you all want to come back, 1:00 o'clock?

MR. TIMKO: That works.

THE COURT: 1:15?

MR. TIMKO: 1:15 is better.

THE COURT: Yeah, 1:15, just because everyone's moving all their stuff.

Okay. All right. So we'll be in recess until 1:15.

MR. TIMKO: Thank you, Your Honor.

THE COURT: Okay.

COURTROOM DEPUTY: All rise.

(Thereupon, a luncheon recess was taken, after which the following proceedings were had.)

COURTROOM DEPUTY: All rise.

The United States Bankruptcy Court for the Middle District of Florida is now in session. The Honorable Grace E. Robson presiding.

THE COURT: Okay. Good afternoon. Please be seated.

All right. So we're back in session. Mr. Kosto is going to examine Mr. Amodeo. Yes. Mr. Amodeo, you're still under oath.

THE WITNESS: Yes, ma'am.

THE COURT: Okay. All right.

So please take a seat, and then we'll start whenever Mr. Kosto is ready.

MR. KOSTO: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. KOSTO:

Q So go back to Exhibit 47 from the second volume of Mr. Timko's documents.

A Yes, sir. I think I have it.

Q Okay. So what's the relationship between the option fee and the property that was being sold?

A There -– what happened is the -- there were two units that were purchased from IMQA, and they'd come into IMQA by virtue of an agreement with Jim Gissy or more accurately, his son-in-law, Jared Saft.

When -– when Homemakers wanted to add more units, they wanted to buy these two, and they'd been sold to a friend of Mr. Johnson's son, but who had complete arm's length beforehand, and so since IMQA was entitled to some money, we made an agreement that would leave an option on those properties.

Technically, what happens at this closing, and that's what got so confusing, is IMQA exercises its option at the moment of closing so that Mainstreet gets X number of dollars and, you know, some other people got X number of dollars, and IMQA would then own the units for $700,000. But we agreed to simultaneously sell them to Homemakers for the million fifty.

So there was a $350,000 difference that was

between what would go to pay off the encumbrances and the former owners who -- who and then turn it over to IMQA. That's why the statement is so odd, when he mentioned the seller-buyers. They just missed the option transactions that were there, and they were all part of it.

That's what caused the need for the money to come from a different account, because she didn't understand how to do a simultaneous closing.

Q So by virtue of the option, it meant Homemakers paid less for the property; is that correct?

A No, Homemakers paid the full amount, but it only had to pay in cash seven hundred and some thousand.

The balance was in a note to IMQA Investments. The note matures in 2028. It has a 4.8 percent interest rate.

Q And has IMQA been paid the amount for the option?

A No. IMQA was given a note for the amount of the option. That part happened. But they didn't get paid in cash.

Q And the note's never been paid?

A No, the note has not been paid.

THE COURT: Is the note an exhibit?

THE WITNESS: I don't think it's in their exhibit because I only found it this week. I had to go

back to docusign and get the copy. And for once I was thankful it was docusigned so everybody would know when it was signed.

THE COURT: So let's see if Mr. Kosto --

BY MR. KOSTO:

Q Okay. Do we have an unexecuted copy of the note?

A I have an executed copy of the note sitting over there in the box.

Q Okay. But before we go to the executed copy, can you look through 1 through -- is an unexecuted copy attached to the proof of claim, the amended proof of claim? It should be Exhibit 2.

A Exhibit 2?

Q In the second set, the IMQA set.

A The IMQA set.

Q Not the CTO set. No, no, I'm sorry. Yeah.

A This one. Okay.

Q But the second set of 1 through 12. Go down to the next Number 2.

A Oh, I see now. I get where all the confusion took. Okay.

Q Okay.

A The Option to Purchase is here.

Q Okay. So the Option to Purchase is Number 3.

MR. KOSTO: Your Honor, Your Honor, I would offer into evidence Exhibit 2 as the amended proof of claim filed in this case.

THE COURT: Any objection?

MR. TIMKO: Well, the problem with the proof of claim is it attaches a bunch of documents that are hearsay and unauthenticated. So --

MR. KOSTO: It's still a true --

MR. TIMKO: -– I object to it being submitted for the proof of the matter asserted.

They can say they filed a claim, but everything in here that they're relying on needs to be authenticated and addressed. And there's documents in here that relate to, that appear to be Homemakers' documents.

I don't see an unsigned note in here. So I don't know what they're referring to here. But, no, this cannot be used because it is, in fact, hearsay.

THE COURT: Okay. So I'll take judicial notice of the proof of claim that it was filed by IMQA. Okay.

So then, Mr. Kosto, why don't you -– do you want to go attachment by attachment and get them authenticated?

MR. KOSTO: Well, Your Honor, it's a document that was filed with the Court.

THE COURT: Right.

MR. KOSTO: It’s the proof of -- amended proof of claim. I think it’s entitled to be entered into evidence as what it is.

I think he has arguments he can make with respect to the specific documents, but I don’t think it should be disallowed because -–

THE COURT: Well, I’m not disallowing it. I said I’m taking judicial notice.

MR. KOSTO: Okay.

THE COURT: He’s objecting to the truth of the matter asserted. So, for example, one of the exhibits to the proof of claim, because it has a lot of attachments to it, right? So --

MR. KOSTO: Okay.

THE COURT: -– I mean --

MR. KOSTO: Okay. We’ll go one by one.

THE COURT: Okay, so.

BY MR. KOSTO:

Q The first page, it’s labeled as Exhibit 2, right?

A What it says there Official Form 410, right.

Q Okay.

A Right.

Q And is that your sister’s signature?

A Not on Page 1, but on Page 3, yes.

Q Okay. And is this a true and correct copy of the proof of claim filed with the Court?

A Yes.

Q Okay. And then the next document is a balance sheet?

A Yes.

Q I think that this is what Ms. Adams testified to, that were copies, documents that she prepared; is that correct?

A I think she testified that her firm would access QuickBooks directly in validating the tax return, but that she didn't actually prepare this document.

MR. TIMKO: They're seeking to enter this as an exhibit, Your Honor. Authentication, hearsay. It's not a document of IMQA. It's a document of Homemakers.

MR. KOSTO: Yeah, I think Ms. Adams has testified to it, so.

THE COURT: Well, she testified she received it. It doesn't authenticate the document as what it purports to be.

MR. KOSTO: Okay. I'll come back to it.

THE COURT: So It --

MR. KOSTO: I'll come back to it, Your Honor.

THE COURT: Okay.

BY MR. KOSTO:

Q Exhibit 3, the Option to Purchase, is that a true and correct copy of the original Option to Purchase?
A Yes.
Q And this is what we're talking about with the option in the transaction that Mr. Timko was questioning?
A Yes.
Q Okay.
MR. KOSTO: Your Honor, I ask that be admitted into evidence.
THE COURT: Okay. Any objection?
MR. TIMKO: No objection, Your Honor.
THE COURT: Okay. So I don't know how we do this for purposes of the exhibit register, but so, so far, we're going to -- I'll just maybe we'll self flag. exhibits that admitted.
Okay. So far, what's attached to IMQA's Exhibit 2 as Exhibit 3 is admitted, which is the Option to Purchase. Okay?
MR. KOSTO: Okay. Your Honor, just for purposes of the record, the exhibit, the one marked Exhibit 2 is admitted as well?
THE COURT: Right. I'm taking judicial notice of it.
MR. KOSTO: Okay. Any reason that can't come into evidence as well?

THE COURT: Well, because right now we're still going through the attachments with Mr. Timko.

MR. KOSTO: No, no. I'm saying the first three pages, what's marked as Exhibit 2.

THE COURT: Oh, no, there's no --

MR. TIMKO: No, I mean that --

THE COURT: Okay. So, yes, the Proof of Claim form, Exhibit 3.

MR. KOSTO: Did you say 2 was not?

THE COURT: No. Yes. Exhibit 2, the first few pages of the Proof of Claim form --

MR. KOSTO: Right.

THE COURT: -- right, that's admitted --

MR. KOSTO: Okay.

THE COURT: -- as well as the Exhibit 3, which is the option agreement. All right. That's where we are so far.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q Can you turn to Exhibit 5 of this -- not -- of this exhibit.

A Pardon me?

Q Within Exhibit 2.

A Within, yes, 2.5.

Q Okay. Can you tell the Court what this is?

A This is a receipt showing that IMQA had paid a particular power bill for one of the Homemaker units.
Q And that's $578.60.
A Plus the convenience fee, because it was done by credit card.
Q Right.
A So it's five eighty eighty-five.
Q Okay. Has that been repaid?
A No.
Q Okay. Next turn to Exhibit 8. What is Exhibit 8?
A This was IMQA confirming -- this was Florida Power confirming it received a payment from IMQA in a means of payment for power at one of the units.
Q Okay. We don't know the -- do we know the amount of that payment?
A Not from this document, no.
Q Okay. Turn to Exhibit 10. What is Exhibit 10?
A Exhibit 10 is a summary of payments made on a particular unit for account 228070.
MR. TIMKO: Your Honor, I'm going to object to this document on two fronts.
One is, if they're seeking to have it put in as an exhibit, authentication, hearsay. And also this is a summary and under rule -- Federal Rule of Evidence 1006,

you can only use summaries if they're summarized voluminous, voluminous documents, and they're supposed to be made available prior to review. And I did do discovery, and they did not have the documents at the -- at the -- they couldn't show me the documents that match these summaries, and I wasn't able to make heads or tails of that.

I don't think they produced the documents that would support this, and that goes for, assuming they go there, Exhibits 11 and 12 as well.

THE COURT: Okay. So, Mr. Kosto.

BY MR. KOSTO:

Q Do you have the supporting documents for that?

A I don't have them with me, but what you have to actually do is go on the Florida Power portal. That's where they were summarized.

That last multicolored summary sheet I said ties out the payments to these numbers into the unit addresses. Otherwise, it would have to be a Florida Power thing, and I'm just not quite that good on technology. Dinosaur here, so.

THE COURT: Well, do you know who prepared this document?

THE WITNESS: Douglas Pardo (phonetic).

THE COURT: And who's that?

THE WITNESS: He's a contractor I brought in to answer the questions about the utility payments.

THE COURT: Okay. So he didn't got to the FPL's website and login and create this?

THE WITNESS: No. I sat there with him and looked at it, but I didn't go and login. I wouldn't know how to do that.

THE COURT: All right, Mr. Kosto.

BY MR. KOSTO:

Q Were you present when this document was pulled from the FPL website?

A Um-hum.

Q And --

A The document wasn't. The information was.

Q The information in this format?

A No, it shows month-to-month. He talks about voluminous documents, again, I don't want to -- voluminous is a subjective opinion. But Florida Power, you have to produce -- you have to print three or four or five sheets every time you go to one of the payments when you're going in historically, and so this was essentially the number off the last page of those sheets.

MR. TIMKO: Your Honor, it's still hearsay.

THE COURT: Okay. I'm going to sustain the objection. Okay. Let's move on.

BY MR. KOSTO:

Q In addition to the one payment that we talked about, $580.85, were there other payments made by IMQA --

A Yes.

Q -- for utilities?

A There's like 26 utility payments a month for power. Some months there was a little bit more because there was an extra unit. There were six or seven of the Homemaker units that needed to be paid for water. Spectrum bills had to be paid until the HOA finally agreed to incorporate them in the HOA agreement.

So I would imagine over the time period there was eight or nine hundred payments that were made.

THE COURT: And what time period is this?

THE WITNESS: January of 2023. I'm sorry, January of 2024 through June of 2025.

BY MR. KOSTO:

Q Okay. Let's go back to -- let's go to the CTO documents real quick. Exhibit 2 of CTO.

A Same book, earlier tabs. I got it. Okay.

Q Can you tell the Court what payments CTO made on behalf of Homemakers?

A Yeah. To do that, I would, you know, go to their Exhibit 1 to keep my memory fresh, but --

MR. TIMKO: Your Honor, objection. A, to the

exhibit is a summary; B, this is not a proper way to refresh somebody's recollection.

THE COURT: Okay. What are we even looking at?

MR. KOSTO: Exhibit 2, Your Honor.

THE WITNESS: Okay.

THE COURT: Exhibit 2 in 2 or?

MR. KOSTO: Just 2 in general. I'm asking Mr. Amodeo what payments CTO made on behalf of Homemakers.

THE WITNESS: CTO paid -- paid Homemakers' debts to Mainstreet mortgage. Mainstreet Community Bank on the mortgage.

MR. TIMKO: Your Honor, he's just reading off a piece of paper?

THE WITNESS: No. No, I'm not.

THE COURT: Okay. I have --

THE WITNESS: I don't need to read off the paper, Mr. Timko.

THE COURT: All right. Let me -- let's make sure we're all even looking at the same thing. I'm -- okay. So the Exhibit 2I'm looking at is the proof of claim of CTO. Is that where you're at?

MR. KOSTO: Yes, Your Honor.

THE COURT: Okay. So, all right. So Mr. Amodeo wasn't even asked about the document yet. He was just asked whether --

MR. KOSTO: Correct.

THE COURT: -- what's been paid by CTO on behalf of Homemakers, correct?

THE WITNESS: Correct.

MR. KOSTO: Yes, Your Honor.

THE COURT: Okay. That's what your --

THE WITNESS: My understanding.

THE COURT: That's what your answer is based on your own recollection?

THE WITNESS: Yes.

THE COURT: Okay. So go ahead.

THE WITNESS: Mainstreet Community Bank. Property taxes, some association fees, the cost of certain expenses inside the Homemaker estate. They owed a DIP manager or from before Mr. Johnston. Those are the ones.

Legal fees and taxes and association fees and mortgages is what my recollection is.

BY MR. KOSTO:

Q Okay. Does Exhibit 1 summarize what follows Exhibit 1?

A I'll go to Exhibit 1. Yes.

Q I'm sorry, Exhibit 2.1. Let's call it 2.1.

A Yes. Exhibit 2.1, yes. I got it. Yes, 2 --

MR. TIMKO: Objection. Hearsay.

THE COURT: Well, okay. So this, this is a document being used for purposes of his recollection. So I think it's an exception.

MR. TIMKO: I still don't think he did it right, but okay.

THE COURT: Okay. Go ahead.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q So can you tell the Court what Exhibit 2.2 is?

A 2.2 is a bank wire receipt from what I believe is Mr. Johnson's personal account 5492, and he made a $30,000 payment. From this paper, I can't tell what the actual expense was, but in order for it to go on the notes, he had to produce the actual proof that the money had been sent and received.

Q Okay. So if you look in description four lines down, it refers to Mainstreet?

A Correct.

Q So was this paying a debt of Homemakers?

A Undoubtedly a debt of Homemakers. It's just, it's a round number, so I think it's, you know, it doesn't reflect to me which mortgages they were involved.

Q Okay. And it was -- but it's a Homemaker debt?

A Homemaker debt.

Q And why is this booked on the books of CTO and

not Mr. Johnson?
A Because the agreement was out of the monies that were collected Mr. Johnson would get paid first, but we had to keep an exact track of how much money he was putting in to fuel the collections and the preservation of the assets.
Q Okay. So this is a debt due to CTO Holdings?
A This is a debt from -- yeah, this -- this is a debt from CTO to Mr. Johnson to be paid from the collection of assets either at Cape Crossing, Sherwood Construction, Holly Bluff Marina, et cetera.
Q Okay. And Homemakers is responsible for that; is that correct?
A That's correct.
Q And the next one, 105,000?
A Yes.
Q And the next one, 30,000?
A Yes.
Q These are all related to Mainstreet?
A That's correct.
Q And the next one, $6,677?
A Yeah, this is actually the payment on those two units we discussed before. This was his mortgage. This was Homemakers' mortgage on the two Anidar units.
Q So CTO is paying the Anidar units mortgage?

A He’s paying the mortgage from the purchase, the Anidar.

Q For Homemakers.

A Mm-hmm.

MR. KOSTO: Okay. Your Honor, I’d like to admit into evidence the documents at 2.2.

MR. TIMKO: Again, objection. Hearsay.

THE COURT: Okay. So I don’t know that you --

MR. TIMKO: And some of these --

BY MR. KOSTO:

Q Are these true and correct copies of the original?

A Yes.

Q Are they documents that CTO keeps in the ordinary course of business?

A Yes.

Q Are you a records custodian at CTO?

A Yes.

Q Are you familiar with the books and records of CTO?

A I am.

MR. KOSTO: Your Honor, I would ask that they be admitted into evidence.

MR. TIMKO: I also didn’t get to finish my -- it’s a summary, Your Honor, under 106.

MR. KOSTO: It’s --

THE COURT: Well, he’s talking about the pages with the bank transfers.

MR. TIMKO: Which, which -- oh, I’m sorry. So, wait. Were you doing Exhibit 1 or Exhibit 2?

MR. KOSTO: 2.2.

MR. TIMKO: What’s 2.2? Oh, this is 2.2?

THE COURT: 2.2, yeah.

MR. TIMKO: Oh, okay. Well, then I object to this due to authentication. These are Mr. Johnson’s. This is Mr. Johnson’s bank account, not CTO’s bank account.

THE COURT: Well, Mr. Amodeo just testified that these are records that are kept in his -- in CTO’s business for accounting for the debts. So I’ll allow it. Okay.

BY MR. KOSTO:

Q Can you turn to Exhibit 5? It’s 2.5.

A Yes, sir.

Q Can you tell the Court what these documents are?

A It looks like a -- well, not looks like, it is a photocopy of some CTO checks, front and back.

MR. TIMKO: I’m sorry, I’m not there yet, guys.

THE WITNESS: Oh, I didn’t realize.

MR. TIMKO: I don't mean to hold you up. I'm just trying to find it.

THE WITNESS: No, no problem.

MR. TIMKO: Ah, okay. Thank you.

BY MR. KOSTO:

Q Okay. Is this monies that were paid on behalf of Homemakers?

A Yes.

THE COURT: Is this CTO's bank account?

MR. KOSTO: Yes.

THE WITNESS: Yes, it is, ma'am.

MR. KOSTO: Your Honor, I'd like to have it admitted into evidence.

MR. TIMKO: I'd like to object to the relevance, Your Honor. These checks are all after the petition date, and the issue is whether or not they were holder of a claim as of the petition date, and the petition date was September 2nd, 2025. This is dated the 4th, the 5th, and it looks like October 21st.

THE COURT: Okay. So, Mr. Kosto.

MR. KOSTO: I think it shows a pattern, Your Honor, of making payments on behalf of Homemakers, and I think it's relevant.

THE COURT: But doesn't that hurt you? I mean, okay. Anyway, I'll sustain the objection.

MR. TIMKO: Thank you, Your Honor.
BY MR. KOSTO:
Q Okay. Going back to Exhibit 48, and the disbursements listed there, the $29,477.51 IMQA slash CCVR loan.
A Yes.
Q Does that relate to the option fee?
A No.
Q What is that transaction?
A There was money outstanding for rents on the IMQA units, and they made that money up with that payment.
Q So that's money that Homemakers owed to IMQA?
A (No verbal response)
Q Is that a yes?
A Not Homemakers owed to IMQA. That money was owed to IMQA by CCVR, Cape Crossing Vacation Rentals. Separate. It had nothing to do with Homemakers.
Q Okay. So that was a loan to CCVR.
A It was being repaid.
Q It was being -- so somebody was making a loan to CCVR and using that money to pay IMQA; is that what you're saying?
A This is Alison Pitkanen's summary of multiple accounts. And so she was attempting to redo the math to

make up the difference, the shortfall that occurred, because the $350,000 was taken out of the particular account and used to conduct the transaction. And so that -- these numbers aren't related to the sale.

Q Okay.

A They're just her trying to balance it up. And we worked all the way through August trying to get her accounts reconciled.

Q Okay. In June --

A And that's all -- this is nothing -- I don't know why, I mean, you know, IMQA put it into the package but...

Q June 26, 2023, two hundred and twenty-eight thousand four hundred fifty-six forty purportedly going to IMQA, is that related to the option fee?

A No.

Q What was that transaction?

A Sherwood Construction had no trade credit. In 2023, IMQA began to -- my idea and effort, to get and step in to help Sherwood Construction get through from draw to draw. This was a repayment of that money.

Q And the 40,000 on June 28, 2023?

A Relates to work to the Garcia Brothers who are just above it. And they worked on jobs at Amelia, Amelia Village for Sherwood at what they call KCBC, King Colony

Beach Club. Again, IMQA advanced materials or credit cards and got repaid.

THE COURT: Mr. Amodeo, can you turn the microphone over?

THE WITNESS: Oh, yes, ma'am. Sorry.

THE COURT: Okay.

BY MR. KOSTO:

Q So this has nothing, again, nothing to do with the option fee?

A No, it did not.

Q And has IMQA ever been repaid the option fee?

A No, it has not.

MR. KOSTO: Your Honor, do you want me to go into other issues beyond what's been discussed so far, such as the numerosity issues or these other issues while Mr. Amodeo is on the stand, or do you want me to --

THE COURT: I would say yes.

MR. KOSTO: Okay.

THE COURT: I mean, because he's your witness for that point.

MR. KOSTO: I didn't know if you want to -– you tried to bifurcate it or no. Okay.

THE COURT: Well, no. I think Mr. Amodeo conceded that there were over the 20 creditors.

MR. KOSTO: I don't think that's a correct

interpretation.

THE COURT: I think that's what he said.

THE WITNESS: That's exactly what I said, but the rest of the story is coming.

THE COURT: Okay.

BY MR. KOSTO:

Q Okay. Let's turn to Exhibit 26 of Mr. Timko's book.

A 26. This is Volume 2. Okay. I think I got it now. Got it.

Q Okay. So are you familiar with the Homemakers Rule 1003 disclosure?

A I am.

Q And how many creditors are listed in this document?

A Twelve.

Q Okay. And this is marked as Exhibit 26 in Mr. Timko's booklet?

A Yes.

Q And did the amended disclosure provide addresses for any of the creditors?

A No.

Q Did the amended disclosure describe the nature, origin, and timing of any of the claims with any specificity?

A No.
Q Did anybody verify the accuracy of this document?
A I don't know. I filed objections to it, so I don't think so.
Q Does Mr. Dixon have personal knowledge of Homemakers' creditors or financial condition?
A I --
MR. TIMKO: Objection. Speculation.
THE COURT: Sustain.
BY MR. KOSTO:
Q Do you know whether Mr. Dixon has personal knowledge of Homemakers' creditors?
A In our conversations --
MR. TIMKO: Objection. Speculation.
THE WITNESS: In our conversations he said he doesn't.
THE COURT: Hold on.
THE WITNESS: All right.
THE COURT: Sustain. Why don't you rephrase the question?
MR. KOSTO: Okay.
BY MR. KOSTO:
Q Have you ever had conversations with Mr. Dixon about creditors of Homemakers?

A Yes.
Q Has he ever told you whether or not he had any knowledge of who the creditors were of Homemakers?
A He generally says that's left for his underlings.
Q Okay. So has he indicated to you he had no knowledge of who the creditors were of Homemakers?
A No, not with any -- he would not know, know any details is what he said.
Q Okay. So is it your belief that he has no knowledge of a --
MR. TIMKO: Objection. Speculation again.
THE COURT: Okay. It's Mr. Amodeo's belief, but okay.
THE WITNESS: I believe that Mr. Dixon assigns this task to other people to do, and he would not know himself if this information was accurate or not. He's an excellent accountant. We've been through that. But he wouldn't be spending his time talking to tax credit persons. And in our discussions, we -- we don't do that. Other people do that for us.
BY MR. KOSTO:
Q So let's go to creditor number one on his disclosure. Brevard County Tax Collector, $320,655.57. Is this claim secured or unsecured?

A It's a fully secured claim against the property.

Q Okay. Does the tax collector's claim represent a right to personal payment from Homemakers, or is it a lien against the real property?

A It's only a lien against the real property and doesn't represent a claim against the person.

MR. TIMKO: Objection. Legal.

THE COURT: It's a legal conclusion.

MR. KOSTO: He's an attorney.

THE COURT: He's a disbarred attorney.

MR. KOSTO: Okay.

THE WITNESS: So but I --

MR. KOSTO: Still has the legal knowledge.

THE WITNESS: I am an expert.

THE COURT: Okay. Well, then you can make that in your argument. It doesn't have to be --

MR. KOSTO: Okay.

BY MR. KOSTO:

Q So there's -- there's a tax lien that covers that claim, correct?

A There's a tax lien from Brevard County Tax Collector against Crescent Sound, yes. Whether it ever reaches Homemakers is a different issue.

Q And is the property on which that tax lien is

claimed worth in excess of $320,655.57?
A Many fold.
Q Okay. Let's go to Number 2, Cape Crossing Condominium Association, $318,786.
A Yes.
Q Is that an HOA fee, or what is that?
A Yes. The condominium association gets a fee for each of the condominium units, and this is the debt that's accrued since January of 2024.
Q Is that debt secured?
A It is.
Q Does the condominium association have a lien against all the units?
A They do. Well, particular units, because they can only place a lien against somebody whose his name is on title. Each unit has a separate one.
Q And are those properties worth in excess of the $318,786?
A They are.
Q Are those the same units as the Brevard County Tax Collector?
A They are.
Q So between roughly $640,000, are those units worth in excess of $640,000?
A Yes.

Q Are they worth in excess of the -- is the 91,149 --

MR. TIMKO: Objection, Your Honor.

BY MR. KOSTO:

Q -- the third one also related to those units?

MR. TIMKO: Foundation.

THE COURT: Hold on. Hold on.

MR. TIMKO: He's not -- he's not testifying as an expert as to value. He's not an owner of Homemakers. He's not an owner of the units. They've laid no foundation as to why he would know the value of the units whatsoever. So I object to this whole line of questioning.

THE COURT: Sustained.

MR. KOSTO: Your Honor, he's been intimately involved in all of this stuff with the parties and --

THE COURT: Okay. Well, then ask him those questions.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q Okay. How do you have personal knowledge of these items?

A I was party to -- I was a party to this, and that'll be used in a different context. I was aware of the Unit 503 that was sold that went to foreclosure and

then was sold for $400,000 plus some extra funds, because they called me, and that was sold to the Shackenbergs. That was done, I think, November. So I know that some of the units are 400,000, $405,000 worth.

Also, the partner of IMQA was Satori, and they recently sold their unit for $705,000, so.

THE COURT: Okay. And how do you know that?

THE WITNESS: How do I know that? Because when they -- when Mr. Buchalter makes a sale for Satori, he needed to get clearance from IMQA. And so he called me and talked to me about the numbers. And then I confirmed it with the real estate broker, Lemons and Lemons (ph).

MR. TIMKO: Objection. So this is, again, speculation. Hearsay.

We don't know the layouts of the units, whether certain units are worth more than others. We don't know which units he's talking about. There's no comparables. We don't know exactly when these sales occurred, et cetera, et cetera.

THE COURT: Okay. All right. So, Mr. Kosto.

MR. KOSTO: I'm not sure what the objection is geared toward.

THE COURT: Well, he's still saying lack of foundation and Mr. Amodeo is not a realtor expert.

MR. KOSTO: That these are secured claims?

MR. TIMKO: Well, correct.

THE COURT: Well, you were asking about the value, whether the value exceeded the claim. And so Mr. Amodeo was saying that the value of the units were in excess of the claim.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q Are you aware what sales have taken place in that community?

A Yes.

Q Okay. And are you -- you've sold -- you've been involved in many sales in that community; is that correct?

A Yes.

Q And you own property in that community on behalf IMQA; is that correct?

A All this being as IMQA, yes.

Q Right. But IMQA owns property --

A Yes.

Q So IMQA is --

MR. TIMKO: Objection. Misstates the prior testimony. He testified earlier that he sold all of his units back in -- I think the last units was in September of 2025, which was, what, eight months ago. The real estate market's changed.

BY MR. KOSTO:

Q Are you aware of sales that have occurred in that community since September 2025?

A Unit 503 has gone for 400, 400,000, 405,000, but on the records it shows 400, and the condominiums that IMQA was maintaining for Satori was sold for 705,000.

Q Okay.

THE COURT: And when was that sale?

THE WITNESS: That was sold in December.

THE COURT: In what year?

THE WITNESS: 2025.

MR. TIMKO: Okay. I still renew my objection because, again, we don't know layouts, comparables, how Mainstreet's condos -- the maintenance of the condos. We know nothing about condos. We have -- we have no evidence as to how, why that sale price would be equivalent to a Mainstreet condo.

THE COURT: Okay. All right. Well, Mr. Kosto, anything else that you want to --

MR. KOSTO: No, I wonder if I can go on or whether --

THE COURT: Well, presuming the values are all the same and the apartments are all the same is, I mean, is that what you would think that they're all worth the

same amount or similar amount?

THE WITNESS: There are three basic layouts, Your Honor. Yes, most of them are identical to the 400,000 one. A few are identical to the 700.

THE COURT: Okay. So it's just an estimate. We're not going to hold it to be.

MR. KOSTO: But we're not going to -- we're not trying to pinpoint an exact figure. The question was whether the value exceeds $600,000 or 700,000. I mean, I think he testified it did.

BY MR. KOSTO:

Q Okay. Next is Key Funding, 500 -- $5938. Is that -- that's a tax certificate holder?

A Yes.

Q Is that related to these same properties?

A Yes.

Q And they're fully secured as well; is that correct?

A Yes.

MR. TIMKO: Again, objection. Speculation.

THE WITNESS: I'll save a lot of this argument, Your Honor, but 303 has some very specific language about persons and property. None of these count.

THE COURT: Okay. So then can we move along then?

MR. KOSTO: Okay.

THE COURT: I mean, is that your point, Mr. Kosto?

MR. KOSTO: Yes, Your Honor.

THE COURT: Okay. So they're all lien holders, yes?

MR. KOSTO: Yes, Your Honor.

THE WITNESS: Number 6 is not.

THE COURT: Okay. So for $85.

THE WITNESS: Yes. Otherwise --

THE COURT: Everyone else is either --

THE WITNESS: Six and eleven have separate. And, again, I just know because I filed the objections upstairs this morning.

THE COURT: Okay. So I don't know that we need Mr. Amodeo to go through these if that's --

MR. KOSTO: Okay. Thank you, Your Honor.

THE COURT: Um-hum.

BY MR. KOSTO:

Q Okay. You indicated there were other -– other creditors; is that correct?

A Yes. P.E. Dixon and ZPD are purportedly two creditors, but they only come into existence against Homemakers by virtue of the consolidated agreement in September 2023. So I believe they're one creditor. But

they are a creditor that's out there; and although, it may be disputed, they're still a creditor.

Of course, there's IMQA, which they left off. They left off Tiered Capital. They left off CTO. They left off Mr. Johnson, and they left off me. Though the truth is if I would have been them, I'd have paid me the three ninety-four and shut me up.

Q Okay.

A So there's some creditors that are not on the list. W.M. Holdings is not on the list, but it's on the financial statements. And so there's another, in my mind, I thought there's like 15 or so at the deposition. I went back and checked and think that there's probably 21, but only four count under 303. And again, I'm only a witness --

MR. TIMKO: Again objection. Legal conclusion.

THE COURT: Hold on.

THE WITNESS: I'm a witness. I'll wait for argument and I'll make it then.

THE COURT: Okay. So the entities that you just listed starting with P.E. Dixon and ZPD and IMQA, so you're saying all of those creditors are unsecured creditors?

THE WITNESS: No. No, ma'am. I'm just saying they're creditors of the estate altogether. I don't know

the nature of the W.M. Holding. I only picked it up from the financial statements.

THE COURT Okay. But you are more -- you are familiar with IMQA and CTO, which is you're saying.

THE WITNESS: Those are definitely unsecured creditors, as is Mr. Johnson and myself.

THE COURT: Okay. And Tiered Capital?

THE WITNESS: Tiered Capital for sure.

THE COURT: Okay. And Mr. Johnson and yourself. Okay. So then all but the W.M. Holdings is what --

THE WITNESS: And P.E. Dixon. P.E. Dixon has a similar option-type arrangement that I had, and that may mean that $600,000 of their claim is secured, theoretically.

BY MR. KOSTO:

Q Is P.E. Dixon owed money by -- by Homemakers?

A Only by virtue of the consolidated agreement, but they did pledge some units in a very complicated option agreement, which I'd much rather do from our view than here, that did provide some security on some portion of the Sherwood loans. No money was ever given to Homemakers.

Q So is Pedixon (sic) going to have a disputed debt?

A Yes.

Q And the other debt that you tied in with Pedixon, is that --

MR. TIMKO: Objection. Again, objection. Foundation. He’s not Homemakers. How does he know whether or not a debt is disputed? How does he know these debts? He’s got to lay the foundation as to where he can learned these facts.

MR. KOSTO: Okay.

THE COURT: Okay. Sustained. Mr. Kosto.

BY MR. KOSTO:

Q Okay. Can you tell the Court why those -– why those two debts are disputed?

A There’s like six lawsuits out there in the state court that are contesting those matters. So I have to assume from that nature the debts are disputed. But we can get back to deciding who is Homemakers and figure out whether the debts are disputed or not.

Q Okay. What was the reason CTO, CTO Holdings and IMQA Investments joined the involuntary petition?

A Because Ms. Robson -- Judge Robson, the Honorable Robson said that to actually have a voice in the proceeding, they needed to be a joined petitioner.

Q Okay. Let me clarify my question. Sorry.

A Okay.

Q What is the purpose of the bankruptcy case as

opposed to litigating, suing Homemakers to try to collect the debt?

A The bankruptcy is because there are multiple creditors, when all the funds were going to one creditor and that creditor had control of the Debtor. And so there was going to be essentially a wasting of the estate and a foreclosure of the units, which is what's occurred. So the bankruptcy was a way to get a fair distribution of money to all the creditors. And so what I told my sister is, you know, we'd probably get the money back, or at least some of it, it won't be a hundred percent, if we can an orderly sale of the assets.

Q Is that the only purpose in filing this? Is there any ill intent involved in filing this chapter?

A No, there's no ill intent at all. My sister obviously wouldn't know enough to have ill intent, and Ken Dixon is my friend, so.

Q Do you still communicate with Ken Dixon?

A Yeah. Not as much as I'd like or he would like, because this stands in between us. But when it resolves, you know, there's a few people that can walk in that upper league, he's one of them.

Q So right now where does all the revenue from the rentals of the 26 units go?

A Based --

MR. TIMKO: Objection. Speculation.

THE WITNESS: Not speculation at all. I'm going to use your exhibit.

BY MR. KOSTO:

Q What's that?

THE COURT: Do you have personal knowledge?

THE WITNESS: I do. I read their 50 page -- Exhibit 50.

THE COURT: But that's based upon their paper.

MR. KOSTO: Well, Your Honor, Mr. -- Mr. Dixon testified he's getting all the monies from the rentals.

THE COURT: Okay. So then why do you need to ask Mr. Amodeo?

MR. TIMKO: Okay. Well, so why do you need him?

MR. KOSTO: I just want to follow up the next question, Your Honor.

THE COURT: Just ask the next question.

BY MR. KOSTO:

Q Were you here and present in the courtroom when Mr. Dixon indicated he was receiving all the revenue from the --

A I was.

Q Okay. And is that --

MR. TIMKO: Misstates testimony.

THE COURT: Okay. Hold on. What?

MR. TIMKO: It misstates testimony. He didn't say he was receiving all of the revenue.

MR. KOSTO: Well, all the revenue after the -- the --

MR. TIMKO: The expenses were paid.

THE COURT: The net, the net.

MR. KOSTO: The next, all the net earnings.

BY MR. KOSTO:

Q So, no creditors -- so to your knowledge that no creditors are being paid apart from Mr. Dixon?

A Yes, I have knowledge that the creditors are not being paid.

Q Okay. Without trying to get an exact figure, what's the ballpark figure that you believe is coming in from the 26 units?

A On average, I think it's probably $75,000 a month.

MR. TIMKO: Objection. Foundation.

THE COURT: What's the foundation?

BY MR. KOSTO:

Q Are you aware of what the rentals revenues are?

A I've seen the Beachside Vacation Rental reports that were filed in this case, and their portal is still open to me, so yes.

MR. TIMKO: Objection. Hearsay.

THE COURT: Okay. What do you mean their portal is open to you?

THE WITNESS: They have a portal that you report the owners' sales to, and IMQA is part of that. So I can see what the unit sales were for all the units.

THE COURT: And you've accessed this?

THE WITNESS: I have. Well, I mean, I'm not a computer guy, Judge, but I have had somebody sit there and do it for me so I could read it.

THE COURT: Okay. So you're saying based upon what you've seen Beachside filed here in this case?

THE WITNESS: And what I've seen on other portals and what IMQA got, I'll estimate $75,000 a month.

THE COURT: Okay. So where is it filed here? What document --

THE WITNESS: Exhibit -–

THE COURT: What document was filed --

THE WITNESS: there was a big, gigantic exhibit that Mr. Timko put in, which I really read last night. It looks like it's a Beachside report. I think it's Exhibit 50.

THE COURT: Okay. So you're saying based upon your view of that document, that's what it shows?

THE WITNESS: correct.

THE COURT: Okay. Well, we'll just use your

Exhibit 50, if that's what it says.

BY MR. KOSTO:

Q Okay. Can you turn to Exhibit 50?

A Yeah. Here it is.

Q Okay. So if we look at the first page, it says $616,550.22 as rental income; is that correct?

A It says payment due to the owner one fifty seven thousand ninety six in the monthly income amount. That had to be a really good month.

Q So if you go to the top, the third line item down is rental income.

A Rental income, $616,550.22. Presuming this is the period from July to the end of March as opposed to April 1st. That encompasses their slow season.

Q Okay. So --

THE COURT: So that's nine months. So that number divided by nine months is the average monthly rental income is what's going to go there.

THE WITNESS: Okay. Then sixty some thousand dollars a month. Yeah, sixty-six, sixty-eight. Yeah.

THE COURT: Okay. So proceed.

BY MR. KOSTO:

Q Okay. So for some reason you and Mr. Dixon are able to remain friends despite these lawsuits flying around; is that correct?

A Yes.

Q And have you had dinner with him in the last three months?

MR. TIMKO: Objection. Relevance.

THE COURT: Yeah. What's the relevance?

MR. KOSTO: Your Honor, the relevance, relevance is to show there's no bad faith. There's no animosity. There's no hostilities to one another. This isn't done for an improper purpose. It's done simply because he -- he doesn't want Mr. Dixon to receive all of the monies, but at the same time they're able to maintain a friendship, and there's no ill will or spite to any of this.

THE COURT: Okay. I'll allow it.

THE WITNESS: Yes, I have. I want to do it more often, and it is because this -- this for me and him is about business. I don't have any personal issue with him.

MR. TIMKO: Your Honor, he's the corporate representative of two corporations. He's not speaking in his personal capacity. And he's not the owner or president of those corporations. So I'm not sure whether or not him liking Mr. Dixon is relevant at all to any of this.

THE COURT: Well, okay. We've all heard that

Mr. Amodeo is the one that's -- right, or your side has alleged that he's the one controlling everything and he's the one calling shots behind the scene, even if he's --

MR. TIMKO: Well, but Ms. Milotte -– Ms. Milotte does -– he does answer to Ms. Milotte.

THE COURT: Correct. Right. But the strategies --

MR. TIMKO: Okay.

THE COURT: -- any steps taken are at Mr. Amodeo's suggestion, analysis, et cetera. So he does that part of it. So I do think it's relevant.

MR. TIMKO: Okay.

THE COURT: Okay. Mr. Kosto, you can proceed.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q Are you aware of whether any assets from Homemakers has been diverted to Mr. Dixon or one of his companies?

A Yeah. I mean -–

MR. TIMKO: Objection. Foundation.

THE COURT: Well, he's asking if he knows and how he knows, I presume.

THE WITNESS: Yes, I am aware that funds were tran -– are transferred from Beachside to Alison Pitkanen's escrow account and then to Mr. Dixon to pay

down the consolidated debt.

BY MR. KOSTO:

Q And what about properties themselves?

A There wasn't -- the transaction that his -- and Mr. Dixon has signed, not by electronic and with a real notary, that eight units were transferred out of Homemakers Real Estate.

MR. TIMKO: But now I'm going to object based on relevance. What does this have to do with numerosity of creditors?

THE COURT: Mr. Kosto.

MR. KOSTO: Your Honor, it doesn't have anything to do with numerosity. He's indicated that Mr. Dixon's claim is disputed and this goes to why there's a legitimate dispute as to Mr. Dixon's company's claims against Homemakers is that he's received other funds, other monies, other properties that have paid down for which no credits have been provided.

THE COURT: Well, I don't think Mr. Dixon's debt was listed as a debt.

MR. KOSTO: It wasn't listed, but it was talked about as one --

MR. TIMKO: We didn't -- we didn't --

THE COURT: Okay. Hold on.

MR. KOSTO: -- of the -- one of the debts that

are out there.

MR. TIMKO: We didn't list it --

THE COURT: Okay.

MR. TIMKO: -- as stated on the disclosure specifically, because we knew that they were -- that parties were disputing it.

Now we haven't sued Homemakers on that debt because -- well, Mr. Dixon will testify to that later but, yeah.

THE COURT: Okay.

MR. KOSTO: Okay. Okay.

So if he stipulates it's a disputed debt, that's fine, Your Honor.

MR. TIMKO: No, I didn't. Well, I didn't stipulate that it's disputed as to Homemakers. I stipulated that there are creditors that are disputing the debt.

MR. KOSTO: Okay.

THE COURT: Okay. Let's move on.

MR. KOSTO: Your Honor, I think I will stop there for now.

THE COURT: Okay. All right.

Is Mr. Leibert going to ask any additional questions, or are we going to go to cross examination or redirect?

REDIRECT EXAMINATION

BY MR. TIMKO:

Q Okay. Can you turn to -- I want to make sure I have this right, the way we did this. Let's turn to C -- I think it's CTO's --

MR. TIMKO: I'm sorry, Your Honor. It's a little --

THE COURT: That's okay. We're all in the same --

MR. TIMKO: Yeah, no, I got you.

THE COURT: Okay.

BY MR. TIMKO:

Q Okay. Yeah, let's turn to the CTO proof of claim. I'm sorry, IMQA proof of claim. So that would Exhibit 2 in the IMQA Investments documents in Mr. Kosto's binder.

A Of the folder. Yes. Okay. All right. Yes, I'm here.

Q And we'll turn to Exhibit 5 in that document. There's no real page number to give you. So it was the Florida Power and Light confirmation email.

A Yes, I see that here.

Q Okay. Do you see it?

A Yes, I do.

Q Okay. On this document, it doesn't -- it

specifies that it is IMQA Investments on the account, correct?

A Yes, that's correct.

Q I don't see exactly which unit is named in this document, correct?

A That's correct.

Q And IMQA, and you testified that IMQA sold its last unit in September of 2025, correct?

A That's correct.

Q And that's after this payment confirmation, correct?

A Yes.

Q Okay. Let's go I think it's Exhibit 8 in this document. If I remember correctly, it's towards the back. You've got to get past the bank statements if that's helpful.

A Okay.

Q It's the other -- it's another email from FPL.

A Oh, yes, I remember. I got it.

Q Okay. And in that document it states there's an updated total balance of zero. I don't see a reference to a specific address. Do you?

A No, I do not on this page.

Q Okay. So, and at that time, IMQA, this was in March of 2025, so IMQA owned units at that time as well,

correct?

A That’s correct.

Q Now let’s go back to the CTO claim, which would be Exhibit 2 in the beginning of the binder.

A I have it.

Q Can you turn to Exhibit 1 to that?

A I did.

Q Okay. I just want to point to the three transactions on the bottom. It says paid by CTO Chase on behalf of Homemakers.

A Yes.

Q Okay. Those are dated 9/4/2025, 9/5/2025, and 9/5/2025. Do you see that?

A Yes.

Q Those are all after the petition was filed, correct?

A The --

Q The involuntary petition.

A Yeah. The services were probably incurred before, but the payments were after.

Q Okay. Well, one’s for insurance, and one just says Homemakers. So there was no service there, was there?

A There was no service?

Q Yeah, there was no service provided.

A The insurance was service, and the law firm looks like it was.

Q Yeah, but you pay for insurance in advance, generally, correct?

A I don't know. I guess it was probably so, if your car insurance. But I don't actually know, Mr. Timko, so.

I just know it was an insurance payment that was due, and often in these commercial places they require you to put 25 percent down or something like that but --

Q Okay.

A And this date, I think they would be paying for probably a past due bill.

Q And now if you turn to Exhibit 2, all of these account statements for Bank of America 5492, these are -- I believe you testified before that these are Mr. Johnson's bank account. These are all payments made out of Mr. Johnson's bank account, correct?

A Yes.

Q Okay. Now we're going to go to my second binder, Exhibit 48. Let me pull out mine.

Now this was a document that originally was one of IMQA's exhibits filed back on January 31st, 2025 by an order of this Court, correct?

A Yes.

Q Okay. And when I deposed you, I went through with you each of the IMQA disbursements. Do you recall that?

A Yes.

Q And at that time, you couldn't recall what any of these IMQA disbursements were for, correct?

A Correct.

Q And even though you're the corporate representative for IMQA and you knew that I was going to be asking you questions about these exhibits, you weren't aware of that information, correct?

A Correct.

Q Okay. But now suddenly for this hearing, you're -- you're aware.

A Not suddenly for this hearing. It's I wasn't going to speak about Ms. Pitkanen's IOTA accounts without confirming it because I don't want her to get in any trouble she doesn't need to be in.

These are attorney trust accounts, Mr. Timko. Frankly, right now, if you were the FBI, I'd be claiming privilege because I've had privilege. Privilege, even though I'm not licensed.

Q There's no question pending. You've answered my question. Thank you.

MR. KOSTO: Objection, Your Honor. I think he was still answering the question.

THE COURT: I'm sorry?

MR. TIMKO: The FBI had nothing to do with whether or not he had knowledge of IMQA's payments. That's absurd.

THE WITNESS: The point is I wouldn't discuss her trust accounts with anybody for any reason without knowing for sure. And that's what I said at the deposition, without mentioning the trust accounts. I said I'd go back and look at it. I wasn't going to guess. I went and checked.

THE COURT: Okay.

THE WITNESS: So I knew what happened.

THE COURT: Okay. The question was answered. So let's move on.

BY MR. TIMKO:

Q Again, Mr. Kosto went through a, you know, a list of claims that were claimed to be secured, and you were claiming that the valuations of the units would cover those claims, correct?

A Yes.

Q Would it -- and were you taking into account the Mainstreet claims as well?

A Yes.

Q You're not a licensed appraiser, are you?
A No.
Q There's no valuation before this Court, is there?
A No. There's comparables before the Court.
Q Do you recall -- do you recall Mr. Dixon's testimony that he thought the units averaged about $300,000 per unit from the last hearing?
A Yes.
Q Okay. Do you recall Mr. Johnson's testimony that he thought the value of the units was probably depressed in their current condition? Do you remember that?
A Yes.
Q Okay. With respect to IMQA, as we stand here right now, and the expenses they paid, there are -- there is no evidence or documents specifying exactly what expenses were paid for exactly which unit by IMQA, correct?
A I have them. I gave you a summary. You should have them, too.
Q It doesn't specify the exact unit. It doesn't specify what those payments were.
A It's not in these documents.
Q It's not in these documents before this Court.

A I sent it over -– I sent it over when -- before the last deposition.

Q But it's not before this Court, is it?

A Well, if we want to get into CSX Transportation and when dispositive evidence could be introduced after the fact, I'll be glad to argue that case, Mr. Timko.

Q Happy to do that.

THE COURT: Okay. But --

BY MR. TIMKO:

Q Same question --

A Right now I don't have it in front of me, no.

THE COURT: Okay. So the answer is no.

BY MR. TIMKO:

Q Same question for CTO. We don't have those documents, do we, either?

A The CTO documents that were here showing the payments?

Q Right. We don't have any. We don't have any. Actually, with respect to IMQA, we also don't have any like bank statements showing anything, do we?

A Not here today, no.

Q We don't have any credit card statements.

A Well, if you're talking about in these folders --

Q Mr. Kosto didn't provide you with any credit

card statements, did he?

A Not -- not in these folders, no. But there's some stuff in my filings, so that's why I hesitated.

MR. TIMKO: No further questions, Your Honor.

THE COURT: All right. So I think we're done with Mr. Amodeo. You may step down. And then, Mr. Timko, I think you wanted to call --

MR. TIMKO: Yeah, I'd like to call Ms. Milotte. May I take a three minute break real quick?

THE COURT: Yeah.

MR. TIMKO: Okay. Thank you very much.

THE COURT: Okay, so. All right. Let's all take a three minute break then.

COURTROOM DEPUTY: All rise.

(Thereupon, a brief recess was taken, after which the following proceedings were had.)

COURTROOM DEPUTY: All rise. Court is back in session.

THE COURT: Okay. Please be seated. All right, Mr. Timko.

MR. TIMKO: All right. We're going to call -- Homemakers is going to call Deborah Milotte.

THE COURT: Let's find out how her name is really pronounced.

MR. TIMKO: Same thing, so I asked her at her

deposition, and I believe she said -- I believe it's Milotte, correct?

THE WITNESS: That's correct.

MR. TIMKO: Okay. All right.

THE COURT: Okay.

COURTROOM DEPUTY: Can you raise your right hand?

Do you swear or affirm that the evidence you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

COURTROOM DEPUTY: Please state your full name and address for the record.

THE WITNESS: Deborah Milotte, 222 Ivory Coral Lane, Building 3, Number 103, Merritt Island, Florida, 32953.

COURTROOM DEPUTY: Thank you. Have a seat.

MR. TIMKO: Oh, just right over here.

Actually let me set up the microphone. Do you mind if I move it?

THE COURT: Oh, yeah. Go ahead.

THEREUPON:

DEBORAH MILOTTE

having been first duly sworn, was examination and testified as follow:

DIRECT EXAMINATION

BY MR. TIMKO:

Q Thank you, Ms. Milotte, for being here today.

Ms. Milotte, you are the president of CTO, CTO Holdings, correct?

A Yes.

Q And you are also the president of IMQA Investments; is that correct?

A Yes.

Q Okay. And you are also the court-appointed guardian of Frank Amodeo; is that correct?

A Yes.

Q And you're also his sister?

A Yes.

Q Okay. Let's start with questions about CTO, and then we'll go to IMQA, all right, so there's no confusion.

CTO was started, I believe you testified it was in June of 2024; is that correct?

A I believe I said I believed that was correct. I do not know the exact date --

Q Okay.

A -- nor the exact month.

Q Okay. All right. But in the summer of 2024?

A Thereabouts.

Q Okay. And you are the sole owner of CTO; is that correct?
A Yes.
Q And CTO was a collection company?
A Collections like holding company, yes.
Q Right. And it was supposed to collect monies owed to Canaveral Crossings and Sherwood Construction, correct?
A Yes.
Q Okay. And you don’t recall exactly what debts CTO was attempting to collect on behalf of Sherwood; is that right?
A That’s right.
Q And you don’t recall what debts exactly CTO was attempting to collect on behalf of Canaveral Crossings, correct?
A Correct.
Q Okay. You asked Mr. Amodeo and Mr. Johnson to handle those collections; isn’t that right?
A Yes. I didn’t do any of that.
Q Okay. And initially you put in some money for CTO to open a business and a bank account, right?
A Yes.
Q And the only other source of funds of the business was a loan made by Mr. Johnson, correct?

A Yes.
Q Okay. And other than the initial investment and Mr. Johnson’s loans, there was no other sources of revenue for CTO, correct?
A Correct.
Q And CTO has very little funds remaining at this time, correct?
A Very little.
Q Okay. And do you recall filing a proof of claim for CTO in this bankruptcy case?
A Yes.
Q Okay. And you actually signed that claim, correct?
A I did.
Q Okay. And you do not know who compiled the documents attached to CTO’s claim, do you?
A I know how they were delivered to me. Who actually put them together, no.
Q Yeah. Mr. -- Mr. Amodeo handed you the claim, correct?
A No.
Q Oh, was that -- was that from Mr. Flynn then?
A Originally through an email, yes.
Q Okay. Was it from Mr. Flynn or Mr. Amodeo; do you recall?

A Mr. Flynn sent the email, yes.

Q Okay. And he sent it on behalf of Mr. Amodeo?

A Yes, because, I'm sorry, my brother doesn't really do technology.

Q Doesn't do emails. Okay.

And, and then you reviewed the claim and the attachments and you signed it?

A Correct.

Q Okay. Let's turn to IMQA for a second. IMQA was started in 2021, correct?

A Yes.

Q And Mr. Amodeo actually gave you the opportunity to start IMQA, correct?

A Yes.

Q And he gave you that opportunity because under his guardianship he's not permitted to own a business and sign papers, correct?

A Yes.

Q And IMQA's business was to manage some of the units at the Cape Crossing development, correct?

A That's what I did, yes.

Q And you -- it was your job to make sure that certain bills were paid for the units?

A Yes, I paid the bills.

Q And those units include units owned by

Homemakers, Satori Investments, and IMQA; is that correct?

A Well, Homemakers and then IMQA, Satori.

Q IMQA, Satori, okay. So they were one, okay.

But there's also a property manager overseeing those units at that time as well, right?

A Um-hum. You met him this morning, Mr. Riley.

Q Right. Yeah.

And you live at Cape Crossing, so you were the person to go -- you know, you were the person to call onsite if there was a problem with one of the units, correct? Like if something was --

A If there was an issue --

Q Right.

A -- with something. If they needed something repaired, they need an approval to get it repaired. And Brooke, one of his assistants at the time, I don't know where she stands in the company now, her and I would speak often, yes.

Q And if IMQA made a payment of a Homemakers expense, you didn't use IMQA's money to pay Homemakers' expenses, correct?

A I used the money that was there.

Q Okay. But do you recall testifying at your deposition that you would not use IMQA's revenue to pay

the bills of Homemakers?

A If I had to, I did.

Q Okay.

A Guests needed to have power and water and electricity.

Q Okay.

MR. TIMKO: I’m going to Page 19, Line 5 of her deposition.

Okay. Then when you say pay the bills, what was -- was IMQA just making sure that the bills were paid or was IMQA using its own revenue to pay the bills?

Well, no. I was getting them paid, but we would get the money -- we would get the loan -- the money from Homemakers and use that to pay those bills, and that’s the electric, the water, and the Spectrum.

* * * * *

BY MR. TIMKO:

Q And IMQA didn’t really have its own source of revenue, correct?

A Correct. Well, other than -- well, some of the revenues from the rental properties, the portion that was given back, I don’t know what that’s called.

Q Okay. And IMQA had some units, but you don’t

know how IMQA actually acquired those units, do you?
A (No verbal response)
THE COURT: Verbally.
THE WITNESS: No.
THE COURT: Okay.
THE WITNESS: My apologies.
THE COURT: Okay.
BY MR. TIMKO:
Q And IMQA's not currently operating, correct?
A That's correct.
Q Do you recall signing a proof of claim on behalf of IMQA in this bankruptcy case?
A Yes.
Q And you don't know who prepared that claim either, do you?
A No.
Q And you received that claim either from Mr. Amodeo or Mr. Flynn, correct?
A Mr. Flynn.
Q Mr. Flynn. By email?
A Yes.
Q Okay. And was that on behalf of Mr. Amodeo?
A Yes.
Q Okay. And for that claim you just reviewed the attachments, looked at the number on the claim, and

signed it, correct?
A I verified that they were one and the same, that it all evened, matched out, yes.
Q Right. But you only looked at the attachments and the claim form itself, correct?
A Correct.
Q Okay. And the IMQA claim is based on an alleged loan from IMQA to Homemakers, correct?
A Based on the unpaid note, is that what you mean?
Q Yes, ma'am.
A Then, yes.
Q Okay. And that that note was in -- I think it was in connection with the sale of two units; is that correct?
A Yes.
Q All right. But you don't know the details, the real details of that transaction, do you?
A No.
Q In fact, you weren't really involved in that deal at all, were you?
A I was not there, no.
Q And you don't recall signing a promissory note in connection with that loan, correct?
A I think I told you that I'm sure I did. I

didn’t have it in front of me. I didn’t have it with me.
Q Well --
A But I believe I did.
Q So do you recall me asking you that same question or a very similar question at your deposition?
A Probably. I was very confused at that.
Q Okay. So on Page 40, Line – starting --
A I haven’t reviewed my deposition yet.
Q Okay. I’m just going to read your --
A I just received it in the last few days.
Q I’m just going to read your testimony at the deposition.
Page 40, Line 19:
Okay. Do you -- can -- when was -- were you involved in the signing of the note?
No. I mean, I don’t recall. I was in transition during a lot of that time.
* * * * *
So you don’t recall signing that note, correct?
A Again, if it was a note, I signed it. I don’t recall where it’s at. While in transition, I have things in bags, boxes, suitcases, buckets. I don’t know where it’s at.
Q But you don’t recall signing that note, do you?
A As I said, I’m pretty sure I did. I don’t

recall if that was something particular that I signed. I signed more than one note. I would have to see the paper. I mean, I -- I don't know.

Q Okay. So you don't recall if you signed that specific note, you'd have to see it?

A I'm sure I did. But, no, I do not recall sitting down signing that particular one. But if it's signed, I'm sure that was my signature.

Q You are the trustee of the Phoenix-Odyssey Trust, correct?

A Yes.

Q And Mr. Amodeo is the beneficiary of that trust?

A Yes.

MR. KOSTO: Objection, Your Honor. Relevancy.

THE COURT: Well, it's --

MR. TIMKO: It relates to Tiered Capital.

THE COURT: Okay.

BY MR. TIMKO:

Q And that trust owns shares in a company called Tiered Capital, correct?

A I believe so.

Q And you don't recall what business Tiered Capital was in, do you?

A No.

Q And you did not attend, attend any shareholder meetings of Tiered Capital, correct?

A I mentioned that I attended meetings. I don't know what specifically they were.

Q And you did not participate in Tiered Capital's business, did you?

A No.

Q And you also don't know what Mr. Amodeo's role in Tiered Capital was, do you?

A No.

MR. TIMKO: No further questions.

THE COURT: All right. So Mr. Kosto or Mr. Amodeo, you're going to --

MR. AMODEO: I guess it would be me. Something I never thought I'd be doing.

THE COURT: Well, you don't have to. We can leave it to Mr. Kosto.

MR. TIMKO: Again, I --

MR. AMODEO: I do to get the truth out.

MR. TIMKO: Again, I'm just going to put on the record, he's only allowed to represent his interests, not CTO's and IMQA's. He's not an owner. He's not the president of CTO and IMQA. Apparently he did some work for them.

THE COURT: But is he not the beneficial owner?

MR. TIMKO: Not of CTO and IMQA. He has no ownership interest. Ms. Milotte --

THE COURT: But Tiered Capital.

MR. TIMKO: For Tiered Capital, yes.

THE COURT: Okay.

MR. TIMKO: So if he -- if he wants to ask questions about Tiered Capital, he can.

THE COURT: All right. Well, let's see what Mr. Amodeo asks.

MR. TIMKO: CTO and IMQA have competent counsel.

THE COURT: Understood. Okay.

MR. KOSTO: Thank you for your assessment.

MR. TIMKO: I don't care.

THE COURT: Everyone needs validation. Okay, so.

MR. KOSTO: I think -- I think that will be one of my opening pieces for this hearing.

MR. TIMKO: No, I -- I've always liked Larry.

THE COURT: Okay. And, Mr. Amodeo, please remember to try to speak close into the microphone.

MR. AMODEO: Yes. Stand up here by this, yes.

THE COURT: Okay.

CROSS EXAMINATION

BY MR. AMODEO:

Q Debbie, to start with, you took a deposition

ten days or so ago?
A Yes.
Q Were you nervous at that deposition?
A Yes.
Q Did you -- are you still nervous today?
A Well, yes.
MR. TIMKO: Objection. Relevance.
MR. AMODEO: I'll get --
THE COURT: He's getting to it. Okay.
MR. AMODEO: Yes. All right.
BY MR. AMODEO:
Q Do you -- you live at Cape Crossing Resorts, is that correct, in a unit that was an IMQA Satori unit?
A Yes.
Q You've lived there for how long?
A It's been more than three years, probably closer to four. Again, I -- I don't remember when I -- I say escaped, when I escaped Orlando.
Q Have you, while you're living there, have you been effectively managing the IMQA Satori units as vacation rental properties?
A Yes.
Q During that time, were you asked by me to pay the utility bills on somebody else's units?
A Yes.

Q Have you done that?
A Yes.
Q How often?
A Incredibly a lot.
Q Describe the process that you go through to pay those units.
A I log on to the FPL site, if it's FPL, because they have a portal and it lists every unit with account numbers. So I go on the phone. As a matter of fact, my phone, I have them as one of my speed dials. Go through the prompts, enter the account information, how much is being submitted, card information, confirmation, verification, and repeat.
THE COURT: Were you doing that --
THE WITNESS: Repeat for each and every unit.
THE COURT: -- by phone?
THE WITNESS: By phone. Because there's no physical place to go where I'm at to go into. Like there's no FPL guest service office where I can go in and just pay it.
THE COURT: Okay. But you said --
THE WITNESS: Go online.
THE COURT: -- that you looked online and saw account numbers. So you couldn't pay online?
THE WITNESS: Oh, no. If it came out directly

from a -- like a checking account, but I was paying with the card. So, no, they didn't do it like that. I don't know if they do now, but they didn't at the time.

BY MR. AMODEO:

Q How did you pay those bills?

A One by one with the credit card.

Q Credit card from where?

A American Express.

Q What name is on the American Express card?

A IMQA, and my name. It has both, actually.

Q When there's problems with the unit, would Mr. Goldman call you?

A Not always himself. It would either be Brooke or one of his people that work there. And because I'm onsite, if they weren't, they had a report of, like, a maintenance person saying the ice machine is not working, we need to do this, and this is the estimate to get it replaced. Do you authorize this? And I would say, of course. It's been as severe as a washing machine at times. I mean, it varied.

Q Have you signed multiple documents for IMQA and CTO?

A Yes.

Q Have you had my advice on each and every one of those?

A Yes.

Q Your daughter is maybe going to Harvard Law School soon. Where did you send her to get advice about law school?

A To you.

MR. TIMKO: Objection. Relevance.

THE COURT: What is the relevance?

MR. AMODEO: The relevance is she gets my advice on lots of things, not just on the business.

THE COURT: Okay. All right. Well --

THE WITNESS: Yeah. I believe you asked me that, if people ask for my brother's advice, and I said, yeah, I send my children to my brother because it's very sound.

THE COURT: Okay.

BY MR. AMODEO:

Q Mr. Timko talked to you about a note back in June of 2023, and you said you don't remember the note. Can I refresh your memory?

MR. TIMKO: No.

MR. AMODEO: No?

THE COURT: Why not?

THE WITNESS: But, no, I remember -- okay.

MR. AMODEO: There's a real note that you've been asking for that shows she and Horton signed it.

MR. TIMKO: Well, she -- let me -- hold on.

THE COURT: Okay. Hold on. First of all, talk toward the microphone.

MR. AMODEO: Oh, yes. Sorry about that.

THE COURT: And you're addressing me and not Mr. Timko directly, please.

MR. TIMKO: IMQA and CTO were required to provide all of their exhibits under a court -- under an order of this Court, I think it's Docket 116, by January 31st --

THE COURT: He's just using this to refresh her recollection.

MR. TIMKO: But he's trying to ger the note in after I asked for it in discovery, after I asked for it and it wasn't provided, after it wasn't provided in the exhibits, after they both testified. He testified he never saw a signed note. She testified at her deposition, which I just went over, that she didn't recall signing a note.

THE WITNESS: That particular one.

MR. TIMKO: Now the day before the hearing, all of a sudden, out of nowhere, they're coming with a -- trying to prove the existence of a note. I hadn't seen the note. This is completely improper. It violates a court order, because he's essentially not representing

his interests. He's representing CTO's and IMQA's interests, which, again, is improper.

The exhibit wasn't filed seven days before the hearing, and he's subject to a state court order that says he's allowed to represent his interests. Frank Amodeo has an interest, a $400 claim, and his joinder. He's trying to represent CTO and IMQA rather than have his attorney to do it and do an end around. We don't know when that note was signed. It's just magically suddenly appeared.

THE COURT: Well, again --

MR. TIMKO: This is completely wrong.

THE COURT: Okay. He's using it to refresh her recollection. He's not seeking to admit it at this time. So let's -- you can go ahead and show it to her.

MR. TIMKO: Can I see a copy?

MR. AMODEO: Yes.

THE COURT: Yes. Oh, so you have a copy.

MR. AMODEO: Oh, I have copies.

THE WITNESS: May I move this? Well, you put the binder right there.

MR. AMODEO: Oh, yes.

THE WITNESS: Okay.

MR. AMODEO: Are all bankruptcy cases this fun?

THE COURT: No.

MR. TIMKO: And by the way, that's an improper use of refreshing recollection. He's supposed to -- he's required to recall of the fact is there something that you could see to refresh the fact and then the witness is supposed to say a specific document and then they bring it through.

THE WITNESS: Okay. If I had known that, I would have asked.

THE COURT: Well, they were talking about a note. I mean, what else? Okay.

MR. TIMKO: I'm just -- I'm just --

THE COURT: Okay.

MR. TIMKO: I'm just saying, Your Honor, because I see a stack of papers there, and I have a feeling this is going to continue.

MR. AMODEO: No, no. I've submitted all these, I've filed them this morning, Mr. Timko.

THE COURT: Okay. Why don't you just take it back and --

THE WITNESS: And I have to look at it?

MR. AMODEO: Let me give it to you.

THE COURT: Okay. Hold on. Just let counsel is going to take a look at it first, and then Mr. Amodeo will hand it back to you. I mean, we already know you haven't seen it before, so it's --

MR. TIMKO: Okay. It's docusigned, Your Honor. It's not even signed. So I --

THE COURT: Well, if they -- I think that's what Mr. Amodeo mentioned before, that it was docusigned, so.

MR. TIMKO: Okay.

THE COURT: Okay. All right. So let's hand the document to Mr. Amodeo and then proceed.

MR. TIMKO: Both been -– oh, I'm sorry, Your Honor.

BY MR. AMODEO:

Q Debbie, can you look at that, what the document is? Just read it, and don't mention it, and then look at your signature on the third page.

MR. TIMKO: Well, refresh your recollection. She looks at it, and then she testifies as to --

THE COURT: Okay.

MR. TIMKO: -– if it refreshes her recollection.

THE COURT: It's okay. Well, let Mr. Amodeo go ahead. Ms. Milotte, go ahead and look at the document and see if it refreshes your memory about this transaction.

Also, while Ms. Milotte's reading the document, I'm just letting the parties know, we have to be out of the courtroom by 4:45. So just keep that in mind.

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. So you --

THE WITNESS: That is my electronic signature. That's the font I've used.

THE COURT: All right. So, Mr. Amodeo, do you want to take that document back?

MR. AMODEO: Yes, I'll take that.

BY MR. AMODEO:

Q Debbie, has Homemakers ever paid you --

A No.

Q -- any money directly?

A My apologies. No.

Q Are you aware of any payment from Homemakers to IMQA investments Incorporated ever?

A No.

Q Are you aware of any money that came to IMQA Investments from Mr. Johnson?

A No.

MR. AMODEO: I'm done, Your Honor. Thank you.

THE COURT: Okay. All right. Any redirect or cross?

THE WITNESS: I'm so confused.

MR. TIMKO: No, Your Honor.

THE COURT: No. Okay, so. Okay, so you're done. You may step down, and you're excused. So you don't have to stick around. Okay.

THE WITNESS: Thank you.

MR. TIMKO: We're going to call Ken Dixon, Your Honor.

THE COURT: Okay. All right, Mr. Dixon, if you can come to the podium to be sworn in a second time.

COURTROOM DEPUTY: Raise your right hand.

Do you swear or affirm that the evidence you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

COURTROOM DEPUTY: Please state your full name for the record. Can you back up just a little bit?

THE COURT: Okay. Hold on. Yeah.

COURTROOM DEPUTY: Okay.

THE WITNESS: Kenneth G. Dixon. My address is 1485 Riviera Drive in Kissimmee, Florida, 34744.

COURTROOM DEPUTY: Okay. You can have a seat over there.

THE COURT: All right. Let's just give a second to make sure the setup will be -- all right.

All right. So, Mr. Dixon, you may have to speak up a little bit so that the -- there's minimal interference between that microphone and the headset that you have. So, okay. Okay. So let's see how it goes. Okay.

THEREUPON:

KENNETH G. DIXON

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. TIMKO:

Q Mr. Dixon, who are you appearing on behalf of?

A Crescent Sound Limited.

Q Okay. And is Crescent sound Limited the trustee of the Tiered, the Tiered Trust?

A Yes.

Q And is it your understanding that the Tiered Trust is the owner of Homemakers?

A Yes.

Q In your role, what is your role at Crescent Sound?

A I am the president of the general partner.

Q Okay. In your role as president of the general partner of the trustee of the Tiered Trust, do you have corporate authority to make decisions on behalf of Homemakers?

A Yes.

Q And are you appearing here today as the corporate representative for Homemakers?

A Yes.

Q Why are you testifying today?

A Primarily to contest the -- the bankruptcy proceeding with respect to the Homemakers.

Q Can you provide a brief, brief summary of your professional experience?

A I was a CPA with Price Waterhouse for 12 years, and then I've been in real estate development for the last 35 years, including development of apartments, single family homes, and real estate lending.

MR. KOSTO: Your Honor, I would like to object to there being a duplication of his prior testimony.

THE COURT: Okay. Well, I was going to say Mr. Dixon already gave his background before. We don't have to --

MR. TIMKO: Okay. All right.

THE COURT: I mean, he's got a lot of history and experience.

MR. TIMKO: Okay.

THE COURT: So I do recall that.

MR. TIMKO: Okay.

THE COURT: Okay.

BY MR. TIMKO:

Q In your experience, what types of documents would you need to see to know whether or not a debt is owed?

A Well, generally, I'd like to see a note. And ideally, bank statements that show the transfer of cash going in and out, and any other kind of loan agreements that might exist.

Q Would you ever rely just on someone's word that a debt is owed?

A No.

Q Would you rely solely on entries in a corporation's books and records to determine if a debt was owed?

A No.

Q Why not?

A Entries can be made in the books and records of a company that don't have support. So entries can be made up for whatever reason or erroneously input, but the real proof is is the supporting documents.

Q Are you aware that CTO Holdings is claiming it is owed a debt by Homemakers in the amount of $298,661.29?

A That's my understanding.

Q When did you first learn about CTO's claim?

A I think when they filed a proof of claim.

Q Do you dispute that CTO is a creditor of Homemakers?

A Not that I'm aware. I'm sorry, if I understood

the question.

Q Do you dispute that they are a creditor of Homemakers?

A Oh, I do.

Q Actually, do you mind -- oh, we had to move the --

A Right, because of the --

Q -- the microphone because of the ear.

A Because of my hearing aid.

THE COURT: Maybe let's move it like a little bit towards him.

MR. TIMKO: No, no, that's -- that's fine. I need to speak louder.

THE COURT: Okay.

BY MR. TIMKO:

Q Why do you dispute that CTO is a creditor of Homemakers?

A Because I haven't been, you know, during my ownership of Homemakers, I've never been presented with any documents to prove that an amount was owed to CTO.

Q Did CTO ever make a demand for repayment of the alleged loan to Homemakers?

A No.

Q Are you aware that IMQA also claims it is owed $360,459.40 for repayment of a loan?

A Yes. My understanding is they've filed a proof of claim.
Q Do you dispute that IMQA is a creditor of Homemakers?
A I do.
Q Why?
A Because, again, I've had no -- I don't have any support.
Q Okay.
A I've never seen any support for that liability, and I've never been asked to pay it, so.
Q And even if somebody presented you with a note, would you want to look at like bank statements and other items to make sure that that note was not repaid?
A Absolutely.
Q Do you have any relation with Pedixon LLC?
A I'm sorry.
Q I'm sorry, that's me again. Do you have any relation with the Pedixon LLC?
A With P.E. Dixon.
Q P.E. Dixon, I'm sorry.
A Yeah, P.E. Dixon. Yes, I'm the -- I'm the managing member.
Q And as the managing member, what is your role with P.E. Dixon?

A I approve all -- all loans. It's primarily a lender, and I negotiate and approve all -- all the loans.
Q Did P.E. Dixon -- did you through P.E. Dixon have any dealings with Homemakers?
A Through -- through Frank, yes.
THE COURT: You mean Mr. Amodeo, yes?
THE WITNESS: Yes. I'm sorry. I'm sorry.
THE COURT: Okay.
THE WITNESS: Excuse me. That's right.
THE COURT: I'm trying to keep the record.
THE WITNESS: Mr. Amodeo.
BY MR. TIMKO:
Q Do you recall Homemakers ever asking for money to close the purchase of condo units in June of 2023?
A I do.
Q Do you recall approximately how much money they asked for?
A They needed $350,000 but -- and I was assured I'd be paid back the next day.
Q Okay. And were those funds already held in a reserve?
A They were. There was a $2 million reserve that Frank wanted me to -- to set up so that he could see there was cash. I'm sorry, Mr. Amodeo.
THE COURT: That's okay.

THE WITNESS: That, that he could see there was cash available if he was able to -- to come up with a satisfactory secured loan.

So we put up the $2 million, and it was held in escrow, subject to finding a suitable loan.

BY MR. TIMKO:

Q Can you -- all right. So Volume 2 of my exhibits, turn to Tab 48. If you have trouble finding it, I can walk right over.

A Volume 2. Okay. What tab was that?

Q 48.

A Okay.

Q Okay. Do you see the disbursement or the transaction balance on the second page of that exhibit? It says up on the top June 2023 transactions balance.

A Yes.

Q Okay. Have you seen this document before?

A It's vaguely familiar to me. I didn't prepare it, but I seem to have seen it at some point.

Q Okay. And if you go down in the disbursements category, you see where it says 6/14/2023?

A Yes.

MR. KOSTO: Objection, Your Honor. Foundation. He's got no personal knowledge of this document. I think it's improper for him to be testifying from it.

THE COURT: I'll overrule it. Go ahead.
MR. TIMKO: Okay.
BY MR. TIMKO:
Q You see where it says $347,482.40 acquisition funds Anidar units?
A Yes.
Q Was that the repayment of the money you provided to Homemakers to close the condo sale?
A It appears to be. On 6/14, I provided the almost 350,000, and then one day later, on 6/15, it was repaid.
Q Okay. And then if you go down to the bottom of the page, it says reserve funds to be held in trust, it says $200,000. Is that the reserve that you were referring to?
THE COURT: Are you talking about two million?
MR. TIMKO: Yeah, the two million dollars
THE WITNESS: Oh, two million.
MR. TIMKO: I'm sorry. What did I say?
THE COURT: You said 200,000.
MR. TIMKO: Oh, sorry. Getting tired, Judge.
THE COURT: Okay.
THE WITNESS: Yeah. That's -- that's the reserve money.
BY MR. TIMKO:

Q Right. And that shows -- and that shows that the reserve was fully reimbursed, correct?

A Correct.

Q Okay.

MR. TIMKO: No further questions.

THE COURT: Okay. Mr. Amodeo, are you -- is this about your -- you know what Mr. Timko --

MR. AMODEO: Certainly, it's my personal interest to be sure this bankruptcy survives so I can get my $394 back, Your Honor.

THE COURT: Okay.

MR. TIMKO: Your Honor, I don't find this funny.

MR. AMODEO: I bet.

CROSS EXAMINATION

BY MR. AMODEO:

Q Hi, Ken. I'll call you Mr. Dixon to make sure the record's clear. I'm going to go in reverse order. It won't be long, I promise.

The last thing you said when you went through the exhibit that's still in front of you, I believe, is that you did receive back your money that was taken out of the proof of funds account. I know you like show and tell better, but proof of funds is probably best.

THE COURT: Okay. Remember talk into the mic if possible?

MR. AMODEO: Oh, okay.
BY MR. AMODEO:
Q So you have been repaid that money?
A Yes.
Q That money went back in?
A Yes.
Q You are not IMQA Investments?
A I'm not IMQA investments.
Q You didn't give me the $350,000 that was due. You just kept it in the show and tell account.
A Right.
Q Thank you.
You are a CPA and I would say of exceptional grade. I'll say that and I hope you'll accept that acknowledgment.
A I accept it.
Q Good. So if you have a tax return that you were preparing for a client and you would include on it Schedule L and M, and L and M is the means by which a tax return -- well, why don't you tell me what the schedule L and M means for a tax return?
MR. TIMKO: Objection. Relevance.
THE COURT: It's outside the scope.
MR. TIMKO: Outside the scope.
MR. AMODEO: I'm going to -- it's -- okay. Then

I'll be direct because I prefer direct instead of the nonsense anyway.

BY MR. AMODEO:

Q Doesn't L and M allow an accounting firm to reconcile a book -- the normal books and records of a company with the tax return?

A That's exactly what it does.

MR. TIMKO: Objection. Relevance.

MR. AMODEO: The relevance is the $350,000 has to be correct or Geller Ragans wouldn't have signed that tax return. They know that those financial statements are correct. They would have relied upon --

MR. TIMKO: Objection. Argument.

THE COURT: Okay.

MR. AMODEO: All right.

THE COURT: You can save that for argument.

MR. AMODEO: I'll save that for argument.

THE COURT: Okay.

BY MR. AMODEO:

Q Geller Ragans is a good law -- accounting firm, right?

A As far as I know.

Q Thank you. Now you said you owned Homemakers. When did you get ownership of Homemakers?

A I don't remember the date. I did -- if

somebody will refresh my memory, I would see where -- where --

Q September of 2023?

A I think that sounds right.

Q Like in my kitchen?

A Okay.

Q Yeah. The Tiered Land Trust, who owns the Tiered Land Trust?

MR. TIMKO: Objection. We're going into trust issues now again. Outside the scope.

MR. AMODEO: He's here as the trustee of the land trust.

THE COURT: Well, right. But we weren't talking about the --

MR. TIMKO: I was just establishing his role as the corporate representative and why he is -- and if he had personal knowledge.

MR. AMODEO: And if -- oh.

MR. TIMKO: I did not ask about the trust. And we also said we were not going to address trust issues today.

MR. AMODEO: Well, if I get -- don't want to get into the law, Your Honor, but under Florida law, the trustee has to obey the beneficiaries. They have no discretion.

MR. TIMKO: Again, that's for state court, Your Honor.

THE COURT: That's -- that's outside the scope.

MR. AMODEO: Okay.

BY MR. AMODEO:

Q Are you the -- do you -- are you the decision maker inside of Crescent Sound?

A Yes.

Q And Crescent Sound became the trustee of the Tiered Land Trust when?

MR. TIMKO: Objection. Scope.

THE WITNESS: I think it's the September --

MR. AMODEO: September 2023.

THE COURT: Well, it was the foundation of when he -- when it was, so it's already been asked.

BY MR. AMODEO:

Q And is it that position that gives you control of Homemakers?

A Yes.

Q When was the documentation filed that made Crescent Sound trustee of the land trust?

MR. TIMKO: Objection. Scope.

THE COURT: Okay. Sustained.

THE WITNESS: I assume --

BY MR. AMODEO:

Q You don't have to answer, Ken.
A Oh, I'm sorry.
Q My point's being made.
Did you realize that the -- did you as trustee realize you never had -- you never filed a trustee's deed that would create the land trust?

MR. TIMKO: Objection. Scope.

THE COURT: Okay. Sustained.

MR. AMODEO: Okay. Thank you, Ken.

THE COURT: Nice try, Mr. Amodeo. Okay.

MR. AMODEO: I'm done, Your Honor. I'll turn it over to the other creditors.

THE COURT: Okay. Mr. Kosto.

MR. LEIBERT: Are you going to let me ask him why he's not at his registered agent address and he's dodging service.

MR. TIMKO: Objection. Relevance.

MR. LEIBERT: Okay.

THE COURT: Okay.

MR. TIMKO: He's right here.

THE COURT: And, Mr. Kosto, did you --

MR. KOSTO: In addition to the --

THE COURT: Okay. Hold on. Remember, only address the Court here, not each other.

MR. KOSTO: Nothing for this witness, Your

Honor.

THE COURT: All right. So any redirect?

MR. TIMKO: No, Your Honor, and those are all my witnesses.

THE COURT: Okay. All right. You may step down Mr. Dixon.

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. So, Mr. Kosto, or Mr. Leibert, did you have anyone else you wanted to call? I know you had already called Ms. Adams. I don't know if there was anyone else that was disclosed.

MR. KOSTO: I would call Mr. Johnson. But before I do, Your Honor, I would like to move for a directed verdict. There's been no showing of --

THE COURT: Okay. Come up.

MR. KOSTO: There's been no showing of bad faith whatsoever. You know, the only testimony is that the purpose of the bankruptcy was to prevent Mr. Dixon from taking all the money and being the only person and creditor receiving any money from -– from the operations of the business -- of the properties. There's been not a scintilla of evidence of bad faith, and I ask Your Honor to, on the issue of bad faith, grant directed verdict.

THE COURT: Okay. Well, Mr. Timko, I'm sure you don't agree but.

MR. TIMKO: Yeah, I greatly don't agree.

THE COURT: Okay.

MR. TIMKO: The standard for bad faith, under the Eleventh Circuit, there's three tests; improper purpose test, motivated by ill will, malice, or embarrassing or harassing a creditor. I'm sorry, improper use test, whether or not you're using the bankruptcy filing for an improper purpose. And then the third test analyzes bad faith in line with Bankruptcy Rule 9011, and objective review of the legal justification of the claims, and a subjective inquiry as to whether the bankruptcy was filed for an improper purpose.

I can give my closing, if you'd like, because that's -- that's going to address essentially all of those things.

THE COURT: Okay. But you're saying based upon.

MR. TIMKO: Based upon the fact that none of these creditors even had provable claims shows bad faith.

If you'll recall, CTO had a deal with Mr. Johnson. There's been no signed promissory notes or anything like that or loan agreements in evidence. They have not been able to prove specific amounts or expenses or items that they paid for any of the units.

With respect to numerosity, they admit that

there's 22 creditors, but they don't -- and they say they're secured, but they don't specify how. And I have case law, which I can bring up in my closing later, but there's case law saying that if you don't -- they had the burden on both of these issues. They came to this Court without proof of their claims, all five of them. Then there's their actions during the bankruptcy case, Your Honor, filing claims.

Mr. Johnson filed his claim the day before a hearing. Mr. Amodeo filed IMQA and CTO the week before the hearing. We had to have this hearing because even though they were fully aware of the bankruptcy case the entire time, they didn't bother to file their claims beforehand. And the idea that the testimony was only to reorganize the company is just false.

Mr. Amodeo specifically said he realized he needed more claims to participate in this case. And that's why -- and that's when he went to Ms. Milotte, and they filed the -- they filed the joinders.

You also have all the filings in the case. They say that there's no bad faith, we get along great with Mr. Dixon. And, yeah, on a personal level they seem to. But read their filings. They've charged -- they've claimed that this man forged -- that his company forged documents. They claim that -- I mean, he's been -- he's

been --

THE COURT: So are you making your closing then?

MR. TIMKO: No, I'm not. But I'm just saying that there's plenty of evidence before the Court to deny directed evidence.

THE COURT: Okay. All right. So I'm going to deny the directed verdict. How do you all want to proceed? Do you want to take a few minutes and --

MR. KOSTO: I would like to call Mr. Johnson.

THE COURT: Oh, you do? Okay. All right. So any objection, Mr. Timko, to calling Mr. Johnson?

MR. TIMKO: No.

THE COURT: Okay. All right. So, Mr. Johnson, why don't you come to the podium to be sworn in?

COURTROOM DEPUTY: Raise your right hand.

Do you swear or affirm that the evidence you are about to give will be the truth, the whole truth, nothing but the truth?

THE WITNESS: Yes.

COURTROOM DEPUTY: Please state your full name and address for the record.

THE WITNESS: Horton Johnson, 2523 Kissam Court, Belle Isle, Florida.

COURTROOM DEPUTY: Okay. Have a seat.

MR. KOSTO: Save you some time.

THE COURT: Okay. So you're pushing the witness to get to a particular exhibit you want to discuss?

MR. KOSTO: Yes, Your Honor.

THE COURT: Okay.

MR. TIMKO: What exhibit?

THE COURT: Want to tell us what it is so we can turn there, too?

MR. KOSTO: Sure. It's the Geller Ragans Exhibit 6 to Exhibit 2.

THE COURT: Which set? The first set or the second set?

MR. KOSTO: Second set.

MR. TIMKO: Are we in the proof of claim?

MR. KOSTO: Yes.

THE COURT: Exhibit --

MR. TIMKO: Second set, 2-6, you're saying?

MR. KOSTO: Yes.

THEREUPON:

HORTON JOHNSON

having been first duly sworn, was examined and testified as followed:

DIRECT EXAMINATION

BY MR. KOSTO:

Q Are you familiar with this tax return?

A Yes, I am.

Q Is this the 2023 tax return for Homemakers?

A No. 2024, I believe. Isn't it? Oh, I'm sorry, you're right. I was looking at the date of the letter there.

Q And were you in charge of Homemakers during that time frame?

A I -- yes.

THE COURT: When you say that time frame, are you referring to calendar year 2023?

MR. KOSTO: Yes.

THE COURT: Okay.

BY MR. KOSTO:

Q The tax year 2023.

A Yes.

Q Okay. Before I get into that, are you familiar with the promissory note related to the IMQA option agreement?

MR. TIMKO: All the same objections, Your Honor. agreement?

THE COURT: Hold on. There's an objection. Mr. Kosto, why do you get to try to introduce this note that was not produced in discovery?

MR. KOSTO: Your Honor, I'm not introducing the note. I'm asking him whether he's familiar with it.

THE COURT: Okay. Well, it looked like you were

approaching him with it.

MR. KOSTO: Oh, I was going to ask him to look at it, if he could look at it.

MR. TIMKO: Well --

THE WITNESS: I don't even need to look at it. I -- I know, I know what it is.

MR. KOSTO: Okay.

THE COURT: Okay. So then why don't you just him the question.

MR. KOSTO: Okay.

BY MR. KOSTO:

Q Are you familiar with the promissory note?

A Yes.

Q Did you execute the promissory note?

A Yes.

THE COURT: Okay. Who is this promissory note between? Between --

THE WITNESS: Between Homemakers and IMQA.

THE COURT: Okay. So it's a note from Homemakers to IMQA?

THE WITNESS: Homemakers owed IMQA, yes.

BY MR. KOSTO:

Q Okay. So it's for $342,482.40, correct?

A Yes.

Q And that's related to the option agreement?

MR. TIMKO: Your Honor, he's leading.
THE COURT: Sustained.
BY MR. KOSTO:
Q Okay. Tell us how this note came about.
A It was a complex situation that I didn't fully understand. But there was a couple of units that Homemakers wanted to purchase. It was actually owned by a company named Anidar, and Anidar wanted to sell, but IMQA had the option to purchase those units. So IMQA purchased them and then pretty much immediately sold them to Homemakers. The difference between what was financed by Mainstreet Bank and the purchase price was the amount of the note.
Q Okay. So this is sort of, for lack of better words, a discount that Homemakers received by virtue of the option price on the purchase price.
MR. TIMKO: Objection. Leading.
THE WITNESS: Confusing. Probably more of a --
THE COURT: Okay.
THE WITNESS -- discount that IMQA received because they had the option and then sold it to Homemakers.
BY MR. KOSTO:
Q Okay. And so Homemakers obligated themselves to pay IMQA $342,482, correct?

A Yes.
Q Has any of that money been repaid?
A No.
Q Is that money that's been on the balance sheets and tax returns carried on the balance sheet and tax returns for Homemakers for 2023?
A I believe so, yes.
Q And is it on the balance sheet and tax records for 2024?
A I believe so, yes.
Q Okay.
MR. KOSTO: Nothing further, Your Honor.

CROSS EXAMINATION

BY MR. TIMKO:
Q Mr. Johnson, you didn't physically execute that note, did you? It's docusigned, correct?
A Well, you have to physically operate the computer to docusign it.
Q Okay. But you didn't actually sit down and put your wet signature on that note, did you?
A Obviously not that, but I obviously did do the docusign.
Q And neither did Ms. Milotte, did she?
A She docusigned it and I wasn't with her.
Q Were you in person or was there an email?

A I don't understand the question.
Q Was the document emailed to you?
A By docusign.
Q Okay. Do you have a copy of that email?
A That's it? That's all -- that's all docusign sends. Haven't you ever done a docusign signature?
Q I'm asking if you have the doc -- if you have the email from docusign dated in whenever you're claiming you signed this note.
A From what I understand, as soon as you click on it, you authorize the signature, hit the go button.
Q So you don't have any evidence that this note was actually signed in 2023, do you?
A I signed it.
Q But you don't have any -- there's no -- there's no -- no writing, no email. You don't have the docusign email. You don't have the submittal email that you receive from docusign to show that, do you?
A As far as I know, those disappear pretty much right after you sign them.
Q Your email just disappears.
A Doesn't it? I don't know. I'm not all that adept with technology. But docusign sends you the electronic thing, walks you through those steps that I just talked about, and you hit the -- the send button.

Q Can you turn to the Exhibit 6? I'm looking at I guess it was -- oh, I'm sorry, 2-6.

A I don't know what that means.

Q It was the first tax return that you looked at attached to the proof of claim. So it's in the IMQA side.

A I don't know what the IMQA side is.

MR. TIMKO: All right. Let me -- may I approach?

THE COURT: Yeah, it's the same document we were looking at.

MR. TIMKO: Same document that we were looking at before.

THE WITNESS: Oh, okay. Sorry, I flipped the page, so I'm lost.

MR. TIMKO: Yeah, I know. It's -- it's not -- oh, wow, I turned pretty close. There you go. We're good. There you go.

BY MR. TIMKO:

Q Can you tell me specifically where in this tax return it says that there's a $342,000 note, loan note?

A No.

Q Okay. With respect to -- was it Exhibit 7 was the next tax return?

Can you tell me in any of the tax returns that

you reviewed today specifically where it references a $342,000 note?

A Quite honestly, accounting is not my forte.

Q Okay.

A But I know that that information was on the financials that were submitted to Geller Ragans.

Q Okay.

MR. TIMKO: No further questions, Your Honor.

THE COURT: Any redirect, Mr. Kosto?

MR. KOSTO: Yes.

REDIRECT EXAMINATION

BY MR. KOSTO:

Q Are you still involved with the taxes for Homemakers?

MR. TIMKO: This goes beyond the scope of my cross.

THE WITNESS: Yes.

MR. TIMKO: Objection.

MR. KOSTO: Sorry?

THE COURT: Mr. Kosto, any response?

MR. TIMKO: Goes beyond -- objection. It goes beyond the scope of my cross.

MR. KOSTO: It goes to his personal knowledge of the taxes and --

MR. TIMKO: Well, you should have asked him on

direct.

THE COURT: Okay. But what's the relevance of his continued involvement with the tax returns anyway?

MR. KOSTO: Well, number one, to authenticate the balance sheet attached to Exhibit 2.

MR. TIMKO: He didn't -- he didn't ask these questions in his direct.

THE COURT: He didn't. Yeah, you didn't ask that before.

THE COURT: Okay. I'm sustaining the objection.

MR. TIMKO: Thank you.

THE COURT: Okay.

MR. KOSTO: Okay. Nothing further, Your Honor.

THE COURT: Okay. All right. So, Mr. Johnson, you can -- oh.

MR. AMODEO: I've got a procedural issue.

THE COURT: What's the --

MR. AMODEO: I was not able to like buy bread the last time I was before the Court. I'm joking, Your Honor, I'm sorry. I would like to ask Mr. Johnson some questions I couldn't ask him last time.

THE COURT: But you had -- counsel was here.

MR. AMODEO: I didn't have counsel. Remember, that was the problem. I was by myself.

THE COURT: But the guardians were here and they

had counsel.

MR. AMODEO: They're not lawyers. The guardians' attorney left.

MR. TIMKO: The guardians are supposed to -- even if he appears pro se, his guardians represent him. The guardians were here to act on his behalf.

I specifically asked if they were going to ask questions, Your Honor, and act in Mr. Amodeo's stead, and they said no. So that, that ship has passed.

THE COURT: Okay. So any response?

MR. AMODEO: I've had no notice, Your Honor. Due process requires notice and reasonable opportunity.

THE COURT: You've had no notice of what?

MR. AMODEO: Of my being able to ask questions. I've not been allowed to do so pro se.

THE COURT: Well, you've had -- okay. No, denied.

MR. AMODEO: Denied, okay.

THE COURT: So I'll sustain the objection.

MR. AMODEO: Well, then let me perfect for the record that I have, you know, only appearing today for the first time officially.

THE COURT: Okay.

MR. AMODEO: So...

THE COURT: Okay. All right. So then, are we

ready for a closing? Do you want to take a ten minute break?

MR. TIMKO: Yeah. Do you -- how do you want to do closing, closing and abstention? Do you want us to have those as one argument or do you want to do them both separately?

THE COURT: Okay. Hold on. Let's let Mr. Johnson step down.

THE WITNESS: Yeah, we're done?

THE COURT: You can go ahead. I'm sorry.

THE WITNESS: Thank you.

THE COURT: I didn't mean to keep you there. I mean, you should probably address it altogether.

MR. TIMKO: Address it altogether? Okay. That's -- yeah.

THE COURT: Yeah. I mean, to the extent the arguments overlap, I mean.

MR. TIMKO: Yeah. Well, that's what I was kind of thinking.

MR. LEIBERT: Your Honor, we did the closing arguments as to bad faith as to Mr. Johnson last time we were here.

THE COURT: Um-hum.

MR. LEIBERT: So we're not going to revisit that.

THE COURT: Yeah, you don't need to repeat. So it's just a matter of the -- for CTO and IMQA, and then the other issues regarding the creditors, the existence of creditors.

MR. TIMKO: I may -- I may refer to some facts from the prior hearing but I --

THE COURT: Yeah, that's fine.

MR. TIMKO: -- I'm making my argument as to CTO and IMQA.

THE COURT: Okay. All right. Well, do you want a few minutes to gather your thoughts, or are you ready to go?

MR. TIMKO: I'll take a couple minutes if I could. That would be great.

THE COURT: Okay. All right. So why don't we just take like another -- do you guys want --

MR. TIMKO: Like five minutes?

THE COURT: Okay. Is five minutes enough?

MR. KOSTO: Yes, Your Honor.

THE COURT: All right. So let's take a five minute break, and we'll be back.

COURTROOM DEPUTY: All rise.

(Thereupon, a brief recess was taken, after which the following proceedings were had)

COURTROOM DEPUTY: All rise. Court is back in

session.

THE COURT: Okay. Please be seated.

Okay. So are we ready for closing?

MR. TIMKO: Yes.

THE COURT: Okay. So then I'm going to expect the parties to address both like the motion to dismiss and the abstention and anything else that's relevant.

MR. TIMKO: I was trying to figure out how to combine these.

THE COURT: However you want to do it.

MR. TIMKO: I didn't do a very good job, so I'm just going to --

THE COURT: You can't take it. Yes.

MR. TIMKO: Okay.

MR. LEIBERT: Your Honor, is the abstention motion on the docket today?

MR. TIMKO: Yes, it is.

THE COURT: It -- it wasn't his motion per se. I addressed it in my order setting the hearing.

MR. TIMKO: And I believe that the motion was put on as well today.

THE COURT: Oh, okay. So technically it is, yeah.

MR. TIMKO: Well, yeah, the --

THE COURT: Yeah, it's on.

MR. TIMKO: -- the scheduling order raised the issue.

THE COURT: Okay.

MR. TIMKO: Okay. So the Eleventh, going back to my argument five minutes ago, the Eleventh Circuit has held there are three tests that may be utilized to determine if an involuntary petition is filed in bad faith.

The first is the improper purpose test where the filing is motivated by ill will, malice, or purpose of embarrassing or harass -– or harassing of the debtor. The second test is known as the improper use test where a creditor’s actions amount to an improper use of the bankruptcy code. And the third test analyzes bad faith in line with Bankruptcy 9011, and that test includes an objective review of the legal justification of the claim and a subjective inquiry as to whether the bankruptcy was filed for an improper purpose. And that’s the General Trading case, 119 F.3d 1485.

Now, first, the petitioning creditors have the burden to show that their debts are not subject to a bona fide dispute, and this is important, very important, in the context of an involuntary bankruptcy, Your Honor. And to determine bad faith, we must look at the petitioning creditor’s claims and whether they’re

actually factually and legally supported -- supportable as one of the aspects of bad faith.

An involuntary petition is an extreme remedy with serious consequences to an alleged debtor. And that’s the Professional Services case, 335 B.R. 221.

Due to the nature of the involuntary bankruptcy petition, Section 303 of the bankruptcy code places specific burdens on the petitioning creditors in order to obtain an order for relief. And that first burden is that the petitioning creditor has the burden to show that their claim is not subject to a bona fid dispute. And a determination of whether a claim is subject to a bona fide dispute requires only a determination of whether there exists a genuine issue of material fact that bears upon the debtor’s liability of a meritorious contention as to the law as to undisputed facts. That’s the Ballato case, 252 B.R. 553.

The Court, when applying this test, need not resolve the dispute, but must only ascertain its presence or absence. And that’s Manhattan Industries, 224 B.R. 195.

Now normally when involuntary petitions are filed, the creditors that come forward are, you know, they’re trade creditors with very easy, specific claims. Here’s an invoice. I didn’t get paid. In my practice,

I've only filed one involuntary due to this -- due to this burden.

Creditors generally have clear documentation. That is certainly not the case here, Your Honor. Not a single petitioning creditor, including CTO and IMQA, has a signed promissory note in evidence, a signed loan agreement, or even really submitted clear documents to support their claims that they paid expenses or other things, such as bank statements, credit card statements. There's no tracing that the payments they allegedly made went in fact to Homemakers, to Homemakers condominiums. We know IMQA owned other condominiums. We don't know really -- there's no evidence here really specifically as to the amounts of those debts. We don't know what the expenses were. We really don't know anything as to specifically what was funded other than, yeah, sometimes we pay them. That is their case. Yeah, sometimes we pay them.

And, if you look at the papers, which they weren't able to get into evidence, but if you look at a lot of the payments, they're after July 1st, 2025, and we have testimony from Beachside with a very good summary, which is something you would expect a petitioning creditor to have, going through all the payments and where they went. To the extent those payments overlap,

they, you know, they likely didn't make them. I couldn't even go back through their documents and compare them to the summary and figure out which payment went to which, because those payments were meticulously done unit by unit. They don't even mention the units that were paid. It was -- it was after about a half hour I gave up.

Now at the first hearing, Tiered Capital, Mr. Johnson and Mr. Amodeo did not present evidence to support their claims. And we went through it, and there was substantial evidence that they didn't have claims at all. Today -- and we also know that all of these individuals were working together. We know that Mr. Johnson was the vice president of CTO. We know that Mr. Amodeo, even though he wasn't the president and the owner of CTO and IMQA, was very involved in the businesses. We know that Mrs. Milotte wasn't involved in any of the transactions other than paying the utility payments, which Mr. Amodeo admitted was not his responsibility. We know that Mr. Flynn emailed Ms. Milotte the proofs of claims to file on behalf of Mr. Amodeo.

So we also know that they were all talking. They were -- they were all involved in the first bankruptcy case. They were all involved with the filing, and they were all involved with the filing of this bankruptcy case.

With respect to CTO's claim -- so we really have to look at all of their actions together, and that's where I may refer to some of the prior -– prior things. With respect to CTO's claims, it was not included in the prior schedules in the first bankruptcy case. There is no written agreement. It was not included in Mr. Johnson's affidavit consenting to the bankruptcy case on behalf of Homemakers, even though Mr. Amodeo assisted him with that affidavit. Further, Mr. Amodeo testified that Mr. Johnson borrowed money from CTO allegedly to make payments for Homemakers. So the debt is really between CTO and Johnson, not Homemakers and CTO.

There's, again, no evidence of any agreement between CTO and Homemakers at all. There's no written evidence that the loans occurred or direct evidence that the funds they claim were used for Homemakers were actually paid towards Homemakers' units. To the extent they were paid to the Mainstreet loan, Mr. Johnson guaranteed that loan and was paying essentially off his own debt and trying to avoid liability under that guarantee. Clearly, there is a dispute, a genuine dispute as to the existence of the debt, let alone just maybe around the edges regarding the amount. This debt does not exist with respect to CTO and Homemakers.

With respect to IMQA, there's no signed

promissory note in evidence relating to the alleged $342,000 loan. It wasn't for my lack of trying. I -- they were required to provide their exhibits on the 31st. They didn't provide an unsigned or signed promissory note. You allowed me to do discovery. I asked for all documents supporting their claim. I never received a signed promissory note. Mr. Amodeo acknowledged that. At no point was I aware of a signed promissory note, an alleged signed promissory note, until Mr. Amodeo suddenly got his order that he could participate and be here today. And that promissory note is signed by docusign, not by actually wet signatures. And at their depositions, Mr. Amodeo testified he had never seen -- he had never seen a signed promissory note, and Ms. Milotte couldn't recall signing a note. And she testified that she would have recalled seeing such a note, signing such a note.

They claim that that loan was made to close a transaction to purchase the Anidar units to pay for IMQA's option fee, and that around $350,000 was necessary to close that loan. But according to the disbursement summary, which was their exhibit, the $350,000 was paid. It shows $350,000 being paid by the buyer from the -- from the purchase funds. I'm sorry, that was the ALTA Statement, Exhibit 47. Then we see the disbursement

schedule and we see the option fee appears in the disbursement schedule within a couple of days, and on that document, we see $347,000 was paid to IMQA.

Now when I deposed Mr. Amodeo, he couldn't remember why those payments were made. Today, he suddenly did. And he was the corporate representative, it was one of their exhibits, and he was required to prepare for that deposition.

So it appears there's at least a very colorful argument that the option fee was, in fact, likely repaid. And we have testimony from Mr. Dixon that it was actually Mr. Dixon with P.E. Dixon that he actually made $350,000 available to close that transaction in the first place. Presumably, that was the $350,000 they needed to close that transaction. So there's two ways that this was resolved. Again, there's a very genuine dispute of material facts regarding that loan.

With respect to the expenses IMQA alleged were paid on Homemakers' behalf, we have Ms. Milotte's testimony that she would not use Homemakers' funds to pay those expenses during her deposition. I'm sorry, she would only use Homemakers' funds to pay those expenses, not IMQA's. They also have no real documentary evidence that supports those claims. Again, no bank records, no receipts, really nothing. We don't even know if now, and

again, there's no loan agreement related to the repayment of those expenses. All they rely on is self-serving documents that they prepared, such as an unauthenticated -- such as a balance sheet or Quickbooks that they prepared. But they prepared them. They're self-serving and they're hearsay. Certainly IMQA's claims are subject to a dispute.

Now, but not only did they not meet their burden -- further with respect to expenses, okay, and again, IMQA also claims various payments made after July 1st, 2025 and payments paid after the petition date. We have Beachside's testimony that they were paying those amounts, and payments made after the petition date are not -- are not to be considered. So not only did they not meet their burden, their claims were so easily contestable and have so little support, you cannot claim that they were asserted in good faith when you -- when you take into account the high standard of Section 303. But then, you have to take that into account with the purpose of the joinders of CTO and IMQA.

Johnson, Flynn, and Mr. Amodeo all testified that they wanted to litigate the ownership and control of Homemakers in this bankruptcy case. They tried to do it today. You've already issued multiple orders on that issue. I don't know how many filings are on the docket

at this point. It's probably over a dozen. That's clearly what they've been trying to do this time, the entire time.

None of the petitioning creditors filed any objection to Mainstreet's relief from stay motion or put up any real obstacle to that relief. Now let's think about that for a moment.

MR. KOSTO: Your Honor, I object. It's not --

MR. TIMKO: It's record of the case, Your Honor.

MR. KOSTO: It's not -– there's not testimony in this case.

THE COURT: This is a closing argument. He's --

MR. KOSTO: But it's not evidence it was presented today, Your Honor, or the other day.

MR. TIMKO: It's -– it's --

MR. KOSTO: It's just not proper.

MR. TIMKO: It's on the record, Your Honor.

THE COURT: I can take judicial notice of the stay relief.

MR. TIMKO: Okay.

THE COURT: Okay.

MR. TIMKO: By not taking a position, this established that this case was not really about reorganization at all. The condos are the only asset, other than a $2,000 Kubota tractor, of the estate. I

expected the creditors would reach out and try to work together with respect to Mainstreet. I expected them to be jumping out of their seats over the stay relief, but they didn't. They just let it go. I stood here, made the best argument I could under the circumstances.

Mr. Johnson offered to pay for a trustee, but he didn't offer to pay for adequate protection payments. In fact, what they did, and the testimony shows, they said they wanted to take control of Homemakers by having a -- the trustee, by having a trustee, a bankruptcy trustee appointed. And at that hearing, that's what they argued for. They argued to have a trustee appointed and make Mainstreet pay for it without Mainstreet's consent to the use of its cash collateral.

The joinders of CTO and IMQA were also strategic and not meant to afford a reorganization or repayment of debt. They were filed after the first evidentiary hearing was scheduled. And if you recall, we continued that hearing thinking that we might be able to have settlement conferences. Multiple state court complaints were filed just before the conferences and before any counteroffer by petitioning creditors were made. So apparently the settlement conference was just a ruse for a continuance. We addressed that at the last hearing.

After the settlement conference and after a hearing where Mr. Amodeo announced that he was going to bring in petitioning creditors, this Court was required to enter an order to setting a date, a bar date, for petitioning creditors and requiring that their exhibits be provided by January 31st, which was a Saturday, and to give me a chance to do some discovery, which is why we’re here today. I was ready to go with the first three. Actually, I was ready to go back in November with the first petitioning creditor.

Mr. Johnson and Mr. Amodeo filed their joinders either the day before -– well, Mr. Johnson filed his the day before the first evidentiary hearing that was continued, and Mr. Amodeo was a few days before that. So CTO ad IMQA joined a week before the hearing, the February 3rd hearing. And we have testimony from Mr. Amodeo that the reason he did that was he was afraid he was not going to be able to participate in these proceedings. And we know Mr. Amodeo really wanted to participate in his proceedings because CTO and IMQA chose someone subject to a guardianship order that can’t sign contracts, can’t take loans, can’t litigate to be their corporate representative, rather than preparing the president and owner of both of those companies or someone else at those companies to testify. Today was all about

Mr. Amodeo being able to participate. That's what today was.

We also know the late -- the joinders were not due to lack of joinder of the proceedings, the lack of knowledge of the proceedings. Mr. Amodeo has been involved throughout, going all the way back to the first bankruptcy case, and he confirmed that CTO and IMQA were aware of the case from the very beginning, were aware of the motion to dismiss, and were aware of numerosity issues. As made clear on the docket -- and, well, and then after they filed their joinders, then they kept filing more and more motions to disqualify me, to litigate the issues regarding the trust, to litigate corporate control of -- of --

MR. LEIBERT: Your Honor, I object. You wouldn't let us do it. You wouldn't let us explain why. So why should he be able to argue it --

THE COURT: Okay. You can address it in --

MR. LEIBERT: -- against us?

THE COURT: Okay. You can address it in your closing.

MR. TIMKO: So the docket is pretty clear that they kept trying to bring these issues in front of the Court. They just kept trying to bring them. Every hearing they kept trying to bring these issues. The

Court would say, no, we're not dealing with that. No, the scheduling order says this. The Court set parameters. Those demonstrative aids are evidence of what this case is truly about. They want -- after this Court said, you need an adversary proceeding or a state court proceeding to litigate these issues and put it in one of the Court's last orders, they still filed motions and tried to do it today, through motion practice, without full discovery and the full protections. Again, all of those things are an improper purpose for a bankruptcy case.

With respect to numerosity, bad faith can be measured -– I'm quoting a case here. Bad faith can be measured by what the petitioning creditor knew or should have known about the number of the debtor's creditors at the time of the filing of the petition, unquote. That's the Smith case, 243 B.R. 169. And it's the petitioning creditor's duty and burden to meet that requirement.

We heard testimony from Mr. Johnson and we've seen his affidavit where there are multiple creditors of the estate included in that affidavit. And that's not including four of the petitioning creditors. We also have Mr. Amodeo's testimony that there's, I don't know, 22 creditors of the estate. Now they claim, however, that most of the creditors are secured creditors.

However, that does not fulfill their burden.

We heard testimony that Mr. Dixon -- that the condos were worth approximately $300,000-ish each, which if multiplied by 17 is approximately what Mainstreet's debt would be. Mr. Johnson testified at the first hearing that the value of the condos was depressed. It is also not in dispute that there are significant tax claims and that there are significant association claims. In fact, Mr. Amodeo, when pointing to a claim that was, I believe, $326,000, that he's like, oh, double that amount. So $600,000?

Now courts have held that to the extent a secured creditor is not fully secured, the unsecured portion of their claim qualifies for the purposes of a petitioning creditor. I'll give you a site for that. I have the case with me if you'd like to see it. It's Judge Specie's opinion in In re: Bos, 561 B.R. 868, and she made that decision in 2016.

CTO and IMQA have not presented any reliable evidence of the value of the condos. Nowhere have they addressed whether any of these partially secured creditors will qualify under Section 303. Thus, they have not met their burden under Section 303.

Debts not being paid as they become due. With respect to debts not being paid as they become due, the

mortgage and the association dues that are not -- under the loan, Section 5.3 of the loan agreement, we went through this at the last hearing, it's such a waterfall. First, Pedixon is paid, and then it gets their regular payments. And then if there's money left over, it goes down the waterfall, mortgages, association dues. And if there's not enough money to pay them, under Section 8.4 of the loan agreement, the obligors of the loan. Tiered Capital, Mr. Johnson, not CTO. Not CTO. IMQA did guarantee the loan, but they were not technically an obligor. But those parties were required to make those payments. So it's not -– it's not Homemakers wasn't paying the debts as they become -– became due. It is the parties under the loan agreement that were responsible to pay those payments, not making those payments as they came due, because they put that in the loan agreement, obviously to protect -- they didn't think the revenues were going to be able to cover all that, those payments in the first place.

If you recall the loan, the loan agreement, P.E. Dixon loaned an extra $750,000 to Tiered Capital to allow them to sell the condos and try to pay everything off, and then they didn't sell the condos. So it's their failure to pay the debts as they come due, not Homemakers.

So in the end, what we've learned during these two hearings, based on the evidence, is that Amodeo, Flynn and Johnson conspired to have their entities, including CTO and IMQA, join in this involuntary case due to the first case being dismissed. Their actions and testimony in this case establish that this case was filed not to reorganize, but to try and have this Court make a ruling that they have authority to file a bankruptcy case and that they have control of the company.

Through that process, Amodeo and Johnson conspired to file a false affidavit, making it look like Johnson had authority to file this case. Tiered Capital, the initial petitioning creditor, saw the writing on the wall and gave up. CTO and IMQA were essentially brought in to try save the case. That's another thing. Tiered Capital had dropped out. Mr. Amodeo had a $400 claim and was incapacitated. Mr. Johnson didn't include a $2.5 million debt in any of its schedules and was unable to provide any evidence of a debt. So CTO and IMQA came in to try to -- to try to -- to try to save this case again, and they didn't have any debts. All they've done is churn fees, cause delay, and burden this Court with this case.

I can't imagine a case -- well, I guess I could imagine, because I can imagine a lot of things. But this

case is clearly in bad faith, and the Court should dismiss this case, award fees and costs and punitive damages to be determined at a later hearing, bar the petitioning creditors from filing any further bankruptcy cases of Homemakers, and grant any further relief the Court deems just. And now I can turn to abstention.

THE COURT: Okay. So when you say dismiss, et cetera, and bar them from future, there's already a pending Chapter 7, so are you saying any ruling here should apply there?

MR. TIMKO: Well, I filed -- so I did something a little weird. Yes, I do. I do think, I do think it should apply there. And I've also filed -- and I think the abstention will also address that Chapter 7 case. But I also filed a -- I filed it in this case, a motion to dismiss the duplicative case.

THE COURT: Um-hum.

MR. TIMKO: And to name Mr. Johnson a vexatious litigant, to enjoin him from filing any other further cases. I'd like to orally amend -- well, if we're going to hear it at a later date, but I'd like to orally amend that motion to also include Mr. Amodeo since he's filed so many specious pleadings before this case, and now he's technically --

THE COURT: Well --

MR. TIMKO: -- allowed to represent his interests.

MR. LEIBERT: Your Honor, his motion is nothing but slander and defamation.

THE COURT: Okay. Okay, let's --

MR. LEIBERT: It doesn't come anywhere near the definition of vexatious litigant. He knows it.

THE COURT: All right. Let's just -- we're not -- we're not addressing the vexatious litigant issue now. Let's talk about abstention.

MR. TIMKO: Well, I'm very confident that --

THE COURT: Let's --

MR. TIMKO: -- that he's a vexatious litigant but...

THE COURT: Okay. Let's talk about abstention.

MR. TIMKO: Okay. So you raised the issue of abstention under Section 305 in your scheduling order. And to supplement that, I filed a motion to abstain under Section -- 28 U.S.C. Section 1334.

Under Section 305, the question is will the creditors be served by the bankruptcy case or better off in state court? Under Section 1334, the question is really, you know, there's a bunch of criteria that courts consider, But when you boil it down, should the matter raised burden the bankruptcy court or are they more

appropriate in state court? And those matters in this case are corporate control of Homemakers, issues regarding the trust, and the ownership of Homemakers. Does the trust exist? Who is the trustee? Were the documents properly filed? These are all state law issues.

As you may be aware, in spite of the Court's order in the first bankruptcy case that Mr. Johnson is not the sole member -- well, actually, you just, you just raised it, so you are aware -- is not the sole member of Homemakers and his concession at the time that Crescent Sound is the trustee and the fact that this case is still pending, Mr. Johnson has filed a third bankruptcy case on behalf of Homemakers. In that case, they also filed an emergency motion to determine corporate -- the corporate authority again to file the bankruptcy case. Again, for the fifth or sixth time, actually I think it's more than that, trying to get the Court to address the corporate governance and trust issues and overrule its order in the first case. Those filings demonstrate why this is a matter for state court, and this Court should abstain.

Let's start with the Chapter 7 Schedules they filed. In the schedules, they list physical assets of a Kubota tractor worth $2,000, and I think they intended to list the condos. As we know, the stay has been lifted as

to the condos in the second bankruptcy case. They filed the Chapter 7 case, I'm presuming, to try to get the stay reinstated. Since stay has already been lifted as to Mainstreet, and I'm assuming it will be lifted again, all we have is a Kubota tractor that they claim is worth $2,000. So there's nothing that a Chapter 7 trustee can administer to fund the estate.

With respect to the creditors, they list the tax collector and the condo and townhome associations. Those creditors have not participated in this case.

MR. LEIBERT: Your Honor, I'm objecting. I'm trying to get our Chapter 7 argued now in this Chapter 11.

THE COURT: He's using it as to evidence bad faith.

MR. TIMKO: Well, I'm using it --

THE COURT: I mean, I'm allowing it.

MR. TIMKO: I'm using it as to why this case should abstain.

THE COURT: Abstention, okay.

MR. TIMKO: Although, trying to litigate issues that should be abstained from are an indicator of bad faith, and those are cited in my papers. I believe that's the Axl Industries case.

THE COURT: Okay.

MR. TIMKO: So the tax collector and the condo, townhome associations, they have not participated in this case and presumably have some sort of lien rights.

The remaining secured creditors are Mainstreet, who you granted relief from stay to, Tamamoi and the -- the Carton Trust, who also received limited relief from stay. And in his deposition, Mr. Johnson admitted they were in fact not creditors of Homemakers. Homemakers did not sign the notes of Tamamoi or the Carton Trust, and none of the petitioning creditors, again, contested their actions for relief from stay.

As I understand it, from my discussion with Tamamoi's and Carton Trust counsel, the reason they are involved in this bankruptcy --

MR. KOSTO: Excuse me, Your Honor. He's talking about conversations with third parties?

THE COURT: Okay. It does --

MR. TIMKO: Okay.

THE COURT: Let's get back on.

MR. TIMKO: My understanding is that the reason that they were included in this bankruptcy case is that, just before the bankruptcy filing, they --

MR. LEIBERT: (Simultaneous speaking) Your Honor, I object to him giving this --

MR. TIMKO: This argument was --

MR. LEIBERT: -– (simultaneous speaking, inaudible) -– isn't in evidence.

MR. TIMKO: This argument was made in court --

THE COURT: Okay. This isn't -– okay. Let's --

MR. TIMKO: -– by other attorneys.

THE COURT: Okay. So you're just refreshing me as to what they argued in court?

MR. TIMKO: Yes. This was raised in the court. They were -– and Mr. Johnson testified to this in his deposition, I believe. They were transferred into Homemakers --

THE COURT: Oh, okay.

MR. TIMKO: -– from another entity.

THE COURT: Okay.

MR. TIMKO: Do you remember that?

THE COURT: I do remember that.

MR. TIMKO: Okay.

THE COURT: Um-hum.

MR. TIMKO: So they're not creditors of Homemakers.

The unsecured creditors listed are the petitioning creditors in this case, who we have shown either do not really have claims or at best their claims are questionable. And essentially, the way they conducted their business, they're sort of like insiders.

They did the development together. They were moving money around they're claiming. They were doing all these things. They were working together. They're essentially insider claims. But the claims are disputed.

The remaining two claims listed in that petition are an $85 claim of Old Republic Trust and a claim by the IRS, and the Pedixon claims, which are disputed, and Pedixon would rather fight it out in state court than in this bankruptcy court.

Recently, they just filed the document, I forget which filing it was, but it was in this case, they claimed that when they were arguing numerosity, Mr. Johnson's most recent filing, they claimed that the IRS could not be a creditor of Homemakers, because it was a Subchapter S Corporation. So in their schedules, they listed the -- listed the IRS. In their numerosity documents, they took the position that they can't be a creditor. But in there -- so either there are $935 of unsecured claims that are not obviously in dispute, or $85. They can pick which one they want to use in whatever filing they want to put it in, but that's where we were. So there's no value a bankruptcy case can really provide based on their own filings, the lack of assets in this newly filed Chapter 7 case.

Then we have a motion that they just filed,

also filed in the new case seeking an evidentiary proceeding. In that motion, they claim the trust does not exist, after acknowledging the trust in the first case and acknowledging the trust, and then again acknowledging the trust exists because they've also claimed throughout these proceedings that Mr. Johnson is the trustee of the trust. When they sought to disqualify me and fire me, they said Mr. Johnson was actually the trustee of the trust. So they're claiming the trustee -– the trust doesn't exist. Then they're claiming Mr. Johnson is the trustee of the trust and he has --

MR. LEIBERT: Your Honor, you let him argue these things, but then you don't let us explain what it's all about.

MR. TIMKO: You're going to have your chance to argue.

MR. LEIBERT You're really going to let me argue, say what it's really all about?

THE COURT: It's a closing anyway. So, okay.

MR. TIMKO: Well, this is the abstention argument. This all relates to the abstention argument.

They go ahead and they claim that the deed is a forgery after acknowledging it. They claim the trust was revoked, after acknowledging the trust existed in the first bankruptcy case, but they didn't pursue those

claims in the first bankruptcy case. In addition to that, they didn't pursue these claims until after they lost in the first bankruptcy case. Then they had to find a reason to try to get Homemakers back, and that's what this second bankruptcy case is all about, and the third bankruptcy case is all about.

In addition to that, as this Court is aware, Mr. Johnson filed a Complaint for Declaratory Relief in state court. And the Court, in its order denying their motion to remove the trustee of the trust, this Court stated, quote, Mr. Johnson already filed a state court complaint seeking the same relief requested in the motion under Chapter 86 of the Florida Statutes and he can proceed in that chosen forum, unquote.

Again, I bring up the fact that the parties didn't file any objections to any of the stay motions.

MR. LEIBERT: Your Honor, he's got to leave us some time.

THE COURT: I know. Okay. So, all right. So, Mr. Timko, I've given you --

MR. TIMKO: So --

THE COURT: -- it's been like 40 minutes, and to do theirs.

MR. TIMKO: Okay. Well, I'm doing two. I'm sorry, Your Honor, I'm doing two. I'm doing the best I

can.

THE COURT: Well, I know. Well, they need time, too, so.

MR. TIMKO: Okay. So now even if we assume the Court has jurisdiction over the trust issues under -- related to jurisdiction under 33 and 34, which I don't -- I think it's tenuous at best. You go through permissive abstention. And all the requirements, nearly all the requirements of permissive abstention are met.

There's really no estate to administer at this point. The trust and control issues are all state law issues. There's a related proceeding filed in state court. There are no federal law issues. This is not a -- the control is not a core proceeding. This involuntary case and the first voluntary case were clearly a burden on the Court.

To the extent they are seeking damages against any party, there are jury trial rights, and parties may assert counterclaims for damages in any adversary proceedings filed, because this Court had already held this is not proper for motion practice. So there will be jury trial rights there.

For example, tortious interference, the filing of false deeds regarding the condo. Mr. Johnson filing false documents with the Secretary of State, and other

acts that we are still learning about. The trustee, Mr. Dixon, Pedixon, and others, are all non-debtor parties. Really, it's a fight between who owns it. It has nothing to do with the bankruptcy case itself.

The most economical use of this Court's resource would be to let this dispute go to state court, and a state court would have more expertise on purely state law, state statutes related to trust issues.

I also want to take brief, very briefly, let's go back to the first bankruptcy court case for one second.

THE COURT: Well, I want to give them time, because if we don't finish soon --

MR. TIMKO: Okay.

THE COURT: -- we're going to have to come back another day.

MR. TIMKO: You'll recall, I made very similar arguments in that case in response to the trust issues that Mr. Johnson -- Mr. Wolff was bringing up. I said, you know, they were -– they're claiming my client defrauded them in that case, and I said, Your Honor, that requires a lawsuit. And he dropped those issues because he acknowledged that I was correct on that issue. It's no different here, Your Honor. The Court should abstain from these bankruptcy cases. The creditors aren't being

served. This is all a ruse to fight over this stuff.

THE COURT: Okay. All right. So who wants to go first? Mr. Kosto?

MR. LEIBERT: Are you going? Because I'm -- you go first because I'm going to go into some of the --

MR. KOSTO: Nobody wants to go first.

MR. AMODEO: I guess it's me, Your Honor.

THE COURT: Okay.

MR. AMODEO: I'm going to address some of Mr. Timko's stuff, but I'm not going to waste a lot of time. I'm going to start with he cites General Trading correctly. He doesn't cite the primary holding in this circuit. And that is, regardless of which test is used, bad faith does not exist when a petitioning creditor's primary motivation in filing the petition is to protect itself against others creditors obtaining a disproportionate share of the alleged debtor's assets.

Uncontested, Mr. Dixon has a $2 million preference. He had --

MR. TIMKO: There's no evidence of that, Your Honor.

MR. AMODEO: Mr. Dixon testified last time, and if not, I'll leave it to Your Honor to understand what's evidence and what's not.

There is a preferential transfer. They've

admitted the monies went to Homemakers -- that went to P.E. Dixon. The exhibit they show at least shows $660,000 in the last nine months, none of which has been used to pay the ordinary debts.

MR. TIMKO: That's not what the evidence shows, Your Honor.

THE COURT: Okay. Let's let him.

MR. AMODEO: Yes.

THE COURT: Okay, we're talking about Exhibit 50, um-hum.

MR. AMODEO: The point -- the point is, the test here today is, even if there was blatant bad faith, and there's not, then the test would be is it better for the creditors generally? And it simply is. There are 26 units. If they go to foreclosure, they're going to go cheap. Who is going to buy them? They don't know yet. But the money -- the equity there, the equity that I testified to from the public record, is enough to give a million and half dollars to the unsecured creditors, including Mr. Dixon. But, so that's the purpose of this bankruptcy filing. It's been to have an orderly disposition of the assets.

If the assets are worth nothing and go into foreclosure, let a trustee make that decision. Let a trustee decide if there's going to -- if there's a need

for a preferential asset recovery. They can do that. Mr. Dixon can't. He's conflicted. He got the preference. Mr. Johnson can't. He gave Mr. Dixon the right to get the preference. We need somebody independent. That's what I've asked for from day one. Even in the stricken pleadings, my only request was, please appoint a trustee, and I think the Eleventh Circuit really mandates that.

This is a case where one creditor is getting all the money, at least all the net revenues, and the other creditor is not being paid, and there's no dispute the other creditors are not being paid. Brevard County, IMQA, W.M. Holdings, CTO, Old Republic for $85, and Frank Amodeo for his 394 that he advanced for utilities. After they began to panic, when this Court brought up the utility issue in the first case, noticed something that Mr. Goldman said, until July of 2025 they didn't make any utility payments.

MR. TIMKO: Misstates testimony.

THE COURT: Let him. Go ahead.

MR. AMODEO: They had the utility payments were paid. They were paid extensively by IMQA and never reimbursed, although we were promised we would be reimbursed. So IMQA is owed a lot of money, as are others, and right now only one creditor has gotten paid

for over two and a half years. That's a reason that this circuit requires, regardless of the bad faith issues, but let me turn to bad faith.

There is, improper purpose and use are often conflated in the juris prudence, and it's in my filing from this morning, so I won't get into all the details. But here, Mr. Timko identifies issue number one, that there's an argument over ownership that needs to be decided in the state court. There's no argument over ownership. For these purposes, the trust owns it. There is an argument over who controls the trust. I understand that. But this Court, AT Engineering and In re: Bowling have often applied state law on straightforward facts. In fact, in AT Engineering, the real issue was they didn't have any corporate governance. There was nothing to look at, and that's why he kicked -- that's why Judge Banks kicked that case.

Here, there's really easy corporate governance. This Court made a statement at the last hearing. It said, Mr. Dixon couldn't really have wanted this thing to be an agreement, and then suddenly these guys can just go poof, and it goes away. Well, that's true. That would be something that wouldn't make a lot of sense, but that wasn't the purpose of this trust. And the only person who can testify to the purpose of that trust is me. My

pleadings have been verified throughout this under penalty of perjury while on supervised release, so there's great danger if I do anything stupid.

I know what happened, I was there. Look, Mr. Timko wasn't. Most of the time Mr. Dixon wasn't with me. Mr. Dixon did things he doesn't even remember to this day.

MR. TIMKO: Is this regarding abstention or bad faith?

MR. AMODEO: This is regarding bad faith.

THE COURT: He's talking about bad faith.

MR. TIMKO: Okay. Well, then, none of this is in evidence, so.

MR. AMODEO: That's fine.

THE COURT: He's just making an argument.

MR. TIMKO: I understand.

THE COURT: Okay.

MR. AMODEO: The point of this now is that there's no bad faith on IMQA's part, on Tiered's part. Everybody just wanted the money to be shared right. I grant you they filed it as an involuntary 11. That wasn't my call. I like the Chapter 7. Put an independent trustee in to determine who's right and wrong. This law gets settled.

As to the numerosity issues, 303(b)(1)

specifically provides holders of claims against the person, not the property. So any creditor in there that is not, have an individual claim against Homemakers, is not a claim for purposes of 303. They may be a creditor. They may even be allowed to participate in the bankruptcy, because 1109 is so extensive, but they are not a creditor for purposes of 303. They're not a holder of a claim. So all those tax certificate people, out. Because, and under Florida law particularly, there is no personal liability, even if you were the owner and you didn't pay the taxes. That certificate runs only in rem to the property. And when those certificates were issued, Homemakers wasn't even the owner. It was Crescent Sound. So his entire amended schedule just disappears, five of them at least.

He talks about Cape Crossing Condominium and Townhome Association. Both of their, again, privity runs to the titled owner, which for most of this time, if not all, was in Crescent Sounds' name, not Homemakers. And all are secured by a senior position. They don't add to -- the way that works, they don't add to the aggregated total of debt that needs to be above any existing liens in Subsection (b)(1).

And I said I filed something, it's not here, but it goes into great detail why none of those secured

creditors, property taxes, homeowners associations, can ever count unless there’s some way that the property is going to be, you know, environmentally unsafe or they agreed to subordinate their positions to the banks in advance. Did not happen.

Mainstreet, I’ve heard Mr. Luna on a couple of occasions here and Mr. Porter both argue that Mainstreet thinks the value’s different than Mr. Dixon. That’s because they, like me, can read the public record and we know the value exceeds $400,000. There’s assets for unsecured creditors. I think there’s assets to reorganize this business. In fact, I think this business can be sold as a going concern. Everybody, including Mr. Dixon, can get paid. But right now, nobody wants to cooperate with it.

So I don’t know if 11's a good idea, and I don’t have a substitute for the, you know, for the trustee at the moment, but I certainly think a trustee in a liquidating 11 would be ideal, and alternatively in Chapter 7 is okay.

As for abstention, sorry, you probably want to get out of this case more than I do. But I’m stuck because I have too many friends, and I think you are stuck because the supreme court has made it pretty abundantly clear that, that when you have that -- I’ll

just give you the quote. The supreme court has long held federal courts have a virtually unflagging obligation to exercise jurisdiction conferred on them by Congress. Particularly, when the Eleventh Circuit looks at this and talks about abstention is appropriate on a permissive basis when, even the cases you cited, when it's very quickly in the process of the case. You know more about this case than anybody else. And so, at this stage of the game, it's far more likely that you can most efficiently resolve this.

Plus, unlike the cases where abstention has happened and been admitted, the evidence is pretty easy to read. It's the face of the documents themselves that are filed in the public record that that would resolve the state court issues. Ownership is not. I think the Court's wrong, but I accept your prior orders. I wasn't part of that proceeding. And that, by the way, brings up one of the very significant events with Mr. Timko's arguments about relitigation.

There's no relitigating here. Homemakers made the concessions in that initial case that allowed this Court to make its rulings. Homemakers did. Now they're Homemakers. Then they were P.E. Dixon and ZPD. There's somebody different, but there's been no independent creditor making the arguments that are presented today.

This Court should not abstain. It should look at those documents, which have been in this record since October, and decide who actually controls the trust and how that matters to this case. And guess what? It doesn't matter a lot, because there should be a trustee appointed. Neither of these gentlemen, as much as I'd be glad to have dinner with them, should be allowed to run this business under these circumstances. We need a trustee. But as to good faith, and as to -- as to abstention, I don't think you're allowed. It's filed. So the motion with all the authority is there.

As to eligible -- numerosity, one creditor is enough. I think three stand. Certainly the discussions and evidence before this Court show that, you know, although there may be some debate about something, IMQA lent its money, CTO lent its money, and Mr. Johnson spent two and a half million dollars building this to get it taken away from him like this. If he loses his money in a bad business deal, hundred percent that's okay. You know, and I have had a couple thousand bankruptcy clients. But what should not --

MR. TIMKO: Your Honor, it's supposed to be argument on --

MR. AMODEO: But what should not happen, what should not happen is that Mr. Johnson loses his

investment because one creditor gets more money than all the rest.

This Court needs to keep this in bankruptcy and keep the 11 going, appoint a trustee, and let him sell it for a going concern. Everybody will get paid.

THE COURT: Okay. Thank you.

MR. KOSTO: Thank you.

Your Honor, I think with the -- there's one thing for sure that's not in dispute, and that is that all the money that comes in from the revenue after paying the management fees goes to Mr. Dixon or his company and that none of the creditors are being paid. So there exists no dispute that this matter belongs in a bankruptcy. It's not -- the company is not paying its debts as they become due.

One of the things Mr. Timko argued about is that bankruptcy creates some sort of stigma. It's an extraordinary thing, and there's case law that says it is an extraordinary thing, and that it creates a stigma when someone goes into bankruptcy. And that's normally true with a creditor that's out there in the community and their name is important in their transacting business and they're -- they're stuck with that bankruptcy label. But this is a different situation here. We've got a company that's clearly not paying any debts. And so that

-- so that company's manage company -- management company that's renting out property, and they're not renting it because it's Homemakers' property, they're renting it because there's a management company running the property, whether it's on Vrbo or --

THE COURT: Airbnb or something?

MR. KOSTO: Thank you, Judge. Airbnb. They're renting the property for those reasons and not because someone wants to rent a Homemakers property. Homemakers has no name. It has no reputation in the community, and it's -- it's -- it has no stigma attached to it. They're not out there obtaining credit. They're not out there transacting business as a going concern. They're -- they're basically milking the monies as long as they can until these foreclosures are completed.

So, and one of the things Mr. Timko -- one of the other things that Mr. Timko said is he said Beachside had -- Beachside had some great documentation showing their transactions, and I agree. Their Exhibit 50 was spectacular. It showed all the money that went to Mr. Dixon, and it showed a lot of information in their management company. They're set up to have that, and they're not doing it just for this company. They're doing it because they manage other properties in that area as well and probably other areas. But to compare

Mr. -- I'm sorry -- Beachside's records with IMQA's records or CTO's records is just not fair. This is -- there's no dispute that IMQA and CTO paid expenses for Homemakers.

MR. TIMKO: Yes, there is.

MR. KOSTO: The representative from Mr. -- from Beachside acknowledged that Homemakers was paying obligations, expenses, when they didn't have the money. And he even acknowledged they weren't paying all of the Homemakers units expenses, that he was paying the ones that he was -- had money to pay them on. And when they didn't and when he didn't have money, he acknowledged that Homemakers would pay those.

And he acknowledged, he also stated, Your Honor, that it wasn't his obligation to repay IMQA or CTO. Well, I think he didn't -- I think CTO was before he got involved. But he said it was not his obligation to repay IMQA the monies they laid out for Homemakers. So it was either he got -- he collected his monies when it came in, and he took his management fee out of the monies that came in, and anything left, anything else, went to Mr. Dixon or one of his companies. Nothing -- they did not repay any debts to IMQA, and acknowledged -- he acknowledged that IMQA was paying obligations at the time for different expenses.

Mr. Timko says -- makes a big deal about the document being docusigned. Well, the docusign dates the document and has an electronic signature, and it’s a generally accepted form of signing things. There’s nothing improper about signing a docusign. You can’t backdate, as far as I’m aware. There’s no evidence that anybody’s backdated anything. It was a contemporaneous transaction from June of 2023, and there’s no evidence that it could be backdated, let alone that it was backdated, so. And Mr. Johnson clearly testified it was his signature. Ms. Milotte testified it was her signature.

MR. TIMKO: Your Honor, he’s referring to a document that’s not in evidence.

THE COURT: That’s true.

MR. KOSTO: I understand. Your Honor, I acknowledge it’s not in evidence.

MR. TIMKO: Well...

MR. KOSTO: But the debt is listed, it’s listed on the closing statement that Mr. Timko put in evidence.

MR. TIMKO: It’s also not in evidence.

MR. KOSTO: Well, you testified from the closing statement, the $350,000 debt.

THE COURT: Go ahead.

MR. KOSTO: Anyway, there’s -- there’s no

dispute that that there’s a 350,000 or 400, whatever that number was, debt that’s owed by Homemakers to IMQA, and there’s no dispute that IMQA also paid expenses for Homemakers. You know, you can say the amount might be in dispute, but there’s no dispute that IMQA paid debts and expenses, and that CTO paid debts and expenses.

Your Honor, the testimony was, the purpose of the bankruptcy was to prevent Mr. Dixon from taking all of the money that comes in. There’s no dispute he’s getting all the money. There’s no dispute he’s not paying any other creditors, and that’s -- that is the point of a bankruptcy case. So I don’t think it’s fair to say there’s any bad -- there’s bad faith when that’s the underlying purpose of the bankruptcy petition. And it’s not fair to say that the creditors did not oppose the relief from the stay.

We did not want the relief from the stay. We were disappointed Your Honor granted relief from the stay. The creditors wanted a trustee appointed and stood with the lender on appointing the trustee. And my perception of that hearing was it looked like Your Honor was going to appoint a trustee, and I was, you know, that’s what I anticipated the situation, the outcome to be, and that’s why I voiced in my argument that day I did not support a relief from the stay.

The question is, you know, Mr. Timko wants to say it's bad faith on the creditors that they want this case in the bankruptcy case, where this -- where this property can be sold in a reasonable manner to achieve the most outcome, the best outcome for all the creditors, and you have to wonder why Mr. Dixon doesn't want it in the bankruptcy case. And, in fact, at the last hearing on the motion for relief from stay, Your Honor suggested, discussed, or it was discussed at the hearing that there would be some moratorium on filing any bankruptcy, and Mr. Dixon said -- Mr. Timko said, absolutely not, you know, we don't want that, because they want the option when Mainstreet gets close to a foreclosure to be able to file their own bankruptcy. So it's -- it's, you know, he clearly wants the option of filing a bankruptcy but he wants to drag this out outside of bankruptcy as long as he can and continue to be the only person to get paid from the revenues of the company, and that's -- that's not equitable. It's not -- it's not proper.

Your Honor, we would -- we disagree that abstention is proper. We don't agree that that there are predominantly state law, state law issues. These are clearly bankruptcy issues that are mostly issues that are -- that are at issue in this case, and it would be proper for the Court to continue to hold the case and decide the

issues in the case.

A lot of the claims that Mr. Timko discussed don't come with jury trial rights. You know, when you're taking about declaratory judgment, for example, on who's -- who's entitled to manage the properties, that's not a jury trial issue. Your Honor, that's a -- that's a court decision issue, an equitable issue, not a jury trial issue.

So I just don't think it's appropriate for abstention. I don't think it's appropriate for any determination of bad faith. And I think the case belongs here, and it should be administered by this Court.

THE COURT: Okay.

MR. LEIBERT: Thank you, Larry. Your Honor.

THE COURT: Yes, Mr. Leibert.

MR. LEIBERT: What is this case really about, Your Honor? It's about Horton Johnson spending 14 years of his life building a company called Homemakers Real --

MR. TIMKO: Your Honor --

MR. LEIBERT: -- Estate, LLC.

MR. TIMKO: Are we -- hold on. Hold on one second.

MR. LEIBERT: Let me do this, in like two minutes, Your Honor.

THE COURT: Well, let's give him -- well, he can

have his two minutes.

MR. TIMKO: Well, absolutely he can have his two minutes, but I just want to make sure we're sticking to abstention.

MR. LEIBERT: This is about abstention.

MR. TIMKO: And not to CTO and IMQA.

MR. LEIBERT: Sure. This is why you should keep it in state -- in here in bankruptcy, Your Honor. He tried to say what this case was about. Now I'm saying what this case is about. It's about Horton Johnson building this company from nothing into what it is. Mr. Dixon didn't build this company. Horton Johnson, with the help of Marty Flynn back there, built this company, put two and a half million dollars of his own money into it, and now he has nothing. He doesn't have the property. He doesn't have any money. He got nothing at all now. Who has it? Mr. Dixon has it.

Remember when Mr. Dixon sat right there and said, Woody Johnson was absolutely victimized, and he was, Your Honor, and that's what I've been trying to tell you the last few times I've been coming in here, raising my hands about, let me show you, let me show you. We didn't know in the first bankruptcy hearing what really went on. But we know now, Your Honor.

This document over here was the document that

made the land trust was signed by Horton Johnson here. He signed there. And then later on, all this stuff was added on to it. The attestation, the notary and all that was altered, Your Honor, and that was filed, and that's why we're telling you it's an illegal land trust. It never existed.

There's more to that. There were promises made to Horton Johnson about the land trust that never came true.

THE COURT: Okay. But why can't --

MR. LEIBERT: And we never got to get into it. So, okay.

THE COURT: Okay. Why can't you deal with that in state court where you have your dec action.

MR. LEIBERT: Because this thing is going to be gone. We're trying to salvage some money for these people that, you know. Have an orderly sale. Let them get something out of it. Why does Mr. Dixon want them to have nothing at all? After all they put into it, Your Honor, they should get something out of it.

So, you know, he's taken everything, and he wants them to get nothing, and we just want you to keep it in bankruptcy, do an orderly sale, and let them get something out of what they put so much time and energy into. Thank you.

MR. TIMKO: Brief reply, Your Honor?

THE COURT: Okay.

MR. TIMKO: Extremely brief.

THE COURT: Okay.

MR. TIMKO: You know, they were talking about how the expenses are not contested. They are contested. Ms. Milotte testified that she didn't use IMQA's money to pay revenue. That's contested.

With respect, this is all state court claims. These are all state court claims. And with respect to Mr. Johnson wanting to save his company and do all those things, relief from stay was granted. They had their shot to contest that. They had their shot to go get a valuation. They had their shot to make adequate assurance payments. They had their shot to comply with the loan agreement and pay the -- pay the amounts they were supposed to pay. They didn't do those things.

MR. LEIBERT: Your Honor --

MR. TIMKO: Now -- hold on, let me finish. Then they file a Chapter 7 case, which, okay, we have a Chapter 7 case.

MR. KOSTO: Your Honor, this is beyond the cross. This goes beyond our --

MR. LEIBERT: And it's all unfair. They were supposed to pay the mortgages.

THE COURT: Okay. Okay.

MR. LEIBERT: And they never paid it, Your Honor.

THE COURT: All right. Let's not argue. The facts --

MR. TIMKO: Okay. And the Chapter 7 case, there's nothing to reorganize, Your Honor.

THE COURT: Okay. You already argued that.

MR. TIMKO: Okay.

THE COURT: So let's --

MR. TIMKO: Okay.

THE COURT: Okay.

MR. TIMKO: I just wanted to bring that up.

THE COURT: Okay.

MR. TIMKO: Okay. Thank you.

THE COURT: So, all right. Thank you.

So, okay. So the Court will take it under advisement. I guess I have a question as far as the Chapter 7 case. Mr. Timko's position is that any ruling here should apply in the Chapter 7 case, Mr. Timko, I presume?

MR. LEIBERT: Your Honor, it shouldn't have anything to do with the Chapter 7 case.

THE COURT: Okay. Hold on.

MR. LEIBERT: This is my chance --

THE COURT: I'm just -- hold on.

MR. LEIBERT: The Chapter 7 is my chance to show you from the beginning what actually happened. That's why we filed this motion to give us -- to show you the authority. We did it all in transparency so that we can come before you and show what actually happened and, you know, the truth of it.

THE COURT: Okay. So, all right. So, Mr. Timko, obviously, they're opposing any applicability of any --

MR. TIMKO: With respect to abstention, Your Honor, it would apply in all of the cases because the existence of the trust and all of those things should be abstained from.

Now, do we want to have another trial on authority, which will bring up all of these issues all over again for a third bankruptcy case to do this again? No, this should go to state court and be dealt with there.

THE COURT: Okay. So if I --

MR. TIMKO: Mr. Dixon --

THE COURT: Okay. So if I dismiss it on bad faith, but don't abstain, you're saying we'll be back.

MR. TIMKO: Then we will be back with another battle before this Court on the same issues that we're

going. Mainstreet will continue to be victimized and not be able to pay.

THE COURT: Okay. That’s --

MR. TIMKO: It’s -- it’s a hamster wheel.

THE COURT: The question was just whether you think it applies to the other cases.

MR. TIMKO: It’s a hamster wheel.

THE COURT: Okay. So, Mr. Leibert, you want -- you say --

MR. LEIBERT: We want the --

THE COURT: -- anything here should not apply.

MR. LEIBERT: Should not apply. I want to come before you and show what really happened, show who really owns the trust, who should really be in control of it.

MR. TIMKO: Well, then they should file it --

THE COURT: Okay, but --

MR. LEIBERT: And it never happened. You had one hearing in the beginning and a couple of papers were shown to you, and we believe those papers were altered from the beginning.

THE COURT: Okay. But why would a Chapter 7, I guess we can discuss it, is necessary then?

MR. LEIBERT: Well, you could freeze everything now. You know, this would be a different stay than what happened in the Chapter 11. And then we can have a

trustee examine everything and say who's right, who's telling the truth.

THE COURT: Well, that wouldn't --

MR. LEIBERT: And then if we're telling the truth, there can be an orderly sale.

THE COURT: Okay. But a trustee doesn't determine who owns anything. So the trustee --

MR. LEIBERT: Well, we'll have our hearing, our motion for authority in front of you but --

MR. AMODEO: Your Honor, what I'm going to ask if I can -- if we can set up a post-trial brief; and second of all, this is nonsense. I was a party to the first Chapter 20 cases that took place in the late 80s and early 90s in this circuit.

THE COURT: Okay. Come closer to the microphone.

MR. AMODEO: In this circuit, I know what the Chapter 20s are. I filed many of the 13 and 7s in serial all the way back to In re: Sailors (phonetic) in 1987. So those original cases I know really well.

This circuit has a single estate rule for in terms of how it manages assets. If you dismiss the case, the Chapter 7 should stay because it has the assets. If not, you have a tough decision on which stay should remain.

THE COURT: Okay.

MR. AMODEO: But I'll be glad to submit a trial brief. Five pages, is that acceptable?

THE COURT: A post-trial brief, you're saying?

MR. AMODEO: Post-trial brief, yes.

THE COURT: On what issue? The abstention issue or the --

MR. AMODEO: On the abstention, and the single estate, the Chapter 7 issue. None of which I've had a chance to respond to, so I would like to be heard.

THE COURT: Okay. You're saying five pages?

MR. AMODEO: Five pages, no more, I promise.

THE COURT: Okay. You oppose it?

MR. TIMKO: I do oppose it, Your Honor. But I just -– I just want to say one other thing that's going to throw a wrench into all of this. The Court has already said that these issues should be determined through an adversary proceeding, not motion practice. I agree with you on that.

So if we're going to have to deal with the authority of filing the bankruptcy case for an adversary proceeding, we're not going to know the -– by the time we determine the authority, Mainstreet will likely have relief from stay. They're like, it's -– it -– it -– none of this works.

THE COURT: I understand what you're saying.

MR. AMODEO: They wouldn't have relief from stay because the rents will be going to them from here on out.

THE COURT: Okay, so.

MR. AMODEO: They'll have --

THE COURT: All right. So Mr. Amodeo's going to --

MR. TIMKO: You don't operate a business in Chapter 7.

THE COURT: Okay. Hold on. Again, address me and not each other.

The post-trial brief, Mr. Amodeo's going to file five pages. When do you need -- how much time do you want?

MR. AMODEO: It'll take me three days to transcribe this. So by next Friday, a week.

THE COURT: Okay. And that's fine. Okay, by next Friday.

MR. TIMKO: Do I have a chance to reply, if necessary?

THE COURT: Okay. And how much time would you want? A week from his paper or two?

MR. TIMKO: I don't want to hold this out any longer.

THE COURT: Well, you're asking for -- how much

time do you need?

MR. TIMKO: Well, I know. So he would file it on Friday. If I'm going to file something, I'll file it that next Tuesday.

THE COURT: That fast? Okay.

MR. TIMKO: I don't need a weekend.

THE COURT: Okay. All right, so.

MR. KOSTO: You got this weekend.

THE COURT: Okay. So, all right.

And then was there anything else I need to address this afternoon? No? Okay.

So I'll issue an order that gives the deadlines for the post-trial briefing, and then I'll make my ruling after that. Okay?

MR. KOSTO: Okay.

MR. LEIBERT: Thank you.

MR. TIMKO: Thank you, Your Honor.

THE COURT: All right. Court is adjourned. Thank you.

COURTROOM DEPUTY: All rise.

MR. KOSTO: Thank you, Your Honor.

MR. LEIBERT: Thank you, Your Honor.

(Thereupon, the taking of the proceedings was concluded)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-styled matter.

Cynthia D. Vachon April 19, 2026

Cynthia D. Vachon

Notary Public-State of Florida

Commission Expires: 07/24/2026

Commission Number: HH291609

**A**

**A.M** 5:1
**ability** 16:19 17:9
**able** 76:2 85:18 108:12 116:20,21 135:6 166:24 167:11 209:2 218:23 229:18 230:14 236:20 243:19 244:18 245:1,17 248:18 275:13 282:2
**above-styled** 287:4
**absence** 14:17 235:20
**absentia** 72:5
**absolutely** 17:24 84:14 86:19 207:15 275:11 277:2,19
**abstain** 251:18 252:21 253:19 260:24 269:1 281:23
**abstained** 253:22 281:14
**abstention** 7:14 15:9 17:17,17 68:22 231:4 233:7,15 250:6,14 251:10,15 251:17 253:20 257:20,21 259:8,9 265:8 267:21 268:5 268:11 269:9 275:21 276:10 277:4,5 281:11 284:6,8
**absurd** 176:6
**abundantly** 267:25
**accept** 103:1 212:14 212:16 268:16
**acceptable** 284:3
**accepted** 79:3 91:6 273:4
**access** 31:9 37:18 59:16 131:11
**accessed** 165:6
**accident** 109:13
**account** 40:10 44:14 44:16 47:25 48:3 49:1,17,23,23 50:1 50:1 82:25 83:4 107:16 108:18 109:7,8,9 127:7 134:20 140:11 143:11,12 144:9 146:3 168:25 172:1 174:16,18,19 176:23 182:22 194:8,11,24 195:1 211:22 212:10 241:18,19
**accountant** 150:18
**accounting** 91:4 107:15,16 143:15 213:4,20 228:3
**accounts** 30:8,12,14 31:9 107:5 109:11 109:15 145:25 146:8 175:17,20 176:8,10
**ACCREDITED** 1:48
**accrued** 152:9
**accuracy** 149:2
**accurate** 99:6 110:17 150:17
**accurately** 126:11
**achieve** 275:4
**acknowledge** 273:17
**acknowledged** 239:7 260:23 272:7,9,12 272:14,23,24
**acknowledging** 257:3 257:4,5,23,24
**acknowledgment** 212:15
**acquired** 74:19 187:1
**acquisition** 108:7 210:4
**acquisitions** 74:15
**acreporters@emba...** 1:49
**act** 79:14 85:2 230:6 230:8
**acted** 105:21
**acting** 66:23 112:25 122:4 124:7
**action** 8:6 278:14
**actions** 219:7 234:13 238:2 249:5 254:11
**active** 77:9 121:9
**activities** 78:20
**acts** 260:1
**actual** 14:12 59:21 80:11 97:23 108:19 140:13,14
**ad** 244:15
**Adams** 3:17 19:8 24:9 50:23 51:8,16 51:23 64:11 67:10 68:10 101:7 131:7 131:16 217:10
**add** 91:11 126:12 266:20,21
**added** 44:16 278:3
**adding** 28:20
**addition** 137:2 216:22 258:1,7
**additional** 170:23
**address** 6:19 16:4,14 25:10,12 32:13 36:5 51:7,9,9,10 118:24 172:22 180:13 202:15 214:20 216:15,24 218:15 220:21 231:13,14 233:6 245:18,20 250:14 252:18 261:9 285:10 286:11
**addressed** 15:7 18:25 65:1 129:13 233:19 243:24 247:21
**addresses** 135:19 148:21
**addressing** 20:5 197:5 251:9
**adept** 226:23
**adequate** 243:7 279:14
**adjourned** 286:18
**adjustment** 37:24
**administer** 253:7 259:10
**administered** 276:12
**administrative** 6:18
**admit** 31:20 142:5 198:14 218:25
**admitted** 90:16 101:21 104:21 132:8,15,17,21 133:13 142:23 144:13 237:18 254:7 262:1 268:12
**advance** 174:3 267:5
**advanced** 147:1 263:14
**adversary** 246:5 259:19 284:18,21
**advice** 93:11 114:5 195:24 196:3,8,12
**advisement** 7:6 17:11 280:18
**advisor** 124:8
**affairs** 79:10 93:1
**affidavit** 87:19 88:6 88:10,13,22 238:7,9 246:20,21 249:11
**affiliates** 62:4
**affirm** 25:5 51:2 180:8 202:7 220:16
**afford** 72:6 243:16
**affordable** 80:23
**afraid** 57:25 100:9 244:17
**afternoon** 13:20 17:23 125:16 286:11
**agency** 77:19 79:14
**agent** 105:22 216:15
**aggregated** 266:21
**ago** 28:14 34:8 36:19 103:3 155:24 193:1 234:5
**agree** 19:11 217:25 218:1 271:19 275:21 284:19
**agreed** 9:22 126:23 137:11 267:4
**agreement** 13:12,13

82:6 85:15 95:21 108:11 110:10 126:10,16 133:16 137:11 141:2 158:24 160:17,19 222:17,19 223:25 236:7 238:6,13 241:1 248:2,8,14,16 248:20 264:21 279:16
**agreements** 112:1 205:3 218:22
**agrees** 55:19
**Ah** 80:16 144:4
**ahead** 14:20 28:25 33:1,9,25 39:16 60:23 61:15 86:21 116:9 119:4 122:24 139:11 140:6 180:21 198:15 200:19,19 210:1 231:10 257:22 263:20 273:24
**aid** 206:9
**aids** 246:3
**Airbnb** 271:6,7
**Alison** 34:10 35:5,5 38:5 67:12 104:15 109:14 145:24 168:24
**Alison's** 107:5
**allegation** 82:14
**alleged** 8:14 89:12,14 168:2 188:8 206:22 235:4 239:1,9 240:18 261:17
**allegedly** 236:10 238:10
**alleges** 82:12
**allow** 86:21 143:15 167:14 213:4 248:22
**allowed** 24:9 76:5,24 100:9 108:9 191:21 198:5 230:15 239:5 251:1 266:5 268:21 269:7,10
**allowing** 253:17
**allows** 67:22
**ALTA** 239:24
**altered** 278:4 282:19
**alternatively** 267:19
**altogether** 159:25 231:13,14
**amateurs** 87:11
**Amelia** 146:24,24
**amend** 250:20,21
**amended** 39:20 128:12 129:2 130:1 148:20,23 266:14
**America** 49:17,24 174:16
**American** 195:8,9
**Amodeo** 2:8 3:12,21 3:24,34,40 5:20,25 6:1,1,5,25 7:10,11 8:2,22 9:6,9,13,18 10:4,5,23 11:3,16 11:18,20 12:4,7,9 12:13,15,17,22 14:2 14:8,10,12,17,23,25 15:8,20 17:8,16 18:21,24 19:4 20:20 21:1,3,10 22:8,11 22:15,22 23:2 24:1 28:2,5,25 29:4 31:24 32:5,8,10 33:5,10 34:1 35:2 35:16,17 38:8,9 57:24 67:7,9 68:6,8 68:19,23,25 69:4,11 69:12,13,15,17,25 70:5 71:1,19 78:11 119:8 120:23 124:20 125:19,19 138:8,23 143:13 147:3,16,23 154:24 155:4 158:16 163:13 168:1 179:6 181:11 182:18 183:19,24 184:2,12 187:18,22 190:12 191:13,14,19 192:9 192:19,21,24 193:8 193:10,11 195:4 196:8,16,21,24 197:4 198:6,17,19 198:22,24 199:16 199:21,23 200:4,7 200:10,18 201:4,6,7 201:18 208:6,11,24 211:6,8,13,15 212:1 212:2,25 213:3,9,15 213:17,19 214:11 214:18,22 215:4,5 215:13,16,25 216:9 216:10,11 219:10 219:16 229:16,18 229:23 230:2,11,14 230:18,20,24 237:8 237:14,18,20 238:8 238:9 239:7,9,13 240:4 241:21 244:2 244:11,14,17,19 245:1,5 247:9 249:2 249:10,16 250:22 261:7,9,22 262:8,11 263:14,21 265:10 265:14,18 269:24 283:10,17 284:2,5,8 284:12 285:2,5,15
**Amodeo's** 7:4 16:19 18:12 19:22 72:23 150:13 168:10 191:8 230:8 246:23 285:6,12
**amount** 55:12 82:20 96:4 106:23 107:6,8 107:23 127:11,16 127:18 134:16 157:1,1 166:9 205:18 206:20 224:12 234:13 238:23 247:11 274:4
**amounts** 107:2 218:23 236:14 241:13 279:16
**analysis** 168:10
**analyzed** 110:20
**analyzes** 218:9 234:14
**And/or** 77:2
**Anidar** 96:10 102:1 102:14,19 108:7,12 141:24,25 142:2 210:5 224:8,8 239:19
**animosity** 167:7
**announced** 244:2
**announcements** 6:13
**answer** 12:17 40:22 40:23 42:2,3 45:16 87:12,16 100:5,15 107:25 122:13 123:6 124:13 136:2 139:8 168:5 178:12 216:1
**answered** 113:15 175:24 176:15
**answering** 176:2
**answers** 105:19 107:19
**anticipated** 274:23
**anybody** 20:23 21:8 84:14 124:21 149:2 176:8 268:8
**anybody's** 273:7
**anyway** 20:5 64:10 144:25 213:2 229:3 257:19 273:25
**apart** 164:10
**apartment** 80:23
**apartments** 156:24 204:8
**apologies** 187:6 201:11
**apologize** 34:24 54:15 119:14 123:22
**apologizes** 13:14
**apology** 13:24
**apparent** 110:22
**apparently** 88:13 191:23 243:23
**appear** 15:2 16:19 39:10 59:1 117:4 129:14

**appearances** 2:1 5:13
**appeared** 61:4 198:10
**appearing** 1:34,41 2:6,12 203:7,23 230:21
**appears** 46:15 55:10 210:9 230:5 240:1,9
**applicability** 16:1 281:9
**applied** 264:13
**applies** 16:7 282:6
**apply** 117:1 250:10 250:13 280:20 281:12 282:11,12
**applying** 235:18
**appoint** 263:7 270:4 274:22
**appointed** 243:11,12 269:5 274:19
**appointing** 274:20
**appraiser** 177:1
**appreciate** 50:13 78:13
**approach** 38:17 47:13 227:9
**approached** 30:3
**approaching** 24:23 223:1
**appropriate** 50:4 252:1 268:5 276:9 276:10
**approval** 78:20,22 185:16
**approve** 79:6 208:1,2
**approved** 109:18
**approving** 65:8
**approximately** 208:16 247:3,4
**April** 166:14 287:6
**area** 271:25
**areas** 271:25
**aren't** 78:10 117:1 118:21 146:4 260:25
**argue** 6:5 7:13,23 8:8 14:19 45:15 178:6 245:17 257:12,16 257:18 267:7 280:4
**argued** 243:12,12 253:12 255:7 270:16 280:8
**arguing** 14:7,10 256:12
**argument** 13:10,12 16:8 17:18,18 50:3 89:8 114:16 119:15 151:17 157:21 159:19 213:13,16 213:17 231:5 232:8 234:5 240:10 242:12 243:5 254:25 255:3 257:21,21 264:8,9 264:11 265:15 269:23 274:24
**arguments** 4:9 15:8 17:17 18:2,14 19:3 130:4 231:17,21 260:18 268:19,25
**arm's** 126:15
**arrangement** 160:12
**arriving** 41:12,12
**articulating** 8:25
**ascertain** 235:19
**aside** 86:11 120:8
**asked** 13:16 31:17 32:24 34:13 41:6,10 42:4 48:20,22 60:20 64:8 73:23 85:19 86:11 88:2,2 98:8 99:7 107:1 110:22 113:15 138:24,25 179:25 182:18 193:23 196:11 197:14,14 199:8 207:11 208:17 215:15 228:25 230:7 239:5 263:5
**asking** 15:10 32:5 40:6 44:10 47:12 49:19 57:17 60:22 79:5 88:7 108:1 122:3,22 138:7 155:2 168:21 175:11 189:4 196:25 208:13 222:24 226:7 285:25
**asks** 192:9
**aspects** 235:2
**assert** 259:19
**asserted** 129:10 130:11 241:17
**asserting** 16:11
**assessment** 192:12
**asset** 242:24 263:1
**assets** 11:10 141:6,10 162:12 168:16 252:23 256:24 261:17 262:22,23 267:10,11 283:22 283:23
**assign** 8:17
**assigned** 58:6
**assignment** 8:15
**assigns** 150:15
**assistants** 185:17
**assisted** 238:8
**association** 139:13,17 152:4,7,12 247:8 248:1,6 266:17
**associations** 253:9 254:2 267:1
**assume** 21:5 161:15 215:24 259:4
**assumed** 92:8
**assuming** 135:9 253:4
**assurance** 279:15
**assured** 208:18
**Atlanta** 71:23
**attach** 53:22 83:6
**attached** 15:1 46:20 104:13 128:12 132:16 183:16 227:5 229:5 271:11
**attaches** 6:3 129:6
**attachment** 129:21 129:21
**attachments** 130:12 133:2 184:7 187:25 188:4
**attack** 78:14 116:4
**attempt** 10:1 37:15
**attempting** 145:25 182:11,15
**attend** 191:1,1
**attended** 110:14 191:3
**attention** 85:7
**attestation** 278:3
**attorney** 71:19 100:23 108:18 112:19 113:19 114:21 151:10,11 175:20 198:8 230:3
**attorneys** 20:24 84:3 84:12 86:13 93:9,10 255:5
**audible** 38:21
**audience** 23:10
**audit** 62:11,13 64:14
**August** 43:24 44:6,7 44:12 77:22,23 89:15,17 91:1,15 146:7
**authenticate** 131:19 229:4
**authenticated** 39:10 129:12,22
**authentication** 131:14 134:24 143:10
**authority** 8:23,24 9:2 9:4 10:10 14:14 82:25 123:24 203:20 249:8,12 252:16 269:11 281:5,16 283:9 284:21,23
**authorization** 109:2 109:7
**authorize** 195:18 226:11
**authorized** 10:6 76:11
**available** 135:3 209:2

240:13
**Avenue** 1:31 2:9 51:11
**average** 164:16 166:17
**averaged** 177:7
**avoid** 238:20
**award** 250:2
**aware** 10:15 40:23,25 66:13,19 75:22 87:1 87:19 88:6 89:3 112:19 115:18,23 121:10 153:24 155:8 156:2 164:21 168:16,23 175:12 175:15 201:12,15 205:17,25 206:24 219:12 239:8 245:8 245:8,9 252:7,10 258:7 273:6
**awful** 87:10
**Axl** 253:24

**B**

**b** 138:1 266:23
**B.R** 235:5,17,20 246:17 247:17
**back** 12:20 16:21 20:2,13 28:17 36:4 36:20 44:5 46:24 55:18 56:5,17 62:1 62:7 63:9,25 64:6 69:4,8 72:7 74:8 82:6 84:18 95:5 97:6 100:1 107:3 108:16 109:3 110:20,25 119:2 121:12 122:8,20 124:24 125:18 126:3 128:1 131:21 131:23 137:18 143:23 145:3 155:23 159:13 161:16 162:10 172:15 173:3 174:24 176:11 179:17 186:24 196:17 199:19,24 201:5 202:12 208:19 211:10,21 212:5 232:21,25 234:4 237:2 244:9 245:6 254:19 258:4 260:10,15 277:13 281:23,24 283:19
**backdate** 273:6
**backdated** 273:7,9,10
**background** 90:18 204:13
**backup** 62:12
**bad** 6:10 9:23 10:17 11:15 12:11,12,13 14:6 16:25 21:4,12 21:21 22:16 47:19 167:7 217:16,22,23 218:3,9,19 219:21 231:21 234:7,14,24 235:2 246:12,13 250:1 253:14,22 261:14 262:12 264:2,3 265:8,10,11 265:19 269:19 274:13,13 275:2 276:11 281:22
**badgering** 33:23
**bags** 189:22
**balance** 52:13,15 54:2 56:15 57:2,7 57:10,11,13,17,20 58:4,7,15,25 60:6 60:11,12,23,25 61:4 61:8,11,21,24 62:21 63:1,5,8,13,20 64:2 64:6 65:23 104:12 104:23 107:7 127:13 131:4 146:6 172:21 209:14,15 225:4,5,8 229:5 241:4
**Ballato** 235:16
**ballpark** 164:14
**bank** 34:11 40:10 49:17,24 82:24 91:8 138:10 139:12 140:10 143:3,11,11 144:9 172:15 174:16,18,19 178:20 182:22 205:2 207:13 224:12 236:9 240:24
**bankruptcy** 1:1,19 3:6 5:4 15:3,3 57:3 71:22 73:14,25 75:2 75:7,10 86:2 87:7,8 87:21 89:11 95:11 113:11,13,19 114:12,17,21 115:19 118:13 121:7,8,8,24 123:4 125:13 161:25 162:3,8 183:10 187:12 198:24 204:2 211:9 217:18 218:8,9,12 219:7,12 234:14,15,17,23 235:6,7 237:23,25 238:5,7 241:23 243:10 245:7 246:11 249:8 250:4 251:21,25 252:8,13 252:16 253:1 254:14,21,22 256:9 256:22 257:25 258:1,3,5,6 260:4 260:10,25 262:21 266:6 269:20 270:3 270:14,17,20,23 274:8,12,14 275:3,7 275:10,14,15,16,23 277:8,23 278:23 281:17 284:21
**banks** 264:17 267:4
**bar** 244:4 250:3,8
**based** 11:7 21:6 57:5 57:9,10,14 62:21 63:2 64:13 65:16 82:11 96:2 103:24 139:8 162:25 163:9 165:10,22 169:8 188:7,9 218:17,18 249:2 256:23
**basic** 110:21 157:2
**basically** 29:17 113:3 271:14
**basis** 268:6
**battle** 281:25
**Beach** 25:13 147:1
**Beachside** 24:21 26:1 26:2,5,11,18 27:3 27:12,16 30:1,18 36:16 164:22 165:11,20 168:24 236:22 271:17,18 272:7
**Beachside's** 26:7 27:9 37:16 241:12 272:1
**bears** 235:14
**began** 146:19 263:15
**beginning** 173:4 245:8 281:3 282:18 282:20
**behalf** 1:34,41 2:6 6:6 30:7 36:25 37:1 40:24 45:10,13,19 76:25 77:3 82:12 89:12 90:23 93:22 109:24 137:22 138:8 139:2 144:6 144:22 155:16 173:10 182:11,15 184:2 187:12,22 203:7,20 230:6 237:20 238:8 240:19 252:14
**behave** 20:22
**belief** 122:7 150:10 150:13
**believe** 18:24 62:5 71:22 72:17 77:8 81:5,15,21 84:25 85:17 88:17 89:16 89:20 93:8 95:14 110:17 115:13 116:8 118:12 140:10 150:15 158:25 164:14

174:17 180:1,1 181:18,20 189:3 190:22 196:11 211:20 222:2 225:7 225:10 233:20 247:10 253:23 255:10 282:19
**believed** 84:8 100:22 181:20
**believer** 122:1
**Belle** 220:23
**belongs** 270:13 276:11
**bench** 13:17,18 97:10
**beneficial** 8:11 84:10 92:20 191:25
**beneficiaries** 214:24
**beneficiary** 79:23 190:12
**benefit** 92:13,20,23 109:10
**Berry** 8:16
**best** 8:25 10:10 59:3 74:18 109:5,25 211:23 243:5 255:23 258:25 259:7 275:5
**bet** 211:13
**better** 6:22,22 71:14 84:4 93:16 125:2 211:23 224:14 251:21 262:13
**beyond** 15:9 74:20,21 147:14 228:15,21 228:22 279:22,23
**bifurcate** 147:22
**big** 17:23 165:18 273:1
**bill** 29:25 30:16,22,22 34:17 35:23 36:7,24 36:25 37:4 42:24 43:25,25 44:1,3,8 44:20,21 45:1,12,17 45:17,22,23 134:2 174:14
**bills** 26:15 29:13,14 35:18,25 37:7 43:3 45:4,10,13,19 62:12 84:5 94:6,11 114:22 137:10 184:23,24 186:1,9,10,12,16 193:24 195:5
**binder** 27:20 38:20 46:11 53:14,23 54:21,24 171:16 173:4 174:22 198:21
**binders** 25:22
**bit** 31:6 107:12,17 120:4 137:7 202:12 202:22 206:11
**blatant** 262:12
**Blechman** 75:21 76:19
**Bloodworth** 1:29
**Bluff** 141:11
**Blvd** 2:4
**boil** 251:24
**bona** 234:21 235:11 235:12
**book** 52:16 53:12 137:20 148:8 213:5
**booked** 27:2 140:25
**booking** 26:22
**bookings** 26:15
**booklet** 148:18
**books** 57:5 59:22,23 62:19 68:3 94:16 140:25 142:19 205:9,13 213:5
**boot** 74:11
**borrowed** 81:1 238:10
**Bos** 247:17
**boss** 109:1
**bother** 219:13
**bottom** 43:19 46:19 47:2,22 173:9 210:12
**Bowling** 264:12
**box** 101:24 128:9
**boxes** 189:22
**Bozarth** 1:30 75:3
**bread** 229:18
**break** 69:1,3 124:16 124:17,20 179:9,13 231:2 232:21
**Brevard** 150:24 151:22 152:20 263:12
**brief** 24:17 67:7 69:6 179:15 204:4,4 232:23 260:9 279:1 279:3 283:11 284:3 284:4,5 285:12
**briefing** 16:13 286:13
**briefly** 260:9
**brilliant** 85:4
**bring** 7:19 10:2 17:9 17:12 30:6 71:5 199:5 219:3 244:3 245:23,24,25 258:15 280:13 281:16
**bringing** 8:3 260:19
**brings** 268:17
**broker** 154:12
**Brooke** 185:17 195:13
**brother** 184:3 196:13
**brother's** 196:12
**Brothers** 146:23
**brought** 29:18 46:12 46:13 47:7 67:6 136:1 249:14 263:15
**Buchalter** 154:9
**Buchalter's** 95:2
**buckets** 189:22
**build** 80:17 277:12
**builder** 80:12
**building** 180:15 269:17 276:18 277:11
**built** 277:13
**bunch** 28:20 117:2 123:19 129:6 251:23
**burden** 219:5 234:21 235:9,10 236:2 241:9,15 246:18 247:1,23 249:22 251:25 259:16
**burdens** 235:8
**burned** 85:6
**business** 52:19 65:6 74:17 76:18 93:1 94:19 112:16 142:15 143:15 167:17 182:22,25 184:16,19 190:23 191:6 196:9 217:21 255:25 267:12,12 269:8,19 270:22 271:13 285:8
**businesses** 76:6,16,18 237:15
**button** 226:11,25
**buy** 126:13 229:18 262:16
**buyer** 101:24,25 239:23

**C**

**C** 1:21,26 5:2 171:4 287:1,1
**calamity** 110:21
**calculated** 91:10
**calendar** 222:9
**call** 19:17,25,25 23:25 24:1,19 30:24 31:1 37:2 50:19 62:1 69:13 76:21,22 83:7 93:3 113:5 139:23 146:25 179:7,8,21,22 185:10 195:12 202:2 211:16 217:9 217:12 220:9 265:22
**called** 12:10 20:13 52:14 59:22 73:5 74:12 96:10 118:10 154:2,10 186:24 190:20 217:10 276:18
**calling** 20:2 105:16 168:3 220:11

**calls** 13:14 66:7 67:4
**camp** 74:11
**can't** 8:17 17:24 18:1 58:20 59:4 76:20 86:12 109:14 118:25 132:24 140:12 233:13 244:21,22,22 249:24 256:17 263:2,3 273:5 278:10,13
**Canaveral** 77:24 79:11,20 80:1,10 92:1 182:7,15
**canceled** 34:9,12,13
**capacity** 8:8 15:1,18 167:21
**Cape** 26:9 80:2,8,12 92:15 95:18 141:10 145:17 152:3 184:20 185:9 193:12 266:16
**Capital** 17:9 20:17 21:4 22:16 79:18,24 80:22 92:20,22 108:11 159:4 160:7 160:8 190:17,21,24 191:2,9 192:3,4,7 237:7 248:9,21 249:12,16
**Capital's** 191:5
**capitalized** 17:2
**Capouano** 1:30
**car** 174:6
**card** 134:5 178:22 179:1 194:12 195:2 195:6,7,9 236:9
**cards** 147:2
**care** 31:1,2 34:17,17 121:11 122:19 192:13
**carried** 225:5
**Carton** 254:6,9,13
**case** 1:5 5:11 8:25 12:20,21,22 13:3,7 15:3,4,13 16:14 19:20 20:2,4,12 22:11 32:6,9 73:19 75:18,19 79:19 86:2 86:6,7 87:1,8,20,21 87:23 89:11 90:7 93:20 95:22 97:8 113:11,13,19,20 114:2,12,12,18 115:1,2,19 116:13 118:9,11,14,16 120:6 121:5,24 122:17 123:4 129:3 161:25 164:23 165:11 178:6 183:10 187:12 219:3,4,7,12,17,20 234:19 235:5,17 236:4,17 237:23,25 238:5,7 241:23 242:9,11,23 245:7,8 246:4,11,13,17 247:16 249:4,5,6,6 249:8,12,15,20,23 249:24 250:1,2,14 250:15,16,23 251:21 252:2,8,12 252:13,14,16,20 253:1,2,10,18,24 254:3,21 255:22 256:11,22,24 257:1 257:4,25 258:1,3,5 258:6 259:15,15 260:4,10,18,21 263:9,16 264:17 267:22 268:7,8,21 269:4 270:18 274:12 275:3,3,7,24 275:25 276:1,11,16 277:9,10 279:20,21 280:6,19,20,23 281:17 283:22 284:21
**cases** 8:17 15:14 75:1 198:24 250:5,20 260:25 268:6,11 281:12 282:6 283:13,20
**cash** 103:1,10 127:12 127:20 205:2 208:24 209:2 243:14
**category** 209:21
**cause** 249:22
**caused** 127:6
**CC-103** 43:11,22 44:2,25
**CCVR** 30:5 145:5,17 145:19,22
**cent** 39:24
**cents** 40:4
**certain** 26:15 27:13 29:14 89:3,3 90:22 139:14 154:16 184:23
**certainly** 21:7 28:5 71:24 75:1 114:10 120:16 211:8 236:4 241:6 267:18 269:13
**certificate** 4:11 157:13 266:8,11
**certificates** 266:12
**certify** 287:2
**cetera** 58:10 141:11 154:19,19 168:10 250:8
**chain** 109:21
**chambers** 13:18
**chance** 16:6 21:7 117:15 244:7 257:15 280:25 281:2 284:10 285:19
**change** 119:9
**changed** 66:18 155:25
**Chao** 79:7
**chaos** 8:4,5 79:7
**chapter** 11:9,13 74:25 162:14 250:9 250:14 252:22 253:2,6,12,12 256:24 258:13 265:22 267:20 279:20,21 280:6,19 280:20,23 281:2 282:21,25 283:13 283:18,23 284:9 285:9
**charge** 11:10 94:6 110:8 111:9 113:2 122:20 222:5
**charged** 36:23 44:5 219:23
**charges** 39:21
**Chase** 173:9
**cheap** 262:16
**check** 47:2,23 49:3 49:20 56:6 62:1,7 83:3 108:17 111:13
**checked** 159:13 176:12
**checking** 195:1
**checks** 143:23 144:15
**children** 92:17,17 196:13
**chime** 57:24
**choice** 79:8
**chose** 244:20
**chosen** 258:14
**churn** 249:22
**circled** 55:12
**circuit** 10:9 89:6 99:4 118:14 218:4 234:5 261:13 263:8 264:2 268:4 283:14,17,21
**circumstances** 243:5 269:8
**cite** 261:12
**cited** 253:23 268:6
**cites** 118:13 261:11
**City** 30:16 36:2,6
**claim** 7:4,5 15:4 32:7 32:9 39:20 46:16 47:7 48:11,14 82:11 96:2 98:12 109:23 121:8 128:12,13 129:3,6,11,19 130:2 130:12 131:2 133:7 133:11 138:21 144:17 150:25 151:1,3,7,21 155:3

155:5 160:13 169:14 171:14,14 173:3 183:10,12,16 183:19 184:6 187:11,14,17,24,25 188:5,7 198:6 205:21,22 207:2 219:9,25 221:13 227:5 234:16 235:11,12 238:1,16 239:6,18 241:16 246:24 247:9,14 249:16 253:5 256:6 256:7 257:2,22,23 266:3,4,8
**claimant** 120:9
**claimed** 152:1 176:19 219:24 256:12,13 257:6
**claiming** 71:16 95:15 96:2 107:8 175:21 176:20 205:17 226:8 256:2 257:9 257:10 260:20
**claims** 9:24 71:17 96:3 97:14 107:7 148:24 154:25 169:15 176:19,21 176:24 206:24 218:11,19 219:6,8 219:13,17 234:25 235:24 236:8 237:9 237:10,20 238:4 240:24 241:6,10,15 247:8,8 255:23,23 256:4,4,5,7,19 258:1,2 266:1 276:2 279:9,10
**clarification** 65:20
**clarify** 7:14 14:23 34:22 35:22 161:23
**cleaning** 26:14
**clear** 34:25 84:4 99:2 107:24 211:17 236:3,7 245:10,22 267:25
**clearance** 154:10
**clearly** 238:21 242:2 250:1 259:16 270:25 273:10 275:15,23
**click** 226:10
**client** 13:15 58:20 62:10 65:20 66:10 68:2 212:18 260:20
**client's** 48:14 53:14 64:2 68:3 72:4 120:22
**clients** 269:21
**close** 56:9 105:7 109:3,20 192:20 208:14 210:8 227:17 239:18,21 240:13,14 275:13
**closer** 9:17 68:7 71:3 71:5 93:25 193:17 283:15
**closing** 4:9 101:12 105:5,9,9,22 126:18 126:20 127:8 218:14 219:3 220:2 231:1,4,4,20 233:3 242:12 245:21 257:19 273:20,22
**Club** 147:1
**clue** 116:1
**co-founder** 26:6
**CO2** 40:16
**Cocoa** 25:13 30:16 36:3,4,6,11
**code** 234:14 235:7
**codes** 37:17
**Coincidentally** 106:24
**collapsing** 77:25
**collateral** 243:14
**collect** 27:9 77:2 79:15 85:9 162:1 182:6,11,15
**collected** 80:25 81:6 141:3 272:19
**collecting** 43:5 81:7
**collection** 77:19 79:14 141:10 182:4
**collections** 141:5 182:5,19
**collector** 150:24 151:23 152:21 253:9 254:1
**collector's** 151:3
**Colony** 146:25
**colorful** 240:9
**combine** 233:9
**come** 14:4 20:8 30:1 38:11 56:17 69:4 72:7 75:25 93:11 100:1 119:2 124:23 126:9 127:7 131:21 131:23 132:24 158:23 202:5 209:2 217:15 220:14 235:23 248:24 251:6 260:15 276:3 281:6 282:12 283:15
**comes** 83:4 270:10 274:9
**coming** 50:20 148:4 164:14 197:22 277:21
**commence** 8:6
**comment** 87:9
**commercial** 174:9
**Commission** 287:9 287:10
**communicate** 162:18
**communication** 26:24
**community** 138:10 139:12 155:9,12,15 156:3 270:21 271:10
**companies** 34:3 74:19 76:11 81:3,3 111:18 168:18 244:24,25 272:22
**company** 26:6,14,25 30:5 34:14,18 37:1 66:24 73:5 74:12,15 78:19 79:19 80:15 81:14 85:3,5 90:25 94:13,16,17 95:2,6 96:9 113:2 182:4,5 185:18 190:20 205:14 213:6 219:15,24 224:8 249:9 270:11,14,25 271:1,1,4,22,23 275:18 276:18 277:11,12,13 279:11
**company's** 169:15 271:1
**comparables** 154:17 156:14 177:5
**compare** 237:2 271:25
**competency** 120:8
**competent** 192:10
**compiled** 183:15
**complaint** 258:8,12
**complaints** 243:21
**complete** 14:3 126:14
**completed** 73:4 271:15
**completely** 197:24 198:12
**completion** 80:22
**complex** 80:23 224:5
**complicated** 160:18
**compliment** 78:13
**comply** 279:15
**computer** 165:8 225:18
**conceded** 147:24
**conceding** 21:5
**concern** 17:19 267:13 270:5 271:13
**concerned** 107:5 116:19,25
**concession** 252:11
**concessions** 114:1,7 268:21
**conclude** 99:20
**concluded** 286:24
**conclusion** 10:18 108:21 151:9 159:16

**condition** 149:7 177:12
**condo** 26:16 91:24 156:18 208:14 210:8 253:9 254:1 259:24
**condominium** 152:4 152:7,8,12 266:16
**condominiums** 33:15 33:15 156:5 236:11 236:12
**condos** 26:9,19 27:4 27:10,13 30:4,6 80:5,6 96:7,13 97:15 103:25 105:5 108:12 156:15,15 156:16 242:24 247:3,6,20 248:22 248:23 252:25 253:1
**conduct** 146:3
**conducted** 255:25
**conference** 243:23 244:1
**conferences** 243:20 243:21
**conferred** 268:3
**confident** 251:11
**confinement** 76:13
**confirmation** 171:21 172:10 194:12
**confirmed** 154:11 245:7
**confirming** 134:12,13 175:18
**conflated** 264:5
**conflicted** 263:2
**confused** 189:6 201:21
**confusing** 126:19 224:18
**confusion** 128:21 181:17
**Congress** 268:3
**connection** 72:9 96:6 100:24 188:14,24
**consent** 87:22 243:13
**consented** 88:5
**consenting** 87:20 238:7
**consequences** 235:4
**consider** 251:24
**considered** 241:14
**considering** 35:11
**consolidated** 158:24 160:17 169:1
**conspired** 249:3,11
**constraint** 23:21
**constraints** 23:3,4
**Construction** 77:24 79:11 80:11,14 82:2 141:11 146:18,20 182:7
**consumer** 75:1
**contact** 30:24
**contemporaneous** 273:7
**contention** 235:15
**contest** 204:2 279:13
**contestable** 241:16
**contested** 254:10 279:6,6,8
**contesting** 161:14
**context** 153:24 234:23
**continuance** 243:24
**continue** 10:25 16:24 55:22 68:21 98:22 199:15 275:17,25 282:1
**continued** 2:1 3:5 22:1 28:16 66:16 100:11,16 229:3 243:19 244:14
**continues** 14:5
**contract** 34:6 36:25 37:20,22 38:1 41:21 45:11,18
**contractor** 136:1
**contracts** 76:3 78:23 244:22
**contributed** 81:16
**contribution** 81:17 81:18
**control** 29:14,25 162:5 215:17 241:22 243:9 245:14 249:9 252:2 259:11,14 282:14
**controlling** 168:2
**controls** 264:11 269:3
**convenience** 134:4
**conversations** 149:14 149:16,24 254:16
**convicted** 72:8
**conviction** 73:1
**convince** 13:21
**cooperate** 267:15
**copies** 85:8 131:8 142:11 198:19
**copy** 55:8,19 92:18 118:11 128:1,6,8,10 128:11 131:1 132:2 198:16,18 226:4
**Coral** 180:14
**core** 259:14
**corporate** 24:20 70:5 70:14 112:25 122:4 124:7 167:19 175:9 203:20,24 214:16 240:6 244:23 245:14 252:2,15,15 252:18 264:15,18
**Corporation** 256:15
**corporation's** 205:9
**corporations** 167:20 167:22
**correct** 6:11 7:15 22:10 35:4,11,20 45:24 46:2,3 47:23 48:1,4 49:14,18 53:21 55:8 63:6,11 63:22 65:6,9,17 66:3,4,6,24 70:6,9 70:12,15,24 71:18 71:23 72:4 73:6 74:7 75:10,11,14,18 76:3,4,7,8,25 77:2 77:12,13,16 78:21 79:1,12,13,17,20,24 79:25 80:7,12 81:8 81:10,14,20,24 82:4 82:7,16,21 83:2,14 83:15,17,25 84:20 84:23 85:3,13,16,24 85:25 86:3 87:2,8 87:17,21 89:13 91:17,19,24 92:4,14 92:21 93:9,13 94:21 95:12,16 96:4,13 97:15,23 100:12,21 101:14 102:5,14,23 103:25 104:1,4,16 106:3,21 107:9 110:8,12,15 111:3,7 111:10,23 113:11 113:20 114:14 115:3,19 116:24 120:6 121:21 122:17 123:11 124:9 127:10 131:1 131:9 132:2 139:1,3 139:4 140:18 141:13,14,20 142:11 147:25 151:21 155:1,13,16 157:18 158:21 165:24 166:6,25 168:6 172:2,3,5,6,8 172:9,11 173:1,2,16 174:4,19,25 175:7,8 175:12,13 176:21 177:19 180:2,3 181:5,8,11,19,20 182:2,8,16,17,25 183:4,5,7,13,20 184:8,10,13,17,20 185:2,12,22 186:21 186:22 187:9,10,18 188:1,5,6,8,15,24 189:19 190:10,21 191:2 193:13 211:2 211:3 213:10,12 223:23 224:25 225:16 260:23 287:2
**corrected** 55:13
**corrections** 118:19

**correctly** 22:17 61:10 62:2 74:14 109:17 172:14 261:12
**corrects** 119:8
**corresponds** 105:4
**cost** 115:7 139:13
**costs** 84:16,20 250:2
**couldn't** 10:14 31:7 56:6 108:14 116:16 120:18 135:5 175:6 194:24 229:21 237:1 239:15 240:4 264:20
**counsel** 32:18 34:11 117:10 192:10 199:22 229:22,23 230:1 254:13
**counselor** 7:1
**count** 103:6 157:23 159:14 267:2
**counterclaims** 259:19
**counteroffer** 243:22
**country** 99:3,5
**County** 150:24 151:22 152:20 263:12
**couple** 19:6 224:6 232:13 240:2 267:6 269:20 282:18
**course** 7:14 87:3 93:24 94:3 119:24 142:15 159:3 195:19
**court** 1:1,48 5:4,7,8 5:11,16,21,23,25 6:2,3,7,12,15,17,20 6:24 7:2,16,21 8:1 8:10,20 9:1,3,8,10 9:16,19,22 10:2,3,4 10:7,14,24,25 11:1 11:12,17,19 12:1,6 12:8,12,14,16,18,21 13:23 14:1,7,9,11 14:16,17,19 15:24 16:5,16 17:15,21,25 18:5,8,11,19,23 19:1,11,15,18,23 20:7,11,17,25 21:2 21:4,9,11,17,19,24 22:6,14,21,24 23:7 23:12,15,18,24 24:2 24:4,7,11,14,16,22 25:3 28:1,4,7,9,21 28:24 31:14,17,20 31:22 32:8,15,17 33:1,9,25 34:22,25 35:14 38:8,13,15,19 39:6,12,15 41:7 42:2,7,15 43:2,7 44:10,17 46:7 47:7 47:11,15 48:8,13,16 48:20,24 49:4,10,19 50:2,9,14,18,21,24 51:10 52:1 53:3,7 53:13,19,25 54:5,8 54:12,16,20,25 55:2 56:19,22 57:21,23 58:1,9,23 59:2,7,11 59:13,17,19,24 60:2 60:10,14,18,22 61:6 61:15 62:9,15,23 63:1 64:10,17,23 66:19 67:1,3,5 68:6 68:9,13,15,17,24 69:2,8,10,15,18,21 69:23 71:1,5,7,10 71:14 72:1,15,19,22 72:25 73:12,16,21 74:2,4 75:4,13 78:11 84:5 86:21 87:12,14 88:24 89:7 90:13,13,15 101:19 101:21 103:11 104:20 105:18 108:21,24 109:8 112:22 117:3,18 118:7,18,21 119:3,6 119:17 120:23 121:17 123:22 124:15,19,23 125:1 125:3,8,13,16,22 127:23 128:4 129:4 129:18,24,25 130:7 130:10,15,17 131:2 131:18,22,24 132:10,12,22 133:1 133:5,7,10,13,15,25 135:11,22,25 136:3 136:8,24 137:14,21 138:3,6,15,18,23 139:2,6,8,11 140:1 140:6,9 142:8 143:2 143:8,13,20 144:9 144:20,24 147:3,6 147:17,19,23 148:2 148:5 149:10,18,20 150:13 151:9,11,16 153:7,14,17 154:7 154:20,23 155:2 156:9,11,19,23 157:5,24 158:2,5,9 158:11,15,18 159:17,20 160:3,7,9 161:9,11,14 163:6,9 163:12,17,25 164:6 164:19 165:1,6,10 165:14,17,22,25 166:16,21 167:5,14 167:25 168:6,9,13 168:21 169:11,19 169:24 170:3,10,19 170:22 171:8,11 174:25 176:3,13,15 177:3,5,25 178:3,8 178:12 179:5,10,12 179:17,19,23 180:5 180:21 187:3,5,7 190:16,18 191:12 191:16,25 192:3,5,8 192:11,14,19,22 193:9 194:14,16,21 194:23 196:7,10,15 196:22 197:2,5,8,9 197:11,25 198:4,11 198:13,18,25 199:9 199:12,18,22 200:3 200:6,16,18 201:1,4 201:19,23 202:4,13 202:19 204:12,16 204:19,21 206:10 206:14 208:6,8,10 208:25 210:1,16,20 210:22 211:6,11,24 212:23 213:14,16 213:18 214:13 215:1,3,14,23 216:8 216:10,13,19,21,23 216:24 217:2,5,8,15 217:24 218:2,17 219:5 220:2,4,6,10 220:13,22 221:1,4,6 221:10,15 222:8,11 222:20,25 223:8,16 223:19 224:2,19 227:10 228:9,20 229:2,8,10,12,14,17 229:19,22,25 230:10,13,16,19,23 230:25 231:7,10,12 231:16,23 232:1,7 232:10,15,18,20,25 233:2,5,10,13,18,22 233:25 234:3 235:18 242:12,18 242:21 243:20 244:3 245:18,20,24 246:1,2,5,6 249:7 249:22 250:1,6,7,17 250:25 251:5,8,12 251:15,22,25 252:1 252:18,21,21 253:14,17,20,25 254:17,19 255:3,4,6 255:7,8,12,14,16,18 256:9,9 257:19 258:7,9,9,10,11,19 258:22 259:2,5,13 259:16,20 260:6,7 260:10,12,15,24 261:2,8 262:7,9 263:15,20 264:9,12 264:19 265:11,15 265:17 267:24 268:1,15,22 269:1 269:14 270:3,6 271:6 273:15,24 275:25 276:6,12,13 276:15,25 278:10

278:13,14 279:2,4,9 279:10 280:1,4,8,10 280:12,14,16,17,24 281:1,8,18,20,22,25 282:3,5,8,11,16,21 283:3,6,15 284:1,4 284:6,11,13,16 285:1,4,6,10,17,21 285:25 286:5,7,9,18 286:18
**court-appointed** 181:10
**Court's** 58:5 120:1 121:23 246:7 252:7 260:5 268:16
**COURTHOUSE** 1:21
**courtroom** 5:3 25:4,9 25:14 50:25 51:6,13 69:5,8 125:9,12 163:19 179:14,17 180:6,12,17 200:24 202:6,11,14,17 220:15,20,24 232:22,25 286:20
**courts** 247:12 251:23 268:2
**cover** 84:15 176:21 248:18
**coverage** 33:17
**covers** 151:20
**CPA** 19:8 23:9 52:5 204:6 212:13
**create** 42:18 136:4 216:6
**creates** 270:17,19
**creating** 107:19
**credit** 102:12,18,24 103:9,9 134:5 146:18 147:1 150:19 178:22,25 195:6,7 236:9 271:12
**credited** 102:21,22
**creditor** 78:1 79:19 87:6 88:4,9 89:5,5 90:21 116:7,16 117:9 120:9 121:14 150:23 158:25 159:1,2 162:4,5 205:23 206:2,16 207:3 217:20 218:6 235:10 236:5,24 244:10 246:14 247:13,15 249:13 256:14,18 263:9,11 263:25 266:2,4,7 268:25 269:12 270:1,21
**creditor's** 117:10 234:13,25 246:18 261:14
**creditors** 7:24 16:23 17:1,2 21:22 79:16 80:25 81:2 88:11 105:23 117:1 120:5 121:12 123:11,12 123:14 147:24 148:14,21 149:7,13 149:25 150:3,7 158:21,23 159:9,22 159:23,25 160:6 162:4,9 164:9,10,11 169:10 170:16 216:12 218:19 219:1 232:3,4 234:20 235:8,23,24 236:3 242:4 243:1 243:22 244:3,5 246:15,20,22,24,25 246:25 247:22 250:4 251:21 253:8 253:10 254:4,8,10 255:19,21,22 260:25 261:16 262:14,19 263:12 267:1,11 270:12 274:11,15,19 275:2 275:5
**credits** 169:18
**Crescent** 37:23 38:4 38:5 151:23 203:8,9 203:15 215:7,9,21 252:11 266:14,19
**crime** 72:9
**criteria** 251:23
**cross** 3:12,13,20,21 3:27,34,40 4:6 20:6 29:1 31:23 38:22 64:23 65:1,3 67:8 105:13 126:1 170:24 192:23 201:20 211:14 225:13 228:16,22 279:23
**Crossing** 26:10 80:2 80:8,12 92:16 95:18 141:10 145:17 152:3 184:20 185:9 193:12 266:16
**Crossings** 182:7,15
**Crossroad** 79:11 92:1
**Crossroads** 77:24 79:20 80:1,10
**CS** 10:9
**CSX** 10:9 178:4
**CTO** 1:41 5:18 6:10 7:7 8:4 17:1,8 22:1 22:5 32:16 39:20 40:14,14,17 46:1,15 49:25 52:23 60:13 63:10,17,20 70:6,6 70:8,11,21,22,23 71:16 77:6,8,16,17 78:21 79:2,3,7,10 80:24 81:9,23 82:12 82:19,24 83:14,16 83:22 84:23 85:11 85:12,23 87:6 88:9 89:12,15 90:2,6,21 90:22 91:15 94:13 94:15,18 116:3,23 117:6,8 120:14 121:1,3,3,6,10 122:4 123:1 128:17 137:18,19,21 138:8 138:9,21 139:2 140:25 141:7,9,25 142:14,17,20 143:23 159:4 160:4 161:18,18 171:13 173:3,9 178:14,16 181:4,4,15,18 182:1 182:4,11,14,22 183:4,6,10 191:23 192:1,10 195:22 197:7 198:7 205:17 205:23 206:16,20 206:21 218:20 219:10 232:2,8 236:5 237:13,15 238:10,12,12,14,24 241:20 243:15 244:15,20 245:7 247:19 248:9,9 249:4,14,19 263:13 269:16 272:3,16,16 274:6 277:6
**CTO's** 50:1 77:11 82:11 143:11,14 144:9 171:5 183:16 191:22 198:1 205:21 238:1,4 272:2
**current** 62:3 93:1 114:11 177:12
**currently** 76:2 82:3 92:24 95:14 187:9
**custodian** 142:17
**CVR** 106:13
**Cynthia** 287:7

**D**

**D** 3:1 4:1 5:2 287:7
**damages** 15:19 250:3 259:17,19
**danger** 265:3
**Daniel** 8:16
**Daniels** 94:9
**darn** 13:23
**data** 62:14
**date** 28:17 44:11 56:8 56:8 80:24 97:2 99:21 102:4,5 105:4 124:6 144:16,17,17 174:13 181:21 213:25 222:3 241:11,13 244:4,4

250:21
**dated** 58:5 144:18 173:12 226:8
**dates** 273:2
**daughter** 196:2
**day** 6:8 11:22 13:3 15:11 23:17 27:6 29:22 44:15 105:11 115:19 197:21 208:19 210:10 219:9 242:14 244:12,13 260:16 263:5 265:7 274:24
**day-to-day** 65:5 77:15,17
**days** 105:6,8 116:15 118:3 189:10 193:1 198:3 240:2 244:14 285:15
**deadline** 56:9
**deadlines** 286:12
**deal** 59:25 60:1 83:12 106:2,4 109:1,3 188:21 218:20 269:19 273:1 278:13 284:20
**dealing** 7:7 246:1
**dealings** 208:4
**deals** 77:11 93:21,24 94:3 105:22 106:3
**dealt** 7:3 281:18
**Dean** 1:29
**debate** 269:15
**Debbie** 30:25 83:10 109:5 120:13,13 192:25 200:11 201:8
**Debbie's** 94:9
**debit** 31:11
**debited** 44:13 104:2
**debits** 103:16
**Deborah** 2:19 3:31 37:3,16 45:7 70:8 179:22 180:14,23
**debt** 22:18 60:7,17,21 60:25 61:10 62:18 63:10,23 83:24 140:19,20,23,24 141:7,8,9 152:8,10 160:24 161:1,5 162:2 169:1,19,20 170:7,12,17 204:24 205:6,9,18 238:11 238:20,22,23 243:17 247:5 249:18,19 266:22 273:19,23 274:2
**debtor** 1:11,34 90:22 162:5 234:11 235:4
**debtor's** 3:5 235:15 246:15 261:17
**debts** 7:25 17:5 20:5 64:15 77:2 100:1 138:9 143:15 161:6 161:12,15,17 169:25 182:10,14 234:21 236:14 247:24,25 248:13 248:24 249:21 262:4 270:15,25 272:23 274:5,6
**dec** 278:14
**December** 27:5,7,8 35:19 37:21 54:3 58:5 59:8 63:12 156:10
**decide** 262:25 269:3 275:25
**decided** 30:6 116:22 116:22 264:9
**deciding** 161:16
**decision** 117:23,25 119:21 215:6 247:18 262:24 276:7 283:24
**decisions** 13:1 93:13 203:20
**declaratory** 258:8 276:4
**deduct** 37:1
**deed** 10:11,11 11:23 216:5 257:22
**deeds** 259:24
**deems** 250:6
**defamation** 251:4
**default** 13:5,6,8 91:9
**defend** 76:24
**defines** 17:1
**definitely** 19:4 62:8 160:5
**definition** 251:7
**defrauded** 260:21
**delay** 249:22
**delivered** 183:17
**demand** 206:21
**demonstrate** 252:20
**demonstrative** 246:3
**denied** 10:3,24 230:17,18
**deny** 11:1 220:4,7
**denying** 48:16,25 49:2 258:9
**deposed** 175:2 240:4
**deposition** 81:5 85:2 97:17 98:2,8,22 99:21,21 100:11,12 100:14,16,17,19 107:1 108:14 110:14 112:20 117:13,15,19,22,24 118:17,19 119:20 121:1 122:5,23 159:12 176:10 178:2 180:1 185:25 186:8 189:5,8,12 192:25 193:3 197:18 240:8,21 254:7 255:10
**depositions** 22:4 112:10 239:13
**depressed** 177:12 247:6
**DEPUTY** 5:3 25:4,9 25:14 50:25 51:6,13 69:5,8 125:9,12 179:14,17 180:6,12 180:17 202:6,11,14 202:17 220:15,20 220:24 232:22,25 286:20
**describe** 148:23
194:5
**described** 77:8 84:25 85:2
**description** 140:16
**despite** 166:24
**detail** 62:4 266:25
**detailed** 31:6
**details** 150:9 188:17 188:18 264:6
**determination** 8:7 97:7 235:12,13 276:11
**determine** 9:1 42:21 43:5 205:9 234:7,24 252:15 265:23 283:7 284:23
**determined** 10:17 116:22 250:3 284:17
**determining** 11:22
**developed** 80:9
**developer** 80:2
**development** 184:20 204:7,8 256:1
**dials** 194:10
**didn't** 8:18 11:1 12:1 13:1,9,15 18:9 20:20 27:24 28:10 31:9 33:18 53:22 57:20 58:7,23 64:8 64:14 68:20 73:24 74:10,13 78:5 87:22 88:11 91:13 94:10 97:18,22,24 98:7,14 98:16 99:12,20 100:3,6,18,25 101:2 105:11 107:2,3 109:1,19 112:1 115:9 117:8,14 121:3,11 123:24 127:7,19 131:12 136:3,6 142:24 143:25 147:21 164:1 169:23,23 170:2,14,14 178:25 182:20 185:21 186:20 189:1,1

195:2,3 197:18 209:18 212:9 219:13 224:5 225:15,19 229:6,6,8 229:8,23 231:12 233:11 235:25 237:1,10 239:4 243:4,7 248:17,23 249:17,21 257:25 258:2,16 263:17 264:15 266:11 272:8,12,12,16 277:12,23 279:7,17
**difference** 14:6 108:4 126:25 146:1 224:11
**differences** 108:2
**different** 41:19 42:12 54:13 127:7 151:24 153:24 260:24 267:8 268:24 270:24 272:25 282:24
**difficulty** 41:16 107:18
**dinner** 167:2 269:7
**Dinosaur** 135:21
**DIP** 139:15
**direct** 3:11,19,26,33 3:39 4:5 25:20 49:9 51:19 70:3 181:1 203:5 213:1,1 221:22 229:1,7 238:15
**directed** 78:1 217:14 217:23 220:5,7
**direction** 43:1
**directive** 120:2
**directly** 62:10 75:24 82:23 131:11 194:25 197:6 201:10
**disagree** 275:20
**disallowed** 130:6
**disallowing** 130:7
**disappear** 226:19
**disappears** 226:21
266:15
**disappointed** 274:18
**disbarment** 72:25
**disbarred** 72:3,5 151:11
**disbursement** 102:5 209:13 239:21,25 240:2
**disbursements** 106:6 106:7,20 145:4 175:3,7 209:20
**disclosed** 217:11
**disclosure** 148:12,20 148:23 150:24 170:4
**discount** 224:15,20
**discovery** 22:2,3 58:7 135:4 197:14 222:22 239:5 244:7 246:9
**discretion** 214:25
**discuss** 57:17 176:7 221:2 282:22
**discussed** 72:18 82:7 86:5 114:12 141:23 147:14 275:9,9 276:2
**discussing** 101:14
**discussion** 254:12
**discussions** 113:18 150:20 269:13
**dismiss** 3:6 6:9 117:9 233:6 245:9 250:2,7 250:16 281:22 283:22
**dismissal** 113:25
**dismissed** 249:5
**dismissing** 13:3 115:1
**disperse** 11:11
**disposition** 262:22
**dispositive** 10:8 178:5
**disproportionate** 261:17
**dispute** 72:22 121:23 169:15 205:23 206:2,16 207:3
234:22 235:11,13 235:19 238:21,22 240:16 241:7 247:7 256:19 260:6 263:11 270:9,13 272:3 274:1,3,5,5,9 274:10
**disputed** 159:2 160:23 161:5,12,15 161:17 169:14 170:12,15 256:4,8
**disputing** 48:8 170:6 170:16
**disqualify** 245:12 257:7
**dissolve** 93:2
**distressed** 74:15,20 74:21,22,23
**distribution** 162:8
**District** 1:2 5:5 118:12 125:14
**diverted** 168:17
**divided** 166:17
**DIVISION** 1:3
**divorce** 35:11
**Dixon** 2:17 3:37 5:15 12:24 22:19 24:3,4 34:10 41:19 67:10 84:17 86:10 91:5 103:2 106:1 114:19 122:20 123:9 124:10 149:6,12,24 150:15 158:22 159:21 160:11,11 160:16 162:17,18 163:10,20 164:10 166:23 167:10,23 168:17,25 169:5 170:8 202:2,4,15,21 203:2,7 204:13 207:20,21,22,25 208:3,3 211:16 217:6,18 219:22 240:11,12,12 247:2 248:21 260:2 261:18,22 262:2,20 263:2,3 264:20
265:5,6 267:8,14 268:23 270:11 271:21 272:22 274:8 275:6,11 277:12,17,18 278:18 281:21
**Dixon's** 35:7 95:6 169:13,15,19 177:6
**doc** 55:23 226:7
**docket** 197:9 233:16 241:25 245:10,22
**docketing** 90:8
**document** 8:9 9:13 11:11 27:21 28:10 29:7,8,10 39:14 46:15 48:18,18 49:18 55:23 56:12 57:1 58:8,13,14,17 58:24 59:5 61:18 64:18 65:22 85:21 89:23 90:2,13 99:14 101:10 102:16,17 129:23 131:4,12,15 131:15,19 134:17 134:22 135:23 136:10,14 138:24 140:2 148:15 149:3 165:15,17,23 171:19,25 172:5,14 172:20 174:23 199:5 200:7,11,19 200:22 201:5 209:17,24 226:2 227:10,12 240:3 256:10 273:2,3,14 277:25,25
**documentary** 123:16 240:23
**documentation** 215:20 236:3 271:18
**documents** 11:8 65:15,16 98:8,9,11 126:4 129:6,13,14 130:5 131:8 135:2,4 135:5,8,13 136:17 137:19 142:6,14

143:20 171:15 177:17,24,25 178:15,16 183:16 195:21 204:23 205:16 206:20 219:25 236:7 237:2 239:6 241:3 252:5 256:17 259:25 268:13 269:2
**docusign** 128:1 225:18,22 226:3,5,6 226:8,16,18,23 239:11 273:2,5
**docusigned** 96:25 97:24 128:2 200:1,4 225:16,24 273:2
**dodging** 216:16
**doesn't** 11:6,12,14,18 11:20 22:20,23 39:10 64:11 85:5 89:24 90:1 91:12 102:20 109:13 112:16 113:3 119:9 131:19 140:22 144:24 149:17 151:7,17 167:10 169:12 171:25 175:19 177:22,22 184:3,5 213:4 226:22 251:6 257:10 261:12 265:6 269:4 275:6 277:15,16 283:6
**doggone** 13:22
**doing** 6:23 20:1,20 45:19 62:13 78:20 109:14 114:23 115:5 143:5 191:15 194:14 256:2 258:24,25,25 271:23,24
**dollar** 15:4 39:24,24
**dollars** 40:4 92:9 102:13,19 126:21 126:22 166:20 210:17 262:19 269:17 277:14
**don't** 6:12 7:11,17 8:18 9:2,10 11:23 14:9 15:24 16:14 20:22 23:3 31:15,17 32:18 34:17 35:12 36:5 37:25 38:9 39:13 40:1,8,22 41:5 44:14 46:2,16 48:17 54:16,16 55:13 58:8,9 60:18 62:10 63:24 66:1 69:2,3 72:22 73:21 73:22,23 77:10 81:15 82:8 93:2,4 97:25 99:12 100:4 105:16 107:19 112:7,8,9,11,12 115:13 117:18 118:4,15 122:18,19 124:20 127:24 129:15,16,20 130:5 132:12 134:15 135:8,14 136:17 138:16 140:4 142:8 144:1 146:10 147:25 149:4,5,20 150:20 154:15,16 154:18 156:14 158:15 159:25 167:17 169:19 172:4,21 174:5,6 175:18 178:11,14 178:18,18,19,22 182:10,14 185:17 186:24,25 187:14 188:17,23 189:16 189:19,20,22,24,25 190:3,4,23 191:3,8 191:16 192:13 193:17 195:2 196:18 198:8 199:18 200:12 201:25 204:13 205:14 207:7 211:12 212:20 213:25 214:22 216:1 217:10,25 218:1 219:1,2,4 220:14 223:5,8 226:1,12,15,16,17 226:22 227:3,7 232:1,15 236:12,14 236:15 237:5 240:25 241:25 246:23 257:13 259:6 260:13 262:16 266:20,21 267:16,17 269:10 274:12 275:12,21 276:3,9,10 281:23 285:8,23 286:6
**double** 247:10
**doubt** 75:2
**Douglas** 135:24
**dozen** 242:1
**draft** 55:17,21 56:7
**drag** 275:16
**draw** 84:4 146:21,21
**Drive** 25:13 202:16
**dropped** 17:9 249:16 260:22
**due** 7:25 17:5 40:4 62:4 92:5 141:7 143:10 166:7 174:9 174:14 212:9 230:12 235:6 236:1 236:1 245:4 247:24 247:25 248:13,16 248:24 249:4 270:15
**dues** 248:1,6
**duly** 25:18 51:17 180:24 203:3 221:20
**duplication** 204:11
**duplicative** 72:20 73:13,17,20 250:16
**duties** 27:9
**duty** 10:8 246:18

## E

**E** 1:18,26,26 3:1 4:1 5:2,2,6 125:15 287:1,1
**ear** 206:8
**earlier** 83:3 84:25 86:1 110:6 114:16 121:5 137:20 155:22
**early** 19:9 21:12 86:22 283:14
**earnings** 164:7
**earth** 84:14
**easily** 241:15
**East** 1:39
**easy** 235:24 264:18 268:12
**economical** 260:5
**edges** 238:23
**educator** 112:15
**effect** 121:22
**effectively** 18:16 193:20
**efficiently** 268:10
**effort** 146:19
**Egerton** 1:29
**eidetic** 20:21
**eight** 94:20,24 137:13 155:24 169:6
**eighty** 109:25 134:7
**eighty-five** 134:7
**eighty-two** 44:1
**either** 85:15 117:15 141:10 158:11 178:15 187:15,17 195:13 244:12 255:23 256:18 272:19
**electric** 29:13 42:24 186:16
**electricity** 186:5
**electronic** 1:47 169:5 201:2 226:24 273:3 287:3
**electronically** 67:21 67:22
**eleven** 158:12
**eleventh** 10:1,9 218:4 234:4,5 263:7 268:4
**eligibility** 14:6
**eligible** 269:12

**Elizabeth** 86:15
**else's** 99:25 193:24
**email** 34:18 104:12 104:15 171:21 172:18 183:23 184:1 187:20 225:25 226:4,8,16 226:17,17,21
**emailed** 34:16 226:2 237:19
**emails** 37:19 65:21 184:5
**embarrassing** 218:6 234:11
**emergency** 252:15
**emphasis** 95:4
**employed** 51:24
**encompasses** 166:14
**encumbrances** 127:1
**ended** 75:6
**ends** 47:25
**endures** 34:7
**energy** 278:24
**Engineering** 8:25 264:12,14
**enjoin** 250:19
**enter** 31:18 76:2 90:11,12 101:17 104:18 131:13 194:11 244:4
**entered** 31:16 88:22 121:10 130:2
**entire** 26:22 66:24 77:15 109:21 219:13 242:3 266:14
**entities** 5:19 65:9 74:20,21,22 79:16 124:11 159:20 249:3
**entitled** 126:15 130:2 276:5
**entity** 8:12,18,20 74:24 84:13 93:3 123:2,3 255:13
**entries** 205:8,13,14
**entry** 18:18 57:15 63:9,16
**environmentally** 267:3
**equitable** 275:19 276:7
**equity** 262:17,17
**equivalent** 156:18
**errata** 112:12 118:4 118:17 119:7,8
**erroneously** 205:15
**error** 18:22 108:2
**escaped** 193:18,18
**escrow** 168:25 209:5
**especially** 82:24
**ESQUIRE** 1:28,37 2:3
**essentially** 56:15 85:2 92:25 94:19 136:21 162:6 197:25 218:15 238:19 249:14 255:24 256:3
**establish** 249:6
**established** 75:9 242:23
**establishing** 73:14,25 214:15
**estate** 1:9,35 5:12,15 55:9 62:20 90:23 139:14 154:12 155:25 159:25 162:6 169:7 204:7,9 242:25 246:21,24 253:7 259:10 276:20 283:21 284:9
**estimate** 157:5 165:13 195:17
**et** 58:10 141:11 154:18,19 168:10 250:7
**evened** 188:3
**event** 17:23
**events** 268:18
**eventually** 80:18
**everybody** 5:9 124:12 128:2 265:20 267:13 270:5
**everybody's** 93:10 103:6
**everyone's** 125:3
**evidence** 9:5 11:4 14:13 15:10 17:3,7 17:11 21:21 25:5 31:16,19 39:8 51:2 64:18,22 88:18 90:11,12 97:3,4,5,8 99:17 101:18 104:19 118:18,20 123:16,17,19,20 129:2 130:3 132:9 132:25 134:25 142:6,23 144:13 156:17 177:17 178:5 180:8 202:7 217:22 218:22 220:4,5,16 226:12 236:6,13,20 237:8 237:10 238:13,15 238:15 239:1 240:23 242:13 246:3 247:20 249:2 249:19 253:14 255:2 261:20,24 262:5 265:13 268:12 269:14 273:6,8,14,17,20,21
**evidencing** 85:12 110:11
**evidentiary** 7:12 243:18 244:13 257:1
**exact** 36:5 44:15 141:4 157:8 164:13 177:22 181:21,23
**exactly** 6:23 34:21 148:3 154:18 172:4 177:17,18 182:10 182:14 213:7
**exam** 20:6
**examination** 3:11,12 3:13,14,19,20,21,26 3:27,28,33,34,39,40 4:5,6,7 25:20 31:23 38:22 46:8 51:19 64:24 65:3 67:8 70:3 126:1 170:24 171:1 180:24 181:1 192:23 203:5 211:14 221:22 225:13 228:11
**examine** 21:8 105:14 125:19 283:1
**examined** 25:18 51:17 70:1 203:3 221:20
**example** 130:11 259:23 276:4
**exceeded** 155:3
**exceeds** 157:9 267:10
**Excel** 42:18
**excellent** 150:18
**exception** 140:3
**exceptional** 212:13
**excess** 152:1,17,24 153:1 155:5
**excuse** 36:15 208:9 254:15
**excused** 50:11 68:14 68:15 201:24
**execute** 223:14 225:15
**executed** 96:19 128:8 128:10
**executing** 82:22
**exercise** 268:3
**exercises** 126:19
**exhibit** 31:16,18,20 38:20,24 39:2,2,21 39:22 42:8 43:17 46:10,22,25 52:21 53:1,3,3,4,8,8,9,14 53:14,15,17,19,19 54:1,2,7,9,25 55:23 55:25 56:18,20,20 56:21,21 58:15 63:9 63:12,22 88:22 89:20 90:16 101:17 104:10,18,21 118:5 126:3 127:23,25 128:13,14 129:2

130:19 131:14 132:1,13,17,17,20 132:20 133:4,8,10 133:15,20,21,23 134:10,10,18,18,19 134:24 137:19,24 138:1,4,6,20 139:20 139:21,22,23,24 140:9 143:5,5,18 145:3 148:7,17 163:3,8 165:16,18 165:21 166:1,3 171:15,19 172:13 173:4,6 174:15,22 198:3 209:14 211:20 221:2,5,9,9 221:15 227:1,23 229:5 239:22,25 262:2,9 271:19
**exhibits** 7:10 27:25 46:19 47:17 53:11 53:15,22 54:18 112:11 130:11 132:15 135:10 174:24 175:11 197:8,16 209:8 239:3 240:7 244:5
**exist** 8:18,23 9:4 18:16 205:4 238:24 252:4 257:3,10 261:14
**existed** 8:12 21:22 60:17 122:7 257:24 278:6
**existence** 158:23 197:23 232:3 238:22 281:13
**existing** 266:22
**exists** 8:9 235:14 257:5 270:13
**expect** 46:16 105:14 233:5 236:23
**expected** 243:1,2
**expense** 140:13 185:21
**expenses** 27:13 29:17 43:23 82:12,17,19 83:17 89:3 90:22 91:2,15,18 112:6 139:14 164:5 177:16,18 185:22 218:23 236:8,15 240:18,21,22 241:2 241:9 272:3,8,10,25 274:3,6,6 279:6
**experience** 71:24 73:15 74:1,23 75:10 204:5,17,23
**experienced** 75:3
**expert** 75:1 112:16 113:6 151:15 153:9 154:24
**expertise** 260:7
**Expires** 287:9
**explain** 33:7 99:10 245:16 257:13
**explained** 76:19
**explaining** 22:17
**explanation** 100:2
**Express** 195:8,9
**extended** 15:14 56:9
**extensive** 112:13 266:6
**extensively** 263:22
**extent** 32:23 75:22 231:16 236:25 238:17 247:12 259:17
**extra** 137:8 154:1 248:21
**extraordinary** 270:18 270:19
**extreme** 235:3
**extremely** 84:6 279:3

**F**

**F** 287:1
**F.3d** 234:19
**face** 268:13
**facially** 11:25
**facing** 13:5
**fact** 11:24 71:22 88:15 114:1,16,25 115:8 120:12 129:17 178:6 188:20 194:9 199:3 199:4 218:18 235:14 236:11 240:10 243:8 247:9 252:12 254:8 258:15 264:14 267:12 275:7
**facts** 9:5 10:18 77:22 161:7 232:5 235:16 240:17 264:13 280:5
**factually** 235:1
**failure** 248:24
**fair** 13:1 28:18 40:11 41:1 162:8 272:2 274:12,15
**faith** 6:10 9:23 10:17 11:15 14:6 16:25 21:4,13,21 22:16 167:7 217:16,22,23 218:3,9,19 219:21 231:21 234:8,14,24 235:2 241:17 246:12,13 250:1 253:15,23 261:14 262:12 264:2,3 265:9,10,11,19 269:9 274:13 275:2 276:11 281:23
**fall** 116:1
**false** 219:15 249:11 259:24,25
**familiar** 31:25 52:10 60:7,21 61:1 142:19 148:11 160:4 209:18 221:24 222:15,24 223:12
**family** 110:25 204:9
**far** 55:17 58:24 71:24 74:20,21 124:21 132:14,16 133:17 147:14 213:22 226:19 268:9 273:6 280:18
**fast** 117:18 286:5
**FBI** 74:18 175:21 176:4
**February** 8:14 15:6 244:16
**federal** 134:25 259:13 268:2
**fee** 96:15 97:14 101:13 103:20,24 105:2 106:21 109:4 126:7 134:4 145:7 146:15 147:9,11 152:6,7 239:20 240:1,10 272:20
**feeling** 199:14
**fees** 15:19 16:9 92:5 139:13,17,17 249:22 250:2 270:11
**felony** 72:25
**fid** 235:11
**fide** 234:22 235:13
**fifth** 252:17
**fifty** 102:13,18 126:24 166:7
**fifty-six** 146:14
**fight** 12:24 72:7 120:12 256:8 260:3 261:1
**figure** 106:25 109:17 157:8 161:16 164:13,14 233:8 237:3
**file** 13:21,22 27:24 28:5 59:6,10 67:23 114:17 115:2,2 116:23 117:25 119:21 121:8 219:13 237:20 249:8,11,12 252:16 258:16 275:14 279:20 282:15 285:13 286:2,3,3
**filed** 6:3 7:10 9:23 11:15,23,24 18:17 28:14,16 48:12 55:8 60:15,17 67:21 78:23 87:7,20 89:11 90:7 95:12 99:19

113:19 114:13 115:19 116:14 121:4,22 129:3,11 129:19,24 131:2 149:4 158:13 164:23 165:11,14 165:17 173:15 174:24 198:3 199:17 205:22 207:1 215:20 216:5 218:12 219:9,10,19 219:19 234:7,18 235:23 236:1 242:4 243:17,21 244:11 244:12 245:11 246:7 249:6 250:11 250:13,15,15,22 251:18 252:5,13,14 252:23 253:1 256:10,24,25 257:1 258:8,11 259:12,20 265:21 266:24 268:14 269:10 278:4 281:4 283:18
**files** 59:16 84:8 91:13
**filing** 15:1 66:21 75:7 87:20 88:3 114:12 115:5 124:7 162:13 162:14 183:9 218:8 219:8 234:10 237:23,24 245:12 246:16 250:4,19 254:22 256:11,13 256:21 259:23,24 261:15 262:21 264:5 275:10,15 284:21
**filings** 179:3 219:20 219:23 241:25 252:20 256:23
**final** 55:20,24 56:7 56:10 84:10
**finally** 137:10
**finance** 91:4
**financed** 224:11
**financial** 68:1 95:6 149:7 159:11 160:2 213:11
**financials** 228:6
**find** 34:18 39:3 56:11 98:17 99:14 144:2 179:23 211:12 258:3
**finding** 209:5,8
**fine** 53:25 54:1 68:22 69:3 170:13 206:12 232:7 265:14 285:17
**finish** 142:24 260:13 279:19
**finished** 38:12
**fire** 257:8
**firm** 19:8 52:5,8 55:10 56:3 67:23 71:25 74:6 75:2 101:7 115:9,11 131:10 174:1 213:4 213:20
**first** 5:12 6:10 9:2 10:6,17,19,23 12:21 12:22 13:8 15:13,13 16:24 18:25 23:3 24:11,18 25:18 27:5 28:12,17 30:1 40:1 43:11,23 44:2,5,25 51:17 58:1 60:20 73:4 86:2 87:8 89:11 91:5,13 113:10,13,19 115:1 117:16 118:2 121:24 130:19 133:3,10 141:3 166:5 180:24 197:2 199:23 203:3 205:21 221:10,20 227:4 230:22 234:9 234:20 235:9 237:7 237:22 238:5 240:13 243:17 244:8,10,13 245:6 247:5 248:4,19 249:5 252:8,20 257:3,25 258:1,3 259:15 260:10 261:3,5,6 263:16 277:23 283:13
**five** 39:24 40:4 75:22 134:7 136:20 219:6 232:17,18,20 234:5 266:15 284:3,11,12 285:13
**five-minute** 69:3
**flag** 132:14
**flake** 14:5
**flipped** 227:14
**Florida** 1:2,23,33,40 2:5,11 5:1,5 8:16 25:13 29:24 30:15 40:3 51:12 76:23 125:14 134:12 135:15,19 136:18 171:21 180:15 202:16 214:23 220:23 258:13 266:9 287:8
**flow** 24:17
**fluidly** 20:11
**flying** 166:24
**Flynn** 2:20 30:3 35:3 35:4 37:16 79:22 80:19,19 86:15 114:13 115:11 124:8 183:22,24 184:1 187:18,19,20 237:19 241:21 249:3 277:13
**Flynn's** 80:14
**fold** 152:2
**folder** 171:17
**folders** 178:24 179:2
**folks** 20:18
**follow** 51:18 65:19 78:7 120:16 163:15 180:25
**followed** 221:21
**following** 69:7 125:11 179:16 232:24
**follows** 25:19 70:2 139:20 203:4
**font** 201:3
**foreclosed** 91:8
**foreclosure** 95:5 153:25 162:7 262:15,24 275:13
**foreclosures** 271:15
**foregoing** 287:2
**forged** 219:24,24
**forgery** 11:25 257:23
**forget** 256:11
**form** 67:22,24 130:21 133:8,11 188:5 273:4
**formally** 118:1 119:23
**format** 136:15
**formation** 8:14 91:5
**formed** 8:13 10:12 11:24 77:22,23 78:4 79:10 89:15 91:1,23 94:18
**former** 127:2
**forte** 228:3
**Fortunately** 97:24
**forty** 146:14
**forty-eight** 43:25
**forum** 258:14
**forward** 17:14 71:9 235:23
**found** 55:4 74:13 99:14 123:12 127:25
**foundation** 14:3 22:18 48:7 57:21,22 60:9 61:4 153:6,11 154:24 161:4,6 164:18,19 168:20 209:23 215:14
**founded** 74:6
**four** 15:4 136:19 140:16 146:14 159:14 193:17 246:22
**FP** 44:8
**FPL** 29:24 30:20,22 43:24,25 44:1 45:12 45:12,17 136:11 172:18 194:7,7,19
**FPL's** 136:3

**frame** 222:6,8
**framed** 18:15
**Frank** 2:8 3:24 5:20 6:1 13:5,16,19 69:25 86:16 115:1,4 181:11 198:5 208:5 208:23 263:13
**Frankie** 83:8
**frankly** 85:6 175:21
**freeze** 282:23
**fresh** 137:24
**Friday** 5:9,10 13:20 285:16,18 286:3
**friend** 126:14 162:17
**friend's** 120:22
**friends** 12:24 86:11 166:24 267:23
**friendship** 167:12
**front** 25:22,24 39:19 89:21 118:15 143:23 178:11 189:1 211:20 245:23 283:9
**fronts** 134:22
**fuel** 141:5
**fulfill** 247:1
**full** 25:9 26:13 51:6 51:21 75:22 127:11 180:12 202:11 220:20 246:9,9
**fully** 151:1 157:17 211:2 219:12 224:5 247:13
**fun** 198:24
**fund** 74:13 108:12 253:7
**funded** 236:16
**Funding** 157:12
**funds** 72:4,9 81:9 108:7,9,22 110:2 154:1 162:4 168:23 169:16 182:24 183:6 208:20 210:5 210:13 211:22,23 238:16 239:24 240:20,22
**funny** 211:12
**furniture** 29:15,16
**further** 31:13 46:5 64:19 179:4 191:11 211:5 225:12 228:8 229:13 238:9 241:9 250:4,5,19
**future** 16:13 68:6 84:15 250:8

**G**

**G** 2:17 3:37 5:2 202:15 203:2
**G-E-L-L-E-R** 52:2
**G-O-L-D-M-A-N** 25:12
**gain** 31:9
**Gallagher** 118:10
**game** 114:24 268:9
**Garcia** 146:23
**gather** 232:11
**geared** 154:22
**Geller** 51:25 52:4,6 54:10 55:9 57:6 213:10,20 221:8 228:6
**general** 9:1 22:11 138:7 203:17,18 234:18 261:11
**generally** 17:5 29:22 93:11 102:24 150:4 174:4 205:1 236:3 262:14 273:4
**gentleman** 67:14
**gentlemen** 269:6
**genuine** 235:14 238:21 240:16
**GEORGE** 1:21
**ger** 197:13
**getting** 18:2 26:14 37:14 41:11 107:18 123:23 163:11 186:13 193:9 210:21 263:9 274:10
**gigantic** 165:18
**girlfriend's** 35:11
**Gissy** 126:10
**give** 22:2 25:6 37:4 37:18 51:3 74:18 93:3 119:1 171:20 180:9 199:21 202:8 202:19 212:9 218:14 220:17 244:7 247:15 260:12 262:18 268:1 276:25 281:4
**given** 56:8 59:16 62:10 64:12 82:24 101:2 118:3 127:18 160:21 186:24 258:20
**gives** 215:17 286:12
**giving** 254:24
**glad** 88:14 178:6 269:6 284:2
**go** 13:21 14:20 18:13 23:18 27:20 28:25 33:1,9,25 36:6,7,11 37:4 39:16 42:23 43:9,17 47:20 49:18 56:13 60:23 61:15 61:25 62:1,3,6 63:9 63:25 64:6 68:21,22 69:12 77:5 86:14,21 89:2 90:18 95:20 97:6 100:13 102:9 103:15 105:14 106:25 114:17 115:9 119:4 120:13 122:24 126:3 127:1 127:25 128:10,19 129:21 130:16 135:9,15 136:6,20 137:18,18,23 139:11,22 140:6,13 147:13 150:23 152:3 156:21 158:16 162:24 166:10,18 170:24 172:13 173:3 174:21 176:11 180:21 181:16 185:10 194:5,9,10 194:18,18,19,22 198:15 200:18,19 209:20 210:1,12 211:17 226:11 227:17,18 231:10 232:12 237:2 243:4 244:8,9 257:22 259:7 260:6,10 261:3,5,5,6 262:15 262:15,23 263:20 264:21 273:24 279:13 281:18
**God** 5:6
**goes** 26:22 74:3 82:6 135:9 169:14 202:24 228:15,21 228:21,23 248:5 264:22 266:25 270:11,20 279:23
**going** 9:20 10:21 11:10,21 12:22,23 13:21,21 14:4 16:3 16:3,3,21 18:13 19:2,2,8 20:5 22:13 22:22,25 25:23 27:19,23 29:21 32:4 32:8,10,20 33:2 39:7,9 43:2,3,3 44:9 50:15 53:17 55:2,18 56:5 57:16 68:21,21 69:12,13,19 72:12 79:5,9,14 85:4 86:13 87:23 88:4,25 89:2 93:2 99:8,10 99:22 105:16 107:25 108:17 109:4 112:12 114:17 115:7 116:2 116:20,21 117:19 119:3 120:7,17,20 120:21 121:14 122:8 125:19 132:14 133:2 134:21 136:21,24 145:3 146:14 157:6 157:7 160:23 162:4 162:6 163:2 166:18 169:8 170:23,24

174:21 175:10,17 176:11 179:21,22 186:7 189:9,11 191:13,20 196:2 199:15,23 202:2 204:12 205:3 211:17 212:25 214:9,20 216:14 218:15 220:6 223:2 230:7 231:24 233:5 233:12 234:4 236:24 244:2,18 245:6 248:18 250:20 257:15,17 260:15 261:4,5,9,10 261:11 262:15,16 262:25 267:3,13 270:4,5 271:13 274:22 278:15 282:1 283:10 284:15,20,22 285:3 285:6,12 286:3
**Goldman** 3:9 24:21 25:11,12,17,22,25 31:25 32:12 33:11 67:15 94:8 195:12 263:17
**good** 5:8,16,17 6:7 34:19 86:13 119:11 124:15,17 125:16 135:20 166:9 212:17 213:20 227:18 233:11 236:22 241:17 267:16 269:9
**Goodman** 23:23
**gopher** 85:3,4
**gotten** 15:12 81:2 263:25
**governance** 252:19 264:15,18
**Grace** 1:18 5:6 125:15
**grade** 212:14
**grant** 18:18 217:23 250:5 265:21
**granted** 254:5 274:18 279:12
**great** 5:21 85:8 219:21 232:14 265:3 266:25 271:18
**greatly** 218:1
**Greene** 86:15
**guarantee** 83:25 238:21 248:10
**guaranteed** 83:19 95:15 238:19
**guarantees** 82:3
**guardian** 15:20 76:3 76:10 181:11
**guardians** 77:4 229:25 230:3,4,5,6
**guardianship** 75:13 76:1 78:24 184:16 244:21
**guess** 22:13 24:15 54:12 57:19 97:4 102:3 106:2 174:5 176:12 191:14 227:2 249:24 261:7 269:4 280:18 282:22
**guest** 194:19
**Guests** 186:4
**guidance** 116:7
**guy** 165:8
**guys** 12:24 103:5 143:24 232:16 264:21

**H**

**hadn't** 22:1 81:6 197:23
**half** 37:8 84:15 237:6 262:19 264:1 269:17 277:14
**Hall** 97:7
**hamster** 282:4,7
**hand** 10:13 25:4 51:1 180:7 199:24 200:6 202:6 220:15
**handed** 183:19
**handle** 26:16,21,23 26:24 27:1 76:18,20 182:19
**hands** 277:22
**happen** 74:10 267:5 269:24,25
**happened** 10:20,20 22:18,19 102:4,8 106:25 108:25 109:20 126:8 127:19 176:14 265:4 268:12 281:3 281:6 282:13,17,25
**happening** 13:23
**happens** 126:18
**Happy** 5:9,10 178:7
**harass** 234:11
**harassing** 218:6 234:11
**hard** 120:20,21
**harder** 68:9
**Harvard** 196:2
**hasn't** 48:20 118:4
**haven't** 16:10 20:23 21:7 39:8 112:9 117:14 170:7 189:8 199:25 206:18 226:6
**he's** 15:14 17:23 33:3 33:23 44:10 48:8,22 66:23 69:19 75:22 84:4 85:4,6 130:10 136:1 138:12 142:1 143:2 147:19 150:17 151:10,11 153:8,8,9,10,15 154:17,23 161:4,6 162:22 163:11 167:19,20,21 168:2 168:2,3,21 169:13 169:16 184:16 191:21,22,22 193:9 197:11,13,25 198:1 198:4,5,7,13,14 199:2,2 204:16 209:24 214:11 216:15,15,20 219:25,25 222:24 224:1 242:12 247:10 250:22,23 251:13 253:14 254:15 258:17 263:2 265:11,15 273:13 274:9,10 278:21
**head** 36:5,12 37:11 37:25 42:14
**heads** 135:6
**headset** 202:23
**hear** 7:18 10:21 12:18 14:18 68:9 119:10 250:21
**heard** 40:16 122:9 167:25 246:19 247:2 267:6 284:10
**hearing** 13:11 20:16 21:11 22:4,4 27:25 28:15,16,17,18 72:21 73:13,19,24 82:7 123:17 175:14 175:16 177:8 192:17 197:21 198:4 206:9 219:10 219:11,11 232:6 233:19 237:7 243:11,18,19,25 244:2,13,15,16 245:25 247:6 248:3 250:3 264:19 274:21 275:7,9 277:23 282:18 283:8
**hearings** 249:2
**hearsay** 39:9 57:22 129:7,17 131:14 134:24 136:23 139:25 142:7 154:14 164:25 241:6
**heart** 116:4
**height** 94:22
**held** 94:16 96:12 208:20 209:4 210:13 234:6 247:12 259:20

268:1
**help** 12:23 39:5 52:21 86:11,12,13 109:17 146:20 277:13
**helpful** 172:16
**here's** 83:5 124:13 235:25
**hesitated** 179:3
**hey** 115:15
**HH291609** 287:10
**Hi** 211:16
**high** 241:18
**Hire** 109:15
**historically** 136:21
**history** 204:16
**hit** 78:8 105:11 226:11,25
**HOA** 33:17 137:10 137:11 152:6
**Hoffner** 2:9
**hold** 9:16 22:21,24 28:4,4 58:1 61:15 72:15 73:12,16 98:24,24 144:1 149:18 153:7,7 157:6 159:17 163:25 169:24 197:1,2 199:22 202:13 216:23 222:20 231:7 275:25 276:21,21 279:19 280:24 281:1 285:10,23
**holder** 144:16 157:13 266:7
**holders** 158:5 266:1
**holding** 79:19 108:10 160:1 182:5 261:12
**Holding's** 46:15
**Holdings** 1:41 5:18 39:20 40:14,16,17 46:1 63:10,17,20 70:6,22 90:3,21,22 122:5 141:7 159:10 160:10 161:18 181:5 205:17 263:13
**holds** 33:17 118:16
**Holly** 141:11
**home** 37:7 51:9 76:12
**Homemaker** 37:20 134:2 137:9 139:14 140:23,24
**Homemakers** 1:9,34 5:12,14 8:12,24 14:15 26:8,12,19,19 26:24 30:2,8,20 31:8 33:15 35:7 37:8,9,13 38:3 41:1 41:15,17,20 45:10 45:14 52:7,8 54:2 55:9 57:6,18 58:6 59:6,12,14,23,24 62:19,20,22,25 65:6 65:11,13,17 66:13 66:16,17,21,22 67:17 77:25 80:6 82:11,12,17,19 83:17 84:7 85:12,12 86:3 87:7 88:1,3,10 89:4,13 90:23 96:3 96:6,9 100:1 101:24 101:25 109:24 110:11 111:15,21 112:6 114:21 115:6 121:21,25 122:12 123:2,3,11,13,18,21 124:5 126:12,24 127:9,11 129:14 131:15 137:22 138:8,9 139:3 140:19,20 141:12 141:24 142:3 144:7 144:22 145:13,16 145:18 148:11 149:7,13,25 150:3,7 151:4,24 153:9 158:24 160:16,22 161:4,16 162:1 168:17 169:7,16 170:7,15 173:10,22 179:22 185:1,3,20 185:21 186:1,15 188:8 201:8,12 203:13,21,24 204:3 205:18,24 206:3,17 206:19,22 207:4 208:4,13 210:8 213:23,24 215:18 222:1,5 223:18,20 223:21 224:7,11,15 224:22,24 225:6 228:14 236:11,11 238:8,11,12,14,16 238:17,24 240:19 240:20,22 241:23 243:9 248:12,25 250:5 252:2,3,11,14 254:8,8 255:11,20 256:14 258:4 262:1 266:3,13,19 268:20 268:22,23 271:3,9,9 272:4,7,10,13,18 274:2,4 276:18
**homeowners** 267:1
**homes** 204:9
**honest** 37:25
**honestly** 7:11 20:4 228:3
**Honor** 5:17 6:1 7:20 7:22 8:2 9:12,15,20 12:9 14:22 17:13 19:12 20:15,19 23:9 23:14 24:8 27:23 28:2,12 31:19 32:4 32:23 33:24 35:13 38:12,14,18 39:5,7 39:17 41:23 43:4 46:5,6 47:4,5 48:5 48:11,15 49:22 50:3 50:17 53:5 54:6,14 54:19 55:1 57:16,24 58:4 60:8,13,16 61:3,12 64:4 66:7 66:25 67:7 68:8,25 69:20 72:12 73:8 86:17 88:21 90:12 101:20 107:18 118:2,6 119:14 124:14,18,22 125:7 125:25 129:1,1,23 131:14,23 132:8,11 132:19 134:21 136:23 137:25 138:4,12,22 139:5 142:5,22,25 144:12 144:15,22 145:1 147:13 153:3,15 157:3,22 158:4,7,17 163:10,16 167:6,19 169:12 170:13,20 171:6 176:1 179:4 190:15 199:13 200:1,9,25 201:18 201:22 202:3 204:10 209:23 211:10,12 214:23 215:2 216:11 217:1 217:3,7,13,22 219:8 221:3 222:18,23 224:1 225:12 228:8 229:13,20 230:8,11 231:20 232:19 233:15 234:23 236:4 242:8,9,14,17 245:15 251:3 253:11 254:15,24 257:12 258:17,25 260:21,24 261:7,21 261:23 262:6 269:22 270:8 272:15 273:13,16 274:7,18,21 275:8 275:20 276:6,14,17 276:19,24 277:8,20 277:24 278:4,20 279:1,18,22 280:3,7 280:22 281:12 283:10 284:14 286:17,21,22
**Honor's** 64:25
**Honorable** 1:18 5:6,7 125:15 161:21
**hope** 212:14
**Horton** 2:6,18 4:3 5:22 9:14 48:3,4,23 49:25 81:23 196:25 220:22 221:19

276:17 277:10,12 278:1,8
**hostilities** 167:8
**hour** 237:6
**Howard** 113:5
**Hum-hum** 7:2
**hundred** 15:4 39:23 39:24 40:4 92:9 115:8 127:12 137:13 146:13,14 162:11 269:19
**hurt** 24:17 144:24

**I**

**I'd** 19:16 21:10 31:15 62:6 63:25 74:19 90:11 99:13 101:17 104:18 106:25 114:20 142:5 144:12,14 159:6 160:19 162:19 175:21 176:11 179:8 191:15 205:1 208:19 250:20,21 269:6
**I'll** 12:14 14:10 29:4 33:7 42:3 55:3 67:7 71:3 84:15 86:21 88:14,15 90:8 93:3 105:13 112:24 113:5 119:1 124:2 129:18 131:21,23 132:14 139:22 143:15 144:25 157:21 159:18,19 165:13 167:14 178:6 193:8 201:6 210:1 211:16 212:14 213:1,17 216:11 230:19 232:13 247:15 261:23 267:25 284:2 286:3,12,13
**I'm** 8:2 9:20 12:10 13:14,20,21 14:2,20 16:11 17:12 18:12 18:13 19:23 20:4 22:12,15,22 27:23 28:13,25 32:4,10 33:2,7 34:6,19 38:9 38:12 39:1,7,9 40:22 43:4 47:3,16 48:11 49:2,5,22 50:23 52:20 53:1,7 54:6 55:11,25,25 56:14 57:16,25 58:3 59:21 63:13 65:7 66:15 68:8 69:13,17 70:21 72:12 73:10 73:14,25 75:1 77:1 78:3 80:6,8 84:1 85:4 86:13 88:18,25 89:1 91:4 99:5,5 101:9 107:4,17,18 107:19,25 108:17 109:15 117:18 118:3,23 119:11,15 120:2,3 122:1,1,7 128:17 130:7,8 132:22 133:3 134:21 135:20 136:24 137:15 138:7,14,19 139:23 143:4,24,24 144:1 154:21 159:14,18 159:24 163:2 165:7 167:22 169:8 171:6 171:14,18 175:23 176:3 184:3 186:7 188:25 189:9,11,25 190:6,8 191:20 194:18 195:14 199:11,11,13 200:8 200:23 201:18,21 205:25,25 207:17 207:18,21,22,22 208:7,7,10,24 210:19 211:17 212:8,25 216:2,11 217:24 218:6 220:3 220:3,6 222:2,23,24 226:7,22 227:1,2,15 229:10,19,20 231:10 232:8 233:5 233:11 239:24 240:21 246:13 251:11 253:2,4,11 253:11,16,17,18 258:24,24,25,25 261:4,5,9,10,11 267:22 272:1 273:6 277:9 281:1 283:10 286:3
**I've** 10:6 40:1,16 57:24 59:5 74:25 76:11 89:25 107:4 108:19 115:16 164:22 165:12 175:22 192:18 199:16,17 201:3 204:7 206:19 207:7 207:10,11 229:16 230:11,15 236:1 250:13 258:20 263:5 267:6 277:20 277:21 284:9
**ice** 195:16
**idea** 22:5 146:19 219:14 267:16
**ideal** 267:19
**ideally** 205:2
**identical** 157:3,4
**identified** 89:4
**identifies** 264:7
**identify** 28:10 41:3 100:5
**ignored** 114:5
**ill** 162:14,15,16 167:12 218:5 234:10
**illegal** 278:5
**imagine** 18:1 137:12 249:24,25,25
**immediately** 74:10 224:10
**impeachment** 118:22 118:24,25 119:6 121:18
**important** 234:22,22 270:22
**improper** 11:23 167:9 197:24 198:2 199:1 209:25 218:4 218:7,8,12 234:9,12 234:13,18 246:10 264:4 273:5
**impugned** 98:25
**IMQA** 1:42 5:18 6:10 7:7 13:22 17:1,8 20:18 22:1,5 30:9 30:25 32:16 36:13 36:16,18,20 39:25 40:5,11 41:20,21 45:3,9,10,13,23 52:23,24 53:11 60:6 60:13 61:1 62:18 63:23 70:15,17,19 70:21,22,23 71:16 91:21,22 92:3,12,13 92:24 93:13,22 94:13,20,23,25 95:14,15 96:1,12,15 97:14,18 98:12 100:3 103:20,24 104:3 105:2,22 106:9,12,14,17,21 107:7,8 109:4,23 110:2 111:7,14,17 111:20,24 114:20 115:18 116:1,23 117:6,8,12 119:20 120:14 126:9,10,15 126:19,22 127:2,13 127:16,18 128:15 128:16 129:19 131:15 134:1,12,13 137:3 145:4,11,13 145:16,17,22 146:11,15,19 147:1 147:11 154:5,10 155:16,17,18,20 156:6 159:3,21 160:4 161:19 165:4 165:13 171:14,15 172:1,7,7,24,25 175:3,7,10 177:15 177:18 178:19 181:7,16 184:9,9,13

185:1,3,4,20 186:10 186:11,20,25 187:1 187:12 188:7,8 191:23 192:1,10 193:13,20 195:10 195:21 197:7 198:7 201:13,15 206:24 207:3 212:7,8 219:10 222:16 223:18,20,21 224:9 224:9,20,25 227:5,7 232:2,9 236:5,12 237:15 238:25 240:3,18 241:10,20 243:15 244:15,20 245:7 247:19 248:9 249:4,14,19 263:13 263:22,24 269:15 272:3,15,18,23,24 274:2,3,5 277:6
**IMQA's** 31:8 37:10 37:12 41:17 93:8 94:4,19 95:24 99:25 100:23 112:6 115:23,25 117:23 132:16 174:24 176:5 184:19 185:21,25 187:9 191:22 198:1 239:20 240:23 241:6 265:19 272:1 279:7
**inability** 45:20
**inaccurate** 66:6
**inadequate** 117:10
**inaudible** 255:2
**incapable** 41:9
**incapacitated** 109:15 249:17
**incapacity** 15:21
**incidental** 19:7
**include** 29:23 52:12 184:25 212:18 249:17 250:22
**included** 29:25 31:3 61:11,14 64:2 87:17 91:16 101:13 238:4 238:6 246:21 254:21
**includes** 29:12,12,19 52:14 234:15
**including** 204:8 236:5 246:22 249:4 262:20 267:13
**income** 29:12,18 52:17,19 76:6,18 84:9 166:6,8,11,12 166:18
**incoming** 104:24 105:1
**incorporate** 137:11
**incorporated** 1:42 5:18 91:6 103:21 201:13
**increase** 82:20
**Incredibly** 194:4
**incurred** 173:19
**independent** 112:2 263:5 265:23 268:24
**independently** 62:11 62:11 64:14
**INDEX** 4:13
**indicate** 55:23
**indicated** 84:5 150:6 158:20 163:20 169:13
**indicator** 253:22
**indirect** 75:25
**indiscernible** 110:24
**individual** 42:23 266:3
**individually** 35:10
**individuals** 237:12
**Industries** 235:20 253:24
**inevitably** 79:4
**information** 57:9,10 57:12 62:9 63:2 64:12,13 66:2,5,10 99:22 100:6,18,19 101:1 136:14,15 150:17 175:12 194:11,12 228:5 271:21
**informed** 66:17 116:13
**initial** 79:18 80:2 183:2 249:13 268:21
**initially** 15:18 91:22 182:21
**innocent** 109:16
**input** 205:15
**inquiry** 218:11 234:17
**inside** 139:14 215:7
**insider** 256:4
**insiders** 255:25
**instance** 13:8
**instructions** 116:6
**insurance** 34:2,7,9,12 34:13,16 173:21 174:1,3,6,8
**insure** 34:5
**insures** 33:11,13
**integrity** 78:15 99:1
**intend** 23:25
**intended** 252:24
**intent** 92:12 121:20 162:14,15,16
**intention** 7:9
**interest** 8:8,11 21:7 32:6,11 33:3,6 75:17,24,25 79:23 80:20 84:7 92:20 127:14 192:2 198:6 211:9
**interesting** 97:13
**interests** 15:2,3,6 58:6 191:21 198:1,2 198:5 251:2
**interference** 202:23 259:23
**internal** 34:11 35:7 62:19,22
**internally** 58:17
**interpretation** 148:1
**intimately** 86:2,20 153:15
**introduce** 222:21
**introduced** 115:10,12 178:5
**introducing** 222:23
**invested** 110:25
**investment** 183:2 270:1
**investments** 1:42 5:18 30:9 70:22 103:20 111:15,20 127:13 161:19 171:15 172:1 181:8 185:1 201:13,16 212:7,8
**invoice** 235:25
**involuntary** 3:6 10:16,21 11:14 13:22 16:25 17:3 60:15,17 70:23 114:11,21 115:2,15 115:18 124:7 161:19 173:18 234:7,23 235:3,6,22 236:1 249:4 259:15 265:21
**involved** 15:13 65:5,8 65:25 80:3 85:7 86:2,20 95:6 105:23 113:10,13 140:22 153:16 155:12 162:14 188:20 189:15 228:13 237:15,16,22,23,24 245:6 254:14 272:17
**involvement** 229:3
**involves** 103:10
**IOTA** 175:17
**IRS** 97:7 256:7,13,16
**Island** 180:15
**Isle** 220:23
**isn't** 48:14 72:10 97:19 98:3,12 102:24 106:23 108:9 111:18 114:2 114:5 121:25 167:8 182:19 222:2 255:2 255:4

**issue** 6:10 10:17,21 11:19 12:24 13:2 16:14,15,21,22,24 17:7 18:15,19,20,20 18:24 21:3 37:3 47:19 118:11 144:16 151:24 167:17 185:13 217:23 229:16 234:2 235:14 241:25 251:9,16 260:23 263:16 264:7,14 275:24 276:6,7,7,8 284:6,6 284:9 286:12
**issued** 241:24 266:13
**issues** 7:4,12 9:24,24 10:2,8 17:10 19:3 93:9 114:8,8 120:8 122:17 147:14,15 147:15 214:10,20 219:5 232:3 245:10 245:13,23,25 246:6 252:2,6,19 253:21 259:5,11,12,13 260:8,18,22 264:2 265:25 268:15 275:22,23,23 276:1 281:16,25 284:17
**It'll** 119:6 285:15
**it's** 14:19 15:15,25 18:14 20:6,15 23:22 23:22 24:20 28:18 34:5 39:9 41:25 43:11 44:8 45:11 47:6,8 48:24,25 49:11 50:3 52:14,16 53:17 54:18 55:3,24 56:10 57:25 60:14 61:20 62:2,22,23 63:1 66:5,10 67:3,3 67:25 68:9 73:13,19 77:19 81:1 83:10 85:22 86:19 88:8,15 88:17 89:20 90:13 93:17,20 94:8 95:21 95:21,22,23 96:24 96:24 97:1,2,3,4 98:19 99:16 102:5,6 102:8,8,20,20 103:5 105:6,7,8 106:22,23 106:24 109:13 110:1,19,21 112:12 114:23 118:9,10,12 121:17 123:10 124:17 127:24 129:8,23 130:1,2,19 131:14,15 134:7 136:23 140:3,20,21 140:21,23 142:25 143:1,18 144:23 150:13 151:1,6,9 157:5 159:10 164:16 165:20,20 167:9 168:11 170:12,15 171:5,6 172:13,14,18,18 175:16 177:24,25 178:3 180:1 189:21 189:23 190:7,16 193:16 194:7 195:19 196:13 197:9 198:9 199:25 200:1,2,18 208:1 209:18,25 211:8 212:23,25 215:12 215:15 221:8 223:19,23 225:16 227:5,10,16,16 232:2 233:25 242:1 242:8,9,10,13,15,15 242:16,17 246:17 247:16 248:3,12,12 248:23 252:17 257:13,18,19 258:22 259:7 260:3 260:23 261:7 262:21 264:5 266:24 268:6,9,13 269:10,22 270:14 270:17 271:3,5,11 271:11 273:3,17,19 273:21 274:12,15 275:2,14,14,19,19 276:9,10,17 277:10 278:5 279:24 282:4 282:4,7 284:24
**item** 61:10 63:15,21 108:6 166:10
**items** 64:1 153:22 207:14 218:24
**Ivory** 180:14

**J**

**James** 1:28 5:14
**January** 36:9,10 58:6 90:23 116:8 137:15 137:16 152:9 174:24 197:9 244:6
**Jared** 126:11
**Jeton** 92:8
**Jim** 126:10
**job** 66:1,9 94:9 184:22 233:11
**jobs** 80:23 146:24
**Johnson** 2:6,18 4:3 5:22,23 7:12 10:11 17:8 21:6,13,16 34:23,24 37:17 48:4 48:25 49:2 60:3 62:24 66:14,16,20 67:22 79:22 80:18 81:1,11,23 82:19,20 82:23 83:3,14,16,19 84:3,15,19,19,22 85:23 86:16 87:20 89:2 91:7,15,18 97:11 114:13 115:6 115:7,11 121:24 122:20 123:9 124:8 141:1,3,9 159:5 160:6,9 182:18,25 201:16 217:12 218:21 219:9 220:9 220:11,13,22 221:19 225:15 229:14,20 231:8,21 237:8,13 238:10,12 238:18 241:21 243:6 244:11,12 246:19 247:5 248:9 249:3,10,12,17 250:18 252:8,13 254:7 255:9 257:6,8 257:11 258:8,11 259:24 260:19 263:3 269:16,25 273:10 276:17 277:10,12,19 278:1 278:8 279:11
**Johnson's** 7:1,5 48:23 49:1,23,25 85:18 126:14 140:11 143:10,11 174:18,19 177:10 183:3 238:7 256:13
**Johnston** 49:3 139:15
**join** 116:2 117:6,8,11 117:12 120:10,17 249:4
**joinder** 7:4,5 15:5 32:7 90:3,3,6 117:25 119:22 198:6 245:4
**joinders** 219:19 241:20 243:15 244:11 245:3,11
**joined** 70:23 116:24 161:19,22 244:15
**joint** 111:25
**joke** 103:5
**joking** 229:19
**Judge** 1:19 3:3 13:17 41:23 75:21 76:19 76:21 100:13 116:6 120:7 121:6,13 161:20 165:8 210:21 247:17 264:16 271:7
**judgment** 15:22 81:2 276:4
**judgments** 81:6,8
**judicial** 48:10 129:18 130:8 132:22 242:18
**July** 29:11 30:17 35:23 39:25 40:5,6 44:6,22,23 45:8

166:13 236:21 241:10 263:17
**July's** 44:8,19,21
**jumping** 243:3
**June** 36:10,10 94:18 102:4,5 105:2 106:10 137:16 146:9,13,22 181:19 196:18 208:14 209:15 273:8
**juris** 264:5
**jurisdiction** 119:24 259:5,6 268:3
**jury** 259:18,22 276:3 276:6,7
**justification** 218:11 234:16

K

**KCBC** 146:25
**keep** 91:8 137:24 141:4 200:24 208:10 231:12 270:3,4 277:7 278:22
**keeps** 142:14
**Ken** 34:10 35:9 41:19 86:12 162:17,18 202:2 211:16 216:1 216:9
**Kenneth** 2:17 3:37 202:15 203:2
**kept** 143:14 212:10 245:11,23,24,25
**Key** 157:12
**kicked** 264:16,17
**kind** 20:11 32:13 52:16 80:20,21 86:9 88:7 101:5 102:25 103:6,7,8,10 205:3 231:18
**King** 146:25
**Kissam** 220:22
**Kissimmee** 202:16
**kitchen** 214:5
**knew** 13:2 34:13 170:5 175:10
176:14 246:14
**know** 7:17 8:3,25 9:10 12:10 13:6 15:12,15 16:7,8,14 18:9,15,17 22:20,23 31:15 32:19 33:11 33:20,22 34:2,17,20 35:8 36:2,5,12 37:11,17,25 39:8 40:1,8 42:14 46:2 46:16 48:17 56:5 58:8 65:20 68:20 74:17 75:3 77:22 82:8 85:19 93:2 94:8 99:5 100:3 107:2 109:1,11,13 109:19 112:11,16 113:3 115:13 116:25 118:18,24 119:7,15 120:3 122:6,7,15 124:1,1 124:20 126:21 128:2 129:16 132:12 134:15,15 135:22 136:6 137:23 140:21 142:8 146:11,11 147:21 149:4,12 150:8,8,16 153:11 154:3,7,8,15,16,18 156:14,16 158:13 158:15 159:25 161:4,5 162:10,16 162:21 174:5,6,8 176:18 181:21 183:15,17 185:10 185:17 186:24 187:1,14 188:17 189:22 190:3 191:4 191:8 195:3 198:9 199:24 200:23 204:24 206:18 211:7,22 213:11,22 217:10,10,17 223:6 223:6 226:19,22 227:3,7,16 228:5 230:21 235:23
236:12,12,14,15 237:1,11,12,13,16 237:19,21 240:25 241:25 244:19 245:3 246:23 251:23 252:25 258:19 259:2 260:20 262:16 265:4 267:3,10,16 267:17 268:7 269:14,20 274:4,22 275:1,12,14 276:3 277:23,24 278:17 278:21 279:5 281:7 282:24 283:17,20 284:22 286:2
**knowing** 176:9
**knowledge** 39:25 47:9 57:19 61:5,7 66:20 108:19 149:6 149:13 150:3,7,11 151:14 153:21 163:6 164:9,11 176:5 209:24 214:17 228:23 245:5
**known** 15:14 199:7 234:12 246:15
**knows** 22:19,20 63:2 112:18 113:8 168:21,22 251:7
**knuckleheads** 86:12
**Kosto** 1:37,38 3:13 3:19,27 4:5,7 5:16 5:17,18 20:15 23:9 23:14,16 24:7,8,13 24:16 27:23 28:9,11 28:12,15,20 32:20 32:23 38:16,17,21 38:23 39:5,16,17,18 41:5,23 42:1,4,11 42:20 43:4,13 44:18 46:5 47:4,6,8 48:5,7 48:14,15,17,22 49:2 49:5,8 50:3,7,17,19 50:20,23 51:20 52:3 52:24,25 53:5,9,11
53:17,21,24 54:6,9 54:14,23 55:1,5,6 56:19,21,23 58:9,11 58:12 60:5,10,12,16 60:20,24 61:13,16 61:22 62:16,17 63:4 64:8,16,19 66:7,25 67:2,4 72:12,17,20 73:8,13,18 101:20 113:15 124:16,17 125:19,24,25 126:2 128:4,5 129:1,8,20 129:23 130:1,9,14 130:16,18 131:16 131:21,23,25 132:8 132:19,24 133:3,9 133:12,14,18,19 135:11,12 136:8,9 137:1,17 138:4,7,22 139:1,5,19 140:7,8 142:5,10,22 143:1,6 143:17 144:5,10,12 144:20,21 145:2 147:7,13,18,21,25 148:6 149:11,22,23 150:22 151:10,12 151:14,18,19 153:4 153:15,19,20 154:20,21,25 155:6 155:7 156:1,19,21 157:7,11 158:1,3,4 158:7,17,19 160:15 161:8,9,10 163:4,10 163:15,18 164:3,7,8 164:20 166:2,22 167:6 168:13,14,15 169:2,11,12,21,25 170:11,18,20 176:1 176:18 178:25 190:15 191:12,17 192:12,16 204:10 209:23 216:13,21 216:22,25 217:8,12 217:16 220:9,25 221:3,8,12,14,17,23 222:10,12,21,23 223:2,7,10,11,22

224:3,23 225:12 228:9,10,12,19,20 228:23 229:4,13 232:19 242:8,10,13 242:16 254:15 261:3,6 270:7 271:7 272:6 273:16,19,22 273:25 279:22 286:8,15,21
**Kosto's** 50:15 171:16
**Kubota** 242:25 252:24 253:5

L

**L** 44:8 52:15 56:11 56:14,15 57:14 61:21,23 63:8 64:2 68:1 212:19,19,20 213:4
**label** 270:23
**labeled** 43:11 130:19
**lack** 57:21,22 60:8 61:3 154:23 224:14 239:2 245:4,4 256:23
**laid** 153:10 272:18
**land** 8:10,21,22 9:4 214:7,8,12 215:10 215:21 216:6 278:1 278:5,8
**Lane** 180:15
**language** 112:15 157:22
**Larry** 5:17 192:18 276:14
**late** 15:16 116:1 245:3 283:13
**laugh** 103:5
**laughed** 86:9
**law** 8:16 16:14 71:23 174:1 196:2,4 213:20 214:23,23 219:3,4 235:16 252:5 259:11,13 260:8 264:13 265:24 266:9 270:18 275:22,22
**LAWRENCE** 1:37
**lawsuit** 260:22
**lawsuits** 76:25 161:13 166:24
**lawyer** 91:3
**Lawyering** 12:11,12 12:13
**lawyers** 85:9 230:2
**lay** 161:6
**laying** 14:3 22:17
**layouts** 154:15 156:14 157:2
**leading** 224:1,17
**league** 162:22
**learn** 205:21
**learned** 161:7 249:1
**learning** 260:1
**lease** 111:25
**leave** 126:16 191:17 258:17 261:23
**leaving** 120:8
**lectern** 51:1
**ledger** 102:10
**Lee** 115:13
**left** 23:2 150:4 159:3 159:4,4,5,5 230:3 248:5 272:21
**left-** 10:12
**legal** 10:18 17:18 119:15 139:17 151:8,9,14 159:16 218:10 234:16
**legally** 84:14 235:1
**legitimate** 169:15
**Leibert** 2:3 5:22,22 5:24 7:22 32:20,22 50:10 170:23 216:14,18 217:9 231:20,24 233:15 245:15,19 251:3,6 253:11 254:23 255:1 257:12,17 258:17 261:4 276:14,15,16,20,23 277:5,7 278:11,15 279:18,24 280:2,22 280:25 281:2 282:8 282:10,12,17,23 283:4,8 286:16,22
**Lemons** 154:12,12
**lender** 85:1 102:1 208:2 274:20
**lending** 204:9
**length** 126:15
**lent** 84:17 269:16,16
**let's** 5:12 7:18 11:9 14:11 23:8 35:14 39:2 41:7 42:2 46:10 47:12 61:6,25 72:16 77:5,5,6 91:21 95:22 103:4 103:12,15 104:23 105:18 119:3,3 128:4 136:25 137:18,18 138:18 139:23 148:7 150:23 152:3 170:19 171:4,13 172:13 173:3 176:16 179:12,23 181:15 184:9 192:8 198:15 200:6 202:19,24 206:10 231:7 232:20 242:6 251:5,8,10,12,15 252:22 254:19 255:4 260:9 262:7 276:25 280:4,10
**letter** 54:11 55:7,12 112:24 222:4
**letting** 20:13 200:23
**level** 219:22
**liabilities** 62:3
**liability** 207:10 235:15 238:20 266:10
**licensed** 175:23 177:1
**lie** 122:13
**lien** 151:5,6,20,22,25 152:12,15 158:5 254:3
**liens** 266:22
**lieu** 95:5
**life** 276:18
**lifted** 252:25 253:3,4
**light** 29:24 30:15 40:3 44:2,8,19,21 44:25 45:4,22 171:21
**liked** 115:11 192:18
**liking** 167:23
**limit** 32:9
**limitation** 76:22
**limited** 16:20 32:17 84:6 203:8,9 254:6
**line** 61:10 62:2 63:15 63:21 64:1 84:4 108:6 117:21 119:20 121:1 122:25 153:12 166:10 186:7 189:7 189:13 218:9 234:15
**lines** 140:16
**liquidating** 267:19
**list** 39:3 88:9,11 99:23 100:23,25 159:10,10 170:2 176:19 252:23,25 253:8
**listed** 87:6 145:4 148:14 159:21 169:20,21 255:21 256:5,16,16 273:19 273:19
**listened** 86:9
**lists** 39:21 194:8
**litigant** 250:19 251:7 251:9,13
**litigate** 76:25 241:22 244:22 245:13,13 246:6 253:21
**litigated** 15:5 32:7 122:17 123:3,5,6
**litigating** 9:23 114:8 162:1
**litigation** 95:23,24
**little** 15:15 31:6 107:12,17 117:17 120:4 137:7 171:7 183:6,8 202:12,22

206:10 241:16 250:12
**live** 185:9 193:12
**lived** 193:15
**living** 193:19
**LLC** 1:9,35 5:12 26:4 55:9 62:20 79:11 207:16,19 276:20
**loan** 61:1 81:13,13,15 81:23,25 82:6,20 85:12,15 95:16,21 96:3,16 104:8 106:13 107:8,10 108:10 110:10 145:5,19,21 182:25 186:14 188:8,24 205:3 206:22,25 209:3,5 218:22 227:21 236:6 238:18,19 239:2,18 239:21 240:17 241:1 248:2,2,8,8 248:10,14,16,20,20 279:16
**loaned** 248:21
**loans** 65:8 79:1,2 81:10,12 110:11 160:21 183:3 208:1 208:2 238:15 244:22
**locate** 85:19
**located** 80:7,8
**log** 194:7
**login** 136:4,6
**long** 18:2 27:3 72:13 91:12 103:3 115:25 124:16 193:15 211:18 268:1 271:14 275:16
**longer** 30:4 66:14 84:6 285:24
**look** 10:8 46:19 47:25 55:22 63:25 64:6 89:24 90:1 97:6 101:23 106:6 109:14 128:11 140:16 166:5 176:11 199:20,23 200:11,12,19 207:13 223:2,3,5 234:24 236:19,20 238:2 249:11 264:16 265:4 269:1
**looked** 83:5 107:4 108:16 116:1 118:8 136:6 187:25 188:4 194:23 222:25 227:4 274:21
**looking** 39:4 43:21 53:16 55:25 97:21 121:11 138:3,19,20 222:3 227:1,11,12
**looks** 58:17 83:8 143:22,22 144:19 165:20 174:2 200:15 268:4
**loses** 269:18,25
**loss** 52:12
**lost** 227:15 258:3
**lot** 21:1 86:8 108:3,3 111:1,6 117:16 130:12 157:21 189:17 194:4 204:16 236:21 249:25 261:10 263:24 264:23 269:5 271:21 276:2
**lots** 74:17 196:9
**louder** 71:4 206:13
**LOUIS** 2:8 3:24 69:25
**Luna** 267:6
**lunch** 124:19
**luncheon** 125:10

**M**

**M** 1:37 68:1 212:19 212:19,21 213:4
**M-1** 52:16
**ma'am** 42:9 69:17 125:21 144:11 147:5 159:24 188:11
**machine** 195:16,19
**magically** 198:9
**Mainstreet** 34:11 80:5 83:19,23,24 91:8 102:1 106:2 126:20 138:10,10 139:12 140:17 141:19 156:18 176:24 224:12 238:18 243:2,13 253:4 254:4 267:6,7 275:13 282:1 284:23
**Mainstreet's** 156:15 242:5 243:13 247:4
**maintain** 167:11
**maintaining** 156:6
**maintains** 59:22
**maintenance** 26:17 29:15 156:15 195:16
**maker** 215:7
**making** 12:25 15:8 16:11 17:16 20:12 34:25 45:21 53:20 83:22,22,23 89:12 113:2 119:15 144:22 145:21 186:10 220:2 232:8 248:15 249:11 265:15 268:25
**malice** 218:5 234:10
**man** 219:24
**manage** 26:9,14 30:4 30:6 38:10 76:6 112:18 184:19 271:1,24 276:5
**managed** 27:3
**management** 26:13 27:6 30:5 35:19 270:11 271:1,4,22 272:20
**manager** 24:21 139:15 185:5
**managers** 113:9
**manages** 283:22
**managing** 41:15 193:20 207:23,24
**mandates** 263:8
**Manhattan** 235:20
**manner** 275:4
**March** 1:14 5:1 29:12 37:7 93:17,19 100:11,16 166:13 172:25
**Marina** 141:11
**marked** 132:20 133:4 148:17
**market's** 155:25
**Martins** 59:20 60:4
**Marty** 2:20 30:3 34:15 35:3,3,4 277:13
**Mary** 97:7
**masterful** 78:9,14
**match** 83:9 99:9,23 100:4 135:6
**matched** 188:3
**material** 235:14 240:17
**materials** 147:1
**math** 106:19 145:25
**Matt** 5:22
**matter** 11:6,21 52:7 64:11 129:10 130:11 194:9 232:2 251:24 252:21 269:4 270:13 287:4
**matters** 35:11 161:14 252:1 269:4
**MATTHEW** 2:3
**matures** 127:14
**McPhillips** 80:20,21
**Mead** 1:29
**mean** 7:13 11:14,20 15:12 17:17 18:5 20:3,3,6,20 34:23 35:3,5 48:13,25 57:19 64:12 67:3 73:21,22 88:6 130:15 133:6 144:1 144:24 146:11 147:19 156:24 157:9 158:2 160:13 165:1,7 168:19

188:10 189:16 190:3 195:20 199:10,24 204:16 208:6 219:25 231:12,13,16,17 253:17
**meaning** 72:25 95:5
**means** 15:25 20:22 84:14 134:14 212:19,21 227:3
**meant** 127:9 243:16
**measured** 246:13,14
**meet** 241:8,15 246:18
**meetings** 191:2,3
**meets** 17:4
**member** 207:23,24 252:9,10
**memorandum** 85:17
**memory** 20:21 82:9 137:24 196:19 200:20 214:1
**mention** 200:12 237:5
**mentioned** 20:24 21:5 36:1 45:5 127:3 191:3 200:4
**mentioning** 176:10
**meritorious** 235:15
**Merritt** 180:15
**mess** 110:19
**met** 67:10,12,14 185:7 247:23 259:9
**meticulously** 237:4
**mic** 211:24
**microphone** 9:17 68:7 71:5 93:25 147:4 180:19 192:20 197:3 202:23 206:8 283:16
**Middle** 1:2 5:5 125:14
**midway** 41:21
**Mike** 80:20,21
**milking** 271:14
**mill** 13:25
**million** 81:25 84:17 102:13,18 126:24 208:22 209:4 210:16,17,18 249:18 261:18 262:19 269:17 277:14
**Milotte** 2:19 3:31 5:20 19:7,13,19 23:25 24:3 30:25 37:3,17 41:14 45:7 70:9,11,17 78:18 81:13 92:11 93:5,6 94:5,5 97:11 110:6 110:7,14 168:4,4,5 179:8,22 180:2,14 180:23 181:3,4 192:2 200:19 219:18 225:23 237:16,19 239:14 273:11 279:7
**Milotte's** 100:12,17 110:5 200:22 240:19
**mind** 24:23 159:12 180:20 200:24 206:5
**mine** 21:5 174:22
**minimal** 202:22
**minute** 36:19 179:9 179:13 231:1 232:21
**minutes** 220:8 232:11 232:13,17,18 234:5 258:22 276:24 277:1,3
**Mirabilis** 73:5,24 74:7,12,15,17,19 75:6
**mishandling** 72:3,9
**missed** 127:4
**misstated** 64:4
**misstates** 155:21 163:24 164:1 263:19
**mistake** 109:13 115:5
**mistakes** 117:17
**misunderstood** 35:22
**mitigate** 115:5
**Mm-hmm** 142:4
**moment** 33:8 126:20 242:7 267:18
**Monday** 13:20
**money** 36:19 38:1,2 41:10 60:13 79:15 80:25 81:1,3 85:10 88:4 104:3,5,6 105:10 108:3 109:6 110:24 111:1 112:6 116:11 120:13,22 121:12 126:16 127:6 140:14 141:4 145:10,11,13,16,22 146:21 160:16,21 162:9,10 182:21 185:21,23 186:14 186:15 201:10,15 208:13,16 210:7,24 211:21 212:3,5 217:19,20 225:2,4 238:10 248:5,7 256:2 262:17 263:10,24 265:20 269:16,16,18 270:1 270:10 271:20 272:8,11,12 274:9 274:10 277:14,16 278:16 279:7
**monies** 141:2 144:6 163:11 167:10 169:17 182:6 262:1 271:14 272:18,19 272:21
**month** 34:8 37:7 42:18,25 89:19 106:3,5 137:6 164:17 165:13 166:9,20 181:23
**month-to-month** 136:16
**monthly** 29:9 166:8 166:17
**months** 36:9 137:7 155:24 166:16,17 167:3 262:3
**moot** 11:12,19
**moratorium** 275:10
**morning** 5:8,16,17 158:14 185:7 199:17 264:6
**mortgage** 13:13 65:23 83:20 92:8 138:10,11 141:23 141:24,25 142:1 248:1
**mortgages** 139:18 140:22 248:6 279:25
**motion** 3:5 6:9 14:12 15:17 16:11 18:17 68:22 73:19 88:8,8 121:22 233:6,16,18 233:20 242:5 245:9 246:8 250:15,22 251:3,18 252:15 256:25 257:2 258:10,12 259:21 269:10 275:8 281:4 283:9 284:18
**motions** 245:12 246:7 258:16
**motivated** 218:5 234:10
**motivation** 261:15
**mouth** 120:3
**movant** 19:15
**move** 17:14 28:21 35:14 39:8 42:1,1 136:25 157:24 170:19 176:16 180:20 198:20 206:5,10 217:13
**moved** 39:8 121:22
**moving** 125:4 256:1
**multicolored** 135:17
**multiple** 9:21 111:17 111:17,18 145:24 162:3 195:21 241:24 243:20 246:20
**multiplied** 247:4

N

**N** 1:26 3:1 4:1 5:2
**name** 8:4 24:25 25:1 25:9 30:9 31:8 34:17 37:7,10,14,16 41:19 48:3 50:18,21 51:6,22 115:13 152:15 179:23 180:12 195:9,10 202:11 220:20 250:18 266:19 270:22 271:10
**named** 74:6 172:4 224:8
**names** 34:2,3 41:17 41:18
**nature** 148:23 160:1 161:15 235:6
**near** 251:6
**nearly** 259:8
**necessarily** 66:1,2
**necessary** 239:20 282:22 285:20
**need** 8:5 26:25 43:8 69:16 74:8 78:19 120:21 122:18,18 127:6 138:16 158:15 163:12,14 175:19 185:16 195:17 204:24 206:13 223:5 232:1 235:18 246:5 259:2 262:25 263:4 269:8 285:13 286:1,6,10
**needed** 34:20 120:5 137:9 154:10 161:22 185:15 186:4 208:18 219:17 240:14
**Needless** 23:16
**needs** 16:13 29:15 129:12 192:14 264:8 266:22 270:3
**negotiate** 208:2
**negotiated** 93:21
**negotiator** 77:11
**Neil** 41:22 95:2
**neither** 122:20 225:23 269:6
**nervous** 193:3,5
**net** 164:6,6,7 263:10
**Netflix** 12:10
**never** 8:12,13 11:24 40:16 66:16 77:21 80:24 89:4 97:14 98:3,5,6,19 99:13 108:20 120:17 127:21 191:15 197:17 206:19 207:10,11 216:5,5 239:6,13,14 263:22 278:6,8,11 280:2 282:17
**new** 109:1 115:6 257:1
**newly** 256:24
**Nice** 216:10
**niece** 107:15 109:12 109:15
**night** 13:14 165:19
**nine** 137:13 166:16 166:17 262:3
**ninety** 166:8
**ninety-four** 159:7
**ninety-nine** 43:25
**non-debtor** 260:2
**non-entity** 8:18
**non-responsive** 86:18
**nonsense** 213:2 283:12
**noon** 17:23
**normal** 123:23 213:5
**normally** 30:24 235:22 270:20
**North** 25:12 51:11
**Northern** 118:12
**notary** 169:6 278:3 287:8
**note** 29:19 82:23 83:6 85:11 91:5,13,14 96:16,17,19,24 97:18,23 98:3,14 101:1,2,5 109:5 110:11 127:13,14 127:18,22,23 128:7 128:8 129:15 188:9 188:13,23 189:15 189:19,20,24 190:2 190:5 196:17,18,24 197:13,17,19,23,24 198:9 199:10 205:1 207:12,14 222:16 222:21,24 223:12 223:14,16,19 224:4 224:13 225:16,20 226:9,12 227:21,21 228:2 236:6 239:1,5 239:7,8,9,11,14,15 239:16,17
**note's** 127:21
**notes** 68:18 83:13 85:23 100:4 118:15 140:14 218:21 254:9
**notice** 34:11 41:22 48:10 49:16 90:3 97:10 117:16 129:18 130:8 132:22 230:11,12 230:13 242:18
**noticed** 6:25 7:10 263:16
**noticing** 55:11
**notified** 34:8
**November** 154:3 244:9
**number** 5:11 42:10 42:19 47:25 49:23 57:25 83:9 90:8 91:12 106:24 126:21,22 128:20 128:25 136:22 140:21 150:23 152:3 158:8 166:17 171:20 180:15 187:25 229:4 246:15 264:7 274:2 287:10
**numbers** 83:11 99:9 100:4 107:13 108:4 135:18 146:4 154:11 194:9,24
**numerosity** 7:24 16:22 147:15 169:9 169:13 218:25 245:9 246:12 256:12,16 265:25 269:12

O

**O** 5:2
**o'clock** 13:4 18:3 124:24
**oath** 69:17 124:20 125:20
**obey** 214:24
**object** 9:20 15:8 27:23 28:2 32:4 39:7,9 57:16 60:8 72:12 91:12 118:3 129:9 134:21 143:9 144:14 153:12 169:8 204:10 242:8 245:15 254:24
**objected** 28:9 64:21 65:1
**objecting** 130:10 253:11
**objection** 10:5 18:12 19:19,24 24:14 28:6 28:11 29:3,4 35:13 38:7 47:4 48:5 61:3 62:21 64:4 66:7,25 69:18 72:15,16 73:8 101:19 104:20 129:4 132:10,11 136:25 137:25 139:25 142:7 144:25 149:9,15 150:12 151:8 153:3 154:13,21 155:21 156:13 157:20 159:16 161:3,3 163:1 164:18,25 167:4 168:20 176:1 190:15 193:7 196:6 209:23 212:22 213:8,13 214:9

215:11,22 216:7,17 220:11 222:20 224:17 228:18,21 229:10 230:19 242:5
**objections** 27:24 90:15 149:4 158:13 222:18 258:16
**objective** 218:10 234:16
**obligated** 224:24
**obligation** 268:2 272:15,17
**obligations** 38:10 272:8,24
**obligor** 248:11
**obligors** 248:8
**obstacle** 242:6
**obtain** 235:9
**obtaining** 261:16 271:12
**obviously** 12:5 18:21 19:2 29:21 83:11 88:7 110:21 162:16 225:21,21 248:17 256:19 281:9
**occasion** 45:6
**occasionally** 29:16 30:23 35:9 36:1 65:19,22
**occasions** 267:7
**occur** 30:22 31:7
**occurred** 97:12 105:9 106:3 146:1 154:18 156:2 162:7 238:15
**October** 44:1 144:19 269:2
**odd** 127:3
**off-the-books** 80:20
**offer** 129:2 243:7
**offered** 243:6
**office** 13:4 63:5 64:13 194:19
**officer** 65:11
**Official** 130:21
**officially** 230:22
**oh** 9:6 20:3 21:17,17 23:22 24:20 31:15 31:18 38:1 44:12 47:3,16,18 53:5,10 54:4,25,25 63:17 68:8 71:3,11 78:16 82:8 88:12 90:5 93:19 94:5 103:13 110:5 112:14,24 113:23 116:12,18 124:6 128:21 133:5 143:4,7,9,25 147:5 172:19 180:18,21 183:22 194:25 197:4 198:18,19,22 200:8 206:4,5 210:18,21 212:1 214:18 216:2 220:10 222:2 223:2 227:2,14,17 229:15 233:22 247:10 255:12
**okay** 5:8,9,11,16,21 5:23,25,25 6:2,7,8 6:15,17,20,24 7:16 7:17,21 8:1,1 9:3,8 9:10,11,16,18 10:4 10:14 11:2 12:1,14 12:14,16,19,25 13:19 14:1,7,8,9,11 14:19,20 15:24 16:16 17:25 18:6,8 18:11,19,20,23 19:1 19:15,18,18,23 20:7 20:25 21:11,19,24 22:21,24 23:5,6,7 23:12,15,18,19,24 24:2,4,4,11,14,18 24:22 25:3,25 26:5 26:7 27:3,19 28:1,4 28:7,8,9,19,21,21 28:23,24 29:2,5,7 31:3,12,14,20,22 32:8,15,15 33:1,9 33:23,25 34:22 35:1 38:13,15,16,19,25 39:15,16,17,19,20 40:3,11,19,25 41:7 41:7 42:2,7,15,21 43:7,20 44:2,10,17 45:3,9,22 46:4,7,18 46:24 47:1,11,13,22 48:13,16 49:4,10,12 50:2,5,7,9,10,15,21 50:24 51:21 52:6,20 52:24 53:2,3,10,17 53:19,20 54:1,12,20 55:2,2,3,3,5,14,16 55:22 56:2,4,17,22 57:1,5,9,15,23 58:1 58:1,9,11,19,22,23 59:2,7,11,13,19,24 60:6,10,14,20,22 61:6,23 62:15,16 63:1,5 64:10,17,19 64:23,25 65:25 66:13,23 67:1,6,6 68:10,12,16 69:2,2 69:10,14,15,18,21 71:1,11 72:1,24 73:2,12 74:2,4,6,14 74:23 75:4,6,6,9 76:1,1,14,17,24 77:5,7,18,20 78:11 78:13,18 79:1,5,6 79:22 80:5,11,24 81:9,17,17,22 82:2 82:10,15 83:16,22 84:22 85:21 86:21 87:4,6,14,25 88:9 88:24 89:1,7,9,18 89:23 90:5,6,10,15 90:15,21 91:11,14 91:21 92:3,7,11,19 92:24 93:19,21 94:2 94:5,10,18,25 95:14 95:21 96:1,18,20 97:13 100:25 101:4 101:10,12,19,21,23 102:3,7,9,15,22,24 103:4,11,13,23 104:7,10,20,20,23 105:4,7,11,13,18 106:6 107:6,14,24 108:5,21 109:6,23 111:2,12,22 113:10 113:16 114:11,25 116:3,18 117:11,21 118:21 119:5,13,17 119:18 120:16 121:3,23 122:10 123:14,25 124:3,15 124:19 125:5,8,16 125:22 126:6 128:6 128:10,18,22,23,25 129:18,19 130:9,14 130:16,17,22 131:1 131:4,21,24 132:7 132:10,12,16,18,19 132:24 133:7,14,18 133:25 134:8,10,15 134:18 135:11 136:3,24,25 137:18 137:20 138:3,5,15 138:20,23 139:6,11 139:20 140:1,5,6,7 140:16,23 141:7,12 142:5,8 143:9,16 144:4,6,20,25 145:3 145:19 146:5,9 147:6,18,22 148:5,7 148:9,11,17 149:22 150:6,10,13,14 151:3,12,16,18 152:3 153:17,19,21 154:7,20 155:6,11 156:8,13,19 157:5 157:12,24 158:1,5,9 158:15,17,20 159:8 159:20 160:3,7,9,10 161:8,9,11,18,23,24 163:12,14,23,25 164:13 165:1,10,14 165:22,25 166:3,5 166:15,19,21,23 167:14,25 168:8,12 168:13,14 169:24 170:3,10,11,11,18 170:19,22 171:3,8 171:11,13,17,23,25 172:13,17,20,24 173:8,12,21 174:12

174:21 175:2,14 176:13,15 177:10 177:15 178:8,12 179:11,12,19 180:4 180:5 181:10,15,22 181:24 182:1,10,18 182:21 183:2,9,12 183:15,24 184:2,5,9 185:4,4,24 186:3,6 186:9,25 187:5,7,22 187:24 188:7,13 189:7,9,14 190:4,18 192:5,11,14,19,22 193:9 194:21 196:10,15,23 197:2 198:13,23 199:7,10 199:12,18,22 200:1 200:5,6,16,18 201:1 201:19,23,23,25 202:4,13,14,17,24 202:24,25 203:9,18 204:12,15,18,20,21 206:14 207:9 208:8 208:20,25 209:10 209:12,13,17,20 210:2,12,22 211:4,6 211:11,24 212:1,25 213:14,18 214:6 215:4,23 216:8,9,10 216:13,18,19,23 217:5,15,24 218:2 218:17 220:6,10,13 220:24 221:1,4 222:11,15,25 223:7 223:8,10,16,19,23 224:4,14,19,24 225:11,19 226:4 227:14,23 228:4,7 229:2,10,12,13,14 230:10,16,18,23,25 231:7,14 232:10,15 232:18 233:2,3,5,14 233:22 234:3,4 241:9 242:20,21 245:18,20 250:7 251:5,5,15,16 253:20,25 254:17 254:18 255:4,4,6,12 255:14,17 257:19 258:19,24 259:4 260:14 261:2,8 262:7,9 265:12,17 267:20 269:19 270:6 276:13 278:10,12,13 279:2 279:4,20 280:1,1,6 280:8,9,11,12,14,15 280:17,24 281:8,20 281:22 282:3,8,16 282:21 283:6,15 284:1,11,13 285:4 285:10,17,17,21 286:5,7,9,11,14,15

**old** 107:16 109:2,9,19 256:6 263:13

**once** 44:12 57:3 121:6 128:1

**one-** 31:6

**one-off** 31:5

**one's** 173:21

**ones** 12:5 19:9 41:8 42:5,24 139:16 272:10

**online** 194:22,23,24

**onsite** 185:11 195:15

**open** 43:18 164:24 165:2 182:22

**opening** 192:17

**openings** 18:10

**operate** 225:17 285:8

**operating** 187:9

**operation** 77:21 94:3

**operations** 26:16 77:15,17,20 217:20

**opinion** 108:1 123:10 136:18 247:17

**opportunity** 21:10 184:13,15 230:12

**oppose** 87:24 274:15 284:13,14

**opposed** 13:20 20:1 20:12 88:3 103:1 162:1 166:13

**opposing** 20:14 281:9

**option** 96:12,15 97:14 101:13 103:20,23,24 105:2 106:20 126:7,17,20 127:4,9,17,19 128:24,25 132:1,2,5 132:17 133:16 145:7 146:15 147:9 147:11 160:19 222:16 223:25 224:9,16,21 239:20 240:1,10 275:12,15

**option-type** 160:12

**orally** 97:9 250:20,21

**Orange** 1:31 51:11

**order** 6:3 7:5,22 8:3 8:11 13:3 14:24,25 15:12,25 16:19,22 16:23 17:6,12,13 18:19 19:17 21:20 23:1 24:9 58:5 68:18 75:12,13,16 76:2,17 77:6 78:25 79:7 114:25 121:9 122:8 140:13 174:25 197:9,25 198:4 211:17 233:19 234:1 235:8 235:9 239:10 244:4 244:21 246:2 251:17 252:8,19 258:9 286:12

**orderly** 162:12 262:21 278:17,23 283:5

**orders** 241:24 246:7 268:16

**ordinary** 52:19 93:24 94:3 142:15 262:4

**origin** 148:24

**original** 12:4 55:8 92:12 99:21 118:19 132:2 142:12 283:20

**originally** 80:17 174:23 183:23

**Orlando** 1:3,23,33,40 2:5,11 5:1 51:11 52:5 193:18

**outcome** 274:23 275:5,5

**outset** 6:21 10:15 12:2

**outside** 35:14 47:6 49:9 62:14 67:5 73:9 212:23,24 214:10 215:3 275:16

**outstanding** 145:10

**overcome** 13:7

**overlap** 231:17 236:25

**overrule** 210:1 252:19

**Overruled** 28:21

**overruling** 18:12

**oversee** 27:12

**overseeing** 185:5

**owe** 81:3 120:13

**owed** 60:13 63:19 71:17 79:15 82:4,20 83:24 85:10,12 95:16 96:2 103:24 139:14 145:13,16 145:17 160:16 182:7 204:25 205:6 205:10,18 206:20 206:24 223:21 263:24 274:2

**owned** 8:11 41:19 66:14 70:8 79:23 80:18,19 84:10 92:13 94:20 111:14 172:25 184:25 213:23 224:7 236:12

**owner** 26:6,18 29:8 43:10 62:24 65:13 66:20 70:17 80:21 84:10 88:2 92:12 121:25 122:10,11 153:9,10 166:7 167:21 182:1 191:22,25 203:13

237:14 244:24 266:10,13,18
**owners** 29:9 45:19 127:2 165:4
**ownership** 66:17 114:8 122:16 123:1 123:2 192:2 206:19 213:24 241:22 252:3 264:8,10 268:15
**owns** 92:19,22 122:1 122:19 155:18 190:20 214:7 260:3 264:10 282:14 283:7

**P**

**P** 1:26,26 5:2
**P.A** 1:30
**P.E** 158:22 159:21 160:11,11,16 207:20,21,22,25 208:3,3 240:12 248:21 262:2 268:23
**package** 146:12
**page** 43:14,15,18,22 43:23 47:2,16,22 48:9,9,12 52:18 56:13,14 103:15,15 117:21 119:13,20 121:1 122:25 130:19,25,25 136:22 163:7 166:5 171:20 172:23 186:7 189:7,13 200:13 209:14 210:13 227:15
**pages** 43:18 46:24 133:4,11 143:2 284:3,11,12 285:13
**paid** 7:24 29:13,17 30:23 35:18 36:20 36:24 42:10,19,24 42:25 43:8 44:3,14 44:15 45:1,10,23 46:1 49:25 82:12,17 83:5 89:4 90:22 91:18 96:15 97:14 102:19,20 104:3,3,5 111:14 127:10,11 127:16,20,21,22 134:1 137:9,10 138:9,9 139:2 141:3 141:9 144:6 159:6 164:5,10,12 169:17 173:9 177:16,18 184:23,24 186:11 186:13 201:8 208:19 218:24 235:25 236:8 237:5 238:17,18 239:22 239:23 240:3,19 241:11 247:24,25 248:4 263:11,12,22 263:22,25 267:14 270:5,12 272:3 274:3,5,6 275:17 280:2
**panic** 263:15
**paper** 138:13,17 140:12 163:9 190:3 285:22
**papers** 18:18 62:7 64:1 184:17 199:14 236:19 253:23 282:18,19
**paragraph** 90:19
**parameters** 246:3
**Pardo** 135:24
**Pardon** 133:22
**Parke** 95:5
**part** 9:25 12:11 18:18 19:13 27:9 53:15 59:15 80:18 121:17 127:5,19 165:4 168:11 265:19,19 268:17
**partially** 247:21
**participant** 120:10
**participate** 15:18 100:10 116:17,20 116:21 117:7,13 120:5,8,18 191:5 219:17 239:10 244:18,20 245:1 266:5
**participated** 253:10 254:2
**participation** 75:17
**particular** 59:5 78:1 99:8 134:2,20 146:2 152:14 190:1,7 197:20 221:2
**particularly** 78:9 266:9 268:4
**parties** 7:9,17 17:6 18:9 82:3 153:16 170:6 200:23 233:6 248:11,14 254:16 258:15 259:18 260:2
**partner** 67:23 95:3 115:12 154:5 203:17,19
**party** 8:7 20:12 21:7 32:11 34:16 37:16 40:23 153:23,23 259:18 283:12
**party's** 23:3
**passed** 118:4 230:9
**pattern** 144:21
**pay** 31:10 36:6,7,11 36:25 37:4,6 40:3 41:10 45:12,16,18 45:20 77:2,10 79:16 80:25 81:1 82:14,19 82:23 84:20 92:3 110:11 112:6 121:12 127:1,12 145:22 168:25 174:3 185:21,25 186:9,11,15 193:23 194:5,20,24 195:5 207:11 224:25 236:17,17 239:19 240:20,22 243:6,7 243:13 248:7,15,22 248:24 262:4 266:11 272:11,13 279:8,16,16,17,25 282:2
**paying** 17:5 26:15 27:12 35:24 36:4 37:12 40:7,8,12,15 40:19 41:1,8,9,13 41:14 42:5,6,12,22 43:6 45:3,13,15,16 83:24 84:5 85:7 91:1 94:6,11 111:17 114:22,22 140:19 141:25 142:1 174:13 195:1 237:17 238:19 241:12 248:13 270:10,14,25 272:7 272:9,10,24 274:11
**payment** 31:2,2 39:24 40:9 44:7 45:6,7 102:24 103:7 103:8,10,10 134:13 134:14,16 137:2 140:12 141:22 145:12 151:4 166:7 172:10 174:8 185:20 201:12 237:3
**payments** 27:10,16 30:11,18 32:13 35:23 36:13,17 37:18 38:12 39:3,22 45:20,21 83:22,23 83:23 89:12,14 91:6 91:7,10 99:9,24 100:3 102:25 103:6 109:24 110:3,8,9,12 111:9,11 113:3 134:19 135:18 136:2,20 137:3,6,13 137:21 138:8 144:22 173:20 174:18 176:5 177:23 178:17 236:10,21,24,25 237:4,17 238:11 240:5 241:10,11,13 243:7 248:5,12,15 248:15,18 263:18

263:21 279:15
**payout** 31:11
**pays** 84:9,16
**Pedixon** 82:4 95:15 95:24 108:9 160:23 161:2 207:16,19 248:4 256:7,8 260:2
**penalty** 265:2
**pending** 87:4,5 113:20,23 120:19 120:23 175:24 250:9 252:13
**people** 24:5 27:10 76:12 84:18 85:6 86:8 108:3,19 126:21 150:16,21 162:21 195:14 196:12 266:8 278:17
**percent** 17:24 87:22 127:14 162:11 174:10 269:19
**perception** 274:21
**perfect** 230:20
**period** 15:14 59:7 137:12,14 166:13
**perjury** 265:2
**permission** 37:2,4 77:4
**permissive** 259:7,9 268:5
**permitted** 184:16
**person** 22:19 23:20 24:18 28:7 35:7 36:4,8 50:18 99:3 117:20 151:7 185:10,10 195:16 217:19 225:25 264:24 266:2 275:17
**personal** 47:9 50:1 57:18 61:5,7 76:14 76:15 83:4 98:19 140:11 149:6,12 151:4 153:21 163:6 167:17,21 209:24 211:8 214:17
219:22 228:23 266:10
**personally** 87:23 88:3 116:21
**persons** 150:20 157:23
**perspective** 110:21
**pest** 29:14,25
**petition** 3:6 13:22 16:25 17:3 70:23 117:12 120:11,17 144:15,17,17 161:19 173:15,18 234:7 235:3,7 241:11,13 246:16 256:6 261:15 274:14
**petitioner** 161:22
**petitioning** 21:22 79:18 105:23 116:7 116:16 121:14 234:20,25 235:8,10 236:5,23 242:4 243:22 244:3,5,10 246:14,17,22 247:15 249:13 250:4 254:10 255:22 261:14
**petitions** 235:22
**ph** 154:12
**Phoenix-Odyssey** 92:18 190:9
**phone** 194:9,10,16,17
**phonetic** 83:7 92:8 135:24 283:19
**photocopy** 143:23
**physical** 194:18 252:23
**physically** 110:9 225:15,17
**pick** 256:20
**picked** 160:1
**piece** 138:13
**pieces** 192:17
**pinpoint** 157:8
**Pitkanen** 35:5 38:6 67:12 87:10 99:11
100:2 104:15 105:21 107:13 108:25
**Pitkanen's** 145:24 168:25 175:17
**place** 10:19 91:8 101:6 121:21 122:19 152:15 155:8 194:18 240:13 248:19 283:13
**placed** 92:16
**places** 174:9 235:7
**plan** 92:15
**played** 114:24
**player** 113:8
**playing** 8:4
**pleading** 18:16 88:8
**pleadings** 9:7 11:4 12:5 78:23 99:3 250:23 263:6 265:1
**please** 5:8 27:19 28:7 50:25 51:6,14,21 69:10,23 93:25 100:15 101:8 105:8 125:16,23 179:19 180:12 192:19 197:6 202:11 220:20 233:2 263:7
**pledge** 160:18
**plenty** 220:4
**plus** 134:4 154:1 268:11
**podium** 24:23 202:5 220:14
**point** 14:12 15:15 16:18 20:8 22:12,12 43:1,7 55:18 58:3 64:10 77:14 107:20 116:4 147:20 158:2 173:8 176:7 209:19 239:8 242:1 259:11 262:11,11 265:18 274:12
**point's** 216:3
**pointed** 121:13
**pointing** 49:22 247:9
**poof** 264:22
**portal** 135:15 164:23 165:1,3 194:8
**portals** 165:13
**Porter** 267:7
**portion** 92:13 160:20 186:23 247:14
**position** 26:5 215:17 242:22 256:17 266:20 280:19
**positions** 267:4
**possession** 97:18
**possible** 23:11 40:14 40:19 66:5 76:23 211:25
**possibly** 40:13 61:20 62:2
**post-trial** 283:11 284:4,5 285:12 286:13
**potential** 123:12,14
**power** 29:24 30:15,23 36:1 40:3 41:11,12 41:13,22 134:2,13 134:14 135:15,20 136:18 137:7 171:21 186:4
**practice** 67:25 235:25 246:8 259:21 284:18
**practiced** 71:22
**precise** 99:5
**predominantly** 275:22
**prefer** 19:21 213:1
**preference** 261:19 263:3,4
**preferential** 261:25 263:1
**preparation** 59:15
**prepare** 58:23 65:16 66:1,11 67:17 131:12 209:18 240:8
**prepared** 29:10 52:8 55:11 56:3 57:3,8 57:18 58:13,17 63:5

63:7 64:13 83:6 85:18 131:8 135:22 187:14 241:3,5,5
**preparer** 62:14
**preparing** 212:18 244:23
**presence** 235:19
**present** 2:15 17:3,7 75:23 110:5 136:10 163:19 237:8
**presentation** 19:14 20:6
**presented** 11:5 13:11 206:19 207:12 242:14 247:19 268:25
**presenting** 15:10 118:5
**preservation** 141:5
**preserve** 18:21 33:3
**preserved** 33:5
**president** 70:11,19 78:18,19 84:22 111:7 113:2 167:22 181:4,7 191:23 203:17,18 237:13 237:14 244:24
**presiding** 5:6 125:15
**presumably** 11:14 240:14 254:3
**presume** 6:12 7:17 109:10 168:22 280:21
**presumes** 9:5
**presuming** 15:25 18:12 156:23 166:12 253:2
**pretty** 189:25 224:10 226:19 227:17 245:22 267:24 268:12
**prevent** 217:18 274:8
**previously** 21:4 70:1
**price** 156:17 204:6 224:12,16,16
**primarily** 83:2 96:2 204:2 208:1
**primary** 261:12,15
**principal** 96:4 107:7 107:8
**print** 136:19
**prior** 10:20 27:25 30:18 44:14 45:3 72:20 73:18,24 74:9 91:2,6,15 93:7 117:6 135:3 155:21 204:11 232:6 238:3 238:3,5 268:16
**prison** 13:7 74:11 99:4
**prisoners** 99:4
**privilege** 175:22,22 175:22
**privity** 266:17
**pro** 2:8,12 6:1 230:5 230:15
**probably** 6:19 39:2 56:10 82:1 93:17 112:11 115:20,25 117:17 122:6,24 159:13 162:10 164:16 173:19 174:5,14 177:11 189:6 193:16 211:23 224:18 231:13 242:1 267:21 271:25
**problem** 13:5 50:14 129:5 144:3 185:11 229:24
**problems** 98:1 195:11
**procedural** 13:5,6,7 229:16
**procedures** 59:16
**proceed** 6:9 19:2 23:3 47:12 69:23 166:21 168:13 200:7 220:8 258:14
**proceeded** 11:13
**proceeding** 1:16 17:13 32:17 161:22 204:3 246:5,6 257:2 259:12,14 268:17
284:18,22
**proceedings** 1:47 3:3 9:25 57:3 66:19 69:7 74:25 100:10 115:23 116:20,22 125:11 179:16 232:24 244:19,20 245:4,5 257:6 259:20 286:23 287:3
**process** 26:22 117:4 194:5 230:12 249:10 268:7
**produce** 136:19 140:14
**produced** 98:9 99:10 135:8 222:22
**professional** 204:5 235:5
**profit** 52:12
**project** 95:19
**prominent** 8:17
**promise** 211:18 284:12
**promised** 263:23
**promises** 278:7
**promissory** 85:11 110:10 188:23 218:21 222:16 223:12,14,16 236:6 239:1,4,7,8,9,11,14
**prompts** 194:11
**pronounced** 179:24
**proof** 13:11 39:20,20 46:16 48:11,14 83:5 128:12,12 129:2,5 129:10,19 130:1,1 130:12 131:2 133:7 133:11 138:20 140:14 171:13,14 183:9 187:11 205:16,22 207:1 211:22,23 219:6 221:13 227:5
**proofs** 237:19
**proper** 138:1 242:16 259:21 275:19,21
275:24
**properly** 8:13 97:11 252:5
**properties** 32:1 33:12 33:13 126:17 152:17 157:15 169:3,17 186:23 193:21 217:21 271:24 276:5
**property** 24:21 26:13 37:1 126:7 127:10 139:13 151:2,5,6,25 155:15,18 157:23 185:5 266:2,12 267:1,2 271:2,3,5,8 271:9 275:4 277:16
**protect** 116:10 248:17 261:15
**protecting** 75:24
**protection** 243:7
**protections** 246:9
**provable** 218:19
**prove** 16:23 197:23 206:20 218:23
**proved** 91:11
**provide** 26:11 40:9 66:6 98:14,21 99:22 100:6,18,18,25 148:20 160:20 178:25 197:8 204:4 239:3,4 249:19 256:23
**provided** 1:48 59:11 59:14 63:2 64:14 65:16 123:16 169:18 173:25 197:15,15 210:8,9 244:6
**provides** 66:10 266:1
**prudence** 264:5
**public** 8:9 262:18 267:9 268:14
**Public-State** 287:8
**Puerto** 72:6
**pull** 58:21 65:18 174:22
**pulled** 45:8 57:12

58:18,21 136:10
**punitive** 15:19 250:2
**purchase** 96:7 108:12 128:24,25 132:1,2 132:18 142:1 208:14 224:7,9,12 224:16 239:19,24
**purchased** 126:9 224:10
**purely** 260:7
**purported** 8:15
**purportedly** 146:14 158:22
**purports** 131:19
**purpose** 161:25 162:13 167:9 217:18 218:5,8,13 234:9,10,18 241:20 246:10 262:20 264:4,24,25 274:7 274:14
**purposes** 108:11 132:13,19 140:2 247:14 264:10 266:4,7
**pursue** 257:25 258:2
**push** 114:21
**pushing** 221:1
**put** 11:9 21:21 37:15 54:1 86:8 97:8 109:16 112:11 114:20 121:20 122:19 134:23 146:11 165:19 174:10 182:21 183:18 191:20 198:20 209:4 225:19 233:21 242:5 246:6 248:16 256:21 265:22 273:20 277:14 278:19,24
**putative** 8:14
**putatively** 95:4,4
**putting** 120:2 141:5

**Q**

**qualifies** 247:14
**qualify** 247:22
**quasi-counsel** 117:5
**question** 32:24,25 37:6 39:23 40:20 41:6,24 42:3,3 45:16 48:20 49:7,8 49:8,11 60:19 62:18 64:8 74:9 78:5,12 90:25 91:3 107:25 119:21 120:1,19,24 121:16 122:3,11,23 149:21 157:8 161:23 163:16,17 175:24,25 176:2,15 178:10,14 189:5,5 206:1 223:9 226:1 251:20,22 275:1 280:18 282:5
**questionable** 255:24
**questioning** 132:5 153:13
**questions** 15:11 18:7 20:1,9 31:13 32:5 32:11,21 64:20 78:7 85:20 93:16 100:15 105:19 110:23 136:2 153:18 170:24 175:11 179:4 181:15 191:11 192:7 211:5 228:8 229:7,21 230:8,14
**quick** 33:8 46:6 59:1 137:19 179:9
**QuickBooks** 57:2,12 57:14 58:18 59:1,6 59:13,16 65:17,19 131:11 241:4
**quickly** 23:11 268:7
**quite** 16:19 135:20 228:3
**quote** 258:11 268:1
**quoting** 246:13

**R**

**R** 1:26 5:2 287:1
**R-A-G-A-N-S** 52:2
**Ragans** 51:25 52:4,6 54:10 55:9 57:6 213:10,20 221:8 228:6
**raise** 13:1,9 25:4 51:1 180:6 202:6 220:15
**raised** 12:2,4,7,8,18 13:10 234:1 251:16 251:25 252:10 255:8
**raising** 277:21
**ran** 77:15
**random** 31:5,6
**rate** 127:15
**re-ask** 32:24
**reach** 243:1
**reached** 34:15
**reaches** 151:24
**read** 88:13,13,15,19 117:15 118:3 119:1 119:4 138:16 163:7 165:9,19 189:9,11 200:12 219:23 267:9 268:13
**reading** 48:9,11 138:12 200:22
**ready** 7:23 125:24 231:1 232:11 233:3 244:8,9
**real** 1:9,35 5:12,14 8:7 55:9 62:20 83:11 90:23 95:4 121:11 137:19 151:5,6 154:12 155:24 169:5,7 171:20 179:9 188:18 196:24 204:7,9 205:16 240:23 242:6 264:14 276:18
**realize** 143:25 216:4 216:5
**realized** 219:16
**really** 7:12 13:12,15 17:18,23 20:6 21:13 33:8 38:9 44:7 95:20 99:2 107:24 121:3 122:21 165:19 166:9 179:24 184:4 186:20 188:20 236:7,13,13,15 238:1,11 240:25 242:23 244:19 251:23 255:23 256:23 257:17,18 259:10 260:3 263:8 264:18,20 276:16 277:23 282:13,13 282:14 283:20
**realtor** 154:24
**reason** 31:5 84:17 132:24 161:18 166:23 176:8 205:15 244:17 254:13,20 258:4 264:1
**reasonable** 230:12 275:4
**reasons** 271:8
**recall** 55:13 61:10 62:2 63:24 73:21,23 98:8 99:15,15,20 111:12 112:5,8 122:3 175:3,6 177:6 177:6,10 182:10,14 183:9,25 185:24 187:11 188:23 189:4,16,19,21,24 190:1,4,6,23 197:19 199:3 204:19 208:13,16 218:20 239:15 243:18 248:20 260:17
**recalled** 239:16
**receipt** 29:21 31:8,10 134:1 140:10
**receipts** 29:19,22 37:19 40:9 240:25
**receive** 91:23 167:10 211:21 226:18
**received** 65:9 99:24 112:19 131:18

134:13 140:15 169:16 187:17 189:10 224:15,20 239:6 254:6
**receiving** 163:20 164:2 217:20
**recess** 69:6 125:5,10 179:15 232:23
**recollection** 39:11 59:3 138:2 139:9,18 140:2 197:12 198:14 199:2 200:14,17
**recommendation** 119:25
**reconcile** 67:25 68:3 213:5
**reconciled** 146:8
**reconciliation** 52:17
**reconsideration** 18:17
**record** 10:25 33:4,5 34:25 51:7,22 84:6 85:22 86:8 88:15,21 107:20 132:20 180:13 191:21 202:12 208:10 220:21 230:21 242:9,17 262:18 267:9 268:14 269:2
**record's** 211:17
**recorded** 1:47 62:6 97:25
**recording** 1:47 287:3
**records** 8:9 55:19 56:6 57:6,14 62:1 62:19,19,22 64:7 68:4 98:20 124:5 142:17,19 143:14 156:5 205:9,13 213:5 225:8 240:24 272:1,2,2
**recovery** 263:1
**redirect** 3:14,28 4:7 38:13 46:6,8 170:25 171:1 201:19 217:2 228:9,11
**redo** 145:25
**reestablished** 117:4
**refer** 70:21 232:5 238:3
**reference** 172:22
**references** 60:6,25 228:1
**referring** 39:13 61:18 63:15 70:22 129:16 210:15 222:9 273:13
**refers** 106:1 140:17
**reflect** 140:22
**reflected** 42:7
**refresh** 82:8 138:2 196:19 197:11 198:13 199:4 200:14 214:1
**refreshes** 200:17,20
**refreshing** 39:11 199:2 255:6
**regard** 63:23
**regarding** 123:17 232:3 238:23 240:17 245:13 252:3 259:24 265:8 265:10
**regardless** 261:13 264:2
**register** 132:13
**registered** 216:15
**regular** 248:4
**regularly** 45:23
**reimburse** 36:13,16 36:18
**reimbursed** 38:11 211:2 263:23,24
**reinstated** 253:3
**reinstates** 6:4
**relate** 114:7,10 129:13 145:7
**related** 26:16 75:16 89:3 141:19 146:4 146:15 153:5 157:15 222:16 223:25 241:1 259:6 259:12 260:8
**relates** 95:18 146:23 190:17 257:21
**relating** 27:13 239:1
**relation** 207:16,19
**relationship** 26:7 52:7 126:6
**release** 22:13 265:2
**released** 76:12
**relevance** 38:7,8 60:11,12 144:14 167:4,5,6,6 169:9 193:7 196:6,7,8 212:22 213:8,9 216:17 229:2
**Relevancy** 190:15
**relevant** 49:11 144:23 167:23 168:11 233:7
**reliable** 247:19
**relied** 213:12
**relief** 121:9 235:9 242:5,6,19 243:3 250:5 254:5,6,11 258:8,12 274:16,17 274:18,25 275:8 279:12 284:24 285:2
**relitigating** 268:20
**relitigation** 268:19
**rely** 205:5,8 241:2
**relying** 129:12
**rem** 266:11
**remain** 166:24 283:25
**remaining** 183:6 254:4 256:5
**remedy** 235:3
**remember** 46:18 99:13 100:9 117:11 122:22 172:14,19 177:12 192:20 193:17 196:18,23 211:24 213:25 216:23 229:23 240:5 255:15,16 265:6 277:18
**remove** 258:10
**renew** 156:13
**Reno** 80:9
**rent** 271:9
**rental** 29:12 164:22 166:6,11,12,18 186:23 193:21
**rentals** 26:1 145:17 162:24 163:11 164:21
**rented** 27:2
**renting** 271:2,2,3,8
**rents** 37:5 145:10 285:3
**reorganization** 242:24 243:16
**reorganize** 219:15 249:7 267:12 280:7
**rep** 10:6 112:25
**repaid** 83:16 134:8 145:20 147:2,11 207:14 210:11 212:3 225:2 240:10
**repaired** 185:16,16
**repairs** 29:14
**repay** 45:9 272:15,18 272:23
**repayment** 146:21 206:21,25 210:7 241:1 243:17
**repeat** 194:13,15 232:1
**rephrase** 149:20
**replaced** 29:16 195:18
**reply** 279:1 285:19
**report** 74:18 165:3 165:20 195:15
**reporter** 4:11 112:22 117:18
**REPORTERS** 1:48
**reports** 65:18 164:22
**represent** 8:24 14:14 151:3,7 191:21 198:5,7 230:5 251:1
**representation** 10:25 35:9 75:17
**representative** 5:19

24:20 44:8 70:6,14 122:4 167:20 175:10 203:24 214:16 240:6 244:23 272:6
**represented** 15:20,21 35:10
**representing** 32:16 33:3 75:19 197:25 198:1
**Republic** 109:2,19 256:6 263:13
**reputation** 271:10
**request** 45:7 109:12 263:6
**requested** 45:21 98:11 258:12
**requests** 29:11
**require** 174:10
**required** 21:21 197:7 199:3 239:3 240:7 244:3 248:11
**requirement** 110:11 246:18
**requirements** 17:4 259:8,9
**requires** 230:12 235:13 260:22 264:2
**requiring** 244:5
**research** 16:6
**reserve** 108:10 208:21,22 210:13 210:14,24 211:2
**reserved** 16:18
**reserving** 16:11
**resolve** 235:19 268:10,14
**resolved** 240:16
**resolves** 162:21
**resort** 80:2,9,12 94:7
**Resorts** 193:12
**resource** 260:6
**respect** 7:12 14:23,24 14:25 15:2 19:13 26:19 30:12 75:13 76:9,14 117:3 124:5 130:5 177:15 178:19 204:3 218:25 227:23 238:1,4,24,25 240:18 241:9 243:2 246:12 247:25 253:8 279:9,10 281:11
**respond** 284:10
**responding** 10:5 119:16
**response** 38:21 145:14 187:2 228:20 230:10 260:18
**responses** 117:2
**responsibilities** 85:1
**responsibility** 34:4,5 45:12 66:21 111:13 237:18
**responsible** 34:6 45:18 141:12 248:14
**responsive** 41:24 86:19
**rest** 20:21 148:4 270:2
**rested** 20:16 22:5,8 22:11
**resting** 20:12
**restroom** 69:1,1
**resume** 69:19
**retroactive** 15:25 44:4,9
**retroactively** 16:7
**return** 52:15,18 55:7 55:8,10,14,18,20,24 56:3,16 57:8,12,13 63:7,8,22,24 64:3 67:23 68:1 84:9 131:11 212:17,20 212:21 213:6,11 221:24 222:1 227:4 227:21,24
**returns** 52:8,10,12,14 66:11,22 67:17,20 67:21 225:5,6 227:25 229:3
**revenue** 43:23 81:22 162:23 163:20 164:2,3 183:4 185:25 186:11,21 270:10 279:8
**revenues** 36:20 77:25 164:21 186:23 248:17 263:10 275:18
**reverse** 211:17
**review** 117:15 121:4 135:3 218:10 234:16
**reviewed** 112:9 184:6 187:24 189:8 228:1
**revisit** 231:24
**revoked** 257:24
**Richard** 115:13
**Rico** 72:6
**right** 6:2 8:19 9:5 10:14,19,20,24 11:22 12:6 13:16 14:3,8 18:13 19:5 20:7,10 22:21 23:1 24:22 25:4 28:8 32:11 35:16 37:6 38:15 43:17 46:10 47:20 50:5,8,10,25 51:1 53:13 68:10,17 68:24 69:11,15,18 71:13,17,20 72:10 72:19 74:16 76:5 77:9 78:6 79:7,16 80:1,15,25 81:23 82:13 83:20 90:2 91:20 92:25 93:22 94:7,14 95:11 96:10 96:12 97:19 98:4,12 98:18 101:16 102:5 102:12 103:16 104:9 105:1,5,21,24 107:11 109:16,24 111:5,18 113:22 114:3,5,13 116:18 118:15,21,23 121:25 125:5,18,22 129:25 130:13,20 130:21,23 132:22 133:1,12,13,16 134:6 136:8 138:18 138:23 140:4 149:19 151:4 154:20 155:18 156:19 162:23 168:1,6 170:22 171:4,17 175:21 177:16 178:11,18 179:5,12,19,21 180:4,6,18 181:16 181:24 182:6,12,13 182:19,22 185:6,8 185:14 188:4,17 191:12 192:8 193:10 196:10 198:21 200:6 201:4 201:19 202:4,6,19 202:20,21 204:15 206:7 208:9 209:7,9 211:1 212:11 213:15,21 214:4,13 216:20 217:2,5,8 220:6,10,13,15 222:3 226:20 227:8 229:14 230:25 232:10,15,20 251:8 258:19 261:2 263:4 263:25 265:20,23 267:14 277:18 280:4,16 281:8 283:1 285:6 286:7,9 286:18
**rights** 6:4 76:23 117:4 254:3 259:18 259:22 276:3
**Riley** 24:21 67:15 185:7
**rise** 5:3 69:5,8 125:9 125:12 179:14,17 232:22,25 286:20
**rising** 7:18
**Riverfly** 106:2
**Riviera** 202:16
**road** 79:9

**Robinson** 1:39
**Robson** 1:18 3:3 5:6 13:17 76:21 120:7 121:6,13 125:15 161:20,20,21
**Robson's** 116:6
**role** 7:13 26:18 35:8 77:8 92:24 124:12 191:8 203:15,15,18 207:24 214:15
**roles** 105:25
**Ross** 49:3
**Rost** 115:10
**Rotella** 1:38
**roughly** 152:23
**round** 140:21
**rounding** 108:2
**Ruben** 83:6
**rule** 8:8 13:17,17 114:24 122:8 134:25,25 148:12 218:10 283:21
**rules** 13:18
**ruling** 13:24 121:23 249:8 250:9 280:19 286:13
**rulings** 268:22
**run** 13:25 76:11 85:8 94:19 117:16 269:7
**running** 94:6 271:4
**runs** 266:11,17
**ruse** 243:24 261:1
**rushed** 123:23

**S**

**S** 1:26 2:4,6,18 5:2 256:15
**S-T-U-A-R-T** 25:11
**Saft** 126:11
**Sailors** 283:19
**sale** 96:7 101:13 105:5 146:4 154:9 156:9,17 162:12 188:14 210:8 278:17,23 283:5
**sales** 123:21 124:1 154:18 155:8,12 156:2 165:4,5
**salvage** 278:16
**sanctions** 15:19
**sat** 136:5 277:18
**satisfactory** 209:3
**Satori** 111:14,20 112:1 154:5,9 156:6 185:1,3,4 193:13,20
**Satori's** 111:24
**Saturday** 244:6
**save** 5:6 89:7 100:13 157:21 213:16,17 220:25 249:15,20 279:11
**saw** 57:19 87:9 98:5,6 194:23 197:17 249:13
**saying** 8:20 12:2 13:12 15:1 19:24 24:16 34:12,16 44:19 46:19 49:24 53:7 57:21 78:10 86:5 104:7 115:16 133:3 145:23 154:23 155:4 159:22,24 160:4 165:10,22 195:16 199:13 218:17 219:4 220:3 221:16 250:9 277:9 281:23 284:4,11 285:1
**says** 16:24 17:2 43:18 55:12 62:4 64:17,17 64:18,18 76:17 83:5 88:8 90:21 101:23 102:6,12,16,20,22 103:11,12,18,20 104:2,24 105:3 106:7 108:6 130:21 150:4 166:1,5,7 173:9,22 198:5 209:15,21 210:4,13 210:14 227:21 246:2 270:18 273:1
**scene** 168:3
**schedule** 52:14,16 56:11,14,15 57:14 61:21,23 63:8 64:2 68:1 87:9 99:8 212:19,20 240:1,2 266:14
**scheduled** 243:18
**schedules** 87:7 238:5 249:18 252:22,23 256:15
**scheduling** 7:5 21:20 234:1 246:2 251:17
**school** 196:3,4
**scintilla** 217:22
**scoot** 71:8,9
**scope** 35:14 47:6 49:9 62:14 67:5 73:9 75:20 212:23,24 214:10 215:3,11,22 216:7 228:15,22
**screwed** 86:7
**se** 2:8,12 6:1 230:5,15 233:18
**season** 166:14
**seat** 25:14 51:13 125:23 180:17 202:17 220:24
**seated** 5:9 69:10 125:17 179:19 233:2
**seats** 243:3
**second** 10:7 11:6 53:5 53:12 54:18 55:3 90:19 118:14 126:3 128:15,19 174:21 184:9 202:5,19 209:14 221:11,12 221:16 234:12 253:1 258:5 260:11 276:22 283:12
**Secretary** 259:25
**section** 90:18 235:7 241:18 247:22,23 248:2,7 251:17,19 251:19,20,22
**secured** 150:25 151:1 152:10 154:25 157:17 160:13 176:19 209:3 219:2 246:25 247:13,13 247:21 254:4 266:20,25
**security** 13:12 160:20
**see** 6:2 13:23 39:2,12 39:15 42:24 43:24 47:2 48:24 49:11 54:2 61:6,25 65:2 72:16 88:14 90:19 91:13 99:24 102:1 103:16,18 104:13 104:24 106:6,9,12 106:16,17 108:6 122:16,18 123:1 128:4,21 129:15 165:5 171:22,23 172:4,21 173:13 190:2,5 192:8 198:16 199:4,14 200:20 202:24 204:24 205:1 208:23 209:1,13,21 210:4 214:1 239:25 240:1,3 247:16
**seeing** 28:13 99:13 239:16
**seek** 15:19 16:9
**seeking** 21:12,14,15 131:13 134:23 198:14 257:1 258:12 259:17
**seen** 27:21 40:2 59:2 59:5,5,8,10 89:23 89:25 98:3,19 101:10 164:22 165:11,12 197:23 199:25 207:10 209:17,19 239:13 239:14 246:20
**self** 132:14
**self-serving** 241:2,5
**sell** 94:25 122:18 126:23 224:8 248:22,23 270:4
**seller** 101:25 102:9 102:13 104:3
**seller-buyers** 127:4

**Semoran** 2:4
**send** 29:9 196:3,13 226:25
**sends** 226:6,23
**senior** 115:12 266:20
**sense** 11:8 64:11 77:6 264:23
**sent** 83:7 140:15 178:1,1 184:1,2
**sentence** 73:4
**separate** 82:22 84:13 99:11 145:18 152:16 158:12
**separately** 53:23 91:10 100:5 231:6
**September** 43:25 56:8 95:2,8,8,12 144:18 155:23 156:3 158:25 172:8 214:3 215:12,13
**serial** 283:18
**series** 12:10 103:16
**serious** 235:4
**served** 251:21 261:1
**service** 173:22,24,25 174:1 194:19 216:16
**services** 26:11 173:19 235:5
**session** 5:5 69:9 125:14,18 179:18 233:1
**set** 10:16,16 37:18 53:5,12 54:18,23 109:3 128:15,15,16 128:17,19 180:19 208:23 221:10,10 221:11,12,16 246:2 271:22 283:11
**setting** 233:19 244:4
**settled** 103:2 265:24
**settlement** 6:13 102:4 243:20,23 244:1
**setup** 202:20
**seven** 20:23 94:20 127:12 137:8 166:8 198:3
**severe** 195:19
**Shackenbergs** 154:2
**share** 261:17
**shared** 265:20
**shareholder** 191:1
**shares** 190:20
**she'd** 83:7 109:18
**she'll** 60:16 109:16
**she's** 19:13 35:10 50:20 59:20 61:18 64:6 70:19 93:2 109:14,15 111:4,6
**sheet** 52:13,15 54:2 56:15 57:2,7,10,11 57:13,17,20 58:4,15 58:25 60:6,11,12,23 60:25 61:4,11,21,24 62:22 63:1,6,8,13 63:19,20 64:2,6 105:3 112:12 118:4 118:17 119:7,8 131:5 135:17 225:5 225:8 229:5 241:4
**sheets** 58:7 61:8 136:20,22 225:4
**Sherwood** 77:24 79:11 80:11,14 82:2 89:19 141:10 146:18,20,25 160:21 182:7,11
**ship** 230:9
**Shore** 25:13
**short** 17:20 19:9 124:13
**shortfall** 146:1
**shot** 279:13,13,14,15
**shots** 168:3
**shouldn't** 280:22
**show** 8:10 47:13 56:11 60:13 61:14 61:17,23 112:24 135:5 167:7 198:15 205:2 211:22 212:10 226:18 234:21 235:10 262:2 269:14 277:22,22 281:2,4,6 282:13,13
**showed** 271:20,21
**showing** 38:9 73:11 100:2 134:1 178:16 178:20 217:14,16 271:18
**shown** 255:22 282:19
**shows** 99:8,23 100:23 136:16 144:21 156:5 165:23 196:25 211:1,1 218:19 239:23 243:8 262:2,5
**shut** 30:23 36:2,3,7 41:11 89:19 159:7
**sic** 40:16 63:12 160:23
**side** 10:13 12:23 19:25 20:14 102:10 168:1 227:6,7
**sign** 83:10 99:3 112:15 184:17 226:20 244:21 254:9
**signature** 84:13 130:24 190:8 200:13 201:2 225:20 226:6,11 273:3,11,12
**signatures** 239:12
**signed** 9:14 37:22 67:20 78:23 96:24 97:11,18 98:3,14 128:3 169:5 183:12 184:7 188:1 189:20 190:1,2,4,8 195:21 196:25 197:17 198:9 200:2 213:10 218:21 226:9,13,14 236:6,6 238:25 239:4,7,8,9,11,14 278:1,2
**significant** 75:10 247:7,8 268:18
**signing** 97:23 187:11 188:23 189:15,19 189:24 190:7 197:19 239:15,16 273:4,5
**signs** 67:22,23
**silly** 120:12
**similar** 106:24 122:3 122:22 157:1 160:12 189:5 260:17
**simply** 167:9 262:14
**simultaneous** 22:8 33:18 73:10 99:16 109:20 127:8 254:23 255:1
**simultaneously** 126:23
**single** 40:8 204:9 236:5 283:21 284:8
**sir** 27:21 39:4 69:22 78:5,15 89:21 93:16 94:1 97:3 100:15 101:10,14,23 102:16 103:15 104:24 105:17 113:11 120:19 126:5 143:19
**Sirius** 113:6
**sister** 13:21 19:7 70:8 83:7 91:12 93:6 94:13,17 110:22 112:15 114:20 115:25 116:9,13 118:1 119:23 121:10 162:9,15 181:13
**sister's** 130:24
**sit** 12:23 50:10 93:25 165:8 225:19
**site** 194:7 247:15
**sitting** 23:10,17 128:8 190:7
**situation** 30:4,21 41:16 224:5 270:24 274:23
**six** 39:23 75:23 87:11 137:8 158:12 161:13 166:8
**sixth** 252:17

**sixty** 166:19
**sixty-eight** 166:20
**sixty-six** 166:20
**skip** 82:10
**skipped** 32:14
**slander** 251:4
**slash** 145:4
**slow** 166:14
**small** 76:23 81:13
**Smith** 246:17
**sold** 80:18 95:1 126:7 126:13 153:25 154:1,2,6 155:11,22 156:6,10 172:7 224:10,21 267:13 275:4
**sole** 182:1 252:9,10
**solely** 205:8
**solid** 95:6
**somebody** 11:9 85:8 91:4 99:25 108:20 145:21 152:15 165:8 193:24 207:12 214:1 263:4 268:24
**somebody's** 138:2
**someone's** 205:5
**someplace** 123:7
**son** 85:18 126:14
**son-in-law** 126:11
**soon** 196:3 226:10 260:13
**sophisticated** 84:1
**sorry** 39:1 47:17 50:23 52:20,22 53:1 53:6,24 54:6 55:1 55:25 56:1,14 58:4 63:13 68:8 80:6,8 128:17 137:15 139:23 143:4,24 147:5 161:23 171:6 171:14 176:3 184:3 197:4 200:8 205:25 207:17,18,21 208:7 208:7,24 210:19,21 216:2 218:6 222:3 227:2,14 228:19 229:20 231:10 239:24 240:21 258:25 267:21 272:1
**sort** 224:14 254:3 255:25 270:17
**sought** 257:7
**sound** 1:47 37:23 38:4,5 151:23 196:14 203:8,9,16 215:7,9,21 252:12 266:14 287:3
**sounds** 214:4 266:19
**source** 58:10 65:22 76:6 81:9,22 108:22 182:24 186:20
**sources** 183:3
**South** 1:31
**speak** 11:22 68:7 121:14 175:17 185:19 192:20 202:22 206:13
**speaking** 10:18 22:8 33:18 73:10 99:16 167:20 254:23 255:1
**Spec** 67:2
**specialized** 74:15
**Specie's** 247:17
**specific** 7:6 40:7 49:20 130:5 157:22 172:22 190:5 199:5 218:23 235:8,24
**specifically** 13:16 26:20 32:5,12 75:16 117:12 170:5 191:4 219:16 227:20 228:1 230:7 236:13 236:16 266:1
**specificity** 148:25
**specifies** 172:1
**specify** 177:22,23 219:2
**specifying** 177:17
**specious** 250:23
**spectacular** 271:20
**Spectrum** 137:10 186:17
**speculation** 66:8 67:4 105:15 149:9,15 150:12 154:14 157:20 163:1,2
**speed** 88:20 120:3 194:10
**spell** 24:25 52:1
**spend** 115:8
**spending** 150:19 276:17
**spent** 269:16
**spite** 167:12 252:7
**spreadsheet** 42:18
**stack** 88:16 199:14
**stage** 268:8
**stake** 111:1
**stand** 14:2 19:19,22 20:22 22:12,15 25:15 33:6 50:25 69:19 147:16 177:15 192:21 269:13
**standard** 67:25 218:3 241:18
**standards** 89:5
**standing** 18:13,15,20 24:24
**stands** 79:7 162:20 185:18
**star** 113:8
**start** 18:2 28:20 30:1 37:20,23 41:14 42:6 43:14 45:21 77:5,6 81:13 125:23 181:15 184:13 192:25 252:22 261:11
**started** 12:20 27:5 28:17 35:24 41:13 57:4 73:5 79:9 89:12 115:24 181:18 184:10
**starting** 43:23 44:6 80:17 119:20 159:21 189:7
**starts** 30:17 43:15,21 109:21 117:22
**state** 6:3 18:19 24:25 25:9 51:6,21 161:14 180:12 198:4 202:11 215:1 220:20 243:20 246:5 251:22 252:1 252:5,21 256:8 258:9,11 259:11,12 259:25 260:6,7,8,8 264:9,13 268:15 275:22,22 277:8 278:14 279:9,10 281:18
**stated** 170:4 258:11 272:14
**statement** 43:10 45:8 52:13,17 62:3 65:23 99:11,11 100:2 101:12 108:18 127:3 239:25 264:19 273:20,23
**statements** 29:8 49:17,24 68:2 159:11 160:2 172:15 174:16 178:20,22 179:1 205:2 207:13 213:11 236:9,9
**states** 1:1,19 5:4,7 36:25 63:19 88:22 88:23 89:2 118:13 125:13 172:20
**stating** 75:13 86:1 113:1
**status** 72:23
**statute** 76:23
**statutes** 258:13 260:8
**stay** 27:10 32:10 86:22,24 242:5,19 243:3 252:25 253:2 253:3 254:5,7,11 258:16 274:16,17 274:19,25 275:8 279:12 282:24 283:23,24 284:24 285:2

**staying** 78:24
**stead** 230:8
**step** 68:10 86:11 91:23 146:20 179:6 201:24 217:5 231:8
**Stephanie** 3:17 19:8 24:9 50:23 51:8,16 51:23
**steps** 168:9 226:24
**Stern** 113:5
**stick** 105:18 201:25
**sticking** 277:3
**stigma** 270:17,19 271:11
**stipulate** 170:15
**stipulated** 170:16
**stipulates** 170:12
**stock** 92:22
**stock's** 94:16
**stood** 243:4 274:19
**stop** 14:10 170:20
**story** 34:20 72:13 148:4
**straight** 87:11
**straightforward** 264:13
**strategic** 93:13,23 94:2 243:16
**strategies** 168:7
**strategist** 124:8
**Street** 1:22,39
**stricken** 9:7 12:5 263:6
**strike** 42:1,1 86:17 118:11
**struck** 11:3 18:15
**Stuart** 3:9 25:11,17
**stuck** 267:22,24 270:23
**stuff** 125:4 153:16 179:3 261:1,10 278:2
**stupid** 265:3
**style** 123:23
**Subchapter** 256:15
**subject** 80:22 119:7 198:4 209:5 234:21 235:11,12 241:6 244:21
**subjective** 108:1 136:18 218:11 234:17
**submit** 284:2
**submittal** 226:17
**submitted** 9:6 10:24 44:5 75:12 123:19 123:20 129:9 194:12 199:16 228:6 236:7
**subordinate** 267:4
**subpoenaed** 23:10
**Subsection** 266:23
**subsidiary** 80:22 94:15
**substantial** 237:10
**substitute** 267:17
**sudden** 197:22
**suddenly** 175:14,16 198:10 239:9 240:6 264:21
**sued** 82:3 95:15 170:7
**suggest** 17:13
**suggested** 275:8
**suggestion** 168:10
**suing** 162:1
**suitable** 209:5
**suitcases** 189:22
**Suite** 1:32
**summaries** 135:1,6
**summarize** 139:20
**summarized** 135:1,16
**summary** 30:17 31:4 39:21 42:16,17,21 100:23,25 134:19 134:25 135:17 138:1 142:25 145:24 177:20 204:4 236:22 237:3 239:22
**summer** 181:24
**supervised** 265:2
**supplement** 251:18
**supplies** 29:15
**support** 65:23 135:9 205:14 207:8,10 236:8 237:9 241:16 274:25
**supportable** 235:1
**supported** 98:11 235:1
**supporting** 135:13 205:16 239:6
**supports** 240:24
**supposed** 7:23 9:25 135:3 182:6 199:2,5 230:4 269:22 279:17,25
**supreme** 267:24 268:1
**sure** 7:8,15 14:20 16:10,17 17:15 24:24 33:7 38:19 47:15 49:5 53:20 55:20 56:6,13 59:21 62:12 64:5 91:4 110:23 111:13 138:19 154:21 160:8 167:22 171:3 176:9 184:22 186:10 188:25 189:25 190:6,8 202:20 207:14 211:9,16 217:24 221:8 270:9 277:3,7
**survives** 211:9
**sustain** 42:3 136:24 144:25 149:10,20 230:19
**sustained** 33:25 50:6 67:3 153:14 161:9 215:23 216:8 224:2
**sustaining** 229:10
**swear** 25:5,8 51:2 69:16 180:8 202:7 220:16
**switched** 37:14
**sworn** 24:24 25:18 51:17 70:1 180:24 202:5 203:3 220:14 221:20
**system** 43:12 44:15

**T**

**T** 287:1,1
**tab** 27:20 56:21,21 98:7 101:8 209:8,10
**tabbed** 56:19
**tabs** 137:20
**tails** 135:7
**take** 5:12 11:10 18:2 18:3 19:9,16,22 31:1,2,10 37:4 47:16 48:10 63:25 69:3 105:13 109:4 124:15,17,19 125:23 129:18 179:9,13 199:18,23 201:5,6 220:8 231:1 232:13,16,20 233:13 241:18,19 242:18 243:9 244:22 260:9 280:17 285:15
**taken** 7:6 17:10 22:2 24:9 69:6 95:5 104:8 109:6,8,9,18 125:10 146:2 155:8 168:9 179:15 211:21 232:23 269:18 278:21
**takes** 66:21
**talk** 13:15 20:23 21:1 71:3 85:9 96:21 100:8 115:4 116:5 117:17 120:13 124:21 197:2 211:24 251:10,15
**talked** 8:3 12:19 84:12 116:9 137:2 154:11 169:21 196:17 226:25
**talking** 33:13 41:4 56:19 93:23 94:2 95:19 103:9 132:4 143:2 150:19 154:17 178:23 199:9 210:16

214:13 237:21 254:15 262:9 265:11 279:5
**talks** 136:16 266:16 268:5
**Tamamoi** 254:5,9
**Tamamoi's** 254:13
**task** 150:16
**tax** 52:8,10,12,14,15 52:16,18 55:7,8,14 56:3,16 57:7,12,13 59:9,15 61:9,11 62:14 63:7,8,22,24 64:3 65:15,15 66:2 66:11,22 67:17,20 67:21,23 68:1 84:9 131:11 150:19,24 151:3,20,22,22,25 152:21 157:13 212:17,19,21 213:6 213:11 221:24 222:1,13 225:5,5,8 227:4,20,24,25 229:3 247:7 253:9 254:1 266:8
**taxes** 84:9 139:13,17 228:13,24 266:11 267:1
**technically** 23:1 31:17 126:18 233:22 248:10 250:24
**technology** 135:21 184:4 226:23
**teed** 18:14
**tell** 12:19 22:22 34:3 35:12 72:14 108:15 133:25 137:21 140:9,12 143:20 161:11 211:23 212:10,20 221:6 224:4 227:20,25 277:20
**telling** 78:3 278:5 283:2,4
**ten** 18:6 193:1 231:1
**tenants** 30:24 41:12
**tenuous** 259:7
**terms** 26:16 283:22
**terrible** 107:13
**terribly** 116:25
**test** 218:5,7,9 234:9 234:12,12,14,15 235:18 261:13 262:11,13
**testified** 9:14 10:12 25:18 51:17 64:12 70:1 81:6 89:16 93:8 97:5,22 98:2 110:6,6 131:7,10,17 131:18 143:13 155:22 157:10 163:11 172:7 174:17 180:25 181:18 197:16,16 197:17 203:3 221:20 238:9 239:13,15 241:21 247:5 255:9 261:22 262:18 273:10,11 273:22 279:7
**testifies** 200:15
**testify** 60:16 69:4 170:8 244:25 264:25
**testifying** 14:2 22:16 23:2 48:18 112:5,8 113:4 117:11 153:8 185:24 204:1 209:25
**testimony** 3:9,17,24 3:31,37 4:3 19:22 64:5 97:5 110:17 111:12 119:9 124:21 155:22 163:24 164:1 177:7 177:10 189:11 204:11 217:17 219:14 236:22 240:11,20 241:12 242:10 243:8 244:16 246:19,23 247:2 249:6 263:19 274:7
**tests** 218:4 234:6
**Thank** 5:21 24:13 25:3 31:21 35:16 38:12 39:17 46:13 50:8,13 64:19 68:5 68:13,16 71:7,14 89:9 108:5 123:14 124:14 125:7,25 144:4 145:1 158:17 175:25 179:11 180:17 181:3 192:12 201:18 202:1 212:12 213:23 216:9 217:7 229:11 231:11 270:6,7 271:7 276:14 278:25 280:15,16 286:16 286:17,19,21,22
**thankful** 128:2
**Thanksgiving** 86:10 114:19
**that'll** 153:24
**that's** 7:16,19 10:11 11:17 12:11 15:9 16:2 22:6,7,10 23:12 26:15 29:18 34:19,19 35:4,24 43:22 44:13,13,16 44:25 45:20 47:19 48:18 50:3 53:25 54:1,21 61:18 62:5 63:21 68:22 69:2 71:14 74:1 78:3,11 80:3,5,6 82:3 83:11 84:8,10,17 85:10 86:7 88:4,7 91:3,20 92:17,19 93:3,5 95:6,11 97:13 102:23 104:9 105:3 106:20 107:15 109:5,20 112:10 115:15,16 116:18 117:7 119:10 121:16 122:13 123:25 126:19 127:3,6 133:13,16 134:3 135:15 139:6 139:8 141:14,20 145:13 146:10 147:25 148:2,3 150:4 152:9 157:13 158:16 159:1 163:9 165:23 166:1,16 168:1 170:13 171:8 172:3,6,9,10,16 173:2 176:6,9 179:3 180:3 182:13 184:21 186:16,24 187:10 199:1 200:3 201:3 205:20 206:12,12 207:18 208:9,25 210:23,23 211:20 213:7 215:1 215:3,3 218:15,15 219:18,18 223:25 225:4 226:5,5,5 231:15,18 232:7 233:7 234:18 235:5 235:16,20 238:2 242:1 243:11 245:1 246:16,21 249:15 253:24 256:21 258:4 262:5,20 263:5 264:1,16,16 264:22 265:14 267:8 269:19 270:9 270:20,21,25 271:2 273:14,15 274:2,11 274:13,23,24 275:18,18 276:5,6,6 277:20 278:4 279:8 281:3 282:3 284:15 285:17
**theirs** 258:23
**Theore** 83:7
**theoretically** 160:14
**theory** 9:1
**there's** 6:18 14:13 16:14 25:22 33:16 33:16 39:1,3 41:18 41:18 43:18 47:17 47:22 52:18 54:14 54:23 55:11,12

63:19 65:2 72:13,15 72:22 81:12 85:14 85:15,17 89:3 100:3 103:16 104:5 106:4 106:9,14,16 108:3 110:10,13 117:16 120:19,23 129:13 133:5 137:6 151:20 151:20,22 154:17 159:3,9,11,12,13 161:13 162:15,21 167:7,7,8,12 169:14 171:20 172:20 175:24 177:3,5 179:2 181:16 185:5 194:17,19 195:11 196:24 202:22 217:14,16,21 218:4 218:21 219:1,4,7,21 220:4 222:20 226:15,15 227:21 236:10,13 238:13 238:14,25 240:9,15 240:16 241:1 242:10 246:23 248:5,7 250:8 251:23 253:6 256:22 259:10,12 261:20 262:13,25 262:25 263:11 264:8,9,18 265:3,19 267:2,10,11 268:20 268:23,24 270:8,18 271:4 272:3 273:4,6 273:8,25,25 274:1,3 274:5,9,10,13,13 278:7 280:7
**Thereabouts** 181:25
**they'd** 126:9,13
**They'll** 285:5
**they're** 9:6 17:4 21:5 39:10 49:17,24 57:17 80:8 107:22 129:12,16 131:13 134:23 135:1,2 146:6 156:25 157:17 158:5,25 159:2,25 167:11 197:22 219:2 230:2 234:25 235:24 236:21 241:5,6 255:19,25 256:2,3 257:9,10 260:20 262:15 266:7 268:22 270:23,23 271:2,3,7,11,12,13 271:14,22,23,23 281:9 284:24
**they've** 153:10 207:1 219:23,23 242:2 249:21 257:5 261:25
**thing** 11:6 19:12 20:24 47:12 58:4 74:18 107:4 113:6 135:20 138:19 179:25 211:19 226:24 249:15 264:20 270:9,18,19 278:15 284:15
**things** 6:18 10:23 14:22 15:22 16:22 22:22 29:14 78:10 94:6 189:21 196:9 218:16 236:9 238:3 246:10 249:25 256:3 257:13 265:6 270:16 271:16,17 273:4 279:12,17 281:13
**think** 6:19 7:11 8:5 10:1,2 15:4,9 20:4 31:17 40:22 44:10 47:3 50:9 60:22 64:25 68:17 71:8 72:22 73:19,24 78:7 79:9,15 80:16,18 81:15,19 83:10 86:22 94:19 100:8 105:16 108:2,3 110:1,20 114:16 115:20 116:5 117:18 118:10 121:17 123:5,6 124:16 126:5 127:24 130:2,4,5 131:7,10,16 135:8 140:3,4,21 144:21 144:23 147:23,25 148:2,9 149:5 154:3 155:23 156:25 157:10 159:13 164:16 165:20 168:11 169:19 170:20 171:5 172:13 174:13 176:1 179:5,7 188:13,25 192:16 192:16 197:9 200:3 205:22 209:24 214:4 215:12 242:6 248:17 250:12,12 250:13 252:17,24 259:7 263:7 267:11 267:12,18,23 268:15 269:10,13 270:8 272:16,16 274:12 276:9,10,11 282:6
**thinking** 121:7 231:19 243:19
**thinks** 267:8
**third** 101:24 153:5 166:10 200:13 218:9 234:14 252:13 254:16 258:5 281:17
**thirty** 15:4
**thoroughly** 88:14
**thought** 7:22 12:25 15:22 159:12 177:7 177:11 191:15
**thoughts** 232:11
**thousand** 87:22 92:9 102:13,18 109:25 127:12 146:14 166:8,19 269:20
**three** 25:22 92:9 133:3 136:19 157:2 159:7 167:3 173:8 179:9,13 193:16 218:4 234:6 244:8 269:13 285:15
**throw** 284:16
**tied** 111:24 161:1
**Tiered** 8:10,22 17:8 20:17 21:4 22:16 79:18,24 80:22 92:20,22 108:11 109:10 159:4 160:7 160:8 190:17,21,23 191:2,5,9 192:3,4,7 203:10,10,12,19 214:7,8 215:10 237:7 248:8,21 249:12,15
**Tiered's** 265:19
**ties** 135:18
**time** 8:3 10:6,7 11:8 15:15 19:5 21:23 22:2 23:3,4,20 28:7 28:12 35:19 40:12 40:15,20 44:5 45:22 50:4 59:7 62:25 66:24 71:20 74:19 77:14,15 80:4,16 86:15 92:10 94:18 98:15 100:13 103:3 103:6 105:7 112:2 113:1,25 115:3 120:22 124:15,17 124:23 136:20 137:12,14 150:19 167:11 172:24,25 175:6 183:7 185:6 185:17 189:17 193:23 195:3 198:14 202:5 219:13 220:25 222:6,8 229:19,21 230:22 231:21 242:2,3 246:16 252:11,17 258:18 259:2 260:12 261:10,22 265:5 266:18 272:25 278:24 284:22 285:13,21 286:1

**times** 9:21 26:15 36:11 82:24 195:20 277:21
**timing** 148:24
**Timko** 1:28 3:11,14 3:20,26,28,33,39 4:6 5:10,13,14,14 6:8,11,14,16,18,21 6:25 7:3,19 8:3 9:12 9:20 14:5,20,22 16:2,6,17 17:16,22 18:1,6,9 19:12,16 19:21 20:3,10,16,19 21:12,15,18,20,25 22:7,10 23:6,8,19 23:22 24:1,3,6,15 24:20,23 25:21 27:24 28:8,14,19,23 29:2,5,6 31:13,15 31:18,21 32:4,16 33:2,7,23 35:13 38:7,14 39:7,13 41:3 46:6,9 47:5,10 47:13,16,19,21 48:10 49:7,10,12,13 49:19,22 50:8 52:23 53:8,10,22 54:4,10 54:18,21 57:16,22 58:3 60:8 61:3,12 61:18 62:21,24 64:4 64:21,23,25 65:4 66:12 67:6 68:17,20 69:11,13,19,20,22 70:4 71:8,12,15 72:2,24 73:2,3,10 73:14,23 74:3,5,8 74:25 75:5 77:22 78:10,13,17 84:1 86:7,17,25 87:15 88:21,25 89:1,9,10 90:11,14,17 93:10 98:23 101:17,22 102:25 103:11,13 103:14 104:18,22 105:8,20 107:17,21 107:25 109:22 113:16,17 117:2 118:6,8,23 119:5,12 119:14,18,19 120:20,25 121:19 122:13 124:14,25 125:2,7 129:5,9 131:13 132:5,11 133:2,6 134:21 136:23 137:25 138:12,17 139:25 140:4 142:7,9,24 143:4,7,9,24 144:1 144:4,14 145:1 149:9,15 150:12 151:8 153:3,6,8 154:13 155:1,21 156:13 157:20 159:16 161:3 163:1 163:14,24 164:1,5 164:18,25 165:19 167:4,19 168:4,8,12 168:20 169:8,23 170:2,4,14 171:2,6 171:10,12 174:7 175:20 176:4,17 178:6,9,13 179:4,7 179:8,11,20,21,25 180:4,18 181:2 186:7,19 187:8 190:17,19 191:11 191:18,20 192:1,4,6 192:10,13,18 193:7 196:6,17,20 197:1,6 197:7,13,21 198:12 198:16 199:1,11,13 199:17 200:1,5,8,14 200:17 201:22 202:2 203:6 204:15 204:18,20,22 206:12,15 208:12 209:6 210:2,3,17,19 210:21,25 211:5,7 211:12 212:22,24 213:8,13 214:9,15 214:19 215:1,11,22 216:7,17,20 217:3 217:24 218:1,3,18 220:3,11,12 221:5 221:13,16 222:18 223:4 224:1,17 225:14 227:8,12,16 227:19 228:8,15,18 228:21,25 229:6,11 230:4 231:3,14,18 232:5,8,13,17 233:4 233:8,11,14,17,20 233:24 234:1,4 242:9,15,17,20,22 245:22 250:11,18 251:1,11,13,16 253:16,18,21 254:1 254:18,20,25 255:3 255:5,8,13,15,17,19 257:15,20 258:20 258:21,24 259:4 260:14,17 261:20 262:5 263:19 264:7 265:5,8,12,16 269:22 270:16 271:16,17 272:5 273:1,13,18,20,21 275:1,11 276:2,19 276:21 277:2,6 279:1,3,5,19 280:6 280:9,11,13,15,20 281:9,11,21,24 282:4,7,15 284:14 285:8,19,23 286:2,6 286:17
**Timko's** 18:13 23:4 24:11 126:4 148:7 148:18 261:10 268:18 280:19
**tired** 85:6 210:21
**title** 59:21 152:16
**titled** 266:18
**today** 5:15 6:5,23 7:1 7:1,7,9,13 8:4,23 14:13 15:2,10,10 17:7 21:12 22:22 85:22 100:9 105:17 178:21 181:3 193:5 203:23 204:1 214:21 228:1 230:21 233:16,21 237:11 239:11 240:5 241:24 242:14 244:8,25 245:1 246:8 262:12 268:25
**today's** 18:20 123:17
**told** 20:22 34:20 41:13 42:6 84:3,15 84:16 91:9 97:17,20 98:16 106:25 107:3 109:5 114:1,19 115:1,6 116:15 120:18 150:2 162:9 188:25
**top** 36:5,12 37:11,25 42:14 49:16 166:10 209:15
**tortious** 259:23
**total** 41:18 106:20 172:21 266:22
**tough** 283:24
**townhome** 253:9 254:2 266:17
**townhomes** 26:9 96:8 96:9
**trace** 62:7
**tracing** 236:10
**track** 141:4
**tracking** 107:4 109:11
**tractor** 242:25 252:24 253:5
**Tracy** 59:18,19,20 60:3
**trade** 146:18 235:24
**Trading** 234:19 261:11
**tran** 168:24
**transacting** 270:22 271:13
**transaction** 97:12 102:3 104:12,23 132:5 145:9 146:3 146:17 169:4 188:18 200:21 209:14 239:19 240:13,15 273:8

**transactions** 77:12 95:7 106:1 127:4 173:9 209:15 237:17 271:19
**transcribe** 285:16
**transcript** 1:16,48 86:9 118:17,19 119:4 287:2
**transfer** 91:23 205:2 261:25
**transferred** 168:24 169:6 255:10
**transfers** 143:3
**transition** 189:17,21
**transparency** 281:5
**Transportation** 10:9 178:4
**treat** 94:15
**treated** 96:16
**trial** 1:16 3:5 10:16 14:24 16:21,23,24 18:20 259:18,22 276:3,6,7 281:15 284:2
**tried** 37:14 86:22,24 147:22 241:23 246:8 277:9
**trouble** 175:19 209:8
**true** 8:1,1 22:6 55:7 78:10 83:8 108:9 116:3 129:8 131:1 132:2 142:11 264:22 270:21 273:15 278:9
**truly** 246:4
**trust** 8:10,21,22 9:4 9:24 10:12,19 11:24 14:14 75:25 79:23 92:13,17,18,19 108:18 109:9,11 114:8 122:1,7,17 175:20 176:8,10 190:10,13,20 203:10,13,19 210:13 214:7,8,9,12 214:19,20 215:10 215:21 216:6 245:13 252:3,4,19 254:6,9,13 256:6 257:2,3,4,5,7,9,10 257:11,23,24 258:10 259:5,11 260:8,18 264:10,11 264:24,25 269:3 278:1,5,8 281:13 282:14
**trusted** 109:6
**trustee** 11:9 121:20 122:18 190:9 203:10,19 214:11 214:24 215:9,21 216:4 243:6,10,10 243:11,12 252:4,12 253:6 257:7,9,9,11 258:10 260:1 262:24,25 263:7 265:23 267:18,18 269:5,8 270:4 274:19,20,22 283:1 283:6,7
**trustee's** 216:5
**truth** 12:10,18,19 13:23 25:6,6,7 51:3 51:3,4 130:10 159:6 180:9,9,10 191:19 202:8,8,9 220:17,17 220:18 281:7 283:2 283:5
**truthful** 110:18,19 111:2,4,6
**try** 10:2 77:5 162:1 192:20 216:10 222:21 243:1 248:22 249:7,15,20 249:20,20 253:2 258:4
**trying** 17:12 43:4 83:3 88:18 98:16 110:24 120:3 144:2 146:6,7 157:8 164:13 197:13,23 198:7 208:10 233:8 238:20 239:2 242:2 245:23,24,25
252:18 253:12,21 277:20 278:16
**TT** 121:3
**Tuesday** 286:4
**turn** 27:19,20 32:18 38:24 46:10,18,19 46:22,24 52:20 56:17 89:20 91:21 98:7 101:8 103:4 104:10,23 127:2 133:20 134:10,18 143:18 147:3 148:7 166:3 171:3,4,13,19 173:6 174:15 184:9 209:8 216:11 221:7 227:1 250:6 264:3
**turned** 100:22 227:17
**turnkey** 26:13
**twelve** 44:1 148:16
**twenty** 115:8
**twenty-eight** 146:13
**Twenty-one** 123:14
**two** 5:19 6:8 10:23 14:22 32:18 33:16 46:24 47:17 81:3,10 81:12 95:3 96:7,8,9 96:13 97:15 105:6,8 106:1,3 108:4 112:4 126:8,13 134:22 141:22,24 146:13 158:22 161:12 167:20 188:14 210:16,17,18 240:15 249:2 256:5 258:24,25 264:1 269:17 276:23 277:1,2,14 285:22
**types** 204:23
**typographic** 119:8

U

**U.S.C** 251:19
**ultimately** 74:11 92:16
**um-hum** 16:5 17:21 21:2 96:5 136:12 158:18 185:7
231:23 250:17 255:18 262:10
**unable** 249:18
**unauthenticated** 129:7 241:3
**Uncontested** 261:18
**underlings** 150:5
**underlying** 66:10 274:14
**understand** 7:9 11:3 19:23 34:21 53:13 74:14 80:3,9 81:10 82:18 83:13 85:5 91:22 96:1 99:12 127:8 224:6 226:1 226:10 254:12 261:23 264:11 265:16 273:16 285:1
**understanding** 6:22 7:15 20:15 116:12 139:7 203:12 205:20 207:1 254:20
**understands** 91:5
**understood** 18:23 19:1 64:16 114:23 192:11 205:25
**undisputed** 235:16
**Undoubtedly** 140:20
**unexecuted** 128:6,11
**unfair** 279:24
**unflagging** 268:2
**unfortun** 37:15
**unit** 40:5,8 41:18 42:9,19 43:11,22 44:6 91:24 92:4 94:25 99:9 134:20 135:18 137:8 152:16 153:25 154:6 156:4 165:5 172:4,8 177:8,18,22 193:13,13 194:8,15 195:11 237:4,5
**United** 1:1,19 5:4,7 125:13
**units** 27:1 34:9 36:17

37:10 38:10 40:7,7 40:12,15,20 41:1,4 41:11,12,15 42:12 42:22 43:5 92:6,15 94:4,7,20,22 95:1,3 99:23 108:7 111:14 111:17,24 112:1,2 112:18 123:18 126:9,13,22 134:2 134:14 137:9 141:23,24,25 145:11 152:8,13,14 152:20,23 153:5,10 153:11 154:4,15,16 154:17 155:4,23,23 160:18 162:7,24 164:15 165:5 169:6 172:25 176:20 177:7,11 184:20,23 184:25,25 185:6,11 186:25 187:1 188:14 193:20,24 194:6 208:14 210:5 218:24 224:6,9 237:5 238:17 239:19 262:15 272:10
**unmask** 8:5
**unpaid** 188:9
**unquote** 246:16 258:14
**unsafe** 267:3
**unsecured** 71:17 150:25 159:22 160:5 247:13 255:21 256:19 262:19 267:11
**unsigned** 129:15 239:4
**updated** 172:21
**upper** 162:22
**upset** 115:7
**upstairs** 158:14
**use** 68:25 85:8 112:6 135:1 163:3 165:25 185:21,25 186:15 199:2 218:7 234:12 234:13 240:20,22 243:14 256:20 260:5 264:4 279:7
**usually** 30:25 65:20 83:6
**utilities** 27:14,17 36:17 37:8 39:25 40:5 42:13 43:6 111:13 137:5 263:14
**utility** 30:8,11 32:13 35:18,23,25 37:7 38:12 45:9 94:6,11 109:24 110:12 111:9,11 113:3 136:2 137:6 193:24 237:17 263:16,18 263:21
**utilize** 62:9 110:2
**utilized** 234:6

**V**

**vacation** 26:1 145:17 164:22 193:21
**Vachon** 287:7
**vaguely** 209:18
**valid** 11:14
**validating** 131:11
**validation** 192:14
**valuation** 177:3 279:14
**valuations** 176:20
**value** 123:17,21 153:9,11 155:3,3,4 157:9 177:11 247:6 247:20 256:22 267:10
**value's** 267:8
**values** 124:2 156:23
**varied** 195:20
**various** 93:9 105:23 241:10
**venture** 111:25
**Ventures** 73:5 74:7 74:12
**verbal** 145:14 187:2
**Verbally** 187:3
**verdict** 217:14,23 220:7
**verification** 62:13 194:13
**verified** 97:2 188:2 265:1
**verifies** 101:6
**verify** 55:19 64:1 66:2,9 109:25 149:2
**version** 56:10 89:25
**versus** 8:16
**vexatious** 250:18 251:7,9,13
**vice** 84:22 237:13
**victimized** 277:19 282:1
**view** 7:16 88:1 160:19 165:23
**Village** 146:25
**violated** 41:21
**violates** 197:24
**Virginia** 118:13
**virtually** 268:2
**virtue** 8:10 126:10 127:9 158:24 160:17 224:15
**voice** 161:21
**voiced** 274:24
**void** 11:7 15:22
**volume** 25:23 89:21 126:3 148:9 209:7 209:10
**voluminous** 135:2,2 136:17,18
**voluntarily** 11:13
**voluntary** 115:1,6 259:15
**volunteer** 77:9
**VR** 26:2
**Vrbo** 271:5

**W**

**W.M** 159:10 160:1 160:10 263:13
**wait** 47:3 143:5 159:18
**waited** 116:5 121:7
**waiting** 29:1
**waived** 16:9,10
**waiver** 16:8
**walk** 162:21 209:9
**walks** 226:24
**wall** 249:14
**want** 7:8 12:9 13:9 14:20 15:17 16:9 19:24 28:25 32:18 34:22 41:3,5 58:3 72:14 93:2 95:20 97:6 100:14 101:5 113:5 115:9 116:10 117:19 119:1,10 122:21 124:23 129:21 136:17 147:13,16,21 156:20 163:15 167:10,15 171:3 173:8 175:18 178:4 201:5 207:13 214:22 220:7,8 221:2,6 231:1,3,4,5 232:10,16 233:10 246:4 256:20,21 260:9,12 267:21 274:17 275:2,6,12 275:12 277:3 278:18,22 281:15 282:8,10,12 284:15 285:14,22,23
**wanted** 6:9 7:14,19 16:15,17,18 18:10 22:2 68:18 76:22 85:7 108:16 115:2 115:14 118:24 120:4 126:12,13 179:7 208:23 217:9 224:7,8 241:22 243:9 244:19 264:20 265:20 274:19 280:13
**wanting** 279:11
**wants** 12:18 19:25 53:25 93:4 192:6 261:2,6 267:14 271:9 275:1,15,16

278:22
**washing** 195:19
**WASHINGTON** 1:22
**wasn't** 8:12 13:13 15:21 62:24 64:5 79:8 80:3 86:20 87:23 91:1 100:9 105:10 110:23 112:23 114:22 116:6,7,25 117:9 121:6 135:6 136:14 138:24 169:4,21 175:16 176:11 197:15,15 198:3 225:24 233:18 237:14,16 239:2 248:12 264:24 265:5,5,22 266:13 268:16 272:15
**waste** 11:8 120:22 261:10
**wasting** 103:6 162:6
**watch** 12:23
**water** 29:13,25 30:15 30:22 36:2,3,6,7,11 45:16,23 137:9 186:4,16
**waterfall** 248:3,6
**Waterhouse** 204:6
**way** 6:23 10:3 12:20 14:19 18:14 19:10 36:3,24 41:6 43:2 43:10,11 44:4 78:24 84:1,1 94:16 96:21 99:16 114:24 115:12 120:21,21 138:1 146:7 162:8 171:4 199:1 245:6 255:24 266:21 267:2 268:17 283:19
**ways** 240:15
**we'd** 23:10 29:22 162:10
**we'll** 7:18 20:7,11 23:18,18 39:12,15 49:11 69:4 78:2,8 84:13 124:19 125:5 125:23 130:16 132:14 165:25 171:19 181:16 232:21 281:23 283:8
**we're** 5:11 6:8,23 7:7 10:1 11:21 15:10 19:1,2,8 22:25 25:23 27:19 37:12 39:13 43:2,3 50:9 50:15 52:5 53:13 81:7 99:7 101:24 119:3 120:20,21 125:18 132:4,14 133:1 138:19 157:6 157:7,7 171:8 174:21 179:5,21 202:2 214:9 227:17 231:9,24 244:7 246:1 250:20 251:8 251:9 260:15 262:9 277:3 278:5,16 281:25 283:4 284:20,22
**we've** 7:3 9:21 13:24 15:5 29:13,17 75:9 95:19 150:18 167:25 246:19 249:1 270:24
**website** 136:4,11
**week** 28:14,15 99:14 127:25 219:10 244:15 285:16,22
**weekend** 286:6,8
**weeks** 20:23 116:13
**weird** 250:12
**welcome** 76:21
**went** 74:20 82:24 86:15,16 107:3 108:16 110:20 115:4 116:9 117:3 153:25 159:13 175:2 176:12,18 197:18 211:19 212:5 219:18 236:11,25 237:3,9 248:2 262:1,1 271:20 272:22 277:24
**weren't** 31:3 175:11 188:20 195:15 214:13 236:20 272:9
**WEST** 1:22
**wet** 225:20 239:12
**what's** 9:3,3 13:23 28:10 38:19 44:2 49:20 50:18,21 54:22 60:10 73:16 126:6 132:16 133:4 139:2 143:7 147:14 162:7 163:5 164:14 164:19 166:18 167:5 229:2,17 261:23,24
**whatsoever** 153:12 217:17
**wheel** 282:4,7
**who's** 11:10 23:9 135:25 265:23 276:4,5 283:1,1
**wide** 78:24
**wind** 79:10 92:25 93:1
**winding** 93:7
**wire** 38:2,2,4,5 105:11 140:10
**wires** 104:24 105:1
**wish** 6:16
**withdraw** 29:2,4
**witness** 17:19 18:4 20:8,13 22:12,15 23:13 24:12 25:2,8 25:11,15 33:23 34:24 38:17 39:5 41:8,25 42:5,9,17 43:9 44:12 47:9,18 48:6,17 49:21 50:5 50:13,16,19 51:5,8 51:11 52:2 58:25 59:4,8,12,15,18,20 60:1,3 61:8,20 62:13 66:9 68:12,14 68:16 71:3,6,11,13 72:13 78:16 86:19 86:24 87:13 89:1 97:22 105:17 108:23,25 109:9 118:2,25 119:10 124:22 125:21 127:24 135:24 136:1,5 137:15 138:5,9,14,16 139:4 139:7,10,12 143:25 144:3,11 147:5,19 148:3 149:16,19 150:15 151:13,15 154:8 156:10,12 157:2,21 158:8,10 158:12 159:15,18 159:18,24 160:5,8 160:11 163:2,7 165:3,7,12,16,18,24 166:19 167:15 168:23 176:7,14 180:3,11,14 187:4,6 194:15,17,22,25 196:11,23 197:20 198:20,23 199:4,7 199:20 200:25 201:2,21 202:1,10 202:15 208:7,9,11 209:1 210:18,23 215:12,24 216:25 217:7 220:19,22 221:1 223:5,18,21 224:18,20 227:14 228:17 231:9,11
**witnessed** 82:16
**witnesses** 15:11 19:6 19:10 22:25 23:4,19 24:6 75:23 217:4
**woke** 120:11
**Wolff** 12:19 13:1,9,10 13:13 86:16 113:18 115:2 260:19
**won't** 32:24,24 37:18 86:12 162:11 211:18 264:6

**wonder** 156:21 275:6
**wonderful** 91:3
**Woody** 34:15,15,23 60:1 83:4 109:6 122:10,11 277:19
**Woody's** 83:4
**word** 4:13 205:5
**words** 120:2 224:15
**work** 25:25 26:1 35:8 43:10 51:9,10 55:14 59:9 61:9,11 62:7 64:1 76:12 93:8 109:1 146:23 191:23 195:14 243:1
**worked** 82:18 93:10 146:7,24
**working** 25:23 30:1 195:16 237:12 256:3
**works** 124:25 266:21 284:25
**world** 124:12
**worries** 119:17
**worth** 152:1,17,24 153:1 154:4,16 156:25 247:3 252:24 253:5 262:23
**wouldn't** 24:17,23 45:6 57:18 100:8 103:1 107:12 122:19 136:6 150:19 162:16 176:7 213:10 245:16,16 264:23 283:3 285:2
**wow** 102:15 227:17
**wrench** 284:16
**write** 12:14
**writing** 226:16 249:13
**written** 85:15 238:6 238:14
**wrong** 13:13 47:3 111:6 198:12 265:24 268:16
**wrote** 49:3 68:18

**X**

**X** 3:1 4:1 126:20,21
**xerox** 47:23

**Y**

**yeah** 7:21 20:20 21:18 31:18 44:24 46:13 48:22 65:18 69:13 71:10,12,13 79:4,8 83:9 94:9 102:11 113:5 125:3 128:17 131:16 137:23 141:8,22 143:8 162:19 166:4 166:20,20 167:5 168:19 170:9 171:10,13 173:19 173:25 174:3 179:8 179:10 180:21 183:19 185:8 196:11,13 202:13 207:22 210:17,23 214:7 218:1 219:22 227:10,16 229:8 231:3,9,15,16,18 232:1,7 233:23,24 233:25 236:16,17
**year** 65:24 156:11 222:9,13
**years** 193:16 204:6,8 264:1 276:17
**Yep** 104:11
**yesterday** 7:11 9:7 12:7 76:19 118:9 123:20,20
**you'd** 50:19 103:1 190:5 218:14 247:16
**you'll** 25:14 49:16 51:13 82:8 105:14 124:16 212:14 218:20 260:17
**you're** 8:20 9:16 10:18 12:1,3 13:5 14:3,7 15:24 19:15 40:6,25 41:4 43:21 44:19 50:11 57:21 65:5,8,11,13,25 68:15 76:2,5,24 78:9 88:6 90:2 93:23 94:2 100:8 103:9 104:7 105:16 108:1 112:25 113:1 121:10,14 124:20 125:20 136:21 138:21 145:23 159:22 160:4 165:10,22 175:9,15 175:15 177:1 178:23 180:8 181:13 191:13 193:19 197:5 201:23,24 202:7 218:7,17 221:1,16 222:3 226:8 255:6 257:15,17 269:10 276:3 281:23 284:4 284:11 285:1,25
**you've** 16:9 17:10 116:10 155:11,11 165:6,11 172:15 175:24 193:15 196:24 230:13,16 241:24
**YOUNG** 1:21

**Z**

**zero** 172:21
**zone** 78:24
**Zoom** 117:19
**ZPD** 158:22 159:21 268:23

**0**

**07/24/2026** 287:9

**1**

**1** 3:5 29:11 35:23 52:18 54:23 57:25 128:11,19 130:25 137:24 139:20,21 139:22 143:5 173:6 266:23
**1.5** 81:25
**1:00** 124:24
**1:15** 125:1,2,3,6
**10** 18:7 44:25 81:19 84:17 134:18,18,19
**100** 17:24
**1003** 148:12
**1006** 134:25
**103** 43:11 180:15
**105,000** 141:15
**106** 142:25
**10th** 116:8
**11** 74:25 135:10 253:13 265:21 267:19 270:4 282:25
**11's** 267:16
**11:00** 13:4 18:3,4
**110** 51:11
**1109** 32:10 266:6
**1120-S** 56:14
**116** 197:9
**119** 234:19
**12** 54:23 128:19 135:10 204:6
**125** 125:1
**126** 3:27
**12th** 106:10
**13** 283:18
**1334** 251:19,22
**134** 43:15,16,18,19
**13th** 102:4
**14** 122:25 276:17
**1485** 202:16 234:19
**14th** 43:25 44:1 102:5
**15** 92:15 105:2 123:10 159:12
**15,000** 81:19,21
**1517** 1:39
**16** 40:5
**169** 246:17
**16th** 39:25 100:12,16
**17** 8:8 247:4
**171** 3:28
**18** 36:9 62:2

**181** 3:33
**19** 186:7 189:13 287:6
**192** 3:34
**195** 235:21
**1987** 283:19
**1990** 97:7
**19th** 112:20
**1st** 30:17 45:8 166:14 236:21 241:11

**2**

**2** 38:24 39:2 43:15,16 43:22 46:10 53:1,3 53:8,9,14,19 54:2,7 89:21 128:13,14,20 129:2 130:19 132:17,20 133:4,9 133:10,23 137:19 138:4,6,6,7 139:24 143:5 148:9 152:3 171:15 173:4 174:15 208:22 209:4,7,10 221:9 229:5 261:18
**2-6** 221:16 227:2
**2,000** 75:1 242:25 252:24 253:6
**2.1** 139:23,23,24
**2.2** 140:9,10 142:6 143:6,7,7,8
**2.5** 133:24 143:18 249:17
**20** 36:9 63:24 92:15 147:24 283:13
**200,000** 210:14,20
**2005** 63:12
**2016** 247:18
**2020** 76:13
**2021** 80:21 91:23 184:10
**2022** 52:9 93:12,14 93:17,18,19 94:19
**2023** 27:5,8 35:19 37:21 63:22,24 97:11 101:6 105:2 137:15 146:13,19 146:22 158:25 196:18 208:14 209:15 214:3 215:13 222:1,9,13 225:6 226:13 273:8
**2024** 8:14 57:8,13 58:6 61:10,11 67:18 77:22,23 86:10 89:15,17 90:24 91:1 91:7 137:16 152:9 181:19,24 222:2 225:9
**2025** 29:11 30:17 35:24 36:10 40:5 43:24 44:23 54:3 57:7 58:5 59:9 61:9 61:9 63:20 95:9 137:16 144:18 155:24 156:3,12 172:8,25 174:24 236:21 241:11 263:17
**2026** 1:14 5:1 287:6
**2028** 127:14
**203** 3:39
**20s** 283:18
**21** 123:12 159:14
**211** 3:40
**21st** 144:19
**22** 219:1 246:24
**221** 4:5 235:5
**222** 180:14
**224** 235:20
**225** 4:6
**228** 4:7
**228,456** 106:14
**228070** 134:20
**23** 52:9
**234** 4:9
**24** 36:10 52:9 121:2
**243** 246:17
**25** 3:11 54:5 174:10
**25-5570** 5:12
**252** 235:17
**2523** 220:22
**26** 41:18,20 43:5 117:21 119:13,20 137:6 146:13 148:7 148:9,17 162:24 164:15 262:14
**260,206** 63:10
**260,208** 63:19
**27** 1:14 5:1 41:18
**28** 146:22 251:19
**287** 4:11
**288** 4:13
**29,477** 106:12
**29,477.51** 145:4
**298,661.29** 205:19
**2I'm** 138:20
**2nd** 27:5,7,8 35:19 37:21 95:12 144:18

**3**

**3** 25:23,23 39:2,21 46:22 56:18 58:15 63:9,12 128:25 130:25 132:1,17 133:8,15 180:15
**30** 118:3
**30,000** 140:12 141:17
**300,000** 110:25 177:8
**300,000-ish** 247:3
**303** 117:1 157:22 159:14 235:7 241:18 247:22,23 266:4,7
**303(b)** 17:4
**303(b)(1)** 265:25
**303(I)** 16:10
**305** 251:17,20
**31** 3:12 54:3
**318,786** 152:4,18
**31st** 43:24 44:6,7,12 58:5 63:12 174:24 197:10 239:3 244:6
**320,655.57** 150:24 152:1
**326,000** 247:10
**32801** 51:12
**32931** 25:13
**32953** 180:16
**33** 259:6
**335** 235:5
**34** 259:6
**342,000** 107:10 227:21 228:2 239:2
**342,482** 96:4 224:25
**342,482.40** 223:23
**347** 107:11
**347,000** 240:3
**347,482.40** 108:7 210:4
**347,903.81** 106:20
**34744** 202:16
**348** 2:10
**35** 204:8
**350** 103:18 109:18
**350,000** 103:18 105:2 109:2 126:25 146:2 208:18 210:10 212:9 213:9 239:20 239:22,23 240:12 240:14 273:23 274:1
**360,459.40** 206:25
**374,459** 60:7
**374,459.40** 61:1
**38** 3:13
**394** 211:10 263:14
**3rd** 15:6 17:10 244:16

**4**

**4** 39:22 52:21 53:8 56:14 117:21 119:20
**4.8** 127:14
**4:45** 200:24
**40** 189:7,13 258:22
**40,000** 106:17 146:22
**400** 1:22 32:7 156:4,5 198:6 249:16 274:1
**400,000** 154:1,4 156:4 157:4 267:10
**405,000** 154:4 156:4
**407** 1:50
**41** 89:20 90:16
**410** 130:21
**420** 1:31
**4409** 2:9

**443-9289** 1:50
**46** 3:14
**47** 98:7 101:8,9,17 126:3 239:25
**48** 104:10,18,21 145:3 174:22 209:8 209:11
**485** 25:12
**4th** 144:18

**5**

**5** 3:3 56:13 133:20 143:18 171:19 186:7
**5,000** 107:6 108:2,3,4
**5.3** 248:2
**50** 27:20 31:16,18,20 43:17 163:7,8 165:21 166:1,3 262:10 271:19
**50,000** 106:9
**500** 157:12
**503** 153:25 156:4
**506** 41:18
**51** 3:19
**53** 121:1
**5492** 48:1 49:14,17 49:23 140:11 174:16
**553** 235:17
**561** 247:17
**57** 122:25
**578.60** 134:3
**5782A** 2:4
**580.85** 137:3
**5938** 157:12
**5th** 144:18

**6**

**6** 43:24 53:18,19 54:1 62:3 158:8 221:9 227:1
**6,677** 141:21
**6/14** 210:9
**6/14/2023** 209:21
**6/15** 210:10
**6:25-bk-05570-GER** 1:5
**60** 74:25 122:8
**600,000** 157:9 160:13 247:11
**616,550.22** 166:6,12
**640,000** 152:23,24
**65** 3:20
**660,000** 262:3
**67** 3:21

**7**

**7** 11:9,13 55:23 56:1 227:23 250:9,14 252:22 253:2,6,12 256:24 265:22 267:20 279:20,21 280:6,19,20,23 281:2 282:21 283:23 284:9 285:9
**70** 3:26
**700** 1:32 157:4
**700,000** 126:23 157:9
**705,000** 154:6 156:7
**74** 74:19
**75,000** 164:16 165:13
**750,000** 248:21
**7s** 283:18

**8**

**8** 134:10,11 172:13
**8.4** 248:7
**80,000** 92:5
**80s** 283:13
**85** 158:9 256:6,20 263:13
**85,000** 115:7
**86** 258:13
**868** 247:17

**9**

**9** 56:8 88:22
**9/4/2025** 173:12
**9/5/2025** 173:12,13
**9:30** 5:1
**9011** 218:10 234:15
**90s** 71:23 283:14
**91,149** 153:2
**935** 256:18
**9th** 56:9