**Frank Amodeo**
**1311 Hoffner Ave.**
**Orlando, FL 32809**



FILED ORL INTAKE - USBC
8 JUN 2026 PH2:49

June 8, 2026

The Honorable Grace E. Robson
United States Bankruptcy Court
Middle District of Florida
Orlando Division

Re: Homemakers Real Estate, LLC, Debtor.
   Case No. 6:25-bk-05570-GER
   Chapter 11

Dear Judge Robson:

I have asked that this motion be delivered to your chambers because it is being filed on the eve of our June 9 Status Conference and, because I do not file electronically, you might not otherwise be aware of the document.

I will serve this filing by email on all relevant attorneys and parties before the morning, and the Clerk will, of course, transmit it through the CM/ECF system; however, that process could be delayed until after our hearing tomorrow.

I apologize for any inconvenience, but I only became aware of the creditors' objection in the middle of last week. Their reappearance in this case also raises subject matter jurisdiction issues, which I will describe in a separate notice.

Thank you very much for your consideration.

Respectfully submitted,

Frank Amodeo

FILED ORL INTAKE- USBC
8 JUN 2026 PM2:48

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

Homemakers Real Estate, LLC,

Debtor.

_____/

Case No. 6:25-bk-02685-GER
Chapter 11 (Voluntary)
Case No. 6:25-bk-05570-GER
Chapter 11 (Involuntary)

## FRANK AMODEO'S ARGUMENT IN SUPPORT OF GRANTING THE RULE 60 MOTIONS AND HIS MOTION UNDER RULE 1015(a), TO CONSOLIDATE THE HOMEMAKERS' BANKRUPTCY WITH THE INVOLUNTARY BANKRUPTCY

For more than a year, the creditors opposing Horton Johnson's motions to vacate engaged in a systematic campaign of deception, disinformation, disingenuity, and obfuscation. The deplorable actions were designed to obtain financial gain and punish certain persons through financial attrition without regard for fairness, the law, or common decency. In opposing this motion to vacate, these creditors now seek to protect the gains of their earlier misconduct, including the taking of millions of dollars in cash and property; assets to which PEDixon, LLC and ZPD, LLC are not entitled to possess.[1] Most disturbingly, the creditors' attorneys, both in this case and out, are complicit in the development and implementation of the destructive, dilatory

---

[1] Between January 2022 and September 2023, there were 11 extensions of credit to entities affiliated with the owners of Tiered Capital, Inc. The loans totaled $11,225,000. Between February 2022 and December 2023, the Dixon lenders received $11,363,595. (Exhibit E). It appears the Dixon lenders are seriously misadvised about the law. They do not comprehend that an in-kind payment or collateral seizures require a commercially reasonable disposition both as to the value of the in-kind credit, and as to the time such credit must be applied.

1

scheme. In order to mitigate the injustice, this court should vacate its dismissal order. Then, to comply with this circuit's single estate rule, and right the course of these proceedings this court should consolidate the two Chapter 11 cases via Rule 1015(a).

### Mootness

In its scheduling order, the Court effectively inquired about mootness: "This circuit considers a matter 'moot' when it no longer presents a live controversy with respect to which the Court can provide meaningful relief." *Soliman v. U.S. ex rel. INS*, 296 F.3d 1237, 1242 (11th Cir. 2002). Here the court provides meaningful relief by vacating its dismissal order (Doc 73), the vacatur alters the statute of limitation for preferences and fraudulent conveyances. *See* 11 U.S.C. § 547(b)(4). In other words, vacating this case's dismissal expands the extant bankruptcy estate's capacity to recover avoidable transfers, that is, granting vacatur in #02685 add four months to the time period for recovering preferential transfer.

Furthermore, the vacatur mitigates the negative consequences to the estate and third parties caused by the creditors' obfuscatory and dilatory antics. Succinctly, vacating its dismissal order generates meaningful relief for the debtor and its creditors. And impedes the obstructive-creditors' profiteering from Mr. Dixon's expressed intent to win by financial "attrition" regardless of the otherwise likely

2

(lawful) outcome. Justice requires that the estate not be harmed by a scheme that is improper.[2]

## Preferential Payments to PEDixon

The Bankruptcy Code, provides that a trustee, or the Debtor-in-Possession may avoid, thus recover, a transfer made "… between ninety days and one year before the date of filing the petition, if such creditor at the time of the transfer was an insider…,". See 11 U.S.C. § 547(b)(4)(B).

Homemakers vacation rental revenues were diverted via Beachside Vacation Rentals through Alison Pitkanen's IOLTA account to PEDixon. These revenues belonged to Homemakers and it creditors. Except for PEDixon and Crescent Sound's dilatory conduct, that ran the limitations period; all these transfers are avoidable under 11 U.S.C. § 547(b)(4)(B). These payments were made while Homemakers was insolvent; within one year before the filing of the petition (Exhibit A, Tr., May 20, 2026 Status Conference, p. 25: 3-7); and based on the (alleged) guarantee of Homemakers to repay the debt of another. Significantly, that

---

[2] Cf. e.g. *Tamamoi, LLC v. Canaveral*, 05-2024-CA-023943-XXCA-BC (18th Judicial Cir. For Brevard County, FL 2024) (PEDixon refused to comply with the state court order to deposit funds into the registry). Similarly, Crescent Sound, Ltd. refused to obey the instructions of the so-called Tiered Land Trust Directors despite a contractual and statutory duty to do so.

3

other's debt has been repaid.[3] As a result PEDixon received more than it would have in a case commenced under Chapter 7 of the Bankruptcy Code. The upshot the payments are avoidable as a preference.

## An Efficient Path to Justice

Vacating the dismissal of this case and consolidating it with the involuntary case permits an accurate determination of which transfers are avoidable under 11 U.S.C. § 547(b)(4). The salient concern is the "filing of the petition" date. *See generally In re State Airlines, Inc.*, 873 F.2d 264, 268 (11th Cir. 1989)("we cannot say as a matter of law or logic, that an order for relief is the same thing as a petition"). The avoidance period is one year before the petition date, hence the look back period in the involuntary case extends to September 2, 2024. *In re Homemakers Real Estate, LLC*, No. 6:25-bk-05570 (Bankr. M.D. Fla. 2025) (Doc. 1). While the avoidance period in this case is May 5, 2024, that is, one year from the date the petition in this case was filed. (Doc. 1). There is a four month difference, which corresponds to at least $274,224.20 in cash and at least $250,000 in net real estate transferred. ($524,224.20, and quite likely more). An amount that would substantially pay the

---

[3]. Once more, it appears the Dixon lenders are seriously misadvised about the law. They do not comprehend that in-kind payments or collateral seizures require a commercially reasonable disposition, both as to market value of the collateral, and the time such credit must be applied. See Fla. Stat. § 679.608(1): *see also Weiner v. Am. Petrofina Mktg., Inc.*, 482 So. 2d 1362, 1364 (Fla. 1986)(in order to collect on a deficiency judgement the creditor must prove the collateral was disposed of in a commercially reasonable manner).

Under the correct application of the law, the Dixon-loans were repaid by the end of 2023. (Exhibit E)(List of loans and repayments through 2023). After this the Dixon-lenders took or received more than $5,000,000 more in cash or property. Quite literally receiving money for nothing-an unconscionable behavior at the very best for the Dixon Organization.

claims of non-insider unsecured creditors. Vacating the dismissal and having this case jointly administered by the Chapter 11 trustee creates fairness and efficiency.

## Manifest Injustice From Intentional Deception

A manifest injustice occurs when a judicial mistake or intentional misconduct by a party, or a party's attorney, damages the substantial rights of another, especially an innocent third party.

Here the creditors and counsel deceived the court into believing a land trust existed, that the loan transactions were valid, rather than universally defective, and that the creditors' sibling company (Crescent Sound) was operating the business in a proper manner.[4] None of this was true, the creditors considered the business a cookie jar of cash.

---

[4] Attorney Misconduct Constitutes a Manifest Injustice

The Dixon lenders have argued that the ubiquitous (more than 34) false notary attestations are mere technical errors in the documents and of little consequence. Similarly, they disregard the fabrications, falsifications, and forgeries which permeate the transaction documents: Fabricated and falsified Assignment of Membership Units, forged February 14, 2024 Trustee's Deed, fabricated and falsified Assignment of MTF and WM, etc. Hubris that shows a fundamental disregard for the law — but hubris to which a party is entitled. The Florida Supreme Court, however, does not extend the entitlement to arrogance to attorneys. *The Florida Bar v. Farinas*, 608 So. 2d 22 (Fla. 1992)(suspending an attorney for permitting a notary certificate when the notary was outside the presence of the signer).; The Florida Bar v. Kicklighter, 559 So. 2d 1123 (Fla. 1990)(disbarring an attorney for, amongst other things, recording a forged document). The Florida Supreme Court finds this type of conduct worthy of suspension of the lawyer. Moreover, counsel knew or should have known — and disclosed — that the purported Trustee's Deed which belatedly created the trust was not only falsely attested to, but also a fabrication, falsification, and forgery.

Likewise, this circuit (the country for that matter) finds attorney countenance or use of deceptive documents unacceptable — a manifest injustice. (infra n. 11)

Here, for example, the January 9, 2024 Assignment document is fabricated and falsified; it is not the document Mr. Johnson signed. Counsel's presenting it to this Court without production of the unlined, unnotarized original violates the best evidence rule and either counsel's duty of candor, or counsel's Rule 9011 duty of reasonable investigation.

The Rule 60(b) motions and the record (composite Exhibit B) reveal that PEDixon and ZPD have made misrepresentations that, if not made, would have altered the dismissal of this action. (Compare Doc. 73, 85, and Exhibit B)(Creditors stating the assignment was an absolute transfer as payment for a six month forbearance). This court concluded, and Mr. Dixon declared (Doc. 69, Exh. B, ¶12,14), that Mr. Johnson had "...agreed that the Assignment would be a total assignment..." of all the membership units of Homemakers; (Doc. 73, at 2).

This court dismissed this bankruptcy by deciding that Horton Johnson lacked the authority to direct Homemakers to file a bankruptcy (Doc. 73 at 2-4). This court's determination of that question turned on the nature of a January 9, 2024 document: "Assignment of Homemakers Membership Units" and the existence of a land trust to which the ownership interest had been transferred. (Doc. 73 at 4).

But Mr. Timko's later revelation showed Mr. Dixon's declaration on repayment of the debt to be untrue. (Exhibit C)(Letter to Leibert)("If the debts owed to Pedixon and ZPD were paid, the interest would have been returned.").

If Mr. Dixon had told the truth, as subsequently revealed by his attorney, then the outcome of the earlier motion to dismiss would have been different — minimally an evidentiary hearing would have been required, since the intent of Mr. Johnson

6

and Mr. Dixon would have been essential to determining the nature of the assignment.[5]

Governing authority provides that an assignment's true nature depends on the intent of the parties, rather than the labels of a document. *In re Radice Corp.*, 88 B.R. 422, 426 (Bankr. S.D. Fla. 1988).

Mr. Timko's representation in his letter to Mr. Leibert render Mr. Dixon's representations in his Declaration false (Doc 69 at 2-3) The statement also wrecks this court's conclusion that the intent of the "Assignment" was an absolute transfer in consideration for a six[6] month forbearance is mistaken.¶ (Doc. 73 at 2).[7]

As a result of that mistake of law, PEDixon, et al., has cost the bankruptcy estate more than a million dollars in revenue, and the parties and the court more than a million dollars in time and resources. A total loss greater than the arrearages of all the secured creditors claiming against the estate.

---

[5] Once again I believe the Dixon-lenders are receiving horrific legal advice. Governing law provides that an "Assignment" does not necessarily equate to a sale of the property even if identified as such in the agreement. Instead, substance rather than form controls. The true nature of an assignment is a matter of fact to be decided by trial. *In re Radice Corp.*, 88 B.R. 422 (1988)

[6] If this court's forbearance finding is upheld, this court loses subject matter jurisdiction over the PEDixon-ZPD claims. Since the forbearance value alone makes the claims a violation of Florida's loansharking statute § 687.071(7)("No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."). And in turn, deprives this court of subject matter jurisdiction

[7] It is worth noting that even if Johnson had thought it was a sale, Dixon's statement expressing a different view requires an evidentiary hearing since third parties are affected by the nature of the assignment. *In re Radice Corp.*, 88 B.R. 422 (1988).

7

Some of the loss may be recoverable through sanction actions (safe harbor letters have been served) and by this court holding PEDixon to its president's sworn statement that monies are held separately (Exhibit F, Tr. at 3)("I did talk to my client. He did say, and I actually instructed him to hold the money that came in as of September 2nd, when the case filed. He confirmed to me that he did that."). But although the more than $660,000 collected since September 2025 provides a substantial feasibility boost to the reorganization,[8] it still deprives the estate and other creditors of at least $524,224 (4 months of preference), as well as participation in a substantial contingency lawsuit against the Dixon lender organization (since the statute of limitation may have expired on some state causes of action).

Specifically, by delaying the order for relief for more than a year, PEDixon has removed over a million dollars from the estate and pushed at least a half a million dollars (assets and cash) outside the preference period. (Exhibit D)(schedule of direct revenue diversion). Also, it may have put certain tortious actions outside the statute of limitations.

**Consolidation**

A significant injustice exists when multiple parties (e.g., creditors, interest holders) lose a substantial recovery as a result of an explainable court mistake or

---

[8] This source provides funds for administering the estate and giving secured creditors adequate protection.

8

deceptive conduct by a party-in-interest—or worse—by a party's counsel. Misconduct which not only deceives the opponent but impairs the functioning of the Court. Stated otherwise, when counsel's misconduct equates to a fraud upon the court, it creates a miscarriage of justice.[9]

### This Court's Application of the Florida Land Trust Act Is the Type of Mistake Rule 60(b)(1) Is Meant to Correct

Johnson's Rule 60 motions present precisely these scenarios. Creditors' counsel or the creditors deceived the other parties and the court. As a result—albeit understandably, given the woeful record created by Homemakers and PEDIXON, , this Court applied the wrong law (i.e., the Florida Land Trust Act), and that is the type of mistake that Rule 60(b)(1) is meant to correct. *See Kemp v. United States*, 596 U.S. 528 (2022). Moreover, the other parties were justified in relying on counsel's representation given his ethical duty of candor (Fla. Bar Rule 4-3.3) and Rule 9011 dictates of reasonable investigation. Correcting this mistake is particularly warranted here because the mistake harms innocent third parties (creditors and interest holders) rather than the parties culpable for creating the deficient record.

### The Court Has a Ready-Made Solution to Attain Justice: Reopen the Original Case and Consolidate the Two Chapter 11s Under Bankruptcy Rule 1015

---

[9] See generally *Hazel-Atlas*, 322 U.S.; *Chambers v. NASCO*, 501 U.S. 32; and *Zakrzewski v. McDonough*, 490 F.3d 1264 (11th Cir. 2007)

Fortunately, this Court can prevent injustice, preserve the integrity of the bankruptcy system, and place the balance of these proceedings on a manageable course: <u>consolidation of the voluntary Chapter 11 with the involuntary Chapter 11</u>. *See* Fed. R. Bankr. P. 1015(a) (authorizing a court to consolidate cases involving the same debtor).[10] The Notes of the Advisory Committee on Rules—1983 expressly provide this rule applies to cases when the same debtor is named in both voluntary and involuntary petitions. Interestingly, our circumstances, and seemingly the first of its kind in this circuit. But, the very reason Congress permitted the rule.

This Court should grant the Rule 60 motions, reopen this case (the original Chapter 11), and then consolidate the two Chapter 11 cases with a commencement date of May 5, 2025. This will provide an extended reach-back period to allow recovery of the fraudulent conveyances and (indisputable) preferential transfers; thereby maximizing the potential estate for the Debtor and its creditors.[11]

---

[10] Amusingly, Mr. Timko says "Reinstating this bankruptcy case and having two bankruptcy cases pending for one entity provides no relief, is nonsensical, and does nothing to benefit any party-in interest or creditor." (Doc. 93) the 11th Circuit and Congress have found reasons why multiple estates could be important. The "single estate" rule emerges from the Supreme Court decision; *Freshman v. Atkins*, 269 U.S. 121 (1925). This circuit refines that holding to permit simultaneous bankruptcy estates as long as the assets of each are different. In re Saylors, 869 F.2d 1434 (11th Cir. 1989); *In re Sanchez-Dobazo*, 343 B.R. 742, 744-46 (Bankr. D.D. Fla. 2006)(discussing 11th Circuit concept of a single estate). Here, the otherwise unavailable preferences are assets of the original bankruptcy case, and not assets of the involuntary estate. Congress has promulgated the rule that directly addresses this circumstance, Bankruptcy Rule 9015(a) which permits consolidation of an involuntary and voluntary involving the same debtor.

[11] Notably, the Eleventh Circuit has this week reaffirmed the appropriateness and power of a bankruptcy court to consolidate companies. Although that decision addressed substantive consolidation of non-debtor companies with a debtor rather than Rule 1015 consolidation, the overarching principle is that the bankruptcy court has wide-reaching power to protect creditors and interest holders alike. *See In re NoRust Rebar, Inc.*, No. 24-13383 (11th Cir. June 1, 2026) (to be published).

## Relief Requested

WHEREFORE, the Movant respectfully requests that this Court;

(i)    grant Johnson's Rule 60 motions;

(ii)   reopen the original Chapter 11 case;

(iii)  consolidate the two Chapter 11 cases (Nos. 6:25-bk-02685-GER and 6:25-bk-05570-GER), and allow a commencement date of May 5, 2025, so as to maximize the reach-back period and the potential estate for the Debtor and its creditors; and

(iv)   grant such other and further relief as the Court deems just and proper.

## Verification

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Frank L. Amodeo
Pro se

Respectfully submitted this 8th day of June, 2026,

Frank L. Amodeo, Pro Se
1311 Hoffner Avenue
Orlando, FL 32809
Flahome32809@gmail.com
(407) 406-1315

11

## CERTIFICATE OF SERVICE

I certify that on June 8th, 2026, I filed the foregoing with the Clerk of Court

through the CM/ECF system, which will serve electronic notice on all counsel of

record.

Frank L. Amodeo

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

Homemakers Real Estate, LLC,

Case No. 6:25-bk-02685-GER
Chapter 11 (Voluntary)

Debtor.

Case No. 6:25-bk-05570-GER
Chapter 11 (Involuntary)

---

**NOTICE OF FILING EXHIBITS IN SUPPORT OF
FRANK AMODEO'S ARGUMENT IN SUPPORT OF THE RULE 60
MOTIONS
AND MOTION TO CONSOLIDATE UNDER BANKRUPTCY RULE
1015(a)**

Frank L. Amodeo, creditor, files the following exhibits in support of his

Argument in Support of Granting the Rule 60 Motions and his Motion under Rule

1015(a) to Consolidate, filed contemporaneously herewith:

**Exhibit A**   Transcript excerpt, Status Conference held May 20, 2026 (at p. 25, lines 3–7).

**Exhibit B**   Composite record excerpts: Order Dismissing Case (Doc. 73); Order Denying Motion for Reconsideration (Doc. 85); and Declaration of Kenneth G. Dixon (Doc. 69, ¶¶ 12, 14).

**Exhibit C**   Letter from James A. Timko, Esq., to Matthew A. Leibert, Esq., dated May 5, 2026.

**Exhibit D**   Schedule of Homemakers' revenues diverted to PEDixon, LLC.

**Exhibit E**   Transcript excerpt regarding funds received since September 2, 2025 held separately (at p. 3).

**Exhibit F**   Transcript of Status Conference Hearing held March 10, 2026.

1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

Homemakers Real Estate, LLC,                    Case No. 6:25-bk-02685-GER
                                                Chapter 11 (Voluntary)
Debtor.                                         Case No. 6:25-bk-05570-GER
                                                Chapter 11 (Involuntary)

---

**NOTICE OF FILING EXHIBITS IN SUPPORT OF
FRANK AMODEO'S ARGUMENT IN SUPPORT OF THE RULE 60
MOTIONS
AND MOTION TO CONSOLIDATE UNDER BANKRUPTCY RULE
1015(a)**

Frank L. Amodeo, creditor, files the following exhibits in support of his

Argument in Support of Granting the Rule 60 Motions and his Motion under Rule

1015(a) to Consolidate, filed contemporaneously herewith:

**Exhibit A**    Transcript excerpt, Status Conference held May 20, 2026 (at p. 25, lines 3–7).

**Exhibit B**    Composite record excerpts: Order Dismissing Case (Doc. 73); Order Denying Motion for Reconsideration (Doc. 85); and Declaration of Kenneth G. Dixon (Doc. 69, ¶¶ 12, 14).

**Exhibit C**    Letter from James A. Timko, Esq., to Matthew A. Leibert, Esq., dated May 5, 2026.

**Exhibit D**    Schedule of Homemakers' revenues diverted to PEDixon, LLC.

**Exhibit E**    Transcript excerpt regarding funds received since September 2, 2025 held separately (at p. 3).

**Exhibit F**    Transcript of Status Conference Hearing held March 10, 2026.

1

Respectfully submitted this 8th day of June, 2026,

Frank L. Amodeo
Creditor, Pro Se
1311 Hoffner Avenue
Orlando, FL 32809
Flahome32809@gmail.com
(407) 406-1315

2

## CERTIFICATE OF SERVICE

I certify that on 8th June, 2026, a true and correct copy of the foregoing, together with the attached Exhibits A through F, was served on all counsel of record by the Court's CM/ECF system.

Frank L. Amodeo

# Exhibit A

## May 20, 2026 Transcript

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-bk-05570-GER
6:26-bk-01776-GER

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

DEBTOR.

_____/

HEARING

BEFORE:        THE HONORABLE GRACE E. ROBSON

DATE:          MAY 20, 2026

TIME:          11:00 A.M. - 11:35 A.M.

LOCATION:      UNITED STATES BANKRUPTCY COURT
400 WEST WASHINGTON STREET
ORLANDO, FL 32801

REALTIME REPORTERS, INC.   407-884-4662
REALTIMERPRS@GMAIL.COM

Exhibit "A"

its debts.  This test is subject to considerable flexibility and judicial discretion.

Here, there's no question that Homemakers is not paying its mortgage, condo and townhome association fees, or real property tax debts as they come due, and has not done so for quite some time.

All of the mortgage lenders filed foreclosure actions and have requested relief from the stay, which the Court has granted through the entry of a Judgment.  Therefore, the Court finds the requirements of § 303 are satisfied.

However, even if the Court finds an involuntary petition was properly filed, it can abstain from hearing and dismiss the case.

Homemakers argues that abstention is appropriate because this case is being pursued purely as a litigation strategy with respect to ownership and control of Homemakers.

Abstention is recognized as an extraordinary remedy, and because a decision to abstain is not subject to review, Courts are cautious in their consideration of dismissing or suspending proceedings under this provision of the

Exhibit D

# Exhibit B

## Dixon Declaration

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

Debtor.

CASE No. 6:25-bk-02685-GER
Chapter 11

_____

## DECLARATION OF KENNETH DIXON IN SUPPORT OF MOTION TO DISMISS BANKRUPTCY CASE FOR LACK OF CORPORATE AUTHORITY

I, KENNETH DIXON, declare as follows:

1.    I am the Managing Member of PEDIXON, LLC ("PEDIXON") and ZPD, LLC ("ZPD") and its corporate representative for the matters addressed in this Declaration.

2.    I am over 18 years of age and I am competent to make this Declaration. I am authorized to make this Declaration on behalf of PEDIXON and ZPD and based on my personal knowledge and the business records of PEDIXON and ZPD, including all of the exhibits attached to this Declaration.

3.    I am familiar with the business records which PEDIXON and ZPD regularly create and maintain. The business records attached hereto are true and accurate copies; were made by, or from information transmitted by, a person with knowledge of the facts contained in the business records made at or near the time of the acts and events appearing on them; made or compiled as part of the regular practice of PEDIXON and ZPD; and kept in the regular course of Plaintiff's regularly conducted business activities. The documents attached hereto all constitute business records of PEDIXON and/or ZPD.

4.    Horton Johnson and Homemakers Real Estate, LLC ("Homemakers") are the guarantors of several loan accommodations made by PEDIXON and ZPD to Tiered Capital, Inc.,

5735770.v1


Exhibit
B

its shareholders and their affiliates, including Homemakers Real Estate, LLC and Horton ("Woody") Johnson (collectively, "Tiered") made from January 2022 through October 2023 (collectively, the "Loan").

5.    In 2022, at the request of Ken Jones, the Chief Financial Officer of Tiered (the "CFO"), I began to attend meetings with Frank Amodeo ("Amodeo") at his place of residence located at 1311 Hoffner Ave, Orlando FL 32809.

6.    For the first few months, the CFO was present at these meetings. Amodeo was introduced to me as the designated representative and consultant of Tiered, and specifically, Homemakers and Johnson.

7.    Johnson was present for at least two of the meetings.

8.    Johnson's legal counsel, Baylor Johnson, was present at one of the meetings.

9.    After several months, PEDIXON's and ZPD's legal counsel, Alison Pitkanen, generally accompanied me to these meetings.

10.   During these meetings, Amodeo orchestrated and negotiated the loan accommodations between PEDIXON, ZPD, and Tiered.

11.   In December 2023, the Loan was in default, and the principal amount due was approximately $10,625,000. At this time, I instructed my legal counsel to deliver a default notice to Tiered.

12.   On January 7, 2024, I attended a meeting with Frank Amodeo to discuss alternative solutions to foreclosure and legal action against Johnson and Homemakers. At this meeting, Mr. Amodeo suggested that Mr. Johnson would be willing to relinquish all interest in Homemakers to obtain a forbearance of legal action under and enforcement of Mr. Johnson's personal guaranty. Since the Assignment was not merely collateral, and it was something new being offered, I agreed

2

5735770.v1

to forbear. The parties agreed that the Assignment would be a total assignment of the interests with no return to Johnson.

13. On January 9, 2024, I instructed my legal counsel to meet with Amodeo and Johnson to formalize the total assignment from Johnson. On that same date, Johnson executed the Assignment and in exchange therefor, PEDIXON LLC agreed to a six (6) month forbearance of the Loan. A true and correct copy of the Assignment is attached hereto as Exhibit "A."

14. I decided that the interests in Homemakers would be held in the Trust because it was a total assignment and the Trust would own Homemakers and own the beneficial interest in the Tiered Trust for the Trustee to administer to work towards paying off the Loan.

15. The Trustee has the authority to control the entity and holds the beneficiary interest of Homemakers in the Tiered Trust.

16. On or about January 24, 2025, I instructed my counsel to send another default notice to Johnson, among others. A true and correct copy of the default notice is attached hereto as Exhibit "B". In the default notice the assignment of the interests in Homemakers to obtain a forbearance was mentioned. Mr. Johnson never responded to contest the assignment of Homemakers to the Trust.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Kenneth Dixon

3

5735770.v1

# Exhibit C

## Timko Letter

# DEAN|MEAD

Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A.
420 South Orange Avenue, Suite 700
P.O. Box 2346
Orlando, FL 32801

(407) 841-1200
(407) 423-1831 Fax
www.deanmead.com

Attorneys and Counselors at Law
Orlando
Fort Pierce
Naples
Viera/Melbourne
Vero Beach

JAMES A. TIMKO
407-613-2588
JTimko@deanmead.com

May 5, 2026

Via Email Leibert@urbanthier.com and U.S. Mail

Mr. Matthew A. Leibert, Esq.
Law Office Matthew A. Leibert
5782A S. Semoran Blvd.
Orlando, FL 32822

Re:    Response to Civil Theft Demand

Dear Mr. Leibert:

This letter is being sent on behalf of Kenneth Dixon and his related entities in response to your letter dated April 6, 2026.

My clients deny any wrongdoing with respect to the assignment of Mr. Johnson's membership interest in Homemakers and deny the arguments asserted in your letter. Mr. Johnson signed the assignment of his interest in Homemakers voluntarily and for consideration.

In addition, Mr. Johnson's claim fails for an obvious reason. The interest in Homemakers was placed in the Tiered Trust. If the debts owed to Pedixon and ZPD were paid, the interest would have been returned. As a result, there was never any intent to permanently deprive Mr. Johnson of his interest. Indeed, we have attempted to resolve this dispute and included in our proposal the return of Mr. Johnson's interest in Homemakers.

Your claim that Mr. Johnson's interest in Homemakers had a value of $8,981,897.00 is not supported by any accepted valuation standard. By way of background, as you are aware, prior to Mr. Johnson assigning his interest in Homemakers to the Tiered Trust, Homemakers assigned its ownership of the condominiums and townhomes to the Tiered Trust. That real property was the only asset of Homemakers. Homemakers made that assignment in connection with a series of loans made to Homemakers' related entities and business partners that were already in default and made in connection with the Cape Crossing development. As reflected in the Loan Agreement that Mr.

6388205.v1



Exhibit
"C"

May 5, 2026
Page 2

Johnson signed, Pedixon, LLC provided additional funding and agreed to reinstate the notes that were in default to allow Mr. Johnson and his business partners to sell the condominiums and townhomes to pay off their debts.

The valuation presented in your letter does not take into account Homemakers' prior assignment of the real property to the Tiered Trust. It does not take into account Mainstreet's mortgage and other encumbrances that are attached to the real property. For example, two other mortgages encumbered certain condos and townhomes and multiple options were held against several of the properties. In addition, association fees, property taxes and any other unpaid debts are also not reflected in the valuation. Finally, Mr. Johnson's valuation does not take into account that Homemakers was not generating sufficient income to pay its debt service, which is why they agreed to sell the condos and townhomes in the first place. As a result, the value of any equity interest in Homemakers was likely $0.00 not $8,981,897.00.

While you claim that the documentation of the Tiered Trust was deficient, your allegations do not rise to the level of fraud. Mr. Johnson does not dispute that he initially agreed to place Homemakers' assets into the Tiered Trust and that he signed a trustee's deed conveying the condos and townhomes. He also does not assert any injury he incurred due to the deed being recorded. Even if your allegations that the deed was deficient are somehow established in Court, it does not change the fact that Mr. Johnson agreed to the recording of a trustee's deed in the first place and suffered no harm due to the recording the deed.

Mr. Johnson has also claimed the Tiered Trust was procured by fraud because he did not understand what constituted the corpus of the trust. That is an absurd claim. Mr. Johnson signed the Tiered Trust agreement which clearly states the assets that would be included in the Tiered Trust.

Mr. Johnson should also be cognizant of the fact that he entered into the Loan Agreement without any intent to comply with it. He admitted during his deposition that he did not want to sell the condos and townhomes. As a result, the Loan Agreement was procured by fraud because the sale of the condos and townhomes and a repayment of the debt was a material term of the Loan Agreement.

In addition to the above, you ignore the fact that the bankruptcy court already ruled on ownership of Homemakers and Mr. Johnson acknowledged or failed to dispute the existence of the Tiered Trust and the assignment of his membership interest in Homemakers in those proceedings. Mr. Johnson has not acted in a manner that complies with his claim that he has an interest in Homemakers or Homemakers' assets. He took no efforts to dispute Mainstreet's Motion for Relief from the Automatic Stay filed in the bankruptcy proceedings nor has he taken any action to directly dispute Mainstreet's foreclosure claims. Indeed, he sat on his hands for over two-years since the assignment, and waited until after he was sued on his guaranty, before making a claim for his interest in Homemakers or deny the existence of the Tiered Trust.

6388205.v1

May 5, 2026
Page 3

      Your letter and the asserted civil theft claim is in bad faith. Mr. Johnson has stated that he is not collectible and, assuming that is true, he believes he has nothing to lose by pursuing meritless claims. His willingness to pursue meritless claims is evidenced by the fact that a vexatious litigant motion is already pending against him. It is clear to us that Mr. Johnson is simply going after the deepest pockets and attempting to elevate a loan dispute and a failed business transaction into something nefarious to pressure, harass, and smear my clients.

      Be advised, my clients will continue to protect their interests to the fullest extent of the law.

               Sincerely,

               *James A. Timko*

               James A. Timko

JAT:mg

6388205.v1

# Exhibit D

## Diverted Revenues

# HOMEMAKERS REVENUES DIVERTED TO

| DATE | TRANSACTION | PAYMENTS | |
|---|---|---|---|
| 1/30/2024 | WIRE FROM ALISON (Beachside?) | 55,487.97 | |
| 2/14/2024 | BEACHSIDE DISTRIBUTION | 57,424.57 | |
| 3/13/2024 | BEACHSIDE DISTRIBUTION | 70,166.57 | |
| 4/11/2024 | BEACHSIDE DISTRIBUTION | 136,113.39 | |
| 5/14/2024 | BEACHSIDE DISTRIBUTION | 50,157.31 | |
| 6/12/2024 | BEACHSIDE DISTRIBUTION | 47,451.52 | |
| 7/11/2024 | BEACHSIDE DISTRIBUTION | 86,807.48 | |
| 8/15/2024 | BECHSIDE DISTRIBUTION | 89,807.89 | $274,224.20 |
| 9/12/2024 | BEACHSIDE DISTRIBUTION | 88,144.09 | |
| 10/16/2024 | BEACHSIDE DISTRIBUTION | 33,297.06 | |
| 11/10/2025 | BEACHSIDE DISTRIBUTION | 52,848.88 | |
| 12/15/2025 | BEACHSIDE DISTRIBUTION | 50,085.93 | |
| 1/15/2025 | BEACHSIDE DISTRIBUTION | 66,750.57 | |
| 2/15/2025 | BEACHSIDE DISTRIBUTION | 84,789.99 | |
| 3/12/2025 | BEACHSIDE DISTRIBUTION | 101,696.19 | |
| 4/11/2025 | BEACHSIDE DISTRIBUTION | 118,563.85 | |
| 5/10/2025 | BEACHSIDE DISTRIBUTION | 62,143.00 | |
| 6/10/2025 | BEACHSIDE DISTRIBUTION | 55,136.92 | |
| 7/10/2025 | BEACHSIDE DISTRIBUTION | 64,229.37 | |
| 8/10/2025 | BEACHSIDE DISTRIBUTION | 66,364.82 | |
| 9/10/2025 | BEACHSIDE DISTRIBUTION | 23,454.67 | |
| 10/10/2025 | BEACHSIDE DISTRIBUTION | | |
| 11/10/2025 | BEACHSIDE DISTRIBUTION | | |
| 12/10/2025 | BEACHSIDE DISTRIBUTION | | |
| 1/10/2026 | BEACHSIDE DISTRIBUTION | | |
| 2/10/2026 | BEACHSIDE DISTRIBUTION | | |
| 3/10/2026 | BEACHSIDE REVENUE REPORT TO BANKRUPTCY | 616,550.22 | |
| 4/10/2026 | BEACHSIDE DISTRIBUTION | | |
| 5/10/2026 | BEACHSIDE DISTRIBUTION | | |
| | | | |

**Totals**     **$2,077,472.26**

Exhibit "A"

# Exhibit E

## Dixon Loans

# Dixon's Repaid

Between January 2022 and September 2023, three Dixon-owned lenders[1] made 11 extensions of credit to six persons[2] affiliated with the owners of Tiered Capital, Inc. (borrowers): As of December 31, 2023, there is no outstanding principal due, and the interest had been paid in full.

## Dixon Loans:

| Date | Description | Amount |
|------|-------------|--------|
| Jan. 2022 | Sherwood Note (Amelia CD) | 500,000 |
| July 2022 | IMQA Loan 506 | 300,000 |
| Aug. 2022 | Allonge to Sherwood Note | 250,000 |
| Aug. 2022 | Hampton | 1,300,000 |
| Oct. 2022 | Sherwood Option Loan | 500,000 |
| Dec. 2022 | Million Dollar Loan (Cherry CD) | 1,000,000 |
| Feb. 2023 | Resorts Common Area Loan | 500,000 |
| June 2023 | River Fly In | 3,000,000 |
| July 2023 | Holly Bluff | 3,000,000 |
| July 2023 | Flynn | 125,000 |
| Sept. 2023 | Tiered | 750,000 |
| | **Total** | **11,225,000** |

## Payments to Dixon:

| Date | Description | Amount |
|------|-------------|--------|
| Jan. 2022 | ROGOs | 150,000 |
| July 2023 | 7.24 Acres of River Front Property | 4,210,000 |
| July 2023 | 57.36 Acres of Industrial Property | 4,300,000 |
| Oct. 2023 | Cash | 2,603,595 |
| | **Total** | **11,363,595** |
| | | |

## Subsequent Payments Taken and received by Dixon:

At the end of 2023, the borrowers had repaid the entire consolidated loans including any interest due on that loan. Yet since then, Dixon has received or taken more than $5,000,000.

---

[1] PEDixon, LLC, Parke Financial Limited Partnership, and ZPD, LLC

[2] Sherwood Construction, Inc., IMQA Investments Incorporated, Recycled Group of SC, LLC, Florida Space Coast Resorts, Inc., Tiered Capital, Inc., and Martin Flynn.


Exhibit "E"

# Exhibit F

## Transcript

# TRANSCRIPT OF PROCEEDINGS

## United States Bankruptcy Court
## Middle District of Florida — Orlando Division

### In re: Homemakers Real Estate, LLC
Case No. 6:25-bk-05570-GER

Chapter 11 (Involuntary)

Hearing Date: March 10, 2026

Commencement: Approximately 1:30 PM

Before the Honorable Judge Grace E. Robson

**MATTERS HEARD:**

Motion for Appointment of Trustee (Main Street Community Bank)

Motion for Stay Relief (Main Street Community Bank)

Motion to Disqualify James Timko

Motion to Abstain (Doc. 172)

Motion to Remove Dixon as Trustee of Tiered Land Trust

Exhibit
Lift

# SPEAKER IDENTIFICATION

*Note: This transcript was generated from an automated speech-to-text system. Speaker identifications are approximate and were reconstructed based on context, stated appearances, and the substance of the dialogue. Numerical speaker labels in the source recording did not consistently correspond to the same individual throughout the proceeding.*

**THE COURT (Judge Robson)** — Speakers 1/2/5 (identified by judicial context)

**Justin Luna, Esq.** — Counsel for Main Street Community Bank

**James Timko, Esq.** — Special Counsel for Homemakers Real Estate, LLC

**Matt Leibert, Esq.** — Counsel for Horton Johnson

**Larry Costa, Esq.** — Counsel for IMQA Investments Inc. and CTO Holdings Inc.

**Frank Amodeo** — Corporate Representative for IMQA Investments Inc. and CTO Holdings Inc.

# TRANSCRIPT OF PROCEEDINGS

## 1:30 PM — Opening / Appearances

**TIMKO:** I represent Homemakers. [Referring to another party] Sam was a witness. You represent PT Dixon.

**UNIDENTIFIED:** I do represent PT Dixon in several matters, yes.

**COURTROOM DEPUTY:** United States Bankruptcy Court for the Middle District of Florida, now in session.

**THE COURT:** Okay. Good afternoon. Please be seated. Good morning. Afternoon. Yeah, I'm losing track of time here. Okay, we're here on Homemakers Real Estate, LLC, Case Number 25-05570. Let's take appearances, Mr. Timko.

**TIMKO:** James Timko, special counsel for Homemakers.

**LUNA:** Good afternoon, Your Honor. Justin Luna on behalf of Main Street Community Bank.

**COSTA:** Good afternoon, Your Honor. Larry Costa on behalf of IMQA Investments Incorporated and CTO Holdings, Inc. And with me, Your Honor, is Frank Amodeo as the corporate representative for both entities.

**THE COURT:** Good afternoon.

**LEIBERT:** Matt Leibert representing Horton Johnson.

**THE COURT:** All right. Any other appearances? Okay. So we're here on a couple of things. Mr. Luna's motion—there were some joiners. There was Mr. Johnson's motion to disqualify and to remove Mr. Dixon. Then responses, and Mr. Timko also filed a motion to abstain. How do we want to start? Is there any agreement or resolution the parties can—

**TIMKO:** Why don't we start with a motion for trustee, Your Honor, and then we can deal with the other motions.

**THE COURT:** Oh yeah. Okay. All right. So that's your motion.

## Main Street Community Bank's Motion for Trustee / Stay Relief

**LUNA:** Thank you, Your Honor. I'll be brief. We filed this motion and let me actually take a couple steps back just to refresh—Main Street Community Bank is the proverbial gorilla secured creditor in this matter. First mortgage, an assignment of rents on a significant portion of the debtor's assets. We have not received payments for over two years, in part due to what is going on. My client does not take any position with respect to the involuntary, so it is staying out of that. However, what it's interested in is not continuing to potentially lose equity in its collateral or have its collateral go out the back door.

**LUNA:** And so we had stay relief set for cause, which I think is formally set for a couple of days. And the last time we were here in a non-evidentiary hearing, we brought up why we wanted stay relief. And one of the issues was the lack of transparency in this gap period, which is becoming a substantial period of time from the filing and before there's a decision on whether there's going to be an order for relief or not.

**LUNA:** At that hearing, we said, look, we just need some transparency. And our impression was, look, we need to go to Mr. Timko, ask for some documents. We did. We didn't hear from him for a little bit, but then we subsequently got some information that actually raised bigger

issues. We think for us, and that has to do with what was produced—a lot of accounting statements and information from Beachside Vacation Rental, Beachside VR LLC. The document I'm looking at is Docket Number 176.

**LUNA:** This document purports to be all of my client's collateral income, rental income, and the thing that really caught our eye, which is why we filed the instant motion, is two line items. There's a management fee of nearly 20% of the entire rental income for $80,000. And then curiously, there is a 'payment to owner' line item for $247,000. We don't have the debtor's bank statements. So what we don't know—and what we're presuming—is that this money is being distributed to the actual principals of the owner of the debtor, depending on who you believe is the owner.

**LUNA:** So the concern here is that we're not maintaining the status quo in the interim, that there is money going out the back door. If this was cash collateral, if there was a payment to insiders, everybody would be jumping up and down. We don't have that. I'm also currently not able to go and enforce my pending motion to enforce the assignment of rents in state court.

**LUNA:** The whole intent of this motion—and I will agree with Mr. Timko that I believe the statute, Section 303, does refer to a Chapter 7—but I also think that a trustee should be strongly looked at in this interim period, or even an examiner, to ensure that the status quo, however long this is going to last, ensures that there's no money going out the back door. Otherwise the estate is losing money.

**THE COURT:** Wouldn't you argue under this piece of paper that all of the money that would have gone to the owner theoretically should have gone to your client, right? Meaning, like, if it's rental income that your client has a first lien on—you would say after paying whatever expenses your client probably would have paid to maintain the property, then anything after that would be your client's collateral.

**LUNA:** Yes, Judge. And if we're in state court, our motion that's pending—that's exactly what we'd be asking for.

**THE COURT:** You have a pending motion already in state court?

**LUNA:** We do, Judge. We have that and an order to show cause why a final judgment should not be granted. But we stopped and did not continue it in light of the current proceedings. So it's been pending. And obviously this thing kind of sidestepped it. But the relief we're requesting is: either go ahead and grant stay relief and these guys can fight out who's going to be the owner; or if this is going to stay an involuntary that might change things after the fact; or if it gets dismissed, then there's no worse for wear because we're going to set that hearing in approximately 30 days.

**LUNA:** Alternatively, if you're not inclined to allow us to immediately go back and enforce our rights, somebody needs to be accountable for what is happening with these funds under the current circumstances, especially in light of what we've discovered in this 'payment to owner' of nearly a quarter of a million dollars. That's our concern, and that's why we filed the motion the way we did.

**THE COURT:** Okay. But what's the first relief? You'd prefer going back to state court?

**LUNA:** Yes, Your Honor.

**THE COURT:** Okay.

## Timko's Response on Behalf of Homemakers

**TIMKO:** Okay, Your Honor. So as Your Honor knows, this case has been a sticky wicket, trying to deal with the various parties. And I've been very clear that we've been trying to be as open with Main Street and the other secured creditors as we could. On October 11th, Mr. Luna sent me a list of documents that he was seeking, which was fairly broad. And we have the potential of this case being dismissed in two short weeks and then having to go back to state court where litigation is pending with Main Street. The rents issue is a disputed issue in the state court case as to who has the rights to them.

**TIMKO:** I think Dixon will take the position that Main Street knew about this deal and that it didn't have any contractual obligations as far as the rents that were paid out. And it didn't have any contractual obligations with Main Street. I'm sure they'll dispute that—that'll be a state court issue.

**TIMKO:** So how to deal with the issue without providing potential post-judgment recovery discovery or things of that nature, but still give Main Street some comfort—we provided them with, they only filed one page of this, but a 101-page document for the time period that they requested, showing every single person that rented, the money coming in, where it went— paying for electricity, the management fee. I believe the management fee is Beachside. Beachside is a third party; my client doesn't have any interest in it.

**THE COURT:** I don't think he's disputing now that he has the information. He's just saying that based on the information, because whoever the owner is, presumably—

**TIMKO:** Right. But this is also not a voluntary case. And the Bankruptcy Code states that until an order for relief is entered, you can still essentially run your business. I cited it in my papers. I did talk to my client. He did say, and I actually instructed him to hold the money that came in as of September 2nd, when the case was filed. He confirmed to me that he did that. I don't have an account statement, but he did confirm that. So to say that we're not trying to address Main Street's concerns—

**THE COURT:** You probably don't care if they get stay relief, then? You're happy to take it?

**TIMKO:** My only concern with stay relief really is that my client, who's the owner of this, has never filed a bankruptcy. And if it does come to a point where he makes a determination that a bankruptcy makes sense, I'd like to at least have him have that option instead of having this case pending at the same time as the Main Street case. We've had discussions with Main Street to try to resolve this. We even at one point presented them with a buyer for the loan. Unfortunately, I believe that did not close because they couldn't close it because of this bankruptcy case.

**THE COURT:** So what about adequate protection payments? I mean, why—

**TIMKO:** They haven't really been asked for. We actually haven't had that discussion. So, I mean, that's something—

**THE COURT:** Well, either they're getting a trustee or we can let them go back to state court.

**TIMKO:** Of the two, I'd probably take state court because I don't think there's any reason to even have a bankruptcy case. If stay is granted—I mean, the only thing here is the condos.

**THE COURT:** Right. Because even if—okay, so if I grant them stay relief, they go back, they set their motion for hearing on the rent issue, and then you can raise the disputes there. And then in two weeks, we'll have the outcome of the dismissal in any event.

**TIMKO:** And then we can also get back to our negotiations, if that's where the Court is leaning.

**THE COURT:** I don't—because, you know, it has been a while since the case was filed, right. Main Street has been kind of sitting here, mostly silent. They did file their motion and they were

patient, but now it's been set over for a while and they haven't been getting paid anything during this either, and they haven't been able to proceed.

**TIMKO:** I completely acknowledge all of that, Your Honor, and have worked very hard to try to alleviate those issues and balance all of these things.

**THE COURT:** Right. Well, I mean, like I said, because if your client's saying, 'Well, we don't want to be in bankruptcy court anyway,' and this is a fight between the parties on whether it's appropriate to pay them the rents, then why not let it go back? Because are there other creditors that are affected by that? Because if a Chapter 11 trustee is appointed, who's paying for that?

**TIMKO:** Well, that's the thing. And if you go through this, the $240,000—you're still going to have to run the property. So you're still going to have property management fees, still have to pay for electricity, still have to do all that. That $240,000 is actually from July 1st of last year. So it's not spinning off much. And that's one of the problems with the bankruptcy. It's not really spinning off enough for us. It's questionable whether with this level of litigation, it's enough for counsel, let alone a trustee. That is a fair point.

**THE COURT:** So all right. It doesn't sound like you're strenuously opposing the stay relief at this point.

**TIMKO:** I oppose it, Your Honor, but I understand the situation that we're all in, and I understand the situation you're in. My—to me, we're going to hopefully have this dismissed in two weeks, but I also understand that Main Street's in the position it's in and I've done the best that I can. And ultimately, it is what it is. I can't—

**THE COURT:** Okay. So like I said, if I'm granting the motion, they get to go back to state court, they're going to have to set a hearing, which I presume is not going to be a five-minute calendar matter. It's probably going to take three months to get a hearing is my guess, the way state court is so logjammed. So I don't know that much is going to happen as far as Main Street getting the relief. But also, if I was going to appoint a trustee—like I said, don't you have remedies in state court? If you think that the property is not being run properly, you can ask for a receiver there.

**TIMKO:** Main Street has remedies, as do all the other parties.

**THE COURT:** Well, unsecured creditors don't necessarily have that remedy. The secured creditor has a potential—

**TIMKO:** Well, the parties that have participated in these proceedings.

**THE COURT:** Yeah. Okay. All right. So let's hear from other folks that want to be heard.

## Horton Johnson's Position (Leibert) and IMQA/CTO's Position (Costa)

**LEIBERT:** Your Honor, representing Horton Johnson, we've joined asking for a trustee as a creditor because the money is going every month—we don't know where it's getting collected up. It doesn't go to a Homemaker's bank account that we're aware of, and we believe it's collected by Beachside. It goes to Alison Pitkanen, then where—we don't know. We ask for accountings. We don't get anything. Even the directors of the trust ask for accountings. We get nothing. Absolutely nothing.

**LEIBERT:** We don't know how much has been collected, how much has gone to the loans of PE Dixon. We don't know anything. And so every month they just take the money. And where does it go? The creditors get nothing. The trustee of the property pays nothing to the property. He doesn't pay the mortgage. He doesn't pay the insurance on the property. This morning,

Horton Johnson had to pay the insurance because it was let go. The trustee isn't taking care of the properties at all, and the creditors get nothing. We're in the dark about all of it.

**LEIBERT:** We need a trustee to come in and see what's going on with the money and be fair to everybody. If they're right, they'll give them the money. If they're not right, the money will go elsewhere. That's what we want—some relief here. The creditors need some relief because the money's flowing away every month to God knows where.

**THE COURT:** Well, so I'll go back to—isn't there a way to get this information? Like, Mr. Johnson is a party to—right. Because he's a guarantor. So is he not a party to the proceedings?

**LEIBERT:** We have a lawsuit filed. We can't get him served. Crescent Sound—the trustee who's supposed to have a registered agent at his registered agent address from 10 a.m. to 2 p.m.—and he's not there, ever. He's gone. He's in violation of the state statutes to have a registered agent. So we go to his house to serve him. He won't come to the door. We can't get him. If he's saying state court, state court, then have him accept service of the lawsuit.

**THE COURT:** Okay. So you're still—despite Main Street's primary request for stay relief—if I grant that, you're still asking for a trustee.

**LEIBERT:** We want a trustee right now.

**THE COURT:** Okay. But you didn't file your own motion. You just joined in.

**LEIBERT:** We joined in, yeah.

**TIMKO:** Your Honor, with respect to a lot of the things that were just said, they're not 100% accurate. I don't know about the state court litigation. There have been six or seven lawsuits that have been filed and not served. I was just informed of a new lawsuit that's apparently been served against the trustee.

**THE COURT:** I think he's referring to the one that Mr. Johnson—

**TIMKO:** Oh, is that the same one? It's hard to keep track, Your Honor, because there's five or six that I'm aware of. We've never been asked—I've never been asked for an accounting from CTO or IMQA. They've done no discovery. They have not asked me for anything. So I don't know how I'm supposed to respond and provide them with information that was never asked for.

**COSTA:** He says he doesn't represent the trustee. You don't represent Crescent Sound.

**TIMKO:** I represent Homemakers.

**COSTA:** Right. But the trustee, Crescent Sound, has taken all the money.

**TIMKO:** I just confirmed that the money's being held. And furthermore, with respect to the loan agreement, as we went through at the hearing, Mr. Johnson and the obligors of the loan are responsible under the loan agreement for the mortgages, for the taxes, and all of those things.

**THE COURT:** This is not evidence, this is argument.

**TIMKO:** They've followed the agreement that they entered into. And they don't like the agreement that they signed. Again, this is why this is all a state court issue, as will come up in the motion to abstain.

**THE COURT:** All right, Mr. Costa.

**COSTA:** Just to clarify, Your Honor—Mr. Timko referred to IMQA and CTO when responding to Mr. Leibert, but he's confused on the parties. Your Honor, we also join in the motion on behalf of IMQA and CTO. As you heard at the last hearing, Mr. Dixon acknowledged taking every penny that came in from the properties and putting them in his own pocket.

**THE COURT:** When all the money would go to Mr. Luna's client, I mean, it's not like it would go—

**COSTA:** I don't think all of it, Your Honor. It would be adequate protection payments. It would be enough to keep them from getting further behind. That's all he's asking for, in the interim. He shouldn't fall further behind—adequate protection payments or something. But I think it shouldn't go in Mr. Dixon's pocket. These are monies—

**THE COURT:** Right now it's being held, apparently.

**COSTA:** So that's the first we've heard. We don't know that for sure, Your Honor. It's the first we've heard of that. And we've heard different things—that it's been held since September, and now he's saying it's been held since July.

**THE COURT:** Well, what I'm saying is, even if I appointed a trustee, who's paying for it?

**COSTA:** The estate would pay for it. The estate has the money.

**THE COURT:** If all the money is Mr. Luna's cash collateral, he's not agreeing to pay anything as far as I can tell. So where is this trustee going to get paid?

**COSTA:** Your Honor, I think there's sufficient monies to allow for—Your Honor asked if you would accept adequate protection, and he indicated he would not be opposed to that. Through the rents, there's sufficient monies to do both—to pay adequate protection and fund a trustee.

**THE COURT:** Then I'd be in advance requesting a surcharge. Why would I do that? If they're protected—like, we're here to protect unsecured creditors, right? That's what bankruptcy is supposed to do. If the secured creditor has questionable equity in the property, is any of this money going to flow to unsecured? And then if we appoint a trustee and they get counsel, that's another expense. Who's paying for it? If there is money to go to unsecured credit, that's where it's going to go.

**LEIBERT:** If Horton Johnson agrees to pay for the trustee, can we get a trustee?

**THE COURT:** Not necessarily. Because again, who's benefiting here? And second, isn't your client taking the position that there's fewer than 13 creditors? So what are we—

**COSTA:** Well, Your Honor, the point is nobody's benefiting from anything going from the rentals other than Mr. Dixon. He's the only one benefiting right now, to the detriment of everybody involved. Any change is a welcome change. A trustee can implement a means of looking into things. There's allegations of Mr. Dixon having received far in excess of the amounts he ever lent—more than paid him back. There's a lot of stuff for a trustee to look into that we think would benefit the creditors.

**COSTA:** Right now, the status quo benefits only Mr. Dixon. Stay relief benefits only Main Street, at the expense of everybody else. I think in the interest of the estate, a trustee is in the best interest of the estate. And it's interesting to hear Mr. Timko say if you dismiss the case, he wants the right to be able to come back and file bankruptcy if he sees that as expedient. So on the one hand, he's opposed to this bankruptcy case, but he does—

**THE COURT:** I'm not sure that's what he said.

**COSTA:** It is, Your Honor, exactly what he said. He said, 'I don't want to preclude my client, the debtor, from filing bankruptcy.' So it just seems disingenuous for him to complain about this case when in his mind he's thinking, 'If I get rid of these guys and Main Street puts too much pressure on me, we're going to come back into bankruptcy court.' I think that's what Your Honor would see.

**THE COURT:** Okay. Well, again, I don't think that's what Mr. Timko said.

**AMODEO:** Your Honor, we are in favor of the appointment of a trustee, and we would like to see—even if those monies get put into the registry of the Court or something—to prove that those monies do exist and that they're readily accounted for.

## Timko's Bad Faith Argument / Court's Response on Trustee Appointment

**TIMKO:** This is what they've been trying to do all along—file a bad faith bankruptcy case, get a trustee appointed. Now, first of all, we have a motion to dismiss pending that's going to be heard in two weeks. So if you appoint a trustee now—well, first, it's an evidentiary issue as to whether a trustee would even be required. But second, there's a very good chance that this case will be dismissed in two weeks anyway.

**THE COURT:** Well—or if I don't dismiss it and I grant the order for relief, then I would likely be appointing a trustee immediately. If that's what happens—if I don't dismiss it—

**TIMKO:** If you don't dismiss it—

**THE COURT:** I would, is what I'm telling you.

**TIMKO:** Okay. All right. Well, if that occurs, that occurs. I don't think we're going to get past the dismissal hearing. And at that point—

**THE COURT:** Well, I'm saying if I don't dismiss it and I say an order for relief is appropriate, then in all likelihood I'd be appointing a trustee because all of the background stuff—like, you are not able to represent the estate, right?

**TIMKO:** Well, right. So we have counsel in tow to take over for when I leave. Mr. Ainsworth— that was brought up at the last hearing. Mr. Ainsworth is waiting to see where this case goes.

**THE COURT:** That would be a positive.

**TIMKO:** Yeah. Mr. Ainsworth is great, especially in sticky cases. So again, we've been treating this as a serious case. I've been trying to—the idea that we have not tried to be as forthcoming as possible and deal with all these issues as straightforward a manner as possible, including providing information showing where the money is going—'payments to owner'—we're not hiding anything. But we're also trying to protect ourselves in future litigation.

**THE COURT:** I don't think anyone's saying—or if they're saying it—they're just upset about the fact that Mr. Dixon, through whatever the entity is, is the one that appears to be receiving the proceeds.

**TIMKO:** Which they agreed to in the loan agreement.

**THE COURT:** But I also want to point out—one of the issues of bad faith is seeking to take ownership or control of the company, or seeking to throw a company into bankruptcy to try to get a trustee. And at the trial, Mr. Flynn testified—here's my question: 'When you filed this bankruptcy case, you intended to also litigate the ownership of Homemakers itself, correct?' 'If necessary.' 'The point of it was to get it into a bankruptcy, appoint a trustee, and if there were issues of ownership, they could be dealt with in the bankruptcy.'

**TIMKO:** They've been aware of issues of ownership from the beginning because they raised the issues of ownership—because they're trying to get around the Court's prior order.

**THE COURT:** Well, I thought in the most recent papers, they're not fighting that anymore.

**TIMKO:** Well, but they're seeking control. So it's ownership or control. And they both testified that they would also like to—Mr. Johnson testified that he would like to have determined in this case who the appropriate trustee is. So they said, 'Oh no, we're not really talking about

ownership anymore,' but now they're talking about who controls the trust, which is essentially the same thing in this case.

**TIMKO:** 'You also participated in filing the involuntary bankruptcy case to seek a determination as to who's the trustee of the tiered trust, correct?' [Reading testimony] 'At the first bankruptcy—no, you filed this involuntary to have the bankruptcy court make that determination.' 'I was hoping the court would, yes.' 'In fact, recently, you took the position before this court that you are, in fact, the trustee of that trust, didn't you?' 'Yes.'

**TIMKO:** These are all state court issues, Your Honor. Who has control of Homemakers—these are state court issues that will come up in the abstention motion. I have case law that the court should abstain from these issues. But that's what this is really all about.

**TIMKO:** So they're now trying to take a bad faith case where I don't think there's any argument that the first two creditors that appeared before Your Honor can say there's not a disputed debt. There's clearly numerosity issues that you raised. There's not a lot of creditors participating in this case.

**TIMKO:** Mr. Johnson, just this week or last week, decided to change some bids and claim that he's now currently managing Homemakers on Sundays. He changed those. There's also a wild deed that has been filed on certain properties—Tamimi and Carton Trust. The reason they were seeking relief from stay was because they moved properties into Homemakers when they weren't the original mortgagor or owner. It's all just the shell game that they keep running.

**TIMKO:** And that's what they're trying to do—get everything here before this bankruptcy court for an entity that—Main Street has a mortgage, they're claiming a right to the rent that may be disputed amongst the creditors, but I'm not sure it's necessarily disputed with Homemakers. We've merely filed an answer at this point, and a couple of motions got filed. There are tax deed certificates, there are association liens. Although I've been told by them that they're not a creditor, they're seeking to foreclose on other properties.

**TIMKO:** There's really not going to be anything left on the best day for unsecured creditors. And that's another problem with filing a bankruptcy case in the first place. So anyway, that's where we stand.

## Abstention Motion (Doc. 172) and Motion to Disqualify Timko

**THE COURT:** Okay. So then let's talk about your abstention motion. I presume you're going to want to hear it at the same time as the trial, because I raised that when I continued it, saying I want the parties to address abstention.

**TIMKO:** Yes. So with respect to—they filed the motion to disqualify me, which Your Honor already denied on nearly the exact same motion.

**LEIBERT:** Your Honor, we object. What happened in the first case is not what happens in this case. That was a different set of facts. That was dismissed and gone.

**TIMKO:** That was in this case, sir. Earlier in this case, Mr. Amodeo filed almost exactly the same motion as Horton Johnson's, and the Court ruled on it and said that I could continue to represent Homemakers during the dismissal period. And then if the case continued, we would have an issue over Section 327—which again, I've said since the beginning, I was not going to be taking on this debtor's case. I haven't even analyzed 327 with respect to that issue. I have a five-week trial coming up and I couldn't do the case anyway.

**TIMKO:** They're claiming the same thing because I represented creditors in the first case, that I can't represent Homemakers in this case. The other issue was to make a determination as to

who the trustee is of the trust and to remove Crescent Sound, which they've already filed a state court lawsuit on—I don't think we've been served yet, but they did file it.

**TIMKO:** I have case law—Axle Industries and Florida Medical Clinic. They're not exactly the same facts, but both stand for the proposition that ownership and control of an entity is really a state court issue. This also came up during the first case with respect to authority. I also raised abstention in that case because that's what this really is.

**TIMKO:** While there's multiple creditors, they're all interrelated. They're all somehow involved in the project. And it's really a two-party dispute between Mr. Johnson and Crescent Sound as to who the actual trustee of the trust is. They've made multiple attempts to overturn the trust and take it back. I think they've even recorded documents attempting to do that. There's legal arguments about whether the trust became, by defaulting on the loans, whether or not they should be able to take back the collateral, which is how the trust was set up. But those are all state court issues for a state court determination.

**THE COURT:** So all right. My point was, as to your motion regarding abstention—

**TIMKO:** I think we can have that heard on the 27th, Your Honor, at the same time. It's basically the same.

**THE COURT:** Right. Any reason why I shouldn't do that from any of the parties? Okay. So we'll deal with that. So then obviously you also addressed the request to disqualify you and the like. But let me hear from Mr. Leibert, who filed the motion.

**TIMKO:** The abstention motion relates to the disqualification motion as well, Your Honor. To be clear, partially because they're saying they are now the trustee.

## Leibert's Argument: Trust Dissolution and Fraud Allegations

**LEIBERT:** We're not really saying that, Your Honor. We're saying there is no trust at all. I have the trust document here—the Tiered Land Trust Agreement. There's nothing in there that says the directors can't dissolve the trust, and they've dissolved the trust. They did it in March of 2025. They did it again in January of this year. They have the power to dissolve the trust. This whole thing is like Hans Christian Andersen's 'The Emperor's New Clothes.' Somebody needs to stand up and say, 'What's going on?' They shouldn't be here. There's no trust. It's dissolved. Why are they here?

**THE COURT:** But, okay. I don't even know if the motion is appropriate to be heard in this way, as a motion. Is the complaint that you have already filed in state court? But it doesn't make sense to me, at least without reading—I don't know if there's any case law on it—but it doesn't make sense that this trust would be created for the protection of Mr. Dixon's asset or collateral, and then it can just go 'poof' when the people who—

**AMODEO:** Your Honor, please give us a half a day's hearing and we will show you that this is not about a bad business deal. It's about fraud in the inducement. It's about ongoing criminal actions by Alison Pitkanen and Ken Dixon. I have Marty Flynn and Horton Johnson here to testify that they were defrauded—deceived by their own lawyer in conjunction with Ken Dixon, and it's ongoing.

**AMODEO:** And they took—Ken Dixon took two properties out of the trust illegally, just deeded them to himself, so that he has the properties, he has the collections. He's taken back $27 million on an $11 million loan. It's usurious. It's illegal. I would love to have a half a day just to show you why we're here.

## Court's Rulings

**THE COURT:** All right. Maybe I shouldn't have said that. Like I said, the motion is not properly—I don't think it's properly before me as far as the format. You already have that state court paper that raises all the stuff. I don't think this motion is appropriate for me to hear. So, okay, I'm just going to deny that.

**THE COURT:** But okay, so then tell me why Mr. Timko shouldn't be here, even though I've already ruled on a motion in this case.

**AMODEO:** It's a huge conflict of interest, Your Honor. He represents Homemakers, whose interests are 180 degrees opposed to his other client, PE Dixon. PE Dixon is taking all the money when it should be going to Homemakers. The rents are coming in from Homemakers properties to pay Homemakers' debts. Let's have a half-day hearing on the loan agreement and who should be getting the money coming in from Homemakers. It should be going to the mortgages, to the creditors, to the bills. It shouldn't be going to PE Dixon. He's got a conflict of interest in representing both these two sides. The trustee isn't taking care of the trust properties at all. He represents the trust property and the person who's violating it.

**THE COURT:** Okay. But right now there's no order for relief, right? It's not a debtor. He's not a debtor in possession. Admittedly, right. Mr. Timko admits if there is an order for relief, he's not going to be representing the estate. Right?

**AMODEO:** He did say that.

**THE COURT:** Yeah. So for now, why can't he—he already has all the background, and—I'm going to be granting stay relief to Mr. Luna's client, and then they can go to state court and deal with the rents there, at least. Or—we'll probably have the hearing on the motion to dismiss before that happens in any event.

**AMODEO:** Are you telling me this or asking me this?

**THE COURT:** No, I'm telling you.

**AMODEO:** Because that's not what we want. But if you're telling me this, I can't overrule you.

**THE COURT:** So, all right. Mr. Costa, did you want to be heard in connection with—it wasn't your motion. Okay.

**THE COURT:** So I'm going to deny the motion to disqualify Mr. Timko the second time. I'm going to hear the motion to abstain, Document 172—that part that requests the abstention—at the trial that we have coming up in two weeks. April 27th. And then, was there any other requests that were set for today that I need to deal with? No.

**LUNA:** Yes, Judge. I'll circulate the order in a bit.

**THE COURT:** All right. So to Mr. Luna for the order on his motion, and I'll handle the rest.

## Preserving the Record / Closing

**AMODEO:** If Your Honor's prior order to disqualify me is still subject to appeal—that's not final.

**THE COURT:** Oh, you appealed it already?

**AMODEO:** No, but I will. I really didn't want to, but after today, I think I have to. So let me, just for the record, put on the fact that there's a writ of error. The overwhelming amount of authority would suggest that you would rule that you will not abstain. And I will be glad to provide that in a

subsequent brief. I know the clerk won't accept it, but they should at least docket it for the appeal to Judge Antoon.

**AMODEO:** The second part is—

**THE COURT:** Well, the abstention I'm hearing on later.

**AMODEO:** I know. You shouldn't even get there. The second part is—okay, it'll be in the brief. I'm not the counsel, so I'm really not going to speak to that. The other part, though, is the trust doesn't exist as a matter of law. It's void. And this Court should entertain that evidence, and then it should go back all the way to the original case and reverse its order.

**THE COURT:** That's not what's up before me right now anyway.

**AMODEO:** Just because you overturned their objections about the trust existing, I'm going to have to perfect error.

**THE COURT:** Well, the motion was to disqualify. It wasn't a—it wasn't a dec action. The motion to remove Mr. Dixon is basically the dec action that's already filed in state court, from what I can tell. So I don't think that's procedurally appropriate as a motion.

**AMODEO:** Probably not a procedural motion. Again, I didn't file it, Judge. I don't mind helping with the legal stuff, but I'm trying to stay away from being a lawyer after your ruling. But I do have to go ahead and perfect error on both of your denials today.

**THE COURT:** Okay. That's fine. Thank you. All right. Anything else I need to address?

**LEIBERT:** No, thank you, Your Honor.

**THE COURT:** So to Mr. Luna for the order on his motion, and I'll handle the rest. Okay. Court is adjourned. Thank you.

**COURTROOM DEPUTY:** All rise.

# SUMMARY OF RULINGS

## Stay Relief (Main Street Community Bank)

GRANTED. Main Street may return to state court to enforce assignment of rents and pursue pending motions.

## Appointment of Chapter 11 Trustee

DEFERRED. Court declined to appoint a trustee at this time but indicated that if an order for relief is entered at the April 27 hearing (i.e., if the motion to dismiss is denied), the Court would likely appoint a trustee at that time.

## Motion to Disqualify James Timko

DENIED (second time). Court noted Timko has acknowledged he will not continue as estate counsel if an order for relief is entered and that replacement counsel (Mr. Ainsworth) is identified.

## Motion to Remove Dixon / Declare Trust Void

DENIED as not properly before the Court in this procedural format. Court noted the issues are the subject of pending state court litigation.

## Motion to Abstain (Doc. 172)

SET FOR HEARING on April 27, 2026, to be heard at the same time as the trial on the motion to dismiss.

## Preservation of Record

Frank Amodeo stated his intent to appeal the denial of disqualification and to perfect error on both denials entered at this hearing.

E