FILED ORL INTAKE - USBC
13 JUL 2026 PM3:08

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: | Case No. 6:25-bk-05570-GER |
| **HOMEMAKERS REAL ESTATE, LLC,** | Chapter 11 |
| Debtor. | |

/

# DISCLOSURE STATEMENT IN SUPPORT OF THE PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO,
## a Creditor and Party in Interest

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | flahome32801@gmail.com

Dated: July 13, 2026

## 1. INTRODUCTION AND SUMMARY

I file this Disclosure Statement (the "Disclosure Statement") under section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to give holders of claims and interests in the above-captioned case (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), the adequate information they need to make an informed judgment about the Plan of Reorganization (the "Plan") I propose for Homemakers Real Estate, LLC (the "Debtor").

The Plan does three things. The Plan preserves the Debtor's vacation-rental enterprise at the Cape Crossing Resort as a going concern. The Plan recovers for



the Estate the transfers and unlawful interest taken from it. And the Plan delivers a recovery approaching one hundred percent to legitimate creditors.

**A. Who I am, and why I file this Plan.**

Candor about the proponent is part of adequate information, so I begin with myself. I am Frank L. Amodeo. I hold an unsecured claim against the Debtor of $396, and I was one of the petitioning creditors who joined the involuntary petition. My claim is not why I file this Plan. For four years I advised the owners of Tiered Capital, Inc. and its affiliates — my friends, the borrowers — without charge, and I advised the lender too: Kenneth Dixon ("Mr. Dixon") and I met nearly weekly for two years, over dinners at my home, to discuss the state of the Tiered businesses. I watched the events this Disclosure Statement describes as they happened; several of the transactions described below occurred at my dining-room table. IMQA Investments Incorporated, a company owned by members of my family, and CTO Holdings, Inc. also hold claims; each is a Class 9 non-Insider unsecured creditor, and the Plan treats them, and me, exactly as it treats every other non-Insider unsecured creditor.

Creditors weighing my judgment should also know its history. Georgia disbarred me in 1997. In 1999, I was convicted of mail fraud and served my sentence in a federal boot camp. A second conviction, for failure to pay corporate payroll taxes, sent me to federal prison. In 2008, Florida declared me incompetent.

Those facts are public, the parties opposing this Plan repeat them often, and I do not contest them. Read the Plan, verify the numbers against the Schedules and the exhibits, and judge the work on the record. Every figure in this Disclosure Statement carries a verification path.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINDER OF THIS DISCLOSURE STATEMENT, WHICH IS IN TURN QUALIFIED BY THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS NOT DEFINED HEREIN HAVE THE MEANINGS GIVEN IN THE PLAN.

THE INFORMATION HEREIN HAS NOT BEEN SUBJECT TO AUDIT. WHILE EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE ACCURACY, I CANNOT WARRANT THAT THE INFORMATION IS WITHOUT INACCURACY. THIS DISCLOSURE STATEMENT MAY INCLUDE FORWARD-LOOKING STATEMENTS SUBJECT TO RISKS AND UNCERTAINTIES. AS TO CONTESTED MATTERS, ADVERSARY

PROCEEDINGS, AND CAUSES OF ACTION, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BUT IS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

**B. Voting and the Confirmation Hearing.**

The Bankruptcy Code and Rules place claims against, and interests in, the Debtor into Classes. The Plan designates eleven (11) Classes of Claims and Interests. The classification and treatment of each Class are discussed below. If the Plan alters the legal, contractual, or equitable rights of a holder, the Claim or Interest is "Impaired," and the holder is entitled to vote.

THE VOTE OF EACH HOLDER OF AN IMPAIRED CLAIM IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT. THE LAST DAY TO VOTE TO ACCEPT OR REJECT THE PLAN IS _____, 2026, AT 5:00 P.M. (ET). BALLOTS MUST BE RECEIVED BY THE CLERK OF THE U.S. BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, BY THAT TIME.

After the Ballots are tabulated, the Bankruptcy Court will hold a hearing (the "Confirmation Hearing") to consider whether the Plan satisfies the confirmation requirements of section 1129 of the Bankruptcy Code. The Bankruptcy Code



permits confirmation even if not every Impaired Class accepts; confirmation over the objection of an Impaired Class is sometimes called "cramdown." I expressly reserve the right to seek cramdown under section 1129(b).

I URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

## 2. HISTORY AND DESCRIPTION OF THE DEBTOR'S BUSINESS

### A. The Debtor owns the rental heart of the Cape Crossing Resort.

The Debtor, Homemakers Real Estate, LLC, owns and operates a portfolio of vacation-rental units within the Cape Crossing Resort and Marina (the "Resort"), located at 201 Ivory Coral Lane, Merritt Island, Florida 32953. At full build-out the Resort comprises forty-seven (47) townhomes, thirty-six (36) condominiums, a restaurant, two (2) marinas, a clubhouse and pool, and related commercial and intangible property. On October 31, 2020, the Debtor acquired thirty-three (33) of the vacation-rental units by quitclaim deed in lieu of foreclosure; twenty-seven (27) remain — twenty-six (26) units plus one (1) additional unit — together with units to be returned to the Estate through conveyance avoidance. In the Debtor's Schedule A/B filed June 16, 2026, the real property is valued at approximately $11,860,000 (the twenty-six units at $11,300,000 and one further unit at $560,000), and the Debtor scheduled substantial Causes of Action as additional assets.



**B. Four investors built the Resort, and by 2019 an institutional consolidation was within reach.**

Michael McPhillips ("Mr. McPhillips") and Martin Flynn ("Mr. Flynn") conceived the Resort. Lacking the capital to complete it alone, Mr. McPhillips and Mr. Flynn brought in two close associates, Horton Johnson ("Mr. Johnson") and Neil Buchalter ("Mr. Buchalter"), whose capital enabled development to begin in approximately 2015. To finish the project, the developers presold units, entered construction loans, and stacked second, third, and fourth mortgages on individual units. By 2019, with most structures nearing completion, the enterprise involved more than fifty (50) investors, lenders, and owners across more than one hundred fifty (150) transactions, and an institutional lender had tentatively committed to consolidate the debt and fund completion (the "Consolidation").

**C. The pandemic, a bank merger, and a partition starved the enterprise of cash.**

Between December 2020 and January 2021, Mr. McPhillips and Mr. Flynn entered a partition agreement (the "Partition Agreement") to resolve their disputes and disentangle their business arrangements. Mr. McPhillips took the marinas and restaurant; Mr. Flynn took the development entities, including the entity that became the Debtor. The COVID-19 pandemic then slowed construction and sharply increased materials costs, and a bank merger derailed the Consolidation, leaving the enterprise without the cash flow to meet its obligations. In late 2020,

two mortgage-service entities (TACIRA, LLC and DRCIRA, LLC) commenced foreclosure actions, which were resolved after Mr. Johnson purchased the relevant mortgages. In April 2024, Tamamoi, LLC initiated a mortgage-foreclosure action relating to nine (9) residential units.

**D. Mr. Dixon lent $11.225 million; by his own records, he has collected more than $27 million.**

Between January 2022 and September 2023, Mr. Dixon, a retired accountant and self-described hard-money lender acting through PEDixon, LLC, ZPD, LLC, and Parke Financial, Ltd., made eleven loans totaling $11,225,000 to companies and individuals affiliated with the Resort enterprise, including Tiered Capital, Inc. ("Tiered Capital"), Sherwood Construction, Inc., IMQA Investments Incorporated, and Mr. Flynn. Each loan carried interest of 12% or 15%, a 2% origination fee, 1% renewal fees, and provisions for collection costs, due-diligence expenses, and legal fees; on default, the rate rose to the statutory maximum of 25%. I watched most of these loans made: I introduced Mr. Dixon to several of the borrowers, and I negotiated all but two of the eleven.

Attorney Alison Pitkanen ("Ms. Pitkanen") prepared all or most of the loan documents, controlled escrow and disbursement of the loan proceeds through her IOLTA accounts, and — notwithstanding the conflict — represented both the Tiered-affiliated borrowers and the Dixon-related lenders in the same transactions.

On September 13, 2023, the Dixon and Pitkanen interests purported to consolidate the eleven loans through a Tiered Consolidated Loan Agreement and an alleged Tiered Land Trust Agreement, under which the Debtor's ownership was said to be held by the Tiered Land Trust, with Crescent Sound, Ltd. — an entity Mr. Dixon owned and controlled — as trustee.

The borrowers' verified accounting, drawn from Mr. Dixon's own records, shows that Mr. Dixon has since collected more than $27,123,645 in cash, real estate, business interests, and purported forbearance fees against the $11,225,000 lent — an overpayment exceeding $15.8 million. The same records show effective interest rates of 32.33% in 2024 and 29.10% in 2025, each above the 25% ceiling of the Florida criminal-usury statute. *Fla. Stat. § 687.071*. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026) (verified complaint ¶¶ 16–19, 400–420).

**E. A three-page unrecorded deed and a falsely notarized assignment purported to move the Debtor into Mr. Dixon's hands.**

I contend the Tiered Land Trust was never validly formed. In September 2023, Mr. Johnson electronically signed a three-page trustee's deed that was never notarized, never witnessed, contained no legal descriptions, and was never recorded — an instrument unrecordable under Florida law. On February 14, 2024, a "curative" trustee's deed appeared in the Brevard County public records: eight

pages long, bearing witness signatures, twenty-seven legal descriptions, and a notarization that the notary's own records contradict. On January 9, 2024, Ms. Pitkanen presented Mr. Johnson with an Assignment of Membership Units transferring the Debtor's membership interests. The signing happened in my home, and I objected to the first version of the document in the room; after Mr. Johnson signed the revised version, Ms. Pitkanen emailed the executed document to her assistant, Janelle Morea ("Ms. Morea"), who checked "Physically Present" on a notarial certificate for a signing Ms. Morea never attended. The verified complaint identifies more than thirty-four (34) false attestations and notarization irregularities across the Dixon loan documents. Because the trust was never validly formed, ownership of the Debtor remains with, or has reverted to, Mr. Johnson.

That ownership question is already before a court. On February 9, 2026, Mr. Johnson filed a declaratory action in Orange County to settle whether the Tiered Land Trust or Mr. Johnson owns the Debtor's membership units. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026) (the "Declaratory Action"). The Plan accommodates either answer: the Class 11 Interest is held by Mr. Johnson as Trustee of the Tiered Land Trust or, if the trust is determined never to have been validly formed, as the restored owner of the Debtor, and the treatment is identical in either capacity.

**F. For thirty months Mr. Dixon collected the Debtor's rents and paid none of the Debtor's creditors.**

From December 2023 through the entry of the order for relief, the Dixon-related interests controlled the Debtor. Crescent Sound seized the rental operations; the Debtor's revenues were routed through Ms. Pitkanen's IOLTA account and transferred to PEDixon and ZPD — more than $2,800,000 over the period — while, on the present record, the mortgages, ad valorem taxes, association assessments, and maintenance obligations of the Debtor went unpaid. The arithmetic of that diversion is the story of this case: every secured creditor now asserting an arrearage — Jetton, Mainstreet, Tamamoi, Carton, the Brevard County Tax Collector, and both associations — traces its default to revenue Mr. Dixon collected and kept. The foreclosures, the association liens, and the tax delinquencies are not the product of a failed business; the units rented and the money came in. The money simply never reached the creditors it belonged to.

**G. The forged assignment defeated the first bankruptcy case; the second produced an order for relief and a trustee.**

On May 5, 2025, Mr. Johnson, as Manager, filed a voluntary Chapter 11 petition for the Debtor. *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025) (the "First Bankruptcy Case"). The Dixon-affiliated lenders moved to dismiss, relying on the January 9, 2024 Assignment of Membership Units to argue Mr. Johnson lacked authority, and on June 27, 2025

10

the case was dismissed on that ground. Reconsideration was denied on August 26, 2025, but the court identified the paths by which a renewed filing would be authorized.

Two Rule 60 motions remain pending in the First Bankruptcy Case. (Docs. 87, 88.) The motions seek to vacate the June 27, 2025 dismissal — a dismissal procured with the forged Assignment — and to consolidate the two Chapter 11 cases. If the motions are granted, the operative petition date relates back to May 5, 2025, the First Bankruptcy Case's petition date, extending the Estate's avoidance reach-back periods and converting the revenues Mr. Dixon diverted between the dismissal and the order for relief into recoverable post-petition transfers under section 549. The Plan is drafted to capture that benefit without depending on it: the Plan defines a contingent Relation-Back Date of May 5, 2025 for avoidance computations, while every payment obligation — including the adequate-protection stream — runs in all events from the September 2, 2025 petition date. Creditors should understand the pending motions as potential upside to the Recovery Trust, not as a condition of the Plan.

On September 2, 2025 — within a week of that denial — Tiered Capital filed an involuntary Chapter 11 petition commencing this Bankruptcy Case; Mr. Johnson, IMQA Investments Incorporated, CTO Holdings, Inc., and I joined as petitioning creditors. After contested proceedings, the Bankruptcy Court entered

11

the order for relief on May 21, 2026, finding on the record of the May 20 hearing the involuntary filing was made in good faith and that its principal purpose was to prevent the Dixon lenders from capturing a disproportionate share of the Resort. On June 11, 2026, the Bankruptcy Court directed the appointment of Lara Roeske Fernandez as Chapter 11 Trustee. On June 16, 2026, Mr. Johnson filed the Debtor's Schedules and Statement of Financial Affairs. The section 341 meeting of creditors and an election of trustee are set for July 16, 2026. Because exclusivity ended upon the appointment of the Chapter 11 Trustee, I file the Plan as a party in interest under section 1121(c).

**H. A verified tort action now quantifies the scheme.**

On July 9, 2026, Mr. Johnson and Tiered Capital filed a verified complaint in the Circuit Court of the Ninth Judicial Circuit against Mr. Dixon, PEDixon, ZPD, Parke Financial, Ms. Pitkanen, her professional association, and Crescent Sound. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026). The sixteen counts include fraud in the inducement, criminal usury, forgery-based fraud, conversion, civil theft, abuse of process, breach of fiduciary duty, and federal and Florida civil RICO, and allege actual damages of $33,050,155 — $99,150,465 after mandatory trebling — exclusive of fees, interest, and ongoing receipts.

12

I am a witness to the events that complaint describes. The claims it pleads belong to Mr. Johnson and Tiered Capital, not to the Estate, and no creditor should vote in reliance on their outcome. The Estate holds its own claims arising from the same events — the avoidance and turnover claims, the section 549 claims for post-petition transfers, and the usury forfeitures — all of which the Plan places in the Recovery Trust, and the decision whether and how to pursue each recovery rests with the Chapter 11 Trustee, presumably Ms. Fernandez, whom the Plan names as Recovery Trustee. The tort action's significance to this Bankruptcy Case is evidentiary: the same documents, the same false notarizations, and the same diverted revenues that support Mr. Johnson's claims support the Estate's. The record is already assembled, verified, and exhibit-supported; the Estate does not start from zero.

## 3. SUMMARY OF THE PLAN

THE FOLLOWING IS ONLY A SUMMARY. ANY PARTY CONSIDERING A VOTE SHOULD READ THE PLAN IN ITS ENTIRETY. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.

### A. Overview.

The Plan classifies and treats all Claims against, and Interests in, the Debtor in eleven (11) Classes: eight (8) Classes of Secured Claims (Classes 1–8), one (1) Class of non-Insider General Unsecured Claims (Class 9), one (1) Class of Insider

13

Unsecured Claims (Class 10), and one (1) Class of Interests (Class 11). Administrative Claims and Priority Tax Claims are not classified and are treated separately. Each secured creditor receives parallel treatment — adequate-protection payments at 4.8% per annum through the Effective Date, then a 360-month amortization at 6% with a five-year balloon — even though the collateral securing each differs. Non-Insider unsecured creditors are paid in full from litigation recoveries, and ninety percent (90%) of net recoveries are dedicated to unsecured creditors.

The Plan establishes a Recovery Trust that holds all of the Estate's Causes of Action — including the claims for preferences and fraudulent transfers, the section 549 post-petition-transfer claims, the claims against P.E. Dixon and, separately, against Tamamoi, LLC, and the recovery of the one unit lost to foreclosure — administered to conclusion by the Chapter 11 Trustee, Lara Roeske Fernandez, as Recovery Trustee. The Recovery Trust is funded with $250,000 from the $880,000 in post-petition funds to be turned over by P.E. Dixon; the remaining $630,000 funds the Debtor's operations and the adequate-protection payments. The net proceeds of the Recovery Trust flow through the Plan's waterfall to cure secured-creditor defaults and to pay unsecured creditors.

14

## B. Classification and Voting.

| Class | Designation | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| 1 | Jetton Investments, Inc. / Paul Rene, Jr. | Impaired | Yes |
| 2 | Mainstreet Community Bank (Loan One) | Impaired | Yes |
| 3 | Mainstreet Community Bank (Loan Two) | Impaired | Yes |
| 4 | Tamamoi, LLC | Impaired | Yes |
| 5 | Carton Family Trust of 1992 | Impaired | Yes |
| 6 | Brevard County Tax Collector | Impaired | Yes |
| 7 | Cape Crossing Townhome Owners Association | Impaired | Yes |
| 8 | Cape Crossing Condominium Association | Impaired | Yes |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Yes |
| 10 | Insider Unsecured Claims | Impaired | Yes |
| 11 | Interests in the Debtor | Impaired | Yes |

## C. Treatment of Claims and Interests.

The treatment of each Class is summarized below and set forth in full in Article 4 of the Plan. The dollar amounts shown are the amounts asserted by the respective creditors and reflected in the Debtor's Schedules and my claims analysis; they are not admissions, and many Claims are disputed and subject to objection and reduction.

| Class | Claim / Amount | Summary of Treatment |
|-------|----------------|----------------------|
| Admin / Priority | Trustee & professional fees; § 1930 fees; tax claims | Paid in full under § 1129(a)(9); priority tax claims over 5 years; IRS/FDOR claims disputed and may be reduced to zero. |
| 1 — Jetton | $1,634,600.00 (senior mortgage on the land) | Lien retained; 4.8% adequate protection; 360-month amortization at 6%; 5-year |

15

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
|  |  | balloon. Treated as allowed and undersecured. |
| 2 — Mainstreet One | $3,520,717.75 | Common secured treatment; subject to Estate offset for lender conduct. |
| 3 — Mainstreet Two | $694,564.66 | Common secured treatment; subject to Estate offset for lender conduct. |
| 4 — Tamamoi | $3,069,220.83 (9 loans) | Common secured treatment on the Allowed (principal) amount after usury forfeiture of interest under Fla. Stat. §§ 687.03, 687.04. |
| 5 — Carton | $376,757.47 (1 loan) | Same terms as Tamamoi; usury forfeiture of interest; common secured treatment on the Allowed amount. |
| 6 — Brevard County Tax | $303,421.77 | Paid in full with statutory interest from recoveries; assessments contested as 25–30% over fair market value. |
| 7 — Townhome Assoc. | $118,731.84 | Full Allowed Claim paid from recoveries; subject to Estate negligence/waste claims (up to $125,000/unit). |
| 8 — Condominium Assoc. | $445,810.10 | Common secured treatment; subject to Estate negligence/waste claims. |
| 9 — Unsecured (Non-Insider) | Under $1,000,000 aggregate | 100% of Allowed Claims, no interest, from recoveries; in any event paid in full within 5 years. 90% of net recoveries dedicated to unsecured creditors. |
| 10 — Insider Unsecured | Johnson claims (~$4.43M) | Paid only after Classes 1–9 satisfied and $1,000,000 improvement reserve funded; then pro rata in remaining recoveries. |
| 11 — Interests | Tiered Land Trust / Johnson | Interest retained subject to governance in Plan Article 6; no distribution on the Interest until senior Classes satisfied. |

The Debtor scheduled the secured claims of P.E. Dixon (KAE) and ZPD, LLC at $0.00 and marked each disputed, contingent, and unliquidated. I contend the Dixon-related claims are unenforceable as usurious — the Florida criminal-

usury statute makes an extension of credit at more than 25% an unenforceable debt in the courts of this State. *Fla. Stat. § 687.071(7).* I further contend that the Debtor never borrowed from, and signed no enforceable guaranty in favor of, the Dixon parties, and that the Dixon-related debt was in any event satisfied by December 2023. The Estate accordingly treats P.E. Dixon as a source of recovery, not a creditor.

## D. The Recovery Trust's Causes of Action, itemized.

The Recovery Trust holds every Cause of Action of the Estate. The identified recoveries, each with its verification path, are these. First, the turnover of the $880,000 in post-petition rents that P.E. Dixon and Crescent Sound collected and hold in a separate account — the Dixon Turnover Funds — applied as Section 6.4 of the Plan provides. Second, preferential transfers to the Dixon lenders of approximately $1,400,000; a forensic accounting now underway will fix the precise amount, and the Recovery Trustee will prosecute the claims it supports. Third, the $1,166,008.69 in interest the Debtor paid to Tamamoi, LLC, forfeited under the Florida usury statutes and recoverable from Tamamoi or credited against principal, together with the corresponding $129,556.52 paid to the Carton Family Trust. *Fla. Stat. §§ 687.03, 687.04.* Fourth, the recovery of at least one unit fraudulently conveyed out of the Estate; net of the liens against it, its return adds a minimum of $183,000 in equity, and more likely $250,000 to $300,000. Fifth, the

17

Estate's tort and contract claims against various parties, described in Section 2, which remain unquantified; whatever they produce flows through the same waterfall. Together the itemized recoveries total at least approximately $3,758,000, exclusive of the unquantified claims. The decision whether and how to pursue each rests with the Recovery Trustee.

**E. Governance proceeds in three stages: the Trustee now, Mr. Johnson at exit, the builders upon combination.**

Governance under the Plan is staged, and no stage returns the Debtor to the hands that emptied it. While the case proceeds to conclusion, the Debtor remains under the direction and control of the Chapter 11 Trustee, and the Plan proposes the appointment of a committee of unsecured creditors under section 1102 to monitor operational performance and assist Ms. Fernandez. On the Effective Date, ownership of the Reorganized Debtor rests with Mr. Johnson — in whichever capacity the Declaratory Action determines — and Mr. Johnson will oversee a professional management company engaged to run the resort day to day and will be responsible for effectuating the Plan. I propose to engage Ross Johnston as a monitor reporting to the unsecured creditors committee. This should allow for a smooth transition out of the reorganization with Mr. Johnson as the managing member after the consummation of the plan. Ms. Fernandez continues as Recovery Trustee, administering the Recovery Trust to its conclusion with authority to retain

18

professionals and to settle or abandon claims, subject to such Bankruptcy Court approval as may be required. The Class 11 Interest holder retains the Interest subject to this structure and receives nothing on account of it until every senior Class is satisfied.

## 4. CONFIRMATION OF THE PLAN

### A. The Plan satisfies the best-interests test because liquidation pays unsecured creditors nothing.

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either accept the Plan or receive at least as much as it would in a Chapter 7 liquidation. In a hypothetical Chapter 7, a trustee would sell the Debtor's units (scheduled at approximately $11,860,000, and supported by a broker's opinion of value in the range of $483,000 to $486,000 per unit) at distressed, forced-sale prices. After satisfaction of the senior Jetton mortgage (which encumbers the underlying land by metes and bounds and is recorded ahead of the Mainstreet, Tamamoi, and Carton interests), the secured claims of Mainstreet, Tamamoi, and Carton, the ad valorem taxes, and the costs and commissions of a trustee's sale, little or nothing would remain for unsecured creditors. A Chapter 7 trustee would also be far less able than the reorganized enterprise to fund and prosecute the Estate's Causes of Action. The Plan, by contrast, pays non-Insider unsecured creditors in full, preserves and prosecutes the

19

Causes of Action, and positions the Resort for a going-concern realization. The Plan therefore satisfies the best-interests test.

The following table compares the estimated recoveries under the Plan and under a hypothetical Chapter 7 liquidation:

| Constituency | Estimated Chapter 7 Recovery | Estimated Plan Recovery |
|---|---|---|
| Secured creditors (Classes 1–8) | Partial; senior liens paid first from forced-sale value of ~$13–16.2M | Paid over time at 6% with 5-year balloon; arrearages cured from recoveries |
| Non-Insider unsecured (Class 9) | Little to none after senior liens and sale costs | 100% of Allowed Claims |
| Insider unsecured (Class 10) | None | Pro rata from remaining recoveries after senior Classes |
| Interests (Class 11) | None | Retained, subject to governance and senior satisfaction |

## B. The Plan is feasible; the rents that funded Mr. Dixon now fund the creditors.

Section 1129(a)(11) requires that confirmation is not likely to be followed by liquidation or further reorganization, except as proposed in the Plan. The feasibility case rests on a simple substitution: the rental stream that produced more than $2.8 million for Mr. Dixon during the control period is redirected to operations and debt service. The Debtor's twenty-seven units are projected to generate rental income of approximately $1,631,000 over the fifteen-month projection period of April 2027 through June 2028 (the "Projection Period"), an

20

average of roughly $109,000 per month, which, in most months, meets operating expenses and the adequate-protection and amortized debt-service payments the Plan contemplates.

The Debtor's proforma reflects a seasonal liquidity trough and a working-capital need of approximately $248,000 over the Projection Period. The Plan bridges that need, and funds the cure of arrearages and the payment of unsecured creditors, principally through the net proceeds of the Recovery Trust's Causes of Action (itemized in Section 3.D; identified recoveries of at-least approximately $3,758,000, exclusive of the larger tort and RICO claims). Of the $880,000 in post-petition funds to be turned over by P.E. Dixon, $250,000 funds the Recovery Trust and the remaining $630,000 is applied to the Debtor's operations and to adequate-protection payments to the secured creditors. The five-year balloon obligations are expected to be satisfied through a refinancing supported by a seasoned operating history, or through a going-concern sale of the consolidated Resort at fair market value, estimated at $90,000,000 to $100,000,000. On these bases, the Plan is feasible.

## C. Acceptance; Cramdown.

An Impaired Class of Claims accepts the Plan if holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in that Class that vote, vote to accept. If any Impaired Class does not accept, I will request

21

confirmation under section 1129(b), which permits confirmation so long as the Plan does not discriminate unfairly and is fair and equitable as to each non-accepting Impaired Class.

## 5. RISK FACTORS

Holders should weigh the following risks in deciding how to vote. First, the Plan's funding of arrearage cure and unsecured distributions depends substantially on recoveries from the Causes of Action, the timing and amount of which are uncertain and subject to litigation risk. Second, several Claims are disputed; the outcome of claim objections (including the usury challenges to the Tamamoi, Carton, and Dixon claims) will affect distributions. Third, the five-year exit depends on the availability of refinancing or a going-concern sale on acceptable terms, which is subject to market and interest-rate conditions. Fourth, the vacation-rental business is seasonal, creating periodic liquidity stress, and the projections assume the bridging of a working-capital gap. Fifth, the consolidation strategy contemplates the acquisition of Canaveral Crossroads, LLC and cooperation with the McPhillips interests, neither of which is assured. Sixth, I am a pro se proponent with the history disclosed in Section 1.A; creditors who discount my judgment should weigh the Plan's arithmetic, which does not depend on it. I believe the value the Plan preserves outweighs these risks relative to a liquidation.

## 6. ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, the alternatives are (a) confirmation of a different plan, (b) conversion of the case to Chapter 7, or (c) a going-concern sale under section 363. For the reasons set forth in the liquidation analysis, a Chapter 7 liquidation would yield materially lower recoveries to creditors than the Plan, particularly for unsecured creditors, and would impair the prosecution of the Estate's Causes of Action.

## 7. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The federal income tax consequences of the Plan are complex and may vary among holders. This Disclosure Statement does not constitute tax advice. Each holder is urged to consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

## 8. RECOMMENDATION

The Plan pays legitimate creditors in full or nearly so, preserves the Cape Crossing Resort as a going concern, and converts the architects of the Debtor's insolvency from its controllers into its funding source. No alternative before the Bankruptcy Court does any of the three. The arithmetic, not the advocate, makes the case. Vote to accept the Plan.

Respectfully submitted this 13th day of July, 2026.

23

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32801@gmail.com
*Plan Proponent, pro se*

Proposed

## CERTIFICATE OF SERVICE

I certify that on July 13, 2026, a true and correct copy of this motion was furnished by U.S. Mail and, where available, by electronic mail to the Chapter 11 Trustee, the United States Trustee, and the parties on the attached service list.

Frank L. Amodeo