FILED USBC INTAKE - USBC
17 AUG 2026 PM2:16

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

In re:

| | |
|---|---|
| HOMEMAKERS REAL ESTATE, LLC, | Case No. 6:25-bk-05570-GER<br>Chapter 11 |

Debtor.

_______________________________/

## FRANK L. AMODEO'S SUPPLEMENT TO THE MOTION TO DISQUALIFY PEDIXON AND ZPD FOR WANT OF SUBJECT-MATTER JURISDICTION, ADDRESSING THE HOLLY BLUFF CLOSING

Dixon's attorney's closing reconciliation reveals that the Holly Bluff acquisition loan violates Florida usury laws. The document carries the title *Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation*, it bears the date August 1, 2023, it names Pedixon LLC as Lender, Tiered Capital, Inc. as Borrower, and A Marine, Inc. as Buyer, and it states the purpose of the transaction as the Holly Bluff stock purchase. (Ex. 1). Every figure in the sections that follow is Dixon's attorney's figure. I added nothing, and I altered nothing.[1]

Doc. 242 asked whether this court holds the power to enforce the PEDixon and ZPD claims. That question turns on a rate, and a rate turns on two numbers and

[1] The reconciliation foots exactly as printed: total incoming monies $3,105,288.55, total outgoing funds $3,103,657.04, and a closing balance of $1,631.51. I checked each column against its stated total before relying on any line.

timing — what the lender put in, and what the lender took out, and when each occurred. The calculation now rests on PEDixon's own settlement arithmetic, PEDixon's own loan schedule, and a deed PEDixon recorded in its own name.

**PEDixon advanced $2,754,031.59 against a $3,000,000 obligation, and the $245,968.41 difference was interest before the ink dried.**

The reconciliation (Ex. 1) lists eight sources of incoming money totaling $3,105,288.55. Three of the eight are Dixon entries: "dixon show money" at $1,754,031.59, "dixon" at $500,000.00, and "dixon cd" at $500,000.00. Those three total $2,754,031.59. The other five — a 2022 overage held in trust, the Austin, Cherry and Amelia draws, and an entry marked "alison" — total $351,256.96, and not one of them is a Dixon entity. PEDixon nonetheless charged Tiered Capital as though PEDixon had lent $3,000,000. The difference is $245,968.41.

Florida law has a name for that difference — interest. A discount from loan amount is added to the stated interest and to origination fees when usury is determined. The usury statute makes it unlawful to reserve, charge, or take, "by any contract, contrivance, or device whatever," a sum "greater than the actual principal sum received, together with interest at the rate of the equivalent of 18 percent per annum simple interest." *Fla. Stat. § 687.03(1).* On a loan of this size the same subsection substitutes the section 687.071 rate for the eighteen percent

figure, so only the number changes (25%); the device language governs either way. The Fifth District states the operative test.[2]

> Courts look to the substance of the transaction to determine whether a transaction is usurious. That is, a finding of usury depends on the intent and understanding of the parties. A key issue is the liability of the borrower under the contract's terms, or what may be demanded of a borrower, rather than what is demanded of him.

*Oregrund Ltd. P'ship v. Sheive*, 873 So. 2d 451, 457 (Fla. 5th DCA 2004) (citations omitted); accord *In re Boling*, 2008 WL 5100204, at *6–*7 (Bankr. M.D. Fla. July 24, 2008).

The August 1, 2023 reconciliation disburses $93,750.00 as "Lender fees," and the same instrument names PEDixon as the Lender (Ex. 1). A fee a lender takes out of the borrower's closing proceeds does not reduce the loan. It is a sum the borrower must repay and never received. Once more it is, by any measure, interest. A bankruptcy court in this division said as much of a charge dressed in other clothing: "Notwithstanding whether an amount charged in connection with a loan is labeled as interest or as something else, if the total amount exceeds the amount of interest permitted by law, a transaction possibly is usurious." *In re Boling*, 2008 WL 5100204, at *7. The same passage collects the rule that a bonus exacted in connection with financing may be regarded as interest, and that "[o]ne

[2] The eighteen percent ceiling governs a loan of $500,000 or less. Six of the eleven Dixon-lender loans fall below that line. The remaining five, including the Holly Bluff loan, are governed instead by Fla. Stat. § 687.03(1), which for a loan exceeding $500,000 incorporates the rate prescribed in Fla. Stat. § 687.071 — the lowest of which is twenty-five percent per annum. Fla. Stat. § 687.03(3)(b) and (c) further provide that a loan which may reasonably be expected to exceed $500,000 during its term, or which exceeds $500,000 at any time, is treated as exceeding that sum.

does not have to specifically charge interest for there to be usury." *Id.* Succinctly, PEDixon lent Tiered $2,754,031.59 (on $3,000,000), charged Tiered immediate "interest" of $93,750, then also charged it 15% interest per year (Ex. 4).[3]

**On the same day PEDixon funded the loan, PEDixon took the company's most valuable asset, and what PEDixon took exceeded every dollar PEDixon advanced.**

On July 20, 2023, Holly Bluff Marina, Inc. conveyed to PEDIXON LLC by quit claim deed 7.24 acres of St. Johns riverfront land on the Beresford Peninsula. The deed recites that it was made "this 20th day of July 2023 A.D." The Volusia County clerk recorded it on February 23, 2024, as Instrument No. 2024035593, in Official Records Book 8521 at Pages 2618 through 2619. The instrument already sits in this record. (Ex. 3; Doc. 48-3 at 16–19).[4]

The reconciliation puts the funding on the same day. The money moved and the land moved in one motion. A Florida deed operates on delivery, and the seven-month wait before recording did not postpone the conveyance as between PEDixon and its grantor.

An appraisal in this record values the real estate with one of the two Holly Bluff businesses at $4,210,000 going-concern value, and allocates $3,760,000 to

[3] I rest on what the instrument shows — a disbursement captioned "Lender fees" in a reconciliation that identifies PEDixon as the Lender. I do not assert the identity of the payee beyond that, and the point does not depend on it: whoever received the $93,750.00, Tiered Capital never did.

[4] County sales data records the date of sale as July 20, 2023.

real estate, $160,000 to furniture, fixtures and equipment, and $290,000 to goodwill. (Ex. 6). On July 20, 2023, a deed conveys the real estate to PEDixon. Measured against the $2,754,031.59 PEDixon advanced, the land PEDixon took exceeded the advance by $1,005,968.41. PEDixon closed the day ahead. PEDixon had property worth more than the cash it had "lent" and it had a $3,000,000, 15% "demand note" from Tiered to boot.[5]

**Because PEDixon was paid in full at closing, every charge after July 20, 2023 was interest on a principal that no longer existed.**

Interest is the price of the use of money. Where the lender recovers more than the lender advanced, on the day the lender advanced it, the lender has no money in use and no principal at risk. A charge levied against no principal is not interest at a high rate. It is a charge for which the arithmetic supplies no rate at all, because the denominator has gone to zero. The statute asks whether the charge exceeds twenty-five percent of the sum outstanding, and every positive number exceeds twenty-five percent of nothing.

[5] Two businesses were operating; the marina business, and Wee Bee Rentals, which owned and rented six boats at the marina. I count only the $3,760,000 the deed conveyed and leave the $450,000 going-concern premium of Holly Bluff Marina, Inc. and the $600,000 operating value of Wee Bee Rentals (i.e., the houseboats) out of the calculation.

**The September 2023 consolidation did not purge the usury; it restated the fictitious principal and carried the taint forward.**

In September 2023, a purported loan consolidation accompanied the alleged formation of the Tiered Land Trust.[6] The consolidation carried the Holly Bluff obligation forward at $3,000,000, as though PEDixon had advanced that sum and as though nothing had come back. Both premises were false when the papers were signed. PEDixon had advanced $2,754,031.59, and PEDixon had received a deed to land worth more than that. The Tiered Land Trust transaction was meant to conceal and consummate both deceptions: the transfer of the real estate to PEDixon, and the underfunding of the PEDixon loan. The reconciliation came from Dixon's own counsel, PEDixon took the deed, and PEDixon prepared the schedules from which the billings ran (Ex. 4), and a lender that consciously makes charges resulting in usury has the corrupt intent Florida requires. *Rollins v. Odom*, 519 So. 2d 652, 657–58 (Fla. 1st DCA 1988).[7] The same court forecloses the maneuver attempted here: "The usurious character of a transaction is established at its inception, and the taint of usury follows through and becomes a part of any new

---

[6] The so-called Tiered Land Trust supposedly consolidated eleven outstanding loans, which brought the taint of the Holly Bluff usury to all of them. By January 2024 PEDixon was paid in full. The debtor's schedules list the PEDixon and ZPD claims as disputed at $0, "Paid in Full Since December 2023."

[7] Usury has four elements: a loan, an understanding that the money is to be repaid, an agreement to pay a rate greater than the law allows, and a corrupt intent to take more than the legal rate. *Oregrund*, 873 So. 2d at 456–57; *In re Boling*, 2008 WL 5100204, at *6; *Stein v. Lavay (In re Omni Capital Group, Ltd.)*, 157 B.R. 712, 717 (Bankr. S.D. Fla. 1993); *Antonelli v. Neumann*, 537 So. 2d 1027, 1028 (Fla. 3d DCA 1988) (citing *Rollins*); *Beausejour Corp. v. Offshore Development Co. (In re Offshore Development Corp.)*, 37 B.R. 96, 101 (Bankr. M.D. Fla. 1984), *aff'd*, 802 F.2d 1319 (11th Cir. 1986).

or substituted contract." *Id.* at 658. The single exit is narrow and PEDixon did not take it — only if every element of usury is abandoned in a new agreement, and the borrower voluntarily agrees to carry out the new agreement, will the new contract be enforceable. *Id.*; *Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d 1, 3 (Fla. 1971). Purging requires the lender to remit the excess and retain only what the law allows. PEDixon remitted nothing. PEDixon restated the principal as purported rather than as actual.

Timing shows the concealment.[8] PEDixon took delivery of the Holly Bluff deed on July 20, 2023. On September 14, 2023, control of the transferring companies passed to the purported land trust and its purported trustee, Crescent Sound, Ltd., whose principal is Kenneth G. Dixon — the same person who signed for PEDixon. The deed then sat unrecorded through the September 2023 consolidation, through the balance of that year, and into the next. The recording clerk stamped the quitclaim deed on February 23, 2024 — seven months after delivery and five months after the consolidation restated the Holly Bluff principal at $3,000,000. A conveyance that never reached the public record could not

[8] Further evidencing the concealing nature of this transaction, as a practical matter, the parties informed me of the transaction, in great part since many key decisions were made by Ken Dixon and me at regular (nearly weekly) dinners. It is telling that instead of an escrow agreement that was mentioned to me, Mr. Dixon simply had the property transferred. The purposefulness of the plan is established and augmented by the suspicious behavior: Mr. Dixon and Ms. Pitkanen recorded the Holly Bluff deed and (apparently) attempted to record the Hampton deed without my knowledge or notice to me.

contradict a schedule that pretended the loan was outstanding. The consolidation did not cure the July 2023 usury. It papered over the event that created it.[9]

**Under any set of verifiable facts, the effective rate of interest exceeds 25% from inception, and throughout, a violation that renders this court without authority to enforce the transactions.**

On November 17, 2023, any doubt as to the usurious nature of the aggregated loan evaporates with the River Fly-In closing proceeds of $2,603,595, taken in at the closing and disbursed in full by the closing attorney — loan payoffs, interest, an extension fee, the PEDixon interest reserve, and $2,000,000 into the trust account of Alison Pitkanen. Dixon's counsel held that $2,000,000 in trust for the benefit of PEDixon, and those funds never left that trust except in transfers to PEDixon or an affiliate. Crediting that $2,603,595 in full to principal on the day it was received, and giving the Holly Bluff deed no credit whatsoever, the loan remains usurious. Usury is fixed at inception, and the section 687.03(3) computation there yields an effective rate of 82.94 percent if the demand loan is measured over two months, 42.18 percent if measured to the December 2023 declaration of default, and 26.32 percent even if it is stretched to a full year (Ex. 2).

[9] The recording date is verified against the recorded image and the Volusia County Property Appraiser parcel record for Alt Key 2076887, which shows PEDIXON LLC in fee simple by a July 20, 2023 quit claim deed. Both pages are already before this court at Doc. 48-3 at 16–19. I do not ask this court to infer a motive from the delay. I point out the delay in recording is what made the restated principal possible. Florida courts look through arrangements of this kind: "the concealment of the needle of usury in a haystack of subterfuge will not avail to prevent its pricking the body of the law into action." *Kay v. Amendola*, 129 So. 2d 170, 173 (Fla. 2d DCA 1961); accord *Pinchuck v. Canzoneri*, 920 So. 2d 713, 715–16 (Fla. 4th DCA 2006).

After this loan modification or reduction in principal, every valuation scenario produces a figure that exceeds twenty-five percent. That is, every valuation violates section 687.071 and animates section 687.071(7).

Put differently, subsection (7) attaches to a violation of any provision of the section, and subsection (2) is violated on every set of assumptions once the River Fly In ($2,603,595 received November 17, 2023) funds are credited. Fla. Stat. § 687.071(2). Subsection (2) reaches the willful and knowing charge or receipt of interest above twenty-five percent, *Jersey Palm-Gross, Inc. v. Paper*, 658 So. 2d 531, 534 (Fla. 1995), and PEDixon charged from documents its own side produced.

Any violation of section 687.071 renders the extension of credit (Dixon loans) unenforceable. *Fla. Stat. § 687.071(7)*; *Oregrund*, 873 So. 2d at 455–57, 459 (explaining that "for loans exceeding $500,000 the operative statute is section 687.071," which reaches loans with "effective interest rates of 25% or more," and that "when a usurious contract is renewed by a new or substituted contract, usury follows and becomes a part of the second contract").

A bankruptcy court in this division described the consequence of violating section 687.071: loans above the statutory ceilings "are unenforceable in Florida courts," and "[t]he lender can recover neither interest nor principal on the loan, regardless of whether the loans are prosecuted criminally." *In re Boling*, 2008 WL

5100204, at *6. That court added the point that matters where a trustee has been appointed: "No one, not even the Chapter 7 trustee, could step into Green's shoes to collect principle or interest on this loan." *Id.* at *9. This removes the entire class of claims from this court's jurisdiction. Should this court nonetheless reach the claims, they are unenforceable against the debtor under applicable law and must be disallowed. *11 U.S.C. § 502(b)(1)*; *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992); cf. *Bay United Holdings, LLC v. INXS 7, LLC (In re Aegis Asset Management, LLC)*, No. 25-10331, 2026 WL 2131679 (11th Cir. July 24, 2026) (Tjoflat, J.).

**Section 687.071(7) withdrew the power to enforce, and nothing in this supplement changes the order of decision.**

The Florida Legislature removed a class of obligation from the reach of every court of this state.

> No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state.

*Fla. Stat. § 687.071(7)*.

A court asked to enforce such a debt is not asked to decide a close question on the merits. It is asked to exercise a power the Legislature withheld, and the answer to that question must come first. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). The consequence of a lender violating section 687.071 is the forfeiture of the entire principal, debt, and interest. *Jersey*

*Palm-Gross*, 658 So. 2d at 534; *In re Omni Capital Group, Ltd.*, 157 B.R. at 717 (a loan that reaches criminal usury under section 687.071 is unenforceable in its entirety, and the borrower may seek forfeiture of "any and all principal and interest actually paid"). The usurious character of the transaction fixed at its inception on July 20, 2023, and it fixed there whatever the parties wrote in September. That character requires disallowance in this court and every court. *Oregrund*, 873 So. 2d at 458–59.

This supplement adds facts that the funds attributable to the Dixon-lender were less than the amount charged, incorporated into the proof of claim. It does not reorder the questions. Doc. 242 remains the jurisdictional motion, and the claim-allowance consequence remains second in sequence but identical in result. What the reconciliation and the loan schedule supply is the one thing the July 14, 2026 colloquy identified as decisive: the arithmetic. Math is math.[10] On PEDixon's own numbers the rate charged exceeds twenty-five percent on every assumption in this record. More outrageously, after July 20, 2023 the interest was charged against a principal balance that closing had already extinguished, for which the arithmetic

[10] MR. AINSWORTH, for the Dixon parties: "In any event, I think that both sides are gearing up to get some experts. And I think that this will shed light. There's going to be some other experts because you need to have the disposition of collateral valuation. So there's going to be some real estate experts. But, you know, this should be – my guess is when we go comply – look at the reports, I mean, math is math. So it should be – it will either be usurious or it will not. It will either be repaid or it will not. This is not the type of stuff that I think most people will actually be fighting about." (Ex. 5, July 14, 2026 Hearing Tr. at 34:21–35:8).

supplies no rate at all. Quite literally, PEDixon received money for nothing, chattel for free.

**RELIEF REQUESTED.**

I ask this court to examine the written evidence and the public record without further hearing and find that the Dixon loans violate *Fla. Stat. § 687.071*, and therefore they cannot sustain claims within this court, based on PEDixon's own documents, which should not be in dispute because PEDixon and its counsel made them, and to consider my verification below together with the exhibits identified here and the matters of which judicial notice may be taken. Specifically, I ask this court to find that the Holly Bluff extension of credit violated *Fla. Stat. § 687.071(2)* at its inception; that the September 2023 consolidation abandoned no element of the usury and purged nothing; and that *Fla. Stat. § 687.071(7)* removes the PEDixon and ZPD claims from this court's power to enforce.

In the alternative, I ask that Claims 67 and 68 be disallowed as unenforceable obligations under Florida law and *11 U.S.C. § 502(b)(1)*.

Finally, I would seek an evidentiary hearing to develop a proper record for review; and such other and further relief as the court deems appropriate or fair.

**VERIFICATION**

The factual statements in this supplement are true and correct, and the figures stated here are taken from the documents identified as exhibits without alteration. I declare under penalty of perjury that the foregoing is true and correct. Executed on August 17, 2026.

Respectfully submitted this 17th day of August, 2026.

______________________________

Frank L. Amodeo
*Pro se*
1311 Hoffner Avenue
Orlando, FL 32809
(407) 406-1315
flahome32809@gmail.com

# EXHIBITS

**Exhibit 1.** Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation, August 1, 2023 (Pedixon LLC, Lender; Tiered Capital, Inc., Borrower; A Marine, Inc., Buyer; Holly Bluff stock purchase).

**Exhibit 2.** Effective interest rate computation on the Holly Bluff loan under *Fla. Stat. § 687.03(3)*, assigning no value to the real estate, showing the $339,718.41 advance against the $3,000,000 face amount and the resulting rate on a two-month, a five-month, and a one-year term.

**Exhibit 3.** Quit Claim Deed, Holly Bluff Marina, Inc. to PEDIXON LLC, made July 20, 2023, recorded February 23, 2024, Instrument No. 2024035593, Official Records Book 8521, Pages 2618–2619, Volusia County (also at Doc. 48-3 at 16–19).

**Exhibit 4.** PEDixon loan schedule (DX 250603 Dixon Account), as updated May 14, 2025, stating the Holly Bluff rate of fifteen percent.

**Exhibit 5.** Transcript of the July 14, 2026 hearing before the Honorable Grace E. Robson, Case Nos. 6:25-bk-05570-GER and 6:25-bk-02685-GER.

**Exhibit 6.** Excerpts from the appraisal of the Holly Bluff property by Jack E. Mounteer, State-Certified General Real Estate Appraiser RZ2294, InQuest Valuation, effective April 21, 2023, prepared for Mainstreet Community Bank of Florida, allocating $3,760,000 to real estate, $160,000 to furniture, fixtures and equipment, and $290,000 to goodwill within a $4,210,000 going-concern value. The complete 505-page appraisal will be furnished on request.

**CERTIFICATE OF SERVICE**

I certify that on the 17th day of August, 2026, I filed this supplement with the clerk of the court, and that the clerk's CM/ECF entry serves a copy on all counsel and parties registered to receive electronic notice in this case.

______________________________
Frank L. Amodeo

# EXHIBIT 1

Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation, August 1, 2023 (Pedixon LLC, Lender; Tiered Capital, Inc., Borrower; A Marine, Inc., Buyer; Holly Bluff stock purchase).

**Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation**

August 1, 2023

Lender: Pedixon LLC
Buyer: A Marine, Inc.
Borrower: Tiered Capital, Inc.
Purpose: Holly Bluff Stock Purchase

**Credits to Borrower - Applied to Purchase Price**

| | | |
|---|---|---|
| Deposit | 50,000.00 | |
| Closing Prorations | 100,000.00 | |
| Real estate tax pro-ration | 11,150.60 | |
| Wells Fargo LOC | 35,000.00 | |
| Wee Bee Boat Loan | 33,516.40 | |
| **TOTAL BORROWER CREDITS** | | **229,667.00** |

**Incoming Monies**

| | | | |
|---|---|---|---|
| dixon show money | 1,754,031.59 | | |
| 2022 overage held in ap trust | 25,000.00 | | |
| austin draw | 59,103.70 | | |
| cherry draw | 207,153.26 | | |
| dixon | 500,000.00 | | |
| alison | 20,000.00 | | |
| amelia draw | 40,000.00 | | |
| dixon cd | 500,000.00 | | |
| | | **TOTAL INCOMING MONIES** | **3,105,288.55** |

**Outgoing Funds:**

| | | | | | | |
|---|---|---|---|---|---|---|
| cleared | 7/20 | Seller Proceeds | 1,679,111.45 | | | |
| cleared | 7/25 | Lender fees | 93,750.00 | | | |
| cleared | 7/25 | Broker - Baumgartner | 64,000.00 | | | |
| cleared | 7/25 | Mainstreet Payoff 8109 | 552,638.09 | ($73 short) | | |
| PENDING | 8/1 | SBA Payoff 7002 | 336,988.00 | | | |
| PENDING | | SBA Payoff 5002 | 338,000.00 | | | |
| PENDING | | Volusia County title fees | 31,164.50 | | | |
| PENDING | | South Carolina title fees | 7,710.00 | | | |
| PENDING | | Westside Title | 295.00 | | | |
| | | | | | **TOTAL OUTGOING FUNDS** | **3,103,657.04** |

**BALANCE** **1,631.51**

Balance held in trust until all disbursements made, funds cleared & overage/shortage of payoffs accounted for

# EXHIBIT 2

Effective interest rate computation on the Holly Bluff loan under Fla. Stat. § 687.03(3), assigning no value to the real estate, showing the $339,718.41 advance against the $3,000,000 face amount and the resulting rate on a two-month, a five-month, and a one-year term.

# EXHIBIT 2
## EFFECTIVE RATE OF INTEREST — HOLLY BLUFF EXTENSION OF CREDIT
## Computed under Fla. Stat. § 687.03(3)

Sources. Exhibit 1 (Loan Closing and Stock Purchase Incoming/Outgoing Reconciliation, August 1, 2023) and Exhibit 4 (PEDixon loan schedule, DX 250603 Dixon Account, as updated May 14, 2025). Every input is taken from those documents without alteration.

**The statutory formula.**

> "... calculated by first computing the advance or forbearance as a percentage of the total stated amount of such loan .... This percentage shall then be divided by the number of years, and fractions thereof, of the loan .... The resulting annual percentage rate shall then be added to the stated annual percentage rate of interest to produce the effective rate of interest for purposes of this chapter." Fla. Stat. § 687.03(3).

**Step one — the advance or forbearance.**

| | | |
|---|---|---|
| A | Face amount of the extension of credit | $3,000,000.00 |
| B | Funds actually placed by PEDixon (the three Dixon entries on Ex. 1) | $2,754,031.59 |
| C | Underfunding (A − B) | $245,968.41 |
| D | "Lender fees" disbursed at closing (Ex. 1) | $93,750.00 |
| **E** | **Advance or forbearance (C + D)** | **$339,718.41** |

**Step two — the advance as a percentage of the total stated amount.**

$339,718.41 ÷ $3,000,000.00 = 11.32%

**Step three — spread over the term, then added to the stated rate.**

The stated annual rate is 15.00%. (Ex. 4). No promissory note has been produced for this borrowing; the obligation is payable on demand and states no maturity date. The computation is therefore shown on three terms.

| **Term applied** | **Spread** | **Stated rate** | **Effective rate of interest** |
|---|---|---|---|
| Two months — July 20, 2023 closing to the September 2023 aggregation | 67.94% | 15.00% | 82.94% |
| Five months — closing to the December 2023 declaration of default | 27.18% | 15.00% | 42.18% |
| One year | 11.32% | 15.00% | 26.32% |

**The statutory threshold.**

For an extension of credit exceeding $500,000, Fla. Stat. § 687.03(1) substitutes the rate prescribed in Fla. Stat. § 687.071 for the eighteen percent figure. The lowest rate that section prescribes is twenty-five percent per annum. Fla. Stat. § 687.071(2). Every computation above exceeds it.

Note on method. This exhibit performs only the arithmetic the statute prescribes. It assigns no value to the Holly Bluff real estate and takes no position on what that property was worth; the result does not depend on any appraisal. See St. Petersburg Bank & Trust Co. v. Hamm, 414 So. 2d 1071, 1073–74 (Fla. 1982).

**EXHIBIT 2**

# EXHIBIT 3

Quit Claim Deed, Holly Bluff Marina, Inc. to PEDIXON LLC, made July 20, 2023, recorded February 23, 2024, Instrument No. 2024035593, Official Records Book 8521, Pages 2618–2619, Volusia County (also at Doc. 48-3 at 16–19).

2/23/2024 12:14:55 PM Instrument #2024035593 #1 Book:8521 Page:2618
Doc Stamps $0.70 Transfer Amt $10.00

DocuSign Envelope ID: CDEB0C[redacted]635-4A019F106BEC

PREPARED BY AND RETURN TO:
Alison Pitkanen, Esq.
1900 N. Atlantic Ave, Suite 328
Cocoa Beach, FL 32931
407-449-0037

# Quit Claim Deed

Made this 20th day of **July 2023 A.D.**, by and between **Holly Bluff Marina, Inc., a Florida corporation**, whose address is **2280 Hontoon Road, Deland, Florida 32720** hereinafter called the Grantor, and PEDIXON LLC, a Florida limited liability company, whose address is **1627 East Vine Street, Suite E, Kissimmee, FL 34744**, hereinafter called the Grantee.

(Whenever used herein the term "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

**Witnesseth:** that the Grantor, for and in consideration of the sum of Ten Dollars and 00/100 ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, does hereby remise, release, and quit claim unto the Grantee forever, all the right, title, interest, claim and demand which the said Grantor has in and to, all that certain land situate in Volusia County, Florida viz:

See Exhibit A attached hereto

This Property is not the homestead of the Grantor.

**Together** with all the tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining.

**To Have And To Hold** the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of the said Grantor, either in law or equity, to the only proper use, benefit, and behoof of the said Grantee forever.

**In Witness Whereof,** the said Grantor has signed and sealed these presents the day and year first above written.

*Signed, sealed, and delivered in our presence:*

Holly Bluff Marina, Inc.
DocuSigned by:
Yaniv Amar
Yaniv Amar, President of A Marine, Inc.
on behalf of Holly Bluff Marina, Inc.

Witness #1 Signature ____

Witness #1 Printed Name David Ruiz
Address - 3319 Fenton DR, Orlando, FL 32824

Witness #2 Signature ____

Witness #2 Printed Name Anthony Amador
Address - 4998 Dockside Dr, Orlando, FL 32822

State of Florida
County of Florida

The foregoing instrument was acknowledged before me by means of [ ] physical presence or [ ] online notarization, on this 20th day of July 2023 by Yaniv Amar, President of A Marine, Inc., on behalf of Holly Bluff Marina, Inc., who [ ] is personally known or [✓] has produced a driver's license as identification.

[Seal]

Notary Public
Print Name: Janelle Morea
My Commission Expires: 1/15/25

**EXHIBIT 3**

Instrument #2024036593 #2 Book:8521 Page:2619 Laura E. Roth, Volusia County Clerk of Court

DocuSign Envelope ID: CDEB0C2[redacted]019F108BEC

**EXHIBIT "A"**
**PROPERTY**

PARCEL 1:

That part of Government Lot 1 in Section 35, Township 17 South, Range 29 East, and that part of Lot 2 in Section 36, Township 17 South, Range 29 East, lying on the Westerly and Northerly side of a county road,

running down the Beresford Peninsula, described as follows: Commencing at the Southwest corner of Lot 4 of Assessor's Subdivision of Government Lots 5 and 6, Section 25, Township 17 South, Range 29 East, run thence East along the North line of Government Lots 1 and 2, Section 36, Township 17 South, Range 29 East, a distance of 894.60 feet to the center line of the graded county road as now laid out; run thence South 8°15'45" West along or near the center line of said county road a distance of 396.00 feet; thence South 22°11'00" West along county road a distance of 528.53 feet; thence South 34°22'20" West along county road a distance of 760.00 feet; thence South 47°29'20" West along a county road a distance of 539.00 feet to the point of beginning; run thence along county road South 54°33'00" West a distance of 627.50 feet; thence South 76°01'30" West, a distance of 277.70 feet; thence North 78°44'10" West, a distance of 283.40 feet to the Easterly bank of the St. Johns River; thence along the Easterly bank of St. Johns River, North 48°12'00" East a distance of 165.57 feet; thence North 37°22'35" East, a distance of 381.42 feet; thence North 42°01'30" East, a distance of 271.95 feet; thence South 65°17'55" East, a distance of 574.45 feet to the point of beginning, all lying and situate in Volusia County, Florida.

Subject to an easement of access for vehicles and utility services to the property abutting the premises on the Northerly boundary, over that portion of the premises described as follows:

From the point of beginning of the parcel above described, continued thence South 54°33'00" West along county road 60 feet; run thence North 58°39'28" West 450 feet; run thence South 65°17'55" East 476.84 feet to the point of beginning.

Less and except that portion conveyed by Warranty Deed recorded in Official Records Book 3759, page 563, of the Public Records of Volusia County, Florida.

PARCEL 2:

That part of Gov't Lot 1 in Sec. 35, TWP. 17S, RGE. 29E, Volusia County, Florida, Lying on the Westerly and Northerly side of a County Road Running Down the Beresford Peninsular, Described as follows: Commencing at the S.W. corner of Lot 4 of Assessors Subdivision of Gov't Lots 5 and 6, Sec. 25, Twp. 17S, RGE. 29E, run thence East along the N. line of Gov't Lots 1 and 2, Sec. 36, TWP. 17S, RGE. 29E, 894.60 ft. to the center line of the graded county road as now laid out; thence run S 08° 15'45 N along or near said center line 396.00 ft.; thence S. 22° 11 '00"W, 528.53 ft.; thence S 34° 22'20" W., 760.00 ft.; thence S 47°29'20"W, 539.00 ft.; thence S. 54°33'00" W, 627.50 ft. to a Point of Beginning: thence run S. 21°35'40"E, 6.00 ft.; thence S. 68°24'20" W, along the Platted line of Peninsular Drive according to a map in Map Book 23, Page 58 and 59, 132.40 ft.; thence S. 78° 20'10"W along said platted line, 160.52 FT; Thence N 83°09'50"W, along said platted line, 390.72 ft. to the St. Johns River; thence N 32°29'21"E, 111.09 ft. along the St. Johns River; Thence S. 41° 48'00"E, 86.00 ft. to a point mentioned in a deed recorded in deed book 355, page 270; thence S 78°44'10"E, 283.40 ft.; thence N 76°10'30"E 277.70 ft. in accordance with said deed to the Point of Beginning. Less and except Road Right of Way. .

# EXHIBIT 4

PEDixon loan schedule (DX 250603 Dixon Account), as updated May 14, 2025, stating the Holly Bluff rate of fifteen percent.

PEDIXON LLC, ZPD LLC
LOANS TO TIERED AND RELATED ENTITIES
INTEREST AND COSTS INCURRED
TIERED LOANS 6 11 24 H375
AS OF 5/14/2025

| DATE | | TOTAL | TIERED | OUTSTANDING INTEREST AND COSTS BALANCE | ACCELERATED INTEREST |
|---|---|---|---|---|---|
| 9/19/2023 | OPENING LOAN BALANCE | 750,000.00 | 375,000.00 | 375,000.00 | |
| 9/19/2023 | FUNDED TO TIERED AT CLOSING/ESCROW | | -375,000.00 | | |
| 9/19/2023 | LOAN CLOSING COSTS | | | -44,786.00 | |
| 9/15/2023 | AUGUST 1ST INTEREST | | | -51,712.50 | |
| 9/15/2023 | SEPTEMBER 1 INTEREST | | | -124,491.15 | |
| 10/1/2023 | OCTOBER 1 INTEREST PAYMENT | | | -118,563.00 | |
| 10/13/2023 | WIRE FOR INTEREST SINCE 9/19/23 | | | 47,500.00 | |
| 10/19/2023 | WIRE FROM ALISON | | | 21,250.00 | |
| 10/30/2023 | WIRE FROM ALISON | | | 28,750.00 | |
| 11/1/2023 | NOVEMBER 1 PMT | | | -127,937.50 | |
| 11/17/2023 | EXCESS RIVER FLY IN RESERVE | | | 121,093.17 | |
| 12/29/2023 | DECEMBER 1 PMT | | | -123,375.00 | |
| 12/29/2023 | WIRE FROM FROM MARTYS LOAN PLUS $5K | | | 125,000.00 | |
| 1/1/2024 | JANUARY 1 PAYMENT | | | -123,375.00 | |
| 1/30/2024 | WIRE FROM ALISON | | | 55,487.97 | |
| 2/2/2024 | FEBRUARY 1 PAYMENT | | | -123,375.00 | 86,362.50 |
| 2/5/2024 | FEBRUARY LATE FEE | | | -6,168.75 | -6,168.75 |
| 2/5/2024 | $500,000 CD INTEREST FOR 5 DAYS | | | -833.00 | |
| 2/14/2024 | BEACHSIDE DISTRIBUTION | | | 57,424.57 | |
| 3/1/2024 | MARCH PAYMENT | | | -123,375.00 | 86,362.50 |
| 3/1/2024 | LATE FEE FOR MARCH | | | -6,168.75 | -6,168.75 |
| 3/13/2024 | BEACHSIDE DISTRIBUTION | | | 70,166.57 | |
| 4/1/2024 | APRIL PAYMENT PLUS LATE FEE | | | -129,543.75 | 80,193.75 |
| 4/11/2024 | BEACHSIDE DISTRIBUTION | | | 136,113.39 | |
| 4/15/2024 | RENEWAL FEES ON $1 MILLION CD, 1% ON DRAWS, CLUBHOUSE | | | -85,000.00 | |
| 5/1/2024 | MAY PAYMENT | | | -129,543.75 | 80,193.75 |
| 5/14/2024 | BEACHSIDE DISTRIBUTION | | | 50,157.31 | |
| 6/1/2024 | JUNE PAYMENT | | | -129,543.75 | 80,193.75 |
| 6/12/2024 | BEACHSIDE DISTRIBUTION | | | 47,451.52 | |
| 7/1/2024 | JULY PAYMENT | | | -129,543.75 | 80,193.75 |
| 7/11/2024 | BEACHSIDE DISTRIBUTION | | | 86,807.48 | |
| 7/15/2024 | RENEWAL FEES ON ALL LOANS EXCEPT $15,000 CHARGED ON 4/15/24 | | | -86,500.00 | |
| 7/12/2024 | INTEREST ON $1 MILLION FOR 12 DAYS IN JULY BEFORE PAYDOWN | | | -5,000.00 | |
| 7/15/2024 | BOAT FUNDS FROM WOODY-THE COMMISSION HE TOOK | | | -5,000.00 | |
| 7/31/2024 | AUGUST 1ST INTEREST | | | -116,418.75 | 77,612.50 |
| 8/15/2024 | BEACHSIDE DISTRIBUTION | | | 89,007.89 | |
| 8/28/2024 | $1 MILLION PAYDOWN WITH 3 DAYS OF INTEREST CREDITED FOR August | | | 1,232.88 | |
| 9/1/2024 | SEPTEMBER 1 INTEREST DUE FOR AUGUST | | | -116,418.75 | 77,612.50 |
| 9/12/2024 | BEACHSIDE DISTRIBUTION | | | 88,144.09 | |
| 10/1/2024 | OCTOBER 1 PAYMENT DUE FOR SEPTEMBER INTEREST | | | -98,043.75 | 65,362.50 |
| 10/16/2024 | BEACHSIDE DISTRIBUTION | | | 33,297.06 | |
| 8/31/2024 | LEASE INCOME FROM BOATS AT HOLLEY BLUFF | | | -994.00 | |
| 10/5/2024 | HAMPTON CLEAN UP DEPOSIT | | | -20,000.00 | |
| 11/1/2024 | NOVEMBER 1ST PAYMENT FOR OCTOBER INTEREST | | | -93,043.75 | 65,362.50 |
| 11/15/2024 | BEACHSIDE DISTRIBUTION | | | 52,848.88 | |
| 12/1/2024 | DECEMBER 1ST PAYMENT DUE FOR NOVEMBER INTEREST | | | -98,043.75 | 71,747.25 |
| 12/2/2024 | HOLLY BLUFF INSURANCE PROCEEDS | | | 125,000.00 | |
| 12/10/2024 | HAMPTON DEPOSIT FOR CLEAN UP | | | -12,587.50 | |
| 12/15/2024 | BEACHSIDE DISTRIBUTION | | | 50,065.83 | |
| 1/15/2025 | HAMPTON LOST FOREST ADVANCE | | | -17,221.05 | |
| 1/15/2025 | HOLLY BLUFF INSURANCE PREMIUM | | | -21,527.00 | |
| 1/15/2025 | BEACHSIDE DISTRIBUTION | | | 66,750.57 | |
| 1/1/2025 | JANUARY 1ST PAYMENT DUE FOR DECEMBER INTEREST | | | -98,043.75 | 71,747.25 |
| 2/1/2025 | FEBRUARY 1ST PAYMENT DUE FOR JANUARY INTEREST | | | -98,043.75 | 71,747.25 |
| 2/1/2025 | CASH FROM MILLER FOR SALE OF HOLLLY BLUFF | | | 200,000.00 | |
| 2/4/2025 | ALISON TRANSFERRED $6,000 TO VALLEY TO COVER HOLLY PAYROLLS | | | -6,000.00 | |
| 2/15/2025 | BEACHSIDE DISTRIBUTION | | | 84,789.99 | |
| 3/1/2025 | MARCH 1ST PAYMENT FOR FEBRUARY INTEREST | | | -55,875.00 | 51,416.67 |
| 2/5/2025 | INSURANCE PROCEEDS FROM HOLLY OFR BOATS DAMAGED | | | 53,683.58 | |
| 2/26/2025 | COTTON INSURANCE DIVIDEND FOR HOLLY BLUFF | | | 4,257.00 | |
| 3/12/2025 | BEACHSIDE DISTRIBUTION | | | 101,696.13 | |
| 3/14/2025 | KEN JONES FOR HAMPTON | | | -6,366.02 | |
| 3/25/2025 | KEN JONES FOR HAMPTON | | | -5,000.00 | |
| 3/22/2025 | HOLLEY BLUFF BILLS BEFORE SALE | | | -35,262.26 | |
| 3/26/2025 | APRIL 1ST INTEREST PAYMENT DUE | | | -55,875.00 | 51,416.67 |
| 4/3/2025 | INSURANCE PROCEEDS FROM HOLLY BLUFF CLAIMS | | | 204,183.54 | |
| 4/11/2025 | BEACHSIDE DISTRIBUTION | | | 118,563.85 | |
| 4/11/2025 | KEN JONES FOR HAMPTON | | | -5,000.00 | |
| 4/15/2025 | KEN JONES FOR HAMPTON | | | -7,220.00 | |
| 4/10/2025 | RETAINER TO BYRD FIRM FOR MARATHON FORECLOSURE | | | -5,000.00 | |
| 4/15/2025 | RETAINER TO DEAN MEAD FOR PERSONAL GUARANTOR WOODY | | | -10,000.00 | |
| 5/1/2025 | MAY 1ST INTEREST PAYMENT DUE | | | -55,875.00 | 51,416.67 |
| 4/29/2025 | HOLLEY BLUFF 2024 TAXES | | | -17,139.08 | |
| 5/10/2025 | BEACHSIDE DISTRIBUTION | | | 62,143.00 | |
| | TOTALS | | | -175,107.54 | 1,136,604.26 |
| | | | ACCELERATED INTEREST | -1,136,604 | |
| | | | TOTAL INTEREST DUE | -1,311,712 | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KEN DIXON LOAN | | | | | | | | | | | |
| TIERED LOANS G325 | | | | | | | | | | | |
| UPDATED | 5/14/2025 | | | | | | | | | | |
| LENDER | | INITIAL COLLATERAL | INITIAL BORROWER | | LOAN MATURITY | | AMOUNT | INTEREST PER MONTH | INTEREST RATE | | |
| ZPD LLC | | SC LAND | NAVIV AMUR | | 8/30/2024 | | 1,300,000 | 13,000 | 0.12 | | |
| PE DIXON LLC | | 2ND MORTGAGE | SHERWOOD/FLYNN | | 2/3/2023 | | 100,000 | 1,000 | 0.12 | | |
| PE DIXON LLC | | CF AND CONSOL. | FSC/DR. NAJAGI | | 6/13/2024 | | 603,595 | 7,545 | 0.15 | | |
| PEDIXON LLC | | 1%+6 OPTIONS+CC | SHERWOOD | | 10/1/2024 | | 500,000 | 5,000 | 0.12 | | |
| PEDIXON LLC | | CD FOR JOB/RETAINAGES | SHERWOOD | | 12/13/2023 | | 1,000,000 | 10,000 | 0.12 | | |
| PEDIXON LLC | | CLUBHS/POOL | SHERWOOD | | 3/1/2024 | | 500,000 | 5,000 | 0.12 | | |
| PEDIXON LLC | | HOLLY BLUFF | TIERED AND OTHERS | | 7/12/2024 | | 0 | 0 | 0.15 | | SOLD HOLLY TO MILLER ON 2/1/25 |
| PEDIXON LLC | | 27 HOMEMAKERS UNITS | WOODY GUARANTEES | | 3/19/2026 | | 750,000 | 9,375 | 0.15 | | |
| PE DIXON LLC | | FLASH IN ESCROW | SHERWOOD/ALISON | | 6/30/2024 | | 0 | 0 | 0.15 | | REPAID 8/29/24 |
| PEDIXON LLC | | ROGOS | TIERED | | 6/13/2024 | | 396,405 | 4,955 | 0.15 | | |
| | | | | | | | 5,150,000 | 55,875 | | | 0.130 |
| | | | | | NET | | 5,150,000 | | | | |
| | | | | | INTEREST AT | 5/14/2025 | 1,311,712 | | | | |
| | | | | | TOTAL DUE DIXON ENTITIES | | 6,461,712 | | | | |

# EXHIBIT 5

Transcript of the July 14, 2026 hearing before the Honorable Grace E. Robson, Case Nos. 6:25-bk-05570-GER and 6:25-bk-02685-GER.

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:25-bk-05570-GER
6:25-bk-02685-GER

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

DEBTOR.

______________________________/

HEARING

BEFORE: THE HONORABLE GRACE E. ROBSON

DATE: JULY 14, 2026

TIME: 2:01 p.m. - 2:50 p.m.

LOCATION: UNITED STATES BANKRUPTCY COURT
400 WEST WASHINGTON STREET
ORLANDO, FL 32801

A P P E A R A N C E S

APPEARING IN PERSON:

AUDREY ALESKOVSKY, ESQUIRE, on behalf of U.S. Trustee

JAMES TIMKO, ESQUIRE, on behalf of PEDIXON LLC and ZPD LLC

CATHERINE CHOE, ESQUIRE, on behalf of Mainstreet Community Bank

MATTHEW LEIBERT, ESQUIRE, on behalf of Horton S. Johnson

LAWRENCE M. KOSTO, ESQUIRE, on behalf of IMQA Investments and CTO Holdings

FRANK AMODEO, Pro Se

ANTHONY MARZOCCA, ESQUIRE, and RHYS LEONARD, ESQUIRE, on behalf of the Chapter 11 Trustee

JEFFREY AINSWORTH, ESQUIRE, on behalf of PEDIXON

CHRISTOPHER CROWDER, ESQUIRE, on behalf of Cape Crossings Townhome Association and Homeowners Association

APPEARING BY ZOOM:

LARA FERNANDEZ, ESQUIRE, Chapter 11 Trustee

LINDSEY SAVASTANO, ESQUIRE, on behalf of Tamamoi and Carton Family Trust

# I N D E X

Status by Ms. Fernandez ........................6
Response by Mr. Crowder ........................8
Continued status by Ms. Fernandez .............11
Response by Ms. Savastano .....................12
Ms. Fernandez re: case 25-2685 motions .........12
Filings in 25-2685 by Mr. Amodeo .....................15
Ruling by the Court ...........................16
Ms. Aleskovsky regarding election status .......30
Status conference set for August 19, 2026, 9:30 a.m. .....................40
Procedural questions by Ms. Fernandez ..........42
CERTIFICATE OF REPORTER ........................51

P R O C E E D I N G S

THE CLERK: All rise. The United States Bankruptcy Court for the Middle District of Florida is now in session, the Honorable Grace E. Robson presiding.

THE COURT: Good afternoon. Please be seated. Okay.

So we have a number of matters set this afternoon on -- I'm just going to call both Homemakers cases -- Homemakers Real Estate LLC, Case Number 25-5570 and Case Number 25-2685.

Let's take appearances first in the courtroom. Ms. Aleskovsky.

MS. ALESKOVSKY: Good afternoon, Your Honor. Audrey Aleskovsky on behalf of the United States trustee.

THE COURT: Okay. Mr. Timko.

MR. TIMKO: Good afternoon, Your Honor. James Timko on behalf of PEDIXON LLC and ZPD LLC.

MR. MARZOCCA: Good afternoon, Your Honor. Anthony Marzocca, M-A-R-Z-O-C-C-A, on behalf of the Chapter 11 Trustee.

MS. CHOE: Good afternoon, Your Honor. Catherine Choe on behalf of Mainstreet Community Bank.

THE COURT: Okay. Thank you.

MR. LEONARD: Good afternoon, Your Honor. Rhys Leonard on behalf of the Chapter 11 Trustee.

MR. LEIBERT: Matt Leibert for Horton Johnson and world peace.

THE COURT: Okay.

MR. CROWDER: Good afternoon, Your Honor. Christopher Crowder on behalf of Cape Crossings Townhome Association and Homeowners Association. I will advise the Court that I have a 2:30 next door. I'm kind of small in this case, so if I pop out, I'll come back in and get filled in by everybody else.

THE COURT: Okay. Gotcha. Thank you for letting me know. Okay. Mr. Kosto.

MR. KOSTO: Thank you, Your Honor. Larry Kosta on behalf of IMQA and CTO Holdings.

MR. AMODEO: Your Honor, Frank Amodeo, Pro se.

THE COURT: All right. And then on Zoom I see Ms. Fernandez.

MS. FERNANDEZ: Good afternoon, Your Honor. Lara Fernandez, the Chapter 11 Trustee.

THE COURT: Okay. And is that Ms. Savastano?

MS. SAVASTANO: Yes. Good afternoon, Your Honor. Lindsey Savastano on behalf of Tamamoi and Carton Family trust.

THE COURT: All right. Is there anyone that wanted to make an appearance that I did not call? Okay.

So we're here on the initial status conference of the case. I did see Ms. Fernandez filed a status report, which is greatly appreciated by the Court. I guess before we talk about any of the matters that are set, is there anything, Ms. Fernandez, you wanted to disclose or tell me about that -- from your investigation to date?

MS. FERNANDEZ: Thank you, Your Honor. So, again, Lara Fernandez, the Chapter 11 Trustee. Since the filing of that report, which I guess was actually yesterday, I am in communication with the lender regarding having the HOA -- sorry. Let me back up. Having the net excess proceeds from the rental units to be deposited into my account. And I understand that the HOA, although I was going to ask the HOA's counsel, I understand the HOA should be current moving prospectively and that the payments are

auto-debited on, I think, on the first of the month.

So at least in those regards I am getting control of the income from the units, and I'll have them in the DIP account. And then from there forward I could discuss, you know, next steps with the secured creditors and all the other parties.

THE COURT: Okay.

MS. FERNANDEZ: So I guess that's probably the largest update.

THE COURT: Okay. So when you say -- when you say the HOA auto-debit, who's account are they debiting? Are you saying it's already set up with your trustee account? Or is it some other --

MS. FERNANDEZ: No. It's set up -- it's set up, I guess, with the management company. I wanted to understand it first. I know that the management company paid July's HOA fees. It's the HOA and a townhouse. Or I guess it's the townhouse and the condominium. So I know both of those it's auto-debited from the property management's manager's account. And I needed to understand that to see whether or not it will be

changed where the funds -- all of the funds come into the DIP account and then I pay it, or if we could keep this arrangement.

THE COURT: Okay.

MS. FERNANDEZ: But at least I was assured that that arrangement has been made.

THE COURT: Okay. I see Mr. Crowder is standing, but -- well, whether that's happened or not, hopefully, some arrangement, it sounds like is made to take care of the --

MR. CROWDER: Yeah, I am -- I reached out to the HOA to find out about this July 1st payment. So I'm not aware that one has processed, but my contact with the HOA is out of town. So I'm going through the Board.

THE COURT: But as far as you know, was it already -- like, previously auto-debited from the property management account or...

MR. CROWDER: No. For the -- prior to the filing there were no payments to the HOA for a significant period of time. So -- and I'll just kind of refer them to as one, although there different claims in different HOAs that sort of come together to manage this.

Anyhow --

THE COURT: It was delinquent prior to now where it's delinquent, but it sounds like there are arrangements being made to bring it current.

MR. CROWDER: There was one payment made in May. There was a payment made in June, although three of the checks were inadvertently returned. The Trustee got those checks. So the Trustee is in control of those checks. And so now I'll have to find out about these July 1st ones.

And I'm happy to work with the Trustee either way on how they want to handle it, if they wanted to run through them and then send a check to the HOA or if it's sent directly through an auto draft to the -- from the management company over -- we'll work with the Trustee on that one. We just want to see that the current HOA's fees are paid.

THE COURT: Okay. And I know the Trustee's status report referenced communicating with the association for purposes of determining the scope of insurance coverage and things like that. So there may be policies that your clients have. And then so she -- it sounds like she's trying to put together the picture of what's covered, where are there gaps, if any.

MR. CROWDER: Yeah. I had requested some policies. I believe we sent them over, right? Or did you...

THE COURT: Okay, so --

MR. CROWDER: I'll make sure they get over there, if they haven't gotten over.

THE COURT: All right. So --

MR. CROWDER: I was out of town last week, so it will all catch up on my part.

THE COURT: I just want to make sure if things are not -- like it's in process or if there's some -- there's no opposition to providing that information, I hope, to the Trustee.

MR. CROWDER: No. No. We're happy to provide all the insurance information.

THE COURT: Okay. Very good. Thanks.

MR. CROWDER: All right. Thank you.

THE COURT: All right, Ms. Fernandez, okay, so you're getting a handle on the scope of the units and the insurance and the income and expenses and all of that. So, okay -- and I don't know --

MS. FERNANDEZ: And then --

THE COURT: Go ahead.

MS. FERNANDEZ: Sorry, Your Honor.

THE COURT: No, that's okay. Go ahead.

MS. FERNANDEZ: I was going to say, and then I believe maybe on your calendar today was either providing more relief to the secured creditors. And, obviously, they're represented. But I had tentatively talked to them and I do think they're giving me some time to kind of get my arms around stabilizing the units and understanding what the best steps would be to dispose of the units, or certainly get the secured creditors paid.

So I think if there was further relief from stay to set the foreclosure sale, I would hope that both of the -- that the creditors would give me additional time.

THE COURT: Okay.

MS. FERNANDEZ: I thought it was on your calendar.

THE COURT: Yeah, in this case, the 5570 case, I should say, there are status conferences on the two stay relief motions, whose clients are represented by Ms. Savastano. So I had granted relief to all the secured creditors, at least through judgment, but not setting a sale. So I don't know if, Ms. Savastano, you are looking to

proceed with a sale or if you are agreeing to defer that at this moment. Oh, you're on mute.

MS. SAVASTANO: Apologies. We've been in contact with both of our clients, and they do agree to defer the foreclosure sale for now and allow the Trustee time to try and, as she said, stabilize everything and work out a plan.

THE COURT: Okay. Great. Very good. So then we'll just keep it on a status conference for now. Okay. So in the meanwhile in the 2685 case prior to -- I think they were filed prior to Ms. Fernandez' appointment -- there are motions to vacate the dismissal of that case. I don't know if the Trustee has even looked at those motions. I mean, it's technically not the case that you're appointed in, but it's just like a weird posture. So I don't know if one of the attorneys want to speak to that or, Ms. Fernandez, do you want to speak to whether you've had a chance or even looked at the other case's pending motions.

MS. FERNANDEZ: I generally looked at the other case's pending motions, but I didn't necessarily have a position. I guess my general outline is that I think that the involuntary case

should remain the active case. It seems it would be strange to have a motion vacating a prior case that would then debunk this entire matter.

THE COURT: Well, I think the request was to kind of vacate the order and then put the two cases together and for the purpose of having a different clawback period of time. So that's -- that's the intent. How it technically or procedurally would play out, I guess I'll get into that, but...

All right. So there's -- you don't necessarily take a position on the motions to vacate in the 2685 case. You just note the odd procedural posture and would say that the Chapter 11, at least, involuntary should continue course.

MS. FERNANDEZ: Yes. I would think that -- I understand having a different clawback period of time, but I also think that the lender is an insider, so the different clawback periods, to some degree, I feel are maybe irrelevant. And -- the fact -- I mean, this is not a -- this seems to be -- albeit it seems to be complicated, it's really not that complicated of a case, Your Honor. Right?

The lender has received payments from Homemakers, the units, from at least 2023 through current. And I just -- you know, I'm trying to have an understanding of how much the lender received and then how the lender applied it and whether that was proper or whether the loan in general is proper, which is, you know.

So the different filing dates, to some degree, are semi-irrelevant to the overall picture of what I'm trying to accomplish. That is generally my position.

THE COURT: Okay. All right. So I think at the last hearing I indicated that I would either be ruling on the motions or have had ruled on the motions. And I know Mr. Amodeo had -- there was a motion to strike documents that Mr. Timko had filed, to which there were some responses in the -- this is in the 2685 case.

And then Mr. Amodeo filed a bunch of stuff this morning or yesterday, which I don't know if anyone's had a chance to look at. But so -- Mr. Amodeo, do you want to just briefly tell me what your -- at least in the 2685 case, maybe. Let's start with that one.

MR. AMODEO: Yes, Your Honor. My original

response was a legal brief on Rule 1015, since, obviously, from the courtroom that day I could tell no one was familiar with the rule. PEDIXON moved to strike it. I responded to say that that's, you know, no basis for striking it. And alls I did was provide all the authority there is on the topic that I could find in the jurisprudence, especially the published authority, basically said you can have two bankruptcy cases. This is its purpose. When there's the voluntarily and involuntary, Rule 1015 allows you to consolidate them and, in fact, encourages that consolidation.

THE COURT: Right. But that -- okay. So that would only be in effect if I vacated the dismissal order, right?

MR. AMODEO: Yes, ma'am.

THE COURT: I mean, so if my ruling is -- which I have my ruling here -- is denying that motion to vacate, then the consolidation is a moot point. Right? Even if it's possible, it's not going to happen if there's --

MR. AMODEO: If there's only one case pending.

THE COURT: Okay.

MR. AMODEO: Yes. And that would run to whether the look-back period, the clawback period is correct. And I understand where Mr. Fernandez is in her progress so far. But, frankly, if this isn't about fraudulent conveyances and it's just about preferences, the clawback period is material. And if we had known in -- if Mr. Wolff had known, even, that Mr. Dixon planned to give the property back, then this is not an absolute assignment and the first case would have held.

So the look-back period is important. It's $500,000 and one fraudulent conveyance for a couple hundred thousand more that are easily obtained if the case is open. So if your decision is to deny it, I understand Rule 60. I've done a bunch of them. And I'll proceed from there. But I do believe it's material that the date looking back is easier under the preference rule than under the conveyance rules.

THE COURT: Okay. So -- all right. So did anyone else want to be heard in connection with the rule 1015 issue? No?

Okay. So I'm just going to -- I've reviewed the Rule 60 motions. So I -- unless someone else has anything new to argue that's not in the

papers, I'm going to -- first, I'm going to deny the Motion to Strike because it's going to be moot in a second.

And then after I do my ruling on the Rule 60 I'm going to want to talk to you about your sanctions motion. Okay?

Okay. So in Case Number 25-2685 there are two matters pending before the Court, document number 88 and 89 that were filed by Mr. Johnson seeking relief from the Court's order dismissing the case under Rule 60(b)(1), (b)(3), and (d)(3) of the Florida Rules of Civil Procedure.

The first motion asserts mistakes of law and fraud on the Court premised on alleged defects in the formation of the Tiered Land Trust, and alleged forgery in the trustee's deed that was recorded.

The second motion asserts newly-disclosed misrepresentation under Rule 60(b)(3) based on a May 5th, 2026, letter from counsel for PEDIXON and ZPD concerning the nature of an assignment of the membership units.

PEDIXON and ZPD filed an omnibus response in opposition, arguing, among other things, that the motions are moot in light of the order for relief

in the later-filed involuntary case, which is 25-5570, and that the movant fails to meet the Rule 60 standards.

The Court had denied reconsideration, concluding that the trustee of the land trust was the only person who could authorize or ratify the petition and the proffered resolution was not newly-available evidence, and in any event, did not alter the outcome.

Subsequently, the involuntary petition was filed against the same Debtor commencing case 25-5570, in which case the Court ultimately entered the order for relief and directed the appointment of a trustee, who is Ms. Fernandez.

Mr. Amodeo filed a written argument in support of granting the Rule 60 motions that included the argument that the estates could be consolidated under bankruptcy Rule 1015(a). One reason would be that it would enable the estate's ability to recover transfers avoidable under the Bankruptcy Code. And then, as I stated earlier, what the premise underlying that argument is that the Court would be vacating the order dismissing case 25-2685.

However, as the Court will explain, I'm not

vacating the dismissal order. The operative relief sought, which is vacating and reinstating the voluntarily case would create parallel estates for the Debtor, contrary to the orderly administration and fairness concerns recognized in reorganizations.

The involuntary case does provide a functioning forum. And on the facts that were presented, even if the Rule 60 standards were satisfied, prudential concerns would compel denial or render further proceedings on reinstatement unwarranted.

But Johnson has not met the requirements for Rule 60 relief. Mr. Johnson contends the dismissal rests on a false premise that a valid Florida trust exist -- land trust existed, arguing the deed was un-recordable or forged; and, therefore, the Florida Land Trust Act should not have applied.

Those assertions were not presented to the Court before entry of the dismissal order. And on the record on reconsideration, reflected that Homemakers and the Respondents agreed that Mr. Johnson had assigned all of his right, title, and interest in 100 percent of the membership

units to the land trust and that Crescent Sound was the trustee as of the petition date.

Homemakers elected not to seek an evidentiary hearing, represented the Court could rely on the documentary record attached to its response, and agreed, for purposes of adjudication, that the assignment was validly made to the land trust.

On that record, the Court applied the Florida Land Trust Act and made findings grounded in undisputed facts and documents presented. The dismissal order specifically found the trustee held legal and equitable ownership of the membership units and that Mr. Johnson lacked authority to file, and no ratification by the trustee was shown, the trustee of the land trust, that is.

Rule 60(b)(1) does not function as a vehicle to relitigate new theories or belated factual disputes that could have been raised earlier through discovery or an evidentiary hearing. Respondents correctly emphasize that Rule 60 is not a substitute for appeal and that tactical choices not to pursue discovery or evidentiary testing did not convert later-developed

contentions into a mistake by the Court.

On this record, the Court finds it did not commit a mistake of law in applying the Florida Land Trust Act on the parties' undisputed premise at the time of dismissal.

Next, Mr. Johnson invokes Rule 60(d)(3) asserting that the recorded deed was fabricated and that counsel for Curidan (phonetic) presented fabricated evidence.

The bar for fraud on Court is exceptionally high and targets conduct that corrupts the judicial process itself. The opposition details why those allegations, even if now asserted, rest on disputed facts that were neither presented nor prevented from presentation at the time and underscores that Homemakers itself relied on and acknowledged the existence of the land trust and assignment in opposing the dismissal.

The record does not clearly establish -- or does not establish by clear and convincing evidence an egregious fraud that prevented the Court from performing its adjudicative function. To the contrary, the dismissal order was entered on the documentary record and the party -- that the parties asked the Court to consider after

supplement briefing on narrowly-framed issue.

Therefore, Rule 60(d)(3) relief is not warranted.

Mr. Johnson's second motion rests largely on a May 5, 2026, letter from Mr. Timko's client -- or counsel, Mr. Timko, stating that the January 2024 assignment would have been returned upon repayment, which Mr. Johnson contends contradicts the earlier sworn statement of Mr. Dixon that the assignment was total with no return to Johnson.

Mr. Johnson argues this contradiction proves a misrepresentation that prevented full and fair presentation of a theory advanced at the June 11, 2025, hearing.

Rule 60(b)(3) requires clear and convincing proof that the adverse party obtained the judgment through fraud, misrepresentation, or misconduct, and that such conduct prevented the movant from fully and fairly presenting its case.

Respondents contend the civil theft response letter's phrasing does not alter the legal effect of the executed assignment and trust documents on which the Court relied, does not concede collateralization. And in any event, Homemakers chose not to conduct discovery or seek an

evidentiary hearing to explore intent; and, thereby, failed to show that any opponent conduct prevented a full and fair presentation.

The Court finds, again, that Mr. Johnson has not carried his burden. First, the letter postdates the dismissal by more than ten months, and standing alone does not establish that the earlier evidentiary record was procured by fraud or misrepresentation.

Second, the record demonstrates that the Debtor and Mr. Johnson had a full and fair opportunity to present their theory, including by requesting an evidentiary hearing to explore intent, but instead elected to submit documents. Respondents' opposition notes that Homemakers and Johnson declined discovery and that an evidentiary hearing -- and an evidentiary hearing, and asked the Court to decide on the papers.

The Court finds that was a strategic choice, not misconduct by the adverse parties, accounts for lack of -- any lack of evidentiary development.

Therefore, Mr. Johnson has not demonstrated by clear and convincing evidence either the

requisite misconduct or that such misconduct prevented a full and fair presentation.

And to the extent Mr. Johnson renews arguments that were rejected on reconsideration, those contentions do not supply a basis for Rule 60 relief here.

So for all of these reasons, the motion fails on the merits. And so I will be denying the motions to vacate.

So I do reserve jurisdiction to issue a more fulsome written opinion, but I just wanted to at least give the parties my oral ruling so that you-all know where we're going.

So with that said, there is a pending motion that Mr. Amodeo filed for sanctions, which I haven't had a chance to review yet. So I don't know if that pertains to that case. Because I know you also filed one in 25-5570. So, Mr. Amodeo, do you want to tell me about it?

MR. AMODEO: Your Honor, yes. I don't think that's ready. I don't think (inaudible) had an opportunity to respond. And there'll be another motion coming. I found 32 violations in the records to date. Those were two that are covered by the 9011 letters that I sent out in May. One

of them addresses very much the issue you just ruled on. So I have to -- again, I understand your factual premise. I would love a written order at this time. And I will preserve it for appeal. Although it may apply to Johnson, I don't know that it can generally be applied to the estate. So I would like to see a written order. And I'll address more thoroughly the issue of the false deed, the forgery.

THE COURT: Okay.

MR. AMODEO: Experts have been retained. They'll be -- I've talked with Mr. Ainsworth this morning. I'm willing to stand still on everything until the expert reports come in. They'll be in by August 1st. One is on usury and whether Dixon has been repaid. The other is a postal inspector on the -- former postal inspector on the status of all the various DocuSign -- and I'm not an electronics guy.

THE COURT: Yes, I know that.

MR. AMODEO: I completely know -- yes. I completely would not have agreed to the electronic filings anyway. So Mr. Johnson and Mr. Leibert have retained an expert to tell us whether these are valid or not valid so we can

stop this argument.

THE COURT: Okay. But you also filed a motion for an evidentiary hearing on the subject matter --

MR. AMODEO: And I'm absolutely consistent with that opinion. I have -- you know, the bench memo from this morning which has been filed, I have copies if people want, provide that if for any jurisdictional reason, being standing or mootness or the fact that the Florida legislature has removed usurious claims, this Court should conduct evidentiary proceedings on the usury issue only. And then they should not hear Mr. Dixon today, or back in the prior case.

THE COURT: But I couldn't do that unless I -- presuming -- I don't know, I haven't read the paper, but based upon what you're saying and my recollection of you raising this before, you're saying they shouldn't be able to say anything in court because their claim is --

MR. AMODEO: In fact, not only should not be able to anything today, they shouldn't have been able to say anything back in the Chapter 7. I understand the historical track record is called hypothetical jurisdiction. The Supreme Court

overturned seven circuits that had adopted this before, and it no longer is the case.

If there is a bona fide jurisdictional issue, the court should conduct evidentiary proceedings on the jurisdictional matter alone. And that should be the case today. Not just because the Florida legislature says you can't a enforce usurious loan. Let's wait for the experts so we can find out whether it's usury or not.

But on standing and mootness, if Mr. Dixon has been repaid, he has no standing. If the judgment is unenforceable under Florida law -- if their claim is unenforceable under Florida law, it's moot, and they can't be heard now or ever.

THE COURT: Okay, but is it -- so is your paper basically an objection to claim?

MR. AMODEO: Oh, but, you know what, Your Honor, to be very honest with you, I expected in the first case, the July 13th deadline to hit, Mr. Dixon not to file his claim and then this would have become a claim fight. That should have happened July of 2025.

So, yes, in some sense it is a claims fight. They haven't filed a claim in any of the cases

except Mr. Flynn's. But I have turned over to the expert, a forensic accountant, all the transactions I've been able to gather from every party, including Mr. Dixon, and said please just tell me how much money is owed, if any.

THE COURT: Okay. Well, all right, so then we'll --

MR. AMODEO: So, like I said, they asked for it to be done after August 4th when we'll have the report in hand and we'll have the experts here to testify.

THE COURT: Okay. So we will -- this is a preview of your papers that are filed that we'll be setting for a hearing. You also filed a plan and disclosure statement, which is a reorg, it looks like, from my quick review where the trustee looked like, at least initially, that they were heading towards liquidation, which I think is kind of what we had talked about in this case before they were involved. So --

MR. AMODEO: Still. And I have communicated with the Trustee. Still my plan, if we don't get a strategic buyer to come in, then -- and purchase it as an ongoing unit, then it should be sold off in pieces in the ordinary course.

Either way, there's a few million dollars of equity.

THE COURT: Okay. Well, this is -- this case is a fun law school examination, to say the least. So, anyway.

Okay. So should we find a date now? I mean, I know -- also, I know there's an election. Is that happening?

MR. AMODEO: There's an election. I spoke with --

THE COURT: Ms. Aleskovsky?

MR. AMODEO: -- Mr. Borges (phonetic) just before we got here. We're pretty happy with where Ms. Fernandez is right now. And because some of the other components of this disastrous resort are heading for bankruptcy, probably going to leave it as Ms. Fernandez. And then ask that Mr. Johnston, who I know is before you in other matters, becomes the trustee over the other components. It was originally planned for him.

THE COURT: Then. Okay.

MR. AMODEO: But that's another case on which I'm sure you'll get stuck with.

THE COURT: Okay. Well, I don't know. We'll just wait and see. Okay. So,

Ms. Aleskovsky from the U.S. Trustee is coming behind you, Mr. Amodeo.

So I know it's scheduled. I think it's at the same time as the 341, which obviously makes sense. So --

MS. ALESKOVSKY: Yes, Your Honor.

THE COURT: -- as far as you're still planning to proceed and see what happens?

MS. ALESKOVSKY: Yes, Your Honor. One procedural quagmire we're in is who the Debtor representative should be that testifies on behalf of the Debtor. We have schedules filed by Mr. Johnson, who we understand was the Debtor's representative in the 2685 case. But it seems now that it's Mr. Dixon is the Debtor's representative in this -- I don't know.

So I'm not sure who should be testifying. But my intention is to call that meeting on Thursday and record the votes of any creditors who participate, as well as the amount of their claims so that we can determine if that makes a valid election, and then to file the report with the Court. Given the history here, I'm assuming it will be a disputed election.

THE COURT: Or maybe not. I don't know.

MS. ALESKOVSKY: But either way, the report will be filed shortly after that election takes place on Thursday.

THE COURT: Okay. I mean, the Trustee's initial report was pretty thorough in the short amount of time that they had to gather information. And so I certainly --

MS. ALESKOVSKY: And I would just say, Your Honor, that the U.S. Trustee had solicited input from all interested parties that we could get a hold of. And we interviewed numerous candidates. And we are very satisfied with the work so far that's been done. But we are directed by the Code to --

THE COURT: I know.

MS. ALESKOVSKY: -- conduct the election, and we will do so. And Ms. Fernandez is the trustee and will be the trustee unless or until --

THE COURT: Someone else may be --

MS. ALESKOVSKY: -- there is another result.

THE COURT: Okay. So then for the Debtor representative, I don't know. Is Mr. Johnson here? I see him there. And I don't know if Mr. Leibert wants to say, like, is he --

Mr. Leibert, is Mr. Johnson intending to testify at this meeting of creditors or what's --

MR. LEIBERT: You mean on Thursday?

THE COURT: Yes.

MR. LEIBERT: Yes.

THE COURT: Okay. Just -- I know it's his position, and the position has been that Mr. Johnson is the hundred-percent owner. So I don't know if Mr. Timko's client representative wants -- I mean, is going to plan to be there. So...

MR. TIMKO: I actually don't know that at this time, either, Your Honor. I am being substituted out as counsel. So except for maybe these sanctions motions against me for --

THE COURT: Yes. Well -- it's not saying that I haven't read it.

MR. TIMKO: -- utilizing documents that people agreed to.

THE COURT: I just -- yeah, you don't have to say anything at this moment.

MR. TIMKO: I think that this is probably my last appearance.

THE COURT: Okay. Well, maybe you'll have more fun now with other matters.

MR. TIMKO: I hope so, Your Honor.

MR. LEIBERT: Your Honor, next week we have a hearing set in state court on the whole trustee trust issue, land trust issue in Orange County. And then on August 4th we have the usury issue set for hearing in Osceola County. All these things could be heard by the next time we meet.

THE COURT: Okay. Great. That would be lovely. Okay. So, Mr. Ainsworth, so who are you in this case now?

MR. AINSWORTH: I believe I'll be getting in for Mr. Timko, Your Honor.

THE COURT: Oh, okay.

MR. AINSWORTH: So there was some discussion on a standstill agreement. I think that -- you know, I think that everybody is right. There is a couple threshold matters that everybody needs to digest. Is the Dixon loans, we'll call them, usurious. I think that's a threshold matter. Have the Dixon loans been repaid. Again, threshold matter. I think that everybody can work through -- there's certain facets that are being filed across multiple fronts that I think that, you know, Your Honor can -- Your Honor sees claim objections and these types of things

frequently. I think that this would be an appropriate venue to go to determine this. And so I think the parties have agreed to standstill.

I will likely -- and I haven't previewed this to anybody, but I will likely file an adversary proceeding to extend the stay just so we can take it to all the state courts and just say, hey, this is -- we'll either remove over to this Court or just try to pause everything. But I think there is an ability --

THE COURT: Please pause it. I don't need removed.

MR. AINSWORTH: I've been told people that Your Honor -- I am well aware Your Honor does not prefer to remove a bunch of --

THE COURT: I think I've remanded everything I could. I don't think I've kept maybe one.

MR. AINSWORTH: Certainly it is related to, but not -- neither here nor there.

THE COURT: I don't care. Yeah. Okay.

MR. AINSWORTH: In any event, I think that both sides are gearing up to get some experts. And I think that this will shed light. There's going to be some other experts because you need to have the disposition of collateral valuation.

So there's going to be some real estate experts. But, you know, this should be -- my guess is when we go comply -- look at the reports, I mean, math is math. So it should be -- it will either be usurious or it will not. It will either be repaid or it will not. This is not the type of stuff that I think most people will actually be fighting about. I think that there's a lot of --

THE COURT: Don't you have another usury case that you should have an expert on? Or maybe -- I don't know.

MR. AINSWORTH: We filed our expert report on that one, Your Honor. The other side.

But, so, no -- you know, the intention is -- I think Ms. Fernandez is spot on. I think she has really dove in and has digested a bunch of this. I mean, this is -- if you look at -- if you kind of get lost in the forest, there is just a staggering amount of moving parts and there's a bunch of he said/she said. And I'm not sure how it all got here.

If you look at it from a this is functionally a defunct project, there are some loans that are associated with a defunct project. And so they're trying to figure out how you

maximize the value. This is not -- I mean, we're not reinventing the wheel here. This is pretty straightforward.

And so I think with some expert reports and, you know, really just the professionals getting together, there is a resolution that is not, you know, outside the realm of possibility. I've looked at some of Mr. Amodeo's pleadings where he said, you know, we should determine if there's usury. We should. And I read it and I said, yeah, this -- we should do this, one way or the other.

I looked at the plan and thought, I mean, this is not -- this is not terrible, right? I mean, there is -- if there is a path forward and they generate the cash flow that he's suggesting it does, then there would be the ability to service the debt.

Now, I don't know enough about the actual operation at this point to say whether that's -- you know, there is a restructure here or it really will be a functional liquidation. But you have really competent people sitting here that can help digest this and work through it.

And so, you know, before we continue to

over-complicate, what we're hoping for is to get some period of time to have people that are, they're true subject-matter experts within their respective area. They can lay out, you know, is this usurious? Has it been repaid? What was the value of the real estate?

And once we have that data, we can get that in front of Your Honor. And, assuming Your Honor agrees with whatever the expert is, from there everything should fall into place without too much effort.

THE COURT: Well, I don't know that that has to happen first versus -- I mean, I guess the parties can talk about what makes most sense. But at some point the claim issue is going to be --

MR. AINSWORTH: Well, this is -- I mean, I agree. I think that that is -- that is central to any resolution. I mean, this is a over-complicated with how it was all papered getting here. But it is functionally going to be a claim dispute, so...

THE COURT: Okay. So then when should we come back, either Mr. Leonard or Ms. Fernandez? When do you think -- I know you're speaking with

the parties and all of that. And so...

MS. FERNANDEZ: Your Honor, maybe the week of --

MR. AMODEO: If I could help, I spoke to Ms. -- we think the end of August might be appropriate. It also works well for the operation of the business, which doesn't need to be disrupted during its last good summer month. That will give Ms. Fernandez a chance to see it, touch it, feel it. All that happens.

THE COURT: A road trip? Is that's what? So then the end of -- Ms. Whitsett what do we have? August 18th?

MS. FERNANDEZ: So the week of August 24th, Your Honor, then? Is that what it --

THE COURT: I think we have something the week before that, right? Don't we have some -- because this is just going to be a status conference.

MR. AINSWORTH: The week before -- oh, you're talking about in here August.

THE COURT: In August.

MR. AINSWORTH: The week before is the JBBA seminar, also, that week.

THE COURT: No, I mean -- the week after.

MS. FERNANDEZ: So, Your Honor, I will be in Orlando on August 20th for another hearing in front of Judge Vaughan. So if we did it that day, that would be ideal.

THE COURT: Okay. I have New Shiloh, that's Mr. Ainsworth's case. That's a confirmation hearing isn't it?

MR. AINSWORTH: That is -- yes.

THE COURT: Is that going to be settled? Let's put him on the spot now.

MR. AINSWORTH: That's the one we have an expert in, so...

MS. FERNANDEZ: I actually think -- yeah, I'm wondering if what I have is actually wrong. In any event --

MR. AINSWORTH: I would prefer not to do it on the New Shiloh day, but that is -- I will defer to the group.

THE COURT: You're going to be preparing the whole day, I presume.

MR. AINSWORTH: We intend to be in a fight, Your Honor.

THE COURT: Oh, well, that's disappointing. All right, so Ms. Fernandez, do you have any other day that week besides the 20th?

MS. FERNANDEZ: It doesn't matter to me. I'll make myself available to, you know, come over. That's not a problem.

THE COURT: Because this will be a status conference. It wouldn't be more than -- could we do the 19th, Ms. Whitsett, in the morning, like 11:00?

THE CLERK: The 19th at 9:30. You have half an hour.

THE COURT: Okay. So half an hour for a status conference? Do you think we can do it? August 19th? At 9:30. So if it's a status conference, you-all can appear by Zoom.

MR. AINSWORTH: I will be here. I have a confirmation hearing at 10:30, Your Honor.

THE COURT: Okay. So anyone who cannot be here for whatever reason in person is more than welcome to come by Zoom. I mean, I'd like to see you in person, but if you can't, then that's fine.

Okay. So then we're going to continue over the stay relief motions by Tamamoi and Carton Family Trust. We'll set -- should we have preliminary hearings, Mr. Amodeo, on your papers, the motions that you filed?

MR. AMODEO: Yes.

THE COURT: I know, Mr. Timko, you said you're maybe getting out.

MR. TIMKO: Yes, Your Honor.

THE COURT: But should I set a response deadline, or should it just be the standard week before the hearing response deadline to the motion?

MR. TIMKO: Which -- I don't think it really matters, Your Honor.

THE COURT: Okay. So we'll just keep it the standard one week before the hearing, any response to pending motions will be due. And then on the case 25-2685, I'll just take care of the short from of orders that deny the motions to vacate and the motion to strike. And then the pending motions would be denied as moot, based upon the dismissal of that case. And then I'll be issuing a longer order for everyone's benefit.

MR. AMODEO: So, Your Honor, I would prefer, then, to wait for the longer order to file any notice of appeal. And, again, the issue is -- and I understand your factual ruling. It's a law school -- it's a law school text thing on where jurisdiction belongs, so...

THE COURT: Okay. Well, I appreciate the academic exercise. So we'll see what happens. Okay. Anything else we should discuss this after?

MS. FERNANDEZ: Yes, Your Honor. I had two other kind of procedural questions/issues that I wanted to raise.

THE COURT: Okay.

MS. FERNANDEZ: So one, I guess, with the election, then is there going to be a determination before August 19th about my status?

THE COURT: Well, right. So, Ms. Aleskovsky indicated if she would be filing the results shortly thereafter. So, for example, if someone else is elected then they -- it's like the same process, right? Like they would then be selected, the notice would be file.

MS. ALESKOVSKY: Yes.

THE COURT: And then I would have to approve it.

MS. ALESKOVSKY: Yes.

THE COURT: Okay. And then I don't know -- I haven't seen this happen, so I don't know if then -- is it automatic that Ms. Fernandez is not the trustee? Like is there an order that then

discharges her?

MS. ALESKOVSKY: We would ask that, Your Honor, if that's necessary. In the event the election is disputed and in the event we can't determine who the winner is based on claim amounts, disinterested candidate, et cetera, then we would file that in the report and ask the Court to set a hearing to determine that.

THE COURT: Okay. Well, hopefully that won't happen and we'll just --

MS. ALESKOVSKY: For Ms. Fernandez' benefit, we would ask for it to be heard on an emergency basis so that we would know who is in the driver's seat --

THE COURT: Before the next hearing.

MS. ALESKOVSKY: Yes.

THE COURT: Okay. So, hopefully, Ms. Fernandez, that answered your question.

MS. FERNANDEZ: That answers my one question.

THE COURT: Okay. What's the other one?

MS. FERNANDEZ: Then I -- well, I guess maybe I'd like to do an oral motion to extend or excuse my filing of the monthly operating reports until a determination of, you know, of my status.

THE COURT: Okay.

MS. FERNANDEZ: So the report --

THE COURT: Okay. So any opposition to that motion? Ms. Aleskovsky?

MS. ALESKOVSKY: Your Honor, Ms. Fernandez is the trustee until she's not the trustee. So unless there's some other burden that would prohibit her from timely filing her reports, we need a trustee in charge and we need to see those reports. I think all the parties are playing nice because we're in a place where we've got a neutral third party in control. And to make those transparent, I think is important.

THE COURT: Okay. Well, I guess, so Ms. Fernandez, I don't know if it's just the fact of the tentative nature, right, like meaning there's a chance that you might not be the trustee, but is there another reason why you wouldn't be able to timely file them?

MS. FERNANDEZ: Sure. I guess at this point in time I could file them. I mean, candidly, I don't normally do this. They'll probably be handwritten. Because if I'm actually going to stay on, I would most likely employ Larry Hyman to do the operating reports, to help me with,

like, ultimately tax returns and that kind of device.

But in the interim it should be pretty easy. I have a DIP account, and I've had one deposit. I don't think it will be very complicated. So that's --

THE COURT: Okay.

MS. FERNANDEZ: -- so that's not a problem.

And then I guess my other -- and then my other issue or question, Your Honor, was the schedules as presented, I would like -- I would like to have claimants actually file proofs of claims. And so maybe I'll -- maybe I could just file -- maybe I could file some type of a motion and it could just be granted. But I don't necessarily want a hearing on it.

THE COURT: Okay. So you're saying for those liabilities that were scheduled as undisputed who normally would not have to file a proof of claim, you're saying you want everyone to have to file a proof of claim under penalty of perjury and all of that. That's what you're saying?

MS. FERNANDEZ: That is correct, Your Honor. Yes.

THE COURT: Okay. So then -- I mean, right now the clams bar date is July 30. So are you saying for those folks you would want to extend it out because now it's like a new deadline and a new requirement?

MS. FERNANDEZ: Either extend it out, or I know that my counsel is doing an analysis between, like, the three different bankruptcy cases and the schedules and who's on this latest matrix and who's not.

And so I am -- you know, I could certainly talk to them about filing some kind of notice to correct the mailing matrix or something, and then I'm happy to provide the notice of the filing to all of those parties, as well, or to everyone again. Or if you want to extend the date, I'm also okay with that, Your Honor.

THE COURT: Yeah. I mean, I think it makes most sense to maybe do this by motion. It can be without a hearing, right? Because unless anyone is objecting here to require those scheduled liabilities -- undisputed scheduled liabilities, and maybe in the motion we list who they are, so at least for our -- like we know who is the body of people, at least identifiable. And then

indicate that they have 30 days from entry of the order to file their proof of claim with the court. And they're not going to be treated as undisputed for purposes of claim allowance.

Mr. Kosto?

MR. KOSTO: Just to clarify, we're talking about parties that the Debtor has listed in the recently-filed schedules who have not already filed proofs of claim that something will be directed to them to file hard -- regular proof of claim?

THE COURT: Obviously, if there's already a proof of claim filed, that's been satisfied. But I think the idea behind Ms. Fernandez' concern was that, right now, since it's -- it was kind of -- there's a dispute over who's in charge, right? So the schedules that Mr. Johnson prepared, maybe they're accurate and maybe they're not.

And so make the people who he lists as undisputed come to the table under penalty of perjury and say: You know what? If you have a claim, come forward and subject yourself to this without, you know, just relying on the schedules.

MR. KOSTO: So the motion and order will be directed solely to those people, those that she

identifies?

THE COURT: Right.

MR. KOSTO: Okay.

THE COURT: Because everyone else would have to file one anyway. Because if they're listed as disputed --

MR. KOSTO: And any extension of time would be directed to those people so --

THE COURT: Right. Yes.

MR. KOSTO: No objection.

THE COURT: Okay. Mr. Leonard?

MR. LEONARD: Yes, Your Honor. Just one clarification to what the Chapter 11 Trustee said. We have been going through the various schedules to see if certain creditors have been listed on prior schedules had not appeared on the schedules. We have noticed a discrepancy in the all-party matrix for this case where there are certain parties listed in the current schedules that don't appear on the matrix and may not have notice of the case.

And so we're going to work to get those updated because of pending proof of claim deadline.

THE COURT: Okay. So, I mean, you may want

to then include, like, anyone who is either scheduled as undisputed in this particular case, was scheduled in the other case. Like, whatever the realm of folks that you're trying to require to come and assert that they have a --

MR. LEONARD: Yes, Your Honor. Our intention is to cast a wide net and make certain everyone who could have a claim has been provided notice and given the opportunity to file a claim if they so choose.

THE COURT: Okay. All right. So then just include that whoever you think it applies to in the motion and then submit a proposed order with the motion and I'll take care of it.

MR. LEONARD: Thank you, Your Honor.

THE COURT: Okay. Thank you. All right. Anything else we should address this afternoon?

Mr. Ainsworth?

MR. AINSWORTH: Your Honor, I probably will get that adversary. I don't know, because everybody's agreed to a standstill, but just so there's something for the state court. I'll probably -- I think I'll work on that tomorrow and try to get -- is there any hearing time later on this week? It will be something similar to

what we've done in prior cases where we try to extend the stay for some period of time just to give everybody breathing room to digest this.

THE COURT: Okay. So I'm going to be out of town on Friday. And then I'm leaving next Wednesday. So you have between now and --

MR. AINSWORTH: To get it filed quickly.

THE COURT: -- Tuesday to file and get an order. I mean, I do have hearings on the 21st, which you should know because Dr. Vornstein case is here. Sapphire. All your cases. They're all your cases on the 21st. So to the extent that's a day that you might want to --

MR. AINSWORTH: Try to get in. Thank you.

THE COURT: -- try to get it done. All right. Anything else?

MR. AINSWORTH: No, Your Honor.

THE COURT: Okay. All right. Very good, then -- did I set another hearing date? Yeah, August 19th. Okay. So we'll see you all back here on August 19th. Thank you.

(WHEREUPON, the proceeding was concluded at 2:50 p.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF ORANGE

I, SANDRA A. BATTAGLIA, NOTARY PUBLIC, CERTIFY THAT I WAS AUTHORIZED TO AND MY OFFICE DID TRANSCRIBE, FROM DIGITAL RECORDING, THE FOREGOING PROCEEDINGS AND THAT THE TRANSCRIPT IS A TRUE RECORD.

I FURTHER CERTIFY THAT I AM NOT A RELATIVE, EMPLOYEE, ATTORNEY OF COUNSEL OF ANY OF THE PARTIES, NOR AM I FINANCIALLY INTERESTED IN THE ACTION.

DATED THIS 26TH DAY OF JULY 2026.

Sandra A. Battaglia

SANDRA A. BATTAGLIA, RPR, FPR-C
NOTARY PUBLIC - STATE OF FLORIDA

**$**

**$500,000 [1]** 16/12

**1**

**100 [1]** 19/25
**1015 [4]** 15/1 15/12 16/22 18/18
**10:30 [1]** 40/15
**11 [9]** 2/11 2/17 4/22 5/3 5/23 6/16 13/15 22/13 48/13
**11:00 [1]** 40/7
**13th [1]** 27/20
**14 [1]** 1/15
**18th [1]** 38/13
**19 [1]** 3/12
**19th [6]** 40/6 40/8 40/12 42/11 50/20 50/21
**1st [3]** 8/12 9/9 25/15

**2**

**2023 [1]** 14/2
**2024 [1]** 22/7
**2025 [2]** 22/14 27/23
**2026 [5]** 1/15 3/12 17/20 22/5 51/12
**20th [2]** 39/2 39/25
**21st [2]** 50/9 50/12
**24th [1]** 38/14
**25-2685 [5]** 3/7 4/11 17/7 18/24 41/14
**25-5570 [4]** 4/11 18/2 18/12 24/18
**2685 [10]** 3/7 4/11 12/10 13/13 14/18 14/23 17/7 18/24 30/14 41/14
**26TH [1]** 51/12
**2:01 [1]** 1/16
**2:30 [1]** 5/10
**2:50 [2]** 1/16 50/23

**3**

**30 [2]** 46/2 47/1
**32 [1]** 24/23
**32801 [1]** 1/18
**341 [1]** 30/4

**4**

**400 [1]** 1/17
**4th [2]** 28/9 33/5

**5**

**5570 [5]** 4/11 11/19 18/2 18/12 24/18
**5th [1]** 17/20

**6**

**60 [15]** 16/15 16/24 17/4 17/11 17/19 18/3 18/16 19/9 19/14 20/18 20/22 21/6 22/2 22/15 24/6
**6:25-bk-02685-GER [1]** 1/5
**6:25-bk-05570-GER [1]** 1/5

**8**

**88 [1]** 17/9
**89 [1]** 17/9

**9**

**9011 [1]** 24/25
**9:30 [3]** 3/12 40/8 40/12

**A**

**a.m [1]** 3/12
**ability [3]** 38/20 [illegible]
**able [5]** 26/19 26/22 26/23 28/3 44/19
**about [16]** 6/11 6/13 8/12 9/9 16/5 16/6 17/5 24/19 28/19 35/8 36/19 37/14 38/21 42/11 46/12 47/7
**absolute [1]** 16/9
**absolutely [1]** 26/5
**academic [1]** 42/2
**accomplish [1]** 14/10
**account [8]** 6/22 7/5 7/13 7/15 7/24 8/2 8/18 45/4
**accountant [1]** 28/2
**accounts [1]** 23/21
**accurate [1]** 47/18
**acknowledged [1]** 21/17
**across [1]** 33/23
**Act [3]** 19/18 20/10 21/4
**ACTION [1]** 51/11
**active [1]** 13/1
**actual [1]** 36/19
**actually [7]** 6/18 32/12 35/7 39/13 39/14 44/23 45/12
**additional [1]** 11/15
**address [2]** 25/8 49/17
**addresses [1]** 25/1
**adjudication [1]** 20/7
**adjudicative [1]** 21/22
**administration [1]** 19/5
**adopted [1]** 27/1
**advanced [1]** 22/13
**adversary [2]** 34/6 49/20
**adverse [2]** 22/16 23/21
**advise [1]** 5/10
**after [6]** 17/4 21/25 28/9 31/2 38/25 42/4
**afternoon [11]** 4/6 4/9 4/14 4/18 4/20 4/23 5/2 5/7 5/22 6/1 49/17
**again [6]** 6/16 23/4 25/2 33/20 41/22 46/16
**against [2]** 18/11 32/15
**agree [2]** 12/5 37/18
**agreed [6]** 19/23 20/6 25/22 32/19 34/3 49/21
**agreeing [1]** 12/1
**agreement [1]** 33/15
**agrees [1]** 37/9
**ahead [2]** 10/25 11/2
**AINSWORTH [4]** 2/12 25/12 33/9 49/18
**Ainsworth's [1]** 39/6
**albeit [1]** 13/23
**ALESKOVSKY [7]** 2/3 4/13 4/15 29/11 30/1 42/12 44/4
**all [42]** 4/2 5/20 6/4 7/7 8/1 10/7 10/9 10/16 10/18 10/19 10/22 11/23 13/11 14/12 15/6 16/20 19/24 24/7 24/13 25/18 28/2 28/6 31/10 33/6 34/7 35/21 37/20 38/1 38/10 39/24 40/13 44/10 45/22 46/15 48/18 49/11 49/16 50/11 50/11 50/15 50/18 50/20
**all-party [1]** 48/18
**allegations [1]** 21/13
**alleged [2]** 17/14 17/16
**allow [1]** 12/6
**allowance [1]** 47/4
**allows [1]** 15/12
**alls [1]** 15/6
**alone [2]** [illegible] 27/5
**already [4]** 7/14 8/17 47/8 47/12
**also [8]** 13/19 24/18 26/2 28/14 29/7 38/6 38/24 46/17
**alter [2]** 18/9 22/21
**although [4]** 6/23 8/22 9/5 25/5
**am [8]** 6/18 7/3 8/11 32/13 34/14 46/11 51/9 51/11
**AMODEO [11]** 2/10 3/8 5/18 14/15 14/19 14/22 18/15 24/15 24/19 30/2 40/24
**Amodeo's [1]** 36/8
**among [1]** 17/24
**amount [3]** 30/20 31/6 35/19
**amounts [1]** 43/6
**analysis [1]** 46/7
**another [7]** 24/22 29/22 31/21 35/9 39/2 44/18 50/19
**answered [1]** 43/18
**answers [1]** 43/19
**ANTHONY [2]** 2/11 4/21
**any [20]** 6/11 9/25 18/8 22/24 23/2 23/22 26/9 27/25 28/5 30/19 34/21 37/19 39/15 39/24 41/12 41/21 44/3 48/7 49/24 51/10
**anybody [1]** 34/5
**Anyhow [1]** 8/25
**anyone [5]** 6/4 16/21 40/16 46/20 49/1
**anyone's [1]** 14/21
**anything [9]** 6/12 16/25 26/19 26/22 26/23 32/21 42/3 49/17 50/16
**anyway [3]** 25/23 29/5 48/5
**Apologies [1]** 12/3
**appeal [3]** 20/23 25/5 41/22
**appear [2]** 40/13 48/20
**appearance [2]** 6/5 32/23
**appearances [1]** 4/12
**appeared [1]** 48/16
**APPEARING [2]** 2/2 2/16
**applied [4]** 14/5 19/19 20/9 25/6
**applies [1]** 49/12
**apply [1]** 25/5
**applying [1]** 21/3
**appointed [1]** 12/16
**appointment [2]** 12/12 18/14
**appreciate [1]** 42/1
**appreciated [1]** 6/10
**appropriate [2]** 34/2 38/6
**approve [1]** 42/19
**are [34]** 6/11 6/25 7/13 7/14 9/3 9/17 9/25 10/11 11/20 11/21 11/25 12/1 12/12 13/21 14/9 16/13 17/7 17/25 24/24 25/25 28/13 29/16 31/12 31/13 33/9 33/22 34/22 35/23 35/24 37/2 44/10 46/2 46/23 48/18
**area [1]** 37/4
**argue [1]** 16/25
**argues [1]** 22/11
**arguing [2]** 17/24 19/17
**argument [4]** 18/15 18/17 18/22 26/1
**arguments [1]** 24/4
**arms [1]** 11/8
**around [1]** 11/8
**arrangement [3]** 8/3 8/6 8/9

**A**


**arrangements [1]** 9/3
**as [24]** 8/16 8/16 8/22 12/6 18/21 18/25 20/2 20/18 28/24 29/17 30/4 30/7 30/7 30/20 30/20 32/14 41/17 45/11 45/18 46/15 47/3 47/19 48/5 49/2
**ask [5]** 6/23 29/17 43/2 43/7 43/12
**asked [3]** 21/25 23/18 28/8
**assert [1]** 49/5
**asserted [1]** 21/13
**asserting [1]** 21/7
**assertions [1]** 19/20
**asserts [2]** 17/13 17/18
**assigned [1]** 19/24
**assignment [7]** 16/10 17/21 20/7 21/18 22/7 22/10 22/22
**associated [1]** 35/24
**association [5]** 2/14 2/14 5/9 5/9 9/20
**assuming [2]** 30/23 37/8
**assured [1]** 8/5
**at [36]** 7/3 8/5 11/23 12/2 12/14 12/20 12/22 13/15 14/2 14/12 14/21 14/23 21/5 21/15 22/13 24/11 25/4 28/17 30/3 32/2 32/12 32/21 35/3 35/17 35/22 36/8 36/13 36/20 37/15 40/8 40/12 40/15 44/20 46/24 46/25 50/22
**attached [1]** 20/5
**ATTORNEY [1]** 51/10
**attorneys [1]** 12/18
**AUDREY [2]** 2/3 4/15
**August [14]** 3/12 25/15 28/9 33/5 38/5 38/13 38/14 38/21 38/22 39/2 40/12 42/11 50/20 50/21
**authority [3]** 15/6 15/9 20/15
**authorize [1]** 18/6
**AUTHORIZED [1]** 51/6
**auto [5]** 7/1 7/13 7/23 8/17 9/14
**auto-debit [1]** 7/13
**auto-debited [3]** 7/1 7/23 8/17
**automatic [1]** 42/24
**available [2]** 18/8 40/2
**avoidable [1]** 18/20
**aware [2]** 8/13 34/14


**B**


**back [10]** 5/12 6/20 16/2 16/9 16/11 16/18 26/14 26/23 37/24 50/20
**Bank [2]** 2/6 4/25
**bankruptcy [8]** 1/3 1/17 4/3 15/10 18/18 18/21 29/16 46/8
**bar [2]** 21/10 46/2
**based [4]** 17/19 26/17 41/17 43/5
**basically [2]** 15/9 27/17
**basis [3]** 15/5 24/5 43/13
**BATTAGLIA [2]** 51/5 51/18
**be [85]**
**because [17]** 17/2 24/17 26/20 27/7 29/14 34/24 38/18 40/4 44/11 44/23 46/4 46/20 48/4 48/5 48/23 49/20 50/10
**become [1]** 27/22
**becomes [1]** 29/19
**been [19]** 8/6 12/3 20/20 22/7 25/11 25/16 26/7 26/22 27/12 28/3 31/13 32/7 33/20 34/13 37/5 47/13 48/14 48/15 49/8
**before [17]** 1/14 6/10 17/8 19/21 26/18 27/2 28/20 29/13 29/18 36/25 38/17 38/20 38/23 41/7 41/12 42/11 43/15
**behalf [18]** 2/3 2/4 2/5 2/7 2/8 2/11 2/12 2/13 2/18 4/15 4/19 4/21 4/24 5/3 5/8 5/17 6/2 30/11
**behind [2]** 30/2 47/14
**being [4]** 9/3 26/9 32/13 33/23
**belated [1]** 20/19
**believe [4]** 10/2 11/4 16/17 33/11
**belongs [1]** 41/25
**bench [1]** 26/6
**benefit [2]** 41/19 43/11
**besides [1]** 39/25
**best [1]** 11/10
**between [2]** 46/8 50/6
**bk [2]** 1/5 1/5
**Board [1]** 8/15
**body [1]** 46/24
**bona [1]** 27/3
**Borges [1]** 29/12
**both [5]** 4/9 7/22 11/14 12/4 34/22
**breathing [1]** 50/3
**brief [1]** 15/1
**briefing [1]** 22/1
**briefly [1]** 14/22
**bring [1]** 9/3
**bunch [5]** 14/19 16/16 34/15 35/16 35/20
**burden [2]** 23/5 44/7
**business [1]** 38/7
**but [46]** 8/5 8/8 8/13 8/16 9/2 11/6 11/24 12/16 12/23 13/10 13/19 14/21 15/14 16/4 16/17 19/13 23/14 24/11 26/2 26/15 26/17 27/11 27/16 27/18 28/1 29/22 30/14 30/18 31/1 31/13 34/5 34/9 34/19 35/2 35/14 36/22 37/15 37/21 39/17 40/19 41/5 44/18 45/3 45/15 47/13 49/21
**buyer [1]** 28/23


**C**


**calendar [2]** 11/4 11/18
**call [4]** 4/9 6/5 30/18 33/18
**called [1]** 26/24
**can [15]** 15/9 25/6 25/25 27/9 30/21 33/21 33/24 34/7 36/24 37/4 37/7 37/14 40/11 40/13 46/19
**can't [4]** 27/7 27/15 40/19 43/4
**candidate [1]** 43/6
**candidates [1]** 31/11
**candidly [1]** 44/21
**cannot [1]** 40/16
**Cape [2]** 2/13 5/8
**care [4]** 8/10 34/20 41/14 49/14
**carried [1]** 23/5
**Carton [3]** 2/18 6/3 40/22
**case [48]** 1/5 4/11 4/11 5/11 6/8 11/19 11/20 12/11 12/13 12/15 12/25 13/1 13/2 13/13 13/24 14/18 14/23 15/23 16/10 16/14 17/7 17/11 18/1 18/11 18/12 18/24 19/3 19/7 22/19 24/17 26/14 27/2 27/6 27/20 28/20 29/4 29/22 30/14 33/10 35/10 39/6 41/14 41/18 48/18 48/21 49/2 49/3 50/10
**case's [2]** 12/20 12/23
**cases [8]** 4/10 13/6 15/10 27/25 46/9 50/1 50/11 50/12
**cash [1]** 36/16
**cast [1]** 49/7
**catch [1]** 10/9
**CATHERINE [2]** 2/5 4/24
**central [1]** 37/18
**certain [4]** 33/22 48/15 48/19 49/7
**certainly [4]** 11/11 31/7 34/18 46/11
**CERTIFICATE [2]** 3/14 51/1
**CERTIFY [2]** 51/5 51/9
**cetera [1]** 43/6
**chance [5]** 12/20 14/21 24/16 38/9 44/17
**changed [1]** 8/1
**Chapter [9]** 2/11 2/17 4/22 5/3 5/23 6/16 13/15 26/23 48/13
**Chapter 11 [1]** 13/15
**charge [2]** 44/9 47/16
**check [1]** 9/12
**checks [3]** 9/6 9/7 9/8
**CHOE [2]** 2/5 4/24
**choice [1]** 23/20
**choices [1]** 20/24
**choose [1]** 49/10
**chose [1]** 22/25
**CHRISTOPHER [2]** 2/13 5/8
**circuits [1]** 27/1
**civil [2]** 17/12 22/20
**claim [21]** 26/20 27/14 27/17 27/21 27/22 27/25 33/25 37/15 37/22 43/5 45/20 45/21 47/2 47/4 47/9 47/11 47/13 47/22 48/23 49/8 49/9
**claimants [1]** 45/12
**claims [5]** 8/23 26/11 27/24 30/21 45/13
**clams [1]** 46/2
**clarification [1]** 48/13
**clarify [1]** 47/6
**clawback [5]** 13/7 13/18 13/20 16/2 16/6
**clear [3]** 21/20 22/15 23/25
**clearly [1]** 21/19
**client [2]** 22/5 32/9
**clients [3]** 9/22 11/21 12/4
**Code [2]** 18/21 31/14
**collateral [1]** 34/25
**collateralization [1]** 22/24
**come [11]** 5/12 8/1 8/24 25/14 28/23 37/24 40/2 40/18 47/20 47/22 49/5
**coming [2]** 24/23 30/1
**commencing [1]** 18/11
**commit [1]** 21/3
**communicated [1]** 28/21
**communicating [1]** 9/19
**communication [1]** 6/18
**Community [2]** 2/6 4/24

## C


**company [3]** 7/18 7/20 9/14
**compel [1]** 19/10
**competent [1]** 36/23
**completely [2]** 25/21 25/22
**complicate [1]** 37/1
**complicated [4]** 13/23 13/24 37/20 45/5
**comply [1]** 35/3
**components [2]** 29/15 29/20
**concede [1]** 22/23
**concern [1]** 47/14
**concerning [1]** 17/21
**concerns [2]** 19/5 19/10
**concluded [1]** 50/22
**concluding [1]** 18/5
**condominium [1]** 7/22
**conduct [7]** 21/11 22/18 22/25 23/2 26/12 27/4 31/16
**conference [7]** 3/11 6/8 12/9 38/19 40/5 40/11 40/13
**conferences [1]** 11/20
**confirmation [2]** 39/6 40/15
**connection [1]** 16/21
**consider [1]** 21/25
**consistent [1]** 26/5
**consolidate [1]** 15/12
**consolidated [1]** 18/18
**consolidation [2]** 15/13 15/20
**contact [2]** 8/14 12/4
**contend [1]** 22/20
**contends [2]** 19/14 22/8
**contentions [2]** 21/1 24/5
**continue [3]** 13/15 36/25 40/21
**contradiction [1]** 22/11
**contradicts [1]** 22/8
**contrary [2]** 19/4 21/23
**control [3]** 7/4 9/8 44/12
**convert [1]** 20/25
**conveyance [2]** 16/12 16/19
**conveyances [1]** 16/5
**convincing [3]** 21/20 22/15 23/25
**copies [1]** 26/8
**correct [3]** 16/3 45/24 46/13
**correctly [1]** 20/22
**corrupts [1]** 21/11
**could [19]** 7/6 8/3 15/2 15/7 18/6 18/17 20/4 20/20 31/10 33/7 34/17 38/4 40/5 44/21 45/13 45/14 45/15 46/11 49/8
**couldn't [1]** 26/15
**counsel [7]** 6/23 17/20 21/8 22/6 32/14 46/7 51/10
**County [3]** 33/4 33/6 51/3
**couple [2]** 16/13 33/17
**course [2]** 13/16 28/25
**court [33]** 1/3 1/17 4/3 5/10 6/10 17/8 17/14 18/4 18/12 18/23 18/25 19/21 20/4 20/9 21/1 21/2 21/10 21/22 21/25 22/23 23/4 23/18 23/20 26/11 26/20 26/25 27/4 30/23 33/3 34/9 43/8 47/3 49/22
**Court's [1]** 17/10
**courtroom [2]** 4/13 15/2
**courts [1]** 34/7
**coverage [1]** 9/21
**covered [2]** 9/24 24/24
**create [1]** 19/3
**creditors [8]** 7/7 11/5 11/11 11/14 11/23 30/19 [illegible]
**Crescent [1]** 20/1
**Crossings [2]** 2/14 5/8
**CROWDER [3]** 2/13 5/8 8/7
**CTO [2]** 2/9 5/17
**Curidan [1]** 21/8
**current [5]** 6/24 9/3 9/16 14/3 48/19


## D


**data [1]** 37/7
**date [9]** 1/15 6/14 16/18 20/2 24/24 29/6 46/2 46/16 50/19
**DATED [1]** 51/12
**dates [1]** 14/8
**day [7]** 15/2 39/4 39/17 39/20 39/25 50/13 51/12
**days [1]** 47/1
**deadline [5]** 27/20 41/6 41/7 46/4 48/24
**debit [1]** 7/13
**debited [3]** 7/1 7/23 8/17
**debiting [1]** 7/14
**debt [1]** 36/18
**DEBTOR [8]** 1/9 18/11 19/4 23/11 30/10 30/12 31/22 47/7
**Debtor's [2]** 30/13 30/15
**debunk [1]** 13/3
**decide [1]** 23/18
**decision [1]** 16/15
**declined [1]** 23/16
**deed [4]** 17/16 19/17 21/7 25/9
**defects [1]** 17/14
**defer [3]** 12/2 12/5 39/18
**defunct [2]** 35/23 35/24
**degree [2]** 13/21 14/9
**delinquent [2]** 9/1 9/2
**demonstrated [1]** 23/24
**demonstrates [1]** 23/10
**denial [1]** 19/11
**denied [2]** 18/4 41/17
**deny [3]** 16/15 17/1 41/15
**denying [2]** 15/19 24/8
**deposit [1]** 45/4
**deposited [1]** 6/21
**details [1]** 21/12
**determination [2]** 42/11 43/25
**determine [5]** 30/21 34/2 36/9 43/5 43/8
**determining [1]** 9/20
**developed [1]** 20/25
**development [1]** 23/23
**device [1]** 45/2
**did [11]** 6/5 6/8 10/3 15/6 16/20 18/8 20/25 21/2 39/3 50/19 51/6
**didn't [1]** 12/23
**different [7]** 8/23 8/23 13/7 13/18 13/20 14/8 46/8
**digest [3]** 33/18 36/24 50/3
**digested [1]** 35/16
**DIGITAL [1]** 51/7
**DIP [3]** 7/5 8/2 45/4
**directed [5]** 18/13 31/13 47/10 47/25 48/8
**directly [1]** 9/13
**disappointing [1]** 39/23
**disastrous [1]** 29/15
**discharges [1]** 43/1
**disclose [1]** 6/12
**disclosed [1]** 17/18
**disclosure [1]** 28/15
**discovery [4]** 20/21 20/24 22/25 23/16
**discrepancy [1]** 48/17
**discuss [2]** 7/6 42/3
**discussion [1]** 33/14
**disinterested [1]** 43/6
**dismissal [11]** 12/13 15/16 19/1 19/15 19/21 20/12 21/5 21/18 21/23 23/6 41/18
**dismissing [2]** 17/10 18/23
**dispose [1]** 11/10
**disposition [1]** 34/25
**dispute [2]** 37/22 47/16
**disputed [4]** 21/14 30/24 43/4 48/6
**disputes [1]** 20/20
**disrupted [1]** 38/8
**DISTRICT [2]** 1/3 4/3
**DIVISION [1]** 1/4
**Dixon [10]** 16/8 22/9 25/16 26/14 27/11 27/21 28/4 30/15 33/18 33/20
**do [24]** 11/7 12/4 12/19 14/22 16/17 17/4 24/5 24/10 24/19 26/15 31/17 36/11 37/25 38/12 39/16 39/24 40/6 40/11 40/11 43/23 44/22 44/25 46/19 50/9
**document [1]** 17/8
**documentary [2]** 20/5 21/24
**documents [5]** 14/16 20/11 22/22 23/14 32/18
**DocuSign [1]** 25/19
**does [9]** 19/7 20/18 21/19 21/20 22/21 22/23 23/7 34/14 36/17
**doesn't [2]** 38/7 40/1
**doing [1]** 46/7
**dollars [1]** 29/1
**don't [37]** 10/23 11/25 12/13 12/17 13/11 14/20 24/16 24/20 24/21 25/6 26/16 28/22 29/24 30/16 30/25 31/23 31/24 32/9 32/12 32/20 34/11 34/17 34/20 35/9 35/11 36/19 37/12 38/17 41/9 42/22 42/23 44/15 44/22 45/5 45/15 48/20 49/20
**done [5]** 16/16 28/9 31/13 50/1 50/15
**door [1]** 5/11
**dove [1]** 35/16
**Dr [1]** 50/10
**draft [1]** 9/14
**driver's [1]** 43/14
**due [1]** 41/13
**during [1]** 38/8


## E


**earlier [4]** 18/21 20/20 22/9 23/8
**easier [1]** 16/18
**easily [1]** 16/13
**easy [1]** 45/3
**effect [2]** 15/15 22/21
**effort [1]** 37/11
**egregious [1]** 21/21
**either [13]** 9/11 11/4 14/13 23/25 29/1 31/1 32/13 34/8 35/4 35/5 37/24 46/6 49/1
**elected [3]** 20/3 23/14 42/15
**election [8]** 29/7 29/9 30/22

**E**

**election... [5]** 30/24 31/2 31/16 42/10 43/4
**electronic [1]** 25/23
**electronics [1]** 25/19
**else [9]** 5/13 16/21 16/24 31/20 42/3 42/15 48/4 49/17 50/16
**emergency [1]** 43/12
**emphasize [1]** 20/22
**employ [1]** 44/24
**EMPLOYEE [1]** 51/10
**enable [1]** 18/19
**encourages [1]** 15/13
**end [2]** 38/5 38/12
**enforce [1]** 27/8
**enough [1]** 36/19
**entered [2]** 18/13 21/23
**entire [1]** 13/3
**entry [2]** 19/21 47/1
**equitable [1]** 20/13
**equity [1]** 29/2
**especially [1]** 15/8
**ESQUIRE [11]** 2/3 2/4 2/5 2/7 2/8 2/11 2/11 2/12 2/13 2/17 2/18
**establish [3]** 21/19 21/20 23/7
**estate [5]** 1/8 4/10 25/7 35/1 37/6
**estate's [1]** 18/19
**estates [2]** 18/17 19/4
**et [1]** 43/6
**even [6]** 12/14 12/20 15/21 16/8 19/9 21/13
**event [6]** 18/8 22/24 34/21 39/15 43/3 43/4
**ever [1]** 27/15
**every [1]** 28/3
**everybody [5]** 5/13 33/16 33/17 33/21 50/3
**everybody's [1]** 49/21
**everyone [4]** 45/20 46/15 48/4 49/8
**everyone's [1]** 41/19
**everything [5]** 12/7 25/14 34/9 34/16 37/10
**evidence [4]** 18/8 21/9 21/21 23/25
**evidentiary [12]** 20/4 20/21 20/24 23/1 23/8 23/13 23/17 23/17 23/22 26/3 26/12 27/4
**examination [1]** 29/4
**example [1]** 42/14
**except [2]** 28/1 32/14
**exceptionally [1]** 21/10
**excess [1]** 6/20
**excuse [1]** 43/24
**executed [1]** 22/22
**exercise [1]** 42/2
**exist [1]** 19/16
**existed [1]** 19/16
**existence [1]** 21/17
**expected [1]** 27/19
**expenses [1]** 10/22
**expert [8]** 25/14 25/24 28/2 35/10 35/12 36/4 37/9 39/12
**experts [7]** 25/11 27/9 28/10 34/22 34/24 35/1 37/3
**explain [1]** 18/25
**explore [2]** 23/1 23/13
**extend [6]** 34/6 43/23 46/3 26/6 40/13 30/2
**extension [1]** 48/7
**extent [2]** 24/3 50/12

**F**

**fabricated [2]** 21/7 21/9
**facets [1]** 33/22
**fact [5]** 13/22 15/13 26/10 26/21 44/15
**facts [3]** 19/8 20/11 21/14
**factual [3]** 20/19 25/3 41/23
**failed [1]** 23/2
**fails [2]** 18/2 24/8
**fair [4]** 22/12 23/3 23/11 24/2
**fairly [1]** 22/19
**fairness [1]** 19/5
**fall [1]** 37/10
**false [2]** 19/15 25/9
**familiar [1]** 15/3
**Family [3]** 2/18 6/3 40/23
**far [4]** 8/16 16/4 30/7 31/12
**feel [2]** 13/21 38/10
**fees [2]** 7/20 9/16
**FERNANDEZ [21]** 2/17 5/21 5/23 6/8 6/12 6/16 10/19 12/19 16/3 18/14 29/14 29/17 31/17 35/15 37/24 38/9 39/24 42/24 43/18 44/5 44/15
**Fernandez' [3]** 12/12 43/11 47/14
**few [1]** 29/1
**fide [1]** 27/3
**fight [3]** 27/22 27/24 39/21
**fighting [1]** 35/8
**figure [1]** 35/25
**file [19]** 20/15 27/21 30/22 34/5 41/21 42/17 43/7 44/19 44/21 45/12 45/14 45/14 45/19 45/21 47/2 47/10 48/5 49/9 50/8
**filed [25]** 6/9 12/11 14/17 14/19 17/9 17/23 18/1 18/11 18/15 24/15 24/18 26/2 26/7 27/25 28/13 28/14 30/12 31/2 33/23 35/12 40/25 47/8 47/9 47/13 50/7
**filing [8]** 6/17 8/20 14/8 42/13 43/24 44/8 46/12 46/14
**filings [2]** 3/7 25/23
**filled [1]** 5/12
**FINANCIALLY [1]** 51/11
**find [5]** 8/12 9/9 15/7 27/9 29/6
**findings [1]** 20/10
**finds [3]** 21/2 23/4 23/20
**fine [1]** 40/20
**first [9]** 4/12 7/1 7/19 16/10 17/1 17/13 23/5 27/20 37/13
**FL [1]** 1/18
**FLORIDA [13]** 1/3 4/4 17/12 19/16 19/18 20/10 21/3 26/10 27/7 27/13 27/14 51/2 51/19
**flow [1]** 36/16
**Flynn's [1]** 28/1
**folks [2]** 46/3 49/4
**foreclosure [2]** 11/13 12/5
**FOREGOING [1]** 51/7
**forensic [1]** 28/2
**forest [1]** 35/18
**forged [1]** 19/17
**forgery [2]** 17/16 25/9
**[illegible] [1]** 17/15
**former [1]** 25/17
**forum [1]** 19/8
**forward [3]** 7/6 36/15 47/22
**found [2]** 20/12 24/23
**FPR [1]** 51/18
**FPR-C [1]** 51/18
**framed [1]** 22/1
**FRANK [2]** 2/10 5/18
**frankly [1]** 16/4
**fraud [5]** 17/14 21/10 21/21 22/17 23/8
**fraudulent [2]** 16/5 16/12
**frequently [1]** 34/1
**Friday [1]** 50/5
**front [2]** 37/8 39/3
**fronts [1]** 33/23
**full [4]** 22/12 23/3 23/11 24/2
**fully [1]** 22/19
**fulsome [1]** 24/11
**fun [2]** 29/4 32/25
**function [2]** 20/18 21/22
**functional [1]** 36/22
**functionally [2]** 35/23 37/21
**functioning [1]** 19/8
**funds [2]** 8/1 8/1
**further [3]** 11/12 19/11 51/9

**G**

**gaps [1]** 9/25
**gather [2]** 28/3 31/6
**gearing [1]** 34/22
**general [2]** 12/24 14/7
**generally [3]** 12/22 14/11 25/6
**generate [1]** 36/16
**GER [2]** 1/5 1/5
**get [19]** 5/12 10/5 11/8 11/11 13/9 28/22 29/23 31/10 34/22 35/18 37/1 37/7 48/22 49/20 49/24 50/7 50/8 50/14 50/15
**getting [6]** 7/3 10/20 33/11 36/5 37/21 41/3
**give [5]** 11/14 16/8 24/12 38/9 50/3
**given [2]** 30/23 49/9
**giving [1]** 11/8
**go [4]** 10/25 11/2 34/2 35/3
**going [27]** 4/9 6/23 8/15 11/3 15/22 16/23 17/1 17/1 17/2 17/5 24/13 29/16 32/10 34/24 35/1 37/15 37/21 38/18 39/9 39/19 40/21 42/10 44/23 47/3 48/14 48/22 50/4
**good [13]** 4/6 4/14 4/18 4/20 4/23 5/2 5/7 5/22 6/1 10/17 12/8 38/8 50/18
**got [4]** 9/7 29/13 35/21 44/11
**Gotcha [1]** 5/14
**gotten [1]** 10/6
**GRACE [2]** 1/14 4/5
**granted [2]** 11/22 45/15
**granting [1]** 18/16
**Great [2]** 12/8 33/8
**greatly [1]** 6/9
**grounded [1]** 20/10
**group [1]** 39/18
**guess [14]** 6/10 6/17 7/10 7/18 7/21 12/24 13/9 35/2 37/13 42/9 43/22 44/14 44/20

**G**

**guess...** [1] 45/9
**guy** [1] 25/19

**H**

**had** [22] 10/1 11/6 11/22 12/20 14/14 14/15 14/16 14/21 16/7 16/8 18/4 19/24 23/11 24/16 24/21 27/1 28/19 31/6 31/9 42/5 45/4 48/16
**half** [2] 40/8 40/10
**hand** [1] 28/10
**handle** [2] 9/11 10/20
**handwritten** [1] 44/23
**happen** [4] 15/22 37/13 42/23 43/10
**happened** [2] 8/8 27/23
**happening** [1] 29/8
**happens** [3] 30/8 38/10 42/2
**happy** [4] 9/10 10/15 29/13 46/14
**hard** [1] 47/10
**has** [20] 8/6 8/13 12/14 14/1 16/25 19/13 23/4 23/24 25/16 26/7 26/11 27/12 27/12 32/7 35/16 35/16 37/5 37/12 47/7 49/8
**have** [68]
**haven't** [7] 10/6 24/16 26/16 27/25 32/17 34/4 42/23
**having** [4] 6/19 6/20 13/6 13/18
**he** [5] 27/12 31/25 35/20 36/8 47/19
**he's** [1] 36/16
**heading** [2] 28/18 29/16
**hear** [1] 26/13
**heard** [4] 16/21 27/15 33/7 43/12
**hearing** [24] 1/12 14/13 20/4 20/21 22/14 23/1 23/13 23/17 23/18 26/3 28/14 33/3 33/6 39/2 39/7 40/15 41/7 41/12 43/8 43/15 45/16 46/20 49/24 50/19
**hearings** [2] 40/24 50/9
**held** [2] 16/10 20/13
**help** [3] 36/24 38/4 44/25
**her** [4] 16/4 43/1 44/8 44/8
**here** [19] 6/7 15/19 24/6 28/11 29/13 30/23 31/24 34/19 35/21 36/2 36/21 36/23 37/21 38/21 40/14 40/17 46/21 50/11 50/21
**hey** [1] 34/8
**high** [1] 21/11
**him** [3] 29/20 31/24 39/10
**his** [4] 19/24 23/5 27/21 32/6
**historical** [1] 26/24
**history** [1] 30/23
**hit** [1] 27/20
**HOA** [10] 6/19 6/22 6/24 7/13 7/20 7/21 8/12 8/14 8/20 9/13
**HOA's** [2] 6/23 9/16
**HOAs** [1] 8/23
**hold** [1] 31/11
**Holdings** [2] 2/9 5/17
**HOMEMAKERS** [9] 1/8 4/10 4/10 14/2 19/23 20/3 21/16 22/24 23/15
**Homeowners** [3] 2/14 5/8
**honest** [1] 27/19
**Honor** [49] 4/14 4/18 4/20 4/23 5/2 5/7 5/16 5/18 5/22 6/2 6/15 11/1 13/25 14/25 24/20 27/19 30/6 30/9 31/9 32/13 33/1 33/2 33/12 33/24 33/24 34/14 34/14 35/13 37/8 37/8 38/2 38/15 39/1 39/22 40/15 41/4 41/10 41/20 42/5 43/3 44/5 45/10 45/24 46/17 48/12 49/6 49/15 49/19 50/17
**HONORABLE** [2] 1/14 4/4
**hope** [3] 10/13 11/13 33/1
**hopefully** [3] 8/9 43/9 43/17
**hoping** [1] 37/1
**Horton** [2] 2/7 5/4
**hour** [2] 40/9 40/10
**how** [8] 9/11 13/8 14/4 14/5 28/5 35/20 35/25 37/20
**However** [1] 18/25
**hundred** [2] 16/13 32/8
**hundred-percent** [1] 32/8
**Hyman** [1] 44/24
**hypothetical** [1] 26/25

**I**

**I'd** [2] 40/18 43/23
**I'll** [16] 5/12 7/4 8/21 9/8 10/5 13/9 16/16 25/8 33/11 40/2 41/14 41/18 45/13 49/14 49/22 49/23
**I'm** [25] 4/9 5/11 8/13 8/14 9/10 14/3 14/10 16/23 17/1 17/1 17/5 18/25 25/13 25/19 26/5 29/23 30/17 30/23 35/20 39/14 44/23 46/14 46/16 50/4 50/5
**I've** [9] 16/16 16/23 25/12 28/3 34/13 34/16 34/17 36/7 45/4
**idea** [1] 47/14
**ideal** [1] 39/4
**identifiable** [1] 46/25
**identifies** [1] 48/1
**if** [60]
**important** [2] 16/11 44/13
**IMQA** [2] 2/8 5/17
**in** [110]
**inadvertently** [1] 9/6
**inaudible** [1] 24/21
**include** [2] 49/1 49/12
**included** [1] 18/17
**including** [2] 23/12 28/4
**income** [2] 7/4 10/21
**indicate** [1] 47/1
**indicated** [2] 14/13 42/13
**information** [3] 10/13 10/16 31/7
**initial** [2] 6/7 31/5
**initially** [1] 28/17
**input** [1] 31/9
**insider** [1] 13/20
**inspector** [2] 25/17 25/18
**instead** [1] 23/14
**insurance** [3] 9/21 10/16 10/21
**intend** [1] 39/21
**intending** [1] 32/1
**intent** [3] 13/8 23/1 23/14
**intention** [3] 30/18 35/14 49/7
**interest** [1] 19/25
**interested** [2] 31/10 51/11
**interim** [1] 45/3
**interviewed** [1] 31/11
**into** [5] 6/22 8/2 13/10 21/1 37/10
**investigation** [1] 6/13
**Investments** [1] 2/9
**invokes** [1] 21/6
**involuntary** [6] 12/25 13/15 15/11 18/1 18/10 19/7
**involved** [1] 28/20
**irrelevant** [2] 13/21 14/9
**is** [134]
**isn't** [2] 16/5 39/7
**issue** [13] 16/22 22/1 24/10 25/1 25/9 26/13 27/4 33/4 33/4 33/5 37/15 41/22 45/10
**issues** [1] 42/6
**issuing** [1] 41/19
**it** [88]
**it's** [32] 7/14 7/17 7/17 7/20 7/21 7/23 9/2 9/13 10/11 12/15 12/16 13/23 15/21 15/21 16/5 16/11 16/17 17/2 27/9 27/15 30/3 30/3 30/15 32/6 32/16 40/12 41/23 41/24 42/15 44/15 46/4 47/15
**its** [5] 15/10 20/5 21/22 22/19 38/8
**itself** [2] 21/12 21/16

**J**

**JAMES** [2] 2/4 4/19
**January** [1] 22/6
**JBBA** [1] 38/23
**JEFFREY** [1] 2/12
**Johnson** [23] 2/7 5/5 17/9 19/13 19/14 19/24 20/14 21/6 22/8 22/10 22/11 23/4 23/11 23/16 23/24 24/3 25/5 25/23 30/13 31/23 32/1 32/8 47/17
**Johnson's** [1] 22/4
**Johnston** [1] 29/18
**Judge** [1] 39/3
**judgment** [3] 11/24 22/17 27/13
**judicial** [1] 21/12
**JULY** [7] 1/15 8/12 9/9 27/20 27/23 46/2 51/12
**July's** [1] 7/20
**June** [2] 9/5 22/13
**jurisdiction** [3] 24/10 26/25 41/25
**jurisdictional** [3] 26/9 27/3 27/5
**jurisprudence** [1] 15/8
**just** [39] 4/9 8/21 9/16 10/10 12/9 12/16 13/13 14/3 14/22 16/5 16/23 24/11 25/1 27/6 28/4 29/12 29/25 31/8 32/6 32/20 34/6 34/7 34/9 35/18 36/5 38/18 41/6 41/11 41/14 43/10 44/15 45/13 45/15 47/6 47/23 48/12 49/11 49/21 50/2

**K**

**keep** [3] 8/3 12/9 41/11
**kept** [1] 34/17
**kind** [10] 5/11 8/22 11/8 13/5 28/19 35/18 42/6 45/1 46/12 47/15
**know** [65]

**K**

**known [2]** 16/7 16/8
**Kosta [1]** 5/17
**KOSTO [3]** 2/8 5/15 47/5

**L**

**lack [2]** 23/22 23/22
**lacked [1]** 20/14
**land [11]** 17/15 18/5 19/16 19/18 20/1 20/8 20/10 20/16 21/4 21/17 33/4
**LARA [3]** 2/17 5/23 6/16
**largely [1]** 22/4
**largest [1]** 7/11
**Larry [2]** 5/16 44/24
**last [4]** 10/8 14/13 32/23 38/8
**later [3]** 18/1 20/25 49/24
**later-developed [1]** 20/25
**later-filed [1]** 18/1
**latest [1]** 46/9
**law [7]** 17/13 21/3 27/13 27/14 29/4 41/23 41/24
**LAWRENCE [1]** 2/8
**lay [1]** 37/4
**least [11]** 7/3 8/5 11/23 13/15 14/2 14/23 24/12 28/17 29/5 46/24 46/25
**leave [1]** 29/17
**leaving [1]** 50/5
**legal [3]** 15/1 20/13 22/21
**legislature [2]** 26/10 27/7
**LEIBERT [5]** 2/7 5/4 25/24 31/25 32/1
**lender [5]** 6/19 13/19 14/1 14/4 14/5
**LEONARD [4]** 2/11 5/3 37/24 48/11
**Let [1]** 6/20
**Let's [4]** 4/12 14/24 27/8 39/10
**letter [3]** 17/20 22/5 23/5
**letter's [1]** 22/21
**letters [1]** 24/25
**letting [1]** 5/15
**liabilities [3]** 45/18 46/22 46/22
**light [2]** 17/25 34/23
**like [27]** 8/9 8/17 9/2 9/21 9/23 10/11 12/16 25/7 28/8 28/16 28/17 31/25 40/6 40/18 42/15 42/16 42/25 43/23 44/16 45/1 45/11 45/12 46/4 46/8 46/24 49/1 49/3
**likely [3]** 34/4 34/5 44/24
**LINDSEY [2]** 2/18 6/2
**liquidation [2]** 28/18 36/22
**list [1]** 46/23
**listed [4]** 47/7 48/5 48/16 48/19
**lists [1]** 47/19
**LLC [6]** 1/8 2/4 2/4 4/10 4/19 4/19
**loan [2]** 14/6 27/8
**loans [3]** 33/18 33/20 35/24
**LOCATION [1]** 1/17
**longer [3]** 27/2 41/19 41/21
**look [6]** 14/21 16/2 16/11 35/3 35/17 35/22
**look-back [2]** 16/2 16/11
**looked [6]** 12/14 12/20 12/22 28/17 36/8 36/13
**looking [2]** 11/25 16/18
**looks [1]** 28/16
**lost [1]** 35/18
**lot [1]** 35/8
**love [1]** 25/3
**lovely [1]** 33/9

**M**

**M-A-R-Z-O-C-C-A [1]** 4/21
**ma'am [1]** 15/17
**made [7]** 8/6 8/10 9/3 9/4 9/5 20/8 20/10
**mailing [1]** 46/13
**Mainstreet [2]** 2/5 4/24
**make [7]** 6/5 10/5 10/10 40/2 44/12 47/19 49/7
**makes [4]** 30/4 30/21 37/14 46/18
**manage [1]** 8/24
**management [4]** 7/18 7/20 8/18 9/14
**management's [1]** 7/24
**manager's [1]** 7/24
**MARZOCCA [2]** 2/11 4/21
**material [2]** 16/7 16/17
**math [2]** 35/3 35/4
**matrix [4]** 46/10 46/13 48/18 48/20
**Matt [1]** 5/4
**matter [7]** 13/3 26/4 27/5 33/19 33/21 37/3 40/1
**matters [7]** 4/8 6/11 17/8 29/19 32/25 33/17 41/10
**MATTHEW [1]** 2/7
**maximize [1]** 36/1
**may [9]** 9/5 9/22 17/20 22/5 24/25 25/5 31/20 48/20 48/25
**maybe [18]** 11/4 13/21 14/23 30/25 32/14 32/24 34/17 35/10 38/2 41/3 43/23 45/13 45/13 45/14 46/19 46/23 47/17 47/18
**me [11]** 5/15 6/13 6/20 11/8 11/15 14/22 24/19 28/5 32/15 40/1 44/25
**mean [22]** 12/15 13/22 15/18 29/7 31/4 32/3 32/10 35/3 35/17 36/1 36/13 36/15 37/13 37/17 37/19 38/25 40/18 44/21 46/1 46/18 48/25 50/9
**meaning [1]** 44/16
**meanwhile [1]** 12/10
**meet [2]** 18/2 33/7
**meeting [2]** 30/18 32/2
**membership [3]** 17/22 19/25 20/14
**memo [1]** 26/7
**merits [1]** 24/8
**met [1]** 19/13
**MIDDLE [2]** 1/3 4/3
**might [3]** 38/5 44/17 50/13
**million [1]** 29/1
**misconduct [4]** 22/18 23/21 24/1 24/1
**misrepresentation [4]** 17/19 22/12 22/17 23/9
**mistake [2]** 21/1 21/3
**mistakes [1]** 17/13
**moment [2]** 12/2 32/21
**money [1]** 28/5
**month [2]** 7/2 38/8
**monthly [1]** 43/24
**months [1]** 23/6
**moot [5]** 15/20 17/3 17/25 27/15 41/17
**mootness [2]** 26/10 27/11
**more [8]** 11/5 16/13 23/6 24/10 25/8 32/25 40/5 40/17
**morning [4]** 14/20 25/13 26/7 40/6
**most [4]** 35/7 37/14 44/24 46/19
**motion [22]** 13/2 14/16 15/20 17/2 17/6 17/13 17/18 22/4 24/7 24/14 24/23 26/3 41/8 41/16 43/23 44/4 45/14 46/19 46/23 47/24 49/13 49/14
**motions [18]** 11/21 12/12 12/15 12/21 12/23 13/12 14/14 14/15 16/24 17/25 18/16 24/9 32/15 40/22 40/25 41/13 41/15 41/17
**movant [2]** 18/2 22/19
**moved [1]** 15/4
**moving [2]** 6/24 35/19
**Mr [51]** 3/7 4/17 5/15 8/7 14/15 14/16 14/19 16/3 16/7 16/8 17/9 18/15 19/14 20/14 21/6 22/4 22/5 22/6 22/8 22/9 22/11 23/4 23/11 23/24 24/3 24/15 25/12 25/23 25/24 27/11 27/21 28/1 28/4 29/12 29/18 30/2 30/15 31/23 32/1 32/9 33/9 33/12 36/8 37/24 39/6 40/24 41/2 47/5 47/17 48/11 49/18
**Mr. [8]** 14/22 19/24 24/19 26/14 30/13 31/25 32/1 32/8
**Mr. Amodeo [2]** 14/22 24/19
**Mr. Dixon [1]** 26/14
**Mr. Johnson [3]** 19/24 30/13 32/8
**Mr. Leibert [2]** 31/25 32/1
**Ms [27]** 4/13 5/21 6/8 6/12 10/19 11/22 11/25 12/12 12/18 18/14 29/11 29/14 29/17 31/17 35/15 37/24 38/4 38/9 38/12 39/24 40/6 42/12 42/24 43/11 44/4 44/5 47/14
**Ms. [4]** 5/25 30/1 43/18 44/15
**Ms. Aleskovsky [1]** 30/1
**Ms. Fernandez [2]** 43/18 44/15
**Ms. Savastano [1]** 5/25
**much [4]** 14/4 25/1 28/5 37/11
**multiple [1]** 33/23
**mute [1]** 12/2
**my [25]** 6/22 8/13 10/9 11/8 12/24 14/11 14/25 15/18 15/19 17/4 24/12 26/17 28/16 28/22 30/18 32/22 35/2 42/11 43/19 43/24 43/25 45/9 45/9 46/7 51/6
**myself [1]** 40/2

**N**

**narrowly [1]** 22/1
**narrowly-framed [1]** 22/1
**nature [2]** 17/21 44/16
**necessarily [3]** 12/24 13/12 45/16
**necessary [1]** 43/3
**need [5]** 34/11 34/24 38/7 44/9 44/9
**needed [1]** 7/24

**N**


**needs [1]** 33/17
**neither [2]** 21/14 34/19
**net [2]** 6/20 49/7
**neutral [1]** 44/12
**new [6]** 16/25 20/19 39/5 39/17 46/4 46/5
**newly [2]** 17/18 18/8
**newly-available [1]** 18/8
**newly-disclosed [1]** 17/18
**next [7]** 5/10 7/6 21/6 33/2 33/7 43/15 50/5
**nice [1]** 44/11
**no [19]** 1/5 7/17 8/19 8/20 10/12 10/15 10/15 11/2 15/3 15/5 16/22 20/15 22/10 27/2 27/12 35/14 38/25 48/10 50/17
**nor [3]** 21/14 34/19 51/11
**normally [2]** 44/22 45/19
**not [72]**
**NOTARY [2]** 51/5 51/19
**note [1]** 13/13
**notes [1]** 23/15
**notice [6]** 41/22 42/17 46/12 46/14 48/21 49/9
**noticed [1]** 48/17
**now [18]** 4/4 9/1 9/8 12/5 12/10 21/13 27/15 29/6 29/14 30/15 32/25 33/10 36/19 39/10 46/2 46/4 47/15 50/6
**number [5]** 4/8 4/11 4/11 17/7 17/9
**numerous [1]** 31/11


**O**


**objecting [1]** 46/21
**objection [2]** 27/17 48/10
**objections [1]** 33/25
**obtained [2]** 16/14 22/16
**obviously [4]** 11/6 15/2 30/4 47/12
**odd [1]** 13/13
**off [1]** 28/25
**OFFICE [1]** 51/6
**oh [5]** 12/2 27/18 33/13 38/20 39/23
**okay [74]**
**omnibus [1]** 17/23
**on [100]**
**once [1]** 37/7
**one [25]** 8/13 8/22 9/4 9/15 12/17 14/24 15/3 15/23 16/12 18/18 24/18 24/25 25/15 30/9 34/17 35/13 36/11 39/11 41/12 42/9 43/19 43/21 45/4 48/5 48/12
**ones [1]** 9/9
**ongoing [1]** 28/24
**only [5]** 15/15 15/23 18/6 26/13 26/21
**open [1]** 16/14
**operating [2]** 43/24 44/25
**operation [2]** 36/20 38/7
**operative [1]** 19/1
**opinion [2]** 24/11 26/6
**opponent [1]** 23/2
**opportunity [3]** 23/12 24/22 49/9
**opposing [1]** 21/18
**opposition [5]** 10/12 17/24 21/12 23/15 44/3
**or [53]**
**oral [2]** 24/12 43/23
**Orange [2]** 33/4 51/3
**order [19]** 13/5 15/16 17/10 17/25 18/13 18/23 19/1 19/21 20/12 21/23 25/4 25/8 41/19 41/21 42/25 47/2 47/24 49/13 50/9
**orderly [1]** 19/4
**orders [1]** 41/15
**ordinary [1]** 28/25
**original [1]** 14/25
**originally [1]** 29/20
**ORLANDO [3]** 1/4 1/18 39/2
**Osceola [1]** 33/6
**other [20]** 7/8 7/16 12/20 12/23 17/24 25/16 29/15 29/18 29/19 32/25 34/24 35/13 36/12 39/25 42/6 43/21 44/7 45/9 45/10 49/3
**our [4]** 12/4 35/12 46/24 49/6
**out [17]** 5/12 8/11 8/12 8/14 9/9 10/8 12/7 13/9 24/25 27/9 32/14 35/25 37/4 41/3 46/4 46/6 50/4
**outcome [1]** 18/9
**outline [1]** 12/25
**outside [1]** 36/7
**over [12]** 9/15 10/2 10/5 10/6 28/1 29/19 34/8 37/1 37/20 40/3 40/21 47/16
**over-complicate [1]** 37/1
**over-complicated [1]** 37/20
**overall [1]** 14/9
**overturned [1]** 27/1
**owed [1]** 28/5
**owner [1]** 32/8
**ownership [1]** 20/13


**P**


**p.m [3]** 1/16 1/16 50/23
**paid [3]** 7/20 9/17 11/11
**paper [2]** 26/17 27/17
**papered [1]** 37/20
**papers [4]** 17/1 23/19 28/13 40/24
**parallel [1]** 19/3
**part [1]** 10/9
**participate [1]** 30/20
**particular [1]** 49/2
**parties [13]** 7/8 21/25 23/21 24/12 31/10 34/3 37/14 38/1 44/10 46/15 47/7 48/19 51/10
**parties' [1]** 21/4
**parts [1]** 35/19
**party [5]** 21/24 22/16 28/4 44/12 48/18
**path [1]** 36/15
**pause [2]** 34/9 34/11
**pay [1]** 8/2
**payment [3]** 8/12 9/4 9/5
**payments [3]** 6/25 8/20 14/1
**peace [1]** 5/5
**PEDIXON [6]** 2/4 2/12 4/19 15/3 17/20 17/23
**penalty [2]** 45/21 47/20
**pending [8]** 12/21 12/23 15/24 17/8 24/14 41/13 41/17 48/23
**people [10]** 26/8 32/19 34/13 35/7 36/23 37/2 46/25 47/19 47/25 48/8
**percent [2]** 19/25 32/8
**performing [1]** 21/22
**period [9]** 8/21 13/7 13/18 16/2 16/2 16/6 16/11 37/2 50/2
**periods [1]** 13/20
**perjury [2]** 45/22 47/21
**person [4]** 2/2 18/6 40/17 40/19
**pertains [1]** 24/17
**petition [3]** 18/7 18/10 20/2
**phonetic [2]** 21/8 29/12
**phrasing [1]** 22/21
**picture [2]** 9/24 14/10
**pieces [1]** 28/25
**place [3]** 31/3 37/10 44/11
**plan [5]** 12/7 28/14 28/22 32/10 36/13
**planned [2]** 16/8 29/20
**planning [1]** 30/8
**play [1]** 13/9
**playing [1]** 44/10
**pleadings [1]** 36/8
**please [3]** 4/6 28/4 34/11
**point [4]** 15/21 36/20 37/15 44/20
**policies [2]** 9/22 10/2
**pop [1]** 5/12
**position [5]** 12/24 13/12 14/11 32/7 32/7
**possibility [1]** 36/7
**possible [1]** 15/21
**postal [2]** 25/17 25/17
**postdates [1]** 23/6
**posture [2]** 12/17 13/14
**prefer [3]** 34/15 39/16 41/20
**preference [1]** 16/18
**preferences [1]** 16/6
**preliminary [1]** 40/24
**premise [4]** 18/22 19/15 21/4 25/3
**premised [1]** 17/14
**prepared [1]** 47/17
**preparing [1]** 39/19
**present [1]** 23/12
**presentation [4]** 21/15 22/13 23/3 24/2
**presented [6]** 19/9 19/20 20/11 21/8 21/14 45/11
**presenting [1]** 22/19
**preserve [1]** 25/4
**presiding [1]** 4/5
**presume [1]** 39/20
**presuming [1]** 26/16
**pretty [4]** 29/13 31/5 36/2 45/3
**prevented [6]** 21/15 21/21 22/12 22/18 23/3 24/2
**preview [1]** 28/13
**previewed [1]** 34/4
**previously [1]** 8/17
**prior [8]** 8/19 9/1 12/11 12/11 13/2 26/14 48/16 50/1
**Pro [2]** 2/10 5/18
**probably [6]** 7/10 29/16 32/22 44/22 49/19 49/23
**problem [2]** 40/3 45/8
**procedural [3]** 13/14 30/10 42/6
**procedurally [1]** 13/9
**Procedure [1]** 17/12
**proceed [3]** 12/1 16/16 30/8
**proceeding [2]** 34/6 50/22
**proceedings [4]** 19/11 26/12

**P**

proceedings... [2] 27/5 51/7
proceeds [1] 6/21
process [3] 10/11 21/12 42/16
processed [1] 8/13
procured [1] 23/8
professionals [1] 36/5
proffered [1] 18/7
progress [1] 16/4
prohibit [1] 44/8
project [2] 35/23 35/24
proof [7] 22/16 45/20 45/21 47/2 47/10 47/13 48/23
proofs [2] 45/12 47/9
proper [2] 14/6 14/7
property [3] 7/23 8/18 16/9
proposed [1] 49/13
prospectively [1] 6/25
proves [1] 22/11
provide [5] 10/16 15/6 19/7 26/8 46/14
provided [1] 49/8
providing [2] 10/13 11/5
prudential [1] 19/10
PUBLIC [2] 51/5 51/19
published [1] 15/8
purchase [1] 28/24
purpose [2] 13/6 15/10
purposes [3] 9/20 20/6 47/4
pursue [1] 20/24
put [3] 9/24 13/5 39/10

**Q**

quagmire [1] 30/10
question [3] 43/18 43/20 45/10
questions [1] 42/6
questions/issues [1] 42/6
quick [1] 28/16
quickly [1] 50/7

**R**

raise [1] 42/7
raised [1] 20/20
raising [1] 26/18
ratification [1] 20/15
ratify [1] 18/6
RE [1] 1/7
reached [1] 8/11
read [3] 26/16 32/17 36/10
ready [1] 24/21
real [4] 1/8 4/10 35/1 37/6
really [6] 13/24 35/16 36/5 36/22 36/23 41/9
realm [2] 36/7 49/4
reason [4] 18/19 26/9 40/17 44/18
reasons [1] 24/7
received [2] 14/1 14/5
recently [1] 47/8
recently-filed [1] 47/8
recognized [1] 19/5
recollection [1] 26/18
reconsideration [3] 18/4 19/22 24/4
record [11] 19/22 20/5 20/9 21/2 21/19 21/24 23/8 23/10 26/24 30/19 51/8
recordable [1] 19/17
recorded [2] 17/17 21/7
RECORDING [1] 51/7
records [1] 24/24
recover [1] 18/20
refer [1] 8/22
referenced [1] 9/19
reflected [1] 19/22
regarding [1] 6/19
regards [1] 7/3
regular [1] 47/10
reinstatement [1] 19/12
reinstating [1] 19/2
reinventing [1] 36/2
rejected [1] 24/4
related [1] 34/18
RELATIVE [1] 51/9
relied [2] 21/16 22/23
relief [12] 11/5 11/12 11/21 11/23 17/10 17/25 18/13 19/2 19/14 22/2 24/6 40/22
relitigate [1] 20/19
rely [1] 20/5
relying [1] 47/23
remain [1] 13/1
remanded [1] 34/16
remove [2] 34/8 34/15
removed [2] 26/11 34/12
render [1] 19/11
renews [1] 24/3
rental [1] 6/21
reorg [1] 28/15
reorganizations [1] 19/6
repaid [5] 25/16 27/12 33/20 35/6 37/5
repayment [1] 22/8
report [10] 6/9 6/17 9/19 28/10 30/22 31/1 31/5 35/12 43/7 44/2
REPORTER [2] 3/14 51/1
reports [7] 25/14 35/3 36/4 43/24 44/8 44/10 44/25
representative [5] 30/11 30/14 30/16 31/23 32/9
represented [3] 11/6 11/22 20/4
request [1] 13/4
requested [1] 10/1
requesting [1] 23/13
require [2] 46/21 49/4
requirement [1] 46/5
requirements [1] 19/13
requires [1] 22/15
requisite [1] 24/1
reserve [1] 24/10
resolution [3] 18/7 36/6 37/19
resort [1] 29/16
respective [1] 37/4
respond [1] 24/22
responded [1] 15/4
Respondents [3] 19/23 20/22 22/20
Respondents' [1] 23/15
response [7] 15/1 17/23 20/6 22/20 41/5 41/7 41/13
responses [1] 14/17
rest [1] 21/13
restructure [1] 36/21
rests [2] 19/15 22/4
result [1] 31/21
results [1] 42/13
retained [2] 25/11 25/24
return [1] 22/10
returned [2] 9/6 22/7
returns [1] 45/1
review [2] 24/16 28/16
reviewed [1] 16/23
RHYS [2] 2/11 5/3
right [33] 5/20 6/4 10/2 10/7 10/18 10/19 13/11 13/25 14/12 15/14 15/16 15/21 16/20 19/24 28/6 29/14 33/16 36/14 38/17 39/24 42/12 42/16 44/16 46/1 46/20 47/15 47/16 48/2 48/9 49/11 49/16 50/16 50/18
rise [1] 4/2
road [1] 38/11
ROBSON [2] 1/14 4/5
room [1] 50/3
RPR [1] 51/18
rule [21] 15/1 15/3 15/12 16/15 16/19 16/22 16/24 17/4 17/11 17/19 18/3 18/16 18/18 19/9 19/14 20/18 20/22 21/6 22/2 22/15 24/6
Rule 1015 [1] 15/12
Rule 60 [1] 24/6
ruled [2] 14/14 25/2
rules [2] 16/19 17/12
ruling [6] 14/14 15/18 15/19 17/4 24/12 41/23
run [2] 9/12 16/1

**S**

said [11] 12/6 15/9 24/14 28/4 28/8 35/20 35/20 36/9 36/10 41/2 48/14
said/she [1] 35/20
sale [4] 11/13 11/24 12/1 12/5
same [3] 18/11 30/4 42/15
sanctions [3] 17/6 24/15 32/15
SANDRA [2] 51/5 51/18
Sapphire [1] 50/11
satisfied [3] 19/10 31/12 47/13
SAVASTANO [5] 2/18 5/25 6/2 11/22 11/25
say [15] 7/12 7/13 11/3 11/20 13/14 15/4 26/19 26/23 29/4 31/8 31/25 32/21 34/8 36/20 47/21
saying [8] 7/14 26/17 26/19 32/16 45/17 45/20 45/23 46/3
says [1] 27/7
scheduled [6] 30/3 45/18 46/21 46/22 49/2 49/3
schedules [10] 30/12 45/11 46/9 47/8 47/17 47/23 48/15 48/16 48/17 48/19
school [3] 29/4 41/24 41/24
scope [2] 9/20 10/20
se [2] 2/10 5/19
seat [1] 43/14
seated [1] 4/7
second [4] 17/3 17/18 22/4 23/10
secured [4] 7/7 11/5 11/11 11/23
see [15] 5/21 6/8 7/25 8/7 9/16 25/7 29/25 30/8 31/24 38/9 40/18 42/2 44/9 48/15 50/20
seek [2] 20/3 22/25
seeking [1] 17/10
seems [4] 13/1 13/22 13/23 30/14

## S


seen [1] 42/23
sees [1] 33/24
selected [1] 42/17
semi [1] 14/9
semi-irrelevant [1] 14/9
seminar [1] 38/24
send [1] 9/12
sense [4] 27/24 30/5 37/14 46/19
sent [3] 9/13 10/2 24/25
service [1] 36/18
session [1] 4/4
set [13] 3/11 4/8 6/11 7/14 7/17 7/17 11/13 33/3 33/6 40/23 41/5 43/8 50/19
setting [2] 11/24 28/14
settled [1] 39/9
seven [1] 27/1
she [6] 9/23 12/6 35/15 35/20 42/13 47/25
she's [2] 9/23 44/6
shed [1] 34/23
Shiloh [2] 39/5 39/17
short [2] 31/5 41/15
shortly [2] 31/2 42/14
should [30] 6/24 11/20 13/1 13/15 19/18 26/11 26/13 26/21 27/4 27/6 27/22 28/24 29/6 30/11 30/17 35/2 35/4 35/10 36/9 36/10 36/11 37/10 37/23 40/23 41/5 41/6 42/3 45/3 49/17 50/10
shouldn't [2] 26/19 26/22
show [1] 23/2
shown [1] 20/16
side [1] 35/13
sides [1] 34/22
significant [1] 8/21
similar [1] 49/25
since [3] 6/17 15/1 47/15
sitting [1] 36/23
small [1] 5/11
so [134]
sold [1] 28/25
solely [1] 47/25
solicited [1] 31/9
some [24] 7/15 8/9 10/1 10/12 11/8 13/21 14/8 14/17 27/24 29/15 33/14 34/22 34/24 35/1 35/23 36/4 36/8 37/2 37/15 38/17 44/7 45/14 46/12 50/2
someone [3] 16/24 31/20 42/14
something [5] 38/16 46/13 47/9 49/22 49/25
sorry [2] 6/20 11/1
sort [1] 8/23
sought [1] 19/2
Sound [1] 20/1
sounds [3] 8/9 9/2 9/23
speak [2] 12/18 12/19
speaking [1] 37/25
specifically [1] 20/12
spoke [2] 29/9 38/4
spot [2] 35/15 39/10
stabilize [1] 12/7
stabilizing [1] 11/9
staggering [1] 35/19
stand [1] 25/13
standard [2] 41/6 41/12
standards [2] 18/3 19/9
standing [5] 8/8 23/7 26/19 27/11 27/12
standstill [3] 33/15 34/3 49/21
start [1] 14/24
state [5] 33/3 34/7 49/22 51/2 51/19
stated [1] 18/21
statement [2] 22/9 28/15
STATES [4] 1/3 1/17 4/2 4/15
stating [1] 22/6
status [13] 3/11 6/7 6/9 9/19 11/20 12/9 25/18 38/18 40/4 40/11 40/12 42/11 43/25
stay [6] 11/13 11/21 34/6 40/22 44/24 50/2
steps [2] 7/7 11/10
still [4] 25/13 28/21 28/22 30/7
stop [1] 26/1
straightforward [1] 36/3
strange [1] 13/2
strategic [2] 23/20 28/23
STREET [1] 1/17
strike [4] 14/16 15/4 17/2 41/16
striking [1] 15/5
stuck [1] 29/23
stuff [2] 14/19 35/7
subject [3] 26/3 37/3 47/22
subject-matter [1] 37/3
submit [2] 23/14 49/13
Subsequently [1] 18/10
substitute [1] 20/23
substituted [1] 32/14
such [2] 22/18 24/1
suggesting [1] 36/16
summer [1] 38/8
supplement [1] 22/1
supply [1] 24/5
support [1] 18/16
Supreme [1] 26/25
sure [6] 10/5 10/10 29/23 30/17 35/20 44/20
sworn [1] 22/9


## T


table [1] 47/20
tactical [1] 20/23
take [6] 4/12 8/10 13/12 34/7 41/14 49/14
takes [1] 31/2
talk [4] 6/10 17/5 37/14 46/12
talked [3] 11/7 25/12 28/19
talking [2] 38/21 47/6
Tamamoi [3] 2/18 6/2 40/22
targets [1] 21/11
tax [1] 45/1
technically [2] 12/15 13/8
tell [6] 6/13 14/22 15/3 24/19 25/24 28/5
ten [1] 23/6
tentative [1] 44/16
tentatively [1] 11/7
terrible [1] 36/14
testifies [1] 30/11
testify [2] 28/11 32/1
testifying [1] 30/17
testing [1] 20/25
text [1] 41/24
than [4] 16/19 23/6 40/5 40/17
Thank [9] 5/1 5/14 5/16 6/15 10/18 49/15 49/16 50/14 50/21
Thanks [1] 10/17
that [207]
that's [25] 7/10 8/8 11/2 13/7 13/8 15/5 16/25 24/21 29/22 31/13 33/19 36/20 38/11 39/5 39/6 39/11 39/23 40/3 40/19 43/3 45/6 45/8 45/22 47/13 50/12
theft [1] 22/20
their [6] 23/12 26/20 27/14 30/20 37/3 47/2
them [13] 7/5 8/22 9/12 10/2 11/7 15/12 16/16 25/1 33/18 44/19 44/21 46/12 47/10
then [55]
theories [1] 20/19
theory [2] 22/13 23/12
there [41] 6/4 6/11 7/6 8/20 8/22 9/2 9/4 9/5 9/22 9/25 10/6 11/12 11/20 12/12 14/15 14/17 15/6 16/17 17/7 24/14 27/3 31/21 31/24 32/10 33/14 33/16 34/10 34/19 35/18 35/23 36/6 36/15 36/15 36/17 36/21 37/9 42/10 42/25 44/18 48/18 49/24
there'll [1] 24/22
there's [20] 10/12 10/12 13/11 15/11 15/22 15/23 29/1 29/7 29/9 33/22 34/23 35/1 35/8 35/19 36/9 44/7 44/17 47/12 47/16 49/22
thereafter [1] 42/14
thereby [1] 23/2
therefore [3] 19/18 22/2 23/24
these [6] 9/9 24/7 25/25 32/15 33/6 33/25
they [24] 7/14 9/11 9/11 10/5 10/6 12/4 12/11 26/13 26/19 26/22 27/15 27/25 28/8 28/18 28/20 31/6 36/16 37/4 42/15 42/16 46/23 47/1 49/5 49/10
They'll [3] 25/12 25/15 44/22
they're [9] 11/6 11/7 35/25 37/3 47/3 47/18 47/18 48/5 50/11
thing [1] 41/24
things [5] 9/21 10/11 17/24 33/7 33/25
think [45] 7/1 11/7 11/12 12/11 12/25 13/4 13/17 13/19 14/12 24/20 24/21 28/19 30/3 32/22 33/15 33/16 33/19 33/21 33/23 34/1 34/3 34/10 34/16 34/17 34/21 34/23 35/7 35/8 35/15 35/15 36/4 37/18 37/25 38/5 38/16 39/13 40/11 41/9 44/10 44/13 45/5 46/18 47/14 49/12 49/23
third [1] 44/12
this [73]
thorough [1] 31/5
thoroughly [1] 25/8
those [19] 7/3 7/23 9/7 9/8 12/14 19/20 21/13 24/5 24/24 44/9 44/13 45/18 46/3 46/15 46/21 47/25 47/25 48/8 48/22
thought [2] 11/17 36/13

**T**

**thousand [1]** 16/13
**three [2]** 9/6 46/8
**threshold [3]** 33/17 33/19 33/21
**through [10]** 8/15 9/12 9/13 11/24 14/2 20/21 22/17 33/22 36/24 48/14
**Thursday [3]** 30/19 31/3 32/3
**Tiered [1]** 17/15
**time [19]** 1/16 8/21 11/8 11/15 12/6 13/7 13/19 21/5 21/15 25/4 30/4 31/6 32/13 33/7 37/2 44/21 48/7 49/24 50/2
**timely [2]** 44/8 44/19
**TIMKO [7]** 2/4 4/17 4/19 14/16 22/6 33/12 41/2
**Timko's [2]** 22/5 32/9
**title [1]** 19/24
**today [4]** 11/4 26/14 26/22 27/6
**together [4]** 8/24 9/24 13/6 36/6
**told [1]** 34/13
**tomorrow [1]** 49/23
**too [1]** 37/10
**topic [1]** 15/7
**total [1]** 22/10
**touch [1]** 38/10
**towards [1]** 28/18
**town [3]** 8/14 10/8 50/5
**Townhome [2]** 2/14 5/9
**townhouse [2]** 7/21 7/22
**track [1]** 26/24
**transactions [1]** 28/3
**TRANSCRIBE [1]** 51/6
**TRANSCRIPT [1]** 51/8
**transfers [1]** 18/20
**transparent [1]** 44/13
**treated [1]** 47/3
**trip [1]** 38/11
**true [2]** 37/3 51/8
**trust [17]** 2/18 6/3 17/15 18/5 19/16 19/16 19/18 20/1 20/8 20/10 20/16 21/4 21/17 22/22 33/4 33/4 40/23
**trustee [36]** 2/3 2/11 2/17 4/16 4/22 5/3 5/23 6/16 7/15 9/7 9/7 9/10 9/15 10/14 12/6 12/14 18/5 18/14 20/2 20/12 20/16 20/16 28/17 28/22 29/19 30/1 31/9 31/18 31/18 33/3 42/25 44/6 44/6 44/9 44/18 48/13
**trustee's [3]** 9/18 17/16 31/4
**try [6]** 12/6 34/9 49/24 50/1 50/14 50/15
**trying [5]** 9/23 14/3 14/10 35/25 49/4
**Tuesday [1]** 50/8
**turned [1]** 28/1
**two [6]** 11/21 13/5 15/9 17/8 24/24 42/5
**type [2]** 35/6 45/14
**types [1]** 33/25

**U**

**U.S [3]** 2/3 30/1 31/9
**ultimately [2]** 18/12 45/1
**un [1]** 19/17
**un-recordable [1]** 19/17
**under [10]** [illegible] 17/19 18/18 18/20 27/13 27/14 45/21 47/20
**underlying [1]** 18/22
**underscores [1]** 21/16
**understand [11]** 6/22 6/24 7/19 7/25 13/18 16/3 16/15 25/2 26/24 30/13 41/23
**understanding [2]** 11/9 14/4
**undisputed [7]** 20/11 21/4 45/19 46/22 47/4 47/20 49/2
**unenforceable [2]** 27/13 27/14
**unit [1]** 28/24
**UNITED [4]** 1/3 1/17 4/2 4/15
**units [9]** 6/21 7/4 10/21 11/9 11/10 14/2 17/22 20/1 20/14
**unless [5]** 16/24 26/15 31/18 44/7 46/20
**until [4]** 25/14 31/19 43/25 44/6
**unwarranted [1]** 19/12
**up [6]** 6/20 7/15 7/17 7/18 10/9 34/22
**update [1]** 7/11
**updated [1]** 48/23
**upon [3]** 22/7 26/17 41/18
**us [1]** 25/24
**usurious [5]** 26/11 27/8 33/19 35/5 37/5
**usury [6]** 25/15 26/12 27/9 33/5 35/9 36/10
**utilizing [1]** 32/18

**V**

**vacate [6]** 12/13 13/5 13/13 15/20 24/9 41/16
**vacated [1]** 15/15
**vacating [4]** 13/2 18/23 19/1 19/2
**valid [4]** 19/15 25/25 25/25 30/22
**validly [1]** 20/7
**valuation [1]** 34/25
**value [2]** 36/1 37/6
**various [2]** 25/18 48/14
**Vaughan [1]** 39/3
**vehicle [1]** 20/18
**venue [1]** 34/2
**versus [1]** 37/13
**very [7]** 10/17 12/8 25/1 27/19 31/12 45/5 50/18
**violations [1]** 24/23
**voluntarily [2]** 15/11 19/3
**Vornstein [1]** 50/10
**votes [1]** 30/19

**W**

**wait [3]** 27/8 29/25 41/21
**want [16]** 9/11 9/16 10/10 12/18 12/19 14/22 16/21 17/5 24/19 26/8 45/16 45/20 46/3 46/16 48/25 50/13
**wanted [6]** 6/5 6/12 7/19 9/12 24/11 42/7
**wants [2]** 31/25 32/10
**warranted [1]** 22/3
**was [43]** 6/18 6/23 8/5 8/16 9/1 9/4 9/5 10/8 11/3 11/4 11/12 11/17 13/4 14/6 14/15 15/1 15/3 15/6 17/16 18/5 18/7 18/10 19/17 20/2 20/7 20/16 21/7 21/23 22/10 23/8 [illegible] 30/13 31/5 33/14 37/5 37/20 45/10 47/15 47/15 49/3 50/22 51/6
**WASHINGTON [1]** 1/17
**way [4]** 9/11 29/1 31/1 36/11
**we [58]**
**we'll [14]** 9/15 12/9 28/7 28/9 28/10 28/13 29/25 33/18 34/8 40/23 41/11 42/2 43/10 50/20
**we're [11]** 6/7 10/15 24/13 29/13 30/10 36/1 37/1 40/21 44/11 47/6 48/22
**we've [3]** 12/3 44/11 50/1
**Wednesday [1]** 50/6
**week [13]** 10/8 33/2 38/2 38/14 38/17 38/20 38/23 38/24 38/25 39/25 41/6 41/12 49/25
**weird [1]** 12/17
**welcome [1]** 40/18
**well [19]** 8/8 13/4 28/6 29/3 29/24 30/20 32/16 32/24 34/14 37/12 37/17 38/6 39/23 42/1 42/12 43/9 43/22 44/14 46/15
**were [14]** 8/20 9/6 12/11 14/17 17/9 19/8 19/9 19/20 21/14 24/4 24/24 28/18 28/20 45/18
**WEST [1]** 1/17
**what [20]** 11/9 14/10 14/23 18/22 26/17 27/18 28/19 30/8 37/1 37/5 37/14 38/11 38/12 38/15 39/14 42/2 45/22 47/21 48/13 50/1
**what's [3]** 9/24 32/2 43/21
**whatever [3]** 37/9 40/17 49/3
**wheel [1]** 36/2
**when [7]** 7/12 7/12 15/10 28/9 35/2 37/23 37/25
**where [12]** 8/1 9/2 9/24 16/3 24/13 28/16 29/14 36/8 41/24 44/11 48/18 50/1
**WHEREUPON [1]** 50/22
**whether [10]** 7/25 8/8 12/19 14/6 14/6 16/2 25/16 25/25 27/9 36/20
**which [20]** 6/9 6/17 14/7 14/17 14/20 15/19 18/1 18/12 19/2 22/8 22/23 24/15 26/7 28/15 28/18 29/23 30/4 38/7 41/9 50/10
**Whitsett [2]** 38/12 40/6
**who [18]** 18/6 18/14 29/18 30/10 30/13 30/17 30/20 33/9 40/16 43/5 43/13 45/19 46/23 46/24 47/8 47/19 49/1 49/8
**who's [4]** 7/13 46/9 46/10 47/16
**whoever [1]** 49/12
**whole [2]** 33/3 39/20
**whose [1]** 11/21
**why [2]** 21/13 44/18
**wide [1]** 49/7
**will [31]** 5/10 7/25 10/9 18/25 24/8 25/4 28/12 30/24 31/2 31/17 31/18 34/4 34/5 34/23 35/4 35/5 35/5 35/6 35/7 36/22 38/9 39/1 39/17 40/4 40/14 41/13 45/5 47/9 47/24 49/19 49/25
**willing [1]** 25/13

**W**

**winner [1]** 43/5
**within [1]** 37/3
**without [3]** 37/10 46/20 47/23
**Wolff [1]** 16/7
**won't [1]** 43/10
**wondering [1]** 39/14
**work [8]** 9/10 9/15 12/7 31/12 33/22 36/24 48/22 49/23
**works [1]** 38/6
**world [1]** 5/5
**would [46]** 11/10 11/13 11/14 13/1 13/3 13/9 13/14 13/17 14/13 15/15 16/1 16/10 18/19 18/19 18/23 19/3 19/10 22/7 25/3 25/7 25/22 27/22 31/8 33/8 34/1 36/17 39/4 39/16 41/17 41/20 42/13 42/16 42/17 42/19 43/2 43/7 43/12 43/13 44/7 44/24 45/11 45/11 45/19 46/3 48/4 48/7
**wouldn't [2]** 40/5 44/19
**written [4]** 18/15 24/11 25/3 25/7
**wrong [1]** 39/14

**Y**

**yeah [9]** 8/11 10/1 11/19 32/20 34/20 36/11 39/13 46/18 50/19
**yes [25]** 6/1 13/17 14/25 15/17 16/1 24/20 25/20 25/21 27/24 30/6 30/9 32/4 32/5 32/16 39/8 41/1 41/4 42/5 42/18 42/21 43/16 45/25 48/9 48/12 49/6
**yesterday [2]** 6/18 14/20
**yet [1]** 24/16
**you [89]**
**you'll [2]** 29/23 32/24
**you're [14]** 10/20 12/2 12/16 26/17 26/18 30/7 37/25 38/21 39/19 41/3 45/17 45/20 45/22 49/4
**you've [1]** 12/19
**you-all [2]** 24/13 40/13
**your [65]**
**yourself [1]** 47/22

**Z**

**ZOOM [4]** 2/16 5/20 40/13 40/18
**ZPD [4]** 2/4 4/19 17/21 17/23

# EXHIBIT 6

Excerpts from the Appraisal Report of Holly Bluff Marina by Jack E. Mounteer, Florida State Certified General Real Estate Appraiser RZ2294, InQuest Valuation, effective April 21, 2023, prepared for Mainstreet Community Bank of Florida (cover; letter of transmittal; Certificate of Value; Summary of Salient Facts; Reconciliation of Approaches; Report Reliance & Use Restrictions), allocating $3,760,000 to real estate, $160,000 to furniture, fixtures and equipment, and $290,000 to goodwill within a $4,210,000 going-concern value. The complete 505-page appraisal is available and will be furnished on request.

InQuest Valuation

**Appraisal Report**
**of**



**Holly Bluff Marina**

**Located at**
**2280 Hontoon Road**
**DeLand, Florida 32720**

**for**
**Mainstreet Community Bank of Florida**

**Valuation Date**
**April 21, 2023**

**Prepared By:**
**Jack E. Mounteer**
**Florida State Certified General Appraiser RZ2294**
**InQuest Valuation**

**INQUEST Valuation**

April 27, 2023

Mainstreet Community Bank of Florida
204 South Woodland Boulvard
DeLand, Florida 32720

Re: Appraisal of Holly Bluff Marina at 2280 Hontoon Road, DeLand, Florida 32720

Appraisal Management:

As requested, I have prepared an appraisal of the above referenced property. The subject property is currently being operated as Holly Bluff Marina. The marina offers boat storage, sales, rental, and service. The property contains a total site area of 7.24 acres which includes an on-site canal. The property is improved with two main buildings which consist of the Marina office/showroom/service shop and a two-bedroom single-family residence. Additionally, there is docking in place for 74 boat slips, 49 located within the St. Johns River, and 25 located within the on-site canal. The docking includes fueling and sewer pump out stations.

In addition to the operating marina component and single-family residence, the 7.24-acre subject property includes an estimated 4.1 acres of land that has previously been entitled for the development of 30 residential condominium units on 2.99 acres and 1.11 acres of conservation area to remain undisturbed. The Development Order for the 30 condominium units expires October 5, 2023. Several permits and conditions necessary for development of the 30 units have lapsed or remain unmet as of the effective date of value of this Appraisal. Per our interview with Volusia County land planning staff, the lapsed permits and unmet conditions must be expeditiously renewed and accomplished in order for development of the 30 condominium units to commence.

Our interview with Volusia County land planning staff revealed that all lapsed permits must be obtained and all unmet conditions must be accomplished before further extensions of the Development Order will be considered by the County. Further, County staff advised us that application for extension of the Development Order should be submitted to the County at least 90 days prior to the October 5, 2023 expiration date if extension is to be accomplished.

The Appraisal and the appraised value are based on the extraordinary assumption that the Development Order for development of the 30 proposed condominium units will be extended. Importantly, if the subject property owner does not take timely action toward extension of the Development Order, and the Development Order expires as a result, then application for approval for development of the subject 4.1 acres of land planned for development of 30 condominium units will need to start all over again from the beginning.

According to Standard Rule 2-2 of the Uniform Standards of Professional Appraisal Practice (USPAP), the following appraisal report is a narrative *Appraisal Report* of the property presented in a summary format. The purpose of this appraisal is to estimate the going-concern value and the market value of the subject property, "as-is". The property rights appraised are the fee simple interest. The going-concern value and market value estimates are based on an exposure period of up to 14 months.

An inspection of the subject property was conducted, and to the best of my knowledge, the statements and conditions contained in the following appraisal report are correct, subject to any conditions or restrictions mentioned in the report. The appraisal is subject to those items listed in the *"Assumptions and Limiting Conditions"*. Following this letter is the Certificate of Value and the entire narrative appraisal report on the above mentioned property. The estimated going-concern value of the subject property is as follows:

**Estimated Going-Concern Value "As-Is" as of April 21, 2023 $ 4,210,000**

The going-concern value for the subject is allocated to its component parts as follows:

## ALLOCATION OF VALUE

| | |
|---|---|
| Market Value of The Real Estate - 7.24 Acres of Land & Improvements | $ 3,760,000 |
| Equipment - FF&E | $ 160,000 |
| Business - Goodwill | $ 290,000 |
| Going Concern Value | $ 4,210,000 |

The market value for the subject real estate is allocated to its component parts as follows:

## ALLOCATION OF REAL ESTATE VALUE

| | |
|---|---|
| Value of Existing Marina, Residence, and 3.13-Acres of Underlying Land | $ 2,740,000 |
| Value of 4.10-Acre Planned Residential Condo Land | $ 1,020,000 |
| Estimated Market Value of Subject Real Estate Only | $ 3,760,000 |

Respectfully submitted,

Jack Mounteer

Jack E. Mounteer, State Certified General Appraiser No. RZ2294

**CERTIFICATE OF VALUE**

I certify to the best of my knowledge and belief, that the statements of fact contained in this report are true and correct.

Property: Holly Bluff Marina
Location: 2280 Hontoon Road, DeLand, FL
County: Volusia County
State: Florida

1. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, unbiased, professional analyses, opinions, and conclusions.

2. I have [no] present or prospective interest in the property that is the subject of this report, and I have [ no] personal interest or bias with respect to the parties involved. I (the Appraiser, Jack Mounteer) have performed no other services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

3. My compensation is not contingent upon the reporting of a predetermined value of direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

4. My analyses, opinions, or conclusions were developed and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice, and the provisions of Chapter 475, Part II, Florida Statutes.

5. I have made a personal inspection of the property that is the subject of this report. I have not made a personal field inspection all of the comparable sales relied upon in making this appraisal. The subject and the comparable sales relied upon in making this appraisal were as represented by the photographs contained in this appraisal.

6. No persons other than those named herein provided significant professional assistance to the person signing this report.

7. I understand that this appraisal is to be used to determine going-concern value and market value for the client's lending purposes. The going-concern value and market value estimates are based on an exposure period of up to 14 months.

8. This appraisal has been made in conformity with the appropriate State laws, regulations, policies and procedures applicable to its purpose(s); and, to the best of my knowledge, no portion of the property value entered on this certificate consists of non-realty items under the established law of the State of Florida.

9. I have not revealed my findings or results of this appraisal to anyone other than the client. I will not do so unless authorized by the client, or until I am required by due process of law, or until I am released from this obligation by having publicly testified as to such findings.

10. Regardless of any stated limiting condition or assumption, I acknowledge that this appraisal report and all maps, data, summaries, charts and other exhibits collected or prepared under this agreement shall become the property of the client without restriction or limitation on their use.

Based on my independent appraisal and the exercise of my professional judgment, my opinion of the going-concern value of the fee simple interest in the property appraised, "as-is" as of the 21st day of April, 2023, is: $4,210,000, allocated as follows.

## ALLOCATION OF VALUE

| | |
|---|---|
| Market Value of The Real Estate - 7.24 Acres of Land & Improvements | $ 3,760,000 |
| Equipment - FF&E | $ 160,000 |
| Business - Goodwill | $ 290,000 |
| Going Concern Value | $ 4,210,000 |

## ALLOCATION OF REAL ESTATE VALUE

| | |
|---|---|
| Value of Existing Marina, Residence, and 3.13-Acres of Underlying Land | $ 2,740,000 |
| Value of 4.10-Acre Planned Residential Condo Land | $ 1,020,000 |
| Estimated Market Value of Subject Real Estate Only | $ 3,760,000 |

Jack Mounteer

September 27, 2023
DATE

APPRAISER – Jack E Mounteer, Florida State Certified General Appraiser RZ2294

## 120 SUMMARY OF SALIENT FACTS

Effective Date of Appraisal: April 21, 2023

Date of Inspection: April 21, 2023 and prior dates. A physical walk-through interior inspection was made of the subject improvements as well as a physical walk-around inspection of the subject site.

Property Location: The subject is located on the northwest side of Hontoon Road, south of Lake Forest Drive, along the St. Johns River, in unincorporated Volusia County, Florida. The physical address is 2280 Hontoon Road, Deland, Florida.

Description of Property: The subject property is currently being operated as Holly Bluff Marina. The marina offers boat storage, sales, rental, and service. The property contains a total site area of 7.24 acres which includes an on-site canal. The property is improved with two main buildings which consist of the Marina office/showroom/service shop and a two-bedroom single-family residence. Additionally, there is docking in place for 74 boat slips, 49 located within the St. Johns River, and 25 located within the on-site canal. The docking includes fueling and sewer pump out stations. In addition to the operating marina component and single-family residence, the 7.24-acre subject property includes an estimated 4.1 acres of land that has previously been entitled for the development of 30 residential condominium units on 2.99 acres and 1.11 acres of conservation area to remain undisturbed.

Estimated Values: $4,210,000, "As-Is" reconciled as follows:

**RECONCILIATION OF VALUE INDICATIONS**

| | | | | | |
|---|---|---|---|---|---|
| Indicated Value by Sales Comparison Approach | $ 4,040,000 | x | 25% | = | $ 1,010,000 |
| Indicated Value by Income Approach | $ 4,260,000 | x | 75% | = | $ 3,195,000 |
| Estimated Going Concern Value (Rounded) | | | | | $ 4,210,000 |

Allocation of Estimated Value:

**ALLOCATION OF VALUE**

| | |
|---|---|
| Market Value of The Real Estate - 7.24 Acres of Land & Improvements | $ 3,760,000 |
| Equipment - FF&E | $ 160,000 |
| Business - Goodwill | $ 290,000 |
| Going Concern Value | $ 4,210,000 |

**ALLOCATION OF REAL ESTATE VALUE**

| | |
|---|---|
| Value of Existing Marina, Residence, and 3.13-Acres of Underlying Land | $ 2,740,000 |
| Value of 4.10-Acre Planned Residential Condo Land | $ 1,020,000 |
| Estimated Market Value of Subject Real Estate Only | $ 3,760,000 |

120 SUMMARY OF SALIENT FACTS – Continued

| | |
|---|---|
| Highest and Best Use: | |
| As If Vacant: | Mixed Use |
| As Improved: | Mixed Use |
| Tax Parcel ID #'s: | 793600000030<br>793500000040<br>793500000021 |
| Owner of Record: | Holly Bluff Marina Inc. |
| Zoning: | MPUD, Mixed-Use Planned Unit Development, by Volusia County, Florida |
| Property Rights Appraised: | Fee Simple |
| Estimated Exposure Time: | Up to 14 months |
| Flood Zone: | Per Map No. 12127C0605H of the National Flood Insurance Program dated February 19, 2014 the subject site is located within Flood Zones X and AE. Zone X includes areas of moderate risk with between a 0.2%annual chance of flood hazard and 1% annual chance of flood with average depth of less than one foot or with drainage areas of less than one square mile. Zone AE is considered a high-risk area with a 1% annual chance of flooding with base flood elevations undetermined. Properties located within Flood Zone AE may should carry flood insurance. |
| Appraisal Client: | Mainstreet Community Bank of Florida |
| Intended User of Appraisal: | Mainstreet Community Bank of Florida |
| Intended Use: | Lending purposes |
| Extraordinary Assumptions: | The subject property borders sovereign, submerged lands. Sovereign submerged lands include, but are not limited to, tidal lands, islands, sandbars, shallow banks and lands waterward of the ordinary or mean high water line, beneath navigable fresh water or beneath tidally-influenced waters. The operation of the marina requires the lease of sovereign, submerged lands from the Department of Natural Resources. This type of lease is typical of similar marina properties. It was indicated that the lease requires periodic renewals. This appraisal has been made under the extraordinary assumption that the submerged land lease will run into perpetuity. If the alternative is found to be true, the assignment results may be affected. |

## 370 RECONCILIATION OF APPROACHES - MARKET VALUE ESTIMATE

The indications of value for the subject property by the applied approaches are as follows:

### RECONCILIATION OF VALUE INDICATIONS

| | | | | | |
|---|---|---|---|---|---|
| Indicated Value by Sales Comparison Approach | $ 4,040,000 | x | 25% | = | $ 1,010,000 |
| Indicated Value by Income Approach | $ 4,260,000 | x | 75% | = | $ 3,195,000 |
| Estimated Going Concern Value (Rounded) | | | | | $ 4,210,000 |

As previously explained, the Cost Approach was applied in our appraisal analysis to aid in the allocation of the going concern value. However, given the age of the subject improvements and the fact that replacement cost is applicable only to tangible assets, the Cost Approach was given no emphasis in final reconciliation of the going concern value of the subject property.

The Sales Comparison Approach mirrors buyer's behavior regarding the purchase of other similar type properties. The value indication obtained by this approach was supported by sales that are considered to have similar utility and highest and best use to that of the subject. This approach merits considerable emphasis in the final reconciliation of value.

Purchasers of properties capable of producing income are often concerned with the net income which a property such as the subject will produce. Income for the subject property is confirmed by observation of the historical profit and loss statements for the subject property provided by the subject property owner. Industry surveys and inquiries allowed for calculation of an appropriate overall capitalization rate for direct capitalization of the subject's estimated net operating income from operation of the subject property. Marinas are purchased primarily based on the income an owner expects to realize from operation of the property. Hence, this valuation approach merits primary emphasis.

Placing primary emphasis on the Income Approach and secondary emphasis on the Sales Comparison Approach, the final estimate of going concern value for the fee simple interest in the subject property is **4,210,000**, as-is.

The going-concern value for the subject is allocated to its component parts as follows:

### ALLOCATION OF VALUE

| | |
|---|---|
| Market Value of The Real Estate - 7.24 Acres of Land & Improvements | $ 3,760,000 |
| Equipment - FF&E | $ 160,000 |
| Business - Goodwill | $ 290,000 |
| Going Concern Value | $ 4,210,000 |

The market value for the subject real estate is allocated to its component parts as follows:

### ALLOCATION OF REAL ESTATE VALUE

| | |
|---|---|
| Value of Existing Marina, Residence, and 3.13-Acres of Underlying Land | $ 2,740,000 |
| Value of 4.10-Acre Planned Residential Condo Land | $ 1,020,000 |
| Estimated Market Value of Subject Real Estate Only | $ 3,760,000 |

**Report Reliance & Use Restrictions**

No liability is assumed, expressed, or implied by the appraiser(s) for unauthorized use of this report. Only those persons, parties, entities, companies, corporations, partnerships, associations, or groups that are clearly and explicitly identified as an intended user on page 2 may rely on, and use this report. There are no implied, suggested, inferred, consequential, or indirect intended users of this report. Unauthorized users should not use, or rely on any portion of this document. Unauthorized users do so at their own risk and peril.

Borrower
This appraisal report was prepared to assist a lender in underwriting a loan. A prospective borrower is not the appraiser's client or an intended user simply because the borrower obtains a copy of this document. Even though the borrower may directly or indirectly pay for this appraisal service, the borrower should not rely on, or use this report unless the borrower is clearly and explicitly identified as an intended user herein.

**Scope of Work Exclusion - Insurable Value**
The cost approach may or may not have been developed herein. Unless explicitly stated otherwise, the cost approach was developed solely to support the subject's market value. Use of this appraisal, in whole or part, for another purpose is not an expected intended use. Nothing in this appraisal should be used, or relied upon, for the purpose of determining the amount or type of insurance coverage to be placed on the subject property. The signatory / signatories to this report assume no liability for, and do not guarantee that any insurable value inferred from this report will result in the subject property being adequately insured for any loss that may be sustained. Since labor costs, material costs, building codes, construction intervals, and governmental regulations are constantly changing, the cost approach may not be a reliable indication of replacement or reproduction cost for any date other than this report's effective value date.

**Extraordinary Assumptions & Disclosures**

An extraordinary assumption is defined by USPAP to be "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinion or conclusions". Extraordinary assumptions presume as fact otherwise uncertain information. In other words, this type of assumption involves uncertainty about an underlying premise. An example is a survey or public record that displays a lot size. If the lot size is later found to be much smaller, then the value conclusion may be negatively affected.

USPAP Standard Rule 1-2(f) requires the identification of all extraordinary assumptions that are necessary for credible assignment results. This appraisal employs the following extraordinary assumptions.

> The subject property borders sovereign, submerged lands. Sovereign submerged lands include, but are not limited to, tidal lands, islands, sandbars, shallow banks and lands waterward of the ordinary or mean high water line, beneath navigable fresh water or beneath tidally-influenced waters. The operation of the marina requires the lease of sovereign, submerged lands from the Department of Natural Resources. This type of lease is typical of similar marina properties. It was indicated that the lease