# EXHIBIT A

---

**Letter from James A. Timko, Esq., to Matthew A. Leibert, Esq., dated May 5, 2026 (Re: Response to Civil Theft Demand)**

*On letterhead of Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A. — bearing internal reference No. 6388205.v1 — three pages.*

DEAN|MEAD

Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A.
420 South Orange Avenue, Suite 700
P.O. Box 2346
Orlando, FL 32801

(407) 841-1200
(407) 423-1831 Fax
www.deanmead.com

Attorneys and Counselors at Law
Orlando
Fort Pierce
Naples
Viera/Melbourne
Vero Beach

JAMES A. TIMKO
407-613-2588
JTimko@deanmead.com

May 5, 2026

Via Email Leibert@urbanthier.com and U.S. Mail

Mr. Matthew A. Leibert, Esq.
Law Office Matthew A. Leibert
5782A S. Semoran Blvd.
Orlando, FL 32822

Re: Response to Civil Theft Demand

Dear Mr. Leibert:

This letter is being sent on behalf of Kenneth Dixon and his related entities in response to your letter dated April 6, 2026.

My clients deny any wrongdoing with respect to the assignment of Mr. Johnson's membership interest in Homemakers and deny the arguments asserted in your letter. Mr. Johnson signed the assignment of his interest in Homemakers voluntarily and for consideration.

In addition, Mr. Johnson's claim fails for an obvious reason. The interest in Homemakers was placed in the Tiered Trust. If the debts owed to Pedixon and ZPD were paid, the interest would have been returned. As a result, there was never any intent to permanently deprive Mr. Johnson of his interest. Indeed, we have attempted to resolve this dispute and included in our proposal the return of Mr. Johnson's interest in Homemakers.

Your claim that Mr. Johnson's interest in Homemakers had a value of $8,981,897.00 is not supported by any accepted valuation standard. By way of background, as you are aware, prior to Mr. Johnson assigning his interest in Homemakers to the Tiered Trust, Homemakers assigned its ownership of the condominiums and townhomes to the Tiered Trust. That real property was the only asset of Homemakers. Homemakers made that assignment in connection with a series of loans made to Homemakers' related entities and business partners that were already in default and made in connection with the Cape Crossing development. As reflected in the Loan Agreement that Mr.

Johnson signed, Pedixon, LLC provided additional funding and agreed to reinstate the notes that were in default to allow Mr. Johnson and his business partners to sell the condominiums and townhomes to pay off their debts.

The valuation presented in your letter does not take into account Homemakers' prior assignment of the real property to the Tiered Trust. It does not take into account Mainstreet's mortgage and other encumbrances that are attached to the real property. For example, two other mortgages encumbered certain condos and townhomes and multiple options were held against several of the properties. In addition, association fees, property taxes and any other unpaid debts are also not reflected in the valuation. Finally, Mr. Johnson's valuation does not take into account that Homemakers was not generating sufficient income to pay its debt service, which is why they agreed to sell the condos and townhomes in the first place. As a result, the value of any equity interest in Homemakers was likely $0.00 not $8,981,897.00.

While you claim that the documentation of the Tiered Trust was deficient, your allegations do not rise to the level of fraud. Mr. Johnson does not dispute that he initially agreed to place Homemakers' assets into the Tiered Trust and that he signed a trustee's deed conveying the condos and townhomes. He also does not assert any injury he incurred due to the deed being recorded. Even if your allegations that the deed was deficient are somehow established in Court, it does not change the fact that Mr. Johnson agreed to the recording of a trustee's deed in the first place and suffered no harm due to the recording the deed.

Mr. Johnson has also claimed the Tiered Trust was procured by fraud because he did not understand what constituted the corpus of the trust. That is an absurd claim. Mr. Johnson signed the Tiered Trust agreement which clearly states the assets that would be included in the Tiered Trust.

Mr. Johnson should also be cognizant of the fact that he entered into the Loan Agreement without any intent to comply with it. He admitted during his deposition that he did not want to sell the condos and townhomes. As a result, the Loan Agreement was procured by fraud because the sale of the condos and townhomes and a repayment of the debt was a material term of the Loan Agreement.

In addition to the above, you ignore the fact that the bankruptcy court already ruled on ownership of Homemakers and Mr. Johnson acknowledged or failed to dispute the existence of the Tiered Trust and the assignment of his membership interest in Homemakers in those proceedings. Mr. Johnson has not acted in a manner that complies with his claim that he has an interest in Homemakers or Homemakers' assets. He took no efforts to dispute Mainstreet's Motion for Relief from the Automatic Stay filed in the bankruptcy proceedings nor has he taken any action to directly dispute Mainstreet's foreclosure claims. Indeed, he sat on his hands for over two-years since the assignment, and waited until after he was sued on his guaranty, before making a claim for his interest in Homemakers or deny the existence of the Tiered Trust.

Your letter and the asserted civil theft claim is in bad faith. Mr. Johnson has stated that he is not collectible and, assuming that is true, he believes he has nothing to lose by pursuing meritless claims. His willingness to pursue meritless claims is evidenced by the fact that a vexatious litigant motion is already pending against him. It is clear to us that Mr. Johnson is simply going after the deepest pockets and attempting to elevate a loan dispute and a failed business transaction into something nefarious to pressure, harass, and smear my clients.

Be advised, my clients will continue to protect their interests to the fullest extent of the law.

Sincerely,
*James A. Timko*
James A. Timko

JAT:mg

# EXHIBIT B

**Assignment of Membership Units of Homemakers Real Estate, LLC**

*Executed January 9, 2024, by Horton S. Johnson, as sole member, purporting to assign all right, title, and interest in the membership units to Crescent Sound, Limited, as Trustee of the Tiered Land Trust dated September 13, 2023.*

*In re Homemakers Real Estate, LLC*
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

In Support of Motion to Vacate Order Dismissing Case

Pursuant to Fed. R. Civ. P. 60(b)(3)

**Assignment of Membership Units**

I, Horton S. Johnson, as the sole owner and holder of all of the issued and outstanding membership units of Homemaker Real Estate, LLC, and in consideration of the loan accommodations made by PEDIXON, LLC, a Florida limited liability company, do now assign the following unto Crescent Sound, Ltd., as Trustee of the Tiered Land Trust u/d/t 9/13/2023: all of my right, title and interest in and to all of the issued and outstanding membership units of Homemakers Real Estate, LLC, a Florida limited liability company.

I have executed this assignment in Orlando, Florida on this 9th day of January 2024.

[signature]
*Horton S. Johnson*
*Manager of*
*Homemakers Real Estate, LLC*

STATE OF FLORIDA
COUNTY OF Orange

THE FOREGOING INSTRUMENT WAS sworn to (or affirmed) and subscribed before me by means of __ physical presence or __ online notarization on January 9, 2024, by Horton S. Johnson.

[signature]
Notary Public, State of Florida
Name: [illegible]
(Please print or type)

Commission Number: [illegible]
Commission Expires: [illegible]

Janelle Moroa
Notary Public
State of Florida
Comm# HH077342
Expires 1/5/2025

Notary: Check one of the following:
__ Personally known OR
__ Produced Identification (if this box is checked, fill in blank below).
Type of Identification Produced: [illegible]

HSJ

# EXHIBIT C

## Declaration of Kenneth G. Dixon

*Sworn under penalty of perjury and filed June 24, 2025 as Exhibit C to Respondents' Supplemental Pleading in Support of Motion to Dismiss (Doc. 69), and refiled in In re Homemakers Real Estate, LLC, Case No. 6:25-bk-05570-GER, as Exhibit A to Doc. 7. Paragraphs 12–14 set forth the "total/no return" representation.*

*In re Homemakers Real Estate, LLC*
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

In Support of Motion to Vacate Order Dismissing Case

Pursuant to Fed. R. Civ. P. 60(b)(3)

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

Debtor.

CASE No. 6:25-bk-02685-GER
Chapter 11

**DECLARATION OF KENNETH DIXON IN SUPPORT OF MOTION TO DISMISS BANKRUPTCY CASE FOR LACK OF CORPORATE AUTHORITY**

I, KENNETH DIXON, declare as follows:

1. I am the Managing Member of PEDIXON, LLC ("PEDIXON") and ZPD, LLC ("ZPD") and its corporate representative for the matters addressed in this Declaration.

2. I am over 18 years of age and I am competent to make this Declaration. I am authorized to make this Declaration on behalf of PEDIXON and ZPD and based on my personal knowledge and the business records of PEDIXON and ZPD, including all of the exhibits attached to this Declaration.

3. I am familiar with the business records which PEDIXON and ZPD regularly create and maintain. The business records attached hereto are true and accurate copies; were made by, or from information transmitted by, a person with knowledge of the facts contained in the business records made at or near the time of the acts and events appearing on them; made or compiled as part of the regular practice of PEDIXON and ZPD; and kept in the regular course of Plaintiff's regularly conducted business activities. The documents attached hereto all constitute business records of PEDIXON and/or ZPD.

4. Horton Johnson and Homemakers Real Estate, LLC ("Homemakers") are the guarantors of several loan accommodations made by PEDIXON and ZPD to Tiered Capital, Inc.,

EXHIBIT
A

its shareholders and their affiliates, including Homemakers Real Estate, LLC and Horton ("Woody") Johnson (collectively, "Tiered") made from January 2022 through October 2023 (collectively, the "Loan").

5. In 2022, at the request of Ken Jones, the Chief Financial Officer of Tiered (the "CFO"), I began to attend meetings with Frank Amodeo ("Amodeo") at his place of residence located at 1311 Hoffner Ave, Orlando FL 32809.

6. For the first few months, the CFO was present at these meetings. Amodeo was introduced to me as the designated representative and consultant of Tiered, and specifically, Homemakers and Johnson.

7. Johnson was present for at least two of the meetings.

8. Johnson's legal counsel, Baylor Johnson, was present at one of the meetings.

9. After several months, PEDIXON's and ZPD's legal counsel, Alison Pitkanen, generally accompanied me to these meetings.

10. During these meetings, Amodeo orchestrated and negotiated the loan accommodations between PEDIXON, ZPD, and Tiered.

11. In December 2023, the Loan was in default, and the principal amount due was approximately $10,625,000. At this time, I instructed my legal counsel to deliver a default notice to Tiered.

12. On January 7, 2024, I attended a meeting with Frank Amodeo to discuss alternative solutions to foreclosure and legal action against Johnson and Homemakers. At this meeting, Mr. Amodeo suggested that Mr. Johnson would be willing to relinquish all interest in Homemakers to obtain a forbearance of legal action under and enforcement of Mr. Johnson's personal guaranty. Since the Assignment was not merely collateral, and it was something new being offered, I agreed

to forbear. The parties agreed that the Assignment would be a total assignment of the interests with no return to Johnson.

13. On January 9, 2024, I instructed my legal counsel to meet with Amodeo and Johnson to formalize the total assignment from Johnson. On that same date, Johnson executed the Assignment and in exchange therefor, PEDIXON LLC agreed to a six (6) month forbearance of the Loan. A true and correct copy of the Assignment is attached hereto as Exhibit "A."

14. I decided that the interests in Homemakers would be held in the Trust because it was a total assignment and the Trust would own Homemakers and own the beneficial interest in the Tiered Trust for the Trustee to administer to work towards paying off the Loan.

15. The Trustee has the authority to control the entity and holds the beneficiary interest of Homemakers in the Tiered Trust.

16. On or about January 24, 2025, I instructed my counsel to send another default notice to Johnson, among others. A true and correct copy of the default notice is attached hereto as Exhibit "B". In the default notice the assignment of the interests in Homemakers to obtain a forbearance was mentioned. Mr. Johnson never responded to contest the assignment of Homemakers to the Trust.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Kenneth Dixon

# EXHIBIT D

**Summary — Dixon's Repaid by December 2023**

*One-page tabular summary identifying eleven (11) extensions of credit, totaling $11,225,000, made between January 2022 and September 2023 by three Dixon-affiliated lenders (PEDIXON LLC, Parke Financial Limited Partnership, and ZPD LLC) to six (6) borrowers affiliated with Tiered Capital, Inc., and showing $11,863,595 in principal payments received (in cash and in-kind) by January 2024 — establishing that Dixon was repaid in full, with a $548,595 surplus, prior to the January 9, 2024 Assignment.*

*In re Homemakers Real Estate, LLC*
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

In Support of Motion to Vacate Order Dismissing Case

Pursuant to Fed. R. Civ. P. 60(b)(3)

# Dixon's Repaid

Between January 2022 and September 2023, three Dixon-owned lenders[1] made 11 extensions of credit to six persons[2] affiliated with the owners of Tiered Capital, Inc. (borrowers):

| Date | Description | Amount |
|---|---|---|
| Jan. 2022 | Sherwood Note (Amelia CD) | 500,000 |
| July 2022 | IMQA Loan 506 | 300,000 |
| Aug. 2022 | Allonge to Sherwood Note | 250,000 |
| Aug. 2022 | Hampton | 1,300,000 |
| Oct. 2022 | Sherwood Option Loan | 500,000 |
| Dec. 2022 | Million Dollar Loan (Cherry CD) | 1,000,000 |
| Feb. 2023 | Resorts Common Area Loan | 500,000 |
| June 2023 | River Fly In | 3,000,000 |
| July 2023 | Holly Bluff | 3,000,000 |
| July 2023 | Flynn | 125,000 |
| Sept. 2023 | Tiered | 750,000 |
| | **Total** | **11,225,000** |

Between January 2022 and January 2024, the borrowers made all payments of interest and expenses; plus, either in-kind or in-cash, made $11,863,595 in payments earmarked for the payment of principal:

| Date | Description | Amount |
|---|---|---|
| Jan. 2022 | ROGOs | 150,000 |
| July 2023 | 57.36 Acres of river front property | 4,210,000 |
| July 2023 | 7.24 Acres of industrial property | 4,300,000 |
| Oct. 2023 | Cash | 2,603,595 |
| Jan. 2024 | Cash from CD | 500,000 |
| | **Total** | **11,863,595** |

Despite Dixon having received all interest and expenses due through December 2023 and $548,595 more than the principal of all the loans, Dixon continued to collect monies and properties from January 2024 through to the present (April 2026). Simply, Dixon has taken more than $5,000,000 since being repaid, not including the 27 condominiums and townhomes.

[1] PEDixon, LLC, Parke Financial Limited Partnership, and ZPD, LLC
[2] Sherwood Construction, Inc. IMQA Investments Incorporated, Recycled group of SC, LLC, Florida Space Coast Resorts, Inc., Tiered Capital, Inc., and Martin Flynn

# EXHIBIT 93

---

In re Homemakers Real Estate, LLC
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

**Doc. 93, filed June 2, 2026**

Omnibus Response to Motion to Vacate Order Dismissing Case

*PEDixon, LLC and ZPD, LLC*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

Debtor.

CASE No. 6:25-bk-02685-GER
Chapter 11

## OMNIBUS RESPONSE TO MOTION TO VACATE OR DISMISSING CASE (DOC. NO. 88 AND DOC. NO. 89)

Creditors, PEDIXON LLC and ZPD, LLC (collectively "Respondents"), by and through counsel, hereby object to the Motions of Horton Johnson to Vacate Order Dismissing Case Under Rules of Civil Procedure 60(b)(1) and 60(d)(3) (Doc. No. 88) (the "First Motion to Vacate") and to Vacate Order Dismissing Case Pursuant to Rule of Civil Procedure Rule 60(b)(3) (Doc. No. 89) (the "Second Motion to Vacate"), and respectfully states:

## THE MOTIONS PROVIDE NO RELIEF AND ARE MOOT

Mr. Johnson who was fully aware of the dismissal proceedings in this Bankruptcy Case and even participated through Court call,[1] seeks to vacate the Order dismissing this case. After the Motions were filed, the Court entered an Order for Relief in the involuntary bankruptcy proceeding of the above captioned debtor and provided the parties with 14-days to reach a resolution regarding corporate authority or the Court will appoint a trustee.

Shortly thereafter, on May 26, 2026, the Court entered its Order Scheduling Hearing "to determine if the Motions should be denied given that an Order for relief has been entered in the Involuntary Case."

[1] See Ex. A, Pg. 125:19-Pg. 126:3.

The Motions are moot. "A case is moot when it no longer presents a live controversy with respect to which the Court can provide meaningful relief." Soliman v. U.S. ex. Rel. Ins., 296 F.3d 1237, 1242 (11th Cir. 2002). The relief granted was the dismissal of this bankruptcy case. Now, a bankruptcy case is pending. Reinstating this bankruptcy case and having two bankruptcy cases pending for one entity provides no relief, is nonsensical, and does nothing to benefit any party-in-interest or creditor. Procedurally, vacating the Dismissal Order presents a quandary as to how to reinstate a case that was dismissed nearly one (1) year ago when another case for the same entity is still pending. After its dismissal, the creditors and parties in interest all acted and conducted business as if the bankruptcy were not in place. Reinstating a chapter 11 bankruptcy case could potentially create confusion, legal claims and administrative issues that are not warranted or fair to anyone.

In addition, all the issues raised in the Motions are based on allegations that, if they are true, were known or should have been known at the time of the first bankruptcy filing. The issue in question in this case was the effect of an unequivocal written assignment of Johnson's membership interests to a trust on his corporate authority to file a bankruptcy case. Both the purported debtor, Homemakers Real Estate, LLC ("Homemakers"), and Johnson had the opportunity to conduct discovery and an evidentiary hearing on this matter and both decided against it. In fact, Homemakers agreed that the Court did not need to conduct an evidentiary hearing and discovery was not necessary and that the Court could rely on the documents attached to Homemakers Response to the Motion to Dismiss when making its decision.[2] The Motions should be seen for what they are, another attempt of Johnson to litigate his alleged rights in Homemakers through impermissible motion practice, rather than pursuing his pending claims

[2] The documents included the Assignment, Land Trust Agreement and certain loan documents attached to Homemakers' response to Respondents' Motion to Dismiss.

between two non-debtors in state court. The Eleventh Circuit has held that if a Rule 60(b) motion is filed to obtain an adjudication of a state court claim in the District Court there must be an independent jurisdictional basis. Padilla v. Smith, 53 F. 4th 1303, 1317-18 (11th Cir 2022). No such basis is asserted in the Motions.[3]

**THERE IS NO BASIS TO VACATE THE DISMISSAL ORDER UNDER RULE 60**

**The Issues Presented Underlying the Dismissal Order Were Limited in Scope**

Before addressing the arguments reflected in the Motions, providing a brief summary of the proceeding is appropriate. The issue raised in the Motion to Dismiss was whether Johnson had the requisite corporate authority to file a bankruptcy case on behalf of Homemakers. Attached to that Motion was an assignment of Johnson's sole membership interest to the Land Trust.

After Homemakers informed the Court it did not need to conduct an evidentiary hearing, the Court required the parties to provide supplemental briefing. The Court determined that Johnson did not have corporate authority to commence this case.

As stated in the Dismissal Order, the existence of the assignment of Johnson's membership interest in Homemakers and the existence of the Land Trust was not in dispute.

> Movant and Debtors agree that prior to the Petition Date, Mr. Johnson, assigned all of his right, title and interest in 100% of Debtor's membership interests (the "Membership Units") to the Land Trust. The parties also agree that Crescent Sound Ltd., was the trustee of the Land Trust on the Petition Date.

Dismissal Order, Pg. 2 (emphasis added).

No discovery was conducted by Homemakers or Johnson. Based on the Land Trust Agreement, Johnson is not named as a beneficiary in the Land Trust. There is no dispute that the

[3] This particularly true now that a Trustee is to be appointed. Main Street has already obtained relief from stay and the secured creditors, let alone unsecured creditors, will likely not be paid in full. There will also be no distribution to equity. The absolute priority rule also applies. Quite simply, there is nothing of value for equity holders to fight over in this case and it is a waste of the Court's resources and time.

Land Trust documents were <u>not</u> amended to include Johnson as a beneficiary or to include the membership interests in Homemakers as collateral.

Johnson was fully aware of the proceedings, but did not take any action on his own to protect his interests. As reflected in the Motion to Name Johnsons as a Vexatious Litigant (Doc. No. 184 in the involuntary bankruptcy case), when the Court dismissed this case, Johnson filed a flurry of motions and pleadings, participated in, or filed two additional bankruptcy cases. Several of these filings, if not most, were attempts to relitigate the Court's ruling on the Motion to Dismiss. His conduct continues to this day.

Not surprisingly, the First and Second Motions to Vacate lack merit and attempt to assert claims that existed well before the bankruptcy case was filed and Homemakers and Johnson failed to assert or that they would have discovered had they conducted discovery, conducted an evidentiary proceeding and cross examined witnesses. Their failures should not result in the vacating of this Court's Order.

**<u>Rule 60 Motions are Disfavored</u>**

Once a matter is decided, Courts are wary of granting motion under Rule 60 and as discussed below, the burdens on the movant to succeed on a Rule 60 motion is high. "The purpose of a Rule 60(b) motion is to allow a court to correct obvious error or injustice but it is not intended to be a substitute for appeal." <u>United States v. Battle</u>, 272 F. Supp. 2d 1354, 1364 (N.D. Ga. 2003). "The desirability for order and predictability in the judicial process speaks for caution in the reopening of judgments." <u>Griffin v. Swim-Tech Corp.</u>, 722 F.2d 677, 680 (11th Cir. 1984). As presented below, Rule 60 is not available to parties who failed to conduct discovery, did not present evidence or arguments, or slept on their rights.

**Rule 60(b)(1) Docs not Apply**

Under Rule 60(b)(1) a Court may vacate its Order if the Court made an erroneous application of the law of the law to the facts before it. See In re Mulig, 494 B.R. 755, 763 (Bankr. S.D. Fla. 2013).

In the First Motion to Vacate, Johnson asserts that the Trust Deed was forged in 2024 and therefore the Court made a mistake of law applying the Florida Land Trust Act in its Order dismissing the first bankruptcy case. The Trust Deed was not an issue in the dismissal proceedings and was not submitted to the Court. Indeed, Homemakers agreed to present their case and rely on the loan, trust, and assignment documents Homemakers presented to the Court. As a result, Homemakers acknowledged the existence of the Land Trust. Johnson made the decision to not participate in the proceedings. It is impossible for the Court to erroneously apply the law to the facts of a case, if the alleged facts were never before the Court.

In addition, Johnson's forgery claims are subject to significant dispute which is discussed further below.

**Rule 60(d)(3) does not Support Vacating the Dismissal Order**

In the First Motion to Vacate, Johnsons claims that a fraud on the Court occurred because he disputes the existence of the Land Trust. In the Eleventh Circuit to commit a fraud on the Court, the conduct must "embrace only that species of fraud perpetrated by officers of the court do that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Travelers Indem. Co. v. Gorem, 761 F.2d 1549, 1551 (11th Cir. 1985). The conduct must be egregious, be "perpetrated against the judicial machinery,' "defile the Court itself" and must involve "an unconscionable plan or scheme." Mills v. Commissioner, Alabama Dept' of Corrections, 102 F. 4th 1235, 1240 (11th Cir. 2024).. Fraud on the Court is



6456547.v1

limited to the most egregious forms of subversion of the legal process…those we cannot necessarily expect to be exposed to by the normal adversary process." Travelers, 761 F.2d at 1552 (citations omitted)(emphasis added); see also Debose v. USF Board of Trustees, 844 Fed. Appx. 99, 112 (11th Cir. 2021). Furthermore, labeling a legal error claim while claiming "fraud on the court" is insufficient to establish such a claim. United States v. Bueno-Sierra, 723 Fed. Appx. 850, 855 (11th Cir. 2018). Conduct such as "nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court." Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978); Popiel v. Commonwealth Land Title Insurance Company, 2026 WL 321439 *4 (MDGA 2026)(even perjury and fabricated evidences does not qualify as fraud on the Court).

In the First Motion to Vacate, Johnson asserts the Assignment of Johnson's sole member interest in Homemakers in January 2024 was invalid. Johnson alleges Trust Deed for the condominiums owned by Homemakers was not recorded properly and the Land Trust was not formed because the Trust Deed was "forged." All of these allegations occurred more than a year prior to the filing of this bankruptcy case and were not pursued during the first dismissal proceedings. Indeed, Homemakers relied on the existence of these documents in it arguments to the Court and acknowledged the existence of the Land Trust and the Assignment during the proceedings.

Johnson's claim of a forgery leaves out some key facts. In the affidavit attached as Exhibit "B", the notary, Janelle Morca, affirms she was an employee of one of Johnson's entities and took the direction solely of Johnson, Frank Amodeo, and Martin Flynn with respect to notarizing documents. She also confirms that Alison Pitkanen never instructed her to falsify a notary seal and that she did not take direction from Ms. Pitkanen on any matter including notarizing signatures.

Further, she confirms that any signature that she notarized for Johnson was actually his signature. These documents included the transaction documents involving Respondents. In other words, Johnson is claiming that the notary seal that **he** was responsible for and presented to the Respondents is forged or fraudulent. Furthermore, nowhere does Johnson claim he did not sign a deed, that he was tricked into signing a deed, or that he did not intend to sign a deed for the condominiums in favor of Land Trust.[4] He only argues that he has a copy of a deed without an exhibit attached that contained the property descriptions. It is not surprising that Johnson would have multiple copies of the deed in different states of signature, because he was responsible for the notarization of the document.

Johnson also claims the witnesses are false attestations. But the witnesses are Anthony Amodeo and Gabrielle Amodeo, who are Frank Amodeo's niece and nephew.

Finally, the DocuSign identification number on the recorded deed, matches Johnson's identification number. See Exhibit "C". As a result, all of the evidence supports that Johnson executed the recorded deed, had Amodeo's relatives witness it, and then he provided it to Respondents..[5]

In summary, Homemakers agreed the Land Trust was established. Homemakers also agreed that the Assignment was made to the Land Trust and the parties agreed to the key facts of the case. Johnson was responsible for having the deed notarized. Johnson does not dispute that Homemakers agreed to assign its interests in the condominiums to the Land Trust. There is no

[4] This is no small matter. Johnson cites to sec. 831.01 of the Florida statutes defining the crime of forgery. That statute "requires the intent to injure of defraud another person." Johnson was a willing participant in signing the deed and he does not state any injury.

[5] This is not Mr. Johnson's only claim of forgery. In the initial response to the Motion to Dismiss, Homemakers claimed Johnson did not sign the Assignment. Then during the proceeding they agreed that the Court should rely on the Assignment. In his civil theft letter, Johnson asserted he signed the Assignment in what could be described as some sort of duress.

claim that any evidence Homemakers agreed to be submitted to the Court was fabricated and the Trust Deed was not even an issue in the case. There is no evidence of any plan or scheme by the Respondents to commit any fraud on the Court, there certainly was not any conduct that prevented the Court from adjudicating the matter (like bribing of witnesses, etc.). As a result, Johnson cannot meet his burden to vacate the Order dismissing the case under Rule 60(d)(3).

**Rule 60(b)(3) Does not Support Vacating the Dismissal Order**

To vacate an Order under Rule 60(b)(3), in the Eleventh Circuit, the movant must meet tow requirements. First, the movant must prove by clear and convincing evidence that the adverse party obtained the verdict through fraud, misrepresentations, or other misconduct. Waddell v. Hendry County Sheriff's Office, 392 F.3d 1300, 1309 (11th Cir. 2003). Second, the moving party must also demonstrate that the conduct prevented them from fully presenting the case. Id. The rule is aimed at judgments that are "unfairly obtained, not at those which are factually incorrect." Rozier, 573 F.2d at 1339. Therefore, it is not enough to show that the opposing party behaved badly or that the judgment may have been wrong on the merits; the movant must show a causal link between the misconduct and an actual prevention the movant's ability to present their case. Frederic v. Kirby Tankships, Inc., 205 F.3d 1277, 1288 (11th Cir. 2000).

In the Second Motion to Vacate, Johnson asserts that Respondents misrepresented the effect of the Assignment of Johnson's interests. Context is necessary. Well after the dismissal of this case, parties related to the Respondents received a civil theft letter from Johnson regarding the assignment of the interest in Homemakers. A key issue for civil theft is the subjective intent of the defendant. In response to the civil theft letter the parties stated that they lacked the intent for civil theft because if Johnson's loans were paid in full or if they reached a resolution they would have returned the membership interests to Johnson. Nowhere does the response does it state that Land

Trust did not exist, that Johnson's Assignment did not result in a total assignment the membership interest in Homemakers, that those membership interests were collateral for the loans, or that there was a secret undocumented trust where Johnson was a beneficiary.[6]

The statement in the civil theft letter response does not change the legal standing of the parties under the Land Trust or the Assignment. In review, the assignment of Johnson's interests to the Land Trust occurred several month after the Tiered Loan, the Loan Agreement and the Land Trust Agreement were entered into. The Tiered Loan fell into default and Johnson entered into the assignment for a forbearance. The Land Trust was never revised to include Johnson as a beneficiary and there is no evidence of such an agreement. Thus, Johnson had no right to any of the *res* in the Land Trust. In addition, the Land Trust was never amended or revised to state that the assignment of Johnson's interests was collateral for the loans. Not only do the Motions not dispute these facts and these were the facts reflected in the documents that Homemakers submitted to the Court when entering the Order dismissing this case.

Two things can be true at once, the parties entered into a deal giving a party certain legal rights, but one party could always have the subjective intent to agree to waive those rights later if they received what they wanted from the deal. Here, what Dixon wanted was payment of the full debt. Even if the statements are contrary, taking an inconsistent position in a subsequent lawsuit does not result in the granting of a Rule 60(b)(3) motion. Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1298 (11th Cir. 2000).

As a result, of the above, Johnson does not meet the first requirement established by the 11th Circuit under Rule 60(b)(3).

---

[6] Counsel acknowledges that the language in the civil theft letter response should have been more precise. But, that does not change the parties legal rights.

As stated above, the Eleventh Circuit's second requirement to vacate a judgment under Rule 60(b)(3) is that Johnson must show that the conduct of Respondents prevented Homemakers (or Johnson) from "fully presenting their case." Conduct relating to the inability to fully present a case often involves purposefully not providing information during discovery. See Brown v. Walmart Stores East, LP, 2017 WL 3608186 *3 (GAND 2017)(citations omitted). A party cannot invoke Rule 60(b)(3) when its own tactical decision — rather than the opposing party's misconduct — were responsible for the failure to fully present the case. Waddell, 329 F.3d at 1310. Furthermore, failure of the movant to assiduously investigate a claim or cross examine a witness results in the denial of a Rule 60(b)(3) motion. Armstrong v. The Cadle Co., 239 F.R.D. 688, 695 (FLSB 2007) (citing Gov't Fin. Servs. One LTD Partnership v. Payton Place, Inc., 62 F.3d 767, 773 (5th Cir. 1999)).

Here, Homemakers made the tactical decision to not conduct discovery or an investigation, to not conduct an evidentiary hearing to cross-examine Dixon, and to rely solely on the documents that Homemakers presented to the Court as part of its response. Under clear legal authority, Johnson should not be granted relief based on his own and Homemakers their tactical decisions.

Based on the foregoing, the First and Second Motion to Vacate should be denied.

DATED: June 2, 2026.

*/s/ James A. Timko*
JAMES A. TIMKO, ESQ.
Florida Bar No. 0088858
**DEAN, MEAD, EGERTON, BLOODWORTH, CAPOUANO & BOZARTH, P.A.**
420 S. Orange Avenue, Suite 700
Orlando, Florida 32801
Telephone: 407-841-1200
Facsimile : 407-423-1831
Email: jtimko@deanmead.com
***Counsel for PEDIXON AND ZPD***



6456547.v1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 2, 2026, I electronically filed this Objection with the Clerk of Court through CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

*/s/ James A. Timko*
JAMES A. TIMKO, ESQ.



6456547.v1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:6:25-bk-05570-GER

IN RE:

HOMEMAKERS REAL ESTATE, LLC,

Debtor.

---

FEBRUARY 3, 2026

VOLUME I

TRANSCRIPT OF TRIAL PROCEEDING

BEFORE THE HONORABLE GRACE E. ROBSON
UNITED STATES BANKRUPTCY JUDGE

GEORGE C. YOUNG COURTHOUSE
400 WEST WASHINGTON STREET
ORLANDO, FLORIDA

A P P E A R A N C E S:

JAMES A. TIMKO, ESQUIRE
Dean, Mead, Egerton, Bloodworth,
Capouano & Bozarth, P.A.
420 South Orange Avenue
Suite 700
Orlando, Florida
Appearing on behalf of Debtor Homemakers Real Estate, LLC

LAWRENCE M. KOSTO, ESQUIRE
Kosto & Rotella
1517 East Robinson Street
Orlando, Florida
Appearing on behalf of CTO Holdings, Inc., IMQA Investments Incorporated

Proceedings recorded by electronic sound recording
Transcript Provided by ACCREDITED COURT REPORTERS
acreporters@embarqmail.com
(407) 443-9289

EXHIBIT
A

enough money to pay you back, they pay you back?
A That's my expectation.
Q Okay. So, so is it fair to say that the loan -- the repayment is contingent on Homemakers ever having money to pay you?
A I suppose that be fair.
Q And we mentioned the only assets of Homemakers before and you said they were townhomes and condos.
Are all of those townhomes and condos currently subject to foreclosure actions?
A Yes.
Q Now, at one time you did, though, own a hundred percent of Homemakers, correct?
A Yes.
Q And this Court ruled in the first bankruptcy case that the legal and beneficial interests in Homemakers are owned by a land trust, correct?
A Correct.
Q And you attended the hearings in the first bankruptcy case remotely, correct?
A Correct.
Q And you were aware of the motion to dismiss when it was pending, correct?
A The motion to dismiss?
Q The motion -- I'm sorry. The motion -- a

motion to dismiss the involun -- the first bankruptcy case was filed, correct?

A Yes.

Q And you were aware of the motion to dismiss in the --

A Aware of that, yes.

Q -- first bankruptcy case while it was pending, correct?

A I'm not sure of the timing, but, yeah, sounds -- sounds reasonable.

Q Can you please turn to Number 10? Is this the order dismissing the first bankruptcy case?

A Yes.

MR. TIMKO: Your Honor, I'd like to enter this into evidence.

THE COURT: Okay. Any objection?

MR. KOSTO: No objection, Your Honor.

THE COURT: Okay. Admitted.

BY MR. TIMKO:

Q And if you turn to Page 2, it says Movants and Debtor agree that prior to the petition date Mr. Johnson assigned all of his right, title, and interest in a hundred percent of Debtor's membership interest to the land trust, correct?

A That's what it says, yes.

# DECLARATION OF JANELLE MOREA

**I, Janelle Morea, under penalty of perjury, declare that I have personal knowledge of all statements contained herein and state as follows:**

1. Employment: From approximately September 2020 through April 2024, I was a full-time employee of Tiered Capital, Inc. and its subsidiary, Sherwood Construction, Inc., serving as an Executive Assistant, certified paralegal, and Office Manager. I was never employed by Alison Pitkanen or her law firm.

2. Notary Certification and Insurance: My Florida Notary Public certification and the required surety bond and insurance were paid for and maintained by my employer, Sherwood Construction, Inc. My commission remained valid and in good standing from January 2022 until its expiration on January 5, 2025.

3. Professional Record: In my years of service as a Notary Public, I have never been the subject of any complaint, inquiry, or disciplinary action regarding a notarial act. To the best of my knowledge, I have always performed my duties in strict compliance with the notarial laws of the State of Florida.

4. Authorization and Reporting: Every document I notarized related to the numerous loans made and/or guaranteed to or for the benefit of Tiered Capital, Inc., Sherwood Construction, Inc., Martin C. Flynn, Jr. or Horton Johnson, was done with the express permission and under the direction of Martin C. Flynn, Jr. or Horton Johnson. Any signature I notarized for Martin C. Flynn, Jr. was actually his signature. Any signature I notarized for Horton Johnson was actually his signature.

   During my employment, I reported exclusively to Martin C. Flynn, Jr., Horton Johnson, or the CFO, Ken Jones.

5. Direction Regarding Amodeo: I was specifically directed by Martin C. Flynn, Jr. to report to and take daily direction from Frank Amodeo regarding business affairs.

6. Interactions with Counsel: At no time did Alison Pitkanen ever ask me to falsify a notary seal, nor did she ever direct me to perform any "false attestation" or improper notarial act. I did not take directions from Ms. Pitkanen

EXHIBIT
B

regarding notarizing signatures or any other matter related to my job. I would not have falsely notarized a document at her request, but no such request was ever made. Alison Pitkanen was the Closing Attorney and did not have the authority to direct my actions as an employee of the borrower. After I notarized documents, they were provided to Ms. Pitkanen at the direction of my employer. In my experience, Ms. Pitkanen never asked me to do anything inappropriate. To my knowledge, Ms. Pitkanen never took an action that was unethical.

**I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.**

**Executed on: February 8, 2026**

JANELLE MOREA

DocuSign

## Certificate Of Completion

Envelope Id: 9078288BFE204A15A658110FB6D3929D
Status: Completed
Subject: Complete with DocuSign: Assignment Beneficial Interest.Homemakers.pdf, GUARANTY.Homemakers.pdf,...
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 11 | Signatures: 4 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Alison Pitkanen |
| AutoNav: Enabled | | 13514 Lake Mary Jane Rd |
| EnvelopeId Stamping: Enabled | | nil |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Orlando, FL 32832 |
| | | alisonplaw@gmail.com |
| | | IP Address: 162.230.108.92 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>9/13/2023 10:23:34 AM | Holder: Alison Pitkanen<br>alisonplaw@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Horton S. Johnson<br>wjohnsonbbf@gmail.com<br>MGR<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Horton S. Johnson<br>E350F031D3EE499<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 72.238.64.53 | Sent: 9/13/2023 10:34:34 AM<br>Viewed: 9/13/2023 10:50:44 AM<br>Signed: 9/13/2023 10:52:42 AM |

Electronic Record and Signature Disclosure:
Accepted: 9/13/2023 10:50:44 AM
ID: 48040a3a-7398-431c-8b28-11e194a8ab09

| In Person Signer Events | Signature | Timestamp |
|---|---|---|
| **Editor Delivery Events** | **Status** | **Timestamp** |
| **Agent Delivery Events** | **Status** | **Timestamp** |
| **Intermediary Delivery Events** | **Status** | **Timestamp** |
| **Certified Delivery Events** | **Status** | **Timestamp** |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| alison pitkanen<br>alisonpitkanen@gmail.com<br>Manager<br>Alison Pitkanen Law Firm LLC<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 9/13/2023 10:34:34 AM |

Electronic Record and Signature Disclosure:
Accepted: 8/1/2023 11:28:04 AM
ID: 5809624e-9b86-40f5-99c9-60014a00251e

| Witness Events | Signature | Timestamp |
|---|---|---|
| **Notary Events** | **Signature** | **Timestamp** |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/13/2023 10:34:34 AM |
| Certified Delivered | Security Checked | 9/13/2023 10:50:44 AM |

EXHIBIT
tabbies
C

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Signing Complete | Security Checked | 9/13/2023 10:52:42 AM |
| Completed | Security Checked | 9/13/2023 10:52:42 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 8/12/2022 12:34:00 PM
Parties agreed to: Horton S. Johnson, alison pitkanen

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Alison Pitkanen (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Alison Pitkanen:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: alisonplaw@gmail.com

**To advise Alison Pitkanen of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at alisonplaw@gmail.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Alison Pitkanen**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to alisonplaw@gmail.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Alison Pitkanen**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to alisonplaw@gmail.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

> You can access and read this Electronic Record and Signature Disclosure; and
> You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
> Until or unless you notify Alison Pitkanen as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Alison Pitkanen during the course of your relationship with Alison Pitkanen.

# EXHIBIT 94

---

In re Homemakers Real Estate, LLC
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

**Doc. 94, filed June 5, 2026**

Reply in Support of the Motions to Vacate (Docs. 88 and 89) and in Response to the Objection of PEDixon LLC and ZPD LLC (Doc. 93)

*Horton Johnson*

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 6:25-bk-02685-GER |
| HOMEMAKERS REAL ESTATE, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**MOVANT'S OMNIBUS REPLY IN SUPPORT OF THE MOTIONS TO VACATE (DOC. 88 AND DOC. 89) AND IN RESPONSE TO THE OBJECTION OF PEDIXON LLC AND ZPD LLC (DOC. 93)**

The Movant, by and through undersigned counsel, replies in support of the pending Motions to Vacate (Doc. 88 and Doc. 89) and responds to the Omnibus Objection of PEDIXON LLC and ZPD LLC (Doc. 93, the "Objection"), and states:

The threshold concern is mootness given the order for relief in the involuntary action.[1] The other dispositive issue is one concerning legal characterization. The Objection treats the Assignment of Membership Units as an absolute, ownership-vesting transfer. But Mr. Timko, as Dixon's counsel, has represented that Dixon's intent was to return the assigned assets to Mr. Johnson once the debt was repaid — and under Florida law that admitted intent makes the Assignment a collateral assignment for security, not an absolute transfer.[2] Everything else in this case follows from that characterization. The balance of the Objection rests on three further legal arguments and one evidentiary linchpin: that the Florida Land Trust Act supplied a valid basis for the dismissal; that Rule 60 cannot reach a "tactical" choice or facts "known" at the time of dismissal; that the fraud standards of Rule 60(b)(3) and 60(d)(3) are too demanding to be met; and, factually, the sworn Declaration of Janelle Morea (Doc. 93, Ex. B) and its companion DocuSign certificate (Ex. C), offered to rebut the forgery. As set forth below, <u>the characterization issue resolves the case in the Debtor's favor; no "Tiered Land Trust" ever legally existed; the forgery is</u>

[1] *In re Homemakers*, No. 6:25-bk-05570 (Bankr. M.D. Fla. 2026).
[2] *In re JLK Construction, LLC*, 2025 WL 3681827, at *4 (Bankr. W.D. Mo. Dec. 18, 2025) ("Under Florida law, the parties' intent determines whether a transaction constitutes a sale or a loan." (citing *Indian Lake Estates, Inc. v. Special Investments, Inc.*, 154 So. 2d 883, 888 (Fla. 2d DCA 1963); *Griffin v. Kelly*, 92 So. 2d 515, 519 (Fla. 1957); *Foster v. Weber*, 578 So. 2d 857, 858 (Fla. 2d DCA 1991))).

now documented instrument-by-instrument; and the Morea Declaration has collapsed under a sworn complaint filed with the Florida notary regulator.

## I. BY DIXON'S OWN ADMITTED INTENT, THE ASSIGNMENT WAS A COLLATERAL ASSIGNMENT FOR SECURITY — NOT AN ABSOLUTE TRANSFER — AND TIMKO'S DEFENSE OF DIXON CONCEDES THE POINT THAT DEFEATS THE DISMISSAL.

This is the first and primary issue before the Court, because it determines the legal nature of the entire transaction and, with it, the validity of the dismissal. Under Florida law, the character of an assignment or conveyance is fixed by the **intention of the parties**, not by the label the instrument happens to wear. The Legislature has so commanded: "All conveyances… or other instruments of writing conveying or selling property, either real or personal, **for the purpose or with the intention of securing the payment of money**, whether such instrument be from the debtor to the creditor or from the debtor to some third person in trust for the creditor, shall be deemed and held mortgages." Fla. Stat. § 697.01(1). The Florida Supreme Court has enforced that rule for more than a century: "Neither artifice of form nor superficial declaration of intention will successfully obscure the true nature of the transaction." *Gollnick v. Barker*, 94 Fla. 885, 114 So. 527 (1927). The "controlling question is the intention of the parties," found "from the entire transaction and circumstances, not just the conveyance instrument itself," and "in doubtful cases" the instrument is construed to be a mortgage. *McLendon v. Davis*, 131 So. 2d 765 (Fla. 1st DCA 1961); accord *Marcus v. Hull*, 142 Fla. 306, 195 So. 170 (1939); *Brumick v. Morris*, 131 Fla. 46, 178 So. 564 (1938); *Barr v. Schlarb*, 314 So. 2d 609 (Fla. 4th DCA 1975) (§ 697.01 "permits construing an instrument as a mortgage even if it appears otherwise on its face").

Here, the controlling intent is not in dispute — because Dixon's own counsel has admitted it. Mr. Timko has represented that Dixon's intent was to **return** the assigned assets to Mr. Johnson upon repayment of the debt; the May 5, 2026 letter attached to Doc. 89 (Ex. A) concedes that the Assignment "would have been returned." An assignment made with the intention that the asset revert to the assignor upon satisfaction of a debt is, by definition, an assignment for collateral purposes — a security interest, not an outright sale. That is precisely the transaction § 697.01 "deem[s] and held [a] mortgage." On Dixon's own stated intent, the Assignment of Membership Units in Homemakers was a collateral assignment securing the September 2023 loan, and nothing more.

Mr. Timko cannot have it both ways. To shield Dixon from the civil-theft demand, the Objection now suggests that it is unremarkable for a party to harbor a subjective intent different from the written agreement. That suggestion is wrong as a matter of law: under § 697.01 and the authorities above, intent does not yield to the form of the writing — it controls over it, and a recital that an instrument is an absolute conveyance does not make the conveyance absolute "when it may be shown to have been executed for the purpose or with the intention of securing the payment of money." *Connor v. Connor*, 59 Fla. 467 (1910) ("once a mortgage always a mortgage"). More fundamentally, the argument is self-defeating. The very intent Mr. Timko invokes to absolve Dixon of theft — that Dixon meant to return the assets once the loan was repaid — is the statutory hallmark of a security transaction. Counsel cannot simultaneously invoke Dixon's benign intent-to-return to defeat the theft accusation and insist that the Assignment was an absolute transfer that vested ownership. The first concession proves the second false: if Dixon's intent was to return, the Assignment was collateral; and if it was collateral, Dixon and his entities are at most secured creditors, not owners.

The consequence is sharper still because the debt has been paid. The record establishes that Dixon was repaid in full before the Assignment was ever recorded — approximately $11,225,000 advanced against $11,863,595 repaid, a surplus of roughly $548,595. (Doc. 89, Ex. D.) A collateral assignment secures a debt; when the debt is satisfied, the security is discharged and the collateral reverts to the assignor as a matter of law, and the assignor's equity of redemption cannot be cut off by the form of the instrument. A creditor who has been paid in full and nonetheless retains and records an assignment of the collateral does not hold an absolute transfer; he holds property that equity requires him to return.

The Debtor's reconciliation, submitted as Exhibit D to Doc. 89, lays this out plainly. Between January 2022 and September 2023, three Dixon-owned lenders made eleven extensions of credit to the borrowers totaling $11,225,000:

| Date | Description | Amount |
|---|---|---|
| Jan. 2022 | Sherwood Note (Amelia CD) | 500,000 |
| July 2022 | IMQA Loan 506 | 300,000 |
| Aug. 2022 | Allonge to Sherwood Note | 250,000 |
| Aug. 2022 | Hampton | 1,300,000 |
| Oct. 2022 | Sherwood Option Loan | 500,000 |
| Dec. 2022 | Million Dollar Loan (Cherry CD) | 1,000,000 |

| | | |
|---|---|---|
| Feb. 2023 | Resorts Common Area Loan | 500,000 |
| June 2023 | River Fly In | 3,000,000 |
| July 2023 | Holly Bluff | 3,000,000 |
| July 2023 | Flynn | 125,000 |
| Sept. 2023 | Tiered | 750,000 |
| **Total** | | **11,225,000** |

Between January 2022 and January 2024, the borrowers paid all interest and expenses and made $11,863,595 in payments earmarked to principal — in cash and in kind:

| **Date** | **Description** | **Amount** |
|---|---|---|
| Jan. 2022 | ROGOs | 150,000 |
| July 2023 | 57.36 acres of river-front property | 4,210,000 |
| July 2023 | 7.24 acres of industrial property | 4,300,000 |
| Oct. 2023 | Cash | 2,603,595 |
| Jan. 2024 | Cash from CD | 500,000 |
| **Total** | | **11,863,595** |

Dixon thus received $548,595 more than the principal of all eleven loans, with every dollar of interest and expense satisfied through December 2023. Yet he continued to collect — by his own admission, more than $5,000,000 since being repaid, not counting the 27 condominium and townhome units. (Doc. 89, Ex. D.)

Had this characterization been resolved — as § 697.01 requires it to be resolved, on intent — the Court would have had before it a secured-creditor relationship, not an ownership transfer. PEDIXON and ZPD would stand as creditors; Crescent Sound, Ltd. would be, at most, the trustee of a mortgage; and the Debtor would retain its membership units and its equity, free to proceed with its case. That is the Debtor's original position, and it is the position Florida law compels once Dixon's admitted intent is taken at face value. The dismissal, however, proceeded on the opposite premise — that an absolute transfer had stripped the Debtor of its interests and vested ownership in the Dixon/Crescent Sound structure. That premise is irreconcilable with Dixon's own admitted intent and with § 697.01, and its correction is a textbook basis for relief under Rule 60(b)(1) (mistake of law). (The same admission also supplies an independent ground under Rule 60(b)(3); see Section IV below.)

## II. THE COURT MISAPPLIED THE FLORIDA LAND TRUST ACT BECAUSE NO "TIERED LAND TRUST" EVER LEGALLY EXISTED — A FURTHER MISTAKE OF LAW UNDER RULE 60(b)(1).

Parties cannot will a Florida land trust into existence by saying so. A land trust is a creature of statute, Fla. Stat. § 689.071, and it arises only when the statutory formalities are satisfied — a recorded instrument vesting title in a trustee, coupled with the powers and beneficial-interest structure the statute prescribes. A recital, an acknowledgment, or the parties' shared assumption that a trust exists is not a substitute for the statute. The label does not create the thing.

Here, the "Tiered Land Trust" was treated below as an established legal entity holding title to the Homemakers condominium units. It was nothing of the kind. The only instrument said to have placed the units "in trust" — the Trustee's Deed dated September 13, 2023 — was, in its executed form, a three-page DocuSign document bearing no witnesses, no notarial acknowledgment, and no legal descriptions. On its face it was incapable of conveying Florida real property and incapable of vesting title in any trustee. An instrument that cannot convey title cannot fund a land trust. The trust res was empty; the trust did not exist.

That matters dispositively to the dismissal. The Court applied the Florida Land Trust Act — and the consequences that flow from a beneficiary's or trustee's authority under it — to an entity that the governing statute never brought into being. Applying a statute to a non-existent trust is a mistake of law, and a mistake of law by the Court is precisely the ground that Rule 60(b)(1) exists to correct. See Fed. R. Civ. P. 60(b)(1) (made applicable by Fed. R. Bankr. P. 9024); *Kemp v. United States*, 596 U.S. 528 (2022) (a "mistake" under Rule 60(b)(1) includes a legal error by the court). The Objection's reliance on *In re Mulig* is misplaced: this is not a litigant's second-guessing of strategy, but a request that the Court correct its own legal premise that a statutory trust existed when the statute's requirements were never met.

## III. THE FORGERY IS NOW DOCUMENTED, AND THE OBJECTION'S SOLE REBUTTAL — THE MOREA DECLARATION — IS PERJURIOUS.

The Objection does not, and cannot, dispute the documentary record of forgery on its own terms. Instead, it offers a single counterweight: the sworn Declaration of Janelle Morea (Doc. 93, Ex. B), the notary whose seal appears on the recorded Trustee's Deed and the related instruments, together with a DocuSign certificate (Ex. C). The entire objection therefore rises or falls with Ms. Morea's credibility. It falls.

***A. Who Ms. Morea is, and how she came to hold the pen.***

Ms. Morea's history is directly relevant to the weight her Declaration can bear. In August 2021, she came up through the Amodeo-affiliated "Correcting Injustice" orbit, where she was admonished by Frank Amodeo for notarizing documents without the signer's presence — the very practice at issue here. She then went to the Sherwood/Flynn entities, and there raised — through Alison Pitkanen — sexual-discrimination complaints against Ken Jones, a Tiered Capital officer, after which she was moved into the Tiered human-resources function, and now functions as an instrument of Kenneth G. Dixon and the PEDIXON/ZPD interests that authored the Objection. Her Declaration is not the disinterested recollection of a neutral notary; it is the statement of a person who has been positioned, repeatedly, to serve whoever needed the documents.

***B. Ms. Morea worked at the direction of Alison Pitkanen — and the contemporaneous record proves it.***

The pivotal sworn assertion in the Morea Declaration is that she "did not take directions from Ms. Pitkanen regarding notarizing signatures or any other matter related to [her] job." That statement is contradicted by Ms. Morea's own words and by Ms. Pitkanen's, in writing, contemporaneously:

1. **LinkedIn / employment.** Ms. Morea's own LinkedIn profile reflects her working relationship within the Pitkanen-affiliated operation. (Notary Compl. Ex. I.)

2. **Email control.** Ms. Morea sent notary-related correspondence from and "on behalf of Alison Pitkanen Law Firm LLC" using the firm's alisonplaw@gmail.com account. (Notary Compl. Exs. F, E.)

3. **Direction to notarize.** Ms. Pitkanen wrote directly to Ms. Morea on August 1, 2023: "Janelle, 1. Did you notarize these? If not, can you? 2. After notarizing, please record the mortgage in Orange County… There are funds in my 1542 account to pay the doc stamps and intangible tax on the mortgage." Ms. Pitkanen then confirmed to Mr. Amodeo: "FYI — I asked Janelle to take care of this. She has a Simplifile account set up with my information for recording." (Notary Compl. Ex. G-2.)

4. **Routing of the Homemakers instrument itself.** On January 9, 2024, Ms. Pitkanen's assistant directed Ms. Morea to notarize "the document to notarize" — the Assignment

of Membership Units in Homemakers, the very instrument later placed before this Court. (Notary Compl. Ex. G-3.)

5. **Pitkanen's own admission.** Ms. Pitkanen acknowledged in a contemporaneous text message that "Janelle assists Alison with TITLE work. Only title work," and that the documents were converted to PDF and "sent… to her for Marty's execution." (Notary Compl. Ex. H.)

Ms. Morea's sworn denial that she took direction from Ms. Pitkanen cannot survive Ms. Pitkanen's own contemporaneous instruction to "notarize these" and "record the mortgage," funded out of Pitkanen's account and recorded through a Simplifile credential set up in Pitkanen's name. A declarant who swears the opposite of the contemporaneous written record is not a witness whose say-so can defeat a Rule 60 motion.

***C. Ms. Morea was not authorized to perform online notarizations until September 13, 2025 — which makes the recited acknowledgments physically impossible.***

The single most important fact for present purposes is regulatory and undisputed. The Florida Department of State confirmed in writing, on November 25, 2025 (Andrea J. Parishani, Section Supervisor), that Ms. Morea's Remote Online Notarization authorization did not issue until **September 13, 2025**. (Notary Compl. Exs. B-1, B-2, B-3.) Before that date she had no authority to perform any notarial act remotely by audio-video means.

Yet the acknowledgments on which the Objection relies recite events that occurred years earlier and at a distance, by electronic execution:

1. The **14556 Saint Georges Hill Drive Mortgage** (executed by DocuSign on July 28, 2023, with the notarial block entirely blank on the executed copy) was recorded on August 2, 2023 with a fully completed Morea acknowledgment grafted onto it, reciting personal presence that never occurred. (Notary Compl. Exs. L-1, L-2.)

2. The **Trustee's Deed** exists in three sequential versions, all bearing the identical DocuSign Envelope ID 9078288B-FE20-4A15-A658-110FB6D3929D: Version 1 (DocuSign final, no witnesses, no notary, "26 UNITS" with no legal descriptions); Version 2 (Morea acknowledgment and witness signature added after the fact, still 26 units); and Version 3 (recorded February 14, 2024 as CFN 2024031262, OR Book

9992, Page 2830, Brevard County — now eight pages, with six pages of 27-unit legal descriptions substituted in and witness addresses added). An identical envelope ID across three materially different documents is a technical impossibility unless the document was rebuilt after execution. (Notary Compl. Exs. M-1, M-2, M-3.)

3. The **River Fly In Security Pledge Agreement** is the clearest forensic illustration: Version 1 (DocuSign Envelope ID FA265EF5-31FC-48FE-A327-47C1E98C5BC9, October 30, 2023, Flynn-only, five pages) bears no notary block at all; a sixth "jurat" page reciting an October 30, 2023 oath was later grafted on with no envelope ID; and the document was then re-enveloped, producing an entirely new Envelope ID 545249E8-5982-4DFA-92C0-E713A3E9775F across all pages — with Mr. Dixon's signature now added. A DocuSign envelope ID is assigned at the instant an envelope is created; a new ID can only mean the document was rebuilt long after the recited execution date. (Notary Compl. Exs. N-1, N-2, N-3.)

Because Ms. Morea had no online-notarization authority until September 13, 2025, every acknowledgment she executed before that date on a remotely-executed instrument was, as a matter of Florida law, an unauthorized and false notarial act. See Fla. Stat. §§ 117.05(4)(c), 117.05(5), 117.225, 117.265; see also id. § 117.05(12) (self-notarization bar, violated in the related Le Lourec affidavit of April 5, 2023). The DocuSign certificate offered as Exhibit C does not cure this; it confirms the documents were executed electronically and at a distance, which is exactly what makes the in-presence recitals false.

***D. The Morea Declaration is now the subject of a sworn complaint to the Florida regulator.***

On June 3, 2026, Martin C. Flynn, Jr. executed and submitted a Sworn Complaint Against a Florida Notary Public to the Notary Section of the Executive Office of the Governor (copy to the Department of State, Notary Public Section). The complaint sets out, with exhibits, the unauthorized remote notarizations from January 2022 through September 13, 2025; the self-notarization of the Le Lourec affidavit; the signature-stamp "acknowledgments" of Mr. Flynn's signature; the post-execution grafting of acknowledgments onto the 14556 mortgage; the three-stage progressive forgery of the Trustee's Deed; and the re-enveloped River Fly In jurat. The same conduct that the Objection asks this Court to accept as a valid notarial act is now formally alleged to the State as a basis to suspend or revoke Ms. Morea's commission and let the statute speak under

Fla. Stat. §§ 117.105, 831.01, and 831.02. The Court should not credit a declaration that the declarant's own contemporaneous emails, the State's own RON records, and a pending sworn complaint all contradict.

## IV. THE OBJECTION MISUNDERSTANDS RULE 60: IT IS NOT AN APPEAL SUBSTITUTE, AND THE DISMISSAL WAS ENTERED WITHOUT FUNDAMENTAL FAIRNESS.

The Objection repeatedly characterizes the Motions to Vacate as an improper substitute for an appeal, and insists the relevant facts were "known" and the dismissal a "tactical choice." That argument misconceives both the function of Rule 60 and what actually happened below.

First, Rule 60 is not an appeal substitute — but an appeal presupposes a developed record on which error can be reviewed. There was no such record here. The forgery and the notarial defects were not litigated and decided; they were concealed. One cannot appeal a factual record that the opposing parties' attorneys prevented from being made. Rule 60(b) and 60(d)(3) exist precisely for the situation in which the integrity of the proceeding itself — not merely the correctness of a ruling — is in question. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944); *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Here, counsel had Mr. Dixon make a false declaration and perjure himself in testimony.

Second, a dismissal entered against a party must be entered in a proceeding conducted under the ordinary rules of fair play. A default or dismissal procured while the moving parties were tendering forged instruments and an unauthorized notary's false acknowledgments is not the product of fair play; it is the product of a cloud of deception maintained by counsel. The dismissal here suffered from independent defects: it applied the wrong legal rules (treating a collateral assignment as an absolute transfer, see Section I, and applying the Land Trust Act to a trust that did not exist, see Section II), and it was obtained against the backdrop of documents the proponents knew or should have known were fabricated (see Section III). A judgment so obtained lacks the fundamental fairness on which finality depends, and Rule 60 is the vehicle to set it aside.

Third, the "known at the time" and "tactical choice" arguments fail on their own facts. The dispositive regulatory fact — that Ms. Morea had no RON authority until September 13, 2025 — was confirmed by the Florida Department of State only on November 25, 2025, well after the dismissal. The reconstruction of the River Fly In agreement under a new DocuSign envelope ID,

and the instrument-by-instrument forensic comparison, likewise post-date the dismissal. These are not facts the Movant sat on; they are facts the proponents' own conduct kept hidden until the documentary and regulatory record was assembled.

Fourth, the Objection's own words confirm the fraud it seeks to wave away. Counsel for PEDIXON and ZPD has now conceded — in the May 5, 2026 letter attached to Doc. 89 — that the Assignment "would have been returned" to Mr. Johnson, directly contradicting the sworn assertion in the Dixon Declaration (Doc. 69, ¶¶ 11–14) that there was "no return." As shown in Section I, that admission is doubly damaging: it recharacterizes the Assignment as collateral, and it establishes a material misrepresentation. And the Objection itself, at footnote 6, retreats from the civil-theft demand by admitting its language "should have been more precise." These are party-opponent admissions, Fed. R. Evid. 801(d)(2)(B), (D), and prior inconsistent statements, Fed. R. Evid. 613(b). Loose lips have confirmed what the documents already show: the declaration the proponents prepared for their client was false, and the misrepresentation was material to the relief the Court granted. That is the heartland of Rule 60(b)(3). See *Cox Nuclear Pharmacy, Inc. v. CTI, Inc.*, 478 F.3d 1303 (11th Cir. 2007).

The Objection's remaining authorities do not compel a different result. *Travelers Indem. Co. v. Gore*, 761 F.2d 1549 (11th Cir. 1985); *Mills v. Commissioner, Alabama Dep't of Corrections*, 102 F.4th 1235 (11th Cir. 2024); and *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338–39 (5th Cir. 1978) recite the (concededly demanding) fraud-on-the-court standard, but that standard is met where, as here, an officer of the court's notarial seal and a party's sworn declaration are shown to be fabricated — the standard is high, and the proof here is higher. *Padilla v. Redmont Properties, LLC*, 53 F.4th 1303 (11th Cir. 2022), is inapposite: it holds only that a Rule 60 motion must actually seek to set aside the judgment — not affirmative relief against a non-party — which is precisely what the Movant seeks here in moving to vacate the order of dismissal. The Objection's remaining theory — mootness — is addressed in Section V.

## V. THE MOTIONS ARE NOT MOOT: VACATUR IS THE VEHICLE TO RECOVER MORE THAN $274,000 IN HOMEMAKERS REVENUES DIVERTED TO PEDIXON THAT THE LATER FILING DATE CANNOT REACH.

A matter is moot only when the court can no longer grant any effective relief. That is the opposite of this case. The relief the Movant seeks — vacatur of the dismissal, reinstatement, and

an evidentiary hearing — is not abstract; it unlocks a concrete, quantifiable recovery for the estate that exists today and grows each month. The vacatur of the dismissal order and reopening of this case permits the recovery of at least $274,224.20 in preferential payments and $250,000 in real estate equity.

The record establishes that Crescent Sound, Ltd. directed Homemakers' operating revenues — the monthly "Beachside" distributions generated by the Cape Crossing rental operations — **directly to PEDIXON** rather than to the Debtor. The Debtor's own revenue accounting itemizes those diversions, month by month, beginning January 30, 2024 and continuing through the present, and totaling **at least $2,077,472.26**[3]. (See Debtor's schedule, "Homemakers Revenues Diverted to PEDIXON.") And Mr. Johnson believes approximately $500,000 more exists outside the verified accounting. Every one of those dollars is property the estate is entitled to pursue — and, as Section I shows, because PEDIXON is at most a secured creditor and not an owner, those distributions are payments to a creditor, squarely within the estate's avoidance powers, not an owner collecting its own rents.

Whether and how far those diversions can be recovered turns directly on the petition date — which is precisely why the Rule 60 relief is not moot. Transfers of estate property made after the petition date are recoverable as unauthorized post-petition transfers under 11 U.S.C. § 549; transfers made within the 90-day window before the petition (or, for an insider, the one-year window) are recoverable as preferences under 11 U.S.C. § 547. The voluntary Chapter 11 (Case No. 6:25-bk-02685) was filed on May 5, 2025; the later involuntary case (Case No. 6:25-bk-05570) was not filed until September 2, 2025. Because the insider preference look-back runs one year from the petition date, restoring the earlier May 5, 2025 filing reaches transfers back to May 5, 2024, while the September 2, 2025 involuntary filing reaches only to September 2, 2024. The difference is decisive: the Beachside diversions for May, June, July, and August 2024 — totaling $274,224.20 — are within the estate's preference reach only if the earlier 02685 petition date is restored; under the later filing they fall outside the one-year window and are lost.

[3] Once more noting that if those funds had not been raided, then every Homemakers debt would be current and all non-insider debts paid. Particularly egregious since at the time of the diversion Dixon had already received cash and property worth more than all the debts owed by all the borrowers. Mr. Johnson emphasizes Homemakers never borrowed or received a single dollar from any Dixon lender.

Vacating the dismissal (Doc. 73) and reinstating Case No. 02685 is therefore the vehicle that preserves the earlier petition date and the additional preference reach that comes with it. Because the choice between vacatur and dismissal changes the property the estate can recover — by $274,224.20 in additional reachable diversions, atop the more than $2 million already documented — the controversy is emphatically live. *Soliman v. U.S. ex rel. INS*, 296 F.3d 1237 (11th Cir. 2002), concerned a genuinely dead controversy in which no relief remained to be granted; this controversy is the opposite, and the relief sought is concrete and measurable.

## CONCLUSION

The transaction was, by Dixon's own admitted intent, a collateral assignment for security — and the debt it secured has been paid in full. The Court applied a statute to a trust that never existed; the forgery is now documented instrument-by-instrument; and the Objection's only rebuttal is a declaration the declarant's own emails, the State's RON records, and a pending sworn complaint all expose as false. Far from moot, the case presents a live controversy over more than $2 million in Homemakers revenues diverted to PEDIXON, including $274,224.20 in 2024 distributions that the estate can reach only if the earlier petition date is restored. The Movant respectfully requests that the Court grant the Motions to Vacate (Doc. 88 and Doc. 89), vacate the order of dismissal, reinstate the case, set an evidentiary hearing at which Kenneth G. Dixon and Frank L. Amodeo may be examined, and grant such further relief as is just.

Respectfully submitted this 5th day of June, 2026

/s/ Matthew A. Leibert
Matthew A. Leibert, Esq.
Florida Bar No. 0752266
Urban Thier & Federer, P.A.
5782A S. Semoran Blvd.
Orlando, FL 32822
Telephone: (407) 579-8355
Email: leibert@urbanthier.com
Counsel for Movant

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 5, 2026, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will serve electronic notice on all counsel of record, including James A. Timko, Esq., counsel for PEDIXON LLC and ZPD LLC.

/s/ Matthew A. Leibert
Matthew A. Leibert, Esq.

# EXHIBIT 95

---

In re Homemakers Real Estate, LLC
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

**Doc. 95, filed June 9, 2026**

Hearing Proceeding Memorandum, hearing held June 9, 2026

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA

# PRO MEMO

06/09/2026 01:00 PM

COURTROOM 6D, 6th Floor

HONORABLE GRACE ROBSON

CASE NUMBER: FILING DATE:

**6:25-bk-02685-GER** **11** **05/05/2025**

**Chapter 11**

**DEBTOR:** Homemakers Real Estate, LLC

**DEBTOR ATTY:** **Frank Wolff**

**TRUSTEE:** **NA**

**HEARING:**

1) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rules of Civil Procedure 60(b)(1), and 60(d)(3) (Doc #88)
Pedixon's Omnibus Response (Doc #93)
H. Johnson's Reply (Doc #94)
2) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rule of Civil Procedure 60(b)(3) Based on Newly-Disclosed Misrepresentation by Kenneth G. Dixon (Doc #89)
Pedixon's Omnibus Response (Doc #93)
H. Johnson's Reply (Doc #94)
Note:
Order Scheduling Hearing (Doc #91)

**APPEARANCES:**: Matthew Liebert (Johnson Atty); James Timkco (Pedixon Atty);

**RULING:**
1) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rules of Civil Procedure 60(b)(1), and 60(d)(3) (Doc #88) - cont. to July 14, 2026 at 2:00 pm (AOCNFNG);

2) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rule of Civil Procedure 60(b)(3) Based on Newly-Disclosed Misrepresentation by Kenneth G. Dixon (Doc #89) - cont. to July 14, 2026 at 2:00 pm (AOCNFNG);

(gww).
Proposed Orders, if applicable, should be submitted within three days after the date of the hearing - Local Rule 9072-1(c). Failure to submit proposed orders before this case/adversary proceeding is closed will result in motions/objections/applications being denied as moot. This docket entry/document is not an official order of the Court.

# EXHIBIT 102

---

In re Homemakers Real Estate, LLC
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

**Doc. 102, filed July 6, 2026**

Motion for an Evidentiary Hearing on the Court's Subject-Matter Jurisdiction Over the Pedixon and ZPD Claims

*Frank L. Amodeo | Filed in this case as Doc. 306*

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re: Case No. 6:25-bk-02685-GER
Chapter 11 (Voluntary)

Homemakers Real Estate, LLC, Case No. 6:25-bk-05570-GER
Chapter 11 (Involuntary)

Debtor.
_______________________________________/

## FRANK L. AMODEO'S MOTION FOR AN EVIDENTIARY HEARING ON THIS COURT'S SUBJECT-MATTER JURISDICTION OVER THE PEDIXON AND ZPD CLAIMS

A subject-matter-jurisdiction concern stands apart from every other question a court decides. Those concerns are never subject to procedural bars, in part because a court bears an independent obligation to determine whether it holds the power to hear the cause or the case. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

**1. A subject-matter-jurisdiction challenge is never subject to procedural bars, and the court must resolve it before reaching the merits.**

Because of the unique characteristics of a subject-matter-jurisdiction concern, a court must first address and resolve the issue before proceeding to the merits. See *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93-102 (1998). Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. *Steel Co.*, 523 U.S. at 94

(quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)); accord *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 431 (2007).[1]

**2. A challenge to subject-matter jurisdiction comes in two forms, facial and factual.**

Challenges to subject-matter jurisdiction come in two forms: facial attacks and factual attacks. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)) (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).[2] A facial attack requires the court merely determine if the party has sufficiently alleged a basis for subject-matter jurisdiction, and the court may presume the allegations true. *Scarfo v. Ginsberg*, 175 F.3d 957, 960-61 (11th Cir. 1999). A factual attack, in contrast, questions the court's jurisdiction irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered. *Lawrence*, 919 F.2d at 1529. Here the challenge is a factual one.

[1] The Supreme Court overturned several Federal Circuits Courts of Appeals that had found it proper to proceed immediately to the merits question, despite jurisdictional objections. The Court did not accept the circuit courts' rationale for delaying the jurisdictional decision: (1) the merits question being more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. The circuits' rationale would carry the courts beyond the bounds of authorized judicial action and thus offends fundamental separation-of-powers principles. In a long and venerable line of cases, this Court has held that, without proper jurisdiction, a court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit. See, e.g., *Capron v. Van Noorden*, 2 Cranch 126, 2 L.Ed. 229 (1804); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997); *Bell v. Hood*, 327 U.S. 678 (1946); *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 465 n.13 (1974); *Norton v. Mathews*, 427 U.S. 524, 531 (1976); *Secretary of Navy v. Avrech*, 418 U.S. 676, 678 (1974) (per curiam); *United States v. Augenblick*, 393 U.S. 348 (1969); *Philbrook v. Glodgett*, 421 U.S. 707, 721 (1975); and *Chandler v. Judicial Council of Tenth Circuit*, 398 U.S. 74, 86-88 (1970).

[2] Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc)(this circuit adopts as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

**3. In a factual jurisdictional challenge, the court weighs the evidence itself, and no presumption of truthfulness attaches to the claimant's allegations.**

In a factual challenge to subject-matter jurisdiction, unlike a typical motion under Rule 12(b)(6) or Rule 56, the court is free to weigh the evidence and satisfy itself of its power to hear the case. No presumptive truthfulness attaches to the claimant's allegations, and the existence of disputed facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims.

Here the factual question is whether the PEDixon and ZPD claims[3] violate Florida Statute § 687.071.[4] If the Dixon debts violate § 687.071, then the Florida legislature has removed any matter involving enforcement (including the validity) of these claims from this court's jurisdiction. *Fla. Stat.* § 687.071(7). Additionally, based on that legislative command, the Constitutions mootness doctrine divests this court of subject-matter jurisdiction, since no remedy is available.

**4. Florida Statute § 687.071(7) strips every court in this state of the power to enforce a usurious extension of credit.**

Florida Statute § 687.071(7) expressly removes from every court in this state the power to enforce a debt that violates any section of § 687.071.

---

[3] The "PEDixon" claim and the "ZPD" claim are the two Dixon-originated extensions of credit at issue, whether asserted separately or as consolidated. I use the collective labels for the claims those parties assert against the estate; the underlying instruments are the Dixon-generated loan documents in the record.

[4] Section 687.071 is Florida's criminal-usury and loan-sharking statute. Subsection (2) makes an extension of credit at interest exceeding twenty-five percent per annum criminal usury, and subsection (7) makes any extension of credit made in violation of the section unenforceable as a debt in the courts of this state. Fla. Stat. § 687.071(2), (7).

> *No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state.*

Florida courts hold that criminally usurious debts are void not voidable. *Fla. Stat. § 687.071(7)*.

**5. Article III's case-or-controversy requirement withholds jurisdiction where the court has no capacity to grant an enforceable remedy.**

The United States Constitution requires an active and actual controversy, which includes this court's capacity to provide a remedy. A court in this district described the constitutional principles and the mootness doctrine the principle empower:

> *Article III of the Constitution grants the Judicial Branch authority to adjudicate "Cases and Controversies." Conversely, courts have no business deciding legal disputes or expounding on the law in the absence of such a case or controversy.*

*Couture v. Austin*, 720 F. Supp. 3d 1243, 1247 (M.D. Fla. 2024). (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013), and *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

Once a case is moot, the court loses subject-matter jurisdiction and must take no other action but to dismiss the case or cause. See *Seay Outdoor Advertising, Inc. v. City of Mary Esther*, 397 F.3d 943, 946 (11th Cir. 2005). A case is moot when the issue presented is no longer live, the parties lack a legally cognizable interest in its outcome, or a court decision could no longer provide meaningful relief to a party.

*Couture*, 720 F. Supp. 3d at 1243 (citing *Troiano v. Supervisor of Elections in Palm Beach County*, 382 F.3d 1276, 1281 (11th Cir. 2004))(emphasis added).

Here, once this court weighs the evidence, then it can no longer provide the Dixon claimants with a remedy; these debts cannot be enforced. *Fla. Stat § 687.071.* Any determination regarding the claim is moot.

**6. The Dixon-generated documents establish an effective interest rate above twenty-five percent per annum, which renders the PEDixon and ZPD claims unenforceable and removes their enforcement from this court's subject-matter jurisdiction.**

On the available Dixon-generated documents, the loans violate Florida Statutes §§ 687.01 and 687.02. No later than January 2024, the stated rate of interest exceeds twenty-five percent. The Florida legislature removed from every court in Florida the authority and the power to enforce a contract or debt that violates any provision of § 687.071. Fla. Stat. § 687.071(7).

The verified pleadings and the exhibits (Docs. 203, 241 at Ex E) demonstrate that the PEDixon and ZPD claims are fundamentally usurious, whether taken separately or consolidated. That fact removes enforcement of these claims — as a cause, as a claim, or as an affirmative defense — from this court's subject-matter jurisdiction, whether by legislative mandate, by constitutional mootness, or by both.

**7. This court should bifurcate any proceeding involving the PEDixon or ZPD claims from the rest of the bankruptcy until the factual challenge to its jurisdiction is resolved.**

Until such time as the factual challenge to this court's subject-matter jurisdiction over the PEDixon and ZPD claims is resolved, this court should stay all proceeding related to the PEDixon or ZPD claims. This court should bifurcate adjudication of the factual challenge and conduct-if needed, an evidentiary hearing to present expert testimony that the PEDixon and ZPD claims are beyond this court's jurisdiction to enforce.

## RELIEF REQUESTED

The law, as applied to these facts, brings to this court's immediate attention the need to determine the enforceability of the PEDixon and ZPD claims, which in turn determine this court's subject-matter jurisdiction:

(a) Consider the extant record including ordering supplemental briefing with evidentiary support on whether the PEDixon and ZPD transactions violate *Fla. Stat. § 687.071*;

(b) sets an evidentiary hearing to allow expert accounting testimony that demonstrates the PEDixon and ZPD claims are fundamentally usurious and beyond this court's jurisdiction to enforce;

(c) bifurcate and stay any proceeding related to the PEDixon or ZPD claims until the factual challenge to this court's subject-matter jurisdiction over those claims is resolved; and

(d) grants such other relief as the court deems appropriate and fair.

Respectfully submitted this 5th day of July, 2026.

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32801@gmail.com
Movant, pro se

## CERTIFICATE OF SERVICE

I certify that on the 6th day of July, 2026, I filed the foregoing with the Clerk of the court, who will serve a notice of electronic filing on all counsel of record, including James A. Timko, Esq., Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., counsel for PEDixon LLC and ZPD LLC.

____________________

Frank L. Amodeo

# EXHIBIT 104

---

In re Homemakers Real Estate, LLC
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

**Doc. 104, filed July 14, 2026**

Bench Memorandum on Deciding Subject-Matter Jurisdiction First and Disqualifying Pedixon, ZPD, and Crescent Sound From Participating

*Frank L. Amodeo | Filed in this case as Doc. 307*

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

FILED ORL INTAKE- USBC
14 JUL 2026 AM8:51

In re:
**HOMEMAKERS REAL ESTATE, LLC,**
Debtor.
Case No. 6:25-bk-02685-GER (Voluntary Chapter 11)

---

# BENCH MEMORANDUM ON DECIDING SUBJECT-MATTER JURISDICTION FIRST AND DISQUALIFYING PEDIXON, ZPD, AND CRESCENT SOUND FROM PARTICIPATING

*Submitted for the July 14, 2026 status conference*

## QUESTION PRESENTED

Before the court hears PEDixon LLC and ZPD LLC, on any matter—above all their objection to the Rule 60 motions pending in *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025)—must the court first satisfy itself that it has power to enforce, and to allow a claim based on, the eleven loans on which those entities stake their standing to appear?

## SHORT ANSWER

Yes. Jurisdiction comes first. A federal court must establish subject-matter jurisdiction as a threshold matter, on its own motion, and no litigant can waive it, forfeit it, or confer it by consent. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The Eleventh Circuit enforces that command. *Gardner v. Mutz*, 962 F.3d 1329, 1336 (11th Cir. 2020). The Florida Legislature has withdrawn from

every court of this state the power to enforce a criminally usurious loan, *Fla. Stat. § 687.071(7)*, and *11 U.S.C. § 502(b)(1)* carries that withdrawal into this court. The United States Constitution requires an active case and controversy, which requires that a matter is not moot and the party has standing. I ask the court to decide that one jurisdictional question first and to stay the Dixon parties' participation until it does.

## INTRODUCTION

The Dixon parties sat out the involuntary case through the order for relief and returned only to oppose the Rule 60 motions that would restore the original voluntary Chapter 11. Their objection rests on eleven extensions of credit—$11,225,000 in stated principal advanced between January 2022 and September 2023—and on the guaranties said to secure them. I welcome their return, because it lays their own instruments on the table. A party that resists relief on the strength of a debt invites the question whether the debt may be enforced at all. The Legislature already answered that question, and the answer is no. *Fla. Stat. § 687.071(7)*.

Crescent Sound stands in the same doorway through a different threshold. Its asserted interest depends on the contested 2024 conveyance of the Homemakers membership units, and ownership of those units is now before the state court in *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026). Whether the question is the enforceability of the loans or Crescent's ownership of

the units, the Dixon parties' standing to appear is unresolved—and the court must resolve it before it proceeds.

**Subject-matter jurisdiction is the threshold question, and the court must decide it first, on its own motion, before reaching any matter the Dixon claims support.**

"The requirement that jurisdiction be established as a threshold matter … is inflexible and without exception." *Steel Co.*, 523 U.S. at 94–95. A court may not assume its power to reach an easier question; the Supreme Court has condemned that shortcut by name, because "hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion." *Id.* at 101. The rule holds against every procedural objection the Dixon parties can raise. Subject-matter jurisdiction "can never be forfeited or waived," *United States v. Cotton*, 535 U.S. 625, 630 (2002); it may be raised "at any stage in the litigation, even after trial and the entry of judgment," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); and "no action of the parties can confer subject-matter jurisdiction upon a federal court," *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

The reason the sequence matters is the same reason a builder checks the deed before he pours the footings. A judgment entered on a debt the Legislature placed beyond every Florida court writes on water—it wears the shape of a judgment until

someone asks where the power to enter it came from, and then it is void. *Mannino v. Mannino*, 980 So. 2d 575, 578 (Fla. 2d DCA 2008).

**The Eleventh Circuit makes the rule concrete and recent: a court that reaches the merits before resolving its own power commits reversible error.**

Sitting en banc, the court held that "because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting." *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019). Applying *Lewis*, the court reversed a trial judge who "sidestep[ped] the standing issue and proceed[ed] directly to the merits," holding plainly that "in bypassing standing to address the merits, the district court erred." *Gardner*, 962 F.3d at 1336. The same court had said it years earlier: "standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012).

*Gardner* also shuts the escape hatch the Dixon parties will reach for—that jurisdiction is "intertwined" with the merits and may be put off. That principle "does not ... create a broad-ranging exception to the *Steel Co.* rule" and applies only where a single statute supplies both the court's jurisdiction and the substantive claim. *Id.* at 1336–37. And a court may resolve its jurisdiction first rather than let the proponent litigate toward it; the Eleventh Circuit held that a trial court "did not err by first

determining whether it had subject matter jurisdiction" instead of allowing discovery. *Gilberti v. Governor of Fla.*, 835 F. App'x 508, 512 (11th Cir. 2020).

**The court can grant no remedy on these loans, and a court that can afford no relief has no live case—so however the statute is read, the matter is moot and jurisdiction is absent.**

A shorter road avoids the debate over labels. Read *Fla. Stat. § 687.071(7)* as a withdrawal of jurisdiction or as a merits defense—the result does not change, because either reading leaves the court powerless to grant any remedy on the Dixon loans. The statute says the loans "shall not be an enforceable debt in the courts of this state." *Fla. Stat. § 687.071(7)*. A court that cannot enforce cannot redress, and a court that cannot redress has nothing to decide.

That is a moot controversy. A case is not justiciable once it is "impossible for the court to grant any effectual relief whatever to a prevailing party." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). The same defect carries a second name at the threshold—redressability—and it is jurisdictional. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107. The Dixon parties ask the court to sustain an objection built on debts the court may never enforce, and no order the court could enter would give them anything the law allows. Their request is moot, and mootness—like standing—limits the court's power rather than serving as a defense the parties may trade away. The court may

take up this ground first, and it should, because it ends the Dixon parties' participation without the court ever choosing between the jurisdictional and the merits reading of the statute.

**The Dixon parties' authority to participate is itself the threshold, because only a party in interest holding an allowable claim may be heard.**

The Code lets a "party in interest" be heard. *11 U.S.C. § 1109(b)*. A party in interest is one with a real, legally cognizable stake—an allowable claim against, or interest in, the estate. Standing to invoke the court's process is jurisdictional, *Lewis*, 944 F.3d at 1296, and the court must confirm it before it lets PEDixon and ZPD drive an objection to the Rule 60 motions. If the loans cannot be enforced and the guaranty does not bind the estate, PEDixon and ZPD hold no allowable claim and no standing to appear; and Crescent Sound's asserted interest falls with the contested unit conveyance now pending in state court. To presume that standing so the Dixon parties may litigate is the very hypothetical jurisdiction *Steel Co.* forbids.

**Section 687.071(7) withdraws from every Florida court the power to enforce a criminally usurious loan, and section 502(b)(1) carries that withdrawal into this court.**

Florida fixes two criminal thresholds—interest above 25 percent is a second-degree misdemeanor, and interest above 45 percent is third-degree felony loan sharking. *Fla. Stat. § 687.071(2), (3)*. The Legislature then commanded the judiciary: "No extension of credit made in violation of any of the provisions of this

section shall be an enforceable debt in the courts of this state." *Fla. Stat. § 687.071(7)*. The actor the statute restrains is the courts. It did not hand the borrower a shield to raise or lower at will; it took the sword out of the courthouse. A defense belongs to a party and can be waived; a withdrawal of the court's power belongs to no one, and no one can give it back. A criminally usurious debt is therefore unenforceable in full, and the lender forfeits both principal and interest. *Jersey Palm-Gross, Inc. v. Paper*, 658 So. 2d 531, 533 (Fla. 1995) (a violation of the statute "render[s]" the debt unenforceable and forfeits both principal and interest). The statute reaches the guaranties directly: an "extension of credit" includes an agreement for "forbearance," and a "debtor" includes "any person who guarantees the repayment of a loan." *Fla. Stat. § 687.071(1)(c), (d)*.

That state-law disability governs here, because a bankruptcy court applies the same Florida law the state courts would. Claim and property rights in bankruptcy are creatures of state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). The court looks to state law to test a claim's validity. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007). Section 502(b)(1) then disallows a claim "to the extent that ... such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." *11 U.S.C. § 502(b)(1)*. The estate cannot owe what no court of this state may enforce.

**The Dixon lenders' own records establish the violation, and no procedural doctrine revives a claim the Legislature made unenforceable.**

I rely on no fact the lenders dispute. PEDixon's internal loan reports, spreading payments across the aggregated portfolio, yield effective rates of 32.33 percent in 2024 and 29.10 percent in 2025—each above the 25 percent line. PEDixon drafted the instruments, PEDixon computed the charges, and PEDixon's books record the collection. And Dixon swore that the January 2024 assignment of one hundred percent of the Homemakers units—valued at $8,750,000—bought a six-month forbearance. (Doc. 69 at 9–10.) Florida calls a charge for forbearance interest. *Fla. Stat. § 687.03*. Counted as Dixon swore it, that single charge drives the effective rate to roughly 139.69 percent—past the felony line and into a loan shark's book. The court need not accept any borrower's valuation; Dixon's own sworn words supply the fact.

Because the bar is jurisdictional, no procedural doctrine revives these claims. No waiver reaches it, no limitations period bars its consideration, and no earlier order works a preclusion that resurrects a debt the Legislature made unenforceable. A void claim does not become valid because a prior tribunal failed to notice it was void. *Arbaugh*, 546 U.S. at 506.

**The court should decide the single jurisdictional fact first—on the papers or at a hearing limited to section 687.071—and stay the Dixon parties' participation until it does.**

A Rule 12(b)(1) inquiry "bifurcate[s]" into facial and factual attacks, and on a factual question the court may take evidence and find the jurisdictional facts. *Bankston v. Ala. Pub. Serv. Comm'n*, 752 F. Supp. 3d 1268, 1274 (M.D. Ala. 2024). A bankruptcy court runs the same path: where a jurisdictional fact is intertwined with a foundational element, the court assumes jurisdiction and tests the issue under a summary-judgment standard rather than deciding the merits for the claimant. *In re Reynolds*, No. 17-20026-MAM, 2020 WL 1969455, at *4 (Bankr. S.D. Fla. Apr. 23, 2020). Here the jurisdictional fact—the usury rate—is discrete and printed in the lenders' own books, so the court can resolve it now or at a short hearing limited to *Fla. Stat. § 687.071*. Until it does, the court should not let the Dixon parties press their Rule 60 objection or any other claim-driven matter.

**The waivable-defense and intertwinement answers fail, and each independent ground reaches the same result.**

**Waivable defense.** The Dixon parties will call usury a waivable affirmative defense. The cases that say so construed the pre-1969 civil-usury statute. *Yaffee v. Int'l Co.*, 80 So. 2d 910 (Fla. 1955); *Sodi, Inc. v. Salitan*, 68 So. 2d 882 (Fla. 1953). The 1969 enactment of section 687.071 added what the old regime lacked—criminalization and the forum-court withdrawal of subsection (7), which speaks to judicial power, not litigant strategy. *Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d

1 (Fla. 1971), enforced a stipulated waiver in a routine note whose rate never neared the criminal line and never confronted subsection (7).

**Intertwinement.** They will next say jurisdiction is intertwined with the merits and must wait. *Gardner* forecloses that as a general escape from *Steel Co.*, 962 F.3d at 1336–37, and *Gilberti* confirms the court may decide jurisdiction first. At most, intertwinement changes the procedure—assume and test under a Rule 56 standard, *Reynolds*, 2020 WL 1969455, at *4—it never licenses a merits ruling for the Dixon parties before their standing is confirmed.

**Same result on the alternative ground.** Even read as a rule of claim allowance rather than of jurisdiction, section 687.071(7) compels the same disposition: section 502(b)(1) disallows the claims as unenforceable under Florida law, and a claimant with no allowable claim is no party in interest able to drive the Rule 60 objection. And in either direction, the no-remedy bar shown above leaves the objection moot. *11 U.S.C. § 502(b)(1)*.

**Independent ground.** The guaranty is separately unenforceable against the estate, because Homemakers Real Estate, LLC never signed it—only Johnson signed, and his capacity line is *descriptio personae*, not an execution by the company. *Fla. Stat. § 725.01*. This ground reinforces the usury bar; it does not depend on it.

**RELIEF REQUESTED**

The law, applied to the lenders' own records, requires the court to:

(a) determine, as a threshold matter, whether the PEDixon and ZPD extensions of credit violate Fla. Stat. § 687.071, or set a short evidentiary hearing limited to that question;

(b) stay any consideration of the Dixon parties' objection to the Rule 60 motions, and of any other claim-driven matter, until the jurisdictional question is resolved;

(c) on a finding of violation, disallow the PEDixon and ZPD claims under Fla. Stat. § 687.071(7) and 11 U.S.C. § 502(b)(1), overrule their Rule 60 objection, and disqualify PEDixon, ZPD, and Crescent Sound from further participation in matters resting on those claims and the contested units; and

(d) grant the further relief that gives effect to the Legislature's command that no court of this state enforce a debt made in violation of Fla. Stat. § 687.071.

The Florida Legislature has already decided this question. The law requires that these claims not be enforced, and that those who hold them not be heard on the strength of them.

Respectfully submitted this 14th day of July, 2026.

Frank L. Amodeo
*Pro se*
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32809@gmail.com

## CERTIFICATE OF SERVICE

I certify that on the 14th day of July, 2026, I filed the foregoing with the Clerk of the court using the CM/ECF system, which will serve a notice of electronic filing on all counsel of record, including counsel for PEDixon LLC and ZPD LLC.

Frank L. Amodeo

# EXHIBIT 106

---

In re Homemakers Real Estate, LLC
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

**Doc. 106, filed July 14, 2026**

Hearing Proceeding Memorandum, hearing held July 14, 2026

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA

# PRO MEMO

07/14/2026 02:00 PM

COURTROOM 6D, 6th Floor

HONORABLE GRACE ROBSON

| CASE NUMBER: | | FILING DATE: |
|---|---|---|
| **6:25-bk-02685-GER** | **11** | **05/05/2025** |

**Chapter 11**

**DEBTOR:** Homemakers Real Estate, LLC

**DEBTOR ATTY:** **Frank Wolff**

**TRUSTEE:** **NA**

**HEARING:**

1) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rules of Civil Procedure 60(b)(1), and 60(d)(3) (Doc #88)
Pedixon's Omnibus Response (Doc #93)
H. Johnson's Reply (Doc #94)
Johnson's Notice of Filing Notary Complaint (Doc #96)
2) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rule of Civil Procedure 60(b)(3) Based on Newly-Disclosed Misrepresentation by Kenneth G. Dixon (Doc #89)
Pedixon's Omnibus Response (Doc #93)
H. Johnson's Reply (Doc #94)
3) Pedixon's Motion to Strike Late Filed Documents (Doc #97)
Amodeo's Response in Opposition (Doc #99)
H. Johnson's Response (Doc #101)
PENDING:
Amodeo's Motion For Sanctions Under Federal Rule of Bankruptcy Procedure 9011 (Doc #100)
Amodeo's Motion For an Evidentiary hearing on the Court's Subject-Matter Jurisdiction Over the Pedixon and ZPD Claims (Doc #102)
Note: 6/9/26
Order Scheduling Hearing (Doc #91)

**APPEARANCES:**: James Timko (Homemakers/Pedixon Atty); Anthony Marzocca, Rhys Leondard (Chapter 11 Trustee Atty); Catherine Choe (Mainstreet Bank Atty); Matthew Leibert (Johnson Atty); Christopher Crowder (Cape Crossing Atty); Larry Kosto (IMQA/CTO Atty); Frank Amodeo (Creditor); Lindsey Savastano (Tamamoi/Carton Atty); Jeffrey Ainsworth (Pedixon Atty);

**RULING:**
1) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rules of Civil Procedure 60(b)(1), and 60(d)(3) (Doc #88) - Denied:Order by CHAMBERS;

2) Johnson's Motion to Vacate Order Dismissing Case Pursuant to Federal Rule of Civil Procedure 60(b)(3) Based on Newly-Disclosed Misrepresentation by Kenneth G. Dixon (Doc #89) - Denied:Order by CHAMBERS;

3) Pedixon's Motion to Strike Late Filed Documents (Doc #97) - Denied:Order by CHAMBERS;

PENDING:
Amodeo's Motion For Sanctions Under Federal Rule of Bankruptcy Procedure 9011 (Doc #100) - Denied as Moot;

Amodeo's Motion For an Evidentiary hearing on the Court's Subject-Matter Jurisdiction Over the Pedixon and ZPD Claims (Doc #102) - Denied as Moot;
(gww).

Proposed Orders, if applicable, should be submitted within three days after the date of the hearing - Local Rule 9072-1(c). Failure to submit proposed orders before this case/adversary proceeding is closed will result in motions/objections/applications being denied as moot. This docket entry/document is not an official order of the Court.

# EXHIBIT 107

---

In re Homemakers Real Estate, LLC
Case No. 6:25-bk-02685-GER (Bankr. M.D. Fla.)

**Doc. 107, entered July 21, 2026**

Order Denying Motions (Related Docs. 88, 89)

**ORDERED.**

**Dated: July 20, 2026**

Grace E. Robson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| Homemakers Real Estate, LLC, | ) | Case No. 6:25-bk-02685-GER |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**ORDER DENYING MOTIONS**

THIS CASE came before the Court on July 14, 2026 at 2:00 p.m. (the "Hearing") where the Court announced its ruling with respect to the Motions to Vacate[1] filed by Horton S. Johnson. Also pending as of the Hearing were the Motion to Strike[2] filed by PEDIXON[3] and the Amodeo Motions[4] filed by Frank L. Amodeo. For the reasons stated on the record, the Court **ORDERS** as follows:

1. The Motions to Vacate (Doc. Nos. 88 and 89) are **DENIED.**

2. The Motion to Strike (Doc. No. 97) is **DENIED.**

[1] The *Motion to Vacate Order Dismissing Case Pursuant to Federal Rules of Civil Procedure 60(b)(1), and 60(d)(3)* (Doc. No. 88) and the *Motion to Vacate Order Dismissing Case Pursuant to Federal Rule of Civil Procedure 60(b)(3) Based on Newly-Disclosed Misrepresentation by Kenneth G. Dixon* (Doc. No. 89) are collectively referred to as the "Motions to Vacate."
[2] *Motion to Strike Late Filed Documents* (the "Motion to Strike") (Doc. No. 97).
[3] PEDIXON LLC and ZPD, LLC are collectively referred to as "PEDIXON."
[4] *Frank L. Amodeo's Motion for Sanctions Under Federal Rule of Bankruptcy Procedure 9011* (Doc. No. 100) and *Frank L. Amodeo's Motion for an Evidentiary Hearing on this Court's Subject-Matter Jurisdiction Over the Pedixon and ZPD Claims* (Doc. No. 102) are collectively referred to as the "Amodeo Motions."

3. The Amodeo Motions (Doc. Nos. 100 and 102) are **DENIED AS MOOT**.

4. Any other pending requests for relief are **DENIED AS MOOT**.

5. The Court retains jurisdiction to issue findings of fact and conclusions of law at a later date to supplement this Order.[5]

###

The Clerk's Office is directed to serve a copy of this Order on all interested parties.

[5] *See Educ. Credit Mgmt. Corp. v. Mosley (In re Mosley)*, 494 F.3d 1320, 1328 (11th Cir. 2007).