**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| In re:<br><br>**HOMEMAKERS REAL ESTATE, LLC,**<br><br>Debtor.<br>_________________________________/ | Case No. 6:25-bk-05570-GER<br>Chapter 11 |

**OBJECTION OF PEDIXON, LLC AND ZPD, LLC TO THE DISCLOSURE STATEMENT IN SUPPORT OF THE PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO**

Creditors and parties in interest Pedixon, LLC ("Pedixon") and ZPD, LLC ("ZPD," and together with Pedixon, the "Dixon Creditor***s***"), by and through undersigned counsel, hereby file this Objection (the "Objection") to the *Disclosure Statement in Support of the Plan of Reorganization Proposed by Frank L. Amodeo, a Creditor and Party in Interest* (Dkt. No. 304) (the "Disclosure Statement"), filed in support of the plan of reorganization (Dkt. No. 303) (the "Plan") proposed by Frank L. Amodeo ("Amodeo" or the "Proponent") in the above-captioned case of Homemakers Real Estate, LLC (the "Debtor"). In support of this Objection, the Dixon Creditors respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The Dixon Creditors hold claims against the Debtor's estate (Claim Nos. 67 and 68, in the amounts of $4,779,864.58 and $1,380,166.67) and are the principal targets of the Plan. The Disclosure Statement, filed *pro se* by a creditor holding a $396 unsecured claim, is less a disclosure document than an advocacy brief against the Dixon Creditors. It recites as established fact allegations of forgery, false notarization, criminal usury, and diversion of rents that no court has adjudicated, that the Dixon Creditors deny, and that are drawn largely from a verified complaint filed by the Debtor's former manager four days before the Disclosure Statement was

filed. It then builds the Plan's funding, feasibility, and liquidation analyses on the premise that those allegations will be proven and reduced to cash.

2. The Disclosure Statement should not be approved for two overarching reasons. First, it fails to contain the "adequate information" required by 11 U.S.C. § 1125. It does not disclose the amount or treatment of the Dixon Creditors' claims, which the Plan does not classify at all, instead declaring the Dixon Creditors a "source of recovery, not a creditor"; it does not disclose the dispute over ownership of the Debtor or the effect of the Plan on that dispute; it double-counts its principal funding source; it offers fifteen months of projections for a five-year plan; and it contains a liquidation analysis that its own figures contradict. Second, the Plan is patently unconfirmable on its face, so approving the Disclosure Statement and soliciting votes would be a wasteful exercise. The Plan fails to classify filed claims as required by §§ 1122 and 1123; it vests ownership of the Reorganized Debtor in an insider holding a $4.43 million claim in violation of the absolute priority rule; it purports to resolve, by plan fiat, disputes that must be adjudicated by claim objection or adversary proceeding; and it is not feasible.

3. For these reasons, and as set forth more fully below, the Dixon Creditors respectfully request that the Court deny approval of the Disclosure Statement.

## BACKGROUND

4. On September 2, 2025, Tiered Capital, Inc. ("Tiered Capital") filed an involuntary Chapter 11 petition against the Debtor, joined by Horton Johnson ("Johnson"), IMQA Investments Incorporated ("IMQA"), CTO Holdings, Inc., and Amodeo as petitioning creditors. The Court entered an order for relief on May 21, 2026 (Dkt. No. 229), and on June 11, 2026 directed the appointment of Lara Roeske Fernandez as Chapter 11 Trustee (the "Trustee") (Dkt. No. 240). Schedules were filed on June 16, 2026 by Johnson, after the Trustee's appointment, and list the

claims of Pedixon and ZPD at $0.00, as disputed, contingent, and unliquidated. (Disclosure Statement at 12, 16.)

5. The Debtor owns 27 vacation-rental units within the Cape Crossing Resort and Marina in Merritt Island, Florida, scheduled at approximately $11,860,000. (*Id.* at 5.) The Debtor's membership interests are held by the Tiered Land Trust, of which Crescent Sound, Ltd. ("Crescent Sound") is trustee, pursuant to the Tiered Land Trust Agreement and a January 9, 2024 Assignment of Membership Units (the "Assignment"). (*Id.* at 8–9.) On the basis of the Assignment, on June 27, 2025, this Court dismissed the Debtor's prior voluntary case, *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (the "First Case"), because Johnson lacked authority to file it, and denied reconsideration on August 26, 2025. (*Id.* at 10–11.)

6. Johnson has since sued to determine ownership of the Debtor's membership units in *Johnson v. Crescent Sound, Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct.) (the "Declaratory Action"), and, with Tiered Capital, filed a sixteen-count tort action against the Dixon Creditors and others on July 9, 2026, styled *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct.) (the "Tort Action"). (*Id.* at 9, 12.) Both actions remain pending, and the Dixon Creditors dispute the allegations in each.

7. On July 13, 2026, Amodeo filed the Plan and Disclosure Statement under 11 U.S.C. § 1121(c). Amodeo discloses that he holds a $396 unsecured claim; that he "advised the owners of Tiered Capital" for four years; that he negotiated most of the loans at issue; that IMQA, a company owned by members of his family, was itself a borrower on those loans and holds a claim in this case; and that he is a witness to the events alleged in the Tort Action. (*Id.* at 2, 7, 13.)

8. The Plan places claims and interests in eleven classes: eight classes of secured claims (Classes 1–8), non-insider general unsecured claims (Class 9), insider unsecured claims of

Johnson in the approximate amount of $4.43 million (Class 10), and interests in the Debtor (Class 11). (*Id.* at 13–16.) The Dixon Creditors' claims are not placed in any class. Instead, the Disclosure Statement announces that "[t]he Estate accordingly treats P.E. Dixon as a source of recovery, not a creditor." (*Id.* at 17.) The Plan transfers all of the estate's causes of action to a "Recovery Trust," to be funded with $250,000 of $880,000 in post-petition rents the Plan assumes the Dixon Creditors will turn over (the "Dixon Turnover Funds"), and vests ownership of the Reorganized Debtor in Johnson on the Effective Date. (*Id.* at 14, 18.)

## OBJECTION

### A. The Disclosure Statement Fails To Provide "Adequate Information" Under 11 U.S.C. § 1125.

9. A disclosure statement may not be approved unless it contains "adequate information," defined as "information of a kind, and in sufficient detail . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan," including "a discussion of the potential material Federal tax consequences of the plan." 11 U.S.C. §§ 1125(a)(1), (b). Courts evaluate adequacy against a number of non-exclusive factors (*see In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)), including but not limited to the debtor's available assets and their value, the source of the information in the disclosure statement, the claims asserted against the estate, a liquidation analysis, the identity and compensation of future management, the projected recoveries from litigation and avoidance actions, the risks to creditors, and the debtor's relationships with affiliates. A disclosure statement must provide factual support for its assertions, not conclusory allegations or opinion. *See In re Ferretti*, 128 B.R. 16, 18–19 (Bankr. D.N.H. 1991). The Disclosure Statement falls short on each of these points material to the Dixon Creditors.

10. ***Disputed, unadjudicated allegations presented as fact.*** Section 2 of the Disclosure Statement, roughly half the document, is captioned with conclusions: a "falsely notarized assignment," "[t]he forged assignment defeated the first bankruptcy case," and "[f]or thirty months Mr. Dixon collected the Debtor's rents and paid none of the Debtor's creditors." (Disclosure Statement at 8, 10.) Its sources are Amodeo's personal recollection as a self-described participant in the transactions and friend of the owners of Tiered Capital and its affiliates, whom he calls "the borrowers," and the unadjudicated allegations of the Tort Action filed by Johnson and Tiered Capital four days earlier. (*Id.* at 2, 8, 12–13.) It goes so far as to recharacterize this Court's dismissal of the First Case as having been "procured with the forged Assignment." (*Id.* at 11.) The Dixon Creditors deny these allegations. This Court dismissed the First Case on the basis of the Assignment and denied reconsideration (see ¶ 5), and the Assignment's validity is now the subject of the pending Declaratory Action. The Disclosure Statement never acknowledges that position, never describes the available defenses, and never tells creditors that no court has found any of the alleged facts. A disclosure statement that presents one litigant's pleading as established fact is not adequate information; it is misleading information.

11. ***Improper "settlement negotiations" disclaimer.*** The Disclosure Statement also attempts to insulate its contents by declaring that, as to contested matters, it "shall not constitute an admission of any fact or liability but is a statement made in settlement negotiations." (*Id.* at 3–4.) A disclosure statement filed on the public docket to solicit votes is not a settlement communication,[1] and the Proponent should not be permitted to publish accusations against non-debtor parties to the entire creditor body while disclaiming responsibility for them.

[1] Federal Rule of Evidence 408 limits the use of compromise offers and negotiations to prove or disprove the validity or amount of a disputed claim; it does not convert a publicly filed solicitation document into a protected settlement communication.

12. ***No disclosure of the Dixon Creditors' claims or their treatment.*** The Disclosure Statement notes only that the Debtor scheduled Pedixon and ZPD at $0.00 and states the Proponent's "conten[tion]" that the Dixon Creditors' claims are usurious, that the Debtor never borrowed from them, and that the debt was satisfied by December 2023. (*Id.* at 16–17.) The Dixon Creditors dispute these contentions: the loans bore a contractual rate of 15%, well below the 25% threshold of Fla. Stat. § 687.071, and the Proponent's satisfaction theory treats non-cash assets, including a South Carolina parcel the Dixon Creditors never accepted, as if they were cash. Reciting the Proponent's contentions is not disclosure, and the Plan's declaration that the Dixon Creditors are "a source of recovery, not a creditor" is not treatment. A filed proof of claim is deemed allowed unless and until a party in interest objects and the Court rules. 11 U.S.C. § 502(a). Creditors are entitled to know the amount and asserted secured or priority status of the Dixon Creditors' claims, whether any objection has been filed, how the Plan will treat those claims if allowed, in whole or in part, whether the Plan will reserve for them, and what happens to every other class's recovery if the Dixon Creditors prevail. None of this is disclosed. Nor does the Risk Factors section identify the most obvious risk of all—that the Dixon Creditors' claims are allowed and the recoveries the Plan assumes from them never materialize. (Disclosure Statement at 22.)

13. ***No disclosure of the ownership dispute or its effect on the Plan.*** The Disclosure Statement acknowledges that the Tiered Land Trust holds the Debtor's membership interests with Crescent Sound as trustee, and that ownership is "already before a court" in the Declaratory Action. (*Id.* at 8–9.) It nonetheless states that the Class 11 Interest is held "by Mr. Johnson as Trustee of the Tiered Land Trust or . . . as the restored owner of the Debtor," and that, on the Effective Date, "ownership of the Reorganized Debtor rests with Mr. Johnson." (*Id.* at 9, 18.) It never explains how Johnson could hold the interest as trustee of a trust of which Crescent Sound is trustee, what

happens to Crescent Sound's record interest, what happens if the Declaratory Action is resolved against Johnson, or on what legal basis the Plan may vest ownership in Johnson before that dispute is decided. Creditors are asked to vote on a Plan that hands the reorganized enterprise to an insider without being told that a court may determine he owns nothing.

14. ***Double-counted and disputed funding.*** The Plan is funded almost entirely by litigation. Arrearage cures, the projected working-capital shortfall, payment of Class 9, and payments to Classes 6 and 7 all depend on "the net proceeds of the Recovery Trust's Causes of Action," which the Disclosure Statement values at "at least approximately $3,758,000." (*Id.* at 14, 16, 18, 21.) That figure includes the full $880,000 of Dixon Turnover Funds (*id.* at 17–18), yet the Disclosure Statement separately allocates $630,000 of those same funds to operations and adequate-protection payments, leaving only $250,000 for the Recovery Trust. (*Id.* at 14, 21.) The same dollars cannot both fund operations and be available to cure arrearages and pay unsecured creditors. Moreover, the Dixon Turnover Funds are disputed and are not in the estate's possession. No turnover order has been entered, and turnover from a non-debtor holding disputed funds requires an adversary proceeding. *See* Fed. R. Bankr. P. 7001. The Disclosure Statement discloses none of this, nor the effect on the Plan if turnover is delayed or denied.

15. ***Speculative and unquantified litigation recoveries.*** The remaining components of the $3,758,000 figure are equally unsupported. The $1,400,000 preference figure is "approximately" stated pending "a forensic accounting now underway," with no identification of the transfers, dates, transferees, or defenses. (Disclosure Statement at 17.) Further, the Disclosure Statement fails to reconcile its assertion of preference claims, which require a transfer "to or for the benefit of a creditor," 11 U.S.C. § 547(b)(1), with the Proponent's contention that the Debtor never borrowed from the Dixon Creditors at all. The $1,295,565.21 in usury "recoveries" from

Tamamoi, LLC and the Carton Family Trust are described as recoverable "or credited against principal" (Disclosure Statement at 17.) A credit is not cash and cannot fund distributions. The "minimum of $183,000" in equity from a unit to be recovered by fraudulent-transfer action identifies neither the unit, the transferee, nor the theory. (*Id.*) And the Disclosure Statement provides no estimate of litigation costs, duration, probability of success, or collectability. Finally, the Disclosure Statement represents that Class 9 will be paid in full "in any event . . . within 5 years" (*id.* at 16) but identifies no source for that payment if the litigation fails.

16. ***Inadequate financial projections and an unsupported exit strategy.*** The Plan contemplates a 360-month amortization with a five-year balloon. (*Id.* at 14.) The Disclosure Statement, however, offers nothing more than a one-paragraph narrative forecast. That forecast covers only fifteen of the Plan's sixty months (April 2027 through June 2028), and no projections are attached. (*Id.* at 20–21.) By the Proponent's own description, the projected revenues meet expenses and debt service only "in most months," leaving a working-capital deficit of approximately $248,000 to be "bridged" by the same speculative litigation proceeds described above. (*Id.* at 21.) The Disclosure Statement provides no historical operating results, no occupancy or rate assumptions, no expense detail, no class-by-class debt-service schedule, and no analysis of the period between confirmation and April 2027. The exit strategy is described as a refinancing or a "going-concern sale of the consolidated Resort" at an "estimated" $90,000,000 to $100,000,000 (*id.* at 21); however, this is unsupported by any appraisal or methodology. Moreover, the Debtor does not own the Resort; it owns 27 units scheduled at $11,860,000. (*Id.* at 5.) The "consolidated Resort" valuation further assumes the acquisition of Canaveral Crossroads, LLC and the cooperation of the McPhillips interests, neither of which the Proponent contends is assured. (*Id.* at 22.)

17. ***An internally inconsistent and unsupported liquidation analysis.*** The best-interests analysis consists of a narrative assertion that "little or nothing would remain for unsecured creditors" in Chapter 7 and a four-row table whose only figure is an estimated forced-sale value of "~$13-16.2M." (*Id.* at 19–20.) The Disclosure Statement's own figures suggest otherwise. The claims listed for Classes 1 through 8 total $10,163,824.42. (*Id.* at 15–16.) The Proponent's broker opinion of value of $483,000 to $486,000 per unit implies a value of approximately $13.0 to $13.1 million for 27 units, and the forced-sale estimate runs as high as $16.2 million. (*Id.* at 19–20.) On those numbers there is a cushion of approximately $2.9 million to $6.0 million above the listed secured claims, before costs of sale, against Class 9 claims of "[u]nder $1,000,000." (*Id.* at 16.) The analysis cites both the broker opinion and the $11,860,000 value at which the units were scheduled (*id*. at 5, 19) but never says which value it uses, and never explains how a forced-sale value could exceed both. Nor does it support its assertion that a Chapter 7 trustee would be "far less able" to prosecute the same Causes of Action on which the Plan relies (*id*. at 19), explain why Class 1—the senior mortgage on the land—is "[t]reated as allowed and undersecured" (*id*. at 15–16), or address the Dixon Creditors at all, even though § 1129(a)(7) is measured as to each holder of an impaired claim.

18. ***No disclosure of post-confirmation management, insider relationships, or the Proponent's interests.*** Section 1129(a)(5) requires disclosure of the identity and affiliations of post-confirmation management and of any insider to be employed or retained, and the nature of their compensation. The Disclosure Statement states only that Johnson will "oversee a professional management company" and that the Proponent "propose[s] to engage Ross Johnston as a monitor." (*Id.* at 18.) It does not identify the management company or its terms, Johnson's compensation, or Mr. Johnston's qualifications, compensation, affiliations, or source of payment. Nor does it

disclose the amounts of the IMQA and CTO Holdings, Inc. claims, whether IMQA, a borrower on the loans the Plan seeks to recharacterize and a company owned by the Proponent's family, stands to benefit from the Plan's litigation, whether the Proponent has any agreement, understanding, or expectation of compensation with Johnson, Tiered Capital, or any other party, or who is funding the Plan's preparation and prosecution. These facts bear directly on the Plan's good faith under 11 U.S.C. § 1129(a)(3), and creditors are entitled to them.

19. ***An undefined Recovery Trust.*** The Plan transfers every cause of action of the estate to the Recovery Trust, to be administered by the Trustee as "Recovery Trustee." (*Id.* at 14, 18–19.) The Disclosure Statement does not disclose whether the Trustee has consented to serve, the terms of any trust agreement, the Recovery Trustee's compensation and anticipated professional fees, whether $250,000 is sufficient to prosecute the claims identified, how "net recoveries" are calculated, or the order of the "waterfall" through which proceeds flow. Nor does it disclose the Trustee's position on the Plan or her independent assessment of the claims the Plan assigns to her.

20. ***A speculative "Relation-Back Date."*** The Plan defines a "contingent Relation-Back Date" of May 5, 2025 for avoidance computations, premised on Rule 60 motions in the dismissed First Case that would, if granted, vacate a dismissal on which reconsideration was denied more than a year ago and "consolidate" two cases. (*Id.* at 11.) The Disclosure Statement does not explain the legal basis for treating the petition date of a dismissed case as operative in this one, the status of those motions, or what portion of the projected recoveries depends on the Relation-Back Date.

21. ***No discussion of tax consequences.*** The Disclosure Statement's three-sentence tax section states only that the tax consequences "are complex" and advises holders to consult their own advisors. (*Id.* at 23.) That does not satisfy § 1125(a)(1)'s express requirement of "a discussion

of the potential material Federal tax consequences of the plan," particularly for a Plan involving a transfer of ownership, the assignment of claims to a trust, and potential cancellation of indebtedness.

22. ***Missing exhibits and other required information.*** Although the Disclosure Statement represents that "[e]very figure . . . carries a verification path" and invites creditors to "verify the numbers against the Schedules and the exhibits" (*id.* at 3), no exhibits are attached. Indeed, the Disclosure Statement attaches no projections, liquidation analysis, broker opinion of value, claims analysis, or historical financial information. The voting deadline is blank, and the Disclosure Statement does not explain how disputed claims, including the Dixon Creditors' claims, will be treated for voting purposes or how a holder may seek temporary allowance under Fed. R. Bankr. P. 3018(a). (*Id.* at 4.)

23. Each omission independently warrants denial of approval. Collectively, they make it impossible for the Dixon Creditors or any creditor to make the informed judgment that § 1125 requires.

**B. <u>Approval Should Be Denied Because the Plan Is Patently Unconfirmable.</u>**

24. A court should decline to approve a disclosure statement where the plan it describes is "patently unconfirmable," because soliciting votes on a plan that cannot be confirmed as a matter of law wastes the estate's and creditors' resources. *See, e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001). The Plan suffers from multiple defects that cannot be cured by disclosure.

25. ***Failure to classify and treat the Dixon Creditors' claims (§§ 1122, 1123(a), 1129(a)(1)).*** A plan must designate classes of claims and interests and specify the treatment of each impaired class. 11 U.S.C. § 1123(a)(1), (3). The Plan places the Dixon Creditors' claims in no class and provides no treatment for them, and it eliminates Crescent Sound's record interest as

trustee of the Tiered Land Trust without classifying it. A plan that ignores filed claims and existing interests does not comply with §§ 1122 and 1123 and therefore cannot satisfy § 1129(a)(1). Disputes over the allowance of the Dixon Creditors' claims must be resolved through the claims-objection process, and disputes over the validity of the Tiered Land Trust, the Assignment, and the ownership of the Debtor must be resolved in the Declaratory Action or an adversary proceeding—not by plan fiat. *See* Fed. R. Bankr. P. 3007, 7001.

26. ***Violation of the absolute priority rule (§ 1129(b)(2)(B)).*** If a class of unsecured claims rejects the Plan, the Plan may be confirmed only if no junior holder receives or retains property on account of its junior interest. 11 U.S.C. § 1129(b)(2)(B)(ii). The Plan vests ownership and control of the Reorganized Debtor in Johnson on the Effective Date (Disclosure Statement at 18), while the Dixon Creditors receive nothing and Class 9 is paid only if and when litigation succeeds. Johnson contributes no new value, and the opportunity to acquire the equity has not been exposed to competition. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454–58 (1999). The Plan's statement that the Class 11 holder will receive no *distributions* until senior classes are satisfied (Disclosure Statement at 19) does not cure the defect; retention of ownership and control is itself property for purposes of § 1129(b)(2)(B)(ii). *See id.*

27. ***Lack of feasibility (§§ 1123(a)(5), 1129(a)(11)).*** The Plan must provide adequate means for its implementation, 11 U.S.C. § 1123(a)(5), and confirmation must not be likely to be followed by liquidation or further reorganization, 11 U.S.C. § 1129(a)(11). For the reasons set forth in paragraphs 14 through 16 above, the Plan depends on disputed litigation recoveries and contested turnover to cover even its projected operating shortfall, and on an unsupported refinancing or sale of a "consolidated Resort" the Debtor does not own to retire its balloon obligations. That is not a feasible plan.

28. ***Failure of the best-interests test (§ 1129(a)(7)).*** The Plan cannot give the Dixon Creditors at least as much as they would receive in a Chapter 7 liquidation, 11 U.S.C. § 1129(a)(7), because it gives them nothing and offers no analysis of their recovery in liquidation. As set forth above, the Disclosure Statement's own figures indicate a substantial equity cushion in liquidation.

29. ***No legitimate impaired accepting class (§ 1129(a)(10)).*** The Plan impairs every class. (Disclosure Statement at 15.) Absent acceptance by at least one impaired class determined without counting insider votes, the Plan cannot be confirmed, including by cramdown. 11 U.S.C. § 1129(a)(10).

## RESERVATION OF RIGHTS

30. The Dixon Creditors expressly reserve the right to supplement, amend, and assert additional objections, including objections to confirmation of the Plan under 11 U.S.C. §§ 1129(a) and (b), the Proponent's good faith under § 1129(a)(3), and any amended plan or disclosure statement.

31. The Dixon Creditors reserve all rights, claims, defenses, and remedies, including the right to be heard at any hearing on the Disclosure Statement or the Plan, to conduct discovery, to present evidence and argument, and to join in or adopt the objections of other parties in interest. Nothing in this Objection constitutes an admission of any allegation in the Disclosure Statement, the Tort Action, or the Declaratory Action, or a waiver of any of the Dixon Creditors' rights or claims, including with respect to the allowance of their claims and any turnover or avoidance claim, or an election of remedies.

## CONCLUSION

WHEREFORE, Pedixon, LLC and ZPD, LLC respectfully request that the Court: (a) sustain this Objection; (b) deny approval of the Disclosure Statement; (c) in the alternative,

condition any approval of the Disclosure Statement upon the filing and service of an amended plan and disclosure statement that, at a minimum, (i) classify and provide treatment for the Dixon Creditors' claims; (ii) accurately describe the Tort Action, the Declaratory Action, and the Dixon Creditors' positions as disputed and unadjudicated; (iii) disclose the effect on the Plan if the Dixon Creditors' claims are allowed or the Declaratory Action is resolved against Johnson; (iv) provide complete financial projections for the full Plan term and a supported liquidation analysis; (v) correct the double counting of the Dixon Turnover Funds and quantify the litigation recoveries with costs and risks; (vi) disclose post-confirmation management, insider compensation, and the Proponent's relationships and funding; and (vii) include the information required by §§ 1125(a)(1) and 1129(a)(5) and Rule 3016(c); and (d) grant the Dixon Creditors such other and further relief as the Court deems just and proper.

Dated: October 7, 2026.

Respectfully submitted,

/s/ Jennifer L. Morando
Jeffrey S. Ainsworth, Esquire
Florida Bar No.: 60769
E-mail: jeff@bransonlaw.com
Jennifer L. Morando, Esquire
Florida Bar No.: 59363
E-mail: jennifer@bransonlaw.com
**Branson Ainsworth PLLC**
1501 E Concord Street
Orlando, Florida 32803
Telephone: (407) 894-6834
Facsimile: (407) 894-8559

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 7, 2026, a true and correct copy of the foregoing was filed and served via CM/ECF to all parties registered to receive notice in this case, including the Chapter 11 Trustee and the Office of the United States Trustee, and a copy by U.S. Mail will be furnished to Frank L. Amodeo, 1311 Hoffner Avenue, Orlando, Florida 32809.

/s/ Jennifer L. Morando
Jennifer L. Morando, Esquire
**Branson Ainsworth PLLC**
Orlando, Florida 32803