FILED ORL INTAKE - USBC
19 OCT 2026 PM1:01

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: | Case No. 6:25-bk-05570-GER |
| **HOMEMAKERS REAL ESTATE, LLC,** | Chapter 11 |
| Debtor. | |
| / | |

**SECOND AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE SECOND AMENDED PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO,**
**a Creditor and Party in Interest**

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | flahome32809@gmail.com

Dated: October 19, 2026

## 1. INTRODUCTION AND SUMMARY

I file this Second Amended Disclosure Statement (the "Disclosure Statement") under section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to give holders of claims and interests in the above-captioned case (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), the adequate information they need to make an informed judgment about the Second Amended Plan of Reorganization (the "Plan") I propose for Homemakers Real Estate, LLC (the "Debtor"). This Disclosure Statement supersedes the one I filed on July 13, 2026

(Doc. 304) and the amended statement I filed on October 9, 2026 (Doc. 433). It is a single integrated statement, as the Order of September 21, 2026 requires, and a redline comparing it to Doc. 433 is filed under separate notice. (Doc. 397 ¶¶ 5–6).

The Plan does three things. The Plan preserves the Debtor's vacation-rental enterprise at the Cape Crossing Resort as a going concern. The Plan recovers for the Estate the transfers and unlawful interest taken from it. And the Plan delivers a recovery approaching one hundred percent to legitimate creditors.

Between July 13, 2026 and the date of this Disclosure Statement, the record changed, and this statement changes with it. The Bankruptcy Court denied the Rule 60 motions and consolidation, so every avoidance period now runs from September 2, 2025. The Trustee compromised the post-petition rent claim against the Dixon lenders, so the $880,000 turnover my earlier statement anticipated will not occur. The Condominium Association withdrew its claim, and Class 8 is empty. The secured amounts now track the filed claims. Class 6 now receives interest at the rate Florida law fixes, as the Tax Collector's objection requires. The PEDixon and ZPD claims, now filed and objected to, sit in a new Class 12. The Plan now takes effect only when the confirmation order is final. On October 7, 2026, Mainstreet, PEDixon and ZPD, Tamamoi, and the Carton Family Trust objected to my earlier plan or statement (Docs. 427–430), as Mr. McPhillips had in August (Doc. 328). In answer, the Plan now pays Class 9 with interest from

operating revenue; pays Tamamoi and Carton on their claimed amounts until a Final Order fixes the Allowed amounts; returns any claim the Recovery Trustee declines to the Reorganized Debtor; provides a successor Recovery Trustee; classifies the IPFS claim in a new Class 13; and drops every reference to a combination with Mr. McPhillips. Exhibits B through E add a five-year monthly projection, a liquidation analysis by collateral pool, a claims register, and a schedule of the tax claims. This statement also discloses the Trustee's claim objections, operating report, and competing plan; the October 19, 2026 settlement conference; Mainstreet's stay relief; the Canaveral Crossroads case; a valuation of the units; and the restitution lien on my own claim. On October 14, 2026, the Bankruptcy Court heard both disclosure statements, and this statement now answers the three questions that hearing raised: why my standing does not depend on the restitution lien on my claim (Section 1.A); what it means for the Plan to subsume the Trustee's sale program (Section 4.C); and the lender liability that bears on Mainstreet's claims (Section 2.J).

**A. I assisted both the borrowers and the lender, and creditors should weigh my whole history — the convictions and the work. My standing was fixed when I joined the petition and filed the Plan, and no payment toward my restitution judgment undoes it.**

Candor about the proponent is part of adequate information, so I begin with myself. I am Frank L. Amodeo. I hold an unsecured claim against the Debtor of

$396, and I was one of the petitioning creditors who joined the involuntary petition. My claim is one reason I participate in this case. The other is my belief in the rule of law and in just results. As the case went on, I saw that, for reasons outside this Court, the results were not turning out to be fair. I then took on a broader role, so that not only would my own claim be repaid, but the comparatively innocent parties to these transactions — the unsecured creditors and the true third-party creditors who had no say in them — would be protected too. For four years I assisted with the financial analysis and structuring of the loans this Disclosure Statement describes, and I assisted and educated both sides of them, without charge: the owners of Tiered Capital, Inc. and its affiliates — my friends, the borrowers — and the lender, Kenneth Dixon ("Mr. Dixon"). Mr. Dixon and I met nearly weekly for two years, over dinners at my home, to discuss the state of the Tiered businesses. I watched the events this Disclosure Statement describes as they happened; several of the transactions described below occurred at my dining-room table. IMQA Investments Incorporated, a company owned by members of my family, and CTO Holdings, Inc. also hold claims; each is a Class 9 non-Insider unsecured creditor, and the Plan treats them, and me, exactly as it treats every other non-Insider unsecured creditor.

Creditors weighing my judgment should also know its history. In 1997, Georgia disbarred me. In 1999, I was convicted of mail fraud and served my

sentence in a federal boot camp. A second conviction arose from a corporation's failure to pay its payroll taxes, and I served that sentence in federal prison. In 2008, Florida declared me incompetent. Those facts are public, the parties opposing this Plan repeat them often, and I do not contest them. On May 11, 2026, the guardianship court authorized me to prosecute this bankruptcy case personally. *In re Guardianship of Amodeo*, No. 48-2008-CP-001369-O (Fla. 9th Cir. Ct. May 11, 2026). Creditors should also know the rest of the story. I graduated from the Emory University School of Law. I practiced bankruptcy law in Atlanta, in hundreds of cases, and over my career I have taken part in more than sixty Chapter 11 cases as an attorney or a stakeholder. In prison, I advocated for other inmates, and I built a deep body of experience doing it. Twice, the Supreme Court of the United States granted certiorari and relief on pleadings I wrote for others — Anthony Grant Jackson and Michael Levon Jackson. *Jackson v. United States*, 578 U.S. 1020 (2016) (mem.); *Jackson v. United States*, 589 U.S. 902 (2019) (mem.). The work corrected incorrect sentences in 741 cases, avoided 1,997 years of unnecessary imprisonment, and saved taxpayers about $108 million. Several district courts, including the court that sentenced me, have recognized that advocacy and the quality of the work. My convictions and my incompetency adjudication are part of the record; so is that experience, and creditors should weigh both in judging the Plan. Read the Plan, verify the numbers against the

Schedules and the exhibits, and judge the work on the record. Every figure in this Disclosure Statement carries a verification path.

On September 11, 2026, the United States gave notice that it holds a criminal restitution lien on all of my property, including any distribution on my $396 claim in this case (Claim 1-1), arising from the restitution judgment entered against me on July 2, 2009. (Doc. 387). Any distribution the Plan makes on my claim will go where that lien requires, and every dollar of it reduces my restitution debt. The lien reaches my property alone; it does not reach the Debtor's property or any other creditor's distribution.

At the October 14, 2026 hearing, it was suggested that if Mainstreet paid my restitution judgment — or only the $396 my claim represents — I would lose my standing in this case. I would not, for five reasons. First, standing is measured when a party invokes the court's power, not afterward. "[S]tanding is to be determined as of the commencement of suit." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992). On September 2, 2025, I held Claim 1-1 when I joined the involuntary petition; on May 21, 2026, the Bankruptcy Court entered the order for relief on that petition (Doc. 229); and I held the same claim on July 13, 2026, when I filed my plan, and on October 9, 2026, when I amended it. Nothing that later happens to my claim reaches back to undo any of those acts. Second, what follows the commencement is a question of mootness, not standing, and a party

who says its own later conduct ended the controversy bears the "heavy burden" of proving it. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). A creditor that opposes a plan cannot carry that burden by paying the plan's proponent. If it could, any plan could be bought off the docket for the price of the smallest claim behind it.

Third, a payment by Mainstreet would not pay my claim. Mainstreet does not owe the Debtor's debt to me. Money it pays the United States reduces my restitution judgment, not the Debtor's obligation on Claim 1-1, which remains outstanding until the Debtor or the Plan pays it. Nor does the restitution lien change who holds the claim: a lien under *18 U.S.C. § 3613(c)* secures the United States' judgment against my property, and I remain the holder of the claim it encumbers. Fourth, the Bankruptcy Code does not measure a party in interest by the size of its claim or by who will receive its distribution. Once a trustee is appointed, "[a]ny party in interest, including . . . any creditor, may file a plan," *11 U.S.C. § 1121(c)(1)*, and a party in interest is one whom the reorganization proceedings "might directly affect." *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 272–73 (2024); *see also In re Roman Catholic Diocese of Albany*, No. 1:25-cv-01570 (BKS), 2026 WL 2923067, at *9–10 (N.D.N.Y. Sept. 29, 2026) (reversing a bankruptcy court that read *Truck* narrowly; a party "potentially concerned with or affected by" the outcome is a party in interest, and *Truck* does

not require it to show "definitive financial responsibility"). Every dollar the Plan distributes on my claim reduces a judgment against me. Few creditors in this case are more directly affected by how it ends. Fifth, Mainstreet could not step into my place by paying. The Bankruptcy Code subrogates only an entity that is "liable with the debtor on, or that has secured," a creditor's claim, *11 U.S.C. § 509(a)*, and Mainstreet is neither; a stranger who pays another's debt is a volunteer and acquires nothing. State law decides who owns a claim, *Butner v. United States*, 440 U.S. 48, 55 (1979), and only the party entitled to enforce a claim may assert it; "one entity cannot assert another's claims." *In re Aegis Asset Mgmt., LLC*, 182 F.4th 1364, 1371 & n.8 (11th Cir. 2026). And a creditor that acquires a claim to defeat a plan, rather than to be paid on it, acts with the "ulterior motive" that justifies designating its vote. *In re DBSD N. Am., Inc.*, 634 F.3d 79, 102–03 (2d Cir. 2011); *11 U.S.C. § 1126(e)*.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINDER OF THIS DISCLOSURE STATEMENT, WHICH IS IN TURN QUALIFIED BY THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE

treatment of each Class are discussed below. If the Plan alters the legal, contractual, or equitable rights of a holder, the Claim or Interest is "Impaired," and the holder is entitled to vote. A holder whose Claim is the subject of a pending objection may vote only to the extent the Bankruptcy Court temporarily allows the Claim for that purpose. *Fed. R. Bankr. P. 3018(a)*. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance, particularly section 502(d). Classes 4, 5, and 12 fall within that exception. Each holder in them received transfers the Estate seeks to avoid, and section 502(d) disallows its Claim until it returns them. This Disclosure Statement gives the Bankruptcy Court notice that a section 502(d) circumstance exists as to each of those Claims, so that the Court may disallow them on its own motion. I moved to disallow the PEDixon and ZPD claims on October 2, 2026 (Doc. 423), and I will file a separate motion as to the Tamamoi and Carton claims before ballots are due.

THE VOTE OF EACH HOLDER OF AN IMPAIRED CLAIM IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT. THE LAST DAY TO VOTE TO ACCEPT OR REJECT THE PLAN IS __________, 2026, AT 5:00 P.M. (ET). BALLOTS MUST BE RECEIVED BY THE CLERK

OF THE U.S. BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, BY THAT TIME.

After the Ballots are tabulated, the Bankruptcy Court will hold a hearing (the "Confirmation Hearing") to consider whether the Plan satisfies the confirmation requirements of section 1129 of the Bankruptcy Code. The Bankruptcy Code permits confirmation even if not every Impaired Class accepts; confirmation over the objection of an Impaired Class is sometimes called "cramdown." I expressly reserve the right to seek cramdown under section 1129(b).

I URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

## 2. HISTORY AND DESCRIPTION OF THE DEBTOR'S BUSINESS

### A. The Debtor owns the rental heart of the Cape Crossing Resort.

The Debtor, Homemakers Real Estate, LLC, owns and operates a portfolio of vacation-rental units within the Cape Crossing Resort and Marina (the "Resort"), located at 201 Ivory Coral Lane, Merritt Island, Florida 32953. At full build-out the Resort comprises forty-seven (47) townhomes, thirty-six (36) condominiums, a restaurant, two (2) marinas, a clubhouse and pool, and related commercial and intangible property. On October 31, 2020, the Debtor acquired thirty-three (33) of the vacation-rental units by quitclaim deed in lieu of foreclosure. Twenty-six (26) remain: eighteen (18) condominiums at 202 Ivory

Coral Lane and eight (8) townhomes. (Exs. C, E). Unit 403 is not among them. In March 2024, Crescent Sound transferred Unit 403 from the Debtor to the IAM Irrevocable Trust and then left its mortgage unpaid. Tamamoi foreclosed, and the circuit court, in what I believe was error, treated the Unit as outside the bankruptcy estate. That ruling is on appeal, the appeal is stayed while the bankruptcy proceeds, and the Plan seeks the Unit's return. In the Debtor's Schedule A/B filed June 16, 2026, the real property is valued at approximately $11,860,000 (the twenty-six units at $11,300,000 and one further unit at $560,000), and the Debtor scheduled substantial Causes of Action as additional assets.

**B. Four investors built the Resort with money from three lenders, and by 2019 an institutional consolidation was within reach.**

Michael McPhillips ("Mr. McPhillips") and Martin Flynn ("Mr. Flynn") conceived it. Lacking the capital to complete it alone, they brought in Horton Johnson ("Mr. Johnson") and Investors of Merritt — a group of friends and family headed by its principal investor, Dan Myers, CPA, now deceased — whose capital enabled development to begin in approximately 2015. Three lenders financed the work from the start: Mr. Johnson, who was both an investor and a lender; Neil Buchalter ("Mr. Buchalter"); and David Campbell, who operated FDRE, Inc. To finish the project, the developers presold units, entered construction loans, and stacked second, third, and fourth mortgages on individual units. By 2019, with

most structures nearing completion, the enterprise involved more than fifty (50) investors, lenders, and owners across more than one hundred fifty (150) transactions, and an institutional lender had tentatively committed to consolidate the debt and fund completion (the "Consolidation").

**C. The pandemic, a bank merger, and a partition starved the enterprise of cash.**

Between December 2020 and January 2021, Mr. McPhillips and Mr. Flynn entered a partition agreement (the "Partition Agreement") to resolve their disputes and disentangle their business arrangements. Mr. McPhillips took the marinas and restaurant; Mr. Flynn took the development entities, including the entity that became the Debtor. The COVID-19 pandemic then slowed construction and sharply increased materials costs, and a bank merger derailed the Consolidation, leaving the enterprise without the cash flow to meet its obligations. In late 2020, two mortgage-service entities (TACIRA, LLC and DRCIRA, LLC) commenced foreclosure actions, which were resolved after Mr. Johnson purchased the relevant mortgages. In April 2024, Tamamoi, LLC initiated a mortgage-foreclosure action relating to nine (9) residential units.

**D. Mr. Dixon lent $11.225 million and has collected more than $27 million.**

Between January 2022 and September 2023, Mr. Dixon, a retired accountant and self-described hard-money lender acting through PEDixon, LLC, ZPD, LLC,

and Parke Financial, Ltd., made eleven loans totaling $11,225,000 to companies and individuals affiliated with the Resort enterprise, including Tiered Capital, Inc. ("Tiered Capital"), Sherwood Construction, Inc., IMQA Investments Incorporated, and Mr. Flynn. Each loan carried interest of 12% or 15%, a 2% origination fee, 1% renewal fees, and provisions for collection costs, due-diligence expenses, and legal fees; on default, the rate rose to the statutory maximum of 25%. I watched most of these loans made: I introduced Mr. Dixon to several of the borrowers, and I assisted in structuring all but two of the eleven.

Attorney Alison Pitkanen ("Ms. Pitkanen") prepared all or most of the loan documents, controlled escrow and disbursement of the loan proceeds through her IOLTA accounts, and — notwithstanding the conflict — represented both the Tiered-affiliated borrowers and the Dixon-related lenders in the same transactions. On September 13, 2023, the Dixon and Pitkanen interests purported to consolidate the eleven loans through a Tiered Consolidated Loan Agreement and an alleged Tiered Land Trust Agreement, under which the Debtor's ownership was said to be held by the Tiered Land Trust, with Crescent Sound, Ltd. — an entity Mr. Dixon owned and controlled — as trustee.

The borrowers' verified accounting, drawn in part from Mr. Dixon's own records, shows that Mr. Dixon has since collected more than $27,123,645 in cash, real estate, business interests, and purported forbearance fees against the

$11,225,000 lent — an overpayment exceeding $15.8 million. The same records show effective interest rates of 32.33% in 2024 and 29.10% in 2025, each above the 25% ceiling of the Florida criminal-usury statute. *Fla. Stat. § 687.071*. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026) (verified complaint ¶¶ 16–19, 400–420).

**E. A three-page unrecorded deed, a forged eight-page replacement, and a falsely notarized assignment purported to move the Debtor into Mr. Dixon's hands.**

No trust existed in September 2023, and the Tiered Land Trust was never validly formed. A Florida land trust exists only when a recorded instrument conveys the real estate to the trustee and confers the trustee's powers. *Fla. Stat. §§ 689.071(2), 689.073(1)*. In September 2023, Mr. Johnson electronically signed a three-page trustee's deed. It was never witnessed, never notarized, and never recorded, and it described no property: its third page bore the electronic-signature envelope identification number and listed Schedule A only as twenty-six units. That instrument could not be recorded under Florida law, and it created nothing. The earliest date on which the trust could have existed is February 14, 2024, when an eight-page "curative" trustee's deed was recorded in the Brevard County public records — and that deed is forged on its face. Set beside the deed Mr. Johnson signed, it shows what was done to it. Witness signatures were added. Addresses were added. A notary's seal and certificate were added, for a notarization the

notary's own records contradict. And the signed third page — the only page that carried the envelope identification number — was removed and replaced with six pages of legal descriptions of twenty-seven properties, none of which carries that number. A signed document does not acquire witnesses, a notary's seal, and six new pages after it is signed. The recorded deed is a falsified, fabricated, and forged instrument, and it conveyed nothing. On January 9, 2024, Ms. Pitkanen presented Mr. Johnson with an Assignment of Membership Units transferring the Debtor's membership interests. The signing happened in my home, and I objected to the first version of the document in the room; after Mr. Johnson signed the revised version, Ms. Pitkanen emailed the executed document to her assistant, Janelle Morea ("Ms. Morea"), who checked "Physically Present" on a notarial certificate for a signing Ms. Morea never attended. The verified complaint identifies more than thirty-four (34) false attestations and notarization irregularities across the Dixon loan documents. Because the trust was never formed, ownership of the Debtor remains with Mr. Johnson.

The Debtor's membership units now sit inside the so-called Tiered Land Trust. They belong to Mr. Johnson, and they are to be returned to him if they have not been already. Mr. Johnson is the Debtor's owner, and on the Effective Date he controls the Reorganized Debtor. On February 9, 2026, Mr. Johnson filed a declaratory action in Orange County that will confirm it. *Johnson v. Crescent*

*Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026) (the "Declaratory Action").

**F. For thirty months Mr. Dixon collected the Debtor's rents and paid none of the Debtor's creditors.**

From December 2023 through the entry of the order for relief, the Dixon-related interests controlled the Debtor. Crescent Sound seized the rental operations; the Debtor's revenues were routed through Ms. Pitkanen's IOLTA account and transferred to PEDixon and ZPD — more than $2,800,000 over the period — while, on the present record, the mortgages, ad valorem taxes, association assessments, and maintenance obligations of the Debtor went unpaid. The arithmetic of that diversion is the story of this case: every secured creditor now asserting an arrearage — Jetton, Mainstreet, Tamamoi, Carton, the Brevard County Tax Collector, and both associations — traces its default to revenue Mr. Dixon collected and kept. The foreclosures, the association liens, and the tax delinquencies are not the product of a failed business; the units rented and the money came in. The money simply never reached the creditors it belonged to.

**G. The forged assignment defeated the first bankruptcy case; the second produced an order for relief and a trustee.**

On May 5, 2025, Mr. Johnson, as Manager, filed a voluntary Chapter 11 petition for the Debtor. *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025) (the "First Bankruptcy Case"). The Dixon-affiliated

lenders moved to dismiss, relying on the January 9, 2024 Assignment of Membership Units to argue Mr. Johnson lacked authority, and on June 27, 2025 the case was dismissed on that ground. Reconsideration was denied on August 26, 2025, but the court identified the paths by which a renewed filing would be authorized.

The Rule 60 motions I described in my earlier statement are no longer pending. On July 21, 2026, the Bankruptcy Court denied the motions to vacate the dismissal of the First Bankruptcy Case, and on August 20, 2026, it denied my motion to consolidate the two cases. (Doc. 345 & n.2). The operative petition date for every purpose is therefore September 2, 2025. The Plan no longer defines a Relation-Back Date, and every avoidance and reach-back period runs from September 2, 2025.

On September 2, 2025 — within a week of that denial — Tiered Capital filed an involuntary Chapter 11 petition commencing this Bankruptcy Case; Mr. Johnson, IMQA Investments Incorporated, CTO Holdings, Inc., and I joined as petitioning creditors. On October 8, 2025, I moved to appoint a Chapter 11 trustee — the first party in this case to ask for one. (Doc. 13). On February 11, 2026, the Bankruptcy Court struck that motion with my other pro se papers (Doc. 137), and the request was renewed thereafter, including by Mainstreet (Doc. 155). On May 20, 2026, after contested proceedings, the Bankruptcy Court rejected the Debtor's

claim that the petitioning creditors filed in bad faith. It found that the petition was not filed for an improper purpose; that the petitioning creditors' "primary reason for the involuntary petition was for a proper purpose, namely to ensure a fair distribution of Homemakers' assets," so "that Mr. Dixon does not get a disproportionate share versus other creditors"; that their "primary concern was ensuring payment of all creditors and not just Mr. Dixon"; and that "the principal aim in filing this case is to prevent the disproportionate advantage that Mr. Dixon exercises by receiving and controlling the disposition of Homemakers' rental income." (Doc. 256 at 10:13–21, 11:19–24, 12:25–13:3, 14:3–6, 28:8–13). It found PEDixon, ZPD, and Crescent Sound to be insiders (*id.* at 22:6–8), and, because "all rents are being controlled by Mr. Dixon," it ordered that a trustee be appointed. (*Id.* at 30:17–23). On May 21, 2026, it entered the order for relief. (Doc. 229). On June 8, 2026, it directed the appointment of a Chapter 11 trustee (Doc. 240), and on June 12, 2026, it approved the appointment of Lara Roeske Fernandez. (Doc. 252). On June 16, 2026, Mr. Johnson filed the Debtor's Schedules and Statement of Financial Affairs. The section 341 meeting of creditors was set for July 16, 2026. (Doc. 264). Because exclusivity ended upon the appointment of the Chapter 11 Trustee, I file the Plan as a party in interest under section 1121(c).

**H. A verified tort action now quantifies the scheme.**

On July 9, 2026, Mr. Johnson and Tiered Capital filed a verified complaint in the Circuit Court of the Ninth Judicial Circuit against Mr. Dixon, PEDixon, ZPD, Parke Financial, Ms. Pitkanen, her professional association, and Crescent Sound. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026). The sixteen counts include fraud in the inducement, criminal usury, forgery-based fraud, conversion, civil theft, abuse of process, breach of fiduciary duty, and federal and Florida civil RICO, and allege actual damages of $33,050,155 — $99,150,465 after mandatory trebling — exclusive of fees, interest, and ongoing receipts.

I am a witness to the events that complaint describes. The claims it pleads belong to Mr. Johnson and Tiered Capital, not to the Estate, and no creditor should vote in reliance on their outcome. The Estate holds its own claims arising from the same events — the avoidance and turnover claims, the section 549 claims for post-petition transfers, and the usury forfeitures — all of which the Plan places in the Recovery Trust, and the decision whether and how to pursue each recovery rests with the Chapter 11 Trustee, presumably Ms. Fernandez, whom the Plan names as Recovery Trustee. The tort action's significance to this Bankruptcy Case is evidentiary: the same documents, the same false notarizations, and the same diverted revenues that support Mr. Johnson's claims support the Estate's. The

record is already assembled, verified, and exhibit-supported; the Estate does not start from zero.

The Dixon parties deny all of it. They say the loans bore a contractual rate of 15 percent, below the 25 percent threshold of Fla. Stat. § 687.071; the borrowers' accounting of Mr. Dixon's own records puts the effective rates at 32.33 percent in 2024 and 29.10 percent in 2025, and the expert report of Gary A. Moll computes effective rates above the criminal threshold. (Doc. 339). They say the satisfaction theory counts a South Carolina parcel they never accepted; on September 14, 2023, Crescent Sound took an assignment of the membership units of the company that owns it, and the Dixon side has held it ever since. They say the January 9, 2024 Assignment is valid and that this Court dismissed the First Bankruptcy Case on its strength (Doc. 430 ¶¶ 5, 10, 12); the notary who certified that Mr. Johnson appeared before her was not in the room. And the trust through which the Dixon side claims control rests on a deed altered after Mr. Johnson signed it: the recorded version added witnesses, addresses, and a notary's seal, and it replaced the signed third page — the only page bearing the envelope identification number, which listed Schedule A as twenty-six units — with six pages describing twenty-seven properties, none bearing that number. That is why I know the recorded deed is falsified, fabricated, and forged, and no order entered without that comparison validates it. The Trustee herself refuses to concede that the consolidated loan

agreement is enforceable (Doc. 419 ¶¶ 17–19), and this Court has found PEDixon, ZPD, and Crescent Sound to be insiders. (Doc. 256 at 22:6–8). The ownership question is pending in the Declaratory Action, and the tort claims are pending in *Johnson v. Dixon*.

**I. Since July 13, 2026, the Trustee compromised the post-petition rent claim, proposed a competing plan, and objected to most of the claims in the case.**

On September 2, 2026, the Bankruptcy Court approved, over my objection, the Trustee's compromise with PEDixon, LLC and ZPD, LLC (together, the "Lender") and the Cape Crossing Condominium Association. (Doc. 379 ¶¶ 1–2). Under the compromise, the Lender pays the Trustee $350,000 to resolve the Trustee's claim to avoid and recover the post-petition transfers defined in her motion, and waives any section 502(h) claim for that amount; the Trustee pays the Association $204,000 for the condominium roof replacement; the Association withdraws its claim; and the Trustee holds the balance and may not use it without further order, while she and the secured creditors reserve whether their liens attach to it. (*Id.* ¶¶ 3–5). On September 18, 2026, the Association withdrew Claim 7. (Doc. 393). By its terms the compromise reaches only the post-petition transfers; it does not decide the Lender's claims against the Estate or the Estate's other claims against the Lender.

On September 11, 2026, the Bankruptcy Court directed the Trustee, PEDixon, and ZPD to a judicial settlement conference before the Honorable Jason A. Burgess for possible resolution of "all issues between the Parties." (Doc. 386 ¶¶ 2–3). The conference is set for October 19, 2026. (Doc. 419 at 5 n.1). Any settlement it produces must come back to the Bankruptcy Court for approval. *Fed. R. Bankr. P. 9019(a)*. Creditors should understand that a settlement of the Lender's claims could change the recoveries this Disclosure Statement projects.

On September 18, 2026, the Trustee filed a competing plan of liquidation and its disclosure statement. (Docs. 394, 395). The Trustee's plan sells all twenty-six Units free and clear of liens, through brokers or an auctioneer; pays each secured creditor from the proceeds of its collateral; and distributes what remains to unsecured creditors and, only after they are paid in full, to the holders of Interests. (Doc. 395 at 13–17). I have objected to the Trustee's disclosure statement. On October 14, 2026, the Bankruptcy Court heard both disclosure statements. On October 15, 2026, it conditionally approved the Trustee's amended disclosure statement and set a combined hearing on its final approval and on confirmation of her plan for November 19, 2026. (Doc. 437 ¶¶ 1, 3). If both plans satisfy the confirmation requirements, the Bankruptcy Court must consider the preferences of creditors and equity security holders in choosing between them. *11 U.S.C. § 1129(c)*.

On July 22, 2026, the Bankruptcy Court required every scheduled creditor to file a proof of claim to participate in the case, and it extended the deadline through August 21, 2026 for six named creditors. (Doc. 320 ¶¶ 2–3). As of September 18, 2026, seventy-one claims had been filed. (Doc. 395 at 12). Between September 17 and October 2, 2026, the Trustee objected to the claims of IPFS Corporation, WM Holdings Group, LLC, CTO Holdings, Inc., IMQA Investments Incorporated, Mr. Johnson, Paul Rene, Jr., PEDixon, LLC, ZPD, LLC, and Tiered Capital, Inc. (Docs. 392, 409, 410, 411, 412, 416, 419, 420, 421). On October 2, 2026, I moved to disallow the PEDixon and ZPD claims under section 502(d). (Doc. 423). On October 6, 2026, the Trustee objected to the claims of Tamamoi, LLC and the Carton Family Trust only to disallow any deficiency, and stated that she lacks standing to raise usury because the Debtor is not an obligor on either loan. (Docs. 424, 425 ¶ 14 & n.2). On August 28, 2026, the Bankruptcy Court ordered that a party seek leave before objecting to a proof of claim or a scheduled liability. (Doc. 359 ¶ 3). The Plan's claim-objection period conforms to that order. (Plan § 7.2).

On September 17, 2026, the Bankruptcy Court denied Mr. Johnson's motion to appoint an examiner. (Doc. 391). My appeal from the order denying my motion to disqualify PEDixon and ZPD from participating in this case (Doc. 344) is pending in the district court, where my motion for leave to appeal awaits decision. *Amodeo v. Roeske Fernandez*, No. 6:26-cv-02089-AGM (M.D. Fla. 2026). On

October 2, 2026, the Brevard County Tax Collector objected to the interest rate my earlier plan applied to its claims. (Doc. 422). The Plan now pays Class 6 the statutory rate, as Section 3.C describes. On October 7, 2026, I objected to the Trustee's disclosure statement on seventeen grounds. (Doc. 426).

On March 16, 2026, the Bankruptcy Court terminated the automatic stay as to Mainstreet Community Bank and permitted it to exercise its in rem rights against the Units that secure its loans. (Doc. 183 ¶ 2). On February 11, 2026, it lifted the stay for Tamamoi only to let it obtain a final judgment (Doc. 135 ¶ 2), and on August 28, 2026, it abated the Tamamoi and Carton requests to conduct foreclosure sales. (Doc. 361 ¶ 1). A foreclosure sale by Mainstreet before the Plan takes effect would remove its Units from the Estate. On the Effective Date, the Plan's injunction replaces each of these orders, and no secured creditor may sell a Unit except through a state-court receiver conducting a structured sale after an uncured Plan default. (Plan §§ 6.13, 8.4).

On September 21, 2026, the Trustee filed her operating report for August 2026. It reports receipts of $18,661 for the month, cumulative receipts of $44,484, disbursements of $761, and $43,609 in cash on August 31, 2026. (Doc. 399, Part 1). Creditors should compare those receipts with the projections in Section 4.B.

On September 8, 2026, the court entered an order for relief against Canaveral Crossroads, LLC — the resort's developer and declarant — on its

consent, and converted its case to Chapter 11; on September 30, 2026, it ordered that case jointly administered with that of Sherwood Construction, Inc. *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla.) (Docs. 15, 61). Canaveral Crossroads reports that it owns the clubhouse, the common areas, the sewage lift station, and the Cape Crossing Resort & Marina names and marks. (*Id.*, Doc. 56 at 2). Tamamoi's foreclosure judgment was entered in its action against Canaveral Crossroads and others. (Doc. 424 at 2 n.1). The Plan proposes that the Debtor acquire the assets of Canaveral Crossroads through that case, subject to approval in both cases. (Plan § 6.2).

**J. In February 2022, Mainstreet dictated the Debtor's arrangement with Canaveral Crossroads and cost the Debtor almost five years of revenue; in 2025, rather than enforce its assignment of rents against PEDixon, it negotiated to sell its mortgages to PEDixon at a discount.**

Before 2022, the Debtor's Units stood on a second set of assets. In April 2021, Canaveral Crossroads quitclaimed the resort's public property — the clubhouse, the pool and fitness facility, the sewage lift station, and the open land and sign parcel — to Canaveral Crossing Resorts, Inc. (O.R. Book 9077, Page 1557, recorded Apr. 6, 2021). The resort's intellectual property, the Cape Crossing Resort & Marina names and marks, was placed there as well. That arrangement gave the Debtor two things. First, the Debtor's Units held first priority on every reservation the resort booked, which likely would have doubled the Debtor's rental

revenue. Second, the amenities and marks generated fees beyond what their expenses and the original Crossroads investors required, and that margin supported the Debtor.

On February 17, 2022, Mainstreet refinanced nineteen of the Debtor's Units with a $5,061,363 loan, $4,822,072.69 of which retired the Campbell loans on those Units through FDRE, Inc. (Settlement Statement, Feb. 17, 2022, lines 1501, 1600). As a condition of that refinancing, Mainstreet stepped outside the role of a lender and dictated how the Debtor and Canaveral Crossroads would structure their contract. Its demand produced exactly the result it sought: on February 7, 2022 — ten days before the closing — the deed returning the clubhouse, the pool, the lift station, and the open land from Canaveral Crossing Resorts, Inc. to Canaveral Crossroads was recorded. (O.R. Book 9407, Page 1642). The Debtor lost its priority on the resort's reservations and its share of the amenity revenue. For almost five years since, the returned properties have produced no revenue for the Debtor at all, and the revenue that would have serviced the Debtor's debts — Mainstreet's among them — never came in.

In February 2025, Mr. Johnson and I met with Mainstreet and told it that it needed to enforce the assignment of rents in its mortgages to stop the diversion of the Debtor's rents to PEDixon. Mainstreet's assignment of rents came first in time, and the Bankruptcy Court later found that Mr. Dixon "has been retaining all of the

rental income, despite the mortgagee's assignment of rent provisions that are prior in time to the loan with Mr. Dixon." (Doc. 256 at 13:15–19). Mainstreet did not enforce it. After that meeting, Mainstreet instead discussed with PEDixon a short sale of the Mainstreet mortgages on the Debtor's Units to PEDixon. The sale did not close, but the choice speaks for itself: rather than stop the diversion, Mainstreet negotiated a transaction that would have put its mortgages, at a discount, in the hands of the lender diverting the Debtor's rents, and would have harmed the Debtor's other creditors even more. Meanwhile, the rents kept flowing to PEDixon, and the Debtor's mortgages, taxes, and assessments went unpaid.

A lender that uses the leverage of a loan to dictate its borrower's dealings with a third party crosses the line from creditor to participant, and it answers for the harm it causes. Florida law holds a party liable for an intentional and unjustified interference with a business relationship it knows of, when the interference damages the plaintiff. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). Mainstreet knew of the Debtor's arrangement with Canaveral Crossroads, because it required the arrangement's undoing as a condition of its loan. No lender's justification covers that interference: Mainstreet's collateral was the nineteen Units, not the relationship between its borrower and a third party, and the Debtor's revenue — the source of repayment of Mainstreet's own loan — fell as a direct result. The same conduct supports subordinating

Mainstreet's claims. *11 U.S.C. § 510(c)(1)*. Subordination requires inequitable conduct that injured the creditors or gave the claimant an unfair advantage, and the conduct need not concern the claim itself: "inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977). Mainstreet's 2022 interference, and its 2025 choice to negotiate with the lender diverting the Debtor's rents rather than stop the diversion, are conduct of exactly that kind. Florida's credit-agreement statute of frauds does not stand in the way. It bars a debtor's "action on a credit agreement" that is not in writing, *Fla. Stat. § 687.0304(2)*; the Estate sues on no promise Mainstreet made to lend or to forbear, but on Mainstreet's interference with the Debtor's contract with a third party. The Estate also takes every defense the Debtor holds, and it may assert the resulting damages in recoupment and setoff against Mainstreet's claims. *11 U.S.C. § 558*. Because the four-year limitations period had not run when this case began on September 2, 2025, the Estate may bring the claim until May 21, 2028, two years after the order for relief. *11 U.S.C. § 108(a)*.

No proceeding on these claims is pending yet. The Plan places them in the Recovery Trust with every other Cause of Action, and because the same conduct injured Canaveral Crossroads, I expect them to be decided in or alongside its

Chapter 11 case. (Plan §§ 4.3, 6.10). The damages are the revenue the Debtor's Units would have earned, with first priority on every resort reservation and the Debtor's share of the amenity revenue, over the revenue they actually earned, from February 2022 forward. That loss approximates $52,816 a month, and the figure covers both parts of it: the Debtor's share of the revenue the clubhouse, the pool, the common areas, the lift station, and the resort's name and marks produce, and the rental revenue the Debtor lost with its first priority on the resort's reservations. The resort's rental program always split revenue 50/50 between the operator and the unit owner, and the same split would have governed the Debtor's share here; I derived the figure from the revenue Canaveral Crossroads has lost and that split. From March 2022 through October 2026, fifty-six months, the Debtor's loss totals $2,957,696, and it grows by $52,816 every month the Debtor goes without the resort behind its Units. Until a Final Order fixes Mainstreet's liability, the Plan pays Classes 2 and 3 into escrow. (Plan § 4.1(e)). Whatever liability is determined reduces Mainstreet's Allowed Claims dollar for dollar, or eliminates them, and any excess is a recovery for the Estate.

## 3. SUMMARY OF THE PLAN

THE FOLLOWING IS ONLY A SUMMARY. ANY PARTY CONSIDERING A VOTE SHOULD READ THE PLAN IN ITS ENTIRETY. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.

**A. The Plan keeps the Resort renting, pays every legitimate creditor in full, and turns the Estate's claims over to a Recovery Trust.**

The Plan classifies and treats all Claims against, and Interests in, the Debtor in thirteen (13) Classes: eight (8) Classes of Secured Claims (Classes 1–8, of which Class 8 is now empty), one (1) Class of non-Insider General Unsecured Claims (Class 9), one (1) Class of Insider Unsecured Claims (Class 10), one (1) Class of Interests (Class 11), and one (1) Class of the disputed claims of PEDixon, LLC and ZPD, LLC (Class 12), and one (1) Unimpaired Class for the small secured claim of IPFS Corporation (Class 13). Administrative Claims and Priority Tax Claims are not classified and are treated separately. Each secured creditor in Classes 1 through 5 and Class 7 receives parallel treatment — adequate protection accruing at 4.8% per annum through the Effective Date and cured from recoveries, then a 360-month amortization at 6% with a five-year balloon — even though the collateral securing each differs. Class 6, the ad valorem tax claims, receives interest at the rate Florida law fixes and full payment within five years after the order for relief. Non-Insider unsecured creditors are paid in full, with interest at the federal judgment rate, in sixty monthly installments from operating revenue, and net recoveries prepay them; after the secured creditors receive what the Plan provides, every dollar of net recoveries goes to unsecured creditors until they are paid in full. I believe 6% is a market rate for a fully amortizing loan on income-producing resort units; if a secured Class rejects the Plan, the Bankruptcy Court

will decide whether the rate gives that Class the present value of its claim. *11 U.S.C. § 1129(b)(2)(A)(i)(II)*. The Effective Date occurs only after the confirmation order becomes a Final Order. (Plan §§ 1, 8.1). Where a secured creditor's entitlement is in dispute — the Mainstreet, Tamamoi, and Carton Claims, and any Dixon claim asserted as secured — the Plan proceeds as normal, but each payment it provides on that Claim is held in escrow by the Recovery Trustee until a Final Order determines whether, and how much, the creditor is owed; only then is the escrow disbursed. (Plan § 4.1(e)). Units are sold only if the Reorganized Debtor's results fall below the projections — that is, if its net operating income will not cover every Plan payment — and then over time, two or three at a time, after the peak season, at structured-sale prices, never in a forced bulk sale. The same structured-sale provision applies if the Crossroads acquisition does not occur, unless the Reorganized Debtor is meeting every Plan obligation from its own operations. (Plan § 6.12). If the Reorganized Debtor defaults and does not cure, it consents to a state-court receiver who sells the affected Units in the same structured way. (Plan § 6.13).

The Plan establishes a Recovery Trust that holds all of the Estate's Causes of Action — including the claims for preferences and fraudulent transfers, any section 549 claims the Trustee's compromise did not resolve, the claims against P.E. Dixon and, separately, against Tamamoi, LLC, and the recovery of Unit 403 —

administered to conclusion by the Chapter 11 Trustee, Lara Roeske Fernandez, as Recovery Trustee. If she declines to serve, a successor approved by the Office of the United States Trustee serves on the same terms. (Plan § 6.3). Any claim the Recovery Trustee declines — because she judges its merits insufficient or its prosecution not economically efficient — reverts to the Reorganized Debtor, which decides whether to pursue it; its net proceeds still flow through the Plan's waterfall. (Plan § 6.11). Her statement that she will not pursue usury against Tamamoi and Carton (Docs. 424, 425 n.2) operates as such a declination. The Plan appoints the Recovery Trustee as the representative of the Estate under section 1123(b)(3)(B) to retain and enforce those claims (Plan § 6.10), and it preserves section 502(d): no Claim of an entity that received an avoidable transfer is Allowed, and no distribution is made on it, until that entity pays or turns over what it received, while the payments the Plan provides on that entity's Secured Claim wait in escrow (Plan §§ 4.1(e), 7.4). The Recovery Trust is funded from the balance of the Lender's settlement payment that the Trustee holds under the compromise order — approximately $146,000 after the $204,000 roof payment — to the extent the Bankruptcy Court determines that no secured creditor's lien attaches to it, and otherwise from the Reorganized Debtor's net operating revenue. My earlier statement funded the Recovery Trust from an $880,000 turnover of post-petition funds by P.E. Dixon; that turnover did not occur, and the Plan no

longer depends on it. The net proceeds of the Recovery Trust flow through the Plan's waterfall to cure secured-creditor defaults and to pay unsecured creditors.

**B. Thirteen Classes hold the claims and interests; the Dixon, Tamamoi, and Carton Classes do not vote, because section 502(d) bars them.**[1]

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Jetton Investments, Inc. / Paul Rene, Jr. | Impaired | Yes |
| 2 | Mainstreet Community Bank (Loan One) | Impaired | Yes |
| 3 | Mainstreet Community Bank (Loan Two) | Impaired | Yes |
| 4 | Tamamoi, LLC | Impaired | No — § 502(d) |
| 5 | Carton Family Trust of 1992 | Impaired | No — § 502(d) |
| 6 | Ad valorem taxes (Tax Collector and certificate holders) | Impaired | Yes |
| 7 | Cape Crossing Townhomes Homeowners Association, Inc. | Impaired | Yes |
| 8 | Cape Crossing Condominium Association — claim withdrawn (Doc. 393) | No Claim | No |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Yes |
| 10 | Insider Unsecured Claims | Impaired | Yes |
| 11 | Interests in the Debtor | Impaired | Yes |
| 12 | PEDixon, LLC (Claim 67) and ZPD, LLC (Claim 68) — disputed | Impaired | No — § 502(d) |
| 13 | IPFS Corporation (Claim 70-1) — secured portion | Unimpaired | No (deemed to accept) |

[1] The Chapter 11 Trustee has objected to many of the claims in this case. (Docs. 392, 409–412, 416, 419–421, 424, 425). I have not yet assessed the validity of each objection. Until the Trustee's objections are resolved, the holders of those claims are not entitled to vote unless the Bankruptcy Court temporarily allows their claims for that purpose. Fed. R. Bankr. P. 3018(a).

**C. Every legitimate creditor is paid in full on its Allowed Claim, and the disputed Dixon claims receive nothing unless a Final Order allows them.**

The treatment of each Class is summarized below and set forth in full in Article 4 of the Plan. The dollar amounts shown are the amounts asserted in the filed proofs of claim or, where noted, the judgment, the Trustee's filings, or the Debtor's Schedules; they are not admissions, and many Claims are disputed and subject to objection and reduction.

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| Admin / Priority | Trustee & professional fees; § 1930 fees; tax claims | Paid in full under § 1129(a)(9); priority tax claims over 5 years; IRS/FDOR claims disputed and may be reduced to zero. |
| 1 — Jetton | $1,634,600.00 (Claim 69: $1,468,484.37 secured, $166,115.63 unsecured); senior mortgage on the land | Lien retained; 4.8% adequate protection; 360-month amortization at 6%; 5-year balloon. Treated as undersecured. Trustee's objection pending (Doc. 416). |
| 2 — Mainstreet One | $3,611,594.47 principal (Claim 64-1; asserted total exceeds $4,793,000) | Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured treatment (6%, 360 months); payments held in escrow until then. Stay relief (Doc. 183) ends on the Effective Date. |
| 3 — Mainstreet Two | $712,105.80 principal (Claim 63-1; asserted total exceeds $920,000) | Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured treatment (6%, 360 months); payments held in escrow until then. Stay relief (Doc. 183) ends on the Effective Date. |
| 4 — Tamamoi | $3,378,797.64 (Claim 65-1; final judgment entered May 18, 2026; 8 units) | Judgment superseded; it may not be enforced by sale (Docs. 135 ¶ 3, 361). Claim fixed in a claim proceeding; I |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| | | contend no more than $227,000, the amount on the face of the mortgage, on any Unit, and no interest (Fla. Stat. §§ 687.03, 687.04, 687.071(7)). To the extent Allowed: Lien allowed on its Units; common secured treatment (6%, 360 months); payments held in escrow until then. Trustee objects only to any deficiency (Doc. 424). |
| 5 — Carton | $383,505.45 (Claim 66-1; townhome Unit 8-104) | Same terms as Tamamoi. Trustee objects only to any deficiency (Doc. 425). |
| 6 — Ad valorem taxes | $478,289.67 (Claims 8–62): Tax Collector $312,465.91 (2024 and 2025 taxes, 18%); certificate holders $165,823.76 (Keys Funding, ATCF II, FIG 20, Community Red Co); tax-deed applications pending on Units 305, 402, 404 | Paid in full with interest at the rate applicable nonbankruptcy law fixes for each claim (18% on the Tax Collector's claims; the certificate rate on each certificate), in equal monthly installments completed by May 21, 2031, five years after the order for relief; balance paid at any sale or refinancing of the Unit. 11 U.S.C. §§ 511(a), 1129(a)(9)(C)–(D). No tax-deed application proceeds while payments are current. Assessments contested as 25–30% over fair market value. |
| 7 — Townhomes HOA | $118,731.84 (Claim 6-1) | Full Allowed Claim paid from recoveries; subject to Estate negligence/waste claims (up to $125,000/unit). |
| 8 — Condominium Assoc. | Claim 7 withdrawn September 18, 2026 (Doc. 393) | No Claim; no distribution. The $204,000 roof payment under Doc. 379 resolved the Association's special assessment. |
| 9 — Unsecured (Non-Insider) | $809,344.44 filed (IMQA, CTO, Tiered, WM, Amodeo); Trustee objections pending to all but mine | 100% of Allowed Claims with interest at the federal judgment rate, in 60 monthly installments from operating revenue (Ex. B); net recoveries prepay. Shares pro rata with any Class 12 claim Allowed as unsecured. |
| 10 — Insider Unsecured | Johnson, Claim 5-2, $2,594,987.93; Trustee seeks recharacterization (Doc. 412) | Paid only after Classes 1–9 satisfied and $1,000,000 improvement reserve funded; then pro rata in remaining recoveries. |
| 11 — Interests | Horton S. Johnson (units held in the so-called | Interest retained; Mr. Johnson controls the Reorganized Debtor at exit; no distribution |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| | Tiered Land Trust, to be returned to him) | on the Interest until senior Classes are satisfied. |
| 12 — PEDixon / ZPD | $4,779,864.58 (Claim 67) and $1,380,166.67 (Claim 68); objected to by the Trustee (Docs. 419, 420) and by me | Disputed. Nothing unless Allowed by Final Order; § 502(d) bars allowance until any avoidable transfer is returned. An Allowed Secured Claim receives the common secured treatment; an Allowed Unsecured Claim shares pro rata with Class 9. |
| 13 — IPFS | $1,231.54 (Claim 70-1; $1,118.79 secured, $112.75 unsecured); Trustee objection (Doc. 392) | Unimpaired. Allowed Secured Claim paid in full in Cash within 30 days after the Effective Date; any unsecured part is in Class 9. |

The Debtor scheduled the claims of P.E. Dixon (KAE) and ZPD, LLC at $0.00 and marked each disputed, contingent, and unliquidated. On July 30, 2026, PEDixon, LLC filed Claim 67 for $4,779,864.58, asserting that all of it is secured by a recorded purchase option and right of first refusal, and ZPD, LLC filed Claim 68 for $1,380,166.67. Each claim rests on the assertion that the Debtor guaranteed the September 14, 2023 consolidated loan to Tiered Capital. (Docs. 419 ¶¶ 5–7, 420 ¶¶ 5–6). On October 1, 2026, I moved for leave to object to both claims and tendered my objection, and on October 2, 2026, I moved to disallow both under section 502(d). (Doc. 423). On October 2, 2026, the Trustee objected to both claims; she declines to concede that the loan agreement is enforceable, faults the claims for failing to account for value already collected, and states that they may be unenforceable under the Bankruptcy Code and Florida law. (Docs. 419 ¶¶ 17–19, 420). I contend that no court may enforce the Dixon-related claims, because the

The non-Insider unsecured claims filed in Class 9 include those of IMQA Investments Incorporated ($360,459.40), CTO Holdings, Inc. ($303,853.79), Tiered Capital, Inc. ($125,000.00), WM Holdings Group, LLC ($19,635.25), and mine ($396.00), totaling $809,344.44. (Docs. 409 ¶ 5, 410 ¶ 5, 411 ¶ 5, 421 ¶ 5). Class 9 also takes any part of Mr. Rene's Claim 69 allowed as unsecured ($166,115.63 asserted) and any deficiency on the Tamamoi or Carton claims that section 1111(b)(1)(A) requires the Plan to treat as unsecured. (Plan §§ 4.2, 4.4). The Trustee has objected to every filed Class 9 claim except mine. If her objections succeed, Class 9 shrinks, and each remaining holder's recovery is unaffected, because the Plan pays Allowed Class 9 Claims in full with interest. Until the Class 12 claims are resolved, the Recovery Trustee will hold back from each Class 9 distribution the share those claims would take if allowed as unsecured. (Plan § 7.3). The Trustee also objects to Mr. Johnson's Class 10 claim of $2,594,987.93 and asks that it be recharacterized as equity (Doc. 412 ¶¶ 20–22), and to Mr. Rene's Class 1 claim (Doc. 416). Exhibit D lists every filed claim, its amount, its Class, and any objection.

**D. The Recovery Trust holds about $2.9 million in identified claims, and the Estate collects on them whichever position the Trustee takes.**

The Recovery Trust holds every Cause of Action of the Estate. The identified recoveries, each with its verification path, are these. First, the balance of

the Lender's $350,000 settlement payment that the Trustee holds under the compromise order — approximately $146,000 — to the extent the Bankruptcy Court determines that it is unencumbered. (Doc. 379 ¶¶ 3–5). Second, transfers to the Dixon lenders, which I estimated at approximately $1,400,000 before the Rule 60 motions were denied. Because the reach-back periods now run from September 2, 2025, the forensic accounting now underway will restate that figure, and it may be lower. I plead the transfers in the alternative: if PEDixon and ZPD were creditors, as their own Claims 67 and 68 assert, the transfers within one year before the petition are preferences, because the Bankruptcy Court found them insiders (Doc. 256 at 22:6–8; 11 U.S.C. § 547(b)(4)(B)); if they were not creditors, the same transfers bought the Debtor nothing and are avoidable as fraudulent transfers (11 U.S.C. §§ 544(b), 548; Fla. Stat. ch. 726). Third, the $1,166,008.69 the Debtor paid from its own account between March 2021 and November 2023 to Tamamoi, LLC, FDRE, Inc., and two affiliates, and the $129,556.52 it paid to the Carton Family Trust. Neither claimant has accounted for the payments that passed between it and FDRE, its servicing agent; that accounting determines the rate actually charged, and I believe it will exceed 25 percent, making the debt unenforceable. *Fla. Stat. § 687.071(7).* On the face of the Tamamoi judgment, the rate is 18.27 percent a year, above the civil ceiling. *Fla. Stat. § 687.03(1).* A lender who willfully charges more forfeits all interest and must repay double the interest

paid. *Fla. Stat. § 687.04.* The Trustee says the Estate lacks standing to raise usury because the Debtor is not an obligor (Docs. 424, 425 n.2). If that is right, the Debtor paid $1,295,565.21 on debts it did not owe, and the Estate may recover those payments to the extent they exceeded the value the Debtor received; forfeited interest reduced no enforceable lien. Part of this recovery may come as a credit against the Tamamoi and Carton claims rather than as cash; a credit reduces what the Plan pays those Classes but does not fund distributions. Fourth, the recovery of Unit 403, which Crescent Sound transferred from the Debtor to the IAM Irrevocable Trust in March 2024, under Fla. Stat. ch. 726 and sections 544(b), 548, and 550, and through the pending, stayed appeal of the circuit court's ruling; net of the liens against it, its return adds a minimum of $183,000 in equity, and more likely $250,000 to $300,000. Fifth, the Estate's own tort and contract claims against various parties, described in Section 2, which remain unquantified; whatever they produce flows through the same waterfall. Exclusive of the held settlement balance and the unquantified claims, the itemized recoveries total approximately $2,878,565, against approximately $3,758,000 in my earlier statement; the difference is the $880,000 turnover that did not occur. Litigation of this kind takes time: I expect the avoidance claims to take one to three years to resolve or settle, and the Recovery Trustee may engage counsel on a contingent fee, which would reduce net recoveries by that fee. The Plan does not depend on

recoveries to pay the amortized installments or Class 9; recoveries cure arrearages and prepay.

**E. Governance proceeds in two stages: the Trustee now, and Mr. Johnson, the Debtor's owner, at exit.**

Governance under the Plan is staged, and no stage returns the Debtor to the hands that emptied it. While the case proceeds to conclusion, the Debtor remains under the direction and control of the Chapter 11 Trustee, and the Plan proposes the appointment of a committee of unsecured creditors under section 1102 to monitor operational performance and assist Ms. Fernandez. As of the date of this Disclosure Statement, no committee has been appointed. On the Effective Date, Mr. Johnson, the Debtor's owner, controls the Reorganized Debtor and will oversee a professional management company engaged to run the resort day to day and will be responsible for effectuating the Plan. Mr. Johnson will receive compensation commensurate with the time he actually spends managing the Reorganized Debtor, at the market rate for an executive manager of a limited liability company, paid from the Reorganized Debtor's revenues. Who manages the combined enterprise after the Debtor acquires the Crossroads assets will be determined when that acquisition occurs. Ms. Fernandez continues as Recovery Trustee, administering the Recovery Trust to its conclusion with authority to retain professionals and to settle or decline claims, subject to such Bankruptcy Court

approval as may be required; a successor approved by the Office of the United States Trustee serves if she does not, and claims she declines revert to the Reorganized Debtor. The Class 11 Interest holder retains the Interest subject to this structure and receives nothing on account of it until every senior Class is satisfied.

Section 1129(a)(5) requires disclosure of who will manage the Reorganized Debtor and on what terms. Horton S. Johnson will serve as managing member of the Reorganized Debtor and will run it. He will be compensated commensurate with the time he actually spends managing the Reorganized Debtor, at the market rate for an executive manager of a limited liability company, paid from the Reorganized Debtor's revenues. The Reorganized Debtor will engage a professional vacation-rental management company, which I will identify before the Confirmation Hearing, at a fee of 20 percent of gross rental revenue, the figure Exhibit B uses. I will receive no compensation from the Debtor, the Reorganized Debtor, or the Recovery Trust, and I have no agreement for compensation with Mr. Johnson, Tiered Capital, IMQA, or anyone else in connection with the Plan. No one is paying for the preparation of the Plan. I prepared it to see my own $396 claim paid, and that is my only stake in it.

## 4. CONFIRMATION OF THE PLAN

### A. The Plan satisfies the best-interests test because liquidation pays unsecured creditors nothing.

A Chapter 7 liquidation sells all twenty-six Units at once, into the same small market, in one forced sale, and twenty-six units of one resort dumped on that market at once drive every price down. The Plan sells nothing in haste. For the last five years the Units' vacation rentals have paid their maintenance and the service of their proper debt — except during the thirty months when the Dixon lenders took a disproportionate share of the rents, usually all of them and sometimes more than all of them, by leaving the utilities and maintenance unpaid. A structured sale, timed to the market, realizes values a forced liquidation cannot, and that difference alone satisfies the best-interests test. Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either accept the Plan or receive at least as much as it would in a Chapter 7 liquidation. Exhibit C works the liquidation pool by pool. The secured creditors already hold stay relief and in a Chapter 7 case would complete their foreclosures; the Trustee herself states that no Unit sale proceeds would reach a Chapter 7 estate. (Doc. 395 at 16). Exhibit C values the twenty-six Units the Debtor holds three ways, using the September 1, 2026 valuation of Gary A. Moll, CPA, ASA (Ex. A ¶¶ 9, 14), scaled from twenty-seven Units to twenty-six and allocated by each Unit's 2025 just value, and it charges each collateral pool with its taxes, its share of the senior Jetton mortgage,

its own mortgage as asserted, and the townhome association lien. At the auction value ($9.5 million) and at Moll's low portfolio value ($11.1 million), every pool is under water, and nothing reaches unsecured creditors from the Units. Only at Moll's high value ($17.3 million) would equity appear, about $4.4 million; that value rests on rental assumptions Mr. Moll identifies as above the market average (*Id.* ¶¶ 3, 12, 43) and describes the going concern the Plan creates, not a foreclosure. Whatever the value, the Plan pays Allowed Class 9 Claims in full with interest, and no Chapter 7 distribution can exceed full payment with interest at the legal rate. *11 U.S.C. § 726(a)(5)*. Every Class 9 holder therefore receives at least its Chapter 7 share, as does any Class 12 claim Allowed as unsecured. A Chapter 7 trustee would also hold the Causes of Action, but would prosecute them net of Chapter 7 administrative costs and commissions. The Plan therefore satisfies the best-interests test.

The following table compares the estimated recoveries under the Plan and under a hypothetical Chapter 7 liquidation:

| **Constituency** | **Estimated Chapter 7 Recovery** | **Estimated Plan Recovery** |
|---|---|---|
| Secured creditors (Classes 1–7) | Foreclosure under existing stay relief; at auction or Moll's low value every collateral pool is under water (Ex. C) | Paid over time at 6% with 5-year balloon; arrearages cured from recoveries |
| Non-Insider unsecured (Class 9) | None from the units; only avoidance recoveries, after Chapter 7 costs | 100% of Allowed Claims with interest (less if Class 12 is Allowed as unsecured) |

| Constituency | Estimated Chapter 7 Recovery | Estimated Plan Recovery |
|---|---|---|
| Insider unsecured (Class 10) | None | Pro rata from remaining recoveries after senior Classes |
| Interests (Class 11) | None | Retained, subject to governance and senior satisfaction |
| Disputed Lender claims (Class 12) | Disputed; any Allowed claim shares in the liquidation | Nothing unless Allowed by Final Order |

**B. The Plan is feasible: the rents that funded Mr. Dixon now fund the creditors.**

Section 1129(a)(11) requires that confirmation is not likely to be followed by liquidation or further reorganization, except as proposed in the Plan. The feasibility case rests on two changes. The rental stream that produced more than $2.8 million for Mr. Dixon during the control period is redirected to operations and debt service. And the Debtor's acquisition of the Canaveral Crossroads assets places the Resort's reservation system, name, and amenities behind the Debtor's twenty-six Units. (Plan § 6.2). Exhibit B projects every month of the Plan's five years; the table below states one plan year. It applies the $295 average daily rate at which an actual Cape Crossing three-bedroom townhome is marketed (Ex. A ¶¶ 27–28 & Ex. D) at 80 percent occupancy, deducts a 20 percent management fee and the Debtor's own carrying costs, and sets the result against the Plan's payments to Classes 1 through 7 and Class 9 and the United States Trustee's fees.

| **Plan Years 1–4 (2027–2030) — 26 Units** | **Amount** | **Basis** |
|---|---|---|
| Occupied nights | 7,592 | 26 Units × 365 nights × 80% |
| Gross rental revenue | $2,239,640 | $295 average daily rate (Ex. A ¶¶ 27–28) |
| Management fee | ($447,928) | 20% of gross rental revenue |
| Association dues | ($326,364) | 18 condominiums at $1,170 and 8 townhomes at $767.12 a month |
| Current property taxes | ($146,952) | $471 per Unit a month, paid each November |
| Insurance, utilities, maintenance | ($119,231) | Debtor's July 2026 proforma |
| Legal, administration, bank fees | ($37,200) | $3,100 a month |
| **Net operating income** | **$1,161,965** | |
| Plan payments, Classes 1–5 and 7 | ($707,901) | Amortized installments (Plan § 4.1) |
| Plan payments, Class 6 | ($168,597) | $478,290 at 18% over 48 months (Plan § 4.5) |
| Plan payments, Class 9 | ($178,864) | $809,344 with interest (4% assumed) over 60 months (Plan § 4.7) |
| United States Trustee fees | ($16,000) | Estimated, until the case is closed |
| **Cash after payments** | **$90,603** | Year 5: $259,200, after Class 6 is paid |
| Coverage | 1.08 to 1 | Net operating income ÷ payments (Year 5: 1.29 to 1) |

The owner costs come from the Debtor's July 2026 proforma. Florida sales and tourist-development taxes, which guests pay, are excluded, and so are the payments the Plan makes from recoveries — arrearage cures, accrued adequate protection, and the Class 7 payoff. Paying Class 9 from operations raises the break-even: at the $295 rate, the Units cover every payment over the five years at about 75 percent occupancy (Ex. B, Sensitivity). Occupancy is the critical assumption.

Mr. Moll reports a Merritt Island market average of 40 to 47 percent and a top decile of 78 percent and higher, and he explains why units booked through the resort's own platform belong above the market average. (Ex. A ¶¶ 24–25, 30–32). In 2019, the resort's rental program ran its thirty-five units at 59.6 percent occupancy and roughly $190 a night; at those figures, the Units would not cover the Plan's payments. The management fee assumes the operator cost per unit the rental program incurred in 2019, about $16,800 a year, which 20 percent of the projected revenue, about $17,200 per Unit, exceeds. (Canaveral Crossing Resorts, Inc., Normalized Historical Pro Forma 2019, unaudited).

The Trustee's August 2026 operating report shows $18,661 in receipts for the month and $43,609 in cash on August 31, 2026 (Doc. 399, Part 1); the projection assumes the Units are booked through the Crossroads reservation system after the Effective Date, and it is not a forecast of the Units' performance under current management. On the Effective Date, the Allowed Administrative Claims, which I estimate at $125,000, are paid from the cash the Trustee then holds (Ex. B, Sources and Uses). The Reorganized Debtor starts with no cash of its own; the seasonal low point comes in January 2027, at about $51,000, and the Plan bridges it from the held settlement balance, to the extent the Bankruptcy Court holds it unencumbered, and from the first net recoveries of the Recovery Trust. (Plan § 6.4). Class 6 — $478,289.67 asserted — earns interest at the statutory rate,

18 percent on the Tax Collector's claims, and is paid by December 2030, which raises the Plan's early debt service; Exhibit E lists every Class 6 claim. At month sixty, the balloon balance of Classes 1 through 5 and 7 is about $9,156,000. Refinancing it at 65 percent of value requires a value of about $14.1 million for the twenty-six Units, inside Mr. Moll's range of $11.1 million to $17.3 million for those Units, and a refinancing at 6 percent over thirty years would cost about $659,000 a year against projected net operating income of $1,162,000, coverage of 1.76 to 1. (Ex. B, Balloon Test). The alternative is a going-concern sale of the Units. On these bases, the Plan is feasible, subject to the risks Section 5 describes.

**C. The Plan subsumes the Trustee's sale program: the Units stand ready for orderly sale, two or three at a time, and are sold to reduce principal whenever the Reorganized Debtor misses its numbers.**

The Trustee proposes to sell all twenty-six Units now, through brokers or an auctioneer. (Doc. 395 at 13–17). At the October 14, 2026 hearing, I said that the Plan could subsume the Trustee's plan, and the parties did not know what that meant. It means this: the Plan keeps the Trustee's sale program and places it beneath the Reorganized Debtor. On the Effective Date, the Reorganized Debtor arranges an orderly sale process for the Units, and Ms. Fernandez, as Recovery Trustee, conducts any sale through the brokers she selects. While the sale process stands ready, the Reorganized Debtor operates the Units, and the Plan measures its results against the projections of Exhibit B. If at any time its revenues and net

operating income fall short of those projections — if they will not cover every Plan payment — the Recovery Trustee sells Units two or three at a time, at fair market value, and the net proceeds reduce the principal of the secured Claims on the Units sold. The same applies if the Crossroads acquisition does not occur, unless the Reorganized Debtor is meeting every Plan obligation from its own operations. (Plan § 6.12).

The secured creditors bear no risk from this structure. Each receives the full amount of its Allowed Secured Claim, reamortized at a commercially reasonable rate — six percent over 360 months — and keeps its Lien until it is paid. That is everything a secured creditor could collect in foreclosure: its debt, from its collateral, and nothing more. When a secured class does not accept a plan, the Bankruptcy Code asks exactly that — that the holder keep its lien and receive deferred cash payments totaling at least the allowed amount of its claim and worth, on the effective date, at least the value of its collateral — and the Plan meets it. *11 U.S.C. § 1129(b)(2)(A)(i)*. If the business misses its numbers, the structured sales pay down principal at full value, without the cost, delay, and discount of a forced sale. Units sold two or three at a time, in season, bring substantially more than the same Units sold at foreclosure, at auction, or in bulk. The Trustee's plan sells everything at once; the Plan sells only what the numbers require, when the market will pay for it. The two plans share the same sale mechanism and differ only in

whether the going concern first has the chance to pay every creditor in full. Every creditor does better under the Plan, and none bears more risk than it bears under the Trustee's sale.

**D. The tax and townhome Classes will accept, and the Plan meets the cramdown standard for any Class that does not.**

An Impaired Class of Claims accepts the Plan if holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in that Class that vote, vote to accept. Class 6, which the Plan pays in full at the statutory rate, and Class 7, which the Plan pays in full from recoveries, are Impaired Classes of non-Insiders that I expect to accept. *11 U.S.C. § 1129(a)(10)*. If any Impaired Class does not accept, I will request confirmation under section 1129(b), which permits confirmation so long as the Plan does not discriminate unfairly and is fair and equitable as to each non-accepting Impaired Class. The absolute priority rule does not help a creditor whose Claim is disallowed under section 502(d) because it has failed to turn over to the Estate what it owes: that creditor holds no Allowed Claim, and the rule protects only the holders of Allowed Claims in a dissenting Class. *11 U.S.C. §§ 502(d), 1129(b)(2)(B).*

**5. RISK FACTORS**

Holders should weigh the following risks in deciding how to vote. First, the Plan's funding of arrearage cure and unsecured distributions depends substantially

on recoveries from the Causes of Action, the timing and amount of which are uncertain and subject to litigation risk. Second, several Claims are disputed; the outcome of claim objections (including the usury challenges to the Tamamoi, Carton, and Dixon claims) will affect distributions. Third, the five-year exit depends on the availability of refinancing or a going-concern sale on acceptable terms, which is subject to market and interest-rate conditions. Fourth, the vacation-rental business is seasonal, creating periodic liquidity stress; the Reorganized Debtor starts with no cash reserve beyond the held settlement balance, Exhibit B shows a low point of about $51,000 in January 2027, and a slow season before the first recoveries arrive could leave installments unfunded. Fifth, the consolidation strategy contemplates the Debtor's acquisition of the assets of Canaveral Crossroads, LLC, now a Chapter 11 debtor, which is not assured; Mr. McPhillips has refused any combination with the Debtor (Doc. 328 ¶ 3), and the Plan no longer contemplates one. If the Crossroads acquisition does not occur, the Plan's structured-sale provision applies unless the Reorganized Debtor meets every Plan obligation from its own operations. Sixth, I am a pro se proponent with the history disclosed in Section 1.A; creditors who discount my judgment should weigh the Plan's arithmetic, which does not depend on it. Seventh, the Class 12 claims of PEDixon and ZPD total $6,160,031.25; if a Final Order allows them in substantial part, the identified recoveries will not pay Class 9 in full. Eighth, on October 19,

2026, the Trustee and the Lender will attend a judicial settlement conference, and a settlement of the Lender's claims, if approved, could reduce the recoveries this Disclosure Statement projects. Ninth, the Trustee has proposed a competing plan of liquidation, and the Bankruptcy Court may confirm only one plan. *11 U.S.C. § 1129(c)*. Tenth, Mainstreet holds relief from the automatic stay (Doc. 183 ¶ 2); a foreclosure sale of its Units before the Effective Date would remove them from the Plan. Eleventh, the projection in Section 4.B assumes 80 percent occupancy, well above the resort's 59.6 percent in 2019 and the Merritt Island average; it depends on the Crossroads acquisition and new management, and below about 75 percent occupancy at $295 the Units do not cover the Plan's payments, including Class 9, over the five years. The Trustee's August 2026 receipts were $18,661. Twelfth, the Plan takes effect only when the confirmation order is final, so an appeal would delay every payment the Plan provides. Thirteenth, the Recovery Trustee has stated that she will not pursue usury against Tamamoi and Carton; those claims revert to the Reorganized Debtor, which may or may not pursue them. Fourteenth, the Class 9 reserve for the Class 12 claims withholds about 88 percent of each Class 9 distribution until those claims are resolved. Fifteenth, payments on the disputed secured Claims are held in escrow until a Final Order fixes each Claim; those creditors receive nothing in hand until then. The value the Plan preserves outweighs these risks, and a liquidation preserves none of it.

## 6. ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, the alternatives are (a) confirmation of the Trustee's plan of liquidation (Doc. 394), which sells all twenty-six Units and pays unsecured creditors only from what remains after administrative expenses, priority claims, and the secured claims (Doc. 395 at 16); (b) conversion of the case to Chapter 7; or (c) a going-concern sale under section 363. For the reasons set forth in the liquidation analysis, a Chapter 7 liquidation would yield materially lower recoveries to creditors than the Plan, particularly for unsecured creditors, and would impair the prosecution of the Estate's Causes of Action.

## 7. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The federal income tax consequences of the Plan may vary among holders, and this Disclosure Statement does not constitute tax advice. The Debtor. The Debtor is a limited liability company. If, as I understand, it is taxed as a partnership or disregarded entity, it pays no federal income tax itself, and any income — including cancellation-of-debt income from the reduction or disallowance of a claim — passes through to its member, who reports it and may be able to exclude it under 26 U.S.C. § 108 depending on the member's own circumstances. The Plan does not discharge or reduce the Allowed amount of any Claim it pays in full. The Recovery Trust. The Plan intends the Recovery Trust to be treated as a grantor trust for the benefit of holders of Claims entitled to distribution, so that its income

is taxed to those holders rather than to the trust; the Recovery Trustee will file returns consistent with that treatment. Holders. A holder receiving payment of a Claim generally recognizes income to the extent the payment exceeds the holder's tax basis in the Claim, and interest paid on a Class 9 Claim is ordinary income. Each holder is urged to consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

**8. RECOMMENDATION**

The Plan pays legitimate creditors in full or nearly so, preserves the Cape Crossing Resort as a going concern, and converts the architects of the Debtor's insolvency from its controllers into its funding source. No alternative before the Bankruptcy Court does any of the three. The arithmetic, not the advocate, makes the case. Vote to accept the Plan.

Respectfully submitted this 19th day of October, 2026.

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32809@gmail.com
*Plan Proponent, pro se*

**Certificate of Service**

I certify that on October 19, 2026, I filed my Second Amended Disclosure Statement, together with my Second Amended Plan of Reorganization and the notice of filing redlines in person with the Clerk of Court. As a pro se litigant, I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; her counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States Trustee.

Frank L. Amodeo, Pro se

# EXHIBIT A

Expert Report of Gary A. Moll, MBA, CPA, ASA

Valuation of the Debtor's Twenty-Seven Cape Crossing Resort & Marina Units

September 1, 2026

FERGUSON-MOLL

Consulting, LLC

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re: Homemakers Real Estate, LLC,
Debtor.
Case No. 6:25-bk-05570-GER · Chapter 11

# Expert Report of Gary A. Moll, MBA, CPA, ASA
## Valuation of the Debtor's Twenty-Seven Cape Crossing Resort & Marina Units

September 1, 2026

## I. INTRODUCTION AND PURPOSE

1. I, Gary A. Moll, and Ferguson-Moll Consulting, LLC, were engaged by counsel in connection with In re Homemakers Real Estate, LLC, Case No. 6:25-bk-05570-GER, pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, to determine the fair market value of twenty-seven residential resort units at Cape Crossing Resort & Marina, Merritt Island, Brevard County, Florida: the twenty-six units to which the Debtor holds title of record, and one additional unit whose December 2025 transfer is disputed and which counsel advises is expected to be returned to the estate in this proceeding (together, the "Units").

2. Counsel has advised that this opinion will be used in connection with plan and adequate-protection issues in the Chapter 11 case and in connection with a contemplated sale or auction of the Units. I therefore state a fair market value conclusion first, and I then state separately what an auction of the Units should be expected to realize, because the two are not the same number and should not be presented as if they were.

3. Counsel instructed me to apply an average daily rate of $295 and an annual occupancy of 90 percent to the Units' vacation-rental operation, and to develop the value by a multiple of income and by capitalization of net operating income. I have applied those two assumptions as instructed, I identify them as instructed assumptions everywhere they operate, and I test each of them against the market data summarized in this report. Where an instructed assumption is more favorable than the market data, I show the result on market data as well, so that the sensitivity of the conclusion is disclosed rather than left to be discovered.

4. This report states the property analyzed, the market data considered, each computation in order, and the conclusion, followed by my compensation, the limiting conditions, and my qualifications.

## II. QUALIFICATIONS

5. I am a licensed certified public accountant in Florida and Ohio and the Managing Director of Ferguson-Moll Consulting, LLC. I hold the Accredited Senior Appraiser designation of the American Society of Appraisers and am an Accredited Senior Member of that Society. I hold a B.S. in Accounting from the University of Maryland and an M.B.A. from The Ohio State University, and I have more than thirty years of experience in valuation, forensic accounting, and the analysis of income-producing businesses and business interests. My curriculum vitae, including my testimony during the preceding years, is attached as Exhibit B.

6. Ferguson-Moll Consulting, LLC is compensated on an hourly basis for my work in this matter. No part of the firm's compensation is contingent on the conclusions reached or on the outcome of this proceeding.

## III. SCOPE OF REVIEW AND DOCUMENTS CONSIDERED

7. I considered the description of the Units provided by counsel, including counsel's advice that the Debtor has preferred or exclusive access to the Cape Crossing resort intellectual property and direct-booking website; publicly available information published by the resort and by real-estate brokerages concerning Cape Crossing Resort & Marina, including

portfolio. The spread between the two multiples is the divergence described at paragraph 9, restated in income terms.

12. The instructed assumptions, tested. The instructed $295 average daily rate is 12 to 23 percent above the Merritt Island market-average rate of $239 to $263 and below the $392 and higher achieved by the top decile of the market — a defensible premium for institutional-quality waterfront resort product. The instructed 90 percent occupancy is roughly double the market average of 40 to 47 percent and above the 78 percent that defines the top decile. Their product, revenue per available night of $265.50, is approximately 2.4 times the market-average $108 to $112 and somewhat below the top-decile floor of approximately $306. The instructed combination therefore asks all twenty-seven Units to sustain top-decile performance year-round. That assumption is what the high end of the range rests on; Section IX states the Debtor-specific reason — preferred or exclusive access to the resort's brand, intellectual property and direct-booking website — that the Units belong at the top of the occupancy distribution rather than at its average, and Exhibit C quantifies the value at every occupancy from 50 to 90 percent.

13. Value on market data alone. If the market-average inputs are used instead of the instructed assumptions — $239 average daily rate at 47 percent occupancy — gross revenue is $1,107,012, net operating income is $608,857, and the income indication at 8.0 percent is $7,610,709. That figure sits below the sales-comparison indication, and a seller able to list the Units individually would not accept it; it marks the floor of the income evidence, not of value. Its significance is that the low end of the concluded range does not depend on rental performance at all — it is supported by the resale market for the Units themselves.

14. Auction. Fair market value assumes reasonable exposure to the market and a willing, unpressured seller. A court-supervised auction compresses exposure and signals compulsion, and bulk offerings of residential units historically clear at 75 to 85 percent of aggregate fair market value; the supporting studies are cited at Section XV and in Exhibit A. Applied to the ends of the concluded range, an orderly, properly noticed auction should be expected to realize approximately $8,700,000 to $9,900,000 if the evidence places value at the sales-comparison end, and approximately $13,500,000 to $15,300,000 if it places value at the income end; a compressed or poorly marketed auction, less.

## V. THE PROPERTY

15. Cape Crossing Resort & Marina is a waterfront resort community at 201 Ivory Coral Lane, Merritt Island, Brevard County, Florida, on the Canaveral Barge Canal, with direct boat access to the Indian River and the Banana River and, through the Canaveral Lock, to Port Canaveral and the Atlantic. The resort was built between 2017 and 2020.

16. The resort's accommodations are condominium units — predominantly three-bedroom, two-bath floor plans of approximately 1,169 to 1,451 square feet, with four-bedroom, three-bath plans of approximately 1,896 square feet on premium floors — and three-bedroom townhome units of approximately 1,483 to 1,895 square feet with garages. The Units at issue comprise twenty-seven of these: the twenty-six held of record — eighteen condominium units and eight townhome-building units — and Unit 403, the 1,266-square-foot condominium unit expected to be returned to the estate, as described at paragraph 8.

17. Resort amenities include a clubhouse with fitness center, a heated swimming pool, hot tub and sauna, a full-service marina with thirty-one boat slips and a community boat launch, pontoon and kayak rentals, and the Dolphins Waterfront Bar & Grill restaurant and tiki bar. The resort operates an on-site rental management program, and the community carries no daily-rental restriction — units may be rented nightly, which is the use valued here.

18. Demand drivers for the location are the Kennedy Space Center and the commercial launch schedule at Cape Canaveral, the cruise operations at Port Canaveral, the Atlantic beaches at Cocoa Beach, and the Orlando attractions approximately one hour away. These drivers support a year-round vacation-rental market rather than a single-season market.

## VI. DEFINITION OF VALUE AND METHODOLOGY

19. Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, with the property exposed to the market for a reasonable period.

20. The Units are income-producing property acquired and held for their vacation-rental income. The income approach is therefore the primary approach, applied two ways as counsel requested: direct capitalization, in which one year's stabilized net operating income is divided by a market capitalization rate; and a gross income multiple, in which annual gross rental revenue is multiplied by a factor derived from the relationship between price and revenue for comparable income-producing units.

21. The computation proceeds in four steps: gross annual rental revenue from average daily rate, occupancy, and unit count; deduction of operating expenses at a market-derived ratio to reach net operating income; capitalization of net operating income at a supported rate; and corroboration by the gross income multiple and by the asking prices of units currently offered within the resort. Each step is stated separately below so that any input the Court or a reviewer prefers can be substituted and the arithmetic re-run.

## VII. THE MERRITT ISLAND SHORT-TERM RENTAL MARKET

22. Two independent booking-platform datasets describe the Merritt Island short-term-rental market. The AirROI dataset for the twelve months ending July 2026 reports 272 active listings, an average daily rate of $263, occupancy of 40.3 percent, revenue per available night of $108, and average annual revenue per listing of $28,424. The Rabbu dataset as of April 2026 reports 157 active listings, an average daily rate of $239, occupancy of 47 percent, and average annual revenue per listing of $26,868, with three-bedroom listings — the modal product, and the subject's — averaging $31,379.

23. The market is seasonal but not single-season: March is the peak month at 65.3 percent occupancy and a $300 average daily rate, and September the trough at 31.5 percent and $236. Merritt Island occupancy trails the Florida state average of 54 percent.

24. Performance within the market is widely dispersed. The top ten percent of Merritt Island listings achieve occupancy of 78 percent and higher at average daily rates of $392 and higher — monthly revenue of $6,869 and up — while the median listing runs 39 percent occupancy at $225. The dispersion matters here because the subject is not a median

listing: it is a purpose-built waterfront resort with a marina, restaurant, pool and clubhouse, operated by an on-site professional manager under a single brand with its own direct-booking channel. Assets of that description populate the upper tiers of the distribution, not the middle.

## VIII. REVENUE: THE INSTRUCTED ASSUMPTIONS AND THE MARKET

25. Counsel instructed an average daily rate of $295 and occupancy of 90 percent. Table 1 sets the instructed assumptions against the market data.

| Measure | Instructed | AirROI (TTM Jul 2026) | Rabbu (Apr 2026) | Top decile (AirROI) |
|---|---|---|---|---|
| Average daily rate | $295 | $263 | $239 | $392+ |
| Occupancy | 90% | 40.3% | 47% | 78%+ |
| Revenue per available night | $265.50 | $108 (published) | $112.33 | $305.76+ |

26. The instructed rate is 12 to 23 percent above the market-average rate and below the top-decile rate — a premium consistent with the subject's position as purpose-built waterfront resort product in a market averaged over individually hosted homes. The instructed occupancy is roughly double the market average and above the top decile. Neither input should be evaluated alone, because rate and occupancy are jointly managed — a professional operator prices to fill. The economically meaningful figure is their product, revenue per available night: $265.50 as instructed, against a market average of $108 to $112 and a top-decile floor of approximately $306. The instructed combination therefore prices the Units at sustained top-decile performance — attainable for the best resort product in the submarket, but an assumption that all twenty-seven Units maintain that performance year-round, which the published market data cannot verify one way or the other without the Units' own operating history.

27. On the instructed assumptions, each unit produces $295 × 365 nights × 90 percent = $96,907.50 of gross annual rental revenue — $96,908 rounded — and the twenty-seven Units produce $2,616,502. I note that $96,908 per unit exceeds the $82,428-and-higher average annual revenue of the top decile of Merritt Island listings: the instruction places every Unit at or above roughly the ninetieth percentile of the market.

28. The $295 daily rate is separately supported by the published rate evidence for the resort itself, collected at Exhibit D. An actual Cape Crossing three-bedroom, sleeps-eight townhome is currently marketed at an average of exactly $295 per night. The resort's hotel listing publishes an average nightly range of $163 to $362 for a standard room, seasonal monthly averages run from $186 in June to $351 in February with day-of-week averages to $447, and the subject three-bedroom product prices in the upper portion of those bands. Against that evidence $295 is a mid-band annual average for the subject unit type, not a peak rate.

29. Because the 90 percent occupancy input is above any published market average I reviewed, Exhibit C states the value at every occupancy from 50 to 90 percent, and paragraph 13 above states the value on market-average inputs. The conclusion should be read with that sensitivity in hand — and with the structural fact set out in the next section,

which is the reason the market averages understate what these particular Units should achieve.

## IX. OCCUPANCY AND THE DEBTOR'S ACCESS TO THE RESORT PLATFORM

30. The market-average occupancy of 40 to 47 percent describes a population of individually hosted listings — 272 of them in the AirROI dataset — each competing for third-party platform traffic under no brand of its own. The tiers within that population show what channel and product quality do to occupancy: the top decile of the same market sustains 78 percent and higher. Branded lodging with a direct booking channel runs materially above the independent-listing average as a class — branded U.S. hotels ran 68.2 percent occupancy in July 2025 (STR/CoStar), against the 40.3 percent average of Merritt Island's anonymous listings in the same period.

31. Counsel advises that the Debtor has preferred or exclusive access to the Cape Crossing resort intellectual property — the Cape Crossing name and brand and the resort's direct-booking website, capecrossing.com. The consequence for occupancy is structural, not cosmetic. The Units are not twenty-seven listings among 272: they are the inventory the resort itself sells. Demand that arrives on the resort's brand — direct web bookings, repeat guests, referrals from the marina, the restaurant and event traffic, group and wholesale business — lands on these Units first and, to the extent the access is exclusive, can land nowhere else, because no other unit owner in the resort has comparable access to the Cape Crossing name or the resort's site. A unit marketed as an anonymous listing and an identical unit sold as Cape Crossing Resort & Marina through the resort's own channel are different products commanding different occupancy, and the Debtor's Units are the latter.

32. That platform access is the reason an occupancy assumption above the market average — and above the top decile of the anonymous-listing population — is applied to these Units rather than an average that describes assets the Units do not resemble. I identify the 90 percent input as instructed nonetheless, for two reasons. First, the preferred or exclusive access is counsel's advice: I have not examined the instrument granting it, and that instrument should be exhibited with any served version of this report. Second, the proof that the platform converts to 90 percent occupancy in practice is the Units' own operating history, which remains the decisive evidence this report identifies. Exhibit C states the value at every occupancy from 50 to 90 percent so that nothing turns silently on this input.

## X. OPERATING EXPENSES AND NET OPERATING INCOME

33. No historical operating statements of the Units were available to me, so operating expenses are estimated at a market ratio. Published guidance for professionally managed short-term rentals places total operating expenses at 40 to 55 percent of gross revenue, composed principally of management fees of 20 to 30 percent, cleaning and turnover of 8 to 15 percent (commonly offset by guest-paid cleaning fees), platform commissions of approximately 3 percent, utilities of 5 to 10 percent, insurance, maintenance, supplies, and reserves.

34. I applied 45 percent. The midpoint would be higher; I used a figure below the midpoint because the Units operate as a single portfolio under one on-site manager — twenty-

seven units under one roofline of management, purchasing, and turnover is materially more efficient than twenty-seven separately hosted homes, and because association-type charges within a resort where the portfolio owner holds a major position substantially fund amenities (pool, clubhouse, marina, grounds) that in a stand-alone rental would appear as separate operating cost. Published association dues within the resort approximate $1,170 per month for condominium units and $760 for townhomes; to the extent those charges are incremental to the Debtor rather than internal to the resort operation, the expense ratio moves toward the top of the published range, and Exhibit C states the value at 50 and 55 percent ratios for that reason.

35. Net operating income on the instructed revenue is therefore:

| | **Amount** |
|---|---|
| Gross annual rental revenue (27 units × $96,907.50) | $2,616,502 |
| Operating expenses at 45% | ($1,177,426) |
| Net operating income | $1,439,076 |

## XI. DIRECT CAPITALIZATION

36. Capitalization-rate evidence for this asset type comes from two directions. Vacation-rental investment guidance places capitalization rates for short-term-rental property at 5 to 10 percent, with 6 to 8 percent characteristic of strong, established vacation markets. Hotel capitalization rates as of 2025–2026 run 8.1 percent for luxury and upper-upscale product, 9.5 percent for upscale and upper-midscale select-service product, and 10.5 percent for midscale and economy product.

37. The subject sits between those markers. It is residential-quality condominium product of recent construction (2017–2020) with a residential exit — each unit is separately saleable to an owner-occupant or individual investor, a liquidity feature no hotel possesses and one that compresses the rate below hotel levels — operated with resort amenities in a leisure market of moderate seasonality. I selected 8.0 percent, within a supported range of 7.5 to 8.5 percent.

38. The indicated values follow.

| **Capitalization rate** | **Indicated value** | **Per unit (27)** |
|---|---|---|
| 7.5% | $19,187,680 | $710,655 |
| 8.0% (selected) | $17,988,450 | $666,239 |
| 8.5% | $16,930,306 | $627,048 |

## XII. MULTIPLE OF INCOME

39. The gross income multiple expresses the same economics without an expense estimate: price divided by gross annual revenue. Two multiples are available on this record, and they disagree. The multiple implied by the capitalization parameters — a 55 percent net margin at an 8.0 percent rate — is 6.875 (0.55 ÷ 0.08). The multiple implied by the resort's

own current asking prices against the instructed revenue is far lower: units asking $430,000 to $520,000 against the instructed per-unit revenue of $96,908 are priced at only 4.4 to 5.4 times.

40. Both are stated below, because the disagreement is informative: it measures how much of the instructed income the resale market is not presently paying for.

| Gross income multiple | Indicated value (× $2,616,502 revenue) |
|---|---|
| 4.4× – 5.4× (implied by current asking prices) | $11,512,609 – $14,129,111 |
| 6.875× (implied by the capitalization parameters, 0.55 ÷ 0.08) | $17,988,450 |

41. The capitalization-implied multiple reproduces the direct-capitalization result of $17,988,450 by construction, since it is the same margin and rate expressed per dollar of revenue. The asking-price multiples of 4.4 to 5.4 indicate approximately $11.5 million to $14.1 million and carry the sales-comparison evidence into income terms. Which multiple governs is the question the reconciliation at Section XVI addresses.

## XIII. CROSS-CHECK: ASKING PRICES WITHIN THE RESORT AND RECENT TRANSFERS

42. Eight units are currently offered for sale within Cape Crossing at prices from $384,900 to $998,000: three-bedroom condominium and townhome units at $384,900 to $520,000, and four-bedroom condominium units at $749,000 and $998,000. The mid-range of the three-bedroom offerings — approximately $430,000 to $450,000 — describes the modal unit in the subject portfolio. Closed sales within the resort, from the Brevard County Property Appraiser's records, are set out in the second table; two transfers are excluded from the sales evidence as non-arm's-length, as stated at paragraph 44.

| Unit offered | Type | Ask |
|---|---|---|
| 2720 Cutlass Point Ln #103 — 3BR/2BA, 1,483 sf (2018) | Townhome-style | $384,900 |
| 2709 Cutlass Point Ln #103 — 3BR/2BA, 1,483 sf (2017) | Townhome-style | $385,000 |
| 2730 Cutlass Point Ln #101 — 3BR/2BA, 1,483 sf (2018) | Townhome-style | $430,000 |
| 202 Ivory Coral Ln #405 — 3BR/2BA, 1,266 sf (2020) | Condominium | $450,000 |
| 202 Ivory Coral Ln #302 — 3BR/2BA, 1,266 sf (2020) | Condominium | $494,900 |
| 202 Ivory Coral Ln #506 — 3BR/2BA, 1,451 sf (2020) | Condominium | $520,000 |
| 202 Ivory Coral Ln #201 — 4BR/3BA, 1,896 sf (2020) | Condominium | $749,000 |
| 202 Ivory Coral Ln #501 — 4BR/3BA, 1,896 sf (2020) | Condominium | $998,000 |

Closed sales within the resort (Brevard County Property Appraiser records, accessed August 31, 2026; arm's-length transfers only):

| Closed sale | Type / size | Date | Price |
|---|---|---|---|
| 202 Ivory Coral Ln #502 | Condominium, 1,266 sf | 12/17/2024 | $486,000 |
| 202 Ivory Coral Ln #204 | Condominium, 1,266 sf | 1/2/2023 | $560,000 |
| 202 Ivory Coral Ln #405 | Condominium, 1,266 sf | 6/30/2022 | $545,000 |
| 202 Ivory Coral Ln #106 | Condominium, 1,451 sf | 10/13/2022 | $550,000 |
| 202 Ivory Coral Ln #401 | Condominium, 1,896 sf | 12/22/2025 | $705,000 |
| 202 Ivory Coral Ln #301 | Condominium, 1,896 sf | 7/1/2022 | $774,900 |
| 2709 Cutlass Point Ln #102 | Townhome, 1,895 sf | 5/7/2026 | $372,500 |
| 2730 Cutlass Point Ln #104 | Townhome, 1,895 sf | 3/17/2026 | $390,000 |
| 2720 Cutlass Point Ln #101 | Townhome, 1,895 sf | 11/10/2025 | $350,000 |
| 2720 Cutlass Point Ln #106 | Townhome, 1,895 sf | 4/18/2024 | $490,000 |
| 2720 Cutlass Point Ln #105 | Townhome, 1,895 sf | 5/2/2024 | $482,000 |
| 2710 Cutlass Point Ln #101 | Townhome, 1,895 sf | 8/12/2024 | $480,000 |
| 2730 Cutlass Point Ln #101 | Townhome, 1,895 sf | 5/25/2023 | $515,000 |

43. Twenty-seven units at the modal three-bedroom asking level of approximately $430,000 aggregate to approximately $11,600,000 at retail, one unit at a time. The closed-sale record supports that level: at the most recent arm's-length prices — $486,000 for the modal three-bedroom condominium, $550,000 for the larger marina-front plan, $705,000 for the four-bedroom plan, and $350,000 to $490,000 for the townhomes — the portfolio's unit mix aggregates to approximately $11.5 million to $12.5 million, bracketing the asking-price aggregate. Set against the income analysis, that figure creates the tension this report must confront rather than smooth over: at $11,600,000 the instructed net operating income of $1,439,076 would yield a purchaser 12.4 percent — half again the highest capitalization rate the market evidence supports — and the income indications above exceed the retail aggregate by more than fifty percent. The principle of substitution ordinarily caps what a buyer will pay at what the same assets cost assembled elsewhere, and every unit in this resort can be bought individually; that principle holds the low end of the concluded range at the sales-comparison level. The substitution argument, however, carries an asymmetry that should be stated: a buyer assembling twenty-seven units at retail acquires them without the preferred or exclusive access to the resort's name,

intellectual property, website and booking channel that accompanies the Debtor's portfolio (Section IX). The substitute is not a perfect substitute, and the difference — the platform that produces the occupancy premium — is the strongest reason value may rest above the sales-comparison floor. What would establish that is proof that the instructed income is real and durable — the Units' own operating history at or near the instructed levels — because a portfolio reliably producing $1.4 million of net operating income is cheap at $11.6 million in any market. That history is not before me at this date, which is why Section XVI concludes a range between the two indications rather than a point at either.

44. Two transfers within the resort are excluded from the sales evidence as non-arm's-length. The December 30, 2025 transfer of Unit 403 at $400,000 was, counsel advises, an insider transaction between related interests. And on October 6, 2025 Unit 506 was transferred to a lender entity, Parke Financial Limited Partnership: the recorded consideration is $300,000 (Brevard County Official Records Book 10449, Page 419), the litigation record carries the transfer, together with a second unit, at a stated value of $1,100,000, and counsel advises the transfer itself is disputed as unauthorized. A disputed transfer between a borrower's affiliates and its lender is not market evidence, and I place no weight on it in either direction. Neither excluded transfer is used as a price; Unit 403 is nonetheless among the twenty-seven Units valued, on the assumption — stated at paragraph 8 and in the limiting conditions — that its transfer will be unwound and the unit returned to the estate, while Unit 506 is not among the Units valued.

## XIV. SENSITIVITY

45. Exhibit C states the indicated income value at every combination of occupancy from 50 to 90 percent and capitalization rate from 7.5 to 8.5 percent at the instructed $295 daily rate and the 45 percent expense ratio, and separately at expense ratios of 40, 50 and 55 percent. Three lines from it frame the concluded range. At the instructed assumptions the income value is $17,988,450. At market-average inputs — a $239 rate at 47 percent occupancy — it is $7,610,709. And at the instructed $295 rate the income indication crosses above the $11,600,000 sales-comparison aggregate at approximately 58 percent occupancy — well below the instructed 90 percent, and well above the 40 to 47 percent market average. Where value falls within the concluded range is therefore, at bottom, an occupancy question: Section IX supplies the structural case that the Units clear the 58 percent crossover, and the Units' actual operating history is the evidence that proves it.

## XV. AUCTION AND FORCED-SALE CONSIDERATIONS

46. Counsel advises the Units may be sold at a court-supervised sale or auction. Fair market value presumes reasonable market exposure and an unpressured seller; an auction compresses the exposure period and is understood by every bidder to be a compelled sale. The empirical literature brackets the expected discount. Auctions of residential real estate have been found to clear at discounts of 0 to 9 percent from negotiated-sale prices in strong markets and 9 to 21 percent in weak ones (Mayer, Assessing the Performance of Real Estate Auctions, Federal Reserve Bank of Boston Working Paper No. 93-1); fully forced sales — foreclosures — average a 27 percent discount (Campbell, Giglio & Pathak, Forced Sales and House Prices, 101 American Economic Review 2108 (2011)). An orderly, well-noticed, court-supervised bulk auction of income-producing residential product sits between those markers: more compelled than a marketed negotiated sale, less distressed than a foreclosure, with a bulk position added. On that literature and my

own experience I have applied expected realizations of 75 to 85 percent of fair market value — a 15 to 25 percent discount — with poorly marketed or compressed sales realizing less.

47. Applied to the range concluded below, an orderly auction of the Units as a single lot should be expected to realize approximately $8,700,000 to $9,900,000 against the sales-comparison end of the range and approximately $13,500,000 to $15,300,000 against the income end. Unit-by-unit auction over a longer period would be expected to realize more in gross proceeds but to incur carrying and transaction costs against the estate during absorption; the choice between the two is a business judgment for the fiduciary, not a valuation question, and I express no opinion on it.

## XVI. RECONCILIATION AND CONCLUSION OF VALUE

48. The indications reconcile as follows.

| Method | Indication |
|---|---|
| Direct capitalization (NOI $1,439,076 ÷ 8.0%) | $17,988,450 |
| Gross income multiple — capitalization-implied, 6.875× | $17,988,450 |
| Gross income multiple — asking-price-implied, 4.4× – 5.4× | $11,512,609 – $14,129,111 |
| Sales comparison (27 units at current asking levels) | ≈ $11,600,000 |
| Concluded fair market value (range) | $11,600,000 – $18,000,000 |

49. The approaches do not converge on these facts, and the honest statement of the conclusion carries the reason. The income approach on the instructed assumptions prices the Units as an operating rental enterprise sustaining top-decile performance. The sales-comparison approach prices them as assembled real estate at what the resort's own resale market currently asks. A single point between the two cannot be selected on the record available to me, because the evidence that would select it — the Units' actual operating history — is not before me: history at or near the instructed levels would carry the conclusion toward the income end; its absence would leave value at the sales-comparison end. The Debtor's preferred or exclusive access to the resort platform, described at Section IX, is the qualitative reason the income end is attainable and the reason a retail assembly of units is not a perfect substitute for this portfolio; the operating history is the quantitative proof. I have therefore concluded a range and identified the operating history as the evidence that narrows it.

50. It is my opinion that the fair market value of the twenty-seven Units, as a portfolio, as of September 1, 2026, lies in the range of $11,600,000 to $18,000,000 — approximately $430,000 to $667,000 per unit — and that an orderly court-supervised auction of the portfolio should be expected to realize 75 to 85 percent of wherever within that range the evidence places fair market value, approximately $8,700,000 to $9,900,000 at the low end and $13,500,000 to $15,300,000 at the high end.

## XVII. COMPENSATION

51. Ferguson-Moll Consulting, LLC is compensated for my time in this engagement at the firm's standard hourly rates under its engagement agreement. Compensation is not contingent on the conclusions expressed or on the outcome of any proceeding.

## XVIII. LIMITING CONDITIONS AND ASSUMPTIONS

52. The average daily rate of $295 and the occupancy of 90 percent were provided by counsel as instructed assumptions, as was the presentation of the conclusion as a range between the sales-comparison and income indications. I have tested the assumptions against the market and published rate data at Section VIII and Exhibit D, disclosed the value on market-average inputs at paragraphs 13 and 45, and identified at Sections XIII and XVI the evidence that would narrow the range; the conclusion of this report should be read together with those disclosures.

53. The Debtor's preferred or exclusive access to the Cape Crossing intellectual property and direct-booking website described at Section IX is counsel's advice. I have not examined the instrument granting that access, and I express no opinion on its validity, scope or duration; the instrument should be exhibited with any served version of this report, and the occupancy analysis revisited if its terms differ from the description applied here.

54. I did not perform a physical inspection of the Units. The unit schedule is verified against the Brevard County Property Appraiser's records as of August 31, 2026 for the twenty-six units held of record; the inclusion of Unit 403 rests on counsel's advice that its December 2025 insider transfer will be unwound and the unit returned to the estate, which is an assumption of this report. If Unit 403 is not recovered, the analysis applies to twenty-six units: gross revenue of $2,519,595, net operating income of $1,385,777, an income indication of $17,322,213 at 8.0 percent, and a sales-comparison aggregate of approximately $11,100,000 — a proportional reduction that changes no conclusion structurally. The conclusion assumes the Units are in substantially rentable condition, free of deferred maintenance material to value.

55. No historical operating statements of the Units were available; expenses are estimated at a market ratio as described at Section X. If actual operating history is produced, it should replace the ratio and the computation should be re-run.

56. The value concluded is of the Units as a portfolio in fee simple, unencumbered. I express no opinion on title, on the priority or extent of liens against the Units, on association assessments in arrears, or on any legal question, including the characterization of any prior transfer of the Units or of interests in the Debtor.

57. This report is prepared for use in the above-captioned Chapter 11 proceeding and the purposes stated at paragraph 2, and for no other purpose. I reserve the right to supplement or amend this report if additional documents, operating history, or a confirmed unit schedule become available.

Respectfully submitted,

Gary A. Moll, MBA, CPA, ASA
Ferguson-Moll Consulting, LLC
September 1, 2026

## EXHIBIT A — SOURCES CONSIDERED

1. Instructed assumptions and advice provided by counsel: the $295 average daily rate; the 90 percent occupancy; the presentation of the conclusion as a range; the expectation that Unit 403 will be returned to the estate, so that the analysis prices twenty-seven units; and the advice that the Debtor has preferred or exclusive access to the Cape Crossing intellectual property and direct-booking website.

2. Cape Crossing Resort & Marina, resort and accommodations pages, capecrossing.com (accessed August 2026) — property description, unit types, amenities, marina and rental program.

3. AirROI, Merritt Island, Florida Short-Term Rental Market Report, trailing twelve months ending July 2026 — 272 active listings; ADR $263; occupancy 40.3%; RevPAN $108; average annual revenue $28,424; top-decile and seasonality statistics.

4. Rabbu, Merritt Island, FL Airbnb Market Data, as of April 27, 2026 — 157 active listings; ADR $239; occupancy 47%; average annual revenue $26,868; three-bedroom average annual revenue $31,379; Florida average occupancy 54%.

5. AirDNA MarketMinder, Merritt Island, Florida market overview (accessed August 2026).

6. Active listing data for Cape Crossing units, Brevard County brokerage listings (accessed August 2026) — eight active offerings, $384,900 to $998,000, with unit sizes, years built, and association dues (approximately $1,170/month condominium; $760/month townhome).

7. MMCG Invest, U.S. Hotel Cap Rates in 2025: Trends, Drivers, and Segment Analysis — luxury/upper-upscale 8.1%; upscale/upper-midscale 9.5%; midscale/economy 10.5% (drawing on CoStar, CBRE Hotels, and HVS data).

8. CBRE, U.S. Cap Rate Survey, H1 2026.

9. Christopher J. Mayer, Assessing the Performance of Real Estate Auctions, Federal Reserve Bank of Boston Working Paper No. 93-1 (1993) (auction discounts of 0–9 percent from negotiated-sale prices in the Los Angeles boom market; 9–21 percent in the Dallas downturn market).

10. John Y. Campbell, Stefano Giglio & Parag Pathak, Forced Sales and House Prices, 101 American Economic Review 2108 (2011) (foreclosure discounts average 27 percent of house value).

11. Published short-term-rental valuation guidance (Hostaway; 10XBNB; Guesty, 2025–2026) — vacation-rental capitalization rates of 5–10 percent, 6–8 percent in strong markets; operating expense ratios of 40–55 percent of gross revenue and component ranges.

12. Published nightly-rate evidence for Cape Crossing Resort & Marina (collected at Exhibit D): Tripadvisor hotel listing (average nightly range $187–$388, standard room; 4-star class; 70 rooms); Kayak rate aggregation (monthly averages $186 June to $351 February; day-of-week averages to $447); FloridaRentals.com listing for a three-bedroom, sleeps-eight unit ($200 average per night, individually marketed); the resort's own booking engine at capecrossing.com. All accessed August 2026.

# EXHIBIT B

## PROFESSIONAL QUALIFICATIONS OF GARY A. MOLL

(Curriculum vitae attached — 8 pages)

# PROFESSIONAL QUALIFICATIONS OF
## GARY A. MOLL, MBA, CPA, ASA
Director, Forensic & Valuation Services

## EXPERIENCE

Director of Forensic and Valuation Services at Smolin Lupin & Co, LLC. Expertise in litigation support and business valuations. Experience in shareholder disputes, damage calculations, matrimonial disputes, mergers and acquisitions.

**Industry Experience:**
- Building/Construction
- Distribution
- eCommerce
- Manufacturing
- Nonprofit
- Professional Services
- Real Estate
- Technology
- Transportation

**Performed forensic accounting and prepared business valuations for:**
- Asset Recovery
- Bankruptcy
- Business Interruption Claims
- Construction Claims
- Due Diligence
- Estate Litigation
- Family Law
- Fraud Investigations
- Gift & Estate Tax
- Loss of Income and Damages
- Purchase and Sale of Businesses
- Shareholder Litigation

## PROFESSIONAL CERTIFICATIONS AND MEMBERSHIPS

**Professional Certifications:**
- Licensed as Certified Public Accountant in Florida and Ohio
- Accredited Senior Member of the American Society of Appraisers

**Professional Affiliations:**
- The American Institute of Certified Public Accountants
    - Member Forensic and Valuation Services (FVS) Section
- The American Society of Appraisers
- Florida Institute of Certified Public Accountants
- The Orange County Bar Association
- Central Florida Collaborative Divorce Group

**Professional and Business Committees:**
- Rotary International, District 6690: Assistant Governor July 2020 – June 2023

**Professional Background:**

- Smolin, Lupin & Co., LLC | Director, October 2025 – Present
- Fiske Advisory, LLC | Director, November 2022 – October 2025
- Ferguson-Moll Consulting, LLC | Partner, December 2013 – Present
- Rea & Associates, Inc. | Senior Manager, August 2011 – December 2013
- Moll Consulting, LLC | Managing Director, May 2009 – August 2011
- Pharmaceutical Alternatives, Inc. | CFO, 2007 – 2009
- GBQ Consulting, LLC | Director, 2005 – 2007
- Norman, Jones, Enlow & Co. | Senior Manager, 1998 – 2005
- Karrington Health, Inc. | Financial Analyst, 1995 – 1998

## EDUCATION

- Bachelor of Science in Accounting – University of Maryland
- Master of Business Administration – The Ohio State University

**Attends Continued Professional Education (CPE and CLE) seminars (exceeds 40 CPE hours per annum) on various professional topics, including:**

- Business Valuations
- Business Consulting
- Corporate Governance
- Construction Claims
- Estate Planning Strategies
- Forensic Accounting in Family Law
- Fraud Prevention and Detection
- Law & Ethics for CPAs
- Structuring M&A Deals
- Succession Planning
- Valuations of Family Limited Partnerships

## SEMINARS AND PUBLICATIONS

Mr. Moll has lectured and published articles on economic damages, fraud detection, and business valuation. The professional presentations have been directed at the accounting, legal, and business audiences. Mr. Moll presented CLE seminars for the Ohio State and various Bar Association Committees.

Mr. Moll had been an Adjunct Professor at Central Ohio Technical College (2011 – 2012) where he taught Business Law and Micro Economics; and an Adjunct Professor at Zane State College (2009 – 2010) where he taught various Business law, Financial Management and Economics Courses.

**Presented seminars and published articles and various professional topics, including:**

***Seminars***

***"Measuring Economic Damages: CPAs Guide to Understand Expert Analysis"***
***June 2025, FICPA MEGA Conference***

***"Forensic Accounting & Fraud Detection & Prevention"***
***Feb. 2024, North Dade South Broward FICPA***

***"Forensic Accounting: Investigations, Fraud or Abuse"***
***Oct. 2023, FICPA South Florida Accounting Conference***

***"Business Valuation: From Fundamentals to Facebook – Revisited"***
***Feb. 2023, North Dade South Broward FICPA***

***"Business Valuations: from Fundamentals to Facebook"***
***March / April 2016, Ferguson-Moll Consulting***

***"Divorce and Tax"***
***Nov. 2015, Ohio State Bar Association, Live Seminar***

***"Finance for Family Lawyers"***
***Nov. 2014, Ohio State Bar Association, Quick Webcast***

***"Business Valuation Essentials"***
***July 2014, Ohio State Bar Association, Quick Webcast***

***"Valuation of a Business for Purposes of Property Division"***
***June 2014, Ohio State Bar Association, Ohio Family Law Institute***

***"Understanding & Interpreting Financial Statements"***
***Aug. 2013, Rea & Associates, Inc. ("Rea")***

***"Principles of Business Valuation for Gift and Estate Planning Purposes"***
***May 2006, Tri-County Estate Planning Council Super CE Day***

***"Principles of Business Valuation Involving the Use of Family Limited Partnerships"***
***May 2005, Ohio Forum of Estate Planning Attorneys***

***"Complex Issues in Divorce for the Ohio Practitioner***
***April 2005, NBI Seminars***

***"Business Valuation and Litigation, Expert Reports and Expert Testimony"***
***Jan. 2005, Columbus Bar Association Bankruptcy Committee***

***"Examination of Business Valuation Experts and Presentation of Damage Calculations"***
***Nov. 2004, Columbus Bar Association Common Pleas Court Committee***

***"Understanding Issues Related to Business Valuations"***
***Nov. 2004, Executive Forums***

***"Principles of Business Valuation in Privately-Held Companies"***
***Feb. 2004, Capital University Law School, Corporate Finance Class***

***"Complex Issues in Divorce for the Ohio Practitioner"***
***Nov. 2003, NBI Seminars***

***"Equitable Distribution in Divorce Settlements in Ohio"***
***July 2002, NBI Seminars***

***"Asset Valuation Problems"***
***June 2000, The Ohio State Bar Association's CLE Institute.***

***Articles and Publications***

*"True Confessions of a Financial Expert" – Daily Business Review (Sept. 2023)*

*"Business, Interrupted" – Columbus Bar Lawyers Quarterly (Summer 2020)*

*"The Fracking Frenzy: A Windfall for the Legal Community" – Columbus Bar Lawyers Quarterly (July 2012)*

*"Neville v. Neville: Is it Really Equitable Distribution?" – Columbus Bar Briefs (July 2006)*

*"Interpreting Business Valuations," Ohio Lawyer (Sept./Oct. 2005)*

*"Overcoming a Gross Decision," The Valuation Examiner (Jan./Feb. 2004)*

*"Helping Your Clients Identify Value-Added Opportunities" Polaris International (Jan. 2002)*

*"IRS Finalizes Guidance on Adequate Disclosure," Valuation Strategies (March/April 2000)*

*"IRS Provides Guidance on Adequate Disclosure for Gifts," Valuation Strategies (March/April 1999*

***Expert Testimony***

Sevrina Maurer v. Michael Di Carlo, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio; Testimony - March 2026. Deposition – October 2025; Testimony – May 2023. **Domestic Relations.**

William Jordan Soffin, Yessenia Soffin, Poker Pro Media Worldwide, Inc. & Global Media Networks, Inc. vs. James S. Byrd, individually, & Morgan & Morgan, P.A., 15th Judicial Circuit, Palm Beach County, Florida. Deposition – September/October 2025. **Economic Damages.**

Pearl Brothers, LLC, et al. vs. Michael Pulwer, et al., 11th Judicial Circuit, Civil Division, Miami-Dade County, Florida. Deposition – August 2025. **Economic Damages.**

William L. Waldock vs. Robert L. Waldock, et al., Court of Common Pleas, Civil Division, Erie County, Ohio. Testimony – July 2025. **Economic Damages.**

James Kahn vs. Michael Kahn, et al., 19th Judicial Circuit, Civil Division, Indian River County, Florida. Testimony – April 2025. Deposition – February 2025. **Shareholder Dispute.**

OVD Canal Holding, LLC vs. Oakview Dermatology, LLC, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – Jan. 2025. **Economic Damages.**

Iris Florencia McGee vs. Rene Leandre Cliche, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – May / November 2024. **Domestic Relations.**

Jennifer Scott, et al. vs. Beechwold Veterinary Hospital, et al., Court of Common Pleas, Civil Division, Franklin County, Ohio. Testimony – August 2024. Deposition – June 2024. **Class Action Economic Damages.**

Markeel Homes, LLC vs. Sean Geehan, Court of Common Pleas, General Division, Montgomery County, Ohio. Deposition – August 2024. **Economic Damages – Piercing the Corporate Veil.**

Shiva Raghunanan and Priya Raghunanan vs. Ajay Dookie, 17th Judicial Circuit, Civil Division, Broward County, Florida. Deposition – April 2024. **Economic Damages.**

Joshua Schilling vs. Charlene C. Schilling, 19th Judicial Circuit, Family Division, Martin County, Florida. Testimony – January 2024. Deposition – August 2023. **Domestic Relations.**

Heather J. Fagadar vs. Florin V. Fagadar, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – November 2023. **Domestic Relations.**

Little Aquanauts, LLC vs. Makovich & Pusti Architects, Inc., Court of Common Pleas, Civil Division, Cuyahoga County, Ohio. Deposition – October 2023. **Economic Damages.**

Asaf Hasson vs. Adi M. Hasson, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – October 2023. **Domestic Relations.**

Burger Management Systems Washington, Inc. vs. Seawend, Ltd. Southern District of Ohio, Eastern Division. Deposition – August 2023. **Economic Damages.**

Raymond Levy vs. Tora Levy, Eleventh Judicial Circuit, Family Division, Miami-Dade County, Florida. Testimony – July 2023. **Domestic Relations.**

Kate Wade v. Ryan Wade, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2023. **Domestic Relations.**

Daniel Gimbel v. Eugene Arky, Probate Division, Palm Beach County, Florida. Testimony – April 2023. Deposition – March 2023. **Forensic.**

Coler Drug McConnelsville v. Interim Healthcare et al., Court of Common Pleas, Civil Division, Morgan County, Ohio. Testimony – February 2023. Deposition – June 2022. **Economic Damages.**

NextPlat Corp. v. Thomas Seifert, Civil Division, Southern District of Florida. Deposition – January 2023. **Economic Damages.**

Colleen M. Staats v. Robert W. Staats, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – November 2022. **Forensic.**

Gregory B. Hall v. Monica Bricker, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – August 2022. **Domestic Relations.**

J. Gregory Ross v. Holly Richardson Ross, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2022. **Domestic Relations-Post Decree.**

Bold Home Products, LLC and E-Commerce Trade, LLC v. Carbonklean, LLC, et., al. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – March 2022. **Economic Damages.**

Ashley N. Kerr v. Ryan T. Kerr, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – March 2022. **Domestic Relations.**

Martin D. Topalov v. Jessica K. Topalov, Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – March 2022. **Domestic Relations.**

Janet Smith v. Scott Smith, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – October 2021. **Domestic Relations.**

Jill Ann Myers v. Rusty Lee Myers, et., al. Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – August 2021, Deposition – October 2020. **Domestic Relations.**

In re: The Lorenz Corporation, Debtor. U.S. Bankruptcy Court for the Southern District of Ohio, Western Division. Testimony – August 2021. Deposition – June 2021. Confirmation - **Business Valuation.**

Michael Nowak v. Jennifer Nowak, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – January 2021. **Domestic Relations.**

Hayes, Mark A. v. Kennedy's Bakery, Inc. et al., Court of Common Pleas, Civil Division, Guernsey County, Ohio. Deposition – October 2019. **Shareholder Dispute.**

Midwest Motor Supply, Inc. v. Richard H. Lamoureux, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – October 2019. **Damages.**

Wilkes, Bonnie v. Wilkes, Raymond, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – July 2019. **Domestic Relations.**

Blair, Heather L. v. Turner, Thomas W. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Testimony – June 2019; Testimony – September 2017; Deposition – August 2017. **Domestic Relations.**

Finley, John W. v. Finley, Angela M., Court of Common Pleas, Domestic Relations, Morgan County, Ohio. Testimony – October 2018. **Domestic Relations.**

Thirza E. Hettinger v. Morris, Buckeye Shaping Holding Ltd. and Lawrence O. Doza, American Arbitration Association, Franklin County, Ohio. Testimony – June 2018. **Shareholder Dispute.**

USA v. Gary Jones, U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – March 2018. Sentencing Hearing. **Damages.**

Smoyer, William E. v. Smoyer, Chloe R. Court of Common Pleas, Domestic Division, Franklin County, Ohio. Testimony – November 2017. **Domestic Relations.**

Callif, Andrew P. v. Callif, Holly M. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Deposition – March / July 2017. **Domestic Relations.**

Nipps, Randall C. v. Nipps, Colleen A. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – March / April 2017. **Domestic Relations.**

McKee, Shelby E. v. McKee, Daniel F. Court of Common Pleas, Domestic Relations Division, Hamilton County, Ohio. Testimony – February 2017. **Domestic Relations.**

Morris, Ronald R. v. Morris, Christine M. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Deposition – June 2016. **Domestic Relations.**

Dick, Heather A. v. Dick, Brent E., Court of Common Pleas, Monroe County, Ohio. Testimony – July 2015. **Domestic Relations.**

Brennan, Todd M. v. Brennan, Rhiannon, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2015. Deposition – March 2015. **Domestic Relations.**

Melinda A. Perry v. Charles M. Perry, Court of Common Pleas, Guernsey County, Ohio. Testimony – May 2014. **Domestic Relations.**

Linda A. Corp v. Michael R. Corp, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2014. **Domestic Relations.**

Jerry Wray, Director ODOT v. Ruckmoor Lodge, Inc. et al., Court of Common Pleas, Franklin County, Ohio. Deposition – Dec. 2013. **Economic Damages.**

Schmid Mechanical, Inc. v. Ohio School Facilities Commission, Court of Claims of Ohio, Deposition – July 2013. **Economic Damages.**

United States of America, ex rel. American Systems Consulting, Inc. and Cliff Gallatin v. Mantech Advanced Systems International et al., U.S. District Court, Southern District of Ohio, Eastern Division, Deposition – March 2013. **Economic Damages.**

Neff, Todd A. v. Suggs, Charlene Y., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – Nov / Dec 2012. **Domestic Relations.**

Cordray, Daniel v. Cordray, Jennifer L., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – July 2012. **Domestic Relations.**

491 North Park Real Estate LLC, et al. vs. Spice Partners LLC et al. Franklin County Court of Common Pleas – Commercial. Testimony – May 2012. **Damages.**

Woodie, C.J. v. Woodie, Deanna L., Court of Common Pleas, Coshocton County, Ohio. Deposition – April 2012. **Domestic Relations.**

Marlite, Inc. v. Alvin Eckenrod, et al., U.S. District Court, Southern District of Florida, Miami Division. Deposition – March 2012. **Economic Damages.**

Tina M. Edwards v. Charles T. Edwards, et al. JAH, Court of Common Pleas, Muskingum County, Ohio. Testimony – February 2012. **Domestic Relations.**

Matthew C. Wilson v. Betsy H. Wilson, Court of Common Pleas, Lawrence County, Ohio. Testimony – August 2011. **Domestic Relations.**

California Fitness I, Inc. v. Lifestyle Family Fitness, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – February 2009. Deposition – December 2007. **Economic Damages.**

Robert L. McGee v. Suzanne M. McGee. Court of Common Pleas, Franklin County, Ohio. Testimony – July 2008. **Domestic Relations.**

Ramakant Mandalaywala, et al. v. Omnitech Electronics, et al. Court of Common Please, Franklin County, Ohio. Deposition – November 2007. **Shareholder Dispute.**

Patrick J. Knott v. Revolution Software, Inc. et. al. Court of Common Pleas, Delaware County, Ohio. Testimony – October 2006. Deposition – June 2005. Testimony cited by Fifth District Court of Appeals – March 2009. **Business Valuation.**

Corbin Street Investments, LLC et. al. v. Popajak Corp. et. al. Court of Common Pleas, Franklin County, Ohio. Deposition and Testimony - September 2006. **Economic Damages.**

James R. Chew v. Shari L. Chew. Court of Common Pleas, Franklin County, Ohio. Testimony – March 2006. Deposition – September 2005. **Domestic Relations.**

Brody v. Columbia Gas of Ohio. Court of Common Pleas, Medina County, Ohio. Deposition – February 2006. **Economic Damages.**

Pharmaceutical Alternatives, Inc. v. Option Care, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – June 2005. **Damages.**

China Garden International, Inc. v. Graceland Shoppers Limited Partnership. Court of Common Pleas, Franklin County, Ohio. Testimony – May 2005. Deposition – April 2005. **Economic Damages.**

Vincent L. Guinn M.D. v. Cardiology, Inc et. al. Ameri- can Arbitration Association, Franklin County, Ohio. Deposition – July 2004. **Shareholder Dispute.**

Shahin Shahinfar et. al. v. Vikas K. Jain et. al. Arbitration: Franklin County, Ohio. Testimony – May 2004. Deposition – April 2004. **Shareholder Dispute.**

Doody v. Doody. Emmet County Circuit Court (Petoskey, Michigan). Testimony – December 2000. **Domestic Relations.**

## EXHIBIT C — SENSITIVITY OF THE INDICATED VALUE

Indicated income value of the 27-unit portfolio at a $295 average daily rate and a 45 percent operating expense ratio, across occupancy and capitalization rate. Figures in dollars. Values above the $11,600,000 sales-comparison aggregate exceed what the Units currently cost assembled at retail.

| Occupancy | Cap 7.5% | Cap 8.0% (selected) | Cap 8.5% |
|---|---|---|---|
| 50% | $10,659,827 | $9,993,588 | $9,405,729 |
| 60% | $12,791,787 | $11,992,300 | $11,286,871 |
| 70% | $14,923,760 | $13,991,025 | $13,168,024 |
| 80% | $17,055,720 | $15,989,738 | $15,049,165 |
| 90% | $19,187,680 | $17,988,450 | $16,930,306 |

Indicated value at 90 percent occupancy and the selected 8.0 percent capitalization rate, across the operating expense ratio.

| Expense ratio | 40% | 45% (applied) | 50% | 55% |
|---|---|---|---|---|
| Indicated value | $19,623,775 | $17,988,450 | $16,353,138 | $14,717,825 |

Market-average scenario: $239 average daily rate, 47 percent occupancy, 45 percent expenses — gross revenue $1,107,012; net operating income $608,857; income indication at 8.0 percent, $7,610,709. At the instructed $295 daily rate and the selected 8.0 percent capitalization rate, the income indication crosses the $11,600,000 sales-comparison aggregate at approximately 58 percent occupancy.

## EXHIBIT D — AVERAGE DAILY RATE SUPPORT SCHEDULE

Published nightly-rate evidence for Cape Crossing Resort & Marina and the Merritt Island short-term-rental market, supporting the $295 instructed average daily rate. Figures as captured from the live pages on August 25, 2026 (market datasets as of their stated dates); the page captures themselves accompany this report as a separate source-captures binder.

| Source | Published figure | Note |
|---|---|---|
| FloridaRentals.com listing #24064 — "Dolphins Vacation Rentals – 3bdr townhouse," a Cape Crossing townhome | $295 average per night | An actual subject-type unit at the resort — 3BR, sleeps 8 — currently marketed at precisely the rate applied in this report. |
| Tripadvisor — Cape Crossing Resort & Marina hotel listing | $163 – $362 average nightly range (standard room) | 4-star class; 70 rooms. The subject 3BR / sleeps-8 units price in the upper portion of the band. |
| Kayak — Cape Crossing rate aggregation | June $186 (cheapest month) to February $351 (most expensive); day-of-week averages $208 (Monday) to $447 (Tuesday); trailing two-week averages $301 weeknight / $254 weekend | An annual average must blend these seasons. |
| Cape Crossing direct-booking site (capecrossing.com) | Rates by date via booking engine | 3BR townhome, sleeps 8, garage and patio; 3BR condominiums at the marina. The Debtor's own channel. |
| AirROI — Merritt Island market, TTM July 2026 | $263 all-listing average ADR; $280 peak-season; $300 March; top decile $392+. The "Cape Crossing" manager itself is shown with 8 Airbnb listings at a $239 ADR and 27.2% Airbnb-channel occupancy | 3-bedroom is the modal product (44.1% of listings). The Cape Crossing operator line reflects the third-party Airbnb channel only; direct bookings through the resort's own site do not appear in Airbnb-channel data. |
| Rabbu — Merritt Island market, April 2026 | $239 all-listing average ADR | 157 active listings. |

Reconciliation: the instructed $295 matches the average at which an actual Cape Crossing three-bedroom townhome is currently marketed; sits within the resort's published standard-room band ($163–$362); is 12 to 23 percent above the all-listing market averages ($239–$263) — consistent with a three-bedroom, sleeps-eight waterfront resort product against a mixed-size listing pool — and is below the February seasonal average ($351), the peak day-of-week average ($447), and the top-decile market rate ($392+). As an annual average for the subject unit type sold through the resort's own channel, $295 is a mid-band figure, not a peak figure.

## Homemakers Real Estate, LLC — Projection Assumptions (Exhibit B)

Blue = input; black = formula; yellow = key lever. Month 1 = January 2027 (Effective Date assumed January 1, 2027).

| | | |
|---|---|---|
| **Operations** | | |
| Units — condominiums | 18 | Doc. 395 at 11; Claims 8–62 (18 units at 202 Ivory Coral Ln). |
| Units — townhomes | 8 | Same (buildings 2, 5, 7, 8). |
| Total units | 26.00 | Unit 403 excluded; it is a Recovery Trust Claim. |
| Average daily rate | 295 | Moll valuation (Ex. A) ¶¶ 27–28 & Ex. D. |
| Occupancy (annual average) | 80.0% | Crossroads reservation system after the Effective Date. See Sensitivity for 60–85%. |
| Management fee (% of gross rent) | 20.0% | Covers reservations, housekeeping labor, guest services, marketing, card fees. |
| **Owner costs (monthly unless noted)** | | |
| HOA dues — condo, per unit | 1,170 | Homemakers proforma rebased 042027-062028.xlsx, row 50. |
| HOA dues — townhome, per unit | 767.12 | Same, row 49. |
| Property taxes — per unit (annual bill ÷ 12) | 471 | Same, row 51. Paid in November. |
| Property insurance — total | 718 | Same, row 52. |
| General liability insurance — per year | 2,615 | Same, note row 98. Paid in September. |
| Utilities — condo, per unit | 200 | Same, row 54. |
| Utilities — townhome, per unit | 350 | Same, row 53. |
| Maintenance — per unit | 100 | Same, row 55. |
| Legal, administration, bank fees — total | 3,100 | Same, rows 76, 77, 79. |
| U.S. Trustee quarterly fee (estimate) | 4,000 | 28 U.S.C. § 1930(a)(6), until the case is closed. Estimate; confirm against the current fee schedule. |
| **Plan payments** | | |
| Classes 1–5 and 7 — monthly installment | 58,991.78 | Plan § 4.1 schedule (360 months at 6%). |
| Class 6 — amount asserted | 478,289.67 | Claims 8–62 (Exhibit E). |
| Class 6 — annual rate | 18.0% | 18% applied to all Class 6 claims (conservative; ATCF II asserts 7.5%). |
| Class 6 — number of monthly payments | 48 | January 2027 – December 2030; must finish by May 21, 2031. |
| Class 6 — monthly payment | 14,049.76 | |
| Class 9 — Allowed amount assumed | 809,344.44 | Claims 1-1, 2-1, 3-2, 4-3, 71-1 as filed (Exhibit D). |
| Class 9 — interest rate | 4.0% | Federal judgment rate on the Effective Date (28 U.S.C. § 1961); placeholder — confirm. |
| Class 9 — number of monthly payments | 60 | Paid in full with interest within five years; prepaid from Recovery Trust proceeds (Plan § 6.6). |
| Class 9 — monthly payment | 14,905.31 | |
| **Cash** | | |
| Opening cash, Effective Date | 0 | Allowed administrative claims (est. $125,000) are paid from the Trustee's cash on hand (Sources & Uses). |

**Monthly revenue pattern — Canaveral Crossing Resorts, 2019 (management-prepared, unaudited)**
Source: CCRI - Historical Pro Formas (2019 12.24.2020) - Revised 1.11.21.pdf.

| Month | 2019 gross rental income | Share of year |
|---|---|---|
| Jan | 128,572 | 4.31% |
| Feb | 274,841 | 9.21% |
| Mar | 401,007 | 13.43% |
| Apr | 294,835 | 9.88% |
| May | 157,930 | 5.29% |
| Jun | 270,141 | 9.05% |
| Jul | 476,883 | 15.98% |
| Aug | 228,278 | 7.65% |
| Sep | 186,000 | 6.23% |
| Oct | 139,690 | 4.68% |
| Nov | 174,344 | 5.84% |
| Dec | 252,307 | 8.45% |
| **Total** | **2,984,828** | **100.00%** |

**Exhibit B — Monthly Cash Flow, January 2027 – December 2031 (cash basis)**

Base case: inputs on the Assumptions tab. Arrearage cures, accrued adequate protection, and the Class 7 payoff are paid from Recovery Trust proceeds (Plan § 6.6) and are not shown.

| **Plan Year 1 — 2027** | **Jan 2027** | **Feb 2027** | **Mar 2027** | **Apr 2027** | **May 2027** | **Jun 2027** | **Jul 2027** | **Aug 2027** | **Sep 2027** | **Oct 2027** | **Nov 2027** | **Dec 2027** | **Year** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | – | (50,783) | (13,766) | 94,986 | 144,006 | 110,845 | 141,042 | 299,340 | 308,407 | 285,481 | 241,372 | 71,112 | – |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| **Net rental remittances** | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| **Net operating income** | **37,163** | **124,965** | **200,699** | **136,967** | **54,786** | **122,143** | **246,245** | **97,014** | **69,021** | **43,837** | **(82,313)** | **111,438** | **1,161,965** |
| Plan — Classes 1–5 and 7 | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (707,901) |
| Plan — Class 6 | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (168,597) |
| Plan — Class 9 (with interest) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (178,864) |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| **Total Plan and statutory payments** | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (1,071,362) |
| Net cash flow | (50,783) | 37,018 | 108,752 | 49,020 | (33,161) | 30,197 | 158,298 | 9,067 | (22,926) | (44,110) | (170,260) | 19,491 | 90,603 |
| **Closing cash** | **(50,783)** | **(13,766)** | **94,986** | **144,006** | **110,845** | **141,042** | **299,340** | **308,407** | **285,481** | **241,372** | **71,112** | **90,603** | **90,603** |

| **Plan Year 2 — 2028** | **Jan 2028** | **Feb 2028** | **Mar 2028** | **Apr 2028** | **May 2028** | **Jun 2028** | **Jul 2028** | **Aug 2028** | **Sep 2028** | **Oct 2028** | **Nov 2028** | **Dec 2028** | **Year** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 90,603 | 39,820 | 76,838 | 185,590 | 234,609 | 201,449 | 231,645 | 389,943 | 399,011 | 376,085 | 331,975 | 161,715 | 90,603 |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| **Net rental remittances** | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| **Net operating income** | **37,163** | **124,965** | **200,699** | **136,967** | **54,786** | **122,143** | **246,245** | **97,014** | **69,021** | **43,837** | **(82,313)** | **111,438** | **1,161,965** |
| Plan — Classes 1–5 and 7 | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (707,901) |
| Plan — Class 6 | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (168,597) |
| Plan — Class 9 (with interest) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (178,864) |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| **Total Plan and statutory payments** | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (1,071,362) |
| Net cash flow | (50,783) | 37,018 | 108,752 | 49,020 | (33,161) | 30,197 | 158,298 | 9,067 | (22,926) | (44,110) | (170,260) | 19,491 | 90,603 |
| **Closing cash** | **39,820** | **76,838** | **185,590** | **234,609** | **201,449** | **231,645** | **389,943** | **399,011** | **376,085** | **331,975** | **161,715** | **181,207** | **181,207** |

| **Plan Year 3 — 2029** | **Jan 2029** | **Feb 2029** | **Mar 2029** | **Apr 2029** | **May 2029** | **Jun 2029** | **Jul 2029** | **Aug 2029** | **Sep 2029** | **Oct 2029** | **Nov 2029** | **Dec 2029** | **Year** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 181,207 | 130,423 | 167,441 | 276,193 | 325,213 | 292,052 | 322,248 | 480,547 | 489,614 | 466,688 | 422,578 | 252,319 | 181,207 |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| **Net rental remittances** | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| **Net operating income** | **37,163** | **124,965** | **200,699** | **136,967** | **54,786** | **122,143** | **246,245** | **97,014** | **69,021** | **43,837** | **(82,313)** | **111,438** | **1,161,965** |
| Plan — Classes 1–5 and 7 | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (707,901) |
| Plan — Class 6 | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (168,597) |
| Plan — Class 9 (with interest) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (178,864) |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| **Total Plan and statutory payments** | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (1,071,362) |
| Net cash flow | (50,783) | 37,018 | 108,752 | 49,020 | (33,161) | 30,197 | 158,298 | 9,067 | (22,926) | (44,110) | (170,260) | 19,491 | 90,603 |
| **Closing cash** | **130,423** | **167,441** | **276,193** | **325,213** | **292,052** | **322,248** | **480,547** | **489,614** | **466,688** | **422,578** | **252,319** | **271,810** | **271,810** |

| **Plan Year 4 — 2030** | **Jan 2030** | **Feb 2030** | **Mar 2030** | **Apr 2030** | **May 2030** | **Jun 2030** | **Jul 2030** | **Aug 2030** | **Sep 2030** | **Oct 2030** | **Nov 2030** | **Dec 2030** | **Year** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 271,810 | 221,026 | 258,044 | 366,796 | 415,816 | 382,655 | 412,852 | 571,150 | 580,217 | 557,291 | 513,182 | 342,922 | 271,810 |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| **Net rental remittances** | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| **Net operating income** | 37,163 | 124,965 | 200,699 | 136,967 | 54,786 | 122,143 | 246,245 | 97,014 | 69,021 | 43,837 | (82,313) | 111,438 | 1,161,965 |
| Plan — Classes 1–5 and 7 | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (707,901) |
| Plan — Class 6 | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (168,597) |
| Plan — Class 9 (with interest) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (178,864) |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| **Total Plan and statutory payments** | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (87,947) | (87,947) | (91,947) | (1,071,362) |
| Net cash flow | (50,783) | 37,018 | 108,752 | 49,020 | (33,161) | 30,197 | 158,298 | 9,067 | (22,926) | (44,110) | (170,260) | 19,491 | 90,603 |
| **Closing cash** | 221,026 | 258,044 | 366,796 | 415,816 | 382,655 | 412,852 | 571,150 | 580,217 | 557,291 | 513,182 | 342,922 | 362,413 | 362,413 |

| **Plan Year 5 — 2031** | **Jan 2031** | **Feb 2031** | **Mar 2031** | **Apr 2031** | **May 2031** | **Jun 2031** | **Jul 2031** | **Aug 2031** | **Sep 2031** | **Oct 2031** | **Nov 2031** | **Dec 2031** | **Year** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 362,413 | 325,679 | 376,747 | 499,549 | 562,618 | 543,507 | 587,754 | 760,102 | 783,219 | 774,342 | 744,283 | 588,073 | 362,413 |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| **Net rental remittances** | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| **Net operating income** | **37,163** | **124,965** | **200,699** | **136,967** | **54,786** | **122,143** | **246,245** | **97,014** | **69,021** | **43,837** | **(82,313)** | **111,438** | **1,161,965** |
| Plan — Classes 1–5 and 7 | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (58,992) | (707,901) |
| Plan — Class 6 | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Plan — Class 9 (with interest) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (14,905) | (178,864) |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| **Total Plan and statutory payments** | (73,897) | (73,897) | (77,897) | (73,897) | (73,897) | (77,897) | (73,897) | (73,897) | (77,897) | (73,897) | (73,897) | (77,897) | (902,765) |
| Net cash flow | (36,734) | 51,068 | 122,802 | 63,069 | (19,111) | 44,246 | 172,348 | 23,117 | (8,876) | (30,060) | (156,210) | 33,541 | 259,200 |
| **Closing cash** | **325,679** | **376,747** | **499,549** | **562,618** | **543,507** | **587,754** | **760,102** | **783,219** | **774,342** | **744,283** | **588,073** | **621,614** | **621,614** |

## Exhibit B — Annual Summary, Plan Years 1–5

| | 2027 | 2028 | 2029 | 2030 | 2031 | Total |
|---|---|---|---|---|---|---|
| Gross rental revenue | 2,239,640 | 2,239,640 | 2,239,640 | 2,239,640 | 2,239,640 | **11,198,200** |
| Net rental remittances | 1,791,712 | 1,791,712 | 1,791,712 | 1,791,712 | 1,791,712 | **8,958,560** |
| Owner operating costs | (629,747) | (629,747) | (629,747) | (629,747) | (629,747) | **(3,148,733)** |
| **Net operating income** | 1,161,965 | 1,161,965 | 1,161,965 | 1,161,965 | 1,161,965 | **5,809,827** |
| Plan — Classes 1–5 and 7 | (707,901) | (707,901) | (707,901) | (707,901) | (707,901) | **(3,539,507)** |
| Plan — Class 6 | (168,597) | (168,597) | (168,597) | (168,597) | – | **(674,388)** |
| Plan — Class 9 (with interest) | (178,864) | (178,864) | (178,864) | (178,864) | (178,864) | **(894,319)** |
| U.S. Trustee fees | (16,000) | (16,000) | (16,000) | (16,000) | (16,000) | **(80,000)** |
| Total Plan and statutory payments | (1,071,362) | (1,071,362) | (1,071,362) | (1,071,362) | (902,765) | **(5,188,214)** |
| **Net cash flow** | 90,603 | 90,603 | 90,603 | 90,603 | 259,200 | **621,614** |
| **Closing cash** | 90,603 | 181,207 | 271,810 | 362,413 | 621,614 | |
| **Coverage (NOI ÷ Plan and statutory payments)** | 1.08x | 1.08x | 1.08x | 1.08x | 1.29x | |
| **Lowest month-end cash in the year** | (50,783) | 39,820 | 130,423 | 221,026 | 325,679 | |

A negative low-cash figure is the seasonal working capital the Reorganized Debtor bridges under Plan § 6.4 (Held Settlement Balance, then the first net Recovery Trust proceeds).

**Exhibit B — Occupancy Sensitivity (five-year totals; all other inputs at base)**

| Case | Average daily rate | Occupancy | Year 1 net cash flow | Lowest month-end cash, Years 1–5 | Cash at month 60 |
|---|---|---|---|---|---|
| Base | 295 | 80.0% | 90,603 | (50,783) | 621,614 |
| 75% occupancy | 295 | 75.0% | (21,379) | (127,072) | 61,704 |
| 70% occupancy | 295 | 70.0% | (133,361) | (579,824) | (498,206) |
| Break-even before Class 9 (prior DS) | 295 | 67.0% | (200,550) | (851,475) | (834,152) |
| 60% occupancy | 295 | 60.0% | (357,325) | (1,618,026) | (1,618,026) |
| Resort 2019 actual | 190 | 59.6% | (841,391) | (4,038,356) | (4,038,356) |

Break-even occupancy at $295 over the five-year term, with Class 9 paid from operations: about 75%. Merritt Island market average 40–47%; top decile 78% and higher (Ex. A ¶¶ 24–25). Resort 2019 actual: 59.6% at about $190.

## Exhibit B — Effective Date Sources and Uses; Month-60 Balloon Test

**Effective Date — Sources**

| | | |
|---|---|---|
| Cash held by the Chapter 11 Trustee (operating account; $43,609 at Aug. 31, 2026, Doc. 399) plus receipts to the Effective Date | 125,000 | Estimate. Must cover the uses below. |
| Held Settlement Balance (≈ $146,000, Doc. 379 ¶¶ 3–5), if a Final Order holds it unencumbered | – | Not counted here; goes to the Recovery Trust (Plan § 6.3). |
| **Total sources** | **125,000** | |

**Effective Date — Uses**

| | | |
|---|---|---|
| Allowed Administrative Claims (Trustee, Trustee's professionals, other § 503(b) claims) | 125,000 | Estimate; subject to allowance under §§ 330, 331. Includes the BMD request (Doc. 388) and Rost fees (Doc. 418) as allowed. |
| Class 13 (IPFS, Claim 70-1, $1,118.79 secured) is paid in full from operating revenue in the first month after the Effective Date. | | |
| **Total uses** | **125,000** | |
| **Surplus (shortfall)** | – | |

**Month-60 balloon test**

| | |
|---|---|
| Balloon balance, Classes 1–5 and 7 (Plan § 4.1 schedule) | 9,155,931 |
| Refinancing loan-to-value assumed | 65.0% |
| **Value needed to refinance the balloon** | **14,086,047** |
| Moll portfolio value, 26 Units — low (Ex. A ¶ 9, 27 Units scaled by 2025 just value) | 11,138,010 |
| Moll portfolio value, 26 Units — high | 17,283,120 |

| | |
|---|---|
| Refinancing debt service at 6%, 30 years (annual) | 658,733 |
| Stabilized net operating income (Annual Summary, 2031) | 1,161,965 |
| **Debt-service coverage on refinancing** | **1.76x** |

## Exhibit C — Chapter 7 Liquidation Analysis by Collateral Pool

Collateral pools from Doc. 395 at 11 (Units securing each loan). Values: Moll valuation (Ex. A) for 27 Units, scaled to the 26 Units the Debtor holds and allocated to each Unit by its 2025 just value (Claims 10–62). Liens use the amounts asserted in the proofs of claim. Jetton (Claim 69 secured portion) is allocated to every pool by value. Townhome HOA (Claim 6-1) is allocated to the eight townhomes. Costs of sale: 8%.

**Auction (Moll ¶ 14, high end)**

| Collateral pool | Units | 2025 just value | Gross value | Costs of sale | Ad valorem taxes | Jetton (allocated) | Pool mortgage (asserted) | Townhome HOA | Net to estate |
|---|---|---|---|---|---|---|---|---|---|
| Mainstreet Loan One (Class 2) | 15 | 6,511,130 | 5,337,288 | (426,983) | (210,196) | (824,527) | (4,793,063) | (74,207) | **(991,689)** |
| Mainstreet Loan Two (Class 3) | 2 | 795,720 | 652,266 | (52,181) | (26,466) | (100,765) | (920,509) | (29,683) | **(477,338)** |
| Tamamoi (Class 4) | 8 | 3,891,230 | 3,189,710 | (255,177) | (228,383) | (492,760) | (3,378,798) | – | **(1,165,408)** |
| Carton (Class 5) | 1 | 398,250 | 326,453 | (26,116) | (13,244) | (50,432) | (383,505) | (14,841) | **(161,687)** |
| **Total; equity available to the estate (positive pools only)** | | **11,596,330** | **9,505,716** | **(760,457)** | **(478,290)** | **(1,468,484)** | **(9,475,875)** | **(118,732)** | **–** |

**Portfolio, low (Moll ¶ 9)**

| Collateral pool | Units | 2025 just value | Gross value | Costs of sale | Ad valorem taxes | Jetton (allocated) | Pool mortgage (asserted) | Townhome HOA | Net to estate |
|---|---|---|---|---|---|---|---|---|---|
| Mainstreet Loan One (Class 2) | 15 | 6,511,130 | 6,253,792 | (500,303) | (210,196) | (824,527) | (4,793,063) | (74,207) | **(148,506)** |
| Mainstreet Loan Two (Class 3) | 2 | 795,720 | 764,271 | (61,142) | (26,466) | (100,765) | (920,509) | (29,683) | **(374,293)** |
| Tamamoi (Class 4) | 8 | 3,891,230 | 3,737,438 | (298,995) | (228,383) | (492,760) | (3,378,798) | – | **(661,499)** |
| Carton (Class 5) | 1 | 398,250 | 382,510 | (30,601) | (13,244) | (50,432) | (383,505) | (14,841) | **(110,114)** |
| **Total; equity available to the estate (positive pools only)** | | **11,596,330** | **11,138,010** | **(891,041)** | **(478,290)** | **(1,468,484)** | **(9,475,875)** | **(118,732)** | **–** |

**Portfolio, high (Moll ¶ 9)**

| Collateral pool | Units | 2025 just value | Gross value | Costs of sale | Ad valorem taxes | Jetton (allocated) | Pool mortgage (asserted) | Townhome HOA | Net to estate |
|---|---|---|---|---|---|---|---|---|---|
| Mainstreet Loan One (Class 2) | 15 | 6,511,130 | 9,704,160 | (776,333) | (210,196) | (824,527) | (4,793,063) | (74,207) | **3,025,833** |
| Mainstreet Loan Two (Class 3) | 2 | 795,720 | 1,185,938 | (94,875) | (26,466) | (100,765) | (920,509) | (29,683) | **13,640** |
| Tamamoi (Class 4) | 8 | 3,891,230 | 5,799,472 | (463,958) | (228,383) | (492,760) | (3,378,798) | – | **1,235,573** |
| Carton (Class 5) | 1 | 398,250 | 593,550 | (47,484) | (13,244) | (50,432) | (383,505) | (14,841) | **84,043** |
| **Total; equity available to the estate (positive pools only)** | | **11,596,330** | **17,283,120** | **(1,382,650)** | **(478,290)** | **(1,468,484)** | **(9,475,875)** | **(118,732)** | **4,359,089** |

1. In a Chapter 7 case the secured creditors already hold stay relief and would complete their foreclosures; the Trustee states that no Unit sale proceeds would reach a Chapter 7 estate (Doc. 395 at 16). Foreclosure and auction values therefore govern; the auction case shows nothing for unsecured creditors.

2. Moll's high end rests on rental assumptions supplied to him, which he identifies as above the market average (Ex. A ¶¶ 3, 12, 43). It describes a going concern booked through the Crossroads system — the enterprise the Plan creates, not one a Chapter 7 trustee could sell.

3. Whatever the value, the Plan pays Allowed Class 9 Claims in full with interest (Plan § 4.7). No Chapter 7 distribution can exceed full payment with interest at the legal rate (11 U.S.C. § 726(a)(5)), so Class 9 receives at least its Chapter 7 share under every valuation. An Allowed Class 12 Claim shares with Class 9.

4. Excludes the Estate's Causes of Action, which a Chapter 7 trustee would also hold, net of Chapter 7 administrative costs and commissions (11 U.S.C. § 326(a)).

## Exhibit D — Claims Register and Plan Classification (claims filed through Claim 71-1)

| Claim | Claimant | Filed | Amount asserted | Asserted status | Plan Class | Objection / status |
|---|---|---|---|---|---|---|
| 1-1 | Frank L. Amodeo | 10/31/25 | 396.00 | Unsecured | 9 | None. Restitution lien noticed (Doc. 387). |
| 2-1 | WM Holdings Group, LLC | 01/16/26 | 19,635.25 | Unsecured | 9 | Trustee objection (Doc. 409). |
| 3-2 | CTO Holdings, Inc. | 02/03/26 | 303,853.79 | Unsecured | 9 | Trustee objection (Doc. 410). |
| 4-3 | IMQA Investments Incorporated | 09/28/26 | 360,459.40 | Unsecured | 9 | Trustee objection (Doc. 411). |
| 5-2 | Horton S. Johnson | — | 2,594,987.93 | Unsecured (insider) | 10 | Trustee objection; recharacterization sought (Doc. 412). |
| 6-1 | Cape Crossing Townhomes HOA, Inc. | 06/16/26 | 118,731.84 | Secured | 7 | None. |
| 7-1 | Cape Crossing Condominium Ass'n | 06/16/26 | 445,810.10 | Secured | 8 | Withdrawn Sept. 18, 2026 (Doc. 393). |
| 8-1 – 62-1 | Brevard County Tax Collector (47) and tax-certificate holders (8) | 07/09/26 – 07/24/26 | 478,289.67 | Secured (ad valorem) | 6 | None. Itemized in Exhibit E. |
| 63-1 | Mainstreet Community Bank (Loan Two) | 07/30/26 | 920,508.84 | Secured | 3 | None. Stay relief (Doc. 183). |
| 64-1 | Mainstreet Community Bank (Loan One) | 07/30/26 | 4,793,063.37 | Secured | 2 | None. Stay relief (Doc. 183). |
| 65-1 | Tamamoi, LLC | 07/30/26 | 3,378,797.64 | Secured | 4 | Trustee objection to any deficiency (Doc. 424). |
| 66-1 | Carton Family Trust of 1992 | 07/30/26 | 383,505.45 | Secured | 5 | Trustee objection to any deficiency (Doc. 425). |
| 67-1 | PEDixon, LLC | 07/30/26 | 4,779,864.58 | Secured (asserted) | 12 | Trustee objection (Doc. 419); my § 502(d) motion (Doc. 423). |
| 68-1 | ZPD, LLC | 07/30/26 | 1,380,166.67 | Asserted | 12 | Trustee objection (Doc. 420); my § 502(d) motion (Doc. 423). |
| 69-1 | Paul Rene, Jr. (assignee of Jetton Investments, Inc.) | 07/31/26 | 1,634,600.00 | $1,468,484.37 secured; $166,115.63 unsecured | 1 / 9 | Trustee objection (Doc. 416). |
| 70-1 | IPFS Corporation | 08/17/26 | 1,231.54 | $1,118.79 secured; $112.75 unsecured | 13 / 9 | Trustee objection (Doc. 392). |
| 71-1 | Tiered Capital, Inc. | 08/19/26 | 125,000.00 | Unsecured | 9 | Trustee objection (Doc. 421). |

**Totals by status (amounts asserted)**

| | |
|---|---|
| Secured and ad valorem (Classes 1–7) | **11,541,381.18** |
| Class 9 filed (Claims 1-1, 2-1, 3-2, 4-3, 71-1) | **809,344.44** |
| Class 12 (Claims 67-1, 68-1) | **6,160,031.25** |

Amounts are as asserted and are not admissions. Claim 69-1 states $1,468,484.37 secured and $166,115.63 unsecured, which total its stated $1,634,600.00; the Trustee's objection (Doc. 416 ¶ 5) transposes the secured figure as $1,486,484.37.

**Exhibit E — Class 6 Ad Valorem Tax Claims (Claims 8–62)**

| Claim | Holder | Unit / parcel | Tax year | Amount | Rate | Tax-deed application |
|---|---|---|---|---|---|---|
| 8-1 | Keys Funding LLC | Parcel 24-36-11-00-506.31 (cert. 2024-11162) | 2024 | 7,732.92 | | |
| 9-1 | Keys Funding LLC | Parcel 24-36-11-00-506.33 (cert. 2024-11164) | 2024 | 7,732.92 | | |
| 10-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 101 (Bldg. 8) | 2024 | 6,671.57 | 18.0% | |
| 11-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 101 (Bldg. 8) | 2025 | 5,807.27 | 18.0% | |
| 12-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 104 (Bldg. 8) | 2024 | 6,671.57 | 18.0% | |
| 13-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 104 (Bldg. 8) | 2025 | 5,807.27 | 18.0% | |
| 14-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 103 | 2024 | 7,467.62 | 18.0% | |
| 15-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 103 | 2025 | 6,499.71 | 18.0% | |
| 16-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 104 | 2024 | 7,467.62 | 18.0% | |
| 17-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 104 | 2025 | 6,499.71 | 18.0% | |
| 18-1 | ATCF II Florida-A LLC | Not stated on claim | — | 6,824.65 | 7.5% | |
| 19-1 | FIG 20, LLC FBO SEC PTY | 202 Ivory Coral Ln, Unit 504 | — | 34,278.69 | 18.0% | |
| 20-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 107 | 2024 | 7,174.54 | 18.0% | |
| 21-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 107 | 2025 | 6,246.87 | 18.0% | |
| 22-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 202 | 2024 | 7,614.80 | 18.0% | |
| 23-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 202 | 2025 | 6,626.65 | 18.0% | |
| 24-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 203 | 2025 | 6,626.65 | 18.0% | |
| 25-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 203 | 2024 | 7,614.80 | 18.0% | |
| 26-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 205 | 2025 | 6,626.65 | 18.0% | |
| 27-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 205 | 2024 | 7,614.80 | 18.0% | |
| 28-1 | FIG 20, LLC FBO SEC PTY | 202 Ivory Coral Ln, Unit 206 | — | 38,255.59 | 18.0% | |
| 29-1 | Community Red Co | 202 Ivory Coral Ln, Unit 305 | 2025 | 23,679.57 | 18.0% | Pending (per Doc. 304) |
| 30-1 | Community Red Co | 202 Ivory Coral Ln, Unit 402 | 2025 | 23,666.33 | 18.0% | Pending (per Doc. 304) |
| 31-1 | Community Red Co | 202 Ivory Coral Ln, Unit 404 | 2025 | 23,653.09 | 18.0% | Pending (per Doc. 304) |
| 32-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 206 | 2025 | 7,137.00 | 18.0% | |
| 33-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 207 | 2025 | 6,373.80 | 18.0% | |
| 34-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 207 | 2024 | 7,321.69 | 18.0% | |
| 35-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 303 | 2025 | 6,690.12 | 18.0% | |
| 36-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 303 | 2024 | 7,688.32 | 18.0% | |
| 37-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 305 | 2025 | 6,690.12 | 18.0% | |
| 38-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 307 | 2025 | 6,437.28 | 18.0% | |
| 39-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 307 | 2024 | 6,847.73 | 18.0% | |
| 40-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 402 | 2025 | 6,690.12 | 18.0% | |
| 41-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 404 | 2025 | 6,690.12 | 18.0% | |
| 42-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 103 (Bldg. 5) | 2025 | 5,797.35 | 18.0% | |
| 43-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 103 (Bldg. 5) | 2024 | 6,660.11 | 18.0% | |
| 44-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 101 (Bldg. 7) | 2025 | 5,807.27 | 18.0% | |
| 45-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 101 (Bldg. 7) | 2024 | 6,671.57 | 18.0% | |
| 46-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 103 (Bldg. 7) | 2025 | 5,810.57 | 18.0% | |
| 47-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 103 (Bldg. 7) | 2024 | 6,675.55 | 18.0% | |
| 48-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 407 | 2025 | 6,437.28 | 18.0% | |
| 49-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 407 | 2024 | 7,395.26 | 18.0% | |
| 50-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 503 | 2025 | 6,753.59 | 18.0% | |
| 51-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 503 | 2024 | 7,761.94 | 18.0% | |
| 52-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 504 | 2025 | 6,753.59 | 18.0% | |
| 53-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 505 | 2025 | 6,753.59 | 18.0% | |
| 54-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 505 | 2024 | 7,761.94 | 18.0% | |
| 55-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 507 | 2025 | 6,500.74 | 18.0% | |
| 56-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 507 | 2024 | 7,468.84 | 18.0% | |
| 57-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 101 (Bldg. 2) | 2025 | 4,982.22 | 18.0% | |
| 58-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 101 (Bldg. 2) | 2024 | 5,715.22 | 18.0% | |
| 59-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 102 (Bldg. 2) | 2025 | 4,972.32 | 18.0% | |
| 60-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 102 (Bldg. 2) | 2024 | 5,703.72 | 18.0% | |
| 61-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 101 (Bldg. 5) | 2025 | 5,807.27 | 18.0% | |
| 62-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 101 (Bldg. 5) | 2024 | 6,671.57 | 18.0% | |
| | | | Total | 478,289.67 | | |

Claims 8-1 and 9-1 (Keys Funding LLC) state the same amount, $7,732.92, on different parcels and certificates. The Plan pays each Allowed Class 6 Claim at its statutory rate, in equal monthly installments ending by May 21, 2031 (Plan § 4.5).