FILED ORL INTAKE- USBC
19 OCT 2026 PM1:01

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:
HOMEMAKERS REAL ESTATE, LLC,

Debtor.
_______________________________/

Case No. 6:25-bk-05570-GER
Chapter 11 (Involuntary)

**NOTICE OF FILING REDLINE COMPARISONS OF MY SECOND AMENDED DISCLOSURE STATEMENT AND SECOND AMENDED PLAN**

On October 19, 2026, together with this notice, I filed my Second Amended Plan of Reorganization and my Second Amended Disclosure Statement. The Order of September 21, 2026 requires that any amendment to a disclosure statement be accompanied by a redline comparison filed under a separate notice of filing. (Doc. 397 ¶ 6). I file these two:

Exhibit 1 my Second Amended Disclosure Statement compared to the Disclosure Statement I filed on July 13, 2026 (Doc. 304); and

Exhibit 2 my Second Amended Plan of Reorganization compared to the Plan I filed on July 13, 2026 (Doc. 303).

Each comparison is cumulative and shows both rounds of amendment. Inserted text is underlined and deleted text is struck through. Red marks the changes my Amended Disclosure Statement (Doc. 433) and Amended Plan (Doc. 432) made on October 9, 2026, as shown in my earlier notice (Doc. 431). Blue

marks the changes this amendment makes to those documents. The Second Amended Disclosure Statement remains a single integrated statement, as paragraph 5 of the Order requires. It answers the three questions raised at the October 14, 2026 hearing: why my standing does not depend on the restitution lien on my claim; what it means for the Plan to subsume the Trustee's sale program; and the lender liability that bears on the claims of Mainstreet Community Bank of Florida.

Respectfully submitted this 19th day of October, 2026.

Frank L. Amodeo, Pro se
1311 Hoffner Avenue
Orlando, FL 32809
(407) 406-1315
flahome32809@gmail.com

## Certificate of Service

I certify that on October 19, 2026, I filed this notice, my Second Amended Plan of Reorganization, and my Second Amended Disclosure Statement in person with the Clerk of Court. As a pro se litigant, I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; her counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States Trustee.

Frank L. Amodeo, Pro se

# EXHIBIT 1

Second Amended Disclosure Statement compared to the Disclosure Statement (Doc. 304)

Red: changes filed October 9, 2026 (Docs. 432, 433)

Blue: changes in this amendment

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: | Case No. 6:25-bk-05570-GER |
| **HOMEMAKERS REAL ESTATE, LLC,** | Chapter 11 |
| Debtor. | |
| / | |

**SECOND AMENDED DISCLOSURE STATEMENT IN SUPPORT OF ~~THE~~ THE SECOND AMENDED PLAN OF ~~REORGANIZATION~~ REORGANIZATION PROPOSED BY FRANK L. AMODEO,**
**a Creditor and Party in Interest**

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | ~~flahome32801@gmail.com~~flahome32809@gmail.com

Dated: ~~July 13,~~ October ~~9,~~ 19, 2026

## 1. INTRODUCTION AND SUMMARY

I file this Second Amended Disclosure Statement (the "Disclosure Statement") under section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to give holders of claims and interests in the above-captioned case (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), the adequate information they need to make an informed judgment about the Second Amended Plan of Reorganization (the "Plan") I propose for Homemakers Real Estate, LLC (the ~~"Debtor").~~"Debtor"). This Disclosure Statement supersedes the one I filed on July

13, ~~2026.~~ 2026 (Doc. ~~304).~~ 304) and the amended statement I filed on October 9, 2026 (Doc. 433). It is a single integrated statement, as the Order of September 21, 2026 requires, and a redline comparing it to Doc. ~~304~~ 433 is filed under separate notice. (Doc. 397 ¶¶ 5–6).

The Plan does three things. The Plan preserves the Debtor's vacation-rental enterprise at the Cape Crossing Resort as a going concern. The Plan recovers for the Estate the transfers and unlawful interest taken from it. And the Plan delivers a recovery approaching one hundred percent to legitimate creditors.

Between July 13, 2026 and the date of this Disclosure Statement, the record changed, and this statement changes with it. The Bankruptcy Court denied the Rule 60 motions and consolidation, so every avoidance period now runs from September 2, 2025. The Trustee compromised the post-petition rent claim against the Dixon lenders, so the $880,000 turnover my earlier statement anticipated will not occur. The Condominium Association withdrew its claim, and Class 8 is empty. The secured amounts now track the filed claims. Class 6 now receives interest at the rate Florida law fixes, as the Tax Collector's objection requires. The PEDixon and ZPD claims, now filed and objected to, sit in a new Class 12. The Plan now takes effect only when the confirmation order is final. On October 7, 2026, Mainstreet, PEDixon and ZPD, Tamamoi, and the Carton Family Trust objected to my earlier plan or statement (Docs. 427–430), as Mr. McPhillips had in

August (Doc. 328). In answer, the Plan now pays Class 9 with interest from operating revenue; pays Tamamoi and Carton on their claimed amounts until a Final Order fixes the Allowed amounts; returns any claim the Recovery Trustee declines to the Reorganized Debtor; provides a successor Recovery Trustee; classifies the IPFS claim in a new Class 13; and drops every reference to a combination with Mr. McPhillips. Exhibits B through E add a five-year monthly projection, a liquidation analysis by collateral pool, a claims register, and a schedule of the tax claims. This statement also discloses the Trustee's claim objections, operating report, and competing plan; the October 19, 2026 settlement conference; Mainstreet's stay relief; the Canaveral Crossroads case; a valuation of the units; and the restitution lien on my own ~~claim.~~claim. On October 14, 2026, the Bankruptcy Court heard both disclosure statements, and this statement now answers the three questions that hearing raised: why my standing does not depend on the restitution lien on my claim (Section 1.A); what it means for the Plan to subsume the Trustee's sale program (Section 4.C); and the lender liability that bears on Mainstreet's claims (Section 2.J).

**A. ~~Who~~ I ~~am,~~ assisted both the borrowers and ~~why I file this Plan.~~the lender, and creditors should weigh my whole history — the convictions and the ~~work.~~work. My standing was fixed when I joined the petition and filed the Plan, and no payment toward my restitution judgment undoes it.**

Candor about the proponent is part of adequate information, so I begin with myself. I am Frank L. Amodeo. I hold an unsecured claim against the Debtor of $396, and I was one of the petitioning creditors who joined the involuntary petition. My claim is one reason I participate in this case. The other is my belief in the rule of law and in just results. As the case went on, I saw that, for reasons outside this Court, the results were not ~~why~~ turning out to be fair. I ~~file this Plan.~~ then took on a broader role, so that not only would my own claim be repaid, but the comparatively innocent parties to these transactions — the unsecured creditors and the true third-party creditors who had no say in them — would be protected too. For four years I ~~advised~~ assisted with the financial analysis and structuring of the loans this Disclosure Statement describes, and I assisted and educated both sides of them, without charge: the owners of Tiered Capital, Inc. and its affiliates — my friends, the borrowers — ~~without charge,~~ and ~~I advised~~ the ~~lender too:~~ lender, Kenneth Dixon ("Mr. ~~Dixon")~~ Dixon"). Mr. Dixon and I met nearly weekly for two years, over dinners at my home, to discuss the state of the Tiered businesses. I watched the events this Disclosure Statement describes as they happened; several of the transactions described below occurred at my dining-room table. IMQA Investments Incorporated, a company owned by members of my family, and CTO

Holdings, Inc. also hold claims; each is a Class 9 non-Insider unsecured creditor, and the Plan treats them, and me, exactly as it treats every other non-Insider unsecured creditor.

Creditors weighing my judgment should also know its history. In 1997, Georgia disbarred ~~me in 1997.~~ me. In 1999, I was convicted of mail fraud and served my sentence in a federal boot camp. A second ~~conviction, for~~ conviction arose from a corporation's failure to pay ~~corporate~~ its payroll taxes, ~~sent me to~~ and I served that sentence in federal prison. In 2008, Florida declared me incompetent. Those facts are public, the parties opposing this Plan repeat them often, and I do not contest them. On May 11, 2026, the guardianship court authorized me to prosecute this bankruptcy case personally. *In re Guardianship of* ~~*Amodeo,*~~ *Amodeo*, No. 48-2008-CP-001369-O (Fla. 9th Cir. Ct. May 11, 2026). Creditors should also know the rest of the story. I graduated from the Emory University School of Law. I practiced bankruptcy law in Atlanta, in hundreds of cases, and over my career I have taken part in more than sixty Chapter 11 cases as an attorney or a stakeholder. In prison, I advocated for other inmates, and I built a deep body of experience doing it. Twice, the Supreme Court of the United States granted certiorari and relief on pleadings I wrote for others — Anthony Grant Jackson and Michael ~~Avon~~ Levon Jackson. *Jackson v. United* ~~*States*, 136 S. Ct. 2408~~ *States*, 578 U.S. 1020 (2016) (mem.); *Jackson v. United* ~~*States*, 140 S. Ct. 129~~ *States*, 589

U.S. 902 (2019) (mem.). The work corrected incorrect sentences in 741 cases, avoided 1,997 years of unnecessary imprisonment, and saved taxpayers about $108 million. Several district courts, including the court that sentenced me, have recognized that advocacy and the quality of the work. My convictions and my incompetency adjudication are part of the record; so is that experience, and creditors should weigh both in judging the Plan. Read the Plan, verify the numbers against the Schedules and the exhibits, and judge the work on the record. Every figure in this Disclosure Statement carries a verification path.

On September 11, 2026, the United States gave notice that it holds a criminal restitution lien on all of my property, including any distribution on my $396 claim in this ~~case,~~ case (Claim 1-1), arising from the restitution judgment entered against me on July 2, 2009. (Doc. 387). Any distribution the Plan makes on my ~~$396~~ claim will go where that lien ~~requires.~~ requires, and every dollar of it reduces my restitution debt. The lien reaches my property alone; it does not reach the Debtor's property or any other creditor's distribution.

At the October 14, 2026 hearing, it was suggested that if Mainstreet paid my restitution judgment — or only the $396 my claim represents — I would lose my standing in this case. I would not, for five reasons. First, standing is measured when a party invokes the court's power, not afterward. "[S]tanding is to be determined as of the commencement of suit." *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 570 n.5 (1992). On September 2, 2025, I held Claim 1-1 when I joined the involuntary petition; on May 21, 2026, the Bankruptcy Court entered the order for relief on that petition (Doc. 229); and I held the same claim on July 13, 2026, when I filed my plan, and on October 9, 2026, when I amended it. Nothing that later happens to my claim reaches back to undo any of those acts. Second, what follows the commencement is a question of mootness, not standing, and a party who says its own later conduct ended the controversy bears the "heavy burden" of proving it. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). A creditor that opposes a plan cannot carry that burden by paying the plan's proponent. If it could, any plan could be bought off the docket for the price of the smallest claim behind it.

Third, a payment by Mainstreet would not pay my claim. Mainstreet does not owe the Debtor's debt to me. Money it pays the United States reduces my restitution judgment, not the Debtor's obligation on Claim 1-1, which remains outstanding until the Debtor or the Plan pays it. Nor does the restitution lien change who holds the claim: a lien under *18 U.S.C. § 3613(c)* secures the United States' judgment against my property, and I remain the holder of the claim it encumbers. Fourth, the Bankruptcy Code does not measure a party in interest by the size of its claim or by who will receive its distribution. Once a trustee is appointed, "[a]ny party in interest, including . . . any creditor, may file a plan," *11*

*U.S.C. § 1121(c)(1)*, and a party in interest is one whom the reorganization proceedings "might directly affect." *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 272–73 (2024); *see also In re Roman Catholic Diocese of Albany*, No. 1:25-cv-01570 (BKS), 2026 WL 2923067, at *9–10 (N.D.N.Y. Sept. 29, 2026) (reversing a bankruptcy court that read *Truck* narrowly; a party "potentially concerned with or affected by" the outcome is a party in interest, and *Truck* does not require it to show "definitive financial responsibility"). Every dollar the Plan distributes on my claim reduces a judgment against me. Few creditors in this case are more directly affected by how it ends. Fifth, Mainstreet could not step into my place by paying. The Bankruptcy Code subrogates only an entity that is "liable with the debtor on, or that has secured," a creditor's claim, *11 U.S.C. § 509(a)*, and Mainstreet is neither; a stranger who pays another's debt is a volunteer and acquires nothing. State law decides who owns a claim, *Butner v. United States*, 440 U.S. 48, 55 (1979), and only the party entitled to enforce a claim may assert it; "one entity cannot assert another's claims." *In re Aegis Asset Mgmt., LLC*, 182 F.4th 1364, 1371 & n.8 (11th Cir. 2026). And a creditor that acquires a claim to defeat a plan, rather than to be paid on it, acts with the "ulterior motive" that justifies designating its vote. *In re DBSD N. Am., Inc.*, 634 F.3d 79, 102–03 (2d Cir. 2011); *11 U.S.C. § 1126(e)*.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINDER OF THIS DISCLOSURE STATEMENT, WHICH IS IN TURN QUALIFIED BY THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS NOT DEFINED HEREIN HAVE THE MEANINGS GIVEN IN THE PLAN.

THE INFORMATION HEREIN HAS NOT BEEN SUBJECT TO AUDIT. WHILE EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE ACCURACY, I CANNOT WARRANT THAT THE INFORMATION IS WITHOUT INACCURACY. THIS DISCLOSURE STATEMENT MAY INCLUDE FORWARD-LOOKING STATEMENTS SUBJECT TO RISKS AND UNCERTAINTIES. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND CAUSES OF ACTION, THIS DISCLOSURE STATEMENT ~~SHALL~~ STATES MY CONTENTIONS AND THE POSITIONS OF OTHERS. IT IS NOT ~~CONSTITUTE~~ AN ADMISSION ~~OF~~ BY ANY ~~FACT OR LIABILITY BUT IS A STATEMENT MADE IN SETTLEMENT~~

~~NEGOTIATIONS.~~PARTY, AND NO COURT HAS ADJUDICATED THE CONTESTED ALLEGATIONS IT DESCRIBES.

**B. ~~Voting and the Confirmation Hearing.~~Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance — above all, section 502(d).**

The Bankruptcy Code and Rules place claims against, and interests in, the Debtor into Classes. The Plan designates ~~eleven (11)~~ thirteen (13) Classes of Claims and Interests. Class 8 holds no Claim, because the Cape Crossing Condominium Association withdrew its claim on September 18, 2026. (Doc. 393). Class 13 is Unimpaired and is presumed to accept. *11 U.S.C. § 1126(f).* The classification and treatment of each Class are discussed below. If the Plan alters the legal, contractual, or equitable rights of a holder, the Claim or Interest is "Impaired," and the holder is entitled to ~~vote.~~vote. A holder whose Claim is the subject of a pending objection may vote only to the extent the Bankruptcy Court temporarily allows the Claim for that purpose. *Fed. R. Bankr. P. 3018(a).* Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance, particularly section 502(d). Classes 4, 5, and 12 fall within that exception. Each holder in them received transfers the Estate seeks to avoid, and section 502(d) disallows its Claim until it returns them. This Disclosure Statement gives the Bankruptcy Court notice that a section 502(d) circumstance exists as to each of those Claims, so that the Court may disallow them on its own

motion. I moved to disallow the PEDixon and ZPD claims on October 2, 2026 (Doc. 423), and I will file a separate motion as to the Tamamoi and Carton claims before ballots are due.

THE VOTE OF EACH HOLDER OF AN IMPAIRED CLAIM IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT. THE LAST DAY TO VOTE TO ACCEPT OR REJECT THE PLAN IS __________, 2026, AT 5:00 P.M. (ET). BALLOTS MUST BE RECEIVED BY THE CLERK OF THE U.S. BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, BY THAT TIME.

After the Ballots are tabulated, the Bankruptcy Court will hold a hearing (the "Confirmation Hearing") to consider whether the Plan satisfies the confirmation requirements of section 1129 of the Bankruptcy Code. The Bankruptcy Code permits confirmation even if not every Impaired Class accepts; confirmation over the objection of an Impaired Class is sometimes called "cramdown." I expressly reserve the right to seek cramdown under section 1129(b).

I URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

## 2. HISTORY AND DESCRIPTION OF THE DEBTOR'S BUSINESS

### A. The Debtor owns the rental heart of the Cape Crossing Resort.

The Debtor, Homemakers Real Estate, LLC, owns and operates a portfolio of vacation-rental units within the Cape Crossing Resort and Marina (the "Resort"), located at 201 Ivory Coral Lane, Merritt Island, Florida 32953. At full build-out the Resort comprises forty-seven (47) townhomes, thirty-six (36) condominiums, a restaurant, two (2) marinas, a clubhouse and pool, and related commercial and intangible property. On October 31, 2020, the Debtor acquired thirty-three (33) of the vacation-rental units by quitclaim deed in lieu of ~~foreclosure; twenty-seven (27) remain — twenty-six~~ foreclosure. Twenty-six (26) ~~units plus one (1) additional unit — together with units to be returned~~ remain: eighteen (18) condominiums at 202 Ivory Coral Lane and eight (8) townhomes. (Exs. C, E). Unit 403 is not among them. In March 2024, Crescent Sound transferred Unit 403 from the Debtor to the ~~Estate through conveyance avoidance.~~ IAM Irrevocable Trust and then left its mortgage unpaid. Tamamoi foreclosed, and the circuit court, in what I believe was error, treated the Unit as outside the bankruptcy estate. That ruling is on appeal, the appeal is stayed while the bankruptcy proceeds, and the Plan seeks the Unit's return. In the Debtor's Schedule A/B filed June 16, 2026, the real property is valued at approximately

$11,860,000 (the twenty-six units at $11,300,000 and one further unit at $560,000), and the Debtor scheduled substantial Causes of Action as additional assets.

**B. Four investors built the ~~Resort,~~ Resort with money from three lenders, and by 2019 an institutional consolidation was within reach.**

Michael McPhillips ("Mr. McPhillips") and Martin Flynn ("Mr. Flynn") conceived ~~the Resort.~~ it. Lacking the capital to complete it alone, ~~Mr. McPhillips and Mr. Flynn~~ they brought in ~~two close associates,~~ Horton Johnson ("Mr. Johnson") and ~~Neil Buchalter ("Mr. Buchalter"),~~ Investors of Merritt — a group of friends and family headed by its principal investor, Dan Myers, CPA, now deceased — whose capital enabled development to begin in approximately 2015. Three lenders financed the work from the start: Mr. Johnson, who was both an investor and a lender; Neil Buchalter ("Mr. Buchalter"); and David Campbell, who operated FDRE, Inc. To finish the project, the developers presold units, entered construction loans, and stacked second, third, and fourth mortgages on individual units. By 2019, with most structures nearing completion, the enterprise involved more than fifty (50) investors, lenders, and owners across more than one hundred fifty (150) transactions, and an institutional lender had tentatively committed to consolidate the debt and fund completion (the "Consolidation").

### C. The pandemic, a bank merger, and a partition starved the enterprise of cash.

Between December 2020 and January 2021, Mr. McPhillips and Mr. Flynn entered a partition agreement (the "Partition Agreement") to resolve their disputes and disentangle their business arrangements. Mr. McPhillips took the marinas and restaurant; Mr. Flynn took the development entities, including the entity that became the Debtor. The COVID-19 pandemic then slowed construction and sharply increased materials costs, and a bank merger derailed the Consolidation, leaving the enterprise without the cash flow to meet its obligations. In late 2020, two mortgage-service entities (TACIRA, LLC and DRCIRA, LLC) commenced foreclosure actions, which were resolved after Mr. Johnson purchased the relevant mortgages. In April 2024, Tamamoi, LLC initiated a mortgage-foreclosure action relating to nine (9) residential units.

### D. Mr. Dixon lent $11.225 ~~million; by his own records, he~~ million and has ~~collected~~ collected more than $27 million.

Between January 2022 and September 2023, Mr. Dixon, a retired accountant and self-described hard-money lender acting through PEDixon, LLC, ZPD, LLC, and Parke Financial, Ltd., made eleven loans totaling $11,225,000 to companies and individuals affiliated with the Resort enterprise, including Tiered Capital, Inc. ("Tiered Capital"), Sherwood Construction, Inc., IMQA Investments Incorporated, and Mr. Flynn. Each loan carried interest of 12% or 15%, a 2% origination fee, 1%

renewal fees, and provisions for collection costs, due-diligence expenses, and legal fees; on default, the rate rose to the statutory maximum of 25%. I watched most of these loans made: I introduced Mr. Dixon to several of the borrowers, and I ~~negotiated~~ assisted in structuring all but two of the eleven.

Attorney Alison Pitkanen ("Ms. Pitkanen") prepared all or most of the loan documents, controlled escrow and disbursement of the loan proceeds through her IOLTA accounts, and — notwithstanding the conflict — represented both the Tiered-affiliated borrowers and the Dixon-related lenders in the same transactions. On September 13, 2023, the Dixon and Pitkanen interests purported to consolidate the eleven loans through a Tiered Consolidated Loan Agreement and an alleged Tiered Land Trust Agreement, under which the Debtor's ownership was said to be held by the Tiered Land Trust, with Crescent Sound, Ltd. — an entity Mr. Dixon owned and controlled — as trustee.

The borrowers' verified accounting, drawn in part from Mr. Dixon's own records, shows that Mr. Dixon has since collected more than $27,123,645 in cash, real estate, business interests, and purported forbearance fees against the $11,225,000 lent — an overpayment exceeding $15.8 million. The same records show effective interest rates of 32.33% in 2024 and 29.10% in 2025, each above the 25% ceiling of the Florida criminal-usury statute. *Fla. Stat. § 687.071*. *Johnson*

*v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026) (verified complaint ¶¶ 16–19, 400–420).

**E. A three-page unrecorded ~~deed~~ deed, a forged eight-page replacement, and a falsely notarized assignment purported to move the Debtor into Mr. Dixon's hands.**

~~I contend~~ No trust existed in September 2023, and the Tiered Land Trust was never validly formed. A Florida land trust exists only when a recorded instrument conveys the real estate to the trustee and confers the trustee's powers. *Fla. Stat. §§ 689.071(2), 689.073(1).* In September 2023, Mr. Johnson electronically signed a three-page trustee's ~~deed that~~ deed. It was never witnessed, never notarized, and never ~~witnessed, contained~~ recorded, and it described no ~~legal descriptions,~~ property: its third page bore the electronic-signature envelope identification number and ~~was never~~ listed Schedule A only as twenty-six units. That instrument could not be recorded ~~— an instrument unrecordable~~ under Florida ~~law. On~~ law, and it created nothing. The earliest date on which the trust could have existed is February 14, 2024, ~~a~~ when an eight-page "curative" trustee's deed ~~appeared~~ was recorded in the Brevard County public ~~records: eight pages long, bearing witness signatures, twenty-seven legal descriptions,~~ records — and that deed is forged on its face. Set beside the deed Mr. Johnson signed, it shows what was done to it. Witness signatures were added. Addresses were added. A notary's seal and certificate were added, for a notarization ~~that~~ the notary's own records

contradict. And the signed third page — the only page that carried the envelope identification number — was removed and replaced with six pages of legal descriptions of twenty-seven properties, none of which carries that number. A signed document does not acquire witnesses, a notary's seal, and six new pages after it is signed. The recorded deed is a falsified, fabricated, and forged instrument, and it conveyed nothing. On January 9, 2024, Ms. Pitkanen presented Mr. Johnson with an Assignment of Membership Units transferring the Debtor's membership interests. The signing happened in my home, and I objected to the first version of the document in the room; after Mr. Johnson signed the revised version, Ms. Pitkanen emailed the executed document to her assistant, Janelle Morea ("Ms. Morea"), who checked "Physically Present" on a notarial certificate for a signing Ms. Morea never attended. The verified complaint identifies more than thirty-four (34) false attestations and notarization irregularities across the Dixon loan documents. Because the trust was never ~~validly~~ formed, ownership of the Debtor remains ~~with, or has reverted to,~~ with Mr. Johnson.

~~That ownership question~~ The Debtor's membership units now sit inside the so-called Tiered Land Trust. They belong to Mr. Johnson, and they are to be returned to him if they have not been already. Mr. Johnson is ~~already before a court.~~ the Debtor's owner, and on the Effective Date he controls the Reorganized Debtor. On February 9, 2026, Mr. Johnson filed a declaratory action in Orange

County ~~to settle whether the Tiered Land Trust or Mr. Johnson owns the Debtor's membership units.~~ that will confirm it. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026) (the "Declaratory ~~Action"). The Plan accommodates either answer: the Class 11 Interest is held by Mr. Johnson as Trustee of the Tiered Land Trust or, if the trust is determined never to have been validly formed, as the restored owner of the Debtor, and the treatment is identical in either capacity.~~Action").

**F. For thirty months Mr. Dixon collected the ~~Debtor's rents~~ Debtor's rents and paid none of the Debtor's creditors.**

From December 2023 through the entry of the order for relief, the Dixon-related interests controlled the Debtor. Crescent Sound seized the rental operations; the Debtor's revenues were routed through Ms. Pitkanen's IOLTA account and transferred to PEDixon and ZPD — more than $2,800,000 over the period — while, on the present record, the mortgages, ad valorem taxes, association assessments, and maintenance obligations of the Debtor went unpaid. The arithmetic of that diversion is the story of this case: every secured creditor now asserting an arrearage — Jetton, Mainstreet, Tamamoi, Carton, the Brevard County Tax Collector, and both associations — traces its default to revenue Mr. Dixon collected and kept. The foreclosures, the association liens, and the tax

delinquencies are not the product of a failed business; the units rented and the money came in. The money simply never reached the creditors it belonged to.

**G. The forged assignment defeated the first bankruptcy case; the second produced an order for relief and a trustee.**

On May 5, 2025, Mr. Johnson, as Manager, filed a voluntary Chapter 11 petition for the Debtor. *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025) (the "First Bankruptcy Case"). The Dixon-affiliated lenders moved to dismiss, relying on the January 9, 2024 Assignment of Membership Units to argue Mr. Johnson lacked authority, and on June 27, 2025 the case was dismissed on that ground. Reconsideration was denied on August 26, 2025, but the court identified the paths by which a renewed filing would be authorized.

~~Two~~ The Rule 60 motions ~~remain pending~~ I described in my earlier statement are no longer pending. On July 21, 2026, the Bankruptcy Court denied the motions to vacate the dismissal of the First Bankruptcy ~~Case. (Docs. 87, 88.) The motions seek to vacate the June 27, 2025 dismissal — a dismissal procured with the forged Assignment —~~ Case, and on August 20, 2026, it denied my motion to consolidate the two ~~Chapter 11~~ cases. ~~If the motions are granted, the~~ (Doc. 345 & n.2). The operative petition date ~~relates back to May 5, 2025, the First Bankruptcy Case's petition date, extending the Estate's avoidance reach-back~~

~~periods and converting the revenues Mr. Dixon diverted between the dismissal and the order~~ for ~~relief into recoverable post-petition transfers under section 549.~~ every purpose is therefore September 2, 2025. The Plan ~~is drafted to capture that benefit without depending on it: the Plan~~ no longer defines a ~~contingent~~ Relation-Back ~~Date of May 5, 2025 for~~ Date, and every avoidance ~~computations, while every payment obligation — including the adequate-protection stream —~~ and reach-back period runs ~~in all events~~ from ~~the~~ September 2, ~~2025 petition date. Creditors should understand the pending motions as potential upside to the Recovery Trust, not as a condition of the Plan.~~ 2025.

On September 2, 2025 — within a week of that denial — Tiered Capital filed an involuntary Chapter 11 petition commencing this Bankruptcy Case; Mr. Johnson, IMQA Investments Incorporated, CTO Holdings, Inc., and I joined as petitioning creditors. ~~After~~ On October 8, 2025, I moved to appoint a Chapter 11 trustee — the first party in this case to ask for one. (Doc. 13). On February 11, 2026, the Bankruptcy Court struck that motion with my other pro se papers (Doc. 137), and the request was renewed thereafter, including by Mainstreet (Doc. 155). On May 20, 2026, after contested proceedings, the Bankruptcy Court rejected the Debtor's claim that the petitioning creditors filed in bad faith. It found that the petition was not filed for an improper purpose; that the petitioning creditors' "primary reason for the involuntary petition was for a proper purpose, namely to

ensure a fair distribution of Homemakers' assets," so "that Mr. Dixon does not get a disproportionate share versus other creditors"; that their "primary concern was ensuring payment of all creditors and not just Mr. Dixon"; and that "the principal aim in filing this case is to prevent the disproportionate advantage that Mr. Dixon exercises by receiving and controlling the disposition of Homemakers' rental income." (Doc. 256 at 10:13–21, 11:19–24, 12:25–13:3, 14:3–6, 28:8–13). It found PEDixon, ZPD, and Crescent Sound to be insiders (*id.* at 22:6–8), and, because "all rents are being controlled by Mr. Dixon," it ordered that a trustee be appointed. (*Id.* at 30:17–23). On May 21, 2026, it entered the order for ~~relief on May 21, 2026, finding on the record of the May 20 hearing the involuntary filing was made in good faith and that its principal purpose was to prevent the Dixon lenders from capturing a disproportionate share of the Resort.~~ relief. (Doc. 229). On June ~~11,~~ 8, 2026, it directed the ~~Bankruptcy Court directed~~ appointment of a Chapter 11 trustee (Doc. 240), and on June 12, 2026, it approved the appointment of Lara Roeske ~~Fernandez as Chapter 11 Trustee.~~ Fernandez. (Doc. 252). On June 16, 2026, Mr. Johnson filed the Debtor's Schedules and Statement of Financial Affairs. The section 341 meeting of creditors ~~and an election of trustee are~~ was set for July 16, 2026. (Doc. 264). Because exclusivity ended upon the appointment of the Chapter 11 Trustee, I file the Plan as a party in interest under section 1121(c).

**H. A verified tort action now quantifies the scheme.**

On July 9, 2026, Mr. Johnson and Tiered Capital filed a verified complaint in the Circuit Court of the Ninth Judicial Circuit against Mr. Dixon, PEDixon, ZPD, Parke Financial, Ms. Pitkanen, her professional association, and Crescent Sound. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026). The sixteen counts include fraud in the inducement, criminal usury, forgery-based fraud, conversion, civil theft, abuse of process, breach of fiduciary duty, and federal and Florida civil RICO, and allege actual damages of $33,050,155 — $99,150,465 after mandatory trebling — exclusive of fees, interest, and ongoing receipts.

I am a witness to the events that complaint describes. The claims it pleads belong to Mr. Johnson and Tiered Capital, not to the Estate, and no creditor should vote in reliance on their outcome. The Estate holds its own claims arising from the same events — the avoidance and turnover claims, the section 549 claims for post-petition transfers, and the usury forfeitures — all of which the Plan places in the Recovery Trust, and the decision whether and how to pursue each recovery rests with the Chapter 11 Trustee, presumably Ms. Fernandez, whom the Plan names as Recovery Trustee. The tort action's significance to this Bankruptcy Case is evidentiary: the same documents, the same false notarizations, and the same diverted revenues that support Mr. Johnson's claims support the Estate's. The

record is already assembled, verified, and exhibit-supported; the Estate does not start from zero.

The Dixon parties deny all of it. They say the loans bore a contractual rate of 15 percent, below the 25 percent threshold of Fla. Stat. § 687.071; the borrowers' accounting of Mr. Dixon's own records puts the effective rates at 32.33 percent in 2024 and 29.10 percent in 2025, and the expert report of Gary A. Moll computes effective rates above the criminal threshold. (Doc. 339). They say the satisfaction theory counts a South Carolina parcel they never accepted; on September 14, 2023, Crescent Sound took an assignment of the membership units of the company that owns it, and the Dixon side has held it ever since. They say the January 9, 2024 Assignment is valid and that this Court dismissed the First Bankruptcy Case on its strength (Doc. 430 ¶¶ 5, 10, 12); the notary who certified that Mr. Johnson appeared before her was not in the room. And the trust through which the Dixon side claims control rests on a deed altered after Mr. Johnson signed it: the recorded version added witnesses, addresses, and a notary's seal, and it replaced the signed third page — the only page bearing the envelope identification number, which listed Schedule A as twenty-six units — with six pages describing twenty-seven properties, none bearing that number. That is why I know the recorded deed is falsified, fabricated, and forged, and no order entered without that comparison validates it. The Trustee herself refuses to concede that the consolidated loan

agreement is enforceable (Doc. 419 ¶¶ 17–19), and this Court has found PEDixon, ZPD, and Crescent Sound to be insiders. (Doc. 256 at 22:6–8). The ownership question is pending in the Declaratory Action, and the tort claims are pending in *Johnson v. Dixon*.

**I. Since July 13, 2026, the Trustee compromised the post-petition rent claim, proposed a competing plan, and objected to most of the claims in the case.**

On September 2, 2026, the Bankruptcy Court approved, over my objection, the Trustee's compromise with PEDixon, LLC and ZPD, LLC (together, the "Lender") and the Cape Crossing Condominium Association. (Doc. 379 ¶¶ 1–2). Under the compromise, the Lender pays the Trustee $350,000 to resolve the Trustee's claim to avoid and recover the post-petition transfers defined in her motion, and waives any section 502(h) claim for that amount; the Trustee pays the Association $204,000 for the condominium roof replacement; the Association withdraws its claim; and the Trustee holds the balance and may not use it without further order, while she and the secured creditors reserve whether their liens attach to it. (*Id.* ¶¶ 3–5). On September 18, 2026, the Association withdrew Claim 7. (Doc. 393). By its terms the compromise reaches only the post-petition transfers; it does not decide the Lender's claims against the Estate or the Estate's other claims against the Lender.

On September 11, 2026, the Bankruptcy Court directed the Trustee, PEDixon, and ZPD to a judicial settlement conference before the Honorable Jason A. Burgess for possible resolution of "all issues between the Parties." (Doc. 386 ¶¶ 2–3). The conference is set for October 19, 2026. (Doc. 419 at 5 n.1). Any settlement it produces must come back to the Bankruptcy Court for approval. *Fed. R. Bankr. P. 9019(a)*. Creditors should understand that a settlement of the Lender's claims could change the recoveries this Disclosure Statement projects.

On September 18, 2026, the Trustee filed a competing plan of liquidation and its disclosure statement. (Docs. 394, 395). The Trustee's plan sells all twenty-six Units free and clear of liens, through brokers or an auctioneer; pays each secured creditor from the proceeds of its collateral; and distributes what remains to unsecured creditors and, only after they are paid in full, to the holders of Interests. (Doc. 395 at 13–17). I have objected to the Trustee's disclosure statement. On October 14, 2026, the Bankruptcy Court ~~will consider~~ heard both disclosure statements. On October 15, 2026, it conditionally approved the Trustee's amended disclosure statement and set a combined hearing on its final approval and on confirmation of her plan for November 19, 2026. (Doc. ~~397 ¶ 2).~~ 437 ¶¶ 1, 3). If both plans satisfy the confirmation requirements, the Bankruptcy Court must consider the preferences of creditors and equity security holders in choosing between them. *11 U.S.C. § ~~1129(e).~~ 1129(c).*

On July 22, 2026, the Bankruptcy Court required every scheduled creditor to file a proof of claim to participate in the case, and it extended the deadline through August 21, 2026 for six named creditors. (Doc. 320 ¶¶ 2–3). As of September 18, 2026, seventy-one claims had been filed. (Doc. 395 at 12). Between September 17 and October 2, 2026, the Trustee objected to the claims of IPFS Corporation, WM Holdings Group, LLC, CTO Holdings, Inc., IMQA Investments Incorporated, Mr. Johnson, Paul Rene, Jr., PEDixon, LLC, ZPD, LLC, and Tiered Capital, Inc. (Docs. 392, 409, 410, 411, 412, 416, 419, 420, 421). On October 2, 2026, I moved to disallow the PEDixon and ZPD claims under section 502(d). (Doc. 423). On October 6, 2026, the Trustee objected to the claims of Tamamoi, LLC and the Carton Family Trust only to disallow any deficiency, and stated that she lacks standing to raise usury because the Debtor is not an obligor on either loan. (Docs. 424, 425 ¶ 14 & n.2). On August 28, 2026, the Bankruptcy Court ordered that a party seek leave before objecting to a proof of claim or a scheduled liability. (Doc. 359 ¶ 3). The Plan's claim-objection period conforms to that order. (Plan § 7.2).

On September 17, 2026, the Bankruptcy Court denied Mr. Johnson's motion to appoint an examiner. (Doc. 391). My appeal from the order denying my motion to disqualify PEDixon and ZPD from participating in this case (Doc. 344) is pending in the district court, where my motion for leave to appeal awaits decision. *Amodeo v. Roeske Fernandez*, No. 6:26-cv-02089-AGM (M.D. Fla. 2026). On

October 2, 2026, the Brevard County Tax Collector objected to the interest rate my earlier plan applied to its claims. (Doc. 422). The Plan now pays Class 6 the statutory rate, as Section 3.C describes. On October 7, 2026, I objected to the Trustee's disclosure statement on seventeen grounds. (Doc. 426).

On March 16, 2026, the Bankruptcy Court terminated the automatic stay as to Mainstreet Community Bank and permitted it to exercise its in rem rights against the Units that secure its loans. (Doc. 183 ¶ 2). On February 11, 2026, it lifted the stay for Tamamoi only to let it obtain a final judgment (Doc. 135 ¶ 2), and on August 28, 2026, it abated the Tamamoi and Carton requests to conduct foreclosure sales. (Doc. 361 ¶ 1). A foreclosure sale by Mainstreet before the Plan takes effect would remove its Units from the Estate. On the Effective Date, the Plan's injunction replaces each of these orders, and no secured creditor may sell a Unit except through a state-court receiver conducting a structured sale after an uncured Plan default. (Plan §§ 6.13, 8.4).

On September 21, 2026, the Trustee filed her operating report for August 2026. It reports receipts of $18,661 for the month, cumulative receipts of $44,484, disbursements of $761, and $43,609 in cash on August 31, 2026. (Doc. 399, Part 1). Creditors should compare those receipts with the projections in Section 4.B.

On September 8, 2026, the court entered an order for relief against Canaveral Crossroads, LLC — the resort's developer and declarant — on its

consent, and converted its case to Chapter 11; on September 30, 2026, it ordered that case jointly administered with that of Sherwood Construction, Inc. *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla.) (Docs. 15, 61). Canaveral Crossroads reports that it owns the clubhouse, the common areas, the sewage lift station, and the Cape Crossing Resort & Marina names and marks. (*Id.*, Doc. 56 at 2). Tamamoi's foreclosure judgment was entered in its action against Canaveral Crossroads and others. (Doc. 424 at 2 n.1). The Plan proposes that the Debtor acquire the assets of Canaveral Crossroads through that case, subject to approval in both cases. (Plan § 6.2).

**J. In February 2022, Mainstreet dictated the Debtor's arrangement with Canaveral Crossroads and cost the Debtor almost five years of revenue; in 2025, rather than enforce its assignment of rents against PEDixon, it negotiated to sell its mortgages to PEDixon at a discount.**

Before 2022, the Debtor's Units stood on a second set of assets. In April 2021, Canaveral Crossroads quitclaimed the resort's public property — the clubhouse, the pool and fitness facility, the sewage lift station, and the open land and sign parcel — to Canaveral Crossing Resorts, Inc. (O.R. Book 9077, Page 1557, recorded Apr. 6, 2021). The resort's intellectual property, the Cape Crossing Resort & Marina names and marks, was placed there as well. That arrangement gave the Debtor two things. First, the Debtor's Units held first priority on every reservation the resort booked, which likely would have doubled the Debtor's rental

revenue. Second, the amenities and marks generated fees beyond what their expenses and the original Crossroads investors required, and that margin supported the Debtor.

On February 17, 2022, Mainstreet refinanced nineteen of the Debtor's Units with a $5,061,363 loan, $4,822,072.69 of which retired the Campbell loans on those Units through FDRE, Inc. (Settlement Statement, Feb. 17, 2022, lines 1501, 1600). As a condition of that refinancing, Mainstreet stepped outside the role of a lender and dictated how the Debtor and Canaveral Crossroads would structure their contract. Its demand produced exactly the result it sought: on February 7, 2022 — ten days before the closing — the deed returning the clubhouse, the pool, the lift station, and the open land from Canaveral Crossing Resorts, Inc. to Canaveral Crossroads was recorded. (O.R. Book 9407, Page 1642). The Debtor lost its priority on the resort's reservations and its share of the amenity revenue. For almost five years since, the returned properties have produced no revenue for the Debtor at all, and the revenue that would have serviced the Debtor's debts — Mainstreet's among them — never came in.

In February 2025, Mr. Johnson and I met with Mainstreet and told it that it needed to enforce the assignment of rents in its mortgages to stop the diversion of the Debtor's rents to PEDixon. Mainstreet's assignment of rents came first in time, and the Bankruptcy Court later found that Mr. Dixon "has been retaining all of the

rental income, despite the mortgagee's assignment of rent provisions that are prior in time to the loan with Mr. Dixon." (Doc. 256 at 13:15–19). Mainstreet did not enforce it. After that meeting, Mainstreet instead discussed with PEDixon a short sale of the Mainstreet mortgages on the Debtor's Units to PEDixon. The sale did not close, but the choice speaks for itself: rather than stop the diversion, Mainstreet negotiated a transaction that would have put its mortgages, at a discount, in the hands of the lender diverting the Debtor's rents, and would have harmed the Debtor's other creditors even more. Meanwhile, the rents kept flowing to PEDixon, and the Debtor's mortgages, taxes, and assessments went unpaid.

A lender that uses the leverage of a loan to dictate its borrower's dealings with a third party crosses the line from creditor to participant, and it answers for the harm it causes. Florida law holds a party liable for an intentional and unjustified interference with a business relationship it knows of, when the interference damages the plaintiff. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). Mainstreet knew of the Debtor's arrangement with Canaveral Crossroads, because it required the arrangement's undoing as a condition of its loan. No lender's justification covers that interference: Mainstreet's collateral was the nineteen Units, not the relationship between its borrower and a third party, and the Debtor's revenue — the source of repayment of Mainstreet's own loan — fell as a direct result. The same conduct supports subordinating

Mainstreet's claims. *11 U.S.C. § 510(c)(1)*. Subordination requires inequitable conduct that injured the creditors or gave the claimant an unfair advantage, and the conduct need not concern the claim itself: "inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977). Mainstreet's 2022 interference, and its 2025 choice to negotiate with the lender diverting the Debtor's rents rather than stop the diversion, are conduct of exactly that kind. Florida's credit-agreement statute of frauds does not stand in the way. It bars a debtor's "action on a credit agreement" that is not in writing, *Fla. Stat. § 687.0304(2)*; the Estate sues on no promise Mainstreet made to lend or to forbear, but on Mainstreet's interference with the Debtor's contract with a third party. The Estate also takes every defense the Debtor holds, and it may assert the resulting damages in recoupment and setoff against Mainstreet's claims. *11 U.S.C. § 558*. Because the four-year limitations period had not run when this case began on September 2, 2025, the Estate may bring the claim until May 21, 2028, two years after the order for relief. *11 U.S.C. § 108(a)*.

No proceeding on these claims is pending yet. The Plan places them in the Recovery Trust with every other Cause of Action, and because the same conduct injured Canaveral Crossroads, I expect them to be decided in or alongside its

Chapter 11 case. (Plan §§ 4.3, 6.10). The damages are the revenue the Debtor's Units would have earned, with first priority on every resort reservation and the Debtor's share of the amenity revenue, over the revenue they actually earned, from February 2022 forward. That loss approximates $52,816 a month, and the figure covers both parts of it: the Debtor's share of the revenue the clubhouse, the pool, the common areas, the lift station, and the resort's name and marks produce, and the rental revenue the Debtor lost with its first priority on the resort's reservations. The resort's rental program always split revenue 50/50 between the operator and the unit owner, and the same split would have governed the Debtor's share here; I derived the figure from the revenue Canaveral Crossroads has lost and that split. From March 2022 through October 2026, fifty-six months, the Debtor's loss totals $2,957,696, and it grows by $52,816 every month the Debtor goes without the resort behind its Units. Until a Final Order fixes Mainstreet's liability, the Plan pays Classes 2 and 3 into escrow. (Plan § 4.1(e)). Whatever liability is determined reduces Mainstreet's Allowed Claims dollar for dollar, or eliminates them, and any excess is a recovery for the Estate.

**3. SUMMARY OF THE PLAN**

THE FOLLOWING IS ONLY A SUMMARY. ANY PARTY CONSIDERING A VOTE SHOULD READ THE PLAN IN ITS ENTIRETY. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.

**A. ~~Overview.~~The Plan keeps the Resort renting, pays every legitimate creditor in full, and turns the Estate's claims over to a Recovery Trust.**

The Plan classifies and treats all Claims against, and Interests in, the Debtor in ~~eleven (11)~~ thirteen (13) Classes: eight (8) Classes of Secured Claims (Classes ~~1–8),~~ 1–8, of which Class 8 is now empty), one (1) Class of non-Insider General Unsecured Claims (Class 9), one (1) Class of Insider Unsecured Claims (Class 10), ~~and~~ one (1) Class of Interests (Class ~~11).~~ 11), and one (1) Class of the disputed claims of PEDixon, LLC and ZPD, LLC (Class 12), and one (1) Unimpaired Class for the small secured claim of IPFS Corporation (Class 13). Administrative Claims and Priority Tax Claims are not classified and are treated separately. Each secured creditor in Classes 1 through 5 and Class 7 receives parallel treatment — ~~adequate-protection payments~~ adequate protection accruing at 4.8% per annum through the Effective ~~Date,~~ Date and cured from recoveries, then a 360-month amortization at 6% with a five-year balloon — even though the collateral securing each differs. Class 6, the ad valorem tax claims, receives interest at the rate Florida law fixes and full payment within five years after the order for relief. Non-Insider unsecured creditors are paid in ~~full~~ full, with interest at the federal judgment rate, in sixty monthly installments from ~~litigation recoveries,~~ operating revenue, and ~~ninety-percent (90%)~~ net recoveries prepay them; after the secured creditors receive what the Plan provides, every dollar of net recoveries ~~are dedicated~~ goes to unsecured ~~creditors.~~creditors until they are paid in full. I believe 6% is a market rate for a

fully amortizing loan on income-producing resort units; if a secured Class rejects the Plan, the Bankruptcy Court will decide whether the rate gives that Class the present value of its claim. *11 U.S.C. § 1129(b)(2)(A)(i)(II)*. The Effective Date occurs only after the confirmation order becomes a Final Order. (Plan §§ 1, 8.1). Where a secured creditor's entitlement is in dispute — the Mainstreet, Tamamoi, and Carton Claims, and any Dixon claim asserted as secured — the Plan proceeds as normal, but each payment it provides on that Claim is held in escrow by the Recovery Trustee until a Final Order determines whether, and how much, the creditor is owed; only then is the escrow disbursed. (Plan § 4.1(e)). Units are sold only if the Reorganized Debtor's results fall below the projections — that is, if its net operating income will not cover every Plan payment — and then over time, two or three at a time, after the peak season, at structured-sale prices, never in a forced bulk sale. The same structured-sale provision applies if the Crossroads acquisition does not occur, unless the Reorganized Debtor is meeting every Plan obligation from its own operations. (Plan § 6.12). If the Reorganized Debtor defaults and does not cure, it consents to a state-court receiver who sells the affected Units in the same structured way. (Plan § 6.13).

The Plan establishes a Recovery Trust that holds all of the Estate's Causes of Action — including the claims for preferences and fraudulent transfers, ~~the~~ any section 549 ~~post-petition transfer claims,~~ claims the Trustee's compromise did not

resolve, the claims against P.E. Dixon and, separately, against Tamamoi, LLC, and the recovery of ~~the one unit lost to foreclosure~~ Unit 403 — administered to conclusion by the Chapter 11 Trustee, Lara Roeske Fernandez, as Recovery Trustee. If she declines to serve, a successor approved by the Office of the United States Trustee serves on the same terms. (Plan § 6.3). Any claim the Recovery Trustee declines — because she judges its merits insufficient or its prosecution not economically efficient — reverts to the Reorganized Debtor, which decides whether to pursue it; its net proceeds still flow through the Plan's waterfall. (Plan § 6.11). Her statement that she will not pursue usury against Tamamoi and Carton (Docs. 424, 425 n.2) operates as such a declination. The Plan appoints the Recovery Trustee as the representative of the Estate under section 1123(b)(3)(B) to retain and enforce those claims (Plan § 6.10), and it preserves section 502(d): no Claim of an entity that received an avoidable transfer is Allowed, and no distribution is made on it, until that entity pays or turns over what it received, while the payments the Plan provides on that entity's Secured Claim wait in escrow (Plan §§ 4.1(e), 7.4). The Recovery Trust is funded ~~with $250,000~~ from the balance of the Lender's settlement payment that the Trustee holds under the compromise order — approximately $146,000 after the $204,000 roof payment — to the extent the Bankruptcy Court determines that no secured creditor's lien attaches to it, and otherwise from the Reorganized Debtor's net operating revenue. My earlier

statement funded the Recovery Trust from an $880,000 ~~in~~ turnover of post-petition funds ~~to be turned over~~ by P.E. Dixon; ~~the remaining $630,000 funds the Debtor's operations~~ that turnover did not occur, and the ~~adequate-protection payments.~~ Plan no longer depends on it. The net proceeds of the Recovery Trust flow through the Plan's waterfall to cure secured-creditor defaults and to pay unsecured creditors.

**B. ~~Classification~~ Thirteen Classes hold the claims and ~~Voting.~~ interests; the Dixon, Tamamoi, and Carton Classes do not vote, because section 502(d) bars them.**[1]

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Jetton Investments, Inc. / Paul Rene, Jr. | Impaired | Yes |
| 2 | Mainstreet Community Bank (Loan One) | Impaired | Yes |
| 3 | Mainstreet Community Bank (Loan Two) | Impaired | Yes |
| 4 | Tamamoi, LLC | Impaired | ~~Yes~~No — § 502(d) |
| 5 | Carton Family Trust of 1992 | Impaired | ~~Yes~~No — § 502(d) |
| 6 | ~~Brevard County Tax Collector~~Ad valorem taxes (Tax Collector and certificate holders) | Impaired | Yes |
| 7 | Cape Crossing ~~Townhome Owners Association~~Townhomes Homeowners Association, Inc. | Impaired | Yes |
| 8 | Cape Crossing Condominium ~~Association~~Association — claim withdrawn (Doc. 393) | ~~Impaired~~No Claim | ~~Yes~~No |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Yes |
| 10 | Insider Unsecured Claims | Impaired | Yes |
| 11 | Interests in the Debtor | Impaired | Yes |

---

[1] The Chapter 11 Trustee has objected to many of the claims in this case. (Docs. 392, 409–412, 416, 419–421, 424, 425). I have not yet assessed the validity of each objection. Until the Trustee's objections are resolved, the holders of those claims are not entitled to vote unless the Bankruptcy Court temporarily allows their claims for that purpose. Fed. R. Bankr. P. 3018(a).

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| 12 | PEDixon, LLC (Claim 67) and ZPD, LLC (Claim 68) — disputed | Impaired | No — § 502(d) |
| 13 | IPFS Corporation (Claim 70-1) — secured portion | Unimpaired | No (deemed to accept) |

**C. ~~Treatment of Claims~~ Every legitimate creditor is paid in full on its Allowed Claim, and ~~Interests.~~the disputed Dixon claims receive nothing unless a Final Order allows them.**

The treatment of each Class is summarized below and set forth in full in Article 4 of the Plan. The dollar amounts shown are the amounts asserted ~~by the respective creditors and reflected~~ in the filed proofs of claim or, where noted, the judgment, the Trustee's filings, or the Debtor's ~~Schedules and my claims analysis;~~ Schedules; they are not admissions, and many Claims are disputed and subject to objection and reduction.

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| Admin / Priority | Trustee & professional fees; § 1930 fees; tax claims | Paid in full under § 1129(a)(9); priority tax claims over 5 years; IRS/FDOR claims disputed and may be reduced to zero. |
| 1 — Jetton | $1,634,600.00 ~~(senior~~ (Claim 69: $1,468,484.37 secured, $166,115.63 unsecured); senior mortgage on the ~~land)~~land | Lien retained; 4.8% adequate protection; 360-month amortization at 6%; 5-year balloon. Treated as ~~allowed and undersecured.~~undersecured. Trustee's objection pending (Doc. 416). |
| 2 — Mainstreet One | ~~$3,520,717.75~~$3,611,594.47 principal (Claim 64-1; asserted total exceeds $4,793,000) | ~~Common~~ Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured ~~treatment; subject to Estate offset for lender conduct.~~treatment (6%, 360 months); payments held in escrow until then. Stay |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| | | relief (Doc. 183) ends on the Effective Date. |
| 3 — Mainstreet Two | $694,564.66$712,105.80 principal (Claim 63-1; asserted total exceeds $920,000) | Common Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured treatment; subject to Estate offset for lender conduct.treatment (6%, 360 months); payments held in escrow until then. Stay relief (Doc. 183) ends on the Effective Date. |
| 4 — Tamamoi | $3,069,220.83 (9 loans) $3,378,797.64 (Claim 65-1; final judgment entered May 18, 2026; 8 units) | Common secured treatment Judgment superseded; it may not be enforced by sale (Docs. 135 ¶ 3, 361). Claim fixed in a claim proceeding; I contend no more than $227,000, the amount on the Allowed (principal) amount after usury forfeiture face of the mortgage, on any Unit, and no interest under Fla. (Fla. Stat. §§ 687.03, 687.04.687.04, 687.071(7)). To the extent Allowed: Lien allowed on its Units; common secured treatment (6%, 360 months); payments held in escrow until then. Trustee objects only to any deficiency (Doc. 424). |
| 5 — Carton | $376,757.47 (1 loan) $383,505.45 (Claim 66-1; townhome Unit 8-104) | Same terms as Tamamoi; usury forfeiture of interest; common secured treatment on the Allowed amount.Tamamoi. Trustee objects only to any deficiency (Doc. 425). |
| 6 — Brevard County TaxAd valorem taxes | $303,421.77$478,289.67 (Claims 8–62): Tax Collector $312,465.91 (2024 and 2025 taxes, 18%); certificate holders $165,823.76 (Keys Funding, ATCF II, FIG 20, Community Red Co); tax-deed applications pending on Units 305, 402, 404 | Paid in full with statutory interest from recoveries; assessments at the rate applicable nonbankruptcy law fixes for each claim (18% on the Tax Collector's claims; the certificate rate on each certificate), in equal monthly installments completed by May 21, 2031, five years after the order for relief; balance paid at any sale or refinancing of the Unit. 11 U.S.C. §§ 511(a), 1129(a)(9)(C)–(D). No tax-deed application proceeds while payments are current. Assessments contested as 25–30% |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| | | over fair market value. |
| 7 — ~~Townhome Assoc.~~Townhomes HOA | ~~$118,731.84~~$118,731.84 (Claim 6-1) | Full Allowed Claim paid from recoveries; subject to Estate negligence/waste claims (up to $125,000/unit). |
| 8 — Condominium Assoc. | ~~$445,810.10~~Claim 7 withdrawn September 18, 2026 (Doc. 393) | ~~Common secured treatment; subject to Estate negligence/waste claims.~~No Claim; no distribution. The $204,000 roof payment under Doc. 379 resolved the Association's special assessment. |
| 9 — Unsecured (Non-Insider) | ~~Under $1,000,000 aggregate~~$809,344.44 filed (IMQA, CTO, Tiered, WM, Amodeo); Trustee objections pending to all but mine | 100% of Allowed ~~Claims, no interest,~~ Claims with interest at the federal judgment rate, in 60 monthly installments from ~~recoveries; in any event paid in full within 5 years. 90% of~~ operating revenue (Ex. B); net recoveries ~~dedicated to unsecured creditors.~~prepay. Shares pro rata with any Class 12 claim Allowed as unsecured. |
| 10 — Insider Unsecured | ~~Johnson claims (~$4.43M)~~Johnson, Claim 5-2, $2,594,987.93; Trustee seeks recharacterization (Doc. 412) | Paid only after Classes 1–9 satisfied and $1,000,000 improvement reserve funded; then pro rata in remaining recoveries. |
| 11 — Interests | Horton S. Johnson (units held in the so-called Tiered Land ~~Trust / Johnson~~Trust, to be returned to him) | Interest ~~retained subject to governance in Plan Article 6;~~ retained; Mr. Johnson controls the Reorganized Debtor at exit; no distribution on the Interest until senior Classes are satisfied. |
| 12 — PEDixon / ZPD | $4,779,864.58 (Claim 67) and $1,380,166.67 (Claim 68); objected to by the Trustee (Docs. 419, 420) and by me | Disputed. Nothing unless Allowed by Final Order; § 502(d) bars allowance until any avoidable transfer is returned. An Allowed Secured Claim receives the common secured treatment; an Allowed Unsecured Claim shares pro rata with Class 9. |
| 13 — IPFS | $1,231.54 (Claim 70-1; $1,118.79 secured, $112.75 unsecured); Trustee objection (Doc. 392) | Unimpaired. Allowed Secured Claim paid in full in Cash within 30 days after the Effective Date; any unsecured part is in Class 9. |

The Debtor scheduled the secured claims of P.E. Dixon (KAE) and ZPD, LLC at $0.00 and marked each disputed, contingent, and unliquidated. On July 30, 2026, PEDixon, LLC filed Claim 67 for $4,779,864.58, asserting that all of it is secured by a recorded purchase option and right of first refusal, and ZPD, LLC filed Claim 68 for $1,380,166.67. Each claim rests on the assertion that the Debtor guaranteed the September 14, 2023 consolidated loan to Tiered Capital. (Docs. 419 ¶¶ 5–7, 420 ¶¶ 5–6). On October 1, 2026, I moved for leave to object to both claims and tendered my objection, and on October 2, 2026, I moved to disallow both under section 502(d). (Doc. 423). On October 2, 2026, the Trustee objected to both claims; she declines to concede that the loan agreement is enforceable, faults the claims for failing to account for value already collected, and states that they may be unenforceable under the Bankruptcy Code and Florida law. (Docs. 419 ¶¶ 17–19, 420). I contend that no court may enforce the Dixon-related claims are unenforceable as usurious — claims, because the Florida criminal-usury statute makes an extension of credit at more than 25% an unenforceable debt in the courts of this State. *Fla. Stat. § 687.071(7)*. I further contend that the Debtor never borrowed from, and signed no enforceable guaranty in favor of, the Dixon parties, and that the Dixon-related debt was in any event satisfied by December 2023. The Estate accordingly treats P.E. Dixon Plan places both claims in Class 12. Class 12 receives nothing unless and until a Final Order allows a claim in it, and section

502(d) bars allowance while the claimant holds an avoidable transfer. If a Final Order allows a Class 12 claim as secured, the allowed amount receives the common secured treatment against the collateral the order identifies; if it allows a ~~source~~ claim as unsecured, the allowed amount shares pro rata with Class 9. Creditors should weigh that contingency carefully. The non-Insider unsecured claims identified below total $809,344.44; Allowance of ~~recovery,~~ both Class 12 claims in full as unsecured would raise the unsecured pool to $6,969,375.69, and the identified recoveries would no longer pay Class 9 in full. Until a Final Order resolves the Class 12 claims, the Plan's reserve (Plan § 7.3) holds back the share they would take if allowed in full as unsecured — about 88 percent of each Class 9 distribution ($6,160,031.25 of a $6,969,375.69 pool) — and releases it to Class 9 if the claims are disallowed. If a Final Order allows Claim 67 as secured in the amount asserted, the common secured treatment adds about $28,700 a month to the Plan's installments, which Exhibit B does not ~~a creditor.~~ carry.

The non-Insider unsecured claims filed in Class 9 include those of IMQA Investments Incorporated ($360,459.40), CTO Holdings, Inc. ($303,853.79), Tiered Capital, Inc. ($125,000.00), WM Holdings Group, LLC ($19,635.25), and mine ($396.00), totaling $809,344.44. (Docs. 409 ¶ 5, 410 ¶ 5, 411 ¶ 5, 421 ¶ 5). Class 9 also takes any part of Mr. Rene's Claim 69 allowed as unsecured ($166,115.63 asserted) and any deficiency on the Tamamoi or Carton claims that

section 1111(b)(1)(A) requires the Plan to treat as unsecured. (Plan §§ 4.2, 4.4). The Trustee has objected to every filed Class 9 claim except mine. If her objections succeed, Class 9 shrinks, and each remaining holder's recovery is unaffected, because the Plan pays Allowed Class 9 Claims in full with interest. Until the Class 12 claims are resolved, the Recovery Trustee will hold back from each Class 9 distribution the share those claims would take if allowed as unsecured. (Plan § 7.3). The Trustee also objects to Mr. Johnson's Class 10 claim of $2,594,987.93 and asks that it be recharacterized as equity (Doc. 412 ¶¶ 20–22), and to Mr. Rene's Class 1 claim (Doc. 416). Exhibit D lists every filed claim, its amount, its Class, and any objection.

**D. The Recovery ~~Trust's Causes of Action, itemized.~~Trust holds about $2.9 million in identified claims, and the Estate collects on them whichever position the Trustee takes.**

The Recovery Trust holds every Cause of Action of the Estate. The identified recoveries, each with its verification path, are these. First, the ~~turnover~~ balance of the ~~$880,000 in post-petition rents~~ Lender's $350,000 settlement payment that ~~P.E. Dixon and Crescent Sound collected and hold in a separate account~~ the Trustee holds under the compromise order — approximately $146,000 — to the ~~Dixon Turnover Funds — applied as Section 6.4 of~~ extent the ~~Plan provides.~~ Bankruptcy Court determines that it is unencumbered. (Doc. 379 ¶¶ 3–5). Second, ~~preferential~~ transfers to the Dixon ~~lenders of~~ lenders, which I estimated at

approximately ~~$1,400,000; a~~ $1,400,000 before the Rule 60 motions were denied. Because the reach-back periods now run from September 2, 2025, the forensic accounting now underway will ~~fix~~ restate that figure, and it may be lower. I plead the ~~precise amount,~~ transfers in the alternative: if PEDixon and ZPD were creditors, as their own Claims 67 and 68 assert, the ~~Recovery Trustee will prosecute~~ transfers within one year before the ~~claims it supports.~~ petition are preferences, because the Bankruptcy Court found them insiders (Doc. 256 at 22:6–8; 11 U.S.C. § 547(b)(4)(B)); if they were not creditors, the same transfers bought the Debtor nothing and are avoidable as fraudulent transfers (11 U.S.C. §§ 544(b), 548; Fla. Stat. ch. 726). Third, the $1,166,008.69 ~~in interest~~ the Debtor paid from its own account between March 2021 and November 2023 to Tamamoi, LLC, ~~forfeited under~~ FDRE, Inc., and two affiliates, and the ~~Florida usury statutes and recoverable from Tamamoi or credited against principal, together with the corresponding~~ $129,556.52 it paid to the Carton Family Trust. Neither claimant has accounted for the payments that passed between it and FDRE, its servicing agent; that accounting determines the rate actually charged, and I believe it will exceed 25 percent, making the debt unenforceable. *Fla. Stat.* ~~*§§ 687.03, §*~~ *687.071(7)*. On the face of the Tamamoi judgment, the rate is 18.27 percent a year, above the civil ceiling. *Fla. Stat. § 687.03(1).* A lender who willfully charges more forfeits all interest and must repay double the interest paid. *Fla. Stat. § 687.04*. The

Trustee says the Estate lacks standing to raise usury because the Debtor is not an obligor (Docs. 424, 425 n.2). If that is right, the Debtor paid $1,295,565.21 on debts it did not owe, and the Estate may recover those payments to the extent they exceeded the value the Debtor received; forfeited interest reduced no enforceable lien. Part of this recovery may come as a credit against the Tamamoi and Carton claims rather than as cash; a credit reduces what the Plan pays those Classes but does not fund distributions. Fourth, the recovery of ~~at least one unit fraudulently conveyed out~~ Unit 403, which Crescent Sound transferred from the Debtor to the IAM Irrevocable Trust in March 2024, under Fla. Stat. ch. 726 and sections 544(b), 548, and 550, and through the pending, stayed appeal of the ~~Estate;~~ circuit court's ruling; net of the liens against it, its return adds a minimum of $183,000 in equity, and more likely $250,000 to $300,000. Fifth, the Estate's own tort and contract claims against various parties, described in Section 2, which remain unquantified; whatever they produce flows through the same waterfall. ~~Together~~ Exclusive of the held settlement balance and the unquantified claims, the itemized recoveries total ~~at least~~ approximately ~~$3,758,000, exclusive~~ $2,878,565, against approximately $3,758,000 in my earlier statement; the difference is the $880,000 turnover that did not occur. Litigation of this kind takes time: I expect the ~~unquantified claims. The decision whether~~ avoidance claims to take one to three years to resolve or settle, and ~~how to pursue each rests with~~ the Recovery ~~Trustee.~~ Trustee may engage

counsel on a contingent fee, which would reduce net recoveries by that fee. The Plan does not depend on recoveries to pay the amortized installments or Class 9; recoveries cure arrearages and prepay.

**E. Governance proceeds in ~~three~~ two stages: the Trustee now, and Mr. ~~Johnson~~ Johnson, the Debtor's owner, at ~~exit, the builders upon combination.~~exit.**

Governance under the Plan is staged, and no stage returns the Debtor to the hands that emptied it. While the case proceeds to conclusion, the Debtor remains under the direction and control of the Chapter 11 Trustee, and the Plan proposes the appointment of a committee of unsecured creditors under section 1102 to monitor operational performance and assist Ms. Fernandez. As of the date of this Disclosure Statement, no committee has been appointed. On the Effective Date, ~~ownership of~~ Mr. Johnson, the Debtor's owner, controls the Reorganized Debtor ~~rests with Mr. Johnson — in whichever capacity the Declaratory Action determines —~~ and ~~Mr. Johnson~~ will oversee a professional management company engaged to run the resort day to day and will be responsible for effectuating the Plan. ~~I propose to engage Ross Johnston as a monitor reporting to the unsecured creditors committee. This should allow for a smooth transition out of the reorganization with~~ Mr. Johnson ~~as~~ will receive compensation commensurate with the time he actually spends managing ~~member~~ the Reorganized Debtor, at the market rate for an executive manager of a limited liability company, paid from the

Reorganized Debtor's revenues. Who manages the combined enterprise after the ~~consummation of~~ Debtor acquires the ~~plan.~~ Crossroads assets will be determined when that acquisition occurs. Ms. Fernandez continues as Recovery Trustee, administering the Recovery Trust to its conclusion with authority to retain professionals and to settle or ~~abandon~~ decline claims, subject to such Bankruptcy Court approval as may be ~~required.~~ required; a successor approved by the Office of the United States Trustee serves if she does not, and claims she declines revert to the Reorganized Debtor. The Class 11 Interest holder retains the Interest subject to this structure and receives nothing on account of it until every senior Class is satisfied.

Section 1129(a)(5) requires disclosure of who will manage the Reorganized Debtor and on what terms. Horton S. Johnson will serve as managing member of the Reorganized Debtor and will run it. He will be compensated commensurate with the time he actually spends managing the Reorganized Debtor, at the market rate for an executive manager of a limited liability company, paid from the Reorganized Debtor's revenues. The Reorganized Debtor will engage a professional vacation-rental management company, which I will identify before the Confirmation Hearing, at a fee of 20 percent of gross rental revenue, the figure Exhibit B uses. I will receive no compensation from the Debtor, the Reorganized Debtor, or the Recovery Trust, and I have no agreement for compensation with Mr.

Johnson, Tiered Capital, IMQA, or anyone else in connection with the Plan. No one is paying for the preparation of the Plan. I prepared it to see my own $396 claim paid, and that is my only stake in it.

**4. CONFIRMATION OF THE PLAN**

**A. The Plan satisfies the best-interests test because liquidation pays unsecured creditors nothing.**

A Chapter 7 liquidation sells all twenty-six Units at once, into the same small market, in one forced sale, and twenty-six units of one resort dumped on that market at once drive every price down. The Plan sells nothing in haste. For the last five years the Units' vacation rentals have paid their maintenance and the service of their proper debt — except during the thirty months when the Dixon lenders took a disproportionate share of the rents, usually all of them and sometimes more than all of them, by leaving the utilities and maintenance unpaid. A structured sale, timed to the market, realizes values a forced liquidation cannot, and that difference alone satisfies the best-interests test. Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either accept the Plan or receive at least as much as it would in a Chapter 7 liquidation. ~~In~~ Exhibit C works the liquidation pool by pool. The secured creditors already hold stay relief and in a ~~hypothetical~~ Chapter ~~7,~~ 7 case would complete their foreclosures; the Trustee herself states that no Unit sale proceeds would reach a ~~trustee would sell~~ Chapter 7

estate. (Doc. 395 at 16). Exhibit C values the Debtor's units (scheduled at approximately $11,860,000, twenty-six Units the Debtor holds three ways, using the September 1, 2026 valuation of Gary A. Moll, CPA, ASA (Ex. A ¶¶ 9, 14), scaled from twenty-seven Units to twenty-six and supported allocated by a broker's opinion of value in the range of $483,000 to $486,000 per unit) at distressed, forced-sale prices. After satisfaction each Unit's 2025 just value, and it charges each collateral pool with its taxes, its share of the senior Jetton mortgage, its own mortgage (which encumbers the underlying land by metes and bounds and is recorded ahead of the Mainstreet, Tamamoi, and Carton interests), the secured claims of Mainstreet, Tamamoi, and Carton, the ad valorem taxes, as asserted, and the costs townhome association lien. At the auction value ($9.5 million) and commissions of at Moll's low portfolio value ($11.1 million), every pool is under water, and nothing reaches unsecured creditors from the Units. Only at Moll's high value ($17.3 million) would equity appear, about $4.4 million; that value rests on rental assumptions Mr. Moll identifies as above the market average (*Id.* ¶¶ 3, 12, 43) and describes the going concern the Plan creates, not a trustee's sale, little or nothing would remain for unsecured creditors. foreclosure. Whatever the value, the Plan pays Allowed Class 9 Claims in full with interest, and no Chapter 7 distribution can exceed full payment with interest at the legal rate. *11 U.S.C. § 726(a)(5)*. Every Class 9 holder therefore receives at least its Chapter 7 share, as

does any Class 12 claim Allowed as unsecured. A Chapter 7 trustee would also be far less able than the reorganized enterprise to fund and prosecute the Estate's Causes of Action. The Plan, by contrast, pays non-Insider unsecured creditors in full, preserves and prosecutes hold the Causes of Action, but would prosecute them net of Chapter 7 administrative costs and positions the Resort for a going-concern realization. commissions. The Plan therefore satisfies the best-interests test.

The following table compares the estimated recoveries under the Plan and under a hypothetical Chapter 7 liquidation:

| **Constituency** | **Estimated Chapter 7 Recovery** | **Estimated Plan Recovery** |
|---|---|---|
| Secured creditors (Classes 1–8)1–7) | Partial; senior liens paid first from forced-sale Foreclosure under existing stay relief; at auction or Moll's low value of ~$13–16.2Mevery collateral pool is under water (Ex. C) | Paid over time at 6% with 5-year balloon; arrearages cured from recoveries |
| Non-Insider unsecured (Class 9) | Little to none None from the units; only avoidance recoveries, after senior liens and sale Chapter 7 costs | 100% of Allowed ClaimsClaims with interest (less if Class 12 is Allowed as unsecured) |
| Insider unsecured (Class 10) | None | Pro rata from remaining recoveries after senior Classes |
| Interests (Class 11) | None | Retained, subject to governance and senior satisfaction |
| Disputed Lender claims (Class 12) | Disputed; any Allowed claim shares in the liquidation | Nothing unless Allowed by Final Order |

**B. The Plan is feasible: the rents that funded Mr. Dixon now fund the creditors.**

Section 1129(a)(11) requires that confirmation is not likely to be followed by liquidation or further reorganization, except as proposed in the Plan. The feasibility case rests on ~~a simple substitution: the~~ two changes. The rental stream that produced more than $2.8 million for Mr. Dixon during the control period is redirected to operations and debt service. ~~The~~ And the Debtor's ~~twenty-seven units are projected to generate rental income~~ acquisition of ~~approximately $1,631,000 over~~ the ~~fifteen-month projection period~~ Canaveral Crossroads assets places the Resort's reservation system, name, and amenities behind the Debtor's twenty-six Units. (Plan § 6.2). Exhibit B projects every month of ~~April 2027 through June 2028 (the "Projection Period"),~~ the Plan's five years; the table below states one plan year. It applies the $295 average daily rate at which an ~~average of roughly $109,000 per month, which, in most months, meets operating expenses~~ actual Cape Crossing three-bedroom townhome is marketed (Ex. A ¶¶ 27–28 & Ex. D) at 80 percent occupancy, deducts a 20 percent management fee and the ~~adequate-protection~~ Debtor's own carrying costs, and ~~amortized debt service~~ sets the result against the Plan's payments to Classes 1 through 7 and Class 9 and the ~~Plan contemplates.~~ United States Trustee's fees.

| **Plan Years 1–4 (2027–2030) — 26 Units** | **Amount** | **Basis** |
|---|---|---|
| Occupied nights | 7,592 | 26 Units × 365 nights × 80% |

| **Plan Years 1–4 (2027–2030) — 26 Units** | **Amount** | **Basis** |
|---|---|---|
| Gross rental revenue | $2,239,640 | $295 average daily rate (Ex. A ¶¶ 27–28) |
| Management fee | ($447,928) | 20% of gross rental revenue |
| Association dues | ($326,364) | 18 condominiums at $1,170 and 8 townhomes at $767.12 a month |
| Current property taxes | ($146,952) | $471 per Unit a month, paid each November |
| Insurance, utilities, maintenance | ($119,231) | Debtor's July 2026 proforma |
| Legal, administration, bank fees | ($37,200) | $3,100 a month |
| **Net operating income** | **$1,161,965** | |
| Plan payments, Classes 1–5 and 7 | ($707,901) | Amortized installments (Plan § 4.1) |
| Plan payments, Class 6 | ($168,597) | $478,290 at 18% over 48 months (Plan § 4.5) |
| Plan payments, Class 9 | ($178,864) | $809,344 with interest (4% assumed) over 60 months (Plan § 4.7) |
| United States Trustee fees | ($16,000) | Estimated, until the case is closed |
| **Cash after payments** | **$90,603** | Year 5: $259,200, after Class 6 is paid |
| Coverage | 1.08 to 1 | Net operating income ÷ payments (Year 5: 1.29 to 1) |

The owner costs come from the Debtor's July 2026 proforma. Florida sales and tourist-development taxes, which guests pay, are excluded, and so are the payments the Plan makes from recoveries — arrearage cures, accrued adequate protection, and the Class 7 payoff. Paying Class 9 from operations raises the break-even: at the $295 rate, the Units cover every payment over the five years at about 75 percent occupancy (Ex. B, Sensitivity). Occupancy is the critical assumption.

Mr. Moll reports a Merritt Island market average of 40 to 47 percent and a top decile of 78 percent and higher, and he explains why units booked through the resort's own platform belong above the market average. (Ex. A ¶¶ 24–25, 30–32). In 2019, the resort's rental program ran its thirty-five units at 59.6 percent occupancy and roughly $190 a night; at those figures, the Units would not cover the Plan's payments. The management fee assumes the operator cost per unit the rental program incurred in 2019, about $16,800 a year, which 20 percent of the projected revenue, about $17,200 per Unit, exceeds. (Canaveral Crossing Resorts, Inc., Normalized Historical Pro Forma 2019, unaudited).

The ~~Debtor's proforma reflects~~ Trustee's August 2026 operating report shows $18,661 in receipts for the month and $43,609 in cash on August 31, 2026 (Doc. 399, Part 1); the projection assumes the Units are booked through the Crossroads reservation system after the Effective Date, and it is not a forecast of the Units' performance under current management. On the Effective Date, the Allowed Administrative Claims, which I estimate at $125,000, are paid from the cash the Trustee then holds (Ex. B, Sources and Uses). The Reorganized Debtor starts with no cash of its own; the seasonal ~~liquidity trough~~ low point comes in January 2027, at about $51,000, and ~~a working-capital need of approximately $248,000 over~~ the ~~Projection Period. The~~ Plan bridges ~~that need,~~ it from the held settlement balance, to the extent the Bankruptcy Court holds it unencumbered, and

~~funds~~ from the ~~cure of arrearages and the payment of unsecured creditors, principally through the~~ first net ~~proceeds~~ recoveries of the Recovery ~~Trust's Causes~~ Trust. (Plan § 6.4). Class 6 — $478,289.67 asserted — earns interest at the statutory rate, 18 percent on the Tax Collector's claims, and is paid by December 2030, which raises the Plan's early debt service; Exhibit E lists every Class 6 claim. At month sixty, the balloon balance of ~~Action (itemized in Section 3.D; identified recoveries~~ Classes 1 through 5 and 7 is about $9,156,000. Refinancing it at 65 percent of ~~at least approximately $3,758,000, exclusive~~ value requires a value of about $14.1 million for the ~~larger tort~~ twenty-six Units, inside Mr. Moll's range of $11.1 million to $17.3 million for those Units, and ~~RICO claims). Of the $880,000 in post-petition funds to be turned over by P.E. Dixon, $250,000 funds the Recovery Trust and the remaining $630,000 is applied to the Debtor's operations and to adequate-protection payments to the secured creditors. The five-year balloon obligations are expected to be satisfied through~~ a refinancing ~~supported by~~ at 6 percent over thirty years would cost about $659,000 a ~~seasoned~~ year against projected net operating ~~history, or through~~ income of $1,162,000, coverage of 1.76 to 1. (Ex. B, Balloon Test). The alternative is a going-concern sale of the ~~consolidated Resort at fair market value, estimated at $90,000,000 to $100,000,000.~~ Units. On these bases, the Plan is ~~feasible.~~ feasible, subject to the risks Section 5 describes.

**C. ~~Nothing prevents~~ The Plan subsumes the Trustee's sale ~~program from working inside my Plan — as structured sales, over~~ program: the Units stand ready for orderly sale, two or three at a time, ~~at full value.~~and are sold to reduce principal whenever the Reorganized Debtor misses its numbers.**

The Trustee proposes to sell all twenty-six Units now, through brokers or an auctioneer. (Doc. 395 at 13–17). ~~Nothing in her approach conflicts with mine,~~ At the October 14, 2026 hearing, I said that the Plan could subsume the Trustee's plan, and the parties did not know what that meant. It means this: the Plan keeps the Trustee's sale program and places it beneath the Reorganized Debtor. On the Effective Date, the Reorganized Debtor arranges an orderly sale process for the Units, and Ms. Fernandez, as Recovery Trustee, conducts any sale through the brokers she selects. While the sale process stands ready, the Reorganized Debtor operates the Units, and the Plan ~~incorporates it on better terms.~~ measures its results against the projections of Exhibit B. If ~~the Reorganized Debtor's results~~ at any time its revenues and net operating income fall ~~below the~~ short of those projections — if ~~its net operating income~~ they will not cover every Plan payment — ~~then, beginning no earlier than~~ the ~~summer of 2027 and after the peak season, it will market~~ Recovery Trustee sells Units two or three ~~Units~~ at a time, ~~realize their~~ at fair market value, and ~~distribute~~ the net proceeds ~~exactly as~~ reduce the ~~Plan distributes every other dollar.~~ principal of the secured Claims on the Units sold. The same applies if the Crossroads acquisition does not occur, unless the

Reorganized Debtor is meeting every Plan obligation from its own operations. (Plan § 6.12).

The secured creditors bear no risk from this structure. Each receives the full amount of its Allowed Secured Claim, reamortized at a commercially reasonable rate — six percent over 360 months — and keeps its Lien until it is paid. That is everything a secured creditor could collect in foreclosure: its debt, from its collateral, and nothing more. When a secured class does not accept a plan, the Bankruptcy Code asks exactly that — that the holder keep its lien and receive deferred cash payments totaling at least the allowed amount of its claim and worth, on the effective date, at least the value of its collateral — and the Plan meets it. *11 U.S.C. § 1129(b)(2)(A)(i)*. If the ~~shortfall persists,~~ business misses its numbers, the structured sales ~~continue — essentially~~ pay down principal at full value, without the ~~process the Trustee proposes — but over two to three years rather than all at once.~~ cost, delay, and discount of a forced sale. Units sold two or three at a time, in season, bring substantially more than the same Units sold at foreclosure, ~~in an early forced sale,~~ at auction, or in bulk. The Trustee's plan sells everything at once; the Plan sells only what the numbers require, when the market will pay for it. The two plans share the same sale mechanism and differ only in whether the going concern first has the chance to pay every creditor in full. Every creditor does better ~~when~~

under the ~~Units are sold that way,~~ Plan, and ~~only~~ none bears more risk than it bears under the ~~Plan sells them that way.~~ Trustee's sale.

**~~C. Acceptance; Cramdown.~~D. The tax and townhome Classes will accept, and the Plan meets the cramdown standard for any Class that does not.**

An Impaired Class of Claims accepts the Plan if holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in that Class that vote, vote to accept. Class 6, which the Plan pays in full at the statutory rate, and Class 7, which the Plan pays in full from recoveries, are Impaired Classes of non-Insiders that I expect to accept. *11 U.S.C. § 1129(a)(10).* If any Impaired Class does not accept, I will request confirmation under section 1129(b), which permits confirmation so long as the Plan does not discriminate unfairly and is fair and equitable as to each non-accepting Impaired ~~Class.~~ Class. The absolute priority rule does not help a creditor whose Claim is disallowed under section 502(d) because it has failed to turn over to the Estate what it owes: that creditor holds no Allowed Claim, and the rule protects only the holders of Allowed Claims in a dissenting Class. *11 U.S.C. §§ 502(d), 1129(b)(2)(B).*

**5. RISK FACTORS**

Holders should weigh the following risks in deciding how to vote. First, the Plan's funding of arrearage cure and unsecured distributions depends substantially on recoveries from the Causes of Action, the timing and amount of which are

uncertain and subject to litigation risk. Second, several Claims are disputed; the outcome of claim objections (including the usury challenges to the Tamamoi, Carton, and Dixon claims) will affect distributions. Third, the five-year exit depends on the availability of refinancing or a going-concern sale on acceptable terms, which is subject to market and interest-rate conditions. Fourth, the vacation-rental business is seasonal, creating periodic liquidity ~~stress,~~ stress; the Reorganized Debtor starts with no cash reserve beyond the held settlement balance, Exhibit B shows a low point of about $51,000 in January 2027, and a slow season before the ~~projections assume the bridging of a working-capital gap.~~ first recoveries arrive could leave installments unfunded. Fifth, the consolidation strategy contemplates the Debtor's acquisition of the assets of Canaveral Crossroads, ~~LLC and cooperation~~ LLC, now a Chapter 11 debtor, which is not assured; Mr. McPhillips has refused any combination with the ~~McPhillips interests, neither of which is assured.~~ Debtor (Doc. 328 ¶ 3), and the Plan no longer contemplates one. If the Crossroads acquisition does not occur, the Plan's structured-sale provision applies unless the Reorganized Debtor meets every Plan obligation from its own operations. Sixth, I am a pro se proponent with the history disclosed in Section 1.A; creditors who discount my judgment should weigh the Plan's arithmetic, which does not depend on it. ~~I believe~~ Seventh, the Class 12 claims of PEDixon and ZPD total $6,160,031.25; if a Final Order allows them in

substantial part, the identified recoveries will not pay Class 9 in full. Eighth, on October 19, 2026, the Trustee and the Lender will attend a judicial settlement conference, and a settlement of the Lender's claims, if approved, could reduce the recoveries this Disclosure Statement projects. Ninth, the Trustee has proposed a competing plan of liquidation, and the Bankruptcy Court may confirm only one plan. *11 U.S.C. § 1129(c)*. Tenth, Mainstreet holds relief from the automatic stay (Doc. 183 ¶ 2); a foreclosure sale of its Units before the Effective Date would remove them from the Plan. Eleventh, the projection in Section 4.B assumes 80 percent occupancy, well above the resort's 59.6 percent in 2019 and the Merritt Island average; it depends on the Crossroads acquisition and new management, and below about 75 percent occupancy at $295 the Units do not cover the Plan's payments, including Class 9, over the five years. The Trustee's August 2026 receipts were $18,661. Twelfth, the Plan takes effect only when the confirmation order is final, so an appeal would delay every payment the Plan provides. Thirteenth, the Recovery Trustee has stated that she will not pursue usury against Tamamoi and Carton; those claims revert to the Reorganized Debtor, which may or may not pursue them. Fourteenth, the Class 9 reserve for the Class 12 claims withholds about 88 percent of each Class 9 distribution until those claims are resolved. Fifteenth, payments on the disputed secured Claims are held in escrow until a Final Order fixes each Claim; those creditors receive nothing in hand until

then. The value the Plan preserves outweighs these ~~risks relative to~~ risks, and a ~~liquidation.~~ liquidation preserves none of it.

## 6. ALTERNATIVES TO THE PLAN

If the Plan is not confirmed, the alternatives are (a) confirmation of ~~a different plan,~~ the Trustee's plan of liquidation (Doc. 394), which sells all twenty-six Units and pays unsecured creditors only from what remains after administrative expenses, priority claims, and the secured claims (Doc. 395 at 16); (b) conversion of the case to Chapter ~~7,~~ 7; or (c) a going-concern sale under section 363. For the reasons set forth in the liquidation analysis, a Chapter 7 liquidation would yield materially lower recoveries to creditors than the Plan, particularly for unsecured creditors, and would impair the prosecution of the Estate's Causes of Action.

## 7. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The federal income tax consequences of the Plan ~~are complex and~~ may vary among ~~holders. This~~ holders, and this Disclosure Statement does not constitute tax advice. The Debtor. The Debtor is a limited liability company. If, as I understand, it is taxed as a partnership or disregarded entity, it pays no federal income tax itself, and any income — including cancellation-of-debt income from the reduction or disallowance of a claim — passes through to its member, who reports it and may be able to exclude it under 26 U.S.C. § 108 depending on the member's own

circumstances. The Plan does not discharge or reduce the Allowed amount of any Claim it pays in full. The Recovery Trust. The Plan intends the Recovery Trust to be treated as a grantor trust for the benefit of holders of Claims entitled to distribution, so that its income is taxed to those holders rather than to the trust; the Recovery Trustee will file returns consistent with that treatment. Holders. A holder receiving payment of a Claim generally recognizes income to the extent the payment exceeds the holder's tax basis in the Claim, and interest paid on a Class 9 Claim is ordinary income. Each holder is urged to consult its own tax advisor regarding the federal, state, local, and foreign tax consequences of the Plan.

## 8. RECOMMENDATION

The Plan pays legitimate creditors in full or nearly so, preserves the Cape Crossing Resort as a going concern, and converts the architects of the Debtor's insolvency from its controllers into its funding source. No alternative before the Bankruptcy Court does any of the three. The arithmetic, not the advocate, makes the case. Vote to accept the Plan.

Respectfully submitted this ~~13th~~ ~~9th~~ 19th day of ~~July,~~ October, 2026.

______________________________

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
~~flahome32801@gmail.com~~flahome32809@gmail.com

*Plan Proponent, pro se*

**Certificate of Service**

I certify that on October ~~9,~~ 19, 2026, I filed my Second Amended Disclosure Statement, together with my Second Amended Plan of Reorganization and the notice of filing redlines in person with the Clerk of Court. As a pro se litigant, I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; her counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States ~~Trustee. On October 9, 2026, as paragraph 5 of the Order of September 21, 2026 (Doc. 397) requires, I also served copies by United States Mail on each party that objected to my disclosure statement or plan, at the address stated in its objection: Michael McPhillips (Doc. 328); IMQA Investments Incorporated (Doc. 413); the Brevard County Tax Collector (Doc. 422); the Carton~~

~~Family Trust of 1992 (Doc. 427); Tamamoi, LLC (Doc. 428); Mainstreet Community Bank of Florida (Doc. 429); and PEDixon, LLC and ZPD, LLC (Doc. 430).~~ Trustee.

______________________________

Frank L. Amodeo, Pro se

# EXHIBIT 2

Second Amended Plan of Reorganization compared to the Plan (Doc. 303)

Red: changes filed October 9, 2026 (Docs. 432, 433)

Blue: changes in this amendment

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re:<br><br>**HOMEMAKERS REAL ESTATE, LLC,**<br><br>Debtor.<br><br>/ | Case No. 6:25-bk-05570-GER<br><br>Chapter 11 |

**SECOND AMENDED PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO,**
**a Creditor and Party in Interest**

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | ~~flahome32801@gmail.com~~flahome32809@gmail.com

Dated: ~~July 13,~~ October ~~9,~~ 19, 2026

I propose the following second amended plan of reorganization (the "Plan") for Homemakers Real Estate, LLC (the "Debtor") under Chapter 11 of the Bankruptcy Code. The Plan supersedes the plan I filed on July 13, ~~2026.~~ 2026 (Doc. ~~303).~~ 303) and the amended plan I filed on October 9, 2026 (Doc. 432). The Debtor's exclusive period to file a plan ended when the court appointed a Chapter 11 trustee, and section 1121(c) permits any party in interest — including a creditor — to file a plan. I am a creditor of the Debtor. Since July 13, 2026, the Rule 60 motions and consolidation were denied, the Chapter 11 Trustee compromised the post-petition rent claim, the Condominium Association withdrew its claim, PEDixon, LLC and ZPD, LLC filed claims, the Brevard County Tax Collector

objected to my treatment of its claims, and the Chapter 11 Trustee filed a competing plan and objected to most of the claims in the case. On October 7, 2026, Mainstreet Community Bank, PEDixon, LLC and ZPD, LLC, Tamamoi, LLC, and the Carton Family Trust of 1992 objected to my earlier plan or disclosure statement (Docs. 427–430), as Michael McPhillips had on August 6, 2026 (Doc. 328). The Plan changes with that record and answers those objections. The accompanying Amended Disclosure Statement discusses the Debtor's history, business, projections, and risk factors, and summarizes the Plan.

**Article 1 — Definitions and Construction**

The following terms have the meanings set forth below. A term used but not defined here carries the meaning the Bankruptcy Code gives it. The rules of construction in section 102 of the Code apply.

**"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Code and entitled to priority under § 507(a)(2), including the actual and necessary costs of preserving the Estate, compensation for professional services allowed under §§ 330(a) or 331, and all fees and charges assessed under Chapter 123 of Title 28.

**"Allowed Claim"** means a Claim as to which a proof of Claim has been timely filed or deemed filed under § 1111(a), and as to which no objection has been interposed within the applicable period, or as to which any objection has been

resolved by a Final Order. An Allowed Claim does not include post-petition interest unless the Plan expressly provides it.

**"Avoidance Actions"** means all claims and causes of action arising under §§ 502, 510, 542–545, 547, 548, 549, 550, 551, and 553 of the Code, or under applicable non-bankruptcy law, including the recovery of preferential transfers, fraudulent transfers, post-petition transfers, and unauthorized conveyances described in the Disclosure Statement, each computed from the Relation-Back Date if Petition Date. Section 502(d) of the pending Rule 60 motions in the First Bankruptcy Case are granted. Code is a ground of disallowance rather than a cause of action, and Section 7.4 addresses it.

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, 11 U.S.C. § 101, et seq.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

**"Business Day"** means any day other than a Saturday, a Sunday, or a legal holiday as defined in Fed. R. Bankr. P. 9006(a).

**"Causes of Action"** means all claims, rights, and causes of action of the Debtor or the Estate, including the Avoidance Actions and claims for breach of fiduciary duty, conversion, fraud, civil conspiracy, usury, professional malpractice, and the tort and civil RICO claims scheduled by the Debtor, together with all proceeds

thereof. All Causes of Action transfer to ~~and are prosecuted by~~ the Recovery Trust as provided in Article ~~6.~~6; a Cause of Action the Recovery Trustee declines reverts to the Reorganized Debtor under Section 6.11.

**"Chapter 11 Trustee" or "Trustee"** means Lara Roeske Fernandez, the duly appointed and acting Chapter 11 trustee of the Debtor, and any successor.

**"Claim"** has the meaning set forth in § 101(5) of the Code.

**"Class 12 Claims"** means Claim 67 of PEDixon, LLC, Claim 68 of ZPD, LLC, and any amendment or successor to either.

**"Compromise Order"** means the order entered September 2, 2026 approving the Chapter 11 Trustee's compromise with PEDixon, LLC, ZPD, LLC, and the Cape Crossing Condominium Association. (Doc. 379).

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan under § 1129 of the Code; the "Confirmation Date" is the date of its entry.

**"Declaratory Action"** means *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026).

**"Declined Claim"** means a Cause of Action or Recovery Trust Claim, or any part of one, that the Recovery Trustee declines or is deemed to decline under Section 6.11.

**"Disclosure Statement"** means the disclosure statement filed in respect of this Plan under § 1125 of the Code, as amended.

**"Disputed Claim"** means a Claim, or any portion of a Claim, that is the subject of a timely objection or motion not yet resolved by a Final Order.

~~**"Dixon Turnover Funds"** means the $880,000 in post-petition funds that P.E. Dixon and Crescent Sound collected and held in a separate account and are to turn-over to the Estate, as described in the Disclosure Statement.~~

**"Effective Date"** means the first Business Day ~~that is at least fourteen (14) days after the Confirmation Date and~~ on which ~~no stay of~~ the Confirmation Order is ~~in effect~~ a Final Order and the other conditions in ~~Article 8~~ Section 8.1 are satisfied or waived.

**"Estate"** means the estate created under § 541 of the Code on the Petition Date.

**"Final Order"** means an order no longer subject to appeal, certiorari, reargument, or rehearing, and as to which no such proceeding is pending.

**"First Bankruptcy Case"** means the voluntary Chapter 11 case ~~In re Homemakers Real Estate, LLC,~~ *In re Homemakers Real Estate, LLC,* No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025), filed May 5, 2025 and dismissed June 27, ~~2025, in which two Rule 60~~ 2025. On July 21, 2026, the court denied the motions ~~seeking vacatur of the~~ to vacate that dismissal (No. 6:25-bk-02685-GER, Doc. 107), and ~~consolidation with~~ on August 20, 2026, this ~~Bankruptcy Case remain pending. (Docs. 87, 88.)~~ Court denied consolidation. (Doc. 345).

**“Held Settlement Balance”** means the balance of the Lender’s $350,000 settlement payment under the Compromise Order that remains after the $204,000 roof payment, approximately $146,000, which the Chapter 11 Trustee holds until further order. (Doc. 379 ¶¶ 3–5).

**“Impaired”** means impaired within the meaning of § 1124 of the Code.

**“Insider”** has the meaning set forth in § 101(31) of the Code.

**“Interest”** means an equity or membership interest in the Debtor and any right arising therefrom.

**“Lender”** means PEDixon, LLC and ZPD, LLC.

**“Lien”** has the meaning set forth in § 101(37) of the Code.

**“Petition Date”** means September 2, 2025, the date the involuntary petition commencing this Bankruptcy Case was filed; the order for relief was entered May 21, 2026. ~~If the pending Rule 60 motions in the First Bankruptcy Case are granted and the cases are consolidated, the operative petition date for computing the~~ Every reach-back and avoidance ~~periods~~ period under §§ 544, 546, 547, 548, and 549 of the Code ~~will be~~ runs from the ~~Relation-Back~~ Petition Date, and ~~all Avoidance Actions and Recovery Trust Claims will be computed from the Relation-Back Date; vacatur would also render the revenues diverted between June 27, 2025 and May 21, 2026 avoidable post-petition transfers under § 549. Nothing in the Plan waives or limits the Estate’s rights under those motions. The adequate-protection~~

~~payments~~ adequate protection under Section 4.1(a) ~~are computed in all events~~ accrues from ~~September 2, 2025.~~it.

**"Plan Proponent"** means Frank L. Amodeo, a creditor and party in interest.

**"Priority Tax Claim"** means a Claim of a governmental unit of a kind entitled to priority under § 507(a)(8) of the Code.

**"Recovery Trust"** means the litigation and recovery trust established under Section 6.3 of the Plan on the Effective Date for the benefit of holders of Claims entitled to distribution under the Plan, and administered by the Recovery Trustee.

**"Recovery Trustee"** means Lara Roeske Fernandez, the Chapter 11 Trustee, who will serve as trustee of the Recovery Trust and administer it through its conclusion, and any successor trustee of the Recovery Trust.

**"Recovery Trust Claims"** means all Causes of Action of the Debtor and the Estate, including (a) the Avoidance Actions — among them the claims for preferential transfers under § 547, fraudulent transfers under §§ 544 and 548, and post-petition transfers under § ~~549;~~ 549 that the Compromise Order did not resolve; (b) the Causes of Action against P.E. Dixon, KAE, PEDixon, LLC, and ZPD, LLC; (c), separately, the Causes of Action against Tamamoi, ~~LLC;~~ LLC, the Carton Family Trust of 1992, FDRE, Inc., and their affiliates, including the recovery under Fla. Stat. § 687.04 of twice the usurious interest the Debtor paid and, in the alternative, the avoidance and recovery of the Debtor's payments on

those loans as Section 4.4 describes; and (d) the claim and right to recover Unit 403, which Crescent Sound transferred from the one unit that was foreclosed, Debtor to the IAM Irrevocable Trust in March 2024, under Fla. Stat. ch. 726 and §§ 544(b), 548, and 550 of the Code, together in each case with all proceeds thereof, all of which transfer to and are prosecuted by the Recovery Trust. Trust, subject to reversion under Section 6.11.

**"Relation-Back Date"** means May 5, 2025, the petition date of the First Bankruptcy Case, which becomes the operative petition date for computing avoidance and reach-back periods if the pending Rule 60 motions in the First Bankruptcy Case are granted and the cases are consolidated.

**"Reorganized Debtor"** means Homemakers Real Estate, LLC on and after the Effective Date.

**"Reorganization Manager"** means the person engaged to serve the combined enterprise if the components of the Resort are combined as Section 6.2 contemplates, as described in Section 6.7.

**"Secured Claim"** means a Claim secured by a valid, perfected, and unavoidable Lien on property of the Estate, to the extent of the value of such property under § 506(a).

**"Unsecured Claim"** means a Claim that is not a Secured Claim, Administrative Claim, or Priority Claim.

## Article 2 — Classification of Claims and Interests

Under § 1123(a)(1) of the Code, Administrative Claims and Priority Tax Claims are not classified; Article 3 treats them. All other Claims against, and Interests in, the Debtor are classified as follows.

| Class | Designation | Status | Voting |
|---|---|---|---|
| 1 | Secured Claim of Jetton Investments, Inc. / Paul Rene, Jr. | Impaired | Entitled to vote |
| 2 | Secured Claim of Mainstreet Community Bank (Loan One) | Impaired | Entitled to vote |
| 3 | Secured Claim of Mainstreet Community Bank (Loan Two) | Impaired | Entitled to vote |
| 4 | Secured Claim of Tamamoi, LLC | Impaired | ~~Entitled~~ Not entitled to ~~vote~~vote (§ 502(d)) |
| 5 | Secured Claim of Carton Family Trust of 1992 | Impaired | ~~Entitled~~ Not entitled to ~~vote~~vote (§ 502(d)) |
| 6 | Secured ~~Claim of Brevard~~ Claims for ad valorem taxes (Brevard County Tax ~~Collector~~Collector and tax-certificate holders) | Impaired | Entitled to vote |
| 7 | Secured Claim of Cape Crossing ~~Townhome Owners Association~~Townhomes Homeowners Association, Inc. | Impaired | Entitled to vote |
| 8 | ~~Secured Claim of~~ Cape Crossing Condominium ~~Association~~Association — Claim 7 withdrawn (Doc. 393) | ~~Impaired~~No Claim | ~~Entitled to~~ No vote |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Entitled to vote |
| 10 | Insider Unsecured Claims | Impaired | Entitled to vote |
| 11 | Interests in the Debtor ~~(Tiered Land Trust /~~ (Horton S. Johnson) | Impaired | Entitled to vote* |
| 12 | Claims of PEDixon, LLC (Claim 67) and ZPD, LLC (Claim 68) — disputed | Impaired | Not entitled to vote (§ 502(d)) |
| 13 | Secured Claim of IPFS Corporation (Claim 70- | Unimpaired | Deemed to accept |

| Class | Designation | Status | Voting |
|---|---|---|---|
| | 1) | | |

* Horton S. Johnson owns the Debtor and holds the Class 11 ~~Interest as Trustee of~~ Interest. The Debtor's membership units now sit in the so-called Tiered Land ~~Trust dated September 13, 2023 (or,~~ Trust; they belong to Mr. Johnson and are to be returned to him, if ~~that trust is determined never to~~ they have not been ~~validly formed, dissolved, or wound up, as the restored owner of the Debtor), and retains it under the Plan. A pending declaratory action will determine the capacity in which Horton S. Johnson holds the Interest; the treatment is identical in either capacity. Johnson v. Crescent Sound Ltd.,~~ already. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026). The Class is Impaired and the holder is entitled to vote. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance, particularly § 502(d). Classes 4, 5, and 12 fall within that exception: each holder in them is the transferee of transfers the Estate seeks to avoid, and § 502(d) disallows its Claim until it returns them. The Disclosure Statement gives the Bankruptcy Court notice that a § 502(d) circumstance exists as to each of those Claims, so that the Court may disallow them on its own motion, and a separate motion will follow. Until the Chapter 11 Trustee's objections to other Claims are resolved, those holders vote only if the Bankruptcy Court temporarily allows their Claims. *Fed. R. Bankr. P. 3018(a).* No

junior Class receives or retains property on account of its Interest ahead of a senior dissenting Class except as § 1129(b) permits, and I reserve all rights under § ~~1129(b).~~1129(b). The absolute priority rule does not apply in favor of a Claim disallowed under § 502(d) because its holder has failed to turn over to the Estate what it owes; that holder has no Allowed Claim on which to invoke it.

## Article 3 — Treatment of Unclassified Claims

### 3.1 Administrative Claims.

Except to the extent a holder agrees to different treatment, each holder of an Allowed Administrative Claim will be paid in full, in Cash, on the later of the Effective Date or the date the Claim becomes Allowed, or as soon as practicable thereafter; ordinary-course Administrative Claims will be paid in the ordinary course. Administrative Claims include the allowed fees and expenses of the Chapter 11 Trustee and retained Professionals, subject to Bankruptcy Court approval under §§ 330 and 331.

### 3.2 United States Trustee Fees.

All fees due under 28 U.S.C. § 1930 will be paid in full on or before the Effective Date, and the Reorganized Debtor must continue to pay such fees until the case is closed, converted, or dismissed.

**3.3 Priority Tax Claims.**

Except to the extent a holder agrees to different treatment, each holder of an Allowed Priority Tax Claim will receive ~~deferred~~ regular installment payments in Cash ~~payments~~ over a period ending not ~~exceeding~~ later than May 21, 2031, five ~~(5)~~ years ~~from~~ after the ~~Petition Date,~~ order for relief, with interest at the rate applicable ~~statutory rate,~~ nonbankruptcy law fixes, under ~~§ 1129(a)(9)(C).~~ §§ 511(a) and 1129(a)(9)(C) of the Code. I believe the scheduled priority tax obligations of the Internal Revenue Service and the Florida Department of Revenue are subject to substantial dispute and may be reduced to zero following reconciliation.

**Article 4 — Treatment of Classified Claims and Interests**

Treatment in this Article 4 refers exclusively to the Allowed Amount of each Claim. Notwithstanding Confirmation, I, the Reorganized Debtor, the Chapter 11 Trustee, and the Recovery Trustee each reserve the right to object to any Claim and to prosecute any Cause of Action, including objections seeking reduction, disallowance, equitable subordination, or ~~recharacterization.~~ recharacterization, subject until the Effective Date to the leave requirement of the Case Management Order. (Doc. 359 ¶ 3).

**4.1 Common Treatment of Secured Claims (Classes 1 through ~~8).~~5 and Class 7).**

Each holder of an Allowed Secured Claim in Classes 1 through ~~8~~ 5 and Class 7, and any Class 12 Claim Allowed as a Secured Claim, retains its Lien to the same validity, extent, and priority as existed on the Petition Date, subject to the Estate's rights to challenge the amount, validity, priority, and enforceability of the Claim and Lien. Although the collateral differs, each Allowed Secured Claim receives parallel treatment, as follows:

~~**(a) Adequate-Protection Period.**~~ (a) Adequate Protection. From the Petition Date through the Effective Date, adequate protection accrues for each secured creditor ~~will receive monthly adequate-protection payments computed~~ at 4.8% per annum (0.4% per month) of its claimed amount, as set forth in the schedule ~~below, funded as Section 6.4 provides from~~ below. Whatever part of that accrual the ~~Dixon Turnover Funds and from operating revenue.~~ Chapter 11 Trustee has not paid by the Effective Date is an arrearage cured under paragraph (d).

**(b) Post-Confirmation Amortization.** Commencing the first day of the first full month after the Effective Date, each Allowed Secured Claim will be amortized over three hundred sixty (360) months at a fixed rate of six percent (6.0%) per annum, payable in equal monthly installments, with a balloon payment of the entire outstanding balance due sixty (60) months after the Effective Date.

**(c) Balloon / Exit.** I anticipate that, by the fifth anniversary of the Effective Date, the resort will be sufficiently seasoned to support a refinancing or going-concern sale satisfying the balloon obligations in full, as described in Article 6.

~~**(d) Cure of Arrearages and Defaults.**~~ (d) Cure of Arrearages and Defaults. All arrearages and defaults of the secured creditors, including accrued adequate protection under paragraph (a), together with the full Allowed ~~Claims~~ Claim of ~~the Brevard County Tax Collector (Class 6) and~~ the Cape Crossing ~~Townhome Owners Association~~ Townhomes Homeowners Association, Inc. (Class 7), will be cured and paid from the net proceeds of the Recovery Trust Claims, as and when recovered, in the order Section 6.6 sets forth.

(e) Escrow of Payments on Disputed Secured Claims. Every adequate-protection, cure, and installment payment the Plan provides on a Secured Claim that is a Disputed Claim, that a pending Cause of Action challenges, or whose holder is subject to § 502(d) under Section 7.4 — including the Claims in Classes 2, 3, 4, and 5 and any Class 12 Claim asserted as secured — is paid when due into a segregated escrow account held by the Recovery Trustee. The deposit is computed on the amount the proof of claim asserts, only to size the escrow; it admits nothing. The Plan otherwise proceeds as if each payment had been made: the holder retains its Lien, an escrowed payment counts as paid for every purpose of the Plan, and the holder may not treat it as a default. The Recovery Trustee

disburses nothing from escrow until a Final Order determines whether, and in what amount, the Claim is Allowed. She then pays the holder, from escrow, what the Plan would have paid on the Allowed amount, and the balance of the escrow is distributed under Section 6.6. If the Claim is disallowed, the entire escrow is distributed under Section 6.6.

The following schedule sets forth, for each Class receiving the common secured ~~Class,~~ treatment, the ~~claimed amount,~~ amount its proof of claim asserts, the monthly adequate-protection ~~payment,~~ accrual, the monthly amortized installment, and the projected balloon balance at month 60:

| **Class / Creditor** | **Claimed Amount** | **Adequate Protection (mo.)** | **Amortized Installment (mo.)** | **Balloon (mo. 60)** |
|---|---|---|---|---|
| Class 1: Jetton Investments, Inc. (assigned to Paul Rene, Jr.) | $1,634,600.00 | $6,538.40 | $9,800.25 | ~~$1,521,066.52~~ $1,521,066.72 |
| Class 2: Mainstreet Community Bank (Loan One) | ~~$3,520,717.75~~$3,611,594.47 | ~~$14,082.87~~$14,446.38 | ~~$21,108.48~~$21,653.33 | ~~$3,276,181.26~~ $3,360,746.26 |
| Class 3: Mainstreet Community Bank (Loan Two) | ~~$694,564.66~~$712,105.80 | ~~$2,778.26~~$2,848.42 | ~~$4,164.27~~$4,269.43 | ~~$646,322.68~~$662,645.76 |
| Class 4: Tamamoi, LLC | ~~$3,069,220.83~~$3,378,797.64 | ~~$12,276.88~~$13,515.19 | ~~$18,401.53~~$20,257.60 | ~~$2,856,043.70~~ $3,144,118.34 |
| Class 5: Carton Family Trust of 1992 | ~~$376,757.47~~$383,505.45 | ~~$1,507.03~~$1,534.02 | ~~$2,258.85~~$2,299.31 | ~~$350,589.24~~$356,868.46 |
| Class 6: ~~Brevard County Tax Collector~~Ad valorem taxes (Claims 8–62) | ~~$303,421.77~~$478,289.67 | ~~$1,213.69~~Section 4.5 | ~~$1,819.17~~Section 4.5 | ~~$282,347.18~~Paid by May 21, 2031 |
| Class 7: Cape Crossing ~~Townhome Owners Association~~Townhomes Homeowners Association, Inc. | $118,731.84 | $474.93 | $711.86 | ~~$110,485.15~~$110,484.97 |
| Class 8: Cape Crossing | ~~$445,810.10~~Wit | ~~$1,783.24~~ | ~~$2,672.86~~ | ~~$414,845.72~~ |

| Class / Creditor | Claimed Amount | Adequate Protection (mo.) | Amortized Installment (mo.) | Balloon (mo. 60) |
|---|---|---|---|---|
| Condominium Association | hdrawn | | | |
| **TOTAL (Classes ~~1–8)~~1–5 and 7)** | **~~$10,163,824.42~~$9,839,335.20** | **~~$40,655.30~~$39,357.34** | **~~$60,937.26~~$58,991.78** | **~~$9,457,881.44~~ $9,155,930.51** |

The adequate-protection and amortization figures are computed on the amounts the respective creditors assert and are not an admission of the validity or amount of any Claim. Claim 69 states $1,468,484.37 as secured and $166,115.63 as unsecured, which total its stated $1,634,600.00; the Chapter 11 Trustee's objection transposes the secured figure as $1,486,484.37. (Doc. 416 ¶ 5). As ~~the Disclosure Statement~~ Section 4.4 describes, I contend the Claims of Tamamoi, LLC (Class 4) and the Carton Family Trust of 1992 (Class 5) are subject to forfeiture of all interest under the Florida usury statutes, and that each such ~~Allowed~~ Claim will be ~~substantially~~ reduced ~~after reconciliation.~~ when a Final Order fixes its Allowed amount. *Fla. Stat. §§ 687.03, 687.04*~~.~~. Class 6 is not on the schedule; Section 4.5 treats it.

**4.2 Class 1 — Jetton Investments, Inc. / Paul Rene, Jr. (Secured).**

Class 1 consists of the Allowed Secured Claim under the balloon mortgage recorded May 30, 2018 in the Public Records of Brevard County at Official Records Book 8176, Page 930 (CFN 2018121113), encumbering the underlying resort land by metes and bounds, and assigned to Paul Rene, Jr. in 2022. ~~The~~

~~Bankruptcy Court has treated~~ In Claim 69, Mr. Rene asserts $1,468,484.37 as secured and $166,115.63 as unsecured. On September 30, 2026, the ~~Claim as allowed and undersecured.~~ Chapter 11 Trustee objected to the Claim. (Doc. 416). Class 1 receives the common secured treatment of Section ~~4.1.~~ 4.1, and any portion of Claim 69 Allowed as an Unsecured Claim is a Class 9 Claim. Class 1 is Impaired.

**4.3 Classes 2 and 3 — Mainstreet Community Bank (Secured).**

Classes 2 and 3 consist of the ~~Allowed Secured~~ Claims of Mainstreet Community Bank on its two loan ~~facilities. Each~~ facilities, asserted in Claims 64-1 and 63-1. On February 17, 2022, as a condition of refinancing nineteen Units, Mainstreet ~~interfered in~~ dictated the Debtor's ~~operations when it~~ arrangement with Canaveral Crossroads and forced the return of the resort's clubhouse, pool, lift station, and open land to Canaveral Crossroads, stripping the Debtor of its first priority on resort reservations and its share of the amenity revenue. (Disclosure Statement § 2.J). In February 2025, after Mr. Johnson and I told Mainstreet to enforce its assignment of rents to stop the diversion of the Debtor's rents to PEDixon, Mainstreet instead discussed selling its mortgages to PEDixon at a ~~transfer of property.~~ discount, a transaction that would have harmed the Debtor's other creditors even more. (Id.). That conduct is at issue chiefly in the Canaveral Crossroads case, but it was done in relation to these loans, and the determination

there of Mainstreet's lender liability will decide whether its Claims here are nullified or substantially reduced. To the extent Allowed, each Claim receives the common secured treatment of Section ~~4.1, subject~~ 4.1 — six percent, amortized over 360 months — and until that determination the payments are held in escrow under Section 4.1(e). On March 16, 2026, the Bankruptcy Court terminated the automatic stay as to Mainstreet and permitted it to exercise its in rem rights. (Doc. 183 ¶ 2). Any Unit Mainstreet sells at foreclosure before the ~~Estate's asserted offset for damages arising from~~ Effective Date leaves the ~~lender's conduct between February 2025~~ Estate, and ~~February 2026,~~ its sale price reduces Mainstreet's Allowed Claim. On the Effective Date, the injunction of Section 8.4 replaces that relief, and Mainstreet may proceed against its collateral only as ~~the Disclosure Statement describes.~~ Section 6.13 provides. Classes 2 and 3 are Impaired.

**4.4 Classes 4 and 5 — Tamamoi, LLC and Carton Family Trust of 1992 (Secured).**

~~Classes~~ Class 4 ~~and 5 consist~~ consists of the ~~Claims~~ Claim of Tamamoi, ~~LLC (nine loans, one per unit)~~ LLC, which asserts $3,378,797.64 under a final judgment of foreclosure entered May 18, 2026, secured by eight Units the Debtor holds and by Unit 403 (Claim 65-1). Class 5 consists of the Claim of the Carton Family Trust of ~~1992 (one loan on one unit), each originated~~ 1992, which asserts $383,505.45 under a final judgment of foreclosure, secured by ~~FDRE~~ townhome

Unit 8-104 (Claim 66-1). FDRE, Inc. arranged both loans on materially identical terms ~~(a 10% note rate, 18% default rate,~~ and, as servicing agent, received the payments on them. Between March 2021 and November 2023, the Debtor paid $1,166,008.69 from its own account to Tamamoi, FDRE, and two affiliates, and $129,556.52 to the Carton Family Trust. Neither claimant has accounted for the payments that passed between it and FDRE. A full accounting of those payments determines the rate each lender actually charged, and I believe it will show a ~~10% origination fee). I contend these loans bear~~ rate above 25 percent a year, which makes each extension of credit an ~~effective~~ unenforceable debt. *Fla. Stat. § 687.071(7)*. On the face of the Tamamoi judgment, the rate already exceeds the civil ceiling: the judgment charges 18 percent on a 360-day year, which is 18.27 percent a year. *Fla. Stat. § 687.03(1)*. A lender who willfully charges interest above that ceiling forfeits all of ~~approximately 25.6% per annum, exceeding Florida's 18% civil ceiling~~ it, may enforce only the principal, and ~~reaching~~ must repay double the ~~criminal-usury threshold, so that all~~ interest paid. *Fla. Stat. § 687.04*. One way or the other, the accounting determines whether, and how much, interest is ~~forfeited and interest already paid is credited against principal. *Fla. Stat. §§ 687.03, 687.04*. The Allowed Secured Claim of each such creditor is limited to the principal lawfully due after that credit and receives the common secured treatment of Section 4.1. The Causes of Action against Tamamoi, and the recovery~~

~~of the one foreclosed unit, are Recovery Trust Claims prosecuted by the Recovery Trust under Article 6. Classes 4 and 5 are Impaired.~~forfeited.

Neither foreclosure judgment may be enforced by sale. The Bankruptcy Court lifted the stay for Tamamoi only to let it obtain a judgment and barred it from seeking a sale (Doc. 135 ¶¶ 2–3), and it abated both lenders' requests to conduct foreclosure sales (Doc. 361 ¶ 1). On the Effective Date, the Plan supersedes both judgments; neither may be enforced against the Debtor, the Reorganized Debtor, or any Unit, and each holder's rights are those the Plan provides. The amount of each Claim will be determined in an adversary proceeding or contested matter brought by the Recovery Trustee, or by the Reorganized Debtor under Section 6.11, with leave as the Case Management Order requires. (Doc. 359 ¶ 3). Subject to the accounting each lender owes, I contend that neither was entitled to more than $227,000 on any Unit, the amount stated on the face of the mortgage, and that, because each charged interest above the lawful rate, neither is entitled to any interest. To the extent a Final Order allows a Claim, its Lien is allowed to the same extent, on the Units that secure that Claim, and the Allowed Claim receives the common secured treatment of Section 4.1 — six percent, amortized over 360 months — like every other secured Claim. Until then, the payments are held in escrow under Section 4.1(e).

On October 6, 2026, the Chapter 11 Trustee objected to both Claims only to disallow any deficiency, stating that the Debtor is neither an obligor nor a guarantor on either loan and that, for the same reason, she lacks standing to raise usury and does not intend to pursue it. (Docs. 424, 425 ¶ 14 & n.2). The Estate recovers under one position or the other. If the Debtor may challenge the interest, the interest is forfeited and recoverable as described above. If the Debtor owed nothing on either loan, then the $1,295,565.21 it paid on them left its property on debts it did not owe, and the Estate may recover those payments to the extent they exceeded the value the Debtor received; interest that the law forfeits reduced no enforceable lien and gave the Debtor no value. Either way, these are Recovery Trust Claims, and a claim the Recovery Trustee declines reverts to the Reorganized Debtor under Section 6.11.

Because the Plan retains rather than sells the Units, any Allowed Claim exceeding the value of its collateral is treated as § 1111(b)(1)(A) of the Code directs, as a Class 9 Claim, unless the Class elects under § 1111(b)(2). Classes 4 and 5 are Impaired.

**4.5 Class 6 — ~~Brevard County~~ Ad Valorem Tax ~~Collector~~ Claims (Secured).**

Class 6 consists of the Allowed Secured ~~Claim~~ Claims for ad valorem real property taxes on the Units, asserted in Claims 8 through 62 in the total amount of $478,289.67: forty-seven claims of the Brevard County Tax Collector for ~~ad~~

valorem real property taxes. 2024 and 2025 taxes ($312,465.91), and eight claims of the holders of tax certificates — Keys Funding LLC, ATCF II Florida-A LLC, FIG 20, LLC, and Community Red Co ($165,823.76). Each holder retains its Lien and will be paid its Allowed Claim in full, with interest at the rate applicable nonbankruptcy law fixes for that claim — 18 percent on the Tax Collector's claims, and the certificate rate on each certificate holder's claim — in equal monthly installments beginning the first day of the first full month after the Effective Date and ending not later than May 21, 2031, five years after the order for relief. *11 U.S.C. §§ 511(a), 1129(a)(9)(C)–(D); Fla. Stat. § 197.172*. The Reorganized Debtor may prepay any Class 6 Claim, and must pay the balance of any Class 6 Claim at the closing of a sale or refinancing of the Unit it encumbers. While the Reorganized Debtor is current on these installments, no holder may apply for a tax deed or pursue a pending application; on a default not cured within thirty (30) days after written notice to the Reorganized Debtor, the holder may exercise its remedies under Florida law. I contend the underlying assessments overstate the fair market value of the units Units by approximately 25–30% 25–30%, and will the Reorganized Debtor may contest them. The Allowed Class 6 Claim will be paid in full, with statutory interest, from recoveries them under Section 6.6, and otherwise receives § 505 of the common secured treatment of Section 4.1. Code. Class 6 is Impaired.

**4.6 Classes 7 and 8 — Cape Crossing Associations (Secured).**

~~Classes~~ Class 7 ~~and 8 consist~~ consists of the Allowed Secured ~~Claims~~ Claim of the Cape Crossing ~~Townhome Owners Association and the Cape Crossing Condominium Association~~ Townhomes Homeowners Association, Inc. for unpaid ~~assessments. These Claims are~~ assessments, asserted at $118,731.84 in Claim 6-1. That Claim is disputed as to amount and subject to the Estate's affirmative claims for negligence and waste that diminished unit values by as much as $125,000 per unit. The full Allowed Class 7 Claim will be paid from recoveries under Section 6.6; ~~each~~ Class 7 otherwise receives the common secured treatment of Section ~~4.1. Classes 7~~ 4.1 and is Impaired. Class 8 ~~are Impaired.~~ consisted of the Claim of the Cape Crossing Condominium Association. Under the Compromise Order, the Chapter 11 Trustee paid the Condominium Association $204,000 for the condominium roof, and on September 18, 2026, the Condominium Association withdrew Claim 7. (Docs. 379 ¶ 3, 393). Class 8 holds no Claim, receives nothing, and casts no vote.

**4.7 Class 9 — General Unsecured Claims (Non-Insider).**

Class 9 consists of all Allowed Unsecured Claims of non-Insider ~~creditors, estimated to total less than $1,000,000~~ creditors. The Claims filed in ~~the aggregate.~~ Class 9 are those of IMQA Investments Incorporated (Claim 4-3, $360,459.40), CTO Holdings, Inc. (Claim 3-2, $303,853.79), Tiered Capital, Inc. (Claim 71-1,

$125,000.00), WM Holdings Group, LLC (Claim 2-1, $19,635.25), and mine (Claim 1-1, $396.00), totaling $809,344.44, together with any unsecured portion of Claims 69 and 70 and any deficiency Section 4.4 places here. Each holder of an Allowed Class 9 Claim will be paid one hundred percent (100%) of its Allowed Claim, without post-petition interest, with interest from the Effective Date at the federal judgment rate in effect on the Effective Date, *28 U.S.C. § 1961(a)*, in equal monthly installments over sixty (60) months beginning the first day of the first full month after the Effective Date. The Reorganized Debtor pays the installments from operating revenue, and the net proceeds of the Recovery Trust Claims; Claims available to the extent not so satisfied, all Allowed Class 9 Claims will be paid in full, without interest, no later than five (5) years after under Section 6.6 prepay the Effective Date. The Plan dedicates ninety percent (90%) of net Cause-of-Action recoveries to unsecured creditors until paid in full. remaining balance. Any Class 12 Claim Allowed as an Unsecured Claim shares pro rata with Class 9, and Section 7.3 governs the reserve for it. My own Claim, and the Claims of IMQA Investments Incorporated and CTO Holdings, Inc., are Class 9 Claims and receive no treatment different from any other non-Insider unsecured creditor. The United States holds a restitution lien on any distribution on my Claim (Doc. 387), and any such distribution will be paid as that lien requires. Class 9 is Impaired.

**4.8 Class 10 — Insider Unsecured Claims.**

Class 10 consists of the Allowed Unsecured Claims of Insiders, including the ~~Claims~~ Claim of Horton ~~Johnson.~~ S. Johnson (Claim 5-2, $2,594,987.93), which the Chapter 11 Trustee asks the Bankruptcy Court to disallow or recharacterize as equity. (Doc. 412). Holders of Allowed Class 10 Claims receive distributions only after all Allowed Administrative Claims, Priority Claims, Secured Claims (Classes ~~1–8),~~ 1–7, and any Class 12 Claim Allowed as a Secured Claim), and Class 9 Claims have been satisfied or adequately reserved, and after the $1,000,000 property-improvement reserve in Article 6 is funded. Thereafter, holders share pro rata in remaining net recoveries. Class 10 is Impaired.

**4.9 Class 11 — Interests.**

Class 11 consists of the Interests in the Debtor, ~~held by Horton S. Johnson as Trustee of the Tiered Land Trust dated September 13, 2023 (or, if that trust is determined never to have been validly formed, dissolved, or wound up, as the restored owner of the Debtor). A declaratory action pending in Orange County will determine the capacity in~~ which Horton S. Johnson ~~holds~~ owns. The membership units now sit in the ~~Interest,~~ so-called Tiered Land Trust; they belong to Mr. Johnson and ~~the treatment under this Section is identical in either capacity.~~ are to be returned to him, if they have not been already. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026). ~~The holder of~~ Mr. Johnson retains

the Class 11 ~~Interest retains its~~ Interest in the Reorganized Debtor, ~~subject to~~ controls the ~~governance structure in~~ Reorganized Debtor on and after the Effective Date under Article 6, and receives no distribution on account of the Interest until all senior Classes are satisfied. Class 11 is Impaired.

**4.10 Class 12 — Claims of PEDixon, LLC and ZPD, LLC (Disputed).**

Class 12 consists of Claim 67 of PEDixon, LLC, which asserts $4,779,864.58 as secured, and Claim 68 of ZPD, LLC, which asserts $1,380,166.67. Each rests on the assertion that the Debtor guaranteed the September 14, 2023 consolidated loan to Tiered Capital, Inc. The Debtor scheduled both at $0.00 and marked each disputed, contingent, and unliquidated. I contend that the Legislature withdrew from every court of this State the power to enforce these extensions of credit, *Fla. Stat. § 687.071(7)*, and that the Class 12 Claims are disallowed in any event. On October 2, 2026, the Chapter 11 Trustee objected to both Claims, and I moved to disallow both under § 502(d). (Docs. 419, 420, 423).

A Class 12 Claim receives nothing unless and until a Final Order allows it, and Section 7.4 bars allowance while the claimant holds an avoidable transfer. If a Final Order allows a Class 12 Claim as a Secured Claim, the allowed amount receives the common secured treatment of Section 4.1 against the collateral the order identifies. If a Final Order allows a Class 12 Claim as an Unsecured Claim,

the allowed amount shares pro rata with Class 9. Nothing in the Plan concedes the existence, validity, or enforceability of any guaranty, lien, purchase option, or right of first refusal on which either Claim rests. Class 12 is Impaired.

**4.11 Class 13 — Secured Claim of IPFS Corporation (Unimpaired).**

Class 13 consists of the Allowed Secured Claim of IPFS Corporation, which asserts $1,118.79 as secured and $112.75 as unsecured (Claim 70-1). On September 17, 2026, the Chapter 11 Trustee objected to the Claim. (Doc. 392). The Reorganized Debtor will pay the Allowed Secured Claim in full, in Cash, within thirty (30) days after the later of the Effective Date and the date the Claim is Allowed. Any part Allowed as an Unsecured Claim is a Class 9 Claim. Class 13 is Unimpaired and is conclusively presumed to accept the Plan. *11 U.S.C. § 1126(f)*.

**Article 5 — Executory Contracts and Unexpired Leases**

All executory contracts and unexpired leases not previously assumed or rejected, and not the subject of a pending motion to assume as of the Confirmation Date, are rejected as of the Effective Date, except any contract or lease specifically identified for assumption in a schedule filed before the Confirmation Hearing. Any rejection-damages Claim must be filed within thirty (30) days after entry of the order authorizing rejection (or the Confirmation Order, if rejection occurs thereunder), and any such Allowed Claim will be treated as a Class 9 General Unsecured Claim.

## Article 6 — Means of Implementation

### 6.1 Overview.

The Plan will be implemented through (a) continued operation of the Debtor's ~~27-unit~~ vacation-rental business as a going concern — under the direction and control of the Chapter 11 Trustee until the Effective Date, and thereafter under the governance structure of Section 6.7; (b) the establishment of the Recovery Trust — which holds all of the Estate's Causes of Action, including the claims for preferences and fraudulent transfers — to prosecute and recover them to conclusion; (c) consolidation of the resort through the Debtor's acquisition of the assets of Canaveral Crossroads, LLC and other related assets; (d) structured sales of Units under Section 6.12; and ~~(d)~~ (e) a refinancing or going-concern sale on or before the fifth anniversary of the Effective Date.

### 6.2 Operating Plan.

The Debtor, under the direction and control of the Chapter 11 Trustee until the Effective Date, and thereafter the Reorganized Debtor under the governance of Section 6.7, will: (1) stabilize the Debtor's vacation-rental operations; (2) ~~cause~~ acquire, through its Chapter 11 case and subject to approval in both cases, the assets of Canaveral Crossroads, LLC ~~to be placed into bankruptcy and acquired by the Debtor so~~ — the resort's ~~components~~ developer and declarant, which reports that it owns the clubhouse, the common areas, the sewage lift station, and the Cape

Crossing Resort & Marina names and marks — so that the resort's components, including its reservation system, are combined into a single, self-contained enterprise; enterprise. On September 8, 2026, the court entered an order for relief against Canaveral Crossroads on its consent and converted its case to Chapter 11, and on September 30, 2026, ordered that case jointly administered with that of Sherwood Construction, Inc. *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla.) (Docs. 15, 56 at 2, 61); (3) propose to the McPhillips interests a combination of resort operations into a single operating entity, with management potentially vested in Michael McPhillips; (4) engage a vacation-rental investment bank to arrange the financing necessary to acquire the remaining vacation-rental units; and (5) thereafter, through that investment bank, secure (4) by the fifth anniversary of the Effective Date, refinance the balloon obligations or sell the Reorganized Debtor's Units as a strategic buyer going concern. Nothing in the Plan or the McPhillips family to purchase the restored resort at fair market value (estimated at $90,000,000 to $100,000,000 for a restored resort Confirmation Order authorizes, requires, solicits, or anticipates any acquisition, merger, consolidation, management arrangement, contribution, transfer, or other combination involving any asset or interest of 82 vacation-rental units, 147 boat slips, and EBITDA potential of $8,000,000 or more).Michael McPhillips, who has refused any such transaction. (Doc. 328 ¶¶ 3, 12).

**6.3 Establishment and Funding of the Recovery Trust.**

On the Effective Date, the Recovery Trust will be established as a trust for the benefit of the holders of Claims entitled to distribution under the Plan. Lara Roeske Fernandez, the Chapter 11 Trustee, will serve as the Recovery Trustee and will administer, prosecute, and conclude the Recovery Trust and the Recovery Trust Claims. If Ms. Fernandez declines to serve or ceases to serve, a successor approved by the Office of the United States Trustee will serve, compensated on the same terms, subject to Bankruptcy Court approval. The Recovery Trust will be funded with ~~Two Hundred Fifty Thousand Dollars ($250,000) from~~ the ~~Dixon Turnover Funds,~~ Held Settlement Balance, transferred ~~to the Recovery Trust~~ on or promptly after the Effective ~~Date.~~ Date, to the extent a Final Order determines that no Lien attaches to it; to the extent a Lien attaches, the Reorganized Debtor will fund the Recovery Trust's reasonable costs from net operating revenue, and the Recovery Trustee may engage counsel on a contingent-fee basis under § 328 of the Code. On the Effective Date, the Recovery Trust Claims — all of the Estate's Causes of Action — vest in and transfer to the Recovery Trust, including: (a) the Avoidance Actions, among them the claims for preferential transfers, fraudulent transfers, and post-petition ~~transfers;~~ transfers the Compromise Order did not resolve; (b) the Causes of Action against P.E. Dixon, KAE, PEDixon, LLC, and ZPD, LLC; (c), separately, the Causes of Action against Tamamoi, ~~LLC;~~ LLC, the

Carton Family Trust of 1992, and FDRE, Inc.; and (d) the claim and right to recover Unit 403, which Crescent Sound transferred from the ~~one unit that was foreclosed.~~ Debtor to the IAM Irrevocable Trust in March 2024. The Recovery Trustee has full authority to investigate, commence, prosecute, settle, ~~compromise,~~ and ~~abandon~~ compromise the Recovery Trust Claims, to decline any of them under Section 6.11, to retain counsel and other professionals, and to take all actions necessary to administer the Recovery Trust through its conclusion, in each case subject to such Bankruptcy Court approval as may be required. The reasonable fees, costs, and expenses of the Recovery Trust are paid first from the funding described above and then from the gross proceeds of the Recovery Trust Claims before distribution.

**6.4 ~~Use of the Dixon Turnover Funds.~~ Working Capital and Adequate-Protection Funding.**

No turnover of post-petition funds by P.E. Dixon ~~and~~ or Crescent Sound ~~must turn over~~ occurred, and the Plan no longer depends on one. On September 2, 2026, the Bankruptcy Court approved the Chapter 11 Trustee's compromise under which the Lender paid the Trustee $350,000 to resolve the Estate's claims to avoid and recover the post-petition transfers defined in her motion, the Trustee paid the Condominium Association $204,000 for the condominium roof, and the Trustee holds the balance until further order. (Doc. 379 ¶¶ 3–5). The Reorganized Debtor

will pay its operating expenses and the installments under Article 4 from operating revenue. It will bridge any seasonal shortfall first from the Held Settlement Balance, to the ~~Estate the Dixon Turnover Funds — the $880,000 in post-petition funds collected~~ extent a Final Order holds it unencumbered and ~~held in a separate account. The Dixon Turnover Funds will be applied as follows: (a) Two Hundred Fifty Thousand Dollars ($250,000) transfers to the Recovery Trust~~ it is not needed to fund the ~~prosecution~~ Recovery Trust, and then from the first net recoveries of the Recovery Trust ~~Claims, as~~ Claims under Section ~~6.3 provides; and (b) the remaining Six Hundred Thirty Thousand Dollars ($630,000) funds the operations of the Reorganized Debtor and the adequate-protection payments~~ 6.6(1). Exhibit B to the ~~secured creditors (Classes 1 through 8) provided~~ Disclosure Statement projects the seasonal low point at about $51,000 in ~~Section 4.1.~~ January 2027. The ~~turnover of the Dixon Turnover Funds is without prejudice to, and will be credited against, the Estate's further recoveries against P.E. Dixon~~ Allowed Administrative Claims, which I estimate at $125,000, are paid on the ~~Recovery Trust Claims.~~ Effective Date from the cash the Chapter 11 Trustee holds.

**6.5 Identified Recovery Sources.**

The Recovery Trust holds every Cause of Action of the ~~Estate; no Cause~~ Estate, subject to reversion of ~~Action vests in~~ a Declined Claim to the Reorganized Debtor ~~for prosecution.~~ under Section 6.11. The identified recovery sources

include: (a) the turnover of Held Settlement Balance — approximately $146,000 — to the $880,000 Dixon Turnover Funds held in extent a separate account by P.E. Dixon and Crescent Sound; Final Order holds it unencumbered; (b) preferential transfers to the Dixon lenders, which I estimated at approximately $1,400,000 before the Rule 60 motions were denied, and which the Recovery Trustee will restate now that every reach-back period runs from the Petition Date — as preferences if, as their Claims assert, the Dixon lenders of approximately $1,400,000, with were creditors (the Bankruptcy Court found PEDixon, LLC and ZPD, LLC insiders, so the precise amount to be fixed by a forensic accounting now underway; reach-back is one year), and otherwise as fraudulent transfers; (c) the $1,166,008.69 in interest the Debtor paid to Tamamoi, LLC, forfeited under Fla. Stat. §§ 687.03 FDRE, Inc., and 687.04 two affiliates, and recoverable or credited against principal, together with the corresponding $129,556.52 it paid to the Carton Family Trust; Trust, recoverable as Section 4.4 describes — twice the forfeited interest under Fla. Stat. § 687.04 or, in the alternative, as transfers on debts the Debtor did not owe — or credited against principal; (d) the recovery of at least one unit fraudulently conveyed out Unit 403, which Crescent Sound transferred from the Debtor to the IAM Irrevocable Trust in March 2024, under Fla. Stat. ch. 726 and §§ 544(b), 548, and 550 of the Estate, Code and through the pending appeal described in the Disclosure Statement, adding a minimum of $183,000 in net

equity and more likely $250,000 to $300,000; and (e) the Estate's own claims for breach of fiduciary duty, conversion, ~~fraud,~~ and ~~civil RICO~~ fraud against Crescent Sound, P.E. Dixon, and related ~~parties that, given applicable treble-~~ parties, and ~~punitive-damages statutes, may yield a collectible recovery of $15,000,000 or more, together with~~ its affirmative claims against the Cape Crossing associations and the title ~~companies.~~ companies, which remain unquantified. The Recovery Trustee may coordinate with the committee of unsecured creditors, if one is appointed.

**6.6 Waterfall — Distribution of Recoveries.**

Net proceeds of the Recovery Trust Claims, distributed by the Recovery Trustee after the costs of recovery, including professional fees, and net proceeds of any Declined Claim the Reorganized Debtor recovers under Section 6.11, will be applied in the following ~~order, consistent with the treatment of Claims under the Plan:~~ order: (1) to cure all arrearages and defaults of the secured creditors as the Plan provides, including accrued adequate protection, and to bring all Allowed Secured Claims (Classes ~~1–8)~~ 1–5 and 7, and any Class 12 Claim Allowed as a Secured Claim) current, including the full Allowed ~~Claims~~ Claim of ~~Classes~~ Class 7 and any Class 6 installment then due and ~~7;~~ unpaid, and to fund any seasonal working-capital shortfall of the Reorganized Debtor up to $248,000; (2) to ~~satisfy~~ pay the remaining balance of all Allowed Class 9 ~~General Unsecured~~ Claims in

full; full, with the interest Section 4.7 provides, sharing pro rata with any Class 12 Claim Allowed as an Unsecured Claim; (3) to fund a $1,000,000 reserve for capital improvements to the Debtor's properties; and (4) to satisfy the remaining Allowed Class 10 Insider Unsecured Claims and, thereafter, the Class 11 Interest. Ninety percent (90%) After the secured creditors receive what the Plan provides, every dollar of net Cause-of-Action recoveries will be devoted goes to unsecured creditors until they are paid in full.

**6.7 Governance of the Reorganized Debtor.**

Governance under the Plan proceeds in three two stages. First, while this case proceeds to conclusion, the Debtor remains under the direction and control of the Chapter 11 Trustee, and I propose and will support the appointment of a committee of unsecured creditors under § 1102 of the Code to monitor operational performance and assist the Chapter 11 Trustee. Second, on the Effective Date, ownership of the Reorganized Debtor rests with Horton S. Johnson, in the capacity Debtor's owner, controls the Declaratory Action determines, and Horton S. Johnson Reorganized Debtor; he will oversee a professional management company engaged to operate the resort day to day and will be responsible for effectuating the Plan. Third, if agreements are reached to combine the Debtor Mr. Johnson will receive compensation commensurate with the other components time he actually spends managing the Reorganized Debtor, at the market rate for an executive

manager of a limited liability company, paid from the ~~Resort as Section 6.2 contemplates,~~ Reorganized Debtor's revenues. Who manages the combined enterprise ~~would~~ after the Debtor acquires the assets of Canaveral Crossroads, LLC will be ~~governed by a Board of Directors comprising Horton S. Johnson, Michael McPhillips, and Neil Buchalter, with Michael McPhillips as President and Chief Executive Officer and Ross Johnston as Investor and Finance Officer and as Reorganization Manager;~~ determined when that ~~structure takes effect only upon the combination, not upon Confirmation.~~ acquisition occurs. I support the continued service of Lara Roeske Fernandez as Chapter 11 Trustee and as Recovery ~~Trustee.~~Trustee; Section 6.3 provides her successor.

**6.8 Vesting of Assets.**

Except as the Plan or Confirmation Order otherwise provides, on the Effective Date all property of the Estate other than the Recovery Trust Claims vests in the Reorganized Debtor free and clear of all Claims and Interests, except the Liens retained by holders of Allowed Secured Claims under Article 4 and the obligations created under the Plan; the Recovery Trust Claims vest in the Recovery Trust as Section 6.3 ~~provides.~~provides, and each Declined Claim vests in the Reorganized Debtor as Section 6.11 provides. When the Recovery Trust terminates, any property remaining after the distributions under Section 6.6 vests in the Reorganized Debtor.

**6.9 Settlement of Claims.**

Under Bankruptcy Rule 9019 and in consideration of the distributions and benefits provided under the Plan, the Plan constitutes a good-faith compromise and settlement of all Claims, Interests, and controversies resolved under it. Entry of the Confirmation Order constitutes Bankruptcy Court approval of those compromises as fair, equitable, reasonable, and in the best interests of the Debtor, the Estate, and holders of Claims and ~~Interests.~~Interests. Nothing in this Section compromises any Cause of Action, any pending objection to a Claim, or any Class 12 Claim.

**6.10 Appointment of the Recovery Trustee as Representative of the Estate; Retention and Enforcement of Causes of Action.**

Under § 1123(b)(3)(B) of the Code, the Plan provides for the retention and enforcement, by a representative of the estate appointed for such purpose, of every Cause of Action and Recovery Trust Claim, and the Recovery Trustee is appointed as that representative. The appointment is made expressly for the purpose § 1123(b)(3)(B) describes. The Recovery Trustee holds and may enforce each Cause of Action and Recovery Trust Claim in that capacity and as successor to the Debtor, the Estate, and the Chapter 11 Trustee. As to each Declined Claim, the Reorganized Debtor is also appointed as that representative, for the same purpose, and holds and may enforce the Declined Claim in that capacity and as successor to the Recovery Trustee.

The Causes of Action and the Recovery Trust Claims are retained and preserved. They are not released, waived, discharged, extinguished, or barred by Confirmation, by the occurrence of the Effective Date, by any distribution under the Plan, or by res judicata, collateral estoppel, waiver, estoppel, or laches arising from Confirmation. The retention and preservation this Section effects is specific and unequivocal, and includes: (a) the Avoidance Actions; (b) every Cause of Action against P.E. Dixon, PEDixon, LLC, ZPD, LLC, KAE, Crescent Sound, Ltd., Kenneth G. Dixon, and each of their affiliates, principals, members, transferees, and subsequent transferees, other than the claims the Compromise Order resolved; (c) every Cause of Action against Tamamoi, LLC, the Carton Family Trust of 1992, FDRE, Inc., and their affiliates; (d) the claim and right to recover Unit 403, which Crescent Sound transferred from the Debtor to the IAM Irrevocable Trust in March 2024; and (e) every Cause of Action the Disclosure Statement describes, whether or not pending on the Effective Date and whether or not named in the Plan.

No holder of a Claim or Interest, and no other party in interest, acquires by reason of Confirmation any defense to a Cause of Action or a Recovery Trust Claim that did not exist immediately before the Confirmation Date.

**6.11 Declined Causes of Action; Reversion to the Reorganized Debtor.**

(a) Every Cause of Action and Recovery Trust Claim belongs to the Recovery Trust, and except as this Section provides, the Recovery Trustee alone may prosecute it.

(b) The Recovery Trustee may decline to prosecute any Cause of Action or Recovery Trust Claim, in whole or in part, for any reason, including that she judges its merits insufficient or its prosecution not economically efficient. She declines by filing and serving a notice that identifies the claim and each defendant. A statement the Chapter 11 Trustee filed before the Effective Date that she does not intend to pursue a claim operates as a notice of declination on the Effective Date, including the statements in Docs. 424 and 425 at page 4, note 2.

(c) A claim is deemed declined if the Recovery Trustee has neither commenced it nor filed a notice of declination (i) within sixty (60) days after the Reorganized Debtor's written request, or (ii) one hundred twenty (120) days before the applicable limitations period expires.

(d) Upon declination, the Declined Claim reverts to and vests in the Reorganized Debtor, free of any interest of the Recovery Trust. The Reorganized Debtor holds and may enforce it as the representative of the Estate under § 1123(b)(3)(B) of the Code, with every right the Recovery Trustee held, and may pursue, settle, or abandon it in its business judgment.

(e) The net proceeds of a Declined Claim, after the Reorganized Debtor's reasonable costs of recovery, including any contingent fee, are distributed under Section 6.6.

(f) No defendant acquires any defense by reason of a declination or reversion.

**6.12 Structured Sales of ~~Units.~~Units; the Trustee's Sale Program.**

(a) The Reorganized Debtor sells Units only under this Section. On the Effective Date, the Reorganized Debtor will arrange an orderly sale process for the Units and will engage the Recovery Trustee to conduct any sale under this Section, through brokers she selects; her reasonable fees and the brokers' commissions are costs of sale. If ~~its~~ at any time the Reorganized Debtor's results fall below the projections of Exhibit B to the Disclosure Statement — that is, if its revenues and net operating income will not cover every payment the Plan requires — ~~it~~ the Recovery Trustee will ~~begin structured sales of Units, no earlier than the summer of 2027 and after the peak rental season,~~ sell Units two or three ~~Units~~ at a time, at fair market ~~value.~~ value, timing each sale to the market. At each closing, the proceeds, net of the costs of sale, pay the Class 6 Claim on the Unit sold and, to each holder of a Lien on the Unit, the release amount: the Allowed Secured Claim the Lien secures, allocated to the Unit in proportion to the Unit's 2025 just value among all Units securing the same Claim. A release amount owed on a Claim

subject to Section 4.1(e) is paid into escrow. Each release amount is credited against the principal of the Allowed Claim it pays. The remaining net proceeds are distributed under Section 6.6.

(b) The structured sales continue in the same manner, over not more than three years, until the Reorganized Debtor's net operating income covers the payments the Plan requires or every Allowed Claim is paid in ~~full.~~full, and they resume whenever a shortfall recurs.

(c) If the Debtor's acquisition of the assets of Canaveral Crossroads, LLC does not occur, this Section applies unless the Reorganized Debtor is meeting every obligation the Plan identifies from its own operations.

(d) Each holder of a Lien on a Unit sold under this Section must release the Lien upon payment of its release amount. A sale under this Section requires no further order of the Bankruptcy Court except as the Code or the Confirmation Order requires.

**6.13 Default; Receiver for a Structured Sale.**

If the Reorganized Debtor fails to make a payment the Plan requires and does not cure the failure within thirty (30) days after written notice, the affected holder may seek relief in the Bankruptcy Court. The Reorganized Debtor consents now to the appointment, in any foreclosure action on the affected Units, of a receiver to conduct a structured sale of those Units under the supervision of the

state court, on the terms of Section 6.12 as nearly as practicable. No foreclosure sale of a Unit will occur except through that receiver.

## Article 7 — Distributions and Disputed Claims

### 7.1 Distribution Agents.

The Reorganized Debtor acts as Distribution Agent for distributions from operations, and the Recovery Trustee makes distributions of the net proceeds of the Recovery Trust Claims, in each case in accordance with Section 6.6. No distribution will be made on account of a Disputed Claim until it becomes an Allowed Claim.

### 7.2 Objections to Claims.

Objections to Claims may be filed by the Chapter 11 Trustee, the Recovery Trustee, the Reorganized Debtor, or me on or before the date that is one hundred eighty (180) days after the Effective Date, subject to extension by the Bankruptcy Court. Court; until the Effective Date, an objection requires leave as the Case Management Order directs. (Doc. 359 ¶ 3). Because Local Rule 3020-1(e) sets a sixty-day default for claim objections unless the court orders otherwise, the Confirmation Order will expressly provide for this 180-day period. I have identified substantial challenges Every objection pending on the Effective Date survives Confirmation and is determined under the Plan, including the Chapter 11 Trustee's objections to Claims 2, 3, 4, 5, 65, 66, 67, 68, 69, 70, and 71 (Docs. 392,

409, 410, 411, 412, 416, 419, 420, 421, 424, 425) and my motion to disallow Claims 67 and 68 under § 502(d) (Doc. 423); the Recovery Trustee succeeds to the Claims of P.E. Dixon and ZPD, LLC (each scheduled by the Debtor at $0.00 and marked disputed, contingent, and unliquidated), the Florida Department of Revenue, and others, as the Disclosure Statement describes.Chapter 11 Trustee's objections.

**7.3 Reserves.**

The Reorganized Debtor and the Recovery Trustee must each establish and maintain appropriate reserves for Disputed Claims pending resolution, so that, if and when allowed, those Claims receive the treatment to which the Plan entitles them.them. Until a Final Order resolves the Class 12 Claims, the Recovery Trustee and the Reorganized Debtor will hold back from each distribution to Class 9 the share that would be payable on the Class 12 Claims if they were Allowed as Unsecured Claims in the amounts asserted.

**7.4 Disallowance Under § 502(d).**

Section 502(d) of the Code directs that the court shall disallow the Claim of any entity from which property is recoverable under §§ 542, 543, 550, or 553 of the Code, or that is the transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Code, unless that entity has paid the amount or turned over the property for which it is liable. The Plan preserves that

provision in full. No Claim of an entity that is a defendant in, or a transferee identified in, any Recovery Trust Claim will be Allowed, and no distribution will be made on account of any such Claim, until that entity has paid the amount or turned over the property for which it is liable, or until the Bankruptcy Court determines that no such liability exists. The Plan nonetheless proceeds as to that entity: every payment the Plan provides on its Secured Claim is paid into escrow under Section 4.1(e) and disbursed only as that Section provides.

The Recovery Trustee, and the Reorganized Debtor as to any Declined Claim, may assert § 502(d) as a ground of objection under Section 7.2, and may do so although the related Avoidance Action remains pending and no money judgment has been entered. Nothing in this Section limits § 502(j) of the Code or Fed. R. Bankr. P. 3008, and a Claim disallowed under this Section will be reconsidered and Allowed upon payment or turnover. Nothing in this Section determines that any entity is liable; every defense of every claimant is preserved until the Bankruptcy Court determines the question.

## Article 8 — Conditions and Effect of Confirmation

### 8.1 Conditions to the Effective Date.

The Effective Date will not occur until (a) the Confirmation Order has been entered and ~~is not stayed;~~ has become a Final Order; (b) all documents necessary to implement the Plan, including the Recovery Trust agreement, have been executed;

and (c) all required authorizations and approvals have been obtained. I may waive ~~any legally waivable condition.~~condition (b) or (c) to the extent the law permits; condition (a) may not be waived.

**8.2 Binding Effect.**

Upon the Effective Date, the Plan binds the Debtor, the Reorganized Debtor, the Chapter 11 Trustee, the Recovery Trustee, all holders of Claims and Interests, and all other parties in interest, whether or not the holder voted to accept the Plan and whether or not Impaired.

**8.3 Discharge.**

Except as the Plan or Confirmation Order otherwise provides, confirmation operates as a discharge under § 1141(d) of the Code of all debts that arose before the Confirmation Date. Because the Debtor will continue in business and the Plan does not provide for liquidation of substantially all property, the discharge provisions of § 1141(d)(1) apply.

**8.4 Injunction.**

Except as the Plan otherwise provides, all persons who have held, hold, or may hold Claims or Interests are permanently enjoined from taking any action to collect, recover, or offset any such Claim against the Debtor, the Reorganized Debtor, the Recovery Trust, or the Estate, other than as the Plan expressly

~~permits.~~permits. On the Effective Date, the orders granting relief from the automatic stay to Mainstreet Community Bank, Tamamoi, LLC, and the Carton Family Trust of 1992 (Docs. 135, 183, 361) cease to have effect, and this injunction binds each of them, subject to Section 6.13. Nothing in the Plan releases, enjoins, or affects any claim of one non-debtor against another, the Declaratory Action, or *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026).

**8.5 Preservation of Causes of Action.**

Except to the extent expressly released, all Causes of Action — including the claims for preferences and fraudulent transfers — are preserved and vest in the Recovery Trust, administered by the Recovery ~~Trustee.~~ Trustee, and each Declined Claim vests in the Reorganized Debtor under Section 6.11. No preclusion doctrine applies to any Cause of Action by reason of Confirmation. Because Local Rule 3020-1(e) sets a sixty-day default for adversary proceedings and contested matters contemplated by a plan unless the court orders otherwise, the Confirmation Order will expressly provide that the Recovery ~~Trustee~~ Trustee, and the Reorganized Debtor as to a Declined Claim, may commence any Recovery Trust Claim at any time within the applicable limitations period.

**Article 9 — Retention of Jurisdiction**

The Bankruptcy Court retains jurisdiction to the fullest extent the law permits, including to: determine objections to Claims; adjudicate the Causes of Action and the Recovery Trust Claims; supervise the Recovery Trust and the Recovery Trustee; resolve disputes concerning interpretation or implementation of the Plan; approve professional fees; enter orders necessary to consummate the Plan; and enter a final decree closing the ~~case.~~case. No holder of a Claim or Interest is deemed by the Plan, by voting, or by Confirmation to consent to the jurisdiction of the Bankruptcy Court, and nothing in the Plan supplies a power the law withholds, including the power to enforce an extension of credit that Fla. Stat. § 687.071(7) makes unenforceable.

**Article 10 — Miscellaneous Provisions**

**10.1 Modification; Cramdown.**

I may modify the Plan before Confirmation under § 1127 of the Code, and I expressly reserve the right to seek confirmation under § 1129(b) as to any Impaired Class that does not accept the Plan.

**10.2 Governing Law.**

Except where the Code or other federal law applies, Florida law governs the rights and obligations under the Plan.

**10.3 Severability.**

If any provision of the Plan is invalid or unenforceable, it is severable, and the remainder remains in full force and effect.

**10.4 Headings.**

Headings are for convenience only and do not affect interpretation.

**10.5 Exhibit A — Valuation of the Units.**

Exhibit A to the Plan is the Expert Report of Gary A. Moll, MBA, CPA, ASA, dated September 1, 2026, valuing twenty-seven Cape Crossing Resort & Marina Units — the twenty-six the Debtor holds and Unit 403 — as a portfolio at $11,600,000 to $18,000,000, and an orderly auction of them at approximately $8,700,000 to $9,900,000 at the low end of that range. (Ex. A ¶¶ 9, 14). The report values twenty-seven Units, including Unit 403, which it assumes will return to the Estate.

**10.6 Provisions of the Confirmation Order.**

The Confirmation Order will provide: "Under § 1123(b)(3)(B) of the Bankruptcy Code, the Recovery Trustee is appointed as the representative of the estate for the purpose of retaining and enforcing the Causes of Action and the Recovery Trust Claims defined in the Plan, and is authorized to investigate, commence, prosecute, settle, compromise, and decline each of them in that capacity; as to each Declined Claim under Section 6.11 of the Plan, the

Reorganized Debtor is appointed as that representative for the same purpose. The Causes of Action and the Recovery Trust Claims are retained and preserved as Section 6.10 of the Plan provides, and are not released, waived, or barred by this Order. The Court finds that the retention and preservation Section 6.10 effects is specific and unequivocal, and that Section 7.4 of the Plan preserves § 502(d) of the Bankruptcy Code in full." The Confirmation Order will also fix the periods Sections 7.2 and 8.5 provide, as Local Rule 3020-1(e) permits.

Respectfully submitted this ~~13th~~ ~~9th~~ 19th day of ~~July,~~ October, 2026.

____________________________

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
~~flahome32801@gmail.com~~flahome32809@gmail.com
*Plan Proponent, pro se*

**Certificate of Service**

I certify that on October 9, 19, 2026, I filed my Second Amended Plan of Reorganization, together with my Second Amended Disclosure Statement and the notice of filing redlines in person with the Clerk of Court. As a pro se litigant, I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; her counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States Trustee. On October 9, 2026, as paragraph 5 of the Order of September 21, 2026 (Doc. 397) requires, I also served copies by United States Mail on each party that objected to my disclosure statement or plan, at the address stated in its objection: Michael McPhillips (Doc. 328); IMQA Investments Incorporated (Doc. 413); the Brevard County Tax Collector (Doc. 422); the Carton Family Trust of 1992 (Doc. 427); Tamamoi, LLC (Doc. 428); Mainstreet

~~Community Bank of Florida (Doc. 429); and PEDixon, LLC and ZPD, LLC (Doc. 430).~~ Trustee.

____________________________

Frank L. Amodeo, Pro se