FILED ORL INTAKE- USBC
12 NOV 2026 AM8:41

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

HOMEMAKERS REAL ESTATE, LLC, Case No. 6:25-bk-05570-GER

Debtor. Chapter 11

**FRANK AMODEO'S MEMORANDUM THAT THE SIGNED GLOBAL SETTLEMENT AGREEMENT IS ENFORCEABLE AS WRITTEN**

The Global Settlement Agreement is complete, and every party signed it. Each term the agreement needs appears in its own text or in a document it names, describes, and attaches. One of those documents, the July Outline, already bore the signatures of the parties to it when the Global Settlement Agreement incorporated it. Nothing is missing, and nothing remains to negotiate. The Dixon Parties' second thoughts do not unmake an agreement this complete. The full agreement is on this court's docket as Exhibit A to the motion to approve it in *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla. 2026) (Doc. 100, Ex. A). I cite it as "GSA," and I ask this court to take judicial notice of it. Fed. R. Evid. 201(b)(2).

**The Global Settlement Agreement resolves every dispute among the parties, removes $7.9 million in claims from this estate, and pays the estate $850,000.**

Over three weeks, the parties spent hundreds of hours negotiating a global settlement of the disputes among them. Twenty-six persons and entities signed it, several in more than one capacity (GSA § 2). The agreement resolves the following matters:

> Seven of the trustee's objections to claims (Docs. 409, 410, 411, 412, 419, 420, 421).

My motion to disallow the claims of PEDixon LLC (PEDixon) and ZPD LLC (ZPD), Claims 67-1 and 68-1 (Doc. 423).

Nine state-court lawsuits among the parties, two adversary proceedings (one of them the Monroe County suit removed to bankruptcy court), a contested petition in my guardianship case, and a civil theft demand, all dismissed or withdrawn with prejudice (GSA Exhibit A, items 1–10, 15–17).

My appeal of this court's order denying disqualification of PEDixon and ZPD, an appeal that challenges this court's subject-matter jurisdiction. The agreement dismisses that appeal with prejudice (Doc. 344; GSA Exhibit A, item 14).

The agreement also strips $7,916,473.65 in filed claims from the Homemakers Real Estate, LLC (Homemakers) claims register (GSA §§ 4.2, 8.4 & Exhibit A).

Claims removed from the Homemakers claims register

| | |
|---|---|
| PEDixon, Claim 67-1, withdrawn | $4,779,864.58 |
| ZPD, Claim 68-1, withdrawn | 1,380,166.67 |
| WM Holdings, Claim 2-1, disallowed | 19,635.25 |
| CTO Holdings, Claim 3-2, withdrawn | 303,853.79 |
| IMQA, Claim 4-3, reduced to $350,000 | 10,459.40 |
| Mr. Johnson, Claim 5-2, halved | 1,297,493.96 |
| Tiered Capital, Claim 71-1, disallowed | 125,000.00 |
| **Total** | **$7,916,473.65** |

Within fourteen days after the Effective Date, PEDixon, ZPD, Crescent Sound, Ltd., and Parke Financial Limited Partnership must pay the trustee, Ms. Lara Roeske Fernandez, $850,000 for the estate (GSA § 5.1(a)). That money pays administrative claims and gives Homemakers capital to reorganize. The parties pay their own fees and costs in every dismissed action (GSA § 8.2).

**Every party signed the agreement, and the agreement bound each party at signature.**

Every party to the Global Settlement Agreement signed it. The task was not easy. Twenty-six persons and entities signed, most before witnesses and a notary, and the letter of Mr.

Yaniv Amar shows the effort each signature took (Ex. B). The copy filed in the Crossroads case carries every signature page delivered as of November 6, 2026 (Crossroads Doc. 100, Ex. A). On November 10, 2026, Crossroads reported in its motion that the Dixon Parties and the Pitkanen Parties had delivered their signature pages to Ms. Fernandez, the Chapter 11 trustee (Crossroads Doc. 100 ¶ 6).

The agreement states plainly when it binds. "This Agreement binds each Party when that Party signs it." (GSA § 14.1). Bankruptcy Code requirements and this court's approval condition the agreement only "[a]s to each Estate Party" (GSA § 14.1). No Dixon Party is an Estate Party (GSA §§ 2.1, 3). The Dixon Parties also promised that "[e]ach Party shall support the 9019 Motions and shall not object to them." (GSA § 14.3).

**Florida contract law governs the agreement, and Florida law favors it.**

The Eleventh Circuit and the Florida Supreme Court speak with one voice.

> [S]ettlements are highly favored and will be enforced whenever possible.

*Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1318 (11th Cir. 2014) (quoting *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985)).

The law of the forum state governs a settlement agreement. *Clough Marketing Services, Inc. v. Main Line Corp.*, 313 F. App'x 208, 211 (11th Cir. 2008) ("The construction and enforcement of settlement agreements are governed by the contract law of the forum state."). The parties also chose Florida law (GSA § 16.1). Under Florida law, offer, acceptance, consideration, and specification of essential terms create a contract. *Cahill v. City of Jacksonville*, No. 3:25-cv-1494-MMH-PDB, 2026 WL 3002501, at *6 (M.D. Fla. Sept. 14, 2026) (report and recommendation) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).

Florida measures assent by what the parties said and signed, not by what one of them later claims to have meant. *Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.*, 302 So. 2d 404, 407 (Fla. 1974) ("The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing." (quotations omitted)). Twenty-six signatures are the plainest external signs the law knows. Each signer also represented that the signer had authority and signed "freely, voluntarily, knowingly, and without coercion" after a "full and fair opportunity to consult with counsel" (GSA §§ 16.9, 16.10). The Eleventh Circuit holds parties to a settlement when each one verified that authority and assent. *Clough*, 313 F. App'x at 211 (enforcing a settlement after each party "individually verified that they were authorized to enter the settlement").

**The agreement is complete: every term appears in its own text or in a signed document it names and attaches.**

The Global Settlement Agreement leaves no blank to fill. It names every party and capacity (GSA § 2). It fixes each payment and each payee (GSA § 5.1). It lists every action to dismiss and the treatment of every claim in this case (GSA Exhibit A). It lists every lien to release (GSA Exhibit E), and it states the releases in full (GSA § 9).

Where the agreement relies on another writing, it names that writing and attaches it. The agreement defines the "Flynn Agreement" as "the Final Outline of Compromise dated July 15, 2026, signed July 21, 2026 by Martin C. Flynn, Jr. and Kenneth G. Dixon, as amended by" a separate settlement agreement among PEDixon, ZPD, Martin C. Flynn, Jr. (Mr. Flynn), and three

Flynn entities (GSA § 3).[1] Exhibit B attaches both writings (GSA Exhibit B). The agreement then makes the Flynn Agreement part of itself.

> The Flynn Agreement (including all exhibits and schedules) is incorporated into this Agreement and remains in full force without modification. Nothing in this Agreement amends, waives or conditions any term of the Flynn Agreement.

(GSA § 4.1).

The July Outline was no draft when the parties incorporated it. On July 21, 2026, Mr. Flynn signed it individually and for related entities, and Kenneth G. Dixon (Mr. Dixon) signed it individually and for PEDixon (Ex. A). The Global Settlement Agreement therefore refers to a document that the relevant parties had already signed.

Whether the Flynn Agreement is now in force between Mr. Flynn and the Dixon Parties is irrelevant here. The Global Settlement Agreement needs that document identified, not adjudicated. The agreement keeps the two apart by its own terms. The Flynn Agreement controls only four listed matters in Mr. Flynn's own bankruptcy case, and "[t]his Agreement controls on every other matter." (GSA § 4.5). Even if the Global Settlement Agreement were to terminate, the Flynn Agreement "remains governed by its own terms." (GSA § 14.5). Any dispute between

---

1 Section 3 of the Global Settlement Agreement provides: "'Flynn Agreement' means the Final Outline of Compromise dated July 15, 2026, signed July 21, 2026 by Martin C. Flynn, Jr. and Kenneth G. Dixon, as amended by the Settlement Agreement among PEDixon LLC, ZPD LLC, Martin C. Flynn, Jr., WM Holdings Group, LLC, MTF Holdings, LLC and 650 85th, LLC, including its exhibits and schedules, both attached as Exhibit B to this Agreement." (GSA § 3).

The Final Outline of Compromise is the written settlement that came out of the judicial settlement conference the Honorable Roberta A. Colton conducted on July 1 and July 15, 2026, in *In re Flynn*, No. 6:26-bk-00399-LVV (Bankr. M.D. Fla. 2026) (*Flynn* Docs. 94, 102). A copy is attached as Exhibit A.

The signed agreement is not confidential. Florida's mediation statute, which governed the conference, attaches "no confidentiality or privilege . . . to a signed written agreement reached during a mediation, unless the parties agree otherwise." *Fla. Stat. § 44.405(4)(a)*; *see Fla. Stat. § 44.402(1)(a)*; M.D. Fla. Bankr. L.R. 9019-2(g). The parties' settlement procedures agreement with Judge Colton says the same: "Unless otherwise agreed, the results of the settlement process are not confidential." (Settlement Procedures Agreement ¶ 6).

Mr. Flynn and the Dixon Parties over the Flynn Agreement belongs to the Flynn case. It leaves no hole in this one.

**Rule 9019 makes this court's approval a condition of performance, not of agreement, and no party may repudiate the agreement while approval is pending.**

I recognize that a bankruptcy settlement differs from an ordinary one in one respect. An estate cannot compromise a claim on its own. This court must approve the compromise after notice to creditors and other parties in interest. Fed. R. Bankr. P. 9019(a). That requirement protects the estate and its creditors. It does not hand a signing party a free option to walk away while the court considers the agreement.

The district court for this district has decided the question. A chapter 7 trustee and an adversary defendant signed a settlement, and the trustee moved for approval under Rule 9019. Before the hearing, the defendant's guardian moved to rescind. Bankruptcy Judge Karen S. Jennemann allowed the rescission. District Judge John Antoon II reversed. *Musselman v. Stanonik (In re Seminole Walls & Ceilings Corp.)*, 388 B.R. 386 (M.D. Fla. 2008) (Antoon, J.), *rev'g* 366 B.R. 206 (Bankr. M.D. Fla. 2007) (Jennemann, J.). Judge Antoon put the rule this way.

> To the extent there is a split of authority . . . , the Court finds the better-reasoned view is that the parties to a settlement agreement may not unilaterally repudiate it after approval of it has been sought pursuant to Rule 9019.

*Id.* at 392.

Judge Antoon drew the line that answers the Dixon Parties. A party cannot enforce a bankruptcy settlement before approval, because no duty to perform has yet arisen. That is a different question from whether the parties made a binding agreement. *Id.* ("There is a fundamental difference between whether parties may ask a court to enforce a settlement agreement in advance of bankruptcy court approval and therefore prior to any obligation to

perform under the agreement and whether the parties reached a valid and binding agreement subject only to court approval."). Approval is a condition precedent to performance, not to the contract itself. *Id.* at 393 n.5 ("Court approval, then, triggers the parties' obligations to perform under the contract."). Judge Antoon stated the rule in one sentence. *Id.* at 395–96 ("The fact that a contract is entered into subject to approval of the bankruptcy court does not create a right of unilateral repudiation pending that approval.").

The rule tracks binding Eleventh Circuit law, and that law reaches further. Florida law requires court approval of a minor's settlement. In *Reed,* the minor died before anyone submitted the settlement for approval, and the Eleventh Circuit held the government to it anyway: "Once an agreement to settle is reached, one party may not unilaterally repudiate it." *Reed ex rel. Reed v. United States,* 891 F.2d 878, 882 n.3 (11th Cir. 1990). Judge Antoon read *Reed* to bar repudiation "before the court has a chance to approve it or even before it is submitted for court approval." *Seminole Walls,* 388 B.R. at 393–94. It found "no persuasive reason why unilateral repudiation would be permissible in bankruptcy but not in other arenas." *Id.* at 394.

The reason is practical. A party bound to nothing could sign, take the benefit of the peace the agreement brings, and then walk away. *Id.* at 395 ("If a party could unilaterally withdraw from a settlement agreement, he or she could strategically enter a settlement agreement and effectively 'stay' the proceedings against him and repudiate on the eve of court approval without consequence."). That is this case. From the Execution Date, the Global Settlement Agreement stayed every action among the parties (GSA § 8.3). So a party "is bound to the contract unless and until the bankruptcy court rejects the settlement, the happening of which voids the agreement." *Seminole Walls,* 388 B.R. at 395.

The Global Settlement Agreement follows that rule in its own words. It "binds each Party when that Party signs it," and it makes this court's approval a condition only "[a]s to each Estate Party" (GSA § 14.1). It requires Rule 9019 motions in each of the four bankruptcy cases and names me as one of the movants in this case (GSA § 14.2(b)). Every party agreed to support those motions (GSA § 14.3). Having agreed to seek approval, no party may repudiate while approval is sought, and under *Reed* no party may repudiate before the motion is filed. The agreement supplies the only exit: if this court declines approval, Section 14.5 governs what follows (GSA § 14.5). Until then, no party, the Dixon Parties included, has a right to leave.

**The Dixon Parties' attempt to back out after signing changes nothing, because this court enforces the agreement as written.**

At the last minute, and after they signed, the Dixon Parties tried to hold the Global Settlement Agreement hostage in order to renege on the earlier settlement it references. The attempt changes no word of the agreement they signed. A settlement that takes effect on the last signature binds every party who signed it. *Cahill*, 2026 WL 3002501, at *7 (holding a settlement effective on the last party's signature and the parties "bound by the settlement agreement").

This court enforces the agreement the parties signed. It does not rewrite it. *Cahill*, 2026 WL 3002501, at *7 ("[T]he court's role is to enforce agreements, not make, supplement, or negotiate them."). Where the terms are clear, "a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001).

A party's later demands do not undo a settlement the party already made. *Junco v. Adventist Health Care System*, No. 17-22634-CIV-COOKE/GOODMAN, 2019 WL 13257009, at *4–5 (S.D. Fla. July 26, 2019) (enforcing a settlement after the plaintiff, having agreed, demanded more money and new terms). Florida law "leans against the destruction of contracts

because of uncertainty." *Blackhawk,* 302 So. 2d at 409. And the Eleventh Circuit favors settlement for a practical reason. *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994) ("We favor and encourage settlements in order to conserve judicial resources.").

The Rule 9019 motions will put the factors of *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990), before this court, and my separate memorandum in support of the Global Settlement Agreement will address them. This memorandum answers a narrower question. The agreement is signed, complete, and binding. Nothing the Dixon Parties said after signing changes a word of it.

## RELIEF REQUESTED

The Global Settlement Agreement, as written, is complete and enforceable. When the Rule 9019 motions come before this court, the law, applied to these facts, requires approval of the agreement and holds every party who signed it, the Dixon Parties included, to its terms.

Respectfully submitted this 12th day of November, 2026.

Frank L. Amodeo
*Pro se*
1311 Hoffner Avenue
Orlando, Florida 32809
Telephone: (407) 406-1315
flahome32801@gmail.com

**CERTIFICATE OF SERVICE**

On November 12, 2026, I filed this memorandum and its exhibits with the Clerk of Court, and the CM/ECF system served them on every registered participant in this case.

Frank L. Amodeo

## EXHIBITS

Ex. A Final Outline of Compromise dated July 15, 2026, signed July 21, 2026

Ex. B Letter of Mr. Yaniv Amar

# EXHIBIT A

Final Outline of Compromise dated July 15, 2026, signed July 21, 2026

Pedixon/ZPD Counter:

1) Pedixon and Flynn dismiss suit and counterclaims over Homestead property; FLYNN RESPONSE: **FLYNN RESPONSE: Agreed with withdrawal of Claim #19-1 and release of mortgage on homestead. Upon approval of compromise, Pedixon withdraws all pending motions and objections. Settlement agreement will also provide that claim amounts agreed to are for settlement purposes only.**
**PEDIXON RESPONSE: With respect to motions and objections – we are assuming it is the motion to dismiss and motion to remand. If that is true- agreed. Yes at to both motions includes the reference to Subchapter V election objection.**
2) Quit claim Deed of 650 85th to Pedixon or its designees; There is no dispute that my client has a mortgage on this property. **FLYNN RESPONSE: No quit claim deed. Instead, based on lien rights asserted, Pedixon retains lien on property and receives modified note and mortgage which provides for payment of $100,000.00 over 30yrs at 6.75% interest. Treatment to be specified in amended plan as to Claim #16-1. Pedixon votes Claim 16-1 in favor of plan which separately classifies and provides treatment for claim as specified above.**
**PEDIXON RESPONSE: Quit Claim deed Required. We can agree to grant an option to purchase within one year for $800,000. FLYNN RESPONSE: Flynn will Quit Claim deed to 650 property upon satisfaction or assumption of existing senior mortgage on property and execution of indemnification agreement with respect to any claims asserted against 650 85th, LLC and/or Marty Flynn by First State Bank of the Florida Keys. Transfer remains subject to approval of First State Bank of the Florida Keys. Flynn retains right to repurchase within one year for $800,000.00. PEDIXON RESPONSE: Quit Claim Deed by 650 85th, LLC to PEDixon or its designee to be held in escrow by Dean Mead. Deed will released and recorded upon satisfaction of the loan or assumption of the mortgage with a release of any guaranty owed by Flynn. Option in one year of $800,000, plus any additional costs including for insurance, taxes and mortgage payment. Flynn and 650 85th shall not further encumber the property. Offer is subject to acceptable title search and proof of corporate authority. FLYNN RESPONSE: agreed with terms incorporated into Plan which transfer as indubitable equivalent of Claim #16-1 which Pedixon will vote in favor. Transfer through confirmed plan also avoids transfer taxes via sec. 1146.**
3) Pedixon or other designated entity receives all Rate of Growth Ordinance (ROGO) permits currently held by MTF Holdings (we need confirmation ROGOs owned from Flynn and confirm this is acceptable – it our understanding that there are 7)); We still need the confirmation of this, but the parties appear to agree to the concept.
**PEDIXON RESPONSE: Agreed, subject to confirmation. Pedixon will pay Flynn $10,000 upon the sale of each ROGO. FLYNN RESPONSE: No transfer of ROGOs, Flynn Retains All.**
4) With respect to WM, WM will assign Affordables Kaya and Oceans 73 to Pedixon or its designee – in form reasonably acceptable to Pedixon, Flynn will represent and warrant as to the assignability of these interests and that they are not subject to any encumbrances Marty will receive 75% of the first three years of cash flow from these interests. My client understands that Mr. Flynn may need income. My client also is seeking a middle ground by limiting his request to specific affordables.
**FLYNN RESPONSE: With respect to WM, Flynn will distribute 25% of any distributions received on account of the WM interest over a period of 3 years from the effective date of the debtor's confirmed plan. This distribution treatment will be set forth in an amendment to the plan which separately classifies Claim #18 and provides for the 3 year distributions in satisfaction of such claim. Pedixon agrees to vote to accept the treatment specified in the amended plan.**

**PEDIXON RESPONSE:** Since Flynn values WM at $0.00, Pedixon will pay $25,000 for the interests in WM. **FLYNN RESPONSE: No transfer of any interest in WM Holdings Flynn retains interests.**
5) Marty keeps the cash;
6) We agree to a final claim amount of $4,665,000 to be treated as a fully and finally allowed unsecured claim; Judge Colton stated you were working on a distribution table. We still have not received it, please provide. That would be helpful to give my client an understanding of what they can expect. We removed the request that the distribution be at least $250,000. **FLYNN RESPONSE: SEE INCLUDED DISTRIBUTION TABLE which adopts the voluntary subordination of claims held by Tracey Flynn and Horton Johnson which the Debtor would facilitate to reach compromise and maximize recoveries, but does not account for potential claim objections. Flynn will stipulate to $4,665,000 for voting and distribution purposes under the Plan. Pedixon will vote each claim in favor. Don't believe Pedixon responded to this in last counteroffer.**
**PEDIXON RESPONSE: Accepted.**
7) Complete release by Flynn of Pedixon, Pitkanen, Cresent Sound, ZPD, Ken Dixon, related entities, counsel, all employees, professionals, etc.; **FLYNN RESPONSE; Parties are working on the language but Flynn (on account of his business interests) will only be capable of providing release for entities he controls. As a minority interest holder, Flynn is limited.**
**PEDIXON RESPONSE:** We need to know what entities he controls and have confirmation of the same. **FLYNN RESPONSE: Flynn controls WM Holdings, MTF and 650 85th LLC PEDIXON RESPONSE:** We need confirmation including operating agreements of Teired Capital. Flynn will provide documentation to confirm ownership interest.

8) Dismissal of the Guaranty Complaint with respect to Flynn and the other entities that signed the same guaranty (650 85th, Cape Crossing, etc.); **FLYNN RESPONSE: AGREED**
**PEDIXON RESPONSE:** Agreed.
9) Covenant not to sue, participate in the filing of any suit, claim, etc, including by any third party Flynn has an interest in (Tiered Capital, etc.); **FLYNN RESPONSE: SEE #7 Above, language will be revised based on what Flynn is actually capable of providing. PEDIXON RESPONSE:** We need **confirmation of direct interests and we need language that he will not indirectly participate, commence, etc. A big piece of consideration is an end to litigation.** FLYNN RESPONSE: the Release and Covenant Not to Sue will include language that Flynn will not directly or indirectly participate in litigation or utilize his business interests in support of any action which would violate the terms of the release and covenant not to sue which should resolve any concern here. There will not be a violation of the covenant not to sue if Flynn is compelled to appear in an action via subpoena as a non-party.
10) Flynn takes all steps to withdraw of any Bar Complaints against Alison Pitkanen, Alison Pitkanen P.A. and her firm and he informs the Bar that he will not be pursuing such claims and the issue has been resolved; **FLYNN RESPONSE: Florida Bar confirmed complaint cannot be withdrawn but Flynn will inform the Florida Bar of the compromise reached and his desire not to pursue any further claim.**
**PEDIXON RESPONSE:** Agreed.
11) Failure to comply will result in the entry of a judgment against Flynn and the other guarantors that signed the same guaranty in the amount of $4,665,000. You took the position that this would result in a nondischargeable judgment. That's not the case. First, a judgment is only entered if your client does not comply. Second, the covenant not to sue language you provided included indemnity language that would result in future post-petition liability. This is the same thing. Third, it is a reasonable requirement to make sure there is compliance with the Agreement and does not violate

an covenants. I have had similar provisions approved many times in the past. **FLYNN RESPONSE: In the event of any default under the terms of this agreement, parties retain their rights to enforce claims as provided in the Chapter 11 Plan which would include your client's right to seek entry of a judgment against Flynn for any outstanding amount claimed to be owed which Flynn only retaining the right to contest entry of judgment based upon payment or satisfaction of the amount claimed to be owed.**
**PEDIXON RESPONSE: See Proposed language. FLYNN RESPONSE: Not agreeable to proposed language. Flynn's counter stands at language proposed above.**
**PEDIXON RESPONSE: We are also not waiving right to enforce in Bankruptcy Court and we should have a right to dismissal of litigation and damages for violation of covenant not to sue, or we can agree to judgment in set amount. We need to end this. FLYNN RESPONSE: Pedixon can pursue enforcement of rights (if any) in Bankruptcy Court or State Court to the extent of any violation of covenant not to sue.**

**Martin Charles Flynn on behalf of himself and related entities**

**Ken Dixon individually and on behalf of Pedixon, LLC**

# EXHIBIT B

Letter of Mr. Yaniv Amar dated November 6, 2026

November 6, 2026

Alison Jean Pitkanen, Esq.
1980 N. Atlantic Ave, Suite 328
Cocoa Beach, FL 32931

Kenneth G Dixon
1627 E Vine St # E
Kissimmee, FL 34744

Courtesy copies:

Jeffrey Ainsworth
1501 E Concord St
Orlando, FL 32803

Frank Amodeo
1311 Hoffner Ave
Orlando, FL 32809

To Mr Dixon and Ms Pitkanen:

Ms. Pitkanen, before you became Mr. Dixon's attorney, you were my attorney.

You were entrusted with my legal affairs, my business interests, and transactions involving substantial financial obligations. You prepared the mortgage and loan documentation underlying the very transactions that subsequently became the subject of our disputes. You drafted agreements, rendered legal advice, and offered personal and friendly guidance upon which I relied.

I trusted you not only as a legal professional but also as someone whom I believed had my best interests at heart.

Yet, you subsequently undertook the representation of Mr. Dixon in matters directly adverse to my interests, involving the very transactions and agreements you had previously handled on my behalf.

You never sought my consent. You never afforded me the opportunity to address the conflict created by your decision to represent the opposing party.

The duties owed by an attorney to a former client are not matters of convenience. They are fundamental obligations of professional loyalty, confidentiality, and integrity. They do not simply disappear when an attorney decides to represent someone else.

My concerns extend considerably beyond your decision to change sides.

During July, August, and September of 2023, I was experiencing one of the most difficult and vulnerable periods of my life. My attention was consumed by deeply personal circumstances, and I was relying upon the integrity and good faith of those with whom I had established professional relationships.

It was during this period that I was presented with several DocuSign agreements that I believe were profoundly damaging to my interests. Those documents included quitclaim arrangements that purported to transfer valuable property interests to Mr. Dixon, with consequences far beyond what I understood or intended when I executed them.

Ms. Pitkanen, you misled me regarding the nature and consequences of those agreements. The circumstances surrounding their preparation, presentation, execution, and subsequent use raise serious questions that have never been satisfactorily answered.

Perhaps most disturbing of all is what I have since discovered in the Volusia County property records. A Marine, Inc., the company through which I acquired Holly Bluff Marina, is nowhere to be found in the recorded chain of title. It is as though my company's acquisition of the property never occurred. How is that even possible? How could I have entered into a $3 million mortgage transaction, executed the loan documents, and subjected myself and my businesses to millions of dollars in financial obligations, only to discover that the company supposedly acquiring the property does not even appear in its chain of ownership?

These are not minor technicalities or clerical oversights. They go to the very foundation of the transaction and raise serious questions about the legal advice I received, the documents I was asked to execute, and the protection of my interests. I believe I am entitled to a full explanation of how this happened, who was responsible, and why I am only now discovering what appears to be such a fundamental discrepancy in the ownership records.

Ms. Pitkanen, you were intimately familiar with the underlying financing arrangements. You had drafted the original loan and mortgage documentation. You possessed knowledge of the transactions, the parties, and the circumstances surrounding them. That history makes your subsequent representation of Mr. Dixon, without my consent, particularly difficult to comprehend.

There is a fundamental difference between being disappointed by a business associate and feeling betrayed by someone who once served as your attorney.

Mr. Dixon and I entered into business transactions that ultimately became contentious. We can disagree about those transactions, negotiate their consequences, and reach a settlement.

Ms. Pitkanen, you occupied a position of trust that was entirely different. I relied upon you for legal protection, not merely business cooperation. I expected you to safeguard my interests, not subsequently place yourself in a position where you would advocate against those same interests in disputes arising from agreements you had prepared.

Against this background, I find your refusal to sign even a simple letter of apology particularly disappointing.

I did not ask you for financial compensation. I did not demand a public admission of wrongdoing, an acknowledgment of malpractice, or a confession of professional misconduct.

I simply asked for something far more modest: a personal acknowledgment that the circumstances surrounding your conduct caused me genuine distress, disappointment, and a profound loss of trust.

After everything that has transpired, I would have thought that such a request would be met with understanding, or at the very least, thoughtful consideration.

Instead, you have refused.

An apology would not undo the consequences of the disputed transactions. It would not restore the years consumed by litigation, erase the financial hardship, or resolve the serious questions surrounding your representation. However, it would show a hint of remorse for your conduct.

Surely, acknowledging the pain and disappointment experienced by a former client should not require a court order, a legal admission, or a negotiated financial concession.

I would have hoped that professional courtesy, personal integrity, and simple human decency would have been sufficient.

Instead, your refusal has only deepened my disappointment.

I cannot help but find it remarkable that Mr. Dixon, with whom I have been engaged in substantial financial and legal disputes, is willing to make meaningful concessions to bring this matter to a conclusion, while my own former attorney is unwilling to offer even a modest personal acknowledgment of the distress arising from her conduct.

Mr. Dixon, you are prepared to make financial concessions for our business dispute. Yet, Ms. Pitkanen, who once owed me professional duties of loyalty and confidentiality, will not even offer a simple apology.

That contrast speaks volumes to me.

Mr. Dixon, I want to emphasize that I appreciate your efforts and do not wish to undermine the progress we have made. I recognize that you and Ms. Pitkanen occupy different positions in this matter, and I do not hold you responsible for her personal decision to decline my request.

I remain committed to resolving our differences in good faith.

Ms. Pitkanen, you may believe that declining to apologize protects your legal or professional position. Perhaps you have been advised to take that approach, but there is a difference between protecting oneself legally and acknowledging that one's actions have caused another person genuine harm.

While I remain willing to bring the underlying disputes with Mr. Dixon to a respectful and final conclusion, I will not pretend that the breach of trust I experienced at the hands of my former attorney was insignificant.

Ms. Pitkanen, I hope that you will reconsider your refusal. Not because you are being compelled to do so, but because you recognize that the trust once placed in you deserved greater consideration than it has received.

Sincerely,

Yaniv Amar