FILED ORL INTAKE - USBC
16 NOV 2026 PM12:41

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: | Case No. 6:25-bk-05570-GER |
| **HOMEMAKERS REAL ESTATE, LLC,** | Chapter 11 |
| Debtor. | |
| / | |

**THIRD AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE THIRD AMENDED PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO,**
**a Creditor and Party in Interest**

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | flahome32801@gmail.com

Dated: November 16, 2026

## 1. The Plan keeps the Resort renting, pays non-Insider unsecured creditors in full in cash, and keeps for the Estate every claim the settlement does not release.

Section 1125 of title 11 of the United States Code (the "Bankruptcy Code") entitles every holder of a claim or interest to adequate information before that holder votes. This Third Amended Disclosure Statement (the "Disclosure Statement") supplies that information about the Third Amended Plan of Reorganization (the "Plan") I propose for Homemakers Real Estate, LLC (the "Debtor"). (Doc. ___). This Disclosure Statement supersedes the three statements I filed on July 13, October 9, and October 19, 2026. (Docs. 304, 433, 441). As the

Order of September 21, 2026 requires, this Disclosure Statement is a single integrated statement, and I filed a redline against Doc. 441 under separate notice. (Doc. 397 ¶¶ 5–6).

The Plan pays a substantially greater dividend. The Plan preserves the Debtor's vacation-rental enterprise at the Cape Crossing Resort as a going concern. The Plan puts the Estate's $850,000 recovery under the Global Settlement Agreement to work, paying non-Insider unsecured creditors in full in cash. And the Plan keeps for the Estate the claims the settlement does not release, so that every legitimate creditor is paid.

After October 19, 2026, the case changed again, and this Disclosure Statement changes with the case. On October 19, 2026, the Chapter 11 Trustee, Lara Roeske Fernandez ("Ms. Fernandez" or the "Trustee"), and the Dixon creditors attended the judicial settlement conference before the Honorable Jason A. Burgess. The conference produced the Global Settlement Agreement among the Trustee, the Dixon Parties, the Pitkanen Parties, Horton S. Johnson ("Mr. Johnson") and the companies Mr. Johnson controls, IMQA Investments Incorporated, CTO Holdings, Inc., WM Holdings Group, LLC, Yaniv Amar, me, and others. The agreement bound each party when that party signed; for the Estate and the three other debtors, the agreement remains subject to the Bankruptcy Code and to approval in each debtor's case. (Global Settlement Agreement § 14.1). The

agreement's payments, releases, and claim treatment take effect only after this court approves the agreement here and in the three related cases. On approval, the Dixon Payor Parties pay the Estate $850,000; PEDixon and ZPD withdraw Claims 67 and 68; the agreement fixes or disallows the claims of IMQA, CTO, WM Holdings Group, Tiered Capital, and Mr. Johnson; and the Debtor's membership units return to Mr. Johnson. The Plan implements the agreement. (Section 2.J). The Plan pays non-Insider unsecured creditors in full, in cash, from the Settlement Payment. Classes 12 and 13 are gone, because PEDixon and ZPD withdraw the PEDixon and ZPD claims and the Trustee paid the IPFS claim. The section 502(d) holdback that withheld about 88 percent of every Class 9 payment is gone, and the Recovery Trust keeps only the claims the agreement does not release. On September 18, 2026, the Condominium Association withdrew the Association's claim, which emptied Class 8. (Doc. 393). On November 10, 2026, Claim 69 was withdrawn with prejudice, which empties Class 1. (Doc. 457). On November 12, 2026, the Trustee moved to approve the Global Settlement Agreement. (Doc. 459). On November 12 and 13, 2026, the Trustee and the Trustee's professionals applied for $382,534.13 in fees and costs. The Settlement Payment pays whatever this court allows on those applications ahead of every other use. (Section 3.F). The Plan also changes the secured treatment and the sale program: amortization begins February 1, 2027, the adequate-protection payments are gone, and from January

2027 the Reorganized Debtor keeps at least one Unit listed for sale. (Sections 3.A, 4.C). And all Units will be sold or refinanced by February 1, 2029. The Tamamoi and Carton treatment, the Mainstreet claims, and the staged governance are unchanged.

**A. I assisted both the borrowers and the lender. With regard to my involvement, especially as the Plan proponent, creditors should weigh my whole history — the convictions and the work. My standing attached when I joined the petition and filed the Plan, and no payment toward my restitution judgment undoes that standing.**

Candor about the proponent is part of adequate information. I hold an unsecured claim of $396 against the Debtor, and I joined the involuntary petition as a petitioning creditor. My claim is one reason I participate in this case. My belief in the rule of law and just results is the other. As the case went on, I saw that, for reasons outside this court, the results were not turning out fair. I then took a broader role: by virtue of ensuring my own claim was repaid, I was able to protect the comparatively innocent parties to these transactions — the unsecured creditors and the true third-party claimants who had no say in those transactions.

For four years, I assisted with the financial analysis and structuring of the loans this Disclosure Statement describes. Without charge, I assisted and educated both sides of those loans: the owners of Tiered Capital, Inc. and Tiered Capital's affiliates — my friends, the borrowers — and the lender, Kenneth Dixon ("Mr. Dixon").

For a year and a half, Mr. Dixon and I met nearly weekly, over dinners at my home, to discuss the state of the Tiered businesses. I watched the events this Disclosure Statement describes as those events happened; several of the transactions occurred at my dining-room table. Members of my family own IMQA Investments Incorporated. IMQA holds a Class 9 claim that the Global Settlement Agreement allows at $350,000. The Plan treats IMQA, and me, exactly as the Plan treats every other non-Insider unsecured creditor. Under the same agreement, CTO Holdings, Inc., a company owned by my sister, withdraws CTO's claim.

Creditors weighing my judgment and this Plan's integrity should also know my history. In 1997, Georgia disbarred me. In 1999, I was convicted of mail fraud and served my sentence in a federal boot camp. In 2008, Florida declared me incompetent. In 2009, a second conviction arose from a corporation's failure to pay payroll taxes, and I served that sentence in federal prison. Opposing parties repeat that history often, and I do not contest that history.

Creditors should also know the rest of the story. I graduated from the Emory University School of Law. I practiced bankruptcy law in Atlanta, and over my career I took part in hundreds of cases, including more than sixty Chapter 11 cases as either an attorney or a stakeholder.

In prison, I advocated for other inmates, and I built a deep body of experience doing that work. Twice, the Supreme Court of the United States granted

relief on certiorari pleadings I wrote for others — Anthony Grant Jackson and Michael Levon Jackson. *Jackson v. United States*, 578 U.S. 1020 (2016) (mem.); *Jackson v. United States*, 589 U.S. 902 (2019) (mem.). My advocacy corrected 741 sentences, avoiding 1,997 years of unnecessary imprisonment, and saving taxpayers about $108 million. Several district courts, including the court that sentenced me, recognized that advocacy and the quality of the work. On January 13, 2020, the judge who sentenced me, Judge John Antoon II, observed from the bench that I am "known throughout the — not just the Middle District, but districts in Florida, and my guess is probably districts around the country for his quality assistance of prisoners and filing papers." *United States v. Amodeo*, No. 6:08-cr-176 (M.D. Fla. Jan. 13, 2020) (Doc. 338-1 at 2:22–25). My convictions and my incompetency adjudication are part of the record; so is that experience, and creditors should weigh both in judging the Plan. Read the Plan, verify the numbers against the Schedules and the exhibits, and judge the work on the record. Every figure in this Disclosure Statement carries a verification path.

**Capacity**

On March 25, 2026, the guardianship court authorized me to prosecute this bankruptcy case personally. *In re Guardianship of Amodeo*, No. 48-2008-CP-001369-O (Fla. 9th Cir. Ct. Mar. 25, 2026).

**Standing**

On September 11, 2026, the United States gave notice of a criminal restitution lien on all of my property, including any distribution on my $396 claim in this case, Claim 1-1. (Doc. 387). The lien arises from the restitution judgment the district court entered against me on July 2, 2009. Any distribution the Plan makes on my claim will go where that lien requires, and every dollar of that distribution reduces my restitution debt. The lien reaches my property alone; the lien does not reach the Debtor's property or any other creditor's distribution.

At the October 14, 2026 hearing, Mainstreet's counsel told this court that Mainstreet was paying my claim and that, once Mainstreet paid, "there won't be standing." (Oct. 14, 2026 Hearing Tr. at 21:5–13). Mainstreet's counsel is wrong, for six reasons. First, a court measures standing when a party invokes the court's power, not afterward. "[S]tanding is to be determined as of the commencement of suit." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992). On September 2, 2025, I held Claim 1-1 when I joined the involuntary petition. On May 21, 2026, this court entered the order for relief on that petition. (Doc. 229). I held the same claim when I filed my plan on July 13, 2026, and when I amended that plan on October 9, 2026. Nothing that later happens to my claim reaches back to undo any of those acts.

Second, what follows the commencement is a question of mootness, not standing, and a party claiming that the party's own later conduct ended the controversy bears the "heavy burden" of proving that claim. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). A creditor that opposes a plan cannot carry that burden by paying the plan's proponent. If a creditor could, any creditor could buy a plan off the docket for the price of the smallest claim behind that plan.

Third, a payment by Mainstreet would not pay my claim. Mainstreet does not owe the Debtor's debt to me. Money Mainstreet pays the United States reduces my restitution judgment, not the Debtor's obligation on Claim 1-1, which remains outstanding until the Debtor or the Plan pays that claim. Nor does the restitution lien change who holds the claim. The lien secures the United States' judgment against my property, and I remain the holder of the claim the lien encumbers. *18 U.S.C. § 3613(c).*

Fourth, the Bankruptcy Code does not measure a party in interest by the size of the party's claim or by who will receive the party's distribution. Once a trustee is appointed, "[a]ny party in interest, including . . . any creditor, may file a plan." *11 U.S.C. § 1121(c)(1).* A party in interest is one whom the reorganization proceedings "might directly affect." *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 272–73 (2024); *see also In re Roman Catholic Diocese of Albany*, No.

1:25-cv-01570 (BKS), 2026 WL 2923067, at *9–10 (N.D.N.Y. Sept. 29, 2026) (reversing a bankruptcy court that read *Truck* narrowly; a party "potentially concerned with or affected by" the outcome is a party in interest, and *Truck* does not require that party to show "definitive financial responsibility"). Every dollar the Plan distributes on my claim reduces a judgment against me. How this case ends affects few creditors more directly.

Fifth, Mainstreet could not step into my place by paying. The Bankruptcy Code subrogates only an entity that is "liable with the debtor on, or that has secured," a creditor's claim, and Mainstreet is neither. *11 U.S.C. § 509(a)*. A stranger who pays another's debt is a volunteer and acquires nothing. State law decides who owns a claim. *Butner v. United States*, 440 U.S. 48, 55 (1979). Only the party entitled to enforce a claim may assert that claim; "one entity cannot assert another's claims." *In re Aegis Asset Mgmt., LLC*, 182 F.4th 1364, 1371 & n.8 (11th Cir. 2026). And a creditor that acquires a claim to defeat a plan, rather than to collect on the claim, acts with the "ulterior motive" that justifies designating that creditor's vote. *In re DBSD N. Am., Inc.*, 634 F.3d 79, 102–03 (2d Cir. 2011); *11 U.S.C. § 1126(e)*.

Sixth, as a distinct basis for my standing, at the insistence of the Trustee and the Dixon Parties, I am a party to the Global Settlement Agreement. (Doc. 459 at 2). The agreement binds me, and the agreement requires me to dismiss my appeal.

(Doc. 459 ¶ 18(o)). A party to the settlement of the Estate's claims holds an interest in this case that no payment of Claim 1-1 can end.

**B. Disclaimers and Warnings**

Once this court approves this Disclosure Statement, this Disclosure Statement and the accompanying documents are the only documents authorized for soliciting votes on the Plan. The Plan controls. Where this Disclosure Statement and the Plan differ, creditors should follow the Plan, and every capitalized term this Disclosure Statement does not define carries the meaning the Plan gives that term.

No one audited the information in this Disclosure Statement. I made every reasonable effort to state the information accurately, but I cannot warrant that the information is free of error. The projections are estimates, and the results may differ. On every contested matter, adversary proceeding, and Cause of Action, this Disclosure Statement states my contentions and the positions of others. No party admits those contentions, and no court decided the contested allegations this Disclosure Statement describes.

**C. Classification**

The Bankruptcy Code and Rules place claims against, and interests in, the Debtor into Classes. The original plan designated the Classes of Claims and Interests, and for consistency the Plan retains those Classes. Because of the

Condominium Association's withdrawal and the Global Settlement Agreement, eleven Classes remain, and two Classes are empty. Class 1 holds no Claim, because Claim 69 was withdrawn on November 10, 2026. (Doc. 457). Class 8 holds no Claim, because the Cape Crossing Condominium Association withdrew the Association's claim on September 18, 2026. (Doc. 393). The Plan no longer carries a Class for the PEDixon and ZPD claims, which PEDixon and ZPD withdraw under the Global Settlement Agreement, or for the IPFS claim, which the Trustee paid in full. (Doc. 392 ¶ 13). Section 3 describes the classification and treatment of each Class. If the Plan alters the legal, contractual, or equitable rights of a holder, the Claim or Interest is "Impaired," and the holder may vote.

**D. Objections and Disallowance**

A holder whose Claim is the subject of a pending objection may vote only to the extent this court temporarily allows the Claim for that purpose. *Fed. R. Bankr. P. 3018(a)*. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance, particularly section 502(d). Classes 4 and 5 fall within that exception. Each holder in Classes 4 and 5 received transfers the Estate may avoid, and section 502(d) disallows that holder's Claim until the holder returns those transfers. This Disclosure Statement gives this court notice that a section 502(d) circumstance exists for each of those Claims, and this court should disallow those Claims on this court's own motion. On October 21, 2026, I

moved to disallow the Tamamoi and Carton claims on that ground. (Doc. 444). On October 28, 2026, I moved for leave to object to those claims, and with this Disclosure Statement I ask this court to rule on that motion on an expedited basis, to ensure that those the law does not permit to vote do not cast votes that count. (Doc. 449). Tamamoi and the Carton Family Trust hold the Debtor's money. Tamamoi and Carton took that money without giving the Debtor any consideration, and until Tamamoi and Carton return that money, neither should vote on the Plan or on the Trustee's plan. Under the Global Settlement Agreement, I withdraw my October 2, 2026 motion against the PEDixon and ZPD claims. (Doc. 423).

**E. Voting Deadline**

Every vote counts. The Clerk of the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, must receive each ballot, at the address the ballot states, by 5:00 p.m. (ET) on December 1, 2026. A late ballot does not count.

After the voting deadline, this court will hold a hearing (the "Confirmation Hearing") to consider whether the Plan satisfies the confirmation requirements of section 1129 of the Bankruptcy Code. The Bankruptcy Code permits confirmation even if not every Impaired Class accepts; lawyers call confirmation over the

objection of an Impaired Class "cramdown." If an Impaired Class rejects the Plan, I will seek cramdown under section 1129(b).

I ask every holder entitled to vote to vote to accept the Plan.

## 2. The Debtor owns twenty-six rental Units at the Cape Crossing Resort, and four years of disputes over the Debtor's loans, ownership, and rents produced a global settlement that awaits this court's approval.

### A. The Debtor owns the rental heart of the Cape Crossing Resort.

The Debtor, Homemakers Real Estate, LLC, owns and operates a portfolio of vacation-rental units within the Cape Crossing Resort and Marina (the "Resort"), located at 201 Ivory Coral Lane, Merritt Island, Florida 32953. At full build-out, the Resort comprises forty-seven townhomes, thirty-six condominiums, a restaurant, two marinas, a clubhouse and pool, and related commercial and intangible property. The Debtor owns twenty-six Units: eighteen condominiums at 202 Ivory Coral Lane and eight townhomes. (Exs. C, E). Unit 403 is not among the twenty-six, and the Plan seeks the return of Unit 403.

### B. 2015 to 2019: Four investors built the Resort with money from three lenders, and an institutional consolidation came within reach.

Michael McPhillips ("Mr. McPhillips") and Martin Flynn ("Mr. Flynn") conceived the Resort. Lacking the capital to complete the Resort alone, Mr. McPhillips and Mr. Flynn brought in Mr. Johnson and Investors of Merritt, a group

of friends and family headed by Dan Myers, CPA, the group's principal investor, now deceased.

In approximately 2015, that capital enabled development to begin. Three lenders financed the work from the start: Mr. Johnson, who was both an investor and a lender; Neil Buchalter ("Mr. Buchalter"); and David Campbell, who operated FDRE, Inc. To finish the project, the developers presold units, entered construction loans, and stacked second, third, and fourth mortgages on individual units.

By 2019, with most structures nearing completion, the enterprise involved more than fifty investors, lenders, and owners across more than one hundred fifty transactions. An institutional lender tentatively committed to consolidate the debt and fund completion (the "Consolidation").

**C. 2020 to 2021: The pandemic, a bank merger, and a partition starved the enterprise of cash, and the Debtor took title to the Units.**

Beginning in 2020, the COVID-19 pandemic slowed construction and sharply increased materials costs. A bank merger then derailed the Consolidation and eliminated institutional financing for the whole project, and the enterprise lost the cash flow to meet the enterprise's obligations.

In late 2020, two mortgage-service entities, TACIRA, LLC and DRCIRA, LLC, commenced foreclosure actions, and Mr. Johnson resolved those actions by buying the mortgages. Hence, on October 31, 2020, to preserve the value of the

entire Resort, the Debtor acquired thirty-three vacation-rental units by quitclaim deed in lieu of foreclosure from Canaveral Crossroads, LLC.

Between December 2020 and January 2021, Mr. McPhillips and Mr. Flynn entered a partition agreement (the "Partition Agreement") to divide the Resort, resolve the two men's disputes, and disentangle the two men's business arrangements. Mr. McPhillips took the marinas and restaurant; Mr. Flynn took the development entities, including the entity that became the Debtor.

In April 2021, Canaveral Crossroads quitclaimed the Resort's public property — the clubhouse, the pool and fitness facility, the sewage lift station, and the open land and sign parcel — to Canaveral Crossing Resorts, Inc. (O.R. Book 9077, Page 1557, recorded Apr. 6, 2021). The Resort's intellectual property, the Cape Crossing Resort & Marina names and marks, went there as well.

That arrangement gave the Debtor two things. First, the Debtor's Units held first priority on every reservation the Resort booked, which likely would have doubled the Debtor's rental revenue. Second, the amenities and marks generated fees beyond what the amenities' expenses and the original Crossroads investors required, and that margin supported the Debtor. Disturbingly and irrationally, at that same time, Tamamoi and the Carton Family Trust refused to delegate the mortgages on ten units that had been quitclaimed to the Debtor.

**D. January 2022 to September 2023: Mainstreet refinanced nineteen Units on a condition that cost the Debtor millions in revenue and, via the Debtor's failure to pay the debt to Sherwood Construction, Inc., resulted in Mr. Dixon's companies' loans of $11.225 million.**

Between January 2022 and September 2023, Kenneth G. Dixon made eleven loans totaling $11,225,000 to companies and individuals affiliated with the Resort enterprise. Mr. Dixon is a retired accountant and self-described hard-money lender, and Mr. Dixon lent through PEDixon, LLC, ZPD, LLC, and Parke Financial, Ltd. The borrowers included Tiered Capital, Inc. ("Tiered Capital"), Sherwood Construction, Inc., IMQA Investments Incorporated, and Martin Flynn. Colorably, the guarantor and surety of those loans was the Debtor. The guaranty agreements were defectively signed and executed, but the Dixon entities had a colorable claim on the Debtor.

Each loan carried interest of 12% or 15%, a 2% origination fee, 1% renewal fees, and provisions for collection costs, due-diligence expenses, and legal fees; on default, the rate rose to the statutory maximum of 25%. I watched Mr. Dixon make most of these loans: I introduced Mr. Dixon to several of the borrowers, and I assisted in structuring all but two of the eleven.

Attorney Alison Pitkanen ("Ms. Pitkanen") prepared all or most of the loan documents, controlled escrow and disbursement of the loan proceeds through Ms. Pitkanen's IOLTA accounts, and acted for both the Tiered-affiliated borrowers and the Dixon-related lenders in the same transactions.

On February 7, 2022, at the direction of Mainstreet Bank's attorney, someone recorded the deed returning the clubhouse, the pool, the lift station, and the open land from Canaveral Crossing Resorts, Inc. to Canaveral Crossroads. (O.R. Book 9407, Page 1642). Mainstreet stepped outside the role of a lender and dictated how the Debtor and Canaveral Crossroads would structure the two companies' contract, and Mainstreet's demand produced exactly the result Mainstreet sought.

On February 17, 2022, Mainstreet refinanced nineteen of the Debtor's Units with a $5,061,363 loan. Of that loan, $4,822,072.69 retired the Campbell loans on those Units through FDRE, Inc. (Settlement Statement, Feb. 17, 2022, lines 1501, 1600). Because Tamamoi and Carton had refused to delegate or accept the assignment, the Tamamoi properties could not be refinanced.

From that closing forward, the Debtor lost the Debtor's priority on the Resort's reservations and the Debtor's share of the amenity revenue. For almost five years, the returned properties produced no revenue for the Debtor, and the revenue that would have serviced the Debtor's debts — Mainstreet's among those debts — never came in.

**Out of the Frying Pan into the Incinerator.**

On September 13, 2023, the parties purported to consolidate the eleven Dixon loans through a Tiered Consolidated Loan Agreement and signed a Tiered

Land Trust Agreement. This trust agreement named Crescent Sound, Ltd. — an entity Mr. Dixon owned and controlled — as trustee. Under those documents, the Tiered Land Trust was said to hold the Debtor's real estate.

**E. December 2023 to early 2025: The Dixon-related interests controlled the Debtor's rents, and no one paid the Debtor's secured creditors.**

From December 2023 through the entry of the order for relief, the Dixon-related interests controlled the Debtor. Crescent Sound managed the rental operations, and the Debtor's revenues exceeded $2,800,000 over the period. Most of the Debtor's revenues passed through Ms. Pitkanen's IOLTA account to PEDixon and ZPD.

The borrowers contended that Mr. Dixon collected more than $27,123,645 in cash, real estate, business interests, and forbearance fees against the $11,225,000 lent, at effective interest rates above the 25 percent ceiling of the Florida criminal-usury statute. *Fla. Stat. § 687.071*. The Dixon parties denied that contention and said the loans bore a contractual rate of 15 percent.

Neither the Debtor nor Crescent Sound paid the Debtor's mortgages, ad valorem taxes, association assessments, or maintenance during that period. Every secured creditor now asserting an arrearage — Mainstreet, Tamamoi, Carton, the Brevard County Tax Collector, and both associations — traces the default and

arrearage to that period. The Units rented and the money came in; the money did not reach those creditors. Instead, the money went to the Dixon lenders.

On January 9, 2024, in my home, Mr. Johnson signed an Assignment of Membership Units for the Debtor.

On February 14, 2024, someone recorded a trustee's deed for the Debtor's Units in Brevard County.

Mr. Johnson contended that no one ever validly formed a land trust, that the recorded deed differed from the instrument Mr. Johnson signed, and that the assignment's notarial certificate was false; the Dixon parties maintained that the trust and the assignment were valid. A forensic document examiner, Thomas W. Vastrick, examined the instruments for Mr. Johnson. The Global Settlement Agreement compromises these disputes, and the usury dispute, without any finding. No party admits the validity, enforceability, amount, or characterization of any loan, guaranty, trust, or document, or the genuineness of any signature or notarization. (Global Settlement Agreement § 1.2).

In March 2024, Crescent Sound, then acting for the Debtor, transferred Unit 403 to the IAM Irrevocable Trust, and no one paid the Unit 403 mortgage.

In 2024, Tamamoi, LLC initiated a mortgage-foreclosure action on nine residential units. Tamamoi foreclosed on Unit 403, and the circuit court, in what I

believe was error, treated Unit 403 as outside the bankruptcy estate. That ruling is on appeal, and the appeal is stayed while the bankruptcy proceeds.

**Mainstreet Exacerbates the Damages**

In February 2025, Mr. Johnson and I met with Mainstreet and told Mainstreet to enforce the assignment of rents in Mainstreet's mortgages and stop the payment of the Debtor's rents to PEDixon. Mainstreet's assignment of rents came first in time. Mainstreet did not enforce the assignment.

After that meeting, Mainstreet instead discussed with PEDixon a short sale of the Mainstreet mortgages on the Debtor's Units to PEDixon. The sale did not close, but Mainstreet's choice speaks for itself. Mainstreet also engaged in discussions with associates of PEDixon, and even with the colleagues of Michael McPhillips, a former owner of Crossroads. Mr. McPhillips and Mr. McPhillips's entities reneged on commitments, absconded with the funds of the original Crossroads investors, and absconded with the properties those investments produced. Rather than enforce Mainstreet's own assignment of rents, Mainstreet negotiated a transaction that would have put the Mainstreet mortgages, at a discount, in the hands of the lender then collecting the Debtor's rents, and would have harmed the Debtor's other creditors even more. Meanwhile, the rents kept flowing to PEDixon, and no one paid the Debtor's mortgages, taxes, and assessments.

In 2025, Mainstreet Community Bank of Florida commenced a foreclosure action on the Units that secure the Mainstreet loans. *Mainstreet Cmty. Bank of Fla. v. Home Makers Real Estate, LLC*, No. 05-2025-CA-027661-XXCA-BC (Fla. 18th Cir. Ct.) (Doc. 73 ¶ 11). A lender's usurpation of the Debtor's revenues caused the foreclosure actions.

**F. May 2025 to June 2026: This court dismissed the first bankruptcy case on the strength of the assignment; the second produced an order for relief and a trustee.**

On May 5, 2025, Mr. Johnson, as Manager, filed a voluntary Chapter 11 petition for the Debtor. *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025) (the "First Bankruptcy Case").

On June 27, 2025, on the Dixon-affiliated lenders' motion, this court dismissed the First Bankruptcy Case. The lenders relied on the January 9, 2024 Assignment of Membership Units to argue that Mr. Johnson lacked authority.

On August 26, 2025, this court denied reconsideration but identified the paths by which a renewed filing would be authorized.

On September 2, 2025, within a week of that denial, Tiered Capital filed the involuntary Chapter 11 petition that commenced this case; Mr. Johnson, IMQA Investments Incorporated, CTO Holdings, Inc., and I joined as petitioning creditors. September 2, 2025 is the operative petition date for every purpose, and every avoidance and reach-back period runs from that date.

On October 8, 2025, I moved to appoint a Chapter 11 trustee — the first party in this case to ask for one. (Doc. 13).

On February 3, 2026, the good-faith trial on the involuntary petition commenced. (Doc. 128).

On February 11, 2026, this court struck that motion with my other papers. (Doc. 137). On the same day, this court lifted the automatic stay for Tamamoi only to let Tamamoi obtain a final judgment. (Doc. 135 ¶ 2). Other parties, Mainstreet among those parties, later renewed the request for a trustee. (Doc. 155).

On March 16, 2026, this court terminated the automatic stay for Mainstreet Community Bank and permitted Mainstreet to exercise Mainstreet's in rem rights against the Units that secure the Mainstreet loans. (Doc. 183 ¶ 2). A foreclosure sale by Mainstreet before the Plan takes effect would remove Mainstreet's Units from the Estate.

On March 25, 2026, the Florida guardianship court partially restored my capacity and authorized me to prosecute my interests in this case personally. *In re Guardianship of Amodeo*, No. 48-2008-CP-001369-O (Fla. 9th Cir. Ct. Mar. 25, 2026).

On March 27, 2026, the good-faith trial on the involuntary petition continued for a second day, and this court took the Debtor's motion to dismiss under advisement. (Doc. 208).

On April 7, 2026, this court authorized the clerk to accept my *pro se* filings, effective March 25, 2026. (Doc. 217).

On May 18, 2026, the circuit court entered Tamamoi's foreclosure judgment in Tamamoi's action against Canaveral Crossroads and others. (Doc. 424 at 2 n.1).

On May 20, 2026, after contested proceedings, this court rejected the Debtor's claim that the petitioning creditors filed in bad faith. This court found that the petitioning creditors did not file the petition for an improper purpose; that the petitioning creditors' "primary reason for the involuntary petition was for a proper purpose, namely to ensure a fair distribution of Homemakers' assets," so "that Mr. Dixon does not get a disproportionate share versus other creditors"; that the petitioning creditors' "primary concern was ensuring payment of all creditors and not just Mr. Dixon"; and that "the principal aim in filing this case is to prevent the disproportionate advantage that Mr. Dixon exercises by receiving and controlling the disposition of Homemakers' rental income." (Doc. 256 at 10:13–21, 11:19–24, 12:25–13:3, 14:3–6, 28:8–13).

In the same ruling, this court found that Mr. Dixon "has been retaining all of the rental income, despite the mortgagee's assignment of rent provisions that are prior in time to the loan with Mr. Dixon." (Doc. 256 at 13:15–19). This court found PEDixon, ZPD, and Crescent Sound to be insiders. (*Id.* at 22:6–8). Because "all

rents are being controlled by Mr. Dixon," this court ordered the appointment of a trustee. (*Id.* at 30:17–23).

On May 21, 2026, this court entered the order for relief. (Doc. 229).

On June 8, 2026, this court directed the appointment of a Chapter 11 trustee. (Doc. 240).

On June 12, 2026, this court approved the appointment of Ms. Fernandez. (Doc. 252).

On June 16, 2026, Mr. Johnson filed the Debtor's Schedules and Statement of Financial Affairs. Schedule A/B valued the real property at approximately $11,860,000 — the twenty-six units at $11,300,000 and one further unit at $560,000 — and listed substantial Causes of Action as additional assets.

**G. July to September 2026: The Trustee compromised the post-petition rent claim, proposed a competing plan of liquidation, and objected to most of the claims in the case.**

On July 9, 2026, Mr. Johnson and Tiered Capital filed a verified complaint against Mr. Dixon, PEDixon, ZPD, Parke Financial, Ms. Pitkanen, Ms. Pitkanen's professional association, and Crescent Sound. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026). Those claims belonged to Mr. Johnson and Tiered Capital, not to the Estate.

On July 13, 2026, I filed my first plan as a party in interest, because the Trustee's appointment ended exclusivity. (Doc. 303). *11 U.S.C. § 1121(c).*

July 16, 2026 was the date noticed for the section 341 meeting of creditors. (Doc. 264).

On July 21, 2026, this court denied the motions to vacate the dismissal of the First Bankruptcy Case. (Doc. 345 & n.2).

On July 22, 2026, this court required every scheduled creditor to file a proof of claim to participate in the case and extended the deadline through August 21, 2026 for six named creditors. (Doc. 320 ¶¶ 2–3).

On August 20, 2026, this court denied my motion to consolidate the two cases. (Doc. 345 & n.2). The Rule 60 motions my earlier statement described are therefore no longer pending, and the Plan no longer defines a Relation-Back Date.

On August 28, 2026, this court ordered that a party seek leave before objecting to a proof of claim or a scheduled liability. (Doc. 359 ¶ 3). The Plan's claim-objection period conforms to that order. (Plan § 7.2). On the same day, this court abated the Tamamoi and Cartón requests to conduct foreclosure sales. (Doc. 361 ¶ 1). On the Effective Date, the Plan's injunction replaces each stay order, and no secured creditor may sell a Unit except through a state-court receiver conducting a structured sale after an uncured Plan default. (Plan §§ 6.13, 8.4).

On September 2, 2026, over my objection, this court approved the Trustee's compromise with PEDixon, LLC and ZPD, LLC (together, the "Lender") and the Cape Crossing Condominium Association. (Doc. 379 ¶¶ 1–2). Under the

compromise, the Lender pays the Trustee $350,000 to resolve the Trustee's claim to avoid and recover the post-petition transfers the Trustee's motion defined, and the Lender waives any section 502(h) claim for that amount. The Trustee pays the Association $204,000 for the condominium roof replacement, and the Association withdraws the Association's claim. The Trustee holds the balance and may not use the balance without further order, while the Trustee and the secured creditors reserve whether the secured creditors' liens attach to the balance. (Doc. 379 ¶¶ 3–5). The compromise reaches only the post-petition transfers; the compromise does not decide the Lender's claims against the Estate or the Estate's other claims against the Lender.

On September 8, 2026, this court entered an order for relief against Canaveral Crossroads, LLC — the Resort's developer and declarant — on Canaveral Crossroads's consent, and converted that case to Chapter 11. *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla. 2026) (Doc. 15).

On September 11, 2026, this court directed the Trustee, PEDixon, and ZPD to a judicial settlement conference before the Honorable Jason A. Burgess for possible resolution of "all issues between the Parties." (Doc. 386 ¶¶ 2–3).

Between September 17 and October 2, 2026, the Trustee objected to the claims of IPFS Corporation, WM Holdings Group, LLC, CTO Holdings, Inc.,

IMQA Investments Incorporated, Mr. Johnson, Paul Rene, Jr., PEDixon, LLC, ZPD, LLC, and Tiered Capital, Inc. (Docs. 392, 409, 410, 411, 412, 416, 419, 420, 421).

On September 18, 2026, the Association withdrew Claim 7. (Doc. 393). On the same day, the Trustee filed a competing plan of liquidation and a disclosure statement for that plan. (Docs. 394, 395). The Trustee's plan sells all twenty-six Units free and clear of liens, through brokers or an auctioneer; pays each secured creditor from the proceeds of that creditor's collateral; and distributes what remains to unsecured creditors and, only after full payment of unsecured creditors, to the holders of Interests. (Doc. 395 at 13–17). By that date, creditors had filed seventy-one claims. (Doc. 395 at 12).

On September 21, 2026, the Trustee filed the Trustee's operating report for August 2026. The report states receipts of $18,661 for the month, cumulative receipts of $44,484, disbursements of $761, and $43,609 in cash on August 31, 2026. (Doc. 399, Part 1). Creditors should compare those receipts with the projections in Section 4.B. The Trustee's reports state totals. The reports do not state occupancy, nightly rates, or bookings by Unit, and the reports do not compare the Units' results with the rest of the Resort.

On September 30, 2026, this court ordered the Canaveral Crossroads case jointly administered with the case of Sherwood Construction, Inc. (*Canaveral*

*Crossroads*, Doc. 61). Canaveral Crossroads reports owning the clubhouse, the common areas, the sewage lift station, and the Cape Crossing Resort & Marina names and marks. (*Canaveral Crossroads*, Doc. 56 at 2). I propose that a third party acquire the Reorganized Debtor and the Crossroads assets and combine the two to maximize revenues, subject to approval in both cases. (Plan § 6.2). The acquirer takes the Reorganized Debtor subject to the Plan.

**H. October to November 2026: A judicial settlement conference produced the Global Settlement Agreement, and this court set the settlement and the Trustee's plan for hearing on December 3, 2026.**

On October 2, 2026, I moved to disallow the PEDixon and ZPD claims under section 502(d). (Doc. 423). On the same day, the Brevard County Tax Collector objected to the interest rate my earlier plan applied to the Tax Collector's claims. (Doc. 422). The Plan now pays Class 6 the statutory rate, as Section 3.C describes.

On October 6, 2026, the Trustee objected to the claims of Tamamoi, LLC and the Carton Family Trust only to disallow any deficiency, and the Trustee stated that the Trustee lacks standing to raise usury because the Debtor is not an obligor on either loan. (Docs. 424, 425 ¶ 14 & n.2).

On October 7, 2026, I objected to the Trustee's disclosure statement on seventeen grounds. (Doc. 426).

On October 14, 2026, this court heard both disclosure statements. At that hearing, I said that whatever came of the Trustee's settlement with PEDixon and ZPD, "the disclosure statement needs to be amended to include it," because where those claims land changes the distribution to unsecured creditors. (Oct. 14, 2026 Hearing Tr. at 8:5–19, 10:9–13).

On October 15, 2026, this court conditionally approved the Trustee's amended disclosure statement and set a combined hearing for November 19, 2026 on final approval of that disclosure statement and on confirmation of the Trustee's plan. (Doc. 437 ¶¶ 1, 3). On the same day, the Trustee reported holding $191,048 on September 30, 2026, including the balance of the $350,000 compromise payment. (Doc. 439, Part 1).

On October 19, 2026, the settlement conference took place and produced the Global Settlement Agreement that Section 2.J describes. The agreement resolves the objections to the claims of WM Holdings Group, CTO, IMQA, Mr. Johnson, PEDixon, ZPD, and Tiered Capital, and withdraws my October 2, 2026 motion. As of this filing, the Trustee has not amended the Trustee's disclosure statement to describe the settlement.

On October 21, 2026, I moved to disallow the Tamamoi and Carton claims under section 502(d). (Doc. 444).

On October 28, 2026, I sought leave to object to the Mainstreet claims and to the Tamamoi and Carton claims. (Docs. 448, 449).

On November 10, 2026, Claim 69 was withdrawn with prejudice. (Doc. 457). On the same day, Canaveral Crossroads and Sherwood Construction moved for approval of the Global Settlement Agreement in the Canaveral Crossroads and Sherwood Construction cases. (*Canaveral Crossroads,* Docs. 100, 101).

On November 12, 2026, the Trustee moved to approve the agreement in this case and asked for a hearing on or before November 19, 2026. (Doc. 459). *Fed. R. Bankr. P. 9019(a).*

On November 13, 2026, this court set the Trustee's motion for an evidentiary hearing on December 3, 2026, at 11:30 a.m. (Doc. 465 ¶ 1(a)). This court moved the hearing on the Trustee's disclosure statement and plan to the same date and time, and said this court will set a hearing on this Disclosure Statement once I file this Disclosure Statement. (Doc. 465 at 2 & ¶ 1). If both plans satisfy the confirmation requirements, this court must consider the preferences of creditors and equity security holders in choosing between the two plans. *11 U.S.C. § 1129(c).*

**I. Cause of Action Against Mainstreet — In February 2022, Mainstreet dictated the Debtor's arrangement with Canaveral Crossroads and cost the Debtor almost five years of revenue; in 2025, rather than enforce Mainstreet's own assignment of rents against PEDixon, Mainstreet elected another remedy, which cost the Debtor a million dollars.**

A lender that uses the leverage of a loan to dictate the borrower's dealings with a third party crosses the line from creditor to participant, and that lender answers for the harm the lender causes. Florida law holds a party liable for an intentional and unjustified interference with a business relationship the party knows of, when the interference damages the plaintiff. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). Mainstreet knew of the Debtor's arrangement with Canaveral Crossroads, because Mainstreet required the undoing of that arrangement as a condition of the Mainstreet loan. No lender's justification covers that interference: Mainstreet's collateral was the nineteen Units, not the relationship between Mainstreet's borrower and a third party, and the Debtor's revenue — the source of repayment of Mainstreet's own loan — fell as a direct result.

**Apart from the tortious liability, Mainstreet's interference supports equitable subordination of Mainstreet's claims.**

The Bankruptcy Code lets a court subordinate a claim on equitable grounds. *11 U.S.C. § 510(c)(1)*. Subordination requires inequitable conduct that injured the creditors or gave the claimant an unfair advantage, and the conduct need not concern the claim itself: "inequitable conduct directed against the bankrupt or its

creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977). Mainstreet's 2022 interference, and Mainstreet's 2025 choice to negotiate with the lender then collecting the Debtor's rents rather than enforce Mainstreet's own assignment of rents, are conduct of exactly that kind.

Florida's credit-agreement statute of frauds does not stand in the way. That statute bars a debtor's "action on a credit agreement" that is not in writing. *Fla. Stat. § 687.0304(2).* The Estate sues on no promise Mainstreet made to lend or to forbear; the Estate sues on Mainstreet's interference with the Debtor's contract with a third party. The Estate also takes every defense the Debtor holds, and the Estate may assert the resulting damages in recoupment and setoff against Mainstreet's claims. *11 U.S.C. § 558.* Because the four-year limitations period had not run when this case began on September 2, 2025, the Estate may bring the claim until May 21, 2028, two years after the order for relief. *11 U.S.C. § 108(a).*

No proceeding on these claims is pending yet. The Plan places these claims in the Recovery Trust with every other Cause of Action, and because the same conduct injured Canaveral Crossroads, I expect a decision on these claims in or alongside the Canaveral Crossroads Chapter 11 case. (Plan §§ 4.3, 6.10).

The damages are the revenue the Debtor's Units would have earned, with first priority on every Resort reservation and the Debtor's share of the amenity revenue, over the revenue the Units actually earned, from February 2022 forward. That loss approximates $52,816 a month, and the figure covers both parts of the loss: the Debtor's share of the revenue the clubhouse, the pool, the common areas, the lift station, and the Resort's name and marks produce, and the rental revenue the Debtor lost with the Debtor's first priority on the Resort's reservations. The Resort's rental program always split revenue 50/50 between the operator and the unit owner, and the same split would have governed the Debtor's share here; I derived the figure from the revenue Canaveral Crossroads lost and that split. From March 2022 through October 2026, fifty-six months, the Debtor's loss totals $2,957,696, and the loss grows by $52,816 every month the Debtor goes without the Resort behind the Debtor's Units.

Until a Final Order fixes Mainstreet's liability, the Plan pays Classes 2 and 3 into escrow. (Plan § 4.1(e)). Whatever liability the court determines reduces Mainstreet's Allowed Claims dollar for dollar, or eliminates those Claims, and any excess is a recovery for the Estate. Claims 64-1 and 63-1 assert $1,389,871.94 in interest, fees, and costs above the principal of the two loans. The Plan pays the principal. I dispute the rest: Mainstreet's own conduct caused those charges to accrue, and without that conduct none of those charges would exist.

**J. The Global Settlement Agreement pays the Estate $850,000, removes $7.9 million of claims, and fixes the insider claims; in exchange, the Estate releases the Estate's claims against the Dixon and Pitkanen parties.**

Within fourteen days after this court's approval orders become final in all four bankruptcy cases, the Dixon Payor Parties — PEDixon, ZPD, Crescent Sound, and Parke Financial — pay $2,500,000: $850,000 to the Trustee for the Estate; $30,000 to Canaveral Crossroads; $10,000 to Sherwood Construction; $10,000 to Mr. Flynn's estate; and $1,600,000 to a paying agent for the Global Settlement Trust. (Global Settlement Agreement § 5.1(a)). The Dixon Payor Parties pay the Estate's $850,000 in settlement of the Estate's claims, including the Estate's claims under sections 544, 547, 548, and 550, and the $850,000 is not rents or the proceeds of any creditor's collateral. (Global Settlement Agreement § 5.1(c)). No lien attaches to the $850,000.

Within ten days after the payment, PEDixon and ZPD withdraw Claims 67 and 68 with prejudice, and PEDixon and ZPD will not seek a credit bid, a section 502(h) claim, or an administrative expense in this case. (Global Settlement Agreement § 8.4 & Ex. A). The agreement also fixes five claims: the agreement disallows WM Holdings Group's Claim 2-1; withdraws and disallows CTO's Claim 3; allows IMQA's Claim 4 as a general unsecured claim of $350,000; allows Mr. Johnson's Claim 5-2 as a general unsecured claim of $1,297,493.97, half of what Mr. Johnson asserted; and disallows Tiered Capital's Claim 71-1. (Global

Settlement Agreement Ex. A). Together the agreement removes $7,916,473.65 of claims against the Estate: $6,160,031.25 of PEDixon and ZPD claims, $1,297,493.96 of Mr. Johnson's claim, and $458,948.44 of the claims of WM Holdings Group, CTO Holdings, Tiered Capital, and IMQA.

**Homemakers Ownership Controversy Is Mooted**

Under the agreement, Crescent Sound resigns any authority Crescent Sound has or claims as trustee of the Tiered Land Trust, and Mr. Johnson becomes successor trustee. Each Dixon Payor Party relinquishes to the Tiered Land Trust whatever interest that party has or claims in the Debtor's membership units, and the Tiered Land Trust conveys the membership units to Mr. Johnson. (Global Settlement Agreement §§ 5.2, 5.4). None of these steps transfers property of the Estate or affects the Chapter 11 Trustee, who remains in office until this court orders otherwise. (Global Settlement Agreement § 5.4(c)). Mr. Johnson is the Debtor's owner, and on the Effective Date Mr. Johnson controls the Reorganized Debtor.

The agreement dismisses with prejudice Mr. Johnson's declaratory action on the ownership question. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026).

**Boon for the State Courts**

The agreement also dismisses with prejudice the *Johnson v. Dixon* action, the IMQA action, the Mainstreet foreclosure as between the settling parties, the Sherwood adversary proceeding, and the other actions listed in Exhibit A to the agreement. The agreement releases every lien and recorded interest between the two sides, including the recorded purchase option and right of first refusal in favor of PEDixon on the Debtor's Units (O.R. Book 9708, Page 2844). (Global Settlement Agreement §§ 7.1, 8.1 & Exs. A, E).

In return, the Estate releases the Estate's claims against the Dixon Parties and the Pitkanen Parties, and every settling party releases the Trustee. (Global Settlement Agreement §§ 9.2, 9.9, 15.2). The releases reach the parties and the officers, members, agents, and professionals of each party, and no one else. The releases do not reach the seventeen persons the agreement lists as Excluded Persons, and the Estate keeps the Estate's claims against those persons. (Global Settlement Agreement §§ 2.4, 9.6(e) & Sched. 2.4).

Mainstreet, Tamamoi, the Carton Family Trust, FDRE, the IAM Irrevocable Trust, the associations, and the title companies are not parties, and the Plan keeps every claim against those non-parties in the Recovery Trust.

**Agreement Does Not Impede Confirming the Plan**

The agreement leaves every party, including Mr. Johnson and me, free to propose and solicit acceptances of a plan in this case, and the Dixon and Pitkanen parties will not oppose a plan consistent with the agreement. (Global Settlement Agreement § 14.4).

I seek approval of the settlement agreement in my own right, as the agreement provides. (Global Settlement Agreement § 14.2(b)). If this court has not entered that approval when this court considers confirmation, the Plan asks that the confirmation order approve the agreement, and the Effective Date waits for that approval. (Plan §§ 6.9(a), 8.1(d)). If this court declines to approve the agreement, the agreement provides a fallback, and I will modify the Plan before confirmation. (Global Settlement Agreement § 14.5; Plan § 6.9(e)). The $1,600,000 paid to the Global Settlement Trust belongs to the parties that are not estates; the Estate receives none of that money, and no creditor's treatment depends on that money. (Global Settlement Agreement § 6.2).

**District Court Appeal Is Dismissed**

My appeal from the order denying my motion to disqualify PEDixon and ZPD from participating in this case is pending in the district court. (Doc. 344). *Amodeo v. Roeske Fernandez*, No. 6:26-cv-02089-AGM (M.D. Fla. 2026). Under

the agreement, I will dismiss that appeal with prejudice. (Global Settlement Agreement Ex. A).

**3. The Plan pays every Allowed Claim in full and sells Units only when the rents fall short.**

This Section summarizes the Plan. Read the Plan in full before voting; where this summary and the Plan differ, the Plan controls.

**A. The Plan keeps the Resort renting, pays every legitimate creditor in full, and turns the Estate's claims over to a Recovery Trust.**

The Plan classifies and treats all Claims against, and Interests in, the Debtor in eleven Classes: eight Classes of Secured Claims (Classes 1–8, of which Classes 1 and 8 are now empty), one Class of non-Insider General Unsecured Claims (Class 9), one Class of Insider Unsecured Claims (Class 10), and one Class of Interests (Class 11). The earlier Classes 12 and 13 are gone: PEDixon and ZPD withdraw the PEDixon and ZPD claims under the Global Settlement Agreement, and the Trustee paid the IPFS claim in full. (Doc. 392 ¶ 13). The Plan does not classify Administrative Claims and Priority Tax Claims and treats those claims separately. Each secured creditor in Classes 1 through 5 and Class 7 receives parallel treatment — a 360-month amortization at 6% beginning February 1, 2027, with a two-year balloon on February 1, 2029 — even though the collateral securing each Claim differs. Class 6, the ad valorem tax claims, receives interest at the rate Florida law fixes and full payment within five years after the order for relief. The

Plan pays non-Insider unsecured creditors in full, in cash, from the Settlement Payment, on the later of the Effective Date and the fifth business day after the Trustee receives the Settlement Payment. The Plan reserves disputed Class 9 claims in cash and pays those claims with interest when allowed. (Plan § 4.7). After the secured creditors receive what the Plan provides, every dollar of net recoveries goes to unsecured creditors until the Plan pays unsecured creditors in full. I believe 6% is a market rate for a fully amortizing loan on income-producing resort units; if a secured Class rejects the Plan, this court will decide whether the rate gives that Class the present value of the Class's claim. *11 U.S.C. § 1129(b)(2)(A)(i)(II)*. The Effective Date occurs only after the confirmation order becomes a Final Order and this court approves the Global Settlement Agreement. (Plan §§ 1, 8.1).

Where a secured creditor's entitlement is in dispute — the Mainstreet, Tamamoi, and Carton Claims — the Plan proceeds as normal. The Recovery Trustee holds each payment on that Claim in escrow until a Final Order determines whether, and how much, the Debtor owes the creditor; only then does the Recovery Trustee disburse the escrow. (Plan § 4.1(e)). Beginning in January 2027, the Reorganized Debtor lists one condominium for sale at $500,000 and one townhome at $450,000, and the Reorganized Debtor keeps at least one Unit listed at all times unless the prior quarter's operating results covered every Plan payment.

The Plan caps costs of sale at five percent. When a Unit sells, the secured creditor receives a release price of $350,000, or $227,000 for Tamamoi and Carton, and the Reorganized Debtor distributes the rest of the proceeds under the Plan and according to existing lien rights. The Plan sells no Unit in a forced bulk sale. (Plan § 6.12). If the Reorganized Debtor defaults and does not cure, the Reorganized Debtor consents to a state-court receiver who sells the affected Units in the same structured way. (Plan § 6.13).

The Plan establishes a Recovery Trust that holds all of the Estate's Causes of Action other than the claims the Global Settlement Agreement releases. Those Causes of Action include the preference and fraudulent-transfer claims against parties the agreement does not release, the claims against Tamamoi, LLC and Tamamoi's servicing agent, the claims against Mainstreet, the claims against the associations and the associations' directors, the claims against the contractors, the claim against First American Title, and the recovery of Unit 403. Ms. Fernandez, as Recovery Trustee, administers the Recovery Trust to conclusion. If Ms. Fernandez declines to serve, a successor approved by the Office of the United States Trustee serves on the same terms. (Plan § 6.3). Any claim the Recovery Trustee declines — because the Recovery Trustee judges the claim's merits insufficient or the claim's prosecution not economically efficient — reverts to the Reorganized Debtor, which decides whether to pursue the claim; the claim's net

proceeds still flow through the Plan's waterfall. (Plan § 6.11). Ms. Fernandez's statement that the Trustee will not pursue usury against Tamamoi and Carton operates as such a declination. (Docs. 424, 425 n.2). The Plan appoints the Recovery Trustee as the representative of the Estate under section 1123(b)(3)(B) to retain and enforce those claims. (Plan § 6.10). The Plan also preserves section 502(d): the Plan allows no Claim of an entity that received an avoidable transfer, and makes no distribution on that Claim, until that entity pays or turns over what the entity received, while the payments the Plan provides on that entity's Secured Claim wait in escrow. (Plan §§ 4.1(e), 7.4). The Recovery Trust receives what remains of the Settlement Payment after administrative claims and Class 9, up to $100,000 — about $87,000 if this court allows the fee applications now on file in full. The net proceeds of the Recovery Trust flow through the Plan's waterfall to cure secured-creditor defaults and to pay unsecured creditors.

**B. Eleven Classes hold the claims and interests; Classes 1 and 8 are empty, and the Tamamoi and Carton Classes do not vote, because section 502(d) bars the Tamamoi and Carton Claims.**

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Claim 69 withdrawn (Doc. 457) | No Claim | No |
| 2 | Mainstreet Community Bank (Loan One) | Impaired | Yes |
| 3 | Mainstreet Community Bank (Loan Two) | Impaired | Yes |
| 4 | Tamamoi, LLC | Impaired | No — § 502(d) |
| 5 | Carton Family Trust of 1992 | Impaired | No — § 502(d) |
| 6 | Ad valorem taxes (Tax Collector and | Impaired | Yes |

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| | certificate holders) | | |
| 7 | Cape Crossing Townhomes Homeowners Association, Inc. | Impaired | Yes |
| 8 | Cape Crossing Condominium Association — claim withdrawn (Doc. 393) | No Claim | No |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Yes |
| 10 | Insider Unsecured Claims | Impaired | Yes |
| 11 | Interests in the Debtor | Impaired | Yes |

**C. The Plan pays every legitimate creditor in full on that creditor's Allowed Claim, and the Global Settlement Agreement fixes the largest disputed claims.**

The table below summarizes the treatment of each Class, and Article 4 of the Plan states that treatment in full. The dollar amounts shown are the amounts the filed proofs of claim assert or, where noted, the amounts in the judgment, the Trustee's filings, or the Debtor's Schedules. Those amounts are not admissions; I dispute many of those Claims, and many are subject to objection and reduction.

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| Admin / Priority | Trustee & professional fees; § 1930 fees; tax claims | Paid in full under § 1129(a)(9); priority tax claims over 5 years; IRS/FDOR claims disputed and may be reduced to zero. |
| 1 | Claim 69 withdrawn with prejudice on November 10, 2026 (Doc. 457) | No Claim; no distribution; no vote. |
| 2 — Mainstreet One | $3,611,594.47 principal (Claim 64-1; asserted total exceeds $4,793,000) | Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured treatment (6%, 360 months); payments held in escrow until then. Stay relief (Doc. 183) ends on the |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| | | Effective Date. |
| 3 — Mainstreet Two | $712,105.80 principal (Claim 63-1; asserted total exceeds $920,000) | Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured treatment (6%, 360 months); payments held in escrow until then. Stay relief (Doc. 183) ends on the Effective Date. |
| 4 — Tamamoi | $3,378,797.64 (Claim 65-1; final judgment entered May 18, 2026; 8 units) | Judgment superseded; Tamamoi may not enforce the judgment by sale (Docs. 135 ¶ 3, 361). Claim fixed in a claim proceeding; I contend no more than $227,000, the amount on the face of the mortgage, on any Unit, and no interest (Fla. Stat. §§ 687.03, 687.04, 687.071(7)). To the extent Allowed: Lien allowed on Tamamoi's Units; common secured treatment (6%, 360 months); payments held in escrow until then. Trustee objects only to any deficiency (Doc. 424). |
| 5 — Carton | $383,505.45 (Claim 66-1; townhome Unit 8-104) | Same terms as Tamamoi. Trustee objects only to any deficiency (Doc. 425). |
| 6 — Ad valorem taxes | $478,289.67 (Claims 8–62): Tax Collector $312,465.91 (2024 and 2025 taxes, 18%); certificate holders $165,823.76 (Keys Funding, ATCF II, FIG 20, Community Red Co); tax-deed applications pending on Units 305, 402, 404 | Paid in full with interest at the rate applicable nonbankruptcy law fixes for each claim (18% on the Tax Collector's claims; the certificate rate on each certificate), in equal monthly installments completed by May 21, 2031, five years after the order for relief; balance paid at any sale or refinancing of the Unit. 11 U.S.C. §§ 511(a), 1129(a)(9)(C)–(D). No tax-deed application proceeds while payments are current. |
| 7 — Townhomes HOA | $118,731.84 (Claim 6-1) | Full Allowed Claim paid from recoveries; subject to Estate negligence/waste claims (up to $125,000/unit). |
| 8 — Condominium Assoc. | Claim 7 withdrawn September 18, 2026 (Doc. 393) | No Claim; no distribution. The $204,000 roof payment under Doc. 379 resolved the Association's special assessment. |
| 9 — Unsecured | $350,396.00 allowed | 100% of Allowed Claims in cash from the |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| (Non-Insider) | (IMQA $350,000.00 under the Global Settlement Agreement; Amodeo $396.00); CTO withdrawn; Tiered and WM disallowed | Settlement Payment on the later of the Effective Date and receipt; disputed claims reserved in cash and paid with interest when allowed; any shortfall paid over 60 months from operations. |
| 10 — Insider Unsecured | Johnson, Claim 5-2, allowed at $1,297,493.97 under the Global Settlement Agreement | Paid only after Classes 1–9 satisfied and $1,000,000 improvement reserve funded; then pro rata in remaining recoveries. No lien. |
| 11 — Interests | Horton S. Johnson (Dixon interests in the units relinquished and conveyed to him under the Global Settlement Agreement § 5.4) | Interest retained; Mr. Johnson controls the Reorganized Debtor at exit; no distribution on the Interest until senior Classes are satisfied. |

The Debtor scheduled the claims of PEDixon and ZPD at $0.00 and marked each disputed, contingent, and unliquidated. On July 30, 2026, PEDixon filed Claim 67 for $4,779,864.58, and ZPD filed Claim 68 for $1,380,166.67, each on the assertion that the Debtor guaranteed the September 14, 2023 consolidated loan to Tiered Capital. The Trustee and I objected to both claims. (Docs. 419, 420, 423). Under the Global Settlement Agreement, PEDixon and ZPD withdraw both claims with prejudice. The Plan therefore carries no Class for those claims, and the reserve that my earlier plan held back for those claims — about 88 percent of every Class 9 distribution — no longer exists. Every dollar the Plan provides for Class 9 now reaches Class 9.

Under the Global Settlement Agreement, the Class 9 claims change. The agreement allows IMQA's claim at $350,000.00; CTO withdraws CTO's claim ($303,853.79); and the agreement disallows the claims of Tiered Capital ($125,000.00) and WM Holdings Group ($19,635.25). (Global Settlement Agreement Ex. A). Class 9 now holds IMQA's $350,000.00 and my $396.00, a total of $350,396.00 allowed. Class 9 also takes any deficiency on the Tamamoi or Carton claims that section 1111(b)(1)(A) requires the Plan to treat as unsecured. (Plan § 4.4). The Trustee paid IPFS's Claim 70 in full in the ordinary course and asks this court to deem Claim 70 satisfied. (Doc. 392 ¶¶ 13–14). On November 10, 2026, Claim 69, including the $166,115.63 unsecured part of Claim 69, was withdrawn with prejudice. (Doc. 457). On the later of the Effective Date and the fifth business day after the Trustee receives the Settlement Payment, the Reorganized Debtor pays every allowed Class 9 claim in full, in cash, and reserves the full asserted amount of every disputed Class 9 claim — $350,396.00 in all on the present claims. (Plan § 4.7). If a deficiency claim or another late claim exceeds what the Settlement Payment covers, the Reorganized Debtor pays the excess with interest over sixty months from operating revenue, and recoveries prepay that excess. The agreement allows Mr. Johnson's Class 10 claim at $1,297,493.97, which resolves the Trustee's request to recharacterize that claim as equity. (Doc. 412). The Plan pays the Class 10 claim only after the Plan pays Class 9 and funds

the $1,000,000 improvement reserve. Exhibit D lists every filed claim, with the claim's amount, Class, and status as of November 13, 2026, including the treatment the Global Settlement Agreement gives that claim.

**D. The Estate collects $850,000 now, and the Recovery Trust keeps about $1.5 million in identified claims against parties the settlement does not release, plus the Mainstreet claims.**

The Recovery Trust holds every Cause of Action of the Estate other than the Released Claims. The identified recoveries, each with a verification path, are these:

First, the $850,000 Settlement Payment pays administrative claims and Class 9 and, with what remains, funds the Recovery Trust. (Section 3.F; Plan § 6.4).

Second, between March 2021 and November 2023, the Debtor paid $1,166,008.69 from the Debtor's own account to Tamamoi, LLC, FDRE, Inc., and two affiliates, and paid $129,556.52 to the Carton Family Trust. Neither Tamamoi nor Carton accounted for the payments that passed between the claimant and FDRE, the claimants' servicing agent. That accounting determines the rate Tamamoi and Carton actually charged, and I believe that rate will exceed 25 percent, making the debt unenforceable. *Fla. Stat. § 687.071(7)*. On the face of the Tamamoi judgment, the rate is 18.27 percent a year, above the civil ceiling. *Fla. Stat. § 687.03(1)*. A lender who willfully charges more forfeits all interest and must repay double the interest paid. *Fla. Stat. § 687.04*. The Trustee says the Estate lacks standing to raise usury because the Debtor is not an obligor. (Docs. 424, 425

n.2). If the Trustee is right, the Debtor paid $1,295,565.21 on debts the Debtor did not owe, and the Estate should recover those payments. And Tamamoi and Carton should receive nothing from the Estate, except — possibly — the original principal allocated to each of the nine Units titled in the Debtor's name.

Third, the Recovery Trust pursues the recovery of Unit 403 from the IAM Irrevocable Trust, to which Crescent Sound transferred Unit 403 in March 2024. The Recovery Trust proceeds under the Florida fraudulent-transfer statute and sections 544(b), 548, and 550, and through the pending, stayed appeal of the circuit court's ruling. *Fla. Stat. ch. 726.* Net of the liens against Unit 403, the Unit's return adds a minimum of $183,000 in equity, and more likely $250,000 to $300,000.

Fourth, the Mainstreet claims described in Section 2.I — $2,957,696 through October 2026 — reduce Mainstreet's claims in recoupment before those claims produce any cash.

Fifth, the Recovery Trust holds the Estate's claims against the associations and the associations' directors for mismanagement and self-dealing. Those claims include the directors' activities designed to reduce the price of the Debtor's Units, one of which violated the automatic stay.

Sixth, the Recovery Trust holds the Estate's claims against the contractors and design professionals who built the Resort — the architect (Kirschner), the structural engineer (Gerding), the plumbing contractor (Hambel), Turnkey, and

John Shaffer HVAC, each a defendant in the Condominium Association's pending construction-defect action — and against Michael McPhillips, the contractors' de facto project manager, for construction defects that deprived the Debtor of quiet enjoyment and full habitability of the Units and reduced the Debtor's revenues. *Cape Crossing Condo. Ass'n v. Canaveral Crossroads, LLC*, No. 05-2026-CA-035316 (Fla. 18th Cir. Ct.). The Global Settlement Agreement names Mr. McPhillips an Excluded Person and preserves every claim against Mr. McPhillips. (Global Settlement Agreement §§ 2.4, 9.6(e) & Sched. 2.4).

Seventh, the Recovery Trust holds the Estate's claim against First American Title for overlooking a security interest that encumbers the entire Resort property and deprives the Debtor's occupants of quiet enjoyment and full habitability of the condominiums. The fifth, sixth, and seventh recoveries remain unquantified.

The Global Settlement Agreement releases the transfers to the Dixon lenders that my earlier statement estimated at about $1,400,000; the Settlement Payment takes the place of those transfers. Exclusive of the Settlement Payment, the held balance, the Mainstreet recoupment, and the unquantified claims, the itemized recoveries total approximately $1,478,565. I expect the avoidance claims to take one to three years to resolve or settle, and the Recovery Trustee may engage counsel on a contingent fee, which would reduce net recoveries by that fee. The

Plan does not depend on recoveries to pay the amortized installments or Class 9; recoveries cure arrearages and prepay.

**E. Governance proceeds in two stages: the Trustee now, and Mr. Johnson, the Debtor's owner, at exit.**

Governance under the Plan proceeds in stages, and no stage returns the Debtor to the hands that emptied the Debtor. While the case proceeds to conclusion, the Debtor remains under the direction and control of the Chapter 11 Trustee, and the Plan proposes the appointment of a committee of unsecured creditors under section 1102 to monitor operational performance and assist Ms. Fernandez. As of the date of this Disclosure Statement, despite a statutory requirement, no one has appointed a committee. *11 U.S.C. § 1102(a)(1)*. On the Effective Date, Mr. Johnson, the Debtor's owner, controls the Reorganized Debtor, oversees a professional management company engaged to run the Resort day to day, and bears responsibility for effectuating the Plan. Who manages the combined enterprise after a third party acquires the Reorganized Debtor and the Crossroads assets will be determined when that acquisition occurs. Ms. Fernandez continues as Recovery Trustee, administering the Recovery Trust to conclusion with authority to retain professionals and to settle or decline claims, subject to such court approval as the law requires. A successor approved by the Office of the United States Trustee serves if Ms. Fernandez does not, and claims the Recovery Trustee

declines revert to the Reorganized Debtor. The Class 11 Interest holder retains the Interest subject to this structure and receives nothing on account of the Interest until the Plan satisfies every senior Class.

The Bankruptcy Code requires disclosure of who will manage the Reorganized Debtor and on what terms. *11 U.S.C. § 1129(a)(5).* Mr. Johnson will serve as managing member of the Reorganized Debtor and will run the Reorganized Debtor. The Reorganized Debtor will pay Mr. Johnson, from revenues, compensation commensurate with the time Mr. Johnson actually spends managing the Reorganized Debtor, at the market rate for an executive manager of a limited liability company. The Reorganized Debtor will engage a professional vacation-rental management company, which I will identify before the Confirmation Hearing, at a fee of 20 percent of gross rental revenue, the figure Exhibit B uses.

**Amodeo's Involvement.** The only payment the Global Settlement Agreement makes on my account is $1,000 from the Global Settlement Trust, which the Global Settlement Trust pays to the United States toward my restitution judgment. (Global Settlement Agreement § 6.2). I will receive no compensation from the Debtor, the Reorganized Debtor, or the Recovery Trust, and I have no agreement for compensation with Mr. Johnson, Tiered Capital, IMQA, or anyone else in connection with the Plan. No one is paying for the preparation of the Plan. I

prepared the Plan to see my own $396 claim paid, and that claim is my only stake in the Plan.

**F. The Settlement Payment pays the administrative claims and Class 9 in full; on the fee applications now on file, about $87,000 remains for the Recovery Trust and nothing for working capital.**

The Plan applies the $850,000 Settlement Payment in this order: allowed administrative claims; the Class 9 payments and reserve; up to $100,000 to the Recovery Trust; and any balance to the Reorganized Debtor as working capital. (Plan § 6.4). My earlier statements estimated the administrative claims at $125,000. The applications now on file ask for more than three times that estimate. On November 9, 2026, this court allowed the administrative claim of Brennan Manna Diamond, P.L. at $30,000. (Doc. 455). On November 12 and 13, 2026, the Trustee applied for $129,657.00, the Trustee's counsel for $249,397.13, and the Trustee's accountant for $3,480.00. (Docs. 464, 463, 462). Together the four total $412,534.13, and the applications of the Trustee and the Trustee's counsel run only through October 31, 2026. This court has not ruled on the three applications; this court will hear the applications on December 3, 2026. (Doc. 465 ¶ 1(d)). If this court allows the applications in full, the Settlement Payment pays $412,534.13 to administrative claims and $350,396.00 to the allowed Class 9 claims of IMQA and me, and leaves $87,069.87 for the Recovery Trust. Nothing remains for working capital, and every dollar of later administrative fees reduces what the Recovery

Trust receives. The Plan bridges any working capital or seasonal shortfall from recoveries and from new value a third party contributes. Whatever part of the Class 9 reserve the disputed claims do not need flows through the waterfall. Exhibit B states the same sources and uses.

**4. The Plan meets each confirmation requirement of the Bankruptcy Code.**

**A. The Plan satisfies the best-interests test: the Plan pays Class 9 in full in cash, and a liquidation at auction value pays unsecured creditors nothing from the Units.**

A Chapter 7 liquidation sells all twenty-six Units at once, into the same small market, in one forced sale, and twenty-six units of one resort dumped on that market at once drive every price down. The Plan sells nothing in haste. For the last five years, the Units' vacation rentals paid the Units' maintenance and the service of the Units' proper debt — except from December 2023 through the order for relief, when the Debtor's rents went to the Dixon lenders and no one paid the Debtor's utilities and maintenance. A structured sale, timed to the market, realizes values a forced liquidation cannot, and that difference alone satisfies the best-interests test. The Bankruptcy Code requires that each holder of an Impaired Claim or Interest either accept the Plan or receive at least as much as that holder would receive in a Chapter 7 liquidation. *11 U.S.C. § 1129(a)(7).* Exhibit C works the liquidation pool by pool. The secured creditors already hold stay relief and in a Chapter 7 case would complete the secured creditors' foreclosures; the Trustee

states that no Unit sale proceeds would reach a Chapter 7 estate. (Doc. 395 at 16). Exhibit C values the twenty-six Units the Debtor holds three ways, using the September 1, 2026 valuation of Gary A. Moll, CPA, ASA, scaled from twenty-seven Units to twenty-six and allocated by each Unit's 2025 just value. (Ex. A ¶¶ 9, 14). Exhibit C charges each collateral pool with that pool's taxes, that pool's own mortgage as asserted, and the townhome association lien. At the auction value ($9.5 million), every pool is under water, and nothing reaches unsecured creditors from the Units. At Mr. Moll's low portfolio value ($11.1 million), only the Mainstreet Loan One pool shows equity, about $676,000, and the other three pools are under water. At Mr. Moll's high value ($17.3 million), equity would be about $5.8 million; that value rests on rental assumptions Mr. Moll identifies as above the market average and describes the going concern the Plan creates, not a foreclosure. (*Id.* ¶¶ 3, 12, 43). Whatever the value, the Plan pays Allowed Class 9 Claims in full, in cash, from the Settlement Payment, and no Chapter 7 distribution can exceed full payment with interest at the legal rate. *11 U.S.C. § 726(a)(5).* Every Class 9 holder therefore receives at least that holder's Chapter 7 share. A Chapter 7 trustee would also receive the Settlement Payment and hold the Causes of Action, but would pay a commission on both and distribute both net of Chapter 7 administrative costs. *11 U.S.C. § 326(a).* The Plan therefore satisfies the best-interests test.

The following table compares the estimated recoveries under the Plan and under a hypothetical Chapter 7 liquidation:

| Constituency | Estimated Chapter 7 Recovery | Estimated Plan Recovery |
|---|---|---|
| Secured creditors (Classes 1–7) | Foreclosure under existing stay relief; at auction value every collateral pool is under water (Ex. C) | Paid over time at 6% with a two-year balloon on February 1, 2029; arrearages cured from recoveries |
| Non-Insider unsecured (Class 9) | None from the units; only avoidance recoveries, after Chapter 7 costs | 100% of Allowed Claims in cash from the Settlement Payment |
| Insider unsecured (Class 10) | None | Pro rata from remaining recoveries after senior Classes |
| Interests (Class 11) | None | Retained, subject to governance and senior satisfaction |

**B. The Plan is feasible: the Settlement Payment pays the unsecured creditors on day one, and the rents carry the secured creditors.**

The Bankruptcy Code requires that confirmation is not likely to be followed by liquidation or further reorganization, except as the Plan proposes. *11 U.S.C. § 1129(a)(11)*. The feasibility case rests on three changes. The Settlement Payment pays the administrative claims and Class 9 in cash. The Plan redirects to operations and debt service the rental stream that went to the Dixon lenders from December 2023 through the order for relief. And a third party's acquisition of the Reorganized Debtor and the Canaveral Crossroads assets places the Resort's reservation system, name, and amenities behind the Debtor's twenty-six Units. (Plan § 6.2). Exhibit B projects every month of five years, 2027 through 2031; the

table below states one plan year. The table applies the $295 average daily rate at which an actual Cape Crossing three-bedroom townhome is marketed, at 80 percent occupancy. (Ex. A ¶¶ 27–28 & Ex. D). The table then deducts a 20 percent management fee and the Debtor's own carrying costs, and sets the result against the Plan's payments to Classes 1 through 7 and the United States Trustee's fees. Because the Settlement Payment pays Class 9, the table carries no Class 9 installment.

| **A Full Plan Year (2028) — 26 Units** | **Amount** | **Basis** |
|---|---|---|
| Occupied nights | 7,592 | 26 Units × 365 nights × 80% |
| Gross rental revenue | $2,239,640 | $295 average daily rate (Ex. A ¶¶ 27–28) |
| Management fee | ($447,928) | 20% of gross rental revenue |
| Association dues | ($326,364) | 18 condominiums at $1,170 and 8 townhomes at $767.12 a month |
| Current property taxes | ($146,952) | $471 per Unit a month, paid each November |
| Insurance, utilities, maintenance | ($119,231) | Debtor's July 2026 proforma |
| Legal, administration, bank fees | ($37,200) | $3,100 a month |
| **Net operating income** | **$1,161,965** | |
| Plan payments, Classes 2–5 and 7 | ($590,298) | Amortized installments (Plan § 4.1); Class 1 holds no Claim (Doc. 457) |
| Plan payments, Class 6 | ($168,597) | $478,290 at 18% over 48 months, February 2027 – January 2031 (Plan § 4.5) |
| Plan payments, Class 9 | $0 | Paid from the Settlement Payment (Plan §§ 4.7, 6.4) |
| United States Trustee fees | ($16,000) | Estimated, until the case is closed |
| **Cash after payments** | **$387,070** | 2027: $450,311 (eleven installments) |
| Coverage | 1.50 to 1 | Net operating income ÷ payments (2027: 1.63 to 1) |

The owner costs come from the Debtor's July 2026 proforma. The table excludes Florida sales and tourist-development taxes, which guests pay, and the payments the Plan makes from recoveries — arrearage cures and the Class 7 payoff. Paying Class 9 from the Settlement Payment rather than from operations, and removing the Class 1 installments, lowers the break-even: at the $295 rate, the

Units cover every payment over the five-year projection at about 61 percent occupancy. (Ex. B, Sensitivity). Occupancy is the critical assumption. Mr. Moll reports a Merritt Island market average of 40 to 47 percent and a top decile of 78 percent and higher, and Mr. Moll explains why units booked through the Resort's own platform belong above the market average. (Ex. A ¶¶ 24–25, 30–32). In 2019, the Resort's rental program ran thirty-five units at 59.6 percent occupancy and roughly $190 a night; at those figures, the Units would not cover the Plan's payments. The management fee assumes the operator cost per unit the rental program incurred in 2019, about $16,800 a year, which 20 percent of the projected revenue, about $17,200 per Unit, exceeds. (Canaveral Crossing Resorts, Inc., Normalized Historical Pro Forma 2019, unaudited).

The Trustee's August 2026 operating report shows $18,661 in receipts for the month and $43,609 in cash on August 31, 2026. (Doc. 399, Part 1). I believe the Units can earn more than those reports show and that someone held the Units' bookings down; no one produced to the Trustee the resort-wide booking records needed to test that comparison. The projection assumes the Crossroads reservation system books the Units after the Effective Date, and the projection is not a forecast of the Units' performance under current management. The Settlement Payment pays the Allowed Administrative Claims — about $412,500 if this court allows the applications now on file in full — and on that figure the Reorganized Debtor

receives no working capital from the Settlement Payment. (Section 3.F; Plan § 6.4). Because amortization begins February 1, 2027, the projection shows no month in which cash falls below zero; the lowest month-end balance is about $37,000, in January 2027. If a shortfall arises, the Plan bridges the shortfall from the first net recoveries of the Recovery Trust. Class 6 — $478,289.67 asserted — earns interest at the statutory rate, 18 percent on the Tax Collector's claims, and the Plan pays Class 6 by January 2031, which raises the Plan's early debt service; Exhibit E lists every Class 6 claim. On February 1, 2029, after twenty-four installments, the balloon balance of Classes 2 through 5 and 7 is about $7,997,000. Refinancing that balance at 65 percent of value requires a value of about $12.3 million for the twenty-six Units, inside Mr. Moll's range of $11.1 million to $17.3 million for those Units. A refinancing at 6 percent over thirty years would cost about $575,000 a year against projected net operating income of $1,162,000, coverage of 2.02 to 1. (Ex. B, Balloon Test). A refinancing must also pay the Class 6 balance then unpaid, about $281,000. (Plan § 4.5). The alternative is a going-concern sale of the Units. Because Claim 69 was withdrawn, the Class 1 installments — $9,800.25 a month, $117,603 a year — are gone. The table above and Exhibit B omit those installments, which puts coverage at about 1.50 to 1 in a full plan year and takes about $1,593,000 off the balloon. On these bases, the Plan is feasible, subject to the risks Section 5 describes.

**C. The Plan subsumes the Trustee's sale program: from January 2027 at least one Unit is always listed for sale, at a cost of sale capped at five percent, until operations cover every Plan payment.**

The Trustee proposes to sell all twenty-six Units now, through brokers or an auctioneer. (Doc. 395 at 13–17). At the October 14, 2026 hearing, I said that the Trustee's plan "could easily be subsumed within this reorganization plan," and the parties did not know what I meant. (Oct. 14, 2026 Hearing Tr. at 25:1–5). I meant this: the Plan keeps the Trustee's sale program and places that program beneath the Reorganized Debtor. Beginning in January 2027, the Reorganized Debtor lists one condominium for sale at $500,000 and one townhome at $450,000, and Ms. Fernandez, as Recovery Trustee, conducts each sale through the brokers the Recovery Trustee selects. At least one Unit stays on the market at all times. The exception is a quarter that follows a quarter in which the Reorganized Debtor's operating results covered every payment the Plan requires. The Plan caps the costs of sale at five percent of the price, which leaves more of each sale for creditors. When a Unit sells, the holder of the lien on that Unit receives a release price of $350,000, or $227,000 for Tamamoi and Carton, never more than the unpaid balance of the holder's Allowed Claim, and the Reorganized Debtor distributes the rest of the proceeds under the Plan and according to existing lien rights. (Plan § 6.12(a)). The sales conclude by June 30, 2028 unless operations cover the Plan's

payments sooner. (Plan § 6.12(b)). The program applies whether or not the Crossroads acquisition occurs. (Plan § 6.12(c)).

**Risk-Return Neutral for Secured Creditors**

The secured creditors bear no risk from this structure. Each secured creditor receives the full amount of that creditor's Allowed Secured Claim, reamortized at a commercially reasonable rate — six percent over 360 months — and keeps the creditor's Lien until the Plan pays the Claim. That treatment is everything a secured creditor could collect in foreclosure: the debt, from the collateral, and nothing more. When a secured class does not accept a plan, the Bankruptcy Code asks exactly that: the holder keeps the holder's lien and receives deferred cash payments totaling at least the allowed amount of the claim and worth, on the effective date, at least the value of the collateral. *11 U.S.C. § 1129(b)(2)(A)(i)*. The Plan meets that standard. The sales pay down principal at full value, without the cost, delay, and discount of a forced sale. Units sold one or two at a time, in season, bring substantially more than the same Units sold at foreclosure, at auction, or in bulk. The Trustee's plan sells everything at once; the Plan sells only what the numbers require, when the market will pay. The two plans share the same sale mechanism and differ only in whether the going concern first has the chance to pay every creditor in full. Every creditor does better under the Plan, and no creditor bears more risk than that creditor bears under the Trustee's sale.

**D. The Plan meets the cramdown standard for any Class that does not accept.**

An Impaired Class of Claims accepts the Plan if holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in that Class that vote, vote to accept. Class 6, which the Plan pays in full at the statutory rate, and Class 7, which the Plan pays in full from recoveries, are Impaired Classes of non-Insiders that I expect to accept. *11 U.S.C. § 1129(a)(10).* The Tax Collector objected to my earlier plan. (Doc. 460). The Tax Collector's position is not reasoned economically, because the Plan pays the Tax Collector's claims in full at the statutory rate. I contend that Tamamoi acts in concert with the Units' former owner to deprive the original investors of a recovery, and I expect Tamamoi to reject the Plan. If any Impaired Class does not accept, I will request confirmation under section 1129(b), which permits confirmation so long as the Plan does not discriminate unfairly and is fair and equitable for each non-accepting Impaired Class. The absolute priority rule does not help a creditor whose Claim section 502(d) disallows because that creditor failed to turn over to the Estate what that creditor owes: that creditor holds no Allowed Claim, and the rule protects only the holders of Allowed Claims in a dissenting Class. *11 U.S.C. §§ 502(d), 1129(b)(2)(B).*

**5. The Plan carries risks, and creditors should weigh each one before voting.**

Holders should weigh the following risks in deciding how to vote. First, the Plan's cure of secured arrearages depends substantially on recoveries from the Causes of Action, the timing and amount of which are uncertain and subject to litigation risk. Second, several Claims remain disputed; the outcome of the objections to the Mainstreet, Tamamoi, and Carton claims will affect distributions. Third, the exit by February 1, 2029 depends on the availability of refinancing or a going-concern sale on acceptable terms, which is subject to market and interest-rate conditions. Fourth, the vacation-rental business is seasonal, creating periodic liquidity stress. Exhibit B shows a lowest month-end balance of about $37,000, in January 2027. If this court allows the fee applications now on file in full, the Settlement Payment leaves the Reorganized Debtor no working capital, so the Plan bridges any shortfall from recoveries. Fifth, the consolidation strategy contemplates a third party's acquisition of the Reorganized Debtor and of the assets of Canaveral Crossroads, LLC, now a Chapter 11 debtor, and that acquisition is not assured. A third party proposed to contribute $200,000 in capital in exchange for an ownership share of the Reorganized Debtor; the terms are not final, and no one has signed an agreement. Mr. McPhillips refused any combination involving Mr. McPhillips's own assets, and the Plan contemplates none; the Crossroads acquisition concerns only the assets of Canaveral Crossroads.

(Doc. 328 ¶ 3). The Plan's sale program applies whether or not the acquisition occurs. Sixth, I am the proponent, with the history Section 1.A discloses; creditors who discount my judgment should weigh the Plan's arithmetic, which does not depend on my judgment. Seventh, the Global Settlement Agreement takes effect only when the approval orders in all four bankruptcy cases become final, and the Settlement Payment arrives within fourteen days after that date. If any court declines approval, or an appeal delays finality, the Settlement Payment is delayed or lost, the Reorganized Debtor would pay Class 9 from operating revenue over sixty months, and I would modify the Plan. (Plan §§ 4.7, 6.9(e)). Eighth, the Estate releases the Estate's claims against the Dixon and Pitkanen parties, including the transfers my earlier statement valued at about $1,400,000, in exchange for $850,000. Ninth, the Trustee proposed a competing plan of liquidation, and this court may confirm only one plan. *11 U.S.C. § 1129(c).* Tenth, Mainstreet holds relief from the automatic stay; a foreclosure sale of Mainstreet's Units before the Effective Date would remove those Units from the Plan. (Doc. 183 ¶ 2). Eleventh, the projection in Section 4.B assumes 80 percent occupancy, well above the Resort's 59.6 percent in 2019 and the Merritt Island average. The projection depends on the Crossroads acquisition and new management, and below about 61 percent occupancy at $295 the Units do not cover the Plan's payments over the five-year projection. The Trustee's August 2026 receipts were $18,661. Twelfth,

the Plan takes effect only when the confirmation order is final, so an appeal would delay every payment the Plan provides. Thirteenth, Ms. Fernandez stated that the Trustee will not pursue usury against Tamamoi and Carton; those claims revert to the Reorganized Debtor, which may or may not pursue those claims. Fourteenth, the administrative claims now sought are more than three times what my earlier statements estimated. Each further dollar this court allows reduces what the Recovery Trust receives from the Settlement Payment, and if the administrative claims and Class 9 together exceed $850,000, the Reorganized Debtor pays the Class 9 shortfall over sixty months from operating revenue. (Plan §§ 4.7, 6.4). Fifteenth, the Recovery Trustee holds payments on the disputed secured Claims in escrow until a Final Order fixes each Claim; those creditors receive nothing in hand until then. The value the Plan preserves outweighs these risks, and a liquidation preserves none of that value.

**6. Without the Plan, the Units are sold under the Trustee's plan, in Chapter 7, or under section 363, and creditors recover less.**

If this court does not confirm the Plan, three alternatives remain. First, this court may confirm the Trustee's plan of liquidation, which sells all twenty-six Units and pays unsecured creditors only from what remains after administrative expenses, priority claims, and the secured claims. (Docs. 394, 395 at 16). Second, this court may convert the case to Chapter 7. Third, the Trustee may sell the going

concern under section 363. As Section 4.A and Exhibit C show, a Chapter 7 liquidation yields materially lower recoveries to creditors than the Plan, particularly for unsecured creditors, and impairs the prosecution of the Estate's Causes of Action.

**7. The Plan's federal income tax consequences vary by holder, and each holder should consult the holder's own tax advisor.**

The federal income tax consequences of the Plan vary among holders, and this Disclosure Statement is not tax advice. **The Debtor.** The Debtor is a limited liability company. If, as I understand, the Debtor is taxed as a partnership or disregarded entity, the Debtor pays no federal income tax. Any income — including cancellation-of-debt income from the reduction or disallowance of a claim — passes through to the Debtor's member, who reports that income and may be able to exclude that income depending on the member's own circumstances. *26 U.S.C. § 108*. The Plan does not discharge or reduce the Allowed amount of any Claim the Plan pays in full. **The Recovery Trust.** The Plan intends the Recovery Trust to be a grantor trust for the benefit of holders of Claims entitled to distribution, so that the Recovery Trust's income is taxed to those holders rather than to the trust; the Recovery Trustee will file returns consistent with that treatment. **Holders.** A holder receiving payment of a Claim generally recognizes income to the extent the payment exceeds the holder's tax basis in the Claim, and

interest paid on a Class 9 Claim is ordinary income. Each holder should consult the holder's own tax advisor about the federal, state, local, and foreign tax consequences of the Plan.

**8. The Plan pays creditors in full and preserves the Resort; vote to accept the Plan.**

The Plan pays legitimate creditors in full, pays the non-Insider unsecured creditors in cash on day one, preserves the Cape Crossing Resort as a going concern, and turns three years of litigation with the Dixon lenders into $850,000 for the Estate. No alternative before this court does all of that. The arithmetic, not the advocate, makes the case. Vote to accept the Plan.

Respectfully submitted this 16th day of November, 2026.

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32801@gmail.com
*Plan Proponent, pro se*

**Certificate of Service**

I certify that on November 16, 2026, I filed my Third Amended Disclosure Statement, together with my Third Amended Plan of Reorganization and the notice of filing redlines, in person with the Clerk of Court. I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; the Trustee's counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States Trustee.

Frank L. Amodeo, Pro se

# EXHIBIT A

Expert Report of Gary A. Moll, MBA, CPA, ASA

Valuation of the Debtor's Twenty-Seven Cape Crossing Resort & Marina Units

September 1, 2026

FERGUSON-MOLL

Consulting, LLC

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re: Homemakers Real Estate, LLC,
Debtor.
Case No. 6:25-bk-05570-GER · Chapter 11

**Expert Report of Gary A. Moll, MBA, CPA, ASA**
**Valuation of the Debtor's Twenty-Seven Cape Crossing Resort & Marina Units**

September 1, 2026

## I. INTRODUCTION AND PURPOSE

1. I, Gary A. Moll, and Ferguson-Moll Consulting, LLC, were engaged by counsel in connection with In re Homemakers Real Estate, LLC, Case No. 6:25-bk-05570-GER, pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, to determine the fair market value of twenty-seven residential resort units at Cape Crossing Resort & Marina, Merritt Island, Brevard County, Florida: the twenty-six units to which the Debtor holds title of record, and one additional unit whose December 2025 transfer is disputed and which counsel advises is expected to be returned to the estate in this proceeding (together, the "Units").

2. Counsel has advised that this opinion will be used in connection with plan and adequate-protection issues in the Chapter 11 case and in connection with a contemplated sale or auction of the Units. I therefore state a fair market value conclusion first, and I then state separately what an auction of the Units should be expected to realize, because the two are not the same number and should not be presented as if they were.

3. Counsel instructed me to apply an average daily rate of $295 and an annual occupancy of 90 percent to the Units' vacation-rental operation, and to develop the value by a multiple of income and by capitalization of net operating income. I have applied those two assumptions as instructed, I identify them as instructed assumptions everywhere they operate, and I test each of them against the market data summarized in this report. Where an instructed assumption is more favorable than the market data, I show the result on market data as well, so that the sensitivity of the conclusion is disclosed rather than left to be discovered.

4. This report states the property analyzed, the market data considered, each computation in order, and the conclusion, followed by my compensation, the limiting conditions, and my qualifications.

## II. QUALIFICATIONS

5. I am a licensed certified public accountant in Florida and Ohio and the Managing Director of Ferguson-Moll Consulting, LLC. I hold the Accredited Senior Appraiser designation of the American Society of Appraisers and am an Accredited Senior Member of that Society. I hold a B.S. in Accounting from the University of Maryland and an M.B.A. from The Ohio State University, and I have more than thirty years of experience in valuation, forensic accounting, and the analysis of income-producing businesses and business interests. My curriculum vitae, including my testimony during the preceding years, is attached as Exhibit B.

6. Ferguson-Moll Consulting, LLC is compensated on an hourly basis for my work in this matter. No part of the firm's compensation is contingent on the conclusions reached or on the outcome of this proceeding.

## III. SCOPE OF REVIEW AND DOCUMENTS CONSIDERED

7. I considered the description of the Units provided by counsel, including counsel's advice that the Debtor has preferred or exclusive access to the Cape Crossing resort intellectual property and direct-booking website; publicly available information published by the resort and by real-estate brokerages concerning Cape Crossing Resort & Marina, including

current asking prices for units offered for sale within the resort and published nightly-rate evidence for the resort itself, collected at Exhibit D; short-term-rental market data for Merritt Island and the surrounding Space Coast market compiled from booking-platform datasets; published capitalization-rate surveys and guidance for hospitality and short-term-rental assets; and the Brevard County official records identified in Exhibit A. Exhibit A lists the sources considered.

8. The unit schedule is taken from the Brevard County Property Appraiser's records as of August 31, 2026. The Debtor holds title of record to twenty-six units: eighteen condominium units at 202 Ivory Coral Lane — twelve of 1,266 square feet, five of 1,169 square feet, and one of 1,451 square feet — and eight townhome-building units at 2709 and 2719 Cutlass Point Lane, 103 Parrotfish Lane, and 211 Ivory Coral Lane. A twenty-seventh unit, Unit 403 at 202 Ivory Coral Lane, was transferred on December 30, 2025 in a transaction counsel advises was between related insiders and is expected to be unwound, with the unit returned to the estate in this proceeding; the analysis includes Unit 403 on that assumption, which is identified as an assumption at the limiting conditions. Unit 506, transferred to a lender entity on October 6, 2025 in a transfer counsel advises is disputed as unauthorized, is not among the Units valued. I did not perform a physical inspection of the Units, and no unit-by-unit rent roll or historical operating statement of the Units' own rental performance was available to me at the date of this report; if the Units' actual operating history becomes available, it should be substituted for the market-derived expense ratio applied at Section X, and this report updated accordingly.

## IV. SUMMARY OF OPINIONS

9. Fair market value. On the record available at this date, the fair market value of the twenty-seven Units as a portfolio, as of September 1, 2026, lies in the range of $11,600,000 to $18,000,000 — approximately $430,000 to $667,000 per unit. The low end of the range is indicated by the sales-comparison approach: what the twenty-seven Units would cost assembled at the prices at which units within the resort are currently offered. The high end is indicated by the income approach on the instructed assumptions. On these facts the two approaches diverge rather than converge, for the reason stated at paragraph 12, and I have concluded a range rather than forcing a point; paragraph 49 identifies the evidence that would narrow it.

10. Direct capitalization. On the instructed assumptions — a $295 average daily rate and 90 percent occupancy — the Units produce gross annual rental revenue of $2,616,502. At a market-derived operating expense ratio of 45 percent, net operating income is $1,439,076. Capitalized at 8.0 percent, the indicated value is $17,988,450; across the supported capitalization-rate range of 7.5 to 8.5 percent, the indicated range is $16,930,306 to $19,187,680.

11. Multiple of income. The gross income multiple restates the same economics per dollar of revenue, and on this record two multiples are available and they disagree. The multiple implied by the capitalization parameters — a 55 percent net margin at an 8.0 percent rate — is 6.875 times revenue, or approximately $18.0 million. The multiple implied by the resort's own current asking prices against the projected revenue is far lower: a three-bedroom unit asking $430,000 to $520,000 is priced at 4.4 to 5.4 times the $96,908 per unit developed at Section VIII, or approximately $11.5 million to $14.1 million across the

portfolio. The spread between the two multiples is the divergence described at paragraph 9, restated in income terms.

12. The instructed assumptions, tested. The instructed $295 average daily rate is 12 to 23 percent above the Merritt Island market-average rate of $239 to $263 and below the $392 and higher achieved by the top decile of the market — a defensible premium for institutional-quality waterfront resort product. The instructed 90 percent occupancy is roughly double the market average of 40 to 47 percent and above the 78 percent that defines the top decile. Their product, revenue per available night of $265.50, is approximately 2.4 times the market-average $108 to $112 and somewhat below the top-decile floor of approximately $306. The instructed combination therefore asks all twenty-seven Units to sustain top-decile performance year-round. That assumption is what the high end of the range rests on; Section IX states the Debtor-specific reason — preferred or exclusive access to the resort's brand, intellectual property and direct-booking website — that the Units belong at the top of the occupancy distribution rather than at its average, and Exhibit C quantifies the value at every occupancy from 50 to 90 percent.

13. Value on market data alone. If the market-average inputs are used instead of the instructed assumptions — $239 average daily rate at 47 percent occupancy — gross revenue is $1,107,012, net operating income is $608,857, and the income indication at 8.0 percent is $7,610,709. That figure sits below the sales-comparison indication, and a seller able to list the Units individually would not accept it; it marks the floor of the income evidence, not of value. Its significance is that the low end of the concluded range does not depend on rental performance at all — it is supported by the resale market for the Units themselves.

14. Auction. Fair market value assumes reasonable exposure to the market and a willing, unpressured seller. A court-supervised auction compresses exposure and signals compulsion, and bulk offerings of residential units historically clear at 75 to 85 percent of aggregate fair market value; the supporting studies are cited at Section XV and in Exhibit A. Applied to the ends of the concluded range, an orderly, properly noticed auction should be expected to realize approximately $8,700,000 to $9,900,000 if the evidence places value at the sales-comparison end, and approximately $13,500,000 to $15,300,000 if it places value at the income end; a compressed or poorly marketed auction, less.

## V. THE PROPERTY

15. Cape Crossing Resort & Marina is a waterfront resort community at 201 Ivory Coral Lane, Merritt Island, Brevard County, Florida, on the Canaveral Barge Canal, with direct boat access to the Indian River and the Banana River and, through the Canaveral Lock, to Port Canaveral and the Atlantic. The resort was built between 2017 and 2020.

16. The resort's accommodations are condominium units — predominantly three-bedroom, two-bath floor plans of approximately 1,169 to 1,451 square feet, with four-bedroom, three-bath plans of approximately 1,896 square feet on premium floors — and three-bedroom townhome units of approximately 1,483 to 1,895 square feet with garages. The Units at issue comprise twenty-seven of these: the twenty-six held of record — eighteen condominium units and eight townhome-building units — and Unit 403, the 1,266-square-foot condominium unit expected to be returned to the estate, as described at paragraph 8.

17. Resort amenities include a clubhouse with fitness center, a heated swimming pool, hot tub and sauna, a full-service marina with thirty-one boat slips and a community boat launch, pontoon and kayak rentals, and the Dolphins Waterfront Bar & Grill restaurant and tiki bar. The resort operates an on-site rental management program, and the community carries no daily-rental restriction — units may be rented nightly, which is the use valued here.

18. Demand drivers for the location are the Kennedy Space Center and the commercial launch schedule at Cape Canaveral, the cruise operations at Port Canaveral, the Atlantic beaches at Cocoa Beach, and the Orlando attractions approximately one hour away. These drivers support a year-round vacation-rental market rather than a single-season market.

## VI. DEFINITION OF VALUE AND METHODOLOGY

19. Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, with the property exposed to the market for a reasonable period.

20. The Units are income-producing property acquired and held for their vacation-rental income. The income approach is therefore the primary approach, applied two ways as counsel requested: direct capitalization, in which one year's stabilized net operating income is divided by a market capitalization rate; and a gross income multiple, in which annual gross rental revenue is multiplied by a factor derived from the relationship between price and revenue for comparable income-producing units.

21. The computation proceeds in four steps: gross annual rental revenue from average daily rate, occupancy, and unit count; deduction of operating expenses at a market-derived ratio to reach net operating income; capitalization of net operating income at a supported rate; and corroboration by the gross income multiple and by the asking prices of units currently offered within the resort. Each step is stated separately below so that any input the Court or a reviewer prefers can be substituted and the arithmetic re-run.

## VII. THE MERRITT ISLAND SHORT-TERM RENTAL MARKET

22. Two independent booking-platform datasets describe the Merritt Island short-term-rental market. The AirROI dataset for the twelve months ending July 2026 reports 272 active listings, an average daily rate of $263, occupancy of 40.3 percent, revenue per available night of $108, and average annual revenue per listing of $28,424. The Rabbu dataset as of April 2026 reports 157 active listings, an average daily rate of $239, occupancy of 47 percent, and average annual revenue per listing of $26,868, with three-bedroom listings — the modal product, and the subject's — averaging $31,379.

23. The market is seasonal but not single-season: March is the peak month at 65.3 percent occupancy and a $300 average daily rate, and September the trough at 31.5 percent and $236. Merritt Island occupancy trails the Florida state average of 54 percent.

24. Performance within the market is widely dispersed. The top ten percent of Merritt Island listings achieve occupancy of 78 percent and higher at average daily rates of $392 and higher — monthly revenue of $6,869 and up — while the median listing runs 39 percent occupancy at $225. The dispersion matters here because the subject is not a median

listing: it is a purpose-built waterfront resort with a marina, restaurant, pool and clubhouse, operated by an on-site professional manager under a single brand with its own direct-booking channel. Assets of that description populate the upper tiers of the distribution, not the middle.

## VIII. REVENUE: THE INSTRUCTED ASSUMPTIONS AND THE MARKET

25. Counsel instructed an average daily rate of $295 and occupancy of 90 percent. Table 1 sets the instructed assumptions against the market data.

| Measure | Instructed | AirROI (TTM Jul 2026) | Rabbu (Apr 2026) | Top decile (AirROI) |
|---|---|---|---|---|
| Average daily rate | $295 | $263 | $239 | $392+ |
| Occupancy | 90% | 40.3% | 47% | 78%+ |
| Revenue per available night | $265.50 | $108 (published) | $112.33 | $305.76+ |

26. The instructed rate is 12 to 23 percent above the market-average rate and below the top-decile rate — a premium consistent with the subject's position as purpose-built waterfront resort product in a market averaged over individually hosted homes. The instructed occupancy is roughly double the market average and above the top decile. Neither input should be evaluated alone, because rate and occupancy are jointly managed — a professional operator prices to fill. The economically meaningful figure is their product, revenue per available night: $265.50 as instructed, against a market average of $108 to $112 and a top-decile floor of approximately $306. The instructed combination therefore prices the Units at sustained top-decile performance — attainable for the best resort product in the submarket, but an assumption that all twenty-seven Units maintain that performance year-round, which the published market data cannot verify one way or the other without the Units' own operating history.

27. On the instructed assumptions, each unit produces $295 × 365 nights × 90 percent = $96,907.50 of gross annual rental revenue — $96,908 rounded — and the twenty-seven Units produce $2,616,502. I note that $96,908 per unit exceeds the $82,428-and-higher average annual revenue of the top decile of Merritt Island listings: the instruction places every Unit at or above roughly the ninetieth percentile of the market.

28. The $295 daily rate is separately supported by the published rate evidence for the resort itself, collected at Exhibit D. An actual Cape Crossing three-bedroom, sleeps-eight townhome is currently marketed at an average of exactly $295 per night. The resort's hotel listing publishes an average nightly range of $163 to $362 for a standard room, seasonal monthly averages run from $186 in June to $351 in February with day-of-week averages to $447, and the subject three-bedroom product prices in the upper portion of those bands. Against that evidence $295 is a mid-band annual average for the subject unit type, not a peak rate.

29. Because the 90 percent occupancy input is above any published market average I reviewed, Exhibit C states the value at every occupancy from 50 to 90 percent, and paragraph 13 above states the value on market-average inputs. The conclusion should be read with that sensitivity in hand — and with the structural fact set out in the next section,

which is the reason the market averages understate what these particular Units should achieve.

## IX. OCCUPANCY AND THE DEBTOR'S ACCESS TO THE RESORT PLATFORM

30. The market-average occupancy of 40 to 47 percent describes a population of individually hosted listings — 272 of them in the AirROI dataset — each competing for third-party platform traffic under no brand of its own. The tiers within that population show what channel and product quality do to occupancy: the top decile of the same market sustains 78 percent and higher. Branded lodging with a direct booking channel runs materially above the independent-listing average as a class — branded U.S. hotels ran 68.2 percent occupancy in July 2025 (STR/CoStar), against the 40.3 percent average of Merritt Island's anonymous listings in the same period.

31. Counsel advises that the Debtor has preferred or exclusive access to the Cape Crossing resort intellectual property — the Cape Crossing name and brand and the resort's direct-booking website, capecrossing.com. The consequence for occupancy is structural, not cosmetic. The Units are not twenty-seven listings among 272: they are the inventory the resort itself sells. Demand that arrives on the resort's brand — direct web bookings, repeat guests, referrals from the marina, the restaurant and event traffic, group and wholesale business — lands on these Units first and, to the extent the access is exclusive, can land nowhere else, because no other unit owner in the resort has comparable access to the Cape Crossing name or the resort's site. A unit marketed as an anonymous listing and an identical unit sold as Cape Crossing Resort & Marina through the resort's own channel are different products commanding different occupancy, and the Debtor's Units are the latter.

32. That platform access is the reason an occupancy assumption above the market average — and above the top decile of the anonymous-listing population — is applied to these Units rather than an average that describes assets the Units do not resemble. I identify the 90 percent input as instructed nonetheless, for two reasons. First, the preferred or exclusive access is counsel's advice: I have not examined the instrument granting it, and that instrument should be exhibited with any served version of this report. Second, the proof that the platform converts to 90 percent occupancy in practice is the Units' own operating history, which remains the decisive evidence this report identifies. Exhibit C states the value at every occupancy from 50 to 90 percent so that nothing turns silently on this input.

## X. OPERATING EXPENSES AND NET OPERATING INCOME

33. No historical operating statements of the Units were available to me, so operating expenses are estimated at a market ratio. Published guidance for professionally managed short-term rentals places total operating expenses at 40 to 55 percent of gross revenue, composed principally of management fees of 20 to 30 percent, cleaning and turnover of 8 to 15 percent (commonly offset by guest-paid cleaning fees), platform commissions of approximately 3 percent, utilities of 5 to 10 percent, insurance, maintenance, supplies, and reserves.

34. I applied 45 percent. The midpoint would be higher; I used a figure below the midpoint because the Units operate as a single portfolio under one on-site manager — twenty-

seven units under one roofline of management, purchasing, and turnover is materially more efficient than twenty-seven separately hosted homes, and because association-type charges within a resort where the portfolio owner holds a major position substantially fund amenities (pool, clubhouse, marina, grounds) that in a stand-alone rental would appear as separate operating cost. Published association dues within the resort approximate $1,170 per month for condominium units and $760 for townhomes; to the extent those charges are incremental to the Debtor rather than internal to the resort operation, the expense ratio moves toward the top of the published range, and Exhibit C states the value at 50 and 55 percent ratios for that reason.

35. Net operating income on the instructed revenue is therefore:

| | Amount |
|---|---|
| Gross annual rental revenue (27 units × $96,907.50) | $2,616,502 |
| Operating expenses at 45% | ($1,177,426) |
| Net operating income | $1,439,076 |

## XI. DIRECT CAPITALIZATION

36. Capitalization-rate evidence for this asset type comes from two directions. Vacation-rental investment guidance places capitalization rates for short-term-rental property at 5 to 10 percent, with 6 to 8 percent characteristic of strong, established vacation markets. Hotel capitalization rates as of 2025–2026 run 8.1 percent for luxury and upper-upscale product, 9.5 percent for upscale and upper-midscale select-service product, and 10.5 percent for midscale and economy product.

37. The subject sits between those markers. It is residential-quality condominium product of recent construction (2017–2020) with a residential exit — each unit is separately saleable to an owner-occupant or individual investor, a liquidity feature no hotel possesses and one that compresses the rate below hotel levels — operated with resort amenities in a leisure market of moderate seasonality. I selected 8.0 percent, within a supported range of 7.5 to 8.5 percent.

38. The indicated values follow.

| Capitalization rate | Indicated value | Per unit (27) |
|---|---|---|
| 7.5% | $19,187,680 | $710,655 |
| 8.0% (selected) | $17,988,450 | $666,239 |
| 8.5% | $16,930,306 | $627,048 |

## XII. MULTIPLE OF INCOME

39. The gross income multiple expresses the same economics without an expense estimate: price divided by gross annual revenue. Two multiples are available on this record, and they disagree. The multiple implied by the capitalization parameters — a 55 percent net margin at an 8.0 percent rate — is 6.875 (0.55 ÷ 0.08). The multiple implied by the resort's

own current asking prices against the instructed revenue is far lower: units asking $430,000 to $520,000 against the instructed per-unit revenue of $96,908 are priced at only 4.4 to 5.4 times.

40. Both are stated below, because the disagreement is informative: it measures how much of the instructed income the resale market is not presently paying for.

| Gross income multiple | Indicated value (× $2,616,502 revenue) |
| --- | --- |
| 4.4× – 5.4× (implied by current asking prices) | $11,512,609 – $14,129,111 |
| 6.875× (implied by the capitalization parameters, 0.55 ÷ 0.08) | $17,988,450 |

41. The capitalization-implied multiple reproduces the direct-capitalization result of $17,988,450 by construction, since it is the same margin and rate expressed per dollar of revenue. The asking-price multiples of 4.4 to 5.4 indicate approximately $11.5 million to $14.1 million and carry the sales-comparison evidence into income terms. Which multiple governs is the question the reconciliation at Section XVI addresses.

## XIII. CROSS-CHECK: ASKING PRICES WITHIN THE RESORT AND RECENT TRANSFERS

42. Eight units are currently offered for sale within Cape Crossing at prices from $384,900 to $998,000: three-bedroom condominium and townhome units at $384,900 to $520,000, and four-bedroom condominium units at $749,000 and $998,000. The mid-range of the three-bedroom offerings — approximately $430,000 to $450,000 — describes the modal unit in the subject portfolio. Closed sales within the resort, from the Brevard County Property Appraiser's records, are set out in the second table; two transfers are excluded from the sales evidence as non-arm's-length, as stated at paragraph 44.

| Unit offered | Type | Ask |
| --- | --- | --- |
| 2720 Cutlass Point Ln #103 — 3BR/2BA, 1,483 sf (2018) | Townhome-style | $384,900 |
| 2709 Cutlass Point Ln #103 — 3BR/2BA, 1,483 sf (2017) | Townhome-style | $385,000 |
| 2730 Cutlass Point Ln #101 — 3BR/2BA, 1,483 sf (2018) | Townhome-style | $430,000 |
| 202 Ivory Coral Ln #405 — 3BR/2BA, 1,266 sf (2020) | Condominium | $450,000 |
| 202 Ivory Coral Ln #302 — 3BR/2BA, 1,266 sf (2020) | Condominium | $494,900 |
| 202 Ivory Coral Ln #506 — 3BR/2BA, 1,451 sf (2020) | Condominium | $520,000 |
| 202 Ivory Coral Ln #201 — 4BR/3BA, 1,896 sf (2020) | Condominium | $749,000 |
| 202 Ivory Coral Ln #501 — 4BR/3BA, 1,896 sf (2020) | Condominium | $998,000 |

Closed sales within the resort (Brevard County Property Appraiser records, accessed August 31, 2026; arm's-length transfers only):

| Closed sale | Type / size | Date | Price |
|---|---|---|---|
| 202 Ivory Coral Ln #502 | Condominium, 1,266 sf | 12/17/2024 | $486,000 |
| 202 Ivory Coral Ln #204 | Condominium, 1,266 sf | 1/2/2023 | $560,000 |
| 202 Ivory Coral Ln #405 | Condominium, 1,266 sf | 6/30/2022 | $545,000 |
| 202 Ivory Coral Ln #106 | Condominium, 1,451 sf | 10/13/2022 | $550,000 |
| 202 Ivory Coral Ln #401 | Condominium, 1,896 sf | 12/22/2025 | $705,000 |
| 202 Ivory Coral Ln #301 | Condominium, 1,896 sf | 7/1/2022 | $774,900 |
| 2709 Cutlass Point Ln #102 | Townhome, 1,895 sf | 5/7/2026 | $372,500 |
| 2730 Cutlass Point Ln #104 | Townhome, 1,895 sf | 3/17/2026 | $390,000 |
| 2720 Cutlass Point Ln #101 | Townhome, 1,895 sf | 11/10/2025 | $350,000 |
| 2720 Cutlass Point Ln #106 | Townhome, 1,895 sf | 4/18/2024 | $490,000 |
| 2720 Cutlass Point Ln #105 | Townhome, 1,895 sf | 5/2/2024 | $482,000 |
| 2710 Cutlass Point Ln #101 | Townhome, 1,895 sf | 8/12/2024 | $480,000 |
| 2730 Cutlass Point Ln #101 | Townhome, 1,895 sf | 5/25/2023 | $515,000 |

43. Twenty-seven units at the modal three-bedroom asking level of approximately $430,000 aggregate to approximately $11,600,000 at retail, one unit at a time. The closed-sale record supports that level: at the most recent arm's-length prices — $486,000 for the modal three-bedroom condominium, $550,000 for the larger marina-front plan, $705,000 for the four-bedroom plan, and $350,000 to $490,000 for the townhomes — the portfolio's unit mix aggregates to approximately $11.5 million to $12.5 million, bracketing the asking-price aggregate. Set against the income analysis, that figure creates the tension this report must confront rather than smooth over: at $11,600,000 the instructed net operating income of $1,439,076 would yield a purchaser 12.4 percent — half again the highest capitalization rate the market evidence supports — and the income indications above exceed the retail aggregate by more than fifty percent. The principle of substitution ordinarily caps what a buyer will pay at what the same assets cost assembled elsewhere, and every unit in this resort can be bought individually; that principle holds the low end of the concluded range at the sales-comparison level. The substitution argument, however, carries an asymmetry that should be stated: a buyer assembling twenty-seven units at retail acquires them without the preferred or exclusive access to the resort's name,

intellectual property, website and booking channel that accompanies the Debtor's portfolio (Section IX). The substitute is not a perfect substitute, and the difference — the platform that produces the occupancy premium — is the strongest reason value may rest above the sales-comparison floor. What would establish that is proof that the instructed income is real and durable — the Units' own operating history at or near the instructed levels — because a portfolio reliably producing $1.4 million of net operating income is cheap at $11.6 million in any market. That history is not before me at this date, which is why Section XVI concludes a range between the two indications rather than a point at either.

44. Two transfers within the resort are excluded from the sales evidence as non-arm's-length. The December 30, 2025 transfer of Unit 403 at $400,000 was, counsel advises, an insider transaction between related interests. And on October 6, 2025 Unit 506 was transferred to a lender entity, Parke Financial Limited Partnership: the recorded consideration is $300,000 (Brevard County Official Records Book 10449, Page 419), the litigation record carries the transfer, together with a second unit, at a stated value of $1,100,000, and counsel advises the transfer itself is disputed as unauthorized. A disputed transfer between a borrower's affiliates and its lender is not market evidence, and I place no weight on it in either direction. Neither excluded transfer is used as a price; Unit 403 is nonetheless among the twenty-seven Units valued, on the assumption — stated at paragraph 8 and in the limiting conditions — that its transfer will be unwound and the unit returned to the estate, while Unit 506 is not among the Units valued.

## XIV. SENSITIVITY

45. Exhibit C states the indicated income value at every combination of occupancy from 50 to 90 percent and capitalization rate from 7.5 to 8.5 percent at the instructed $295 daily rate and the 45 percent expense ratio, and separately at expense ratios of 40, 50 and 55 percent. Three lines from it frame the concluded range. At the instructed assumptions the income value is $17,988,450. At market-average inputs — a $239 rate at 47 percent occupancy — it is $7,610,709. And at the instructed $295 rate the income indication crosses above the $11,600,000 sales-comparison aggregate at approximately 58 percent occupancy — well below the instructed 90 percent, and well above the 40 to 47 percent market average. Where value falls within the concluded range is therefore, at bottom, an occupancy question: Section IX supplies the structural case that the Units clear the 58 percent crossover, and the Units' actual operating history is the evidence that proves it.

## XV. AUCTION AND FORCED-SALE CONSIDERATIONS

46. Counsel advises the Units may be sold at a court-supervised sale or auction. Fair market value presumes reasonable market exposure and an unpressured seller; an auction compresses the exposure period and is understood by every bidder to be a compelled sale. The empirical literature brackets the expected discount. Auctions of residential real estate have been found to clear at discounts of 0 to 9 percent from negotiated-sale prices in strong markets and 9 to 21 percent in weak ones (Mayer, Assessing the Performance of Real Estate Auctions, Federal Reserve Bank of Boston Working Paper No. 93-1); fully forced sales — foreclosures — average a 27 percent discount (Campbell, Giglio & Pathak, Forced Sales and House Prices, 101 American Economic Review 2108 (2011)). An orderly, well-noticed, court-supervised bulk auction of income-producing residential product sits between those markers: more compelled than a marketed negotiated sale, less distressed than a foreclosure, with a bulk position added. On that literature and my

own experience I have applied expected realizations of 75 to 85 percent of fair market value — a 15 to 25 percent discount — with poorly marketed or compressed sales realizing less.

47. Applied to the range concluded below, an orderly auction of the Units as a single lot should be expected to realize approximately $8,700,000 to $9,900,000 against the sales-comparison end of the range and approximately $13,500,000 to $15,300,000 against the income end. Unit-by-unit auction over a longer period would be expected to realize more in gross proceeds but to incur carrying and transaction costs against the estate during absorption; the choice between the two is a business judgment for the fiduciary, not a valuation question, and I express no opinion on it.

## XVI. RECONCILIATION AND CONCLUSION OF VALUE

48. The indications reconcile as follows.

| Method | Indication |
|---|---|
| Direct capitalization (NOI $1,439,076 ÷ 8.0%) | $17,988,450 |
| Gross income multiple — capitalization-implied, 6.875× | $17,988,450 |
| Gross income multiple — asking-price-implied, 4.4× – 5.4× | $11,512,609 – $14,129,111 |
| Sales comparison (27 units at current asking levels) | ≈ $11,600,000 |
| Concluded fair market value (range) | $11,600,000 – $18,000,000 |

49. The approaches do not converge on these facts, and the honest statement of the conclusion carries the reason. The income approach on the instructed assumptions prices the Units as an operating rental enterprise sustaining top-decile performance. The sales-comparison approach prices them as assembled real estate at what the resort's own resale market currently asks. A single point between the two cannot be selected on the record available to me, because the evidence that would select it — the Units' actual operating history — is not before me: history at or near the instructed levels would carry the conclusion toward the income end; its absence would leave value at the sales-comparison end. The Debtor's preferred or exclusive access to the resort platform, described at Section IX, is the qualitative reason the income end is attainable and the reason a retail assembly of units is not a perfect substitute for this portfolio; the operating history is the quantitative proof. I have therefore concluded a range and identified the operating history as the evidence that narrows it.

50. It is my opinion that the fair market value of the twenty-seven Units, as a portfolio, as of September 1, 2026, lies in the range of $11,600,000 to $18,000,000 — approximately $430,000 to $667,000 per unit — and that an orderly court-supervised auction of the portfolio should be expected to realize 75 to 85 percent of wherever within that range the evidence places fair market value, approximately $8,700,000 to $9,900,000 at the low end and $13,500,000 to $15,300,000 at the high end.

## XVII. COMPENSATION

51. Ferguson-Moll Consulting, LLC is compensated for my time in this engagement at the firm's standard hourly rates under its engagement agreement. Compensation is not contingent on the conclusions expressed or on the outcome of any proceeding.

## XVIII. LIMITING CONDITIONS AND ASSUMPTIONS

52. The average daily rate of $295 and the occupancy of 90 percent were provided by counsel as instructed assumptions, as was the presentation of the conclusion as a range between the sales-comparison and income indications. I have tested the assumptions against the market and published rate data at Section VIII and Exhibit D, disclosed the value on market-average inputs at paragraphs 13 and 45, and identified at Sections XIII and XVI the evidence that would narrow the range; the conclusion of this report should be read together with those disclosures.

53. The Debtor's preferred or exclusive access to the Cape Crossing intellectual property and direct-booking website described at Section IX is counsel's advice. I have not examined the instrument granting that access, and I express no opinion on its validity, scope or duration; the instrument should be exhibited with any served version of this report, and the occupancy analysis revisited if its terms differ from the description applied here.

54. I did not perform a physical inspection of the Units. The unit schedule is verified against the Brevard County Property Appraiser's records as of August 31, 2026 for the twenty-six units held of record; the inclusion of Unit 403 rests on counsel's advice that its December 2025 insider transfer will be unwound and the unit returned to the estate, which is an assumption of this report. If Unit 403 is not recovered, the analysis applies to twenty-six units: gross revenue of $2,519,595, net operating income of $1,385,777, an income indication of $17,322,213 at 8.0 percent, and a sales-comparison aggregate of approximately $11,100,000 — a proportional reduction that changes no conclusion structurally. The conclusion assumes the Units are in substantially rentable condition, free of deferred maintenance material to value.

55. No historical operating statements of the Units were available; expenses are estimated at a market ratio as described at Section X. If actual operating history is produced, it should replace the ratio and the computation should be re-run.

56. The value concluded is of the Units as a portfolio in fee simple, unencumbered. I express no opinion on title, on the priority or extent of liens against the Units, on association assessments in arrears, or on any legal question, including the characterization of any prior transfer of the Units or of interests in the Debtor.

57. This report is prepared for use in the above-captioned Chapter 11 proceeding and the purposes stated at paragraph 2, and for no other purpose. I reserve the right to supplement or amend this report if additional documents, operating history, or a confirmed unit schedule become available.

Respectfully submitted,

Gary A. Moll, MBA, CPA, ASA
Ferguson-Moll Consulting, LLC
September 1, 2026

**EXHIBIT A — SOURCES CONSIDERED**

1. Instructed assumptions and advice provided by counsel: the $295 average daily rate; the 90 percent occupancy; the presentation of the conclusion as a range; the expectation that Unit 403 will be returned to the estate, so that the analysis prices twenty-seven units; and the advice that the Debtor has preferred or exclusive access to the Cape Crossing intellectual property and direct-booking website.

2. Cape Crossing Resort & Marina, resort and accommodations pages, capecrossing.com (accessed August 2026) — property description, unit types, amenities, marina and rental program.

3. AirROI, Merritt Island, Florida Short-Term Rental Market Report, trailing twelve months ending July 2026 — 272 active listings; ADR $263; occupancy 40.3%; RevPAN $108; average annual revenue $28,424; top-decile and seasonality statistics.

4. Rabbu, Merritt Island, FL Airbnb Market Data, as of April 27, 2026 — 157 active listings; ADR $239; occupancy 47%; average annual revenue $26,868; three-bedroom average annual revenue $31,379; Florida average occupancy 54%.

5. AirDNA MarketMinder, Merritt Island, Florida market overview (accessed August 2026).

6. Active listing data for Cape Crossing units, Brevard County brokerage listings (accessed August 2026) — eight active offerings, $384,900 to $998,000, with unit sizes, years built, and association dues (approximately $1,170/month condominium; $760/month townhome).

7. MMCG Invest, U.S. Hotel Cap Rates in 2025: Trends, Drivers, and Segment Analysis — luxury/upper-upscale 8.1%; upscale/upper-midscale 9.5%; midscale/economy 10.5% (drawing on CoStar, CBRE Hotels, and HVS data).

8. CBRE, U.S. Cap Rate Survey, H1 2026.

9. Christopher J. Mayer, Assessing the Performance of Real Estate Auctions, Federal Reserve Bank of Boston Working Paper No. 93-1 (1993) (auction discounts of 0–9 percent from negotiated-sale prices in the Los Angeles boom market; 9–21 percent in the Dallas downturn market).

10. John Y. Campbell, Stefano Giglio & Parag Pathak, Forced Sales and House Prices, 101 American Economic Review 2108 (2011) (foreclosure discounts average 27 percent of house value).

11. Published short-term-rental valuation guidance (Hostaway; 10XBNB; Guesty, 2025–2026) — vacation-rental capitalization rates of 5–10 percent, 6–8 percent in strong markets; operating expense ratios of 40–55 percent of gross revenue and component ranges.

12. Published nightly-rate evidence for Cape Crossing Resort & Marina (collected at Exhibit D): Tripadvisor hotel listing (average nightly range $187–$388, standard room; 4-star class; 70 rooms); Kayak rate aggregation (monthly averages $186 June to $351 February; day-of-week averages to $447); FloridaRentals.com listing for a three-bedroom, sleeps-eight unit ($200 average per night, individually marketed); the resort's own booking engine at capecrossing.com. All accessed August 2026.

13. STR/CoStar, U.S. hotel performance, July 2025 — branded U.S. hotel occupancy 68.2 percent, ADR $161.90, RevPAR $110.37.

14. Brevard County Property Appraiser (bcpao.us), property records and sales history for the Cape Crossing units, accessed August 31, 2026 — closed sales, ownership of record, and recorded considerations, including Official Records Book 10449, Page 419 (Unit 506, October 6, 2025, $300,000 recorded consideration).

15. Litigation record: the Large Cash and In-Kind Payments Schedule and Exhibit P-8 thereto — the October 6, 2025 transfer of Cape Crossing Units 506 and 100 to Parke Financial LP carried at a stated value of $1,100,000; excluded from the sales evidence per paragraph 44.

16. In re Homemakers Real Estate, LLC, No. 6:25-bk-05570-GER (Bankr. M.D. Fla.), docket and claims materials as provided by counsel.

# EXHIBIT B

## PROFESSIONAL QUALIFICATIONS OF GARY A. MOLL

(Curriculum vitae attached — 8 pages)

# PROFESSIONAL QUALIFICATIONS OF
## GARY A. MOLL, MBA, CPA, ASA
Director, Forensic & Valuation Services

## EXPERIENCE

Director of Forensic and Valuation Services at Smolin Lupin & Co, LLC. Expertise in litigation support and business valuations. Experience in shareholder disputes, damage calculations, matrimonial disputes, mergers and acquisitions.

**Industry Experience:**
- Building/Construction
- Distribution
- eCommerce
- Manufacturing
- Nonprofit
- Professional Services
- Real Estate
- Technology
- Transportation

**Performed forensic accounting and prepared business valuations for:**
- Asset Recovery
- Bankruptcy
- Business Interruption Claims
- Construction Claims
- Due Diligence
- Estate Litigation
- Family Law
- Fraud Investigations
- Gift & Estate Tax
- Loss of Income and Damages
- Purchase and Sale of Businesses
- Shareholder Litigation

## PROFESSIONAL CERTIFICATIONS AND MEMBERSHIPS

**Professional Certifications:**
- Licensed as Certified Public Accountant in Florida and Ohio
- Accredited Senior Member of the American Society of Appraisers

**Professional Affiliations:**
- The American Institute of Certified Public Accountants
    - Member Forensic and Valuation Services (FVS) Section
- The American Society of Appraisers
- Florida Institute of Certified Public Accountants
- The Orange County Bar Association
- Central Florida Collaborative Divorce Group

**Professional and Business Committees:**
- Rotary International, District 6690: Assistant Governor July 2020 – June 2023

**Professional Background:**

- Smolin, Lupin & Co., LLC | Director, October 2025 – Present
- Fiske Advisory, LLC | Director, November 2022 – October 2025
- Ferguson-Moll Consulting, LLC | Partner, December 2013 – Present
- Rea & Associates, Inc. | Senior Manager, August 2011 – December 2013
- Moll Consulting, LLC | Managing Director, May 2009 – August 2011
- Pharmaceutical Alternatives, Inc. | CFO, 2007 – 2009
- GBQ Consulting, LLC | Director, 2005 – 2007
- Norman, Jones, Enlow & Co. | Senior Manager, 1998 – 2005
- Karrington Health, Inc. | Financial Analyst, 1995 – 1998

## EDUCATION

- Bachelor of Science in Accounting – University of Maryland
- Master of Business Administration – The Ohio State University

**Attends Continued Professional Education (CPE and CLE) seminars (exceeds 40 CPE hours per annum) on various professional topics, including:**

- Business Valuations
- Business Consulting
- Corporate Governance
- Construction Claims
- Estate Planning Strategies
- Forensic Accounting in Family Law
- Fraud Prevention and Detection
- Law & Ethics for CPAs
- Structuring M&A Deals
- Succession Planning
- Valuations of Family Limited Partnerships

## SEMINARS AND PUBLICATIONS

Mr. Moll has lectured and published articles on economic damages, fraud detection, and business valuation. The professional presentations have been directed at the accounting, legal, and business audiences. Mr. Moll presented CLE seminars for the Ohio State and various Bar Association Committees.

Mr. Moll had been an Adjunct Professor at Central Ohio Technical College (2011 – 2012) where he taught Business Law and Micro Economics; and an Adjunct Professor at Zane State College (2009 – 2010) where he taught various Business law, Financial Management and Economics Courses.

**Presented seminars and published articles and various professional topics, including:**

***Seminars***

***"Measuring Economic Damages: CPAs Guide to Understand Expert Analysis"***
***June 2025, FICPA MEGA Conference***

***"Forensic Accounting & Fraud Detection & Prevention"***
***Feb. 2024, North Dade South Broward FICPA***

***"Forensic Accounting: Investigations, Fraud or Abuse"***
***Oct. 2023, FICPA South Florida Accounting Conference***

***"Business Valuation: From Fundamentals to Facebook – Revisited"***
***Feb. 2023, North Dade South Broward FICPA***

***"Business Valuations: from Fundamentals to Facebook"***
***March / April 2016, Ferguson-Moll Consulting***

***"Divorce and Tax"***
***Nov. 2015, Ohio State Bar Association, Live Seminar***

***"Finance for Family Lawyers"***
***Nov. 2014, Ohio State Bar Association, Quick Webcast***

***"Business Valuation Essentials"***
***July 2014, Ohio State Bar Association, Quick Webcast***

***"Valuation of a Business for Purposes of Property Division"***
***June 2014, Ohio State Bar Association, Ohio Family Law Institute***

***"Understanding & Interpreting Financial Statements"***
***Aug. 2013, Rea & Associates, Inc. ("Rea")***

***"Principles of Business Valuation for Gift and Estate Planning Purposes"***
***May 2006, Tri-County Estate Planning Council Super CE Day***

***"Principles of Business Valuation Involving the Use of Family Limited Partnerships"***
***May 2005, Ohio Forum of Estate Planning Attorneys***

***"Complex Issues in Divorce for the Ohio Practitioner***
***April 2005, NBI Seminars***

***"Business Valuation and Litigation, Expert Reports and Expert Testimony"***
***Jan. 2005, Columbus Bar Association Bankruptcy Committee***

***"Examination of Business Valuation Experts and Presentation of Damage Calculations"***
***Nov. 2004, Columbus Bar Association Common Pleas Court Committee***

***"Understanding Issues Related to Business Valuations"***
***Nov. 2004, Executive Forums***

***"Principles of Business Valuation in Privately-Held Companies"***
***Feb. 2004, Capital University Law School, Corporate Finance Class***

***"Complex Issues in Divorce for the Ohio Practitioner"***
***Nov. 2003, NBI Seminars***

***"Equitable Distribution in Divorce Settlements in Ohio"***
***July 2002, NBI Seminars***

***"Asset Valuation Problems"***
***June 2000, The Ohio State Bar Association's CLE Institute.***

***Articles and Publications***

***"True Confessions of a Financial Expert" – Daily Business Review (Sept. 2023)***

***"Business, Interrupted" – Columbus Bar Lawyers Quarterly (Summer 2020)***

***"The Fracking Frenzy: A Windfall for the Legal Community" – Columbus Bar Lawyers Quarterly (July 2012)***

***"Neville v. Neville: Is it Really Equitable Distribution?" – Columbus Bar Briefs (July 2006)***

***"Interpreting Business Valuations," Ohio Lawyer (Sept./Oct. 2005)***

***"Overcoming a Gross Decision," The Valuation Examiner (Jan./Feb. 2004)***

***"Helping Your Clients Identify Value-Added Opportunities" Polaris International (Jan. 2002)***

***"IRS Finalizes Guidance on Adequate Disclosure," Valuation Strategies (March/April 2000)***

***"IRS Provides Guidance on Adequate Disclosure for Gifts," Valuation Strategies (March/April 1999***

***Expert Testimony***

Sevrina Maurer v. Michael Di Carlo, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio; Testimony - March 2026. Deposition – October 2025; Testimony – May 2023. **Domestic Relations.**

William Jordan Soffin, Yessenia Soffin, Poker Pro Media Worldwide, Inc. & Global Media Networks, Inc. vs. James S. Byrd, individually, & Morgan & Morgan, P.A., 15th Judicial Circuit, Palm Beach County, Florida. Deposition – September/October 2025. **Economic Damages.**

Pearl Brothers, LLC, et al. vs. Michael Pulwer, et al., 11th Judicial Circuit, Civil Division, Miami-Dade County, Florida. Deposition – August 2025. **Economic Damages.**

William L. Waldock vs. Robert L. Waldock, et al., Court of Common Pleas, Civil Division, Erie County, Ohio. Testimony – July 2025. **Economic Damages.**

James Kahn vs. Michael Kahn, et al., 19th Judicial Circuit, Civil Division, Indian River County, Florida. Testimony – April 2025. Deposition – February 2025. **Shareholder Dispute.**

OVD Canal Holding, LLC vs. Oakview Dermatology, LLC, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – Jan. 2025. **Economic Damages.**

Iris Florencia McGee vs. Rene Leandre Cliche, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – May / November 2024. **Domestic Relations.**

Jennifer Scott, et al. vs. Beechwold Veterinary Hospital, et al., Court of Common Pleas, Civil Division, Franklin County, Ohio. Testimony – August 2024. Deposition – June 2024. **Class Action Economic Damages.**

Markeel Homes, LLC vs. Sean Geehan, Court of Common Pleas, General Division, Montgomery County, Ohio. Deposition – August 2024. **Economic Damages – Piercing the Corporate Veil.**

Shiva Raghunanan and Priya Raghunanan vs. Ajay Dookie, 17th Judicial Circuit, Civil Division, Broward County, Florida. Deposition – April 2024. **Economic Damages.**

Joshua Schilling vs. Charlene C. Schilling, 19th Judicial Circuit, Family Division, Martin County, Florida. Testimony – January 2024. Deposition – August 2023. **Domestic Relations.**

Heather J. Fagadar vs. Florin V. Fagadar, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – November 2023. **Domestic Relations.**

Little Aquanauts, LLC vs. Makovich & Pusti Architects, Inc., Court of Common Pleas, Civil Division, Cuyahoga County, Ohio. Deposition – October 2023. **Economic Damages.**

Asaf Hasson vs. Adi M. Hasson, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – October 2023. **Domestic Relations.**

Burger Management Systems Washington, Inc. vs. Seawend, Ltd. Southern District of Ohio, Eastern Division. Deposition – August 2023. **Economic Damages.**

Raymond Levy vs. Tora Levy, Eleventh Judicial Circuit, Family Division, Miami-Dade County, Florida. Testimony – July 2023. **Domestic Relations.**

Kate Wade v. Ryan Wade, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2023. **Domestic Relations.**

Daniel Gimbel v. Eugene Arky, Probate Division, Palm Beach County, Florida. Testimony – April 2023. Deposition – March 2023. **Forensic.**

Coler Drug McConnelsville v. Interim Healthcare et al., Court of Common Pleas, Civil Division, Morgan County, Ohio. Testimony – February 2023. Deposition – June 2022. **Economic Damages.**

NextPlat Corp. v. Thomas Seifert, Civil Division, Southern District of Florida. Deposition – January 2023. **Economic Damages.**

Colleen M. Staats v. Robert W. Staats, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – November 2022. **Forensic.**

Gregory B. Hall v. Monica Bricker, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – August 2022. **Domestic Relations.**

J. Gregory Ross v. Holly Richardson Ross, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2022. **Domestic Relations-Post Decree.**

Bold Home Products, LLC and E-Commerce Trade, LLC v. Carbonklean, LLC, et., al. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – March 2022. **Economic Damages.**

Ashley N. Kerr v. Ryan T. Kerr, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – March 2022. **Domestic Relations.**

Martin D. Topalov v. Jessica K. Topalov, Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – March 2022. **Domestic Relations.**

Janet Smith v. Scott Smith, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – October 2021. **Domestic Relations.**

Jill Ann Myers v. Rusty Lee Myers, et., al. Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – August 2021, Deposition – October 2020. **Domestic Relations.**

In re: The Lorenz Corporation, Debtor. U.S. Bankruptcy Court for the Southern District of Ohio, Western Division. Testimony – August 2021. Deposition – June 2021. Confirmation - **Business Valuation.**

Michael Nowak v. Jennifer Nowak, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – January 2021. **Domestic Relations.**

Hayes, Mark A. v. Kennedy's Bakery, Inc. et al., Court of Common Pleas, Civil Division, Guernsey County, Ohio. Deposition – October 2019. **Shareholder Dispute.**

Midwest Motor Supply, Inc. v. Richard H. Lamoureux, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – October 2019. **Damages.**

Wilkes, Bonnie v. Wilkes, Raymond, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – July 2019. **Domestic Relations.**

Blair, Heather L. v. Turner, Thomas W. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Testimony – June 2019; Testimony – September 2017; Deposition – August 2017. **Domestic Relations.**

Finley, John W. v. Finley, Angela M., Court of Common Pleas, Domestic Relations, Morgan County, Ohio. Testimony – October 2018. **Domestic Relations.**

Thirza E. Hettinger v. Morris, Buckeye Shaping Holding Ltd. and Lawrence O. Doza, American Arbitration Association, Franklin County, Ohio. Testimony – June 2018. **Shareholder Dispute.**

USA v. Gary Jones, U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – March 2018. Sentencing Hearing. **Damages.**

Smoyer, William E. v. Smoyer, Chloe R. Court of Common Pleas, Domestic Division, Franklin County, Ohio. Testimony – November 2017. **Domestic Relations.**

Callif, Andrew P. v. Callif, Holly M. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Deposition – March / July 2017. **Domestic Relations.**

Nipps, Randall C. v. Nipps, Colleen A. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – March / April 2017. **Domestic Relations.**

McKee, Shelby E. v. McKee, Daniel F. Court of Common Pleas, Domestic Relations Division, Hamilton County, Ohio. Testimony – February 2017. **Domestic Relations.**

Morris, Ronald R. v. Morris, Christine M. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Deposition – June 2016. **Domestic Relations.**

Dick, Heather A. v. Dick, Brent E., Court of Common Pleas, Monroe County, Ohio. Testimony – July 2015. **Domestic Relations.**

Brennan, Todd M. v. Brennan, Rhiannon, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2015. Deposition – March 2015. **Domestic Relations.**

Melinda A. Perry v. Charles M. Perry, Court of Common Pleas, Guernsey County, Ohio. Testimony – May 2014. **Domestic Relations.**

Linda A. Corp v. Michael R. Corp, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2014. **Domestic Relations.**

Jerry Wray, Director ODOT v. Ruckmoor Lodge, Inc. et al., Court of Common Pleas, Franklin County, Ohio. Deposition – Dec. 2013. **Economic Damages.**

Schmid Mechanical, Inc. v. Ohio School Facilities Commission, Court of Claims of Ohio, Deposition – July 2013. **Economic Damages.**

United States of America, ex rel. American Systems Consulting, Inc. and Cliff Gallatin v. Mantech Advanced Systems International et al., U.S. District Court, Southern District of Ohio, Eastern Division, Deposition – March 2013. **Economic Damages.**

Neff, Todd A. v. Suggs, Charlene Y., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – Nov / Dec 2012. **Domestic Relations.**

Cordray, Daniel v. Cordray, Jennifer L., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – July 2012. **Domestic Relations.**

491 North Park Real Estate LLC, et al. vs. Spice Partners LLC et al. Franklin County Court of Common Pleas – Commercial. Testimony – May 2012. **Damages.**

Woodie, C.J. v. Woodie, Deanna L., Court of Common Pleas, Coshocton County, Ohio. Deposition – April 2012. **Domestic Relations.**

Marlite, Inc. v. Alvin Eckenrod, et al., U.S. District Court, Southern District of Florida, Miami Division. Deposition – March 2012. **Economic Damages.**

Tina M. Edwards v. Charles T. Edwards, et al. JAH, Court of Common Pleas, Muskingum County, Ohio. Testimony – February 2012. **Domestic Relations.**

Matthew C. Wilson v. Betsy H. Wilson, Court of Common Pleas, Lawrence County, Ohio. Testimony – August 2011. **Domestic Relations.**

California Fitness I, Inc. v. Lifestyle Family Fitness, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – February 2009. Deposition – December 2007. **Economic Damages.**

Robert L. McGee v. Suzanne M. McGee. Court of Common Pleas, Franklin County, Ohio. Testimony – July 2008. **Domestic Relations.**

Ramakant Mandalaywala, et al. v. Omnitech Electronics, et al. Court of Common Please, Franklin County, Ohio. Deposition – November 2007. **Shareholder Dispute.**

Patrick J. Knott v. Revolution Software, Inc. et. al. Court of Common Pleas, Delaware County, Ohio. Testimony – October 2006. Deposition – June 2005. Testimony cited by Fifth District Court of Appeals – March 2009. **Business Valuation.**

Corbin Street Investments, LLC et. al. v. Popajak Corp. et. al. Court of Common Pleas, Franklin County, Ohio. Deposition and Testimony - September 2006. **Economic Damages.**

James R. Chew v. Shari L. Chew. Court of Common Pleas, Franklin County, Ohio. Testimony – March 2006. Deposition – September 2005. **Domestic Relations.**

Brody v. Columbia Gas of Ohio. Court of Common Pleas, Medina County, Ohio. Deposition – February 2006. **Economic Damages.**

Pharmaceutical Alternatives, Inc. v. Option Care, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – June 2005. **Damages.**

China Garden International, Inc. v. Graceland Shoppers Limited Partnership. Court of Common Pleas, Franklin County, Ohio. Testimony – May 2005. Deposition – April 2005. **Economic Damages.**

Vincent L. Guinn M.D. v. Cardiology, Inc et. al. Ameri- can Arbitration Association, Franklin County, Ohio. Deposition – July 2004. **Shareholder Dispute.**

Shahin Shahinfar et. al. v. Vikas K. Jain et. al. Arbitration: Franklin County, Ohio. Testimony – May 2004. Deposition – April 2004. **Shareholder Dispute.**

Doody v. Doody. Emmet County Circuit Court (Petoskey, Michigan). Testimony – December 2000. **Domestic Relations.**

## EXHIBIT C — SENSITIVITY OF THE INDICATED VALUE

Indicated income value of the 27-unit portfolio at a $295 average daily rate and a 45 percent operating expense ratio, across occupancy and capitalization rate. Figures in dollars. Values above the $11,600,000 sales-comparison aggregate exceed what the Units currently cost assembled at retail.

| Occupancy | Cap 7.5% | Cap 8.0% (selected) | Cap 8.5% |
|---|---|---|---|
| 50% | $10,659,827 | $9,993,588 | $9,405,729 |
| 60% | $12,791,787 | $11,992,300 | $11,286,871 |
| 70% | $14,923,760 | $13,991,025 | $13,168,024 |
| 80% | $17,055,720 | $15,989,738 | $15,049,165 |
| 90% | $19,187,680 | $17,988,450 | $16,930,306 |

Indicated value at 90 percent occupancy and the selected 8.0 percent capitalization rate, across the operating expense ratio.

| Expense ratio | 40% | 45% (applied) | 50% | 55% |
|---|---|---|---|---|
| Indicated value | $19,623,775 | $17,988,450 | $16,353,138 | $14,717,825 |

Market-average scenario: $239 average daily rate, 47 percent occupancy, 45 percent expenses — gross revenue $1,107,012; net operating income $608,857; income indication at 8.0 percent, $7,610,709. At the instructed $295 daily rate and the selected 8.0 percent capitalization rate, the income indication crosses the $11,600,000 sales-comparison aggregate at approximately 58 percent occupancy.

## EXHIBIT D — AVERAGE DAILY RATE SUPPORT SCHEDULE

Published nightly-rate evidence for Cape Crossing Resort & Marina and the Merritt Island short-term-rental market, supporting the $295 instructed average daily rate. Figures as captured from the live pages on August 25, 2026 (market datasets as of their stated dates); the page captures themselves accompany this report as a separate source-captures binder.

| Source | Published figure | Note |
|---|---|---|
| FloridaRentals.com listing #24064 — "Dolphins Vacation Rentals – 3bdr townhouse," a Cape Crossing townhome | $295 average per night | An actual subject-type unit at the resort — 3BR, sleeps 8 — currently marketed at precisely the rate applied in this report. |
| Tripadvisor — Cape Crossing Resort & Marina hotel listing | $163 – $362 average nightly range (standard room) | 4-star class; 70 rooms. The subject 3BR / sleeps-8 units price in the upper portion of the band. |
| Kayak — Cape Crossing rate aggregation | June $186 (cheapest month) to February $351 (most expensive); day-of-week averages $208 (Monday) to $447 (Tuesday); trailing two-week averages $301 weeknight / $254 weekend | An annual average must blend these seasons. |
| Cape Crossing direct-booking site (capecrossing.com) | Rates by date via booking engine | 3BR townhome, sleeps 8, garage and patio; 3BR condominiums at the marina. The Debtor's own channel. |
| AirROI — Merritt Island market, TTM July 2026 | $263 all-listing average ADR; $280 peak-season; $300 March; top decile $392+. The "Cape Crossing" manager itself is shown with 8 Airbnb listings at a $239 ADR and 27.2% Airbnb-channel occupancy | 3-bedroom is the modal product (44.1% of listings). The Cape Crossing operator line reflects the third-party Airbnb channel only; direct bookings through the resort's own site do not appear in Airbnb-channel data. |
| Rabbu — Merritt Island market, April 2026 | $239 all-listing average ADR | 157 active listings. |

Reconciliation: the instructed $295 matches the average at which an actual Cape Crossing three-bedroom townhome is currently marketed; sits within the resort's published standard-room band ($163–$362); is 12 to 23 percent above the all-listing market averages ($239–$263) — consistent with a three-bedroom, sleeps-eight waterfront resort product against a mixed-size listing pool — and is below the February seasonal average ($351), the peak day-of-week average ($447), and the top-decile market rate ($392+). As an annual average for the subject unit type sold through the resort's own channel, $295 is a mid-band figure, not a peak figure.

**Homemakers Real Estate, LLC — Projection Assumptions (Exhibit B)**

Blue = input; black = formula; yellow = key lever. Month 1 = January 2027. Amortization of Allowed Claims begins February 1, 2027 (Plan §§ 4.1(b), 4.5), so the first installments fall in Month 2. Revised November 16, 2026 for the Global Settlement Agreement (Doc. 459), the withdrawal of Claim 69 (Doc. 457), and the February 1, 2027 start.

| | | |
|---|---|---|
| **Operations** | | |
| Units — condominiums | 18 | Doc. 395 at 11; Claims 8–62 (18 units at 202 Ivory Coral Ln). |
| Units — townhomes | 8 | Same (buildings 2, 5, 7, 8). |
| Total units | 26.00 | Unit 403 excluded: it is a Recovery Trust Claim. |
| Average daily rate | 295 | Moll valuation (Ex. A) ¶¶ 27–28 & Ex. D. |
| Occupancy (annual average) | 80.0% | Crossroads reservation system after the Effective Date. See Sensitivity for 60–85%. |
| Management fee (% of gross rent) | 20.0% | Covers reservations, housekeeping labor, guest services, marketing, card fees. |
| **Owner costs (monthly unless noted)** | | |
| HOA dues — condo, per unit | 1,170 | Homemakers proforma rebased 042027-062028.xlsx, row 50. |
| HOA dues — townhome, per unit | 767.12 | Same, row 49. |
| Property taxes — per unit (annual bill ÷ 12) | 471 | Same, row 51. Paid in November. |
| Property insurance — total | 718 | Same, row 52. |
| General liability insurance — per year | 2,615 | Same, note row 98. Paid in September. |
| Utilities — condo, per unit | 200 | Same, row 54. |
| Utilities — townhome, per unit | 350 | Same, row 53. |
| Maintenance — per unit | 100 | Same, row 55. |
| Legal, administration, bank fees — total | 3,100 | Same, rows 76, 77, 79. |
| U.S. Trustee quarterly fee (estimate) | 4,000 | 28 U.S.C. § 1930(a)(6), until the case is closed. Estimate; confirm against the current fee schedule. |
| **Plan payments** | | |
| Classes 2–5 and 7 — monthly installment | 49,191.53 | Plan § 4.1 schedule (360 months at 6%). Class 1 holds no Claim; its $9,800.25 installment is removed (Doc. 457). |
| Class 6 — amount asserted | 478,289.67 | Claims 8–62 (Exhibit E). |
| Class 6 — annual rate | 18.0% | 18% applied to all Class 6 claims (conservative; ATCF II asserts 7.5%). |
| Class 6 — number of monthly payments | 48 | February 2027 – January 2031; must finish by May 21, 2031. |
| Class 6 — monthly payment | 14,049.76 | |
| Class 9 — amount paid from operations | – | Allowed Class 9 Claims ($350,396.00) are paid in cash from the Settlement Payment (Plan §§ 4.7, 6.4). |
| Class 9 — interest rate | 4.0% | Applies only to a disputed Class 9 Claim paid from the reserve, or to any shortfall paid from operations (Plan § 4.7). |
| Class 9 — number of monthly payments | 60 | Applies only if the Settlement Payment does not cover Class 9 (Plan § 4.7). |
| Class 9 — monthly payment | – | |
| **Cash** | | |
| Opening cash, Effective Date | 0 | Allowed administrative claims and Class 9 are paid from the Settlement Payment; on the fee applications now on file, no working capital remains (Sources & Uses). |

**Monthly revenue pattern — Canaveral Crossing Resorts, 2019 (management-prepared, unaudited)**

Source: CCRI - Historical Pro Formas (2019 12.24.2020) - Revised 1.11.21.pdf.

| Month | 2019 gross rental income | Share of year |
|---|---|---|
| Jan | 128,572 | 4.31% |
| Feb | 274,841 | 9.21% |
| Mar | 401,007 | 13.43% |
| Apr | 294,835 | 9.88% |
| May | 157,930 | 5.29% |
| Jun | 270,141 | 9.05% |
| Jul | 476,883 | 15.98% |
| Aug | 228,278 | 7.65% |
| Sep | 186,000 | 6.23% |
| Oct | 139,690 | 4.68% |
| Nov | 174,344 | 5.84% |
| Dec | 252,307 | 8.45% |
| **Total** | **2,984,828** | **100.00%** |

**Exhibit B — Monthly Cash Flow, January 2027 – December 2031 (cash basis)**

Base case: inputs on the Assumptions tab. Amortization of Allowed Claims begins February 1, 2027, so January 2027 carries no installment. Avoidance cases and the Class 7 payoff are paid from Recovery Trust proceeds (Plan § 6.6) and are not shown. Class 9 is paid from the Settlement Payment and is not shown. The Plan's balloon falls due February 1, 2029; later months carry the same installment as the debt service on the refinanced balance.

| Plan Year 1 — 2027 | Jan 2027 | Feb 2027 | Mar 2027 | Apr 2027 | May 2027 | Jun 2027 | Jul 2027 | Aug 2027 | Sep 2027 | Oct 2027 | Nov 2027 | Dec 2027 | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | – | 37,163 | 98,887 | 232,344 | 306,070 | 297,614 | 352,517 | 535,520 | 569,293 | 571,073 | 551,669 | 406,114 | – |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,920) |
| Net rental remittances | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| Net operating income | 37,163 | 124,965 | 200,699 | 136,967 | 54,786 | 122,143 | 246,245 | 97,014 | 69,021 | 43,837 | (82,313) | 111,438 | 1,161,965 |
| Plan — Classes 2–5 and 7 | – | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (541,107) |
| Plan — Class 6 | – | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (154,547) |
| Plan — Class 9 (paid from the Settlement Payment) | – | – | – | – | – | – | – | – | – | – | – | – | – |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| Total Plan and statutory payments | – | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (711,654) |
| Net cash flow | 37,163 | 61,723 | 133,457 | 73,725 | (8,455) | 54,902 | 183,004 | 33,773 | 1,780 | (19,404) | (145,554) | 44,197 | 450,311 |
| **Closing cash** | **37,163** | **98,887** | **232,344** | **306,070** | **297,614** | **352,517** | **535,520** | **569,293** | **571,073** | **551,669** | **406,114** | **450,311** | **450,311** |

| Plan Year 2 — 2028 | Jan 2028 | Feb 2028 | Mar 2028 | Apr 2028 | May 2028 | Jun 2028 | Jul 2028 | Aug 2028 | Sep 2028 | Oct 2028 | Nov 2028 | Dec 2028 | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 450,311 | 424,233 | 485,957 | 619,414 | 693,140 | 684,684 | 739,587 | 922,590 | 956,363 | 958,143 | 938,739 | 793,184 | 450,311 |
| Gross rental revenue | 90,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,303 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (13,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| Net rental remittances | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| Net operating income | 37,163 | 124,965 | 200,699 | 136,967 | 54,786 | 122,143 | 246,245 | 97,014 | 69,021 | 43,837 | (82,113) | 111,438 | 1,161,965 |
| Plan — Classes 2–5 and 7 | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (590,298) |
| Plan — Class 6 | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (168,597) |
| Plan — Class 9 (paid from the Settlement Payment) | – | – | – | – | – | – | – | – | – | – | – | – | – |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| Total Plan and statutory payments | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (774,895) |
| Net cash flow | (26,078) | 61,723 | 133,457 | 73,725 | (8,457) | 54,902 | 183,004 | 33,773 | 1,780 | (19,404) | (145,554) | 44,197 | 387,070 |
| Closing cash | 424,233 | 485,957 | 619,414 | 693,140 | 684,684 | 739,587 | 922,590 | 956,363 | 958,143 | 938,739 | 793,184 | 837,381 | 837,381 |

| Plan Year 3 — 2029 | Jan 2029 | Feb 2029 | Mar 2029 | Apr 2029 | May 2029 | Jun 2029 | Jul 2029 | Aug 2029 | Sep 2029 | Oct 2029 | Nov 2029 | Dec 2029 | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 877,381 | 811,303 | 873,027 | 1,006,484 | 1,080,210 | 1,071,754 | 1,126,657 | 1,309,660 | 1,343,433 | 1,345,213 | 1,325,809 | 1,180,254 | 877,381 |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| Net rental remittances | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | — | — | — | — | — | — | — | — | — | — | (146,952) | — | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| Net operating income | 37,163 | 124,965 | 200,699 | 136,967 | 54,786 | 122,143 | 246,245 | 97,014 | 69,021 | 43,837 | (82,313) | 111,438 | 1,161,965 |
| Plan — Classes 2-5 and 7 | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (590,298) |
| Plan — Class 6 | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (168,597) |
| Plan — Class 9 (paid from the Settlement Payment) | — | — | — | — | — | — | — | — | — | — | — | — | — |
| U.S. Trustee fees | — | — | (4,000) | — | — | (4,000) | — | — | (4,000) | — | — | (4,000) | (16,000) |
| Total Plan and statutory payments | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (774,895) |
| Net cash flow | (26,078) | 61,723 | 133,457 | 73,725 | (8,455) | 54,902 | 183,004 | 33,773 | 1,780 | (19,404) | (145,554) | 44,197 | 347,070 |
| Closing cash | 811,303 | 873,027 | 1,006,484 | 1,080,210 | 1,071,754 | 1,126,657 | 1,309,660 | 1,343,433 | 1,345,213 | 1,325,809 | 1,180,254 | 1,224,451 | 1,224,451 |

| Plan Year 4 — 2030 | Jan 2030 | Feb 2030 | Mar 2030 | Apr 2030 | May 2030 | Jun 2030 | Jul 2030 | Aug 2030 | Sep 2030 | Oct 2030 | Nov 2030 | Dec 2030 | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 1,224,451 | 1,190,373 | 1,260,097 | 1,393,554 | 1,467,280 | 1,458,824 | 1,513,727 | 1,696,730 | 1,730,503 | 1,732,283 | 1,712,879 | 1,567,324 | 1,224,451 |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,690 | 357,825 | 171,286 | 139,563 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| Net rental remittances | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,150 | 286,260 | 137,029 | 111,651 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,552) | – | (146,552) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,567) | (40,015) | (629,747) |
| Net operating income | 37,163 | 124,965 | 200,699 | 136,967 | 54,786 | 122,143 | 246,245 | 97,014 | 69,021 | 43,837 | (82,313) | 111,438 | 1,161,965 |
| Plan — Classes 2–5 and 7 | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (590,298) |
| Plan — Class 8 | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (14,050) | (168,507) |
| Plan — Class 9 (paid from the Settlement Payment) | – | – | – | – | – | – | – | – | – | – | – | – | – |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| Total Plan and statutory payments | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (63,241) | (63,241) | (67,241) | (774,892) |
| Net cash flow | (26,078) | 61,723 | 133,457 | 73,725 | (8,455) | 54,902 | 183,004 | 33,773 | 1,780 | (19,404) | (145,554) | 44,197 | 387,070 |
| Closing cash | 1,198,373 | 1,260,097 | 1,393,554 | 1,467,280 | 1,458,824 | 1,513,727 | 1,696,730 | 1,730,503 | 1,732,283 | 1,712,879 | 1,567,324 | 1,611,521 | 1,611,521 |

| Plan Year 5 — 2031 | Jan 2031 | Feb 2031 | Mar 2031 | Apr 2031 | May 2031 | Jun 2031 | Jul 2031 | Aug 2031 | Sep 2031 | Oct 2031 | Nov 2031 | Dec 2031 | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 1,611,521 | 1,585,443 | 1,661,217 | 1,808,724 | 1,896,499 | 1,902,093 | 1,971,045 | 2,168,099 | 2,215,922 | 2,231,751 | 2,226,397 | 2,094,892 | 1,611,521 |
| Gross rental revenue | 96,473 | 206,225 | 300,892 | 221,227 | 118,501 | 202,698 | 357,825 | 171,286 | 139,363 | 104,815 | 130,818 | 189,316 | 2,239,640 |
| Less: management fee | (19,295) | (41,245) | (60,178) | (44,245) | (23,700) | (40,540) | (71,565) | (34,257) | (27,913) | (20,963) | (26,164) | (37,863) | (447,928) |
| Net rental remittances | 77,178 | 164,980 | 240,714 | 176,982 | 94,801 | 162,158 | 286,260 | 137,029 | 111,451 | 83,852 | 104,654 | 151,453 | 1,791,712 |
| HOA dues | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (27,197) | (326,364) |
| Property taxes (November) | – | – | – | – | – | – | – | – | – | – | (146,952) | – | (146,952) |
| Insurance | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (718) | (3,333) | (718) | (718) | (718) | (11,231) |
| Utilities | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (6,400) | (76,800) |
| Maintenance | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (2,600) | (31,200) |
| Legal, administration, bank fees | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (3,100) | (37,200) |
| Owner operating costs | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (40,015) | (42,630) | (40,015) | (186,967) | (40,015) | (629,747) |
| Net operating income | 37,163 | 124,965 | 200,699 | 136,967 | 54,786 | 122,143 | 246,245 | 97,014 | 68,821 | 43,837 | (82,313) | 111,438 | 1,161,965 |
| Plan — Classes 2–5 and 7 | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (49,192) | (590,298) |
| Plan — Class 6 | (14,050) | – | – | – | – | – | – | – | – | – | – | – | (14,050) |
| Plan — Class 9 (paid from the Settlement Payment) | – | – | – | – | – | – | – | – | – | – | – | – | – |
| U.S. Trustee fees | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | – | – | (4,000) | (16,000) |
| Total Plan and statutory payments | (63,241) | (49,192) | (53,192) | (49,192) | (49,192) | (53,192) | (49,192) | (49,192) | (53,192) | (49,192) | (49,192) | (53,192) | (620,348) |
| Net cash flow | (26,078) | 75,773 | 147,507 | 87,775 | 5,595 | 68,952 | 197,054 | 47,823 | 15,629 | (5,354) | (131,504) | 58,247 | 541,617 |
| Closing cash | 1,585,443 | 1,661,217 | 1,808,724 | 1,896,499 | 1,902,093 | 1,971,045 | 2,168,099 | 2,215,922 | 2,231,751 | 2,226,397 | 2,094,892 | 2,153,139 | 2,153,139 |

## Exhibit B — Annual Summary, Plan Years 1–5

| | 2027 | 2028 | 2029 | 2030 | 2031 | Total |
|---|---|---|---|---|---|---|
| Gross rental revenue | 2,239,640 | 2,239,640 | 2,239,640 | 2,239,640 | 2,239,640 | **11,198,200** |
| Net rental remittances | 1,791,712 | 1,791,712 | 1,791,712 | 1,791,712 | 1,791,712 | **8,958,560** |
| Owner operating costs | (629,747) | (629,747) | (629,747) | (629,747) | (629,747) | **(3,148,733)** |
| **Net operating income** | 1,161,965 | 1,161,965 | 1,161,965 | 1,161,965 | 1,161,965 | **5,809,827** |
| Plan — Classes 2–5 and 7 | (541,107) | (590,298) | (590,298) | (590,298) | (590,298) | **(2,902,300)** |
| Plan — Class 6 | (154,547) | (168,597) | (168,597) | (168,597) | (14,050) | **(674,388)** |
| Plan — Class 9 (paid from the Settlement Payment) | – | – | – | – | – | **–** |
| U.S. Trustee fees | (16,000) | (16,000) | (16,000) | (16,000) | (16,000) | **(80,000)** |
| Total Plan and statutory payments | (711,654) | (774,895) | (774,895) | (774,895) | (620,348) | **(3,656,689)** |
| **Net cash flow** | 450,311 | 387,070 | 387,070 | 387,070 | 541,617 | **2,153,139** |
| **Closing cash** | 450,311 | 837,381 | 1,224,451 | 1,611,521 | 2,153,139 | |
| **Coverage (NOI ÷ Plan and statutory payments)** | 1.63x | 1.50x | 1.50x | 1.50x | 1.87x | |
| **Lowest month-end cash in the year** | 37,163 | 424,233 | 811,303 | 1,198,373 | 1,585,443 | |

A negative low-cash figure is the seasonal working capital the Reorganized Debtor bridges under Plan § 6.4 (any working capital from the Settlement Payment, then the first net Recovery Trust proceeds). After the February 1, 2029 balloon, the projection carries the same installment as the debt service on the refinanced balance.

## Exhibit B — Occupancy Sensitivity (five-year totals; all other inputs at base)

| Case | Average daily rate | Occupancy | Year 1 net cash flow | Lowest month-end cash, Years 1–5 | Cash at month 60 |
|---|---|---|---|---|---|
| Base | 295 | 80.0% | 450,311 | 37,163 | 2,153,139 |
| 75% occupancy | 295 | 75.0% | 338,329 | 32,340 | 1,593,229 |
| 70% occupancy | 295 | 70.0% | 226,347 | 27,516 | 1,033,319 |
| 65% occupancy | 295 | 65.0% | 114,365 | 22,692 | 473,409 |
| 60% occupancy | 295 | 60.0% | 2,383 | (225,563) | (86,501) |
| Resort 2019 actual | 190 | 59.6% | (481,683) | (2,506,831) | (2,506,831) |

Break-even occupancy at $295 over the five-year projection, with Class 9 paid from the Settlement Payment and no Class 1 installment: about 61%. Merritt Island market average 40–47%; top decile 78% and higher (Ex. A ¶¶ 24–25). Resort 2019 actual: 59.6% at about $190.

## Exhibit B — Effective Date Sources and Uses; Month-60 Balloon Test

**Sources — the Settlement Payment**

| | | |
|---|---|---|
| Settlement Payment to the Chapter 11 Trustee for the Estate (Global Settlement Agreement § 5.1(a)(i)), due within 14 days after the approval orders in all four cases are final | 850,000.00 | Doc. 459, Ex. A. Not rents; not the proceeds of any creditor's collateral (§ 5.1(c)). |
| **Total sources** | **850,000.00** | |

**Uses — in the order of Plan § 6.4**

| | | |
|---|---|---|
| (1) Administrative Claim allowed — Brennan Manna Diamond, P.L. | 30,000.00 | Doc. 455. |
| (1) Chapter 11 Trustee — application, June 11 – October 31, 2026 | 129,657.00 | Doc. 464. Not yet allowed. |
| (1) Trustee's counsel (Trenam) — application, June 11 – October 31, 2026 | 249,397.13 | Doc. 463. Not yet allowed. |
| (1) Trustee's accountant (Hyman) — application, August 20 – November 20, 2026 | 3,480.00 | Doc. 462. Not yet allowed. |
| (2) Class 9 — Allowed Claims (IMQA $350,000.00; Amodeo $396.00) | 350,396.00 | Plan § 4.7; Global Settlement Agreement Ex. A. |
| (3) Recovery Trust — the balance, up to $100,000 | 87,069.87 | Plan § 6.3. Falls dollar for dollar with any later administrative fees. |
| (4) Working capital to the Reorganized Debtor — any balance above $100,000 | – | None on the applications now on file. |
| **Total uses** | **850,000.00** | |

Claim 70-1 (IPFS) was paid in full by the Chapter 11 Trustee in the ordinary course (Doc. 392 ¶ 13) and takes nothing from these funds.

**Month-24 balloon test**

| | |
|---|---|
| Balloon balance, Classes 2–5 and 7 (Plan § 4.1 schedule; Class 1 removed); due February 1, 2029 | 7,997,011 |
| Refinancing loan-to-value assumed | 65.0% |
| **Value needed to refinance the balloon** | **12,303,093** |
| Moll portfolio value, 26 Units — low (Ex. A ¶ 9, 27 Units scaled by 2025 just value) | 11,138,010 |
| Moll portfolio value, 26 Units — high | 17,283,120 |
| Refinancing debt service at 6%, 30 years (annual) | 575,353 |
| Stabilized net operating income (Annual Summary, 2028) | 1,161,965 |
| **Debt-service coverage on refinancing** | **2.02x** |

## Exhibit C — Chapter 7 Liquidation Analysis by Collateral Pool

Collateral pools from Doc. 395 at 11 (Units securing each loan). Values: Moll valuation (Ex. A) for 27 Units, scaled to the 26 Units the Debtor holds and allocated to each Unit by its 2025 just value (Claims 10–62). Liens use the amounts asserted in the proofs of claim. Claim 69 (Jetton / Rene) was withdrawn with prejudice (Doc. 457) and is not charged to any pool. Townhome HOA (Claim 6-1) is allocated to the eight townhomes. Costs of sale: 8%.

**Auction (Moll ¶ 14, high end)**

| Collateral pool | Units | 2025 just value | Gross value | Costs of sale | Ad valorem taxes | Pool mortgage (asserted) | Townhome HOA | Net to estate |
|---|---|---|---|---|---|---|---|---|
| Mainstreet Loan One (Class 2) | 15 | 6,511,130 | 5,337,288 | (426,983) | (210,196) | (4,793,063) | (74,207) | **(167,162)** |
| Mainstreet Loan Two (Class 3) | 2 | 795,720 | 652,266 | (52,181) | (26,466) | (920,509) | (29,683) | **(376,573)** |
| Tamamoi (Class 4) | 8 | 3,891,230 | 3,189,710 | (255,177) | (228,383) | (3,378,798) | – | **(672,648)** |
| Carton (Class 5) | 1 | 398,250 | 326,453 | (26,116) | (13,244) | (383,505) | (14,841) | **(111,255)** |
| **Total; equity available to the estate (positive pools only)** | | **11,596,330** | **9,505,716** | **(760,457)** | **(478,290)** | **(9,475,875)** | **(118,732)** | **–** |

**Portfolio, low (Moll ¶ 9)**

| Collateral pool | Units | 2025 just value | Gross value | Costs of sale | Ad valorem taxes | Pool mortgage (asserted) | Townhome HOA | Net to estate |
|---|---|---|---|---|---|---|---|---|
| Mainstreet Loan One (Class 2) | 15 | 6,511,130 | 6,253,792 | (500,303) | (210,196) | (4,793,063) | (74,207) | **676,022** |
| Mainstreet Loan Two (Class 3) | 2 | 795,720 | 764,271 | (61,142) | (26,466) | (920,509) | (29,683) | **(273,528)** |
| Tamamoi (Class 4) | 8 | 3,891,230 | 3,737,438 | (298,995) | (228,383) | (3,378,798) | – | **(168,738)** |
| Carton (Class 5) | 1 | 398,250 | 382,510 | (30,601) | (13,244) | (383,505) | (14,841) | **(59,682)** |
| **Total; equity available to the estate (positive pools only)** | | **11,596,330** | **11,138,010** | **(891,041)** | **(478,290)** | **(9,475,875)** | **(118,732)** | **676,022** |

**Portfolio, high (Moll ¶ 9)**

| Collateral pool | Units | 2025 just value | Gross value | Costs of sale | Ad valorem taxes | Pool mortgage (asserted) | Townhome HOA | Net to estate |
|---|---|---|---|---|---|---|---|---|
| Mainstreet Loan One (Class 2) | 15 | 6,511,130 | 9,704,160 | (776,333) | (210,196) | (4,793,063) | (74,207) | **3,850,360** |
| Mainstreet Loan Two (Class 3) | 2 | 795,720 | 1,185,938 | (94,875) | (26,466) | (920,509) | (29,683) | **114,405** |
| Tamamoi (Class 4) | 8 | 3,891,230 | 5,799,472 | (463,958) | (228,383) | (3,378,798) | – | **1,728,333** |
| Carton (Class 5) | 1 | 398,250 | 593,550 | (47,484) | (13,244) | (383,505) | (14,841) | **134,475** |
| **Total; equity available to the estate (positive pools only)** | | **11,596,330** | **17,283,120** | **(1,382,650)** | **(478,290)** | **(9,475,875)** | **(118,732)** | **5,827,573** |

1. In a Chapter 7 case the secured creditors already hold stay relief and would complete their foreclosures; the Trustee states that no Unit sale proceeds would reach a Chapter 7 estate (Doc. 395 at 16). Foreclosure and auction values therefore govern; the auction case shows nothing for unsecured creditors.

2. Moll's high end rests on rental assumptions supplied to him, which he identifies as above the market average (Ex. A ¶¶ 3, 12, 43). It describes a going concern booked through the Crossroads system — the enterprise the Plan creates, not one a Chapter 7 trustee could sell.

3. Whatever the value, the Plan pays Allowed Class 9 Claims in full, in cash, from the Settlement Payment (Plan § 4.7). No Chapter 7 distribution can exceed full payment with interest at the legal rate (11 U.S.C. § 726(a)(5)), so Class 9 receives at least its Chapter 7 share under every valuation.

4. Excludes the Estate's Causes of Action, which a Chapter 7 trustee would also hold, net of Chapter 7 administrative costs and commissions (11 U.S.C. § 326(a)).

**Exhibit D — Claims Register and Plan Classification (claims filed through Claim 71-1; status as of November 13, 2026)**

| Claim | Claimant | Filed | Amount asserted | Asserted status | Plan Class | Objection / status |
|---|---|---|---|---|---|---|
| 1-1 | Frank L. Amodeo | 10/31/25 | 396.00 | Unsecured | 9 | None. Restitution lien noticed (Doc. 387). |
| 2-1 | WM Holdings Group, LLC | 01/16/26 | 19,635.25 | Unsecured | 9 | Disallowed with prejudice under the Global Settlement Agreement (Doc. 459; approval pending). Trustee objection (Doc. 409). |
| 3-2 | CTO Holdings, Inc. | 02/03/26 | 303,853.79 | Unsecured | 9 | Withdrawn with prejudice and disallowed under the Global Settlement Agreement (Doc. 459; approval pending). Trustee objection (Doc. 410). |
| 4-3 | IMQA Investments Incorporated | 09/28/26 | 360,459.40 | Unsecured | 9 | Allowed as a general unsecured claim of $350,000.00 under the Global Settlement Agreement (Doc. 459; approval pending). Trustee objection (Doc. 411). |
| 5-2 | Horton S. Johnson | — | 2,594,987.93 | Unsecured (insider) | 10 | Allowed as a general unsecured claim of $1,297,493.97 under the Global Settlement Agreement (Doc. 459; approval pending). Trustee objection (Doc. 412). |
| 6-1 | Cape Crossing Townhomes HOA, Inc. | 06/16/26 | 118,731.84 | Secured | 7 | None. |
| 7-1 | Cape Crossing Condominium Ass'n | 06/16/26 | 445,810.10 | Secured | 8 | Withdrawn Sept. 18, 2026 (Doc. 393). |
| 8-1 – 62-1 | Brevard County Tax Collector (47) and tax-certificate holders (8) | 07/09/26 – 07/24/26 | 478,289.67 | Secured (ad valorem) | 6 | None. Itemized in Exhibit E. |
| 63-1 | Mainstreet Community Bank (Loan Two) | 07/30/26 | 920,508.84 | Secured | 3 | Stay relief (Doc. 183). My motion for leave to object (Doc. 448). |
| 64-1 | Mainstreet Community Bank (Loan One) | 07/30/26 | 4,793,063.37 | Secured | 2 | Stay relief (Doc. 183). My motion for leave to object (Doc. 448). |
| 65-1 | Tamamoi, LLC | 07/30/26 | 3,378,797.64 | Secured | 4 | Trustee objection to any deficiency (Doc. 424); my § 502(d) motion (Doc. 444) and motion for leave to object (Doc. 449). |
| 66-1 | Carton Family Trust of 1992 | 07/30/26 | 383,505.45 | Secured | 5 | Trustee objection to any deficiency (Doc. 425); my § 502(d) motion (Doc. 444) and motion for leave to object (Doc. 449). |
| 67-1 | PEDixon, LLC | 07/30/26 | 4,779,864.58 | Secured (asserted) | — | Withdrawn with prejudice under the Global Settlement Agreement (Doc. 459; approval pending). Trustee objection (Doc. 419). |
| 68-1 | ZPD, LLC | 07/30/26 | 1,380,166.67 | Asserted | — | Withdrawn with prejudice under the Global Settlement Agreement (Doc. 459; approval pending). Trustee objection (Doc. 420). |
| 69-1 | Paul Rene, Jr. (assignee of Jetton Investments, Inc.) | 07/31/26 | 1,634,600.00 | $1,468,484.37 secured; $166,115.63 unsecured | 1 (no Claim) | Withdrawn with prejudice November 10, 2026 (Doc. 457). |
| 70-1 | IPFS Corporation | 08/17/26 | 1,231.54 | $1,118.79 secured; $112.75 unsecured | — | Paid in full by the Chapter 11 Trustee in the ordinary course; she asks that the claim be deemed satisfied (Doc. 392 ¶¶ 13–14). |
| 71-1 | Tiered Capital, Inc. | 08/19/26 | 125,000.00 | Unsecured | 9 | Disallowed with prejudice under the Global Settlement Agreement (Doc. 459; approval pending). Trustee objection (Doc. 421). |

**Totals after the Global Settlement Agreement and the withdrawal of Claim 69**

| | |
|---|---|
| Secured, Classes 2–7 (as asserted) | **10,072,896.81** |
| Class 9 after the settlement | **350,396.00** |
| Class 10 after the settlement | **1,297,493.97** |

Amounts are as asserted and are not admissions. The treatment under the Global Settlement Agreement takes effect as that agreement provides, after the Bankruptcy Court approves it. Claim 69-1 stated $1,468,484.37 secured and $166,115.63 unsecured before its withdrawal.

**Exhibit E — Class 6 Ad Valorem Tax Claims (Claims 8–62)**

| Claim | Holder | Unit / parcel | Tax year | Amount | Rate | Tax-deed application |
|---|---|---|---|---|---|---|
| 8-1 | Keys Funding LLC | Parcel 24-36-11-00-506.31 (cert. 2024-11162) | 2024 | 7,732.92 | | |
| 9-1 | Keys Funding LLC | Parcel 24-36-11-00-506.33 (cert. 2024-11164) | 2024 | 7,732.92 | | |
| 10-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 101 (Bldg. 8) | 2024 | 6,671.57 | 18.0% | |
| 11-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 101 (Bldg. 8) | 2025 | 5,807.27 | 18.0% | |
| 12-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 104 (Bldg. 8) | 2024 | 6,671.57 | 18.0% | |
| 13-1 | Brevard County Tax Collector | 2709 Cutlass Point Ln, Unit 104 (Bldg. 8) | 2025 | 5,807.27 | 18.0% | |
| 14-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 103 | 2024 | 7,467.62 | 18.0% | |
| 15-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 103 | 2025 | 6,499.71 | 18.0% | |
| 16-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 104 | 2024 | 7,467.62 | 18.0% | |
| 17-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 104 | 2025 | 6,499.71 | 18.0% | |
| 18-1 | ATCF II Florida-A LLC | Not stated on claim | — | 6,824.65 | 7.5% | |
| 19-1 | FIG 20, LLC FBO SEC PTY | 202 Ivory Coral Ln, Unit 504 | — | 34,278.69 | 18.0% | |
| 20-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 107 | 2024 | 7,174.54 | 18.0% | |
| 21-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 107 | 2025 | 6,246.87 | 18.0% | |
| 22-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 202 | 2024 | 7,614.80 | 18.0% | |
| 23-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 202 | 2025 | 6,626.65 | 18.0% | |
| 24-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 203 | 2025 | 6,626.65 | 18.0% | |
| 25-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 203 | 2024 | 7,614.80 | 18.0% | |
| 26-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 205 | 2025 | 6,626.65 | 18.0% | |
| 27-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 205 | 2024 | 7,614.80 | 18.0% | |
| 28-1 | FIG 20, LLC FBO SEC PTY | 202 Ivory Coral Ln, Unit 206 | — | 38,255.59 | 18.0% | |
| 29-1 | Community Red Co | 202 Ivory Coral Ln, Unit 305 | 2025 | 23,679.57 | 18.0% | Pending (per Doc. 304) |
| 30-1 | Community Red Co | 202 Ivory Coral Ln, Unit 402 | 2025 | 23,666.33 | 18.0% | Pending (per Doc. 304) |
| 31-1 | Community Red Co | 202 Ivory Coral Ln, Unit 404 | 2025 | 23,653.09 | 18.0% | Pending (per Doc. 304) |
| 32-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 206 | 2025 | 7,137.00 | 18.0% | |
| 33-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 207 | 2025 | 6,373.80 | 18.0% | |
| 34-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 207 | 2024 | 7,321.69 | 18.0% | |
| 35-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 303 | 2025 | 6,690.12 | 18.0% | |
| 36-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 303 | 2024 | 7,688.32 | 18.0% | |
| 37-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 305 | 2025 | 6,690.12 | 18.0% | |
| 38-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 307 | 2025 | 6,437.28 | 18.0% | |
| 39-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 307 | 2024 | 6,847.73 | 18.0% | |
| 40-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 402 | 2025 | 6,690.12 | 18.0% | |
| 41-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 404 | 2025 | 6,690.12 | 18.0% | |
| 42-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 103 (Bldg. 5) | 2025 | 5,797.35 | 18.0% | |
| 43-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 103 (Bldg. 5) | 2024 | 6,660.11 | 18.0% | |
| 44-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 101 (Bldg. 7) | 2025 | 5,807.27 | 18.0% | |
| 45-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 101 (Bldg. 7) | 2024 | 6,671.57 | 18.0% | |
| 46-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 103 (Bldg. 7) | 2025 | 5,810.57 | 18.0% | |
| 47-1 | Brevard County Tax Collector | 2719 Cutlass Point Ln, Unit 103 (Bldg. 7) | 2024 | 6,675.55 | 18.0% | |
| 48-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 407 | 2025 | 6,437.28 | 18.0% | |
| 49-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 407 | 2024 | 7,395.26 | 18.0% | |
| 50-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 503 | 2025 | 6,753.59 | 18.0% | |
| 51-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 503 | 2024 | 7,761.94 | 18.0% | |
| 52-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 504 | 2025 | 6,753.59 | 18.0% | |
| 53-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 505 | 2025 | 6,753.59 | 18.0% | |
| 54-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 505 | 2024 | 7,761.94 | 18.0% | |
| 55-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 507 | 2025 | 6,500.74 | 18.0% | |
| 56-1 | Brevard County Tax Collector | 202 Ivory Coral Ln, Unit 507 | 2024 | 7,468.84 | 18.0% | |
| 57-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 101 (Bldg. 2) | 2025 | 4,982.22 | 18.0% | |
| 58-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 101 (Bldg. 2) | 2024 | 5,715.22 | 18.0% | |
| 59-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 102 (Bldg. 2) | 2025 | 4,972.32 | 18.0% | |
| 60-1 | Brevard County Tax Collector | 103 Parrotfish Ln, Unit 102 (Bldg. 2) | 2024 | 5,703.72 | 18.0% | |
| 61-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 101 (Bldg. 5) | 2025 | 5,807.27 | 18.0% | |
| 62-1 | Brevard County Tax Collector | 211 Ivory Coral Ln, Unit 101 (Bldg. 5) | 2024 | 6,671.57 | 18.0% | |
| | | | **Total** | **478,289.67** | | |

Claims 8-1 and 9-1 (Keys Funding LLC) state the same amount, $7,732.92, on different parcels and certificates. The Plan pays each Allowed Class 6 Claim at its statutory rate, in equal monthly installments ending by May 21, 2031 (Plan § 4.5).