UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FILED ORL INTAKE - USBC
16 NOV 2026 PM12:40

| | |
|---|---|
| In re:<br><br>**HOMEMAKERS REAL ESTATE, LLC,**<br><br>Debtor.<br><br>/ | Case No. 6:25-bk-05570-GER<br><br>Chapter 11 |

**THIRD AMENDED PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO,**
**a Creditor and Party in Interest**

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | flahome32801@gmail.com

Dated: November 16, 2026

I propose the following third amended plan of reorganization (the "Plan") for Homemakers Real Estate, LLC (the "Debtor") under Chapter 11 of the Bankruptcy Code. The Plan supersedes the plan I filed on July 13, 2026 (Doc. 303), the amended plan I filed on October 9, 2026 (Doc. 432), and the second amended plan I filed on October 19, 2026 (Doc. 440). The Debtor's exclusive period to file a plan ended when the court appointed a Chapter 11 trustee, and section 1121(c) permits any party in interest — including a creditor — to file a plan. I am a creditor of the Debtor. Since July 13, 2026, the Rule 60 motions and consolidation were denied, the Chapter 11 Trustee compromised the post-petition rent claim, the Condominium Association withdrew its claim, PEDixon, LLC and

ZPD, LLC filed claims, the Brevard County Tax Collector objected to my treatment of its claims, and the Chapter 11 Trustee filed a competing plan and objected to most of the claims in the case. On October 7, 2026, Mainstreet Community Bank, PEDixon, LLC and ZPD, LLC, Tamamoi, LLC, and the Carton Family Trust of 1992 objected to my earlier plan or disclosure statement (Docs. 427–430), as Michael McPhillips had on August 6, 2026 (Doc. 328). The Plan changes with that record and answers those objections. After the October 19, 2026 settlement conference before the Honorable Jason A. Burgess, the Chapter 11 Trustee, PEDixon, LLC, ZPD, LLC, their affiliates, the Pitkanen parties, Mr. Johnson, Tiered Capital, Inc., IMQA Investments Incorporated, CTO Holdings, Inc., WM Holdings Group, LLC, Yaniv Amar, and I entered into the Global Settlement Agreement. That agreement bound each party when that party signed it; for the Estate and the three other debtors, it remains subject to the Bankruptcy Code and to approval in each debtor's case. (Global Settlement Agreement § 14.1). Its payments, releases, and claim treatment take effect only after the Bankruptcy Court approves it in this case and in the three related cases. (Global Settlement Agreement §§ 3.5, 5.1(a), 9.5). It pays the Estate $850,000, withdraws the PEDixon and ZPD claims, and fixes the claims of IMQA, CTO, WM Holdings Group, Tiered Capital, and Mr. Johnson. The Plan implements it and pays the non-Insider unsecured creditors in cash from the Settlement Payment. The

accompanying Third Amended Disclosure Statement discusses the Debtor's history, business, projections, and risk factors, and summarizes the Plan.

**Article 1 — Definitions and Construction**

The following terms have the meanings set forth below. A term used but not defined here carries the meaning the Bankruptcy Code gives it. The rules of construction in section 102 of the Code apply.

**"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Code and entitled to priority under § 507(a)(2), including the actual and necessary costs of preserving the Estate, compensation for professional services allowed under §§ 330(a) or 331, and all fees and charges assessed under Chapter 123 of Title 28.

**"Allowed Claim"** means a Claim as to which a proof of Claim has been timely filed or deemed filed under § 1111(a), and as to which no objection has been interposed within the applicable period, or as to which any objection has been resolved by a Final Order. An Allowed Claim does not include post-petition interest unless the Plan expressly provides it.

**"Avoidance Actions"** means all claims and causes of action arising under §§ 510, 542–545, 547, 548, 549, 550, 551, and 553 of the Code, or under applicable non-bankruptcy law, including the recovery of preferential transfers, fraudulent transfers, post-petition transfers, and unauthorized conveyances described in the

Disclosure Statement, each computed from the Petition Date. Section 502(d) of the Code is a ground of disallowance rather than a cause of action, and Section 7.4 addresses it.

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, 11 U.S.C. § 101, et seq.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

**"Business Day"** means any day other than a Saturday, a Sunday, or a legal holiday as defined in Fed. R. Bankr. P. 9006(a).

**"Causes of Action"** means all claims, rights, and causes of action of the Debtor or the Estate, including the Avoidance Actions and claims for breach of fiduciary duty, conversion, fraud, civil conspiracy, usury, professional malpractice, and the tort and civil RICO claims scheduled by the Debtor, together with all proceeds thereof, but excluding the Released Claims. All Causes of Action transfer to the Recovery Trust as provided in Article 6; a Cause of Action the Recovery Trustee declines reverts to the Reorganized Debtor under Section 6.11.

**"Chapter 11 Trustee" or "Trustee"** means Lara Roeske Fernandez, the duly appointed and acting Chapter 11 trustee of the Debtor, and any successor.

**"Claim"** has the meaning set forth in § 101(5) of the Code.

**"Compromise Order"** means the order entered September 2, 2026 approving the Chapter 11 Trustee's compromise with PEDixon, LLC, ZPD, LLC, and the Cape Crossing Condominium Association. (Doc. 379).

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan under § 1129 of the Code; the "Confirmation Date" is the date of its entry.

**"Declined Claim"** means a Cause of Action or Recovery Trust Claim, or any part of one, that the Recovery Trustee declines or is deemed to decline under Section 6.11.

**"Disclosure Statement"** means the disclosure statement filed in respect of this Plan under § 1125 of the Code, as amended.

**"Disputed Claim"** means a Claim, or any portion of a Claim, that is the subject of a timely objection or motion not yet resolved by a Final Order.

**"Effective Date"** means the first Business Day on which the Confirmation Order is a Final Order and the other conditions in Section 8.1 are satisfied or waived.

**"Estate"** means the estate created under § 541 of the Code on the Petition Date.

**"Final Order"** means an order no longer subject to appeal, certiorari, reargument, or rehearing, and as to which no such proceeding is pending.

**"First Bankruptcy Case"** means the voluntary Chapter 11 case *In re Homemakers Real Estate, LLC,* No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025), filed May 5, 2025 and dismissed June 27, 2025. On July 21, 2026, the court denied

the motions to vacate that dismissal (No. 6:25-bk-02685-GER, Doc. 107), and on August 20, 2026, this Court denied consolidation. (Doc. 345).

**"Global Settlement Agreement"** means the Global Settlement Agreement and Mutual General Release among the Chapter 11 Trustee, on behalf of the Estate; PEDixon LLC, ZPD LLC, Crescent Sound, Ltd., Parke Financial Limited Partnership, and Kenneth G. Dixon (the "Dixon Parties"); Alison Pitkanen, Alison Pitkanen, P.A., and Alison Pitkanen Law Firm LLC (the "Pitkanen Parties"); the Flynn-Johnson Parties it names, including Horton S. Johnson, Tiered Capital, Inc., IMQA Investments Incorporated, and me; and Yaniv Amar, including its exhibits and schedules. Capitalized terms the Plan uses but does not define, such as Settlement Funding Date, Released Related Person, and Excluded Person, carry the meaning that agreement gives them.

**"Global Settlement Approval Order"** means the order of the Bankruptcy Court in this case approving the Global Settlement Agreement under Fed. R. Bankr. P. 9019, or the Confirmation Order to the extent it approves the agreement under Section 6.9(a).

**"Impaired"** means impaired within the meaning of § 1124 of the Code.

**"Insider"** has the meaning set forth in § 101(31) of the Code.

**"Interest"** means an equity or membership interest in the Debtor and any right arising therefrom.

**"Lender"** means PEDixon, LLC and ZPD, LLC.

**"Lien"** has the meaning set forth in § 101(37) of the Code.

**"Petition Date"** means September 2, 2025, the date the involuntary petition commencing this Bankruptcy Case was filed; the order for relief was entered May 21, 2026. Every reach-back and avoidance period under §§ 544, 546, 547, 548, and 549 of the Code runs from the Petition Date.

**"Plan Proponent"** means Frank L. Amodeo, a creditor and party in interest.

**"Priority Tax Claim"** means a Claim of a governmental unit of a kind entitled to priority under § 507(a)(8) of the Code.

**"Recovery Trust"** means the litigation and recovery trust established under Section 6.3 of the Plan on the Effective Date for the benefit of holders of Claims entitled to distribution under the Plan, and administered by the Recovery Trustee.

**"Recovery Trustee"** means Lara Roeske Fernandez, the Chapter 11 Trustee, who will serve as trustee of the Recovery Trust and administer it through its conclusion, and any successor trustee of the Recovery Trust.

**"Recovery Trust Claims"** means all Causes of Action of the Debtor and the Estate other than the Released Claims, including (a) the Avoidance Actions against any person other than a Released Party — among them the claims for preferential transfers under § 547, fraudulent transfers under §§ 544 and 548, and post-petition transfers under § 549; (b) the Causes of Action against Mainstreet Community

Bank of Florida arising from the February 17, 2022 refinancing and from its handling of its assignment of rents, described in Section 4.3; (c), separately, the Causes of Action against Tamamoi, LLC, the Carton Family Trust of 1992, FDRE, Inc., and their affiliates, including the recovery under *Fla. Stat. § 687.04* of twice the usurious interest the Debtor paid and, in the alternative, the avoidance and recovery of the Debtor's payments on those loans as Section 4.4 describes; and (d) the claim and right to recover Unit 403 from the IAM Irrevocable Trust, to which it was transferred from the Debtor in March 2024, and from any subsequent transferee that is not a Released Party, under *Fla. Stat. ch. 726* and §§ 544(b), 548, and 550 of the Code, together in each case with all proceeds thereof, all of which transfer to the Recovery Trust, subject to reversion under Section 6.11.

**"Released Claims"** means every claim, cause of action, defense, setoff, lien, and right that the Debtor, the Estate, or the Chapter 11 Trustee releases under Sections 7 and 9 of the Global Settlement Agreement, including every Cause of Action against a Released Party, effective as that agreement provides.

**"Released Party"** means each Dixon Party, each Pitkanen Party, the Chapter 11 Trustee, and each of their Released Related Persons, to the extent of the releases the Global Settlement Agreement gives each of them. No Excluded Person, and no person that is not a party to the Global Settlement Agreement or a Released Related Person of one — including Mainstreet Community Bank of Florida,

Tamamoi, LLC, the Carton Family Trust of 1992, FDRE, Inc., and the IAM Irrevocable Trust — is a Released Party.

**"Reorganized Debtor"** means Homemakers Real Estate, LLC on and after the Effective Date.

**"Secured Claim"** means a Claim secured by a valid, perfected, and unavoidable Lien on property of the Estate, to the extent of the value of such property under § 506(a).

**"Settlement Payment"** means the $850,000.00 the Dixon Payor Parties pay to the Chapter 11 Trustee for the Estate under Section 5.1(a)(i) of the Global Settlement Agreement.

**"Unsecured Claim"** means a Claim that is not a Secured Claim, Administrative Claim, or Priority Claim.

**Article 2 — Classification of Claims and Interests**

Under § 1123(a)(1) of the Code, Administrative Claims and Priority Tax Claims are not classified; Article 3 treats them. All other Claims against, and Interests in, the Debtor are classified as follows.

| Class | Designation | Status | Voting |
|---|---|---|---|
| 1 | Claim 69 withdrawn (Doc. 457) | No Claim | No vote |
| 2 | Secured Claim of Mainstreet Community Bank (Loan One) | Impaired | Entitled to vote |
| 3 | Secured Claim of Mainstreet Community Bank (Loan Two) | Impaired | Entitled to vote |

| Class | Designation | Status | Voting |
|---|---|---|---|
| 4 | Secured Claim of Tamamoi, LLC | Impaired | Not entitled to vote (§ 502(d)) |
| 5 | Secured Claim of Carton Family Trust of 1992 | Impaired | Not entitled to vote (§ 502(d)) |
| 6 | Secured Claims for ad valorem taxes (Brevard County Tax Collector and tax-certificate holders) | Impaired | Entitled to vote |
| 7 | Secured Claim of Cape Crossing Townhomes Homeowners Association, Inc. | Impaired | Entitled to vote |
| 8 | Cape Crossing Condominium Association — Claim 7 withdrawn (Doc. 393) | No Claim | No vote |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Entitled to vote |
| 10 | Insider Unsecured Claims | Impaired | Entitled to vote |
| 11 | Interests in the Debtor (Horton S. Johnson) | Impaired | Entitled to vote* |

* Horton S. Johnson owns the Debtor and holds the Class 11 Interest; Section 4.9 describes how the Global Settlement Agreement returns the membership units to him. The Class is Impaired and the holder is entitled to vote. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance, particularly § 502(d). Classes 4 and 5 fall within that exception: each holder in them is the transferee of transfers the Estate seeks to avoid, and § 502(d) disallows its Claim until it returns them. On October 21, 2026, I moved to disallow both Claims on that ground. (Doc. 444). Until the Bankruptcy Court rules, those holders vote only if the Bankruptcy Court temporarily allows their Claims. Fed. R. Bankr. P. 3018(a). Classes 1 and 8 hold no Claim and cast no vote. No junior Class receives or retains property on account of its Interest ahead of a senior dissenting

Class except as § 1129(b) permits, and I reserve all rights under § 1129(b). The absolute priority rule does not apply in favor of a Claim disallowed under § 502(d) because its holder has failed to turn over to the Estate what it owes; that holder has no Allowed Claim on which to invoke it.

## Article 3 — Treatment of Unclassified Claims

### 3.1 Administrative Claims.

Except to the extent a holder agrees to different treatment, each holder of an Allowed Administrative Claim will be paid in full, in Cash, on the later of the Effective Date or the date the Claim becomes Allowed, or as soon as practicable thereafter; ordinary-course Administrative Claims will be paid in the ordinary course. Administrative Claims include the allowed fees and expenses of the Chapter 11 Trustee and retained Professionals, subject to Bankruptcy Court approval under §§ 330 and 331.

### 3.2 United States Trustee Fees.

All fees due under 28 U.S.C. § 1930 will be paid in full on or before the Effective Date, and the Reorganized Debtor must continue to pay such fees until the case is closed, converted, or dismissed.

**3.3 Priority Tax Claims.**

Except to the extent a holder agrees to different treatment, each holder of an Allowed Priority Tax Claim will receive regular installment payments in Cash over a period ending not later than May 21, 2031, five years after the order for relief, with interest at the rate applicable nonbankruptcy law fixes, under §§ 511(a) and 1129(a)(9)(C) of the Code. I believe the scheduled priority tax obligations of the Internal Revenue Service and the Florida Department of Revenue are subject to substantial dispute and may be reduced to zero following reconciliation.

**Article 4 — Treatment of Classified Claims and Interests**

Treatment in this Article 4 refers exclusively to the Allowed Amount of each Claim. Notwithstanding Confirmation, I, the Reorganized Debtor, the Chapter 11 Trustee, and the Recovery Trustee each reserve the right to object to any Claim and to prosecute any Cause of Action, including objections seeking reduction, disallowance, equitable subordination, or recharacterization, subject until the Effective Date to the leave requirement of the Case Management Order. (Doc. 359 ¶ 3).

**4.1 Common Treatment of Secured Claims (Classes 1 through 5 and Class 7).**

Each holder of an Allowed Secured Claim in Classes 1 through 5 and Class 7 retains its Lien to the same validity, extent, and priority as existed on the Petition Date, subject to the Estate's rights to challenge the amount, validity, priority, and

enforceability of the Claim and Lien. Although the collateral differs, each Allowed Secured Claim receives parallel treatment, as follows:

(a) Reserved.

**(b) Amortization.** Commencing February 1, 2027, each Allowed Secured Claim will be amortized over three hundred sixty (360) months at a fixed rate of six percent (6.0%) per annum, payable in equal monthly installments on the first day of each month, with a balloon payment of the entire outstanding balance due February 1, 2029. If the Effective Date falls after February 1, 2027, the installments that came due before the Effective Date are paid on the Effective Date.

**(c) Balloon / Exit.** I anticipate that, by February 1, 2029, the resort will be sufficiently seasoned to support a refinancing or going-concern sale satisfying the balloon obligations in full, as described in Article 6.

(d) Cure of Arrearages and Defaults. All arrearages and defaults of the secured creditors, together with the full Allowed Claim of the Cape Crossing Townhomes Homeowners Association, Inc. (Class 7), will be cured and paid from the net proceeds of the Recovery Trust Claims, as and when recovered, in the order Section 6.6 sets forth.

(e) Escrow of Payments on Disputed Secured Claims. Every cure and installment payment the Plan provides on a Secured Claim that is a Disputed

Claim, that a pending Cause of Action challenges, or whose holder is subject to § 502(d) under Section 7.4 — including the Claims in Classes 2, 3, 4, and 5 — is paid when due into a segregated escrow account held by the Recovery Trustee. The deposit is computed on the amount the proof of claim asserts, only to size the escrow; it admits nothing. The Plan otherwise proceeds as if each payment had been made: the holder retains its Lien, an escrowed payment counts as paid for every purpose of the Plan, and the holder may not treat it as a default. The Recovery Trustee disburses nothing from escrow until a Final Order determines whether, and in what amount, the Claim is Allowed. She then pays the holder, from escrow, what the Plan would have paid on the Allowed amount, and the balance of the escrow is distributed under Section 6.6. If the Claim is disallowed, the entire escrow is distributed under Section 6.6.

The following schedule sets forth, for each Class receiving the common secured treatment, the amount its proof of claim asserts, the monthly amortized installment, and the projected balloon balance at month 24:

| **Class / Creditor** | **Claimed Amount** | | **Amortized Installment (mo.)** | **Balloon (mo. 24)** |
|---|---|---|---|---|
| Class 2: Mainstreet Community Bank (Loan One) | $3,611,594.47 | | $21,653.33 | $3,520,157.50 |
| Class 3: Mainstreet Community Bank (Loan Two) | $712,105.80 | | $4,269.43 | $694,077.06 |
| Class 4: Tamamoi, LLC | $3,378,797.64 | | $20,257.60 | $3,293,254.42 |
| Class 5: Carton Family Trust | $383,505.45 | | $2,299.31 | $373,795.97 |

| Class / Creditor | Claimed Amount | | Amortized Installment (mo.) | Balloon (mo. 24) |
|---|---|---|---|---|
| of 1992 | | | | |
| Class 6: Ad valorem taxes (Claims 8–62) | $478,289.67 | | Section 4.5 | Paid by May 21, 2031 |
| Class 7: Cape Crossing Townhomes Homeowners Association, Inc. | $118,731.84 | | $711.86 | $115,725.76 |
| Class 8: Cape Crossing Condominium Association | Withdrawn | | — | — |
| **TOTAL (Classes 2–5 and 7)** | **$8,204,735.20** | | **$49,191.53** | **$7,997,010.71** |

The amortization figures are computed on the amounts the respective creditors assert and are not an admission of the validity or amount of any Claim. As Section 4.4 describes, I contend the Claims of Tamamoi, LLC (Class 4) and the Carton Family Trust of 1992 (Class 5) are subject to forfeiture of all interest under the Florida usury statutes, and that each such Claim will be reduced when a Final Order fixes its Allowed amount. *Fla. Stat. §§ 687.03, 687.04*. Class 6 is not on the schedule; Section 4.5 treats it.

**4.2 Class 1 — Claim 69 (Withdrawn).**

On November 10, 2026, Claim 69 was withdrawn with prejudice. (Doc. 457). Class 1 holds no Claim, receives nothing, and casts no vote. The Plan keeps the number so that every other Class keeps its own.

**4.3 Classes 2 and 3 — Mainstreet Community Bank (Secured).**

Classes 2 and 3 consist of the Claims of Mainstreet Community Bank on its two loan facilities, asserted in Claims 64-1 and 63-1. On February 17, 2022, as a condition of refinancing nineteen Units, Mainstreet dictated the Debtor's arrangement with Canaveral Crossroads and forced the return of the resort's clubhouse, pool, lift station, and open land to Canaveral Crossroads, stripping the Debtor of its first priority on resort reservations and its share of the amenity revenue. (Disclosure Statement § 2.J). In February 2025, after Mr. Johnson and I told Mainstreet to enforce its assignment of rents to stop the payment of the Debtor's rents to PEDixon, Mainstreet instead discussed selling its mortgages to PEDixon at a discount, a transaction that would have harmed the Debtor's other creditors even more. (Id.). That conduct is at issue chiefly in the Canaveral Crossroads case, but it was done in relation to these loans, and the determination there of Mainstreet's lender liability will decide whether its Claims here are nullified or substantially reduced. To the extent Allowed, each Claim receives the common secured treatment of Section 4.1 — six percent, amortized over 360 months — and until that determination the payments are held in escrow under Section 4.1(e). On March 16, 2026, the Bankruptcy Court terminated the automatic stay as to Mainstreet and permitted it to exercise its in rem rights. (Doc. 183 ¶ 2). Any Unit Mainstreet sells at foreclosure before the Effective Date leaves the

Estate, and its sale price reduces Mainstreet's Allowed Claim. On the Effective Date, the injunction of Section 8.4 replaces that relief, and Mainstreet may proceed against its collateral only as Section 6.13 provides. Classes 2 and 3 are Impaired.

**4.4 Classes 4 and 5 — Tamamoi, LLC and Carton Family Trust of 1992 (Secured).**

Class 4 consists of the Claim of Tamamoi, LLC, which asserts $3,378,797.64 under a final judgment of foreclosure entered May 18, 2026, secured by eight Units the Debtor holds and by Unit 403 (Claim 65-1). Class 5 consists of the Claim of the Carton Family Trust of 1992, which asserts $383,505.45 under a final judgment of foreclosure, secured by townhome Unit 8-104 (Claim 66-1). FDRE, Inc. arranged both loans on materially identical terms and, as servicing agent, received the payments on them. Between March 2021 and November 2023, the Debtor paid $1,166,008.69 from its own account to Tamamoi, FDRE, and two affiliates, and $129,556.52 to the Carton Family Trust. Neither claimant has accounted for the payments that passed between it and FDRE. A full accounting of those payments determines the rate each lender actually charged, and I believe it will show a rate above 25 percent a year, which makes each extension of credit an unenforceable debt. *Fla. Stat. § 687.071(7)*. On the face of the Tamamoi judgment, the rate already exceeds the civil ceiling: the judgment charges 18 percent on a 360-day year, which is 18.27 percent a year. *Fla. Stat. §*

*687.03(1)*. A lender who willfully charges interest above that ceiling forfeits all of it, may enforce only the principal, and must repay double the interest paid. *Fla. Stat. § 687.04.* One way or the other, the accounting determines whether, and how much, interest is forfeited.

Neither foreclosure judgment may be enforced by sale. The Bankruptcy Court lifted the stay for Tamamoi only to let it obtain a judgment and barred it from seeking a sale (Doc. 135 ¶¶ 2–3), and it abated both lenders' requests to conduct foreclosure sales (Doc. 361 ¶ 1). On the Effective Date, the Plan supersedes both judgments; neither may be enforced against the Debtor, the Reorganized Debtor, or any Unit, and each holder's rights are those the Plan provides. The amount of each Claim will be determined in an adversary proceeding or contested matter brought by the Recovery Trustee, or by the Reorganized Debtor under Section 6.11, with leave as the Case Management Order requires. (Doc. 359 ¶ 3). Subject to the accounting each lender owes, I contend that neither was entitled to more than $227,000 on any Unit, the amount stated on the face of the mortgage, and that, because each charged interest above the lawful rate, neither is entitled to any interest. To the extent a Final Order allows a Claim, its Lien is allowed to the same extent, on the Units that secure that Claim, and the Allowed Claim receives the common secured treatment of Section 4.1 — six percent,

amortized over 360 months — like every other secured Claim. Until then, the payments are held in escrow under Section 4.1(e).

On October 6, 2026, the Chapter 11 Trustee objected to both Claims only to disallow any deficiency, stating that the Debtor is neither an obligor nor a guarantor on either loan and that, for the same reason, she lacks standing to raise usury and does not intend to pursue it. (Docs. 424, 425 ¶ 14 & n.2). The Estate recovers under one position or the other. If the Debtor may challenge the interest, the interest is forfeited and recoverable as described above. If the Debtor owed nothing on either loan, then the $1,295,565.21 it paid on them left its property on debts it did not owe, and the Estate may recover those payments to the extent they exceeded the value the Debtor received; interest that the law forfeits reduced no enforceable lien and gave the Debtor no value. Either way, these are Recovery Trust Claims, and a claim the Recovery Trustee declines reverts to the Reorganized Debtor under Section 6.11.

On October 21, 2026, I moved to disallow Claims 65 and 66 under § 502(d), and on October 28, 2026, I moved for leave to object to them. (Docs. 444, 449). When I file the Third Amended Disclosure Statement, I will ask the Bankruptcy Court to rule on the motion for leave on an expedited basis. Tamamoi holds the Debtor's money, which it took without giving the Debtor any consideration, and

until it returns that money it should not vote on the Plan or on the Chapter 11 Trustee's plan. *11 U.S.C. § 502(d); Fed. R. Bankr. P. 3018(a).*

Because the Plan retains rather than sells the Units, any Allowed Claim exceeding the value of its collateral is treated as § 1111(b)(1)(A) of the Code directs, as a Class 9 Claim, unless the Class elects under § 1111(b)(2). Classes 4 and 5 are Impaired.

**4.5 Class 6 — Ad Valorem Tax Claims (Secured).**

Class 6 consists of the Allowed Secured Claims for ad valorem real property taxes on the Units, asserted in Claims 8 through 62 in the total amount of $478,289.67: forty-seven claims of the Brevard County Tax Collector for 2024 and 2025 taxes ($312,465.91), and eight claims of the holders of tax certificates — Keys Funding LLC, ATCF II Florida-A LLC, FIG 20, LLC, and Community Red Co ($165,823.76). Each holder retains its Lien and will be paid its Allowed Claim in full, with interest at the rate applicable nonbankruptcy law fixes for that claim — 18 percent on the Tax Collector's claims, and the certificate rate on each certificate holder's claim — in equal monthly installments beginning February 1, 2027 and ending not later than May 21, 2031, five years after the order for relief. *11 U.S.C. §§ 511(a), 1129(a)(9)(C)–(D); Fla. Stat. § 197.172.* The Reorganized Debtor may prepay any Class 6 Claim, and must pay the balance of any Class 6 Claim at the closing of a sale or refinancing of the Unit it encumbers. While the

Reorganized Debtor is current on these installments, no holder may apply for a tax deed or pursue a pending application; on a default not cured within thirty (30) days after written notice to the Reorganized Debtor, the holder may exercise its remedies under Florida law. To the extent § 505 of the Code and Florida law permit, the Reorganized Debtor may contest the underlying assessments. Class 6 is Impaired.

**4.6 Classes 7 and 8 — Cape Crossing Associations (Secured).**

Class 7 consists of the Allowed Secured Claim of the Cape Crossing Townhomes Homeowners Association, Inc. for unpaid assessments, asserted at $118,731.84 in Claim 6-1. That Claim is disputed as to amount and subject to the Estate's affirmative claims for negligence and waste that diminished unit values by as much as $125,000 per unit. The full Allowed Class 7 Claim will be paid from recoveries under Section 6.6; Class 7 otherwise receives the common secured treatment of Section 4.1 and is Impaired. Class 8 consisted of the Claim of the Cape Crossing Condominium Association. Under the Compromise Order, the Chapter 11 Trustee paid the Condominium Association $204,000 for the condominium roof, and on September 18, 2026, the Condominium Association withdrew Claim 7. (Docs. 379 ¶ 3, 393). Class 8 holds no Claim, receives nothing, and casts no vote.

**4.7 Class 9 — General Unsecured Claims (Non-Insider).**

Class 9 consists of all Allowed Unsecured Claims of non-Insider creditors. Under the Global Settlement Agreement, Claim 4 of IMQA Investments Incorporated (Claims 4-2 and 4-3) is Allowed as a general unsecured claim of $350,000.00; Claim 3 of CTO Holdings, Inc. is withdrawn with prejudice and disallowed; and Claim 2-1 of WM Holdings Group, LLC and Claim 71-1 of Tiered Capital, Inc. are disallowed with prejudice. (Global Settlement Agreement Ex. A). The other Class 9 Claims are mine (Claim 1-1, $396.00) and any deficiency Section 4.4 places here. The Chapter 11 Trustee paid Claim 70 of IPFS Corporation in full in the ordinary course, and it receives nothing under the Plan. (Doc. 392 ¶ 13). On the later of the Effective Date and the fifth Business Day after the Chapter 11 Trustee receives the Settlement Payment, the Reorganized Debtor will pay each holder of an Allowed Class 9 Claim one hundred percent (100%) of its Allowed Claim, in Cash, from the Settlement Payment, and will reserve in Cash, from the same source, the full asserted amount of every Class 9 Claim that is then a Disputed Claim. Within thirty (30) days after a Disputed Class 9 Claim becomes Allowed, the Reorganized Debtor pays it from that reserve, with interest from the Effective Date at the federal judgment rate in effect on the Effective Date. 28 U.S.C. § 1961(a). Any part of the reserve that no Allowed Claim needs is distributed under Section 6.6. If the Settlement Payment has not arrived by the

Effective Date, or does not cover every Allowed and reserved Class 9 Claim, the Reorganized Debtor pays the balance, with the same interest, in equal monthly installments over sixty (60) months from operating revenue, beginning the first day of the first full month after the Effective Date, and the net proceeds of the Recovery Trust Claims available to Class 9 under Section 6.6 prepay it. My own Claim and the Claim of IMQA Investments Incorporated are Class 9 Claims and receive no treatment different from any other non-Insider unsecured creditor. The United States holds a restitution lien on any distribution on my Claim (Doc. 387), and any such distribution will be paid as that lien requires. Class 9 is Impaired.

**4.8 Class 10 — Insider Unsecured Claims.**

Class 10 consists of the Allowed Unsecured Claims of Insiders. Under the Global Settlement Agreement, the Claim of Horton S. Johnson (Claim 5-2) is Allowed as a general unsecured claim of $1,297,493.97, which resolves the Chapter 11 Trustee's objection to it. (Doc. 412; Global Settlement Agreement Ex. A). Because Mr. Johnson is an Insider, his Claim is classified here. Holders of Allowed Class 10 Claims receive distributions only after all Allowed Administrative Claims, Priority Claims, Secured Claims (Classes 1–7), and Class 9 Claims have been satisfied or reserved, and after the $1,000,000 property-improvement reserve in Article 6 is funded. Thereafter, holders share pro rata in

remaining net recoveries. No Lien secures a Class 10 Claim, and the Plan grants none. Class 10 is Impaired.

**4.9 Class 11 — Interests.**

Class 11 consists of the Interests in the Debtor, which Horton S. Johnson owns. Under the Global Settlement Agreement, each Dixon Payor Party relinquishes to the Tiered Land Trust, acting through Mr. Johnson as its successor trustee, whatever interest it has or claims in the Debtor's membership units, and the Tiered Land Trust then conveys those units to Mr. Johnson. That transfer moves no property of the Estate and leaves the Chapter 11 Trustee in office until the Bankruptcy Court orders otherwise. (Global Settlement Agreement §§ 5.2, 5.4). Mr. Johnson retains the Class 11 Interest in the Reorganized Debtor, controls the Reorganized Debtor on and after the Effective Date under Article 6 until a third party acquires it under Section 6.2, and receives no distribution on account of the Interest until all senior Classes are satisfied. Class 11 is Impaired.

**Article 5 — Executory Contracts and Unexpired Leases**

All executory contracts and unexpired leases not previously assumed or rejected, and not the subject of a pending motion to assume as of the Confirmation Date, are rejected as of the Effective Date, except any contract or lease specifically identified for assumption in a schedule filed before the Confirmation Hearing. Any rejection-damages Claim must be filed within thirty (30) days after entry of the

order authorizing rejection (or the Confirmation Order, if rejection occurs thereunder), and any such Allowed Claim will be treated as a Class 9 General Unsecured Claim.

## Article 6 — Means of Implementation

### 6.1 Overview.

The Plan will be implemented through (a) continued operation of the Debtor's vacation-rental business as a going concern — under the direction and control of the Chapter 11 Trustee until the Effective Date, and thereafter under the governance structure of Section 6.7; (b) the establishment of the Recovery Trust — which holds all of the Estate's Causes of Action, including the claims for preferences and fraudulent transfers — to prosecute and recover them to conclusion; (c) consolidation of the resort through a third party's acquisition of the Reorganized Debtor and of the assets of Canaveral Crossroads, LLC, which the third party combines to maximize revenues; (d) structured sales of Units under Section 6.12; (e) a refinancing or going-concern sale on or before February 1, 2029; and (f) implementation of the Global Settlement Agreement under Section 6.9.

### 6.2 Operating Plan.

The Debtor, under the direction and control of the Chapter 11 Trustee until the Effective Date, and thereafter the Reorganized Debtor under the governance of

Section 6.7, will: (1) stabilize the Debtor's vacation-rental operations; (2) support the acquisition, by a third party and subject to approval in both cases, of the Reorganized Debtor and of the assets of Canaveral Crossroads, LLC — the resort's developer and declarant, which reports that it owns the clubhouse, the common areas, the sewage lift station, and the Cape Crossing Resort & Marina names and marks — so that the third party combines the resort's components, including its reservation system, into a single, self-contained enterprise and maximizes its revenues. The acquirer takes the Reorganized Debtor subject to the Plan, and the acquisition changes no payment, Lien, or other right the Plan gives the holder of a Claim. On September 8, 2026, the court entered an order for relief against Canaveral Crossroads on its consent and converted its case to Chapter 11, and on September 30, 2026, ordered that case jointly administered with that of Sherwood Construction, Inc. *In re Canaveral Crossroads, LLC,* No. 6:26-bk-05426-GER (Bankr. M.D. Fla.) (Docs. 15, 56 at 2, 61); (3) engage a vacation-rental investment bank to arrange the financing necessary to acquire the remaining vacation-rental units; and (4) by February 1, 2029, refinance the balloon obligations or sell the Reorganized Debtor's Units as a going concern. Nothing in the Plan or the Confirmation Order authorizes, requires, solicits, or anticipates any acquisition, merger, consolidation, management arrangement, contribution, transfer, or other

combination involving any asset or interest of Michael McPhillips, who has refused any such transaction. (Doc. 328 ¶¶ 3, 12).

**6.3 Establishment and Funding of the Recovery Trust.**

On the Effective Date, the Recovery Trust will be established as a trust for the benefit of the holders of Claims entitled to distribution under the Plan. Lara Roeske Fernandez, the Chapter 11 Trustee, will serve as the Recovery Trustee and will administer, prosecute, and conclude the Recovery Trust and the Recovery Trust Claims. If Ms. Fernandez declines to serve or ceases to serve, a successor approved by the Office of the United States Trustee will serve, compensated on the same terms, subject to Bankruptcy Court approval. The Recovery Trust will be funded with what remains of the Settlement Payment after the Allowed Administrative Claims and the Class 9 payments and reserve under Section 6.4, up to $100,000. If the Recovery Trust needs more, the Reorganized Debtor will fund its reasonable costs from net operating revenue, and the Recovery Trustee may engage counsel on a contingent-fee basis under § 328 of the Code. On the Effective Date, the Recovery Trust Claims — all of the Estate's Causes of Action other than the Released Claims — vest in and transfer to the Recovery Trust, including: (a) the Avoidance Actions against any person other than a Released Party; (b) the Causes of Action against Mainstreet Community Bank of Florida described in Section 4.3; (c), separately, the Causes of Action against Tamamoi, LLC, the

Carton Family Trust of 1992, and FDRE, Inc.; and (d) the claim and right to recover Unit 403 from the IAM Irrevocable Trust and any subsequent transferee that is not a Released Party. The Recovery Trustee has full authority to investigate, commence, prosecute, settle, and compromise the Recovery Trust Claims, to decline any of them under Section 6.11, to retain counsel and other professionals, and to take all actions necessary to administer the Recovery Trust through its conclusion, in each case subject to such Bankruptcy Court approval as may be required. The reasonable fees, costs, and expenses of the Recovery Trust are paid first from the funding described above and then from the gross proceeds of the Recovery Trust Claims before distribution.

**6.4 Working Capital and Application of the Settlement Payment.**

The Reorganized Debtor will pay its operating expenses and the installments under Article 4 from operating revenue. The Settlement Payment is paid in settlement of the Estate's claims and causes of action; it is not rents and not the proceeds of any creditor's collateral. (Global Settlement Agreement § 5.1(c)). No Lien attaches to it. When the Chapter 11 Trustee receives it, the Settlement Payment is applied in this order: (1) to the Allowed Administrative Claims; (2) to the Class 9 payments and reserve under Section 4.7, $350,396.00 on the present claims; (3) up to $100,000 to the Recovery Trust under Section 6.3; and (4) any balance to the Reorganized Debtor as working capital. On November 9, 2026, the

Bankruptcy Court allowed one Administrative Claim at $30,000. (Doc. 455). On November 12 and 13, 2026, the Chapter 11 Trustee, her counsel, and her accountant applied for $382,534.13 in fees and costs for the period since June 11, 2026. (Docs. 462, 463, 464). If the Bankruptcy Court allows those applications in full, the Administrative Claims total about $412,500 before any later fees, about $87,000 of the Settlement Payment reaches the Recovery Trust, and none remains for working capital. The Reorganized Debtor will bridge any seasonal shortfall first from any such working capital and then from the first net recoveries of the Recovery Trust Claims under Section 6.6(1). Exhibit B to the Disclosure Statement projects no month in which the Reorganized Debtor's cash falls below zero; the lowest month-end balance is about $37,000, in January 2027. If the Settlement Payment has not arrived by the Effective Date, each Allowed Administrative Claim is paid when it arrives, unless its holder agrees otherwise or the Chapter 11 Trustee's cash then covers it. The Plan depends on no turnover of post-petition funds. Under the Compromise Order, the Lender paid the Chapter 11 Trustee $350,000, the Trustee paid the Condominium Association $204,000 for the condominium roof, and the Trustee holds the balance until further order. (Doc. 379 ¶¶ 3–5).

**6.5 Identified Recovery Sources.**

The Recovery Trust holds every Cause of Action of the Estate other than the Released Claims, subject to reversion of a Declined Claim to the Reorganized Debtor under Section 6.11. The identified recovery sources include: (a) the $1,166,008.69 the Debtor paid to Tamamoi, LLC, FDRE, Inc., and two affiliates, and the $129,556.52 it paid to the Carton Family Trust, recoverable as Section 4.4 describes — twice the forfeited interest under *Fla. Stat. § 687.04* or, in the alternative, as transfers on debts the Debtor did not owe — or credited against principal; (b) the recovery of Unit 403 from the IAM Irrevocable Trust under *Fla. Stat. ch. 726* and §§ 544(b), 548, and 550 of the Code and through the pending appeal described in the Disclosure Statement, adding a minimum of $183,000 in net equity and more likely $250,000 to $300,000; (c) the Estate's claims against Mainstreet Community Bank of Florida described in Section 4.3, which reduce Mainstreet's Allowed Claims in recoupment before they produce any cash; and (d) the Estate's affirmative claims against the Cape Crossing associations and the associations' directors, against the contractors and design professionals who built the Resort and Michael McPhillips, and against the title companies, including First American Title, all of which remain unquantified. The Global Settlement Agreement releases the Estate's claims against the Dixon Parties and the Pitkanen Parties, including the transfers to the Dixon lenders that my earlier plan estimated

at about $1,400,000; the Settlement Payment takes their place. The Recovery Trustee may coordinate with the committee of unsecured creditors, if one is appointed.

**6.6 Waterfall — Distribution of Recoveries.**

Net proceeds of the Recovery Trust Claims, distributed by the Recovery Trustee after the costs of recovery, including professional fees, and net proceeds of any Declined Claim the Reorganized Debtor recovers under Section 6.11, will be applied in the following order: (1) to cure all arrearages and defaults of the secured creditors as the Plan provides, and to bring all Allowed Secured Claims (Classes 1–5 and 7) current, including the full Allowed Claim of Class 7 and any Class 6 installment then due and unpaid, and to fund any seasonal working-capital shortfall of the Reorganized Debtor up to $248,000; (2) to pay the remaining balance of all Allowed Class 9 Claims in full, with the interest Section 4.7 provides; (3) to fund a $1,000,000 reserve for capital improvements to the Debtor's properties; and (4) to satisfy the remaining Allowed Class 10 Insider Unsecured Claims and, thereafter, the Class 11 Interest. After the secured creditors receive what the Plan provides, every dollar of net recoveries goes to unsecured creditors until they are paid in full.

**6.7 Governance of the Reorganized Debtor.**

Governance under the Plan proceeds in two stages. First, while this case proceeds to conclusion, the Debtor remains under the direction and control of the

Chapter 11 Trustee, and I propose and will support the appointment of a committee of unsecured creditors under § 1102 of the Code to monitor operational performance and assist the Chapter 11 Trustee. Second, on the Effective Date, Horton S. Johnson, the Debtor's owner, controls the Reorganized Debtor; he will oversee a professional management company engaged to operate the resort day to day and will be responsible for effectuating the Plan. Mr. Johnson will receive compensation commensurate with the time he actually spends managing the Reorganized Debtor, at the market rate for an executive manager of a limited liability company, paid from the Reorganized Debtor's revenues. Who manages the combined enterprise after a third party acquires the Reorganized Debtor and the assets of Canaveral Crossroads, LLC will be determined when that acquisition occurs. I support the continued service of Lara Roeske Fernandez as Chapter 11 Trustee and as Recovery Trustee; Section 6.3 provides her successor.

**6.8 Vesting of Assets.**

Except as the Plan or Confirmation Order otherwise provides, on the Effective Date all property of the Estate other than the Recovery Trust Claims vests in the Reorganized Debtor free and clear of all Claims and Interests, except the Liens retained by holders of Allowed Secured Claims under Article 4 and the obligations created under the Plan; the Recovery Trust Claims vest in the Recovery Trust as Section 6.3 provides, and each Declined Claim vests in the Reorganized

Debtor as Section 6.11 provides. When the Recovery Trust terminates, any property remaining after the distributions under Section 6.6 vests in the Reorganized Debtor.

**6.9 The Global Settlement; Settlement of Claims.**

(a) The Global Settlement Agreement resolves every dispute between the Estate and the Dixon Parties and the Pitkanen Parties, and the Plan implements it. On November 12, 2026, the Chapter 11 Trustee moved for its approval under Bankruptcy Rule 9019. (Doc. 459). I seek its approval in my own right, as the agreement provides. (Global Settlement Agreement § 14.2(b)). If the Bankruptcy Court has not entered the Global Settlement Approval Order before the Confirmation Hearing, the Confirmation Order will approve the Global Settlement Agreement under Bankruptcy Rule 9019 and § 1123(b)(3)(A) of the Code, and to that extent it is the Global Settlement Approval Order.

(b) Effective as the Global Settlement Agreement provides, Claims 67 and 68 are withdrawn with prejudice, and PEDixon and ZPD will not seek any credit bid, any claim under § 502(h), or any administrative expense claim in this case, so the Plan carries no Class for them; Claim 2-1 is disallowed; Claim 3 is withdrawn and disallowed; Claim 4 is Allowed as a general unsecured claim of $350,000.00 in Class 9; Claim 5-2 is Allowed as a general unsecured claim of $1,297,493.97 in Class 10; and Claim 71-1 is disallowed. (Global Settlement Agreement Ex. A).

Every objection, motion, and request between a Flynn-Johnson Party or Yaniv Amar and a Dixon Party or Pitkanen Party pending in this case is withdrawn, including my motion to disallow Claims 67 and 68 under § 502(d). (Doc. 423).

(c) The Settlement Payment is property of the Estate, free of any Lien, and the Plan applies it as Section 6.4 provides.

(d) Nothing in the Plan revives, preserves, or transfers to the Recovery Trust any Released Claim. Nothing in the Plan releases any person the Global Settlement Agreement does not release, including any Excluded Person.

(e) If the Plan and the Global Settlement Agreement conflict, the Global Settlement Agreement controls. If the Global Settlement Agreement terminates under its Section 14.5 before the Effective Date, I will modify the Plan under § 1127 of the Code before it is confirmed or consummated.

(f) Otherwise, under Bankruptcy Rule 9019 and in consideration of the distributions and benefits provided under the Plan, the Plan constitutes a good-faith compromise and settlement of all Claims, Interests, and controversies resolved under it, and entry of the Confirmation Order constitutes Bankruptcy Court approval of those compromises as fair, equitable, reasonable, and in the best interests of the Debtor, the Estate, and holders of Claims and Interests. Nothing in this paragraph compromises any Recovery Trust Claim or any pending objection to a Claim.

**6.10 Appointment of the Recovery Trustee as Representative of the Estate; Retention and Enforcement of Causes of Action.**

Under § 1123(b)(3)(B) of the Code, the Plan provides for the retention and enforcement, by a representative of the estate appointed for such purpose, of every Cause of Action and Recovery Trust Claim, and the Recovery Trustee is appointed as that representative. The appointment is made expressly for the purpose § 1123(b)(3)(B) describes. The Recovery Trustee holds and may enforce each Cause of Action and Recovery Trust Claim in that capacity and as successor to the Debtor, the Estate, and the Chapter 11 Trustee. As to each Declined Claim, the Reorganized Debtor is also appointed as that representative, for the same purpose, and holds and may enforce the Declined Claim in that capacity and as successor to the Recovery Trustee.

The Causes of Action and the Recovery Trust Claims are retained and preserved. They are not released, waived, discharged, extinguished, or barred by Confirmation, by the occurrence of the Effective Date, by any distribution under the Plan, or by res judicata, collateral estoppel, waiver, estoppel, or laches arising from Confirmation. The retention and preservation this Section effects is specific and unequivocal, and includes: (a) the Avoidance Actions; (b) every Cause of Action against Mainstreet Community Bank of Florida; (c) every Cause of Action against Tamamoi, LLC, the Carton Family Trust of 1992, FDRE, Inc., and their affiliates; (d) the claim and right to recover Unit 403 from the IAM Irrevocable

Trust and any subsequent transferee that is not a Released Party; and (e) every Cause of Action the Disclosure Statement describes, whether or not pending on the Effective Date and whether or not named in the Plan. The Released Claims alone are excluded.

No holder of a Claim or Interest, and no other party in interest, acquires by reason of Confirmation any defense to a Cause of Action or a Recovery Trust Claim that did not exist immediately before the Confirmation Date.

**6.11 Declined Causes of Action; Reversion to the Reorganized Debtor.**

(a) Every Cause of Action and Recovery Trust Claim belongs to the Recovery Trust, and except as this Section provides, the Recovery Trustee alone may prosecute it.

(b) The Recovery Trustee may decline to prosecute any Cause of Action or Recovery Trust Claim, in whole or in part, for any reason, including that she judges its merits insufficient or its prosecution not economically efficient. She declines by filing and serving a notice that identifies the claim and each defendant. A statement the Chapter 11 Trustee filed before the Effective Date that she does not intend to pursue a claim operates as a notice of declination on the Effective Date, including the statements in Docs. 424 and 425 at page 4, note 2.

(c) A claim is deemed declined if the Recovery Trustee has neither commenced it nor filed a notice of declination (i) within sixty (60) days after the

Reorganized Debtor's written request, or (ii) one hundred twenty (120) days before the applicable limitations period expires.

(d) Upon declination, the Declined Claim reverts to and vests in the Reorganized Debtor, free of any interest of the Recovery Trust. The Reorganized Debtor holds and may enforce it as the representative of the Estate under § 1123(b)(3)(B) of the Code, with every right the Recovery Trustee held, and may pursue, settle, or abandon it in its business judgment.

(e) The net proceeds of a Declined Claim, after the Reorganized Debtor's reasonable costs of recovery, including any contingent fee, are distributed under Section 6.6.

(f) No defendant acquires any defense by reason of a declination or reversion.

**6.12 Structured Sales of Units; the Trustee's Sale Program.**

(a) The Reorganized Debtor sells Units only under this Section. Beginning in January 2027, the Reorganized Debtor lists one condominium Unit for sale at $500,000 and one townhome Unit for sale at $450,000. At least one Unit remains listed for sale at all times, except during a quarter that follows a quarter in which the Reorganized Debtor's operating results covered every payment the Plan requires. The Recovery Trustee conducts each sale through brokers the Recovery Trustee selects. The costs of sale, including the Recovery Trustee's fees and the

brokers' commissions, may not exceed five percent (5%) of the sale price. At each closing, the proceeds, net of the costs of sale, pay the Class 6 Claim on the Unit sold and then pay the holder of the Lien on the Unit a release price of $350,000, or $227,000 on a Unit that secures the Claim of Tamamoi, LLC or the Carton Family Trust of 1992. No release price exceeds the unpaid balance of the Allowed Claim that the release price pays. A release price owed on a Claim subject to Section 4.1(e) is paid into escrow. Each release price is credited against the principal of that Allowed Claim. The remaining net proceeds are distributed under the Plan and according to existing Lien rights, in the order Section 6.6 sets forth.

(b) The structured sales continue in the same manner over not more than eighteen months and conclude not later than June 30, 2028, unless before then the Reorganized Debtor's net operating income covers the payments the Plan requires or every Allowed Claim is paid in full.

(c) This Section applies whether or not a third party's acquisition of the Reorganized Debtor and of the assets of Canaveral Crossroads, LLC occurs.

(d) Each holder of a Lien on a Unit sold under this Section must release the Lien upon payment of its release amount. A sale under this Section requires no further order of the Bankruptcy Court except as the Code or the Confirmation Order requires.

**6.13 Default; Receiver for a Structured Sale.**

If the Reorganized Debtor fails to make a payment the Plan requires and does not cure the failure within thirty (30) days after written notice, the affected holder may seek relief in the Bankruptcy Court. The Reorganized Debtor consents now to the appointment, in any foreclosure action on the affected Units, of a receiver to conduct a structured sale of those Units under the supervision of the state court, on the terms of Section 6.12 as nearly as practicable. No foreclosure sale of a Unit will occur except through that receiver.

## Article 7 — Distributions and Disputed Claims

**7.1 Distribution Agents.**

The Reorganized Debtor acts as Distribution Agent for distributions from operations, and the Recovery Trustee makes distributions of the net proceeds of the Recovery Trust Claims, in each case in accordance with Section 6.6. No distribution will be made on account of a Disputed Claim until it becomes an Allowed Claim.

**7.2 Objections to Claims.**

Objections to Claims may be filed by the Chapter 11 Trustee, the Recovery Trustee, the Reorganized Debtor, or me on or before the date that is one hundred twenty (120) days after the Effective Date, subject to extension by the Bankruptcy Court; until the Effective Date, an objection requires leave as the Case

Management Order directs. (Doc. 359 ¶ 3). Because Local Rule 3020-1(e) sets a sixty-day default for claim objections unless the court orders otherwise, the Confirmation Order will expressly provide for this 120-day period. Every objection pending on the Effective Date survives Confirmation and is determined under the Plan, including the Chapter 11 Trustee's objections to Claims 65, 66, and 70 (Docs. 392, 424, 425), my motion to disallow Claims 65 and 66 under § 502(d) (Doc. 444), and my motions for leave to object to Claims 63, 64, 65, and 66 (Docs. 448, 449); the Recovery Trustee succeeds to the Chapter 11 Trustee's objections. The Global Settlement Agreement resolves the objections to Claims 2, 3, 4, 5, 67, 68, and 71 (Docs. 409, 410, 411, 412, 419, 420, 421, 423), and the Global Settlement Approval Order governs them. On November 10, 2026, Claim 69 was withdrawn (Doc. 457), and the objection to it (Doc. 416) is moot.

**7.3 Reserves.**

The Reorganized Debtor and the Recovery Trustee must each establish and maintain appropriate reserves for Disputed Claims pending resolution, so that, if and when allowed, those Claims receive the treatment to which the Plan entitles them. The Class 9 reserve under Section 4.7 is one of them.

**7.4 Disallowance Under § 502(d).**

Section 502(d) of the Code directs that the court shall disallow the Claim of any entity from which property is recoverable under §§ 542, 543, 550, or 553 of

the Code, or that is the transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Code, unless that entity has paid the amount or turned over the property for which it is liable. The Plan preserves that provision in full. No Claim of an entity that is a defendant in, or a transferee identified in, any Recovery Trust Claim will be Allowed, and no distribution will be made on account of any such Claim, until that entity has paid the amount or turned over the property for which it is liable, or until the Bankruptcy Court determines that no such liability exists. The Plan nonetheless proceeds as to that entity: every payment the Plan provides on its Secured Claim is paid into escrow under Section 4.1(e) and disbursed only as that Section provides.

The Recovery Trustee, and the Reorganized Debtor as to any Declined Claim, may assert § 502(d) as a ground of objection under Section 7.2, and may do so although the related Avoidance Action remains pending and no money judgment has been entered. Nothing in this Section limits § 502(j) of the Code or Fed. R. Bankr. P. 3008, and a Claim disallowed under this Section will be reconsidered and Allowed upon payment or turnover. Nothing in this Section determines that any entity is liable; every defense of every claimant is preserved until the Bankruptcy Court determines the question.

## Article 8 — Conditions and Effect of Confirmation

### 8.1 Conditions to the Effective Date.

The Effective Date will not occur until (a) the Confirmation Order has been entered and has become a Final Order; (b) all documents necessary to implement the Plan, including the Recovery Trust agreement, have been executed; (c) all required authorizations and approvals have been obtained; and (d) the Global Settlement Approval Order has been entered. I may waive condition (b) or (c) to the extent the law permits; conditions (a) and (d) may not be waived.

### 8.2 Binding Effect.

Upon the Effective Date, the Plan binds the Debtor, the Reorganized Debtor, the Chapter 11 Trustee, the Recovery Trustee, all holders of Claims and Interests, and all other parties in interest, whether or not the holder voted to accept the Plan and whether or not Impaired.

### 8.3 Discharge.

Except as the Plan or Confirmation Order otherwise provides, confirmation operates as a discharge under § 1141(d) of the Code of all debts that arose before the Confirmation Date. Because the Debtor will continue in business and the Plan does not provide for liquidation of substantially all property, the discharge provisions of § 1141(d)(1) apply.

**8.4 Injunction.**

Except as the Plan otherwise provides, all persons who have held, hold, or may hold Claims or Interests are permanently enjoined from taking any action to collect, recover, or offset any such Claim against the Debtor, the Reorganized Debtor, the Recovery Trust, or the Estate, other than as the Plan expressly permits. On the Effective Date, the orders granting relief from the automatic stay to Mainstreet Community Bank, Tamamoi, LLC, and the Carton Family Trust of 1992 (Docs. 135, 183, 361) cease to have effect, and this injunction binds each of them, subject to Section 6.13. Nothing in the Plan releases, enjoins, or affects any claim of one non-debtor against another, or alters any release, covenant, dismissal, or withdrawal the Global Settlement Agreement provides.

**8.5 Preservation of Causes of Action.**

Except to the extent expressly released, including the Released Claims, all Causes of Action — including the claims for preferences and fraudulent transfers — are preserved and vest in the Recovery Trust, administered by the Recovery Trustee, and each Declined Claim vests in the Reorganized Debtor under Section 6.11. No preclusion doctrine applies to any Cause of Action by reason of Confirmation. Because Local Rule 3020-1(e) sets a sixty-day default for adversary proceedings and contested matters contemplated by a plan unless the court orders otherwise, the Confirmation Order will expressly provide that the Recovery

Trustee, and the Reorganized Debtor as to a Declined Claim, may commence any Recovery Trust Claim at any time within the applicable limitations period.

## Article 9 — Retention of Jurisdiction

The Bankruptcy Court retains jurisdiction to the fullest extent the law permits, including to: determine objections to Claims; adjudicate the Causes of Action and the Recovery Trust Claims; supervise the Recovery Trust and the Recovery Trustee; enforce the Global Settlement Approval Order and the Plan's implementation of the Global Settlement Agreement; resolve disputes concerning interpretation or implementation of the Plan; approve professional fees; enter orders necessary to consummate the Plan; and enter a final decree closing the case. No holder of a Claim or Interest is deemed by the Plan, by voting, or by Confirmation to consent to the jurisdiction of the Bankruptcy Court, and nothing in the Plan supplies a power the law withholds, including the power to enforce an extension of credit that Fla. Stat. § 687.071(7) makes unenforceable.

## Article 10 — Miscellaneous Provisions

### 10.1 Modification; Cramdown.

I may modify the Plan before Confirmation under § 1127 of the Code, and I expressly reserve the right to seek confirmation under § 1129(b) as to any Impaired Class that does not accept the Plan.

**10.2 Governing Law.**

Except where the Code or other federal law applies, Florida law governs the rights and obligations under the Plan.

**10.3 Severability.**

If any provision of the Plan is invalid or unenforceable, it is severable, and the remainder remains in full force and effect.

**10.4 Headings.**

Headings are for convenience only and do not affect interpretation.

**10.5 Exhibit A — Valuation of the Units.**

Exhibit A to the Plan is the Expert Report of Gary A. Moll, MBA, CPA, ASA, dated September 1, 2026, valuing twenty-seven Cape Crossing Resort & Marina Units — the twenty-six the Debtor holds and Unit 403 — as a portfolio at $11,600,000 to $18,000,000, and an orderly auction of them at approximately $8,700,000 to $9,900,000 at the low end of that range. (Ex. A ¶¶ 9, 14). The report values twenty-seven Units, including Unit 403, which it assumes will return to the Estate.

**10.6 Provisions of the Confirmation Order.**

The Confirmation Order will provide: "Under § 1123(b)(3)(B) of the Bankruptcy Code, the Recovery Trustee is appointed as the representative of the estate for the purpose of retaining and enforcing the Causes of Action and the

Recovery Trust Claims defined in the Plan, and is authorized to investigate, commence, prosecute, settle, compromise, and decline each of them in that capacity; as to each Declined Claim under Section 6.11 of the Plan, the Reorganized Debtor is appointed as that representative for the same purpose. The Causes of Action and the Recovery Trust Claims are retained and preserved as Section 6.10 of the Plan provides, and are not released, waived, or barred by this Order. The Court finds that the retention and preservation Section 6.10 effects is specific and unequivocal, and that Section 7.4 of the Plan preserves § 502(d) of the Bankruptcy Code in full." The Confirmation Order will also approve the Global Settlement Agreement to the extent Section 6.9(a) provides, will state that the Recovery Trust retains no Released Claim, and will fix the periods Sections 7.2 and 8.5 provide, as Local Rule 3020-1(e) permits.

Respectfully submitted this 16th day of November, 2026.

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32801@gmail.com
*Plan Proponent, pro se*

**Certificate of Service**

I certify that on November 16, 2026, I filed my Third Amended Plan of Reorganization, together with my Third Amended Disclosure Statement and the notice of filing redlines in person with the Clerk of Court. As a pro se litigant, I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; her counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States Trustee.

Frank L. Amodeo, Pro se

# EXHIBIT A

Expert Report of Gary A. Moll, MBA, CPA, ASA

Valuation of the Debtor's Twenty-Seven Cape Crossing Resort & Marina Units

September 1, 2026

FERGUSON-MOLL

Consulting, LLC

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re: Homemakers Real Estate, LLC,
Debtor.
Case No. 6:25-bk-05570-GER · Chapter 11

# Expert Report of Gary A. Moll, MBA, CPA, ASA

## Valuation of the Debtor's Twenty-Seven Cape Crossing Resort & Marina Units

September 1, 2026

## I. INTRODUCTION AND PURPOSE

1. I, Gary A. Moll, and Ferguson-Moll Consulting, LLC, were engaged by counsel in connection with In re Homemakers Real Estate, LLC, Case No. 6:25-bk-05570-GER, pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, to determine the fair market value of twenty-seven residential resort units at Cape Crossing Resort & Marina, Merritt Island, Brevard County, Florida: the twenty-six units to which the Debtor holds title of record, and one additional unit whose December 2025 transfer is disputed and which counsel advises is expected to be returned to the estate in this proceeding (together, the "Units").

2. Counsel has advised that this opinion will be used in connection with plan and adequate-protection issues in the Chapter 11 case and in connection with a contemplated sale or auction of the Units. I therefore state a fair market value conclusion first, and I then state separately what an auction of the Units should be expected to realize, because the two are not the same number and should not be presented as if they were.

3. Counsel instructed me to apply an average daily rate of $295 and an annual occupancy of 90 percent to the Units' vacation-rental operation, and to develop the value by a multiple of income and by capitalization of net operating income. I have applied those two assumptions as instructed, I identify them as instructed assumptions everywhere they operate, and I test each of them against the market data summarized in this report. Where an instructed assumption is more favorable than the market data, I show the result on market data as well, so that the sensitivity of the conclusion is disclosed rather than left to be discovered.

4. This report states the property analyzed, the market data considered, each computation in order, and the conclusion, followed by my compensation, the limiting conditions, and my qualifications.

## II. QUALIFICATIONS

5. I am a licensed certified public accountant in Florida and Ohio and the Managing Director of Ferguson-Moll Consulting, LLC. I hold the Accredited Senior Appraiser designation of the American Society of Appraisers and am an Accredited Senior Member of that Society. I hold a B.S. in Accounting from the University of Maryland and an M.B.A. from The Ohio State University, and I have more than thirty years of experience in valuation, forensic accounting, and the analysis of income-producing businesses and business interests. My curriculum vitae, including my testimony during the preceding years, is attached as Exhibit B.

6. Ferguson-Moll Consulting, LLC is compensated on an hourly basis for my work in this matter. No part of the firm's compensation is contingent on the conclusions reached or on the outcome of this proceeding.

## III. SCOPE OF REVIEW AND DOCUMENTS CONSIDERED

7. I considered the description of the Units provided by counsel, including counsel's advice that the Debtor has preferred or exclusive access to the Cape Crossing resort intellectual property and direct-booking website; publicly available information published by the resort and by real-estate brokerages concerning Cape Crossing Resort & Marina, including

current asking prices for units offered for sale within the resort and published nightly-rate evidence for the resort itself, collected at Exhibit D; short-term-rental market data for Merritt Island and the surrounding Space Coast market compiled from booking-platform datasets; published capitalization-rate surveys and guidance for hospitality and short-term-rental assets; and the Brevard County official records identified in Exhibit A. Exhibit A lists the sources considered.

8. The unit schedule is taken from the Brevard County Property Appraiser's records as of August 31, 2026. The Debtor holds title of record to twenty-six units: eighteen condominium units at 202 Ivory Coral Lane — twelve of 1,266 square feet, five of 1,169 square feet, and one of 1,451 square feet — and eight townhome-building units at 2709 and 2719 Cutlass Point Lane, 103 Parrotfish Lane, and 211 Ivory Coral Lane. A twenty-seventh unit, Unit 403 at 202 Ivory Coral Lane, was transferred on December 30, 2025 in a transaction counsel advises was between related insiders and is expected to be unwound, with the unit returned to the estate in this proceeding; the analysis includes Unit 403 on that assumption, which is identified as an assumption at the limiting conditions. Unit 506, transferred to a lender entity on October 6, 2025 in a transfer counsel advises is disputed as unauthorized, is not among the Units valued. I did not perform a physical inspection of the Units, and no unit-by-unit rent roll or historical operating statement of the Units' own rental performance was available to me at the date of this report; if the Units' actual operating history becomes available, it should be substituted for the market-derived expense ratio applied at Section X, and this report updated accordingly.

## IV. SUMMARY OF OPINIONS

9. Fair market value. On the record available at this date, the fair market value of the twenty-seven Units as a portfolio, as of September 1, 2026, lies in the range of $11,600,000 to $18,000,000 — approximately $430,000 to $667,000 per unit. The low end of the range is indicated by the sales-comparison approach: what the twenty-seven Units would cost assembled at the prices at which units within the resort are currently offered. The high end is indicated by the income approach on the instructed assumptions. On these facts the two approaches diverge rather than converge, for the reason stated at paragraph 12, and I have concluded a range rather than forcing a point; paragraph 49 identifies the evidence that would narrow it.

10. Direct capitalization. On the instructed assumptions — a $295 average daily rate and 90 percent occupancy — the Units produce gross annual rental revenue of $2,616,502. At a market-derived operating expense ratio of 45 percent, net operating income is $1,439,076. Capitalized at 8.0 percent, the indicated value is $17,988,450; across the supported capitalization-rate range of 7.5 to 8.5 percent, the indicated range is $16,930,306 to $19,187,680.

11. Multiple of income. The gross income multiple restates the same economics per dollar of revenue, and on this record two multiples are available and they disagree. The multiple implied by the capitalization parameters — a 55 percent net margin at an 8.0 percent rate — is 6.875 times revenue, or approximately $18.0 million. The multiple implied by the resort's own current asking prices against the projected revenue is far lower: a three-bedroom unit asking $430,000 to $520,000 is priced at 4.4 to 5.4 times the $96,908 per unit developed at Section VIII, or approximately $11.5 million to $14.1 million across the

portfolio. The spread between the two multiples is the divergence described at paragraph 9, restated in income terms.

12. The instructed assumptions, tested. The instructed $295 average daily rate is 12 to 23 percent above the Merritt Island market-average rate of $239 to $263 and below the $392 and higher achieved by the top decile of the market — a defensible premium for institutional-quality waterfront resort product. The instructed 90 percent occupancy is roughly double the market average of 40 to 47 percent and above the 78 percent that defines the top decile. Their product, revenue per available night of $265.50, is approximately 2.4 times the market-average $108 to $112 and somewhat below the top-decile floor of approximately $306. The instructed combination therefore asks all twenty-seven Units to sustain top-decile performance year-round. That assumption is what the high end of the range rests on; Section IX states the Debtor-specific reason — preferred or exclusive access to the resort's brand, intellectual property and direct-booking website — that the Units belong at the top of the occupancy distribution rather than at its average, and Exhibit C quantifies the value at every occupancy from 50 to 90 percent.

13. Value on market data alone. If the market-average inputs are used instead of the instructed assumptions — $239 average daily rate at 47 percent occupancy — gross revenue is $1,107,012, net operating income is $608,857, and the income indication at 8.0 percent is $7,610,709. That figure sits below the sales-comparison indication, and a seller able to list the Units individually would not accept it; it marks the floor of the income evidence, not of value. Its significance is that the low end of the concluded range does not depend on rental performance at all — it is supported by the resale market for the Units themselves.

14. Auction. Fair market value assumes reasonable exposure to the market and a willing, unpressured seller. A court-supervised auction compresses exposure and signals compulsion, and bulk offerings of residential units historically clear at 75 to 85 percent of aggregate fair market value; the supporting studies are cited at Section XV and in Exhibit A. Applied to the ends of the concluded range, an orderly, properly noticed auction should be expected to realize approximately $8,700,000 to $9,900,000 if the evidence places value at the sales-comparison end, and approximately $13,500,000 to $15,300,000 if it places value at the income end; a compressed or poorly marketed auction, less.

## V. THE PROPERTY

15. Cape Crossing Resort & Marina is a waterfront resort community at 201 Ivory Coral Lane, Merritt Island, Brevard County, Florida, on the Canaveral Barge Canal, with direct boat access to the Indian River and the Banana River and, through the Canaveral Lock, to Port Canaveral and the Atlantic. The resort was built between 2017 and 2020.

16. The resort's accommodations are condominium units — predominantly three-bedroom, two-bath floor plans of approximately 1,169 to 1,451 square feet, with four-bedroom, three-bath plans of approximately 1,896 square feet on premium floors — and three-bedroom townhome units of approximately 1,483 to 1,895 square feet with garages. The Units at issue comprise twenty-seven of these: the twenty-six held of record — eighteen condominium units and eight townhome-building units — and Unit 403, the 1,266-square-foot condominium unit expected to be returned to the estate, as described at paragraph 8.

17. Resort amenities include a clubhouse with fitness center, a heated swimming pool, hot tub and sauna, a full-service marina with thirty-one boat slips and a community boat launch, pontoon and kayak rentals, and the Dolphins Waterfront Bar & Grill restaurant and tiki bar. The resort operates an on-site rental management program, and the community carries no daily-rental restriction — units may be rented nightly, which is the use valued here.

18. Demand drivers for the location are the Kennedy Space Center and the commercial launch schedule at Cape Canaveral, the cruise operations at Port Canaveral, the Atlantic beaches at Cocoa Beach, and the Orlando attractions approximately one hour away. These drivers support a year-round vacation-rental market rather than a single-season market.

## VI. DEFINITION OF VALUE AND METHODOLOGY

19. Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, with the property exposed to the market for a reasonable period.

20. The Units are income-producing property acquired and held for their vacation-rental income. The income approach is therefore the primary approach, applied two ways as counsel requested: direct capitalization, in which one year's stabilized net operating income is divided by a market capitalization rate; and a gross income multiple, in which annual gross rental revenue is multiplied by a factor derived from the relationship between price and revenue for comparable income-producing units.

21. The computation proceeds in four steps: gross annual rental revenue from average daily rate, occupancy, and unit count; deduction of operating expenses at a market-derived ratio to reach net operating income; capitalization of net operating income at a supported rate; and corroboration by the gross income multiple and by the asking prices of units currently offered within the resort. Each step is stated separately below so that any input the Court or a reviewer prefers can be substituted and the arithmetic re-run.

## VII. THE MERRITT ISLAND SHORT-TERM RENTAL MARKET

22. Two independent booking-platform datasets describe the Merritt Island short-term-rental market. The AirROI dataset for the twelve months ending July 2026 reports 272 active listings, an average daily rate of $263, occupancy of 40.3 percent, revenue per available night of $108, and average annual revenue per listing of $28,424. The Rabbu dataset as of April 2026 reports 157 active listings, an average daily rate of $239, occupancy of 47 percent, and average annual revenue per listing of $26,868, with three-bedroom listings — the modal product, and the subject's — averaging $31,379.

23. The market is seasonal but not single-season: March is the peak month at 65.3 percent occupancy and a $300 average daily rate, and September the trough at 31.5 percent and $236. Merritt Island occupancy trails the Florida state average of 54 percent.

24. Performance within the market is widely dispersed. The top ten percent of Merritt Island listings achieve occupancy of 78 percent and higher at average daily rates of $392 and higher — monthly revenue of $6,869 and up — while the median listing runs 39 percent occupancy at $225. The dispersion matters here because the subject is not a median

listing: it is a purpose-built waterfront resort with a marina, restaurant, pool and clubhouse, operated by an on-site professional manager under a single brand with its own direct-booking channel. Assets of that description populate the upper tiers of the distribution, not the middle.

## VIII. REVENUE: THE INSTRUCTED ASSUMPTIONS AND THE MARKET

25. Counsel instructed an average daily rate of $295 and occupancy of 90 percent. Table 1 sets the instructed assumptions against the market data.

| Measure | Instructed | AirROI (TTM Jul 2026) | Rabbu (Apr 2026) | Top decile (AirROI) |
|---|---|---|---|---|
| Average daily rate | $295 | $263 | $239 | $392+ |
| Occupancy | 90% | 40.3% | 47% | 78%+ |
| Revenue per available night | $265.50 | $108 (published) | $112.33 | $305.76+ |

26. The instructed rate is 12 to 23 percent above the market-average rate and below the top-decile rate — a premium consistent with the subject's position as purpose-built waterfront resort product in a market averaged over individually hosted homes. The instructed occupancy is roughly double the market average and above the top decile. Neither input should be evaluated alone, because rate and occupancy are jointly managed — a professional operator prices to fill. The economically meaningful figure is their product, revenue per available night: $265.50 as instructed, against a market average of $108 to $112 and a top-decile floor of approximately $306. The instructed combination therefore prices the Units at sustained top-decile performance — attainable for the best resort product in the submarket, but an assumption that all twenty-seven Units maintain that performance year-round, which the published market data cannot verify one way or the other without the Units' own operating history.

27. On the instructed assumptions, each unit produces $295 × 365 nights × 90 percent = $96,907.50 of gross annual rental revenue — $96,908 rounded — and the twenty-seven Units produce $2,616,502. I note that $96,908 per unit exceeds the $82,428-and-higher average annual revenue of the top decile of Merritt Island listings: the instruction places every Unit at or above roughly the ninetieth percentile of the market.

28. The $295 daily rate is separately supported by the published rate evidence for the resort itself, collected at Exhibit D. An actual Cape Crossing three-bedroom, sleeps-eight townhome is currently marketed at an average of exactly $295 per night. The resort's hotel listing publishes an average nightly range of $163 to $362 for a standard room, seasonal monthly averages run from $186 in June to $351 in February with day-of-week averages to $447, and the subject three-bedroom product prices in the upper portion of those bands. Against that evidence $295 is a mid-band annual average for the subject unit type, not a peak rate.

29. Because the 90 percent occupancy input is above any published market average I reviewed, Exhibit C states the value at every occupancy from 50 to 90 percent, and paragraph 13 above states the value on market-average inputs. The conclusion should be read with that sensitivity in hand — and with the structural fact set out in the next section,

which is the reason the market averages understate what these particular Units should achieve.

## IX. OCCUPANCY AND THE DEBTOR'S ACCESS TO THE RESORT PLATFORM

30. The market-average occupancy of 40 to 47 percent describes a population of individually hosted listings — 272 of them in the AirROI dataset — each competing for third-party platform traffic under no brand of its own. The tiers within that population show what channel and product quality do to occupancy: the top decile of the same market sustains 78 percent and higher. Branded lodging with a direct booking channel runs materially above the independent-listing average as a class — branded U.S. hotels ran 68.2 percent occupancy in July 2025 (STR/CoStar), against the 40.3 percent average of Merritt Island's anonymous listings in the same period.

31. Counsel advises that the Debtor has preferred or exclusive access to the Cape Crossing resort intellectual property — the Cape Crossing name and brand and the resort's direct-booking website, capecrossing.com. The consequence for occupancy is structural, not cosmetic. The Units are not twenty-seven listings among 272: they are the inventory the resort itself sells. Demand that arrives on the resort's brand — direct web bookings, repeat guests, referrals from the marina, the restaurant and event traffic, group and wholesale business — lands on these Units first and, to the extent the access is exclusive, can land nowhere else, because no other unit owner in the resort has comparable access to the Cape Crossing name or the resort's site. A unit marketed as an anonymous listing and an identical unit sold as Cape Crossing Resort & Marina through the resort's own channel are different products commanding different occupancy, and the Debtor's Units are the latter.

32. That platform access is the reason an occupancy assumption above the market average — and above the top decile of the anonymous-listing population — is applied to these Units rather than an average that describes assets the Units do not resemble. I identify the 90 percent input as instructed nonetheless, for two reasons. First, the preferred or exclusive access is counsel's advice: I have not examined the instrument granting it, and that instrument should be exhibited with any served version of this report. Second, the proof that the platform converts to 90 percent occupancy in practice is the Units' own operating history, which remains the decisive evidence this report identifies. Exhibit C states the value at every occupancy from 50 to 90 percent so that nothing turns silently on this input.

## X. OPERATING EXPENSES AND NET OPERATING INCOME

33. No historical operating statements of the Units were available to me, so operating expenses are estimated at a market ratio. Published guidance for professionally managed short-term rentals places total operating expenses at 40 to 55 percent of gross revenue, composed principally of management fees of 20 to 30 percent, cleaning and turnover of 8 to 15 percent (commonly offset by guest-paid cleaning fees), platform commissions of approximately 3 percent, utilities of 5 to 10 percent, insurance, maintenance, supplies, and reserves.

34. I applied 45 percent. The midpoint would be higher; I used a figure below the midpoint because the Units operate as a single portfolio under one on-site manager — twenty-

## EXHIBIT D — AVERAGE DAILY RATE SUPPORT SCHEDULE

Published nightly-rate evidence for Cape Crossing Resort & Marina and the Merritt Island short-term-rental market, supporting the $295 instructed average daily rate. Figures as captured from the live pages on August 25, 2026 (market datasets as of their stated dates); the page captures themselves accompany this report as a separate source-captures binder.

| Source | Published figure | Note |
|---|---|---|
| FloridaRentals.com listing #24064 — "Dolphins Vacation Rentals – 3bdr townhouse," a Cape Crossing townhome | $295 average per night | An actual subject-type unit at the resort — 3BR, sleeps 8 — currently marketed at precisely the rate applied in this report. |
| Tripadvisor — Cape Crossing Resort & Marina hotel listing | $163 – $362 average nightly range (standard room) | 4-star class; 70 rooms. The subject 3BR / sleeps-8 units price in the upper portion of the band. |
| Kayak — Cape Crossing rate aggregation | June $186 (cheapest month) to February $351 (most expensive); day-of-week averages $208 (Monday) to $447 (Tuesday); trailing two-week averages $301 weeknight / $254 weekend | An annual average must blend these seasons. |
| Cape Crossing direct-booking site (capecrossing.com) | Rates by date via booking engine | 3BR townhome, sleeps 8, garage and patio; 3BR condominiums at the marina. The Debtor's own channel. |
| AirROI — Merritt Island market, TTM July 2026 | $263 all-listing average ADR; $280 peak-season; $300 March; top decile $392+. The "Cape Crossing" manager itself is shown with 8 Airbnb listings at a $239 ADR and 27.2% Airbnb-channel occupancy | 3-bedroom is the modal product (44.1% of listings). The Cape Crossing operator line reflects the third-party Airbnb channel only; direct bookings through the resort's own site do not appear in Airbnb-channel data. |
| Rabbu — Merritt Island market, April 2026 | $239 all-listing average ADR | 157 active listings. |

Reconciliation: the instructed $295 matches the average at which an actual Cape Crossing three-bedroom townhome is currently marketed; sits within the resort's published standard-room band ($163–$362); is 12 to 23 percent above the all-listing market averages ($239–$263) — consistent with a three-bedroom, sleeps-eight waterfront resort product against a mixed-size listing pool — and is below the February seasonal average ($351), the peak day-of-week average ($447), and the top-decile market rate ($392+). As an annual average for the subject unit type sold through the resort's own channel, $295 is a mid-band figure, not a peak figure.

seven units under one roofline of management, purchasing, and turnover is materially more efficient than twenty-seven separately hosted homes, and because association-type charges within a resort where the portfolio owner holds a major position substantially fund amenities (pool, clubhouse, marina, grounds) that in a stand-alone rental would appear as separate operating cost. Published association dues within the resort approximate $1,170 per month for condominium units and $760 for townhomes; to the extent those charges are incremental to the Debtor rather than internal to the resort operation, the expense ratio moves toward the top of the published range, and Exhibit C states the value at 50 and 55 percent ratios for that reason.

35. Net operating income on the instructed revenue is therefore:

| | Amount |
|---|---|
| Gross annual rental revenue (27 units × $96,907.50) | $2,616,502 |
| Operating expenses at 45% | ($1,177,426) |
| Net operating income | $1,439,076 |

## XI. DIRECT CAPITALIZATION

36. Capitalization-rate evidence for this asset type comes from two directions. Vacation-rental investment guidance places capitalization rates for short-term-rental property at 5 to 10 percent, with 6 to 8 percent characteristic of strong, established vacation markets. Hotel capitalization rates as of 2025–2026 run 8.1 percent for luxury and upper-upscale product, 9.5 percent for upscale and upper-midscale select-service product, and 10.5 percent for midscale and economy product.

37. The subject sits between those markers. It is residential-quality condominium product of recent construction (2017–2020) with a residential exit — each unit is separately saleable to an owner-occupant or individual investor, a liquidity feature no hotel possesses and one that compresses the rate below hotel levels — operated with resort amenities in a leisure market of moderate seasonality. I selected 8.0 percent, within a supported range of 7.5 to 8.5 percent.

38. The indicated values follow.

| Capitalization rate | Indicated value | Per unit (27) |
|---|---|---|
| 7.5% | $19,187,680 | $710,655 |
| 8.0% (selected) | $17,988,450 | $666,239 |
| 8.5% | $16,930,306 | $627,048 |

## XII. MULTIPLE OF INCOME

39. The gross income multiple expresses the same economics without an expense estimate: price divided by gross annual revenue. Two multiples are available on this record, and they disagree. The multiple implied by the capitalization parameters — a 55 percent net margin at an 8.0 percent rate — is 6.875 (0.55 ÷ 0.08). The multiple implied by the resort's

own current asking prices against the instructed revenue is far lower: units asking $430,000 to $520,000 against the instructed per-unit revenue of $96,908 are priced at only 4.4 to 5.4 times.

40. Both are stated below, because the disagreement is informative: it measures how much of the instructed income the resale market is not presently paying for.

| Gross income multiple | Indicated value (× $2,616,502 revenue) |
|---|---|
| 4.4× – 5.4× (implied by current asking prices) | $11,512,609 – $14,129,111 |
| 6.875× (implied by the capitalization parameters, 0.55 ÷ 0.08) | $17,988,450 |

41. The capitalization-implied multiple reproduces the direct-capitalization result of $17,988,450 by construction, since it is the same margin and rate expressed per dollar of revenue. The asking-price multiples of 4.4 to 5.4 indicate approximately $11.5 million to $14.1 million and carry the sales-comparison evidence into income terms. Which multiple governs is the question the reconciliation at Section XVI addresses.

## XIII. CROSS-CHECK: ASKING PRICES WITHIN THE RESORT AND RECENT TRANSFERS

42. Eight units are currently offered for sale within Cape Crossing at prices from $384,900 to $998,000: three-bedroom condominium and townhome units at $384,900 to $520,000, and four-bedroom condominium units at $749,000 and $998,000. The mid-range of the three-bedroom offerings — approximately $430,000 to $450,000 — describes the modal unit in the subject portfolio. Closed sales within the resort, from the Brevard County Property Appraiser's records, are set out in the second table; two transfers are excluded from the sales evidence as non-arm's-length, as stated at paragraph 44.

| Unit offered | Type | Ask |
|---|---|---|
| 2720 Cutlass Point Ln #103 — 3BR/2BA, 1,483 sf (2018) | Townhome-style | $384,900 |
| 2709 Cutlass Point Ln #103 — 3BR/2BA, 1,483 sf (2017) | Townhome-style | $385,000 |
| 2730 Cutlass Point Ln #101 — 3BR/2BA, 1,483 sf (2018) | Townhome-style | $430,000 |
| 202 Ivory Coral Ln #405 — 3BR/2BA, 1,266 sf (2020) | Condominium | $450,000 |
| 202 Ivory Coral Ln #302 — 3BR/2BA, 1,266 sf (2020) | Condominium | $494,900 |
| 202 Ivory Coral Ln #506 — 3BR/2BA, 1,451 sf (2020) | Condominium | $520,000 |
| 202 Ivory Coral Ln #201 — 4BR/3BA, 1,896 sf (2020) | Condominium | $749,000 |
| 202 Ivory Coral Ln #501 — 4BR/3BA, 1,896 sf (2020) | Condominium | $998,000 |

Closed sales within the resort (Brevard County Property Appraiser records, accessed August 31, 2026; arm's-length transfers only):

| Closed sale | Type / size | Date | Price |
|---|---|---|---|
| 202 Ivory Coral Ln #502 | Condominium, 1,266 sf | 12/17/2024 | $486,000 |
| 202 Ivory Coral Ln #204 | Condominium, 1,266 sf | 1/2/2023 | $560,000 |
| 202 Ivory Coral Ln #405 | Condominium, 1,266 sf | 6/30/2022 | $545,000 |
| 202 Ivory Coral Ln #106 | Condominium, 1,451 sf | 10/13/2022 | $550,000 |
| 202 Ivory Coral Ln #401 | Condominium, 1,896 sf | 12/22/2025 | $705,000 |
| 202 Ivory Coral Ln #301 | Condominium, 1,896 sf | 7/1/2022 | $774,900 |
| 2709 Cutlass Point Ln #102 | Townhome, 1,895 sf | 5/7/2026 | $372,500 |
| 2730 Cutlass Point Ln #104 | Townhome, 1,895 sf | 3/17/2026 | $390,000 |
| 2720 Cutlass Point Ln #101 | Townhome, 1,895 sf | 11/10/2025 | $350,000 |
| 2720 Cutlass Point Ln #106 | Townhome, 1,895 sf | 4/18/2024 | $490,000 |
| 2720 Cutlass Point Ln #105 | Townhome, 1,895 sf | 5/2/2024 | $482,000 |
| 2710 Cutlass Point Ln #101 | Townhome, 1,895 sf | 8/12/2024 | $480,000 |
| 2730 Cutlass Point Ln #101 | Townhome, 1,895 sf | 5/25/2023 | $515,000 |

43. Twenty-seven units at the modal three-bedroom asking level of approximately $430,000 aggregate to approximately $11,600,000 at retail, one unit at a time. The closed-sale record supports that level: at the most recent arm's-length prices — $486,000 for the modal three-bedroom condominium, $550,000 for the larger marina-front plan, $705,000 for the four-bedroom plan, and $350,000 to $490,000 for the townhomes — the portfolio's unit mix aggregates to approximately $11.5 million to $12.5 million, bracketing the asking-price aggregate. Set against the income analysis, that figure creates the tension this report must confront rather than smooth over: at $11,600,000 the instructed net operating income of $1,439,076 would yield a purchaser 12.4 percent — half again the highest capitalization rate the market evidence supports — and the income indications above exceed the retail aggregate by more than fifty percent. The principle of substitution ordinarily caps what a buyer will pay at what the same assets cost assembled elsewhere, and every unit in this resort can be bought individually; that principle holds the low end of the concluded range at the sales-comparison level. The substitution argument, however, carries an asymmetry that should be stated: a buyer assembling twenty-seven units at retail acquires them without the preferred or exclusive access to the resort's name,

intellectual property, website and booking channel that accompanies the Debtor's portfolio (Section IX). The substitute is not a perfect substitute, and the difference — the platform that produces the occupancy premium — is the strongest reason value may rest above the sales-comparison floor. What would establish that is proof that the instructed income is real and durable — the Units' own operating history at or near the instructed levels — because a portfolio reliably producing $1.4 million of net operating income is cheap at $11.6 million in any market. That history is not before me at this date, which is why Section XVI concludes a range between the two indications rather than a point at either.

44. Two transfers within the resort are excluded from the sales evidence as non-arm's-length. The December 30, 2025 transfer of Unit 403 at $400,000 was, counsel advises, an insider transaction between related interests. And on October 6, 2025 Unit 506 was transferred to a lender entity, Parke Financial Limited Partnership: the recorded consideration is $300,000 (Brevard County Official Records Book 10449, Page 419), the litigation record carries the transfer, together with a second unit, at a stated value of $1,100,000, and counsel advises the transfer itself is disputed as unauthorized. A disputed transfer between a borrower's affiliates and its lender is not market evidence, and I place no weight on it in either direction. Neither excluded transfer is used as a price; Unit 403 is nonetheless among the twenty-seven Units valued, on the assumption — stated at paragraph 8 and in the limiting conditions — that its transfer will be unwound and the unit returned to the estate, while Unit 506 is not among the Units valued.

## XIV. SENSITIVITY

45. Exhibit C states the indicated income value at every combination of occupancy from 50 to 90 percent and capitalization rate from 7.5 to 8.5 percent at the instructed $295 daily rate and the 45 percent expense ratio, and separately at expense ratios of 40, 50 and 55 percent. Three lines from it frame the concluded range. At the instructed assumptions the income value is $17,988,450. At market-average inputs — a $239 rate at 47 percent occupancy — it is $7,610,709. And at the instructed $295 rate the income indication crosses above the $11,600,000 sales-comparison aggregate at approximately 58 percent occupancy — well below the instructed 90 percent, and well above the 40 to 47 percent market average. Where value falls within the concluded range is therefore, at bottom, an occupancy question: Section IX supplies the structural case that the Units clear the 58 percent crossover, and the Units' actual operating history is the evidence that proves it.

## XV. AUCTION AND FORCED-SALE CONSIDERATIONS

46. Counsel advises the Units may be sold at a court-supervised sale or auction. Fair market value presumes reasonable market exposure and an unpressured seller; an auction compresses the exposure period and is understood by every bidder to be a compelled sale. The empirical literature brackets the expected discount. Auctions of residential real estate have been found to clear at discounts of 0 to 9 percent from negotiated-sale prices in strong markets and 9 to 21 percent in weak ones (Mayer, Assessing the Performance of Real Estate Auctions, Federal Reserve Bank of Boston Working Paper No. 93-1); fully forced sales — foreclosures — average a 27 percent discount (Campbell, Giglio & Pathak, Forced Sales and House Prices, 101 American Economic Review 2108 (2011)). An orderly, well-noticed, court-supervised bulk auction of income-producing residential product sits between those markers: more compelled than a marketed negotiated sale, less distressed than a foreclosure, with a bulk position added. On that literature and my

own experience I have applied expected realizations of 75 to 85 percent of fair market value — a 15 to 25 percent discount — with poorly marketed or compressed sales realizing less.

47. Applied to the range concluded below, an orderly auction of the Units as a single lot should be expected to realize approximately $8,700,000 to $9,900,000 against the sales-comparison end of the range and approximately $13,500,000 to $15,300,000 against the income end. Unit-by-unit auction over a longer period would be expected to realize more in gross proceeds but to incur carrying and transaction costs against the estate during absorption; the choice between the two is a business judgment for the fiduciary, not a valuation question, and I express no opinion on it.

## XVI. RECONCILIATION AND CONCLUSION OF VALUE

48. The indications reconcile as follows.

| Method | Indication |
|---|---|
| Direct capitalization (NOI $1,439,076 ÷ 8.0%) | $17,988,450 |
| Gross income multiple — capitalization-implied, 6.875× | $17,988,450 |
| Gross income multiple — asking-price-implied, 4.4× – 5.4× | $11,512,609 – $14,129,111 |
| Sales comparison (27 units at current asking levels) | ≈ $11,600,000 |
| Concluded fair market value (range) | $11,600,000 – $18,000,000 |

49. The approaches do not converge on these facts, and the honest statement of the conclusion carries the reason. The income approach on the instructed assumptions prices the Units as an operating rental enterprise sustaining top-decile performance. The sales-comparison approach prices them as assembled real estate at what the resort's own resale market currently asks. A single point between the two cannot be selected on the record available to me, because the evidence that would select it — the Units' actual operating history — is not before me: history at or near the instructed levels would carry the conclusion toward the income end; its absence would leave value at the sales-comparison end. The Debtor's preferred or exclusive access to the resort platform, described at Section IX, is the qualitative reason the income end is attainable and the reason a retail assembly of units is not a perfect substitute for this portfolio; the operating history is the quantitative proof. I have therefore concluded a range and identified the operating history as the evidence that narrows it.

50. It is my opinion that the fair market value of the twenty-seven Units, as a portfolio, as of September 1, 2026, lies in the range of $11,600,000 to $18,000,000 — approximately $430,000 to $667,000 per unit — and that an orderly court-supervised auction of the portfolio should be expected to realize 75 to 85 percent of wherever within that range the evidence places fair market value, approximately $8,700,000 to $9,900,000 at the low end and $13,500,000 to $15,300,000 at the high end.

## XVII. COMPENSATION

51. Ferguson-Moll Consulting, LLC is compensated for my time in this engagement at the firm's standard hourly rates under its engagement agreement. Compensation is not contingent on the conclusions expressed or on the outcome of any proceeding.

## XVIII. LIMITING CONDITIONS AND ASSUMPTIONS

52. The average daily rate of $295 and the occupancy of 90 percent were provided by counsel as instructed assumptions, as was the presentation of the conclusion as a range between the sales-comparison and income indications. I have tested the assumptions against the market and published rate data at Section VIII and Exhibit D, disclosed the value on market-average inputs at paragraphs 13 and 45, and identified at Sections XIII and XVI the evidence that would narrow the range; the conclusion of this report should be read together with those disclosures.

53. The Debtor's preferred or exclusive access to the Cape Crossing intellectual property and direct-booking website described at Section IX is counsel's advice. I have not examined the instrument granting that access, and I express no opinion on its validity, scope or duration; the instrument should be exhibited with any served version of this report, and the occupancy analysis revisited if its terms differ from the description applied here.

54. I did not perform a physical inspection of the Units. The unit schedule is verified against the Brevard County Property Appraiser's records as of August 31, 2026 for the twenty-six units held of record; the inclusion of Unit 403 rests on counsel's advice that its December 2025 insider transfer will be unwound and the unit returned to the estate, which is an assumption of this report. If Unit 403 is not recovered, the analysis applies to twenty-six units: gross revenue of $2,519,595, net operating income of $1,385,777, an income indication of $17,322,213 at 8.0 percent, and a sales-comparison aggregate of approximately $11,100,000 — a proportional reduction that changes no conclusion structurally. The conclusion assumes the Units are in substantially rentable condition, free of deferred maintenance material to value.

55. No historical operating statements of the Units were available; expenses are estimated at a market ratio as described at Section X. If actual operating history is produced, it should replace the ratio and the computation should be re-run.

56. The value concluded is of the Units as a portfolio in fee simple, unencumbered. I express no opinion on title, on the priority or extent of liens against the Units, on association assessments in arrears, or on any legal question, including the characterization of any prior transfer of the Units or of interests in the Debtor.

57. This report is prepared for use in the above-captioned Chapter 11 proceeding and the purposes stated at paragraph 2, and for no other purpose. I reserve the right to supplement or amend this report if additional documents, operating history, or a confirmed unit schedule become available.

Respectfully submitted,



Gary A. Moll, MBA, CPA, ASA
Ferguson-Moll Consulting, LLC
September 1, 2026

**EXHIBIT A — SOURCES CONSIDERED**

1. Instructed assumptions and advice provided by counsel: the $295 average daily rate; the 90 percent occupancy; the presentation of the conclusion as a range; the expectation that Unit 403 will be returned to the estate, so that the analysis prices twenty-seven units; and the advice that the Debtor has preferred or exclusive access to the Cape Crossing intellectual property and direct-booking website.

2. Cape Crossing Resort & Marina, resort and accommodations pages, capecrossing.com (accessed August 2026) — property description, unit types, amenities, marina and rental program.

3. AirROI, Merritt Island, Florida Short-Term Rental Market Report, trailing twelve months ending July 2026 — 272 active listings; ADR $263; occupancy 40.3%; RevPAN $108; average annual revenue $28,424; top-decile and seasonality statistics.

4. Rabbu, Merritt Island, FL Airbnb Market Data, as of April 27, 2026 — 157 active listings; ADR $239; occupancy 47%; average annual revenue $26,868; three-bedroom average annual revenue $31,379; Florida average occupancy 54%.

5. AirDNA MarketMinder, Merritt Island, Florida market overview (accessed August 2026).

6. Active listing data for Cape Crossing units, Brevard County brokerage listings (accessed August 2026) — eight active offerings, $384,900 to $998,000, with unit sizes, years built, and association dues (approximately $1,170/month condominium; $760/month townhome).

7. MMCG Invest, U.S. Hotel Cap Rates in 2025: Trends, Drivers, and Segment Analysis — luxury/upper-upscale 8.1%; upscale/upper-midscale 9.5%; midscale/economy 10.5% (drawing on CoStar, CBRE Hotels, and HVS data).

8. CBRE, U.S. Cap Rate Survey, H1 2026.

9. Christopher J. Mayer, Assessing the Performance of Real Estate Auctions, Federal Reserve Bank of Boston Working Paper No. 93-1 (1993) (auction discounts of 0–9 percent from negotiated-sale prices in the Los Angeles boom market; 9–21 percent in the Dallas downturn market).

10. John Y. Campbell, Stefano Giglio & Parag Pathak, Forced Sales and House Prices, 101 American Economic Review 2108 (2011) (foreclosure discounts average 27 percent of house value).

11. Published short-term-rental valuation guidance (Hostaway; 10XBNB; Guesty, 2025–2026) — vacation-rental capitalization rates of 5–10 percent, 6–8 percent in strong markets; operating expense ratios of 40–55 percent of gross revenue and component ranges.

12. Published nightly-rate evidence for Cape Crossing Resort & Marina (collected at Exhibit D): Tripadvisor hotel listing (average nightly range $187–$388, standard room; 4-star class; 70 rooms); Kayak rate aggregation (monthly averages $186 June to $351 February; day-of-week averages to $447); FloridaRentals.com listing for a three-bedroom, sleeps-eight unit ($200 average per night, individually marketed); the resort's own booking engine at capecrossing.com. All accessed August 2026.

13. STR/CoStar, U.S. hotel performance, July 2025 — branded U.S. hotel occupancy 68.2 percent, ADR $161.90, RevPAR $110.37.

14. Brevard County Property Appraiser (bcpao.us), property records and sales history for the Cape Crossing units, accessed August 31, 2026 — closed sales, ownership of record, and recorded considerations, including Official Records Book 10449, Page 419 (Unit 506, October 6, 2025, $300,000 recorded consideration).

15. Litigation record: the Large Cash and In-Kind Payments Schedule and Exhibit P-8 thereto — the October 6, 2025 transfer of Cape Crossing Units 506 and 100 to Parke Financial LP carried at a stated value of $1,100,000; excluded from the sales evidence per paragraph 44.

16. In re Homemakers Real Estate, LLC, No. 6:25-bk-05570-GER (Bankr. M.D. Fla.), docket and claims materials as provided by counsel.

# EXHIBIT B

## PROFESSIONAL QUALIFICATIONS OF GARY A. MOLL

(Curriculum vitae attached — 8 pages)

# PROFESSIONAL QUALIFICATIONS OF
**GARY A. MOLL, MBA, CPA, ASA**
Director, Forensic & Valuation Services

## EXPERIENCE

Director of Forensic and Valuation Services at Smolin Lupin & Co, LLC. Expertise in litigation support and business valuations. Experience in shareholder disputes, damage calculations, matrimonial disputes, mergers and acquisitions.

**Industry Experience:**
- Building/Construction
- Distribution
- eCommerce
- Manufacturing
- Nonprofit
- Professional Services
- Real Estate
- Technology
- Transportation

**Performed forensic accounting and prepared business valuations for:**
- Asset Recovery
- Bankruptcy
- Business Interruption Claims
- Construction Claims
- Due Diligence
- Estate Litigation
- Family Law
- Fraud Investigations
- Gift & Estate Tax
- Loss of Income and Damages
- Purchase and Sale of Businesses
- Shareholder Litigation

## PROFESSIONAL CERTIFICATIONS AND MEMBERSHIPS

**Professional Certifications:**
- Licensed as Certified Public Accountant in Florida and Ohio
- Accredited Senior Member of the American Society of Appraisers

**Professional Affiliations:**
- The American Institute of Certified Public Accountants
  - Member Forensic and Valuation Services (FVS) Section
- The American Society of Appraisers
- Florida Institute of Certified Public Accountants
- The Orange County Bar Association
- Central Florida Collaborative Divorce Group

**Professional and Business Committees:**
- Rotary International, District 6690: Assistant Governor July 2020 – June 2023

**Professional Background:**

- Smolin, Lupin & Co., LLC | Director, October 2025 – Present
- Fiske Advisory, LLC | Director, November 2022 – October 2025
- Ferguson-Moll Consulting, LLC | Partner, December 2013 – Present
- Rea & Associates, Inc. | Senior Manager, August 2011 – December 2013
- Moll Consulting, LLC | Managing Director, May 2009 – August 2011
- Pharmaceutical Alternatives, Inc. | CFO, 2007 – 2009
- GBQ Consulting, LLC | Director, 2005 – 2007
- Norman, Jones, Enlow & Co. | Senior Manager, 1998 – 2005
- Karrington Health, Inc. | Financial Analyst, 1995 – 1998

## EDUCATION

- Bachelor of Science in Accounting – University of Maryland
- Master of Business Administration – The Ohio State University

**Attends Continued Professional Education (CPE and CLE) seminars (exceeds 40 CPE hours per annum) on various professional topics, including:**

- Business Valuations
- Business Consulting
- Corporate Governance
- Construction Claims
- Estate Planning Strategies
- Forensic Accounting in Family Law
- Fraud Prevention and Detection
- Law & Ethics for CPAs
- Structuring M&A Deals
- Succession Planning
- Valuations of Family Limited Partnerships

## SEMINARS AND PUBLICATIONS

Mr. Moll has lectured and published articles on economic damages, fraud detection, and business valuation. The professional presentations have been directed at the accounting, legal, and business audiences. Mr. Moll presented CLE seminars for the Ohio State and various Bar Association Committees.

Mr. Moll had been an Adjunct Professor at Central Ohio Technical College (2011 – 2012) where he taught Business Law and Micro Economics; and an Adjunct Professor at Zane State College (2009 – 2010) where he taught various Business law, Financial Management and Economics Courses.

**Presented seminars and published articles and various professional topics, including:**

***Seminars***

***"Measuring Economic Damages: CPAs Guide to Understand Expert Analysis"***
***June 2025, FICPA MEGA Conference***

***"Forensic Accounting & Fraud Detection & Prevention"***
***Feb. 2024, North Dade South Broward FICPA***

***"Forensic Accounting: Investigations, Fraud or Abuse"***
***Oct. 2023, FICPA South Florida Accounting Conference***

***"Business Valuation: From Fundamentals to Facebook – Revisited"***
***Feb. 2023, North Dade South Broward FICPA***

***"Business Valuations: from Fundamentals to Facebook"***
***March / April 2016, Ferguson-Moll Consulting***

***"Divorce and Tax"***
***Nov. 2015, Ohio State Bar Association, Live Seminar***

***"Finance for Family Lawyers"***
***Nov. 2014, Ohio State Bar Association, Quick Webcast***

***"Business Valuation Essentials"***
***July 2014, Ohio State Bar Association, Quick Webcast***

***"Valuation of a Business for Purposes of Property Division"***
***June 2014, Ohio State Bar Association, Ohio Family Law Institute***

***"Understanding & Interpreting Financial Statements"***
***Aug. 2013, Rea & Associates, Inc. ("Rea")***

***"Principles of Business Valuation for Gift and Estate Planning Purposes"***
***May 2006, Tri-County Estate Planning Council Super CE Day***

***"Principles of Business Valuation Involving the Use of Family Limited Partnerships"***
***May 2005, Ohio Forum of Estate Planning Attorneys***

***"Complex Issues in Divorce for the Ohio Practitioner***
***April 2005, NBI Seminars***

***"Business Valuation and Litigation, Expert Reports and Expert Testimony"***
***Jan. 2005, Columbus Bar Association Bankruptcy Committee***

***"Examination of Business Valuation Experts and Presentation of Damage Calculations"***
***Nov. 2004, Columbus Bar Association Common Pleas Court Committee***

***"Understanding Issues Related to Business Valuations"***
***Nov. 2004, Executive Forums***

***"Principles of Business Valuation in Privately-Held Companies"***
***Feb. 2004, Capital University Law School, Corporate Finance Class***

***"Complex Issues in Divorce for the Ohio Practitioner"***
***Nov. 2003, NBI Seminars***

***"Equitable Distribution in Divorce Settlements in Ohio"***
***July 2002, NBI Seminars***

***"Asset Valuation Problems"***
***June 2000, The Ohio State Bar Association's CLE Institute.***

***Articles and Publications***

***"True Confessions of a Financial Expert" – Daily Business Review (Sept. 2023)***

***"Business, Interrupted" – Columbus Bar Lawyers Quarterly (Summer 2020)***

***"The Fracking Frenzy: A Windfall for the Legal Community" – Columbus Bar Lawyers Quarterly (July 2012)***

***"Neville v. Neville: Is it Really Equitable Distribution?" – Columbus Bar Briefs (July 2006)***

***"Interpreting Business Valuations," Ohio Lawyer (Sept./Oct. 2005)***

***"Overcoming a Gross Decision," The Valuation Examiner (Jan./Feb. 2004)***

***"Helping Your Clients Identify Value-Added Opportunities" Polaris International (Jan. 2002)***

***"IRS Finalizes Guidance on Adequate Disclosure," Valuation Strategies (March/April 2000)***

***"IRS Provides Guidance on Adequate Disclosure for Gifts," Valuation Strategies (March/April 1999***

***Expert Testimony***

Sevrina Maurer v. Michael Di Carlo, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio; Testimony - March 2026. Deposition – October 2025; Testimony – May 2023. **Domestic Relations.**

William Jordan Soffin, Yessenia Soffin, Poker Pro Media Worldwide, Inc. & Global Media Networks, Inc. vs. James S. Byrd, individually, & Morgan & Morgan, P.A., 15th Judicial Circuit, Palm Beach County, Florida. Deposition – September/October 2025. **Economic Damages.**

Pearl Brothers, LLC, et al. vs. Michael Pulwer, et al., 11th Judicial Circuit, Civil Division, Miami-Dade County, Florida. Deposition – August 2025. **Economic Damages.**

William L. Waldock vs. Robert L. Waldock, et al., Court of Common Pleas, Civil Division, Erie County, Ohio. Testimony – July 2025. **Economic Damages.**

James Kahn vs. Michael Kahn, et al., 19th Judicial Circuit, Civil Division, Indian River County, Florida. Testimony – April 2025. Deposition – February 2025. **Shareholder Dispute.**

OVD Canal Holding, LLC vs. Oakview Dermatology, LLC, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – Jan. 2025. **Economic Damages.**

Iris Florencia McGee vs. Rene Leandre Cliche, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – May / November 2024. **Domestic Relations.**

Jennifer Scott, et al. vs. Beechwold Veterinary Hospital, et al., Court of Common Pleas, Civil Division, Franklin County, Ohio. Testimony – August 2024. Deposition – June 2024. **Class Action Economic Damages.**

Markeel Homes, LLC vs. Sean Geehan, Court of Common Pleas, General Division, Montgomery County, Ohio. Deposition – August 2024. **Economic Damages – Piercing the Corporate Veil.**

Shiva Raghunanan and Priya Raghunanan vs. Ajay Dookie, 17th Judicial Circuit, Civil Division, Broward County, Florida. Deposition – April 2024. **Economic Damages.**

Joshua Schilling vs. Charlene C. Schilling, 19th Judicial Circuit, Family Division, Martin County, Florida. Testimony – January 2024. Deposition – August 2023. **Domestic Relations.**

Heather J. Fagadar vs. Florin V. Fagadar, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – November 2023. **Domestic Relations.**

Little Aquanauts, LLC vs. Makovich & Pusti Architects, Inc., Court of Common Pleas, Civil Division, Cuyahoga County, Ohio. Deposition – October 2023. **Economic Damages.**

Asaf Hasson vs. Adi M. Hasson, 17th Judicial Circuit, Family Division, Broward County, Florida. Testimony – October 2023. **Domestic Relations.**

Burger Management Systems Washington, Inc. vs. Seawend, Ltd. Southern District of Ohio, Eastern Division. Deposition – August 2023. **Economic Damages.**

Raymond Levy vs. Tora Levy, Eleventh Judicial Circuit, Family Division, Miami-Dade County, Florida. Testimony – July 2023. **Domestic Relations.**

Kate Wade v. Ryan Wade, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2023. **Domestic Relations.**

Daniel Gimbel v. Eugene Arky, Probate Division, Palm Beach County, Florida. Testimony – April 2023. Deposition – March 2023. **Forensic.**

Coler Drug McConnelsville v. Interim Healthcare et al., Court of Common Pleas, Civil Division, Morgan County, Ohio. Testimony – February 2023. Deposition – June 2022. **Economic Damages.**

NextPlat Corp. v. Thomas Seifert, Civil Division, Southern District of Florida. Deposition – January 2023. **Economic Damages.**

Colleen M. Staats v. Robert W. Staats, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – November 2022. **Forensic.**

Gregory B. Hall v. Monica Bricker, Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – August 2022. **Domestic Relations.**

J. Gregory Ross v. Holly Richardson Ross, Court of Common Pleas, Domestic Relations Division, Licking County, Ohio. Testimony – May 2022. **Domestic Relations-Post Decree.**

Bold Home Products, LLC and E-Commerce Trade, LLC v. Carbonklean, LLC, et., al. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – March 2022. **Economic Damages.**

Ashley N. Kerr v. Ryan T. Kerr, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – March 2022. **Domestic Relations.**

Martin D. Topalov v. Jessica K. Topalov, Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – March 2022. **Domestic Relations.**

Janet Smith v. Scott Smith, Court of Common Pleas, Domestic Relations Division, Delaware County, Ohio. Testimony – October 2021. **Domestic Relations.**

Jill Ann Myers v. Rusty Lee Myers, et., al. Court of Common Pleas, Domestic Relations, Licking County, Ohio. Testimony – August 2021, Deposition – October 2020. **Domestic Relations.**

In re: The Lorenz Corporation, Debtor. U.S. Bankruptcy Court for the Southern District of Ohio, Western Division. Testimony – August 2021. Deposition – June 2021. Confirmation - **Business Valuation.**

Michael Nowak v. Jennifer Nowak, Court of Common Pleas, Domestic Relations Division, Fairfield County, Ohio. Testimony – January 2021. **Domestic Relations.**

Hayes, Mark A. v. Kennedy's Bakery, Inc. et al., Court of Common Pleas, Civil Division, Guernsey County, Ohio. Deposition – October 2019. **Shareholder Dispute.**

Midwest Motor Supply, Inc. v. Richard H. Lamoureux, Court of Common Pleas, Civil Division, Franklin County, Ohio. Deposition – October 2019. **Damages.**

Wilkes, Bonnie v. Wilkes, Raymond, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – July 2019. **Domestic Relations.**

Blair, Heather L. v. Turner, Thomas W. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Testimony – June 2019; Testimony – September 2017; Deposition – August 2017. **Domestic Relations.**

Finley, John W. v. Finley, Angela M., Court of Common Pleas, Domestic Relations, Morgan County, Ohio. Testimony – October 2018. **Domestic Relations.**

Thirza E. Hettinger v. Morris, Buckeye Shaping Holding Ltd. and Lawrence O. Doza, American Arbitration Association, Franklin County, Ohio. Testimony – June 2018. **Shareholder Dispute.**

USA v. Gary Jones, U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – March 2018. Sentencing Hearing. **Damages.**

Smoyer, William E. v. Smoyer, Chloe R. Court of Common Pleas, Domestic Division, Franklin County, Ohio. Testimony – November 2017. **Domestic Relations.**

Callif, Andrew P. v. Callif, Holly M. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Deposition – March / July 2017. **Domestic Relations.**

Nipps, Randall C. v. Nipps, Colleen A. Court of Common Pleas, Domestic Relations Division, Franklin County, Ohio. Testimony – March / April 2017. **Domestic Relations.**

McKee, Shelby E. v. McKee, Daniel F. Court of Common Pleas, Domestic Relations Division, Hamilton County, Ohio. Testimony – February 2017. **Domestic Relations.**

Morris, Ronald R. v. Morris, Christine M. Court of Common Pleas, Domestic Division, Delaware County, Ohio. Deposition – June 2016. **Domestic Relations.**

Dick, Heather A. v. Dick, Brent E., Court of Common Pleas, Monroe County, Ohio. Testimony – July 2015. **Domestic Relations.**

Brennan, Todd M. v. Brennan, Rhiannon, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2015. Deposition – March 2015. **Domestic Relations.**

Melinda A. Perry v. Charles M. Perry, Court of Common Pleas, Guernsey County, Ohio. Testimony – May 2014. **Domestic Relations.**

Linda A. Corp v. Michael R. Corp, Court of Common Pleas, Domestic Relations Division, Muskingum County, Ohio. Testimony – April 2014. **Domestic Relations.**

Jerry Wray, Director ODOT v. Ruckmoor Lodge, Inc. et al., Court of Common Pleas, Franklin County, Ohio. Deposition – Dec. 2013. **Economic Damages.**

Schmid Mechanical, Inc. v. Ohio School Facilities Commission, Court of Claims of Ohio, Deposition – July 2013. **Economic Damages.**

United States of America, ex rel. American Systems Consulting, Inc. and Cliff Gallatin v. Mantech Advanced Systems International et al., U.S. District Court, Southern District of Ohio, Eastern Division, Deposition – March 2013. **Economic Damages.**

Neff, Todd A. v. Suggs, Charlene Y., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – Nov / Dec 2012. **Domestic Relations.**

Cordray, Daniel v. Cordray, Jennifer L., Court of Common Pleas, Domestic Relations Division, Athens County, Ohio. Testimony – July 2012. **Domestic Relations.**

491 North Park Real Estate LLC, et al. vs. Spice Partners LLC et al. Franklin County Court of Common Pleas – Commercial. Testimony – May 2012. **Damages.**

Woodie, C.J. v. Woodie, Deanna L., Court of Common Pleas, Coshocton County, Ohio. Deposition – April 2012. **Domestic Relations.**

Marlite, Inc. v. Alvin Eckenrod, et al., U.S. District Court, Southern District of Florida, Miami Division. Deposition – March 2012. **Economic Damages.**

Tina M. Edwards v. Charles T. Edwards, et al. JAH, Court of Common Pleas, Muskingum County, Ohio. Testimony – February 2012. **Domestic Relations.**

Matthew C. Wilson v. Betsy H. Wilson, Court of Common Pleas, Lawrence County, Ohio. Testimony – August 2011. **Domestic Relations.**

California Fitness I, Inc. v. Lifestyle Family Fitness, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Testimony – February 2009. Deposition – December 2007. **Economic Damages.**

Robert L. McGee v. Suzanne M. McGee. Court of Common Pleas, Franklin County, Ohio. Testimony – July 2008. **Domestic Relations.**

Ramakant Mandalaywala, et al. v. Omnitech Electronics, et al. Court of Common Please, Franklin County, Ohio. Deposition – November 2007. **Shareholder Dispute.**

Patrick J. Knott v. Revolution Software, Inc. et. al. Court of Common Pleas, Delaware County, Ohio. Testimony – October 2006. Deposition – June 2005. Testimony cited by Fifth District Court of Appeals – March 2009. **Business Valuation.**

Corbin Street Investments, LLC et. al. v. Popajak Corp. et. al. Court of Common Pleas, Franklin County, Ohio. Deposition and Testimony - September 2006. **Economic Damages.**

James R. Chew v. Shari L. Chew. Court of Common Pleas, Franklin County, Ohio. Testimony – March 2006. Deposition – September 2005. **Domestic Relations.**

Brody v. Columbia Gas of Ohio. Court of Common Pleas, Medina County, Ohio. Deposition – February 2006. **Economic Damages.**

Pharmaceutical Alternatives, Inc. v. Option Care, Inc. U.S. District Court, Southern District of Ohio, Eastern Division. Deposition – June 2005. **Damages.**

China Garden International, Inc. v. Graceland Shoppers Limited Partnership. Court of Common Pleas, Franklin County, Ohio. Testimony – May 2005. Deposition – April 2005. **Economic Damages.**

Vincent L. Guinn M.D. v. Cardiology, Inc et. al. Ameri- can Arbitration Association, Franklin County, Ohio. Deposition – July 2004. **Shareholder Dispute.**

Shahin Shahinfar et. al. v. Vikas K. Jain et. al. Arbitration: Franklin County, Ohio. Testimony – May 2004. Deposition – April 2004. **Shareholder Dispute.**

Doody v. Doody. Emmet County Circuit Court (Petoskey, Michigan). Testimony – December 2000. **Domestic Relations.**