FILED ORL INTAKE - USBC
16 NOV 2026 PM2:53

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re: Case No. 6:25-bk-05570-GER

HOMEMAKERS REAL ESTATE, LLC, Chapter 11

Debtor.
______________________________/

# FRANK AMODEO'S MEMORANDUM COMPARING THE THIRD AMENDED PLAN WITH THE TRUSTEE'S PLAN AND WITH CHAPTER 7, AND THE COST OF EACH

On July 14, 2026, Jeff Ainsworth, counsel for PEDixon and ZPD, told this court that "math is math." (July 14, 2026 Hearing Tr. at 35:3–4). Mr. Ainsworth was right, and the math decides between the two plans. The Trustee's plan does not pay the creditors in full. Unsecured creditors receive a share of whatever remains. Each secured creditor gives up a carve-out from the proceeds of that creditor's own collateral and carries any shortfall as an unsecured deficiency. (Doc. 394 at 9; Doc. 434 at 18, 22–23). My plan pays every creditor, secured creditors included, the full allowed claim. (Third Am. Plan §§ 4.1, 4.7). The difference lies in the purpose of the sale. My plan reorganizes the Debtor and sells a Unit only when the rents fall short. The Trustee's plan sells every Unit and passes the true value of the Units to the buyer, whether the buyer is a stranger or one of the parties who, like soldiers inside the Trojan horse, help destroy the business. Those parties seek to take the value from those who paid for it.

Start with a premise no one disputes: property sold under compulsion, or sold all at once, brings less than property sold in the ordinary way. The Supreme Court states the premise as law. Market value is "the very antithesis of forced-sale value," and property that must be sold on forced-sale terms "is simply worth less." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 539 (1994) (Scalia, J.). The Eleventh Circuit states the same premise: prices in foreclosure markets "are notoriously lower than prices achieved in other markets." *In re Grissom*, 955 F.2d 1440, 1445–46 (11th Cir. 1992). Before 1994, courts in this circuit treated seventy percent of market value as the mark below which a foreclosure price drew scrutiny. *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203–04 (5th Cir. 1980); *In re Littleton*, 888 F.2d 90, 92 n.5 (11th Cir. 1989). The Trustee's plan and a foreclosure each place twenty-six Units on one small market at once. My Third Amended Plan sells one Unit at a time, at a listed price. (Doc. ___). This court may therefore assume that the Units bring more under my plan, even in the worst case, where the reorganization fails and the Reorganized Debtor turns to the fallback sale program.

At seventy percent, twenty-six Units bring $350,000 each, $9,100,000 in all. Sold one at a time under my plan, the same Units bring $500,000 each, $13,000,000 in all, enough to pay every creditor and leave value for the interest holder.

**My plan keeps the Resort operating, the Trustee's plan sells the Resort's Units, and Chapter 7 forecloses on the Units.**

Under my plan, the Units keep renting as a going concern, and a third party acquires the Reorganized Debtor and the Crossroads assets and combines the two. (Third Am. Plan §§ 6.1, 6.2). Under the Trustee's plan, brokers or an auctioneer sell all twenty-six Units, and the Debtor goes out of business. (Doc. 434 at 21, 31). In Chapter 7, the three secured creditors, who already hold relief from the stay, complete the foreclosures. (Doc. 434 at 32).

**My plan pays non-Insider unsecured creditors in full, the Trustee's plan pays a share of what remains, and Chapter 7 pays nothing.**

My plan pays every allowed non-Insider unsecured claim 100 percent, in cash, from the $850,000 Settlement Payment, when the Plan takes effect and the payment arrives. (Third Am. Plan §§ 4.7, 6.4). The Trustee's plan pays unsecured creditors a pro rata share of "the remaining unencumbered funds of the Estate, if any," and the Trustee cannot estimate the amount or the timing. (Doc. 434 at 18, 25). The Trustee's plan has no Insider class, so Johnson's $1,297,493.97 claim shares that pool. (Doc. 434 at 25). Under my plan, Johnson collects only after the Plan pays the non-Insider creditors in full. (Third Am. Plan §§ 4.8, 6.6).

**My plan pays each secured creditor the allowed claim on the lien, the Trustee's plan pays the net proceeds of a sale, and Chapter 7 leaves each secured creditor to a foreclosure auction.**

Under my plan, each secured creditor keeps the lien and receives the allowed claim in full, at six percent over 360 months from February 1, 2027, with a two-year balloon on February 1, 2029. (Third Am. Plan § 4.1). My plan pays the tax claims in full at the statutory rate no later than January 2031, and sooner as the Units are sold and refinanced. (Third Am. Plan § 4.5). Under the Trustee's plan, each secured creditor receives the net proceeds of that creditor's Units after commissions and any carve-out or surcharge, and any shortfall becomes an unsecured deficiency. (Doc. 434 at 22–23). In Chapter 7, the same creditor sells at foreclosure, and at auction value every collateral pool is under water. (Third Am. Disclosure Statement Ex. C).

**My plan sells one Unit at a time at a listed price, and the other two courses put twenty-six Units on one small market at once.**

Beginning in January 2027, my plan lists one condominium at $500,000 and one townhome at $450,000. At least one Unit stays listed at all times, unless the prior quarter's operations covered every Plan payment. When a Unit sells, the lienholder receives a release price of $350,000, or $227,000 on a Tamamoi or Carton Unit, never more than the unpaid balance of the lienholder's allowed claim, and the Reorganized Debtor distributes the rest under the Plan and according to

existing lien rights. (Third Am. Plan § 6.12). The Trustee's plan sells all twenty-six Units, individually, in groups, or as a portfolio, as the Trustee decides. (Doc. 434 at 21).

**My plan caps the cost of every sale at five percent, and no trustee, foreclosure, or sale motion takes a share of the proceeds.**

The costs of a sale under my plan, including the Recovery Trustee's fee and the brokers' commissions, may not exceed five percent of the price. (Third Am. Plan § 6.12(a)). The Trustee's plan states no cap. Each of the Trustee's sales bears the brokers' or auctioneers' commissions, the carve-out or surcharge, and the fees of the Trustee and the Trustee's professionals. (Doc. 434 at 22–23).

No trustee shares in the proceeds under my plan. The Bankruptcy Code measures a trustee's compensation in a Chapter 7 or Chapter 11 case by the money the trustee disburses, on a scale that reaches three percent of everything above $1,000,000. *11 U.S.C. § 326(a)*. Under the Trustee's plan and in Chapter 7, the proceeds of twenty-six Units pass through a trustee's hands. Under my plan, the Chapter 11 Trustee's administration ends on the Effective Date, the Reorganized Debtor makes the payments, and the Recovery Trustee's fee for a sale comes out of the five percent.

This case already shows the difference. From June 11 through October 31, 2026, five months, the Trustee, the Trustee's counsel, and the Trustee's accountant

applied for $382,534.13, and this court allowed an earlier administrative claim at $30,000. (Docs. 455, 462, 463, 464). Those claims come first, out of the same $850,000 that would otherwise reach creditors.

**A liquidation carries eight ordinary costs, and my plan avoids or caps each one.**

First, a broker charges a commission on each Unit sold; under my plan the commission falls inside the five percent cap. Second, an auction adds the auctioneer's fee, advertising, and often a buyer's premium that lowers the bid; my plan holds no auction. Third, each closing bears title insurance, closing-agent fees, recording fees, and prorated taxes and assessments; under my plan those customary costs fall inside the cap. Fourth, Florida taxes each deed at 70 cents on each $100 of the price. *Fla. Stat. § 201.02(1)(a).* A transfer under a confirmed plan is exempt from that tax, and a Chapter 7 sale is not. *11 U.S.C. § 1146(a)*; *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52–53 (2008). Fifth, a trustee's commission reaches every dollar disbursed, including sale proceeds paid to lenders. *11 U.S.C. § 326(a).*

Sixth, the trustee's lawyers and accountants bill for each sale motion, objection, and closing; a sale under my plan needs no further order of this court. (Third Am. Plan § 6.12(d)). Seventh, each foreclosing lender adds fees and court costs to the debt; my plan permits a foreclosure sale only through a receiver after

an uncured default. (Third Am. Plan §§ 6.13, 8.4). Eighth, someone must carry the Units until the Units sell: association dues of about $26,000 a month, insurance, utilities, and property taxes that accrue at 18 percent until paid. (Oct. 14, 2026 Hearing Tr. at 7:5–7). Under my plan, the rents pay those costs while the Units keep operating.

**The Trustee's plan leaves more than $4.6 million in Estate claims unnamed and unpursued, and my plan pursues each one.**

The Estate holds $4,635,748 in quantified claims against third parties, and more that no one has yet quantified. First, the Debtor paid $1,166,008.69 to Tamamoi and Tamamoi's agents on debts the Trustee says the Debtor did not owe. (Third Am. Disclosure Statement § 3.D). The Trustee says the Trustee lacks standing to raise usury against Tamamoi and "does not intend to pursue" the claim. (Doc. 434 at 18; Docs. 424, 425 n.2). Second, a $1,634,600 mortgage encumbers all eighty-three Resort units, and the title insurers overlooked that mortgage. (Claim 69-1). The Debtor's twenty-six Units bear $512,043 of that mortgage, and the Estate holds a claim in that amount against the title companies, including First American Title. Third, the Estate holds $2,957,696 in claims against Mainstreet, and the Trustee has not objected to the validity of Mainstreet's claims. (Third Am. Disclosure Statement § 2.I; Doc. 434 at 13). Fourth, and unquantified, the Estate holds claims for construction defects and for the loss of quiet enjoyment and full

**The risk of my plan is the rents, and the Plan answers that risk with the sale program.**

My plan pays the secured creditors from rents, and the rents the Trustee reports today are far below my projections. (Doc. 399). I believe the Units can earn more than the Trustee's reports show. If I am wrong, the Plan keeps selling Units, one at a time, until operations cover every payment or the Plan pays every claim. (Third Am. Plan § 6.12). On every measure this court weighs, creditors do better under the Third Amended Plan than under the Trustee's plan, and better under either plan than in Chapter 7.

**Relief Requested**

1. Confirm the Third Amended Plan, and deny confirmation of the Trustee's plan. *11 U.S.C. § 1129(c).*

2. Grant such relief as is appropriate or fair.

Respectfully submitted this 16th day of November, 2026.

Frank L. Amodeo
*Pro se*
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32801@gmail.com

## CERTIFICATE OF SERVICE

I certify that on November 16, 2026, I filed this memorandum in paper form with the clerk of court. When the clerk dockets this memorandum, the CM/ECF system will serve the memorandum electronically on every party registered to receive notice in this case.

Dated: November 16, 2026

Frank L. Amodeo
*Pro se*