FILED ORL INTAKE - USBC
16 NOV 2026 PM12:42

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re: Case No. 6:25-bk-05570-GER

HOMEMAKERS REAL ESTATE, LLC, Chapter 11

Debtor.
_______________________________________/

**FRANK AMODEO'S NOTICE OF FILING REDLINES OF HIS THIRD AMENDED PLAN OF REORGANIZATION AND THIRD AMENDED DISCLOSURE STATEMENT**

On November 16, 2026, I filed my Third Amended Plan of Reorganization and my Third Amended Disclosure Statement. (Docs. ____, ____). This court requires a redline with every amendment to a plan or disclosure statement. (Doc. 397 ¶ 6; Doc. 437 ¶ 5). Exhibit 1 is the Third Amended Disclosure Statement, marked to show every change from the Second Amended Disclosure Statement. (Doc. 441). Exhibit 2 is the Third Amended Plan, marked to show every change from the Second Amended Plan. (Doc. 440). Each amended document is a single integrated statement. (Doc. 397 ¶ 5).

**The amendments carry out the Global Settlement Agreement and answer the objections on file.**

On November 12, 2026, the Trustee moved to approve the Global Settlement Agreement. (Doc. 459). The Third Amended Plan and Disclosure Statement conform to it. The principal changes follow.

1. The Estate's $850,000 Settlement Payment pays the administrative claims and pays every allowed non-Insider unsecured claim in full, in cash. (Third Am. Plan §§ 4.7, 6.4).

2. The classes for the PEDixon and ZPD claims and for the IPFS claim are removed, Claim 69 is withdrawn, and the Plan now has eleven classes. (Third Am. Plan art. 2 & § 4.2).

3. The adequate-protection provisions are removed. Each Allowed Secured Claim amortizes at six percent over 360 months beginning February 1, 2027, with a two-year balloon on February 1, 2029. (Third Am. Plan § 4.1).

4. Any contest of the tax assessments is limited to what section 505 and Florida law permit. (Third Am. Plan § 4.5; Doc. 460).

5. A third party acquires the Reorganized Debtor and the assets of Canaveral Crossroads, LLC and combines them, subject to approval in both cases. (Third Am. Plan § 6.2).

6. The structured-sale program states a release amount for every Unit and concludes within eighteen months, by June 30, 2028. (Third Am. Plan § 6.12).

7. The period to object to claims is shortened from 180 days to 120 days. (Third Am. Plan § 7.2).

8. The Held Settlement Balance is removed as a source of Plan funding. (Third Am. Plan §§ 6.3, 6.4, 6.6).

9. The Disclosure Statement restates the history in date order and identifies the Recovery Trust's claims against the associations, the contractors and design professionals, and First American Title. (Third Am. Disclosure Statement §§ 2, 3.D).

10. The Disclosure Statement describes the settlement, the fee applications on file, the Trustee's competing plan, and the December 3, 2026 hearing, and its headings now state the Plan's argument. (Third Am. Disclosure Statement §§ 2, 3.F).

Respectfully submitted this 16th day of November, 2026.

Frank L. Amodeo
*Pro se*
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32801@gmail.com

# CERTIFICATE OF SERVICE

I certify that on November 16, 2026, I filed this notice in paper form with the clerk of court. When the clerk dockets it, the CM/ECF system will serve it electronically on every party registered to receive notice in this case.

Dated: November 16, 2026

Frank L. Amodeo
*Pro se*

# EXHIBIT 1

Third Amended Disclosure Statement, marked to show changes from the Second Amended Disclosure Statement (Doc. 441)

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: | Case No. 6:25-bk-05570-GER |
| **HOMEMAKERS REAL ESTATE, LLC,** | Chapter 11 |
| Debtor. | |
| / | |

# ~~SECOND~~ THIRD AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE ~~SECOND~~ THIRD AMENDED PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO, a Creditor and Party in Interest

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | ~~flahome32809@gmail.com~~flahome32801@gmail.com

Dated: ~~October 19,~~ November 16, 2026

## 1. ~~INTRODUCTION AND SUMMARY~~The Plan keeps the Resort renting, pays non-Insider unsecured creditors in full in cash, and keeps for the Estate every claim the settlement does not release.

~~I file this Second Amended Disclosure Statement (the "Disclosure Statement") under section~~ Section 1125 of title 11 of the United States Code (the "Bankruptcy Code") entitles every holder of a claim or interest to ~~give holders of claims and interests in the above-captioned case (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), the~~ adequate information ~~they need to make an informed judgment~~ before that holder votes. This Third Amended Disclosure Statement (the

"Disclosure Statement") supplies that information about the ~~Second~~ Third Amended Plan of Reorganization (the "Plan") I propose for Homemakers Real Estate, LLC (the "Debtor"). (Doc. ). This Disclosure Statement supersedes the ~~one~~ three statements I filed on July 13, ~~2026 (Doc. 304) and the amended statement I filed on~~ October 9, ~~2026 (Doc. 433). It is a single integrated statement, as~~ and October 19, 2026. (Docs. 304, 433, 441). As the Order of September 21, 2026 requires, this Disclosure Statement is a single integrated statement, and I filed a redline ~~comparing it to~~ against Doc. ~~433 is filed~~ 441 under separate notice. (Doc. 397 ¶¶ 5–6).

The Plan ~~does three things.~~ pays a substantially greater dividend. The Plan preserves the Debtor's vacation-rental enterprise at the Cape Crossing Resort as a going concern. The Plan ~~recovers~~ puts the Estate's $850,000 recovery under the Global Settlement Agreement to work, paying non-Insider unsecured creditors in full in cash. And the Plan keeps for the Estate the ~~transfers and unlawful interest taken from it. And~~ claims the ~~Plan delivers a recovery approaching one hundred percent to~~ settlement does not release, so that every legitimate ~~creditors.~~ creditor is paid.

~~Between July 13, 2026~~ After October 19, 2026, the case changed again, and this Disclosure Statement changes with the case. On October 19, 2026, the Chapter 11 Trustee, Lara Roeske Fernandez ("Ms. Fernandez" or the "Trustee"), and the

~~date of this Disclosure Statement,~~ Dixon creditors attended the ~~record changed, and this statement changes with it.~~ judicial settlement conference before the Honorable Jason A. Burgess. The ~~Bankruptcy Court denied~~ conference produced the ~~Rule 60 motions and consolidation, so every avoidance period now runs from September 2, 2025. The Trustee compromised~~ Global Settlement Agreement among the ~~post-petition rent claim against~~ Trustee, the Dixon ~~lenders, so~~ Parties, the ~~$880,000 turnover my earlier statement anticipated will~~ Pitkanen Parties, Horton S. Johnson ("Mr. Johnson") and the companies Mr. Johnson controls, IMQA Investments Incorporated, CTO Holdings, Inc., WM Holdings Group, LLC, Yaniv Amar, me, and others. The agreement bound each party when that party signed; for the Estate and the three other debtors, the agreement remains subject to the Bankruptcy Code and to approval in each debtor's case. (Global Settlement Agreement § 14.1). The agreement's payments, releases, and claim treatment take effect only after this court approves the agreement here and in the three related cases. On approval, the Dixon Payor Parties pay the Estate $850,000; PEDixon and ZPD withdraw Claims 67 and 68; the agreement fixes or disallows the claims of IMQA, CTO, WM Holdings Group, Tiered Capital, and Mr. Johnson; and the Debtor's membership units return to Mr. Johnson. The Plan implements the agreement. (Section 2.J). The Plan pays non-Insider unsecured creditors in full, in cash, from the Settlement Payment. Classes 12 and 13 are gone, because PEDixon and ZPD withdraw the

PEDixon and ZPD claims and the Trustee paid the IPFS claim. The section 502(d) holdback that withheld about 88 percent of every Class 9 payment is gone, and the Recovery Trust keeps only the claims the agreement does not ~~occur. The~~ release. On September 18, 2026, the Condominium Association withdrew ~~its~~ the Association's claim, which emptied Class 8. (Doc. 393). On November 10, 2026, Claim 69 was withdrawn with prejudice, which empties Class 1. (Doc. 457). On November 12, 2026, the Trustee moved to approve the Global Settlement Agreement. (Doc. 459). On November 12 and ~~Class 8 is empty.~~ 13, 2026, the Trustee and the Trustee's professionals applied for $382,534.13 in fees and costs. The ~~secured amounts now track the filed claims. Class 6 now receives interest at the rate Florida law fixes, as the Tax Collector's objection requires. The PEDixon and ZPD claims, now filed and objected to, sit in a new Class 12.~~ Settlement Payment pays whatever this court allows on those applications ahead of every other use. (Section 3.F). The Plan ~~now takes effect only when~~ also changes the ~~confirmation order is final. On October 7, 2026, Mainstreet, PEDixon and ZPD, Tamamoi,~~ secured treatment and the ~~Carton Family Trust objected to my earlier plan~~ sale program: amortization begins February 1, 2027, the adequate-protection payments are gone, and from January 2027 the Reorganized Debtor keeps at least one Unit listed for sale. (Sections 3.A, 4.C). And all Units will be sold or ~~statement (Docs. 427–430), as Mr. McPhillips had in August (Doc. 328). In answer, the Plan~~

~~now pays Class 9 with interest from operating revenue; pays~~ refinanced by February 1, 2029. The Tamamoi and Carton ~~on their claimed amounts until a Final Order fixes~~ treatment, the ~~Allowed amounts; returns any claim the Recovery Trustee declines to the Reorganized Debtor; provides a successor Recovery Trustee; classifies the IPFS claim in a new Class 13; and drops every reference to a combination with Mr. McPhillips. Exhibits B through E add a five-year monthly projection, a liquidation analysis by collateral pool, a claims register, and a schedule of the tax claims. This statement also discloses the Trustee's claim objections, operating report, and competing plan; the October 19, 2026 settlement conference; Mainstreet's stay relief; the Canaveral Crossroads case; a valuation of the units;~~ Mainstreet claims, and the ~~restitution lien on my own claim. On October 14, 2026, the Bankruptcy Court heard both disclosure statements, and this statement now answers the three questions that hearing raised: why my standing does not depend on the restitution lien on my claim (Section 1.A); what it means for the Plan to subsume the Trustee's sale program (Section 4.C); and the lender liability that bears on Mainstreet's claims (Section 2.J).~~ staged governance are unchanged.

**A. I assisted both the borrowers and the ~~lender, and~~ lender. With regard to my involvement, especially as the Plan proponent, creditors should weigh my whole history — the convictions and the work. My standing ~~was fixed~~ attached when I joined the petition and filed the Plan, and no payment toward my restitution judgment undoes ~~it.~~that standing.**

Candor about the proponent is part of adequate ~~information, so I begin with myself. I am Frank L. Amodeo.~~ information. I hold an unsecured claim of $396 against the ~~Debtor of $396,~~ Debtor, and I ~~was one of the petitioning creditors who~~ joined the involuntary ~~petition.~~ petition as a petitioning creditor. My claim is one reason I participate in this case. ~~The other is my~~ My belief in the rule of law and ~~in~~ just ~~results.~~ results is the other. As the case went on, I saw that, for reasons outside this ~~Court,~~ court, the results were not turning out ~~to be~~ fair. I then took ~~on~~ a broader ~~role, so that not only would~~ role: by virtue of ensuring my own claim ~~be~~ was repaid, ~~but~~ I was able to protect the comparatively innocent parties to these transactions — the unsecured creditors and the true third-party ~~creditors~~ claimants who had no say in ~~them — would be protected too. For four years I assisted with the financial analysis and structuring of the loans this Disclosure Statement describes, and I assisted and educated both sides of them, without charge: the owners of Tiered Capital, Inc. and its affiliates — my friends, the borrowers — and the lender, Kenneth Dixon ("Mr. Dixon"). Mr. Dixon and I met nearly weekly for two years, over dinners at my home, to discuss the state of the Tiered businesses. I watched the events this Disclosure Statement describes as they happened; several~~

~~of the transactions described below occurred at my dining-room table. IMQA Investments Incorporated, a company owned by members of my family, and CTO Holdings, Inc. also hold claims; each is a Class 9 non-Insider unsecured creditor, and the Plan treats them, and me, exactly as it treats every other non-Insider unsecured creditor.~~those transactions.

For four years, I assisted with the financial analysis and structuring of the loans this Disclosure Statement describes. Without charge, I assisted and educated both sides of those loans: the owners of Tiered Capital, Inc. and Tiered Capital's affiliates — my friends, the borrowers — and the lender, Kenneth Dixon ("Mr. Dixon").

For a year and a half, Mr. Dixon and I met nearly weekly, over dinners at my home, to discuss the state of the Tiered businesses. I watched the events this Disclosure Statement describes as those events happened; several of the transactions occurred at my dining-room table. Members of my family own IMQA Investments Incorporated. IMQA holds a Class 9 claim that the Global Settlement Agreement allows at $350,000. The Plan treats IMQA, and me, exactly as the Plan treats every other non-Insider unsecured creditor. Under the same agreement, CTO Holdings, Inc., a company owned by my sister, withdraws CTO's claim.

Creditors weighing my judgment and this Plan's integrity should also know ~~its~~ my history. In 1997, Georgia disbarred me. In 1999, I was convicted of mail

fraud and served my sentence in a federal boot camp. ~~A~~ In 2008, Florida declared me incompetent. In 2009, a second conviction arose from a corporation's failure to pay ~~its~~ payroll taxes, and I served that sentence in federal prison. ~~In 2008, Florida declared me incompetent. Those facts are public, the~~ Opposing parties ~~opposing this Plan~~ repeat ~~them~~ that history often, and I do not contest ~~them. On May 11, 2026, the guardianship court authorized me to prosecute this bankruptcy case personally. *In re Guardianship of Amodeo*, No. 48-2008-CP-001369-O (Fla. 9th Cir. Ct. May 11, 2026). Creditors should also know the rest of the story. I graduated from the Emory University School of Law. I practiced bankruptcy law in Atlanta, in hundreds of cases, and over my career I have taken part in more than sixty Chapter 11 cases as an attorney or a stakeholder. In prison, I advocated for other inmates, and I built a deep body of experience doing it. Twice, the Supreme Court of the United States granted certiorari and relief on pleadings I wrote for others — Anthony Grant Jackson and Michael Levon Jackson. *Jackson v. United States*, 578 U.S. 1020 (2016) (mem.); *Jackson v. United States*, 589 U.S. 902 (2019) (mem.). The work corrected incorrect sentences in 741 cases, avoided 1,997 years of unnecessary imprisonment, and saved taxpayers about $108 million. Several district courts, including the court~~ that ~~sentenced me, have recognized that advocacy and the quality of the work. My convictions and my incompetency adjudication are part of the record; so is that experience, and creditors should~~

~~weigh both in judging the Plan. Read the Plan, verify the numbers against the Schedules and the exhibits, and judge the work on the record. Every figure in this Disclosure Statement carries a verification path.~~history.

Creditors should also know the rest of the story. I graduated from the Emory University School of Law. I practiced bankruptcy law in Atlanta, and over my career I took part in hundreds of cases, including more than sixty Chapter 11 cases as either an attorney or a stakeholder.

In prison, I advocated for other inmates, and I built a deep body of experience doing that work. Twice, the Supreme Court of the United States granted relief on certiorari pleadings I wrote for others — Anthony Grant Jackson and Michael Levon Jackson. *Jackson v. United States*, 578 U.S. 1020 (2016) (mem.); *Jackson v. United States*, 589 U.S. 902 (2019) (mem.). My advocacy corrected 741 sentences, avoiding 1,997 years of unnecessary imprisonment, and saving taxpayers about $108 million. Several district courts, including the court that sentenced me, recognized that advocacy and the quality of the work. On January 13, 2020, the judge who sentenced me, Judge John Antoon II, observed from the bench that I am "known throughout the — not just the Middle District, but districts in Florida, and my guess is probably districts around the country for his quality assistance of prisoners and filing papers." *United States v. Amodeo*, No. 6:08-cr-176 (M.D. Fla. Jan. 13, 2020) (Doc. 338-1 at 2:22–25). My convictions and my

incompetency adjudication are part of the record; so is that experience, and creditors should weigh both in judging the Plan. Read the Plan, verify the numbers against the Schedules and the exhibits, and judge the work on the record. Every figure in this Disclosure Statement carries a verification path.

**Capacity**

On ~~September 11,~~ March 25, 2026, the ~~United States gave notice that it holds a criminal restitution lien on all of my property, including any distribution on my $396 claim in~~ guardianship court authorized me to prosecute this bankruptcy case ~~(Claim 1-1), arising from the restitution judgment entered against me on July 2, 2009. (Doc. 387). Any distribution the Plan makes on my claim will go where that lien requires, and every dollar of it reduces my restitution debt. The lien reaches my property alone; it does not reach the Debtor's property or any other creditor's distribution.~~ personally. *In re Guardianship of Amodeo*, No. 48-2008-CP-001369-O (Fla. 9th Cir. Ct. Mar. 25, 2026).

**Standing**

On September 11, 2026, the United States gave notice of a criminal restitution lien on all of my property, including any distribution on my $396 claim in this case, Claim 1-1. (Doc. 387). The lien arises from the restitution judgment the district court entered against me on July 2, 2009. Any distribution the Plan makes on my claim will go where that lien requires, and every dollar of that

distribution reduces my restitution debt. The lien reaches my property alone; the lien does not reach the Debtor's property or any other creditor's distribution.

At the October 14, 2026 hearing, ~~it~~ Mainstreet's counsel told this court that Mainstreet was ~~suggested that if Mainstreet paid my restitution judgment — or only the $396~~ paying my claim ~~represents — I would lose my standing in this case. I would not,~~ and that, once Mainstreet paid, "there won't be standing." (Oct. 14, 2026 Hearing Tr. at 21:5–13). Mainstreet's counsel is wrong, for ~~five~~ six reasons. First, a court measures standing ~~is measured~~ when a party invokes the court's power, not afterward. "[S]tanding is to be determined as of the commencement of suit." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.5 (1992). On September 2, 2025, I held Claim 1-1 when I joined the involuntary ~~petition; on~~ petition. On May 21, 2026, ~~the Bankruptcy Court~~ this court entered the order for relief on that ~~petition~~ petition. (Doc. ~~229); and~~ 229). I held the same claim when I filed my plan on July 13, 2026, and when I ~~filed my plan, and~~ amended that plan on October 9, ~~2026, when I amended it.~~ 2026. Nothing that later happens to my claim reaches back to undo any of those ~~acts. Second, what follows the commencement is a question of mootness, not standing, and a party who says its own later conduct ended the controversy bears the "heavy burden" of proving it. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). A creditor that opposes a plan cannot carry that burden by paying the plan's~~

~~proponent. If it could, any plan could be bought off the docket for the price of the smallest claim behind it.~~acts.

Second, what follows the commencement is a question of mootness, not standing, and a party claiming that the party's own later conduct ended the controversy bears the "heavy burden" of proving that claim. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). A creditor that opposes a plan cannot carry that burden by paying the plan's proponent. If a creditor could, any creditor could buy a plan off the docket for the price of the smallest claim behind that plan.

Third, a payment by Mainstreet would not pay my claim. Mainstreet does not owe the Debtor's debt to me. Money ~~it~~ Mainstreet pays the United States reduces my restitution judgment, not the Debtor's obligation on Claim 1-1, which remains outstanding until the Debtor or the Plan pays ~~it.~~ that claim. Nor does the restitution lien change who holds the ~~claim: a~~ claim. The lien ~~under *18 U.S.C. § 3613(c)*~~ secures the United States' judgment against my property, and I remain the holder of the claim ~~it~~ the lien encumbers. ~~Fourth, the Bankruptcy Code does not measure a party in interest by the size of its claim or by who will receive its distribution. Once a trustee is appointed, "[a]ny party in interest, including . . . any creditor, may file a plan," *11*~~ *18* *U.S.C. §* ~~*1121(c)(1)*, and a party in interest is one whom the reorganization proceedings "might directly affect." *Truck Ins. Exch. v.*~~

~~*Kaiser Gypsum Co.*, 602 U.S. 268, 272–73 (2024); *see also In re Roman Catholic Diocese of Albany*, No. 1:25-cv-01570 (BKS), 2026 WL 2923067, at *9–10 (N.D.N.Y. Sept. 29, 2026) (reversing a bankruptcy court that read *Truck* narrowly; a party "potentially concerned with or affected by" the outcome is a party in interest, and *Truck* does not require it to show "definitive financial responsibility"). Every dollar the Plan distributes on my claim reduces a judgment against me. Few creditors in this case are more directly affected by how it ends. Fifth, Mainstreet could not step into my place by paying. The Bankruptcy Code subrogates only an entity that is "liable with the debtor on, or that has secured," a creditor's claim, *11 U.S.C. § 509(a)*, and Mainstreet is neither; a stranger who pays another's debt is a volunteer and acquires nothing. State law decides who owns a claim, *Butner v. United States*, 440 U.S. 48, 55 (1979), and only the party entitled to enforce a claim may assert it; "one entity cannot assert another's claims." *In re Aegis Asset Mgmt., LLC*, 182 F.4th 1364, 1371 & n.8 (11th Cir. 2026). And a creditor that acquires a claim to defeat a plan, rather than to be paid on it, acts with the "ulterior motive" that justifies designating its vote. *In re DBSD N. Am., Inc.*, 634 F.3d 79, 102–03 (2d Cir. 2011); *11 U.S.C. § 1126(e)*~~*3613(c)*.

Fourth, the Bankruptcy Code does not measure a party in interest by the size of the party's claim or by who will receive the party's distribution. Once a trustee is appointed, "[a]ny party in interest, including . . . any creditor, may file a plan."

*11 U.S.C. § 1121(c)(1)*. A party in interest is one whom the reorganization proceedings "might directly affect." *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 272–73 (2024); *see also In re Roman Catholic Diocese of Albany*, No. 1:25-cv-01570 (BKS), 2026 WL 2923067, at *9–10 (N.D.N.Y. Sept. 29, 2026) (reversing a bankruptcy court that read *Truck* narrowly; a party "potentially concerned with or affected by" the outcome is a party in interest, and *Truck* does not require that party to show "definitive financial responsibility"). Every dollar the Plan distributes on my claim reduces a judgment against me. How this case ends affects few creditors more directly.

Fifth, Mainstreet could not step into my place by paying. The Bankruptcy Code subrogates only an entity that is "liable with the debtor on, or that has secured," a creditor's claim, and Mainstreet is neither. *11 U.S.C. § 509(a)*. A stranger who pays another's debt is a volunteer and acquires nothing. State law decides who owns a claim. *Butner v. United States*, 440 U.S. 48, 55 (1979). Only the party entitled to enforce a claim may assert that claim; "one entity cannot assert another's claims." *In re Aegis Asset Mgmt., LLC*, 182 F.4th 1364, 1371 & n.8 (11th Cir. 2026). And a creditor that acquires a claim to defeat a plan, rather than to collect on the claim, acts with the "ulterior motive" that justifies designating that creditor's vote. *In re DBSD N. Am., Inc.*, 634 F.3d 79, 102–03 (2d Cir. 2011); *11 U.S.C. § 1126(e)*.

Sixth, as a distinct basis for my standing, at the insistence of the Trustee and the Dixon Parties, I am a party to the Global Settlement Agreement. (Doc. 459 at 2). The agreement binds me, and the agreement requires me to dismiss my appeal. (Doc. 459 ¶ 18(o)). A party to the settlement of the Estate's claims holds an interest in this case that no payment of Claim 1-1 can end.

## B. Disclaimers and Warnings

~~THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINDER OF THIS DISCLOSURE STATEMENT, WHICH IS IN TURN QUALIFIED BY THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS NOT DEFINED HEREIN HAVE THE MEANINGS GIVEN IN THE PLAN.~~Once this court approves this Disclosure Statement, this Disclosure Statement and the accompanying documents are the only documents authorized for soliciting votes on the Plan. The Plan controls. Where this Disclosure Statement and the Plan differ, creditors should follow the Plan, and

every capitalized term this Disclosure Statement does not define carries the meaning the Plan gives that term.

~~THE INFORMATION HEREIN HAS NOT BEEN SUBJECT TO AUDIT. WHILE EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE ACCURACY,~~ No one audited the information in this Disclosure Statement. I ~~CANNOT WARRANT THAT THE INFORMATION IS WITHOUT INACCURACY. THIS DISCLOSURE STATEMENT MAY INCLUDE FORWARD-LOOKING STATEMENTS SUBJECT TO RISKS AND UNCERTAINTIES. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND CAUSES OF ACTION, THIS DISCLOSURE STATEMENT STATES MY CONTENTIONS AND THE POSITIONS OF OTHERS. IT IS NOT AN ADMISSION BY ANY PARTY, AND NO COURT HAS ADJUDICATED THE CONTESTED ALLEGATIONS IT DESCRIBES.~~made every reasonable effort to state the information accurately, but I cannot warrant that the information is free of error. The projections are estimates, and the results may differ. On every contested matter, adversary proceeding, and Cause of Action, this Disclosure Statement states my contentions and the positions of others. No party admits those contentions, and no court decided the contested allegations this Disclosure Statement describes.

**~~B. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance — above all, section 502(d).~~C. Classification**

The Bankruptcy Code and Rules place claims against, and interests in, the Debtor into Classes. The ~~Plan designates thirteen (13)~~ original plan designated the Classes of Claims and ~~Interests.~~ Interests, and for consistency the Plan retains those Classes. Because of the Condominium Association's withdrawal and the Global Settlement Agreement, eleven Classes remain, and two Classes are empty. Class 1 holds no Claim, because Claim 69 was withdrawn on November 10, 2026. (Doc. 457). Class 8 holds no Claim, because the Cape Crossing Condominium Association withdrew ~~its~~ the Association's claim on September 18, 2026. (Doc. 393). The Plan no longer carries a Class ~~13 is Unimpaired~~ for the PEDixon and ~~is presumed to accept. *11 U.S.C. § 1126(f)*. The~~ ZPD claims, which PEDixon and ZPD withdraw under the Global Settlement Agreement, or for the IPFS claim, which the Trustee paid in full. (Doc. 392 ¶ 13). Section 3 describes the classification and treatment of each ~~Class are discussed below.~~ Class. If the Plan alters the legal, contractual, or equitable rights of a holder, the Claim or Interest is "Impaired," and the holder ~~is entitled to vote. A holder whose Claim is the subject of a pending objection~~ may ~~vote only to the extent the Bankruptcy Court temporarily allows the Claim for that purpose. *Fed. R. Bankr. P. 3018(a)*. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate~~

~~basis for disallowance, particularly section 502(d). Classes 4, 5, and 12 fall within that exception. Each holder in them received transfers the Estate seeks to avoid, and section 502(d) disallows its Claim until it returns them. This Disclosure Statement gives the Bankruptcy Court notice that a section 502(d) circumstance exists as to each of those Claims, so that the Court may disallow them on its own motion. I moved to disallow the PEDixon and ZPD claims on October 2, 2026 (Doc. 423), and I will file a separate motion as to the Tamamoi and Carton claims before ballots are due.~~vote.

**D. Objections and Disallowance**

A holder whose Claim is the subject of a pending objection may vote only to the extent this court temporarily allows the Claim for that purpose. *Fed. R. Bankr. P. 3018(a)*. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance, particularly section 502(d). Classes 4 and 5 fall within that exception. Each holder in Classes 4 and 5 received transfers the Estate may avoid, and section 502(d) disallows that holder's Claim until the holder returns those transfers. This Disclosure Statement gives this court notice that a section 502(d) circumstance exists for each of those Claims, and this court should disallow those Claims on this court's own motion. On October 21, 2026, I moved to disallow the Tamamoi and Carton claims on that ground. (Doc. 444). On October 28, 2026, I moved for leave to object to those claims, and with this

Disclosure Statement I ask this court to rule on that motion on an expedited basis, to ensure that those the law does not permit to vote do not cast votes that count. (Doc. 449). Tamamoi and the Carton Family Trust hold the Debtor's money. Tamamoi and Carton took that money without giving the Debtor any consideration, and until Tamamoi and Carton return that money, neither should vote on the Plan or on the Trustee's plan. Under the Global Settlement Agreement, I withdraw my October 2, 2026 motion against the PEDixon and ZPD claims. (Doc. 423).

**E. Voting Deadline**

~~THE VOTE OF EACH HOLDER OF AN IMPAIRED CLAIM IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT. THE LAST DAY TO VOTE TO ACCEPT OR REJECT THE PLAN IS ___________, 2026, AT~~ Every vote counts. The Clerk of the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, must receive each ballot, at the address the ballot states, by 5:00 ~~P.M. (ET). BALLOTS MUST BE RECEIVED BY THE CLERK OF THE U.S. BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, BY THAT TIME.~~ p.m. (ET) on December 1, 2026. A late ballot does not count.

After the ~~Ballots are tabulated, the Bankruptcy Court~~ voting deadline, this court will hold a hearing (the "Confirmation Hearing") to consider whether the Plan satisfies the confirmation requirements of section 1129 of the Bankruptcy Code. The Bankruptcy Code permits confirmation even if not every Impaired Class accepts; lawyers call confirmation over the objection of an Impaired Class ~~is sometimes called~~ "cramdown." If an Impaired Class rejects the Plan, I ~~expressly reserve the right to~~ will seek cramdown under section 1129(b).

I ~~URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.~~ ask every holder entitled to vote to vote to accept the Plan.

## 2. ~~HISTORY AND DESCRIPTION OF THE DEBTOR'S BUSINESS~~The Debtor owns twenty-six rental Units at the Cape Crossing Resort, and four years of disputes over the Debtor's loans, ownership, and rents produced a global settlement that awaits this court's approval.

### A. The Debtor owns the rental heart of the Cape Crossing Resort.

The Debtor, Homemakers Real Estate, LLC, owns and operates a portfolio of vacation-rental units within the Cape Crossing Resort and Marina (the "Resort"), located at 201 Ivory Coral Lane, Merritt Island, Florida 32953. At full build-out, the Resort comprises forty-seven townhomes, thirty-six condominiums, a restaurant, two marinas, a clubhouse and pool, and related commercial and intangible property. The Debtor owns twenty-six Units: eighteen condominiums at

202 Ivory Coral Lane and eight townhomes. (Exs. C, E). Unit 403 is not among the twenty-six, and the Plan seeks the return of Unit 403.

**B. 2015 to 2019: Four investors built the Resort with money from three lenders, and an institutional consolidation came within reach.**

Michael McPhillips ("Mr. McPhillips") and Martin Flynn ("Mr. Flynn") conceived the Resort. Lacking the capital to complete the Resort alone, Mr. McPhillips and Mr. Flynn brought in Mr. Johnson and Investors of Merritt, a group of friends and family headed by Dan Myers, CPA, the group's principal investor, now deceased.

In approximately 2015, that capital enabled development to begin. Three lenders financed the work from the start: Mr. Johnson, who was both an investor and a lender; Neil Buchalter ("Mr. Buchalter"); and David Campbell, who operated FDRE, Inc. To finish the project, the developers presold units, entered construction loans, and stacked second, third, and fourth mortgages on individual units.

By 2019, with most structures nearing completion, the enterprise involved more than fifty investors, lenders, and owners across more than one hundred fifty transactions. An institutional lender tentatively committed to consolidate the debt and fund completion (the "Consolidation").

**C. 2020 to 2021: The pandemic, a bank merger, and a partition starved the enterprise of cash, and the Debtor took title to the Units.**

Beginning in 2020, the COVID-19 pandemic slowed construction and sharply increased materials costs. A bank merger then derailed the Consolidation and eliminated institutional financing for the whole project, and the enterprise lost the cash flow to meet the enterprise's obligations.

In late 2020, two mortgage-service entities, TACIRA, LLC and DRCIRA, LLC, commenced foreclosure actions, and Mr. Johnson resolved those actions by buying the mortgages. Hence, on October 31, 2020, to preserve the value of the entire Resort, the Debtor acquired thirty-three vacation-rental units by quitclaim deed in lieu of foreclosure from Canaveral Crossroads, LLC.

Between December 2020 and January 2021, Mr. McPhillips and Mr. Flynn entered a partition agreement (the "Partition Agreement") to divide the Resort, resolve the two men's disputes, and disentangle the two men's business arrangements. Mr. McPhillips took the marinas and restaurant; Mr. Flynn took the development entities, including the entity that became the Debtor.

In April 2021, Canaveral Crossroads quitclaimed the Resort's public property — the clubhouse, the pool and fitness facility, the sewage lift station, and the open land and sign parcel — to Canaveral Crossing Resorts, Inc. (O.R. Book 9077, Page 1557, recorded Apr. 6, 2021). The Resort's intellectual property, the Cape Crossing Resort & Marina names and marks, went there as well.

That arrangement gave the Debtor two things. First, the Debtor's Units held first priority on every reservation the Resort booked, which likely would have doubled the Debtor's rental revenue. Second, the amenities and marks generated fees beyond what the amenities' expenses and the original Crossroads investors required, and that margin supported the Debtor. Disturbingly and irrationally, at that same time, Tamamoi and the Carton Family Trust refused to delegate the mortgages on ten units that had been quitclaimed to the Debtor.

**D. January 2022 to September 2023: Mainstreet refinanced nineteen Units on a condition that cost the Debtor millions in revenue and, via the Debtor's failure to pay the debt to Sherwood Construction, Inc., resulted in Mr. Dixon's companies' loans of $11.225 million.**

Between January 2022 and September 2023, Kenneth G. Dixon made eleven loans totaling $11,225,000 to companies and individuals affiliated with the Resort enterprise. Mr. Dixon is a retired accountant and self-described hard-money lender, and Mr. Dixon lent through PEDixon, LLC, ZPD, LLC, and Parke Financial, Ltd. The borrowers included Tiered Capital, Inc. ("Tiered Capital"), Sherwood Construction, Inc., IMQA Investments Incorporated, and Martin Flynn. Colorably, the guarantor and surety of those loans was the Debtor. The guaranty agreements were defectively signed and executed, but the Dixon entities had a colorable claim on the Debtor.

Each loan carried interest of 12% or 15%, a 2% origination fee, 1% renewal fees, and provisions for collection costs, due-diligence expenses, and legal fees; on default, the rate rose to the statutory maximum of 25%. I watched Mr. Dixon make most of these loans: I introduced Mr. Dixon to several of the borrowers, and I assisted in structuring all but two of the eleven.

Attorney Alison Pitkanen ("Ms. Pitkanen") prepared all or most of the loan documents, controlled escrow and disbursement of the loan proceeds through Ms. Pitkanen's IOLTA accounts, and acted for both the Tiered-affiliated borrowers and the Dixon-related lenders in the same transactions.

On February 7, 2022, at the direction of Mainstreet Bank's attorney, someone recorded the deed returning the clubhouse, the pool, the lift station, and the open land from Canaveral Crossing Resorts, Inc. to Canaveral Crossroads. (O.R. Book 9407, Page 1642). Mainstreet stepped outside the role of a lender and dictated how the Debtor and Canaveral Crossroads would structure the two companies' contract, and Mainstreet's demand produced exactly the result Mainstreet sought.

On February 17, 2022, Mainstreet refinanced nineteen of the Debtor's Units with a $5,061,363 loan. Of that loan, $4,822,072.69 retired the Campbell loans on those Units through FDRE, Inc. (Settlement Statement, Feb. 17, 2022, lines 1501,

1600). Because Tamamoi and Carton had refused to delegate or accept the assignment, the Tamamoi properties could not be refinanced.

From that closing forward, the Debtor lost the Debtor's priority on the Resort's reservations and the Debtor's share of the amenity revenue. For almost five years, the returned properties produced no revenue for the Debtor, and the revenue that would have serviced the Debtor's debts — Mainstreet's among those debts — never came in.

**Out of the Frying Pan into the Incinerator.**

On September 13, 2023, the parties purported to consolidate the eleven Dixon loans through a Tiered Consolidated Loan Agreement and signed a Tiered Land Trust Agreement. This trust agreement named Crescent Sound, Ltd. — an entity Mr. Dixon owned and controlled — as trustee. Under those documents, the Tiered Land Trust was said to hold the Debtor's real estate.

**E. December 2023 to early 2025: The Dixon-related interests controlled the Debtor's rents, and no one paid the Debtor's secured creditors.**

From December 2023 through the entry of the order for relief, the Dixon-related interests controlled the Debtor. Crescent Sound managed the rental operations, and the Debtor's revenues exceeded $2,800,000 over the period. Most of the Debtor's revenues passed through Ms. Pitkanen's IOLTA account to PEDixon and ZPD.

The borrowers contended that Mr. Dixon collected more than $27,123,645 in cash, real estate, business interests, and forbearance fees against the $11,225,000 lent, at effective interest rates above the 25 percent ceiling of the Florida criminal-usury statute. *Fla. Stat. § 687.071*. The Dixon parties denied that contention and said the loans bore a contractual rate of 15 percent.

Neither the Debtor nor Crescent Sound paid the Debtor's mortgages, ad valorem taxes, association assessments, or maintenance during that period. Every secured creditor now asserting an arrearage — Mainstreet, Tamamoi, Carton, the Brevard County Tax Collector, and both associations — traces the default and arrearage to that period. The Units rented and the money came in; the money did not reach those creditors. Instead, the money went to the Dixon lenders.

On January 9, 2024, in my home, Mr. Johnson signed an Assignment of Membership Units for the Debtor.

On February 14, 2024, someone recorded a trustee's deed for the Debtor's Units in Brevard County.

Mr. Johnson contended that no one ever validly formed a land trust, that the recorded deed differed from the instrument Mr. Johnson signed, and that the assignment's notarial certificate was false; the Dixon parties maintained that the trust and the assignment were valid. A forensic document examiner, Thomas W. Vastrick, examined the instruments for Mr. Johnson. The Global Settlement

Agreement compromises these disputes, and the usury dispute, without any finding. No party admits the validity, enforceability, amount, or characterization of any loan, guaranty, trust, or document, or the genuineness of any signature or notarization. (Global Settlement Agreement § 1.2).

In March 2024, Crescent Sound, then acting for the Debtor, transferred Unit 403 to the IAM Irrevocable Trust, and no one paid the Unit 403 mortgage.

In 2024, Tamamoi, LLC initiated a mortgage-foreclosure action on nine residential units. Tamamoi foreclosed on Unit 403, and the circuit court, in what I believe was error, treated Unit 403 as outside the bankruptcy estate. That ruling is on appeal, and the appeal is stayed while the bankruptcy proceeds.

**Mainstreet Exacerbates the Damages**

In February 2025, Mr. Johnson and I met with Mainstreet and told Mainstreet to enforce the assignment of rents in Mainstreet's mortgages and stop the payment of the Debtor's rents to PEDixon. Mainstreet's assignment of rents came first in time. Mainstreet did not enforce the assignment.

After that meeting, Mainstreet instead discussed with PEDixon a short sale of the Mainstreet mortgages on the Debtor's Units to PEDixon. The sale did not close, but Mainstreet's choice speaks for itself. Mainstreet also engaged in discussions with associates of PEDixon, and even with the colleagues of Michael McPhillips, a former owner of Crossroads. Mr. McPhillips and Mr. McPhillips's

entities reneged on commitments, absconded with the funds of the original Crossroads investors, and absconded with the properties those investments produced. Rather than enforce Mainstreet's own assignment of rents, Mainstreet negotiated a transaction that would have put the Mainstreet mortgages, at a discount, in the hands of the lender then collecting the Debtor's rents, and would have harmed the Debtor's other creditors even more. Meanwhile, the rents kept flowing to PEDixon, and no one paid the Debtor's mortgages, taxes, and assessments.

In 2025, Mainstreet Community Bank of Florida commenced a foreclosure action on the Units that secure the Mainstreet loans. *Mainstreet Cmty. Bank of Fla. v. Home Makers Real Estate, LLC*, No. 05-2025-CA-027661-XXCA-BC (Fla. 18th Cir. Ct.) (Doc. 73 ¶ 11). A lender's usurpation of the Debtor's revenues caused the foreclosure actions.

**F. May 2025 to June 2026: This court dismissed the first bankruptcy case on the strength of the assignment; the second produced an order for relief and a trustee.**

On May 5, 2025, Mr. Johnson, as Manager, filed a voluntary Chapter 11 petition for the Debtor. *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025) (the "First Bankruptcy Case").

On June 27, 2025, on the Dixon-affiliated lenders' motion, this court dismissed the First Bankruptcy Case. The lenders relied on the January 9, 2024 Assignment of Membership Units to argue that Mr. Johnson lacked authority.

On August 26, 2025, this court denied reconsideration but identified the paths by which a renewed filing would be authorized.

On September 2, 2025, within a week of that denial, Tiered Capital filed the involuntary Chapter 11 petition that commenced this case; Mr. Johnson, IMQA Investments Incorporated, CTO Holdings, Inc., and I joined as petitioning creditors. September 2, 2025 is the operative petition date for every purpose, and every avoidance and reach-back period runs from that date.

On October 8, 2025, I moved to appoint a Chapter 11 trustee — the first party in this case to ask for one. (Doc. 13).

On February 3, 2026, the good-faith trial on the involuntary petition commenced. (Doc. 128).

On February 11, 2026, this court struck that motion with my other papers. (Doc. 137). On the same day, this court lifted the automatic stay for Tamamoi only to let Tamamoi obtain a final judgment. (Doc. 135 ¶ 2). Other parties, Mainstreet among those parties, later renewed the request for a trustee. (Doc. 155).

On March 16, 2026, this court terminated the automatic stay for Mainstreet Community Bank and permitted Mainstreet to exercise Mainstreet's in rem rights

against the Units that secure the Mainstreet loans. (Doc. 183 ¶ 2). A foreclosure sale by Mainstreet before the Plan takes effect would remove Mainstreet's Units from the Estate.

On March 25, 2026, the Florida guardianship court partially restored my capacity and authorized me to prosecute my interests in this case personally. *In re Guardianship of Amodeo*, No. 48-2008-CP-001369-O (Fla. 9th Cir. Ct. Mar. 25, 2026).

On March 27, 2026, the good-faith trial on the involuntary petition continued for a second day, and this court took the Debtor's motion to dismiss under advisement. (Doc. 208).

On April 7, 2026, this court authorized the clerk to accept my *pro se* filings, effective March 25, 2026. (Doc. 217).

On May 18, 2026, the circuit court entered Tamamoi's foreclosure judgment in Tamamoi's action against Canaveral Crossroads and others. (Doc. 424 at 2 n.1).

On May 20, 2026, after contested proceedings, this court rejected the Debtor's claim that the petitioning creditors filed in bad faith. This court found that the petitioning creditors did not file the petition for an improper purpose; that the petitioning creditors' "primary reason for the involuntary petition was for a proper purpose, namely to ensure a fair distribution of Homemakers' assets," so "that Mr. Dixon does not get a disproportionate share versus other creditors"; that the

petitioning creditors' "primary concern was ensuring payment of all creditors and not just Mr. Dixon"; and that "the principal aim in filing this case is to prevent the disproportionate advantage that Mr. Dixon exercises by receiving and controlling the disposition of Homemakers' rental income." (Doc. 256 at 10:13–21, 11:19–24, 12:25–13:3, 14:3–6, 28:8–13).

In the same ruling, this court found that Mr. Dixon "has been retaining all of the rental income, despite the mortgagee's assignment of rent provisions that are prior in time to the loan with Mr. Dixon." (Doc. 256 at 13:15–19). This court found PEDixon, ZPD, and Crescent Sound to be insiders. (*Id.* at 22:6–8). Because "all rents are being controlled by Mr. Dixon," this court ordered the appointment of a trustee. (*Id.* at 30:17–23).

On May 21, 2026, this court entered the order for relief. (Doc. 229).

On June 8, 2026, this court directed the appointment of a Chapter 11 trustee. (Doc. 240).

On June 12, 2026, this court approved the appointment of Ms. Fernandez. (Doc. 252).

On June 16, 2026, Mr. Johnson filed the Debtor's Schedules and Statement of Financial Affairs. Schedule A/B valued the real property at approximately $11,860,000 — the twenty-six units at $11,300,000 and one further unit at $560,000 — and listed substantial Causes of Action as additional assets.

**G. July to September 2026: The Trustee compromised the post-petition rent claim, proposed a competing plan of liquidation, and objected to most of the claims in the case.**

On July 9, 2026, Mr. Johnson and Tiered Capital filed a verified complaint against Mr. Dixon, PEDixon, ZPD, Parke Financial, Ms. Pitkanen, Ms. Pitkanen's professional association, and Crescent Sound. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026). Those claims belonged to Mr. Johnson and Tiered Capital, not to the Estate.

On July 13, 2026, I filed my first plan as a party in interest, because the Trustee's appointment ended exclusivity. (Doc. 303). *11 U.S.C. § 1121(c)*.

July 16, 2026 was the date noticed for the section 341 meeting of creditors. (Doc. 264).

On July 21, 2026, this court denied the motions to vacate the dismissal of the First Bankruptcy Case. (Doc. 345 & n.2).

On July 22, 2026, this court required every scheduled creditor to file a proof of claim to participate in the case and extended the deadline through August 21, 2026 for six named creditors. (Doc. 320 ¶¶ 2–3).

On August 20, 2026, this court denied my motion to consolidate the two cases. (Doc. 345 & n.2). The Rule 60 motions my earlier statement described are therefore no longer pending, and the Plan no longer defines a Relation-Back Date.

On August 28, 2026, this court ordered that a party seek leave before objecting to a proof of claim or a scheduled liability. (Doc. 359 ¶ 3). The Plan's claim-objection period conforms to that order. (Plan § 7.2). On the same day, this court abated the Tamamoi and Carton requests to conduct foreclosure sales. (Doc. 361 ¶ 1). On the Effective Date, the Plan's injunction replaces each stay order, and no secured creditor may sell a Unit except through a state-court receiver conducting a structured sale after an uncured Plan default. (Plan §§ 6.13, 8.4).

On September 2, 2026, over my objection, this court approved the Trustee's compromise with PEDixon, LLC and ZPD, LLC (together, the "Lender") and the Cape Crossing Condominium Association. (Doc. 379 ¶¶ 1–2). Under the compromise, the Lender pays the Trustee $350,000 to resolve the Trustee's claim to avoid and recover the post-petition transfers the Trustee's motion defined, and the Lender waives any section 502(h) claim for that amount. The Trustee pays the Association $204,000 for the condominium roof replacement, and the Association withdraws the Association's claim. The Trustee holds the balance and may not use the balance without further order, while the Trustee and the secured creditors reserve whether the secured creditors' liens attach to the balance. (Doc. 379 ¶¶ 3–5). The compromise reaches only the post-petition transfers; the compromise does not decide the Lender's claims against the Estate or the Estate's other claims against the Lender.

On September 8, 2026, this court entered an order for relief against Canaveral Crossroads, LLC — the Resort's developer and declarant — on Canaveral Crossroads's consent, and converted that case to Chapter 11. *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla. 2026) (Doc. 15).

On September 11, 2026, this court directed the Trustee, PEDixon, and ZPD to a judicial settlement conference before the Honorable Jason A. Burgess for possible resolution of "all issues between the Parties." (Doc. 386 ¶¶ 2–3).

Between September 17 and October 2, 2026, the Trustee objected to the claims of IPFS Corporation, WM Holdings Group, LLC, CTO Holdings, Inc., IMQA Investments Incorporated, Mr. Johnson, Paul Rene, Jr., PEDixon, LLC, ZPD, LLC, and Tiered Capital, Inc. (Docs. 392, 409, 410, 411, 412, 416, 419, 420, 421).

On September 18, 2026, the Association withdrew Claim 7. (Doc. 393). On the same day, the Trustee filed a competing plan of liquidation and a disclosure statement for that plan. (Docs. 394, 395). The Trustee's plan sells all twenty-six Units free and clear of liens, through brokers or an auctioneer; pays each secured creditor from the proceeds of that creditor's collateral; and distributes what remains to unsecured creditors and, only after full payment of unsecured creditors,

to the holders of Interests. (Doc. 395 at 13–17). By that date, creditors had filed seventy-one claims. (Doc. 395 at 12).

On September 21, 2026, the Trustee filed the Trustee's operating report for August 2026. The report states receipts of $18,661 for the month, cumulative receipts of $44,484, disbursements of $761, and $43,609 in cash on August 31, 2026. (Doc. 399, Part 1). Creditors should compare those receipts with the projections in Section 4.B. The Trustee's reports state totals. The reports do not state occupancy, nightly rates, or bookings by Unit, and the reports do not compare the Units' results with the rest of the Resort.

On September 30, 2026, this court ordered the Canaveral Crossroads case jointly administered with the case of Sherwood Construction, Inc. (*Canaveral Crossroads*, Doc. 61). Canaveral Crossroads reports owning the clubhouse, the common areas, the sewage lift station, and the Cape Crossing Resort & Marina names and marks. (*Canaveral Crossroads*, Doc. 56 at 2). I propose that a third party acquire the Reorganized Debtor and the Crossroads assets and combine the two to maximize revenues, subject to approval in both cases. (Plan § 6.2). The acquirer takes the Reorganized Debtor subject to the Plan.

**H. October to November 2026: A judicial settlement conference produced the Global Settlement Agreement, and this court set the settlement and the Trustee's plan for hearing on December 3, 2026.**

On October 2, 2026, I moved to disallow the PEDixon and ZPD claims under section 502(d). (Doc. 423). On the same day, the Brevard County Tax Collector objected to the interest rate my earlier plan applied to the Tax Collector's claims. (Doc. 422). The Plan now pays Class 6 the statutory rate, as Section 3.C describes.

On October 6, 2026, the Trustee objected to the claims of Tamamoi, LLC and the Carton Family Trust only to disallow any deficiency, and the Trustee stated that the Trustee lacks standing to raise usury because the Debtor is not an obligor on either loan. (Docs. 424, 425 ¶ 14 & n.2).

On October 7, 2026, I objected to the Trustee's disclosure statement on seventeen grounds. (Doc. 426).

On October 14, 2026, this court heard both disclosure statements. At that hearing, I said that whatever came of the Trustee's settlement with PEDixon and ZPD, "the disclosure statement needs to be amended to include it," because where those claims land changes the distribution to unsecured creditors. (Oct. 14, 2026 Hearing Tr. at 8:5–19, 10:9–13).

On October 15, 2026, this court conditionally approved the Trustee's amended disclosure statement and set a combined hearing for November 19, 2026

on final approval of that disclosure statement and on confirmation of the Trustee's plan. (Doc. 437 ¶¶ 1, 3). On the same day, the Trustee reported holding $191,048 on September 30, 2026, including the balance of the $350,000 compromise payment. (Doc. 439, Part 1).

On October 19, 2026, the settlement conference took place and produced the Global Settlement Agreement that Section 2.J describes. The agreement resolves the objections to the claims of WM Holdings Group, CTO, IMQA, Mr. Johnson, PEDixon, ZPD, and Tiered Capital, and withdraws my October 2, 2026 motion. As of this filing, the Trustee has not amended the Trustee's disclosure statement to describe the settlement.

On October 21, 2026, I moved to disallow the Tamamoi and Carton claims under section 502(d). (Doc. 444).

On October 28, 2026, I sought leave to object to the Mainstreet claims and to the Tamamoi and Carton claims. (Docs. 448, 449).

On November 10, 2026, Claim 69 was withdrawn with prejudice. (Doc. 457). On the same day, Canaveral Crossroads and Sherwood Construction moved for approval of the Global Settlement Agreement in the Canaveral Crossroads and Sherwood Construction cases. (*Canaveral Crossroads*, Docs. 100, 101).

On November 12, 2026, the Trustee moved to approve the agreement in this case and asked for a hearing on or before November 19, 2026. (Doc. 459). *Fed. R. Bankr. P. 9019(a).*

On November 13, 2026, this court set the Trustee's motion for an evidentiary hearing on December 3, 2026, at 11:30 a.m. (Doc. 465 ¶ 1(a)). This court moved the hearing on the Trustee's disclosure statement and plan to the same date and time, and said this court will set a hearing on this Disclosure Statement once I file this Disclosure Statement. (Doc. 465 at 2 & ¶ 1). If both plans satisfy the confirmation requirements, this court must consider the preferences of creditors and equity security holders in choosing between the two plans. *11 U.S.C. § 1129(c).*

**I. Cause of Action Against Mainstreet — In February 2022, Mainstreet dictated the Debtor's arrangement with Canaveral Crossroads and cost the Debtor almost five years of revenue; in 2025, rather than enforce Mainstreet's own assignment of rents against PEDixon, Mainstreet elected another remedy, which cost the Debtor a million dollars.**

A lender that uses the leverage of a loan to dictate the borrower's dealings with a third party crosses the line from creditor to participant, and that lender answers for the harm the lender causes. Florida law holds a party liable for an intentional and unjustified interference with a business relationship the party knows of, when the interference damages the plaintiff. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). Mainstreet knew of the Debtor's

arrangement with Canaveral Crossroads, because Mainstreet required the undoing of that arrangement as a condition of the Mainstreet loan. No lender's justification covers that interference: Mainstreet's collateral was the nineteen Units, not the relationship between Mainstreet's borrower and a third party, and the Debtor's revenue — the source of repayment of Mainstreet's own loan — fell as a direct result.

**Apart from the tortious liability, Mainstreet's interference supports equitable subordination of Mainstreet's claims.**

The Bankruptcy Code lets a court subordinate a claim on equitable grounds. *11 U.S.C. § 510(c)(1)*. Subordination requires inequitable conduct that injured the creditors or gave the claimant an unfair advantage, and the conduct need not concern the claim itself: "inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977). Mainstreet's 2022 interference, and Mainstreet's 2025 choice to negotiate with the lender then collecting the Debtor's rents rather than enforce Mainstreet's own assignment of rents, are conduct of exactly that kind.

Florida's credit-agreement statute of frauds does not stand in the way. That statute bars a debtor's "action on a credit agreement" that is not in writing. *Fla.*

*Stat. § 687.0304(2)*. The Estate sues on no promise Mainstreet made to lend or to forbear; the Estate sues on Mainstreet's interference with the Debtor's contract with a third party. The Estate also takes every defense the Debtor holds, and the Estate may assert the resulting damages in recoupment and setoff against Mainstreet's claims. *11 U.S.C. § 558*. Because the four-year limitations period had not run when this case began on September 2, 2025, the Estate may bring the claim until May 21, 2028, two years after the order for relief. *11 U.S.C. § 108(a)*.

No proceeding on these claims is pending yet. The Plan places these claims in the Recovery Trust with every other Cause of Action, and because the same conduct injured Canaveral Crossroads, I expect a decision on these claims in or alongside the Canaveral Crossroads Chapter 11 case. (Plan §§ 4.3, 6.10).

The damages are the revenue the Debtor's Units would have earned, with first priority on every Resort reservation and the Debtor's share of the amenity revenue, over the revenue the Units actually earned, from February 2022 forward. That loss approximates $52,816 a month, and the figure covers both parts of the loss: the Debtor's share of the revenue the clubhouse, the pool, the common areas, the lift station, and the Resort's name and marks produce, and the rental revenue the Debtor lost with the Debtor's first priority on the Resort's reservations. The Resort's rental program always split revenue 50/50 between the operator and the unit owner, and the same split would have governed the Debtor's share here; I

derived the figure from the revenue Canaveral Crossroads lost and that split. From March 2022 through October 2026, fifty-six months, the Debtor's loss totals $2,957,696, and the loss grows by $52,816 every month the Debtor goes without the Resort behind the Debtor's Units.

Until a Final Order fixes Mainstreet's liability, the Plan pays Classes 2 and 3 into escrow. (Plan § 4.1(e)). Whatever liability the court determines reduces Mainstreet's Allowed Claims dollar for dollar, or eliminates those Claims, and any excess is a recovery for the Estate. Claims 64-1 and 63-1 assert $1,389,871.94 in interest, fees, and costs above the principal of the two loans. The Plan pays the principal. I dispute the rest: Mainstreet's own conduct caused those charges to accrue, and without that conduct none of those charges would exist.

**J. The Global Settlement Agreement pays the Estate $850,000, removes $7.9 million of claims, and fixes the insider claims; in exchange, the Estate releases the Estate's claims against the Dixon and Pitkanen parties.**

Within fourteen days after this court's approval orders become final in all four bankruptcy cases, the Dixon Payor Parties — PEDixon, ZPD, Crescent Sound, and Parke Financial — pay $2,500,000: $850,000 to the Trustee for the Estate; $30,000 to Canaveral Crossroads; $10,000 to Sherwood Construction; $10,000 to Mr. Flynn's estate; and $1,600,000 to a paying agent for the Global Settlement Trust. (Global Settlement Agreement § 5.1(a)). The Dixon Payor Parties pay the Estate's $850,000 in settlement of the Estate's claims, including the Estate's claims

under sections 544, 547, 548, and 550, and the $850,000 is not rents or the proceeds of any creditor's collateral. (Global Settlement Agreement § 5.1(c)). No lien attaches to the $850,000.

Within ten days after the payment, PEDixon and ZPD withdraw Claims 67 and 68 with prejudice, and PEDixon and ZPD will not seek a credit bid, a section 502(h) claim, or an administrative expense in this case. (Global Settlement Agreement § 8.4 & Ex. A). The agreement also fixes five claims: the agreement disallows WM Holdings Group's Claim 2-1; withdraws and disallows CTO's Claim 3; allows IMQA's Claim 4 as a general unsecured claim of $350,000; allows Mr. Johnson's Claim 5-2 as a general unsecured claim of $1,297,493.97, half of what Mr. Johnson asserted; and disallows Tiered Capital's Claim 71-1. (Global Settlement Agreement Ex. A). Together the agreement removes $7,916,473.65 of claims against the Estate: $6,160,031.25 of PEDixon and ZPD claims, $1,297,493.96 of Mr. Johnson's claim, and $458,948.44 of the claims of WM Holdings Group, CTO Holdings, Tiered Capital, and IMQA.

**Homemakers Ownership Controversy Is Mooted**

Under the agreement, Crescent Sound resigns any authority Crescent Sound has or claims as trustee of the Tiered Land Trust, and Mr. Johnson becomes successor trustee. Each Dixon Payor Party relinquishes to the Tiered Land Trust whatever interest that party has or claims in the Debtor's membership units, and

the Tiered Land Trust conveys the membership units to Mr. Johnson. (Global Settlement Agreement §§ 5.2, 5.4). None of these steps transfers property of the Estate or affects the Chapter 11 Trustee, who remains in office until this court orders otherwise. (Global Settlement Agreement § 5.4(c)). Mr. Johnson is the Debtor's owner, and on the Effective Date Mr. Johnson controls the Reorganized Debtor.

The agreement dismisses with prejudice Mr. Johnson's declaratory action on the ownership question. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026).

**Boon for the State Courts**

The agreement also dismisses with prejudice the *Johnson v. Dixon* action, the IMQA action, the Mainstreet foreclosure as between the settling parties, the Sherwood adversary proceeding, and the other actions listed in Exhibit A to the agreement. The agreement releases every lien and recorded interest between the two sides, including the recorded purchase option and right of first refusal in favor of PEDixon on the Debtor's Units (O.R. Book 9708, Page 2844). (Global Settlement Agreement §§ 7.1, 8.1 & Exs. A, E).

In return, the Estate releases the Estate's claims against the Dixon Parties and the Pitkanen Parties, and every settling party releases the Trustee. (Global Settlement Agreement §§ 9.2, 9.9, 15.2). The releases reach the parties and the

officers, members, agents, and professionals of each party, and no one else. The releases do not reach the seventeen persons the agreement lists as Excluded Persons, and the Estate keeps the Estate's claims against those persons. (Global Settlement Agreement §§ 2.4, 9.6(e) & Sched. 2.4).

Mainstreet, Tamamoi, the Carton Family Trust, FDRE, the IAM Irrevocable Trust, the associations, and the title companies are not parties, and the Plan keeps every claim against those non-parties in the Recovery Trust.

**Agreement Does Not Impede Confirming the Plan**

The agreement leaves every party, including Mr. Johnson and me, free to propose and solicit acceptances of a plan in this case, and the Dixon and Pitkanen parties will not oppose a plan consistent with the agreement. (Global Settlement Agreement § 14.4).

I seek approval of the settlement agreement in my own right, as the agreement provides. (Global Settlement Agreement § 14.2(b)). If this court has not entered that approval when this court considers confirmation, the Plan asks that the confirmation order approve the agreement, and the Effective Date waits for that approval. (Plan §§ 6.9(a), 8.1(d)). If this court declines to approve the agreement, the agreement provides a fallback, and I will modify the Plan before confirmation. (Global Settlement Agreement § 14.5; Plan § 6.9(e)). The $1,600,000 paid to the Global Settlement Trust belongs to the parties that are not estates; the Estate

receives none of that money, and no creditor's treatment depends on that money. (Global Settlement Agreement § 6.2).

**District Court Appeal Is Dismissed**

My appeal from the order denying my motion to disqualify PEDixon and ZPD from participating in this case is pending in the district court. (Doc. 344). *Amodeo v. Roeske Fernandez*, No. 6:26-cv-02089-AGM (M.D. Fla. 2026). Under the agreement, I will dismiss that appeal with prejudice. (Global Settlement Agreement Ex. A).

**A. The Debtor owns the rental heart of the Cape Crossing Resort.**

The Debtor, Homemakers Real Estate, LLC, owns and operates a portfolio of vacation-rental units within the Cape Crossing Resort and Marina (the "Resort"), located at 201 Ivory Coral Lane, Merritt Island, Florida 32953. At full build-out the Resort comprises forty-seven (47) townhomes, thirty-six (36) condominiums, a restaurant, two (2) marinas, a clubhouse and pool, and related commercial and intangible property. On October 31, 2020, the Debtor acquired thirty-three (33) of the vacation-rental units by quitclaim deed in lieu of foreclosure. Twenty-six (26) remain: eighteen (18) condominiums at 202 Ivory Coral Lane and eight (8) townhomes. (Exs. C, E). Unit 403 is not among them. In March 2024, Crescent Sound transferred Unit 403 from the Debtor to the IAM Irrevocable Trust and then left its mortgage unpaid. Tamamoi foreclosed, and the

circuit court, in what I believe was error, treated the Unit as outside the bankruptcy estate. That ruling is on appeal, the appeal is stayed while the bankruptcy proceeds, and the Plan seeks the Unit's return. In the Debtor's Schedule A/B filed June 16, 2026, the real property is valued at approximately $11,860,000 (the twenty-six units at $11,300,000 and one further unit at $560,000), and the Debtor scheduled substantial Causes of Action as additional assets.

**B. Four investors built the Resort with money from three lenders, and by 2019 an institutional consolidation was within reach.**

Michael McPhillips ("Mr. McPhillips") and Martin Flynn ("Mr. Flynn") conceived it. Lacking the capital to complete it alone, they brought in Horton Johnson ("Mr. Johnson") and Investors of Merritt — a group of friends and family headed by its principal investor, Dan Myers, CPA, now deceased — whose capital enabled development to begin in approximately 2015. Three lenders financed the work from the start: Mr. Johnson, who was both an investor and a lender; Neil Buchalter ("Mr. Buchalter"); and David Campbell, who operated FDRE, Inc. To finish the project, the developers presold units, entered construction loans, and stacked second, third, and fourth mortgages on individual units. By 2019, with most structures nearing completion, the enterprise involved more than fifty (50) investors, lenders, and owners across more than one hundred fifty (150)

~~transactions, and an institutional lender had tentatively committed to consolidate the debt and fund completion (the "Consolidation").~~

**~~C. The pandemic, a bank merger, and a partition starved the enterprise of cash.~~**

~~Between December 2020 and January 2021, Mr. McPhillips and Mr. Flynn entered a partition agreement (the "Partition Agreement") to resolve their disputes and disentangle their business arrangements. Mr. McPhillips took the marinas and restaurant; Mr. Flynn took the development entities, including the entity that became the Debtor. The COVID-19 pandemic then slowed construction and sharply increased materials costs, and a bank merger derailed the Consolidation, leaving the enterprise without the cash flow to meet its obligations. In late 2020, two mortgage-service entities (TACIRA, LLC and DRCIRA, LLC) commenced foreclosure actions, which were resolved after Mr. Johnson purchased the relevant mortgages. In April 2024, Tamamoi, LLC initiated a mortgage-foreclosure action relating to nine (9) residential units.~~

**~~D. Mr. Dixon lent $11.225 million and has collected more than $27 million.~~**

~~Between January 2022 and September 2023, Mr. Dixon, a retired accountant and self-described hard-money lender acting through PEDixon, LLC, ZPD, LLC, and Parke Financial, Ltd., made eleven loans totaling $11,225,000 to companies and individuals affiliated with the Resort enterprise, including Tiered Capital, Inc.~~

("Tiered Capital"), Sherwood Construction, Inc., IMQA Investments Incorporated, and Mr. Flynn. Each loan carried interest of 12% or 15%, a 2% origination fee, 1% renewal fees, and provisions for collection costs, due-diligence expenses, and legal fees; on default, the rate rose to the statutory maximum of 25%. I watched most of these loans made: I introduced Mr. Dixon to several of the borrowers, and I assisted in structuring all but two of the eleven.

Attorney Alison Pitkanen ("Ms. Pitkanen") prepared all or most of the loan documents, controlled escrow and disbursement of the loan proceeds through her IOLTA accounts, and — notwithstanding the conflict — represented both the Tiered-affiliated borrowers and the Dixon-related lenders in the same transactions. On September 13, 2023, the Dixon and Pitkanen interests purported to consolidate the eleven loans through a Tiered Consolidated Loan Agreement and an alleged Tiered Land Trust Agreement, under which the Debtor's ownership was said to be held by the Tiered Land Trust, with Crescent Sound, Ltd. — an entity Mr. Dixon owned and controlled — as trustee.

The borrowers' verified accounting, drawn in part from Mr. Dixon's own records, shows that Mr. Dixon has since collected more than $27,123,645 in cash, real estate, business interests, and purported forbearance fees against the $11,225,000 lent — an overpayment exceeding $15.8 million. The same records show effective interest rates of 32.33% in 2024 and 29.10% in 2025, each above

~~the 25% ceiling of the Florida criminal-usury statute. *Fla. Stat. § 687.071*. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026) (verified complaint ¶¶ 16–19, 400–420).~~

**~~E. A three-page unrecorded deed, a forged eight-page replacement, and a falsely notarized assignment purported to move the Debtor into Mr. Dixon's hands.~~**

~~No trust existed in September 2023, and the Tiered Land Trust was never validly formed. A Florida land trust exists only when a recorded instrument conveys the real estate to the trustee and confers the trustee's powers. *Fla. Stat. §§ 689.071(2), 689.073(1)*. In September 2023, Mr. Johnson electronically signed a three-page trustee's deed. It was never witnessed, never notarized, and never recorded, and it described no property: its third page bore the electronic-signature envelope identification number and listed Schedule A only as twenty-six units. That instrument could not be recorded under Florida law, and it created nothing. The earliest date on which the trust could have existed is February 14, 2024, when an eight-page "curative" trustee's deed was recorded in the Brevard County public records — and that deed is forged on its face. Set beside the deed Mr. Johnson signed, it shows what was done to it. Witness signatures were added. Addresses were added. A notary's seal and certificate were added, for a notarization the notary's own records contradict. And the signed third page — the only page that carried the envelope identification number — was removed and replaced with six~~

pages of legal descriptions of twenty-seven properties, none of which carries that number. A signed document does not acquire witnesses, a notary's seal, and six new pages after it is signed. The recorded deed is a falsified, fabricated, and forged instrument, and it conveyed nothing. On January 9, 2024, Ms. Pitkanen presented Mr. Johnson with an Assignment of Membership Units transferring the Debtor's membership interests. The signing happened in my home, and I objected to the first version of the document in the room; after Mr. Johnson signed the revised version, Ms. Pitkanen emailed the executed document to her assistant, Janelle Morea ("Ms. Morea"), who checked "Physically Present" on a notarial certificate for a signing Ms. Morea never attended. The verified complaint identifies more than thirty-four (34) false attestations and notarization irregularities across the Dixon loan documents. Because the trust was never formed, ownership of the Debtor remains with Mr. Johnson.

The Debtor's membership units now sit inside the so-called Tiered Land Trust. They belong to Mr. Johnson, and they are to be returned to him if they have not been already. Mr. Johnson is the Debtor's owner, and on the Effective Date he controls the Reorganized Debtor. On February 9, 2026, Mr. Johnson filed a declaratory action in Orange County that will confirm it. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026) (the "Declaratory Action").

**F. For thirty months Mr. Dixon collected the Debtor's rents and paid none of the Debtor's creditors.**

From December 2023 through the entry of the order for relief, the Dixon-related interests controlled the Debtor. Crescent Sound seized the rental operations; the Debtor's revenues were routed through Ms. Pitkanen's IOLTA account and transferred to PEDixon and ZPD — more than $2,800,000 over the period — while, on the present record, the mortgages, ad valorem taxes, association assessments, and maintenance obligations of the Debtor went unpaid. The arithmetic of that diversion is the story of this case: every secured creditor now asserting an arrearage — Jetton, Mainstreet, Tamamoi, Carton, the Brevard County Tax Collector, and both associations — traces its default to revenue Mr. Dixon collected and kept. The foreclosures, the association liens, and the tax delinquencies are not the product of a failed business; the units rented and the money came in. The money simply never reached the creditors it belonged to.

**G. The forged assignment defeated the first bankruptcy case; the second produced an order for relief and a trustee.**

On May 5, 2025, Mr. Johnson, as Manager, filed a voluntary Chapter 11 petition for the Debtor. *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025) (the "First Bankruptcy Case"). The Dixon-affiliated lenders moved to dismiss, relying on the January 9, 2024 Assignment of Membership Units to argue Mr. Johnson lacked authority, and on June 27, 2025

~~the case was dismissed on that ground. Reconsideration was denied on August 26, 2025, but the court identified the paths by which a renewed filing would be authorized.~~

~~The Rule 60 motions I described in my earlier statement are no longer pending. On July 21, 2026, the Bankruptcy Court denied the motions to vacate the dismissal of the First Bankruptcy Case, and on August 20, 2026, it denied my motion to consolidate the two cases. (Doc. 345 & n.2). The operative petition date for every purpose is therefore September 2, 2025. The Plan no longer defines a Relation-Back Date, and every avoidance and reach-back period runs from September 2, 2025.~~

~~On September 2, 2025 — within a week of that denial — Tiered Capital filed an involuntary Chapter 11 petition commencing this Bankruptcy Case; Mr. Johnson, IMQA Investments Incorporated, CTO Holdings, Inc., and I joined as petitioning creditors. On October 8, 2025, I moved to appoint a Chapter 11 trustee — the first party in this case to ask for one. (Doc. 13). On February 11, 2026, the Bankruptcy Court struck that motion with my other pro se papers (Doc. 137), and the request was renewed thereafter, including by Mainstreet (Doc. 155). On May 20, 2026, after contested proceedings, the Bankruptcy Court rejected the Debtor's claim that the petitioning creditors filed in bad faith. It found that the petition was not filed for an improper purpose; that the petitioning creditors' "primary reason~~

for the involuntary petition was for a proper purpose, namely to ensure a fair distribution of Homemakers' assets," so "that Mr. Dixon does not get a disproportionate share versus other creditors"; that their "primary concern was ensuring payment of all creditors and not just Mr. Dixon"; and that "the principal aim in filing this case is to prevent the disproportionate advantage that Mr. Dixon exercises by receiving and controlling the disposition of Homemakers' rental income." (Doc. 256 at 10:13–21, 11:19–24, 12:25–13:3, 14:3–6, 28:8–13). It found PEDixon, ZPD, and Crescent Sound to be insiders (*id.* at 22:6–8), and, because "all rents are being controlled by Mr. Dixon," it ordered that a trustee be appointed. (*Id.* at 30:17–23). On May 21, 2026, it entered the order for relief. (Doc. 229). On June 8, 2026, it directed the appointment of a Chapter 11 trustee (Doc. 240), and on June 12, 2026, it approved the appointment of Lara Roeske Fernandez. (Doc. 252). On June 16, 2026, Mr. Johnson filed the Debtor's Schedules and Statement of Financial Affairs. The section 341 meeting of creditors was set for July 16, 2026. (Doc. 264). Because exclusivity ended upon the appointment of the Chapter 11 Trustee, I file the Plan as a party in interest under section 1121(c).

**H. A verified tort action now quantifies the scheme.**

On July 9, 2026, Mr. Johnson and Tiered Capital filed a verified complaint in the Circuit Court of the Ninth Judicial Circuit against Mr. Dixon, PEDixon, ZPD, Parke Financial, Ms. Pitkanen, her professional association, and Crescent

Sound. *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026). The sixteen counts include fraud in the inducement, criminal usury, forgery-based fraud, conversion, civil theft, abuse of process, breach of fiduciary duty, and federal and Florida civil RICO, and allege actual damages of $33,050,155 — $99,150,465 after mandatory trebling — exclusive of fees, interest, and ongoing receipts.

I am a witness to the events that complaint describes. The claims it pleads belong to Mr. Johnson and Tiered Capital, not to the Estate, and no creditor should vote in reliance on their outcome. The Estate holds its own claims arising from the same events — the avoidance and turnover claims, the section 549 claims for post-petition transfers, and the usury forfeitures — all of which the Plan places in the Recovery Trust, and the decision whether and how to pursue each recovery rests with the Chapter 11 Trustee, presumably Ms. Fernandez, whom the Plan names as Recovery Trustee. The tort action's significance to this Bankruptcy Case is evidentiary: the same documents, the same false notarizations, and the same diverted revenues that support Mr. Johnson's claims support the Estate's. The record is already assembled, verified, and exhibit-supported; the Estate does not start from zero.

The Dixon parties deny all of it. They say the loans bore a contractual rate of 15 percent, below the 25 percent threshold of Fla. Stat. § 687.071; the borrowers'

~~accounting of Mr. Dixon's own records puts the effective rates at 32.33 percent in 2024 and 29.10 percent in 2025, and the expert report of Gary A. Moll computes effective rates above the criminal threshold. (Doc. 339). They say the satisfaction theory counts a South Carolina parcel they never accepted; on September 14, 2023, Crescent Sound took an assignment of the membership units of the company that owns it, and the Dixon side has held it ever since. They say the January 9, 2024 Assignment is valid and that this Court dismissed the First Bankruptcy Case on its strength (Doc. 430 ¶¶ 5, 10, 12); the notary who certified that Mr. Johnson appeared before her was not in the room. And the trust through which the Dixon side claims control rests on a deed altered after Mr. Johnson signed it: the recorded version added witnesses, addresses, and a notary's seal, and it replaced the signed third page — the only page bearing the envelope identification number, which listed Schedule A as twenty-six units — with six pages describing twenty-seven properties, none bearing that number. That is why I know the recorded deed is falsified, fabricated, and forged, and no order entered without that comparison validates it. The Trustee herself refuses to concede that the consolidated loan agreement is enforceable (Doc. 419 ¶¶ 17–19), and this Court has found PEDixon, ZPD, and Crescent Sound to be insiders. (Doc. 256 at 22:6–8). The ownership question is pending in the Declaratory Action, and the tort claims are pending in *Johnson v. Dixon.*~~

**I. Since July 13, 2026, the Trustee compromised the post-petition rent claim, proposed a competing plan, and objected to most of the claims in the case.**

On September 2, 2026, the Bankruptcy Court approved, over my objection, the Trustee's compromise with PEDixon, LLC and ZPD, LLC (together, the "Lender") and the Cape Crossing Condominium Association. (Doc. 379 ¶¶ 1–2). Under the compromise, the Lender pays the Trustee $350,000 to resolve the Trustee's claim to avoid and recover the post-petition transfers defined in her motion, and waives any section 502(h) claim for that amount; the Trustee pays the Association $204,000 for the condominium roof replacement; the Association withdraws its claim; and the Trustee holds the balance and may not use it without further order, while she and the secured creditors reserve whether their liens attach to it. (*Id.* ¶¶ 3–5). On September 18, 2026, the Association withdrew Claim 7. (Doc. 393). By its terms the compromise reaches only the post-petition transfers; it does not decide the Lender's claims against the Estate or the Estate's other claims against the Lender.

On September 11, 2026, the Bankruptcy Court directed the Trustee, PEDixon, and ZPD to a judicial settlement conference before the Honorable Jason A. Burgess for possible resolution of "all issues between the Parties." (Doc. 386 ¶¶ 2–3). The conference is set for October 19, 2026. (Doc. 419 at 5 n.1). Any settlement it produces must come back to the Bankruptcy Court for approval. *Fed.*

*R. Bankr. P. 9019(a)*. Creditors should understand that a settlement of the Lender's claims could change the recoveries this Disclosure Statement projects.

On September 18, 2026, the Trustee filed a competing plan of liquidation and its disclosure statement. (Docs. 394, 395). The Trustee's plan sells all twenty-six Units free and clear of liens, through brokers or an auctioneer; pays each secured creditor from the proceeds of its collateral; and distributes what remains to unsecured creditors and, only after they are paid in full, to the holders of Interests. (Doc. 395 at 13–17). I have objected to the Trustee's disclosure statement. On October 14, 2026, the Bankruptcy Court heard both disclosure statements. On October 15, 2026, it conditionally approved the Trustee's amended disclosure statement and set a combined hearing on its final approval and on confirmation of her plan for November 19, 2026. (Doc. 437 ¶¶ 1, 3). If both plans satisfy the confirmation requirements, the Bankruptcy Court must consider the preferences of creditors and equity security holders in choosing between them. *11 U.S.C. § 1129(c)*.

On July 22, 2026, the Bankruptcy Court required every scheduled creditor to file a proof of claim to participate in the case, and it extended the deadline through August 21, 2026 for six named creditors. (Doc. 320 ¶¶ 2–3). As of September 18, 2026, seventy-one claims had been filed. (Doc. 395 at 12). Between September 17 and October 2, 2026, the Trustee objected to the claims of IPFS Corporation, WM

Holdings Group, LLC, CTO Holdings, Inc., IMQA Investments Incorporated, Mr. Johnson, Paul Rene, Jr., PEDixon, LLC, ZPD, LLC, and Tiered Capital, Inc. (Docs. 392, 409, 410, 411, 412, 416, 419, 420, 421). On October 2, 2026, I moved to disallow the PEDixon and ZPD claims under section 502(d). (Doc. 423). On October 6, 2026, the Trustee objected to the claims of Tamamoi, LLC and the Carton Family Trust only to disallow any deficiency, and stated that she lacks standing to raise usury because the Debtor is not an obligor on either loan. (Docs. 424, 425 ¶ 14 & n.2). On August 28, 2026, the Bankruptcy Court ordered that a party seek leave before objecting to a proof of claim or a scheduled liability. (Doc. 359 ¶ 3). The Plan's claim-objection period conforms to that order. (Plan § 7.2).

On September 17, 2026, the Bankruptcy Court denied Mr. Johnson's motion to appoint an examiner. (Doc. 391). My appeal from the order denying my motion to disqualify PEDixon and ZPD from participating in this case (Doc. 344) is pending in the district court, where my motion for leave to appeal awaits decision. *Amodeo v. Roeske Fernandez*, No. 6:26-cv-02089-AGM (M.D. Fla. 2026). On October 2, 2026, the Brevard County Tax Collector objected to the interest rate my earlier plan applied to its claims. (Doc. 422). The Plan now pays Class 6 the statutory rate, as Section 3.C describes. On October 7, 2026, I objected to the Trustee's disclosure statement on seventeen grounds. (Doc. 426).

On March 16, 2026, the Bankruptcy Court terminated the automatic stay as to Mainstreet Community Bank and permitted it to exercise its in rem rights against the Units that secure its loans. (Doc. 183 ¶ 2). On February 11, 2026, it lifted the stay for Tamamoi only to let it obtain a final judgment (Doc. 135 ¶ 2), and on August 28, 2026, it abated the Tamamoi and Carton requests to conduct foreclosure sales. (Doc. 361 ¶ 1). A foreclosure sale by Mainstreet before the Plan takes effect would remove its Units from the Estate. On the Effective Date, the Plan's injunction replaces each of these orders, and no secured creditor may sell a Unit except through a state-court receiver conducting a structured sale after an uncured Plan default. (Plan §§ 6.13, 8.4).

On September 21, 2026, the Trustee filed her operating report for August 2026. It reports receipts of $18,661 for the month, cumulative receipts of $44,484, disbursements of $761, and $43,609 in cash on August 31, 2026. (Doc. 399, Part 1). Creditors should compare those receipts with the projections in Section 4.B.

On September 8, 2026, the court entered an order for relief against Canaveral Crossroads, LLC — the resort's developer and declarant — on its consent, and converted its case to Chapter 11; on September 30, 2026, it ordered that case jointly administered with that of Sherwood Construction, Inc. *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla.) (Docs. 15, 61). Canaveral Crossroads reports that it owns the clubhouse, the common

areas, the sewage lift station, and the Cape Crossing Resort & Marina names and marks. (*Id.*, Doc. 56 at 2). Tamamoi's foreclosure judgment was entered in its action against Canaveral Crossroads and others. (Doc. 424 at 2 n.1). The Plan proposes that the Debtor acquire the assets of Canaveral Crossroads through that case, subject to approval in both cases. (Plan § 6.2).

**J. In February 2022, Mainstreet dictated the Debtor's arrangement with Canaveral Crossroads and cost the Debtor almost five years of revenue; in 2025, rather than enforce its assignment of rents against PEDixon, it negotiated to sell its mortgages to PEDixon at a discount.**

Before 2022, the Debtor's Units stood on a second set of assets. In April 2021, Canaveral Crossroads quitclaimed the resort's public property — the clubhouse, the pool and fitness facility, the sewage lift station, and the open land and sign parcel — to Canaveral Crossing Resorts, Inc. (O.R. Book 9077, Page 1557, recorded Apr. 6, 2021). The resort's intellectual property, the Cape Crossing Resort & Marina names and marks, was placed there as well. That arrangement gave the Debtor two things. First, the Debtor's Units held first priority on every reservation the resort booked, which likely would have doubled the Debtor's rental revenue. Second, the amenities and marks generated fees beyond what their expenses and the original Crossroads investors required, and that margin supported the Debtor.

~~On February 17, 2022, Mainstreet refinanced nineteen of the Debtor's Units with a $5,061,363 loan, $4,822,072.69 of which retired the Campbell loans on those Units through FDRE, Inc. (Settlement Statement, Feb. 17, 2022, lines 1501, 1600). As a condition of that refinancing, Mainstreet stepped outside the role of a lender and dictated how the Debtor and Canaveral Crossroads would structure their contract. Its demand produced exactly the result it sought: on February 7, 2022 — ten days before the closing — the deed returning the clubhouse, the pool, the lift station, and the open land from Canaveral Crossing Resorts, Inc. to Canaveral Crossroads was recorded. (O.R. Book 9407, Page 1642). The Debtor lost its priority on the resort's reservations and its share of the amenity revenue. For almost five years since, the returned properties have produced no revenue for the Debtor at all, and the revenue that would have serviced the Debtor's debts — Mainstreet's among them — never came in.~~

~~In February 2025, Mr. Johnson and I met with Mainstreet and told it that it needed to enforce the assignment of rents in its mortgages to stop the diversion of the Debtor's rents to PEDixon. Mainstreet's assignment of rents came first in time, and the Bankruptcy Court later found that Mr. Dixon "has been retaining all of the rental income, despite the mortgagee's assignment of rent provisions that are prior in time to the loan with Mr. Dixon." (Doc. 256 at 13:15–19). Mainstreet did not enforce it. After that meeting, Mainstreet instead discussed with PEDixon a short~~

~~sale of the Mainstreet mortgages on the Debtor's Units to PEDixon. The sale did not close, but the choice speaks for itself: rather than stop the diversion, Mainstreet negotiated a transaction that would have put its mortgages, at a discount, in the hands of the lender diverting the Debtor's rents, and would have harmed the Debtor's other creditors even more. Meanwhile, the rents kept flowing to PEDixon, and the Debtor's mortgages, taxes, and assessments went unpaid.~~

~~A lender that uses the leverage of a loan to dictate its borrower's dealings with a third party crosses the line from creditor to participant, and it answers for the harm it causes. Florida law holds a party liable for an intentional and unjustified interference with a business relationship it knows of, when the interference damages the plaintiff. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). Mainstreet knew of the Debtor's arrangement with Canaveral Crossroads, because it required the arrangement's undoing as a condition of its loan. No lender's justification covers that interference: Mainstreet's collateral was the nineteen Units, not the relationship between its borrower and a third party, and the Debtor's revenue — the source of repayment of Mainstreet's own loan — fell as a direct result. The same conduct supports subordinating Mainstreet's claims. *11 U.S.C. § 510(c)(1)*. Subordination requires inequitable conduct that injured the creditors or gave the claimant an unfair advantage, and the conduct need not concern the claim itself: "inequitable conduct directed against the~~

bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir. 1977). Mainstreet's 2022 interference, and its 2025 choice to negotiate with the lender diverting the Debtor's rents rather than stop the diversion, are conduct of exactly that kind. Florida's credit-agreement statute of frauds does not stand in the way. It bars a debtor's "action on a credit agreement" that is not in writing, *Fla. Stat. § 687.0304(2)*; the Estate sues on no promise Mainstreet made to lend or to forbear, but on Mainstreet's interference with the Debtor's contract with a third party. The Estate also takes every defense the Debtor holds, and it may assert the resulting damages in recoupment and setoff against Mainstreet's claims. *11 U.S.C. § 558*. Because the four-year limitations period had not run when this case began on September 2, 2025, the Estate may bring the claim until May 21, 2028, two years after the order for relief. *11 U.S.C. § 108(a)*.

No proceeding on these claims is pending yet. The Plan places them in the Recovery Trust with every other Cause of Action, and because the same conduct injured Canaveral Crossroads, I expect them to be decided in or alongside its Chapter 11 case. (Plan §§ 4.3, 6.10). The damages are the revenue the Debtor's Units would have earned, with first priority on every resort reservation and the Debtor's share of the amenity revenue, over the revenue they actually earned, from

~~February 2022 forward. That loss approximates $52,816 a month, and the figure covers both parts of it: the Debtor's share of the revenue the clubhouse, the pool, the common areas, the lift station, and the resort's name and marks produce, and the rental revenue the Debtor lost with its first priority on the resort's reservations. The resort's rental program always split revenue 50/50 between the operator and the unit owner, and the same split would have governed the Debtor's share here; I derived the figure from the revenue Canaveral Crossroads has lost and that split. From March 2022 through October 2026, fifty-six months, the Debtor's loss totals $2,957,696, and it grows by $52,816 every month the Debtor goes without the resort behind its Units. Until a Final Order fixes Mainstreet's liability, the Plan pays Classes 2 and 3 into escrow. (Plan § 4.1(e)). Whatever liability is determined reduces Mainstreet's Allowed Claims dollar for dollar, or eliminates them, and any excess is a recovery for the Estate.~~

## 3. ~~SUMMARY OF THE PLAN~~The Plan pays every Allowed Claim in full and sells Units only when the rents fall short.

~~THE FOLLOWING IS ONLY A SUMMARY. ANY PARTY CONSIDERING A VOTE SHOULD READ THE PLAN IN ITS ENTIRETY. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.~~This Section summarizes the Plan. Read the Plan in full before voting; where this summary and the Plan differ, the Plan controls.

**A. The Plan keeps the Resort renting, pays every legitimate creditor in full, and turns the Estate's claims over to a Recovery Trust.**

The Plan classifies and treats all Claims against, and Interests in, the Debtor in ~~thirteen (13)~~ eleven Classes: eight ~~(8)~~ Classes of Secured Claims (Classes 1–8, of which ~~Class~~ Classes 1 and 8 ~~is~~ are now empty), one ~~(1)~~ Class of non-Insider General Unsecured Claims (Class 9), one ~~(1)~~ Class of Insider Unsecured Claims (Class 10), and one ~~(1)~~ Class of Interests (Class ~~11),~~ 11). The earlier Classes 12 and ~~one (1) Class of~~ 13 are gone: PEDixon and ZPD withdraw the ~~disputed~~ PEDixon and ZPD claims ~~of PEDixon, LLC~~ under the Global Settlement Agreement, and ~~ZPD, LLC (Class 12), and one (1) Unimpaired Class for~~ the ~~small secured~~ Trustee paid the IPFS claim ~~of IPFS Corporation (Class~~ in full. (Doc. 392 ¶ 13). The Plan does not classify Administrative Claims and Priority Tax Claims ~~are not classified~~ and ~~are treated~~ treats those claims separately. Each secured creditor in Classes 1 through 5 and Class 7 receives parallel treatment — ~~adequate protection accruing at 4.8% per annum through the Effective Date and cured from recoveries, then~~ a 360-month amortization at 6% beginning February 1, 2027, with a ~~five-year~~ two-year balloon on February 1, 2029 — even though the collateral securing each Claim differs. Class 6, the ad valorem tax claims, receives interest at the rate Florida law fixes and full payment within five years after the order for relief. ~~Non-Insider~~ The Plan pays non-Insider unsecured creditors ~~are paid~~ in full, in cash, from the Settlement Payment, on the later of the Effective Date and the

fifth business day after the Trustee receives the Settlement Payment. The Plan reserves disputed Class 9 claims in cash and pays those claims with interest ~~at the federal judgment rate, in sixty monthly installments from operating revenue, and net recoveries prepay them; after~~ when allowed. (Plan § 4.7). After the secured creditors receive what the Plan provides, every dollar of net recoveries goes to unsecured creditors until ~~they are paid~~ the Plan pays unsecured creditors in full. I believe 6% is a market rate for a fully amortizing loan on income-producing resort units; if a secured Class rejects the Plan, ~~the Bankruptcy Court~~ this court will decide whether the rate gives that Class the present value of ~~its~~ the Class's claim. *11 U.S.C. § 1129(b)(2)(A)(i)(II)*. The Effective Date occurs only after the confirmation order becomes a Final ~~Order.~~ Order and this court approves the Global Settlement Agreement. (Plan §§ 1, ~~8.1). Where a secured creditor's entitlement is in dispute — the Mainstreet, Tamamoi, and Carton Claims, and any Dixon claim asserted as secured — the Plan proceeds as normal, but each payment it provides on that Claim is held in escrow by the Recovery Trustee until a Final Order determines whether, and how much, the creditor is owed; only then is the escrow disbursed. (Plan § 4.1(e)). Units are sold only if the Reorganized Debtor's results fall below the projections — that is, if its net operating income will not cover every Plan payment — and then over time, two or three at a time, after the peak season, at structured-sale prices, never in a forced bulk sale. The same~~

~~structured-sale provision applies if the Crossroads acquisition does not occur, unless the Reorganized Debtor is meeting every Plan obligation from its own operations. (Plan § 6.12). If the Reorganized Debtor defaults and does not cure, it consents to a state-court receiver who sells the affected Units in the same structured way. (Plan § 6.13).~~8.1).

Where a secured creditor's entitlement is in dispute — the Mainstreet, Tamamoi, and Carton Claims — the Plan proceeds as normal. The Recovery Trustee holds each payment on that Claim in escrow until a Final Order determines whether, and how much, the Debtor owes the creditor; only then does the Recovery Trustee disburse the escrow. (Plan § 4.1(e)). Beginning in January 2027, the Reorganized Debtor lists one condominium for sale at $500,000 and one townhome at $450,000, and the Reorganized Debtor keeps at least one Unit listed at all times unless the prior quarter's operating results covered every Plan payment. The Plan caps costs of sale at five percent. When a Unit sells, the secured creditor receives a release price of $350,000, or $227,000 for Tamamoi and Carton, and the Reorganized Debtor distributes the rest of the proceeds under the Plan and according to existing lien rights. The Plan sells no Unit in a forced bulk sale. (Plan § 6.12). If the Reorganized Debtor defaults and does not cure, the Reorganized Debtor consents to a state-court receiver who sells the affected Units in the same structured way. (Plan § 6.13).

The Plan establishes a Recovery Trust that holds all of the Estate's Causes of Action ~~— including~~ other than the claims ~~for preferences~~ the Global Settlement Agreement releases. Those Causes of Action include the preference and ~~fraudulent transfers, any section 549~~ fraudulent-transfer claims against parties the ~~Trustee's compromise did~~ agreement does not ~~resolve,~~ release, the claims against ~~P.E. Dixon and, separately,~~ Tamamoi, LLC and Tamamoi's servicing agent, the claims against ~~Tamamoi, LLC,~~ Mainstreet, the claims against the associations and the associations' directors, the claims against the contractors, the claim against First American Title, and the recovery of Unit ~~403 — administered to conclusion by the Chapter 11 Trustee, Lara Roeske~~ 403. Ms. Fernandez, as Recovery ~~Trustee.~~ Trustee, administers the Recovery Trust to conclusion. If ~~she~~ Ms. Fernandez declines to serve, a successor approved by the Office of the United States Trustee serves on the same terms. (Plan § 6.3). Any claim the Recovery Trustee declines — because ~~she~~ the Recovery Trustee judges ~~its~~ the claim's merits insufficient or ~~its~~ the claim's prosecution not economically efficient — reverts to the Reorganized Debtor, which decides whether to pursue ~~it; its~~ the claim; the claim's net proceeds still flow through the Plan's waterfall. (Plan § 6.11). ~~Her~~ Ms. Fernandez's statement that ~~she~~ the Trustee will not pursue usury against Tamamoi and Carton ~~(Docs. 424, 425 n.2)~~ operates as such a declination. (Docs. 424, 425 n.2). The Plan appoints the Recovery Trustee as the representative of the Estate under section

1123(b)(3)(B) to retain and enforce those ~~claims~~ claims. (Plan § ~~6.10), and it~~ 6.10). The Plan also preserves section 502(d): the Plan allows no Claim of an entity that received an avoidable ~~transfer is Allowed,~~ transfer, and makes no distribution ~~is made~~ on ~~it,~~ that Claim, until that entity pays or turns over what ~~it~~ the entity received, while the payments the Plan provides on that entity's Secured Claim wait in ~~escrow~~ escrow. (Plan §§ 4.1(e), 7.4). The Recovery Trust ~~is funded from the balance~~ receives what remains of the ~~Lender's settlement payment that~~ Settlement Payment after administrative claims and Class 9, up to $100,000 — about $87,000 if this court allows the ~~Trustee holds under the compromise order — approximately $146,000 after the $204,000 roof payment — to the extent the Bankruptcy Court determines that no secured creditor's lien attaches to it, and otherwise from the Reorganized Debtor's net operating revenue. My earlier statement funded the Recovery Trust from an $880,000 turnover of post-petition funds by P.E. Dixon; that turnover did not occur, and the Plan no longer depends~~ fee applications now on ~~it.~~ file in full. The net proceeds of the Recovery Trust flow through the Plan's waterfall to cure secured-creditor defaults and to pay unsecured creditors.

**B. ~~Thirteen~~ Eleven Classes hold the claims and interests; Classes 1 and 8 are empty, and the ~~Dixon, Tamamoi,~~ Tamamoi and Carton Classes do not vote, because section 502(d) bars ~~them.~~the Tamamoi and Carton Claims.**

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| 1 | ~~Jetton Investments, Inc. / Paul Rene, Jr.~~Claim 69 withdrawn (Doc. 457) | ~~Impaired~~No Claim | ~~Yes~~No |
| 2 | Mainstreet Community Bank (Loan One) | Impaired | Yes |
| 3 | Mainstreet Community Bank (Loan Two) | Impaired | Yes |
| 4 | Tamamoi, LLC | Impaired | No — § 502(d) |
| 5 | Carton Family Trust of 1992 | Impaired | No — § 502(d) |
| 6 | Ad valorem taxes (Tax Collector and certificate holders) | Impaired | Yes |
| 7 | Cape Crossing Townhomes Homeowners Association, Inc. | Impaired | Yes |
| 8 | Cape Crossing Condominium Association — claim withdrawn (Doc. 393) | No Claim | No |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Yes |
| 10 | Insider Unsecured Claims | Impaired | Yes |
| 11 | Interests in the Debtor | Impaired | Yes |
| ~~12~~ | ~~PEDixon, LLC (Claim 67) and ZPD, LLC (Claim 68) — disputed~~ | ~~Impaired~~ | ~~No — § 502(d)~~ |
| ~~13~~ | ~~IPFS Corporation (Claim 70-1) — secured portion~~ | ~~Unimpaired~~ | ~~No (deemed to accept)~~ |

**C. ~~Every~~ The Plan pays every legitimate creditor ~~is paid~~ in full on ~~its~~ that creditor's Allowed Claim, and the Global Settlement Agreement fixes the largest disputed ~~Dixon claims receive nothing unless a Final Order allows them.~~claims.**

The table below summarizes the treatment of each ~~Class is summarized below~~ Class, and ~~set forth in full in~~ Article 4 of the ~~Plan.~~ Plan states that treatment in full. The dollar amounts shown are the amounts ~~asserted in~~ the filed proofs of

claim assert or, where noted, the amounts in the judgment, the Trustee's filings, or the Debtor's ~~Schedules; they~~ Schedules. Those amounts are not ~~admissions,~~ admissions; I dispute many of those Claims, and many ~~Claims~~ are ~~disputed and~~ subject to objection and reduction.

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| Admin / Priority | Trustee & professional fees; § 1930 fees; tax claims | Paid in full under § 1129(a)(9); priority tax claims over 5 years; IRS/FDOR claims disputed and may be reduced to zero. |
| ~~1 — Jetton~~1 | ~~$1,634,600.00 (Claim 69: $1,468,484.37 secured, $166,115.63 unsecured); senior mortgage~~ Claim 69 withdrawn with prejudice on ~~the land~~November 10, 2026 (Doc. 457) | ~~Lien retained; 4.8% adequate protection; 360-month amortization at 6%; 5-year balloon. Treated as undersecured. Trustee's objection pending (Doc. 416).~~No Claim; no distribution; no vote. |
| 2 — Mainstreet One | $3,611,594.47 principal (Claim 64-1; asserted total exceeds $4,793,000) | Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured treatment (6%, 360 months); payments held in escrow until then. Stay relief (Doc. 183) ends on the Effective Date. |
| 3 — Mainstreet Two | $712,105.80 principal (Claim 63-1; asserted total exceeds $920,000) | Lender liability for forcing a transfer of property, to be decided in the Canaveral Crossroads case, may nullify or substantially reduce the claim. To the extent Allowed: common secured treatment (6%, 360 months); payments held in escrow until then. Stay relief (Doc. 183) ends on the Effective Date. |
| 4 — Tamamoi | $3,378,797.64 (Claim 65-1; final judgment entered May 18, 2026; 8 units) | Judgment superseded; ~~it~~ Tamamoi may not ~~be enforced~~ enforce the judgment by sale (Docs. 135 ¶ 3, 361). Claim fixed in a claim proceeding; I contend no more than $227,000, the amount on the face of the mortgage, on any Unit, and no interest (Fla. Stat. §§ 687.03, 687.04, 687.071(7)). To the |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| | | extent Allowed: Lien allowed on ~~its~~ Tamamoi's Units; common secured treatment (6%, 360 months); payments held in escrow until then. Trustee objects only to any deficiency (Doc. 424). |
| 5 — Carton | $383,505.45 (Claim 66-1; townhome Unit 8-104) | Same terms as Tamamoi. Trustee objects only to any deficiency (Doc. 425). |
| 6 — Ad valorem taxes | $478,289.67 (Claims 8–62): Tax Collector $312,465.91 (2024 and 2025 taxes, 18%); certificate holders $165,823.76 (Keys Funding, ATCF II, FIG 20, Community Red Co); tax-deed applications pending on Units 305, 402, 404 | Paid in full with interest at the rate applicable nonbankruptcy law fixes for each claim (18% on the Tax Collector's claims; the certificate rate on each certificate), in equal monthly installments completed by May 21, 2031, five years after the order for relief; balance paid at any sale or refinancing of the Unit. 11 U.S.C. §§ 511(a), 1129(a)(9)(C)–(D). No tax-deed application proceeds while payments are ~~current. Assessments contested as 25–30% over fair market value.~~current. |
| 7 — Townhomes HOA | $118,731.84 (Claim 6-1) | Full Allowed Claim paid from recoveries; subject to Estate negligence/waste claims (up to $125,000/unit). |
| 8 — Condominium Assoc. | Claim 7 withdrawn September 18, 2026 (Doc. 393) | No Claim; no distribution. The $204,000 roof payment under Doc. 379 resolved the Association's special assessment. |
| 9 — Unsecured (Non-Insider) | ~~$809,344.44 filed (IMQA, CTO, Tiered, WM, Amodeo); Trustee objections pending to all but mine~~$350,396.00 allowed (IMQA $350,000.00 under the Global Settlement Agreement; Amodeo $396.00); CTO withdrawn; Tiered and WM disallowed | 100% of Allowed Claims in cash from the Settlement Payment on the later of the Effective Date and receipt; disputed claims reserved in cash and paid with interest ~~at the federal judgment rate, in~~ when allowed; any shortfall paid over 60 ~~monthly installments~~ months from ~~operating revenue (Ex. B); net recoveries prepay. Shares pro rata with any Class 12 claim Allowed as unsecured.~~operations. |
| 10 — Insider Unsecured | Johnson, Claim 5-2, ~~$2,594,987.93; Trustee seeks recharacterization (Doc. 412)~~allowed at | Paid only after Classes 1–9 satisfied and $1,000,000 improvement reserve funded; then pro rata in remaining |

| Class | Claim / Amount | Summary of Treatment |
|---|---|---|
| | $1,297,493.97 under the Global Settlement Agreement | ~~recoveries.~~recoveries. No lien. |
| 11 — Interests | Horton S. Johnson ~~(units held~~ (Dixon interests in the ~~so-called Tiered Land Trust,~~ units relinquished and conveyed to ~~be returned to him)~~him under the Global Settlement Agreement § 5.4) | Interest retained; Mr. Johnson controls the Reorganized Debtor at exit; no distribution on the Interest until senior Classes are satisfied. |
| ~~12 — PEDixon / ZPD~~ | ~~$4,779,864.58 (Claim 67) and $1,380,166.67 (Claim 68); objected to by the Trustee (Docs. 419, 420) and by me~~ | ~~Disputed. Nothing unless Allowed by Final Order; § 502(d) bars allowance until any avoidable transfer is returned. An Allowed Secured Claim receives the common secured treatment; an Allowed Unsecured Claim shares pro rata with Class 9.~~ |
| ~~13 — IPFS~~ | ~~$1,231.54 (Claim 70-1; $1,118.79 secured, $112.75 unsecured); Trustee objection (Doc. 392)~~ | ~~Unimpaired. Allowed Secured Claim paid in full in Cash within 30 days after the Effective Date; any unsecured part is in Class 9.~~ |

The Debtor scheduled the claims of ~~P.E. Dixon (KAE)~~ PEDixon and ~~ZPD, LLC~~ ZPD at $0.00 and marked each disputed, contingent, and unliquidated. On July 30, 2026, ~~PEDixon, LLC~~ PEDixon filed Claim 67 for $4,779,864.58, ~~asserting that all of it is secured by a recorded purchase option~~ and ~~right of first refusal, and ZPD, LLC~~ ZPD filed Claim 68 for ~~$1,380,166.67. Each claim rests~~ $1,380,166.67, each on the assertion that the Debtor guaranteed the September 14, 2023 consolidated loan to Tiered Capital. ~~(Docs. 419 ¶¶ 5–7, 420 ¶¶ 5–6). On October 1, 2026,~~ The Trustee and I ~~moved for leave to object to both claims and tendered my~~

objection, and on October 2, 2026, I moved to disallow both under section 502(d). (Doc. 423). On October 2, 2026, the Trustee objected to both claims; she declines to concede that claims. (Docs. 419, 420, 423). Under the loan agreement is enforceable, faults the Global Settlement Agreement, PEDixon and ZPD withdraw both claims for failing to account for value already collected, and states that they may be unenforceable under the Bankruptcy Code and Florida law. (Docs. 419 ¶¶ 17–19, 420). I contend that no court may enforce the Dixon-related claims, because the Florida criminal-usury statute makes an extension of credit at more than 25% an unenforceable debt in the courts of this State. *Fla. Stat. § 687.071(7)*. I further contend that the Debtor never borrowed from, and signed no enforceable guaranty in favor of, the Dixon parties, and that the Dixon-related debt was in any event satisfied by December 2023. with prejudice. The Plan places both claims in therefore carries no Class 12. Class 12 receives nothing unless and until a Final Order allows a claim in it, and section 502(d) bars allowance while the claimant holds an avoidable transfer. If a Final Order allows a Class 12 claim as secured, the allowed amount receives the common secured treatment against the collateral the order identifies; if it allows a claim as unsecured, the allowed amount shares pro rata with Class 9. Creditors should weigh that contingency carefully. The non-Insider unsecured claims identified below total $809,344.44; Allowance of both Class 12 claims in full as unsecured would raise the unsecured pool to

~~$6,969,375.69,~~ for those claims, and the ~~identified recoveries would no longer pay Class 9 in full. Until a Final Order resolves the Class 12 claims, the Plan's~~ reserve ~~(Plan § 7.3) holds~~ that my earlier plan held back ~~the share they would take if allowed in full as unsecured~~ for those claims — about 88 percent of ~~each~~ every Class 9 distribution ~~($6,160,031.25 of a $6,969,375.69 pool)~~ — ~~and releases it to~~ no longer exists. Every dollar the Plan provides for Class 9 ~~if the claims are disallowed. If a Final Order allows Claim 67 as secured in the amount asserted, the common secured treatment adds about $28,700 a month to the Plan's installments, which Exhibit B does not carry.~~ now reaches Class 9.

~~The non-Insider unsecured claims filed in~~ Under the Global Settlement Agreement, the Class 9 ~~include those~~ claims change. The agreement allows IMQA's claim at $350,000.00; CTO withdraws CTO's claim ($303,853.79); and the agreement disallows the claims of ~~IMQA Investments Incorporated ($360,459.40), CTO Holdings, Inc. ($303,853.79),~~ Tiered ~~Capital, Inc. ($125,000.00),~~ Capital ($125,000.00) and WM Holdings ~~Group, LLC ($19,635.25),~~ Group ($19,635.25). (Global Settlement Agreement Ex. A). Class 9 now holds IMQA's $350,000.00 and ~~mine ($396.00), totaling $809,344.44. (Docs. 409 ¶ 5, 410 ¶ 5, 411 ¶ 5, 421 ¶ 5).~~ my $396.00, a total of $350,396.00 allowed. Class 9 also takes ~~any part of Mr. Rene's Claim 69 allowed as unsecured ($166,115.63 asserted) and~~ any deficiency on the Tamamoi or Carton claims that

section 1111(b)(1)(A) requires the Plan to treat as unsecured. (Plan ~~§§ 4.2,~~ § 4.4). The Trustee ~~has objected~~ paid IPFS's Claim 70 in full in the ordinary course and asks this court to deem Claim 70 satisfied. (Doc. 392 ¶¶ 13–14). On November 10, 2026, Claim 69, including the $166,115.63 unsecured part of Claim 69, was withdrawn with prejudice. (Doc. 457). On the later of the Effective Date and the fifth business day after the Trustee receives the Settlement Payment, the Reorganized Debtor pays every ~~filed~~ allowed Class 9 claim ~~except mine. If her objections succeed,~~ in full, in cash, and reserves the full asserted amount of every disputed Class 9 ~~shrinks, and each remaining holder's recovery is unaffected, because~~ claim — $350,396.00 in all on the ~~Plan pays Allowed Class 9 Claims in full with interest. Until the Class 12 claims are resolved, the Recovery Trustee will hold back from each Class 9 distribution the share those claims would take if allowed as unsecured.~~ present claims. (Plan § ~~7.3).~~ 4.7). If a deficiency claim or another late claim exceeds what the Settlement Payment covers, the Reorganized Debtor pays the excess with interest over sixty months from operating revenue, and recoveries prepay that excess. The ~~Trustee also objects to~~ agreement allows Mr. Johnson's Class 10 claim ~~of $2,594,987.93~~ at $1,297,493.97, which resolves the Trustee's request to recharacterize that claim as equity. (Doc. 412). The Plan pays the Class 10 claim only after the Plan pays Class 9 and ~~asks that it be recharacterized as equity (Doc. 412 ¶¶ 20–22), and to Mr. Rene's Class 1 claim~~

~~(Doc. 416).~~ funds the $1,000,000 improvement reserve. Exhibit D lists every filed claim, ~~its~~ with the claim's amount, ~~its~~ Class, and ~~any objection.~~ status as of November 13, 2026, including the treatment the Global Settlement Agreement gives that claim.

**D. The Estate collects $850,000 now, and the Recovery Trust ~~holds~~ keeps about ~~$2.9~~ $1.5 million in identified ~~claims, and~~ claims against parties the ~~Estate collects on them whichever position~~ settlement does not release, plus the ~~Trustee takes.~~ Mainstreet claims.**

The Recovery Trust holds every Cause of Action of the ~~Estate.~~ Estate other than the Released Claims. The identified recoveries, each with ~~its~~ a verification path, are ~~these. First, the balance of the Lender's $350,000 settlement payment that the Trustee holds under the compromise order — approximately $146,000 — to the extent the Bankruptcy Court determines that it is unencumbered. (Doc. 379 ¶¶ 3–5). Second, transfers to the Dixon lenders, which I estimated at approximately $1,400,000 before the Rule 60 motions were denied. Because the reach-back periods now run from September 2, 2025, the forensic accounting now underway will restate that figure, and it may be lower. I plead the transfers in the alternative: if PEDixon and ZPD were creditors, as their own Claims 67 and 68 assert, the transfers within one year before the petition are preferences, because the Bankruptcy Court found them insiders (Doc. 256 at 22:6–8; 11 U.S.C. § 547(b)(4)(B)); if they were not creditors, the same transfers bought the Debtor nothing and~~

~~are avoidable as fraudulent transfers (11 U.S.C. §§ 544(b), 548; Fla. Stat. ch. 726). Third, the $1,166,008.69 the Debtor paid from its own account between March 2021 and November 2023 to Tamamoi, LLC, FDRE, Inc., and two affiliates, and the $129,556.52 it paid to the Carton Family Trust. Neither claimant has accounted for the payments that passed between it and FDRE, its servicing agent; that accounting determines the rate actually charged, and I believe it will exceed 25 percent, making the debt unenforceable. *Fla. Stat. § 687.071(7)*. On the face of the Tamamoi judgment, the rate is 18.27 percent a year, above the civil ceiling. *Fla. Stat. § 687.03(1)*. A lender who willfully charges more forfeits all interest and must repay double the interest paid. *Fla. Stat. § 687.04*. The Trustee says the Estate lacks standing to raise usury because the Debtor is not an obligor (Docs. 424, 425 n.2). If that is right, the Debtor paid $1,295,565.21 on debts it did not owe, and the Estate may recover those payments to the extent they exceeded the value the Debtor received; forfeited interest reduced no enforceable lien. Part of this recovery may come as a credit against the Tamamoi and Carton claims rather than as cash; a credit reduces what the Plan pays those Classes but does not fund distributions. Fourth, the recovery of Unit 403, which Crescent Sound transferred from the Debtor to the IAM Irrevocable Trust in March 2024, under Fla. Stat. ch. 726 and sections 544(b), 548, and 550, and through the pending, stayed appeal of the circuit court's ruling; net of the liens against it, its return adds a minimum of~~

$183,000 in equity, and more likely $250,000 to $300,000. Fifth, the Estate's own tort and contract claims against various parties, described in Section 2, which remain unquantified; whatever they produce flows through the same waterfall. Exclusive of the held settlement balance and the unquantified claims, the itemized recoveries total approximately $2,878,565, against approximately $3,758,000 in my earlier statement; the difference is the $880,000 turnover that did not occur. Litigation of this kind takes time: I expect the avoidance claims to take one to three years to resolve or settle, and the Recovery Trustee may engage counsel on a contingent fee, which would reduce net recoveries by that fee. The Plan does not depend on recoveries to pay the amortized installments or Class 9; recoveries cure arrearages and prepay.these:

First, the $850,000 Settlement Payment pays administrative claims and Class 9 and, with what remains, funds the Recovery Trust. (Section 3.F; Plan § 6.4).

Second, between March 2021 and November 2023, the Debtor paid $1,166,008.69 from the Debtor's own account to Tamamoi, LLC, FDRE, Inc., and two affiliates, and paid $129,556.52 to the Carton Family Trust. Neither Tamamoi nor Carton accounted for the payments that passed between the claimant and FDRE, the claimants' servicing agent. That accounting determines the rate Tamamoi and Carton actually charged, and I believe that rate will exceed 25 percent, making the debt unenforceable. *Fla. Stat. § 687.071(7)*. On the face of the

Tamamoi judgment, the rate is 18.27 percent a year, above the civil ceiling. *Fla. Stat. § 687.03(1)*. A lender who willfully charges more forfeits all interest and must repay double the interest paid. *Fla. Stat. § 687.04*. The Trustee says the Estate lacks standing to raise usury because the Debtor is not an obligor. (Docs. 424, 425 n.2). If the Trustee is right, the Debtor paid $1,295,565.21 on debts the Debtor did not owe, and the Estate should recover those payments. And Tamamoi and Carton should receive nothing from the Estate, except — possibly — the original principal allocated to each of the nine Units titled in the Debtor's name.

Third, the Recovery Trust pursues the recovery of Unit 403 from the IAM Irrevocable Trust, to which Crescent Sound transferred Unit 403 in March 2024. The Recovery Trust proceeds under the Florida fraudulent-transfer statute and sections 544(b), 548, and 550, and through the pending, stayed appeal of the circuit court's ruling. *Fla. Stat. ch. 726*. Net of the liens against Unit 403, the Unit's return adds a minimum of $183,000 in equity, and more likely $250,000 to $300,000.

Fourth, the Mainstreet claims described in Section 2.I — $2,957,696 through October 2026 — reduce Mainstreet's claims in recoupment before those claims produce any cash.

Fifth, the Recovery Trust holds the Estate's claims against the associations and the associations' directors for mismanagement and self-dealing. Those claims

include the directors' activities designed to reduce the price of the Debtor's Units, one of which violated the automatic stay.

Sixth, the Recovery Trust holds the Estate's claims against the contractors and design professionals who built the Resort — the architect (Kirschner), the structural engineer (Gerding), the plumbing contractor (Hambel), Turnkey, and John Shaffer HVAC, each a defendant in the Condominium Association's pending construction-defect action — and against Michael McPhillips, the contractors' de facto project manager, for construction defects that deprived the Debtor of quiet enjoyment and full habitability of the Units and reduced the Debtor's revenues. *Cape Crossing Condo. Ass'n v. Canaveral Crossroads, LLC*, No. 05-2026-CA-035316 (Fla. 18th Cir. Ct.). The Global Settlement Agreement names Mr. McPhillips an Excluded Person and preserves every claim against Mr. McPhillips. (Global Settlement Agreement §§ 2.4, 9.6(e) & Sched. 2.4).

Seventh, the Recovery Trust holds the Estate's claim against First American Title for overlooking a security interest that encumbers the entire Resort property and deprives the Debtor's occupants of quiet enjoyment and full habitability of the condominiums. The fifth, sixth, and seventh recoveries remain unquantified.

The Global Settlement Agreement releases the transfers to the Dixon lenders that my earlier statement estimated at about $1,400,000; the Settlement Payment takes the place of those transfers. Exclusive of the Settlement Payment, the held

balance, the Mainstreet recoupment, and the unquantified claims, the itemized recoveries total approximately $1,478,565. I expect the avoidance claims to take one to three years to resolve or settle, and the Recovery Trustee may engage counsel on a contingent fee, which would reduce net recoveries by that fee. The Plan does not depend on recoveries to pay the amortized installments or Class 9; recoveries cure arrearages and prepay.

**E. Governance proceeds in two stages: the Trustee now, and Mr. Johnson, the Debtor's owner, at exit.**

Governance under the Plan is staged, proceeds in stages, and no stage returns the Debtor to the hands that emptied it. the Debtor. While the case proceeds to conclusion, the Debtor remains under the direction and control of the Chapter 11 Trustee, and the Plan proposes the appointment of a committee of unsecured creditors under section 1102 to monitor operational performance and assist Ms. Fernandez. As of the date of this Disclosure Statement, despite a statutory requirement, no committee one has been appointed. appointed a committee. *11 U.S.C. § 1102(a)(1).* On the Effective Date, Mr. Johnson, the Debtor's owner, controls the Reorganized Debtor and will oversee Debtor, oversees a professional management company engaged to run the resort Resort day to day day, and will be responsible bears responsibility for effectuating the Plan. Mr. Johnson will receive compensation commensurate with the time he actually spends managing the

~~Reorganized Debtor, at the market rate for an executive manager of a limited liability company, paid from the Reorganized Debtor's revenues.~~ Who manages the combined enterprise after a third party acquires the Reorganized Debtor ~~acquires~~ and the Crossroads assets will be determined when that acquisition occurs. Ms. Fernandez continues as Recovery Trustee, administering the Recovery Trust to ~~its~~ conclusion with authority to retain professionals and to settle or decline claims, subject to such ~~Bankruptcy Court~~ court approval as ~~may be required; a~~ the law requires. A successor approved by the Office of the United States Trustee serves if ~~she~~ Ms. Fernandez does not, and claims ~~she~~ the Recovery Trustee declines revert to the Reorganized Debtor. The Class 11 Interest holder retains the Interest subject to this structure and receives nothing on account of ~~it~~ the Interest until the Plan satisfies every senior ~~Class is satisfied.~~ Class.

~~Section 1129(a)(5)~~ The Bankruptcy Code requires disclosure of who will manage the Reorganized Debtor and on what terms. ~~Horton S.~~ *11 U.S.C. § 1129(a)(5)*. Mr. Johnson will serve as managing member of the Reorganized Debtor and will run ~~it. He~~ the Reorganized Debtor. The Reorganized Debtor will ~~be compensated~~ pay Mr. Johnson, from revenues, compensation commensurate with the time ~~he~~ Mr. Johnson actually spends managing the Reorganized Debtor, at the market rate for an executive manager of a limited liability ~~company, paid from the Reorganized Debtor's revenues.~~ company. The Reorganized Debtor will engage a

professional vacation-rental management company, which I will identify before the Confirmation Hearing, at a fee of 20 percent of gross rental revenue, the figure Exhibit B ~~uses. I will receive no compensation from the Debtor, the Reorganized Debtor, or the Recovery Trust, and I have no agreement for compensation with Mr. Johnson, Tiered Capital, IMQA, or anyone else in connection with the Plan. No one is paying for the preparation of the Plan. I prepared it to see my own $396 claim paid, and that is my only stake in it.~~uses.

**Amodeo's Involvement.** The only payment the Global Settlement Agreement makes on my account is $1,000 from the Global Settlement Trust, which the Global Settlement Trust pays to the United States toward my restitution judgment. (Global Settlement Agreement § 6.2). I will receive no compensation from the Debtor, the Reorganized Debtor, or the Recovery Trust, and I have no agreement for compensation with Mr. Johnson, Tiered Capital, IMQA, or anyone else in connection with the Plan. No one is paying for the preparation of the Plan. I prepared the Plan to see my own $396 claim paid, and that claim is my only stake in the Plan.

**F. The Settlement Payment pays the administrative claims and Class 9 in full; on the fee applications now on file, about $87,000 remains for the Recovery Trust and nothing for working capital.**

The Plan applies the $850,000 Settlement Payment in this order: allowed administrative claims; the Class 9 payments and reserve; up to $100,000 to the

Recovery Trust; and any balance to the Reorganized Debtor as working capital. (Plan § 6.4). My earlier statements estimated the administrative claims at $125,000. The applications now on file ask for more than three times that estimate. On November 9, 2026, this court allowed the administrative claim of Brennan Manna Diamond, P.L. at $30,000. (Doc. 455). On November 12 and 13, 2026, the Trustee applied for $129,657.00, the Trustee's counsel for $249,397.13, and the Trustee's accountant for $3,480.00. (Docs. 464, 463, 462). Together the four total $412,534.13, and the applications of the Trustee and the Trustee's counsel run only through October 31, 2026. This court has not ruled on the three applications; this court will hear the applications on December 3, 2026. (Doc. 465 ¶ 1(d)). If this court allows the applications in full, the Settlement Payment pays $412,534.13 to administrative claims and $350,396.00 to the allowed Class 9 claims of IMQA and me, and leaves $87,069.87 for the Recovery Trust. Nothing remains for working capital, and every dollar of later administrative fees reduces what the Recovery Trust receives. The Plan bridges any working capital or seasonal shortfall from recoveries and from new value a third party contributes. Whatever part of the Class 9 reserve the disputed claims do not need flows through the waterfall. Exhibit B states the same sources and uses.

**4. ~~CONFIRMATION OF THE PLAN~~The Plan meets each confirmation requirement of the Bankruptcy Code.**

**A. The Plan satisfies ~~the best-interests test because~~ the best-interests test: the Plan pays Class 9 in full in cash, and a liquidation at auction value pays unsecured creditors ~~nothing.~~ nothing from the Units.**

A Chapter 7 liquidation sells all twenty-six Units at once, into the same small market, in one forced sale, and twenty-six units of one resort dumped on that market at once drive every price down. The Plan sells nothing in haste. For the last five ~~years~~ years, the Units' vacation rentals ~~have~~ paid ~~their~~ the Units' maintenance and the service of ~~their~~ the Units' proper debt — except ~~during~~ from December 2023 through the ~~thirty months~~ order for relief, when the Debtor's rents went to the Dixon lenders ~~took a disproportionate share of~~ and no one paid the ~~rents, usually all of them and sometimes more than all of them, by leaving the~~ Debtor's utilities and ~~maintenance unpaid.~~ maintenance. A structured sale, timed to the market, realizes values a forced liquidation cannot, and that difference alone satisfies the best-interests test. ~~Section 1129(a)(7) of the~~ The Bankruptcy Code requires that each holder of an Impaired Claim or Interest either accept the Plan or receive at least as much as ~~it~~ that holder would receive in a Chapter 7 liquidation. *11 U.S.C. § 1129(a)(7).* Exhibit C works the liquidation pool by pool. The secured creditors already hold stay relief and in a Chapter 7 case would complete ~~their~~ the secured creditors' foreclosures; the Trustee ~~herself~~ states that no Unit sale proceeds would reach a Chapter 7 estate. (Doc. 395 at 16). Exhibit C values the twenty-six Units

the Debtor holds three ways, using the September 1, 2026 valuation of Gary A. Moll, CPA, ~~ASA (Ex. A ¶¶ 9, 14),~~ ASA, scaled from twenty-seven Units to twenty-six and allocated by each Unit's 2025 just ~~value, and it~~ value. (Ex. A ¶¶ 9, 14). Exhibit C charges each collateral pool with ~~its~~ that pool's taxes, ~~its share of the senior Jetton mortgage, its~~ that pool's own mortgage as asserted, and the townhome association lien. At the auction value ($9.5 ~~million) and at Moll's low portfolio value ($11.1~~ million), every pool is under water, and nothing reaches unsecured creditors from the Units. ~~Only at~~ At Mr. Moll's low portfolio value ($11.1 million), only the Mainstreet Loan One pool shows equity, about $676,000, and the other three pools are under water. At Mr. Moll's high value ($17.3 ~~million)~~ million), equity would ~~equity appear,~~ be about ~~$4.4~~ $5.8 million; that value rests on rental assumptions Mr. Moll identifies as above the market average ~~(*Id.* ¶¶ 3, 12, 43)~~ and describes the going concern the Plan creates, not a foreclosure. (*Id.* ¶¶ 3, 12, 43). Whatever the value, the Plan pays Allowed Class 9 Claims in ~~full with interest,~~ full, in cash, from the Settlement Payment, and no Chapter 7 distribution can exceed full payment with interest at the legal rate. *11 U.S.C. § 726(a)(5)*. Every Class 9 holder therefore receives at least ~~its~~ that holder's Chapter 7 ~~share, as does any Class 12 claim Allowed as unsecured.~~ share. A Chapter 7 trustee would also receive the Settlement Payment and hold the Causes of Action, but would ~~prosecute them~~ pay a commission on both and distribute both net of Chapter 7

administrative ~~costs and commissions.~~ costs. *11 U.S.C. § 326(a).* The Plan therefore satisfies the best-interests test.

The following table compares the estimated recoveries under the Plan and under a hypothetical Chapter 7 liquidation:

| **Constituency** | **Estimated Chapter 7 Recovery** | **Estimated Plan Recovery** |
|---|---|---|
| Secured creditors (Classes 1–7) | Foreclosure under existing stay relief; at auction ~~or Moll's low~~ value every collateral pool is under water (Ex. C) | Paid over time at 6% with ~~5-year balloon;~~ a two-year balloon on February 1, 2029; arrearages cured from recoveries |
| Non-Insider unsecured (Class 9) | None from the units; only avoidance recoveries, after Chapter 7 costs | 100% of Allowed Claims ~~with interest (less if Class 12 is Allowed as unsecured)~~in cash from the Settlement Payment |
| Insider unsecured (Class 10) | None | Pro rata from remaining recoveries after senior Classes |
| Interests (Class 11) | None | Retained, subject to governance and senior satisfaction |
| ~~Disputed Lender claims (Class 12)~~ | ~~Disputed; any Allowed claim shares in the liquidation~~ | ~~Nothing unless Allowed by Final Order~~ |

**B. The Plan is feasible: the Settlement Payment pays the unsecured creditors on day one, and the rents ~~that funded Mr. Dixon now fund~~ carry the secured creditors.**

~~Section 1129(a)(11)~~ The Bankruptcy Code requires that confirmation is not likely to be followed by liquidation or further reorganization, except as ~~proposed in the Plan.~~ Plan proposes. *11 U.S.C. § 1129(a)(11).* The feasibility case rests on ~~two~~ three changes. The ~~rental stream that produced more than $2.8 million for Mr.~~

~~Dixon during~~ Settlement Payment pays the ~~control period is redirected~~ administrative claims and Class 9 in cash. The Plan redirects to operations and debt ~~service.~~ service the rental stream that went to the Dixon lenders from December 2023 through the order for relief. And ~~the Debtor's~~ a third party's acquisition of the Reorganized Debtor and the Canaveral Crossroads assets places the Resort's reservation system, name, and amenities behind the Debtor's twenty-six Units. (Plan § 6.2). Exhibit B projects every month of ~~the Plan's~~ five ~~years;~~ years, 2027 through 2031; the table below states one plan year. ~~It~~ The table applies the $295 average daily rate at which an actual Cape Crossing three-bedroom townhome is ~~marketed~~ marketed, at 80 percent occupancy. (Ex. A ¶¶ 27–28 & Ex. ~~D) at 80 percent occupancy,~~ D). The table then deducts a 20 percent management fee and the Debtor's own carrying costs, and sets the result against the Plan's payments to Classes 1 through 7 and ~~Class 9 and~~ the United States Trustee's ~~fees.~~ fees. Because the Settlement Payment pays Class 9, the table carries no Class 9 installment.

| **A Full Plan ~~Years 1–4 (2027–2030)~~ Year (2028) — 26 Units** | **Amount** | **Basis** |
|---|---|---|
| Occupied nights | 7,592 | 26 Units × 365 nights × 80% |
| Gross rental revenue | $2,239,640 | $295 average daily rate (Ex. A ¶¶ 27–28) |
| Management fee | ($447,928) | 20% of gross rental revenue |
| Association dues | ($326,364) | 18 condominiums at $1,170 and 8 townhomes at $767.12 a month |
| Current property taxes | ($146,952) | $471 per Unit a month, paid each November |

| **A Full Plan ~~Years 1–4 (2027–2030)~~ Year (2028) — 26 Units** | **Amount** | **Basis** |
|---|---|---|
| Insurance, utilities, maintenance | ($119,231) | Debtor's July 2026 proforma |
| Legal, administration, bank fees | ($37,200) | $3,100 a month |
| **Net operating income** | **$1,161,965** | |
| Plan payments, Classes ~~1–5~~ 2–5 and 7 | ~~($707,901)~~ ($590,298) | Amortized installments (Plan § ~~4.1)~~4.1); Class 1 holds no Claim (Doc. 457) |
| Plan payments, Class 6 | ($168,597) | $478,290 at 18% over 48 ~~months~~ months, February 2027 – January 2031 (Plan § 4.5) |
| Plan payments, Class 9 | ~~($178,864)~~$0 | ~~$809,344 with interest (4% assumed) over 60 months~~ Paid from the Settlement Payment (Plan ~~§ 4.7)~~§§ 4.7, 6.4) |
| United States Trustee fees | ($16,000) | Estimated, until the case is closed |
| **Cash after payments** | **~~$90,603~~$387,070** | ~~Year 5: $259,200, after Class 6 is paid~~2027: $450,311 (eleven installments) |
| Coverage | ~~1.08~~ 1.50 to 1 | Net operating income ÷ payments ~~(Year 5: 1.29~~ (2027: 1.63 to 1) |

The owner costs come from the Debtor's July 2026 proforma. The table excludes Florida sales and tourist-development taxes, which guests pay, ~~are excluded,~~ and ~~so are~~ the payments the Plan makes from recoveries — arrearage ~~cures, accrued adequate protection,~~ cures and the Class 7 payoff. Paying Class 9 from ~~operations raises~~ the Settlement Payment rather than from operations, and removing the Class 1 installments, lowers the break-even: at the $295 rate, the Units cover every payment over the ~~five years~~ five-year projection at about ~~75~~ 61 percent ~~occupancy~~ occupancy. (Ex. B, Sensitivity). Occupancy is the critical

assumption. Mr. Moll reports a Merritt Island market average of 40 to 47 percent and a top decile of 78 percent and higher, and ~~he~~ Mr. Moll explains why units booked through the ~~resort's~~ Resort's own platform belong above the market average. (Ex. A ¶¶ 24–25, 30–32). In 2019, the ~~resort's~~ Resort's rental program ran ~~its~~ thirty-five units at 59.6 percent occupancy and roughly $190 a night; at those figures, the Units would not cover the Plan's payments. The management fee assumes the operator cost per unit the rental program incurred in 2019, about $16,800 a year, which 20 percent of the projected revenue, about $17,200 per Unit, exceeds. (Canaveral Crossing Resorts, Inc., Normalized Historical Pro Forma 2019, unaudited).

The Trustee's August 2026 operating report shows $18,661 in receipts for the month and $43,609 in cash on August 31, ~~2026~~ 2026. (Doc. 399, Part ~~1);~~ 1). I believe the Units can earn more than those reports show and that someone held the Units' bookings down; no one produced to the Trustee the resort-wide booking records needed to test that comparison. The projection assumes ~~the Units are booked through~~ the Crossroads reservation system books the Units after the Effective Date, and ~~it~~ the projection is not a forecast of the Units' performance under current management. ~~On the Effective Date,~~ The Settlement Payment pays the Allowed Administrative ~~Claims, which I estimate at $125,000, are paid~~ Claims — about $412,500 if this court allows the applications now on file in full — and on

that figure the Reorganized Debtor receives no working capital from the Settlement Payment. (Section 3.F; Plan § 6.4). Because amortization begins February 1, 2027, the projection shows no month in which cash falls below zero; the ~~Trustee then holds (Ex. B, Sources and Uses). The Reorganized Debtor starts with no cash of its own; the seasonal low point comes~~ lowest month-end balance is about $37,000, in January ~~2027, at about $51,000, and~~ 2027. If a shortfall arises, the Plan bridges ~~it from~~ the ~~held settlement balance, to the extent the Bankruptcy Court holds it unencumbered, and~~ shortfall from the first net recoveries of the Recovery Trust. ~~(Plan § 6.4).~~ Class 6 — $478,289.67 asserted — earns interest at the statutory rate, 18 percent on the Tax Collector's claims, and ~~is paid~~ the Plan pays Class 6 by ~~December 2030,~~ January 2031, which raises the Plan's early debt service; Exhibit E lists every Class 6 claim. ~~At month sixty,~~ On February 1, 2029, after twenty-four installments, the balloon balance of Classes ~~1~~ 2 through 5 and 7 is about ~~$9,156,000.~~ $7,997,000. Refinancing ~~it~~ that balance at 65 percent of value requires a value of about ~~$14.1~~ $12.3 million for the twenty-six Units, inside Mr. Moll's range of $11.1 million to $17.3 million for those ~~Units, and a~~ Units. A refinancing at 6 percent over thirty years would cost about ~~$659,000~~ $575,000 a year against projected net operating income of $1,162,000, coverage of ~~1.76~~ 2.02 to 1. (Ex. B, Balloon Test). A refinancing must also pay the Class 6 balance then unpaid, about $281,000. (Plan § 4.5). The alternative is a going-concern sale of the Units.

Because Claim 69 was withdrawn, the Class 1 installments — $9,800.25 a month, $117,603 a year — are gone. The table above and Exhibit B omit those installments, which puts coverage at about 1.50 to 1 in a full plan year and takes about $1,593,000 off the balloon. On these bases, the Plan is feasible, subject to the risks Section 5 describes.

**C. The Plan subsumes the Trustee's sale program: the Units stand ready from January 2027 at least one Unit is always listed for orderly sale, two or three at a time, and are sold to reduce principal whenever the Reorganized Debtor misses its numbers.cost of sale capped at five percent, until operations cover every Plan payment.**

The Trustee proposes to sell all twenty-six Units now, through brokers or an auctioneer. (Doc. 395 at 13–17). At the October 14, 2026 hearing, I said that the Plan could subsume the Trustee's plan, plan "could easily be subsumed within this reorganization plan," and the parties did not know what that I meant. It means (Oct. 14, 2026 Hearing Tr. at 25:1–5). I meant this: the Plan keeps the Trustee's sale program and places it that program beneath the Reorganized Debtor. On the Effective Date, Beginning in January 2027, the Reorganized Debtor arranges an orderly lists one condominium for sale process for the Units, at $500,000 and one townhome at $450,000, and Ms. Fernandez, as Recovery Trustee, conducts any each sale through the brokers she the Recovery Trustee selects. While At least one Unit stays on the market at all times. The exception is a quarter that follows a quarter in which the Reorganized Debtor's operating results covered every

payment the Plan requires. The Plan caps the costs of sale process stands ready, at five percent of the price, which leaves more of each sale for creditors. When a Unit sells, the holder of the lien on that Unit receives a release price of $350,000, or $227,000 for Tamamoi and Carton, never more than the unpaid balance of the holder's Allowed Claim, and the Reorganized Debtor operates distributes the Units, and rest of the proceeds under the Plan measures its results against and according to existing lien rights. (Plan § 6.12(a)). The sales conclude by June 30, 2028 unless operations cover the projections of Exhibit B. If at any time its revenues and net operating income fall short of those projections — if they will Plan's payments sooner. (Plan § 6.12(b)). The program applies whether or not cover every Plan payment — the Recovery Trustee sells Units two or three at a time, at fair market value, and the net proceeds reduce the principal of the secured Claims on the Units sold. The same applies if the Crossroads acquisition does not occur, unless the Reorganized Debtor is meeting every Plan obligation from its own operations. occurs. (Plan § 6.12). 6.12(c)).

**Risk-Return Neutral for Secured Creditors**

The secured creditors bear no risk from this structure. Each secured creditor receives the full amount of its that creditor's Allowed Secured Claim, reamortized at a commercially reasonable rate — six percent over 360 months — and keeps its the creditor's Lien until it is paid. the Plan pays the Claim. That treatment is

everything a secured creditor could collect in foreclosure: ~~its~~ the debt, from ~~its~~ the collateral, and nothing more. When a secured class does not accept a plan, the Bankruptcy Code asks exactly ~~that — that~~ that: the holder ~~keep its~~ keeps the holder's lien and ~~receive~~ receives deferred cash payments totaling at least the allowed amount of ~~its~~ the claim and worth, on the effective date, at least the value of ~~its collateral — and~~ the ~~Plan meets it.~~ collateral. *11 U.S.C. § 1129(b)(2)(A)(i).* ~~If the business misses its numbers, the structured~~ The Plan meets that standard. The sales pay down principal at full value, without the cost, delay, and discount of a forced sale. Units sold one or two ~~or three~~ at a time, in season, bring substantially more than the same Units sold at foreclosure, at auction, or in bulk. The Trustee's plan sells everything at once; the Plan sells only what the numbers require, when the market will ~~pay for it.~~ pay. The two plans share the same sale mechanism and differ only in whether the going concern first has the chance to pay every creditor in full. Every creditor does better under the Plan, and ~~none~~ no creditor bears more risk than ~~it~~ that creditor bears under the Trustee's sale.

**D. The ~~tax and townhome Classes will accept, and the~~ Plan meets the cramdown standard for any Class that does ~~not.~~ not accept.**

An Impaired Class of Claims accepts the Plan if holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in that Class that vote, vote to accept. Class 6, which the Plan pays in full at the statutory

rate, and Class 7, which the Plan pays in full from recoveries, are Impaired Classes of non-Insiders that I expect to accept. *11 U.S.C. § 1129(a)(10)*. The Tax Collector objected to my earlier plan. (Doc. 460). The Tax Collector's position is not reasoned economically, because the Plan pays the Tax Collector's claims in full at the statutory rate. I contend that Tamamoi acts in concert with the Units' former owner to deprive the original investors of a recovery, and I expect Tamamoi to reject the Plan. If any Impaired Class does not accept, I will request confirmation under section 1129(b), which permits confirmation so long as the Plan does not discriminate unfairly and is fair and equitable ~~as to~~ for each non-accepting Impaired Class. The absolute priority rule does not help a creditor whose Claim ~~is disallowed under~~ section 502(d) disallows because ~~it has~~ that creditor failed to turn over to the Estate what ~~it~~ that creditor owes: that creditor holds no Allowed Claim, and the rule protects only the holders of Allowed Claims in a dissenting Class. *11 U.S.C. §§ 502(d), 1129(b)(2)(B)*.

**5. ~~RISK FACTORS~~The Plan carries risks, and creditors should weigh each one before voting.**

Holders should weigh the following risks in deciding how to vote. First, the Plan's ~~funding~~ cure of ~~arrearage cure and unsecured distributions~~ secured arrearages depends substantially on recoveries from the Causes of Action, the timing and amount of which are uncertain and subject to litigation risk. Second,

several Claims ~~are~~ remain disputed; the outcome of ~~claim~~ the objections ~~(including the usury challenges~~ to the Mainstreet, Tamamoi, ~~Carton,~~ and ~~Dixon claims)~~ Carton claims will affect distributions. Third, the ~~five-year~~ exit by February 1, 2029 depends on the availability of refinancing or a going-concern sale on acceptable terms, which is subject to market and interest-rate conditions. Fourth, the vacation-rental business is seasonal, creating periodic liquidity ~~stress; the Reorganized Debtor starts with no cash reserve beyond the held settlement balance,~~ stress. Exhibit B shows a ~~low point~~ lowest month-end balance of about ~~$51,000~~ $37,000, in January ~~2027, and a slow season before~~ 2027. If this court allows the ~~first recoveries arrive could leave installments unfunded.~~ fee applications now on file in full, the Settlement Payment leaves the Reorganized Debtor no working capital, so the Plan bridges any shortfall from recoveries. Fifth, the consolidation strategy contemplates a third party's acquisition of the ~~Debtor's acquisition~~ Reorganized Debtor and of the assets of Canaveral Crossroads, LLC, now a Chapter 11 debtor, ~~which~~ and that acquisition is not ~~assured;~~ assured. A third party proposed to contribute $200,000 in capital in exchange for an ownership share of the Reorganized Debtor; the terms are not final, and no one has signed an agreement. Mr. McPhillips ~~has~~ refused any combination ~~with~~ involving Mr. McPhillips's own assets, and the ~~Debtor~~ Plan contemplates none; the Crossroads acquisition concerns only the assets of Canaveral Crossroads. (Doc.

328 ¶ 3), and 3). The Plan's sale program applies whether or not the Plan no longer contemplates one. If the Crossroads acquisition does not occur, the Plan's structured-sale provision applies unless the Reorganized Debtor meets every Plan obligation from its own operations. occurs. Sixth, I am a pro se proponent the proponent, with the history disclosed in Section 1.A; 1.A discloses; creditors who discount my judgment should weigh the Plan's arithmetic, which does not depend on it. my judgment. Seventh, the Class 12 claims of PEDixon Global Settlement Agreement takes effect only when the approval orders in all four bankruptcy cases become final, and ZPD total $6,160,031.25; if a Final Order allows them in substantial part, the identified recoveries will not Settlement Payment arrives within fourteen days after that date. If any court declines approval, or an appeal delays finality, the Settlement Payment is delayed or lost, the Reorganized Debtor would pay Class 9 from operating revenue over sixty months, and I would modify the Plan. (Plan §§ 4.7, 6.9(e)). Eighth, the Estate releases the Estate's claims against the Dixon and Pitkanen parties, including the transfers my earlier statement valued at about $1,400,000, in full. Eighth, on October 19, 2026, the Trustee and the Lender will attend a judicial settlement conference, and a settlement of the Lender's claims, if approved, could reduce the recoveries this Disclosure Statement projects. exchange for $850,000. Ninth, the Trustee has proposed a competing plan of liquidation, and the Bankruptcy Court this court may confirm

only one plan. *11 U.S.C. § 1129(c)*. Tenth, Mainstreet holds relief from the automatic ~~stay (Doc. 183 ¶ 2);~~ stay; a foreclosure sale of ~~its~~ Mainstreet's Units before the Effective Date would remove ~~them~~ those Units from the Plan. (Doc. 183 ¶ 2). Eleventh, the projection in Section 4.B assumes 80 percent occupancy, well above the ~~resort's~~ Resort's 59.6 percent in 2019 and the Merritt Island ~~average; it~~ average. The projection depends on the Crossroads acquisition and new management, and below about ~~75~~ 61 percent occupancy at $295 the Units do not cover the Plan's ~~payments, including Class 9,~~ payments over the ~~five years.~~ five-year projection. The Trustee's August 2026 receipts were $18,661. Twelfth, the Plan takes effect only when the confirmation order is final, so an appeal would delay every payment the Plan provides. Thirteenth, ~~the Recovery Trustee has~~ Ms. Fernandez stated that ~~she~~ the Trustee will not pursue usury against Tamamoi and Carton; those claims revert to the Reorganized Debtor, which may or may not pursue ~~them.~~ those claims. Fourteenth, the administrative claims now sought are more than three times what my earlier statements estimated. Each further dollar this court allows reduces what the Recovery Trust receives from the Settlement Payment, and if the administrative claims and Class 9 together exceed $850,000, the Reorganized Debtor pays the Class 9 ~~reserve for~~ shortfall over sixty months from operating revenue. (Plan §§ 4.7, 6.4). Fifteenth, the ~~Class 12 claims withholds about 88 percent of each Class 9 distribution until those claims are resolved.~~

~~Fifteenth,~~ Recovery Trustee holds payments on the disputed secured Claims ~~are held~~ in escrow until a Final Order fixes each Claim; those creditors receive nothing in hand until then. The value the Plan preserves outweighs these risks, and a liquidation preserves none of ~~it.~~that value.

**6. ~~ALTERNATIVES TO THE PLAN~~Without the Plan, the Units are sold under the Trustee's plan, in Chapter 7, or under section 363, and creditors recover less.**

If this court does not confirm the ~~Plan is not confirmed, the~~ Plan, three alternatives ~~are (a) confirmation of~~ remain. First, this court may confirm the Trustee's plan of ~~liquidation (Doc. 394),~~ liquidation, which sells all twenty-six Units and pays unsecured creditors only from what remains after administrative expenses, priority claims, and the secured ~~claims (Doc.~~ claims. (Docs. 394, 395 at ~~16); (b) conversion of~~ 16). Second, this court may convert the case to Chapter ~~7; or (c) a going-concern sale~~ 7. Third, the Trustee may sell the going concern under section 363. ~~For the reasons set forth in the liquidation analysis,~~ As Section 4.A and Exhibit C show, a Chapter 7 liquidation ~~would yield~~ yields materially lower recoveries to creditors than the Plan, particularly for unsecured creditors, and ~~would impair~~ impairs the prosecution of the Estate's Causes of Action.

**7. ~~CERTAIN FEDERAL INCOME TAX CONSEQUENCES~~The Plan's federal income tax consequences vary by holder, and each holder should consult the holder's own tax advisor.**

The federal income tax consequences of the Plan ~~may~~ vary among holders, and this Disclosure Statement ~~does~~ is not ~~constitute~~ tax advice. ~~The Debtor.~~ **The Debtor.** The Debtor is a limited liability company. If, as I understand, ~~it~~ the Debtor is taxed as a partnership or disregarded entity, ~~it~~ the Debtor pays no federal income ~~tax itself, and any~~ tax. Any income — including cancellation-of-debt income from the reduction or disallowance of a claim — passes through to ~~its~~ the Debtor's member, who reports ~~it~~ that income and may be able to exclude ~~it under 26 U.S.C. § 108~~ that income depending on the member's own circumstances. *26 U.S.C. § 108.* The Plan does not discharge or reduce the Allowed amount of any Claim ~~it~~ the Plan pays in full. ~~The Recovery Trust.~~ **The Recovery Trust.** The Plan intends the Recovery Trust to be ~~treated as~~ a grantor trust for the benefit of holders of Claims entitled to distribution, so that ~~its~~ the Recovery Trust's income is taxed to those holders rather than to the trust; the Recovery Trustee will file returns consistent with that treatment. ~~Holders.~~ **Holders.** A holder receiving payment of a Claim generally recognizes income to the extent the payment exceeds the holder's tax basis in the Claim, and interest paid on a Class 9 Claim is ordinary income. Each holder ~~is urged to~~ should consult ~~its~~ the holder's own tax advisor ~~regarding~~ about the federal, state, local, and foreign tax consequences of the Plan.

**8. ~~RECOMMENDATION~~The Plan pays creditors in full and preserves the Resort; vote to accept the Plan.**

The Plan pays legitimate creditors in ~~full or nearly so,~~ full, pays the non-Insider unsecured creditors in cash on day one, preserves the Cape Crossing Resort as a going concern, and ~~converts~~ turns three years of litigation with the ~~architects of~~ Dixon lenders into $850,000 for the ~~Debtor's insolvency from its controllers into its funding source.~~ Estate. No alternative before ~~the Bankruptcy Court~~ this court does ~~any~~ all of ~~the three.~~ that. The arithmetic, not the advocate, makes the case. Vote to accept the Plan.

Respectfully submitted this ~~19th~~ 16th day of ~~October,~~ November, 2026.

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
~~flahome32809@gmail.com~~flahome32801@gmail.com
*Plan Proponent, pro se*

**Certificate of Service**

I certify that on ~~October 19,~~ November 16, 2026, I filed my ~~Second~~ Third Amended Disclosure Statement, together with my ~~Second~~ Third Amended Plan of Reorganization and the notice of filing ~~redlines~~ redlines, in person with the Clerk of Court. ~~As a pro se litigant,~~ I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; ~~her~~ the Trustee's counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States Trustee.

______________________________
Frank L. Amodeo, Pro se

# EXHIBIT 2

Third Amended Plan of Reorganization, marked to show changes from the Second Amended Plan (Doc. 440)



UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re: | Case No. 6:25-bk-05570-GER |
| **HOMEMAKERS REAL ESTATE, LLC,** | Chapter 11 |
| Debtor. | |
| / | |

# ~~SECOND~~ THIRD AMENDED PLAN OF REORGANIZATION PROPOSED BY FRANK L. AMODEO,
## a Creditor and Party in Interest

Frank L. Amodeo
1311 Hoffner Avenue, Orlando, Florida 32809
(407) 406-1315 | ~~flahome32809@gmail.com~~flahome32801@gmail.com

Dated: ~~October 19,~~ November 16, 2026

I propose the following ~~second~~ third amended plan of reorganization (the "Plan") for Homemakers Real Estate, LLC (the "Debtor") under Chapter 11 of the Bankruptcy Code. The Plan supersedes the plan I filed on July 13, 2026 (Doc. ~~303) and~~ 303), the amended plan I filed on October 9, 2026 (Doc. ~~432).~~ 432), and the second amended plan I filed on October 19, 2026 (Doc. 440). The Debtor's exclusive period to file a plan ended when the court appointed a Chapter 11 trustee, and section 1121(c) permits any party in interest — including a creditor — to file a plan. I am a creditor of the Debtor. Since July 13, 2026, the Rule 60 motions and consolidation were denied, the Chapter 11 Trustee compromised the post-petition rent claim, the Condominium Association withdrew its claim, PEDixon, LLC and

ZPD, LLC filed claims, the Brevard County Tax Collector objected to my treatment of its claims, and the Chapter 11 Trustee filed a competing plan and objected to most of the claims in the case. On October 7, 2026, Mainstreet Community Bank, PEDixon, LLC and ZPD, LLC, Tamamoi, LLC, and the Carton Family Trust of 1992 objected to my earlier plan or disclosure statement (Docs. 427–430), as Michael McPhillips had on August 6, 2026 (Doc. 328). The Plan changes with that record and answers those objections. After the October 19, 2026 settlement conference before the Honorable Jason A. Burgess, the Chapter 11 Trustee, PEDixon, LLC, ZPD, LLC, their affiliates, the Pitkanen parties, Mr. Johnson, Tiered Capital, Inc., IMQA Investments Incorporated, CTO Holdings, Inc., WM Holdings Group, LLC, Yaniv Amar, and I entered into the Global Settlement Agreement. That agreement bound each party when that party signed it; for the Estate and the three other debtors, it remains subject to the Bankruptcy Code and to approval in each debtor's case. (Global Settlement Agreement § 14.1). Its payments, releases, and claim treatment take effect only after the Bankruptcy Court approves it in this case and in the three related cases. (Global Settlement Agreement §§ 3.5, 5.1(a), 9.5). It pays the Estate $850,000, withdraws the PEDixon and ZPD claims, and fixes the claims of IMQA, CTO, WM Holdings Group, Tiered Capital, and Mr. Johnson. The Plan implements it and pays the non-Insider unsecured creditors in cash from the Settlement Payment. The

accompanying Third Amended Disclosure Statement discusses the Debtor's history, business, projections, and risk factors, and summarizes the Plan.

**Article 1 — Definitions and Construction**

The following terms have the meanings set forth below. A term used but not defined here carries the meaning the Bankruptcy Code gives it. The rules of construction in section 102 of the Code apply.

**"Administrative Claim"** means a Claim for payment of an administrative expense of a kind specified in § 503(b) of the Code and entitled to priority under § 507(a)(2), including the actual and necessary costs of preserving the Estate, compensation for professional services allowed under §§ 330(a) or 331, and all fees and charges assessed under Chapter 123 of Title 28.

**"Allowed Claim"** means a Claim as to which a proof of Claim has been timely filed or deemed filed under § 1111(a), and as to which no objection has been interposed within the applicable period, or as to which any objection has been resolved by a Final Order. An Allowed Claim does not include post-petition interest unless the Plan expressly provides it.

**"Avoidance Actions"** means all claims and causes of action arising under §§ 510, 542–545, 547, 548, 549, 550, 551, and 553 of the Code, or under applicable non-bankruptcy law, including the recovery of preferential transfers, fraudulent transfers, post-petition transfers, and unauthorized conveyances described in the

Disclosure Statement, each computed from the Petition Date. Section 502(d) of the Code is a ground of disallowance rather than a cause of action, and Section 7.4 addresses it.

**"Bankruptcy Code" or "Code"** means Title 11 of the United States Code, 11 U.S.C. § 101, et seq.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

**"Business Day"** means any day other than a Saturday, a Sunday, or a legal holiday as defined in Fed. R. Bankr. P. 9006(a).

**"Causes of Action"** means all claims, rights, and causes of action of the Debtor or the Estate, including the Avoidance Actions and claims for breach of fiduciary duty, conversion, fraud, civil conspiracy, usury, professional malpractice, and the tort and civil RICO claims scheduled by the Debtor, together with all proceeds ~~thereof.~~ thereof, but excluding the Released Claims. All Causes of Action transfer to the Recovery Trust as provided in Article 6; a Cause of Action the Recovery Trustee declines reverts to the Reorganized Debtor under Section 6.11.

**"Chapter 11 Trustee" or "Trustee"** means Lara Roeske Fernandez, the duly appointed and acting Chapter 11 trustee of the Debtor, and any successor.

**"Claim"** has the meaning set forth in § 101(5) of the Code.

~~**"Class 12 Claims"** means Claim 67 of PEDixon, LLC, Claim 68 of ZPD, LLC, and any amendment or successor to either.~~

**"Compromise Order"** means the order entered September 2, 2026 approving the Chapter 11 Trustee's compromise with PEDixon, LLC, ZPD, LLC, and the Cape Crossing Condominium Association. (Doc. 379).

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan under § 1129 of the Code; the "Confirmation Date" is the date of its entry.

~~**"Declaratory Action"** means *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026).~~

**"Declined Claim"** means a Cause of Action or Recovery Trust Claim, or any part of one, that the Recovery Trustee declines or is deemed to decline under Section 6.11.

**"Disclosure Statement"** means the disclosure statement filed in respect of this Plan under § 1125 of the Code, as amended.

**"Disputed Claim"** means a Claim, or any portion of a Claim, that is the subject of a timely objection or motion not yet resolved by a Final Order.

**"Effective Date"** means the first Business Day on which the Confirmation Order is a Final Order and the other conditions in Section 8.1 are satisfied or waived.

**"Estate"** means the estate created under § 541 of the Code on the Petition Date.

**"Final Order"** means an order no longer subject to appeal, certiorari, reargument, or rehearing, and as to which no such proceeding is pending.

**"First Bankruptcy Case"** means the voluntary Chapter 11 case *In re Homemakers Real Estate, LLC*, No. 6:25-bk-02685-GER (Bankr. M.D. Fla. 2025), filed May 5, 2025 and dismissed June 27, 2025. On July 21, 2026, the court denied the motions to vacate that dismissal (No. 6:25-bk-02685-GER, Doc. 107), and on August 20, 2026, this Court denied consolidation. (Doc. 345).

**"Global Settlement Agreement"** means the Global Settlement Agreement and Mutual General Release among the Chapter 11 Trustee, on behalf of the Estate; PEDixon LLC, ZPD LLC, Crescent Sound, Ltd., Parke Financial Limited Partnership, and Kenneth G. Dixon (the "Dixon Parties"); Alison Pitkanen, Alison Pitkanen, P.A., and Alison Pitkanen Law Firm LLC (the "Pitkanen Parties"); the Flynn-Johnson Parties it names, including Horton S. Johnson, Tiered Capital, Inc., IMQA Investments Incorporated, and me; and Yaniv Amar, including its exhibits and schedules. Capitalized terms the Plan uses but does not define, such as Settlement Funding Date, Released Related Person, and Excluded Person, carry the meaning that agreement gives them.

**"Global Settlement Approval Order"** means the order of the Bankruptcy Court in this case approving the Global Settlement Agreement under Fed. R. Bankr. P.

9019, or the Confirmation Order to the extent it approves the agreement under Section 6.9(a).

~~**"Held Settlement Balance"** means the balance of the Lender's $350,000 settlement payment under the Compromise Order that remains after the $204,000 roof payment, approximately $146,000, which the Chapter 11 Trustee holds until further order. (Doc. 379 ¶¶ 3–5).~~

**"Impaired"** means impaired within the meaning of § 1124 of the Code.

**"Insider"** has the meaning set forth in § 101(31) of the Code.

**"Interest"** means an equity or membership interest in the Debtor and any right arising therefrom.

**"Lender"** means PEDixon, LLC and ZPD, LLC.

**"Lien"** has the meaning set forth in § 101(37) of the Code.

**"Petition Date"** means September 2, 2025, the date the involuntary petition commencing this Bankruptcy Case was filed; the order for relief was entered May 21, 2026. Every reach-back and avoidance period under §§ 544, 546, 547, 548, and 549 of the Code runs from the Petition ~~Date, and adequate protection under Section 4.1(a) accrues from it.~~Date.

**"Plan Proponent"** means Frank L. Amodeo, a creditor and party in interest.

**"Priority Tax Claim"** means a Claim of a governmental unit of a kind entitled to priority under § 507(a)(8) of the Code.

**"Recovery Trust"** means the litigation and recovery trust established under Section 6.3 of the Plan on the Effective Date for the benefit of holders of Claims entitled to distribution under the Plan, and administered by the Recovery Trustee.

**"Recovery Trustee"** means Lara Roeske Fernandez, the Chapter 11 Trustee, who will serve as trustee of the Recovery Trust and administer it through its conclusion, and any successor trustee of the Recovery Trust.

**"Recovery Trust Claims"** means all Causes of Action of the Debtor and the ~~Estate,~~ Estate other than the Released Claims, including (a) the Avoidance Actions against any person other than a Released Party — among them the claims for preferential transfers under § 547, fraudulent transfers under §§ 544 and 548, and post-petition transfers under § ~~549 that the Compromise Order did not resolve;~~ 549; (b) the Causes of Action against ~~P.E. Dixon, KAE, PEDixon, LLC,~~ Mainstreet Community Bank of Florida arising from the February 17, 2022 refinancing and ~~ZPD, LLC;~~ from its handling of its assignment of rents, described in Section 4.3; (c), separately, the Causes of Action against Tamamoi, LLC, the Carton Family Trust of 1992, FDRE, Inc., and their affiliates, including the recovery under ~~Fla. Stat. § 687.04~~ *Fla. Stat. § 687.04* of twice the usurious interest the Debtor paid and, in the alternative, the avoidance and recovery of the Debtor's payments on those loans as Section 4.4 describes; and (d) the claim and right to recover Unit ~~403,~~ 403 from the IAM Irrevocable Trust, to which ~~Crescent Sound~~ it

was transferred from the Debtor ~~to the IAM Irrevocable Trust~~ in March 2024, and from any subsequent transferee that is not a Released Party, under ~~Fla. Stat. ch. 726~~ *Fla. Stat. ch. 726* and §§ 544(b), 548, and 550 of the Code, together in each case with all proceeds thereof, all of which transfer to the Recovery Trust, subject to reversion under Section 6.11.

**"Released Claims"** means every claim, cause of action, defense, setoff, lien, and right that the Debtor, the Estate, or the Chapter 11 Trustee releases under Sections 7 and 9 of the Global Settlement Agreement, including every Cause of Action against a Released Party, effective as that agreement provides.

**"Released Party"** means each Dixon Party, each Pitkanen Party, the Chapter 11 Trustee, and each of their Released Related Persons, to the extent of the releases the Global Settlement Agreement gives each of them. No Excluded Person, and no person that is not a party to the Global Settlement Agreement or a Released Related Person of one — including Mainstreet Community Bank of Florida, Tamamoi, LLC, the Carton Family Trust of 1992, FDRE, Inc., and the IAM Irrevocable Trust — is a Released Party.

**"Reorganized Debtor"** means Homemakers Real Estate, LLC on and after the Effective Date.

**"Secured Claim"** means a Claim secured by a valid, perfected, and unavoidable Lien on property of the Estate, to the extent of the value of such property under § 506(a).

**"Settlement Payment"** means the $850,000.00 the Dixon Payor Parties pay to the Chapter 11 Trustee for the Estate under Section 5.1(a)(i) of the Global Settlement Agreement.

**"Unsecured Claim"** means a Claim that is not a Secured Claim, Administrative Claim, or Priority Claim.

## Article 2 — Classification of Claims and Interests

Under § 1123(a)(1) of the Code, Administrative Claims and Priority Tax Claims are not classified; Article 3 treats them. All other Claims against, and Interests in, the Debtor are classified as follows.

| Class | Designation | Status | Voting |
|---|---|---|---|
| 1 | ~~Secured~~ Claim ~~of Jetton Investments, Inc. / Paul Rene, Jr.~~69 withdrawn (Doc. 457) | ~~Impaired~~No Claim | ~~Entitled to~~ No vote |
| 2 | Secured Claim of Mainstreet Community Bank (Loan One) | Impaired | Entitled to vote |
| 3 | Secured Claim of Mainstreet Community Bank (Loan Two) | Impaired | Entitled to vote |
| 4 | Secured Claim of Tamamoi, LLC | Impaired | Not entitled to vote (§ 502(d)) |
| 5 | Secured Claim of Carton Family Trust of 1992 | Impaired | Not entitled to vote (§ 502(d)) |
| 6 | Secured Claims for ad valorem taxes (Brevard County Tax Collector and tax-certificate | Impaired | Entitled to vote |

| Class | Designation | Status | Voting |
|---|---|---|---|
| | holders) | | |
| 7 | Secured Claim of Cape Crossing Townhomes Homeowners Association, Inc. | Impaired | Entitled to vote |
| 8 | Cape Crossing Condominium Association — Claim 7 withdrawn (Doc. 393) | No Claim | No vote |
| 9 | General Unsecured Claims (Non-Insider) | Impaired | Entitled to vote |
| 10 | Insider Unsecured Claims | Impaired | Entitled to vote |
| 11 | Interests in the Debtor (Horton S. Johnson) | Impaired | Entitled to vote* |
| ~~12~~ | ~~Claims of PEDixon, LLC (Claim 67) and ZPD, LLC (Claim 68) — disputed~~ | ~~Impaired~~ | ~~Not entitled to vote (§ 502(d))~~ |
| ~~13~~ | ~~Secured Claim of IPFS Corporation (Claim 70-1)~~ | ~~Unimpaired~~ | ~~Deemed to accept~~ |

* Horton S. Johnson owns the Debtor and holds the Class 11 ~~Interest. The Debtor's~~ Interest; Section 4.9 describes how the Global Settlement Agreement returns the membership units ~~now sit in the so-called Tiered Land Trust; they belong~~ to ~~Mr. Johnson and are to be returned to him, if they have not been already. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026).~~ him. The Class is Impaired and the holder is entitled to vote. Every holder of an Impaired Claim may vote, except a holder whose Claim has a separate basis for disallowance, particularly § 502(d). Classes ~~4, 5,~~ 4 and ~~12~~ 5 fall within that exception: each holder in them is the transferee of transfers the Estate seeks to avoid, and § 502(d) disallows its Claim until it returns them. ~~The Disclosure Statement gives~~ On October 21, 2026, I moved to disallow both Claims on that ground. (Doc. 444). Until the Bankruptcy Court ~~notice that a § 502(d)~~

~~circumstance exists as to each of those Claims, so that the Court may disallow them on its own motion, and a separate motion will follow. Until the Chapter 11 Trustee's objections to other Claims are resolved,~~ rules, those holders vote only if the Bankruptcy Court temporarily allows their Claims. ~~*Fed. R. Bankr. P. 3018(a).*~~ Fed. R. Bankr. P. 3018(a). Classes 1 and 8 hold no Claim and cast no vote. No junior Class receives or retains property on account of its Interest ahead of a senior dissenting Class except as § 1129(b) permits, and I reserve all rights under § 1129(b). The absolute priority rule does not apply in favor of a Claim disallowed under § 502(d) because its holder has failed to turn over to the Estate what it owes; that holder has no Allowed Claim on which to invoke it.

## Article 3 — Treatment of Unclassified Claims

### 3.1 Administrative Claims.

Except to the extent a holder agrees to different treatment, each holder of an Allowed Administrative Claim will be paid in full, in Cash, on the later of the Effective Date or the date the Claim becomes Allowed, or as soon as practicable thereafter; ordinary-course Administrative Claims will be paid in the ordinary course. Administrative Claims include the allowed fees and expenses of the Chapter 11 Trustee and retained Professionals, subject to Bankruptcy Court approval under §§ 330 and 331.

**3.2 United States Trustee Fees.**

All fees due under 28 U.S.C. § 1930 will be paid in full on or before the Effective Date, and the Reorganized Debtor must continue to pay such fees until the case is closed, converted, or dismissed.

**3.3 Priority Tax Claims.**

Except to the extent a holder agrees to different treatment, each holder of an Allowed Priority Tax Claim will receive regular installment payments in Cash over a period ending not later than May 21, 2031, five years after the order for relief, with interest at the rate applicable nonbankruptcy law fixes, under §§ 511(a) and 1129(a)(9)(C) of the Code. I believe the scheduled priority tax obligations of the Internal Revenue Service and the Florida Department of Revenue are subject to substantial dispute and may be reduced to zero following reconciliation.

**Article 4 — Treatment of Classified Claims and Interests**

Treatment in this Article 4 refers exclusively to the Allowed Amount of each Claim. Notwithstanding Confirmation, I, the Reorganized Debtor, the Chapter 11 Trustee, and the Recovery Trustee each reserve the right to object to any Claim and to prosecute any Cause of Action, including objections seeking reduction, disallowance, equitable subordination, or recharacterization, subject until the Effective Date to the leave requirement of the Case Management Order. (Doc. 359 ¶ 3).

**4.1 Common Treatment of Secured Claims (Classes 1 through 5 and Class 7).**

Each holder of an Allowed Secured Claim in Classes 1 through 5 and Class ~~7, and any Class 12 Claim Allowed as a Secured Claim,~~ 7 retains its Lien to the same validity, extent, and priority as existed on the Petition Date, subject to the Estate's rights to challenge the amount, validity, priority, and enforceability of the Claim and Lien. Although the collateral differs, each Allowed Secured Claim receives parallel treatment, as follows:

(a) ~~Adequate Protection. From the Petition Date through the Effective Date, adequate protection accrues for each secured creditor at 4.8% per annum (0.4% per month) of its claimed amount, as set forth in the schedule below. Whatever part of that accrual the Chapter 11 Trustee has not paid by the Effective Date is an arrearage cured under paragraph (d).~~Reserved.

**(b) ~~Post-Confirmation~~ Amortization.** Commencing ~~the first day of the first full month after the Effective Date,~~ February 1, 2027, each Allowed Secured Claim will be amortized over three hundred sixty (360) months at a fixed rate of six percent (6.0%) per annum, payable in equal monthly ~~installments,~~ installments on the first day of each month, with a balloon payment of the entire outstanding balance due ~~sixty (60) months~~ February 1, 2029. If the Effective Date falls after February 1, 2027, the installments that came due before the Effective Date are paid on the Effective Date.

**(c) Balloon / Exit.** I anticipate that, by ~~the fifth anniversary of the Effective Date,~~ February 1, 2029, the resort will be sufficiently seasoned to support a refinancing or going-concern sale satisfying the balloon obligations in full, as described in Article 6.

(d) Cure of Arrearages and Defaults. All arrearages and defaults of the secured creditors, ~~including accrued adequate protection under paragraph (a),~~ together with the full Allowed Claim of the Cape Crossing Townhomes Homeowners Association, Inc. (Class 7), will be cured and paid from the net proceeds of the Recovery Trust Claims, as and when recovered, in the order Section 6.6 sets forth.

(e) Escrow of Payments on Disputed Secured Claims. Every ~~adequate-protection, cure,~~ cure and installment payment the Plan provides on a Secured Claim that is a Disputed Claim, that a pending Cause of Action challenges, or whose holder is subject to § 502(d) under Section 7.4 — including the Claims in Classes 2, 3, 4, and 5 ~~and any Class 12 Claim asserted as secured~~ — is paid when due into a segregated escrow account held by the Recovery Trustee. The deposit is computed on the amount the proof of claim asserts, only to size the escrow; it admits nothing. The Plan otherwise proceeds as if each payment had been made: the holder retains its Lien, an escrowed payment counts as paid for every purpose of the Plan, and the holder may not treat it as a default. The Recovery Trustee disburses nothing from escrow until a Final Order determines whether, and in what

amount, the Claim is Allowed. She then pays the holder, from escrow, what the Plan would have paid on the Allowed amount, and the balance of the escrow is distributed under Section 6.6. If the Claim is disallowed, the entire escrow is distributed under Section 6.6.

The following schedule sets forth, for each Class receiving the common secured treatment, the amount its proof of claim asserts, the monthly ~~adequate-protection accrual, the monthly~~ amortized installment, and the projected balloon balance at month ~~60:~~24:

| **Class / Creditor** | **Claimed Amount** | ~~**Adequate Protection (mo.)**~~ | **Amortized Installment (mo.)** | **Balloon (mo. ~~60)~~24)** |
|---|---|---|---|---|
| ~~Class 1: Jetton Investments, Inc. (assigned to Paul Rene, Jr.)~~ | ~~$1,634,600.00~~ | ~~$6,538.40~~ | ~~$9,800.25~~ | ~~$1,521,066.72~~ |
| Class 2: Mainstreet Community Bank (Loan One) | $3,611,594.47 | ~~$14,446.38~~ | $21,653.33 | ~~$3,360,746.26~~ $3,520,157.50 |
| Class 3: Mainstreet Community Bank (Loan Two) | $712,105.80 | ~~$2,848.42~~ | $4,269.43 | ~~$662,645.76~~$694,077.06 |
| Class 4: Tamamoi, LLC | $3,378,797.64 | ~~$13,515.19~~ | $20,257.60 | ~~$3,144,118.34~~ $3,293,254.42 |
| Class 5: Carton Family Trust of 1992 | $383,505.45 | ~~$1,534.02~~ | $2,299.31 | ~~$356,868.46~~$373,795.97 |
| Class 6: Ad valorem taxes (Claims 8–62) | $478,289.67 | ~~Section 4.5~~ | Section 4.5 | Paid by May 21, 2031 |
| Class 7: Cape Crossing Townhomes Homeowners Association, Inc. | $118,731.84 | ~~$474.93~~ | $711.86 | ~~$110,484.97~~$115,725.76 |
| Class 8: Cape Crossing Condominium Association | Withdrawn | — | — | — |
| **TOTAL (Classes ~~1–5~~ 2–5 and 7)** | ~~$9,839,335.20~~$8,204,735.20 | ~~$39,357.34~~ | ~~$58,991.78~~$49,191.53 | ~~$9,155,930.51~~ $7,997,010.71 |

The ~~adequate-protection and~~ amortization figures are computed on the amounts the respective creditors assert and are not an admission of the validity or amount of any Claim. ~~Claim 69 states $1,468,484.37 as secured and $166,115.63 as unsecured, which total its stated $1,634,600.00; the Chapter 11 Trustee's objection transposes the secured figure as $1,486,484.37. (Doc. 416 ¶ 5).~~ As Section 4.4 describes, I contend the Claims of Tamamoi, LLC (Class 4) and the Carton Family Trust of 1992 (Class 5) are subject to forfeiture of all interest under the Florida usury statutes, and that each such Claim will be reduced when a Final Order fixes its Allowed amount. *Fla. Stat. §§ 687.03, 687.04*. Class 6 is not on the schedule; Section 4.5 treats it.

**4.2 Class 1 — ~~Jetton Investments, Inc. / Paul Rene, Jr. (Secured).~~ Claim 69 (Withdrawn).**

On November 10, 2026, Claim 69 was withdrawn with prejudice. (Doc. 457). Class 1 ~~consists of~~ holds no Claim, receives nothing, and casts no vote. The Plan keeps the ~~Allowed Secured Claim under the balloon mortgage recorded May 30, 2018 in the Public Records of Brevard County at Official Records Book 8176, Page 930 (CFN 2018121113), encumbering the underlying resort land by metes and bounds, and assigned to Paul Rene, Jr. in 2022. In Claim 69, Mr. Rene asserts $1,468,484.37 as secured and $166,115.63 as unsecured. On September 30, 2026, the Chapter 11 Trustee objected to the Claim. (Doc. 416).~~ number so that every

other Class ~~1 receives the common secured treatment of Section 4.1, and any portion of Claim 69 Allowed as an Unsecured Claim is a Class 9 Claim. Class 1 is Impaired.~~keeps its own.

**4.3 Classes 2 and 3 — Mainstreet Community Bank (Secured).**

Classes 2 and 3 consist of the Claims of Mainstreet Community Bank on its two loan facilities, asserted in Claims 64-1 and 63-1. On February 17, 2022, as a condition of refinancing nineteen Units, Mainstreet dictated the Debtor's arrangement with Canaveral Crossroads and forced the return of the resort's clubhouse, pool, lift station, and open land to Canaveral Crossroads, stripping the Debtor of its first priority on resort reservations and its share of the amenity revenue. (Disclosure Statement § 2.J). In February 2025, after Mr. Johnson and I told Mainstreet to enforce its assignment of rents to stop the ~~diversion~~ payment of the Debtor's rents to PEDixon, Mainstreet instead discussed selling its mortgages to PEDixon at a discount, a transaction that would have harmed the Debtor's other creditors even more. (Id.). That conduct is at issue chiefly in the Canaveral Crossroads case, but it was done in relation to these loans, and the determination there of Mainstreet's lender liability will decide whether its Claims here are nullified or substantially reduced. To the extent Allowed, each Claim receives the common secured treatment of Section 4.1 — six percent, amortized over 360 months — and until that determination the payments are held in escrow under

Section 4.1(e). On March 16, 2026, the Bankruptcy Court terminated the automatic stay as to Mainstreet and permitted it to exercise its in rem rights. (Doc. 183 ¶ 2). Any Unit Mainstreet sells at foreclosure before the Effective Date leaves the Estate, and its sale price reduces Mainstreet's Allowed Claim. On the Effective Date, the injunction of Section 8.4 replaces that relief, and Mainstreet may proceed against its collateral only as Section 6.13 provides. Classes 2 and 3 are Impaired.

**4.4 Classes 4 and 5 — Tamamoi, LLC and Carton Family Trust of 1992 (Secured).**

Class 4 consists of the Claim of Tamamoi, LLC, which asserts $3,378,797.64 under a final judgment of foreclosure entered May 18, 2026, secured by eight Units the Debtor holds and by Unit 403 (Claim 65-1). Class 5 consists of the Claim of the Carton Family Trust of 1992, which asserts $383,505.45 under a final judgment of foreclosure, secured by townhome Unit 8-104 (Claim 66-1). FDRE, Inc. arranged both loans on materially identical terms and, as servicing agent, received the payments on them. Between March 2021 and November 2023, the Debtor paid $1,166,008.69 from its own account to Tamamoi, FDRE, and two affiliates, and $129,556.52 to the Carton Family Trust. Neither claimant has accounted for the payments that passed between it and FDRE. A full accounting of those payments determines the rate each lender actually charged, and I believe it will show a rate above 25 percent a year, which makes each extension

of credit an unenforceable debt. *Fla. Stat. § 687.071(7)*. On the face of the Tamamoi judgment, the rate already exceeds the civil ceiling: the judgment charges 18 percent on a 360-day year, which is 18.27 percent a year. *Fla. Stat. § 687.03(1)*. A lender who willfully charges interest above that ceiling forfeits all of it, may enforce only the principal, and must repay double the interest paid. *Fla. Stat. § 687.04*. One way or the other, the accounting determines whether, and how much, interest is forfeited.

Neither foreclosure judgment may be enforced by sale. The Bankruptcy Court lifted the stay for Tamamoi only to let it obtain a judgment and barred it from seeking a sale (Doc. 135 ¶¶ 2–3), and it abated both lenders' requests to conduct foreclosure sales (Doc. 361 ¶ 1). On the Effective Date, the Plan supersedes both judgments; neither may be enforced against the Debtor, the Reorganized Debtor, or any Unit, and each holder's rights are those the Plan provides. The amount of each Claim will be determined in an adversary proceeding or contested matter brought by the Recovery Trustee, or by the Reorganized Debtor under Section 6.11, with leave as the Case Management Order requires. (Doc. 359 ¶ 3). Subject to the accounting each lender owes, I contend that neither was entitled to more than $227,000 on any Unit, the amount stated on the face of the mortgage, and that, because each charged interest above the lawful rate, neither is entitled to any interest. To the extent a Final Order allows a Claim, its Lien is

allowed to the same extent, on the Units that secure that Claim, and the Allowed Claim receives the common secured treatment of Section 4.1 — six percent, amortized over 360 months — like every other secured Claim. Until then, the payments are held in escrow under Section 4.1(e).

On October 6, 2026, the Chapter 11 Trustee objected to both Claims only to disallow any deficiency, stating that the Debtor is neither an obligor nor a guarantor on either loan and that, for the same reason, she lacks standing to raise usury and does not intend to pursue it. (Docs. 424, 425 ¶ 14 & n.2). The Estate recovers under one position or the other. If the Debtor may challenge the interest, the interest is forfeited and recoverable as described above. If the Debtor owed nothing on either loan, then the $1,295,565.21 it paid on them left its property on debts it did not owe, and the Estate may recover those payments to the extent they exceeded the value the Debtor received; interest that the law forfeits reduced no enforceable lien and gave the Debtor no value. Either way, these are Recovery Trust Claims, and a claim the Recovery Trustee declines reverts to the Reorganized Debtor under Section 6.11.

On October 21, 2026, I moved to disallow Claims 65 and 66 under § 502(d), and on October 28, 2026, I moved for leave to object to them. (Docs. 444, 449). When I file the Third Amended Disclosure Statement, I will ask the Bankruptcy Court to rule on the motion for leave on an expedited basis. Tamamoi holds the

Debtor's money, which it took without giving the Debtor any consideration, and until it returns that money it should not vote on the Plan or on the Chapter 11 Trustee's plan. *11 U.S.C. § 502(d); Fed. R. Bankr. P. 3018(a).*

Because the Plan retains rather than sells the Units, any Allowed Claim exceeding the value of its collateral is treated as § 1111(b)(1)(A) of the Code directs, as a Class 9 Claim, unless the Class elects under § 1111(b)(2). Classes 4 and 5 are Impaired.

**4.5 Class 6 — Ad Valorem Tax Claims (Secured).**

Class 6 consists of the Allowed Secured Claims for ad valorem real property taxes on the Units, asserted in Claims 8 through 62 in the total amount of $478,289.67: forty-seven claims of the Brevard County Tax Collector for 2024 and 2025 taxes ($312,465.91), and eight claims of the holders of tax certificates — Keys Funding LLC, ATCF II Florida-A LLC, FIG 20, LLC, and Community Red Co ($165,823.76). Each holder retains its Lien and will be paid its Allowed Claim in full, with interest at the rate applicable nonbankruptcy law fixes for that claim — 18 percent on the Tax Collector's claims, and the certificate rate on each certificate holder's claim — in equal monthly installments beginning ~~the first day of the first full month after the Effective Date~~ February 1, 2027 and ending not later than May 21, 2031, five years after the order for relief. *11 U.S.C. §§ 511(a), 1129(a)(9)(C)–(D); Fla. Stat. § 197.172*. The Reorganized Debtor may prepay any

Class 6 Claim, and must pay the balance of any Class 6 Claim at the closing of a sale or refinancing of the Unit it encumbers. While the Reorganized Debtor is current on these installments, no holder may apply for a tax deed or pursue a pending application; on a default not cured within thirty (30) days after written notice to the Reorganized Debtor, the holder may exercise its remedies under Florida law. ~~I contend~~ To the ~~underlying assessments overstate the fair market value~~ extent § 505 of the ~~Units by approximately 25–30%,~~ Code and Florida law permit, the Reorganized Debtor may contest ~~them under § 505 of~~ the ~~Code.~~ underlying assessments. Class 6 is Impaired.

**4.6 Classes 7 and 8 — Cape Crossing Associations (Secured).**

Class 7 consists of the Allowed Secured Claim of the Cape Crossing Townhomes Homeowners Association, Inc. for unpaid assessments, asserted at $118,731.84 in Claim 6-1. That Claim is disputed as to amount and subject to the Estate's affirmative claims for negligence and waste that diminished unit values by as much as $125,000 per unit. The full Allowed Class 7 Claim will be paid from recoveries under Section 6.6; Class 7 otherwise receives the common secured treatment of Section 4.1 and is Impaired. Class 8 consisted of the Claim of the Cape Crossing Condominium Association. Under the Compromise Order, the Chapter 11 Trustee paid the Condominium Association $204,000 for the condominium roof, and on September 18, 2026, the Condominium Association

withdrew Claim 7. (Docs. 379 ¶ 3, 393). Class 8 holds no Claim, receives nothing, and casts no vote.

**4.7 Class 9 — General Unsecured Claims (Non-Insider).**

Class 9 consists of all Allowed Unsecured Claims of non-Insider creditors. ~~The Claims filed in Class 9 are those~~ Under the Global Settlement Agreement, Claim 4 of IMQA Investments Incorporated ~~(Claim 4-3, $360,459.40),~~ (Claims 4-2 and 4-3) is Allowed as a general unsecured claim of $350,000.00; Claim 3 of CTO Holdings, Inc. ~~(Claim 3-2, $303,853.79), Tiered Capital, Inc. (Claim 71-1, $125,000.00),~~ is withdrawn with prejudice and disallowed; and Claim 2-1 of WM Holdings Group, LLC ~~(Claim 2-1, $19,635.25),~~ and Claim 71-1 of Tiered Capital, Inc. are disallowed with prejudice. (Global Settlement Agreement Ex. A). The other Class 9 Claims are mine (Claim 1-1, ~~$396.00), totaling $809,344.44, together with any unsecured portion of Claims 69 and 70~~ $396.00) and any deficiency Section 4.4 places here. ~~Each~~ The Chapter 11 Trustee paid Claim 70 of IPFS Corporation in full in the ordinary course, and it receives nothing under the Plan. (Doc. 392 ¶ 13). On the later of the Effective Date and the fifth Business Day after the Chapter 11 Trustee receives the Settlement Payment, the Reorganized Debtor will pay each holder of an Allowed Class 9 Claim ~~will be paid~~ one hundred percent (100%) of its Allowed Claim, in Cash, from the Settlement Payment, and will reserve in Cash, from the same source, the full asserted amount of every Class 9

Claim that is then a Disputed Claim. Within thirty (30) days after a Disputed Class 9 Claim becomes Allowed, the Reorganized Debtor pays it from that reserve, with interest from the Effective Date at the federal judgment rate in effect on the Effective Date. 28 U.S.C. § 1961(a). Any part of the reserve that no Allowed Claim needs is distributed under Section 6.6. If the Settlement Payment has not arrived by the Effective Date, ~~*28 U.S.C. § 1961(a),*~~ or does not cover every Allowed and reserved Class 9 Claim, the Reorganized Debtor pays the balance, with the same interest, in equal monthly installments over sixty (60) months from operating revenue, beginning the first day of the first full month after the Effective ~~Date. The Reorganized Debtor pays the installments from operating revenue,~~ Date, and the net proceeds of the Recovery Trust Claims available to Class 9 under Section 6.6 prepay ~~the remaining balance. Any Class 12 Claim Allowed as an Unsecured Claim shares pro rata with Class 9, and Section 7.3 governs the reserve for~~ it. My own ~~Claim,~~ Claim and the ~~Claims~~ Claim of IMQA Investments Incorporated ~~and CTO Holdings, Inc.,~~ are Class 9 Claims and receive no treatment different from any other non-Insider unsecured creditor. The United States holds a restitution lien on any distribution on my Claim (Doc. 387), and any such distribution will be paid as that lien requires. Class 9 is Impaired.

**4.8 Class 10 — Insider Unsecured Claims.**

Class 10 consists of the Allowed Unsecured Claims of ~~Insiders, including~~ Insiders. Under the Global Settlement Agreement, the Claim of Horton S. Johnson (Claim ~~5-2, $2,594,987.93),~~ 5-2) is Allowed as a general unsecured claim of $1,297,493.97, which resolves the Chapter 11 ~~Trustee asks the Bankruptcy Court~~ Trustee's objection to ~~disallow or recharacterize as equity.~~ it. (Doc. ~~412).~~ 412; Global Settlement Agreement Ex. A). Because Mr. Johnson is an Insider, his Claim is classified here. Holders of Allowed Class 10 Claims receive distributions only after all Allowed Administrative Claims, Priority Claims, Secured Claims (Classes ~~1–7, and any Class 12 Claim Allowed as a Secured Claim),~~ 1–7), and Class 9 Claims have been satisfied or ~~adequately~~ reserved, and after the $1,000,000 property-improvement reserve in Article 6 is funded. Thereafter, holders share pro rata in remaining net recoveries. No Lien secures a Class 10 Claim, and the Plan grants none. Class 10 is Impaired.

**4.9 Class 11 — Interests.**

Class 11 consists of the Interests in the Debtor, which Horton S. Johnson owns. ~~The membership units now sit~~ Under the Global Settlement Agreement, each Dixon Payor Party relinquishes to the Tiered Land Trust, acting through Mr. Johnson as its successor trustee, whatever interest it has or claims in the ~~so-called~~ Debtor's membership units, and the Tiered Land ~~Trust; they belong~~ Trust then

conveys those units to Mr. ~~Johnson~~ Johnson. That transfer moves no property of the Estate and ~~are to be returned to him, if they have not been already. *Johnson v. Crescent Sound Ltd.*, No. 2026-CA-001368-O (Fla. 9th Cir. Ct. 2026).~~ leaves the Chapter 11 Trustee in office until the Bankruptcy Court orders otherwise. (Global Settlement Agreement §§ 5.2, 5.4). Mr. Johnson retains the Class 11 Interest in the Reorganized Debtor, controls the Reorganized Debtor on and after the Effective Date under Article ~~6,~~ 6 until a third party acquires it under Section 6.2, and receives no distribution on account of the Interest until all senior Classes are satisfied. Class 11 is Impaired.

~~**4.10 Class 12 — Claims of PEDixon, LLC and ZPD, LLC (Disputed).**~~

~~Class 12 consists of Claim 67 of PEDixon, LLC, which asserts $4,779,864.58 as secured, and Claim 68 of ZPD, LLC, which asserts $1,380,166.67. Each rests on the assertion that the Debtor guaranteed the September 14, 2023 consolidated loan to Tiered Capital, Inc. The Debtor scheduled both at $0.00 and marked each disputed, contingent, and unliquidated. I contend that the Legislature withdrew from every court of this State the power to enforce these extensions of credit, *Fla. Stat. § 687.071(7)*, and that the Class 12 Claims are disallowed in any event. On October 2, 2026, the Chapter 11 Trustee objected to both Claims, and I moved to disallow both under § 502(d). (Docs. 419, 420, 423).~~

~~A Class 12 Claim receives nothing unless and until a Final Order allows it, and Section 7.4 bars allowance while the claimant holds an avoidable transfer. If a Final Order allows a Class 12 Claim as a Secured Claim, the allowed amount receives the common secured treatment of Section 4.1 against the collateral the order identifies. If a Final Order allows a Class 12 Claim as an Unsecured Claim, the allowed amount shares pro rata with Class 9. Nothing in the Plan concedes the existence, validity, or enforceability of any guaranty, lien, purchase option, or right of first refusal on which either Claim rests. Class 12 is Impaired.~~

**~~4.11 Class 13 — Secured Claim of IPFS Corporation (Unimpaired).~~**

~~Class 13 consists of the Allowed Secured Claim of IPFS Corporation, which asserts $1,118.79 as secured and $112.75 as unsecured (Claim 70-1). On September 17, 2026, the Chapter 11 Trustee objected to the Claim. (Doc. 392). The Reorganized Debtor will pay the Allowed Secured Claim in full, in Cash, within thirty (30) days after the later of the Effective Date and the date the Claim is Allowed. Any part Allowed as an Unsecured Claim is a Class 9 Claim. Class 13 is Unimpaired and is conclusively presumed to accept the Plan. *11 U.S.C. § 1126(f)*.~~

## Article 5 — Executory Contracts and Unexpired Leases

All executory contracts and unexpired leases not previously assumed or rejected, and not the subject of a pending motion to assume as of the Confirmation Date, are rejected as of the Effective Date, except any contract or lease specifically

identified for assumption in a schedule filed before the Confirmation Hearing. Any rejection-damages Claim must be filed within thirty (30) days after entry of the order authorizing rejection (or the Confirmation Order, if rejection occurs thereunder), and any such Allowed Claim will be treated as a Class 9 General Unsecured Claim.

## Article 6 — Means of Implementation

### 6.1 Overview.

The Plan will be implemented through (a) continued operation of the Debtor's vacation-rental business as a going concern — under the direction and control of the Chapter 11 Trustee until the Effective Date, and thereafter under the governance structure of Section 6.7; (b) the establishment of the Recovery Trust — which holds all of the Estate's Causes of Action, including the claims for preferences and fraudulent transfers — to prosecute and recover them to conclusion; (c) consolidation of the resort through a third party's acquisition of the ~~Debtor's acquisition~~ Reorganized Debtor and of the assets of Canaveral Crossroads, ~~LLC and other related assets;~~ LLC, which the third party combines to maximize revenues; (d) structured sales of Units under Section 6.12; ~~and~~ (e) a refinancing or going-concern sale on or before ~~the fifth anniversary~~ February 1, 2029; and (f) implementation of the ~~Effective Date.~~ Global Settlement Agreement under Section 6.9.

**6.2 Operating Plan.**

The Debtor, under the direction and control of the Chapter 11 Trustee until the Effective Date, and thereafter the Reorganized Debtor under the governance of Section 6.7, will: (1) stabilize the Debtor's vacation-rental operations; (2) ~~acquire, through its Chapter 11 case~~ support the acquisition, by a third party and subject to approval in both cases, of the Reorganized Debtor and of the assets of Canaveral Crossroads, LLC — the resort's developer and declarant, which reports that it owns the clubhouse, the common areas, the sewage lift station, and the Cape Crossing Resort & Marina names and marks — so that the third party combines the resort's components, including its reservation system, ~~are combined~~ into a single, self-contained ~~enterprise.~~ enterprise and maximizes its revenues. The acquirer takes the Reorganized Debtor subject to the Plan, and the acquisition changes no payment, Lien, or other right the Plan gives the holder of a Claim. On September 8, 2026, the court entered an order for relief against Canaveral Crossroads on its consent and converted its case to Chapter 11, and on September 30, 2026, ordered that case jointly administered with that of Sherwood Construction, Inc. *In re Canaveral Crossroads, LLC*, No. 6:26-bk-05426-GER (Bankr. M.D. Fla.) (Docs. 15, 56 at 2, 61); (3) engage a vacation-rental investment bank to arrange the financing necessary to acquire the remaining vacation-rental units; and (4) by ~~the fifth anniversary of the Effective Date,~~ February 1, 2029, refinance the balloon

obligations or sell the Reorganized Debtor's Units as a going concern. Nothing in the Plan or the Confirmation Order authorizes, requires, solicits, or anticipates any acquisition, merger, consolidation, management arrangement, contribution, transfer, or other combination involving any asset or interest of Michael McPhillips, who has refused any such transaction. (Doc. 328 ¶¶ 3, 12).

**6.3 Establishment and Funding of the Recovery Trust.**

On the Effective Date, the Recovery Trust will be established as a trust for the benefit of the holders of Claims entitled to distribution under the Plan. Lara Roeske Fernandez, the Chapter 11 Trustee, will serve as the Recovery Trustee and will administer, prosecute, and conclude the Recovery Trust and the Recovery Trust Claims. If Ms. Fernandez declines to serve or ceases to serve, a successor approved by the Office of the United States Trustee will serve, compensated on the same terms, subject to Bankruptcy Court approval. The Recovery Trust will be funded with what remains of the ~~Held~~ Settlement ~~Balance, transferred on or promptly~~ Payment after the ~~Effective Date,~~ Allowed Administrative Claims and the Class 9 payments and reserve under Section 6.4, up to $100,000. If the ~~extent a Final Order determines that no Lien attaches to it; to the extent a Lien attaches,~~ Recovery Trust needs more, the Reorganized Debtor will fund ~~the Recovery Trust's~~ its reasonable costs from net operating revenue, and the Recovery Trustee may engage counsel on a contingent-fee basis under § 328 of the Code. On the

Effective Date, the Recovery Trust Claims — all of the Estate's Causes of Action other than the Released Claims — vest in and transfer to the Recovery Trust, including: (a) the Avoidance ~~Actions, among them the claims for preferential transfers, fraudulent transfers, and post-petition transfers the Compromise Order did not resolve;~~ Actions against any person other than a Released Party; (b) the Causes of Action against ~~P.E. Dixon, KAE, PEDixon, LLC, and ZPD, LLC;~~ Mainstreet Community Bank of Florida described in Section 4.3; (c), separately, the Causes of Action against Tamamoi, LLC, the Carton Family Trust of 1992, and FDRE, Inc.; and (d) the claim and right to recover Unit ~~403, which Crescent Sound transferred~~ 403 from ~~the Debtor to~~ the IAM Irrevocable Trust ~~in March 2024.~~ and any subsequent transferee that is not a Released Party. The Recovery Trustee has full authority to investigate, commence, prosecute, settle, and compromise the Recovery Trust Claims, to decline any of them under Section 6.11, to retain counsel and other professionals, and to take all actions necessary to administer the Recovery Trust through its conclusion, in each case subject to such Bankruptcy Court approval as may be required. The reasonable fees, costs, and expenses of the Recovery Trust are paid first from the funding described above and then from the gross proceeds of the Recovery Trust Claims before distribution.

**6.4 Working Capital and ~~Adequate Protection Funding.~~Application of the Settlement Payment.**

~~No turnover of post-petition funds by P.E. Dixon or Crescent Sound occurred,~~ The Reorganized Debtor will pay its operating expenses and the ~~Plan no longer depends~~ installments under Article 4 from operating revenue. The Settlement Payment is paid in settlement of the Estate's claims and causes of action; it is not rents and not the proceeds of any creditor's collateral. (Global Settlement Agreement § 5.1(c)). No Lien attaches to it. When the Chapter 11 Trustee receives it, the Settlement Payment is applied in this order: (1) to the Allowed Administrative Claims; (2) to the Class 9 payments and reserve under Section 4.7, $350,396.00 on ~~one.~~ the present claims; (3) up to $100,000 to the Recovery Trust under Section 6.3; and (4) any balance to the Reorganized Debtor as working capital. On ~~September 2,~~ November 9, 2026, the Bankruptcy Court ~~approved~~ allowed one Administrative Claim at $30,000. (Doc. 455). On November 12 and 13, 2026, the Chapter 11 Trustee, her counsel, and her accountant applied for $382,534.13 in fees and costs for the period since June 11, 2026. (Docs. 462, 463, 464). If the Bankruptcy Court allows those applications in full, the Administrative Claims total about $412,500 before any later fees, about $87,000 of the Settlement Payment reaches the Recovery Trust, and none remains for working capital. The Reorganized Debtor will bridge any seasonal shortfall first from any such working capital and then from the first net recoveries of the Recovery Trust

Claims under Section 6.6(1). Exhibit B to the Disclosure Statement projects no month in which the Reorganized Debtor's cash falls below zero; the lowest month-end balance is about $37,000, in January 2027. If the Settlement Payment has not arrived by the Effective Date, each Allowed Administrative Claim is paid when it arrives, unless its holder agrees otherwise or the Chapter 11 Trustee's ~~compromise under which~~ cash then covers it. The Plan depends on no turnover of post-petition funds. Under the Compromise Order, the Lender paid the Chapter 11 Trustee ~~$350,000 to resolve the Estate's claims to avoid and recover the post-petition transfers defined in her motion,~~ $350,000, the Trustee paid the Condominium Association $204,000 for the condominium roof, and the Trustee holds the balance until further order. (Doc. 379 ¶¶ ~~3–5). The Reorganized Debtor will pay its operating expenses and the installments under Article 4 from operating revenue. It will bridge any seasonal shortfall first from the Held Settlement Balance, to the extent a Final Order holds it unencumbered and it is not needed to fund the Recovery Trust, and then from the first net recoveries of the Recovery Trust Claims under Section 6.6(1). Exhibit B to the Disclosure Statement projects the seasonal low point at about $51,000 in January 2027. The Allowed Administrative Claims, which I estimate at $125,000, are paid on the Effective Date from the cash the Chapter 11 Trustee holds.~~3–5).

**6.5 Identified Recovery Sources.**

The Recovery Trust holds every Cause of Action of the Estate, Estate other than the Released Claims, subject to reversion of a Declined Claim to the Reorganized Debtor under Section 6.11. The identified recovery sources include: (a) the Held Settlement Balance — approximately $146,000 — to the extent a Final Order holds it unencumbered; (b) transfers to the Dixon lenders, which I estimated at approximately $1,400,000 before the Rule 60 motions were denied, and which the Recovery Trustee will restate now that every reach-back period runs from the Petition Date — as preferences if, as their Claims assert, the Dixon lenders were creditors (the Bankruptcy Court found PEDixon, LLC and ZPD, LLC insiders, so the reach-back is one year), and otherwise as fraudulent transfers; (c) the $1,166,008.69 the Debtor paid to Tamamoi, LLC, FDRE, Inc., and two affiliates, and the $129,556.52 it paid to the Carton Family Trust, recoverable as Section 4.4 describes — twice the forfeited interest under Fla. Stat. § 687.04 *Fla. Stat. § 687.04* or, in the alternative, as transfers on debts the Debtor did not owe — or credited against principal; (d) (b) the recovery of Unit 403, which Crescent Sound transferred 403 from the Debtor to the IAM Irrevocable Trust in March 2024, under Fla. Stat. ch. 726 *Fla. Stat. ch. 726* and §§ 544(b), 548, and 550 of the Code and through the pending appeal described in the Disclosure Statement, adding a minimum of $183,000 in net equity and more likely $250,000 to

$300,000; and (e) (c) the Estate's own claims for breach against Mainstreet Community Bank of fiduciary duty, conversion, Florida described in Section 4.3, which reduce Mainstreet's Allowed Claims in recoupment before they produce any cash; and fraud against Crescent Sound, P.E. Dixon, and related parties, and its (d) the Estate's affirmative claims against the Cape Crossing associations and the associations' directors, against the contractors and design professionals who built the Resort and Michael McPhillips, and against the title companies, including First American Title, all of which remain unquantified. The Global Settlement Agreement releases the Estate's claims against the Dixon Parties and the Pitkanen Parties, including the transfers to the Dixon lenders that my earlier plan estimated at about $1,400,000; the Settlement Payment takes their place. The Recovery Trustee may coordinate with the committee of unsecured creditors, if one is appointed.

**6.6 Waterfall — Distribution of Recoveries.**

Net proceeds of the Recovery Trust Claims, distributed by the Recovery Trustee after the costs of recovery, including professional fees, and net proceeds of any Declined Claim the Reorganized Debtor recovers under Section 6.11, will be applied in the following order: (1) to cure all arrearages and defaults of the secured creditors as the Plan provides, including accrued adequate protection, and to bring all Allowed Secured Claims (Classes 1–5 and 7, and any Class 12 Claim Allowed

~~as a Secured Claim)~~ 7) current, including the full Allowed Claim of Class 7 and any Class 6 installment then due and unpaid, and to fund any seasonal working-capital shortfall of the Reorganized Debtor up to $248,000; (2) to pay the remaining balance of all Allowed Class 9 Claims in full, with the interest Section 4.7 ~~provides, sharing pro rata with any Class 12 Claim Allowed as an Unsecured Claim;~~ provides; (3) to fund a $1,000,000 reserve for capital improvements to the Debtor's properties; and (4) to satisfy the remaining Allowed Class 10 Insider Unsecured Claims and, thereafter, the Class 11 Interest. After the secured creditors receive what the Plan provides, every dollar of net recoveries goes to unsecured creditors until they are paid in full.

**6.7 Governance of the Reorganized Debtor.**

Governance under the Plan proceeds in two stages. First, while this case proceeds to conclusion, the Debtor remains under the direction and control of the Chapter 11 Trustee, and I propose and will support the appointment of a committee of unsecured creditors under § 1102 of the Code to monitor operational performance and assist the Chapter 11 Trustee. Second, on the Effective Date, Horton S. Johnson, the Debtor's owner, controls the Reorganized Debtor; he will oversee a professional management company engaged to operate the resort day to day and will be responsible for effectuating the Plan. Mr. Johnson will receive compensation commensurate with the time he actually spends managing the

Reorganized Debtor, at the market rate for an executive manager of a limited liability company, paid from the Reorganized Debtor's revenues. Who manages the combined enterprise after a third party acquires the Reorganized Debtor ~~acquires~~ and the assets of Canaveral Crossroads, LLC will be determined when that acquisition occurs. I support the continued service of Lara Roeske Fernandez as Chapter 11 Trustee and as Recovery Trustee; Section 6.3 provides her successor.

**6.8 Vesting of Assets.**

Except as the Plan or Confirmation Order otherwise provides, on the Effective Date all property of the Estate other than the Recovery Trust Claims vests in the Reorganized Debtor free and clear of all Claims and Interests, except the Liens retained by holders of Allowed Secured Claims under Article 4 and the obligations created under the Plan; the Recovery Trust Claims vest in the Recovery Trust as Section 6.3 provides, and each Declined Claim vests in the Reorganized Debtor as Section 6.11 provides. When the Recovery Trust terminates, any property remaining after the distributions under Section 6.6 vests in the Reorganized Debtor.

**6.9 The Global Settlement; Settlement of Claims.**

~~Under~~ (a) The Global Settlement Agreement resolves every dispute between the Estate and the Dixon Parties and the Pitkanen Parties, and the Plan implements

it. On November 12, 2026, the Chapter 11 Trustee moved for its approval under Bankruptcy Rule 9019. (Doc. 459). I seek its approval in my own right, as the agreement provides. (Global Settlement Agreement § 14.2(b)). If the Bankruptcy Court has not entered the Global Settlement Approval Order before the Confirmation Hearing, the Confirmation Order will approve the Global Settlement Agreement under Bankruptcy Rule 9019 and ~~in consideration~~ § 1123(b)(3)(A) of the ~~distributions~~ Code, and ~~benefits provided under~~ to that extent it is the ~~Plan, the Plan constitutes a good-faith compromise and settlement of all Claims, Interests, and controversies resolved under it. Entry of the Confirmation Order constitutes Bankruptcy Court approval of those compromises as fair, equitable, reasonable, and in the best interests of the Debtor, the Estate, and holders of Claims and Interests. Nothing in this Section compromises any Cause of Action, any pending objection to a Claim, or any Class 12 Claim.~~ Global Settlement Approval Order.

(b) Effective as the Global Settlement Agreement provides, Claims 67 and 68 are withdrawn with prejudice, and PEDixon and ZPD will not seek any credit bid, any claim under § 502(h), or any administrative expense claim in this case, so the Plan carries no Class for them; Claim 2-1 is disallowed; Claim 3 is withdrawn and disallowed; Claim 4 is Allowed as a general unsecured claim of $350,000.00 in Class 9; Claim 5-2 is Allowed as a general unsecured claim of $1,297,493.97 in Class 10; and Claim 71-1 is disallowed. (Global Settlement Agreement Ex. A).

Every objection, motion, and request between a Flynn-Johnson Party or Yaniv Amar and a Dixon Party or Pitkanen Party pending in this case is withdrawn, including my motion to disallow Claims 67 and 68 under § 502(d). (Doc. 423).

(c) The Settlement Payment is property of the Estate, free of any Lien, and the Plan applies it as Section 6.4 provides.

(d) Nothing in the Plan revives, preserves, or transfers to the Recovery Trust any Released Claim. Nothing in the Plan releases any person the Global Settlement Agreement does not release, including any Excluded Person.

(e) If the Plan and the Global Settlement Agreement conflict, the Global Settlement Agreement controls. If the Global Settlement Agreement terminates under its Section 14.5 before the Effective Date, I will modify the Plan under § 1127 of the Code before it is confirmed or consummated.

(f) Otherwise, under Bankruptcy Rule 9019 and in consideration of the distributions and benefits provided under the Plan, the Plan constitutes a good-faith compromise and settlement of all Claims, Interests, and controversies resolved under it, and entry of the Confirmation Order constitutes Bankruptcy Court approval of those compromises as fair, equitable, reasonable, and in the best interests of the Debtor, the Estate, and holders of Claims and Interests. Nothing in this paragraph compromises any Recovery Trust Claim or any pending objection to a Claim.

**6.10 Appointment of the Recovery Trustee as Representative of the Estate; Retention and Enforcement of Causes of Action.**

Under § 1123(b)(3)(B) of the Code, the Plan provides for the retention and enforcement, by a representative of the estate appointed for such purpose, of every Cause of Action and Recovery Trust Claim, and the Recovery Trustee is appointed as that representative. The appointment is made expressly for the purpose § 1123(b)(3)(B) describes. The Recovery Trustee holds and may enforce each Cause of Action and Recovery Trust Claim in that capacity and as successor to the Debtor, the Estate, and the Chapter 11 Trustee. As to each Declined Claim, the Reorganized Debtor is also appointed as that representative, for the same purpose, and holds and may enforce the Declined Claim in that capacity and as successor to the Recovery Trustee.

The Causes of Action and the Recovery Trust Claims are retained and preserved. They are not released, waived, discharged, extinguished, or barred by Confirmation, by the occurrence of the Effective Date, by any distribution under the Plan, or by res judicata, collateral estoppel, waiver, estoppel, or laches arising from Confirmation. The retention and preservation this Section effects is specific and unequivocal, and includes: (a) the Avoidance Actions; (b) every Cause of Action against ~~P.E. Dixon, PEDixon, LLC, ZPD, LLC, KAE, Crescent Sound, Ltd., Kenneth G. Dixon, and each~~ Mainstreet Community Bank of ~~their affiliates, principals, members, transferees, and subsequent transferees, other than the claims~~

~~the Compromise Order resolved;~~ Florida; (c) every Cause of Action against Tamamoi, LLC, the Carton Family Trust of 1992, FDRE, Inc., and their affiliates; (d) the claim and right to recover Unit ~~403, which Crescent Sound transferred~~ 403 from ~~the Debtor to~~ the IAM Irrevocable Trust ~~in March 2024;~~ and any subsequent transferee that is not a Released Party; and (e) every Cause of Action the Disclosure Statement describes, whether or not pending on the Effective Date and whether or not named in the ~~Plan.~~ Plan. The Released Claims alone are excluded.

No holder of a Claim or Interest, and no other party in interest, acquires by reason of Confirmation any defense to a Cause of Action or a Recovery Trust Claim that did not exist immediately before the Confirmation Date.

**6.11 Declined Causes of Action; Reversion to the Reorganized Debtor.**

(a) Every Cause of Action and Recovery Trust Claim belongs to the Recovery Trust, and except as this Section provides, the Recovery Trustee alone may prosecute it.

(b) The Recovery Trustee may decline to prosecute any Cause of Action or Recovery Trust Claim, in whole or in part, for any reason, including that she judges its merits insufficient or its prosecution not economically efficient. She declines by filing and serving a notice that identifies the claim and each defendant. A statement the Chapter 11 Trustee filed before the Effective Date that she does

not intend to pursue a claim operates as a notice of declination on the Effective Date, including the statements in Docs. 424 and 425 at page 4, note 2.

(c) A claim is deemed declined if the Recovery Trustee has neither commenced it nor filed a notice of declination (i) within sixty (60) days after the Reorganized Debtor's written request, or (ii) one hundred twenty (120) days before the applicable limitations period expires.

(d) Upon declination, the Declined Claim reverts to and vests in the Reorganized Debtor, free of any interest of the Recovery Trust. The Reorganized Debtor holds and may enforce it as the representative of the Estate under § 1123(b)(3)(B) of the Code, with every right the Recovery Trustee held, and may pursue, settle, or abandon it in its business judgment.

(e) The net proceeds of a Declined Claim, after the Reorganized Debtor's reasonable costs of recovery, including any contingent fee, are distributed under Section 6.6.

(f) No defendant acquires any defense by reason of a declination or reversion.

**6.12 Structured Sales of Units; the Trustee's Sale Program.**

(a) The Reorganized Debtor sells Units only under this Section. ~~On the Effective Date,~~ Beginning in January 2027, the Reorganized Debtor ~~will arrange an orderly~~ lists one condominium Unit for sale ~~process~~ at $500,000 and one

townhome Unit for sale at $450,000. At least one Unit remains listed for sale at all times, except during a quarter that follows a quarter in which the Units and will engage Reorganized Debtor's operating results covered every payment the Plan requires. The Recovery Trustee conducts each sale through brokers the Recovery Trustee to conduct any sale under this Section, through brokers she selects; her reasonable selects. The costs of sale, including the Recovery Trustee's fees and the brokers' commissions are costs commissions, may not exceed five percent (5%) of sale. If at any time the Reorganized Debtor's results fall below the projections of Exhibit B to the Disclosure Statement — that is, if its revenues and net operating income will not cover every payment the Plan requires — the Recovery Trustee will sell Units two or three at a time, at fair market value, timing each sale to the market. price. At each closing, the proceeds, net of the costs of sale, pay the Class 6 Claim on the Unit sold and, to each and then pay the holder of a the Lien on the Unit, Unit a release price of $350,000, or $227,000 on a Unit that secures the Claim of Tamamoi, LLC or the Carton Family Trust of 1992. No release price exceeds the unpaid balance of the Allowed Claim that the release amount: the Allowed Secured Claim the Lien secures, allocated to the Unit in proportion to the Unit's 2025 just value among all Units securing the same Claim. price pays. A release amount price owed on a Claim subject to Section 4.1(e) is paid into escrow. Each release amount price is credited against the principal of the that Allowed

~~Claim it pays.~~ Claim. The remaining net proceeds are distributed under the Plan and according to existing Lien rights, in the order Section ~~6.6.~~6.6 sets forth.

(b) The structured sales continue in the same ~~manner,~~ manner over not more than ~~three years, until~~ eighteen months and conclude not later than June 30, 2028, unless before then the Reorganized Debtor's net operating income covers the payments the Plan requires or every Allowed Claim is paid in ~~full, and they resume whenever a shortfall recurs.~~full.

(c) ~~If~~ This Section applies whether or not a third party's acquisition of the ~~Debtor's acquisition~~ Reorganized Debtor and of the assets of Canaveral Crossroads, LLC ~~does not occur, this Section applies unless the Reorganized Debtor is meeting every obligation the Plan identifies from its own operations.~~occurs.

(d) Each holder of a Lien on a Unit sold under this Section must release the Lien upon payment of its release amount. A sale under this Section requires no further order of the Bankruptcy Court except as the Code or the Confirmation Order requires.

**6.13 Default; Receiver for a Structured Sale.**

If the Reorganized Debtor fails to make a payment the Plan requires and does not cure the failure within thirty (30) days after written notice, the affected holder may seek relief in the Bankruptcy Court. The Reorganized Debtor consents

now to the appointment, in any foreclosure action on the affected Units, of a receiver to conduct a structured sale of those Units under the supervision of the state court, on the terms of Section 6.12 as nearly as practicable. No foreclosure sale of a Unit will occur except through that receiver.

## Article 7 — Distributions and Disputed Claims

### 7.1 Distribution Agents.

The Reorganized Debtor acts as Distribution Agent for distributions from operations, and the Recovery Trustee makes distributions of the net proceeds of the Recovery Trust Claims, in each case in accordance with Section 6.6. No distribution will be made on account of a Disputed Claim until it becomes an Allowed Claim.

### 7.2 Objections to Claims.

Objections to Claims may be filed by the Chapter 11 Trustee, the Recovery Trustee, the Reorganized Debtor, or me on or before the date that is one hundred ~~eighty (180)~~ twenty (120) days after the Effective Date, subject to extension by the Bankruptcy Court; until the Effective Date, an objection requires leave as the Case Management Order directs. (Doc. 359 ¶ 3). Because Local Rule 3020-1(e) sets a sixty-day default for claim objections unless the court orders otherwise, the Confirmation Order will expressly provide for this ~~180-day~~ 120-day period. Every objection pending on the Effective Date survives Confirmation and is determined

under the Plan, including the Chapter 11 Trustee's objections to Claims ~~2, 3, 4, 5,~~ 65, 66, ~~67, 68, 69, 70,~~ and ~~71~~ 70 (Docs. 392, ~~409, 410, 411, 412, 416, 419, 420, 421,~~ 424, ~~425) and~~ 425), my motion to disallow Claims ~~67~~ 65 and ~~68~~ 66 under § 502(d) (Doc. ~~423);~~ 444), and my motions for leave to object to Claims 63, 64, 65, and 66 (Docs. 448, 449); the Recovery Trustee succeeds to the Chapter 11 Trustee's ~~objections.~~objections. The Global Settlement Agreement resolves the objections to Claims 2, 3, 4, 5, 67, 68, and 71 (Docs. 409, 410, 411, 412, 419, 420, 421, 423), and the Global Settlement Approval Order governs them. On November 10, 2026, Claim 69 was withdrawn (Doc. 457), and the objection to it (Doc. 416) is moot.

**7.3 Reserves.**

The Reorganized Debtor and the Recovery Trustee must each establish and maintain appropriate reserves for Disputed Claims pending resolution, so that, if and when allowed, those Claims receive the treatment to which the Plan entitles them. ~~Until a Final Order resolves the Class 12 Claims, the Recovery Trustee and the Reorganized Debtor will hold back from each distribution to~~ The Class 9 ~~the share that would be payable on the Class 12 Claims if they were Allowed as Unsecured Claims in the amounts asserted.~~reserve under Section 4.7 is one of them.

**7.4 Disallowance Under § 502(d).**

Section 502(d) of the Code directs that the court shall disallow the Claim of any entity from which property is recoverable under §§ 542, 543, 550, or 553 of the Code, or that is the transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Code, unless that entity has paid the amount or turned over the property for which it is liable. The Plan preserves that provision in full. No Claim of an entity that is a defendant in, or a transferee identified in, any Recovery Trust Claim will be Allowed, and no distribution will be made on account of any such Claim, until that entity has paid the amount or turned over the property for which it is liable, or until the Bankruptcy Court determines that no such liability exists. The Plan nonetheless proceeds as to that entity: every payment the Plan provides on its Secured Claim is paid into escrow under Section 4.1(e) and disbursed only as that Section provides.

The Recovery Trustee, and the Reorganized Debtor as to any Declined Claim, may assert § 502(d) as a ground of objection under Section 7.2, and may do so although the related Avoidance Action remains pending and no money judgment has been entered. Nothing in this Section limits § 502(j) of the Code or Fed. R. Bankr. P. 3008, and a Claim disallowed under this Section will be reconsidered and Allowed upon payment or turnover. Nothing in this Section

determines that any entity is liable; every defense of every claimant is preserved until the Bankruptcy Court determines the question.

## Article 8 — Conditions and Effect of Confirmation

### 8.1 Conditions to the Effective Date.

The Effective Date will not occur until (a) the Confirmation Order has been entered and has become a Final Order; (b) all documents necessary to implement the Plan, including the Recovery Trust agreement, have been executed; ~~and~~ (c) all required authorizations and approvals have been ~~obtained.~~ obtained; and (d) the Global Settlement Approval Order has been entered. I may waive condition (b) or (c) to the extent the law permits; ~~condition~~ conditions (a) and (d) may not be waived.

### 8.2 Binding Effect.

Upon the Effective Date, the Plan binds the Debtor, the Reorganized Debtor, the Chapter 11 Trustee, the Recovery Trustee, all holders of Claims and Interests, and all other parties in interest, whether or not the holder voted to accept the Plan and whether or not Impaired.

### 8.3 Discharge.

Except as the Plan or Confirmation Order otherwise provides, confirmation operates as a discharge under § 1141(d) of the Code of all debts that arose before

the Confirmation Date. Because the Debtor will continue in business and the Plan does not provide for liquidation of substantially all property, the discharge provisions of § 1141(d)(1) apply.

**8.4 Injunction.**

Except as the Plan otherwise provides, all persons who have held, hold, or may hold Claims or Interests are permanently enjoined from taking any action to collect, recover, or offset any such Claim against the Debtor, the Reorganized Debtor, the Recovery Trust, or the Estate, other than as the Plan expressly permits. On the Effective Date, the orders granting relief from the automatic stay to Mainstreet Community Bank, Tamamoi, LLC, and the Carton Family Trust of 1992 (Docs. 135, 183, 361) cease to have effect, and this injunction binds each of them, subject to Section 6.13. Nothing in the Plan releases, enjoins, or affects any claim of one non-debtor against another, or alters any release, covenant, dismissal, or withdrawal the ~~Declaratory Action, or *Johnson v. Dixon*, No. 2026-CA-007213-O (Fla. 9th Cir. Ct. 2026).~~Global Settlement Agreement provides.

**8.5 Preservation of Causes of Action.**

Except to the extent expressly released, including the Released Claims, all Causes of Action — including the claims for preferences and fraudulent transfers — are preserved and vest in the Recovery Trust, administered by the Recovery Trustee, and each Declined Claim vests in the Reorganized Debtor under Section

6.11. No preclusion doctrine applies to any Cause of Action by reason of Confirmation. Because Local Rule 3020-1(e) sets a sixty-day default for adversary proceedings and contested matters contemplated by a plan unless the court orders otherwise, the Confirmation Order will expressly provide that the Recovery Trustee, and the Reorganized Debtor as to a Declined Claim, may commence any Recovery Trust Claim at any time within the applicable limitations period.

**Article 9 — Retention of Jurisdiction**

The Bankruptcy Court retains jurisdiction to the fullest extent the law permits, including to: determine objections to Claims; adjudicate the Causes of Action and the Recovery Trust Claims; supervise the Recovery Trust and the Recovery Trustee; enforce the Global Settlement Approval Order and the Plan's implementation of the Global Settlement Agreement; resolve disputes concerning interpretation or implementation of the Plan; approve professional fees; enter orders necessary to consummate the Plan; and enter a final decree closing the case. No holder of a Claim or Interest is deemed by the Plan, by voting, or by Confirmation to consent to the jurisdiction of the Bankruptcy Court, and nothing in the Plan supplies a power the law withholds, including the power to enforce an extension of credit that Fla. Stat. § 687.071(7) makes unenforceable.

## Article 10 — Miscellaneous Provisions

### 10.1 Modification; Cramdown.

I may modify the Plan before Confirmation under § 1127 of the Code, and I expressly reserve the right to seek confirmation under § 1129(b) as to any Impaired Class that does not accept the Plan.

### 10.2 Governing Law.

Except where the Code or other federal law applies, Florida law governs the rights and obligations under the Plan.

### 10.3 Severability.

If any provision of the Plan is invalid or unenforceable, it is severable, and the remainder remains in full force and effect.

### 10.4 Headings.

Headings are for convenience only and do not affect interpretation.

### 10.5 Exhibit A — Valuation of the Units.

Exhibit A to the Plan is the Expert Report of Gary A. Moll, MBA, CPA, ASA, dated September 1, 2026, valuing twenty-seven Cape Crossing Resort & Marina Units — the twenty-six the Debtor holds and Unit 403 — as a portfolio at $11,600,000 to $18,000,000, and an orderly auction of them at approximately $8,700,000 to $9,900,000 at the low end of that range. (Ex. A ¶¶ 9, 14). The report

values twenty-seven Units, including Unit 403, which it assumes will return to the Estate.

**10.6 Provisions of the Confirmation Order.**

The Confirmation Order will provide: "Under § 1123(b)(3)(B) of the Bankruptcy Code, the Recovery Trustee is appointed as the representative of the estate for the purpose of retaining and enforcing the Causes of Action and the Recovery Trust Claims defined in the Plan, and is authorized to investigate, commence, prosecute, settle, compromise, and decline each of them in that capacity; as to each Declined Claim under Section 6.11 of the Plan, the Reorganized Debtor is appointed as that representative for the same purpose. The Causes of Action and the Recovery Trust Claims are retained and preserved as Section 6.10 of the Plan provides, and are not released, waived, or barred by this Order. The Court finds that the retention and preservation Section 6.10 effects is specific and unequivocal, and that Section 7.4 of the Plan preserves § 502(d) of the Bankruptcy Code in full." The Confirmation Order will also approve the Global Settlement Agreement to the extent Section 6.9(a) provides, will state that the Recovery Trust retains no Released Claim, and will fix the periods Sections 7.2 and 8.5 provide, as Local Rule 3020-1(e) permits.

Respectfully submitted this ~~19th~~ 16th day of ~~October,~~ November, 2026.

______________________________

Frank L. Amodeo
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
~~flahome32809@gmail.com~~flahome32801@gmail.com
*Plan Proponent, pro se*

**Certificate of Service**

I certify that on ~~October 19,~~ November 16, 2026, I filed my ~~Second~~ Third Amended Plan of Reorganization, together with my ~~Second~~ Third Amended Disclosure Statement and the notice of filing redlines in person with the Clerk of Court. As a pro se litigant, I am not a registered CM/ECF user. When the Clerk dockets these papers, the CM/ECF system will send a Notice of Electronic Filing to every registered user in this case, including Lara Roeske Fernandez, Chapter 11 Trustee; her counsel, Rhys P. Leonard and Anthony P. Marzocca, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.; Heidi M. Mitchell, counsel for the Brevard County Tax Collector; Justin M. Luna and Catherine R. Choe, counsel for Mainstreet Community Bank of Florida; Jeffrey S. Ainsworth and Jennifer L. Morando, counsel for PEDixon, LLC and ZPD, LLC; Annalise DeLuca, counsel for Tamamoi, LLC and the Carton Family Trust of 1992; counsel for Michael McPhillips; counsel for IMQA Investments Incorporated; and the Office of the United States Trustee.

Frank L. Amodeo, Pro se