FILED ORL INTAKE - USBC
19 NOV 2026 AM8:39

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re: Case No. 6:25-bk-05570-GER

HOMEMAKERS REAL ESTATE, LLC, Chapter 11

Debtor.
_______________________________/

**Frank L. Amodeo's Memorandum of Law in Support of the Trustee's Motion to Approve Compromise of Controversy**

The Settlement Agreement is an eighty-four-page global compromise among twenty-six persons and entities. The Debtor, acting through the Trustee, is one of them, and so am I. (Doc. 459, Ex. A § 2.2(j), (q)). The Settlement Agreement ends the litigation among the Dixon Parties, the Pitkanen Parties, the Flynn-Johnson Parties, and Yaniv Amar in federal and state courts. (*Id.* § 8.1 & Ex. A). The matters the Settlement Agreement resolves include:

- ten state-court actions and proceedings in Osceola, Orange, Brevard, and Monroe Counties;
- two adversary proceedings in this court;
- an appeal pending in the United States District Court for the Middle District of Florida;
- proofs of claim, objections, and motions in four bankruptcy cases, those of the Debtor, Martin C. Flynn, Jr., Sherwood Construction, Inc., and Canaveral Crossroads, LLC; and
- a civil theft demand.

The Settlement Agreement takes effect only after this court and the court in each of the other three bankruptcy cases approve it, and the approval orders become final. (*Id.* §§ 3.1, 14.2).

**The Proposed Settlement: Homemakers gives up an uncertain share of a distant judgment and receives $850,000 now, the withdrawal of more than $6,100,000 in Dixon claims, and the end of litigation it cannot fund.**

Under the Settlement Agreement, Homemakers surrenders a share of the exemplary damages in future litigation against the Dixon Parties. That litigation lies five to seven years out. Homemakers is a guarantor and an obligor on the Dixon loans, so Homemakers would be entitled to some share of any punitive damages. (Doc. 459 ¶ 4). Homemakers was never a borrower. Because Homemakers was not a direct borrower, a question remains whether Homemakers could recover exemplary damages under the usury statute at all.

Homemakers would also hold claims to exemplary damages for the mismanagement of the Tiered Land Trust, because Homemakers was identified as a beneficiary in the Tiered Land Trust Agreement. (*Id.* ¶ 5). Those claims, again, lie seven years in the future. Like Sherwood's share, Homemakers' share is undetermined. No measure, method, or formula tells anyone what portion of those damages Homemakers would be entitled to.

What Homemakers receives under the Settlement Agreement is significant and substantial:

- The Dixon Payor Parties pay the estate $850,000 in cash. (Doc. 459, Ex. A § 5.1).
- PEDixon and ZPD withdraw Claims 67-1 and 68-1 with prejudice. Those claims total $6,160,031.25. (Doc. 459 ¶¶ 15, 22).
- The settlement disallows or reduces other claims against the estate by a further $1,756,442.40. (*Id.* ¶ 22).
- The Dixon Parties will not seek a credit bid, a claim under 11 U.S.C. § 502(h), or an administrative expense claim, and will not object to any plan consistent with the Settlement Agreement. (*Id.* ¶ 18(c)).
- The Dixon Parties and the Pitkanen Parties release the estate, and the estate keeps every claim against the Excluded Persons. (*Id.* ¶ 18(l)).

The $850,000 is a fast recovery on the preferential transfers. In the year before the petition date, I estimate PEDixon received transfers of $1,400,000. On May 5, 2025, Homemakers filed its original bankruptcy case. After the dismissal of

that case, the involuntary petition in this case followed on September 2, 2025. The later petition date cost the estate four months of the preference period. During those four months, PEDixon took money from the estate and applied it to PEDixon's own debt, without sharing it with the other creditors as the law requires. Homemakers receives $850,000 of that sum without litigation, without any offset or recoupment by PEDixon, and receives the monies now rather than after extensive litigation. The payment settles the estate's claims, including claims under 11 U.S.C. §§ 544, 547, 548, and 550. (*Id.* ¶ 18(b)).

From Homemakers' perspective, the settlement constitutes more than an eight-million-dollar swing. The withdrawal and reduction of claims remove $7,916,473.65 from the claim pool, and the payment adds $850,000 in cash. The settlement also ends the expense of recovering a potential $1,400,000 in preferences and an undeterminable portion of a future judgment.

By ending the litigation, which Homemakers does not have the funds to support, the settlement protects the estate under any plan. Under a liquidation plan, Homemakers would cease to exist and would have no money to pursue this litigation. Under a reorganization, Homemakers would be profitable, but those profits should go first to the creditors and then to the interest holders. The profits should not pay professionals to pursue a share of the Dixon litigation that lies seven years in the future and that no one can measure today.

**This court approves a compromise that serves the estate, measured by the Justice Oaks four-part analysis, unless the compromise falls below the lowest point in the range of reasonableness.**

This court recognized the governing framework for approving a compromise and settlement proposed by a trustee or debtor-in-possession. *In re Huckleberry Partners, LLC*, 2023 WL 8453520, at *3 (Bankr. M.D. Fla. 2023) (quoting Fed. R. Bankr. P. 9019 and *In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir. 1990)),

*aff'd*, 2024 WL 4332610 (M.D. Fla. Sept. 27, 2024). This court articulated the four-part analysis:

1. probability of success in litigation;
2. difficulty in collection;
3. complexity and expense of litigation; and
4. deference to the reasonable views of creditors.

*Huckleberry*, 2023 WL 8453520, at *3.

This court explained that these considerations assist it in determining "the fairness, reasonableness, and adequacy of a proposed settlement agreement." This court explicated further that a "bankruptcy court should decline to approve a proposed compromise only when the compromise falls 'below the lowest point in the range of reasonableness.'" *Id.* at *3 (citing *In re Martin*, 490 F.3d 1272, 1275 (11th Cir. 2007)).

The district court affirmed this court's approval of the *Huckleberry* settlement. *In re Huckleberry Partners LLC*, 2024 WL 4332610, at *1 (M.D. Fla. Sept. 27, 2024). The bankruptcy court need not decide the merits of the Homemakers-Dixon claims but only consider the probability that those claims would succeed. *Id.* at *6 ("To do so, the bankruptcy judge has only to canvass the issues."). Within the range of reasonableness, a court must "make a pragmatic decision based on all [of the] equitable factors." *In re BAMC Development Holding, LLC*, 2025 WL 770521, at *22 (M.D. Fla. Mar. 11, 2025) (quoting *Huckleberry*, 2024 WL 4332610, at *5).

Measured against the four-part analysis, this settlement does not approach the lowest point in the range of reasonableness. The settlement sits near the top of it.

**1. Probability of success: Homemakers would likely prevail on liability, but Homemakers' share of the damages is undetermined and lies years away.**

The first part of the analysis is the probability of success in the litigation. The expert analysis and the arithmetic show that the Dixon loans charged interest above the rates Florida law allows. (Doc. 339, Ex. A ¶¶ 91–93). Liability is therefore likely. Homemakers' share of the damages is not. Homemakers was a guarantor, not a borrower, and Homemakers' claims as a trust beneficiary would have to be divided among every other claimant. The preference claim is stronger, but PEDixon would assert offset and recoupment against it. The settlement takes $850,000 now and removes every Dixon claim.

**2. Difficulty in collection: Any judgment would arrive only after years of appeal, and perhaps only after piercing the veil to reach Mr. Dixon.**

The second part of the analysis is the difficulty to be encountered in collection. Collection would begin only at the conclusion of the litigation. To the extent the entities that made the loans lack resources, Homemakers would have to pierce the corporate veil to reach Mr. Dixon, who is himself a financial behemoth. Mr. Dixon could easily bond a judgment for appeal. The settlement pays $850,000 in cash within fourteen days after the Effective Date. (Doc. 459 ¶ 18(a)).

**3. Complexity: Three petitions, more than 470 docket entries, and ten state-court actions make this litigation complex, expensive, and slow.**

The third part of the analysis is the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it. This case alone carries more than 470 docket entries, and three separate petitions were required to establish that Homemakers belongs in bankruptcy. Ten state-court actions and the federal proceedings in four bankruptcy cases are embroiled, one way or another, in this liability. Already, the parties have spent an estimated $2,000,000 in

professional costs, expenses, and fees, and the extant litigation is not even halfway through discovery.

**4. Paramount interest of creditors: Homemakers' creditors gain cash now and a claim pool nearly eight million dollars smaller.**

The fourth part of the analysis is the paramount interest of the creditors and a proper deference to their reasonable views. The settlement adds $850,000 in cash and removes $7,916,473.65 in claims that would otherwise share with every creditor. The creditors' interest lies in an estate whose income goes to creditors, not to professionals pursuing an undetermined share of a judgment seven years from now.

## Conclusion

The ultimate test for approving a compromise is not what is best, but what is reasonable. This compromise and settlement is very reasonable. This court should approve it.

Respectfully submitted this 17th day of November, 2026.

Frank L. Amodeo
*Pro se*
1311 Hoffner Avenue
Orlando, Florida 32809
(407) 406-1315
flahome32801@gmail.com

## Certificate of Service

I certify that on November 17, 2026, I filed this memorandum with the Clerk of Court, who will serve it through the CM/ECF system on every registered CM/ECF recipient in this case.

Frank L. Amodeo